

WSGR Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022

PHONE 212.999.5800
FAX 212.999.5899
www.wsgr.com

February 16, 2018

**VIA HAND DELIVERY**

The Honorable Nicholas G. Garaufis
Senior United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   _United States v. OZ Africa Management GP, LLC_, No. 1:16-cr-00515-NGG

Dear Judge Garaufis:

We represent more than fifty former equity holders of Africo Resources Limited (the "Africo Owners"), victims of the extensive bribery scheme to which defendant OZ Africa Management GP, LLC ("Och-Ziff Africa") pled guilty.[1]  As the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") previously acknowledged, the Africo Owners were harmed by the defendant's outrageous criminal conduct and are entitled to restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A (the "MVRA").  Unfortunately, at the urging of Och-Ziff Africa's team of lawyers, and fearful that the plea bargain and the $213,055,689 fine it secured would be jeopardized should it pursue restitution on our clients' behalf, the DOJ has reversed course and informed us for the first time on January 30, 2018 that it has "preliminarily" concluded that our clients are not victims of the defendant's crimes.

The DOJ has abdicated its legal obligations under the MVRA, and instead puts its own interests – and those of the defendant – ahead of victims.  We are thus forced to write to Your Honor directly so that the Court can assure that the mandate of the MVRA is met – to make our clients whole through an Order of Restitution, and hold the defendant accountable for the significant harms caused by its crimes when it is sentenced.

---

[1] The Africo Owners represent equity holders in or around April 2008 at the time the conspirators bribed DRC judges to prevent the return of the mining rights and engaged in the fraudulent takeover as explained more fully below.  Thus far, holders of about 64% of Africo, numbering about 50 individuals and entities, have been identified.  The Africo Owners include Africo's founders, members of its management and board as well as other employees.

AUSTIN   BEIJING   BOSTON   BRUSSELS   HONG KONG   LOS ANGELES   NEW YORK   PALO ALTO
SAN DIEGO   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, DC   WILMINGTON, DE

WSGR  **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 2 of 26

## I.      BACKGROUND

### A.  The Defendant's Crime[2]

The defendant, Och-Ziff Africa, is a wholly-owned shell subsidiary of Och-Ziff Capital
Management Group LLC ("Och-Ziff"), a publicly-listed, New York-based hedge fund.  Och-Ziff is
regularly ranked as one of the world's largest fund managers with over $30 billion in assets under
management.  On September 29, 2016, Och-Ziff Africa pled guilty to conspiring to violate the
Foreign Corrupt Practices Act ("FCPA") in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78dd-l.
See ECF No. 11.  As explained by then Principal Deputy Assistant Attorney General David
Bitkower, at the time of Och-Ziff Africa's guilty plea, "in its pursuit of profits, Och-Ziff and its
agents paid millions in bribes to high-level officials across Africa."[3]  Specifically, from 2005 to
2015, Och-Ziff Africa, Och-Ziff, and their "DRC Partner" – Israeli businessman Dan Gertler –
together with others, paid bribes to government officials to obtain illicit access to deeply discounted
prices for, and controlling interests in, various lucrative investment opportunities.  Statement of
Facts at ¶ 16.  In short, Och-Ziff Africa, Och-Ziff, and its co-conspirators, corruptly exploited some
of the world's poorest countries for their own pecuniary gain, flagrantly ignoring United States law
and the harms they inflicted on others – including the Africo Owners.  See DPA at Attachment A ¶¶
1-100.

As explained in the stipulated Statement of Facts, one of the "attractive investment
opportunities" that Och-Ziff paid for "special access" to was the mining rights to the Kalukundi
property in the Democratic Republic of the Congo (the "Kalukundi mine" and "DRC," respectively),
owned by Africo Resources Limited ("Africo").  Id. at ¶¶ 16-43.  Africo was a small, closely-held
Canadian public company formed in 2006 specifically to develop the Kalukundi mine.[4]  At the
direction of its owners and investors, Africo worked diligently to develop the copper and cobalt-rich

---

[2] The defendant's crimes are outlined in detail in stipulated statements of fact in both the Plea Agreement
and Deferred Prosecution Agreement.  See Plea Agmt., Ex. 3 (ECF No. 11-3) ("Statement of Facts");
Deferred Prosecution Agmt. & Attachment A, United States v. Och-Ziff Capital Mgmt. Grp. LLC, No. 1:16-
cr-00516-NGG (ECF No. 11).

[3] See https://www.justice.gov/opa/pr/och-ziff-capital-management-admits-role-africa-bribery-
conspiracies-and-agrees-pay-213.

[4] Africo had several predecessor entities and underwent a series of corporate restructurings, which are
relevant here only to the extent that certain Africo Owners originally acquired their interests in Kalukundi
through these predecessor entities.  Africo held a 75% interest in the mining rights on the Kalukundi property.
The remaining 25% of the mining rights to Kalukundi is held by Gecamines, a DRC government-owned
entity.  The rights held by Africo amounted to 75% of the license to develop and benefit from the resources
available on the Kalukundi property.  In short, while Africo did not have an interest in the land itself, it held
the right to develop the property and the right to proceeds generated from the development of that property.

WSGR  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 3 of 26

Kalukundi mine, hiring a specialized, Africa-focused mine development team, defining the geological resource to internationally recognized standards, completing key studies substantiating the economic viability of the project, and making significant capital outlays necessary for the development of the mine.

In early 2007, while the Africo Owners worked to develop the mine, they learned, to their shock, that their mining rights had been taken from them. Specifically, in late 2006, without any notice or opportunity for Africo to be heard, DRC lower court judges awarded Africo's mining rights to a former Africo employee through an *ex parte* default judgment. Id. at ¶ 24. Given the blatant illegality of the *ex parte* default judgment, the Africo Owners continued to work towards the development of the mine, reassured by their counsel that the ruling would be swiftly overturned through the DRC legal process.[5]

What the Africo Owners could not have known, however, was that the illegal default judgment had been orchestrated by one of Gertler's associates through corruption at the DRC lower courts as a part of the conspirators' plan to steal the Kalukundi mine from its rightful owners. Id. at ¶¶ 16, 24. By 2007, the defendant, Och-Ziff Africa, had joined that criminal effort, forming a joint venture with Gertler for the express purpose of consolidating valuable DRC mining properties, including the Kalukundi mine, into a single, publicly-traded mining company. Id. at ¶ 17. The benefits on both sides of the joint venture were clear, and have been admitted by both Och-Ziff and Och-Ziff Africa: Gertler's corrupt "operations" in the DRC would be funded by one of the world's richest hedge funds (Och-Ziff), and that hedge fund would gain illegal, preferential access to lucrative investment opportunities including a hugely valuable copper and cobalt mine at a significant discount. Id. at ¶ 16.

Having knowingly joined the conspiracy, Och-Ziff Africa began working toward (and financing) the conspirators' ultimate goal: to obtain, consolidate, and publicly list valuable mining assets in the DRC. Id. at ¶¶ 16-58. One of the assets that the conspirators sought to consolidate was the Kalukundi mine. However, given the illegal theft of the Kalukundi mining rights, the conspirators had to take additional steps to ensure that they could retain that stolen asset. The conspirators had two options: (1) bribe DRC Supreme Court judges to ensure that no favorable judgment was issued returning the mining rights to the Africo Owners, or (2) acquire control of Africo, rendering the legal process moot as the conspirators would control both sides of the dispute.[6]

---

[5] Simply put, this *ex parte* default judgment was absurd on its face and the product of blatant corruption. See Statement of Facts at ¶ 24. Indeed, the *ex parte* default judgment was viewed as so lawless that the World Bank's International Finance Corporation ("IFC") invested C$4 million in the project while the challenge to the default judgment was pending.

[6] In furtherance of the conspiracy, Gertler, financed entirely by Och-Ziff, acquired Akam, the entity on the other side of Africo's court case. See Statement of Facts at ¶ 27. The acquisition of Akam was purely for the purposes of leveraging the corrupt legal proceedings to force the takeover of Africo. Id. at ¶¶ 27-30. We understand that Akam had no significant assets other than its tenuous hold on the stolen mining interests.

**WSGR** Wilson Sonsini Goodrich & Rosati

PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 4 of 26

To ensure that there was no "mid result," Id. at ¶ 23, the conspirators set off to do both.  There was only one thing standing in the way of their plan: the Africo Owners.

Unaware of the conspirators' corrupt activities – the Africo Owners continued working towards developing the mine as they awaited the DRC Supreme Court's anticipated dismissal of the illegal *ex parte* judgment.  The Africo Owners were approached by Gertler with a "deal" – one that vastly undervalued Africo and forever yielded control over Kalukundi and its development to Gertler, Och-Ziff, and their co-conspirators.  Knowing that the Africo Owners would not agree to such a deal absent additional leverage, the conspirators paid additional bribes to DRC Supreme Court judges, court staff and others – financed wholly by Och-Ziff through Och-Ziff Africa – to ensure that Africo's legal battle to regain the mining interests would not end in success.  Id. at ¶¶ 25-36.

As time passed, the concerns of the Africo Owners were stoked by the conspirators.  The prospect appeared more and more possible that somehow, the default judgment would be sustained.  But here again, it was Och-Ziff, Och-Ziff Africa, and Gertler that were pulling the strings.  Id.  The conspirators recognized, that if the vacatur of the default judgment was delayed until the Africo shareholders were required to vote on Gertler's proposed deal to acquire control of the company, the Africo Owners would be forced to make a Hobson's choice – cede control of the Kalukundi mine to Gertler and his concealed conspirators, or risk what previously had been unthinkable, that the DRC Supreme Court might sustain the default judgment depriving the Africo Owners of their mining rights entirely.  Of course, forcing the Africo Owners to choose between these two awful options was exactly what Gertler, Och-Ziff, and Och-Ziff Africa intended.  See id. at ¶ 34.  As the Statement of Facts makes clear, the conspirators bribed DRC Supreme Court judges to "rewrite the opinion and to make sure that [A]kam wins," and to delay the issuance of the decision until after the scheduled Africo shareholder vote, id. at ¶¶ 34-35, in order to cheat the Africo Owners and deprive them of their interests in the Kalukundi mine.  As Gertler wrote to one accomplice as he finalized the millions in illicit payments to judges, court staff and others: "***Africo must be screw[e]d and finished totally!!!!***"  Id. at ¶ 33 (emphasis added).

On June 12, 2008, understandably fearful that the Supreme Court's delayed decision meant they may never get Kalukundi back and they would be left with nothing, the shareholders reluctantly voted to accept Gertler's unfavorable deal, completely unaware that it had been Gertler, Och-Ziff, and Och-Ziff Africa who had been corruptly paying for the delayed and adverse court rulings all along.  Id. at ¶¶ 25-36.   In the end, rather than developing the mine, the conspirators consolidated the Kalukundi mine with other mining assets and transferred those assets among various corrupt

---

This is supported by the level of the purchase price, $15 million.  Id. at ¶ 28.  The Statement of Facts evidences similar skepticism about the conspirators' purchase of Akam, "this first tranche of $15.750 million was funded *purportedly* to acquire Akam, make a shareholder loan to Africo, and pay legal expenses."  Id. at 30 (emphasis added).  Given that Akam was essentially worthless (unless the conspirators purchased another corrupt judgment from the DRC courts), the government's skepticism seems well placed.

**W S G R**   Wilson Sonsini Goodrich & Rosati

P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 5 of 26

entities for the benefit of the conspirators and to the further detriment of the Africo Owners.  Id. at ¶¶
37-58. The Africo Owners had been victimized.

### B.   The Plea Bargain Struck Between DOJ and Och-Ziff

On September 29, 2016, the DOJ publicly announced that it had uncovered Och-Ziff's
central role in the African bribery conspiracy (including its successful illegal effort to acquire
Kalukundi), that the hedge fund had admitted its long-running criminal activity, and that it would be
held accountable for its outrageous conduct.[7]  In reality, however, the agreements the government
struck did not come close to holding Och-Ziff accountable.  Indeed, despite the fact that Och-Ziff
had used its economic might to pay more than $100 million in bribes to judges and other government
officials so that it could exploit economically challenged third-world countries and victimize the
Africo Owners, Och-Ziff astonishingly faced no meaningful consequences at all.

First, Och-Ziff was allowed to serve up an empty, business-irrelevant shell subsidiary, Och-
Ziff Africa, to plead guilty.  Neither Och-Ziff itself, nor a single officer, director, or employee, were
ever charged with any crime, despite the fact that the illegal conduct at issue was carried out by, and
with the knowledge of, some of the highest ranking executives at the company over the course of
many years.[8]  Instead, Och-Ziff was permitted to enter into a three-year Deferred Prosecution
Agreement ("DPA") with the government.  See Ex. 1 attached hereto.  Under the terms of that DPA,
so long as Och-Ziff acknowledged its wrongdoing, continued to cooperate with the government
(something it apparently did not consistently do throughout the investigation),[9] took on a corporate
monitor of its own choosing, and paid a $213 million "monetary penalty" to the government, the
DOJ would not bring any further criminal or civil cases against Och-Ziff or any of its subsidiaries.

---

[7] See https://www.justice.gov/opa/pr/och-ziff-capital-management-admits-role-africa-bribery-
conspiracies-and-agrees-pay-213.

[8] Though Michael Cohen, Och-Ziff's former European head of office, was indicted in October 2017, the
conduct covered by that indictment is unrelated to the facts of the instant matter.  See United States v.
Michael Leslie Cohen, No. 17-cr-00544-NGG (ECF No. 1).  As laid out in the SEC's civil actions, Och-Ziff
executives were aware of and played critical roles in this scheme.  Specifically, that agency brought actions
against Och-Ziff CEO, Daniel Och, and CFO, Joel M. Frank.  See In re Och-Ziff Capital Mgmt. Grp. LLC,
Oz Mgmt. LP, Daniel S. Och, and Joel M. Frank, No. 3-17595 (Order Instituting Administrative and Cease-
and-Desist Proceedings), https://www.sec.gov/litigation/admin/2016/34-78989.pdf.  The SEC has also issued
charges against two former Och-Ziff executives, Michael Cohen and Vanja Baros.  See Securities and
Exchange Commission v. Michael L. Cohen and Vanja Baros, No. 1:17-cv-00430-PKC (ECF No. 1).

[9] According to the DPA, Och-Ziff "did not receive additional credit because of issues that resulted in a
delay to the early stages of the investigation, including failures to produce important, responsive documents
on a timely basis, and in some instances producing documents only after the Offices flagged for the Company
that the documents existed and should be produced, and providing documents to other defense counsel prior
to their production to the government."  DPA at ¶ 4(b), United States v. Och-Ziff Capital Mgmt. Grp. LLC,
No. 1:16-cr-00516-NGG.

WSGR   **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 6 of 26

Despite the fact that according to the DPA, the "value of the benefit" received by Och-Ziff through its illegal schemes was $221,993,010, inexplicably, Och-Ziff was not required to forfeit its ill-gotten gains. The $213 million "monetary penalty" the DOJ agreed to accept (and promised would be held in escrow to be applied toward any eventual fine this Court imposed against Och-Ziff Africa at its sentencing)[10] was well below the low-end of the $266,319,612 to $532,639,224 fine called for by the Federal Sentencing Guidelines, equal to about 12 weeks' worth of Och-Ziff's revenue,[11] and, perhaps most shockingly, ***significantly less than a single 33-year old Och-Ziff executive's compensation package***.[12]

      As for Och-Ziff Africa, the government agreed to recommend to Your Honor that it should face ***no punishment*** at all. Under the terms of a plea agreement made pursuant to Federal Rules of Criminal Procedure Rule 11(c)(1)(C), attached hereto as Exhibit 2, the government promised to recommend that, in exchange for its guilty plea to a single count of conspiracy to violate the FCPA, waiver of its right to appeal, and continued cooperation, Och-Ziff Africa should pay zero fine, forfeit none of its ill-gotten gains, and suffer no further penalty so long as Och-Ziff paid the $213 "monetary penalty" called for under its DPA. While Och-Ziff Africa did agree that "any fine ***or restitution*** imposed by the Court would be due and payable within ten (10) business days of sentencing," Plea Agmt. (ECF No. 11) at ¶ 12 (emphasis added), no specific restitution amount is called for under either agreement.[13]

      Needless to say, none of the Africo Owners were consulted or informed about the DOJ's plea bargain with Och-Ziff or Och-Ziff Africa, as required under the Crime Victims' Rights Act. See 18 U.S.C. 3771(a)(9). In fact, the Africo Owners learned there was an investigation related to Kalukundi only when they read about Och-Ziff's guilty plea and settlement in the press when they were publicly announced by the DOJ on September 29, 2016.

_____

      [10] Specifically, the DPA provides that a monetary penalty of $213,055,689 would be transferred to an escrow account within ten days of execution of the agreement. DPA at ¶ 7. The DPA further provides that "any criminal fine that might be imposed by the Court against OZ Africa Management GP, LLC, in connection with its guilty plea and plea agreement, will be paid from the $213,055,689 monetary penalty ***held in the escrow account*** and that any remaining balance will be transferred from the escrow account within ten (10) days of entry of the judgment to the United States Treasury." Id. (emphasis added).

      [11] Och-Ziff 10-K 2016.

      [12] See https://www.forbes.com/sites/nathanvardi/2017/02/15/33-year-old-hedge-fund-star-james-levin-awarded-250-million-pay-package-amid-och-ziff-stock-debacle/#17c65b4d49e3; https://www.bloomberg.com/news/articles/2017-07-24/och-ziff-s-280-million-man-is-34-years-old-and-on-the-hot-seat.

      [13] We understand the government also agreed that it would consent to unlimited adjournments of Och-Ziff Africa's sentencing to permit Och-Ziff to pursue a waiver from the Department of Labor allowing it to continue managing public pension funds despite its illegal conduct and its subsidiary's felony conviction.

**WSGR** Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 7 of 26

## C. DOJ and the FBI Confirm that the Africo Owners are Victims of Och-Ziff's Crimes

Despite failing to confer with the victims before entering into its plea bargains with Och-Ziff and Och-Ziff Africa, the government eventually did notify the Africo Owners of their status as victims of Och-Ziff's crimes on repeated occasions in the months that followed.

First, in December 2016, three months after Och-Ziff Africa's guilty plea, Special Agent Jeff Grove of the FBI, the lead case agent on the Och-Ziff investigation, emailed Dr. Anthony Harwood, an Africo Owner and its former President and CEO. Agent Grove explained in his email that he was investigating allegations of corrupt payments to government officials in the DRC surrounding mining deals, and that he "under[stood] that you [Dr. Harwood] and your company at the time, Africo, may have been a victim regarding some of those corrupt payments." See Ex. 3 attached hereto, 12/30/16 email from Agent Grove to Dr. Harwood. Agent Grove requested that Dr. Harwood meet with him to discuss the case, and his experiences with those involved in the DRC court case. Dr. Harwood made himself available and was interviewed by Agent Grove on January 11, 2017 at the U.S. Embassy in Pretoria, South Africa.

Shortly after Dr. Harwood met with the FBI to discuss this case and to confirm the FBI's understanding of how he and the other owners of Africo had been victimized, the undersigned counsel was retained by Dr. Harwood and the other Africo Owners. In multiple ensuing conversations, the lead Eastern District of New York Assistant United States Attorney ("AUSA") handling the Och-Ziff case confirmed that, at least in his view, the Africo Owners certainly appeared to be victims under the MVRA, and invited further submissions on the subject. On March 24, 2017, the undersigned counsel wrote to the EDNY AUSA and the DOJ Trial Attorney assigned to the prosecution to confirm our understanding that the Africo Owners were victims and would be afforded all of the rights to which they are entitled under the MVRA and CVRA. See Ex. 4 attached hereto, March 14, 2017 Letter from Morris J. Fodeman to the government. In response, on April 25, 2017, the undersigned received the attached Victim Notification Notice ("VNN") from the Victim Witness Coordinator for the United States Attorney's Office, prepared at the direction of the EDNY AUSA. See Ex. 5 attached hereto, VNN.

## D. DOJ Reverses Course and "Preliminarily" Concludes that the Africo Owners are Not Victims of Och-Ziff's Crimes

Thereafter, the undersigned learned from discussions with the government that Och-Ziff and its lawyers were taking the position that the parties' Rule 11(c)(1)(C) plea bargain did not contemplate Och-Ziff Africa's payment of restitution and that the defendant was not properly advised of that possibility during its allocution. For these reasons, we understand that Och-Ziff's counsel argued to the government that Och-Ziff Africa should be relieved of any restitution payment obligation, and if the Court disagreed and ordered restitution beyond the amount of the fine Och-Ziff

W S G R   **Wilson Sonsini Goodrich & Rosati**

P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 8 of 26

had paid (which fine must first be applied to restitution),[14] Och-Ziff Africa would then have the right to withdraw its guilty plea. Emphasizing the DOJ's failure to include restitution in the plea agreement and the prospect of the DOJ being required to relinquish its $213 million penalty payment to the victims of Och-Ziff Africa's crime, Och-Ziff began lobbying the DOJ to reverse course and conclude that the Africo Owners were now not victims after all.

At the government's request, the Africo Owners provided the government with well-established legal precedent and the factual bases to support the government's initial and repeated conclusion that the Africo Owners were victims of Och-Ziff Africa's crime and that they had suffered a significant, compensable loss. At the DOJ's request, we also provided it with the report of a mining valuation expert, Dr. Neal Rigby, which formed the basis for the Africo Owners' restitution claim.[15]

At the same time, we understand from the DOJ that Och-Ziff's counsel advanced to the DOJ a laundry list of additional arguments as to why the Africo Owners should not be treated as victims. According to Och-Ziff, if the DOJ embraced any of these arguments, it would allow the DOJ to preserve the plea deal it had struck and keep the $213 million penalty exclusively for the government, with no restitution in any amount being paid to the Africo Owners or any other victim of Och-Ziff's crimes. In other words, Och-Ziff advocated that its conduct should be viewed by the DOJ as a "victimless crime," and the benefit to the DOJ would be both to allow the DOJ to save face in connection with its failure to include a specific restitution amount in the plea agreement and keep all the money for itself that would otherwise go to victims. The "victimless crime" theory advanced by Och-Ziff had an additional benefit to the DOJ: in both the DPA and Plea Agreement, the DOJ represented to the Court that the $213 million penalty would be held in escrow pending the sentencing of Och-Ziff Africo by Your Honor. Notwithstanding that representation, we have learned that the money is not in the escrow account and has instead been deposited with the Treasury for the government's use. By embracing Och-Ziff's "victimless crime" theory, the added benefit was that the DOJ might avoid scrutiny for its failure to abide by its escrow representations to the Court.

Over the course of the next *nine months*, the DOJ repeatedly advised us that it was assessing its position. Finally, after seemingly endless urging from the undersigned,[16] the DOJ informed us on

---

[14] Pursuant to 18 U.S.C. § 3612(c), any money received from a defendant is to be paid toward restitution before the payment of any other penalty or other costs.

[15] According to Dr. Rigby, and as further discussed herein, the loss to Africo Owners caused by Och-Ziff's and Och Ziff Africa's criminal conduct well exceeds the $213 million penalty. In fact, based on the value of the mine outlined in Dr. Rigby's report, Och-Ziff Africa should pay as much as $600 million in restitution to the Africo Owners. See Ex. 6 attached hereto, Expert Report of Dr. Neal Rigby.

[16] Over the course of these nine months, we provided the government with case law, its own submissions made to judges of this Court and others around the country, access to our clients, and repeated offers to address any legal or factual issue either in person or in writing. Yet all along, the government merely told us to be patient.

**WSGR**   **Wilson Sonsini Goodrich & Rosati**

P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 9 of 26

January 30, 2018, that its new "preliminary conclusion" was that the Africo Owners were not victims and thus were not entitled to restitution under the MVRA. The DOJ refused to put the basis for its conclusion in writing, instead reading to the undersigned a statement purportedly explaining the reasons for the government's about face.[17] For the many reasons set forth below, the government's newfound position is completely inconsistent with the law, a complete abdication of its responsibilities under the MVRA, and flies in the face of the facts of this case, not to mention the positions the DOJ has consistently taken in countless other cases.

## II.     RESTITUTION IS MANDATORY UNDER THE MVRA

"The 'primary and overarching' goal of the MVRA 'is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being.'" United States v. Qurashi, 634 F.3d 699, 703 (2d Cir. 2011) (citation omitted); see also United States v. Battista, 575 F.3d 226, 229-30 (2d Cir. 2009) ("statutory focus" of the MVRA is "on the victim's loss and upon making victims whole") (citations omitted); United States v. Scott, 321 F. App'x 71, 72 (2d Cir. 2009) ("The primary purpose of the MVRA is to make victims of crime whole by fully compensating them for their losses.") (citations omitted). In recognition of the importance of restitution to our criminal justice system, Congress greatly expanded the availability of criminal restitution in the federal system in the 1980s and 1990s through the passage of the VWPA, Pub. L. No. 97-291, 96 Stat. 1248 (1982),[18] and the MVRA, Pub. L. No. 104-132, Tit. II, Subtit. A, 110 Stat. 1227 (1996). These laws were enacted to "restore restitution to its proper place in federal criminal law by expanding the scope of the federal restitution sanction, by encouraging its increased imposition, and by fostering improved monitoring and enforcement procedures." United States v. Miguel, 49 F.3d 505, 509 (9th Cir. 1995); see also United States v. Bogart, 490 F. Supp. 2d 885, 905 (S.D. Ohio 2007) ("The legislative history behind the change in the language of the VWPA, subsequently adopted by the MVRA, which broadened the reach of a court's restitutionary powers to victims and conduct beyond those enumerated in the indictment, clearly indicates that Congress intended to the extent possible, 'to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being.'") (quoting United States v. Simmonds, 235 F.3d 826, 830-31 (3d Cir. 2002)); United States v. Martin, 128 F. 3d 1188, 1190 (7th Cir. 1997) (restitution statutes "demonstrate a clarion congressional intent to provide restitution to as many victims and in as many cases as possible").

As set forth below, the Africo Owners are entitled to mandatory restitution under the MVRA. Och-Ziff Africa's crime – conspiracy to commit violations of the FCPA – is covered by the MVRA

---

[17] The DOJ advised us that its "preliminary conclusions" were subject to change upon further investigation and argument. Despite repeated requests for a copy of the DOJ's prepared statement to ensure that we had faithfully captured the DOJ's tortured position, it refused to provide one.

[18] The definitions of "victim" under the MVRA and VWPA are identical. See 18 U.S.C. §§ 3663(a)(2) and 3663A(a)(2); United States v. Marino, 654 F.3d 310, 318 (2d Cir. 2011).

**WSGR** **Wilson Sonsini Goodrich & Rosati**

PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 10 of 26

because it: (1) is a crime under Title 18, (2) is an offense against property, and (3) resulted in
pecuniary losses.  The Africo Owners are victims of the defendant's qualifying offense because the
harms they suffered were directly and proximately caused by the defendant's offense conduct.
Under the MVRA, the Africo Owners are entitled to compensation for harms resulting from the
entire conspiracy including those resulting from the acts of the defendant's co-conspirators as well as
any expenses incurred as a result of their participation in the investigation, prosecution, and
sentencing of the defendant, including attorneys' fees and costs.

### A.  Och-Ziff Africa Pled Guilty to a Qualifying Offense Under the MVRA

Consistent with the purpose of "making victims whole[,]" see United States v. Coriaty, 300
F.3d 244, 253 (2d Cir. 2002), the MVRA *requires* courts to order restitution for victims of certain
crimes involving, "an offense against property under [Title 18] . . . including any offense committed
by fraud or deceit[,]" where the victims have suffered a pecuniary loss.  18 U.S.C. §§ 3663A(a)(1)
and (c)(1)(A)(ii).  The crime of conviction thus must meet the following criteria: (1) an offense
under Title 18, (2) against property, and (3) where the victim suffered a pecuniary loss.  Och-Ziff
Africa has pled guilty to a qualifying offense because (1) conspiracy to commit a violation of the
FCPA is a crime under Title 18, (2) this conspiracy was a crime against property, specifically the
Africo Owners' property, and (3) identifiable victims – *i.e.* the Africo Owners – suffered pecuniary
losses as a result of the defendant's conspiracy.

### 1.    Och-Ziff Africa Pled Guilty to a Crime Under Title 18

As noted above, on September 29, 2016, Och-Ziff Africa pled guilty before Your Honor to
conspiring to violate the FCPA in violation of 18 U.S.C. §§ 371 and 3551 et seq, and thus satisfies
the first criteria for qualifying offenses under the MVRA.  No further analysis on this point is
necessary.  It is irrelevant that the object of the conspiracy, violation of the FCPA, falls under Title
15.  Courts have long recognized that "'conspiracy . . . [is a] crime[] distinct from [its] underlying
predicate acts and purposes, and involve[s] additional harms,' restitution may be awarded for a
violation of the conspiracy statute even when it could not be awarded for the underlying predicates."
United States v. Cummings, 189 F. Supp. 2d 67, 73 (S.D.N.Y. 2002) (quoting United States v.
Helmsley, 941 F.2d 71, 101 (2d Cir. 1991) (awarding restitution where the defendant was convicted
of conspiracy and Title 26 offenses because conspiracy is a separate crime from the underlying
predicate act and noting that nothing in the MVRA limits the court's power to order restitution for
this type of conspiracy)); see also United States v. Brennan, 526 F. Supp. 2d 378, 383 (E.D.N.Y.
2007) (Weinstein, J.) ("Conspiracy to commit a substantive crime under Title 18 or a conspiracy to
commit a crime under Title 18 for a substantive crime under a different title, makes restitution
*mandatory* under section 3663A.") (emphasis in original).  Additionally, the language of the MVRA
specifically contemplates restitution for harms that occurred during the course of a conspiracy. 18
U.S.C. § 3663A(a)(2).  The MVRA has also been used to require restitution in cases involving
conspiracy to violate the FCPA.  See United States v. Green, 722 F.3d 1146 (9th Cir. 2013)

W S G R  **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 11 of 26

(affirming the imposition of restitution under MVRA and/or the VWPA for a scheme involving corrupt payments made to the Government of Thailand).

### 2.    Och-Ziff Africa Pled Guilty to an Offense Against Property

Where, as here, the defendant pled guilty to a conspiracy involving an offense against property, the second criteria for qualifying offenses is satisfied.  An offense against property includes any offense "in which physical or tangible property, including money, is taken (or attempted to be taken) by theft, deceit or fraud." Cummings, 189 F. Supp. 2d at 74-75.  The harm to property need not be an element of the convicted offense; the Second Circuit has instead deemed a wide variety of crimes as offenses against property, including: United States v. Liu, 200 F. App'x 39, 40 (2d Cir. 2000) (affirming restitution award under MVRA against defendant who plead guilty to bribery); United States v. Boyd, 222 F. 3d 47 (2d Cir. 2000) (defendants convicted of mail and wire fraud for making false statements and representations to induce customers to invest in gemstones at inflated prices); United States v. Ismail, 219 F.3d 76, 77 (2d Cir. 2000) (defendant pled guilty to embezzling funds from customer accounts); United States v. Oladimeji, 463 F.3d 152 (2d Cir. 2006) (defendant pled guilty to possession with the intent to defraud of fifteen or more unauthorized access devices); United States v. Marino, 654 F. 3d 310 (2d Cir. 2011) (defendant pled guilty to the misprision of a felony for failure to report a Ponzi scheme); United States v. Bengis, 631 F.3d 33 (2d Cir. 2011) ("Bengis I") (defendant pled guilty to conspiring to violate Lacey Act and to commit smuggling related to a scheme to illegally harvest rock lobsters for export to United States); Green, 722 F.3d 1146 (defendants convicted of, among other things conspiring to violate the FCPA); and United States v. Gushlak, No. 03-CV-833-NGG, 2012 WL 1379627 (E.D.N.Y. Apr. 20, 2012) (Garaufis, J.), aff'd, 728 F.3d 184 (2d Cir. 2013) (defendant pled guilty to conspiracy to commit securities fraud related to a broker kickback scheme).

Bengis I is instructive on this point.  In that case, the defendant pled guilty to conspiring to violate the Lacey Act and to commit smuggling, related to a scheme to illegally harvest rock lobsters in South African waters for export to the United States.  631 F.3d at 35-37.  The question on appeal was whether the government of South Africa had a property interest in illegally harvested rock lobsters that entitled it to restitution.  Id. at 39.  Answering that question in the affirmative and holding that the defendant's scheme deprived the South African government of proceeds from the sale of the illegally harvested lobsters that it was entitled to by law, the Second Circuit explained:

> [L]obsters possessed in violation of the regulatory scheme do not become property of the possessors, rather they are subject to seizure and sale by the government of South Africa. Under this logic, the moment a fisherman pulls an illegally harvested lobster out of the sea, a property right to seize that lobster is vested in the government of South Africa. Evading seizure of overharvested lobsters thus deprives South Africa of an opportunity to sell those illegally captured lobsters at market price and retain the proceeds, representing an economic loss to South Africa each time an illegally harvested

**WSGR**  **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 12 of 26

> lobster goes unseized. South Africa's interest in those illegally harvested
> lobsters, therefore, goes beyond a mere regulatory interest in administering the
> fishing activities in its waters.

Id. The Second Circuit also rejected the notion that its prior decisions had limited the definition of "property" to "tangible property," noting that "[o]ur precedents dictate that the definition of property is broader than those cases suggest." Id. at n.3 (citing United States v. Milstein, 481 F.3d 132, 137 (2d Cir. 2007) (recognizing intangible property)).

Under this controlling law of the Second Circuit, Och-Ziff Africa's crime was clearly an offense against property – specifically, the Africo Owners' interests in the Kalukundi mine. The defendant and its co-conspirators agreed to bribe judges in the DRC to gain illegal access to, and control of, that property. First, the conspirators and their associates obtained the corrupt *ex parte* default judgment allowing them to steal tangible property from its rightful owners. Next, the conspirators paid more bribes, funded by Och-Ziff Africa, to prevent the return of that stolen property and gain leverage to force an undervalued takeover upon the Africo Owners. The victims were left to pay for an asset that was rightfully theirs, by way of diluted and devalued shares, ceding control of their company and the development of the mine, and were left to watch powerlessly as their property was squandered for the benefit of the conspirators. See Statement of Facts at ¶¶ 24-58.

### 3.    The Africo Owners Suffered Pecuniary Losses

The Africo Owners suffered pecuniary losses as a direct result of the defendant's scheme. A pecuniary loss is a loss of property or money to which a victim is entitled by law. See United States v. Skowron, 529 F. App'x 71 (2d Cir. 2013). As a result of the bribery scheme implemented by Och-Ziff, Och-Ziff Africa, and their co-conspirators, the Africo Owners: (1) had their primary asset stolen; (2) were prevented from regaining their stolen asset because the conspirators bribed DRC Supreme Court judges; (3) were forced to accept a takeover that diluted and devalued their shares in order to regain even a portion of their stolen interests as well as forfeit control of Africo and the development of the mine to the conspirators; and (4) had their shares further devalued as the conspirators combined Africo with other corruptly acquired assets, while the Kalukundi mine lay dormant and undeveloped. See Statement of Facts at ¶¶ 24-58. By any measure, each and every loss suffered by the Africo Owners was pecuniary.

### B.    The Africo Owners Are Victims of the Defendant's Crime

The Africo Owners are victims of the Och-Ziff Africa's conspiracy. The MVRA defines "victim" as any "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). As

**W**S**GR**   Wilson Sonsini Goodrich & Rosati
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 13 of 26

explained in greater detail below, the Africo Owners – who but for the actions of the defendant and its co-conspirators would never lost their mining rights, developed, and profited from the Kalukundi mine – were directly and proximately harmed by the defendant's crime.

The harms suffered by the Africo Owners resulted directly and proximately from the defendant's conspiracy. The MVRA's causation standard is broad, see Marino, 654 F.3d at 317, encompassing not only those injuries resulting directly from the defendant's crime, but also those injuries that would not have occurred but for the defendant's crime, and those that were foreseeable or within the zone of risk of the offense conduct. See United States v. Schwamborn, 542 F. App'x 87, 88-89 (2d Cir. 2013) (defendant "directly and proximately" caused investor victims' losses under MVRA where, among other things, it was "entirely foreseeable that the victims here would lose their investments" because the stock was worthless and the "risk of loss that [defendant] created by promoting worthless stock was 'within the zone of risk' concealed by the scheme"); see also Marino, 654 F.3d at 321; Battista, 575 F.3d 226; Oladimeji, 463 F.3d 152. The only limitations on causation under the MVRA are where a harm or loss would have occurred regardless of the defendant's conduct or where the "factual and temporal link between crime and loss [is] so tenuous as to require a 'prolonged and complicated trial[]' on the issue of causation." See Marino, 654 F.3d at 319 (quoting S. Rep. No. 97-532). Those limitations have no application here.

The evidence in this case makes plain that the Africo Owners are victims under the MVRA. Indeed, the stated purpose of the conspiracy to bribe foreign officials was to ensure that Africo was "***screw[e]d and finished totally!!!!***" Statement of Facts at ¶ 33 (emphasis added). The conspirators' plan worked: the Africo Owners' rights to the Kalukundi property were stolen as a part of the conspiracy causing obvious and demonstrable harm to the Africo Owners. Id. at ¶ 24. Just as significant, the conspirators – financed by the defendant – bribed DRC Supreme Court judges to prevent Africo from regaining its rights to the mine and force the otherwise unwilling Africo Owners to accept a deal that diluted and significantly devalued their shares. Moreover, the Africo Owners lost control of their company and the development of the mine to the conspirators in the process. Id. at ¶¶ 31-36. The conspirators then combined their holding in Africo with other assets and refused to develop the mine – further diluting and devaluing the Africo Owners' stakes in the mine for the conspirators' own benefit. Id. at ¶¶ 37-58. As a result of the criminal conspiracy, the Africo Owners' interests in the mine were diminished and devalued. Having lost control of the company and the mining rights, there was no prospect of developing the mine and no recourse for the Africo Owners. Absent the defendant's illegal conduct, the Africo Owners would have retained their full rights to, and control of, the Kalukundi property, and thereby been able to develop and profit from the mine's construction and operation. The Africo Owners were thus "directly and proximately harmed" by the defendant's actions for the purposes of the MVRA.

**WSGR**   Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 14 of 26

### C. The Africo Owners are Entitled to Restitution in an Amount that will Make them Whole

As victims of a crime covered by the MVRA, the Africo Owners are entitled to mandatory restitution in an amount equivalent to their losses – the greater of the value of the property harmed at the time of loss or the time of sentencing – as well as any expenses incurred as a result of their participation in the investigation, prosecution, and sentencing of the defendant, including attorneys' fees and costs. See 18 U.S.C. § 3663A(b).  To assist the Court in determining the value of the Africo Owners' loss, our clients have hired – at great time and expense – a preeminent expert in mining valuation.  The expert report of Dr. Neal Rigby of SRK Consulting is attached as hereto as Exhibit 6 ("Rigby Report").

At the request of counsel, Dr. Rigby offered his expert opinion of the Kalukundi mine in 2008 – the time of loss – as well as the present value of both a developed and undeveloped Kalukundi mine.  Specifically, Dr. Rigby reviewed existing valuation reports of the undeveloped Kalukundi Project prepared in 2008 near the time of the loss, including one commissioned by Och-Ziff itself around the time it and its co-conspirators corruptly secured control of the property.  Dr. Rigby also determined the present value of the undeveloped Kalukundi property.  At counsel's request, Dr. Rigby also assessed the value of the Kalukundi property had the corrupt takeover never occurred, presuming that the mine was developed in accordance with Africo's plan that was underway prior to the defendant's criminal acts.  This approach, consistent with the MVRA, is designed to put the victims back in the financial position they would have been in "but for" the criminal conspiracy.  See Exhibit 6.

### III. THE GOVERNMENT'S PURPORTED BASES FOR DENYING THE AFRICO OWNERS' RIGHTS

As noted above, on January 30, 2018, nearly a year after it first informed the Africo Owners that they were victims of the defendant's crime, the DOJ informed the undersigned that its new "preliminary" conclusion was that the Africo Owners are not entitled to restitution under the MVRA.  The DOJ's explanation as to why it has reversed course encompassed three bases – all of which we understand were supplied to the government by Och-Ziff's counsel.[19]

**First**, the DOJ asserts, for the first time, that there were actually two separate and distinct conspiracies involving the mining rights at Kalukundi: the first by Gertler and his associates to corruptly *take* Kalukundi through the corruption of *DRC lower court judges* and government officials, and the second by Gertler, Och-Ziff, Och-Ziff Africa, and others to bribe *DRC Supreme*

---

[19] While we understand that Och-Ziff provided the government with many other potential reasons why the Africo Owners should not be deemed "victims" of Och-Ziff's corrupt and unlawful conduct, the government could not bring itself to adopt any of Och-Ziff's other arguments and therefore limited its bases for its conclusion to the three reasons it articulated to us.

**WSGR   Wilson Sonsini Goodrich & Rosati**

PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 15 of 26

*Court judges* and the same government officials to allow them to *retain* the Kalukundi mine.
According to the DOJ, while Africo may have been a victim of the first conspiracy, Och-Ziff Africa
was not a participant in that crime and thus cannot be ordered to pay restitution for the harms that
resulted.  The DOJ argument continues: while Och-Ziff Africa was a participant in the second
conspiracy, the Africo Owners suffered "no identifiable harm" from that conduct because the Africo
Owners relented and voted to accept the conspirators' proposed merger before the Supreme Court
decision was actually issued, thus preventing any of us from knowing what the bribes actually
bought.  In other words, the DOJ has embraced Och-Ziff's characterization that Och-Ziff and Och-
Ziff Africa engaged in a victimless crime.

**Second**, the DOJ suggests that even if Africo itself was harmed by Och-Ziff Africa's crimes
and thus entitled to restitution, the government has found no case where former shareholders of a
now defunct entity were awarded restitution directly on that entity's behalf in restitution
proceedings.

**Third**, the DOJ claims that even if Africo's Owners are entitled to restitution, the damages
calculation provided by Dr. Rigby is flawed in several respects.

We address each of these meritless positions in turn.

### A.  Och-Ziff Africa is Responsible for the Harm Caused to Africo and Its Owners

#### 1.  There was One Conspiracy and the Defendant is Responsible for All of the Harm It Caused

As noted above, the DOJ's first justification for concluding that Och-Ziff should not pay
restitution is predicated on the notion that there were two separate conspiracies involving the
Kalukundi mine – one to obtain it and one to retain it.  As even the DOJ acknowledges, when Gertler
and his associates bribed judges to issue an illegal court ruling to *take* the mining rights from Africo,
the company and its owners were obviously harmed.  Under the government's current formulation,
however, Och-Ziff Africa did not participate in that conspiracy – it only joined a second, entirely
different scheme to bribe judges to *retain* that same property.

#### a.  One Conspiracy

As an initial but critical matter, the DOJ's own documents – the Information and Plea
Agreement – outline a single conspiracy: the "DRC Corruption Scheme," lasting from 2005 to 2015,
in which Och-Ziff, Och-Ziff Africa, Gertler, and others conspired to bribe foreign officials to
influence acts and decisions of those officials to assist the conspirators in obtaining and retaining
business in the DRC mining sector.  Statement of Facts at ¶ 16; Information (ECF No.
8)("Information") at ¶¶ 16 and 60(a).  The Plea Agreement and Information each begin by providing
an overview of the scheme – which is consistently referred to in the singular – describing a

WSGR  **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 16 of 26

conspiracy lasting from 2005 to 2015 and encompassing the payment of over $100 million in bribes to "DRC officials to obtain special access to and preferential prices for opportunities in the government-controlled mining sector," and then describing Och-Ziff's place in that scheme, "[b]eginning in December 2007, Och-Ziff . . . had discussions with DRC Partner about forming a joint venture . . . for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large publicly traded mining company." Statement of Facts at ¶ 16; Information at ¶ 16. "In return for access to these attractive investment opportunities, Och-Ziff would finance DRC Partner's operations in the DRC." Id. Och-Ziff understood that Gertler obtained his "special access" to "attractive investment opportunities" through bribery and that the "operations in the DRC" that it would be financing, were the bribery of DRC government officials. Id.

The language from the overview sections is echoed in the single count of "Conspiracy to Bribe DRC Officials" in the Information. Information at ¶¶ 59-64. Not only is the language describing the entire period (2005 to 2015) incorporated into the conspiracy charge, id. at ¶ 59, that section embraces the same common purpose as the scheme described in Paragraph 16 of the Information, specifically, to influence the official acts of foreign officials through bribery "in order to assist Och-Ziff in *obtaining and retaining* business for and with, and directing business to itself" and the other conspirators. Id. at ¶ 60(a) (emphasis added). There is no mention, in either the Plea Agreement or Information, of separate schemes or conspiracies for the obvious reason that the DOJ did not believe that to be the case.[20] Notably, when the DOJ read to us its prepared script and for the first time adopted the Och-Ziff argument that there were two distinct conspiracies, it provided no explanation whatsoever as to how its own charging instrument and DPA belied the very position it was now taking with the Africo Owners.

In addition to the plain and indisputable language of the Information to which Och-Ziff Africa pled guilty and the Statement of Facts to which it agreed, the law also makes it abundantly clear that there was only one conspiracy. The Second Circuit has repeatedly held that a single conspiracy is not magically splintered into multiple ones merely because of changes in membership, the passage of time, or multiple phases or spheres of operation. There is only one conspiracy where there is a single, collective venture towards a common goal. See United States v. Martino, 644 F.2d 860, 876 (2d Cir. 1981). Co-conspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan; nor must the goals of all the participants be congruent, so long as their goals are not at cross-purposes. United States v. Maldonado-Rivera,

---

[20] Notably the Deferred Prosecution Agreement and Information against Och-Ziff Capital Management Group LLC, use the same language – and date range – in reference to the DRC Corruption Scheme. See DPA, Statement of Facts (No. 1:16-cr-00516-NGG, ECF No. 11-1) at ¶ 20, OZ Capital Mgmt. Information (No. 1:16-cr-00516-NGG, ECF No. 8) at ¶¶ 23, 101. While those documents do describe two separate conspiracies – the DRC Corruption Scheme and the Libya Corruption Scheme – these two conspiracies are separated geographically by the conspirators' activities in the DRC and Libya. See DPA, Statement of Facts (No. 1:16-cr-00516-NGG, ECF No. 11-1) at ¶¶ 20-100; OZ Capital Mgmt. Information (No. 1:16-cr-00516-NGG, ECF No. 8) at ¶¶ 23-106.

**WSGR**  Wilson Sonsini Goodrich & Rosati

PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 17 of 26

922 F.2d 934, 963 (2d Cir. 1990); see also United States v. Vila, 599 F.2d 21, 24 (2d Cir. 1979) (rejecting defendant's argument regarding two distinct conspiracies operating in different locales noting that "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations"); United States v. Aracri, 968 F. 2d 1512, 1521-22 (2d Cir. 1992) (finding a single conspiracy even where conspirators were involved in different, distinct phases of the scheme and there was acrimony among the participants); United States v. Washington, 48 F.3d 73, 80 (2d Cir. 1995) ("A conspiracy is not altered merely by a 'change in membership, or a shifting emphasis on its locale of operations.'") (citations omitted).

Finally, there is simply *no evidence* that Gertler and the other co-conspirators had a distinct objective in the period before Och-Ziff joined the conspiracy, or that the defendant's joining changed anything about the conspiracy other than its access to financing. See Statement of Facts and Information. Instead, the "common purpose" – to obtain business opportunities through the bribery of DRC government officials – remained the same throughout the entire period of the conspiracy. Id. Och-Ziff and Och-Ziff Africa shared that purpose with the other conspirators and provided the financing for additional bribes. See Statement of Facts at ¶¶ 16-58; Information at ¶¶ 16-58.[21] Indeed, it would make absolutely no sense for Och-Ziff and Och-Ziff Africa to fund additional bribes to judges and others to **"retain"** what was stolen from the Africo Owners if they were not fully embracing the part of the conspiracy to **"obtain"** those valuable mineral rights in the first place. And that is why the conspiracy is charged in the way that it is – a conspiracy to *obtain and retain* the valuable mineral rights through bribes paid to judges and other government officials. Simply put, the facts of this case unequivocally establish a single conspiracy lasting from 2005 to 2015, through which Gertler, Och-Ziff, Och-Ziff Africa and others bribed DRC government officials to obtain and retain business opportunities in the DRC mining sector. The defendant and the DOJ cannot now through their unseemly alliance retroactively re-define the scope or length of that conspiracy merely because acknowledging that this was a single conspiracy would completely undermine the very foundation of the DOJ's revisionist view that the Africo Owners are now somehow not victims.

---

[21] This case is analogous to United States v. Berger, 224 F.3d 107 (2d Cir. 2000). In that case the defendants were convicted of, among other things, conspiracy to defraud various agencies of the federal government. The defendants appealed, arguing that they were improperly convicted of the fraud conspiracy because the evidence showed that there were multiple separate agreements to defraud different government agencies, and thus supported a finding of multiple conspiracies. Id. at 111. The Second Circuit concluded that the defendants were properly convicted of a single conspiracy, holding that "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." Id. at 114-15 (citations omitted). The court relied on factors including: (1) the schemes served the same goals; (2) the schemes were led by the same core group of community leaders; the schemes shared common participants; (4) the frauds were mutually independent; and (5) the conspirators used the same distinctive methods (including creating sham organizations).

**WSGR**  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 18 of 26

### b. Defendants Are Liable for All Harms Caused by the Conspiracy

As set forth above, the plain language of the Information and the stipulated Statement of Facts both clearly and unambiguously reveal exactly what Och-Ziff and Och-Ziff Africa did to justify the guilty plea that was entered before Your Honor – they were members of a single conspiracy that lasted from 2005 to 2015 through which the conspirators bribed judges and other DRC officials to obtain and retain valuable mineral rights that had belonged to, among others, the Africo Owners. No further analysis is needed, and that is because it is blackletter law that defendants must pay restitution for the harms caused by the entire conspiracy, including actions taken in furtherance of the conspiracy prior to an individual defendant's joining. The co-conspirators need not have agreed on each detail of the conspiracy, so long as each agrees to participate in a scheme that he knows to have an illegal objective. And even where, "over the course of the conspiracy, there occur other illegal acts not specifically contemplated by an individual conspirator but reasonably akin to the anticipated illegality and in furtherance or in consequence of the scheme, the conspirator may not on that account escape liability for participation in the conspiracy." United States v. Gleason, 616 F.2d 2, 16-17 (2d Cir. 1979).

As the First Circuit aptly described, "[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed." United States v. Baines, 812 F.2d 41, 42 (1st Cir.1987). Settled law in this Circuit makes clear that this simile holds in the context of restitution. Under the MVRA, a defendant is liable for restitution for harms caused by the conduct of his co-conspirators prior to his joining the conspiracy if the defendant had reasonable knowledge of his co-conspirator's past activities. See United States v. Bengis, 783 F.3d 407, 413-14 (2d Cir. 2015) ("Bengis II"); see also United States v. Boyd, 222 F.3d 47, 51 (2d Cir. 2000) (affirming a district court restitution order holding the defendant "liable for the reasonably foreseeable acts of all co-conspirators); United States v. Gushlak, No. 3-CR-833 (NGG), 2011 WL 782295, at *3 (E.D.N.Y. Feb. 24, 2011) ("Under Boyd, a participant in a conspiracy may be ordered to pay restitution for harm caused by the acts of his coconspirators done in furtherance of the conspiracy, even though he was not charged with engaging in the specific conduct causing the harm.").

The Second Circuit's decisions in Bengis I and Bengis II are instructive. There, defendants Arnold Bengis, David Bengis, and Jeffrey Noll engaged in a scheme to illegally harvest rock lobsters off the coast of South Africa. Bengis I, 631 F.3d at 35. After indictment, Arnold Bengis and Jeffrey Noll pled guilty to conspiracy to violate the Lacey Act and to commit smuggling of illegally harvested rock lobsters, as well as to violations of the Lacey Act. Id. at 36. David Bengis pled guilty to conspiracy only. Id. On appeal, the defendants argued that South Africa was not a "victim" of the conspiracy because the conspiracy to which they pled guilty was not the illegal harvesting of the lobsters, but rather the importation of the lobsters into the United States with knowledge that they were harvested illegally. Id. at 40. The Second Circuit rejected this argument, stating that the defendants need not have "personally harvested the lobsters" in order to have caused

W S G R  **Wilson Sonsini Goodrich & Rosati**

P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 19 of 26

South Africa's harm. Id. at 40-41. Rather, by "smuggling the lobsters out of South Africa knowing that they had been harvested unlawfully, [the] defendants deprived the South African government of its right to seize and sell the poached lobsters. The defendants' conduct ***facilitated*** the illegal harvesting of the lobsters by providing access to the United States market and enabled the poaching to go undetected by the South African government by, for example, off-loading the overharvested lobsters at night, under-reporting catch amounts to the South African authorities, bribing officials and submitting false documents." Id. at 41 (emphasis added). Accordingly, South Africa was a victim under the MVRA entitled to restitution. Id. at 41-42. On remand, the district court ordered the defendants to pay restitution of approximately $22 million dollars jointly and severally. Bengis II, 783 F.3d at 413.

On a second appeal, David Bengis argued that, because he allocuted to involvement in the conspiracy only from 1999 through August 2001, he could not be liable for losses caused by the acts of his co-conspirators prior to 1999. Id. The Second Circuit rejected this argument as well, holding that a defendant is liable under the MVRA for losses caused by the acts of his co-conspirators prior to joining the conspiracy if he "knew or reasonably should have known" about the co-conspirator's past activities, and remanded to the district court to make that determination in the first instance. Id. at 413-14.

By adopting the arguments propounded by Och-Ziff's lawyers, the DOJ finds itself in stark contrast to the position it regularly advances. The case of United States v. Dupre, No. 04 CR 267 DLC, 2007 WL 1589451, at *5 (S.D.N.Y. June 4, 2007), aff'd, 296 F. App'x 113 (2d Cir. 2008), is particularly illuminating on this point. In Dupre, the defendants were convicted of two counts: conspiracy to commit wire fraud and wire fraud. While the period for each charge was from 2002 to 2004, the first paragraph of the indictment alleged that the scheme lasted from 1994 to 2004. Id. The court held that regardless of the narrower time period alleged in the counts of conviction, restitution was allowed for all losses caused during the course of the criminal scheme, which extended from 1994 to 2004. Id. On appeal, Dupre's co-defendant, Stambaugh, argued that the court could not impose restitution against her for harms that occurred prior to the period covered by her count of conviction and prior to the time she joined the conspiracy. See Dupre, 296 F. App'x at 114. In its brief, the government scoffed at such a suggestion and successfully argued the following:

> The defendants also ascribe undue importance to the October 2002 date charged in the Indictment, which represented the beginning of the conspiracy between Dupre and Stambaugh, inasmuch as the Indictment made clear that the Project Roberta scheme began as far back as 1994. Indeed, the defendants acknowledge that the Indictment charged a scheme to defraud beginning in 1994, but argue that because this information was set out in the background section of the Indictment, it was not part of the charged conspiracy, or scheme. This argument is flawed is several respects. First, the allegation that the scheme began in 1994, which the defendants deride as mere

**WSGR** **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 20 of 26

> background, was fully incorporated into Counts One and Two of the
> Indictment. More importantly, even if that language had not been
> incorporated into each count, there is simply no reason to construe the
> scheme as narrowly as the defendants suggest.

Appellee Brief, United States of America v. Dupre, Nos. 07-1455-cr(L), 07-1463-cr (CON), 2007 WL 7068149, at *47-49 (2d Cir. Nov. 5, 2007)(citations omitted).

The application of the above to Och-Ziff Africa cannot be clearer. There was but one conspiracy charged here and it ran from 2005 to 2015. Information at ¶¶ 16, 58-59. Both the Information and the Statement of Facts expressly state what that conspiracy encompassed – an illegal endeavor to obtain and retain valuable mineral rights that had belonged to the Africo Owners through a series of bribes to DRC officials. Statement of Facts at ¶¶ 16-58; Information at ¶¶ 16-58. Och-Ziff Africa pled guilty to that single conspiracy and must now be held accountable for the consequences of its conduct. Needless to say, it is both highly alarming and enormously disappointing that the DOJ now champions the ridiculous position authored by Och-Ziff that there were actually two unrelated conspiracies here instead of the single conspiracy that the DOJ itself charged.

## 2. Even if There Were Two Conspiracies, Africo and Its Owners were Undeniably Harmed by Both

Even if the Court were to consider DOJ's misguided argument that the criminal information and the Statement of Facts describe two distinct conspiracies and that the defendant is not responsible for the harm caused by the first, the Africo Owners were plainly harmed by the "second" conspiracy.

As noted above, the DOJ has acknowledged that the Africo Owners were victims of the so-called "first" conspiracy, yet, according to the DOJ, they may not recover as victims of the "first" conspiracy because Och-Ziff Africa was not a member of that conspiracy. We have addressed the DOJ's position in this regard above and will not repeat those arguments here. As for the purported "second" conspiracy, while the DOJ acknowledges that Och-Ziff Africa was a participant in that conspiracy, it says that the Africo Owners are still out of luck because the Africo Owners relented and voted to accept the conspirators' proposed merger before the Supreme Court decision was actually issued, thus preventing any of us from knowing what the bribes actually bought. The position of the DOJ in this regard, is, in a word, absurd.

As an initial and dispositive matter, we point the DOJ to the Statement of Facts it drafted at Paragraph 34, which reads: "[o]n or about June 5, 2008, an associate of DRC Partner sent a text message to DRC Partner, which stated: '[lawyer] has met attorney general and the magistrat[e] that has to write the opinion, he also had contact with the 3 judges of supreme court. they got clear instructions to rewrite the opinion and to make sure that [A]kam wins. they also agreed to do the

**WSGR   Wilson Sonsini Goodrich & Rosati**

PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 21 of 26

lecture of the opinion on JUNE 13!'" As this communication makes clear, the bribes to these judges afforded the conspirators the right to dictate the court's opinion; an opinion that would "make sure that [A]kam wins" – meaning that Africo would lose.[22]  Accordingly, any suggestion from the DOJ that we can only speculate about what that result would have been is preposterous.  Statement of Facts at ¶ 34.

Moreover, as set forth above, Och-Ziff, Och-Ziff Africa, and Gertler paid additional bribes to DRC Supreme Court judges, court staff and others to ensure that no decision was issued before June 12, 2008 – the date that Africo was to vote on Gertler's takeover proposal.  Statement of Facts at ¶ 34.  As the conspirators recognized, if the vacatur of the default judgment could be delayed even until the Africo shareholders were required to vote on Gertler's proposed deal to acquire control of the company, the Africo Owners would be forced to choose between two unattractive options – ceding control of the Kalukundi mine to Gertler (and his concealed conspirators), a deal they previously had been unwilling to accept, or risk what had been unthinkable prior to months of delay, that the DRC courts might sustain the default judgment, thereby depriving the Africo Owners of their mining rights entirely.  Of course, forcing the Africo Owners to choose between these two awful options was exactly what Gertler, Och-Ziff, and Och-Ziff Africa intended.  Left with no other viable choice, the conspirators expected that the Africo Owners would approve the very deal that the conspirators sought to extract.  Id. at ¶ 31.

And so, on June 12, 2008, understandably fearful that the Supreme Court's delayed decision meant they may never get Kalukundi back and would be left with nothing, the shareholders reluctantly voted to accept Gertler's unfavorable deal, completely unaware that Gertler, Och-Ziff, and Och-Ziff Africa corruptly paid for the delayed and adverse court rulings.  Id. at ¶¶ 25-36.

So what does that mean for the DOJ's position that the Africo Owners are not victims because they succumbed to the scheme and accepted the conspirators' deal before the DRC Supreme Court issued its decision – a decision that was never issued because once Gertler took control, the dispute before the Supreme Court was resolved as moot?  According to the DOJ, since we don't know how the Supreme Court would have ruled, we cannot know if the bribes paid by Och-Ziff and Och-Ziff Africa would have bought a favorable ruling for the conspirators at all.  But as noted, Paragraph 34 of the Statement of Facts alone dispels this untenable position.  That paragraph demonstrates that the bribes had bought both the ruling the conspirators wanted and a delay past the

---

[22] Akam, the company on the other side of Africo's court case, was purchased purely for the purpose of retaining the Africo Owner's stolen mining interests, "Och-Ziff and DRC Partner agreed on a multi-step plan to obtain the disputed mining interest by acquiring Akam using Och-Ziff funds, and then settling the legal dispute over the DRC Mine."  Id. at ¶ 27; see also id. at ¶¶ 24, 27-30.  Financing the acquisition of Akam is included in the Overt Acts listed in the Information, and is one of the many examples of the affirmative steps that Och-Ziff took to continue the harm initially inflicted on the Africo Owners in 2006.  Information at ¶¶ 61(c)-(d).

**WSGR** **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 22 of 26

shareholder vote date of June 12, 2008. In other words, it doesn't matter that the Supreme Court did not issue a decision; what matters is that the bribes paid by Och-Ziff and Och-Ziff Africa accomplished exactly what they were intended to do – force the Africo Owners to give up valuable rights and assets that they otherwise would not have relinquished.

Indeed, we interrupted the DOJ from its reading of its script to ask that very question: "as the bribes were designed in part to delay the Supreme Court decision, if that delay caused the Africo Owners to vote in a way that they would not have otherwise voted, would the Africo Owners then be victims of your so-called "second" conspiracy?" And the answer from DOJ was: "Yes, but we have not seen any evidence that the delay had such an effect." From this response, the Court might expect that the DOJ undertook a thorough investigation of the impact that the bought and paid for delay of the Supreme Court decision had on the Africo Owners. But that is not the case at all. Beyond closing its eyes to Paragraph 34 of the Statement of Facts, we had a long-standing offer to make our clients available to the DOJ and its investigators on any issue. But the DOJ undertook no effort whatsoever to speak to a single such person. Had it undertaken even the remotest effort, the DOJ would have been able to confirm that the bribes had their intended effect and that even under the DOJ's "two conspiracy" formulation, the Africo Owners were indeed victims of the illegal conduct of Och-Ziff and Och-Ziff Africa.

We respectfully submit that the very notion that there were two distinct conspiracies at play here is baseless and that the Court need only undertake a plain reading of the Information and the Statement of Facts to reach that conclusion. But even if the DOJ's "two conspiracy" theory is considered, as set forth above, the Africo Owners were victims of both conspiracies and thus entitled to restitution under the MVRA.

### B. Shareholders can be Victims Under the MVRA

The DOJ's next justification for not seeking restitution on behalf of the Africo Owners is that it has "not identified cases under which former shareholders of a defunct entity can claim restitution directly on an entity's behalf in restitution proceedings."[23] According to the DOJ, while the now-defunct Africo itself may have been eligible for restitution were it still in existence, Africo's owners at the time of the offense are now somehow ineligible for a restitution award because their claims are merely "derivative" of the company's. This position is entirely inconsistent with the plain language of the MVRA, the cases interpreting that statute, the position the DOJ has taken in other cases, and common sense.

First, the plain language of the MVRA (and VWPA) makes clear that shareholders in a company may be victims entitled to restitution. Both statutes define "victim" clearly and broadly,

---

[23] When pressed by the undersigned, the Government admitted that it had found no case law supporting the proposition that shareholders in the situation it described *were barred* from an award of restitution.

WSGR   Wilson Sonsini Goodrich & Rosati

PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 23 of 26

reflecting Congress' desire that the victims of crimes be made whole.  See Qurashi, 634 F.3d at 703.
Both statutes define as victims any "person directly and proximately harmed as a result of the
commission of an offense for which restitution may be ordered including, in the case of an offense
that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly
harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18
U.S.C. § 3663A(a)(2); see also United States v. Schwamborn, 542 F. App'x 87, 88-89 (2d Cir. 2013)
(defendant "directly and proximately" caused investor victims' losses under MVRA where, among
other things, it was "entirely foreseeable that the victims here would lose their investments" because
the stock was worthless and the "risk of loss that [defendant] created by promoting worthless stock
was 'within the zone of risk' concealed by the scheme").  There are no carve outs or exemptions for
shareholders of defunct companies.  Anyone who has been directly or proximately harmed as a result
of the offense is eligible.[24]

     Second, the case law interpreting the MVRA and VWPA makes clear that there is nothing
that prevents a shareholder of a company – defunct or otherwise – from receiving a restitution
award, so long as it can be shown by a preponderance of the evidence that the shareholder was
directly and proximately harmed by a defendant's crime.  For example, in Marino, the Second
Circuit expressly clarified that the definition of victim is not limited to those individuals who would
have standing in an analogous civil action, holding that "restitution under the MVRA is a remedy
provided to victims independent of the availability, or lack thereof, of a private right of action
against a defendant."  Marino, 654 F.3d at 321.  In that case, the Court held that harms to individual
investors were directly and proximately caused by the defendant's misprision of a Ponzi scheme
because – even though the defendant was not involved in the actual fraudulent financial activities –
no reasonable investor would have invested in the Ponzi scheme he helped conceal.  Id.; see also
Gushlak, 2012 WL 1379627, aff'd 728 F.3d 184 (2d Cir. 2013) (defendant, who pled guilty to
conspiracy to commit securities fraud was ordered to pay restitution to investor shareholders who
bought and sold stock during the period of the defendant's manipulation).

     Accordingly, the relevant inquiry is not whether the individual shareholders would have
"standing" to bring a civil action, as the government now implicitly contends.  Rather, the
aforementioned cases (and others) make clear that the determination of whether someone is a victim
under the MVRA turns on whether that individual was harmed by the defendant's crime.  Since the
Africo Owners were harmed by the defendant's scheme, they are victims under the MVRA.  In fact,

---

[24]    The MVRA contains only two, very limited exceptions to mandatory restitution, neither of which
applies to this case.  Specifically, where the offense and the victim meet the criteria of the MVRA, the court
must order restitution unless, "the number of identifiable victims is so large as to make restitution
impracticable" or "determining complex issues of fact related to the cause or amount of the victim's losses
would complicate or prolong the sentencing process to a degree that the need to provide restitution to any
victim is outweighed by the burden on the sentencing process."  18 U.S.C. §§ 3663A(c)(3)(A)-(B).  Neither of
these exceptions applies to the losses suffered by Africo Owners and the government has not suggested
otherwise to us.

**WSGR** **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 24 of 26

this was the precise argument the United States Attorney for the Eastern District of New York made
in its Second Circuit brief in <u>United States v Swamborn</u>, No. 12-5125, 2013 WL 3772830 (2d Cir.
July 9, 2013).  In defending the district court's restitution award, the United States Attorney cited
<u>Marino</u>, and successfully argued that shareholders of a company were proper victims under the
MVRA because they were proximately harmed by the defendant's crime.  2013 WL 3772830 at *26
("[Defendant's] extensive reliance upon cases involving private actions under the civil securities law
is unavailing. As noted before, the requirements of a private right of action are not controlling under
the MVRA").  The DOJ's inconsistent positions on this very narrow point is disturbing, to say the
least.

Finally, if the DOJ's current position is right – that only a company can be a victim under the
MVRA, and not the former shareholders of that defunct company – then, taken to its logical
conclusion, a defendant whose crime does *some* harm to a company would have to pay restitution,
while a defendant whose crime does *overwhelming* harm to a company and thereby drives it out of
business would not have to pay restitution at all.  When we pressed the DOJ for how such a
formulation either made sense or comported with the remedial purposes of the MVRA, the DOJ
declined to respond.

## C.  <u>The Africo Owners are Entitled to Restitution that Makes them Whole</u>

Finally, the DOJ takes the position that even if the Africo Owners are victims under the
MVRA, the damages calculation presented by the Africo Owners is incorrect in several respects.
Putting aside that the amount of restitution is obviously secondary to the threshold issue of whether
the Africo Owners are "victims," as explained below, the DOJ's criticisms are entirely misplaced.

First, the DOJ notes that Dr. Rigby's present value of the Kalukundi mine is significantly
higher than valuations commissioned in 2008, including one prepared by Dr. Rigby's firm, SRK.
This is true.  But what the government fails to recognize is that the MVRA provides that the
defendant must pay an amount equal to the ***greater*** of the value of the property on the date of the
loss or on the date of sentencing.  18 U.S.C. § 3663A(b)(1)(B)).  As Dr. Rigby explained in his
report, in reaching his expert opinion, he reviewed existing valuation reports of the undeveloped
Kalukundi mine prepared in 2008 near the time of the loss – including the SRK report referenced by
the DOJ, as well as one commissioned *by Och-Ziff itself* around the time it and its co-conspirators
corruptly gained control of the property for good.  As Dr. Rigby explained in his report, these 2008
valuations were performed using copper/cobalt prices well below current market prices for copper
and cobalt, which has a dramatic impact on the value, and ***before*** the geologic confirmation (in
2013) of enormous, additional resources at the Kalukundi mine, which again has a dramatic impact
on the value of the mine.  Given these two developments alone, it is obvious that the Kalukundi mine
is significantly more valuable today than it was ten years ago.

Second, the DOJ contends that the valuations presented in Dr. Rigby's report rely on
different assumptions than those made "at the time."  As explained in the report, aside from the


WSGR **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

The Honorable Nicholas G. Garaufis
February 16, 2018
Page 25 of 26

change in cobalt prices and the increase in the amount of resources now known to be on the Kalukundi property, Dr. Rigby based his discounted cash flow ("DCF") valuations on the *same* methodology, assumptions, and inputs that Och-Ziff utilized for its own valuation in July 2008. See Ex. 6, Rigby Report.

Third, the DOJ contends that Dr. Rigby's valuation for the Kalukundi mine fails to account for the third-party financing necessary to develop the project. Again, this is simply incorrect. Dr. Rigby accounted for any necessary financing in his valuation of both an undeveloped and developed Kalukundi mine. See id. at ¶¶ 62, 94-98.

While the government criticizes Dr. Rigby's report, it offers no alternative valuation and has not, to our knowledge, even consulted with an expert. To the extent that either the government or the defendant dispute Dr. Rigby's conclusions, they can, of course, offer alternative valuations and loss calculations for the Court's consideration.

## IV.   **CONCLUSION**

To say that we are dismayed at the DOJ's reversal of its position that the Africo Owners are victims under the MVRA would be an understatement of significant dimension. But more troubling than the about-face itself are the arguments the DOJ has adopted from Och-Ziff and the obvious motivation the DOJ had to adopt those arguments. As set forth above, these arguments are insincere, at odds with the facts, and repugnant to the law. Accordingly, we ask Your Honor to find that the Africo Owners are victims under the MVRA and to direct that the necessary steps be taken to effectuate an Order of Restitution at the sentencing of Och-Ziff Africa, including (i) ordering the Probation Department to issue a report in accordance with 18 U.S.C. § 3664(a) and (ii) ordering the government to deposit the monetary penalty paid by Och-Ziff with the Clerk of the Court pending resolution of this issue.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

_____
Morris J. Fodeman
Michael S. Sommer



The Honorable Nicholas G. Garaufis
February 16, 2018
Page 26 of 26

Cc:

For Och-Ziff Africa (via email):
F. Joseph Warin, Gibson, Dunn & Crutcher LLP
Joel M. Cohen, Gibson Dunn & Crutcher LLP
Lee G. Dunst, Gibson, Dunn & Crutcher LLP
Mark K. Schonfeld, Gibson, Dunn & Crutcher LLP
Charles A. Gilman, Cahill Gordon & Reindel LLP
Aniruhd Bansal, Cahill Gordon & Reindel LLP
Kevin J. Burke, Cahill Gordon & Reindel LLP
Samantha Lawson, Cahill Gordon & Reindel LLP

For the United States (via email):
Leo Tsao, Assistant Chief, Fraud Section
United States Department of Justice

Jacquelyn Kasulis, Chief, Business and Securities Fraud Section
United States Attorney's Office, E.D.N.Y.