UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

OZ AFRICA MANAGEMENT GP, LLC,

Defendant.

Case No.: 1:16-cr-00515-NGG

## MEMORANDUM OF DEFENDANT
## OZ AFRICA MANAGEMENT GP, LLC

Joel M. Cohen
Lee G. Dunst
Mark K. Schonfeld
Daniel P. Harris
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000

Charles A. Gilman
Anirudh Bansal
Kevin J. Burke
Samantha Lawson
**CAHILL GORDON & REINDEL LLP**
80 Pine Street
New York, New York 10005
Tel.: (212) 701-3000

*Attorneys for OZ Africa Management GP, LLC*

March 2, 2018

## TABLE OF CONTENTS

BACKGROUND .................................................................................................... 1

    A.  The September 29, 2016 Plea and Subsequent Developments ............................ 1

    B.  The Offense Conduct and the Agreed-Upon Sentence ....................................... 3

    C.  The February 16, 2018 WSGR Letter .................................................................. 5

SUMMARY OF ARGUMENT ............................................................................. 6

THE RELEVANT FACTS .................................................................................... 8

    A.  WSGR's Clients Are International Investors Whose Contemporaneous Actions and Statements Contradict Their Current Position .................................................. 8

    B.  As WSGR's Clients Publicly Stated at the Time, Without Financing Africo Would Cease to Be a Going Concern and, If Financing Were Obtained, All Existing Shareholders Would Be "Significantly Diluted." ....................................................... 9

    C.  Whether Viewed in 2006 or 2008, There Is No Injury Supporting Restitution ............... 10

    D.  WSGR's Clients Financially Benefitted from the Camrose Transactions ...................... 13

    E.  Through Several Sets of Owners Over The Past 15 Years, the Kalukundi Property Remains Undeveloped ................................................................................. 15

ARGUMENT .......................................................................................................... 17

    A.  The MVRA Does Not Apply Because There Was No Loss or Destruction of "Property," and Any Alleged Injury Was Not Directly and Proximately Caused by OZ Africa's Offense ....................................................................................................... 18

    B.  WSGR's Clients Are Not "Victims" Because They Suffered No Direct Harm ............... 22

    C.  The Loss Alleged Is Hypothetical, Speculative and Not Linked to the Charged Offense ....................................................................................................... 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Appel* v. *Berkman*,
  2018 WL 947893 (Del. Feb. 20, 2018) ...................................................................21 n.20

*Donato* v. *United States*,
  2012 WL 4328368 (E.D.N.Y. Sept. 20, 2012) ................................................3 n.2

*F5 Capital* v. *Pappas*,
  856 F.3d 61 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 473 (2017) ............................22

*Federal Ins. Co.* v. *United States*,
  2018 WL 826759 (2d Cir. Feb. 13, 2018) ......................................................17, 18

*Kokesh* v. *SEC*,
  137 S. Ct. 1635 (2017) ...............................................................................6

*SEC* v. *Fischbach Corp.*,
  133 F.3d 170 (2d Cir. 1997) ...........................................................................6

*Starr Int'l Co., Inc.* v. *United States*,
  856 F.3d 953 (D.C. Cir. 2017) .........................................................................22

*United States* v. *Adorno*,
  950 F. Supp. 2d 426 (E.D.N.Y. 2013) ...........................................................18 n.14

*United States* v. *Bengis*,
  783 F.3d 407 (2d Cir. 2015) ...........................................................................11

*United States* v. *Dharia*,
  2018 WL 357281 (E.D.N.Y. Jan. 10, 2018) ...................................................20 n.18

*United States* v. *Finazzo*,
  850 F.3d 94 (2d Cir. 2017) .................................................................23, 24 n.22

*United States* v. *Gottesman*,
  122 F.3d 150 (2d Cir. 1997) .....................................................................3, 4 n.5

*United States* v. *Green*,
  595 F.3d 432 (2d Cir. 2010) ........................................................................3 n.3

*United States* v. *Green*,
  722 F.3d 1146 (9th Cir. 2013) ..................................................................18 n.14

*United States* v. *Harrington*,
354 F.3d 178 (2d Cir. 2004)....................................................................4 n.5

*United States* v. *Kahn*,
857 F.2d 85 (2d Cir. 1988), *modified on reh'g*, 869 F.2d 661 (2d Cir. 1989), *cert. denied*, 498 U.S. 1028 (1991)......................................................................4

*United States* v. *Kinney*,
684 F. App'x 73 (2d Cir. 2017) ............................................................24 n.22

*United States* v. *Main*,
579 F.3d 200 (2d Cir. 2009), *cert. denied*, 558 U.S. 1138 (2010).....................3 n.3

*United States* v. *Marino*,
654 F.3d 310 (2d Cir. 2011).........................................18, 20 n.17, 23 n.21

*United States* v. *Maynard*,
743 F.3d 374 (2d Cir. 2014)...................................................................23

*United* States v. *McCall*,
649 F. App'x 114 (2d Cir. May 23, 2016) ...............................................3 n.3

*United States* v. *Messina*,
806 F.3d 55 (2d Cir. 2015)...........................................................3 n.3, 23

*United States* v. *Pescatore*,
637 F.3d 128 (2d Cir. 2011)..............................................................24 n.22

*United States* v. *Schwamborn*,
542 F. App'x 87 (2d Cir. 2013) .........................................................22, 23

*United States* v. *Showerman*,
68 F.3d 1524 (2d Cir. 1995).................................................................4 n.5

*United States* v. *Vaknin*,
112 F.3d 579 (1st Cir. 1997)....................................................18, 20 n.17

*United States* v. *Zangari*,
677 F.3d 86 (2d Cir. 2012)..............................................17, 23, 24 n.22

## Rules

Federal Rules of Criminal Procedure
11(b)(1)(K)..............................................................................4, 4 n.4
11(c)(1)(C) ................................................................................. *passim*

**Statutes**

15 U.S.C.
  §§ 78dd-1 and 78dd-2 ...........................................................................................1

18 U.S.C.
  § 371.........................................................................................................................1
  § 3663A.....................................................................................................................5
  § 3663A(a)(1).......................................................................................................7, 17
  § 3663A(a)(2).........................................................................................................7,17
  § 3663A(b)(1)..........................................................................................7, 17, 19 n.16
  § 3663A(c)(3)(B).......................................................................................................18

OZ Africa Management GP, LLC ("OZ Africa") respectfully submits this memorandum in connection with sentencing and in response to the letter of Wilson Sonsini Goodrich & Rosati LP ("WSGR") dated February 16, 2018, (the "WSGR Letter"), ECF 26.   The WSGR Letter spends several pages addressing undisputed facts concerning the offense, and whether this case involves one conspiracy or two, but does little to address the key issues of whether WSGR's clients suffered harm legally cognizable under the Mandatory Victims Restitution Act ("MVRA"), and whether that harm was directly and proximately caused by OZ Africa's offense. As discussed below, the answer to these questions is no. The MVRA does not apply to the WSGR clients because, there is not loss or destruction of their property and, as former shareholders of an entity that held only an indirect interest in mining rights, they could not have suffered any direct harm.   Moreover, any harm the former shareholders could possibly allege was not directly and proximately caused by OZ Africa's offense.   Finally, even if the former shareholders were directly injured by the offense – which they were not – any calculation of loss would be hypothetical and speculative.

## BACKGROUND

**A.  The September 29, 2016 Plea and Subsequent Developments.**

On September 29, 2016, OZ Africa pled guilty, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to a one-count Information charging it with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78dd-1 and 78dd-2.   *See* Plea Agreement, ECF 11.   The Government and OZ Africa agreed to waive the preparation of a Pre-Sentence Report ("PSR"). The Court granted the waiver and accepted the Rule 11(c)(1)(C) plea.   *See* Plea Transcript, Sept. 29, 2016, at 18-19, ECF 14 (waiver of PSR); *id*. at 30 (acceptance of Plea).

Also on September 29, 2016, with express reference to the Plea Agreement, Och-Ziff

Capital Management Group LLC ("Och-Ziff") entered into a Deferred Prosecution Agreement

("DPA"), the first numbered paragraph of which summarizes the filing of the following charges:

> [Och-Ziff] acknowledges and agrees that the Offices will file the attached four-count
> criminal Information in the United States District Court for the Eastern District of New
> York charging the Company with two counts of conspiracy to . . . violate the anti-bribery
> provisions of the Foreign Corrupt Practices Act of 1977 ('FCPA'), as amended, . . . one
> count of violating the books and records provisions of the FCPA, . . . and one count of
> violating the internal controls provisions of the FCPA, . . . .

*United States* v. *Och-Ziff Capital Mgmt. Grp. LLC*, No. 16-cr-516 (NGG), Deferred Prosecution

Agreement 1-2, (E.D.N.Y. Sept. 29, 2016), ECF 11 (the "DPA") (citations omitted).  Och-Ziff

agreed, among other things, to pay $213,055,689 in monetary penalties and to submit to a

government-selected independent compliance monitor ("Monitor") for a period of three years.

DPA at 8-9, 11-12.  Och-Ziff paid the penalty in full 17 months ago into the account designated

by the Government, and per the DPA that payment "is final and shall not be refunded."  *Id.* at 9.

The Monitor was selected by the Government, is in place, and has completed the first year of his

work.  Och-Ziff is in compliance with the undertakings in the DPA.

The same day, with express reference to the Plea Agreement and the DPA, Och-Ziff and

OZ Management LP entered into an Order issued by the Securities and Exchange Commission

pursuant to which they agreed to pay to the United States Treasury an additional $199,045,167 in

disgorgement and prejudgment interest and undertook, among other things, to implement a

number of measures designed to bolster its control environment.  *In re Och-Ziff Capital Mgmt.*

*Grp. LLC, OZ Mgmt. LP, Daniel S. Och, and Joel M. Frank*, No. 3-17595, Order Instituting

Administrative    and    Cease-and-Desist    Proceedings,    at    33-35    (the    "SEC    Order"),

https://www.sec.gov/litigation/admin/2016/34-78989.pdf.[1]  These funds have been paid in full

and are non-refundable.  Och-Ziff is in compliance with the undertakings in the SEC Order.[2]

## B.  **The Offense Conduct and the Agreed-Upon Sentence.**

The Statements of Facts attached to the Plea Agreement and the DPA set forth the

relevant facts.  They remain undisputed.  In the Plea Agreement, the parties stipulated under Rule

11(c)(1)(C) that the agreed-upon sentence provides fair and appropriate punishment for OZ

Africa's offense.  The penalties paid are among the highest FCPA penalties in history.  Because

the Court accepted OZ Africa's Rule 11(c)(1)(C) plea, a sentence consistent with the Plea

Agreement (*i.e.*, one that does not include an award of restitution) is not only appropriate, but

can be the only legal sentence.  *See United States* v. *Gottesman*, 122 F.3d 150, 153 (2d Cir. 1997)

("Because the agreement between [defendant] and the government did not contemplate court-

ordered restitution, the district court did not have the power to order restitution.").[3]

---

[1]  The SEC Order also includes two senior executives of the company, one of whom paid $2,173,718 in "disgorgement and prejudgment interest."

[2]  Much has changed at Och-Ziff in the time leading up to and following the underlying action.  Numerous steps have been taken to bolster the compliance culture including:  a) Creation of a Business Risk Committee composed of senior legal, compliance and business leaders, chaired by the Chief Legal Officer ("CLO"), that reviews all proposed private transactions presenting atypical risk.  Decisions require unanimity (meaning the CLO and Chief Compliance Officer can veto) and cannot be appealed.  b) All proposed private investments, regardless of geographic location or size, undergo review and approval by a dedicated anti-corruption officer.  c) A Board-level "Corporate Responsibility and Compliance Committee" has been created to oversee management's efforts to ensure an ethical business culture.  And d) Compliance has been separated from Legal, and has received additional resources.

[3]  Once the court accepts a Rule 11(c)(1)(C) plea, it may not change the terms of that plea at sentencing.  *See* Fed. R. Crim. P. 11(c)(1)(C) (recommended sentence in plea agreement "binds the court once the court accepts the plea agreement"); *United States* v. *McCall*, 649 F. App'x 114, 116 (2d Cir. 2016) ("[b]y having accepted the parties' [11(c)(1)(C)] plea agreement, the district court was bound by its terms"); *United States* v. *Messina*, 806 F.3d 55, 62 (2d Cir. 2015) ("an 11(c)(1)(C) sentencing agreement . . . is binding on a court that accepts the agreement"); *United States* v. *Green*, 595 F.3d 432, 438 (2d Cir. 2010) (citations omitted) ("once the court has accepted it, the Rule 11(c)(1)(C) plea agreement 'dictate[s]' the sentence"); *United States* v. *Main*, 579 F.3d 200, 203 (2d Cir. 2009) (citation omitted) ("Under Rule 11(c)(1)(C), a district court may not deviate from the 'specific sentence or sentencing range,' . . . recommended or requested by the accepted plea agreement."), *cert. denied*, 558 U.S. 1138 (2010); *Donato* v. *United States*, 2012 WL 4328368, at *5 (E.D.N.Y. Sept. 20, 2012) (Garaufis, J.) ("*after the

3

An award of restitution would also violate Federal Rule of Criminal Procedure 11(b)(1)(K), which requires that during the plea proceedings, if there is going to be restitution, "the court must inform the defendant of, and determine that the defendant understands, . . . the court's authority to order restitution."[4]  *See United States* v. *Kahn*, 857 F.2d 85, 86-87 (2d Cir. 1988), *modified on reh'g*, 869 F.2d 661, 662 (2d Cir. 1989) (remanding to afford district court the opportunity to eliminate restitution, an "easily identifiable portion of the sentence that is impermissible under Rule 11(c)"), *cert. denied*, 498 U.S. 1028 (1991).[5]

WSGR argues that if the Court were to entertain an award of restitution, "[OZ] Africa would then have the right to withdraw its guilty plea."  ECF 26, at 7-8.  To be clear, OZ Africa does not now look to withdraw its plea.  Putting aside whether withdrawal of a defendant's guilty plea would be a viable option in another case, it is not viable here.  OZ Africa has already complied with the serious requirements imposed by the Plea Agreement, and cannot be restored to the *status quo ante*.  Och-Ziff has already made non-refundable payments totaling over $412 million in criminal penalties and civil disgorgement, and the Monitor has completed the first year of his review.  These and other obligations exist independently under the DPA and SEC Order, to which Och-Ziff agreed in reliance on the finality of the guilty plea, and which explicitly

---

court has accepted the plea agreement . . . the recommended sentencing range becomes binding").

[4] While WSGR notes that a timing of payment provision in the Plea Agreement requires "any fine or restitution" to be paid within 10 days of sentencing, ECF 11, ¶ 12, we do not understand them to be arguing that the parties or Court contemplated restitution, or that this provided sufficient notice under Rule 11(b)(1)(K).  Nor could they credibly argue that restitution was contemplated, since it is not mentioned elsewhere in the Plea Agreement, as would be customary if restitution were contemplated, and was not mentioned at the plea proceeding.  Moreover, the parties and the Court agreed to waive a PSR, which would have been required if restitution were contemplated.

[5] *See also United States* v. *Harrington*, 354 F.3d 178, 186 (2d Cir. 2004) (holding that the "district court's failure to advise a defendant of the possibility that his sentence could include an order of restitution [under the MVRA], followed by a sentence that included such an order, [is] not harmless error") (quoting *United States* v. *Showerman*, 68 F.3d 1524, 1528 (2d Cir. 1995); *Gottesman*, 122 F.3d at 153 (vacating "only that portion of the district court's sentence that imposed restitution, and otherwise affirm[ing] the sentence" where the defendant was not put on notice of the possibility of restitution during plea proceedings).

reference the plea.  Having accepted responsibility for its offense, OZ Africa has no wish to withdraw its guilty plea, and providing OZ Africa with this option would be meaningless.

However, the Court need not reach this issue because, as discussed below, WSGR's clients are not legally entitled to restitution.

## C.  The February 16, 2018 WSGR Letter.

The WSGR Letter asserts claims for restitution on behalf of unidentified former shareholders of Africo Resources Limited ("Africo"), informing the Court that it represents "more than fifty former equity holders of Africo," ECF 26, at 1, that "include Africo's founders, members of its management and board as well as other employees," *id.*, at 1 n.1, and that these Africo insiders are now seeking restitution as victims under the MVRA, 18 U.S.C. § 3663A.  *Id.*, at 1.  The WSGR Letter contains factual inaccuracies that warrant correction from the outset:

- The WSGR Letter states that the former Africo shareholders "learned there was an investigation related to Kalukundi only when they read about Och-Ziff's guilty plea and settlement in the press when they were publicly announced by the DOJ on September 29, 2016."  ECF 26, at 6.  In fact, WSGR's client Antony Harwood (President, Chief Executive Officer and a Director of Africo) was interviewed by the *Wall Street Journal* about the DOJ and SEC investigations two-and-a-half years *before* the plea hearing, and admitted knowing of Och-Ziff's "involvement" with Dan Gertler in "early 2009."  J. Carreyrou, <u>Och-Ziff Loans Financed Controversial Congo Deals</u>, WALL STREET JOURNAL, Apr. 28, 2014, available at <u>https://www.wsj.com/articles/och-ziffs-african-oil-mining-deals-probed-1398633905</u> ("Harwood, Africo's then-chief executive, said Mr. Gertler approached him with a solution to the dispute. . . .  [H]e had no idea the money that financed the transactions came from Och-Ziff.  But he said he realized the hedge fund's involvement in early 2009" when Och-Ziff representatives attended an Africo meeting.) (Lawson Decl., Ex. 1).[6]

- The WSGR Letter asserts that Och-Ziff "astonishingly faced no meaningful consequences at all . . . and [was never] charged with any crime."  ECF 26, at 5.  In fact, Och-Ziff was charged in a four-count criminal Information, paid non-refundable penalties and disgorgement of over $412 million – among the largest FCPA penalties in history – and is subject to a three-year Monitorship.  *See* pages 1-3, *supra*.

---

[6] This and the other public documents cited herein are provided as Exhibits to the Declaration of Samantha Lawson dated March 2, 2018 ("Lawson Decl.").

- The Letter asserts that "inexplicably, Och-Ziff was not required to forfeit its ill-gotten gains." ECF 26, at 6. But as the SEC order expressly states, the over $199 million paid by Och-Ziff under the SEC Order was for "disgorgement and prejudgment interest," SEC Order, at 35, and as WSGR is aware, disgorgement *is* the relinquishment of "ill-gotten gains." *Kokesh* v. *SEC*, 137 S. Ct. 1635, 1643 (2017) (quoting *SEC* v. *Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997).

- The Letter asserts the "illegal conduct at issue was carried out by, and with the knowledge of, some of the highest ranking executives at the company" including Mr. Och and Mr. Frank, ECF 26, at 5 & n.8, but the SEC Order explicitly states that "neither Och nor Frank knew that bribes would be paid." SEC Order at ¶ 5.

- The Letter asserts that Och-Ziff "took on a monitor of its own choosing." ECF 26, at 5. In fact, the DPA required the submission of "a pool of three (3) qualified candidates," from which the Government selected the Monitor; moreover, the Government could reject any candidates proposed by Och-Ziff, and require Och-Ziff to submit additional candidates. *See* DPA at ¶¶ 11-12.

## SUMMARY OF ARGUMENT

The WSGR Letter asserts four supposed harms. ECF 26, at 12. First, WSGR's clients claim that "their primary asset," mining rights to a property in the Katanga province of the Democratic Republic of the Congo (the "DRC") known as the Kalukundi property, was "stolen" from them when, in late 2006, a DRC court awarded the "mining rights to a former Africo employee through an *ex parte* default judgment." ECF 26, at 3. This claim is based on a false premise—that the former Africo shareholders owned mining rights in the Kalukundi property in the first place. Regulatory filings by Africo show that WSGR's clients did not in fact own *any* property or mining rights in the DRC. They owned stock in Africo, which, in turn, owned stock in Africo Resources (B.C.) Ltd. ("Africo BC"), which, in turn, owned 48% of the stock in a DRC company, H&J Swanepoel Family Trust ("H&J"), which, in turn, owned 75% of the stock in another DRC company, Swanmines s.p.r.l. ("Swanmines"), which owned mining rights in the DRC. *See* Africo 2007 Annual Information Form (March 28, 2008) (Lawson Decl., Ex. 2) at 2, 14. Because WSGR's clients cannot claim any direct property right in the Kalukundi mine, restitution is not available under the MVRA, which applies only to a "direct" loss of "property."

18 U.S.C. §§ 3663A(b)(1), 3663A(a)(1), 3663A(a)(2).  Moreover, the 2006 judgment occurred before OZ Africa's involvement, and was not directly and proximately caused by its conduct, as required by the MVRA.

Second, the WSGR clients claim that they were prevented by OZ Africa's offense from regaining the "stolen asset" of the Kalukundi property.  ECF 26, at 12.  However, because the Africo shareholders never owned the mine or any rights to it in the first place, it was not "stolen" from them, and they could not have been deprived of the opportunity to regain it.

The WSGR clients' third and fourth alleged injuries – relating to the dilution and devaluation of their shares – concern agreements Africo entered into in 2008 with the Dan Gertler-controlled Camrose Resources Limited (the "Camrose Transactions"), by which Camrose became a 64% owner of Africo in exchange for the infusion of CAD $100 million into Africo and the resolution of litigation relating to the Kalukundi property.  *Id.*; *see also* ECF 11, Ex. 3 at ¶ 30.  As discussed below, the dilution of which they now complain would have occurred regardless of OZ Africa's offense, and, according to the contemporaneous statements of WSGR's clients, was necessary if Africo was to remain a going concern.  Moreover, the Camrose Transactions did not deprive any of the WSGR clients of any of their shares in Africo, and in fact these shares increased in value.  Shareholder dilution claims are not "direct" injuries cognizable under the MVRA, but rather are derivative of the alleged harm to the corporation, which in this case was itself indirect several times over.  The dilution of a non-controlling shareholder's percentage ownership is not the loss of "property."  Finally, the former Africo shareholders, including many of the WSGR clients, negotiated, agreed to and voted in favor of the Camrose Transactions, and, acting as fiduciaries to the public shareholders, stated that the

Camrose Transactions were fair and "in the best interests of Africo and its shareholders." They should not now be heard to claim the opposite.

Even if all of the foregoing were ignored (and it cannot be), any injury to the former Africo shareholders would be hypothetical, speculative, and not causally linked to the charged offense. The failure to develop the Kalukundi property over the last two decades was not caused by OZ Africa's conduct, but by numerous factors unrelated to OZ Africa's offense.

## THE RELEVANT FACTS

### A. WSGR's Clients Are International Investors Whose Contemporaneous Actions and Statements Contradict Their Current Position.

WSGR's clients are international investors residing in Canada, the United States, England, and South Africa, sophisticated in the mining and mineral spaces. Although they are not named in WSGR's letter to the Court, they include:

- **John Dixon**, a Director of Africo since 2006. *See* Africo Notice of Annual and Special Meeting of Shareholders and Management Information Circular (May 14, 2008) (the "May 14, 2008 Proxy") (Lawson Decl., Ex. 3) at 5. He supported and approved the Camrose Transactions, just prior to which he owned 83,658 Africo shares, or a 0.3% interest. *Id*. at 4-5, 11-12.

- **Dr. Antony Harwood**, President and Chief Executive Officer of Africo from 2006-2009. *See id.* at 5. He supported and approved the Camrose Transactions, *id*. at 11-12, just prior to which he owned 110,195 Africo shares, or a 0.4% interest. *See id.* at 4-5.

- **Christopher Theodoropoulos**, a Director of Africo who supported and approved the Camrose Transactions, *id*. at 6, 11-12, after which he served as CEO of Africo from December 9, 2009 through July 17, 2015. *See* Africo 2015 Annual Information Form (March 16, 2016) (Lawson Decl., Ex. 4) at 32. He served as a Director and Chairman of the Board from 2005 until at least March 2016. *Id*. at 32. Just prior to the Camrose Transactions, Theodoropoulos owned 114,029 Africo shares, or a 0.4% interest. May 14, 2008 Proxy (Lawson Decl., Ex. 3) at 4, 6.

Africo's shares were publicly traded on the Toronto Stock Exchange. If, despite what they said to the public shareholders, WSGR's clients thought that they were being disadvantaged in the Camrose Transactions, they could have sold their shares. Instead, Theodoropoulos

acquired millions of Africo shares after the Camrose Transactions and continued to serve as Africo's Chairman of the Board for eight more years, and another of WSGR's clients, Geologic Resource Partners LLC, increased its ownership interest in Africo after the Camrose Transactions and designated a director of Africo.[7]

### B. As WSGR's Clients Publicly Stated at the Time, Without Financing Africo Would Cease to Be a Going Concern and, If Financing Were Obtained, All Existing Shareholders Would Be "Significantly Diluted." _____

In contrast to the 2018 claim that Africo was well on its way to developing the Kalukundi property, ECF 26, at 2-3, the truth was consistently detailed in contemporaneous regulatory filings and public statements made by Africo over the names of WSGR's clients more than 10 years ago.  Months *before* the September 2006 default judgment that is the earliest point in WSGR's story, and wholly unrelated to the offense, Africo was on the brink of insolvency. *See* Rubicon Notice of Annual and Special Meeting of Shareholders and Management Information Circular (July 7, 2006) (Lawson Decl., Ex. 7) at 16, 20:

> The viability of the Kalukundi project and the ability for the company to continue as a going concern are dependent on future financing. . . .  If financing is not achieved, Africo may not be able to meet its obligations as they become due.

Just weeks before the Camrose Transactions, over the signature of Harwood and under the boldface, italicized heading "***Potential Dilution***," Africo emphasized that it stood to lose any interest in the Kalukundi property if it did not obtain additional financing, and that to obtain such additional financing the interests of its existing shareholders may be "significantly diluted":

> Pursuant to the Swanmines Agreement, Africo is contractually obligated to provide the funding for the Kalukundi Property.  There can be no assurance that such additional financing will be available to Africo or, if it is, that it will be offered on acceptable terms. If additional financing is raised through the issuance of equity or convertible debt

---

[7] *See* Africo 2012 Annual Information Form (March 20, 2013) (Lawson Decl., Ex. 5) at 36; May 14, 2008 Proxy (Lawson Decl., Ex. 3) at 5; Africo Management Information Circular (May 15, 2012) (Lawson Decl., Ex. 6) at 4.

securities of Africo, the interests of shareholders in the net assets of Africo may be **significantly diluted**. If additional financing is not available, Africo may be unable to satisfy its obligations under the Swanmines Agreement. Any such failure, . . . may result in the loss of its interest in the Kalukundi Property.

Africo 2007 Annual Information Form (dated March 28, 2008) (Lawson Decl., Ex. 2) at 17 (emphasis added); *see also id.* at 3-4, 7, 14-20. For years, Africo had publicly disclosed in filings with its regulators and in statements to its public shareholders that, if it did not obtain additional financing, it stood to "lose its interest in the Kalukundi property," and, if additional financing was obtained, all shareholders stood to be "significantly diluted." *See id.* at 17.

## C.  Whether Viewed in 2006 or 2008, There Is No Injury Supporting Restitution.

In addition to inaccurately describing the very indirect connection of its clients to the Kalukundi property, WSGR inconsistently alleges the date of their alleged injury. WSGR says it occurred in 2006, at the time of the judicial sale of the Kalukundi property. ECF 26, at 3, 12. WSGR also says that it occurred in 2008, at the time of the Camrose Transactions. *Id.* at 1, 24.

The facts relating to an alleged 2006 injury do not support any claim for restitution. In September 2006, months after Africo had publicly disclosed that it was on the brink of insolvency, a former Africo consultant obtained a judgment against Africo arising out of an employment dispute. Africo, Interim Financial Statements (Nov. 14, 2008) (Lawson Decl., Ex. 8) at 5-6. There is nothing in the Plea Agreement Statement of Facts that links Gertler or OZ Africa with the entry of that 2006 judgment. That judgment led to a judicially administered sale of whatever derivative rights Africo had to the Kalukundi property to Akam Mining SPRL ("Akam"), a DRC company. In April 2007, Akam and the DRC government co-owner of the Kalukundi property, Gécamines, formalized Akam's acquisition of Africo's stake in the Kalukundi property, and a Congolese court accepted Akam's ownership. Africo Press Release

(April 27, 2007) (Lawson Decl., Ex. 9).[8]  The Statement of Facts notes that the DRC courts seized Kalukundi at the behest of DRC Official 2, who "orchestrated the taking of Africo's interest in the DRC mine and made it available to DRC Partner [Gertler]. . . ."  ECF 11, Ex. 3 ¶ 24.  This indicates that Gertler became involved *after* the alleged taking.  Nothing in the Statement of Facts links OZ Africa or Och-Ziff to the alleged taking.  *See United States v. Bengis*, 783 F.3d 407, 413-14 (2d Cir. 2015) (defendant only liable for acts of co-conspirators prior to defendant's involvement if it "knew or reasonably should have known" of prior acts).

Similarly, the facts relating to an alleged 2008 injury do not support any claim for restitution.  The 2008 Camrose Transactions consisted of three separate agreements:

1. the **Subscription Agreement**, which provided Camrose would pay Africo CAD $100 million in exchange for newly issued equity consisting of 40 million common shares and 20 million warrants that entitled Camrose to purchase an additional 20 million shares;

2. the **Akam Agreement**, which provided (i) Camrose would purchase Akam for U.S. $13.5 million and would then contribute 100% of Akam's assets to Africo in exchange for 5.4 million common shares of Africo, and (ii) there would be an exchange of releases and the termination of all litigation concerning rights to the Kalukundi property; and

3. the **Transfer Agreement**, which provided Camrose would direct a subsidiary to transfer its interest in a property adjoining the Kalukundi property, in exchange for which Africo would issue shares to Camrose based on an appraisal and pre-agreed formula.

*See* May 14, 2008 Proxy (Lawson Decl., Ex. 3) at 7-12.  Only the Akam Agreement related to the litigation over the Kalukundi property, which is the subject of bribes underlying the offense.

WSGR argues in 2018 that Africo was vastly "undervalued" and that Africo's shareholders "reluctantly voted to accept Gertler's unfavorable deal."  ECF 26, at 4.  Again,

---

[8] Over the names of WSGR's clients, Africo defended the litigation by asserting that it had no direct ownership of Swanmines that could be taken.  *See* Africo Press Release (April 27, 2007) (Lawson Decl., Ex. 9) (stating that Africo held no shares in Swanmines).  That concedes the absence of any property right or direct injury, and thus that the MVRA is not applicable.

Africo's contemporaneous public statements, many over the names of WSGR's clients, tell a different story. On April 21, 2008, Africo issued a press release (over Harwood's name) stating:

> Mr. Dan Gertler brings to Africo extensive business experience in the DRC, and a proven track record of successful mining investments and expertise. The private placement with Camrose will provide Africo with the equity funding required to advance the Kalukundi project. An integral part of our transaction with Camrose includes facilitating a speedy and successful resolution to the legal dispute over ownership of Swanmines.

Africo Press Release (Apr. 21, 2008) (Lawson Decl., Ex. 10). Africo's Board, which at the time included WSGR's clients, negotiated, approved and supported the Camrose Transactions and recommended that all shareholders approve them, emphasizing Africo's "pressing requirement for working capital" and that if the Camrose Transactions were not approved as a means to obtain this required working capital, Africo may "cease to be a going concern."

> The Board of Directors of Africo has approved the terms of the Camrose Transactions. In reaching its conclusion, the Board of Directors: reviewed the risk factors relating to Africo . . . particularly with respect to the litigation that Africo is currently involved in and Africo's need to acquire further working capital. . . . The Board of Directors considers that the Camrose Transactions, overall, represent a reasonable business risk for Africo given Africo's current circumstances involving the uncertainty of its legal efforts to re-acquire the Kalukundi Property and its pressing requirement for working capital. The Camrose Transactions eliminate that uncertainty and provide sufficient working capital for the foreseeable future. Given the current circumstances, the Board of Directors has determined that if the Camrose Transactions are not approved, there is a material risk that Africo will be unable to re-acquire and develop the Kalukundi Property and may in that event **cease to be a going concern**.

May 14, 2008 Proxy (Lawson Decl., Ex. 3) at 11-12 (emphasis added).[9]

On June 11, 2008, one day before the Africo shareholders voted to approve the Camrose Transactions, Africo announced that it had received a competing proposal from Creat Group Co. Ltd., a Chinese company. In addition to a slightly higher price per share and similar dilution of equity ownership, Creat proposed that, subject to due diligence:

---

[9] To incentivize approval and consummation of the Camrose Transactions, the Africo Board (which included Dixon, Harwood and Theodoropoulos) set aside $1,135,000 to be distributed to "employees, officers and directors of Africo at the discretion of Africo's Compensation Committee" upon the successful consummation of the Camrose Transactions. May 14, 2008 Proxy (Lawson Decl., Ex. 3) at 27.

> [I]t would be responsible for arranging the balance of the capital required to develop Africo's Kalukundi property and would assist Africo in resolving its outstanding legal proceedings in the DRC regarding the ownership of Swanmines Sprl.

Africo Press Release (June 11, 2008) (Lawson Decl., Ex. 11).   The terms of this contemporaneous competing offer (unassociated with the offense) rebut any suggestion that the Camrose Transactions were "unfavorable."  The Africo Board told its public shareholders that it:

> maintains and re-confirms its recommendation to its shareholders to approve the transactions contemplated with Camrose . . . .  In making this recommendation, Africo's management is of the view that the injection in the short term of [CAD] $100 million equity capital by Camrose at [CAD] $2.50 per unit as well as the potential project synergies provided through the adjacent Mashitu properties and the settlement of the Akam legal dispute, when taken together, are in the best interests of Africo and its shareholders.

*Id.*  The Africo shareholders approved the Camrose Transactions.[10]

### D.  WSGR's Clients Financially Benefitted from the Camrose Transactions.

The public market saw significant value to Africo in the Camrose Transactions. Immediately prior to shareholder approval of the Camrose Transactions, Africo had a total market capitalization of approximately $42 million.  After the Camrose Transactions closed on July 24, 2008, the price of Africo common shares *rose* CAD $0.23 (from CAD $1.82 on July 23 to CAD $2.05 on July 24), and Africo's total market capitalization *increased* by CAD $99,327,374 (from CAD $49,529,465 on July 23 to CAD $148,856,839 on July 24).  This reflects the issuance of additional shares and the CAD $100 million equity investment in Africo. While their respective percentage ownership interests were reduced, WSGR's clients each held the same number of Africo shares after the Camrose Transactions as they did before, and after

---

[10] Pursuant to the Subscription Agreement, Camrose paid CAD $100 million to Africo for the agreed equity units.  Africo Press Release (July 24, 2008) (Lawson Decl., Ex. 12).  Pursuant to the Akam Agreement, the parties exchanged general releases and terminated litigation concerning Swanmines.  *Id.* The Transfer Agreement was abandoned in 2009 for failure of satisfaction of a condition precedent. Africo 2009 Annual Information Form (March 24, 2010) (Lawson Decl., Ex. 13) at 8.

the complained-of dilution each of those shares was worth CAD $0.23 more than it was the day before—*a one-day increase of nearly 13%.*

WSGR has submitted to the Court a purported expert valuation of the Kalukundi property prepared in 2017 by SRK Consulting Engineers ("SRK"). In the fall of 2008, with Africo still in need of substantial additional financing in order to meet its obligations and remain a going concern and have the opportunity to develop the Kalukundi property, Africo had hired the same firm to assist in investor presentations. At that time, and not for use in litigation, SRK issued a 68-page report opining that, *after* the Camrose Transactions and the infusion of CAD $100 million into Africo, the fair market value of the Kalukundi property was U.S. $102.6 million as of November 28, 2008. SRK Report (Lawson Decl., Ex. 14) at 1, 59.[11] Importantly, in November 2008, SRK concluded that dilutive equity financing had to be assumed in any valuation of Africo. Africo had earlier disclosed that it was on the brink of insolvency. It could not afford the cost of debt financing. As stated by SRK in November 2008:

> If [debt finance] has to be used to demonstrate the economic viability of a project, one has to critically assess whether the project is really worth pursuing. SRK believes the use of [debt financing] in the evaluation of the Kalukundi Project even at a feasibility study stage of development is not appropriate.

*Id.* at 42. Africo required additional financing. If financing was obtained it would result in all existing shareholders being "significantly diluted." *See* Africo 2007 Annual Information Form (dated March 28, 2008) (Lawson Decl., Ex. 2) at 17, quoted at pages 9-10, *supra*. This was inherent in the nature of Africo's business, and unrelated to OZ Africa's offense.

---

[11] This valuation was the mid-point within a range, and assumed, *inter alia*, the technical feasibility of extraction, the accuracy of mineral resources estimates and forward-looking expense and production schedules, future commodity prices, political stability, and was "subject to a number of known and unknown risks, uncertainties and other factors [including] . . . changes in mineral commodity markets, equity markets, costs and availability of materials relevant to the mining industry, changes in government and changes to regulations affecting the mining industry" – matters as to which Africo management had stated there could be no assurance. *Id.* at 7. On the same date as the SRK valuation, the market valued Africo at CAD $50.1 million.

**E. Through Several Sets of Owners Over the Past 15 Years, the Kalukundi Property Remains Undeveloped.**

In 2018, WSGR blames Gertler, and by association OZ Africa, for the failure to develop the Kalukundi property.  ECF 26, at 12.  But it was WSGR's clients who served as Africo's senior management and on its board of directors and at the time they attributed their failure to develop the Kalukundi property to financing, operations and external market factors unrelated to OZ Africa's offense.  Even with the CAD $100 million cash infusion from the Camrose Transactions, one year later Africo failed to meet conditions precedent to acquire a development permit and "significantly scaled back" development of the Kalukundi property.  Africo 2009 Annual Information Form (March 24, 2010) (Lawson Decl., Ex. 13) at 18.

In August 2010, a wholly owned subsidiary of Eurasian Natural Resources Corporation PLC ("ENRC"), ENRC Congo BV, acquired 50.5% of Camrose Resources Limited. *See* ENRC Press Release (August 20, 2010) (Lawson Decl., Ex. 15).  Under new ownership, on March 29, 2012 Africo again disclosed that it needed to raise "substantial" additional funding in order to be able to develop the Kalukundi property. *See* Africo 2011 Annual Information Form (March 29, 2012) (Lawson Decl., Ex. 16) at 4, 21.  In December 2012, ENRC purchased the remaining 49.5% of Camrose's shares, and became the sole owner of Camrose (which still owned 64% of Africo).  Africo Press Release (December 31, 2012) (Lawson Decl., Ex. 17).  In December 2013, Eurasian Resources Group ("ERG") purchased ENRC. *See* ERG, https://www.eurasianresources .1u/en/pages/our-business/history (last visited Feb. 28, 2018).

Despite changes in ownership, with Theodoropoulos still serving as its Chairman, in 2013 Africo again disclosed that "it is unlikely that Africo will be able to fund the development of its Kalukundi property without third party financial backing."  Africo 2012 Annual Information

Form (March 20, 2013) (Lawson Decl., Ex. 5) at 22.[12]  But Africo did not just face financial
obstacles to the realization of its investment in the Kalukundi property.  On March 20, 2013,
Africo disclosed that exploratory drilling had ceased due to "unrest by the local artisanal
workers" and that "[t]he ability to commence this development program is dependent upon
establishment of security control on the Kalukundi Property such that the MDM staff and new
plant, equipment and infrastructure will be secure and not subject to vandalism."  *Id*. at 19, 22.
The unauthorized presence of large numbers of artisanal workers continued for years.  *See* Africo
2015 Annual Information Form (March 16, 2016) (Lawson Decl., Ex. 4) at 21-22.   The
relocation of a tribal village previously stated to be essential to the development of the property
was "postponed."  *Id*. at 8.

     In May 2016, Africo and Camrose (wholly owned by ERG) entered into an agreement
whereby Camrose would acquire the Africo shares that it did not already own.  *See* Africo Press
Release (May 13, 2016) (Lawson Decl., Ex. 18).  On July 6, 2016, after 99.9% of Africo's other
shareholders voted to approve the transaction, Camrose acquired all outstanding shares of
Africo, resulting in ERG now owning 100% of Africo.  *See* ERG Press Release (July 7, 2016)
(Lawson Decl., Ex. 19).  There is no indication that WSGR's clients opposed the transaction,
or ever sought any appraisal of their shares.

     WSGR represents that Africo is "defunct."  ECF 26, at 22-24.  That is not true.
Africo is wholly owned by ERG.  In the going private transaction, Camrose paid CAD $1.00
per share, and an additional U.S. $0.27 per share would be paid if certain transactions related

---

[12] This manifest need for even more dilutive equity financing continued for years.  With Theodoropoulos
still serving as its Chairman, in 2016 Africo again disclosed "it is unlikely that Africo will be able to fund
the development of its Kalukundi project without third party financial backing." Africo 2015 Annual
Information Form (March 16, 2016) (Lawson Decl., Ex. 4) at 22.   Over decades under different
ownerships, Africo never had the capital necessary to fund development of the Kalukundi property.

to the Kalukundi property were completed within 14 months of the sale.   Africo Early Warning Report (July 7, 2016) (Lawson Decl., Ex. 20) at 1-2, 4.   These transactions were never completed.

OZ Africa's offense had nothing to do with the factors that sidelined efforts to develop the property.   Through several sets of owners over the past 15 years, the Kalukundi property remains undeveloped.   It is not likely to be developed any time soon because of recent DRC legislation limiting the potential for profit in foreign investments in DRC natural resources.[13]

## **ARGUMENT**

"Federal courts have no inherent power to order restitution, which is traditionally a civil remedy.   A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute." *Federal Ins. Co.* v. *United States*, 2018 WL 826759, at *6 (2d Cir. Feb. 13, 2018) (citing *United States* v. *Zangari*, 677 F.3d 86, 91 (2d Cir. 2012)).   The MVRA applies "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense," and restricts restitution to the "victim" of the offense. "Victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. §§ 3663A(b)(1), 3663A(a)(1), 3663A(a)(2).

---

[13] *See* W. Clowes, Miners Face Sudden Cost Increases After Congo Law Overhaul, *Bloomberg Markets*, Feb. 1, 2018, https://www.bloomberg.com/news/articles/2018-01-31/congo-surprises-miners-with-last-minute-changes-to-legal-reforms (Lawson Decl., Ex. 21).   This is not addressed anywhere in the expert report tendered by WSGR.

"Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct." *United States* v. *Marino*, 654 F.3d 310, 319 (2d Cir. 2011) (quoting *United States* v. *Vaknin*, 112 F.3d 579, 589 (1st Cir. 1997)).

By the MVRA's own terms, it does not apply if the court makes a factual finding that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); *see also Federal Ins. Co.*, 2018 WL 826759, at *13.

Assuming for argument's sake that the MVRA applies to the FCPA or bribery in general,[14] the injury complained of by WSGR's clients is not the loss of their "property," is not "direct[]," and "would have occurred regardless of the defendant's conduct." *Marino*, 654 F.3d at 319 (quoting *Vaknin*, 112 F.3d at 589). Even were it otherwise, "calculating . . . restitution . . . would unduly prolong the sentencing process." *Federal Ins. Co.*, 2018 WL 826759, at *13; 18 U.S.C. § 3663A(c)(3)(B).

## A. The MVRA Does Not Apply Because There Was No Loss or Destruction of "Property," and Any Alleged Injury Was Not Directly and Proximately Caused by OZ Africa's Offense.

The supposed injury suffered by WSGR's clients cannot be the loss of an ownership interest in the Kalukundi property because WSGR's clients never had any ownership interest in the Kalukundi property. Nor can the supposed injury be the loss of mining rights relating to that property because WSGR's clients never owned any mining rights in the Kalukundi property. They were shareholders in Africo: they owned some stock in a Canadian company, that owned

---

[14] *See United States* v. *Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013) (Gershon, J.) (bribery concerning program receiving federal funds is not an offense against property under MVRA); *but see United States* v. *Green*, 722 F.3d 1146 (9th Cir. 2013) (holding limited to whether *Apprendi* applies to restitution because appellants did not challenge the applicability of the MVRA to the FCPA). *Green* is the only case WSGR cites where a court ordered restitution for a conspiracy to commit FCPA violations.

some stock in a DRC company, that owned some stock in another DRC company, that owned mining rights in the DRC. The injury asserted by WSGR's clients also cannot be the taking of their Africo shares. They retained all of their shares in the Camrose Transactions, and enjoyed an immediate 13% appreciation in price for every one of those shares.[15]

The injury apparently alleged by WSGR's clients is the *dilution* of their individual equity ownership interests in Africo. After the Camrose Transactions, they (like every other public Africo shareholder) each owned a smaller percentage of a larger company. While the dollar value of their individual holdings *increased*, their individual percentage ownership interests were diluted by the issuance of additional shares in connection with the Camrose Transactions.

Individually, none of WSGR's clients exercised control over Africo. Their individual ownership interests were in small fractions of 1%. *See* page 8, *supra*.[16] The dilution of equity ownership of a non-controlling shareholder is not the loss of a "property" right; thus the MVRA does not apply. The offense relates solely to the pending litigation over rights to the Kalukundi property prior to the Camrose Transactions. The only aspect of the Camrose Transactions associated with that litigation and rights to the property is the Akam Agreement, which caused a slight dilution of percentage equity ownership.[17] Absent the existence of a legal right of control

---

[15] Whatever rights were arguably lost in the 2006 default judgment were fully regained in the 2008 Camrose Transactions, which was the express purpose of the Akam Agreement, which was supported by WSGR's clients, and which, on a per-share basis, financially benefitted all Africo shareholders.

[16] WSGR's "more than fifty former equity holders of Africo" collectively owned "about 64% of Africo." ECF 26, at 1 and n.1. There is no evidence of any contemporaneous shareholder voting agreement between and among them that might have given them some collective shareholder control over Africo during the relevant time period. Restitution is required only "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense . . . ." 18 U.S.C. § 3663A(b)(1). The MVRA does not apply to the dilution of individual shareholdings that themselves had no right of control because the absence of control is not a "property" right, and neither is its dilution.

[17] The larger dilution incident to the Camrose Transactions was the foreseeable, publicly disclosed and desired result of the separate Subscription Agreement, involving a CAD $100 million equity investment in Africo, and was: (i) unrelated to the litigation and the offense; (ii) necessary to keep Africo in business

(and none exists or is alleged for any of WSGR's clients), there is no loss or destruction of any "property" within the meaning of the MVRA.

Dilution cannot be a cognizable injury when it was WSGR's clients who negotiated, recommended and approved the Camrose Transactions as in the best interests of Africo and all of its shareholders. Months *before* the September 2006 default judgment that is the earliest point in WSGR's story, and wholly unrelated to the offense,[18] Africo was on the brink of insolvency, *see* page 9, *supra*, and for years before the Camrose Transactions Africo had acknowledged in its regulatory filings and in statements to its public shareholders that: (i) it required substantial financing in order to meet its obligations as they came due, to remain a going concern and to be able possibly in the future to develop the Kalukundi property; (ii) it could not be assured that sufficient financing on acceptable terms would be obtained; and that (iii) if the required financing were obtained, the ownership of all existing shareholders would be "significantly diluted." *See* Africo 2007 Annual Information Form (March 28, 2008) (Lawson Decl., Ex. 2) at 17, quoted at pages 9-10, *supra*. Africo could not bear the cost of debt financing, and the valuation report by SRK, the same valuation expert now used by WSGR, emphasized that using

---

as a going concern; and (iii) consistent with any other alternative that Africo had at the time. That dilution would have occurred had there never been a bribery scheme – or, as WSGR's clients stated at the time, Africo would be out of business. *See Marino*, 654 F.3d at 319 (quoting *Vaknin*, 112 F.3d at 589 ("Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct.")).

[18] WSGR analyzes whether there are one or two conspiracies at issue in this case. It ultimately does not matter. As discussed throughout this submission, WSGR's clients did not lose any property and are not victims under the MVRA. Moreover, a purported victim's harm must have a basis in the charged conduct. In *United States* v. *Dharia*, 2018 WL 357281, at *8 (E.D.N.Y. Jan. 10, 2018) (Weinstein, J.), the defendant was charged with bank fraud, specifically that he "misrepresented ownership interests to obtain loans from banks and then misappropriated the funds." The court concluded that at least one purported victim, whose claim rested on the fact that he unwittingly provided defendant with funds that were used as a down payment on a fraudulent loan, was in fact not a victim as its claim lacked a "basis in the charged conduct," because the defendant was charged with concealing information from a bank, not misleading individual investors. *Id*. Similarly, OZ Africa pleaded guilty to conspiring to bribe DRC officials in the DRC, not to misleading investors in a Canadian mining company.

anything other than shareholder-dilutive equity financing would raise the question of whether the Kalukundi property was even worth pursuing in the first place.  SRK Report (Lawson Decl., Ex. 14) at 42, quoted at page 14, *supra*.  Dilution of the former Africo shareholders' equity ownership in Africo was the inevitable result of obtaining the substantial financing needed to continue the operations of the company, and was unrelated to OZ Africa's offense.

Regardless of whether there ever had been a bribery conspiracy, and regardless of whether OZ Africa had ever participated in the conspiracy, Africo still would have required the infusion of substantial capital to remain a going concern, to meet its obligations as they came due, and to have any chance of seeing the Kalukundi property developed.[19]  That such financing would have resulted in dilution was not only a disclosed risk inherent in the company, it was anticipated and approved by the Africo board of directors (including WSGR's clients) – and it was substantially similar to the dilution that would have occurred had the alternative Creat proposal (which had no relationship to OZ Africa's offense) been accepted.

Subject to penalties for false regulatory filings and false statements in connection with the purchase and sale of securities, WSGR's clients recommended that all Africo shareholders approve the Camrose Transactions because, despite their dilutive effect, the Camrose Transactions were in the best interests of Africo and its shareholders.  *See* Africo Press Release (June 11, 2008) (Lawson Decl., Ex. 11).  They cannot be heard to claim otherwise now.[20]

---

[19] *See* May 14, 2008 Proxy (Lawson Decl., Ex. 3) at 11-12 ("Given the current circumstances, the Board of Directors has determined that if the Camrose Transactions are not approved, there is a material risk that Africo will be unable to re-acquire and develop the Kalukundi Property and may in that event cease to be a going concern.").

[20] In *Appel* v. *Berkman*, 2018 WL 947893, at *1 (Del. Feb. 20, 2018), Diamond Resorts' board recommended to shareholders that they sell their shares to a private equity buyer as part of a merger transaction without disclosing that the company's founder and largest stockholder had abstained from supporting the merger because he did not believe the price was adequate and did not believe it was the right time to sell the company.  The Supreme Court of Delaware found the omission material.  *Id.* at *8.

**B. WSGR's Clients Are Not "Victims" Because They Suffered No Direct Harm**

WSGR's clients do not qualify as "victims" under the MVRA because, even if the dilution of a non-controlling shareholder was an injury to property (and it is not), their injury was not "directly and proximately" caused by OZ Africa's offense.

> Typically, a claim for wrongful equity dilution is premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable. Such claims are not normally regarded as direct . . . . This is so because the alleged injury is to the corporation and it falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation.

*F5 Capital* v. *Pappas*, 856 F.3d 61, 72 (2d Cir. 2017) (citations omitted).

To the extent that now – in conflict with their contemporaneous statements – WSGR's clients argue that they were coerced by Gertler into entering into the Camrose Transactions, the analysis and conclusion remain the same. *See Starr Int'l Co., Inc.* v. *United States*, 856 F.3d 953, 966-67 (Fed. Cir. 2017) (citations omitted), addressing a shareholder claim of wrongful equity dilution as a result of a coerced transaction:

> Although Starr claims that it was directly affected by the Government's acquisition of equity, its alleged injuries require first showing that AIG was either 'caused to overpay for [the loan] that it received in exchange' for newly issued stock or forced to issue that stock without any legal basis whatsoever. Typically, 'claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative.' 'Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction.' The proper remedy for such harms usually goes to the corporation as 'a restoration of the improperly reduced value.'

WSGR does not address these Courts of Appeals decisions, although we provided them.

Instead, WSGR relies on *United States* v. *Schwamborn*, 542 F. App'x 87 (2d Cir. 2013), ECF 26,

---

Similarly, here the Chairman and CEO of Africo are contending that the Camrose Transactions grossly undervalued Africo, but the proxy statement they sent out over their names soliciting the public shareholders' votes for the transactions make no disclosure of that. WSGR's clients' recent change in their assessment of the Camrose Transactions is disingenuous and transparently opportunistic, and finds no support in the law.

at 13, 23-24, a summary order with no precedential value, the facts of which serve only to highlight the lack of any direct claim here. In *Schwamborn*, the defendant pleaded guilty to securities fraud for engaging in a face-to-face scheme to defraud persons to purchase worthless common stock. No such direct connection is alleged here, nor can any such direct connection be found in the Statement of Facts.[21]

**C.** **The Loss Alleged Is Hypothetical, Speculative and Not Linked to the Charged Offense.**

"'[A] restitution order must be tied to the victim's actual, provable, loss,'" *United States* v. *Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017) (quoting *United States* v. *Zangari*, 677 F.3d 86, 91 (2d Cir. 2012), and losses that are hypothetical or speculative or "not clearly causally linked to the offense" are not compensable. *United States* v. *Messina*, 806 F.3d 55, 69 (2d Cir. 2015); *United States* v. *Maynard*, 743 F.3d 374, 378 (2d Cir. 2014).

WSGR's clients assert an injury in the hundreds of millions of dollars. There is no way to characterize such a claim but fanciful. The claim is the *partial* dilution of individual non-controlling shareholders of a corporation whose total market capitalization was only $42 million at the time, and which was stated by WSGR's clients to be on the brink of insolvency. Of the three Camrose Transactions, only the Akam Agreement related to the litigation over the Kalukundi property, the subject of Gertler's bribes at issue in OZ Africa's offense, and the only dilution that bears any relationship to the offense is the minimal dilution attendant to the Akam Agreement.

WSGR states that its clients in the aggregate held "about 64% of Africo." ECF 26, at 1 n.1. Ignoring the threshold issue that they are not victims:

---

[21] *See also United States* v. *Marino*, 654 F.3d 310, 322 (2d Cir. 2011) (injury to investors was similarly direct in conviction related to concealing a Ponzi scheme). WSGR cites *Marino* for the proposition that victim status under the MVRA is distinct from civil standing. ECF 26, at 23. But by the terms of the statute the injury must still be direct. The former Africo shareholders' alleged injury is not direct.

- The nominal value of the Akam Agreement is 5.4 million shares at CAD $2.50 per share, or CAD $13.5 million.  64% of that is CAD $8.64 million.

- The market value of the Akam Agreement on the date of its announcement is 5.4 million shares times CAD $2.25, or $12.2 million.  64% of that is CAD $7.8 million.

- The market value of the Akam Agreement at closing of the Transactions is 5.4 million shares times CAD $2.05, or CAD $11.1 million. 64% of that is CAD $7.1 million.

But the aggregate market value of Africo shares *rose* CAD $15.5 million on the announcement of the Camrose Transactions, and (without ascribing any value to the CAD $100 million paid to Africo in the Camrose Transactions) 64% of that increase is CAD $9.92 million.  Thus, WSGR's clients suffered no loss.[22]

WSGR claims that the former Africo shareholders were harmed because they "had their shares further devalued as the conspirators combined Africo with other corruptly acquired assets, while the Kalukundi mine lay dormant and undeveloped."  ECF 26, at 11.  But in the nine years since the Camrose Transactions, the Africo shareholders made no complaints concerning the failure to develop the property, and Theodoropoulos continued to serve as Chairman of Africo's Board of Directors.  If anyone was in a position to protest the failure to develop the mine, it was WSGR's clients.  They never did.

The reason WSGR's clients did not complain is that the failure to develop the mine in the nine years since the Camrose Transactions (and the seven years since Gertler ceased having control over Camrose) is attributable to numerous factors having nothing to do with who owned Africo.  Development was blocked by the risks inherent in DRC mining ventures, including Africo's inability to obtain financing, its government partner, local civil

---

[22] "[A] restitution order must be tied to the victim's actual, provable, loss." *Zangari*, 677 F.3d at 91; *Finazzo*, 850 F.3d at 117.  "[T]he law does not authorize restitution to victims 'in excess of their losses.'" *United States* v. *Kinney*, 684 F. App'x 73, 75 (2d Cir. 2017) (quoting *United States* v. *Pescatore*, 637 F.3d. 128, 139 (2d Cir. 2011).

unrest and political instability, and external market factors, and WSGR's clients contemporaneously so stated in Africo's public disclosures from 2004 through 2016.  *See* Africo Annual Information Forms for the Fiscal Years Ended December 31, 2012 through 2015 (Lawson Decl., Exs. 5, 22, 23, 4) at § 3.12.  Given these stated causes, it is not possible to conclude that the failure to develop the mine was "directly and proximately" caused by OZ Africa's offense.  The property is not likely to be developed soon.  *See* footnote 13, *supra*.

## CONCLUSION

Sentencing should proceed on March 7, 2018 consistent with the terms of the Rule 11(c)(1)(C) plea accepted by the Court on September 29, 2016.

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: *Joel M Cohen / by CAG*
    Joel M. Cohen
    Lee G. Dunst
    Mark K. Schonfeld
    Daniel P. Harris
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000

CAHILL GORDON & REINDEL LLP

By: *Charles A. Gilman*
    Charles A. Gilman
    Anirudh Bansal
    Kevin J. Burke
    Samantha Lawson
80 Pine Street
New York, New York 10005
Tel.: (212) 701-3000

*Attorneys for OZ Africa Management GP, LLC*

March 2, 2018