# Exhibit 13

# Annual Information Form

AFRICO RESOURCES LTD

**For the Fiscal Year Ended December 31, 2009**

**March 24, 2010**

**Table of Contents**


**CAUTIONARY LANGUAGE REGARDING FORWARD-LOOKING INFORMATION ....................1**

**ITEM 1 CORPORATE STRUCTURE ....................2**
1.1 Name, Address and Incorporation ....................2
1.2 Intercorporate Relationships ....................2

**ITEM 2 GENERAL DEVELOPMENT OF THE BUSINESS ....................3**
2.1 Overview ....................3
2.2 History ....................3
2.3 Significant Acquisitions ....................4

**ITEM 3 NARRATIVE DESCRIPTION OF THE BUSINESS ....................4**
3.1 General ....................4
3.2 Material Contracts ....................4
3.3 Competitive Conditions ....................8
3.4 Environmental Protection ....................8
3.5 Employees ....................9
3.6 Foreign Operations ....................9
3.7 Bankruptcy and Similar Procedures ....................9
3.8 Reorganization ....................10
3.9 Social or Environmental Policies ....................10
3.10 Mineral Projects – The Kalukundi Property ....................10
3.11 Management Update ....................18
3.12 Risk Factors ....................19

**ITEM 4 DIVIDENDS ....................26**

**ITEM 5 DESCRIPTION OF CAPITAL STRUCTURE ....................27**

**ITEM 6 MARKET FOR SECURITIES ....................27**
6.1 Trading Price and Volume ....................27
6.2 Prior Sales ....................27

**ITEM 7 ESCROWED SECURITIES ....................28**

**ITEM 8 DIRECTORS AND OFFICERS ....................28**
8.1 Name, Occupation and Security Holding ....................28
8.2 Cease Trade Orders, Bankruptcies, Penalties or Sanctions ....................29
8.3 Conflicts of Interest ....................30

**ITEM 9 AUDIT COMMITTEE ....................30**
9.1 The Audit Committee's Charter ....................30
9.2 Composition of the Audit Committee ....................30
9.3 Relevant Education and Experience ....................30
9.4 Pre-Approval Policies and Procedures ....................31
9.5 External Auditor Service Fees ....................31

**ITEM 10 LEGAL PROCEEDINGS ....................31**

**ITEM 11 INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ....................31**

**ITEM 12 TRANSFER AGENT AND REGISTRAR ....................32**

**ITEM 13 MATERIAL CONTRACTS ....................32**

**ITEM 14 INTERESTS OF EXPERTS ....................32**

**ITEM 15 ADDITIONAL INFORMATION ....................32**

**CHARTER FOR THE AUDIT COMMITTEE ....................33**

***Agreement between Camrose and Africo dated April 17, 2008 regarding Akam Mining sprl (the "Akam Agreement")***

The Akam Agreement acknowledged that Camrose had, through a wholly-owned subsidiary, purchased the outstanding shares of Akam Mining sprl ("**Akam**"). The Akam Agreement resolved the existing litigation regarding the Kalukundi Property described in Africo's Annual Information Form dated March 28, 2008 (which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the Internet at www.sedar.com); and provided that Camrose would cause Akam to assign all of its rights, title and interest in Swanmines sprl (the "**Swanmines Shares**") to a wholly-owned subsidiary of Africo in consideration of the issuance to Camrose of 5,400,000 shares of Africo at a deemed price of $2.50 per share, subject to usual anti-dilution adjustments. The Akam Agreement also provided for mutual releases from Africo and Akam in connection with the Swanmines Shares. The Swamnines Shares were transferred to Africo DRC on January 15, 2009.

***Termination Agreement dated May 15, 2009 terminating the Agreement dated April 17, 2008 between Africo and La Congolaise des Mines et de Developpement (Comide sprl) ("Comide") (the "Transfer Agreement")***

Africo had entered into the Transfer Agreement with Comide, a joint venture company owned as to 75% by an affiliate of Camrose and as to 25% by La Générale des Carrières et des Mines ("**Gécamines**"), a mining company owned by the Government of the DRC. The Transfer Agreement provided that Comide would transfer to Swanmines (to be owned at least 75% by Africo and the balance by Gécamines) Exploitation Permit No. PE2607 (the "**Exploitation Permit**"), consisting of 41 squares or blocks (approximately 34.83155 $km^2$) for copper, cobalt, gold and nickel extraction, situated in the Territory of Lubudi, District of Kolwezi, Province of Katanga, at a purchase price that was to be based on a valuation and be satisfied by the issuance of common shares in the capital of Africo at a price of Cdn.$2.50 per share. The transfer was subject to a number of conditions precedent being satisfied, including the consent of Gécamines, which was not obtained. As a result of the economic conditions in 2009, the uncertain value of the Exploitation Permit and the corresponding uncertainty as to the number of shares to be issued, and the consent of Gécamines not being obtained, on May 15, 2009 Africo, Comide and Camrose entered into an agreement to terminate the Transfer Agreement subject to the approval of the disinterested shareholders of Africo, which approval was obtained at Africo's annual and special meeting held June 18, 2009.

**3.3 Competitive Conditions**

Africo competes with numerous other companies and individuals, including competitors with greater financial, technical and other resources than Africo, in the search for and the acquisition of attractive mineral properties in the DRC and elsewhere in Africa. See Item 3.12 – Risk Factors.

**3.4 Environmental Protection**

An Environmental and Social Impact Assessment study ("ESIA") was commissioned by Africo in 2008. The ESIA was designed to conform with the requirements of the DRC and World Bank policies and procedures. The work undertaken by Envirolution Consultants on behalf of Africo was designed to evaluate the social impacts of the planned mining and processing activities, as well as to expand on knowledge of the local environment through a more detailed study of the local flora and fauna. This ESIA was finalized towards the end of 2008.

***Fish Study***

An independent ichthyofauna (fish) study was conducted in January 2008 as part of the ESIA. The study identified a number of rare fish species in the Kii stream which drains across the north, just off the Kalukundi Property area. In order to determine whether these species were more widespread, a follow up study in November 2008 of 13 streams in the area established that four out of the 13 steams in the area were considered to be suitable candidates for conservation or protection as river or fish reserves to offset the mining impacts. The other sites were rejected due to their location too far down the river system, or because the present ecological status was assessed as being largely modified to the point that a large loss of natural habitat, aquatic biota (including fish) and basic ecosystem

There is considerable scope to increase the Project Reserve of 7.8Mt by proving up existing Resources, by carrying out follow up studies and also through drilling of other mineralized surface bodies on the property, all of which will be aggressively pursued by Africo in 2006."

### 3.11 Management Update

As a result of global economic conditions during 2008 and 2009, Africo significantly scaled back activities on the Kalukundi Property until such time as global economic conditions improve and also laid off its expatriate development team in order to reduce its costs on the Kalukundi Property.

Exploration activities and drilling activity, which focused on the search for mineralization within new fragments, commenced in 2008 and continued into 2009. The core drilling programme, amounting to 3971m, was undertaken on three fragments:

| | | |
|---|---|---|
| Kesho | 18 holes | 2282m |
| SE Anticline | 6 holes | 674m |
| Principal | 6 holes | 1015m |
| **Totals** | **30 holes** | **3971m** |

This was accompanied by 1139m of RC drilling from 13 boreholes at selected localities on the Kii, Kalukundi, SE Anticline and Principal Fragments to identify the hydrogeological characteristics of the RAT Lilas formation.

Evaluation of the core including sampling, SG measurements, etc., was followed by monitoring and evaluation of the assay data to comply with QA/QC requirements. All borehole collar positions were accurately surveyed for inclusion in the detailed geological models. Accordingly, on August 4, 2009, Africo reported initial results from the drilling programme on the Principal and SE Anticline Fragments. The August 4, 2009 announcement has been electronically filed with regulators and is available for review through the Internet on SEDAR at www.sedar.com.

As Africo outlined in its August 4, 2009 announcement, results from the drilling have returned some of the best values encountered on the Project to date and confirm that the central part of the Principal Fragment is highly anomalous in cobalt, as well as hosting copper grades. The best intersection from BH K107 grades at 7.75% copper and 2.68% cobalt over a drilled width of 32.88m (true width 30.00m). This intersection runs from 157.00m to 189.88m and has established that oxide mineralization on this fragment can be confirmed to a vertical depth of 140m.

Assay results from the drilling on the SE Anticline Fragment have been received and are encouraging, particularly in respect of cobalt values, with the best intersection grading at 1.47% cobalt over a drilled width of 28.86m (true width 25.00m).

The core drilling on the Kesho fragment followed a programme of RC drilling undertaken in 2007, which also confirmed the presence of continuous mineralization. The results of the core drilling were positive with each borehole intersection locating both copper and cobalt mineralization. The better intersections encountered are summarized as follows:

| BH No. | From | To | Drilled Width | Cu | Co |
|---|---|---|---|---|---|
| KES 1 | 8.00m | 44.00m | 36.00M | 3.08% | 0.54% |
| KES 3B | 18.50m | 56.00m | 37.50m | 2.87% | 0.54% |
| KES 5 | 3.35m | 45.50m | 39.15m | 1.65% | 0.71% |
| KES 15 | 53.00m | 87.50m | 34.50m | 1.35% | 0.89% |

**Form 52-109F1**
**Certification of annual filings – full certificate**

I, **Chris Theodoropoulos**, the **Acting Chief Executive Officer** of **Africo Resources Ltd.**, certify the following:

1. ***Review:*** I have reviewed the AIF, if any, annual financial statements and annual MD&A, including, for greater certainty, all documents and information that are incorporated by reference in the AIF (together, the "annual filings") of **Africo Resources Ltd.** (the "issuer") for the financial year ended **December 31, 2009**.

2. ***No misrepresentations:*** Based on my knowledge, having exercised reasonable diligence, the annual filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the annual filings.

3. ***Fair presentation:*** Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the annual filings fairly present in all material respects the financial condition, results of operations and cash flows of the issuer, as of the date of and for the periods presented in the annual filings.

4. ***Responsibility:*** The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

5. ***Design:*** Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer(s) and I have, as at the financial year end

   (a) designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

      (i) material information relating to the issuer is made known to us by others, particularly during the period in which the annual filings are being prepared; and

      (ii) information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

   (b) designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

5.1 ***Control framework:*** The control framework the issuer's other certifying officer(s) and I used to design the issuer's ICFR is "Internal Control – Integrated Framework" published by The Committee of Sponsoring Organisations for the Treadway Commission (commonly called the COSO Framework).

5.2 ***ICFR – material weakness relating to design:*** Not applicable.

5.3 ***Limitation on scope of design:*** Not applicable.

6. ***Evaluation:*** The issuer's other certifying officer(s) and I have

(a) evaluated, or caused to be evaluated under our supervision, the effectiveness of the issuer's DC&P at the financial year end and the issuer has disclosed in its annual MD&A our conclusions about the effectiveness of DC&P at the financial year end based on that evaluation; and

(b) evaluated, or caused to be evaluated under our supervision, the effectiveness of the issuer's ICFR at the financial year end and the issuer has disclosed in its annual MD&A

(i) our conclusions about the effectiveness of ICFR at the financial year end based on that evaluation; and

(ii) not applicable.

7. ***Reporting changes in ICFR:*** The issuer has disclosed in its annual MD&A any change in the issuer's ICFR that occurred during the period beginning on October 1, 2009 and ended on December 31, 2009 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

8. ***Reporting to the issuer's auditors and board of directors or audit committee:*** The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of ICFR, to the issuer's auditors, and the board of directors or the audit committee of the board of directors any fraud that involves management or other employees who have a significant role in the issuer's ICFR.

Date: March 30, 2010.

*"Chris Theodoropoulos:*
Chris Theodoropoulos
Acting Chief Executive Officer