

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F. #2012R02196                                    *271 Cadman Plaza East*
                                                 *Brooklyn, New York 11201*

March 2, 2018

By Hand and ECF

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:    United States v. OZ Africa Management GP, LLC
                   Criminal Docket No. 16-515 (NGG)

Dear Judge Garaufis:

            The government respectfully submits this letter, in connection with the above-captioned matter and pursuant to the Court's order dated February 22, 2018, to address the claim by former shareholders of a now-defunct Canadian mining company, Africo Resources Ltd. ("Africo"), for restitution from the defendant OZ Africa Management GP, LLC ("OZ Africa" or the "defendant").  The letter submitted to the Court by the restitution claimants/former shareholders/putative-victims (the "Claimants") does not accurately set forth the government's position with respect to their status as victims or the government's decision-making process in reaching its position.

            First, as the government explained to the Claimants in January 2018, the government believes that Africo <u>could</u> qualify as a victim of the bribery conspiracy carried out by OZ Africa, but that based upon the presently known evidence, the government could not determine the degree of harm, if any, that OZ Africa proximately caused to the Claimants.  The government therefore invited the Claimants to provide evidence concerning loss causation but, to date, the Claimants have not done so.  Second, the government explained to the Claimants that it was not aware of evidence establishing that the defendant or its co-conspirators caused Africo to initially lose its interest in the mine.  Third, as a result, the government advised the Claimants that based upon the present record, it had preliminarily concluded that they were not entitled to restitution.  The government had not reached any final conclusions, however, and invited the Claimants to offer additional evidence in support of their restitution claim.

Hon. Nicholas G. Garaufis
March 2, 2018
Page 2

      The government therefore requests that the Court provide Africo and the defendant the opportunity to submit to the Court any evidence relevant to the Claimants' restitution request.  Absent the submission of any additional probative evidence, however, the government requests that the Court conduct the sentencing and enter judgment in this matter, finding that the Claimants are victims of the defendant's offense, but that they are not entitled to restitution.

I.     Factual Background

      On September 29, 2016, the defendant, a subsidiary of publicly traded hedge fund Och-Ziff Capital Management Group LLC ("Och-Ziff"), pleaded guilty pursuant to a plea agreement to a single-count criminal information charging conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371, between December 1, 2007 and February 12, 2013.  See ECF Dkt. Nos. 8 (the "Information"), 11 (the "Plea Agreement").  The charged offense arose from the defendant's participation as a co-conspirator in a scheme to obtain special access to and preferential prices for opportunities in the Democratic Republic of the Congo ("DRC") through the payment of substantial sums of Och-Ziff investors' funds to DRC officials.  ECF Dkt. No. 11-3 (the "Statement of Facts" or "SOF"), at ¶ 16.

A.     Africo's Legal Dispute Over DRC Mine

      As described in the Statement of Facts supporting the Plea Agreement, Africo was a Canadian mining company engaged in a dispute concerning its ownership interest in a DRC copper mine called the Kalukundi mine ("Kalukundi").  Id. ¶ 24.  Africo lost its interest in Kalukundi in a series of irregular DRC legal proceedings that began when a former Africo employee (the "Former Employee") sued the company for wrongful termination.  Africo apparently did not receive any notice of the lawsuit.  In or about February 2007, Africo learned that the Former Employee had secured a default judgment against Africo, ex parte and without notice, for approximately $3 million.  A DRC court, again without providing notice to Africo, had then allowed the Former Employee to seize and auction off Africo's interest with respect to Kalukundi to satisfy the default judgment.  The government is not aware of any evidence establishing that the defendant or its co-conspirators participated in the Former Employee's proceedings or orchestrated the Former Employee's actions against Africo, which resulted in its initial loss of the mine.

      The Former Employee subsequently transferred his claim to Akam Mining SPRL ("Akam"), a purported Congolese mining company controlled by two DRC-based individuals ("Akam Shareholders").  Akam purportedly paid the Former Employee $600,000 for the 75 percent interest in the Kalukundi Mine.  In April 2007, a DRC court, without notice to Africo, affirmed Akam's interest in the mine.  According to its public filings, Africo first learned of the proceedings in April 2007, only after it lost its interest in Kalukundi to Akam and after Gécamines, the Congolese state-owned mining company,

Hon. Nicholas G. Garaufis
March 2, 2018
Page 3

recognized Akam's claim as legitimate.  Africo then engaged in legal proceedings in the
DRC courts to try to nullify the seizure of its interest in the mine.  Africo met with some
limited success in the DRC courts and secured a review of Akam's claim by a court in
Kinshasa, DRC.

> **B.**   **DRC Partner and the Defendant Purchased the Interest in Kalukundi from
> Akam and Carried Out a Takeover of Africo**

After the above-described events, an individual who had significant interests
in the diamond and mining industries in the DRC (the "DRC Partner") and Och-Ziff (through
the defendant) formulated a plan to acquire Akam and its disputed interest in Kalukundi.
The plan, which would include the payment of bribes to secure the results, was carried out
primarily by a special purpose vehicle controlled by DRC Partner known as "Camrose."  In
late 2007, both DRC Partner and senior Och-Ziff employees in London agreed that they
would acquire Akam, and then offer to sell Akam to Africo for Africo stock.  They further
agreed that DRC Partner would secure the right for Camrose to purchase additional shares of
Africo, allowing DRC Partner (through Camrose) to obtain control over Kalukundi.  DRC
Partner's plan largely depended on Africo being unable to obtain a favorable ruling from a
DRC court that would nullify Akam's disputed ownership interest in the mine.

In or about February and March 2008, Africo's executive officers were in
negotiations with Camrose over the terms of a potential takeover.  On or about February 4,
2008, Camrose sent a letter to Africo that proposed terms for a Camrose takeover of Africo
and a combination of an adjacent asset with Kalukundi.  At the same time, Africo continued
to press its court case in the DRC against Akam's claimed interest in Kalukundi.  On or
about April 21, 2008, Africo announced that it had reached an agreement with Camrose for a
private placement of CAD $100 million that would result in Camrose owning approximately
60% of the outstanding share capital of Africo and majority representation on the board of
directors of Africo.  This agreement was subject to Africo shareholder approval.  Och-Ziff
(through the defendant) provided an up-front cash payment to DRC Partner to (1) purchase
Akam, (2) resolve the litigation between Akam and Africo, and (3) acquire shares in Africo
that would, in turn, allow Camrose to take control of the company.  See id. ¶¶ 27, 28.  The
money was pre-paid by the defendant to DRC Partner with the understanding that DRC
Partner would use the funds to pay bribes to government officials.  See id. ¶¶ 20, 40.

> **C.**   **Bribes Paid to Judges and the Takeover of Africo**

After the transfer of Akam was complete, the "DRC Partner caused bribes to
be paid to DRC officials, including judges, to ensure that Africo did not obtain a favorable
court ruling in its case against Akam that could have affected the outcome of the Africo
shareholder vote."  Id. at ¶ 31.  The evidence of the payments to the judges comes from,
among other things, text messages between the DRC Partner and his in-country manager.  In

Hon. Nicholas G. Garaufis
March 2, 2018
Page 4

addition to paying the judges, these text messages describe DRC Partner's intent to harm
Africo, the goal of delaying any opinion until after the then-upcoming shareholder meeting
of Africo on June 12, 2008, and paying the owner of Akam with the understanding that he
would pay a senior DRC government official.  Relevant text messages (in chronological
order) include:

1. **(In-Country Manager to DRC Partner):** Hi [DRC Partner], im
with the main lawyer . . . in the africo story, he has to arrange
with supreme court, attorney genral [sic] and magistrates, he
wants 500 to give to all the officials and 600 for 3 lawyers
cabinets  that worked on the file in defense [lawyers] and
batonnier [lawyer]. the converstaion is vey tough.  (while talking
i said to ask money to [one of the Akam Shareholders], [the Akam
shareholder] said he cant because most of the money has to go to
[DRC Official 2] ..i dont know if he wants to provoke me or it
was something [the Akam shareholder] invented...) but they are
now at 1,1 in total...[Manager]  (SOF ¶ 32).

2. **(Manager to DRC Partner):** 900 with guarantee that we win the
case.......

3. **(DRC Partner to Manager):** Do 750 with. Guarentte...its much
too much!

4. **(DRC Partner to Manager):** R u sire that we r going to win?

5. **(Manager to DRC Partner):** they know all very well the deal
and the ega of 12 june, the investment of 100 mio, 60 % shares
for you and that this toni does not want this to happen

6. **(Manager to DRC Partner):** he said [Manager], i know its a lot
of money, i know also why i ask this amount, i have an obligation
to win, theres a lot at stake for different people and with this all
will be sealed and its guarantee, if we go down then i cant
guarantee 100%

7. **(Manager to DRC Partner)**: with 800 they guarantee the results
and they want me to promise that i will add 100 after

8. **(DRC Partner to Manager):** We can't accept a mid result. . .
Africo must be screwd and finished totally!!!!

Hon. Nicholas G. Garaufis
March 2, 2018
Page 5

See id. ¶¶ 32–34.  The messages contain references to Africo (Messages #1, 5, 6, 8) and Tony Harwood (Message #5), the head of Africo at the time, and Mr. Harwood's apparent view that he did not want the deal proposed by Camrose to go through.

On June 12, 2008, Africo announced that its shareholders had voted to approve the CAD $100 million private placement by Camrose.  Id. ¶ 35.  On June 24, 2008, Och-Ziff funded the payment to complete the Africo takeover.  Id. ¶ 38.  One month later, Africo publicly announced that the deal was completed and that Camrose had obtained a controlling interest in Africo.  Apparently as a result of the bribes paid to delay a court opinion, the agreement by Africo was reached before any opinion from the DRC courts was issued.

II.     Procedural History

A.      The Criminal Information and Scope of the Conviction

In January 2013, a grand jury in this district commenced a criminal investigation of Och-Ziff and its employees and agents.  On September 29, 2016, the government entered into two separate agreements with Och-Ziff entities.  First, the Och-Ziff parent company entered into a three-year deferred prosecution agreement (the "DPA").  See United States v. Och-Ziff Capital Management Group LLC, 16-CR-516 (NGG).  Second, the defendant, a wholly owned Och-Ziff subsidiary company, pleaded guilty to conspiracy to violate the FCPA pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).

As part of the Plea Agreement between the defendant OZ Africa and the government, the defendant waived indictment and agreed to the filing of the Information.  As detailed above, the bribery conspiracy charged in the Information concerned Och-Ziff's agreement to partner with DRC Partner "for access to [] attractive investment opportunities" that DRC Partner could provide through bribery and that "Och-Ziff would finance."  Information ¶ 16.

The Information provides that Och-Ziff's (and thus the defendant's) participation in the conspiracy began in December 2007.  Id. ¶ 16 ("Beginning in December 2007, Och-Ziff, through Och-Ziff Employee 3 and Och-Ziff Employee 5, had discussions with DRC Partner . . ."); see also id. ¶ 17.  The Claimants rely heavily on the earlier conduct of DRC Partner in paying bribes to DRC officials ("[i]n or about and between 2005 . . . DRC Partner . . . paid . . . bribes. . ."), which predates the defendant's involvement in the conspiracy and crime of conviction, and the Information does not allege DRC Partner's involvement in the initial taking of the mine from Africo.  It was also during that earlier period, as outlined above, when Africo initially lost its interest in Kalukundi to the Former Employee.  When the defendant began its criminal conduct in December 2007, "Och-Ziff Employee 3 and Och-Ziff Employee 5 began discussions with DRC Partner and others about forming a joint venture for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large mining company [and] DRC Partner communicated to Och-Ziff

Hon. Nicholas G. Garaufis
March 2, 2018
Page 6

Employee 3 and Och-Ziff Employee 5 that DRC Partner would have to pay substantial sums of money to DRC officials, including DRC Official 1, and 'local partners' to secure access to the attractive investment opportunities in the DRC mining sector." Id. The charged conspiracy and crime of conviction lasted through approximately 2013, when Och-Ziff received payments from DRC Partner as part of unwinding its investments with him.

     B.     <u>Plea Agreement and Plea Hearing</u>

        In 2016, the government and Och-Ziff began discussions about resolving the government's investigation of the company.  Eventually, Och-Ziff agreed to enter into the DPA with its parent company and for a subsidiary to plead guilty.  Since at least 2014, there had been numerous public reports of the government's investigation[1] and at least one lawsuit[2] against Och-Ziff that specifically identified the Africo and Kalukundi issue.

        The plea agreement addresses that the defendant would pay restitution if so ordered by the Court; specifically, in paragraph 12, the plea agreement states: "[t]he Defendant agrees that any fine or restitution imposed by the Court will be due and payable within ten (10) business days of sentencing, and the Defendant will not attempt to avoid or delay payment."  The plea agreement also states that the defendant and the government agreed to waive the preparation of the Pre-Sentence Investigation Report ("PSR") but that "[t]he Defendant understands that the decision whether to proceed with the sentencing proceeding without a Pre-Sentence Investigation Report is exclusively that of the Court." Plea Agreement ¶ 22.

        The Plea Agreement further provides that the parties will not recommend a fine to the Court, on account of the separate penalty that the Och-Ziff parent company paid as part of the DPA, which exceeded the maximum fine that could be imposed against the defendant ($182,362,364).  Because the conduct by OZ Africa overlapped that which was admitted to by Och-Ziff in the DPA, the government and Och-Ziff agreed that, to avoid a duplicative penalty, any fine imposed by the Court against the defendant could be satisfied by transferring that amount of the penalty to satisfy the fine.  See DPA ¶ 7 ("The parties

---

[1] See, e.g., Carreyou, John "Och-Ziff Loans Financed Controversial Congo Deals," The Wall Street Journal, Apr. 28, 2014; see also Conway, Brendan, "Och-Ziff Capital: Another Bad Week, This Time Over Congo Deals," Barron's, Apr. 29, 2014.

[2] See Menaldi v. Och-Ziff Capital Mgmt. Group LLC, 14 Civ. 3251 (JPO) (S.D.N.Y. Nov. 24, 2014), ECF Dkt. No. 17: Amended Complaint, at ¶¶ 62 –63 ("Och-Ziff reportedly knew how [the DRC Partner] planned to use the loan . . . .  At that time, the ownership of Kalukundi was in dispute. A Congolese court had confiscated majority rights to the mine from Africo Resources Ltd., a publicly traded Canadian company, and awarded them to a Congolese company.").

Hon. Nicholas G. Garaufis
March 2, 2018
Page 7

agree that any criminal fine that might be imposed by the Court against OZ Africa
Management GP, LLC, in connection with its guilty plea and plea agreement, will be paid
from the $213,055,689 monetary penalty held in the escrow account and that any remaining
balance will be transferred from the escrow account within ten (10) days of entry of the
judgment to the United States Treasury."). Although the DPA stated that the penalty
payment would be held in an "escrow account," the parties encountered logistical issues
when attempting to set up an escrow account after the DPA was signed. The government
and Och-Ziff subsequently agreed that the DPA penalty would be paid into a "suspense
account" maintained by the government pending the sentencing of OZ Africa. Any fine
imposed by the Court will still be satisfied through the transfer of funds from the penalty
amount being held in the suspense account.

At the September 29, 2016 plea hearing, the Court accepted the defendant's
guilty plea. The transcript of the hearing reflects that neither party raised the issue of
restitution to the Court's attention. The Court waived preparation of the PSR and sentencing
is currently scheduled for March 7, 2018.

C. Africo Shareholders' Restitution Claim

Since March 2017, the government has met or spoken with counsel for the
Claimants and Och-Ziff numerous times about the restitution claim and received multiple
submissions from both sides addressing the merits.[3] The government also provided
information to the parties, including all of the purportedly secret information that Claimants'
counsel contends the government now wishes to conceal in order to "avoid scrutiny." In
November 2017, the Claimants for the first time provided a damages assessment to the
government. The expert report, written by the same company that Och-Ziff had engaged

_____

[3] In December 2016, the government contacted a former Africo executive to
inquire if he wanted to speak with the FBI about the government's ongoing investigation.
The agent's email to that individual, which the Claimants have appended (in unredacted
format) to their filing, includes the statement that the individual and Africo "may have been a
victim regarding some of those corrupt payments." (Emphasis added). Approximately three
months after the FBI agent sent that email, Claimants' counsel wrote a letter to the
government notifying it that unidentified "former shareholders and other security holders of
Africo" were "crime victims." Counsel's letter indicated that his clients sustained a loss
because the defendant "working with their [sic] co-conspirators . . . perverted the Congolese
legal system and 'purchased' a favorable judgment, stealing valuable copper and cobalt mine
from Africo and illegally and dramatically deflating the value the security holders' interests."
That statement is inaccurate, and Claimants have now abandoned that theory in their
restitution submission.

Hon. Nicholas G. Garaufis
March 2, 2018
Page 8

years prior to conduct an assessment of Kalukundi, provided an estimate for the same property that was many multiples of the company's earlier assessment.

In January 2018, the government informed counsel for the Claimants and Och-Ziff of its preliminary view that, based on the currently available evidence, Africo (the defunct entity) likely qualified as a victim of the defendant's offense of conviction. The government identified, in particular, that the bribery of DRC judges and the delayed court ruling (during which time DRC Partner was able to secure a final agreement with Africo) were a likely source of harm to Africo. The government also informed the Claimants that the evidence showed Africo was an intended victim of the conduct involving bribery to DRC judges. The government further noted, however, that it lacked sufficient evidence to establish the degree of harm to Africo, if any, that resulted from the defendant's involvement or the payment of bribes to the judges. The government noted, in particular, that much of the harm that Africo sustained in the DRC appeared to be in connection with actions by the Former Employee, who was not a co-conspirator of Och-Ziff or the defendant. The government pointed out that the irregular proceedings in the DRC courts occurred before Och-Ziff even met with DRC Partner about joining the conspiracy and almost one year before the Africa joint venture through which Och-Ziff invested was formally set up by Och-Ziff. Moreover, the government informed Claimants that it was unaware of any evidence establishing a causal connection between the initial taking of the mine from Africo by the Former Employee and the actions of the defendant or its co-conspirators.

The government invited Claimants' counsel to make further submissions to address these issues. However, counsel for the Claimants did not take the government up on that offer and instead chose to file its letter on February 16, 2018. The Court ordered the parties to reply by March 2, 2018.

III.     Restitution is Not Appropriate

         A.     Legal Standard

                i.     The Relevant Statutory Framework Applicable to Restitution

         "Federal courts have no inherent power to order restitution." United States v. Gushlak, 728 F.3d 184, 190 (2d Cir. 2013) (internal quotation omitted). "A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by statute." Id. Relevant statutory frameworks governing criminal restitution include the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA") and the discretionary Victims and Witness Protection Act, 18 U.S.C. § 3663 ("VWPA").

Hon. Nicholas G. Garaufis
March 2, 2018
Page 9

        A court's "statutory authority to award restitution under the MVRA is limited
to awards to victims of the offense of conviction." United States v. Archer, 671 F.3d 149,
170 (2d Cir. 2011). The MVRA applies to specified categories of offenses of conviction, for
which restitution must be ordered, including, as is relevant here: "an offense against property
under [Title 18] . . . , including any offense committed by fraud or deceit; . . . and in which
an identifiable victim or victims has suffered . . . pecuniary harm." 18 U.S.C.
§ 3663A(c)(1)(A)-(B). "Because the purpose of the statute is primarily to restore the victim
to his or her prior state of well-being, and to that end to require federal criminal defendants to
pay full restitution to the identifiable victims of their crimes, restitution is required without
regard to the defendant's economic circumstances." United States v. Finazzo, 2014 WL
3818628, at *9 (E.D.N.Y. Aug. 1, 2014), vacated on other grounds, 850 F.3d 94 (2d Cir.
2017) (citing sources). A "victim" for the purposes of the MVRA is "a person directly and
proximately harmed as a result of the commission of [such an offense] . . . including, in the
case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal
activity, any person directly harmed by the defendant's criminal conduct in the course of the
scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

        The MVRA generally applies to any Title 18 offense against property.
Nevertheless, the MVRA does not apply to such offenses, "if the court finds, from facts on
the record, that–(A) the number of identifiable victims is so large as to make restitution
impracticable; or (B) determining complex issues of fact related to the cause or amount of
the victim's losses would complicate or prolong the sentencing process to a degree that the
need to provide restitution to any victim is outweighed by the burden on the sentencing
process." 18 U.S.C. § 3663A(c)(3). Thus, "[a]pplication of the MVRA is 'accordingly
limited to the actual, provable loss suffered by the victim and caused by the offense
conduct.'" United States v. Adorno, 950 F. Supp. 2d 426, 428 (E.D.N.Y. 2013) (quoting
United States v. Fair, 699 F.3d 508, 512 (D.C. Cir. 2012) (emphasis omitted)).

        By way of comparison, the VWPA provides, with respect to all Title 18
offenses of conviction, among others, that a sentencing court "may order . . . that the
defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1)(A)
(emphasis added). Pursuant to the VWPA, the sentencing court must consider certain
enumerated factors including the "financial resources of the defendant" and "other factors as
the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B). "While the district court must
review these statutory factors, detailed factual findings for each factor are not required."
United States v. Batista, 575 F.3d 226, 230 (2d Cir. 2009). Aside from these differences, the
provisions of the MVRA and the VWPA are nearly identical. See id. The MVRA
definitions of victimhood and causation – threshold issues that are determinative of
entitlement or ability to obtain criminal restitution – are shared in sum and substance with the
VWPA's definitions. Compare 18 U.S.C. § 3663A(a)(2) with 18 U.S.C. § 3663(a)(2).

Hon. Nicholas G. Garaufis
March 2, 2018
Page 10

     ii.    <u>Restitution Requires Direct and Proximate Causation</u>

     Both the MVRA and VWPA require that a victim be "directly and proximately harmed" by the criminal conduct.  <u>See</u> 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2). "Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct." <u>United States v. Marino</u>, 654 F.3d 310, 319 (2d Cir. 2011). Restitution does not compensate for "[l]osses that are hypothetical or speculative," <u>see also</u> <u>United States v. Maynard</u>, 743 F.3d 374, 378 (2d Cir. 2014), or losses that are not "clearly causally linked to the offense." <u>United States v. Messina</u>, 806 F.3d 55, 69 (2d Cir. 2015). As a result, a restitution order must be tied to the victim's actual, provable loss.  <u>United States v. Finazzo</u>, 850 F.3d 94, 117 (2d Cir. 2017) (citation omitted).  The requirement of direct causation maintains efficiency in the sentencing process because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation." <u>United States v. Reifler</u>, 446 F.3d 65, 135 (2d Cir. 2006) (quoting <u>Holmes v. Sec. Investor Prot. Corp.</u>, 503 U.S. 258, 269 (1992)).

     As noted above, even the MVRA provides that restitution may not be imposed if complicated factual analysis regarding causation would excessively "complicate or prolong the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  This reflects Congress's stated desire that "sentencing courts not become embroiled in intricate issues of proof," and that the "process of determining an appropriate order of restitution be streamlined." <u>Reifler</u>, 446 F.3d at 136 (citations and internal quotation marks omitted).

    B.    <u>Application</u>

     The government acknowledges that the issue of restitution in this case is highly complex and involves a difficult application of years of complicated facts to myriad legal concepts.  As discussed below, the government embraces its obligations to the victims of crimes as set forth in the applicable law.  For months, the government has worked in good faith with counsel for both the Claimants and Och-Ziff to determine what it believes is the appropriate legal conclusion based upon the record evidence in this case.  Indeed, the government has repeatedly asked that the Claimants provide additional information related to the causal connection between Och-Ziff's and the Former Employee's conduct but has received no further information on this point.  Even now, the government believes that the parties should have the opportunity to offer additional evidence and make their case to the Court.

     Based upon the present record, however, after careful analysis, which is set forth below, the government has determined that while Africo was an intended victim of Och-Ziff's fraudulent conduct, and likely suffered some loss, as a result of legal and factual complications of identifying the proximate cause for Africo's loss, the government does not believe that the evidence currently meets the preponderance standards required by both the MVRA and VWPA.  Claimants not only dispute the government's conclusion, but they have

Hon. Nicholas G. Garaufis
March 2, 2018
Page 11

unfortunately ascribed inflammatory conduct and a series of false motivations underlying the government's conclusion and analysis.  This is simply not the case.  The government's conclusions are based on the prevailing law and the available facts.

        i.      <u>The Government Takes Seriously Its Obligations to Victims</u>

          As an initial matter, the government recognizes the fundamental importance of victims' rights and its obligations in ensuring that victims of crime are treated appropriately within the confines of the applicable law.  To that end, the government has been open regarding the Claimants' potential status as victims and receptive to positions advanced by the Claimants through counsel.  Indeed, the government notified the Claimants that they were potential victims of Och-Ziff's conduct and then met and communicated with Claimants' counsel regarding their restitution claims on multiple occasions.  Moreover, even after notifying Claimants that the government does not believe they are entitled to restitution, the government asked counsel to provide additional information that could change the government's position.  The government also offered counsel the opportunity to speak with senior members of the government in an attempt to appeal the government's preliminary conclusion.  Counsel did not take the government up on either offer, and instead filed its letter.

          In their letter, Claimants make a number of inaccurate and accusatory claims regarding the government's motivations for reaching its position, including, that the government is "fearful" that the plea agreement with Och-Ziff and the monetary penalty that accompanied the resolution would be "jeopardized" if restitution is awarded to the Claimants.[4]  <u>See</u> Claimants Letter at 1.  This allegation is wholly without factual support and is, in fact, contradicted by the factual record in this case.  Indeed, if there were any problem with the defendant's guilty plea and the defendant were permitted to withdraw that plea, the government would either renegotiate a new plea agreement or prosecute the case.  Moreover, the notion that the government reached its position to keep Och-Ziff's penalty to itself, Claimants Letter at 8, is also meritless.  The penalty paid by Och-Ziff is pursuant to a private agreement, the DPA.  Och-Ziff cannot withdraw from that agreement even if the defendant

---

    [4] At no point during the discussions between the government and Och-Ziff did the latter threaten to withdraw from the plea agreement or the DPA.

Hon. Nicholas G. Garaufis
March 2, 2018
Page 12

were required to pay restitution in the criminal case.[5]  Accordingly, Claimants' accusations are mistaken and without merit.[6]

ii.     The Government' Position on the Claimants' Status Has Been Consistent

Claimants have also asserted that the government has "reversed course" and taken inconsistent positions with regard to their status as victims and their entitlement to restitution.  Claimants have misstated the government's position.  The government has been entirely consistent in its communications with Claimants, first identifying them as potential victims and then, after careful analysis, as likely victims of Och-Ziff's crimes.[7]

As Claimants recognize, the government has consistently communicated to the Claimants that they may be victims of Och-Ziff's conduct since the issue was first raised by the government in 2016.  The very communications the Claimants cite make plain that the government viewed them as potential victims of Och-Ziff's conduct.  See Claimant Exhibits 3 and 5.  But the Claimants disregard that although the earlier communications at that time

---

[5] Claimants belief that they are entitled to the $213 million penalty paid by Och-Ziff is incorrect.  See Claimants Letter at 7-8, n. 14 (citing 18 U.S.C. § 3162(c)).  The penalty was part of a private agreement between Och-Ziff and the government, in a separate case, and does not constitute a criminal penalty pursuant to 18 U.S.C. § 3162.

[6] Also meritless are Claimants' allegations that the government reached its conclusion because it somehow failed to abide by a representation it made to the Court regarding holding Och-Ziff's $213 million penalty in escrow and now seeks to hide that from the Court.  See Claimants Ltr. at 8.  First and foremost, the initial language regarding the government holding Och-Ziff's criminal penalty in escrow to put toward a criminal fine was not made in a representation to the Court.  It was part of the DPA, a private agreement, between the government and Och-Ziff.  Moreover, as mentioned above, subsequent to signing the DPA, the parties learned that creating an escrow account at the U.S. government was not possible, so the parties subsequently agreed to hold the penalty in a suspense account with the specific understanding that the proceeds could still be used to pay a criminal fine.  There was absolutely no misrepresentation to the Court and the money is still available, per the parties' agreement, to be put toward a fine, should one be ordered.

[7] For purposes of this letter, the government assumes that Africo's (a defunct entity) former shareholders can qualify as victims due to Africo's status as a victim.  Should this issue become germane, the government respectfully requests it be allowed to brief this issue to the Court.

Hon. Nicholas G. Garaufis
March 2, 2018
Page 13

state that the Claimants <u>may</u> be victims, those letters do not stand for the conclusion that the Claimants are <u>definitely</u> victims entitled to restitution under the applicable law.  Providing notice and a conclusion are different obligations, which Claimants' letter fails to acknowledge.

Following its initial communications with the Claimants, the government has consistently taken the position that the Claimants are intended victims of the conspiracy involving the defendant and DRC Partner.  The government has further indicated that the delay in the court ruling indicates that Africo suffered some harm.  Such a conclusion was communicated to the Claimants in January 2018 by the government.  Any accusations to the contrary are simply untrue.  Instead, the government communicated that although the Claimants are victims of Och-Ziff, they are not entitled to restitution under the applicable legal standards on account of the myriad other harms and factors that necessarily enter the calculation of damages.  Although Claimants state that the government told them they are not victims of the crime, that statement is simply inaccurate.

      iii.    Claimants are Not Entitled to Restitution on the Current Evidentiary Record

Apart from their misinterpretation of the government's position on their status as victims, the Claimants dispute the government's preliminary conclusion that they are not entitled to restitution.  As the government communicated to the Claimants and as set forth below for the Court, the government's analysis, based on the present record, was that the Claimants had not demonstrated direct or proximate causation for quantifiable harm from the defendant's conduct.

Using facts gathered through its investigation, as well as publicly available facts, the government analyzed the relevant events in Africo's involvement with Kalukundi.  The company's troubles concerning its stake in the mine appear to date back to at least 2006, if not earlier.  The charged conspiracy, as pled to by OZ Africa, however does not include pre-December 2007 conduct.  This is important because much of the harm suffered by Africo was occasioned before Och-Ziff began its conspiracy with DRC Partner.  This earlier conduct would include the initial taking of the mine by the Former Employee, the earlier unfavorable court decisions, and the entry of Akam's involvement into the dispute.  There is nothing in the record to indicate that the defendant played any role in those acts.  Africo filed a series of legal challenges, including to set aside the judgments of the Former Employee and claiming judicial misconduct against the DRC judges.  These facts were offered by Africo in public filings at the time, and again predate the defendant's involvement.  These facts were included in the criminal information to provide background for why the mine was in legal dispute when DRC Partner obtained it.

Hon. Nicholas G. Garaufis
March 2, 2018
Page 14

Nevertheless, this earlier conduct appears to be the major basis for the losses that Claimants sustained and for which they now seek recompense.  The record on which the government is operating, however, does not support imputing to the defendant all of the earlier conduct that predated Och-Ziff's decision to invest in the DRC mining sector.  There is no record of any involvement by the Former Employee after early 2007.  The purchase alone by Och-Ziff and DRC Partner of a disputed mining interest does not, in the government's view, equate to any agreement "to strip the mine" from the outset, which is where Africo sustained the bulk of its harm.  The Claimants have not proffered any evidence demonstrating that the defendant should be accountable for this earlier conduct.

Notably, Claimant's submission glosses over the nuances of the Africo dispute over Kalukundi and simply assumes that DRC Partner was involved in the initial seizure of Kalukundi by the Former Employee and that Och-Ziff somehow supported or ratified this purported conduct when agreeing to pay bribes through DRC Partner.  The Statement of Facts makes plain, however, that Och-Ziff would be partnering with the DRC Partner and paying bribes to DRC officials in the future.  Nothing in the Statement of Facts alleges that DRC Partner had any knowledge of or involvement in the Former Employee taking the mine.  Nor does the Statement of Facts or available evidence suggest that Och-Ziff had knowledge that DRC Partner had such a role in orchestrating the seizure by the Former Employee when he and Och-Ziff joined a conspiracy to cheaply acquire and consolidate Kalukundi.

Consistent with the Statement of Facts, the government has told the Claimants that Och-Ziff was part of a conspiracy to pay bribes to secure an already disputed interest in the DRC.  In 2008, Africo could be an intended victim of bribes paid to DRC officials by DRC Partner and others (financed by Och-Ziff) in connection with the transfer of Akam's interest in the mine to Camrose.  Alternatively, Africo could be an intended victim of a scheme to influence the rulings of the appellate court that was hearing Africo's challenge to the Former Employee's initial judgment.  To date, however, the government has not found the evidence to trace the harm sustained by Africo directly to the involvement of Och-Ziff. The government has not identified how the payment of bribes to obtain the Akam interest directly harmed Africo; rather, Africo seems to have been in the same position as it was when Akam held the claim.  With respect to the court proceedings, there is evidence of the co-conspirators taking steps intended to affect the outcome of that ruling, and to influence the timing of the announcement of the opinion, which either forestalled an unfavorable ruling or provided DRC Partner leverage to have Africo's shareholders accept the Och-Ziff/ DRC Partner terms at a specially convened shareholder meeting in June 2008.  Given the comparatively more significant and damaging conduct by the Former Employee, the initial court decisions, and sale of the claim to Akam, attributing all of the harm Africo suffered to a short period of time in June 2008, perhaps to delay or to influence a court ruling (that may

Hon. Nicholas G. Garaufis
March 2, 2018
Page 15

never have been issued), is too speculative.  Furthermore, the court decision was never issued because of the shareholder vote and, as a result, it is impossible to determine whether there was actual influence on the vote itself.  Thus, even though the evidence is clear that Och-Ziff and DRC Partner intended to bribe the DRC courts to rule against Africo, any harm suffered by the Claimants did not flow directly from an adverse decision by the DRC courts.

In sum, the Claimants take issue with the government's factual and legal conclusions, but despite the government's invitation to do so, they have not provided any facts that would allow the government to bridge the gap in direct or proximate causation. While the Claimants are dismissive of the government's position that the conclusions were "preliminary," the preliminary nature of the conclusions was to give the Claimants ample opportunity to provide facts and evidence that could change the analysis.  They have not done so, instead using the same facts and legal analysis of the prior discussions and adding unsupportable allegations of misconduct by the government.

### iv.   Any Damages are Too Speculative to Merit a Restitution Award

The Claimants are seeking restitution based on hypothetical after-tax revenues of the mine's development from 2010 to 2017, assuming that this development had actually occurred after the financial crisis.  This too depends on many variables and unknowns that go far beyond the facts on which the parties are operating from the plea agreement.  Those variables are numerous and cataloguing them would require a detailed assessment of each of them, going back to 2006 and continuing to the present.  The expert report makes no attempt to fairly apportion losses to the many actors involved.  Given that Och-Ziff played no part in the initial taking of Kalukundi by the Former Employee, apportioning the total harm to the defendant is unwarranted.  The expert report recognizes that the valuation of Kalukundi could vary greatly based on numerous factors all beyond the control of the defendant.  The higher valuation appears to be rooted in assumptions that differ markedly from similar assumptions made nearly ten years earlier by the same valuation company.  Notably, Kalukundi appears not to have been developed since the time of the Former Employee's involvement.  It is also speculative whether Africo could have obtained the mining permits it would have needed to realize any value.  Additionally, the role that third-party financing would play and whether that would have led to an impairment in interest similar to the terms offered by Camrose is also not fully addressed, assuming it is even knowable.

Hon. Nicholas G. Garaufis
March 2, 2018
Page 16

IV.   <u>Conclusion</u>

       While the government is certainly sympathetic to the Claimants' position and has carefully analyzed the Claimants' position and given them extensive process, it is unable to conclude based upon the present record that they are entitled to restitution from the defendant.  To the extent the Claimants or the defendant would like an opportunity to provide additional evidence to the government and the Court concerning the Claimants' restitution claims, the government supports granting the parties that opportunity.

                           Respectfully submitted,

                           RICHARD P. DONOGHUE
                           United States Attorney

By:      /s/ David C. Pitluck
                           David C. Pitluck
                           Jonathan P. Lax
                           James P. McDonald
                           Assistant U.S. Attorneys
                           (718) 254-7000

                           SANDRA L. MOSER
                           Acting Chief
                           Criminal Division, Fraud Section

By:      /s/ Gerald M. Moody, Jr.
                           Gerald M. Moody, Jr.
                           Trial Attorney
                           (202) 616-4988

cc:    Clerk of the Court (NGG) (by ECF)
       All Counsel of Record (by ECF)