```
                                                                 1

              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
 - - - - - - - - - - - - - - - X
  UNITED STATES OF AMERICA,     :   16-CR-515(NGG)
                                :
                                :
                                :   United States Courthouse
        -against-               :   Brooklyn, New York
                                :
                                :
                                :   April 5, 2018
                                :   12:15 p.m.
  OZ AFRICA MANAGEMENT GP,      :
  LLC,                          :
                                :
           Defendant.
 - - - - - - - - - - - - - - - X

     TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
         BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
             UNITED STATES SENIOR DISTRICT JUDGE

                   A P P E A R A N C E S:

For the Government:      RICHARD P. DONOGHUE, ESQ.
                            Acting United States Attorney
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

                     BY: DAVID C. PITLUCK, ESQ.
                         JAMES McDONALD, ESQ.
                         JONATHAN LAX, ESQ.
                         Assistant United States Attorneys


                         UNITED STATES DEPARTMENT OF JUSTICE
                            1400 New York Avenue
                            Washington, D.C. 20005

                     BY: GERALD MOODY, ESQ.


For the Defendant:       CAHILL GORDON & REINDEL LLP
                            80 Pine Street
                            New York, New York 10005

                     BY: ANIRUDH BANSAL, ESQ.
                         CHARLIE GILMAN, ESQ.
```

APPEARANCES: (Continued)

For Defendant:        GIBSON, DUNN & CRUTCHER, LLP
                      200 Park Avenue, 47th Floor
                      New York, New York 10166

                 BY:  JOEL M. COHEN, ESQ.

For Victims:          WILSON SONSINI GOODRICH & ROSATI
                      1301 Avenue of the Americas
                      40th Floor
                      New York, New York 10166

                 BY:  MORRIS J. FODEMAN, ESQ.
                      MICHAEL S. SOMMER, ESQ.

Court Reporter:       Denise Parisi, RPR
                      Official Court Reporter
                      United States Courthouse
                      225 Cadman Plaza East
                      Brooklyn, New York 11201
                      Telephone: (718) 613-2605
                      E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

*   *   *   *   *

THE COURTROOM DEPUTY: Criminal cause for a status conference.

THE COURT: Please be seated in the back and let me have appearances, please.

MR. PITLUCK: Yes, good afternoon. From the United States, from the Eastern District of New York, David Pitluck, Jim McDonald, and Jonathan Lax. And our colleague from the fraud section, Gerald Moody, is at the end of the table.

Proceedings 3

1       THE COURT:  Welcome.
2       Yes.
3       MR. BANSAL:  Anirudh Bansal for the defendant,
4  Och-Ziff Africa.  Charlie Gilman is with me at counsel table,
5  as is Joel Cohen for the defendant.
6       THE COURT:  Welcome.
7       MR. FODEMAN:  Good afternoon, Judge.  Moe Fodeman
8  and Michael Sommer from Wilson Sonsini on behalf of various
9  former owners of Africa, the victims in this case.
10      Thank you.
11      THE COURT:  Please be seated, everybody.
12      Well, let's start off with -- procedurally speaking,
13 I need to resolve the issue of the submission that was made by
14 Mr. Fodeman before we move on to the question of sentencing.
15      So let me hear from Mr. Fodeman, and then I will
16 hear from the parties.
17      MR. FODEMAN:  Thank you, Judge.
18      Do you prefer I stand?
19      THE COURT:  You can sit.
20      MR. FODEMAN:  Judge, as you know from the
21 submissions that you have received from the parties, including
22 ourselves, we represent a number of former owners of the
23 company known as Africa.  It's our view, as you obviously
24 know, that our clients were victimized by the acts of the
25 defendant, which they have now pled guilty and are to be held

1  account.
2         THE COURT:  I think it is an 11(c)(1)(C) plea; isn't
3  that right?
4         MR. FODEMAN:  That's correct, Judge.  And certainly
5  Mr. Pitluck can address the plea that they negotiated with the
6  defendant.  But you're correct, there has been a negotiated
7  plea between the Government and the defendant -- excuse me,
8  the defendant, and they worked out a deal and it is awaiting
9  your approval at sentencing.
10        As you know, we became aware of that deal when it
11 was announced and have tried in the intervening year and a
12 half to try to vindicate our client's rights, and since then
13 there's been a number of arguments advance, principally by the
14 defendant, but also by the Government, about why perhaps we
15 are not entitled to -- or Your Honor is not permitted or
16 shouldn't make our defendants whole through an order of
17 restitution, and there's been a lot of what I would call
18 mental gymnastics by both parties to try to find a way past
19 the agreement that they have which does not allow for
20 restitution and -- and try to essentially prevent us from
21 vindicating our client's rights.
22        And I would just remind the Court that there's a
23 stipulated set of facts in this case, and in that stipulated
24 statement of facts, this defendant, a multi-billion-dollar
25 hedge fund, admitted they joined forces with their

Proceedings                                                              5

1  coconspirators to bribe judges in the Democratic Republic of
2  the Congo so that they could get assets that they otherwise
3  couldn't get -- I'm paraphrasing.  But one thing I'm not going
4  to paraphrase, Judge, is the fact that in those statement of
5  facts, the object of that scheme -- the object, the stated
6  objective was to screw -- and I'm quoting:  Screw Africa.
7  They must be totally finished.
8          That's -- those are my clients, Judge.  That's what
9  this defendant and his band of criminal -- its band of
10 criminals set out to do, and they did it, respectfully.  And
11 now it is time at this sentencing, we would ask Your Honor to
12 make them make us whole, and that's why we're here, and that's
13 why we've made the submissions.
14         So I'm happy to take up any of the specific
15 arguments that have been raised by the parties, but from our
16 perspective what should happen now is that the Court should
17 appoint or ask the Probation Department to become involved,
18 because that had previously been waived; the $213 million that
19 should be available under the law to victims should be set
20 aside now since it's not where it was said to have gone, and
21 we, Your Honor, we would ask -- conclude that we are entitled.
22 In fact, the Mandatory Victim Restitution Act requires an
23 order of restitution at the time of sentencing.
24         MR. PITLUCK:  Yes, Your Honor.  I will be brief.
25         You have the Government's submission, and, you know,

Proceedings                                                                 6

1  we are in -- we are in a tough spot, the Government, and tough
2  in the sense that we, as the Court knows, our office and the
3  Government takes very seriously our obligations to victims of
4  crimes and to award restitution or support restitution where
5  appropriate, and we haven't engaged in mental gymnastics to
6  try to avoid that.  We've engaged in mental gymnastics to try
7  to get it right.  We have had a lengthy, multi-year
8  investigation against the defendant that has resulted in the
9  agreement that was presented to the Court as well as a
10 deferred prosecution agreement, and we -- you know, we're --
11 it was not -- the restitution was not included in the plea
12 agreement, but, Your Honor, we made it clear in our letter
13 that if restitution is appropriate in this case, and we don't
14 believe it is, all it will require us to do is -- is go back
15 and either renegotiate a plea or to prosecute the case.
16          So this is nothing about motives or sticking to a
17 deal.  This is about what we think is right vis-à-vis
18 restitution, and we laid out that -- the facts in our argument
19 and we carefully considered it.  The Government usually isn't
20 in the middle of things like this, but we carefully considered
21 it through multiple submissions encompassing the highest
22 levels of our office and tried to reach the conclusion that we
23 think is appropriate under the law and the facts.  That's it.
24 And we are here supportive of a purported victims' rights to
25 present their case, we have considered it, we have tried our

Proceedings                                                         7

1  very best to hear the arguments of both parties, and here we
2  are with a position that we have advocated to the Court that
3  we think is appropriate under the facts as we know them now
4  and the law as it applies to restitution.
5          We're obviously happy to address the Court's
6  question, we are obviously happy to continue the process as
7  the Court sees fit, but we have asserted our views here that
8  our position, and our preliminary position, that the
9  preliminary -- based on facts that are unknown to us that
10 could possibly be presented to us might change our view, but
11 we haven't heard any of those, but we believe that these
12 claimants from Africa are not victims under the statute and
13 that we should proceed to sentencing as -- under the terms as
14 laid out in the agreement.
15         MR. FODEMAN:  Judge, that's a little bit surprising
16 having read the Government's latest submission, because I
17 understood essentially the opposite from their latest
18 submission, and it seems like in some ways we are talking past
19 each other.  I don't mean to ascribe a motive here, but what I
20 understand the Government to be saying was you were harmed,
21 but because there were two separate conspiracies, one to take
22 your asset and one to keep it, and that the defendants were
23 only involved in the keeping of it, it's too complicated for
24 the Judge to figure out how much you should be compensated.
25 That's what I understand when I received their latest

Proceedings                                                           8

1  submission, and I was gratified to hear that because -- for a
2  number of reasons, which I'm happy to address.  I think we
3  have addressed it in our reply, and I'm happy to address it
4  here.
5           A) The notion that there are two conspiracies is
6  completely illusory based on what's written in the
7  information, what the parties have stipulated to are the
8  facts, common sense, and beyond that, the law, and how this
9  Court treats conspiracies that defendants join.
10          And it -- secondly, it's not complicated at all.
11 They took an asset, the defendants circled the globe, they
12 bribed the Supreme Court of the Congo to get an asset they
13 couldn't get, and it wasn't an asset worth $1,000 or $10,000
14 because 33- or 50-billion-dollar hedge funds don't go around
15 committing federal felonies to make a few bucks, they do it to
16 make millions, and that's what they have taken from our
17 clients.
18          So if you would like to have an oral argument about
19 whether there are two conspiracies, we are happy to do that.
20 I don't know that there are additional facts that the
21 Government needs to learn after a half a decade investigating
22 this case, but if they think there are some out there, we can
23 try to help them understand their case.
24          But candidly, Judge, for the reasons we expressed in
25 our reply, there's no need to get there.  There's -- there's

Proceedings 9

1  no need to be determining whether somehow an information that
2  covers a scheme that goes from 2005 to 2015 really has -- the
3  stuff that happened in 2007 has anything to do with the
4  defendant because it does.
5           THE COURT:  What about the concern that one might
6  posit that even if there was a conspiracy, and even if the
7  defendant in this case played a role in it, that the loss is
8  not ascertainable with any reasonable effort and that the
9  value of the mining interests are difficult to ascertain, and
10 therefore this is not the type of case where a restitution
11 would be appropriate?
12          MR. FODEMAN:  Judge, I will respond to that in two
13 ways.
14          THE COURT:  That is one of the arguments.
15          MR. FODEMAN:  It is an argument and I will say a
16 couple things about that.
17          The first step in the analysis is:  Are we victims?
18 Were we proximately harmed?  If it's offense that fits within
19 the MVRA, which the Government concedes, I know Och-Ziff is
20 still arguing that it doesn't, but the governments concedes
21 it's an offense under the MVRA, and our clients were
22 proximately harmed by the offense, an offense, again, where
23 the defendant set out to screw us, then we are victims and
24 that's the first step.  Once there's a conclusion there, then
25 there -- then there is mandatory restitution, and it only is

when it is so complicated, so complex, so hard to understand that we are going to take the extraordinary step of foregoing what was otherwise mandatory.

I would also say this, Judge: The Government has conceded that in its two conspiracy paradigm where other bad guys stole the mine in 2007 and then these defendants came along and bribed judges to keep the mine, that the harm to us under the first conspiracy where we lost our mine, that's easy, they don't have a problem with that under their -- according to their argument. So it isn't the case that where someone loses their mining rights that it is so difficult to value that. We've submitted an expert report that attempts to do that. If the other folks here want to put in competing expert reports, I haven't seen them, but I would certainly expect the Court to take those sorts of reports, but they admit that taking the mining rights, we could do that. If the defendants in the first scheme were before you, according to the Government, there would be no problem. It's only when these defendants come along and they take on ownership of this impaired right, then it becomes very hard to figure out how we're harmed suddenly.

THE COURT: The MVRA defines a victim with respect to a conspiracy as someone who is directly harmed by the defendant's criminal conduct in the course of the conspiracy, so if there are two different conspiracies, your clients may

Proceedings                                                      11

be the victims of conspiracy number one, but conspiracy number
two, it may be argued by the defendant here, if it ever
existed, is a conspiracy that had nothing to do with your
clients, so it may be that the MVRA does not apply to this
particular litigation criminal case.

          MR. FODEMAN:  It is theoretically possible, yeah,
that that's the case, but --

          THE COURT:  Well, I'm just saying, why are your
clients the victims of the second conspiracy?  You're saying
it's one conspiracy.

          MR. FODEMAN:  I'm saying it's one conspiracy, and I
can explain why, if you would like, but first let me answer
your questions.

          The second conspiracy, as I understand the
Government to now be characterizing it, is that the -- we
were -- our clients were in litigation to get our mining
rights back.  In the course of that litigation, those mining
rights, the other side of the V, if you will, was bought by an
entity called Akam, and now -- and -- and now there's this
litigation, and the defendant and its coconspirators, in an
effort to keep us from getting that mine back, bribed judges
to rewrite the decision that was going to award the mine back
to its rightful owners.  That's what they paid to do.  That's
what they agreed to do.  When they said, Let's screw them,
they were talking about paying judges hundreds of thousands --

Proceedings                                                          12

1   over a million dollars, attorneys and judges, to rewrite a
2   decision that but for that conduct would have resulted in us
3   getting back the very asset that they say was stolen in the
4   first conspiracy.
5           So plainly, the fact that that was undertaken and
6   achieved harmed us.  That was the point of the exercise, to
7   harm us.  If they wanted to just buy it from us, they could
8   have done that, but they didn't do that.  They engaged in a
9   bribery scheme to prevent us from getting back the very asset
10  that we -- that belonged rightfully to us, and the conduct is
11  outrageous and it's egregious and hurt us, because if it
12  wasn't for this multi-billion-dollar hedge fund coming across
13  the globe, we would have our mine back today and that cannot
14  be disputed.
15          Now, the notion that it's two separate bands of
16  criminals acting, hurting us, is, Judge, patently absurd and
17  belied by the facts.
18          THE COURT:  And the loss?
19          MR. FODEMAN:  Excuse me?
20          THE COURT:  And the loss, the amount of the loss,
21  how can that be computed with any certainty?
22          MR. FODEMAN:  Well, the certainty is simple.
23  Whether -- it is, we had a mine, it was taken, we couldn't --
24  the Government thinks it's totally clear how we calculate
25  those -- that mining right, right?  When it's taken.  You get

Proceedings                                                                 13

1   the value of what that was -- we've had an expert calculate
2   what those mining rights were worth.  It's something that
3   happens routinely where companies value mining rights, and
4   that's easy, according to the Government; and the fact that we
5   didn't get those back when we otherwise would have means we
6   were harmed again, the same amount.  We were harmed because we
7   couldn't get the mining rights that we otherwise would have
8   gotten.
9           But the fact of the matter is, Judge, there aren't
10  two conspiracies.  The Government charged in negotiations with
11  this defendant, they charged a scheme that runs from 2005 to
12  2015.  The Government would have you believe, Judge, and the
13  defendant would have you believe, that there were some other
14  folks, former employee, who stole the mine -- some bad guys
15  over here -- had nothing to do with these defendants and their
16  coconspirators.  They stole the mine in 2007, and then in
17  2008, these guys come along, new bad guys, and they bribe
18  judges to keep the mine, and those two things had nothing to
19  do with one another.  The problem with that, Judge, is that
20  the people who are involved and the entities involved in the
21  first scheme who took the mine, an entity named Akam, are the
22  same folks who are involved in the second part of keeping the
23  mine.  They charge a scheme of taking and retaining a mine,
24  that's the scheme the defendant pled guilty to, there's one
25  conspiracy, and this is not complicated.  As the Government

Proceedings                                                          14

concedes, the taking of the mine is easy to ascertain.

MR. PITLUCK:  Judge, I'm not -- I'm not aware of a concession that the taking of the mine is easy to ascertain, even assuming that it was part of it.  I think we said precisely the opposite in our letter.  The point is, as the Court -- and I also resist the notion that we have somehow characterized this as two conspiracies.  What we have is evidence of the conspiracy we charged, which is from 2007 to 2013, and then pre-conspiracy conduct that we do not have -- are not aware of evidence tieing the defendant or their coconspirators to that pre-conspiracy conduct.  If we had it, Judge, we would have loved to have used it two years ago or sooner.  We don't have it.  That's the problem.

So there's -- it's a false dichotomy, and I'm just generally going to resist what we have and haven't conceded to.

I'd like to -- if it becomes salient, we can address those points in more detail, but the conduct on the taking of the mine is what's at issue here, and whether it's a -- we don't take it as two conspiracies.  We would call it pre-conspiracy conduct.  There is no question, as set forth in our statement of facts, that the defendant tried to harm the victims -- the purported victims here through the second step of it, and we've conceded that in our letter to the Court. But that's not -- that's not what the proximate causation

1  issue is here.  It's the actual taking of the mine, the mine
2  that took it out of their -- the actions that took the mine
3  out of the Africa owner's hands.
4           THE COURT:  Anyone have anything else?
5           MR. BANSAL:  Your Honor, I don't have anything to
6  add to what Mr. Pitluck said.  I do think it's important, as
7  Mr. Fodeman says, characterizes his clients as owners and we
8  own the mine and we own an interest --
9           THE COURT:  They are shareholders.
10          MR. BANSAL:  Exactly, Judge.  They owned shares in a
11 company that owned shares in another company that owned shares
12 in another company that owned a permit to develop this mine,
13 and they didn't lose a single one of those shares as a result
14 of the transaction that they complain of.  In fact, they
15 retained all those shares, and those shares, the day after the
16 transaction that they complained of, increased in value by
17 13 percent, an aggregate of $10 million among their clients.
18 What they're really complaining of is the fact that they owned
19 a smaller percentage of shares of the company after these
20 transactions.  But, of course, they didn't own a controlling
21 percentage in the first place.  The shareholders owned, at
22 most of their clients, 10 percent of the shares.  For example,
23 Mr. Harwood has no right to own .4 percent of the shares of
24 ARL as opposed to .3 percent or .2 percent.  His shares
25 retained their value, in fact, increased in value, and not

1  only does that mean that there's no direct harm to the
2  shareholders, but there actually is no harm at all because
3  their shares actually increased -- what they actually owned
4  increased in value.
5              I don't have anything else unless the Court has
6  questions.
7              MR. FODEMAN:  So under that paradigm, the defendant
8  helped my clients.
9              THE COURT:  That's right.
10             MR. FODEMAN:  That sounds right.  Thank you.  I'm
11 sure they would agree.
12             THE COURT:  Isn't that why you are here?
13             MR. FODEMAN:  Of course.
14             THE COURT:  All right.
15             I will decide your application, and then if I deny
16 it, we will go ahead to sentencing; and if I grant it, then we
17 will take it where it goes, or we will start from scratch, and
18 so we will see.
19             Thank you.  Have a nice day.
20             MR. FODEMAN:  Thank you.
21             MR. PITLUCK:  Thank you, Your Honor.
22             (Matter concluded.)
23
24                     *     *     *     *     *
25