**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| - against - | ) |
| | ) |
| OZ AFRICA MANAGEMENT GP, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

ECF Case

Case No.: 1:16-cr-00515-NGG-LB

## <u>OPPOSITION TO OZ AFRICA MANAGEMENT GP, LLC'S MOTION FOR DISCOVERY UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 17(C)</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

      A.     The Defendant Pleads Guilty to Conspiring to Violate the Foreign Corrupt Practices Act ........................................................................................ 2

      B.     The Court Finds that the Africo Owners are Victims of OZ Africa's Crime .............. 5

      C.     The Victims and the Government File Submissions in Response to the Court's Three Requests ........................................................................................ 7

LEGAL STANDARD ......................................................................................................... 11

ARGUMENT ...................................................................................................................... 13

      I.     Subpoena to a Subset of the Defendant's Victims ...................................................... 16

      II.     Subpoena to Victims' Mining Expert, Dr. Neal Rigby and SRK Consulting (U.S.), Inc. ...................................................................................... 24

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bowman Dairy Co. v. United States*,
    341 U.S. 214 (1951) .................................................................................................11

*United States v. Ashburn*,
    No. 11-CR-0303 (NGG),
    2015 U.S. Dist. LEXIS 29413 (E.D.N.Y. Mar. 6, 2015) ......................................13

*United States v. Barnes*,
    No 04 CR 186 (SCR),
    2008 WL 9359654 (S.D.N.Y. Apr. 1, 2008) ........................................................12

*United States v. Bartleson*,
    74 F. Supp. 3d 947 (N.D. Iowa 2015) ....................................................................6

*United States v. Basciano*,
    No. 03-CR-929 (NGG),
    2006 WL 8451585 (E.D.N.Y. Apr. 17, 2006) .................................................11, 25

*United States v. Bengis*,
    631 F.3d 33 (2d Cir. 2011) ......................................................................................6

*United States v. Brown*,
    No. 95 CR 168 (AGS),
    1995 WL 387698 (S.D.N.Y. June 30, 1995) ........................................................11

*United States v. Cheruvu*,
    No. 14-CR-130S,
    2018 U.S. Dist. LEXIS 197922 (W.D.N.Y. Nov. 20, 2018) ............................12, 15

*United States v. Cognetta*,
    No. 18 CR 14 (VM),
    2019 WL 4198544 (S.D.N.Y. Aug. 13, 2019) ......................................................11

*United States v. Conway*,
    615 F. App'x 46 (2d Cir. 2015) .............................................................................12

*United States v. Donaghy*,
    570 F. Supp. 2d 411 (E.D.N.Y. 2008) ..................................................................16

*United States v. Gonzalez*,
    No. 94 CR 134 (WK),
    2002 WL 31641109 (S.D.N.Y. Nov. 13, 2002) ...............................................11, 16

*United States v. Gushlak*,
    No. 08-CR-833 (NGG),
    2011 WL 128359 (E.D.N.Y. Jan. 14, 2011) .............................................19

*United States v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013)...................................................................6

*United States v. Iozia*,
    13 F.R.D. 335 (S.D.N.Y. 1952) ............................................................13

*United States v. Jasper*,
    No. 00 CR 825 (PKL),
    2003 WL 1107526 (S.D.N.Y. Mar. 13, 2003) ......................................13

*United States v. Kline*,
    199 F. Supp. 2d 922 (D. Minn. 2002) ....................................................7

*United States v. Lester*,
    No. 1:14-cr-00236-DAD-BAM-1,
    2016 WL 5109611 (E.D. Cal. Sept. 19, 2016)......................................16

*United States v. Louis*,
    No. 04 CR 203 (LTS),
    2005 WL 180885 (S.D.N.Y. Jan. 27, 2005) ..........................11, 12, 20

*United States v. Marchisio*,
    344 F.2d 653 (2d Cir. 1965)............................................................12, 15

*United States v. Mendineuta-Ibarro*,
    956 F. Supp. 2d 511 (S.D.N.Y. 2013).............................12, 20, 24, 25

*United States v. Nektalov*,
    No. 03 CR 828 (PKL),
    2004 WL 1574721 (S.D.N.Y July 14, 2004) .................................13, 25

*United States v. Nixon*,
    418 U.S. 683 (1974)................................................................... passim

*United States v. Pena*,
    No. 15-CR-551 (AJN),
    2016 WL 8735699 (S.D.N.Y. Feb. 12, 2016) .......................................13

*United States v. Qurashi*,
    634 F.3d 699 (2d Cir. 2011)....................................................................7

*United States v. Rivera*,
    No. 13-CR-149 KAM,
    2015 WL 1540517 (E.D.N.Y. Apr. 7, 2015) ........................................13

*United States v. Robinson*,
    No. 16-cr-545(S-1) (ADS)(AYS),
    2017 U.S. Dist. LEXIS 55199 (E.D.N.Y. Apr. 10, 2017) ...................12

*United States v. RW Prof'l Leasing Servs. Corp.*,
   228 F.R.D. 158 (E.D.N.Y. 2005) ........................................................12, 19, 20

*United States v. Sandoval*,
   No. 10-20243-CR,
   2010 WL 2757188 (S.D. Fla. July 13, 2010) ..............................................16

*United States v. Scott*,
   321 F. App'x 71 (2d Cir. 2009) ...................................................................6

*United States v. Weisberg*,
   No. 08-CR-347 (NGG) (RML),
   2010 WL 5027537 (E.D.N.Y. Dec. 3, 2010) ..............................................22

*United States v. Winner*,
   641 F.2d 825 (10th Cir. 1981) ...................................................................16

*United States v. Yaroch*,
   No. 08-50303-BC,
   2008 WL 1701650 (E.D. Mich. Apr. 10, 2008) ..........................................16

## STATUTES

15 U.S.C. § 78dd-1 ................................................................................................2

15 U.S.C. § 78dd-2 ................................................................................................2

18 U.S.C. § 371 .....................................................................................................2

18 U.S.C. § 3663A .............................................................................................8, 22

18 U.S.C. § 3664 ..............................................................................................6, 19

18 U.S.C. § 3771 .......................................................................................13, 19, 24

## RULES

Fed. R. Crim. P. 17(c) ................................................................................... passim

## **INTRODUCTION**

The undersigned represent a group of individuals and entities who have been found by the Honorable Nicholas G. Garaufis to be victims (the "Victims") under the Mandatory Victim Restitution Act (the "MVRA") of the crimes committed by Defendant OZ Africa Management GP, LLC ("OZ Africa"), along with its parent company, Och-Ziff Capital Management Group LLC ("Och-Ziff"), a publicly-traded US hedge fund (now called Sculptor Capital Management).  In connection with his finding that our clients and others – collectively the former shareholders of Africo Resources Limited ("Africo") – were indeed victims under the MVRA and therefore entitled to restitution, Judge Garaufis directed the parties to make supplemental submissions addressing three discrete issues including the value of the mining rights stolen by OZ Africa and Och-Ziff from the former Africo shareholders.

On November 22, 2019, counsel to the Victims and the Government made their respective submissions.  The Government, working with its own expert, advised Judge Garaufis that the value of the mining rights was no less than $150 million, and that the amount could be as high as $188 million.  The Victims, also employing the services of an expert, advised the Court that the value of the mining rights was no less than $290.4 million and that the amount could be as high as $1.386 billion.

Rather than making its own submission to the Court, counsel for Defendant responded by propounding a series of "discovery" subpoenas pursuant to Fed. R. Crim. P. 17(c), seeking from certain of the victims a wildly broad list of materials, some of it decades old, and most of it clearly evincing a desperate fishing expedition designed to try to find some basis to avoid the very restitution obligations that Judge Garaufis has already found to exist.

To be clear, Defendant did manage to propound some proper requests – a lengthy and expansive series of requests directed to the materials reviewed and relied upon by the Victims' mining expert, Dr. Neal Rigby.  As to those requests, counsel for the Victims agreed to provide the requested materials.  But as to the balance of the requests set out in Defendant's subpoenas, they plainly violate Rule 17 and have been formulated solely for the purpose of trying to relitigate issues already determined by the Court and thereby further delay justice for the victims of OZ Africa's and Och-Ziff's egregious crimes.  The Court should thus deny Defendant's remaining requests in their entirety.

## BACKGROUND

### A.  The Defendant Pleads Guilty to Conspiring to Violate the Foreign Corrupt Practices Act

On September 29, 2016, OZ Africa, a wholly-owned shell subsidiary of Och-Ziff, one of the world's largest public hedge funds, pled guilty to conspiring to violate the Foreign Corrupt Practices Act ("FCPA") in violation of 18 U.S.C. § 371 and 15 U.S.C. §§ 78dd-l and 78dd-2.  *See* ECF No. 11.

Pursuant to an agreed-upon statement of facts (the "Statement of Facts"), OZ Africa and Och-Ziff acknowledged that over a decade ago, they partnered with Israeli businessman, Dan Gertler, to pay tens of millions of dollars in bribes to judges and other public officials in order to obtain corrupt access to lucrative mining investment opportunities in developing countries.  One of the lucrative mining investment opportunities, which Och-Ziff paid millions of dollars in bribes to secure, was the rights to mine the Kalukundi property in the Democratic Republic of the Congo ("DRC").  The mining rights for that property were held by Africo and a DRC government entity called Gecamines, which owned 75 and 25 percent of the Kalukundi mining rights, respectively.  Unable to acquire the mining rights held by Africo through legal means, the conspirators

orchestrated the theft of those rights from Africo through a corrupt default judgement in the DRC courts. When Africo attempted to avail itself of the DRC court system to retrieve its stolen mining rights, Mr. Gertler – funded by Och-Ziff – paid millions of dollars in bribes to DRC judges and other officials to ensure that Africo's legal fight was unsuccessful. Och-Ziff and Mr. Gertler then leveraged the illegally created cloud over the ownership of the Kalukundi mining rights to corruptly take over Africo, finally securing the control of the Kalukundi mining property for themselves.

When Och-Ziff was finally caught – eight years later – the publicly-listed hedge fund managed to secure a Deferred Prosecution Agreement ("DPA") from the Eastern District of New York for its egregious crimes. Under that DPA, Och-Ziff agreed to cooperate with the government, take on a corporate monitor of its choosing, and pay a $213 million penalty to the Department of Justice.[1] Och-Ziff also agreed to serve up an empty, shell subsidiary, OZ Africa, to plead guilty to a single count of conspiring to violate the FCPA.

Pursuant to OZ Africa's Plea Agreement, the Government agreed to recommend that no additional fine be imposed on the Defendant. *See* ECF No. 11 at ¶ 20(a). The parties also agreed that any financial penalty the Court did impose against OZ Africa would be paid from the $213 million payment Och-Ziff made pursuant to its own Deferred Prosecution Agreement. *Id.*[2]

---

[1] In connection with a parallel SEC investigation, Och-Ziff paid an additional $199 million in penalties to settle that action. In total, Och-Ziff paid $412 million in fines and penalties flowing directly from its campaign to steal mining rights by bribing public officials, including judges. https://www.sec.gov/litigation/admin/2016/34-78989.pdf.

[2] Defendant and Och-Ziff, in the Statement of Facts, admitted that from 2005 to 2015, OZ Africa, Och-Ziff and their "DRC Partner," Dan Gertler, together with others, paid bribes to government officials to obtain illicit access to deeply discounted prices for, and controlling interests in, various lucrative investment opportunities. Statement of Facts at ¶ 16, ECF No. 11 at Ex. 3. One of the "attractive investment opportunities" Defendant admitted to paying for "special access" to was the mining rights to the Kalukundi property in the Democratic Republic of the Congo (the

As a part of its Plea Agreement, Defendant agreed (1) to "cooperate fully with [the government] in any and all matters relating to the conduct described in [the Plea Agreement], the Information, and the Statement of Facts" (ECF No. 11 at ¶ 10); (2) that "any fine or restitution imposed by the Court will be due and payable within ten (10) business days of sentencing, and the Defendant will not attempt to avoid or delay payment" (*id*. at ¶ 12); (3) that "the Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and the Statement of Facts, and that the Information and the Statement of Facts accurately reflect the Defendant's criminal conduct" (*id*. at ¶ 14); and (4) that "it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts" (*id*. at ¶ 27).[3]

---

"Kalukundi mine" and "DRC," respectively), owned Africo. *Id*. at ¶¶ 16-43. Defendant admitted that, together with its conspirators, it paid millions of dollars in bribes to DRC judges to corruptly "orchestrate[] the taking of Africo's interest in the [Kalukundi] Mine," *id*. at ¶ 24, and to retain those mining interests in the face of legal challenges mounted by Africo, *id*. at ¶¶ 31-36, all in furtherance of its scheme to illegally obtain and retain mining interests in the DRC. *Id*. at ¶ 16. Specifically, the Defendant and Och-Ziff admitted that, its conspirators "orchestrated the taking of Africo's interest in the DRC Mine." (*id*. at ¶ 24). Then, when Africo attempted to use the DRC courts to regain its stolen mining rights, the Defendant's DRC Partner paid bribes on its behalf "to DRC officials, including judges, to ensure that Africo did not obtain a favorable court ruling…that could have affected the outcome of the Africo shareholder vote," *id*. at ¶ 31, on the proposed takeover of Africo by the conspirators. All of this was done so Defendant and its conspirators could corruptly seize control over the Kalukundi mining rights and consolidate them with other assets held by the conspirators. *See id*. at ¶¶ 23-36.

[3] Africo is described in the Statement of Facts as follows, "Africo was a Canadian mining company engaged in a dispute concerning its ownership interest in a DRC copper mine (the 'DRC Mine'). The dispute involved a Congolese company called Akam Mining SPRL ('Akam'), which

**B.  The Court Finds that the Africo Owners are Victims of OZ Africa's Crime**

On February 20, 2018, the Africo Owners[4] filed a motion requesting confirmation of victim status and an award of restitution under the MVRA.  ECF No. 26.  Following that initial submission, the parties submitted numerous and voluminous briefs regarding *inter alia* whether the Africo shareholders' property interests in the Kalukundi mining rights was recognized by the MVRA, whether the Defendant was responsible for harms to that property caused before it joined the conspiracy, and whether the Defendant's conspiracy was the direct and proximate cause of the harms to the Africo shareholders. *See* ECF Nos. 26, 37, 39, 41, 43, 47, 48, and 49.

On August 29, 2019, the Court issued its Memorandum and Order finding that the Africo Owners were indeed "victims of Defendant's crime under the MVRA[.]"  ECF No. 51 at 1.[5]  In so holding, the Court found that the conspiracy to which OZ Africa had pleaded guilty was the direct and proximate cause of the loss of the Africo Owners' Kalukundi mining rights, *id*. at 17-18, and asked for further briefing on three discrete issues (1) "the value of the mining rights themselves (as opposed to the value of a working mine on the site), as of either 2006-2008 or the present day;" (2) "whether the court should either apportion liability among the coconspirators or make Defendant

---

had obtained an *ex parte* default judgment against Africo following an employment dispute. In fact, DRC Official 2 had orchestrated the taking of Africo's interest in the DRC Mine and made it available to DRC Partner.  Africo had engaged in legal proceedings in the DRC courts to try to nullify the seizure of its interest in the DRC Mine, which remained pending in March 2008." *Id.* at ¶ 24.

[4] The "Africo Owners" include those individuals and entities that held equity in Africo in or around April 2008 at the time when Africo was being coerced into the corrupt takeover by the conspirators.  Our firm represents approximately 50 of those individuals and entities (holders of approximately 68% of the equity), which include Africo's founders, members of its management and board, as well as other former employees and public shareholders.  *See* ECF No. 26 at n.1.

[5] Judge Garaufis's August 29, 2019 Memorandum and Order is attached hereto as Exhibit 1.

jointly and severally liable for all of Claimants' losses under 18 U.S.C. § 3664(h);" and (3) "whether 'determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.'" *Id*. at 20 (citation omitted).   In its decision, the Court analyzed and rejected OZ Africa's arguments with respect to the Africo Owners' status as victims under the MVRA.  *Id*. at 8-18.  Relevant to the Defendant's current motion for subpoenas under Rule 17(c), the Court found as follows:

First, the theft of the Africo Owners' interests in the Kalukundi mining rights was an injury to "property" cognizable under the MVRA.  *Id*. at 12.  Rejecting Defendant's argument that the Africo Owners had not suffered an injury to property because they held ownership interests in a company that held its mining rights indirectly through special-purpose subsidiaries, *id*. at 11, the Court recognized that "the MVRA defines 'victim' broadly; it contains no carve-out for holders of intangible property rights, such as shareholders who hold interests through special-purpose vehicles for tax purposes[.]" *Id*. at 12 (citing *United States v. Gushlak*, 728 F.3d 184, 187 (2d Cir. 2013) and *United States v. Bengis*, 631 F.3d 33, 39-40 & n.3 (2d Cir. 2011)).

Second, OZ Africa mischaracterized the Africo Owners' injury as mere equity dilution.  *Id*. at 13.  The Court categorically rejected Defendant's argument that the only losses suffered by the Africo Owners were the dilution of their shares or damage to the price of those shares because no individual shareholder (or collective group of shareholders) had control over the company.  *Id*. at 11-13.  Instead, the Court found that the Africo Owners lost their Kalukundi mining rights and the opportunity to exploit those rights.  *Id*. at 13 (citing *United States v. Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) (summary order); *United States v. Bartleson*, 74 F. Supp. 3d 947, 984-87 (N.D. Iowa

2015); *United States v. Kline*, 199 F. Supp. 2d 922, 924-27 (D. Minn. 2002); *United States v.*

*Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011)); *see also id.* at 17 & n.12.

Third, the theft and retention (through bribery) of the Kalukundi mining rights by Defendant

and its conspirators was the direct and proximate cause of the injuries to the Africo Owners.  *Id.* at

13-14.  The Court specifically rejected Defendant's arguments that (1) Africo was already in poor

financial condition prior to Och-Ziff's involvement in the conspiracy and had not yet been able to

develop the Kalukundi mine, (2) any third-party financing to develop the Kalukundi mine would

have diluted the Africo Owners, and (3) the board of Africo had recommended that its shareholders

approve the conspirators' takeover (the "Camrose Takeover").  In holding that "[n]one of these

arguments is persuasive," the Court noted *inter alia* that the "theft of Africo's mining rights likely

exacerbated its financial problems," and putting aside whether dilution of Africo would have been

necessary to develop the mine, the shareholders "lost the opportunity to do so fairly, which is a harm

recompensable under the MVRA."  *Id.* at 13-14.  Importantly, the Court also held that, "[h]aving

conspired to deceive Claimants into accepting the Camrose Takeover, Defendant cannot now rely on

Claimants' assent to avoid paying restitution."  *Id.* at 14.

Fourth, Defendant was liable for both the initial theft of the Kalukundi mining rights and the

harms caused by the conspirators' actions to "coerce" the Africo Owners "into accepting the

Camrose Takeover[.]" *Id*. at 17.

## C.  The Victims and the Government File Submissions in Response to the Court's Three Requests

On November 22, the Government and the Victims filed their respective submissions in

response to the three requests delineated in the Court's August 29 Order.  ECF No. 68 (Government)

and ECF No. 69 (Victims).  Both the Victims and the Government agreed that there was no basis for

apportionment (ECF No. 68 at 14-16; ECF No. 69 at 2-3) and that no complex issues of fact would

unduly prolong or complicate the sentencing process under 18 U.S.C. § 3663A(c)(3)(B). (ECF No. 68 at 16-17; ECF No. 69 at 4-9).  On the value of the mining rights, the Victims updated their initial expert report to reflect changes in metals prices and the DRC tax structure during the intervening period, resulting in valuations based on the discounted cash flow ("DCF") method of $290.4 million for an undeveloped mine and $1.386 billion for a mine developed as planned by the victims before the Defendant and its conspirators committed their crimes.  ECF No. 69 at 1-2.  The Government, with the assistance of its own expert, Stout Risius Ross, LLC, valued the mining rights to be "at least $150 million," reflecting Och-Ziff's own 2008 out-of-court DCF valuation, or in the alternative, the Government's own DCF valuation of $188.7 million.  ECF No. 68 at 2.

Notably, on November 7, prior to the submissions of the Victims and the Government, Defendant's parent company reported to its shareholders that it had engaged its own expert and that the expert had done his or her own analysis of the proper value of the restitution award.  According to the earnings conference call transcript, the company "accrued a $19.1 million provision due to the outstanding claim.  There was no previous expense recorded in relation to the matter in prior periods. The provision is based on what accounting rules dictate and based on the ***detailed analysis undertaken by our team, which includes external experts.***"  Yahoo! Finance, Q3 2019 Sculptor Capital Management Inc. Earnings Call Transcript, dated Nov. 7, 2019 (emphasis added), https://finance.yahoo.com/news/edited-transcript-ozm-earnings-conference-035921163.html.  In other words, Defendant and its parent, with the assistance of their own experts, were perfectly able to perform their own valuation and answer Judge Garaufis's question on the value of the mining rights without resorting to issuing expansive subpoenas to the actual victims of their crimes.

But rather than submitting its already completed expert analysis to the Court, Defendant undertook a different course.  On December 3, 2019, counsel for the Defendant sent counsel to the

Victims seven categories of document requests (with 27 total requests).  Twelve of those requests related to the materials that the Victims' expert had reviewed and/or relied upon in formulating his opinions, as well as information relating to the qualifications of the expert and the amount he had been paid.  Specifically, those requests were as follows:

> 6.     Documents, models, and data referenced or relied upon in the drafting of the SRK Consulting Report titled "Valuation of the Kalukundi Copper/Cobalt Project," dated November 21, 2017 and all supplements/amendments thereto including the "November 2019 Addendum to the Valuation of the Kalukundi Copper/Cobalt Project," including:
>
> a.   a complete copy of the 2006 MDM Ferroman (Pty) Ltd feasibility study conducted on the Kalukundi Project;
>
> b.   the RSG Global Financial Model and Valuation of the Kalukundi project (referenced in the 2006 feasibility study and ARL/Rubicon public filings)
>
> c.   all data inputs used in connection with the Leapfrog Software; the Datamine Mining Software; and Whittle Pit Analysis Software, and all models and outputs generated from the same as referenced in the 2017 SRK Consulting Report and the 2019 SRK Report Addendum, including the Whittle 4X files;
>
> d.   all "Technical Economic Models," including those referenced on page 21 of the 2017 SRK Report, pages 59 and 72 of the 2019 SRK Report Addendum, and referenced in Section 6.3.1 of the SRK 2008 Valuation Report, and all native Excel files containing such models and related calculations;
>
> e.   the "Mine Design" shapes as referenced on page 14 of the 2019 SRK Report Addendum;
>
> f.   all geological maps relating to the property;
>
> g.   all digital exploration files relating to the property including: lithological models, structural models, mineralization models, weathering surface models, all drilling trenching, and sampling results, density measurements, geophysical surveys, and mineralogical or petrographic studies;
>
> h.   valuation estimates and financial projections relayed to, or relied upon by SRK Consulting or Dr. Neal Rigby;
>
> i.   information and data utilized by Dr. Neal Rigby and SRK Consulting concerning taxes affecting the Kalukundi Project and its revenues;
>
> j.   information and data utilized by Dr. Rigby and SRK Consulting concerning the prices or price forecasts for copper and cobalt; and
>
> k.   information and data utilized by Dr. Rigby and SRK Consulting concerning the capital expenditures necessary to develop the Kalukundi Project.
>
> 7.     Information concerning the qualifications of Dr. Rigby and all fees and expenses paid to Dr. Rigby.

The undersigned agreed to provide all such materials to Defendant that it and its expert possessed for each of the requests listed above.

But Defendant was not satisfied.  To the contrary, it insisted that it receive all 27 requests sought, including information about the identity of the Victims, any and all contracts relating to the mine dating back more than a decade, any and all breaches of those contracts, and any and all documents specifically relating to Defendant's own crimes.[6]  (The subpoenas drafted by Defendant are attached to its motion).  Defendant went even further – it indicated that unless the Victims acquiesced and agreed to provide all such requested materials, Defendant would make a "discovery" motion, thereby dragging the Victims into Court and inflicting further harm.  When counsel for the Victims expressed that Defendant's discovery requests and tactics were improper, and that it would not acquiesce to Defendant's demands, Defendant followed through on its threat, and this motion followed.

As set forth below, the requests propounded by Defendant in its motion should be denied.  By its motion, it is plain that Defendant is unwilling to accept the Court's determinations and its own restitution obligations, and instead hopes to relitigate issues already resolved by the Court, harass and further victimize its victims, and further delay the payment of restitution.  These are not proper uses of a 17(c) subpoena, and accordingly, Defendant's motion should be denied.

---

[6] While we submit that it should be immediately clear to the Court that such requests are plainly improper and cannot possibly satisfy the *Nixon* standard, we address each of the requests in further detail below.

## LEGAL STANDARD

While attempting to incorporate E.D.N.Y. Local Civil Rule 26.3 into its subpoenas,[7] the Defendant essentially concedes that its ability to seek documents from third parties in a criminal case is limited to Federal Rule of Criminal Procedure 17.  ECF No. 72.  But Rule 17(c) "was not intended to provide a means of discovery for criminal cases[.]" *United States v. Nixon*, 418 U.S. 683, 698-700 (1974); *see also Bowman Dairy Co. v. United States*,  341 U.S. 214, 220 (1951) (same).  Rather, such a subpoena has a very limited purpose: a Rule 17(c) subpoena "may be used only to obtain materials admissible as evidence at trial." *United States v. Louis*, No. 04 CR 203 (LTS), 2005 WL 180885, at *3 (S.D.N.Y. Jan. 27, 2005).  While Rule 17(c) subpoenas may be issued in connection with a sentencing proceeding, a defendant seeking documents still bears the burden of satisfying the "strict standard" set forth by the Supreme Court in *Nixon*, namely of "specifically identifying the materials sought, and showing that they are relevant and admissible." *United States v. Brown*, No. 95 CR 168 (AGS), 1995 WL 387698, at *9 (S.D.N.Y. June 30, 1995).  *See also United States v. Gonzalez*, No. 94 CR 134 (WK), 2002 WL 31641109, at *1 (S.D.N.Y. Nov. 13, 2002) (stating that Defendant attempting to issue subpoenas in advance of sentencing must clear the *Nixon* factors).

Under *Nixon*, the party seeking the production of documents must demonstrate that the materials sought to be produced are (1) relevant, (2) admissible, (3) specifically identified, and (4) not otherwise procurable.  *United States v. Cognetta*, No. 18 CR 14 (VM), 2019 WL 4198544, at *2 (S.D.N.Y. Aug. 13, 2019); *see, e.g.*, *United States v. Basciano*, No. 03-CR-929 (NGG), 2006 WL 8451585, at *5 (E.D.N.Y. Apr. 17, 2006) (stating that subpoena request must be specified and make a showing of relevancy and admissibility, and that the evidence cannot be sought for impeachment

---

[7] *See, e.g.*, ECF No. 72-1, Ex. A at n.1.

purposes); *United States v. Conway*, 615 F. App'x 46, 48 (2d Cir. 2015) (affirming district court's decision to quash defendant's subpoena for victim's medical records for defendant's *Fatico* hearing because subpoenas failed to satisfy relevancy prong of *Nixon*).

Rule 17(c) subpoenas cannot be used to conduct a "general 'fishing expedition.'" *Nixon*, 418 U.S. at 699-700. As a result, courts have found that "[s]ubpoenas seeking 'any and all' materials, without mention of 'specific admissible evidence,' justify the inference that the defense in engaging in the type of 'fishing expedition' prohibited by *Nixon*." *United States v. Mendineuta-Ibarro*, 956 F. Supp. 2d 511, 513 (S.D.N.Y. 2013) (quoting *Louis*, 2005 WL 180885, at *5); *see also United States v. Barnes*, No 04 CR 186 (SCR), 2008 WL 9359654, at *4 (S.D.N.Y. Apr. 1, 2008) (quashing motion that "blindly seeks 'all' documents and recordings that fall into several categories for an approximate 23-month period rather than identifiable pieces of evidence" because "[s]uch a blanket request implicates all of the problems associated with a classic 'fishing expedition'"); *United States v. RW Prof'l Leasing Servs. Corp.*, 228 F.R.D. 158, 163-64 (E.D.N.Y. 2005) (rejecting as "overbroad and totally unreasonable" various requests calling for production of "[a]ll documents" noting it was likely to result in a "massive search for countless documents").[8]

---

[8] *United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir. 1965) (holding that discovery request for production of memorandum prepared by an accountant "did not fall within the ambit of Rule 17(c)" because it did not, at the time, meet the tests of relevancy and admissibility); *United States v. Cheruvu*, No. 14-CR-130S, 2018 U.S. Dist. LEXIS 197922, at *10-11 (W.D.N.Y. Nov. 20, 2018) (granting government's motion to quash defendant's third-party subpoenas that asked for "all documents" from several custodians about the defendant's practice, patients, and other categories over a ten-year period because, in part, "[c]onclusory statements [regarding relevance] are insufficient to satisfy the *Nixon* requirements" and because the subpoena did not "meet the specificity requirement of *Nixon*."); *United States v. Robinson*, No. 16-cr-545(S-1) (ADS)(AYS), 2017 U.S. Dist. LEXIS 55199, at *9 (E.D.N.Y. Apr. 10, 2017) (quashing defendant's rule 17(c) subpoenas requesting police reports because, among other reasons, "[t]he Defendant [did] not [make] any showing that the requested documents [were] admissible or relevant."); *United States v. Ashburn*, No. 11-CR-0303 (NGG), 2015 U.S. Dist. LEXIS 29413, at *5 (E.D.N.Y. Mar. 6, 2015)

Consistent with these principles, a Rule 17(c) subpoena cannot be used to obtain material that could be used only, if at all, for impeachment purposes. *United States v. Nektalov*, No. 03 CR 828 (PKL), 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004) ("[D]ocuments sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena."); *United States v. Jasper*, No. 00 CR 825 (PKL), 2003 WL 1107526, at *2 (S.D.N.Y. Mar. 13, 2003) (quashing defendant's subpoena for personnel files regarding a government witness where the documents were sought only for impeachment and would not have been admissible at trial); *United States v. Iozia*, 13 F.R.D. 335, 340 (S.D.N.Y. 1952) (Rule 17(c) cannot be used to require "disclosure to a defendant of information which may tend to impeach persons the Government may or may not call as witnesses").[9,10]

## ARGUMENT

Defendant's requested Rule 17(c) subpoenas represent an improper fishing expedition and plainly fail to satisfy the strict *Nixon* standard. Each request is instead designed to relitigate issues already decided by the Court or stipulated to in the Plea Agreement, improperly delay the fulfilment

---

(quashing defendant's rule 17(c) subpoenas requesting records from the Metropolitan Detention Center because they failed "*Nixon's* relevancy requirement" and failed "*Nixon's* specificity requirement."); *United States v. Pena*, No. 15-CR-551 (AJN), 2016 WL 8735699, at *2 (S.D.N.Y. Feb. 12, 2016) (quashing subpoenas requesting records relating to two cooperating witnesses in part due to a "lack of specificity" when some requests contained "any and all" language); *United States v. Rivera*, No. 13-CR-149 KAM, 2015 WL 1540517, at *4 (E.D.N.Y. Apr. 7, 2015) (quashing defendant's subpoena requesting information related to cooperating witnesses because the defendant's "speculative requests constitute the type of 'fishing expedition[s]' which are expressly prohibited under Rule 17.").

[9] The cases cited by Defendant do not hold otherwise. In fact, Defendant does not even seem to argue that it is entitled to impeachment evidence.

[10] Victims are also provided a statutory right to privacy under the Crime Victims Rights Act. 18 U.S.C. § 3771 (including "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy" under the enumerated rights of victims).

of its restitution obligations, and harass Defendant's victims.  Specifically, Defendant's submission

makes clear that it seeks to relitigate (1) the relevance of the manner in which the Victims held their

interest in the Kalukundi mining rights (ECF No. 72 at 5-6; raised previously by the Defendant at

ECF No. 37 at 18-19, 22-24; ECF No. 47 at 3, 5, and ruled on by the Court at ECF No. 51 at 11-13);

(2) the financial condition of Africo prior to and during Defendant's criminal conspiracy, and the

potential for dilution with third-party financing (ECF No. 72 at 6; raised previously by Defendant at

ECF No. 37 at 18-21; ECF No. 47 at 6; and ruled on by the Court at ECF No. 51 at 13-14); (3) the

value of the Kalukundi mining rights as the appropriate measure of harm suffered by the Victims

(ECF No. 72 at 4-6; raised by the Defendant at ECF No. 37 at 18-21; and ruled on by the Court at

ECF No. 51 at 10-13, 18, 20 & n.12); and (4) whether Defendant was the direct and proximate cause

of the harm to the victim's mining rights (ECF No. 72 at 5-6; raised previously by Defendant at ECF

No. 37 at 24-25; ECF No. 47 at 7-9; and ruled on by the Court at ECF No. 51 at 13-19). [11]

　　　　While Defendant makes clear through these requests its desire to improperly treat the narrow

submission requested by the Court as an opportunity to relitigate issues already decided by Judge

Garaufis in his August 29 Order, that does not make the ocean of information sought by Defendant

---

[11] Defendant's feigned ignorance of the relevant period of loss, ECF No. 72 at 4-5, should also
be summarily rejected.  The Africo Owners argued, and the Court agreed, that the conspirators
initially stole the Kalukundi mining rights (and the opportunity to develop those rights) in December
2006.  *See* ECF No. 26 at 3; ECF No. 11, Exhibit 3 at ¶ 24; ECF No. 51 at 2.  The conspirators then
bribed DRC judges to ensure that the Africo Owners failed to retrieve their mining rights, allowing
the conspirators to coerce the Africo Owners into a corrupt takeover in or around April 2008,
ensuring that the victims were never again in possession of the opportunity to develop the mining
rights that had been stolen from them.  *See* ECF No. 26 at 3-4; ECF No. 11, Exhibit 3 at ¶¶ 17, 22,
31-36; ECF No. 51 at 3-4.  The Court's finding of the Africo Owners as victims extends to all equity
holders in Africo in or around April 2008 (around the time of the corrupt takeover), ECF No. 51 at 5,
but makes clear that the Defendant is in fact responsible for harms caused both from the initial
taking of the mining rights and the corrupt takeover.  ECF No. 51 at 17.

*relevant* (let alone admissible) to any proceeding to be held by the Court on the three discreet issues the Court has identified: (1) the value of the Kalukundi mining rights, (2) whether apportionment of the restitution award is possible or appropriate, and (3) whether there are issues of such complexity that sentencing would be unduly delayed).  ECF No. 51 at 20.  *Marchisio*, 344 F.2d at 669 ("Unlike the rule in civil actions, a subpoena duces tecum in a criminal action is not intended for the purpose of discovery; the document sought must at that time meet the tests of relevancy and admissibility."); *Cheruvu*, 2018 U.S. Dist. LEXIS 197922, at *7 ("The items sought cannot merely be potentially

relevant or admissible. Rather, they must be shown to be relevant and admissible at the time the subpoena is sought.").[12]

We now address each specific request below.[13]

## I.   Subpoena to a Subset of the Defendant's Victims

**Request 1** – *Documents identifying each Claimant, and separately as to each Claimant: (a) all purchases/acquisitions of ARL securities and the dates, quantities and prices thereof; (b)*

---

[12] The Defendant's cases do not hold otherwise.  For example, for the proposition that "[d]iscovery concerning issues relevant to sentencing, including regarding restitution, is clearly appropriate under Rule 17, and it is equally clear that such discovery may be sought from restitution claimants", Defendant cites the following cases—*United States v. Winner*, 641 F.2d 825 (10th Cir. 1981); *United States v. Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008); *United States v. Lester*, No. 1:14-cr-00236-DAD-BAM-1, 2016 WL 5109611 (E.D. Cal. Sept. 19, 2016); *United States v. Sandoval*, No. 10-20243-CR, 2010 WL 2757188 (S.D. Fla. July 13, 2010); *United States v. Yaroch*, No. 08-50303-BC, 2008 WL 1701650 (E.D. Mich. Apr. 10, 2008); and *United States v. Gonzalez*, No. 94 CR 134 (WK), 2002 WL 31641109 (S.D.N.Y. Nov. 13, 2002).  None of the cited cases stand for the proposition that it is "clear" that defendants may seek discovery from "restitution claimants" that object to that discovery.  *Winner* involved a Colorado court order compelling the presence of a deputy attorney general and assistant attorney general at postconviction proceedings and had nothing to do with seeking discovery from victims.  641 F.2d at 831-34.  *Lester*, a case from the Eastern District of California, involved the *government* challenging the defendant's subpoena to a third party.  The court held simply that the government did not have standing to challenge the subpoena, and the victim did not challenge the subpoena.  2016 WL 5109611, at *2.  *Sandoval*, a case from the Southern District of Florida, did not involve restitution, but sentencing in general.  Because the subpoena service was defective, it was quashed entirely.  In the interest of judicial economy, the court went on to note that the subpoena would be severely limited if served properly.  2010 WL 2757188, at *2-3.  *Yaroch*, from the Eastern District of Michigan, involved an upcoming sentencing hearing and the defendant seeking participation from individuals at that hearing.  2008 WL 1701650, at *4.  In *Gonzalez*, the defendant requested authorization to issue subpoenas under 17(c) in advance of his sentencing hearing.  The court held only that following Rule 17(c) was the appropriate procedure.  Because the defendant did not file any motion in conjunction with his request, the court ordered him to submit one if he still desired to issue a subpoena.  2002 WL 31641109, at *1.  *Donaghy*, the only case from the Eastern District of New York cited by Defendant in this section of its briefing, is an order stating that the National Basketball Association ("NBA") was a victim under the M.V.R.A. and was thus entitled to restitution.  In the background section of the order, the court notes that the defendant submitted a subpoena under 17(c) to the NBA.  After that, the  NBA submitted documentation to the court, taking the position that the subpoena was now moot, and for the first time, it determined that it was entitled to more restitution than it originally sought.  After that, the court "directed the NBA to submit further documentation in support of its request [for restitution]".  570 F. Supp. 2d at 419-20.  Nowhere in the background

*all sales/dispositions of ARL securities and the dates, quantities and prices thereof; (c) any employment position held by each Claimant at ARL (e.g., director, officer, employee or consultant) and the time period the position was held; (d) each Claimant's purported loss; (e) the date of the purported loss; and (f) any contracts or agreements to which each Claimant is a party regarding the voting of ARL securities.*

The Court has requested submissions on the "value of the mining rights" as a whole and not on a victim by victim basis. ECF No. 51 at 20. The Victims'[14] expert and the Government (with its own expert) have opined that DCF analysis is the proper methodology to value the mining rights. ECF No. 68 at 2; ECF No. 69 at 5-6 (describing update to DCF analysis). This is also the very same methodology used by Och-Ziff itself when valuing Africo and the Kalukundi mining rights as a part of its corrupt scheme. ECF No. 68 at 4 ("A July 2008 investment memorandum states that Och-Ziff personnel 'performed a DCF valuation on Africo using the 2006 Feasibility study which was adjusted where appropriate' and that the value of the Kalukundi mining rights at the start of the development of the mine was $150 million."). Of course, now that Defendant is facing a significant

---

section does the court state that it ordered the NBA to turn over documents to the defendant. In fact, because Defendant spends almost its entire brief attempting to relitigate issues already decided by the Court, nowhere in Defendant's brief does it cite a single case ordering objecting victims to turn over documents to the *Defendant*.

[13] As noted above, counsel to the Victims already agreed to voluntarily provide the Defendant with the documents relied on by our expert, Dr. Neal Rigby, and information regarding his payment. We will thus address only requests 1-5.

[14] The Government also supports the DCF approach over that of a share price analysis. ECF No. 68 at 2 ("With respect to the value of the mining rights, the government respectfully submits that the Court should either hold Och-Ziff to its 2008 out-of-court valuation of at least $150 million, or else adopt the government's discounted cash flow valuation of $188.7 million. The defendant should not be entitled to disown or explain away its prior valuation – which it conducted outside the litigation context and around the time of its criminal activity – simply because it is in the defendant's financial interest to do so today.") *See also id.* at 3 ("The government is unaware of any case in which the value of a stolen corporate asset has been measured by a decrease in share price, and the government respectfully submits that it is not necessary to do so here, particularly where there are other reliable valuation methodologies.")

restitution award based on a DCF valuation, it has decided to abandon the very methodology it previously embraced and argue in favor of a market share price analysis as the proper methodology. But the Defendant has already had its own experts complete such a share price analysis, and it has announced publicly to its shareholders the result of that analysis.  What is clear, therefore, is that Defendant does not need data relating to an *individual shareholder's* purchase and sale price to conduct its share price analysis.  Rather, it needs *market prices*, which it already has, and which allowed it to make the vary valuation that Judge Garaufis now awaits.

Further, the information Defendant seeks from each of our clients is plainly irrelevant for another reason.  The subpoena seeks information from only a subset (about 68%) of the victims of Defendant's crimes; only those individuals and entities that happen to be represented by our firm. This artificial subset of information is irrelevant to the determination of the total value of the mining rights, which is the subject the Court has asked the parties to brief.  Importantly, regardless of whether one of the approximately 68% of victims represented by our firm held the shares on a particular date, what is irrefutable is that some individual or entity did in fact hold those interests and thus was harmed by the Defendant.[15] The price of a publicly traded company's shares on any given day is, of course, publicly available information.  This public information is undoubtedly that which Defendant has already used to reach its own valuation of the Kalukundi mining rights of $19.1 million.  To the extent that the Court requests the Victims to provide, either to the Court or to the Probation Department, the identities of the Victims and the amount of equity held by each during the

---

[15] These other victims can be identified by the Government by seeking the information from the Canadian depositories where the shares were held.

relevant period, we will of course do so consistent with each Victim's right to privacy under the Crime Victim Rights Act, 18 U.S.C. § 3771(a)(8).

The cases on which Defendant relies support the provision of the identity and confidential records to **the Court**, rather than to the Defendant.  *See, e.g.*, *United States v. Gushlak*, No. 08-CR-833 (NGG), 2011 WL 128359 at *2-3 (E.D.N.Y. Jan. 14, 2011) (ordering the Government to produce a list of victims and the amount of their losses to the court *in camera* noting, "the Government shall take steps that may be necessary to protect the privacy of victims' records.  *See* 18 U.S.C. § 3664(d)(4) ('The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.').)"  For these reasons, each of the requests for materials under Request 1 should be denied.

The information sought in parts (c) and (f) to this request should be denied for the additional reason that such information is irrelevant to the Court's Order seeking a valuation of the Kalukundi mining rights.  Defendant states that the requests seek "evidence of Claimants' control over ARL, either through their role in management or through their exercise of voting rights, which will ultimately bear on *Claimants' potential argument* that such control was lost or affected by the offense."  ECF No. 72 at 9 n.5 (emphasis added).  *First*, a Rule 17(c) subpoena seeking evidence to rebut a "potential argument" to be made by another party cannot meet the *Nixon* standard.  *RW Prof'l Leasing Servs. Corp.*, 228 F.R.D. at 162 (stating that the fact that documents "are potentially relevant" is "not sufficient").  *Second*, the Government, Defendant, and the Victims have in fact already briefed, and the Court has already decided, the extent to which individual or collective control by shareholders over Africo was relevant to restitution under the MVRA.  Specifically, the Court's Order assumed that no individual shareholder controlled Africo and held, "Defendant insists

-19-

that this dilution of percentage equity ownership, absent a loss of 'control' (i.e., a majority of shares), cannot be a 'loss…of property' under the MVRA.  In support of this assertion, Defendant notes that individual shareholders lack standing to sue for wrongful equity dilution in a direct, rather than a derivative, capacity.  The court disagrees with the Defendant."  ECF No. 51 at 11-12 (citations omitted).  Defendant's request for these documents is thus irrelevant and fails the *Nixon* standard and should be denied by this Court.

**Requests 2 and 3** –

> *Documents valuing ARL or any portion thereof, or any class of ARL securities; and*
>
> *The following categories of documents concerning the Kalukundi mining rights: (a) any contracts, agreements or other documents pursuant to which the mining rights are alleged to exist, any amendments thereto, and any documents or communications concerning the renewal thereof; (b) documents and communications concerning the satisfaction or the failure to satisfy obligations under any contract, agreement, or other document pursuant to which the mining rights are alleged to exist, including but not limited to any communications with any agent or agency of the Democratic Republic of the Congo or Gecamines concerning such obligations; (c) documents concerning the acquisition, transfer, or actual or potential purchase or sale of the mining rights or any portion thereof; (d) documents concerning the value of the mining rights as of the date of the purported loss or as of any other date between January 1, 2006 and the present (including any feasibility or technical mining study discussing the same).*

Requests 2 and 3 fail to meet the *Nixon* standard requiring Rule 17(c) subpoenas to seek only documents that are (1) relevant, (2) admissible, (3) specifically identified, and (4) not otherwise procurable.  *RW Prof'l Leasing Servs. Corp.*, 228 F.R.D. at 162.  Instead, with the explicit and implied "any and all" in front of these requests, they are clearly improper fishing expeditions.[16] Because Defendant makes no effort to specifically identify the documents it seeks, it cannot satisfy

---

[16] Courts have found that "[s]ubpoenas seeking 'any and all' materials, without mention of 'specific admissible evidence,' justify the inference that the defense is engaging in the type of 'fishing expedition' prohibited by *Nixon*."  *Mendineuta-Ibarro*, 956 F. Supp. 2d at 513 (quoting *Louis*, 2005 WL 180885, at *5).

its burden of showing that the materials would be relevant or admissible.  Defendant's bald assertion that these unidentified documents "relate[] directly to the Court's request that the parties address" the value of the mining rights at loss or the time of sentencing, ECF No. 72 at 9, plainly fails to satisfy the stringent *Nixon* standard.  Moreover, Defendant's contention cannot be credited because the Defendant cannot identify these documents, their sources, the date and purpose for which they were created, or any other information bearing on whether the documents would be relevant, admissible, and not otherwise procurable.

In addition, Request 3 also makes clear that Defendant is attempting to relitigate issues to which it stipulated in its Plea Agreement.  For example, Request 3(a) seeks "any contracts, agreements or other documents pursuant to which the mining rights are alleged to exist…" However, Defendant has already stipulated to the fact that Africo legally held the Kalukundi mining interests.  *See* ECF No. 11, Ex. 3 (Statement of Facts) at ¶ 23, "Africo Resources Limited ('Africo')…owned a copper asset 'next door' to DRC Partner's copper and cobalt mine," and  ¶ 24 "DRC Official 2 had orchestrated the taking of Africo's interest in the DRC Mine[.]" The Statement of Facts, therefore, renders Request 3 utterly irrelevant.

Next, each of these requests are unduly burdensome on the Victims.  For the victims of a crime to be forced to search for decades-old records in the hope that they may find documents or communications that fit into the limitless categories identified by Defendant is a nearly impossible undertaking.  Forcing the Victims of Defendant's crimes to do so is particularly unjust in light of the fact that Och-Ziff at the time of the crime undertook and completed thorough diligence on issues specifically related to the mining rights and the value of Africo before spending millions of dollars of its investors' money to bribe DRC officials to steal the Kalukundi mining rights.  ECF No. 11, Exhibit 3 (Statement of Facts) at ¶¶ 6, 16, 21-23.  The results of that diligence are already in the

possession of Defendant (and likely the Government), and Defendant should not be allowed to delay justice for its victims in the hope of making an argument that the mining rights were not as valuable as Defendant itself thought they were when it stole them.

> **Request 4** - *Documents and communications concerning any efforts to develop the Kalukundi property, including documents: (i) concerning the raising of capital or financing for the purposes of developing the property; (ii) plans, specifications, or surveys conducted in an effort to develop the property; and (iii) any other obstacles or impediments to develop the Kalukundi property.*

Here again Defendant is on an improper fishing expedition.  It fails to identify any specific documents and thus cannot offer any support to the documents' relevance, admissibility or its inability to procure them elsewhere.  *See United States v. Weisberg*, No. 08-CR-347 (NGG) (RML), 2010 WL 5027537, at *14 (E.D.N.Y. Dec. 3, 2010) (quashing defendant's subpoena that included requests for "all" documents when they were "phrased in language that resemble[d] civil discovery requests, rather than the specific requests for actual evidence that are allowed under Rule 17(c).").

Again, Defendant seeks to further punish its Victims by forcing those same Victims to mount a search for any and all records relating to the development of the Kalukundi mine from over a decade ago.  To place this type of burden on the Victims is entirely improper when Och-Ziff completed its own diligence at the time, concluded the mining rights were valuable enough to justify going halfway around the world to bribe judges, and cannot identify any specific records that it seeks.  Moreover, under the MVRA, Defendant is required to pay restitution in the amount of the value of what was taken at the time of the loss or at the time of sentencing, ***whichever is greater***.  18 U.S.C. § 3663A(b)(B)(i).  The submissions by both the Victims and the Government make clear that the higher value is the time of sentencing – 2019 – and not the time of the theft – 2006-2008.

Accordingly, the materials sought by Defendant are irrelevant, as they have no bearing whatsoever on the value of the Kalukundi mining rights as of 2019.

**Request 5** - *Documents and communications concerning the Camrose Transactions.*

This request is particularly egregious.  For the Court's benefit, the "Camrose Transactions" were a series of corrupt transactions, financed by Och-Ziff, related to a share purchase agreement through which the conspirators obtained a 60% controlling interest in Africo by leveraging the clouded title to the Kalukundi mining rights they had stolen and bribing judges to prevent Africo from regaining.  *See* ECF No. 23-3 at ¶¶ 23-35.  Accordingly, what Defendant seeks by this request is any documents in the possession of the Victims relating to Defendant's and Och-Ziff's own crime.  Not only does the request fail the *Nixon* standard that 17(c) subpoenas must seek specifically identified documents that are relevant, admissible, and not procurable elsewhere, but also it seeks documents that Defendant – an architect and financial backer of the criminally corrupt Camrose Transactions – likely already has or is in the best position to procure.  Defendant fails to point to any specific documents regarding this transaction that are outside its possession, let alone that are relevant and admissible.  Here again, Defendant's unsupported assertion that this request will result in documents "which would provide valuation information" is not even close to meeting the *Nixon* standard because Defendant cannot possibly attest that each document or communication regarding the Camrose Transactions will contain admissible evidence relevant to the value of the Kalukundi mining rights.

Given the blatantly improper breadth and irrelevance of these requests, especially those which seek to relitigate issues that the Court decided following over eighteen months of voluminous briefing, we can only conclude that Defendant is attempting to use these subpoenas to harass its victims and further delay its restitution obligations in violation of Rule 17, the MVRA, and the

Crime Victim Rights Act, 18 U.S.C. §§ 3771(a)(6) and (a)(8).  Enough is enough.  Defendant went around the world in 2008 to victimize our clients.  It now seeks to further exacerbate the harms it has already caused by issuing irrelevant, improper, and incredibly burdensome document requests to those same Victims and delaying its responsibility to make those Victims whole.  Accordingly, the Defendant's request for the subpoenas should be rejected in its entirety.

**II.      Subpoena to Victims' Mining Expert, Dr. Neal Rigby and SRK Consulting (U.S.), Inc**.

Defendant sent the Victims' mining expert, Dr. Neal Rigby, and SRK Consulting (U.S.) almost identical requests.[17]

**Request 2 to SRK (ECF No. 72-3)** – *All documents, models, and data referenced or relied upon in the drafting of the 2008 SRK Consulting Report on the Kalukundi Project.*[18]

Again, Defendant's refusal to appropriately narrow its request to specific, relevant documents is fatal.  Request 2, like others, asks for "***all***" documents (and models and data), an overly broad request that does not satisfy *Nixon*.  *Mendineuta-Ibarro*, 956 F. Supp. 2d at 513.  Moreover, vaguely asking for "[a]ll . . . data . . .  referenced" in *drafting* a report that was completed ***eleven years ago*** is not only overbroad, it is likely impossible.  Further, because Defendant makes no effort to specifically identify the documents it seeks (despite being in possession of the 2008 report), it can make no showing that the materials would be relevant or admissible.  With that in mind, one would imagine that many of the documents responsive to this request would be irrelevant.  Defendant's desire for these documents is clearly for impeachment purposes, which is not permitted under Rule

---

[17] Request 1 in the subpoena to Dr. Rigby (ECF No. 72-2) and the subpoena to SRK Consulting (ECF No. 72-3) are almost identical to Request 6 in the subpoena to our clients (the only difference seems to be that request "h" has the word "all" in front of it in the request to our clients).  We have already agreed to voluntarily provide that information to Defendant.

[18] This request was sent only to SRK and not to Dr. Rigby.

17(c).  *Nektalov*, 2004 WL 1574721, at *2 ("[D]ocuments sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena.").

>   **Request 2 to Dr. Rigby (ECF No. 72-2) / Request 3 to SRK (ECF No. 72-3)** – *Any reports, analyses, valuations, projections, or feasibility, technical or other studies, and any testimony, authored or provided by Dr. Neal Rigby concerning copper or cobalt mining in the Democratic Republic of the Congo during the period 2004 to the present.*[19]

This request, which is impossibly broad and explicitly asks for "***any***" of a number of different kinds of documents over a ***fifteen-year*** period is clearly an improper fishing expedition. *Mendineuta-Ibarro*, 956 F. Supp. 2d at 513.  Moreover, it asks for documents that are irrelevant—it is hard to fathom how if Dr. Rigby participated in a study fifteen years ago, that study could be helpful to the Court.  But most importantly, this request clearly seeks nothing more than impeachment evidence, which is not permitted under Rule 17(c).  *Basciano*, 2006 WL 8451585, at *5 (stating that the evidence sought in the subpoena cannot be sought for impeachment purposes).  To the extent that this request seeks materials relied upon by Dr. Rigby in formulating his original report and opinions in July 2017, and his updated report and opinions in November 2019, we have already agreed to provide such materials to Defendant, thereby rendering moot the only portion of this request that is even conceivably proper.

---

[19] To SRK (ECF No. 72-3), this request is slightly different, yet just as overbroad and irrelevant, asking for *"Any reports, analyses, valuations, projections, or feasibility, technical or other studies authored in whole or in part by Dr. Neal Rigby, and any testimony by Dr. Rigby, concerning copper or cobalt mining in the Democratic Republic of the Congo during the period 2004 to the present."*

## **CONCLUSION**

For the foregoing reasons, Victims respectfully request that the Court deny Defendant's

request for the issuance of subpoenas under Rule 17(c).

Dated:  December 17, 2019                    Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*s/ Morris J. Fodeman*
Morris J. Fodeman
Michael S. Sommer
Kate T. McCarthy
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899
mfodeman@wsgr.com
msommer@wsgr.com
kmccarthy@wsgr.com

*Counsel for Claimants*