# Exhibit 1



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,

          -against-

OZ AFRICA MANAGEMENT GP, LLC,

                 Defendant.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CR-515 (NGG)**

**TO BE FILED UNDER SEAL**

NICHOLAS G. GARAUFIS, United States District Judge.

      In the aftermath of Defendant OZ Africa Management LLC's guilty plea in this case,

about fifty former shareholders ("Claimants") of the Canadian mining company Africo

Resources Ltd. ("Africo") seek restitution pursuant to the Mandatory Victims Restitution Act, 18

U.S.C. § 3663A (the "MVRA"), for losses they allegedly incurred as a result of Defendant's

bribery of corrupt officials in the Democratic Republic of the Congo ("DRC").  (Feb. 20, 2018

Claimants Mem. in Supp. of Rest. ("Claimants Mem.") (Dkt. 26).)  The Government and

Defendant oppose an order of restitution.  (See Def. Sentencing Mem. ("Def. Mem.") (Dkt. 37);

Mar. 2, 2018 Gov't Letter Regarding Restitution ("Gov't Mem.") (Dkt. 39); July 13, 2018 Gov't

Letter Regarding Restitution ("Gov't Suppl. Mem.") (Dkt. 48).)

      For the following reasons, the court finds that Claimants are victims of Defendant's crime

under the MVRA and directs the parties to submit supplemental briefing regarding how to

calculate the appropriate restitution amount.

## I.     BACKGROUND

### A.     Facts[1]

As of 2006, Africo indirectly held rights to develop the Kalukundi Mine, a copper and cobalt mine in the southern region of the DRC.  (Claimants Mem. at 2-3.)  According to Claimants, Africo held a 75 percent interest in the Kalukundi mining rights, while DRC state-owned entity Gecamines held the remaining 25 percent interest.[2]  (Id. at 2 n.2.)  Claimants aver that they invested ample time and resources into developing the mine.  (Id. at 2-3.)

In 2006, a former Africo employee sued Africo in DRC for wrongful termination and obtained a $3 million ex parte default judgment (the "Default Judgment").  (Gov't Mem. at 2; Statement of Facts ¶ 24.)  A DRC court allowed the former employee to auction off Africo's interest in the Kalukundi Mine to satisfy the judgment, again without notice to Africo.  (Gov't Mem. at 2.)  The former employee then sold the mining rights at issue to Akam Mining SPRL ("Akam"), a DRC mining company.  (Id.)  Africo did not learn that its mining rights had been expropriated until April 2007, when Gecamines publicly confirmed that Akam held the majority interest in the Kalukundi Mine.  (Gov't Mem. at 3.)  Africo then fought the expropriation "with some limited success in the DRC courts," including by obtaining the DRC Supreme Court's review of the Default Judgment.  (Id.; see Statement of Facts ¶ 24.)  Per Claimants, their counsel reassured them that the default judgment would be overturned through the DRC legal process, so they initially continued to work towards the development of the mine.  (Claimants Mem. at 3.)

---

[1] The court derives this section from the "Statement of Facts" entered in connection with Defendant's guilty plea (Statement of Facts (Dkt. 11-3)) and from the parties' briefing.

[2] Defendant avers that Africo actually held a 48 percent stake in a DRC company, H&J Swanepoel Family Trust, which, in turn, owned a 75 percent interest in another DRC company, Swanmines s.p.r.l. ("Swanmines"), which owned the mining rights at issue.  (Def. Mem. at 6.)  Gecamines held the remaining 25 percent interest in Swanmines.  (Id.)

Unbeknownst to Claimants (id. at 3-4), a DRC senior government official, "DRC Official 2," structured these transactions to convey Africo's interest in the Kalukundi Mine to Dan Gertler, an Israeli billionaire active in the DRC mining sector and close to various high-ranking DRC officials.  (Statement of Facts ¶ 24 ("In fact, DRC Official 2 had orchestrated the taking of Africo's interest in the DRC Mine and made it available to DRC Partner."); see Claimants Mem. at 2 (identifying Dan Gertler as the "DRC Partner").)  Between December 2007 and March 2008, Gertler discussed the possibility of using Defendant's money to acquire the Kalukundi mining rights with Defendant's employees.  (Id. ¶¶ 16-27.)  As part of the agreement negotiated between Gertler and Defendant, Defendant invested $150 million in "Camrose," a special-purpose entity controlled by Gertler.  (Id. ¶ 26; see also Gov't Mem. at 3.)  Using these proceeds, Camrose (1) acquired Akam for approximately $15 million,[3] (2) offered to invest $100 million in Canadian dollars in Africo in exchange for a 60 percent stake in the company, and (3) paid millions of dollars in bribes to DRC officials.  (Statement of Facts ¶¶ 27-30; Gov't Mem. at 3.)  The purchase of a majority stake in Africo, however, required the approval of Africo shareholders.  (Statement of Facts ¶ 30.)

The success of this scheme thus depended at least in part on the DRC Supreme Court not invalidating the ex parte default judgment before Africo's shareholders could vote on whether to accept the Camrose investment.  In June 2008, "to ensure that Africo did not obtain a favorable court ruling in its case against Akam that could have affected the outcome of the Africo shareholder vote," Gertler arranged for the payment of bribes to DRC officials, including judges involved in the case.  (Id. ¶¶ 31-33.)  Gertler's in-country representative negotiated these bribes

---

[3] Camrose's acquisition of Akam appears to have been for the sole purpose of leveraging the Default Judgment to enable the takeover of Akam.  (Statement of Facts ¶ 27; see Claimants Mem. at 3 n.6.)

to ensure that Africo would lose the case <u>and</u> that the decision would not be announced until June 13, 2018—the day after Africo shareholders were scheduled to vote on whether to approve Camrose's proposed acquisition of the company.[4]  (<u>Id.</u> ¶¶ 33-34; Gov't Mem. at 3-5.)

On June 12, 2008, Africo shareholders voted to accept Camrose's takeover.  (Statement of Facts ¶ 35.)  Allegedly, they remained unaware of Gertler and Defendant's bribery. (Claimants Mem. at 4.)  Per Claimants, their vote to allow the takeover was the result of a "Hobson's choice" between "ced[ing] control of the Kalukundi mine to Gertler and his concealed conspirators, or risk[ing] . . . that the DRC Supreme Court might sustain the default judgment depriving the Africo Owners of their mining rights entirely."[5]  (Claimants Mem. at 4.) Rather than developing the mine, the conspirators consolidated it with other mining assets and transferred those assets among various entities, and Defendant eventually obtained $91,181,182 in profit.  (Statement of Facts ¶¶ 37-58.)  Subsequently, in 2013, additional resources at the Kalukundi mine were discovered, increasing its value.  (<u>See</u> Claimants Mem. at 24; Sealed Rigby Rep. ("Rigby Rep.") (Dkt. 26-6) ¶ 16).)  The mine remains undeveloped.  (<u>See</u> Def. Mem. at 15-18.)  Claimants suggest that Africo would have developed the mine if Africo had retained control of it.  (<u>See</u> Claimants Mem. at 24-25).  Defendant contends that there are several other reasons why the mine has not been developed, even through several sets of owners, and that Claimants have continued to play a role in the mine's management and the failure to develop it. (<u>See</u> Def. Mem. at 15-18.)

---

[4] In a text message to his in-country representative regarding these bribes, Gertler wrote: "We can't accept a mid result . . . Africo must be screw[e]d and finished totally!!!!"  (Statement of Facts ¶ 33.)

[5] The DRC Supreme Court's decision was ultimately never issued because Camrose's takeover rendered it moot. (<u>See</u> Claimants Mem. at 21; Gov't Mem. at 8.)

4

### B.    Procedural History

On September 29, 2016, Defendant waived indictment and pleaded guilty to one count of conspiracy to bribe DRC officials in violation of the Foreign Corrupt Practices Act. (Information (Dkt. 8); Waiver of Indictment (Dkt. 9); Plea Agreement (Dkt. 11).)  The plea was entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and conditioned on the recommendation that the court not impose a criminal fine on Defendant, provided that Och-Ziff Capital Management Group LLC (Defendant's ultimate parent company ("Och-Ziff")) and its affiliates paid a monetary penalty of $213,055,689, as provided for in Och-Ziff's deferred prosecution agreement.  (Plea Agreement ¶ 20.)  Although this portion of the plea agreement was silent as to restitution, the plea agreement provided elsewhere that "any fine or restitution imposed by the Court will be due and payable within ten (10) business days of sentencing."  (Id. ¶ 12 (emphasis added).)

On February 20, 2018 (two weeks before Defendant was scheduled to be sentenced), Claimants—about fifty shareholders who owned collectively about 64% of Africo in or around April 2008 (Claimants Mem. at 1 n.1)—filed a motion "requesting confirmation of victim status" and an award of restitution pursuant to the MVRA.  (Claimants Mem.)  They seek sufficient restitution to "make them whole," which, by the most optimistic calculations of a mining valuation expert, Dr. Neal Rigby, runs to the estimated $1.8 billion value of Africo's share of the Kalukundi Mine, had it actually been developed as Africo had planned.  (Rigby Rep. ¶ 4.) Defendant opposes the payment of any restitution.  (See generally Def. Mem.)  In a March 2, 2018 memorandum, the Government contended that Claimants may be victims of Defendant's bribery scheme, but that they were not entitled to restitution on the then-existing evidentiary record for two reasons.  (Gov't Mem. at 13-16.)  First, Claimants had not shown direct or

5

proximate causation for quantifiable harm from Defendant's conduct specifically.  (Id.) Defendant was not responsible for the initial theft of Africo's Kalukundi mining rights, which was "the major basis for the losses that Claimants sustained" and occurred before Defendant first engaged in conduct in support of the conspiracy.  (Id. at 13-15.)  Second, Claimants' damages were too speculative to merit a restitution award because calculating them would depend on "many variables and unknowns that go far beyond the facts on which the parties are operating from the plea agreement."  (Id. at 15-16.)

On March 6, 2018, Claimants submitted a reply, asking the court to reject what they characterized as the Government's "two-conspiracy theory"—i.e., that there were effectively two separate conspiracies: one to steal the Kalukundi mining rights and a second, which Defendant joined, to retain those mining rights.  (Mar. 6, 2018 Claimants Mem. in Supp. of Restitution ("Claimants Suppl. Mem.") (Dkt. 40) at 16; but see Apr. 5, 2018 Status Conf. Tr. ("Tr.") (Dkt. 50) at 14:6-15:3 (Government resisting the "two-conspiracy" notion and asserting instead that there was one charged conspiracy from 2007-2013 and "pre-conspiracy conduct," including the theft of Claimants' mining rights, in which Defendant was not involved).)  On April 5, 2018, the court held a status conference at which the parties expanded on their arguments.  Two weeks later, Claimants' counsel met with the Government and presented additional evidence in support of their restitution claim.  (See Apr. 26, 2019 Gov't Letter (Dkt. 45).)  On June 28, 2018, Claimants submitted a letter describing this evidence to the court.  (June 28, 2018 Claimants Mem. in Supp. of Restitution ("Claimants Second Suppl. Mem.") (Dkt. 46).)  In response, the Government stated that it "does not believe that this new information changes the analysis." (Gov't Suppl. Mem. at 1.)  In a brief reply, Claimants insisted that the Government had "ignore[d] most of the information" they had presented.  (July 19, 2018 Claimants Mem. in

6

Supp. of Restitution ("Claimants Third Suppl. Mem.") at 1.)  Claimants summarized their

position as follows:

> At the end of the day, when the Court steps back from all of the
> submissions, and considers that the defendant has admitted to
> bribing a court of law to delay and change a judicial ruling in order
> to obtain an asset—one that rightfully belonged to the Africo
> Owners and that the defendant otherwise could not obtain from the
> Africo Owners—the Africo Owners were obviously directly
> harmed, and harmed significantly. Indeed, that was precisely the
> goal of the defendant and its accomplices. The Africo Owners thus
> qualify as victims under the MVRA and CVRA, and are entitled to
> an Order of Restitution that attempts to make them whole.

(Id. at 3.)

## II.   THE MVRA

Under the MVRA, when a defendant is convicted of an offense specified in 18 U.S.C.

§ 3663A(c), the court must order the defendant to "make restitution to the victim of the offense."

18 U.S.C. § 3663A(a)(1).  The statute defines "victim" as "a person directly and proximately

harmed as a result of the commission of an offense for which restitution may be ordered

including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern

of criminal activity, any person directly harmed by the defendant's criminal conduct in the

course of the scheme, conspiracy, or pattern."  Id. § 3663A(a)(2).

Offenses generally requiring an award of restitution under the MVRA include any

"offense against property under [Title 18] . . . including any offense committed by fraud or deceit

. . . in which an identifiable victim or victims has suffered a . . . pecuniary loss."  Id.

§ 3663A(c)(1).  If a defendant has committed such an offense, the court must order the defendant

to return the property in question or, if the return of the property is "impossible, impracticable, or

inadequate," to pay an amount equal to the greater of the amount of the property at the time of

the offense or the date of the sentencing, less the value of any property returned.  Id.

§ 3663A(b)(1).  When a defendant is convicted of (or pleads guilty to) an "offense against

property," however, the MVRA does not apply if "the court finds, from facts on the record, that .

. . (A) the number of identifiable victims is so large as to make restitution impracticable; or (B)

determining complex issues of fact related to the cause or amount of the victim's losses would

complicate or prolong the sentencing process to a degree that the need to provide restitution to

any victim is outweighed by the burden on the sentencing process."  Id. § 3663A(c)(3).

## III.   DISCUSSION

For the purpose of this motion, the parties do not meaningfully dispute that the offense to

which Defendant pleaded guilty—conspiracy to violate the FCPA—is an "offense against

property" that can trigger restitution under the MVRA.[6]  See 18 U.S.C. §§ 3663A(a)(1),

(c)(1)(A)(ii) (requiring courts to order restitution for identifiable victims of offenses against

---

[6] Defendant assumes this point arguendo but does not concede it, so the court addresses it briefly here.  (Def. Mem. at 18.)  The MVRA states that offenses against property include "offense[s] committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1).  "Courts have disagreed as to whether 'committed by fraud or deceit' refers to 'the manner in which the defendant commits the offense,' . . . or instead requires the [c]ourt to look to 'the elements of the offense' to determine whether an offense of conviction was 'committed by fraud or deceit.'".  United States v. Finazzo, No. 10-CR-457 (RRM), 2014 WL 3818628, at *11 (E.D.N.Y. Aug. 1, 2014), aff'd in part, 682 F. App'x 6 (2d Cir. 2017), vacated on other grounds, 850 F.3d 94 (2d Cir. 2017) (citations omitted) (collecting cases and noting that the Second Circuit has not resolved this question).  For the reasons set forth in Finazzo, the court adopts the former interpretation and finds that the MVRA can apply to conspiracies to violate the FCPA, depending on the manner in which the defendant commits the crime.  See id. at *11-14.

Here, the conspiracy to bribe was part of a scheme to use state instrumentalities to expropriate Africo's mining rights without Africo's knowledge.  The conspirators kept stolen assets from Africo by bribing judges, did not tell Africo about the bribes, and used the stolen assets as leverage to persuade Africo to accept a takeover.  (See Statement of Facts ¶¶ 23-36.)  Thus, Defendant's crime was an "offense against property" and was "committed by fraud or deceit," within the scope of the MVRA.  See United States v. Ritchie, 858 F.3d 201, 209-11 (4th Cir. 2017) (making false statements in violation of 18 U.S.C. § 1001 was "offense against property" within scope of MVRA because false statement deprived another of property); United States v. Liu, 200 F. App'x 39, 40 (2d Cir. 2006) (summary order) (treating bribery-related offense as crime against property because it was committed through corruption or deceit); Finazzo, 2014 WL 3818628, at *10-14 (same); but see United States v. Adorno, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013) (denying New York City's request for restitution for a portion of the salary it paid a defendant, a city employee who had accepted bribes, because the evidence did not support the city's honest-services-fraud theory, and noting that "[w]here the offense of conviction is limited . . . to bribery, it is not clear that the MVRA applies").

Whether Claimants (and not just Africo) were deprived of property and thus qualify as victims under the MVRA presents a separate issue (see Def. Mem. at 18-21), which the court addresses below.

property under Title 18 where the victims have suffered a pecuniary loss).  Instead, the parties

disagree about: (1) whether the court may order restitution after accepting Defendant's guilty

plea (see Def. Mem. at 3-5; Claimants Suppl. Mem. at 3-6); (2) whether Claimants are victims

within the meaning of the MVRA (see Claimants Mem. at 12-14; Def. Mem. at 18-23; Claimants

Suppl. Mem. at 13-15); and (3) the extent to which Defendant is liable for the losses Claimants

suffered (see Claimants Mem. at 14-22; Def. Mem. at 23-25; Gov't Mem. at 10-16; Claimants

Suppl. Mem. at 5-12).

### A.    Whether the Court May Order Restitution After Accepting Defendant's Guilty Plea

Defendant makes two arguments on this issue.  First, according to Defendant, "[o]nce the

court accepts a Rule 11(c)(1)(C) plea, it may not change the terms of that plea at sentencing."

(Def. Mem. at 3 n.3.)  Defendant argues that, because the court accepted Defendant's plea, "a

sentence consistent with the Plea Agreement (i.e., one that does not include an award of

restitution) . . . can be the only legal sentence."  Id.

Defendant is incorrect.  As Claimants note (Claimants Mem. at 3), while the court

accepted Defendant's guilty plea, it has not yet accepted the parties' plea agreement.  The court

stated during the plea colloquy:

> [T]he representations made in the plea agreement are subject to
> review by the Court and in the event that even though the Court is
> inclined to accept this 11(c)(1)(C) plea, if there is some reason why
> the Court determines that it would not be legally appropriate to do
> so, you would be entitled to take back your plea and litigation could
> proceed.

(Sept. 29, 2016 Plea Hr'g Tr. ("Plea Tr.") (Dkt. 14) at 18:7-13.)  A Rule 11(c)(1)(C) plea

agreement only "binds the court once the court accepts the plea agreement."  Fed. R. Crim. P.

11(c)(1)(C).  Thus, Rule 11(c)(1)(C) does not bar the court from ordering restitution.

Second, Defendant maintains that restitution would violate Rule 11(b)(1)(K), which requires the court to specifically warn a defendant of the possibility of restitution during a plea colloquy. (Def. Mem. at 4.) As Claimants point out (Claimants Mem. at 4), however, a failure to address restitution in the plea colloquy is cured where the defendant becomes aware of the possibility of restitution before sentencing and chooses not to withdraw the plea. See United States v. Valval, 404 F.3d 144, 152 (2d Cir. 2005) ("Where a defendant, before sentencing, learns of information erroneously omitted in violation of Rule 11 but fails to attempt to withdraw his plea based on that violation, there can be no 'reasonable probability that, but for the [Rule 11 violation], he would not have entered the plea,' and the plain error standard is not met." (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83 (2004)). Here, Defendant has been aware of the possibility of restitution for some time. Restitution is referenced in the Plea Agreement (Plea Agreement ¶ 12 ("The Defendant agrees that any fine or restitution imposed by the court will be due and payable within ten (10) days of sentencing.")), and Defendant's counsel supposedly met with Claimants and the Government regarding restitution as far back as April 2017 (Claimants Mem. at 4). Therefore, the court's failure to specifically warn Defendant of the possibility of restitution at Defendant's plea colloquy does not preclude a restitution order now.

### B.    Whether Claimants Are "Victims"

Defendant also asserts that Claimants do not qualify as "victims" under the MVRA.[7] (Claimants Mem. at 12-14; Def. Mem. at 18-23.) Defendant makes two arguments in support of this theory. First, Defendant contends that Claimants' interest in the mining rights does not constitute "property." (Def. Mem. at 18-21.) Second, Defendant argues that its theft of

---

[7] The Government assumes that Claimants may qualify as victims, but asks to brief this issue if it becomes germane. (Gov't Mem. at 12 n.7.)

Claimants' mining rights was not the direct and proximate cause of Camrose's takeover of

Africo. (Id. at 22-25.) The court rejects both.

        1.    <u>Whether Claimants' Interest in the Mining Rights Constitutes "Property"</u>

Defendant insists that Claimants cannot be victims under the MVRA because they did not

lose any "property."[8] (Def. Mem. at 18-21.) In Defendant's view, Claimants' interests in the

Kalukundi mining rights were too attenuated to constitute property because Claimants owned

stock in Africo, which owned stock in a DRC company, which owned stock in another DRC

company, which owned the mining rights. (Id. at 18-19.) Individually, none of Claimants

exercised control over Africo because their respective ownership interests in Africo "were in

small fractions of 1%," and there is no evidence of a shareholder voting agreement that might

have given them collective control over Africo during the relevant time period. (Id. at 19.)

Further, while Claimants lost their interests in the mining rights by the 2006 Default Judgment,

Claimants regained them via the 2008 Camrose transactions through which Gertler consolidated

Africo and Akam (the company that owned the mining rights at that time). (Id. at 18-19.)

According to Defendant, the financial values of Claimants' holdings increased on a per-share

basis after this consolidation.[9] (Id. at 13, 19 & n.15.) The only harm Claimants suffered, per

Defendant, was a dilution of their interests in the now-consolidated company (and its mining

rights). (Id. at 19-20.) Defendant insists that this dilution of percentage equity ownership,

absent a loss of "control" (i.e., a majority of shares), cannot be a "loss . . . of property" under the

---

[8] Victims are entitled to restitution under the MVRA only if they have suffered a "physical injury or <u>pecuniary loss</u>." 18 U.S.C. § 3663A(a)(2) (emphasis added). A pecuniary loss includes the loss of tangible or intangible property. <u>See, e.g.</u>, <u>United States v. Bengis</u>, 631 F.3d 33, 39-40 & n.3 (2d Cir. 2011) (holding that South Africa was a victim under the MVRA because it had lost its property interests in illegally harvested lobsters, and that MVRA victims include those who have lost intangible property).

[9] Claimants suggest that their prior share price, and the price for which Camrose bought it, "vastly undervalued" the Kalukundi mining rights. (<u>See</u> Claimants Mem. at 4, 13.)

MVRA. (Id. at 19-20, 22-23 & n.16, 17.)  In support of this assertion, Defendant notes that individual shareholders lack standing to sue for wrongful equity dilution in a direct, rather than a derivative, capacity.  (Def. Mem. at 22.)

The court disagrees with Defendant.  The MVRA defines "victim" broadly; it contains no carve-out for holders of intangible property rights, such as shareholders who hold interests through special-purpose vehicles for tax purposes (see Claimants Mem. at 14 & n.19).  18 U.S.C. § 3663A(a)(2); see, e.g., United States v. Gushlak, 728 F.3d 184, 187 (2d Cir. 2013) (affirming district court's order of restitution for shareholder victims); Bengis, 631 F.3d at 39-40 & n.3 (holding that South Africa was a victim under the MVRA because it had lost its property interests in illegally harvested lobsters, and that MVRA victims include those who have lost intangible property).  While the attenuated nature of Claimants' interest in Africo's mining rights may make calculating restitution more difficult, it does not preclude Claimants from being victims.

Further, individuals can be victims under the MVRA even where they lack a private right of action against a defendant, United States v. Marino, 654 F.3d 310, 321 (2d Cir. 2011), so it does not matter that individual shareholders lack standing to sue directly for wrongful equity dilution.  Defendant's apparent suggestion that Africo (a defunct company), can qualify as a victim under the MVRA, but it's former shareholders cannot (see Def. Mem. at 18-20), lacks support in the case law and would lead to absurd results.  If this were true, as Claimants observe, "a defendant whose crime does some harm to a company would have to pay restitution [to the company], while a defendant whose crime does overwhelming harm to a company [that causes its collapse] would not have to pay restitution at all" (Claimants Mem. at 24).

Additionally, characterizing Claimants' injury as "wrongful equity dilution" is imprecise. Claimants state that they lost control over the development of the Kalukundi mine and the potential value arising from it. (See Claimants Suppl. Mem. at 15.) In other words, Claimants lost a promising opportunity. Courts have ordered restitution for other lost opportunities, even where there was no guarantee the opportunities would have resulted in profit. See, e.g., United States v. Scott, 321 F. App'x 71, 72 (2d Cir. 2009) (summary order) (affirming restitution order that included an award for subsequent investment gains lost as a result of the theft); United States v. Bartleson, 74 F. Supp. 3d 947, 984-87 (N.D. Iowa 2015) (ordering restitution that included a "reasonable estimate" of victims' "lost investment earnings," based on the Standard & Poor's 500 Stock Index); United States v. Kline, 199 F. Supp. 2d 922, 924-27 (D. Minn. 2002) (ordering restitution for shareholder who was deprived of her right to fairly sell her stock, even though there was no way to know whether she would have received more money by doing so); cf. United States v. Qurashi, 634 F.3d 699, 703 (2d Cir. 2011) ("[T]here is no reason to exclude losses that result from the deprivation of the victim's ability to put its money to productive use."). While this uncertainty makes calculating restitution more difficult, it does not preclude Claimants from being victims.

> 2. Whether the Theft of Mining-Rights was the Direct and Proximate Cause of Camrose's Takeover of Africo

Defendant also maintains that Claimants cannot demonstrate that they were actually harmed by the Camrose takeover because Africo: (1) was in dire financial straits prior to those transactions, (2) had not been able to develop the Kalukundi Mine, (3) would not have been able to raise third-party financing necessary to do so without significantly diluting its shareholders, and (4) recommended that its shareholders approve the Camrose transactions. (Def. Mem. at 10-13, 20-21.) None of these arguments is persuasive. Defendant has not shown that Africo's

13

straitened finances would have forced it to accept a takeover anyway, and the earlier theft of Africo's mining rights likely exacerbated its financial problems.  Claimants have represented that they were in the process of developing the Kalukundi mine before the Default Judgment. (Claimants Mem. at 2-3.)  There is no way to know that Africo would have needed to dilute its shareholders, and, in any event, it lost the opportunity to do so fairly, which is a harm recompensable under the MVRA.  See, e.g., Kline, 199 F. Supp. at 924-26.  And while Africo endorsed the Camrose takeover at the time, it appears to have done so under duress, given Gertler's and Defendant's actions to ensure that the DRC Supreme Court would not rule for Africo before its shareholder vote.  (See, e.g., June 9, 2008 Africo Letter to DRC Supreme Court Chief Clerk ("June 9 Letter") (Dkt. 46-12) (asking when the court's decision would be issued, explaining that Africo had scheduled a shareholder vote for June 12, and that "the fate of the company" depended on it); June 12, 2008 DRC Supreme Court Chief Clerk Letter to Africo (acknowledging that the decision should have been announced on June 6, but would instead be released "at the next hearing," at an unspecified date).)  Having conspired to deceive Claimants into accepting the Camrose Takeover, Defendant cannot now rely on Claimants' assent to avoid paying restitution.

In sum, Claimants qualify as victims under the MVRA.

**C.      Extent of Defendant's Liability**

      1.      Liability for Pre-December 2007 Conduct

The Government posits that, while Defendant may be liable for harms incurred by Claimants after Defendant joined the conspiracy in December 2007, it cannot be liable for harms resulting from Gertler's prior conduct.  (Gov't Mem. at 13-14.)  Thus, the Government argues, Defendant should not be liable for harms incurred by Claimants as a result of "the initial taking

14

of the mine by the Former Employee, the earlier unfavorable court decisions, and the entry of

Akam's involvement into the dispute." (Id.)  Indeed, the Government asserts, Claimants simply

assume that Gertler "was involved in the initial seizure of Kalukundi by the Former Employee

and that Och-Ziff somehow supported or ratified this purported conduct when agreeing to pay

bribes through [Gertler]," but "[n]othing in the Statement of Facts alleges that [Gertler] had any

knowledge or involvement in the Former Employee taking the mine." (Id. at 14.)

The court agrees with Claimants and rejects the notion that there were effectively two

separate conspiracies—one to steal the Kalukundi mining rights and a second, joined by

Defendant, to help Gertler retain those mining rights. (See Claimants Mem. at 13-15.)  As

Claimants note (id. at 15), Defendant pleaded guilty to a single conspiracy to bribe DRC

officials, spanning from 2005 to 2015, and nothing in the plea agreement supports the notion that

there were, in fact, two separate conspiracies. (Statement of Facts ¶ 16.)  "[A] single conspiracy

is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two

or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence

and assistance." United States v. Berger, 224 F.3d 107, 114-15 (2d Cir. 2000) (citations

omitted).  Here, there was mutual dependence and assistance between the two phases of

operation because the initial theft of the mining rights would have been futile had Defendant and

Gertler not paid bribes to ensure they would retain the mining rights via the Camrose takeover

and, indeed, the very purpose of the scheme to which Defendant's pleaded guilty was to

"acquir[e] and consolidate[e] valuable mining assets in the DRC" (Plea Tr. at 27:15-17).

Accordingly, there was one conspiracy.

15

A separate issue is whether Defendant must pay restitution for harm arising from conduct that took place before it joined the conspiracy. If the court were interpreting the MVRA on a blank slate, this might be a close call. But the court is not writing on a blank slate.

In United States v. Bengis, 783 F.3d 407 (2d Cir. 2015), the Second Circuit rejected a similar argument from a late-entering co-conspirator who argued that "because he allocuted to . . . involvement in a conspiracy only from 1999 through . . . 2001, the restitution ordered against him must exclude losses caused by the acts of the other defendants prior to 1999." Id. at 413. The Second Circuit looked to ordinary principles of conspiracy law, under which a late-entering co-conspirator is liable for the prior acts of his co-conspirators in furtherance of the conspiracy, at least when he knew or reasonably should have known of them. See id. Under the MVRA, it held, "[r]estitution must be determined in a similar manner": A defendant is liable for restitution for the prior acts of his co-conspirators in furtherance of the conspiracy "if [his] understanding of the scope of the conspiracy he joined . . . was such that he knew or reasonably should have known about some or all of the conspiracy's past imports." Id. (citing United States v. Boyd, 222 F.3d 47, 51 (2d Cir. 2000) (per curiam)); see also United States v. Fiumano, 721 F. App'x 45, 52-53 (2d Cir. 2018) (summary order) (rejecting similar argument).

Defendant thus may be liable for restitution for the acts of Gertler in furtherance of the conspiracy, provided that it knew or reasonably should have known about them. Here, Defendant admitted that "DRC Official 2 had orchestrated the taking of Africo's interest in the [Kalukundi] Mine and made it available to [Gertler]." (Statement of Facts ¶ 24.)[10] It admitted, as discussed above, that it entered into business with Gertler knowing that he paid substantial

---

[10] This admission belies the Government's claim that "[n]othing in the Statement of Facts alleges that [Gertler] had any knowledge of or involvement in the Former Employee taking the mine" (Gov't Mem. at 14).

bribes to obtain mining rights in the DRC and that it needed Och-Ziff "to help fund these corrupt payments." (Id. ¶ 17.)  It seems likely that Defendant knew or should have known that Gertler had been involved in corruptly acquiring control of the Kalukundi mining rights in the first place. (See id. (stating that Defendant employees understood that Gertler's scheme to "acquir[e] and consolidat[e] valuable mining assets in the DRC into one large mining company" would require the payment of substantial bribes, which would be funded by Defendant).)  As Claimants put it, "it would make absolutely no sense for Och-Ziff and [Defendant] to fund additional bribes to judges and others to 'retain' what was stolen from the Africo Owners if they were not fully embracing the part of the conspiracy to 'obtain' those valuable mineral rights in the first place." (Claimants Mem. at 17 (emphasis in original).)

Therefore, in calculating Claimants' restitution, the court will consider Defendant liable for the initial theft of Claimants' Kalukundi mining rights, as Defendant knew or should have known about it.  See Bergis, 783 F.3d at 413.

2.      Liability for Post-December 2007 Conduct

Even if the court adopted the Government's two-conspiracy theory, it would still order Defendant to pay restitution for its post-December 2007 conduct, which appears to have directly and proximately harmed Claimants by coercing them into accepting the Camrose takeover, contrary to the Government's contention.[11]  Defendant admitted to the following: (1) it funded

---

[11] The Government argues:

> With respect to the court proceedings, there is evidence of the co-conspirators taking steps intended to affect the outcome of that ruling, and to influence the timing of the announcement of the opinion, which either forestalled an unfavorable ruling or provided [Gertler] leverage to have Africo's shareholders to accept the Och-Ziff/[Gertler] terms at a specially convened shareholder meeting in June 2008.  Given the comparatively more significant and damaging conduct by the Former Employee, the initial court decisions, and sale of the claim to Akam, attributing all of the harm Africo suffered to a short period of time in June 2008, perhaps to delay or to influence a court ruling (that may never have been issued), is too speculative.  Furthermore, the court decision was never issued because of

17

investments with Gertler knowing that a portion of the investment would be used to pay bribes, and that these bribes were essential to Gertler's plan to consolidate control of DRC mining interests (Statement of Facts ¶¶ 16-17); (2) Gertler and his in-country associate negotiated specifically how much they would need to pay in bribes to "guarantee the results" of the DRC Supreme Court decision (id. ¶¶ 32-33); (3) when Gertler's associate told him that for a $900,000 bribe, the DRC Supreme Court would guarantee the results of the case, Gertler responded that "[w]e can't accept a mid result . . . Africo must be screw[e]d and finished totally!!!!" (id.); and (4) the DRC Supreme Court judges received "clear instructions to rewrite the opinion and to make sure that akam wins" and "agreed to do the lecture of the opinion on JUNE 13!"—the day after Africo's critical shareholder vote (id. ¶ 34). Contemporaneous documents corroborate Claimants' assertion that uncertainty about the timing and outcome of the opinion may have influenced the shareholder vote. (See June 9 Letter.)

In sum, a preponderance of evidence indicates that Defendant's bribe money helped secure a favorable result in the DRC courts, which influenced Claimants' decision to accept the Camrose Takeover. This is sufficient to support an award of restitution under the MVRA.

### D.     Restitution Amount

The MVRA requires a restitution award in the amount of the value of the property in question, either at the time of the crime or at the time of sentencing (whichever is greater). 18 U.S.C. § 3663A(b)(1)(B)). Claimants ask for a restitution award up to the full amount of their interest in the Kalukundi Mine as if it had been developed as Africo intended—approximately

---

the shareholder vote and, as a result, it is impossible to determine whether there was actual influence on the vote itself. Thus, even though the evidence is clear that Och-Ziff and [Gertler] intended to bribe the DRC courts to rule against Africo, any harm suffered by the Claimants did not flow directly from an adverse decision by the DRC courts.

(Gov't Mem. at 14-15.)

18

$1.8 billion, according to their valuation expert's report.  (See Rigby Rep. ¶ 4.)  This report incorporates more recent copper and cobalt market prices (which are important in determining the value of mining rights) as well as the additional resources that have been discovered at the Kalukundi Mine site.  (See Rigby Rep. ¶¶ 4, 78-80.)

The Government and Defendant allege several problems with Claimants' expert's report.  (Gov't Mem. at 15; Def. Mem. at 23-25.)  The Government contends that the report "makes no attempt to fairly apportion losses to the many actors involved," including by failing to apportion some losses to the former employee, and that it fails to present evidence showing how Claimants were specifically injured by Defendant's unlawful conduct in connection with the Camrose transactions and DRC Supreme Court decision.  (Gov't Mem. at 15.)  The Government also objects that the report relies on more optimistic valuations than those used by Och-Ziff in 2008 and fail to account for whether Africo could have obtained the mining permits or third-party financing it needed to develop the Kalukundi Mine.  (Id.)

Defendant argues that Claimants' restitution demand is "hypothetical, speculative" and "fanciful," as their only cognizable claim is supposedly "the partial dilution of individual non-controlling shareholders of a corporation whose total market capitalization was only $42 million at the time, and which was stated by [Claimants] to be on the brink of insolvency."  (Def. Mem. at 23.)  Backing up the Government, Defendant also argues that Claimants cannot complain about the failure to develop the Kalukundi Mine, as Africo shareholders have not developed the mine over the last nine years, and because this failure is the product of "numerous factors having nothing to do with who owned Africo[,] . . . including Africo's inability to obtain financing, its government partner, local civil unrest and political instability, and external market factors."  (Id. at 24-25.)

On the current record, the court is unprepared to decide how much restitution Defendant owes Claimants.  Accordingly, the parties shall submit supplemental briefing regarding the following issues: (1) the value of the mining rights themselves (as opposed to the value of a working mine on the site), as of either 2006-2008 or the present day[12]; (2) whether the court should either apportion liability among the coconspirators or make Defendant jointly and severally liable for all of Claimants' losses under 18 U.S.C. § 3664(h); and (3) whether "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process,"[13] 18 U.S.C. § 3663A(c)(3)(B).

## IV.   CONCLUSION

The court finds that Claimants are victims of Defendant's crime for the purposes of the MVRA.  (See Claimants Mem. (Dkt. 26).)  The parties are DIRECTED to confer and submit a joint letter by no later than September 6, 2019, setting forth a proposed schedule for supplemental briefing regarding how to calculate the appropriate restitution amount.

SO ORDERED.

S/ Nicholas G. Garaufis

Dated: Brooklyn, New York
      August 27, 2019

NICHOLAS G. GARAUFIS
United States District Judge

---

[12] At this time, the court does not believe that Claimants are entitled to a restitution award based on the full projected value of the Kalukundi Mine as if it had been developed.  The property in question here is the misappropriated Kalukundi mining rights themselves, not a working mine on the site (although the two are linked).  The restitution award would need to be based solely on the value of these mining rights, as of either 2006-2008 or the present day.

[13] In particular, the parties should address the complications posed by (1) the number of potential victims in this case, (2) determining how to assign fault to Defendant (as opposed to the former employee, Gertler, and corrupt DRC officials); and (3) determining how to calculate which losses were caused by Defendant's and Gertler's wrongful conduct (as opposed to the multitude of other potential problems with Congolese mining).