## CAHILL GORDON & REINDEL LLP
### EIGHTY PINE STREET
### NEW YORK, NY 10005-1702

HELENE R. BANKS
ANIRUDH BANSAL
DAVID L. BARASH
LANDIS C. BEST
BRADLEY J. BONDI
BROCKTON B. BOSSON
JAMES J. CLARK
CHRISTOPHER W. CLEMENT
LISA COLLIER
AYANO K. CREED
SEAN M. DAVIS
STUART G. DOWNING
ADAM M. DWORKIN
ANASTASIA EFIMOVA
JENNIFER B. EZRING
HELENA S. FRANCESCHI
JOAN MURTAGH FRANKEL

JONATHAN J. FRANKEL
ARIEL GOLDMAN
JASON M. HALL
WILLIAM M. HARTNETT
NOLA B. HELLER
CRAIG M. HOROWITZ
DOUGLAS S. HOROWITZ
TIMOTHY B. HOWELL
DAVID G. JANUSZEWSKI
ELAI KATZ
BRIAN S. KELLEHER
RICHARD KELLY
CHÉRIE R. KISER*
JOEL KURTZBERG
TED B. LACEY
MARC R. LASHBROOK
ALIZA R. LEVINE

TELEPHONE: (212) 701-3000
WWW.CAHILL.COM
———
1990 K STREET, N.W.
WASHINGTON, DC 20006-1181
(202) 862-8900
———
CAHILL GORDON & REINDEL (UK) LLP
24 MONUMENT STREET
LONDON EC3R 8AJ
+44 (0) 20 7920 9800
———
WRITER'S DIRECT NUMBER

JOEL H. LEVITIN
GEOFFREY E. LIEBMANN
BRIAN T. MARKLEY
MEGHAN N. McDERMOTT
WILLIAM J. MILLER
NOAH B. NEWITZ
DAVID R. OWEN
JOHN PAPACHRISTOS
LUIS R. PENALVER
KIMBERLY PETILLO-DÉCOSSARD
SHEILA C. RAMESH
MICHAEL W. REDDY
OLEG REZZY
THORN ROSENTHAL
TAMMY L. ROY
JONATHAN A. SCHAFFZIN
MICHAEL A. SHERMAN

DARREN SILVER
JOSIAH M. SLOTNICK
RICHARD A. STIEGLITZ JR.
ROSS E. STURMAN
SUSANNA M. SUH
ANTHONY K. TAMA
JONATHAN D. THIER
SEAN P. TONOLLI
JOHN A. TRIPODORO
GLENN J. WALDRIP, JR.
HERBERT S. WASHER
MICHAEL B. WEISS
DAVID WISHENGRAD
COREY WRIGHT
JOSHUA M. ZELIG
DANIEL J. ZUBKOFF

* ADMITTED IN DC ONLY

(212) 701-3207

March 6, 2020

Re:  *United States* v. *OZ Africa Management GP, LLC,*
<u>No. 16-cr-515 (NGG)</u>

Dear Judge Garaufis,

Pursuant to the Court's August 29, 2019 Memorandum and Order (ECF 51 at 20) and February 5, 2020 Scheduling Order (ECF 85), defendant OZ Africa Management GP, LLC ("OZ Africa") respectfully submits this letter regarding the appropriate calculation of restitution.

## <u>Preliminary Statement</u>

The Claimants have been attempting to obtain a windfall by presenting to the Court what amounts to a fiction – a demonstrably false account of the property they owned and what it was worth before and after the offense. The Claimants' arguments are counterfactual and directly contrary to the dictates of the Mandatory Victims Restitution Act ("MVRA") and well-established case law. When grounded in the realities of who the Claimants are, what they actually owned, and the actual impact of OZ Africa's offense, their claim collapses to a number that is lower on orders of magnitude than the hundreds of millions of dollars they seek.

*First*, the Claimants present their case as if they directly owned mining rights, when in fact they were *shareholders* in a publicly-traded company that indirectly held a portion of the rights to exploit the Kalukundi property. The Claimants never owned any mining rights, let alone a mine. They owned *shares of stock* in Africo Resources Limited ("Africo"), a Canadian start-up company listed and traded on the Toronto Stock Exchange ("TSX"), at prices quoted every day throughout the relevant period. Africo had no operating revenue and no track record of success, and its *total market capitalization* – only 65% of the shares of which the Claimants purport to have ever owned[1] – never exceeded a small fraction of what the Claimants now say they lost. In other

---

[1] Even the Claimants' assertion of their collective stake in Africo's shares is unsubstantiated, and it does not appear that they will be able to establish their individualized holdings as the MVRA requires. Claimants' counsel acknowledged at the January 28, 2020 argument before Judge Bloom that they only have records of "some" of their clients' shareholdings, and that the rest of the Claimants are estimating their holdings from memory alone. *See* Jan.

CAHILL GORDON & REINDEL LLP

-2-

words, the *entire company* that owned the mining rights was never worth close to what the Claimants purport was taken from them.

At bottom, the Claimants' position that as shareholders they are entitled to a *pro-rata* share of compensation for the mining rights, an asset in which the *company* had an interest, defies law and logic. Imagine the precedent that would be set if shareholders of a company damaged by an offense – and many companies have thousands of shareholders – could appear at sentencing and demand a portion of the value of assets they never individually owned. Certainly if the situation were reversed, and Africo were facing a *liability*, the Claimants would never concede their personal exposure for the liability of the company – and they would undoubtedly be right. The Claimants did not own the liabilities of Africo, nor did they own its interest in the mining rights or any other corporate asset. *See United States* v. *Dupree*, 781 F. Supp. 2d 115, 140 (E.D.N.Y. 2011) (Matsumoto, J.) ("The Second Circuit has recognized that 'shareholders do not hold legal title to any of the corporation's assets'" (quoting *United States* v. *Wallach*, 935 F.2d 445, 462 (2d Cir. 1991))).

Once the record is set straight on what the Claimants actually owned, calculating the damages to their actual property – their common shares in Africo – could not be more straightforward. They owned shares that had a certain, market-determined value before being impacted by the offense, and they owned the same shares that also had a certain value after the offense. Every MVRA case assessing shareholder losses in the Second Circuit calculates restitution by subtracting the second of these values from the first. The Claimants do not even address this controlling authority, pressing instead the fallacy that they owned Africo's indirect mining rights, since it enables them to exaggerate their claimed losses by manipulating the inputs into their subjective and imprecise discounted cash flow ("DCF") valuation.

As discussed below, a proper calculation of the damage to the Claimants' *actual* property, giving the Claimants the benefit of all variables and ignoring further mandatory reductions, shows that *at most* the Claimants lost approximately ***$1.47 per share*** (from $3.39 per share to $1.92 per share) as a result of the offense, and in the aggregate (accepting the Claimants' as yet unsubstantiated assertion that they collectively owned 65% of Africo's outstanding shares), their losses would be less than one-tenth of their demand.

***Second***, even ignoring that the Claimants' use of a discounted cash flow ("DCF") analysis to value the Kalukundi project has no place in calculating their loss – since as shareholders of Africo they did *not* own the project and would *not* have received any of its hypothetical cash flows – the Claimants' DCF valuation relies on erroneous, outcome-driven inputs that grossly inflate the value of the project. The Claimants' expert greatly overstates the rate at which economically viable minerals could be mined from the Kalukundi property, ignoring clear industry standards. He underestimates by nearly half the costs of developing the project. He ignores confiscatory DRC

---

28, 2020 Tr. at 89-90 ("What we discussed briefly, I think is having people swear to the best of their knowledge of what they held, and when they held it. But I believe for at least some of our clients, we have the actual documentation as well.").

CAHILL GORDON & REINDEL LLP

-3-

taxes that would have come out of any revenues the project hypothetically might have generated. And he applies a discount rate – a required reduction based on financing, development, geographic and other risks that negatively impact the value of the project – akin to the rate applicable to a fully operational mine in Arizona or Nevada. The Claimants' DCF valuation thus ignores entirely the fact that the DRC has the highest expropriation risk in the world (tied with Venezuela), and that the DRC government routinely reclaims mining rights held by foreign investors, or requires the renegotiation of the rights on less favorable terms.[2]

The Claimants' DCF valuation also ignores the numerous risks and contingencies that have prevented the Kalukundi project from ever being developed, and that have nothing to do with the offense. Africo's indirect 75% interest in the rights was held under an agreement with the government of the DRC, which owned the other 25% through a state-owned enterprise called Gecamines. The agreement with Gecamines contained a number of contingencies such as the requirement to secure financing that Africo failed to meet (all of which pre-dated and had nothing to do with the offense), and the project had several serious, specific risks impeding development of the property along with the inherent risks of conducting business in one of the highest-risk jurisdictions in the world. Even by the Claimants' low-ball estimates, the project would have taken hundreds of millions of dollars in capital to develop – money that Africo did not have, and would have had to raise through equity financing that would have reduced the Claimants' collective stake in the company in much the same way that the offense did.

The truth is that while the Claimants have ignored these risks and obstacles for the purposes of this litigation, Africo had long recognized the uncertainties inherent in the Kalukundi project and the fact that the project may never have proven profitable. The company explained in its public filings (over the name of at least one of the Claimants) that:

> Africo has no history of developing a mineral resource property. The likelihood of Africo's success must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the establishment of any business, factors that are exacerbated by the fact that Africo's business is conducted in the DRC. *There is no assurance that Africo can successfully develop the Kalukundi Property, generate revenues, operate profitably, or provide a return on investment in the future.*

---

[2]     "When it comes to squeezing investors, DRC is an extreme case in point. The country's downgrade from 6th highest risk in the index to joint 1st was precipitated by its new Mining Code, which imposed onerous fiscal terms on existing operators and allows heightened levels of government intervention in the sector. Since June 2018, when the code came into law, the government has attempted to block commercial asset transfers, tried to usurp operators to glean more profit, and choked exports from a cobalt mine." Mining Review Africa, *DRC Downgraded to Join Risk Rating Alongside Venezuela*, March 29, 2019, available at https://www.miningreview.com/central-africa/drc-downgraded-risk-venezuela/, attached to the accompanying Declaration of Tara H. Curtin ("Curtin Dec.") as Exhibit 6.

CAHILL GORDON & REINDEL LLP

-4-

Curtin Dec. Ex. 7 (Africo 2008 Annual Information Form ("AIF")) at 19 (emphasis added).[3] Africo's public statements before and after the offense – which were required by Canadian securities laws to be true and accurate, and to which some of the Claimants personally attested – are replete with similar statements about the utter lack of certainty that any revenue could ever be extracted from the project.[4]  This uncertainty is why in 2008, Africo conducted a DCF valuation of its interest in the Kalukundi project – the same valuation method the Claimants now assert yields a multi-hundred-million dollar value – and in a written valuation assessed its interest at *$1 million*, and the value of the entire project at $32 million.  A second DCF valuation prepared by Africo for the year 2009 assessed the company's interest in the mining rights at *negative $82 million.*  The Claimants, which include several senior officers of Africo at the time of these valuations, now ask the Court to award them hundreds of millions of dollars more than their own internal valuations – a windfall they never could have hoped to receive in the absence of the offense.

If proper and realistic inputs were used in a DCF valuation, Africo's share of the value of the Kalukundi rights (which the Claimants never owned) would actually be much lower than the value of the Claimants' Africo shares.  And it is only common sense and basic economics that an

---

[3]      Africo made identical statements in all of its annual reports from 2007 through 2015.  *See* Curtin Dec. Ex. 8 (Africo 2007 AIF) at 15; Ex. 9 (Africo 2009 AIF) at 21; Ex. 10 (Africo 2010 AIF) at 21; Ex. 11 (Africo 2011 AIF) at 23; Ex. 12 (Africo 2012 AIF) at 25; Ex. 13 (Africo 2013 AIF) at 26; Ex. 14 (Africo 2014 AIF) at 24; Ex. 15 (Africo 2015 AIF) at 24-25 (all the same).

[4]      *See* Curtin Dec. Ex. 16 (Apr. 19, 2007 Preliminary Short Form Prospectus (certified by Claimants Antony Harwood and Chris Theodoropoulos)) at 5-12 (detailing risk factors relating to Africo's business in the DRC including: "government[] . . . interven[tion] in the export of mineral concentrates[,] . . . [the] renegotiat[ion] or terminat[ion of] [mining] contracts, licenses and permits held by companies . . . [and other] factors (which may include new or modified taxes . . . ) may result in the curtailment or cessation of [Africo's] activities, adversely affecting the value of the [Africo's] assets"; "[t]he transportation and service infrastructure in the DRC is sub-standard and unpredictable . . . delays in the transportation of equipment, supplies and resources may delay the development of the Kalukundi Property . . . [and] increase the cost of developing the Kalukundi Property, and such increase may be material to [Africo's] business"; "[Africo] . . . has no history of developing a mineral resource property"; "The mineral title records in the DRC are incomplete, may not fully reflect the transfer history and may not disclose agreements, charges and claims that could impact on title . . . there can be no assurance that [Africo] holds valid title to the shares . . . and, indirectly, its interest in Swanmines"; "the Swanmines Agreement does not deal with its subject matter comprehensively . . . [failure to comply] may result in a forfeiture without compensation of its interest in the Kalukundi Property"; "there is currently no certainty that the economic analysis proposed [of the mineral resources of the Kalukundi Property] will be achieved . . . or that the indicated level of copper and cobalt recovery will be realized"; "few properties which are explored are ultimately developed into producing mines"; "the combination of these factors [affecting whether a mineral deposit will be commercially viable] may result in [Africo] not receiving an adequate return on its invested capital"; "The price of base and precious metals has fluctuated widely in recent years, and future serious price declines could cause the continued development of, and commercial production from, [Africo's] properties to be impracticable.").  Similar risk factors and others are detailed in Africo's annual reports from 2006 through 2015.  *See* Curtin Dec. Ex. 17 (Africo 2006 AIF) at 12-17; Ex. 8 (Africo 2007 AIF) at 14-20; Ex. 7 (Africo 2008 AIF) at 17-24; Ex. 9 (Africo 2009 AIF) at 19-26; Ex. 10 (Africo 2010 AIF) at 19-26; Ex. 11 (Africo 2011 AIF) at 21-28; Ex. 12 (Africo 2012 AIF) at 22-30; Ex. 13 (Africo 2013 AIF) at 24-32; Ex. 14 (Africo 2014 AIF) at 22-30; Ex. 15 (Africo 2015 AIF) at 22-30.

-5-

accurate discounted cash flow value could not be more than the market value of Africo itself, since a company's single asset cannot be worth several times the value of the company.

*Third*, the Claimants' multi-hundred million dollar valuation, first submitted to the Court in 2017, further strains credulity when compared to the value placed on Africo by its own shareholders and management (including some of the Claimants) *the previous year*. In 2016, Africo's Board of Directors, with the agreement of 99.997% of its shareholders, approved the sale of all of Africo's outstanding public shares for $0.77 per share in a going-private transaction. Since Africo had approximately 71 million outstanding shares at the time, this means that the entire value of Africo, whose sole material asset was its indirect interest in the Kalukundi rights, was determined by its shareholders and management (at least some of whom are Claimants) – in a transaction approved by a Canadian court – to be approximately $54.67 million. There is no rational explanation of why the Claimants now value Africo's sole material asset at a price hundreds of millions of dollars more than Africo's management and shareholders did only the previous year.

The Claimants' exaggerated valuation is even more dubious when considered alongside the undisputed fact that in the twelve years since the offense, with its mining rights intact and under the leadership of at least some of the Claimants, Africo has not extracted a single ounce of profitable ore, or a single dollar of revenue, from the Kalukundi project. This is so even though since 2008 Africo has been majority-owned by companies (including Camrose and a multinational mining conglomerate) with the means and every incentive to develop Kalukundi if it could profitably be done. Essentially, the Claimants are asking the Court to find that even though the Kalukundi rights were incapable of generating any revenue at any time before this case, the day OZ Africa was charged the property was suddenly capable of generating hundreds of millions of dollars in cash flow. It should be apparent that the Claimants see this case not as a chance for compensation, but as a winning lottery ticket.

*Fourth*, the Claimants ignore the MVRA's statutory requirement that any loss not include the value of the property returned. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii) (restitution award be reduced by "the value (as of the date the property is returned) of any part of the property that is returned"). Instead, the Claimants' DCF valuation assumes their property was taken and never returned, which is patently false. Not a single share of Africo stock – the only property Claimants ever owned – was ever taken from them. And even if the Claimants' fiction that they owned Africo's mining rights were adopted, it is undisputed and indisputable that the mining rights were fully restored to the company as a result of the 2008 Camrose Transactions (discussed below). While Claimants state that after the Camrose Transactions they owned less of Africo, they still owned a substantial stake – 24% – which must be deducted from any loss calculation.

And while the Claimants have argued that the Camrose Transactions deprived them of "control" of Africo, this is simply not so, since (i) no Claimant ever owned a controlling stake in Africo, and the Claimants never agreed to vote as a block and therefore never had the "control" they say they lost; (ii) all of the Claimants who held management positions in Africo before the

CAHILL GORDON & REINDEL LLP

-6-

Camrose Transactions continued in those roles after the Transactions, making clear that whatever managerial control any particular Claimant had was not lost; and (iii) the equity financing necessary to the survival of Africo would have had the same impact on Claimants' ownership stake regardless of the offense, making any supposed loss of voting control non-compensable under the MVRA.  *See United States* v. *Marino*, 654 F.3d 310, 319 (2d Cir. 2011) ("Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct" (quoting *United States* v. *Vaknin*, 112 F.3d 579, 589 (1st Cir. 1997))).



It should be equally obvious that Och-Ziff bears no resemblance to the company the Claimants are trying to demonize.  The management of the company has changed completely, and the company's nearly 400 current employees and hundreds of public shareholders and investors are entirely innocent of any wrongdoing.  It is manifestly unfair – and improper under the MVRA – for the Claimants to urge the Court to punish the company's current employees and investors in the guise of a restitution award.

The Claimants' attempts to obfuscate the facts and artificially inflate their demand should be rejected.  The questions before the Court under the MVRA are straightforward:  What property did the Claimants own, and what loss was caused to that property by the offense?  As demonstrated below, the answers are also straightforward:  the Claimants owned publicly-traded shares in Africo, and the damage they suffered is the loss in the value of those shares caused by the offense, which is no more than $1.47 per share.

CAHILL GORDON & REINDEL LLP

-7-

## Statement of Facts[5]

In October 2001, Swanmines s.p.r.l. ("Swanmines") was issued rights to the Kalukundi property under a 20-year exploitation license, which is set to expire in October 2021, with no guarantee it will be renewed.  *See* Curtin Dec. Ex. 7 (Africo 2008 AIF) at 10.  At the time the license was granted, 55% of Swanmines was owned by H&J Swanepoel Family Trust ("H&J"), and 45% was owned by Gecamines, the DRC state-owned entity.  *Id.* at 4.  In May 2004, H&J increased its equity share in Swanmines to 75%, reducing Gecamines's share to 25%.  *Id.* at 5.  The Gecamines interest was a "carried interest," meaning that 100% of the expenses associated with development of the Kalukundi property would be paid by the 75% interest holder, H&J.  *Id.* at 4 ("H&J covenanted to provide all necessary financing to Swanmines in connection with its exploitation and development of the Kalukundi property.").  Therefore, any returns to H&J from the Kalukundi project would be disproportionately impacted by its development costs.  The result was that while H&J (and later Africo) owned a 75% interest in Swanmines, it would not be entitled to 75% of the net economic benefit of the mining rights, and the greater the development cost, the less H&J's or Africo's actual economic interest.[6]

Moreover, for any mining permit renewed after June 2018, a DRC mining regulation adopted that month requires the permit holder to transfer 5% of the total ownership of the mining rights to the DRC government.  *See* Curtin Dec. Ex. 18 (DRC 2018 Mining Regulations (June 8, 2018)) at Article 180, Chapter 4.  Since all of the Claimants' and the Government's DCF valuations assume that production under the Kalukundi permit would begin in 2023, they all necessarily assume the renewal of the permit before its expiration in 2021, resulting in Africo's ownership of *only 70%* of the rights, not 75% as the Claimants assert.  Combined with the application of the carried interest discount discussed above, this means that Africo would actually be entitled to substantially less than 70% of any cash flows from the project.

On March 23, 2004, Africo obtained the right to purchase up to the entirety of H&J (and its 75% interest in Swanmines) for $2.275 million.  *See* Curtin Dec. Ex. 19 (Africo Form 51-102F4 *Business Acquisition Report* (June 12, 2007)) at 1.  H&J's only material asset was its interest in Swanmines, meaning that as of this date, the interest in the mining rights ultimately acquired by Africo was valued at $2.275 million.  *Id.*  From 2004 to 2006, Africo exercised parts of its purchase

---

[5]     The facts set forth herein are taken from the Statement of Facts attached to OZ Africa's Plea Agreement (the "SOF") (ECF 11-3) and public statements and regulatory filings made by Africo over the names of its senior management – who are among the Claimants now seeking restitution.

[6]     *See* Curtin Dec. Ex. 1 (Expert Report of Quadrant Economics prepared by Dr. Daniel Flores (the "Quadrant Report")) at ¶¶ 143-45 (Figure 10) (sensitivity analysis showing the reduction on Africo's economic interest based on reductions in cash flows).  To illustrate with a simplified example, imagine two 50% partners in a manufacturing business, where under the ownership contract, Partner 1 is required to advance all expenses to conduct the manufacturing operations, while Partner 2 does not have any such obligations.  The value of Partner 1's "50%" interest would be less than that of Partner 2's "50%" interest because of the additional costs imposed on Partner 1 under the partnership agreement.  Said differently, a buyer would pay much less for Partner 1's interest than for Partner 2's interest.

-8-

option on H&J, acquiring an aggregate of 48% of the company and its interest in Swanmines, the holder of the Kalukundi rights.  *See* Curtin Dec. Ex. 17 (Africo 2006 AIF) at 6.

On May 25, 2004, Rubicon Minerals Corporation ("Rubicon") announced that it had acquired the right to purchase a 30% interest in Africo for approximately $1.1 million.  *See* Curtin Dec. Ex. 20 (Rubicon News Release (May 25, 2004)).  Accordingly, to Rubicon, a sophisticated multinational mining company, the entire value of Africo, whose only material asset was its interest in the mining rights, was $3.67 million ($1.1 million ÷ 30%).  Rubicon exercised its 30% purchase option and continued to acquire equity in Africo through 2006.  *See* Curtin Dec. Ex. 21 (Rubicon 2006 Annual Information Form (Apr. 2, 2007)) at 18.

In May 2006, Rubicon announced the completion of a feasibility study on the Kalukundi property, carried out on behalf of Swanmines.  *See* Curtin Dec. Ex. 22 (Rubicon News Release (May 23, 2006)) at 1.  Per Rubicon's public filings, the study estimated 7.8 million metric tons ("Mt") of economically viable mineral reserves on the property, and a net present value of $43.6 million if project was 100% equity-financed, which is how Africo intended to fund the project.  *See id.* at 4.   In fact, from 2007 to 2015 all of Africo's "financial models [were] based on the scenario of 100% equity financing for the project."  *E.g.,* Curtin Dec. Ex. 8 (Africo 2007 AIF) at 13.

Even after the completion of the feasibility study, Rubicon warned investors about risks inherent in the Kalukundi project and in Africo's business generally:

> There are also risks associated with the business . . . that should be considered by investors, including (i) the need for additional capital, principally through equity financing and the risk that such funds may not be raised; (ii) the speculative nature of exploration and early stages of the properties; (iii) the effect of changes in commodity prices; (iv) regulatory risk that development will not be acceptable for social, environmental or other reasons; . . . (vii) the risks of holding assets and conducting business in the DRC. . . .

Curtin Dec. Ex. 23 (Rubicon July 13, 2006 Management Information Circular) at 4-5.  And long before the offense, Rubicon warned that "[t]here is no assurance that the Kalukundi Property will prove to be economic . . . .  In order for [Africo] to continue with the exploration and development programs . . . [Africo] will be required to raise additional capital . . . .  There can be no assurance that [Africo] will be able to raise such additional capital if and when required."  *Id.* at K-2.

On December 8, 2006, Rubicon sold its interest in Africo in a spin-off to its shareholders, and Africo's shares were listed on the TSX on December 15, 2006.  *See* Curtin Dec. Ex. 21 (Rubicon 2006 Annual Information Form (Apr. 2, 2007)) at 7; Ex. 24 (Africo News Release (Dec. 21, 2006)) at 1.  In or about March 2007, Africo purchased the remaining 52% of H&J under the 2004 option, and then owned H&J's 75% interest in Swanmines (which, as indicated, did not translate to a 75% economic interest in revenue from the Kalukundi project).  *See* Curtin Dec. Ex. 19 (Africo Form 51-102F4 Business Acquisition Report (June 12, 2007)) at 1.

-9-

Since Africo was a startup company with no significant capital and no operating revenues, it had to obtain financing before it could begin development of the Kalukundi project.[7]  As indicated in the company's public filings, Africo was not a candidate for debt financing, and therefore equity financing was the only realistic option, which is what in fact happened.  On April 13, 2007, Africo publicly announced a $115 million capital raise in a private placement of approximately 35 million additional Africo common shares with a well-known and reputable Canadian investment bank, Paradigm Capital (the "Paradigm Transaction"), stating that "[t]he net proceeds . . . will be primarily used to fund the equity requirements for the development of [the] Kalukundi project and for general corporate purposes including working capital."[8]  In other words, Paradigm, a sophisticated investment bank that had fully diligenced Africo and its assets and prospects, agreed to purchase 35 million shares of Africo for $3.28 per share ($115 million ÷ 35 million shares), and Africo, with a full understanding of what its mining rights were worth, agreed with this valuation.  The market also agreed, since on the day the deal prospectus was filed (April 19, 2007), the company's TSX-listed share price was $3.38 per share.  The Paradigm Transaction was supported by Africo's management and Board of Directors, including a number of the Claimants who were senior officers and directors of the company.

Prior to the Paradigm Transaction, Africo had 25 million outstanding shares.  *See* Curtin Dec. Ex. 27 (Africo Q1 2007 Filing) at 9.  Claimants have refused to disclose how many of these shares they individually or collectively owned, stating only that they collectively owned approximately 65% of Africo's total outstanding shares in April to June 2008 (*see* ECF 69 at 5), which would be approximately 17.68 million shares.[9]  Assuming this was true as of April 2007, the Claimants would have owned approximately 71% of Africo's total shares before the Paradigm Transaction.  After the Paradigm Transaction, Africo would have a total of 60 million shares outstanding, of which Claimants' 17.68 million shares would have constituted 29%.

However, unbeknownst to Paradigm, Africo, or the market, in December 2006 Africo's interest in the mining rights was sold in a DRC court-administered sale to Akam Mining Sprl ("Akam"), to satisfy a default judgment in an employment dispute with a former Africo employee.[10]  The Government has evidence, and the Statement of Facts stipulates, that the sale was orchestrated by a corrupt DRC official who intended to make the mining rights available to Dan Gertler, who later became a co-conspirator of OZ Africa.  *See* SOF ¶ 24.  In April 2007, Africo

[7]     By November 2006, Africo was in breach of an express condition of its agreement with Gecamines requiring it to obtain financing within six months after the feasibility study.  Under this provision, Gecamines could have forfeited Africo's interest in the Kalukundi rights "without consideration."  Curtin Dec. Ex. 15 (Africo 2016 AIF) at 23.

[8]     *See* Curtin Dec. Ex. 25 (Africo News Release (Apr. 13, 2007)) at 1; Ex. 26 (REUTERS, *Africo Announces C$100 Million Financing* (Apr. 13, 2007)).

[9]     *See* Curtin Dec. Ex. 28 (Africo Q1 2008 Filing) at 9 (listing 27.2 million outstanding shares).

[10]    Africo first issued a press release on February 23, 2007 stating the employee had obtained a default judgment for $3 million against the company.  There was no mention of the mining rights being taken to satisfy that judgment. *See* Curtin Dec. Ex. 29 (Africo News Release (Feb. 23, 2007)).

CAHILL GORDON & REINDEL LLP

-10-

learned of the judicially-administered sale, which it disclosed to the market on April 27, 2007. *See* Curtin Dec. Ex. 30 (Africo News Release (Apr. 27, 2007)). On the same day, the Paradigm Transaction was canceled. *See* Curtin Dec. Ex. 31 (Africo "Financing Cancelled" News Release (Apr. 27, 2007)).

Africo's share price materially declined after the announcement of the judicial sale and the withdrawal of the Paradigm Transaction.[11] On August 13, 2007, Africo announced that its appeal of the judicial sale had been unsuccessful, and its shares thereafter reached their low point for any time between the announcement of the sale and the restoration of the mining rights ($0.78 per share). *See* Curtin Dec. Ex. 32 (Africo News Release (Aug. 13, 2007)). The average price of Africo stock during the 90-day period following the appellate loss – the period of greatest impact of the loss of Africo's derivative mining rights – was $1.92 per share.[12]

Between December 2007 and March 2008, Dan Gertler and OZ Africa discussed the possibility of using a loan from OZ Africa to allow Camrose, a company controlled by Gertler, to acquire a majority interest in the Kalukundi mining rights from Akam. *See* SOF ¶¶ 16-27. This was OZ Africa's first involvement in any activity related to the Kalukundi rights. *See* SOF ¶ 16. As part of the agreement between Gertler and OZ Africa, OZ Africa invested approximately $115 million in Camrose. SOF ¶ 27. Using these funds, as noted in the Statement of Facts, Camrose acquired Akam and obtained a majority interest in Africo by purchasing 45.4 million newly-issued shares for approximately $100 million, and Gertler paid bribes to DRC officials to acquire and operate assets in the DRC. SOF ¶¶ 27-30, 40. Africo's Board of Directors approved the terms of these transactions (collectively the "Camrose Transactions") and recommended that its shareholders approve them,[13] which the shareholders did on June 12, 2008. SOF ¶ 35. Significantly, as a result of the Camrose Transactions, Akam relinquished its claim to the Kalukundi exploitation rights, which were fully restored to Africo.[14]

The Camrose Transactions resulted in the infusion of $100 million in new capital into Africo, and the market price reacted accordingly. On July 23, 2008, the day before the Transactions closed, Africo's share price closed at $1.80. On July 24, 2008, the day the Camrose Transactions closed, Africo's share price closed at $2.03.

After the Camrose Transactions, several of the Claimants, including Christopher Theodoropoulos (Chairman), John Dixon (Board member), and Antony Harwood (President and

---

[11]     *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 12 (Figure 1).

[12]     *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 5. As discussed below, this 90-day period is statutorily relevant to determining the loss in value to Claimants' shares.

[13]     *See* Curtin Dec. Ex. 33 (Africo Notice of Annual and Special Meeting of Shareholders and Management Information Circular (May 14, 2008)) at 12.

[14]     *See* Curtin Dec. Ex. 34 (Africo Management's Discussion & Analysis for the year ended December 31, 2008) at 2 (The Camrose Transactions "re-established [Africo's wholly-owned subsidiary's] ownership of 75% of the outstanding shares of Swanmines [], the holder of the permit to the Kalukundi Property.").

CAHILL GORDON & REINDEL LLP

-11-

CEO), continued in their positions as senior executives and directors of Africo. In no sense did any of the Claimants lose any control over Africo that they had prior to the Camrose Transactions. Moreover, while the Claimants' purported 17.68 million shares now constituted 24% of Africo's 72.6 million outstanding shares, this is similar to the percentage they collectively would have owned (29%) after the Paradigm Transaction, which would have been executed in the absence of the offense. *See* Curtin Dec. Ex. 35 (Africo 3Q 2008 Filing) at 9. The Claimants did not and do not claim to have voted as a block, and accordingly neither equity financing transaction deprived them of any voting control.

In August 2010, the mining conglomerate Eurasian Natural Resources Corporation ("ENRC") purchased a majority ownership interest in Camrose, and ultimately purchased the remaining interest in December 2012.[15] In July 2016, Africo was taken private with the purchase of 26 million outstanding shares at $0.77 per share. *See* Curtin Dec. Ex. 38 (Africo Form 51-102F3 Material Change Report (July 7, 2016)). The transaction was approved by Africo's Board of Directors with the consent of 99.997% of its shareholders, deemed fair in an opinion by Paradigm, and approved by a Canadian court.[16] Since Africo had a total of 71 million shares at the time,[17] the transaction valued the company, with its interest in the mining rights intact, at $54.67 million ($0.77 per share x 71 million shares).

Neither Africo, with its mining rights fully secure and under the leadership of several of the Claimants, nor Camrose, nor ENRC has ever developed the Kalukundi property despite every opportunity and economic incentive to do so. Nor, to the best of our knowledge, did any Claimant ever raise any issue or complaint concerning the lack of development, before this case presented an opportunity to seek a windfall from OZ Africa.

Since the events in question, Och-Ziff is an entirely transformed company. None of the company's approximately 400 current employees had anything to do with the DRC transactions related to the offense. The company has brought on former SEC and FINRA regulatory staff in high-level control positions, and implemented a state-of-the-art anti-corruption program that has received the approval of the Government-appointed Monitor. Och-Ziff paid one of the highest FCPA penalties in history, and has been amply punished for the offense. The company and the workforce the Claimants constantly attempt to demonize bear no resemblance to the company that was involved in the offense. And despite the Claimants' continued focus on the offense rather than their own property and the loss to it caused by the offense, the purpose of restitution under

---

[15]    *See* Curtin Dec. Ex. 36 (Financial Times, "ENRC buys into disputed Congo project" (Aug. 21, 2010)); Curtin Dec. Ex. 37 (Financial Times, "ENRC takes full control of Congo venture" (Dec. 10, 2012)).

[16]    *See* Curtin Dec. Ex. 50 (Africo Notice of Annual and Special Meeting and Management Proxy Circular for the Meeting of Shareholders to be Held on June 29, 2016, May 31, 2016 ("Africo Notice Meeting")) at 22, 33; Ex. 51 (Africo Report of Voting Results, June 29, 2016); Ex. 52 (July 6, 2016 Certificate of Arrangement) at 13.

[17]    *See* Curtin Dec. Ex. 50 (Africo Notice Meeting) at 40.

CAHILL GORDON & REINDEL LLP

-12-

the MVRA is not to heap onto punishment already imposed, but rather to compensate victims for actual losses to the property they actually owned, here the Claimants' common shares in Africo.

### Legal Standard

Having found that former shareholders of Africo could be victims under the MVRA, the Court is now tasked with determining the appropriate amount of restitution and to whom specifically it should be awarded. "'Federal courts have no inherent power to order restitution, which is traditionally a civil remedy. A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute.'" *Federal Insurance Co.* v. *United States*, 882 F.3d 348, 357 (2d Cir. 2018) (quoting *United States* v. *Zangari*, 677 F.3d 86, 91 (2d Cir. 2012)). The relevant statute here, the MVRA, provides:

> (b)   The order of restitution shall require that such defendant—
>
> > (1)   in the case of an offense resulting in damage to or loss or destruction of ***property of a victim*** of the offense—
> >
> > > (A)   return the property to the owner of the property or someone designated by the owner; or
> > >
> > > (B)   if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—
> > >
> > > > (i)   the greater of—
> > > >
> > > > > (I)   the value of the property on the date of the damage, loss, or destruction; or
> > > > >
> > > > > (II)   the value of the property on the date of sentencing, less
> > > >
> > > > (ii)   the value (as of the date the property is returned) of any part of the property that is returned[.]

18 U.S.C. § 3663A(b) (emphasis added).

Thus, the calculation of loss under the MVRA is driven by the identity of the "property of [the] victim." It cannot be the property of someone else, such as the corporation in which the Claimants owned shares.[18] Here, the only property the Claimants ever owned – and thus the only property relevant under the MVRA – is common shares in Africo. Claimants and the Government focus on valuing the mining rights, but the Claimants never owned any mining rights, nor did they

---

[18]   *See Dole Food Co.* v. *Patrickson*, 538 U.S. 468, 474-75 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. . . . *An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets.*") (emphasis added); *see also Dupree*, 781 F. Supp. 2d at 140 ("The Second Circuit has recognized that 'shareholders do not hold legal title to any of the corporation's assets' . . . '[s]hareholders are not legal owners or lienholders of the corporation's assets. Instead, the corporation – the entity itself – is vested with title.'" (quoting *Wallach*, 935 F.2d at 462)).

CAHILL GORDON & REINDEL LLP

-13-

ever own a mine.  On this the Court has been clear and consistent.  *See* ECF 51 at 5 ("Claimants [are] about fifty shareholders who owned collectively about 64% of Africo in or around April 2008"); Apr. 5, 2018 Tr. (ECF 50) at 15:5-9 ("They are shareholders.").

Restitution is also limited to a victim's "actual loss caused by the scheme." *United States* v. *Calderon*, 944 F.3d 72, 94 (2d Cir. 2019) (reversing award of restitution) (internal citation omitted).  "[T]he law does not authorize restitution to victims 'in excess of their losses.'" *United States* v. *Kinney*, 684 F. App'x 73, 75 (2d Cir. 2017) (quoting *United States* v. *Pescatore*, 637 F.3d. 128, 139 (2d Cir. 2011)).  While the Court directed the parties to address "the value of the mining rights themselves (as opposed to the value of a working mine on the site), as of 2006-2008 or present day" (ECF 51 at 20), when viewed through the proper lens of the statutory requirements of the MVRA, the value of "the mining rights themselves" *must* be the value of the mining rights as encompassed and reflected in the value of the "property of a victim," and the Claimants' only property was common shares in Africo.  18 U.S.C. § 3663A(b).  Claimants ignore this.  But to hold otherwise, and to conflate the property owned indirectly by the corporation with the stock owned by its shareholders, would contradict foundational corporate legal principles as well as Supreme Court precedent.  *See* note [21], *supra.*

The Claimants' theory – that their loss should be measured by the value of what was taken from Africo, rather than the value of their shares – would also produce manifestly absurd results.  For example, in 2010, a former Goldman Sachs computer programmer was prosecuted for stealing Goldman Sachs' high frequency trading source code.  Under the rationale advanced by the Claimants, Goldman Sachs's *shareholders* could have sought restitution from the programmer at his sentencing, for a pro-rata share of the value of the source code.  This would defy logic and law, since the shareholders did not own the source code, and any loss they suffered would consist of the impact, if any, the theft had on the market value of their Goldman Sachs shares.  *See United States* v. *Ruzicka*, 331 F.Supp.3d 888, 899-901 (D.Minn. 2018) ("If the Court concluded that shareholders are victims merely because they own shares in a victim corporation, then all shareholders would be entitled to 'be reasonably heard at any public proceeding,' 'confer with the attorney for the Government in the case,' and 'full and timely restitution.'  The Court must avoid turning a criminal trial into a judge-led shareholder meeting."); *see also Collins* v. *Mnuchin*, 938 F.3d 553, 624 (5th Cir. 2019) ("Think of the potential for chaos if the law were otherwise.  Any shareholder of a corporation – for major ones like Wal-Mart or GE we are talking about tens of thousands of potential plaintiffs – could claim to represent the company despite shareholders holding widely varying views on issues affecting the corporation.").

Moreover, "not every loss incurred by a person or entity affected by a defendant's conduct qualifies under the MVRA.  The loss must be caused by the conduct underlying the offense with which the defendant was actually convicted." *United States* v. *Bailey*, 2020 WL 370036, at *2 (5th Cir. Jan. 22, 2020); *see United States* v. *Mendenhall*, 945 F.3d 1264, 1267 (10th Cir. 2019).  In particular, "[r]estitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct." *Marino*, 654 F.3d at 319 (quoting *Vaknin*, 112 F.3d at 589).  Accordingly, the Claimants cannot be compensated for any "loss of control" or a reduction

CAHILL GORDON & REINDEL LLP

-14-

in their percentage ownership of Africo's shares because such a reduction would have occurred in the absence of the offense through the Paradigm Transaction.

In addition, because restitution must reflect the actual losses to each victim caused by the offense, it must be determined on an *individualized basis* before sentencing, and cannot be awarded to unidentified victims, or as a "lump sum" to be distributed at a later date. *See United States* v. *Catoggio*, 326 F.3d 323, 328-29 (2d Cir. 2003) ("Identification of victims is a statutory prerequisite to the application of the MVRA" and therefore "the district court should identify the victims and their actual losses prior to imposing restitution under the MVRA"); *United States* v. *Zakhary*, 357 F.3d 186, 190 (2d Cir. 2004) (Raggi, J.) ("A lump sum restitution order entered without any identification of victims and their actual losses is not permissible."); *United States* v. *Gushlak*, 2011 WL 128359, at *2-3 (E.D.N.Y. Jan. 14, 2011) (Garaufis, J.) (ordering the Government to provide a list of victims and the amounts of each of their losses). The Second Circuit has held, for example, that it is error for a district court to award restitution to "unidentified . . . victims," leaving for post-sentencing proceedings the individualized distribution of the award. *See Catoggio*, 326 F.3d at 329 ("the district court did err in ordering restitution to unidentified, as opposed to unidentifiable, victims . . . in an amount [] that may not represent the actual losses to those victims."); *see also United States* v. *Collardeau*, 2005 WL 1106475 at *7 (D.N.J. Apr. 28, 2005) (denying restitution award to "classes" of shareholders without individualized determination of losses since it would be "illogical and overly simplistic" and "presumes without any factual support that the entire loss suffered by the shareholders was caused by" the offense). Accordingly, restitution can only be awarded to individual Claimants who properly substantiate their shareholdings during the relevant period.

And finally, "the amount of restitution ordered must reflect a 'reasonable approximation of losses supported by a sound methodology.'" *United States* v. *Tanner*, 942 F.3d 60, 67 (2d Cir. 2019) (holding district court abused its discretion in ordering restitution because it failed to use a sound methodology) (quoting *United States* v. *Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013)). "[L]osses that are hypothetical or speculative" are not compensable under the MVRA. *United States* v. *Maynard*, 743 F.3d 374, 378 (2d Cir. 2014). As discussed below, the only sound methodology for valuing the damage to what Claimants actually owned, their Africo shares, is the loss to the publicly-traded share price caused by the offense, and the Claimants' litigation-driven valuations are demonstrably unreliable.

## I. Claimants Were Shareholders And Any Loss Must Be Measured By Loss To The Value Of Their Shares.

The Claimants owned common shares in Africo. They did not own any interest, direct or indirect, in a mine, mining rights, any other assets of Africo, or anything other than their shares. Not only is valuing the Claimants' shares the only proper way to measure any damage to their property under the MVRA, but it is also the most straightforward, and the only sound methodology to measure the Claimants' loss. The alternatives advanced by the Claimants, which improperly value property *they did not own*, rely on subjective, imprecise and speculative inputs that are easily

CAHILL GORDON & REINDEL LLP

-15-

manipulated (and have been by the Claimants' expert), resulting in wild swings in value, which is why courts routinely have rejected the Claimants' methodology in analogous cases. On the other hand, the value of the Claimants' publicly traded shares, and the loss in that value caused by the offense, are known and objectively verifiable, and were determined by an efficient market that factored in all information about Africo's assets and opportunities, including the opportunity to develop the Kalukundi project.

In fact, the Claimants themselves have recognized that the property they owned and retained after the offense was, for the purpose of the loss calculation under the MVRA, the value of their shares. *See* Jan. 28, 2020 Tr. at 70 ("they were left with 70 cents"). But the Claimants' *lost* property cannot be their multi-hundred million dollar valuation of the mining rights, while the property they *retained* was only 70 cents a share. Claimants only ever owned one "property" – their common shares of Africo – this is necessarily *both* the property damaged *and* the property retained. *See Robers* v. *United States*, 572 U.S. 639, 643 (2014) ("Generally, identical words used in different parts of the same statute are . . . presumed to have the same meaning.' . . . if [under the MVRA] the property that was damaged, lost, or destroyed was the money, then the property . . . returned must also be the money.") (internal citations and quotation marks omitted).

The Claimants' concession makes all the more perplexing their repeated and misleading argument that the Court has ruled on and rejected the proposition that their only loss was the damage to the price of their shares. *See* ECF 75 at 6; Jan. 28, 2020 Tr. at 57-59. This is a gross distortion of the Court's August 29, 2019 Memorandum and Order. At that time, the Court was not presented with, was not considering, and was certainly not deciding the correct methodology to use in calculating a restitution award. In fact, the Court's Order explicitly requested "supplemental briefing regarding *how to calculate* the appropriate restitution amount." ECF 51 at 20. While holding that Claimants' "attenuated" interest in the Kalukundi mining rights as shareholders permitted them to be "victims" under the MVRA (*id.* at 12), the Court made no determination as to whether the loss to the value of Claimants' Africo shares – the only "property" they owned – was a proper basis for the loss calculation. Indeed, the Court indicated during the September 23, 2019 appearance that it expected the Claimants to submit their "loss per share," making clear the importance of the Claimants' actual property – their shares in Africo – to any restitution calculation. Sept. 23, 2019 Tr. at 10 ("You're going to submit the number of claimants, the amount of the shares per claimant, I assume, and the loss per share, I assume."). Nor, contrary to what the Claimants repeatedly argue, are we asserting that the Claimants' only loss is dilution. We are *not* arguing this, but rather that the Claimants' loss is the decline in the value of their property, their Africo common shares, reflected in the decline in Africo's public share price.

As discussed below, this sound, reliable, and concrete methodology demonstrates incontrovertibly that the *total* value of Africo was never more than a fraction of what the Claimants would have the Court believe is the value of the company's sole material asset. And the impact of the offense on the *Claimants' shares* – the property they actually owned – was no more than approximately $1.47 per share. Curtin Dec. Ex. 1 (Quadrant Report) at ¶¶ 5-6, 19.

CAHILL GORDON & REINDEL LLP

-16-

### A.   Africo's Share Price Accurately Reflects Claimants' Loss, Including Any Lost Opportunities.

The Supreme Court has made clear that when a company's shares are traded in an efficient market, all publicly available information about the company and its assets is reflected in its share price. *See, e.g.*, *Basic, Inc*. v. *Levinson*, 485 U.S. 224, 241-48 (1988) ("the market is performing a substantial part of the valuation process performed by the investor . . . [t]he market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price") (citation omitted); *see also In re Petrobras Securities*, 862 F.3d 250, 275-76 (2d Cir. 2017) (Garaufis, J.) (discussing the fraud on the market theory established in *Basic*).  This includes information about the company's business prospects and opportunities, since as this Court has recognized in the context of the MVRA, "[e]quity prices are a function of expected future earnings." *United States* v. *Gushlak*, 2012 WL 1379627, at *9 n.16 (E.D.N.Y. Apr. 20, 2012) (Garaufis, J.) (emphasis omitted); *see Coburn* v. *Evercore Trust Co.*, 844 F.3d 965, 969 (D.C. Cir. 2016) ("a security price in an efficient market represents that market's most accurate estimate of the value of a particular security based on its riskiness and the future net income flows that investors holding that security are likely to receive") (internal citation and quotation marks omitted); *Central National Bank of Mattoon* v. *U.S. Dep't of Treasury*, 912 F.2d 897, 904 (7th Cir. 1990) (Posner, J.) ("[a] company's prospects are impounded in the market price of its shares"); *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 256 (S.D.N.Y. 2010) (Scheindlin, J.) ("the price at which the security trades in [an efficient] market embodies all publicly available information concerning the issuer and its business prospects"); *In re Executive Telecard Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1027 n.3 (S.D.N.Y. 1997) (Brieant, J.) ("a 'small-cap' stock . . . moves in accordance with the market's expectations and perceptions of its long term economic prospects . . . .  Euphemistically, [such] stock[s] could be said to trade on 'hope.'").

It is clear that Africo's share price reflected the market value of its future opportunity to develop the Kalukundi project, since Africo's only material asset was its interest in the rights to develop the property.  As this property has never been developed and has never produced a single dollar of revenue, the fact that Africo's stock had *any value at all* proves that the market was valuing Africo's future prospects of developing the property.  It could not have been valuing anything else.  Moreover, as a publicly traded company, Africo frequently provided information to the investing public about its risks, prospects, and opportunities with respect to the Kalukundi project, allowing the market to accurately value these opportunities.[19]

---

[19]   *See* Curtin Dec. Ex. 27 (Africo 1Q 2007 Filing) at 5 (disclosing the Akam judgment, signed by Claimants Harwood and Theodoropoulos); Ex. 17 (Africo 2006 AIF) at 3 (stating that "[t]here is no assurance that the Kalukundi Property will prove to be economic," certified by Claimant Harwood); Ex. 28 (Africo 1Q 2008 Filing) at 5 (noting that the continuing operations of the company and its sole asset, Kalukundi, were dependent upon "its ability to continue to raise adequate financing and to ultimately achieve profitable operations in the future," signed by Claimant Dixon and certified by Claimant Harwood).  Moreover, the TSX requires listed mining companies to follow certain requirements in their disclosures, including: reporting "[a]nalytical results . . . in a timely and responsible manner"; not disclosing exploratory results selectively; and correctly using the terms "resources" and "reserves" to describe

CAHILL GORDON & REINDEL LLP

-17-

As confirmed by our experts, it is equally clear that the market for Africo shares on the TSX was efficient, and that the share price factored in all available information concerning the company, including its opportunity to develop the Kalukundi project, and the temporary loss and subsequent restoration thereof.  "An efficient market is 'one in which the prices of the [stock] incorporate most public information rapidly.'" *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) (quoting *Teamsters Local 445 Freight Div. Pension, Fund* v. *Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008)), *cert. denied*, 138 S.Ct. 1702 (2018).  In determining market efficiency, the Second Circuit has endorsed a "holistic analysis based on the totality of the evidence presented." *In re Petrobras*, 862 F.3d at 277-78 (Garaufis, J.) (stating that the Second Circuit and the Supreme Court have "declined to define a precise evidentiary standard for market efficiency, but the Court's opinions consistently suggest that the burden is not an onerous one").  In particular, the Second Circuit has stated that "[a]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of [] [the] causal relationship" which is the foundation of an efficient market. *Teamsters*, 546 F.3d at 207-08.  Here, market and valuation expert Dr. Ronnie Barnes of Cornerstone Research has conducted such an event study and concluded that the market for Africo common shares during the relevant period was efficient.[20]   *See* Curtin Dec. Ex. 2 (Expert Report of Ronnie Barnes, Ph.D. (the "Cornerstone Report")) at ¶¶ 8, 60 (finding that Africo common shares traded in an efficient market from December 2006 through July 2008).

The Government conducted a similar event study and concluded that "there is some reason to believe that Africo stock traded in an efficient market." ECF 68 at 13 n.12.  Additionally, the TSX, on which Africo shares traded, is one of the largest and most active stock exchanges in the world. *See* Curtin Dec. Ex. 2 (Cornerstone Report) at ¶ 35 & n.59 ("As of December 31, 2007, the TSX was the second largest equity exchange group in the world, the seventh largest exchange group in the world, and the third largest exchange.").  From April 2007 through November 2007 (which encompasses the period during which Africo's shares reacted to the dispute over its mining rights), the average weekly trading volume was well over 2% (*see* Curtin Dec. Ex. 2 (Cornerstone Report) at ¶ 40 & n.69), which the Second Circuit has stated justifies a "strong presumption" of market efficiency. *See Waggoner*, 875 F.3d at 91-92.[21]  Finally, the efficiency of the market and the reliability of its pricing of Africo's shares is confirmed by the fact that Paradigm, after extensive diligence, and in the context of a transaction in which it would take $115 million in risk to purchase 35 million Africo shares, valued the company's shares at approximately the publicly-traded market price. *See* Curtin Dec. Ex. 2 (Cornerstone Report) at ¶ 46.

---

mineral assets per the definitions published by CIM. *See* Curtin Dec. Ex. 39 (Toronto Stock Exchange Disclosure Standards for Companies Engaged in Mineral Exploration, Development & Production (Aug. 2017)) at 4-6.

[20]      Event studies are "regression analyses that seek to show that the market price of the [relevant] stock tends to respond to pertinent publicly reported events." *Halliburton* v. *Erica P. John Fund*, 573 U.S. 258, 280 (2014).

[21]      For comparison, shares of Revlon, a multinational company with a market capitalization of nearly $1 billion, had an average weekly trading volume of 1.1% over the past year.  And it could not be seriously argued that the market is not efficiently valuing Revlon's shares.

CAHILL GORDON & REINDEL LLP

-18-

Due to the efficiency of the market and the reliability of its valuation of Africo and its sole material asset, Dr. Barnes has confirmed that *the most accurate and reliable method* for valuing Claimants' loss is the loss in the value of their Africo shares caused by the offense. *See* Curtin Dec. Ex. 2 (Cornerstone Report) at ¶ 11 ("[A]n analysis of Africo's public share price is the most accurate and reliable means of measuring Claimants' loss, particularly as compared to a DCF valuation, which is based on subjective and deterministic inputs.").

> **B.    Courts In The Second Circuit Consistently Calculate Shareholders' Losses Under The MVRA As The Loss In The Publicly-Traded Price Of Their Shares.**

Courts have routinely applied the holding of *Basic* – that publicly traded share prices accurately reflect all available information concerning a company – in calculating restitution to shareholders under the MVRA.  In fact, *every* MVRA case assessing losses to shareholder victims in this Circuit calculates loss in this way. *See, e.g., Gushlak*, 2012 WL 1379627, at *10 (ordering restitution in a securities fraud conspiracy based on submissions from the Government calculating shareholder victims' losses using stock price analysis), *aff'd* 728 F.3d 184 (2d Cir. 2013); *United States* v. *Hatfield*, 2014 WL 7271616, at *12 (E.D.N.Y. Dec. 18, 2014) (Seybert, J.) (using "event windows" to calculate loss to securities fraud shareholder victims under the MVRA and stating "the efficient market theory is critical[,] [i]t counsels the Court that the market digests events quickly and completely"); *United States* v. *Schwamborn*, 2012 WL 6050561, at *3 (E.D.N.Y. Dec. 3, 2012) (Feuerstein, J.) (decline in share price is the appropriate measure of restitution where "the victims' loss on the stock is solely attributable to the fraud"); *see also United States* v. *Stein*, 846 F.3d 1135, 1158 (11th Cir. 2017) (Pryor, J., concurring) ("The Second and Sixth Circuits have recognized that in appropriate cases the government may employ the *Basic* presumption to establish actual loss under [the U.S. Sentencing Guidelines] or the MVRA.").  As Judge Seybert noted in an MVRA case, "[r]egardless of whether the loss-inducing event is a corrective disclosure or a materialization of risk [as is the case here], demonstrating shareholder losses involves measuring the share price decline attributable to the announcement of that event." *Hatfield*, 2014 WL 72716716 at *3.

The Claimants say nothing about this well-settled and controlling authority, since they ignore altogether the fact that they owned Africo common shares, not Africo's assets.  They naturally prefer the fiction that they owned Africo's mining interests, since it enables them to inflate their claimed losses by manipulating the inputs into the highly subjective and imprecise valuation methodology they advance. When valuing companies, courts have routinely rejected the Claimants' methodology – the DCF method – in favor of objective market-based valuations.  As Judge Easterbrook of the Seventh Circuit has noted, "the price of stock in a liquid market is presumptively the one to use in judicial proceedings" to value a company. *Metlyn Realty Corp.* v. *Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985).  This is because "[m]arket prices are typically viewed [as] superior to other valuation techniques because, unlike, *e.g.*, a single person's discounted cash flow model, the market price should distill the collective judgment of the many

-19-

based on all the publicly available information about a given company and the value of its shares." *DFC Global Corp.* v. *Muirfield Value Partners LP*, 172 A.3d 346, 369-70 (Del. 2017) (Strine, C.J.); *see Dell Inc.* v. *Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 24 (Del. 2017) ("[T]he price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."); *In re Iridium Operating LLC*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) (Peck, J.) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation." (citation omitted)); J. Macey & J. Mitts, *Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, 74 BUS. LAWYER 1015, 1016 (2019) ("Recently, courts in Delaware explicitly have embraced the [efficient capital markets hypothesis] and have correctly observed that it is methodologically and analytically superior to discounted cash flow ('DCF') analysis as a means for determining fair value in appraisal proceedings."). "[E]ven prices produced in an *inefficient* market are a more reliable assessment of fair value than the wildly divergent predictions of an expert witness who tailors his or her valuation to the litigation imperatives of his or her client."[22] *Id*. at 1047 (emphasis added).

International arbitration tribunals, often the forum for complex mining valuation disputes, are also in agreement. Where a property lacks a record of operating results – which is indisputably the case here –the DCF method of valuation has been deemed speculative and improper, and tribunals prefer to use a market-based analysis. *See, e.g., Rusoro Mining Ltd*. v. *Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, Aug. 22, 2016 ¶ 785 (declining to use the DCF method to value gold mines in Venezuela – which has the same expropriation risk as the DRC – and stating that the DCF method was inappropriate due to the absence of a historical record of financial performance and the uncertainty of financing for new development); *Khan Resources* v. *Mongolia*, PCA Case No. 2011-09, Award, Mar. 2, 2015 ¶ 393 (refusing to apply DCF even to a mine with proven mineral reserves, since it was still "far from certain . . . whether the mine would actually have reached production [and] if it did, on what terms the parties would have participated in the venture").[23]

---

[22]     *See also* Curtin Dec. Ex. 2 (Cornerstone Report) at ¶ 31 ("The bottom line is that although the market may not be perfectly efficient, there is no evidence that any other pricing mechanism works consistently better.") (citing Cornell, Corporate Valuation: Tools For Effective Appraisal And Decision Making, 1993, Business One Irwin, Inc., at 46).

[23]     Arbitration tribunals outside the mining context have also found DCF models inappropriate for valuing developing businesses since a lack of concrete inputs leads to "contingent and indeterminate" results. *Southern Pacific Properties* v. *Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award, May 20, 1992 ¶ 188-89 ("DCF . . . [was] not appropriate . . . because the project was not in existence for a sufficient period of time to generate the data necessary for a meaningful DCF calculation"); *see also Vecchi* v. *The Arab Republic of Egypt*, INCSID Case no. ARB/05/15, Award, Jun. 1, 2009, ¶ 570 (noting "the wisdom in the established reluctance of tribunals such as this one to utilise DCF analyses for 'young' businesses lacking a long track record . . . where the business is still in its relatively early development phase").

CAHILL GORDON & REINDEL LLP

-20-

The tribunal in *Khan Resources* explained that "[a]bsent countervailing factors, [market capitalization] should be the simplest and most accurate reflection of the value of the Claimants' interest in the [project] and is preferable to the approximations and estimations provided by the DCF and market comparables methodologies, which are used in the absence of an accurate valuation." PCA Case No. 2011-09, Award, March 2, 2015, ¶ 400-01 (using a market-based offer-to-purchase valuation methodology (similar to the Paradigm Transaction valuation) due to certain factors diminishing the reliability of the market capitalization approach); *see also Rusoro*, ICSID Case No. ARB(AF)/12/5, Award, Aug. 22, 2016 ¶¶ 785, 789 (peak market capitalization has "no subjectivity in its calculation"); *Crystallex International Corporation* v. *Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, Apr. 4, 2016 ¶¶ 889-95, 916-17 (Venezuelan gold deposit arbitration award concluding that the "stock market method . . . provides a reasonable and reliable basis to quantify the Claimant's damages").

Indeed, the DCF method is generally viewed as reliable only when it yields a result that is consistent with a market price analysis, since "[a] company's stock price is an 'ideal datapoint' for determining value" and "DCF 'methodology has been subject to criticism for its flexibility.'" *In re Iridium*, 373 B.R. at 293, 346-47, 351 (citations omitted) (calling into question experts who "elected not to test and validate their valuation opinions by utilizing any accepted methodologies other than the discounted cash flow approach to value, and [who] based their opinion on restated cash flow projections that were tailored for litigation purposes well after commencement of [the] adversary proceeding"); *see In re Bachrach Clothing, Inc.*, 480 B.R. 820, 866-67 (Bankr. N.D. Ill. 2012) ("the DCF method is subject to manipulation and should be validated by other approaches"); *Metlyn Realty Corp.*, 763 F.2d at 835-36 (finding the DCF model outcome consistent with the stock price and other valuation methods, and noting "[t]he price of an actively traded stock . . . is [] an unusually reliable source of information").

The Government agrees that a share price loss calculation "would seemingly reduce speculation and subjective factors regarding the value of the mining rights vis-à-vis attempting to value the Kalukundi mine itself," and its sole stated reason for not endorsing a share price analysis is that it is "not aware of a single case where . . . share price analysis was utilized to calculate damages in a case such as this, specifically, where property damage was indirectly caused to shareholders by virtue of theft, damage or loss of an underlying corporate asset." ECF 68 at 14. But this confuses the *cause* of the harm ("by virtue of theft" etc.) with the *property* at issue, only the latter of which is relevant under the MVRA. In other words, regardless of *how* the harm to the Claimants' property was caused, the fact remains that the only property they ever owned consisted of common shares of Africo, and there is a long and completely consistent line of precedent holding that the way to value this property is its publicly-traded share price. In fact, we have not found a single MVRA case in which a court has awarded the shareholders of a public corporation the value of an asset owned not by them, but by the corporation, as the Claimants urge the Court to do here. Nor have we found, and the Claimants and the Government have not cited, a single MVRA case in which losses to shareholders are assessed using Claimants' discounted cash flow method.

CAHILL GORDON & REINDEL LLP

-21-

In short, it is *Claimants'* DCF approach that lacks any precedent, and there is ample – and controlling – precedent for valuing the damage to Claimants' only property, their Africo common shares, by determining the loss to the value of their shares caused by the offense.

### C.      Calculation Of Loss To Claimants' Property

Determining the loss to each Claimant's Africo common shares caused by the offense involves a straightforward calculation:  the value of Africo shares but for the offense, less the value of Africo shares after the offense, times the number of shares owned by that Claimant.  *See* 18 U.S.C. 3663A(b)(1)(B) (requiring calculation of "the value of the property on the date of the damages, loss, or destruction . . . less the value (as of the date the property is returned) of any part of the property that is returned").  Because the MVRA requires that restitution be the greater of the value of the victim's property at the time of the offense and at the time of sentencing (less the value of the property returned), the value of the property must be calculated as of both of those periods.

Dr. Daniel Flores of Quadrant Economics, an expert in the valuation of mining companies and their assets, has set forth these calculations in a detailed report.  *See* Curtin Dec. Ex. 1 (Quadrant Report).   Dr. Flores's calculations, which comport with the MVRA and the aforementioned case law, are summarized below.

### 1.      Loss At The Time Of The Offense

Prior to April 27, 2007 – the date Africo disclosed the dispute over its interest in the mining rights – the market (and Paradigm) priced Africo's shares based on its undisputed interest in the rights to develop the Kalukundi property.  The market price of Africo stock at the close of trading on April 26, 2007 was $3.39 per share.  This is the value of the Claimants' property but for the offense, at the time of the offense.

The Court must then subtract the value of the property *retained* by the Claimants after the offense, in other words the value of their shares after the market fully factored in the judicial sale of the mining rights.  *See* 18 U.S.C. § 3663A(b)(1)(B)(ii) (requiring the deduction of the "value (as of the date the property is returned) of any part of the property that is returned").  In determining the impact of negative information on share price, courts use the average price of the stock during the 90-day period following the disclosure of the negative news.[24]  Here, the maximum negative

---

[24]      "For the purposes of restitution, courts in this Circuit estimate the amount of financial loss suffered by victims of a criminal securities fraud in essentially the same way that they calculate damages in a civil securities fraud case." *Gushlak*, 2012 WL 1379627, at *1; *see also Hatfield*, 2014 WL 7271616, at *3 ("demonstrating shareholder losses involves measuring the share price decline attributable to the announcement of that event").  The Private Securities Litigation Reform Act of 1995 contains a "bounce back" provision that informs the calculation of damages in civil securities cases and provides that the market's valuation of negative news is the mean share price of the 90-day period after the negative news hits the market. *See* 15 U.S.C. § 78u-4(e). The "bounce-back" rule recognizes that the market may have an initial shock reaction to negative news, but it then factors the news more rationally in the next few weeks. The Sentencing Guidelines' "modified rescissory" method ("MRM") closely mirrors the bounce-back provision in

CAHILL GORDON & REINDEL LLP

-22-

impact of the judicial sale on Africo's share price was on August 13, 2007, when Africo announced that it had lost its appeal of the sale.[25]  During the 90-day period following that event, the average price of Africo shares was $1.92 per share.  *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶¶ 5, 19. This share price decline reflects the market's valuation of Africo's loss of its interest in the mining rights, and any lost opportunity to develop and profit from the Kalukundi property.[26]

Giving the Claimants the benefit of all doubts, and assuming that the entire share price drop was directly caused by the offense and not by other exogenous factors,[27] the Claimants' maximum loss per share was $3.39 minus $1.92, or ***$1.47 per share***.

However, simply multiplying the loss per share by the aggregate number of shares the Claimants purport to own does not yield the restitution figure.  This is because until the Claimants disclose when their clients purchased and sold their shares, at what prices, and in what quantities, it cannot be determined whether each Claimant suffered the full potential loss of $1.47 per share.[28] For example, a Claimant that purchased its shares on May 10, 2007 would have done so at $1.99 per share, and experienced a loss of only $0.07 per share ($1.99 less $1.92).  And a Claimant that purchased its shares in early 2008 would have done so with knowledge that Africo's interest in the mining rights was disputed, would have suffered no loss because the purchase price already reflected the full impact of the offense on the mining rights, and indeed would only have *gained* when those rights were restored by the Camrose Transactions and Africo's share price increased. *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 20 & n.24 (purchasers after the public disclosure of the dispute over the mining rights are "gamblers").  These individualized reductions based on the dates and prices of Claimants' share purchases and sales are mandatory under the MVRA, since each victim is only entitled to recover their "actual loss caused by the scheme."  *Calderon*, 944 F.3d at 94 (internal quotation marks and citation omitted); *see also Catoggio*, 326 F.3d at 328.

In addition, Claimants' counsel have acknowledged that some of their clients cannot state with any certainty when they purchased their Africo shares or at what price, and have no documentation showing this information.  *See* Jan. 28, 2020 Tr. at 89-90.  These Claimants cannot

---

calculating loss for the purpose of determining the offense level and Guidelines sentencing range.  *See* U.S.S.G. § 2B1.1, cmt. (3)(F)(ix) (2019).

[25]   *See Hatfield*, 2014 WL 7271616, at *12 (likewise using "event windows" to calculate loss to securities fraud shareholder victims under the MVRA).

[26]   It appears the Government has calculated a loss to Africo's total outstanding shares (not only Claimants' shares) by adding the loss to Africo's share price after the April 2007 announcement of the judicial sale, with the loss after the appellate defeat. This is double-counting. Under this methodology, every time Africo's shares recovered slightly during this period and then declined, it would be a separate "loss," which would grossly overstate Claimants' actual loss per share.

[27]   *See United States* v. *Gushlak*, 2011 WL 782295 at *7 (E.D.N.Y. Feb. 24, 2011) (Garaufis, J.) (restitution must exclude the impact of exogenous factors on share price).

[28]   On January 28, 2020, Judge Bloom ordered the Claimants to produce to the Government, by February 28, 2020, individualized and anonymized information relating to each Claimant's acquisition and disposition of their Africo shares (including the prices and quantities of the same), as well as each Claimant's purported loss.

-23-

receive restitution, since it would be improper under the MVRA to award restitution to Claimants who cannot establish their actual loss. *See Catoggio*, 326 F.3d at 328-29 ("[T]he district court did err . . . in ordering restitution in an amount that may not represent actual losses to those victims").

### 2.    *Loss At The Present Day*

The starting point for calculating the value of the Claimants' shares as of the present is the same as the starting point for calculating their loss at the time of the offense – the $3.39 per share value of their property but for the offense.

The MVRA then requires the Court to determine the value of that property – the Claimants' Africo shares – as of the present. Dr. Flores determined this by using an established index of mining companies similar to Africo – the Solactive Global Copper Miners Total Return Index – which indicates that such companies experienced an overall decline in share value of 50% since the time of the offense. *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 25. As Dr. Flores notes, this estimate may be overly generous to Africo and the Claimants, since a company with no track record and a single asset in the DRC likely would have underperformed in comparison to other more established mining companies. *Id.* at ¶ 25 n.31. However, giving Claimants the benefit of this very real doubt, the value of their shares but for the offense would have declined similarly by 50%, from $3.39 per share in 2007, to $1.69 today. *Id.* at ¶ 25 (Figure 2).

The MVRA then directs that the value that was realized by the Claimants be subtracted from the present-day value of their shares. The Court will not have this information until the Claimants submit the required data concerning when and at what price each of them sold their Africo shares. However, if the average price at which the Claimants sold their shares was $0.77 per share, the share price involved in the 2016 going-private transaction, the Claimants' loss per share would be $0.92 ($1.69 minus $0.77). *Id.* at ¶ 26.

Because the Claimants' loss would be greater at the time of the offense ($1.47 per share – a maximum subject to mandatory individualized reductions as indicated), the MVRA requires that this figure be used for restitution purposes. *See* 18 U.S.C. § 3663A(b).

## II.    The DCF Methodology Is Flawed and Unreliable, As Demonstrated By The Widely Divergent Results Yielded By Claimants' And The Government's Inputs.

Rather than identifying their individualized shareholdings and valuing their shares in Africo, which is what they actually owned, the Claimants advance a DCF valuation of the *Kalukundi project*, property they never owned. The fiction put forth by Claimants – that they owned the mining rights – is compounded by numerous flaws in their DCF model and the inputs they use. The fallacy of the Claimants' inputs, and the subjective and speculative nature of using a DCF model to value a non-producing, undeveloped project, are made clear by the fact that the Government, using the same model, arrives at a value for the entire Kalukundi project (not just

-24-

Africa's share) of *less than half – and two hundred million dollars less than –* the Claimants' value.[29]  As discussed below, both figures are grossly inflated.[30]

### A.   Courts And International Tribunals Have Found DCF Models Unduly Speculative And Unreliable In Valuing Undeveloped Businesses, Preferring Market-Based Valuations.

In its submission, the Government recognized the inherent risks of relying solely on a DCF model for a judicial valuation of an undeveloped project like Kalukundi:

> *While the DCF method may provide a means to assess the potential value of the Kalukundi mining rights, it is also limited by the reliability and accuracy of the various inputs utilized to estimate the revenues, costs, risks and resulting cash flows.*  Adjustments to certain inputs can have a significant effect *on the concluded value.  Further,* because the Kalukundi mine remains undeveloped, no historical results exist on which to support estimates of future cash flows.

ECF 68 at 5-6 (emphasis added).

As discussed, courts and international arbitration tribunals have repeatedly rejected DCF valuations of undeveloped or non-producing businesses as unreliable.  *See* Section I.B., *supra*; *see also United States* v. *400 Acres of Land*, 2019 WL 4120802, at *5-6 (D. Nev. Aug. 29, 2019) (DCF approach was "inappropriate in this case because the [p]roperty was not generating any income on the date of taking and had not generated any income for 60 years"); *Huff Fund Investment Partnership* v. *CKx, Inc.*, 2013 WL 5878807, at *1 (Del. Ch. Nov. 1, 2013) ("the unpredictable nature of the income stream from the company's primary asset render[ed] the apparent precision of the expert witnesses' cash flow valuation illusory").  So have leading academics.  *See* Macey & Mitts at 1044-45 ("Bradford Cornell, a foremost authority on market efficiency, observes in his seminal treatise on corporate valuation that DCF models must be treated with caution and skepticism because such models are 'easily abused.'  Further, because 'value can be created out of thin air by optimistic forecasting . . . the weight applied to a [DCF model] forecast should be

---

[29]     Additionally, Claimants' valuation of the entire Kalukundi project declined *over $500 million* between 2017 and 2019, using the work of the same expert, the same model, and the same project.  And a 2008 valuation of the project by the Claimants' expert's firm was a fraction of both of these calculations.  ECF 68-9 at ii (valuing the entire project at $102.6 million).  The utter lack of consistency in the numerous competing DCF values for the same project are a stark indication of how unreliable this methodology is.  Moreover, as Cornerstone notes, the fact that all of these valuations differ dramatically from the market's assessment of the value of Africa shows that Claimants' "assumptions about the firm's cash flows are wrong."  *See* Curtin Dec. Ex. 2 (Cornerstone Report) at ¶ 27 ("Stock prices aggregate information of many investors. Therefore, if [the] valuation disagrees with the stock's market prices, it is more likely an indication that [the] assumptions about the firm's cash flows are wrong.") (citing Berk & DeMarzo, Corporate Finance, 3d Ed. at 302 (2014)).

[30]     Like the Government, OZ Africa agrees that any valuation that assumes a fully developed mine ignores the directives of the Court, and "is highly speculative and ignores the practical realities."  ECF 68 at 6 n.5.

-25-

directly proportional to the confidence that can be placed in the cash flow forecasts'") (citations omitted).

These tribunals and economists uniformly recognize "that actual prices generated in the market are an unambiguously superior methodology for determining fair value than is the DCF analysis.  DCF calculations are highly subjective, and courts have expressed frustration with the wildly divergent views of competing experts who often arrive at wildly different valuations for companies when employing a DCF analysis."  Macey & Mitts at 1032.  Given the consistent rejection of the DCF model in valuing undeveloped projects like Kalukundi, and the overwhelming support for a market-based approach, Claimants' and the Government's DCF methodology fails to meet the standard of a "sound methodology" necessary for the calculation of a restitution award in this case.  *See Gushlak*, 728 F.3d at 196 ("the MVRA requires [] a reasonable approximation of losses supported by a sound methodology"); *Tanner*, 942 F.3d at 67 (vacating district court's restitution order and stating "the 'restitution ordered must be tied to the victim's actual, provable, loss,' . . . and the amount of restitution ordered must reflect a 'reasonable approximation of losses supported by a sound methodology'") (citations omitted).

### B.       Claimants' And The Government's DCF Valuation Inputs Are Flawed And Contrary To Industry Standards, Yielding Demonstrably Inflated Valuations.

If the precedents were to be ignored and the DCF method used, serious flaws in the Claimants' and the Government's DCF calculations would remain.  The Claimants' DCF valuations, exceeding by two to nine times the Government's valuation, are flagrantly inflated for litigation, inaccurate, and ignore industry standards.  Of the five most significant inputs used by the Claimants' expert Dr. Neal Rigby in his DCF model – (1) mineral volume; (2) discount rate; (3) capital costs; (4) royalty rate and taxes; and (5) commodity prices – the Government rejects the latter four, and only adopts Dr. Rigby's mineral volume due to the Government's lack of its own mining expert.[31]   ECF 68 at 6, 9.  In fact, as confirmed by renowned industry experts Graham Clow and Richard Lambert of the mining firm Roscoe Postle Associates Inc. ("RPA"), and Dr. Flores of Quadrant, all of Dr. Rigby's material inputs are flawed – he has disregarded industry standards in his estimate of economically viable mineral volume; his mineral recovery rate is significantly overstated; his discount rate  ignores the realities of the Kalukundi project and mining in the DRC; his estimated capital costs are far too low; and he did not properly apply the relevant tax rates payable to the DRC government.

**Economically Viable Mineral Volume.**  The DCF value of a mining project depends in part on the amount of economically viable mineral resources that can realistically be mined and sold.  As Quadrant and RPA explain, the value of a mining project cannot be based merely on the tonnage of ore determined to be in the ground, but rather the tonnage that makes economic sense

---

[31]       In his 2019 report, Dr. Rigby reduced his 2017 volume estimate to 13.9 million, but the Government did not take this into account in its DCF calculation.

-26-

to mine.  *See* Curtin Dec. Ex. 3 (Expert Report of Dr. Graham Clow and Richard Lambert (the "RPA Report")) at ¶ 17.

As RPA further notes, Dr. Rigby's use of the 13.9 million Mt mineral estimate in the 2013 report by AMEC is flawed because he treats this entire quantity as equally profitable, making no distinction between inferred resources – resources that are not reliable and have to be discounted – and other better defined resources.  *Id.* at ¶ 20.  Of the resources classified in the AMEC report, *nearly half* were designated as inferred.  Dr. Rigby has almost certainly included at least some of these inferred resources in his mining plan, but has made no effort to properly discount them in his DCF model.  As RPA notes, because of Dr. Rigby's failure to properly account for inferred resources, his use of the 13.9 million Mt estimate overstates the volume of economically viable mineral resources.  *See id.* at ¶ 17.

Ultimately, because the data underlying the 2013 AMEC Report has not been made available to RPA, RPA has determined that it is virtually impossible, without this data, to make a reliable estimate of the economically viable mineral volume based on the information Dr. Rigby used.  But in the absence of other options, RPA has assumed Dr. Rigby's mineral volume estimate – 13.9 million Mt (while maintaining serious concerns about its accuracy) – in order to address the additional flaws in his DCF methodology.  *See id.* at ¶¶ 17, 131.  If anything, the forced reliance on an unsubstantiated and flawed mineral volume, a major input into the DCF analysis, only demonstrates the inherent lack of reliability of the methodology in general, and of Dr. Rigby's approach in particular.

**Mineral Recovery Rate.**  The mineral recovery rate is the percentage of mineral resources that can practicably be mined.  As RPA notes, Dr. Rigby has ignored one of the most basic tenets of mining – resources become more difficult and expensive to extract the deeper they are underground.  Dr. Rigby has not accounted for this increase in cost and has simply assumed that all mineral resources on the Kalukundi property could be extracted at the same cost, using the same procedure.

RPA has corrected Dr. Rigby's errors and reduced the recovery rate of economically viable minerals accordingly, from 90% to 69% for copper, and 70% to 56% for cobalt.  *See id.* at ¶ 164.  Quadrant estimates that using the correct recovery rates, even without correcting Dr. Rigby's other errors, would reduce the Claimants' DCF value of the Kalukundi project by ***$155 million, or over 40%.***  *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 41.

**Terminal Value.**  The "terminal value" is the residual value of a business's assets after its cash flows have been exhausted.  Dr. Rigby has assigned such a "terminal value" of $21 million to theoretical mineral resources not included in his mining plan.  However, as RPA and Quadrant both note, the concept of a terminal value has no place in a DCF analysis of a mining property.  This is because theoretical "leftover" resources have no value since they are so far below ground and so uncertain in quantity that it would not be economically viable to extract them, if they even did exist.  Curtin Dec. Ex. 3 (RPA Report) at ¶ 197.  Again, Dr. Rigby assumes that these hypothetical resources could be extracted at the same cost as the rest of the resources in his mining

-27-

plan, an assertion that, RPA notes, makes no sense because these supposed "terminal value" resources are well beyond the depth of Dr. Rigby's mining plan, and the recovery rate of such minerals is 0% to 5%. Accordingly, the $21 million Dr. Rigby ascribes to these "terminal value" resources must be deducted from his DCF valuation.

The Government, relying only on Dr. Rigby's 2017 DCF model, also ascribes value to these "terminal value" resources. The Government's DCF model calculates a value of $22.9 million for these resources, which must be deducted from the Government's DCF valuation.[32]

**Discount Rate.** Another variable to which the DCF model is highly sensitive is the discount rate – a reduction applied to the projected cash flow to account for risks inherent in the project, including those related to its geographic location and other variables. For example, an investor or prospective purchaser is much less likely to take risk on a project in the DRC, where the government frequently renegotiates or reclaims mining rights,[33] than in the United States or Canada where the government is stable and legal recourse is dependable. Nor is an investor or purchaser likely to be attracted to a start-up company and an undeveloped project with no record of revenues. These risks necessarily reduce the value of a project, which is reflected in the discount rate.

As the Government has recognized, the Claimants' use of a 12% discount rate ignores the realities of doing business in the DRC and the risks involved in a mining project still in its infancy. ECF 68 at 8 (The Government's expert "is familiar with the application of discount rates and believes that a discount rate in excess of 12% is too low, particularly for an undeveloped commodities mine in a high-risk country."). In fact, the Claimants' 12% discount rate is the rate that would apply if the Kalukundi project were an *established* project in *the United States or Canada*. For example, the State of Arizona Department of Revenue has specified a "base discount rate" of 12% for mining properties located in the state, based on a number of industry, expert, and

---

[32]    Dr. Rigby makes a number of additional material mistakes in his mine plan analysis for the Kalukundi Project, which are detailed in the RPA Report. *See* Curtin Dec. Ex. 3 (RPA Report) at ¶ 132 (Dr. Rigby's mine optimization plan uses an incorrect pit design resulting in inflated economics); *id.* at ¶¶ 20, 146 (Dr. Rigby's production plan does not appropriately account for the higher capacity production plant he wishes to use, leading to drastically understated capital costs).

[33]    In 2005, the DRC tasked a parliamentary commission known as the Lutundula Commission with reviewing mining contracts signed between 1996-2003. The Report found that "dozens of contracts [signed during the Congo wars between 1996 and 2003] are either illegal or of limited value for the development of the country and [] recommend[ed] their termination or renegotiation." *See* Curtin Dec. Ex. 40 (Press Release, Human Rights Watch, DR Congo: End Illegal Exploitation of Natural Resources (Feb. 19, 2006)); *see also* Curtin Dec. Ex. 41 (Kapdwadi F. Lukanda, *Renegotiating Investment Contracts: the Case of Mining Contracts in Democratic Republic of the Congo*, 5 Geo. Mason J. Int'l Com. Law 301, 350-51 (2014) (noting that out of 63 mining agreements reviewed by another DRC Commission, 40 were recommended to be renegotiated and 23 were recommended to be cancelled). In 2018, the DRC government also stated its intention to renegotiate various contracts. *See* Curtin Dec. Ex. 42 (Barbara Lewis, *Congo's Gecamines wants to revise contracts with mining partners*, REUTERS, Feb. 5, 2018) ("Democratic Republic of Congo's state mining company Gecamines said… it wanted to renegotiate contracts with its international partners this year to give the state a bigger share of the revenues").

CAHILL GORDON & REINDEL LLP

-28-

agency sources and "the appraisal experience of the Department." Curtin Dec. Ex. 43 (Arizona Department of Revenue, Property Tax Division, Appraisal Manual for Centrally Valued Natural Resource Property for Valuation Year 2011, Tax Year 2012 (Mar. 15, 2010)) at 2.7. In contrast, discount rates of between 26% to 31% are used for projects in the DRC and elsewhere in central Africa. *See* Curtin Dec. Ex. 44 (Asa Resource Group Plc. 2016 Annual Report) at 111 (multinational mining company used a 27% discount rate to value its SEMKHAT (copper) and Zani Kodo (gold) mining projects in the DRC); Ex. 45 (Serafino Capoferri, CRU Group Study (Feb. 12, 2014)) at 2 (calculating DCF discount rates based on OECD rankings, and assigning a discount rate of 26% to 31% to high-risk countries including the DRC). On this basis alone, Claimants' DCF valuation must be rejected as unsound.[34]

The Government's DCF model uses a 20.5% discount rate, but the Government's expert, Stout Risius Ross, LLC ("Stout"), states that a rate of "at least 26%" would be "an appropriate discount rate to employ assuming the project was financed entirely by equity as opposed to a combination of debt and equity." ECF 68 at 9. In fact, Africo stated in all of its annual public filings that there was no guarantee it would be able to secure financing of any kind, and Africo consistently relied upon 100% equity financing in its financial models for the development of the Kalukundi project. *See* Curtin Dec. Ex. 17 (Africo 2006 AIF) at 3 ("In order to develop the Kalukundi Project in accordance with the Feasibility Study . . . Africo will be required to secure additional equity and debt financing. There can be no assurance that Africo will be successful in its endeavours."); *id.* at 13 ("There can be no assurance that such additional financing will be available to Africo or, if it is, that it will be offered on acceptable terms."); *id.* at 11 ("[t]he current financial models are based on the scenario of 100% equity financing for the project" and "[n]o allowance has been made in the model for the effects and levels of debt financing available or required").[35] The Claimants' expert's firm acknowledged the same in 2008. *See* ECF 68-9 (2008 SRK Report) at 42 ("If [debt finance] has to be used to demonstrate the economic viability of a project, one has to critically assess whether the project is really worth pursuing. SRK believes that

---

[34] Nor can the 2008 internal OZ Africa memorandum cited by the Claimants and the Government be used to support a 12% discount rate. As is clear from that memorandum, the 12% base discount rate it used did *not* account for DRC country risk, a required component of an accurate final discount rate. The additional country risk was reflected in a high (45% to 55%) internal rate of return that, according to the memorandum, would have been required to justify an investment in a DRC project. *See* Curtin Dec. Ex. 49 (July 23, 2008 OZ Africa Internal Memorandum ("2008 OZ Africa Memo")) at OZ AFRICA-000077. The Claimants and Dr. Rigby's uncritical use of the memorandum's base discount rate – rejected by the Government – therefore omits the required country risk premium.

[35] *See also* Curtin Dec. Ex. 8 (Africo 2007 AIF) at 4, 13 (*same*); Ex. 7 (Africo 2008 AIF) at 4, 20 (*same*); Ex. 9 (Africo 2009 AIF) at 4, 23 (*same*); *id.* at 19 ("Significant additional debt and/or equity funding is required to bring the Kalukundi Property into production. Due to the current economic environment, there can be no guarantee that such financing will be available at economic terms to enable the Kalukundi Property to be developed."); *see also* Curtin Dec. Ex. 46 (Sept. 17, 2008 Ltr with Report) at 7, 73 (RSG Global Technical Report (Revised) on the Kalukundi Project (dated as of July 2008), which was submitted to securities regulators by Africo on September 17, 2008, states that the financial models underlying RSG's valuation of the Kalukundi Project "are based on the scenario of 100% equity financing for the Project").

CAHILL GORDON & REINDEL LLP

-29-

the use of [debt finance] in the evaluation of the Kalukundi project even at a feasibility study stage of development is not appropriate.").

Using Stout's 26% equity financing discount rate *alone* would decrease the Government's DCF valuation – for the entire project and using the inflated mineral volume the Government adopted from Dr. Rigby's 2017 report – to approximately $100 million.[36]   Africo's (not Claimants') share of this figure would be approximately $72 million, and the Claimants' share would be approximately $46.8 million.[37]   The correct discount rate could be higher still when properly accounting for the very real risk that the Kalukundi mining rights could be revoked at any time because Africo failed to perform numerous contractual conditions – including providing adequate financing for the Kalukundi project[38] – and that in all events the rights were set to expire in 2021, with no assurance that they would be renewed.[39]   Additional project-specific risks included the need to relocate an entire village and regional power lines,[40] both of which sit on proposed drilling sites.  These would further increase the risks and costs of the project, and therefore the correct discount rate as well.

Notwithstanding these additional risks, Quadrant has independently calculated a highly conservative discount rate of 24%.  *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 119.  If this discount rate correction *alone* is made to SRK's 2019 valuation, the DCF value of the Kalukundi project would be ***reduced by nearly 75%, to $100.8 million,*** of which Africo's share (accounting for the carried interest issue) would be ***$43.8 million***.  *Id*. at ¶ 117 & n.164.

**Capital Costs.**  The DCF value of any mining project also must take into account the costs of development, or capital costs.  The Government corrected Dr. Rigby's 2017 capital cost estimate

---

[36]     *See* ECF 68-10 (Government's discount rate sensitivity table showing that with all other variables unchanged, a 25% discount rate under Stout's model would yield a project value of approximately $109 million.).

[37]     As discussed below, this figure would have to be further discounted by the mandatory statutory reduction for the value of the property returned, meaning the value of the Kalukundi rights when Africo regained them as a result of the Camrose Transactions.  *See* 18 U.S.C. § 3663A(b).

[38]     *See* Curtin Dec. Ex. 8 (Africo 2007 AIF) at 17 ("Africo is contractually obligated to provide the funding for the Kalukundi Property . . . If additional financing is not available, Africo may be unable to satisfy its obligations under the Swanmines Agreement.  Any such failure . . . may result in the loss of its interest in the Kalukundi Property."); *see also* Curtin Dec. Ex. 47 (Africo Interim Financial Statements for the period ending March 31, 2016) at 11 (detailing contractual obligations not met by Africo and noting there can be no assurance that Gecamines will not take the title to the Kalukundi Project without compensation).

[39]     *See* Curtin Dec. Ex. 7 (Africo 2008 AIF) at 10, 19.

[40]     *See* Curtin Dec. Ex. 7 (Africo 2008 AIF) at 22 ("[T]here is no assurance that [Africo] will be able to effect any required relocation of people in order to develop the Kalukundi Property."); *see also* Ex. 7 (Africo 2008 AIF) at 19 ("There is no assurance that Africo will be able to secure power or a supply agreement" necessary for Africo's operations"); *see also* Curtin Dec. Ex. 3 (RPA Report) at ¶ 76 ("The power lines (three) will need to be relocated as they pass near or across the Principal, Anticline, and Kesho pits.").

CAHILL GORDON & REINDEL LLP

-30-

from $448.4 million to $539 million.[41]   ECF 68 at 10.   Quadrant and RPA opine that Dr. Rigby's capital cost estimate is even more materially deflated and unrealistic.   Correcting for the errors in Dr. Rigby's 2019 cost estimates, RPA estimates that the true capital costs for the development of the Kalukundi project would be $824 million, over $350 million more than the cost assumption used by Dr. Rigby.   Curtin Dec. Ex. 3 (RPA Report) at Ex. RPA-002; *see also id.* at 43 (Table 8). If this correction *alone* were made to Claimants' DCF model, it would reduce Dr. Rigby's valuation of the project by ***$180.5 million, or almost 50%***.   And if the corrected capital expense estimate were used along with the corrected discount rate, the DCF value of the project would be ***negative***. *Id.*

**DRC Taxes.**   Any DCF value must also take into account taxes that must be paid to the DRC out of any projected revenues.   In 2018, the DRC enacted a new mining code that added a special tax on "excess profits," which as the Government notes is imposed when commodity prices increase more than 25% above the prices stated in a project's feasibility study.[42]   *Id.*   Without explanation, Dr. Rigby incorporates no reduction for this significant tax.   Dr. Flores notes that applying the excess profits tax correction *alone* to the Claimants' DCF model would reduce Dr. Rigby's valuation by approximately ***$59 million***.   *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 84.

Finally, if the excess profits tax was correctly applied, along with the corrected capital expense estimate, mineral recovery rate, 24% discount rate, and the other adjustments determined to be necessary by Quadrant Economics, the DCF value of the project would be ***negative***, meaning it would not be economically viable to develop the Kalukundi property.

\*     \*     \*

As demonstrated above, the correction of even a subset of the erroneous inputs into the Claimants' DCF model renders the Kalukundi project virtually worthless.   This should not be surprising, since Africo itself calculated the DCF value of its interest in the project as only ***$1 million***,[43] and the Kalukundi rights have never made a dollar of profit for any owner.

This is not to say that what the Claimants owned had no value, *because they did not own the cash flow from the mining rights*.   Rather, they owned shares of Africo, which did have value based on the market's assessment of the company's assets and opportunities, and which lost value after the market learned about the judicial sale.   As indicated above, that loss of value to Claimants

---

[41]     Nowhere in Claimants' or the Government's brief or analysis do they explain how Africo would have been able to raise a half a billion dollars to pay for the development of the mining rights.   Africo stated numerous times that its anticipated source of funding was through an equity raise, and the available equity funding – consisting principally of the Paradigm transaction – did not come close to generating this required sum.

[42]     For the Kalukundi project, the 2006 MDM Feasibility Study priced copper at $1.25 per pound, and cobalt at $12.00 per pound.   As the Government's experts note, these are the prices that must be used in calculating the excess profit tax.   *See* ECF 68 at 8.

[43]     *See* Curtin Dec. Ex. 48 (Africo Internal Valuation Models, 2008-2009).

-31-

in the aggregate could be no more than approximately $1.47 per share (without additional required individualized reductions).

### C.   The Claimants' DCF Calculations Drastically Overstate Africo's Interest In The Mining Rights.

Even if all of the flawed inputs into Dr. Rigby's DCF model were accepted, the Claimants' exaggerated valuation would still have to be reduced to reflect Africo's actual economic interest in the Kalukundi property.  As discussed, Africo's 75% interest in Swanmines did not translate to a 75% interest in cash flows from the mining rights, because the Swanmines Agreement required Africo to pay all expenses associated with the project.  Africo's management clearly understood this, since Africo's own 2008 DCF model valued the Kalukundi project at $32 million, but valued Africo's interest at just $1 million.  Curtin Dec. Ex. 48 (Africo Internal Valuation Models, 2008-2009).  In other words, if Africo's 75% ownership interest entitled it to 75% of the cash flows from the project, it would have valued its interest at $24 million, not $1 million.  Dr. Rigby, either unaware of the carried interest issue, or unable to make the required calculation, incorrectly used a simple 75% ratio of his DCF value to calculate Africo's purported share.

Nor is it even correct that Africo would have a 75% *ownership* stake in the Kalukundi project by the time Dr. Rigby assumes the project would begin to generate cash flows.  As indicated, Dr. Rigby's model assumes that production would begin in 2023, after the mining permit is renewed in 2021, at which time the DRC mining code would require Africo to transfer 5% of the Kalukundi rights to Gecamines, leaving Africo with 70% of the rights, not 75%.  *See* Curtin Dec. Ex. 18 (DRC 2018 Mining Regulations (June 8, 2018)) at Article 180, Chapter 4.  This means that the calculation of Africo's economic interest in the hypothetical Kalukundi cash flows would be discounted from its 70% interest, not the 75% interest the Claimants use.

As Quadrant notes, adjusting the Claimants' DCF valuation only to account for Africo's actual economic interest would reduce it by over **$127 million**, and the Government's DCF valuation would be reduced by over **$79 million**.  *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶¶ 154-55 (Figure 11).

### D.   Even If The DCF Method Is Used, The MVRA Requires That Any Restitution Award Be Reduced By The Value Of The Mining Rights When They Were Returned.

The MVRA mandates that any loss calculation must be reduced by "the value (as of the date the property is returned) of any part of the property that is returned."  18 U.S.C. § 3663A(b)(1)(B)(ii).  Here, even if it were ignored that the Claimants owned shares of Africo and not the mining rights, and even if Dr. Rigby's flawed DCF inputs were ignored, any DCF value of the mining rights must be reduced by the value returned to Africo when its rights were fully restored by the Camrose Transactions.  To do otherwise would be to award restitution as if the offense wrested the mining rights from Africo permanently, which was clearly not the case.  *See United States* v. *Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006) ("[A] sentencing court cannot order

CAHILL GORDON & REINDEL LLP

-32-

restitution that 'goes beyond making [the victim] whole.' . . . It cannot award the victim 'a windfall,' i.e., more in restitution than he actually lost." (citations omitted)).

Before the offense, the Claimants purportedly owned 17.68 million Africo shares, or 65% of the company's outstanding shares. They owned 65% of a company with its mining rights intact. After the Camrose Transactions (in other words, after the offense) the Claimants owned 17.68 million of Africo's 72.6 million outstanding shares, or 24% of the same company, with its mining rights again intact. Accordingly, if – despite its subjectivity and susceptibility to manipulation, and the fact that it has no place in valuing losses to shareholders – a DCF valuation were to be used to value Africo's share of the Kalukundi project, any restitution award based on this valuation would have to be reduced by the 24% of that DCF value, which was clearly returned to Claimants after the Camrose Transactions. [44]

Neither the Claimants nor the Government have made the necessary adjustments to their DCF valuations to account for the value of the property returned. Nor have they factored in Africo's true economic interest, or the Claimants' purported 65% interest in Africo.[45]  *See Catoggio*, 326 F.3d at 328-329 (restitution cannot be awarded to unidentified victims and must reflect their actual losses). As Quadrant notes, these adjustments would reduce the Claimants' DCF valuation by ***$280.9 million***, and the Government's DCF valuation by ***$144 million***. *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶¶ 154-55 (Figure 11).

\* \* \*

Ultimately, as Quadrant notes, using correct inputs yields a DCF value of the Kalukundi project that is negative, making these errors immaterial to an accurate DCF valuation. And all of this assumes that we completely disregard that the Claimants owned shares of Africo and not a percentage of its mining rights, and that they are not entitled to a prorated portion of the DCF value of the mining rights in the first place.

---

[44]     As an alternative, the value of the property returned could be measured by a contemporaneous DCF valuation commissioned by Africo and performed by Dr. Rigby's own firm, SRK, in 2008 when the mining rights were restored. *See* 18 U.S.C. § 3663A(b) (requiring subtraction of "the value (*as of the date the property is returned*) of any part of the property that is returned) (emphasis added). In its 2008 report, SRK valued the mining rights at $96 million. *See* ECF 68-9 (2008 SRK Report) at 54. As Quadrant notes, Africo's share of this amount (accounting for the carried interest of Gecamines) was $57.5 million, which is the value Africo retained after the Camrose Transactions. *See* Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 154 n.217. Accordingly, under any DCF valuation, Africo's share of the mining rights must be reduced by $57.5 million, *before* calculating the Claimants' interest.

[45]     This is not to criticize the Government's submission, which was transparent on this issue. *See* ECF at 2 n.2 (noting that its "valuations . . . are for the mining rights to the entire Kalukundi mine, and not the specific portion of those rights that was held by the Claimants . . . . Additional calculations would be necessary to ascribe values of the mining rights . . . to the appropriate restitution amount for individual Claimants").

CAHILL GORDON & REINDEL LLP

-33-

III.   **The Government Misreads The Internal OZ Africa Memorandum Concerning A Convertible Loan In Ascribing A $150 Million Value To The Kalukundi Project.**

The Government ultimately adopts a value for the Kalukundi project (not Claimants' loss) of $150 million, based on a 2008 memorandum written by OZ Africa employees seeking approval for a convertible loan.  The Government bases its reliance on this memorandum on the premise that "no party was better positioned to value the project" than OZ Africa.[46]  ECF 68 at 3.

In fact it was Africo, not OZ Africa, that was best "positioned to value the project," since Africo for years held the interest in H&J, the majority owner of Swanmines.  Africo listed its interest in the Kalukundi rights as its sole material asset in its public filings, and discussed in detail the risks inherent in the project.[47]  It was Africo, not OZ Africa that had "direct access to the resource" (ECF 68 at 3), and the best and most detailed information on the project.  And with its superior knowledge of the potential upside of the project, Africo, in an internal 2008 valuation prepared for its management (not for litigation), calculated the DCF value of the Kalukundi project to the company at *$1 million*.  *See* Curtin Dec. Ex. 48 (Africo Internal Valuation Models, 2008-2009) (also calculating the DCF value of the project to the company in 2009 at *negative $82 million*).  Claimant Christopher Theodoropoulos, then Chairman of the Board of Africo, received this valuation analysis, and it is extremely likely that other Claimants who were involved in the management of the company, such as John Dixon (a Director of Africo from July 2006 through October 2008) and Antony Harwood (President, CEO, and a Director from July 2006 through May 2009), would have been aware of it as well, considering the significance of the project to Africo's balance sheet.  Claimants did not reference this valuation in their submissions, nor explain why they now put the value of the project at nearly *300 times* what it was before the opportunity arose to reap a windfall profit under the guise of restitution.  *See Huff Fund*, 2013 WL 5878807 at *10 (Del. Ch. Nov. 1, 2013) (declining to use a DCF valuation, but noting that "when management projections are made in the ordinary course of business, they are generally deemed reliable" (quoting *Cede & Co.* v. *Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2003))).

Moreover, the Government misreads the OZ Africa memorandum, which actually concluded that at a value of $150 million, the project would *not* generate a sufficient return to justify an investment.  *See* Curtin Dec. Ex. 49 (2008 OZ Africa Memo) at OZ AFRICA-000076 ("these [internal rates of return] are *not* deemed attractive enough for a project in such a stage of development in the DRC") (emphasis added).  In other words, the memorandum concluded that the project did *not* have sufficient value to Africo to justify an equity investment in the company.

---

[46]   At the outset, it should be noted that the Government's reliance on the OZ Africa memorandum disregards the fact that OZ Africa was attempting to value the Kalukundi Project – again, an asset that the Claimants as shareholders of Africo never owned.

[47]   On the other hand, OZ Africa had not even conducted detailed due diligence on the property when the memorandum was written.  *See* Curtin Dec. Ex. 49 (2008 OZ Africa Memo) at OZ AFRICA-000081 ("detailed commercial due diligence and valuation have not yet been undertaken").

-34-

Accordingly, contrary to the Government's reading, the memorandum expressly rebuts, rather than confirms, the notion that $150 million was a fair value for the project.

The Government's reading of the internal OZ Africa memorandum as valuing the Kalukundi project at $150 million is further flawed because the memorandum was not drafted to obtain authorization for an investment, but rather a loan that was secured by over $2 billion in other assets.[48]  *See* Curtin Dec. Ex. 49 (2008 OZ Africa Memo) at OZ AFRICA-000069 (noting that loan would be secured by a guarantee from the Loan Trust Corporation, a Gertler entity that had over $2 billion in assets, and warranted that its liquid assets would not fall below $200 million for the life of the loan).   To use this document to value the Kalukundi project for restitution purposes, when the exercise it summarized was so unimportant to the loan that it was not based on any "detailed commercial diligence" (*id.*), falls far short of the "sound methodology" required by the MVRA.[49]  *Tanner*, 942 F.3d at 67.

Finally, the Claimants have repeatedly and egregiously distorted the OZ Africa memorandum as supporting their unrealistically low 12% discount rate (the rate applicable to a mine in Arizona).  In fact, as even a cursory reading of the memorandum makes clear, the 12% rate it cites is a base rate to which additional discounts, most significantly a country-specific risk premium, would be applied.  As Quadrant notes, "a discount rate for a project necessarily has to be equal to its . . . required minimum expected internal rate of return."  Curtin Dec. Ex. 1 (Quadrant Report) at ¶ 88.  The internal OZ memorandum explicitly notes that internal rates of return, *i.e.*, discount rates, of 20% to 34% for an investment are "not deemed attractive enough for a project in such a stage of development in the DRC."  Curtin Dec. Ex. 49 (2008 OZ Africa Memo) at OZ AFRICA-000076.  It is only at a projected internal rate of return of 45% to 55% (or when applying a 45% to 55% discount rate) that OZ Africa felt an equity investment would be appropriate for this type of a project, and OZ Africa did not make such an investment, opting instead for the loan.  *Id.* at OZ AFRICA-000077.  Accordingly, if the OZ Africa memorandum supports any discount rate, it is one much higher even than the rates used by Stout and Quadrant.



---

[48]     RPA states that they "do not consider this valuation [in the internal OZ Africa memorandum] to be realistic." *See* Curtin Dec. Ex. 3 (RPA Report) at ¶ 101.

[49]     If this valuation were nevertheless to be relied upon, the necessary reductions previously discussed, including but not limited to the value of the property returned and the Claimants' interest in Africo, must be applied to calculate the Claimants' loss.

CAHILL GORDON & REINDEL LLP

-35-



CAHILL GORDON & REINDEL LLP

-36-



## V. In Light Of OZ Africa's Limited Role In The Offense, The Court Should Not Hold It Responsible For The Full Amount Of Any Loss To Claimants.

In its August 29, 2019 Memorandum and Order, the Court asked the parties to address whether it "should either apportion liability among the coconspirators or make Defendant jointly and severally liable for all of Claimants' losses under 18 U.S.C. § 3664(h)" and to address "the complications posted by . . . determining how to assign fault to Defendant (as opposed to the former employee, Gertler, and corrupt DRC officials)." ECF 51 at 20. In MVRA restitution proceedings, the Court has "discretion to apportion liability among [defendant] and [its] coconspirators or to hold [defendant] jointly and severally liable for the full loss." *United States* v. *Smith*, 513 Fed. App'x 43, 45 (2d Cir. 2013).

First, contrary to the Claimants' assertion that Section 3664(h) is inapplicable here because "there is only a single defendant that has been charged by the Government, and only a single defendant who will be sentenced by the Court for this conspiracy" (ECF 69 at 2), the Government has confirmed that there is "an individual [who] pleaded guilty to participating in the same conspiracy in which the defendant participated," but argues that this individual in unable to "meaningfully contribute to the restitution award." ECF 68 at 15. In deciding whether and how much to apportion to a defendant, the Court must consider not only the economic circumstances of each defendant (on which the Government focuses exclusively) but also "the level of contribution to the victim's loss." 18 U.S.C. § 3664(h). This determination sounds in equity, and the Court "may apportion liability in the interest of fairness" or where it will create "a more just result." *See United States* v. *Donaghy*, 570 F. Supp. 2d 411, 433 (E.D.N.Y. 2008); *see also*

CAHILL GORDON & REINDEL LLP

-37-

*Paroline* v. *United States*, 134 S. Ct. 1710, 1716 (U.S. 2014) ("District courts . . . routinely exercise wide discretion both in sentencing generally and in fashioning restitution orders . . . .").[50]

Regardless of the role of the unidentified defendant, the evidence makes clear that it would be unjust to hold OZ Africa accountable for the entirety of the Claimants' losses. OZ Africa had no involvement in the conspiracy prior to December 2007, which was over a year after the judicial sale that caused the Claimants' alleged losses. *See* SOF ¶ 16; ECF 39 at 8 ("[M]uch of the harm that Africo sustained in the DRC appeared to be in connection with actions by [Alejandro Berardone], who was not a co-conspirator of Och-Ziff or [OZ Africa]."). OZ Africa's direct involvement in any loss was limited to financing the Camrose Transactions, which largely positioned the Claimants as they would have been positioned in the absence of the offense, since their ownership percentage of Africo shares would have been similarly reduced by the Paradigm Transaction. SOF at ¶¶ 23-30, 37-41. The record is clear that much of the wrongdoing here was *directly* caused not by OZ Africa, but by others more culpable like Gertler and corrupt DRC officials. *See, e.g.,* ECF 51 at 3-4 ("Gertler arranged for the payments of bribes to DRC officials, including judges involved in the case."). While we are unsure whether there was jurisdiction to charge these individuals, or what other considerations went into the Government's charging decisions (nor is it our place to question them), it is an onerous burden to hold OZ Africa solely responsible for harm primarily caused by other conspirators merely because they are not before the Court.

OZ Africa's parent company, Och-Ziff Capital Management, has already paid a heavy price for the offense. Och-Ziff has gone to extraordinary lengths to account for OZ Africa's past transgressions and to minimize corruption risks going forward. Och-Ziff has separated from all personnel with any connection to the offenses of OZ Africa. The company shed over 200 employees in the wake of the offense, and the almost 400 current employees of Sculptor Capital Management and hundreds of current shareholders had nothing to do with the offenses of OZ Africa. To hold OZ Africa accountable for the full amount of any loss to Claimants would be disproportionate to the company's actual responsibility, and unjustly punitive of the company's current employees and shareholders.

## VI. Claimants' Restitution Methodology Creates Overly Complex Issues Of Fact And Would Unduly Delay The Sentencing Process.

The MVRA does not apply to offenses against property "if the court finds, from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). "The complexity exception creates a balancing test where a court must weigh

---

[50]   OZ Africa has asked the Government to identify the role of the other defendant in the offense, and for particulars on their ability to pay, but thus far the Government has not provided any such details. To the extent there is a legitimate law enforcement reason to withhold this information, OZ Africa would not object to the Court receiving the information *in camera*.

-38-

the need to provide restitution to a victim against the burden on the sentencing process posed by determining complex issues of fact." *United States* v. *Malone*, 747 F.3d 481, 486 (7th Cir. 2014). Congress intended district courts to use streamlined processes to make restitution decisions fairly and quickly and to "not become embroiled in intricate issues of proof." *United States* v. *Reifler,* 446 F.3d 65, 136 (2d Cir. 2006).

Here, OZ Africa respectfully submits that the share price loss method is the only fair, straightforward, and objective way to calculate restitution, whereas the DCF method, as demonstrated above, is overly complex, subject to manipulation, and will unduly delay the sentencing process. As indicated, case law, international arbitration tribunals, economists, and the Government have recognized the inherent unreliability of DCF models for companies without an operating history and that minor input adjustments can cause dramatic valuation swings. We have seen the subjectivity and unreliability of this method play out in the Government's and Claimants' valuations which diverge by nearly $200 million. If a methodology that has already produced a valuation range so wide does not evidence the type of unwieldy complexity contemplated by Section 3663A(c)(3)(B), it would be hard to imagine what would.[51]

On the other hand, valuing the loss to the Claimants' shares – their actual property – employs a methodology frequently used by courts, is straightforward, objective, mathematically clear, and does not depend upon the judgment or discretion that reasonable experts could disagree on. The Court would rely on easily accessible data of Africo's share price history on the TSX. In sum, as the Government stated, "share price analysis could provide a relatively straightforward calculation." *See* ECF 68 at 3.

---

[51]     Additionally, Claimants' false assertion that they represent a "class of victims" and their failure to identify individual Claimants and their specific losses severely complicates and would improperly prolong the sentencing process. *See Catoggio*, 326 F.3d at 328-29 (Court must "identify the victims and their actual losses prior to imposing restitution under the MVRA" to "ensure[] that those victims receive the pro-rat[ed] share of the restitution funds to which they are entitled"); *United States* v. *Ferguson,* 584 F. Supp. 2d 447, 458 (D. Conn. 2008) (court declined to order restitution where the government had identified some shareholders impacted by the alleged fraud, but could not identify and locate the other shareholders because this would severely complicate and prolong the sentencing process); *United States* v. *Parnell,* 2016 WL 1369392, at *10 (M.D. Ga. Apr. 6, 2016) (holding that the "mandatory restitution requirement does not apply because of the complex issues of fact related to identifying victims and calculating their losses"). Claimants indication that a "trust" can be established to account for unidentified Claimants' interests (ECF 59 at 5 n.2), relies on cases easily distinguished, in which the victims had already been identified, but nevertheless still needed to be verified or located. *See United States* v. *Berardini*, 112 F.3d 606, 610-11 (2d Cir. 1997) (victims identified but many could not be located); *United States*  v. *Ageloff*, 809 F. Supp. 2d 89, 103-04 (E.D.N.Y. 2011) ("substantial corpus of victims has been identified" but defendant claimed many were not entitled to restitution because they engaged in fictitious trades that inflated their losses). Here Claimants are refusing to identify themselves at all, and no restitution award can be made to unidentified victims.

CAHILL GORDON & REINDEL LLP

-39-

## Conclusion

For the foregoing reasons, OZ Africa respectfully submits that the restitution due to the Claimants cannot exceed $1.47 per share, and, once information about each Claimant's purchase and sale of Africo shares is known, additional mandatory individualized deductions must be made.

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:    /s/ Anirudh Bansal

Anirudh Bansal
Charles A. Gilman
Tara H. Curtin
Samantha Lawson
Benjamen Starkweather

80 Pine Street
New York, New York 10005
Tel.: (212) 701-3000

*Attorneys for OZ Africa Management GP, LLC*

VIA ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court for the Eastern District of New York
United States Courthouse, Room 1426 S
225 Cadman Plaza East
Brooklyn, New York 11201

cc:    All Counsel of Record via ECF