# Exhibit 17

# Annual Information Form

AFRICO
RESOURCES LTD

**For the Fiscal Year Ended December 31, 2006**

**Dated March 30, 2007**

## Table of Contents


| | | |
|---|---|---|
| **ITEM 1** | **CORPORATE STRUCTURE** | **1** |
| 1.1 | Name, Address and Incorporation | 1 |
| 1.2 | Intercorporate Relationships | 1 |
| **ITEM 2** | **GENERAL DEVELOPMENT OF THE BUSINESS** | **2** |
| 2.1 | Overview | 2 |
| 2.2 | Three Year History | 2 |
| 2.3 | Significant Acquisitions | 2 |
| **ITEM 3** | **NARRATIVE DESCRIPTION OF THE BUSINESS** | **3** |
| 3.1 | General | 3 |
| 3.2 | Material Contracts | 3 |
| 3.3 | Competitive Conditions | 4 |
| 3.4 | Environmental Protection | 4 |
| 3.5 | Employees | 4 |
| 3.6 | Foreign Operations | 4 |
| 3.7 | Bankruptcy and Similar Procedures | 5 |
| 3.8 | Reorganization | 5 |
| 3.9 | Social or Environmental Policies | 5 |
| 3.10 | Mineral Projects – The Kalukundi Property | 5 |
| 3.11 | Risk Factors | 12 |
| **ITEM 4** | **DIVIDENDS** | **18** |
| **ITEM 5** | **DESCRIPTION OF CAPITAL STRUCTURE** | **18** |
| **ITEM 6** | **MARKET FOR SECURITIES** | **18** |
| 6.1 | Trading Price and Volume | 18 |
| **ITEM 7** | **ESCROWED SECURITIES** | **18** |
| **ITEM 8** | **DIRECTORS AND OFFICERS** | **18** |
| 8.1 | Name, Occupation and Security Holding | 18 |
| 8.2 | Cease Trade Orders, Bankruptcies, Penalties or Sanctions | 20 |
| 8.3 | Conflicts of Interest | 20 |
| **ITEM 9** | **PROMOTERS** | **20** |
| **ITEM 10** | **AUDIT COMMITTEE** | **20** |
| 10.1 | The Audit Committee's Charter | 21 |
| 10.2 | Composition of the Audit Committee | 21 |
| 10.3 | Relevant Education and Experience | 21 |
| 10.4 | External Auditor Service Fees | 21 |
| **ITEM 11** | **LEGAL PROCEEDINGS** | **22** |
| **ITEM 12** | **INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS** | **22** |
| **ITEM 13** | **TRANSFER AGENTS AND REGISTRARS** | **22** |
| **ITEM 14** | **MATERIAL CONTRACTS** | **22** |
| **ITEM 15** | **INTERESTS OF EXPERTS** | **22** |
| 15.1 | Names of Experts | 22 |
| 15.2 | Interests of Experts | 23 |
| **ITEM 16** | **ADDITIONAL INFORMATION** | **23** |

All information contained in this Annual Information Form ("**AIF**") for the fiscal year ended December 31, 2006 of **AFRICO RESOURCES LTD.**, referred to herein as "**Africo**" or the "**Corporation**", is as at December 31, 2006, unless otherwise indicated.

## FORWARD LOOKING STATEMENTS

This AIF may include or incorporate by reference certain statements that are "forward looking statements". All statements, other than statements of historical fact, included or incorporated by reference in this AIF that address activities, events or developments that the Corporation or its management expects or anticipates will or may occur in the future, including such things as future capital expenditures (including the amounts and nature thereof), business strategies and measures to implement strategies, goals, expansion and growth of its business and operations, plans and references to the future success of the Corporation, and other such matters, are forward-looking statements. These forward-looking statements are based on certain assumptions and analyses made by the Corporation and its management in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances. However, whether actual results and developments will conform to the expectations and predictions of the Corporation and its management is subject to a number of risks and uncertainties, including those risk factors discussed under "Risk Factors" and elsewhere in this AIF and the documents incorporated by reference. Consequently, all of the forward-looking statements made in this AIF and the documents incorporated herein by reference are qualified by these cautionary statements and other cautionary statements or factors contained herein or in documents incorporated by reference herein, and there can be no assurance that the actual results or developments anticipated by the Corporation and its management will be realized or, even if substantially realized, that they will have the expected consequences for, or effects on, the Corporation.

## ITEM 1 CORPORATE STRUCTURE

### 1.1 Name, Address and Incorporation

Africo was incorporated under the *Canada Business Corporations Act* on July 4, 2006 under the name "CopperCo Resource Corp.". On December 8, 2006, it completed a Plan of Arrangement with Rubicon Minerals Corporation, and Africo Resources Ltd. (now called Africo Resources (B.C.) Ltd.), among others. It also changed its name to "Africo Resources Ltd." concurrent with the completion of the Plan of Arrangement. See "Item 3.8 – Narrative Description of the Business – Reorganization".

Africo's head office and principal business address is Suite 1540 – 800 West Pender Street, Vancouver, British Columbia and the registered and records office is located at Suite 1810 – 1111 West Georgia Street, Vancouver, British Columbia.

### 1.2 Intercorporate Relationships

Africo has two wholly-owned subsidiaries – Africo Resources (B.C.) Ltd. ("**Africo BC**") and Kisankala Mining Corp. ("**Kisankala**").

Africo BC was incorporated as "684657 B.C. Ltd." under the British Columbia *Company Act* on January 7, 2004 and filed a Transition Application and Notice of Articles under the British Columbia *Business Corporations Act* on April 14, 2004. It changed its name to "Africo Resources (B.C.) Ltd." effective December 8, 2006. Africo BC has

a wholly-owned subsidiary called Seven Seasons Trading 146 (Pty) Ltd., which is incorporated under the laws of South Africa and is currently inactive.

In addition, as at December 31, 2006, Africo BC had the right, and made the necessary payment, to acquire 100% of the shares of The Enterprise H&J Swanepoel Famille Trust sprl (also known as H&J Swanepoel Family Trust sprl) ("**H&J**"). H&J is the owner of 75% of the shares of Swanmines s.p.r.l., the holder of the exploitation permit for the Kalukundi Property. Upon the finalization of the transfer of shares of H&J to Africo BC, H&J will be a wholly owned subsidiary of Africo BC. See "Item 3.2 – Narrative Description of the Business – Material Contracts".

Kisankala was incorporated under the *Business Corporations Act* (British Columbia) on January 31, 2007.

## ITEM 2 GENERAL DEVELOPMENT OF THE BUSINESS

### 2.1 Overview

Africo is an exploration company, which is focusing on the further exploration and development of the Kalukundi Property which is located in the Democratic Republic of the Congo (the "**DRC**"). Africo's common shares are listed on The Toronto Stock Exchange under the symbol "ARL". Africo's principal activities include mineral exploration, development and mining, with a focus on the copper and cobalt sectors in the DRC.

### 2.2 Three Year History

The following is a summary of the general development of Africo's and Africo BC's business over the past three years.

***2004***

March 23, 2004 - Africo BC entered into the H&J Agreement whereby Africo BC agreed to purchase all of the right, title and interest of the Sellers in all of the issued and outstanding H&J Shares owned by the Sellers (all as defined and more fully described below under "Item 3.2 – Narrative Description of the Business – Material Contracts"), subsequent to which Africo BC has continued exploration and development work on the Kalukundi Property (see "Item 3.10 – Narrative Description of the Business – Mineral Projects – The Kalukundi Property").

***2005***

Africo BC continued exploration on the Kalukundi Property with a view to completing a feasibility study.

***2006***

May 18, 2006 – Africo BC completed a feasibility study on the Kalukundi Property.

November 23, 2006 – Africo BC completed a financing of subscription receipts which entitled holders to acquire Units of Africo for gross proceeds of $20,000,000.

December 8, 2006 – Africo completed the Plan of Arrangement with Rubicon Minerals Corporation and Africo BC, among others. See "Item 3.8 – Narrative Description of the Business – Reorganization".

December 15, 2006 – Africo's common shares commenced trading on The Toronto Stock Exchange.

### 2.3 Significant Acquisitions

Africo did not complete any significant acquisitions during its most recently completed fiscal year.

## ITEM 3 NARRATIVE DESCRIPTION OF THE BUSINESS

### 3.1 General

Africo's only material property as at the date of this AIF is the Kalukundi Property (hereinafter referred to as the "**Kalukundi Property**" or the "**Kalukundi Project**" **-** see "Item 3.10 – Narrative Description of the Business – Mineral Projects – The Kalukundi Property"). There is no assurance that the Kalukundi Property will prove to be economic, or that Africo's other properties will or will not prove to be economic, in the fullness of time. Africo's primary objective is to carry out the exploration and development programs recommended by the Kalukundi Report (as defined below) and as may be amended from time to time. In order to develop the Kalukundi Project in accordance with the Feasibility Study (as herein defined), Africo will be required to secure additional equity and debt financing. There can be no assurance that Africo will be successful in its endeavours. See "Item 3.11 – Risk Factors".

### 3.2 Material Contracts

The following agreements govern Africo's business and interests in the Kalukundi Property:

***Contract (as amended) for the Establishment of a Company between La Generale des Carrieres et des Mines ("GCM") and H&J for the Mining of the Kalukundi Deposits dated February 2001 (the "Swanmines Agreement")***

GCM was the exclusive holder of the rights relating to the Kalukundi Property as more particularly described below. Pursuant to the Swanmines Agreement, GCM and H&J set up a private limited liability company called Société d'exploitation des gisements de Kalukundi (hereinafter referred to as "**Swanmines**"), of which GCM was to own 45% of the outstanding share capital and H&J was to own 55% of such outstanding share capital.

GCM covenanted to transfer to Swanmines all its right, title and interest in the Kalukundi Property and to provide to Swanmines all data, information, registers and reports on the Kalukundi Property in its possession. GCM also committed to obtain all regulatory approvals in connection with the mining operations on the Kalukundi Property.

H&J covenanted to provide all necessary financing to Swanmines in connection with its exploitation and development of the Kalukundi Property, to finance a feasibility study on the Kalukundi Property, to commit all necessary funds to commence commercial production on the Kalukundi Property and to finance the building of a metallurgical processing plant following the recommendations of the feasibility study.

Swanmines covenanted to carry out all mining and exploration activities on the Kalukundi Property, undertake a feasibility study, mine the Kalukundi deposits and process the ore in plants according to the recommendations of the Feasibility Study (as herein defined) on condition that these recommendations would be accepted by both parties to the Swanmines Agreement, and comply with technical mining standards. Further, Swanmines also covenanted to provide the parties to the Swanmines Agreement with a feasibility study within 24 months of the date of its establishment. The feasibility study (the "**Feasibility Study**") was completed by Africo BC and delivered to the parties pursuant to the Swanmines Agreement on May 18, 2006. Africo BC had a technical report prepared in accordance with National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* in respect of the Feasibility Study. See "Item 3.10 – Mineral Projects – The Kalukundi Property" below.

The Swanmines Agreement provides that the net profits from the Kalukundi Project will be allocated as to 60% to repay all loans incurred by Swanmines, and 40% to GCM and H&J according to their proportionate interests in Swanmines and, thereafter, the net profits will be allocated in proportion to the ownership interests of GCM and H&J. The Swanmines Agreement is in effect until the Kalukundi Property can no longer be mined or is terminated by mutual agreement of the parties.

The Swanmines Agreement was amended by subsequent amendments, the total effect of which was to reduce the interest of GCM in Swanmines to 25% and increase the interest of H&J to 75% effective May 18, 2004. The amendments also extended the time for Swanmines to present the Feasibility Study to 24 months from the last

amendment dated May 18, 2004, and provided that Swanmines would pay a royalty of 2.5% on its gross turnover to GCM (a portion of which GCM could require to be paid in advance).

***Memorandum of Agreement among Lymnokyknos Holdings Ltd. and Hasita s.a. (together, the "Sellers") and Africo BC dated March 23, 2004 (the "H&J Agreement")***

The H&J Agreement provides that the Sellers will transfer all their right, title and interest in all of the issued and outstanding share capital of H&J (the "**H&J Shares**") owned by the Sellers. The purchase price for the H&J Shares is US$2,275,000.

As at the date of this AIF, Africo BC has made the necessary payments under the H&J Agreement to earn a 100% interest in H&J, which in turn has a 75% interest in the shares of Swanmines, the holder of the exploitation permit for the Kalukundi Property. Africo's lawyers in the DRC are in the process of finalizing the transfers of shares of H&J to Africo BC in accordance with the legal requirements of the DRC in order to vest Africo BC with a 100% interest in H&J.

Africo BC entered into a settlement agreement (the "**Settlement Agreement**") on September 16, 2006 with H.A. Swanepoel ("**HAS**") and Lymnokyknos Holdings Limited ("**LHI**") in connection with an interim order that HAS brought against Africo BC in the High Court of South Africa. Pursuant to the Settlement Agreement, HAS and LHI released Africo BC from all claims they had against Africo BC, in consideration for which Africo BC paid US$133,750 to LHI and an additional amount of US$200,000 to HAS and satisfied its obligations under the H&J Agreement. In addition, Africo BC was required to pay 300,000 South African Rands towards HAS's costs in connection with the action (the "**Reimbursement Amount**"). As at the date of this AIF, Africo has made the payment to LHI and has paid to HAS an aggregate of US $254,230 (representing the US$200,000 payment to HAS and the US dollar equivalent of the Reimbursement Amount) and has fully complied with its obligations under the Settlement Agreement.

### 3.3 Competitive Conditions

Africo competes with numerous other companies and individuals, including competitors with greater financial, technical and other resources than the Corporation, in the search for and the acquisition of attractive mineral properties in the DRC and elsewhere in Africa. See "Item 3.11 – Risk Factors".

### 3.4 Environmental Protection

Africo BC has completed an Environmental Impact Assessment by virtue of obtaining an exploitation license on the Kalukundi Project. Africo BC submitted an Environmental Action Plan ("**EAP**") to the Ministry of Environment in the DRC for approval in January 2007. The EAP has a Relocation Action Plan component ("**RAP**"). The RAP details the relocation of the Kisankala Village where the Kalukundi Project is located and the compensation due to bone fide villagers. The first step in the RAP was to hold a meeting with the villagers where they were presented with the plans for a new village and were required to vote on whether to relocate or not. The result of the vote was in favour of relocating and, accordingly, plans will be put in place to implement the relocation as and when necessary. Africo BC expects to receive final approval of the RAP from the Ministry of Environment in the near future.

### 3.5 Employees

Africo employs a total of 33 Congolese and 11 expatriates throughout the year on a full-time basis. Employment figures do not change significantly during the peak exploration season.

### 3.6 Foreign Operations

Substantially all of Africo's operations are currently conducted in the DRC. In the DRC, the assets and operations of Africo are subject to various political, economic and other uncertainties. See "Item 3.11 – Risk Factors".

### 3.7 Bankruptcy and Similar Procedures

Africo or Africo BC have not been subject to any bankruptcy, receivership or similar proceedings within the three most recently completed financial years or during or proposed for the current financial year.

### 3.8 Reorganization

Africo, which was then CopperCo Resource Corp., entered into a plan of arrangement (the "**Arrangement**") pursuant to an Arrangement Agreement made as of July 6, 2006, as amended, among Rubicon Minerals Corporation ("**Rubicon**"), Paragon Minerals Corporation, and Africo BC. The Arrangement was effective on December 8, 2006. As a result of the Arrangement, Africo:

- acquired the shares of Africo BC then held by Rubicon;
- distributed common shares of Africo to Rubicon's shareholders; and
- acquired the remaining shares of Africo BC not then held by Rubicon in exchange for common shares of Africo;

with the result that Africo BC became a wholly-owned subsidiary of Africo.

### 3.9 Social or Environmental Policies

Africo has adopted an environmental policy and is committed to developing and fostering a culture of environmental care, both within the Corporation and in the community. As such, Africo is committed to:

- complying with environmental legislation and regulations as the baseline for its environmental performance and striving to achieve best practice in every aspect;
- managing its operations to minimize or eliminate negative environmental impacts wherever practicable;
- conducting business with service providers and contractors who have a similar commitment to the environment and who embrace its environmental policy; and
- striving for the most efficient use of energy and water, the prevention of pollution and minimizing waste by recycling wherever possible.

Africo has also adopted a community relations policy as it understands that it is a guest in all the countries in which it operates. As such, Africo respects local culture and customs and integrates into the surrounding community through its social development programs. Expatriates are inducted in the local culture and encouraged to learn the local language, to ensure harmonious relationships and good communication are maintained. Where the required skills are available, Africo recruits from the surrounding community. Similarly, where price and quality are acceptable, Africo's policy is to purchase locally, supporting the local economy.

### 3.10 Mineral Projects – The Kalukundi Property

Africo's only material property is the Kalukundi Property. The following summary with respect to the Kalukundi Property has been reproduced from a technical report on the Kalukundi Property dated June 2006 (the "**Kalukundi Report**" or the "**Technical Report**") written by John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global Pty Ltd., who was retained by Africo BC to prepare a technical report compliant with National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* ("**NI 43-101**"). Both Mr. Hearne and Dr. Verbeek are a "Qualified Person" and considered "independent" as both those terms are defined in NI 43-101. Further details with respect to the Kalukundi Property are available from the Kalukundi Report, which is incorporated herein by reference and is available for public

review on the Internet at the System for Electronic Document Analysis and Retrieval (SEDAR) website: www.sedar.com.

***Summary***

“Introduction

RSG Global Pty Ltd (RSG Global) has been commissioned by Africo Resources Limited (Africo) to compile a technical report on the Kalukundi copper cobalt Project located in the copper belt of the Democratic Republic of the Congo (DRC). This report is to comply with disclosure and reporting requirements set forth in National Instrument (NI) 43-101, Standards of Disclosure for Mineral Projects, and in compliance with Form 43-101F1 (the “**Technical Report**”).

This report pertains to the four main deposits that comprise the Project, namely the Principal, Anticline, Kalukundi and Kii Fragments.

Location

The Kalukundi Project is located within the Kolwezi District of Katanga Province in the south-east of the DRC. The Kalukundi Project area is located 60km to the east of Kolwezi and just 4km to the north of the main road between Likasi and Kolwezi. The village of Kisankala is situated close to the Principal and North Fragments of the Kalukundi deposit. The Kalukundi Project is secured under an Exploitation or Mining License, PE591, which was issued on 11 October 2001 for a term of 20 years. The tenement is 19.5km2 in extent, consisting of 23 carres or blocks.

Ownership

The exploitation permit for Kalukundi is held by Swanmines and the ownership of Swanmines is shared between H & J Family trust (75%) and Gécamines (25%). Africo currently holds a 48% interest in H & J Family Trust and has the option to increase this holding to 100%. Rubicon Minerals Corporation (Rubicon), a publicly listed Canadian company (TSX and AMEX) holds a 39.6% interest in Africo. Africo is a private Canadian registered company and has secured funding through Rubicon and independent shareholders to provide funding for the exploration programme and feasibility study on the project. Thus far, over $9M has been committed to the project.

Project Geology

Base metal mineralisation in the world class Zambian and DRC Copperbelt provinces is hosted by sedimentary rocks of the Neo-Proterozoic Katangan Sequence, developed within the Lufilian Arc. This Copperbelt extends over 600km from Luanshya (Zambia) in the southeast and to Kolwezi in the Democratic Republic of the Congo (DRC) in the northwest. Even with sustained production over almost 100 years, there are still huge resources of Cu and Co in this extensive mineral province.

The Katangan Supergroup rocks are up to 7,000m thick and are underlain by basement granite, intermediate metavolcanic and metasedimentary rocks dated at between 1,800Ma to 2,000Ma.

The Katangan Supergroup is subdivided into Roan, Lower and Upper Kundelungu Groups. Mineralisation at Kalukundi occurs within the Mines Sequence (or *Series des Mines*) which is correlated with the Lower Roan rocks within the SE part of the Lufilian arc in Zambia. The sediments represent a facies continuum of proximal to intermediate and distal dolomitic mudstones, siltstones, sandstones and algal reef fragments. The Katangan Supergroup sediments in Zambia are deformed by a series of open folds, whereas in the DRC the Katangan Supergroup is preserved both as tightly folded, but relatively intact sequences and as complexly deformed, locally continuous but structurally dismembered ‘rafts’ of lower Roan strata (*Series Des Mines*) within a ‘mega breccia’ or melange that contains abundant evaporite minerals. The mega breccia is probably the result of decoullement at the northern margin of the basin and northward thrusting of the Katangan Supergroup over basement lithologies

(granites and gneisses) and other, higher, Katangan Supergroup stratigraphy. The mega breccia is probably of tectonic origin, focussed on incompetent chemical sediments.

Metamorphic grade increases southwards but within the Kalukundi area very low-grade chlorite facies metamorphism is evident.

Of the twelve fragments identified in the Kalukundi concession area, only four are the subject of this report. These are the Principal, Anticline, Kalukundi and Kii Fragments.

The Mines series rocks in particular have undergone deep weathering and hypogene alteration, assisted possibly by the acids formed by the breakdown of sulphides. The core units have been silicified and the remobilisation processes have resulted in redistribution of the copper-cobalt mineralisation into open spaces within the Mines Series rocks.

Resource Drilling

The dimensions of the four fragments discussed in this report, expressed as strike length and drilled width, are:

- Principal 630m x 36.70m
- Anticline 150m x 80.25m
- Kalukundi 430m x 44.18m
- Kii 330m x 40.84m

Exploration work in the vicinity of Kalukundi between 1927 and 1987 consisted largely of detailed surface mapping and excavation, mapping and sampling of pits and trenches and the 'manual' drilling of shallow exploratory holes for mapping purposes.

Active exploration has been carried out by three main companies, Gécamines, JCI and Swanmines since about 1986.

Drilling for resource evaluation purposes has been carried out in three campaigns:

| | | | |
|---|---|---|---|
| Gécamines in 1986/87 | 8 holes | 2809m | 10% of the resource drillholes |
| JCI/Seo-Consult in 2001/02 | 12 holes | 1440m | 15% of the resource drillholes |
| Africo Resources/Swanmines 2004/05 | 58 holes | 5401m | 5% of the resource drillholes |
| **Totals** | **78 holes** | **9650m** | |

In addition to the above, 58 holes drilled by Africo, a further 30 boreholes, not used directly in the resource evaluation, were drilled for geotechnical, condemnation and exploration purposes.

Data Quality

QAQC data provided by Africo meets industry standard levels of precision and accuracy. The standards and blanks show good levels of accuracy, core duplicate and interlaboratory pulp-duplicate data showed high levels of precision.

Mineral Resources

Classification of the mineral resource at Kalukundi was based on data quality, drill spacing, confidence in continuity and various kriging efficiency measures. RSG Global considers confidence in the grade estimates to be good, even though drillhole density is limited down dip. Confidence is supported by low grade variability and low skewness parameters. Only resources above 200m below surface have been considered "potentially economically extractable". Resource models exist below this, but extraction of this material would most likely be by underground methods. No evaluations of underground parameters have yet been carried out and hence no resources have been quoted below this level. Furthermore these resources are predicated on very limited drilling information. Significant exploration potential is suggested by these models.

Mineral Resources are tabulated below, based on a 1.5% copper-equivalent cutoff at a 12:1 copper to cobalt equivalence ratio.

**Table 1.7_1**
**Kalukundi Project**
**Resources Between Surface and 200 Metres Below Surface**

| | Resource Tonnes | % Copper Grade | % Cobalt Grade | Copper (Mlbs) | Cobalt (Mlbs) |
|---|---|---|---|---|---|
| Measured | 9,648,484 | 2.45 | 0.61 | 521.5 | 130.1 |
| Indicated | 2,505,924 | 2.29 | 0.61 | 126.6 | 33.7 |
| **Total Measured + Indicated** | **12,154,408** | **2.42** | **0.61** | **648.1** | **163.8** |
| **Inferred** | **15,020,674** | **2.63** | **0.58** | **871.5** | **192.6** |

Resources with the highest confidence levels of continuity and grade occur from surface down to 150m where the density of drilling is greatest. The Resource from 150m to 200m falls almost entirely into the inferred category. Modelling below 200m suggests exploration potential for approximately 16Mt of mineralised material.

Mineral Reserves

The Project mineral Reserve estimate as of May 2006 is reported in Table 1.8_2. All stated Reserves are completely included within the quoted Resources. The input parameters used in the Reserve estimate are described in Section 17. For ease of reference, however, a summary of the most pertinent input parameters is provided in Table 1.8_1.

**Table 1.8_1**
**Kalukundi Project**
**Summary of Input Parameters used for Reserve Estimation**

| **Item** | | | **Value** |
|---|---|---|---|
| Cu Price | | $/lb | 1.25 |
| Co Price | | $/lb | 12.00 |
| Diesel fuel price | | $/lb | 1.29 |
| Mining cost | Ore | $/t | 3.12 |
| | Waste | $/t | 4.01 |
| Processing Costs | 0-10m | $/t | 35.35 |
| | 10-20m | $/t | 36.96 |
| | 20-30m | $/t | 39.02 |
| | 30-40m | $/t | 41.53 |
| | 40-50m | $/t | 44.50 |
| | 50-60m | $/t | 47.93 |
| | 60-70m | $/t | 51.80 |
| | 70-80m | $/t | 56.14 |
| | 80-90m | $/t | 60.92 |
| | 90-100 | $/t | 66.16 |
| | 100-110m | $/t | 71.86 |
| | 110-120m | $/t | 78.01 |
| Processing Recoveries | | % | Variable |
| G&A | | M$/yr | 7.2 |
| Mine supervision | | M$/yr | 1.27 |
| Grade control | | $/t | 0.06 |
| De-watering | | M$/yr | 0.5 |
| Stockpile rehandle | | $/t ore | 1.16 |
| Mining dilution | | % | 2 |
| Mining recovery | | % | 97 |
| Inter ramp slope angle | | Degrees | Variable |
| Royalty | Government | % | 2.0 |
| | Gecamines | % | 2.5 |
| Metal Transport | Cu | $/t | 300 |
| | Co | $/t | 377 |

**Table 1.8_2**

**Kalukundi Project**

**Reserve Summary by Fragment**

| Fragment | Reserves | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Proven | | | | | Probable | | | | | Total | | | | |
| | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | |
| | | Cu [%] | Co {%] | Cu [t] | Co [t] | | Cu [%] | Co {%] | Cu [t] | Co [t] | | Cu [%] | Co {%] | Cu [t] | Co [t] |
| Principal | 2.3 | 2.22% | 1.00% | 50,238 | 22,611 | 0.4 | 2.29% | 1.10% | 8,689 | 4,182 | 2.6 | 2.23% | 1.01% | 58,927 | 26,793 |
| Anticline | 1.4 | 2.59% | 0.54% | 35,550 | 7,358 | 0.2 | 1.60% | 0.65% | 2,984 | 1,223 | 1.6 | 2.47% | 0.55% | 38,534 | 8,581 |
| Kalukundi | 1.1 | 2.55% | 0.42% | 28,471 | 4,730 | 0.4 | 1.40% | 0.47% | 5,214 | 1,764 | 1.5 | 2.26% | 0.44% | 33,685 | 6,493 |
| Kii | 1.8 | 2.55% | 0.58% | 46,010 | 10,420 | 0.3 | 2.62% | 0.50% | 8,886 | 1,699 | 2.1 | 2.56% | 0.56% | 54,896 | 12,119 |
| **Total** | **6.6** | **2.44%** | **0.69%** | **160.268** | **45.119** | **1.3** | **2.02%** | **0.69%** | **25,773** | **8,867** | **7.8** | **2.37%** | **0.69%** | **186,041** | **53,986** |

Development and Operations

It is envisaged that the project could mine and process 0.80Mt per annum ("Mtpa") over approximately ten years. The plant is designed to produce 21,100t of Cu per year and 4,200t of Co per year at an average process cost of $44.42/t of ore treated.

All ore and waste will be mined via conventional, open pit mining methods, using a mining contractor. The operation is planned to utilise selective mining techniques to separate ore and waste. The mining equipment that is considered to be suitable for the Project would include 80t backhoe configured, hydraulic excavators and off-highway haul trucks with a payload capacity of 35t.

The treatment plant flowsheet is based on processing 0.8Mtpa of mill feed. The testwork indicated that the Kalukundi ore could be processed using a single stage crushing circuit followed by a conventional SAG / ball milling circuit with the ball mill in closed circuit with a cyclone. Overall recovery after losses in processing was between 89% and 93% for Cu and between 70% and 78% for Co.

The leach product is then washed in a six stage counter current decantation plant to ensure a clarified liquor is sent to the copper recovery circuit whilst keeping losses due to entrainment below 1%. The copper recovery circuit consists of copper solvent extraction step where the copper is moved to an organic phase before being stripped to produce a advance liquor that is treated in the copper tank house. The copper tank house produces cathode plate that will be sold. A bleed stream from the copper circuit is sent to the cobalt recovery circuit.

The cobalt circuit consists of several purifying steps where impurities like iron, aluminium, manganese, zinc and finally copper are removed before the purified cobalt liquor is sent to solvent extraction circuit where cobalt is loaded onto an organic phase before being stripped to produce the advance solution that is treated in the cobalt tank house. The cobalt tank house produces cobalt cathode that will be binned and sold.

Africo and its contractors will employ approximately 524 people throughout the operating phase of the project. Initially selected posts requiring specific skills or experience will be filled by expatriates. In addition to performing their job function, expatriate personnel will be expected to transfer knowledge and expertise in order to develop the capabilities of the national staff. In the longer term, it is anticipated that nationals of the DRC will fill most operating and management positions within the company.

A water pumping station has been planned to pump the full requirement of water from Lake Nzilo, on the Lualaba River, 22km to the site in a buried steel pipeline into the plant raw water storage dam. Water will be drawn from the storage dam water for plant make-up, fire and potable water. The fire water will be pumped to a fire water ring main by a dedicated electrical and standby diesel pumping system. The raw water will be treated through a chlorination plant for the production of potable water prior to storage in two separate storage tanks. The plant and camp sewerage will be treated in two bio-filter plants with the grey water being discharged to the environment.

Power at 110kV will be supplied to the plant from the existing National Grid overhead power lines which pass 100m from the plant boundary. Plant power transformers will be situated in the plant main switchyard. Power distribution on site will be at 11kV.

Project Implementation

Production is assumed to commence after a pre-production period of 18 months, commencing 1 July 2006.

The development capital cost of the project has been estimated at $166M and is based on an EPCM (engineering, procurement, construction and management) implementation strategy. The estimate includes owner's costs, working capital, and a contingency, totalling approximately $12.23M.

Financial Summary

The overall operating costs for the plant and mining operation per tonne of ore mined are shown in Table 1.11_1.

**Table 1.11_1**
**Kalukundi Project**
**Overall Operating Costs – Average over Life of Mine**
**(Annualised at 801,000tpa)**

| Description | US$/t of ore |
|---|---|
| Mining | 4.32 |
| Process Plant and Infrastructure | 44.42 |
| General & Administration | 7.28 |
| **Total Operating Costs/t of ore** | **US$56.02** |

The investment in working capital and pre-production capital expenditure is $166.6M plus pre-production stripping of $6.85M.

The results of sensitivity analysis show that the project is relatively insensitive to changes in working cost and capital expenditure. Only metal price changes have a substantial effect.

Conclusions

The results of the economic analysis indicate that exploitation of the Kalukundi deposits is economically viable and should proceed. Opportunities exist in most areas of the project that will be more rigorously investigated during the detailed engineering phase and where appropriate will be incorporated into the project.

The current financial models are based on the scenario of 100% equity financing for the project. This, coupled with a conservatively projected base price of Copper and Cobalt gives a before tax IRR of 14.7%. No allowance has been made in the model for the effects and levels of debt financing available or required. When using the maximum allowed level of outside funding in terms of the agreement with Gecamines, the return on investment increases to 28.5%.

The anticipated project payback time is less than four years.

Opportunities exist in most areas of the project to be more rigorously investigated during the detailed engineering phase and to firm up certain assumptions, thereby mitigating and or removing some of the risks that have been identified during the FS.

Recommendations

It is recommended that Africo proceeds with:

- Development of a detailed mine implementation program.
- Compilation of tender documents for mine contracting and subsequent tender process.
- Consideration and evaluation of Africo supplying some major mining consumables (e.g. fuel and explosives) to share some risk and reduce contract mining costs.
- Geotechnical evaluation of the blasting and ‘diggability’ of the rock.
- Bench height optimisation for mining dilution and recovery control.
- Risk based geotechnical and geohydrological evaluation, which may lead to steepening of wall angles.
- Personnel recruitment, policies and procedures and training.

- More detailed or updates to mine design, scheduling and budgeting.
- Design and implementation of a number of technical and production systems and procedures.
- Continue the exploration on the satellite deposits to increase the life of the plant.
- Source local earthworks and civil contractors and machinery."

**3.11 Risk Factors**

The operations of Africo are speculative due to the nature of Africo's business, the location in which it operates, and the present stage of its development. The following risk factors pertain to the business operations of Africo and its subsidiaries.

***Exploration, Development and Operating Risk***

The exploration for and development of mineral deposits involves significant risks, which even a combination of careful evaluation, experience and knowledge may not eliminate. While the discovery of an ore body may result in substantial rewards, few properties which are explored are ultimately developed into producing mines. Major expenses will be required to develop metallurgical processes and to construct mining and processing facilities at the Kalukundi Project. Notwithstanding the Feasibility Study, there is no certainty that ongoing expenditures to be made by Africo towards mining operations on the Kalukundi Project will result in commercial quantities of ore. It may take many years until production is possible, if at all, during which time the economic feasibility of production may change. Whether a mineral deposit will be commercially viable depends on a number of factors, some of which are: the particular attributes of the deposit, such as size, grade and proximity to infrastructure; metal prices, which are highly cyclical; currency exchange rates, which are volatile; and government regulations, including regulations relating to prices, taxes, royalties, land tenure, land use, importing and exporting of minerals and environmental protection. The exact effect of these factors cannot be accurately predicted, but the combination of these factors may result in Africo not receiving an adequate return on invested capital.

Africo's activities will be primarily directed towards the exploration for and development of mineral deposits. Exploration programs entail risks relating to the location of economic ore bodies, the development of appropriate metallurgical processes, the receipt of necessary governmental permits and regulatory approvals, and the timely completion of capital projects, including the construction of mining and processing facilities at mining sites. Major expenses will be required to establish reserves by drilling and to construct mining and processing facilities at a particular site.

Mining operations generally involve a high degree of risk. Although Africo does not yet operate a mine on the Kalukundi Property, it intends to develop a mine as indicated in the Kalukundi Report. Such operations are subject to all the hazards and risks normally encountered in the exploration, development and production of copper, cobalt and other base or precious metals, including unusual and unexpected geologic formations, seismic activity, rock bursts, cave-ins, flooding and other conditions involved in the drilling and removal of material, any of which could result in damage to, or destruction of, mines and other producing facilities, damage to life or property, environmental damage and possible legal liability. Processing operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas, which may result in environmental pollution and consequent liability.

***Mining and Development Plan***

Although Africo has received the Feasibility Study from its consultants, Africo's Board of Directors is considering ways in which to optimize the deposit potential contained on the Kalukundi Project and may elect to modify, expand or otherwise embark on a different course of action regarding the Kalukundi Project depending on, among other things, the amount of capital Africo raises and the development plan that it ultimately undertakes.

***Capital Requirements and Potential Dilution***

Africo will require significant equity capital and debt financing in order to fund its operating costs, to service future indebtedness that may be incurred and to carry out plans to develop its existing and future projects. Africo currently has no revenues and, until production begins on the Kalukundi Property, is wholly reliant upon external financing to fund all of its capital requirements. Africo will require additional equity and debt financing from external sources to meet such requirements and to fund the development of the Kalukundi Project. In addition, even though H&J owns 75% of the equity in Swanmines, Africo is required to arrange funding for the entire Kalukundi Project. There can be no assurance that such additional financing will be available to Africo or, if it is, that it will be offered on acceptable terms. If additional financing is raised through the issuance of equity or convertible debt securities of Africo, the interests of shareholders in the net assets of Africo may be significantly diluted. Any failure of Africo to obtain required financing on acceptable terms could have a material adverse effect on Africo's financial condition, results of operations and liquidity, as well as its indirect interests in Swanmines and the Kalukundi Property, and may require Africo to cancel or postpone planned capital investments or to lose its indirect interests in Swanmines or in the Kalukundi Property.

***Insurance and Uninsured Risks***

Africo's business will be subject to a number of risks and hazards generally, including adverse environmental conditions, industrial accidents, labour disputes, unusual or unexpected geological conditions, ground or slope failures, cave-ins, changes in the regulatory environment and natural phenomena such as inclement weather conditions, floods and earthquakes. Such occurrences could result in damage to mineral properties or production facilities, personal injury or death, environmental damage to Africo's properties or the properties of others, delays in development or mining, monetary losses and possible legal liability. Although Africo will maintain insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance will not cover all the potential risks associated with its operations. In addition, Africo may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against political risk, and risks such as environmental pollution or other hazards as a result of exploration and production, is not generally available to Africo or to other companies in the mining industry on acceptable terms. Losses from these events may cause Africo to incur significant costs that could have a material adverse effect upon its financial performance, solvency and results of operations.

***Environmental Risks and Hazards***

All phases of Africo's operations will be subject to environmental regulation in the DRC. These regulations will mandate, among other things, the maintenance of air and water quality standards and land reclamation and relocation of people. They will also set forth limitations on the generation, transportation, storage and disposal of sulphuric acid and of solid and hazardous waste. Environmental legislation is evolving in a manner which will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Africo's operations. There is also no assurance that Africo will be able to effect any required relocation of people in order to develop the Kalukundi Property.

Environmental hazards may exist on the properties on which Africo holds interests, which are unknown to Africo at present and which have been caused by previous or existing owners or operators of the properties. There can be no assurance that these hazards, if any exist, will not be Africo's responsibility and, consequently, may adversely affect Africo's operations.

***Lack of Infrastructure in the DRC***

Transportation and service infrastructure in the DRC are sub-standard due largely to the recent civil war. The transportation of equipment and supplies into the DRC and into the Kalukundi Property and the transportation of resources out of the DRC and the Kalukundi Property may be subject to delays that adversely affect the ability of

Africo to proceed with the Kalukundi Project in a timely manner. In addition, Africo will be required to negotiate a power supply agreement with the appropriate utility in the DRC. There is no assurance that Africo will be able to secure adequate power or a supply agreement. In addition, failure in electrical power and shortages of the supply of diesel, mechanical parts and other items required for Africo's operations occur frequently in the country. Extended periods without electricity or other necessary elements required to support its operations could have an adverse effect on Africo's business, operating results and financial condition. Administrative delays with government agencies in the DRC could also further delay the progress of the Kalukundi Property. Africo's interests in the DRC will be accessed over lands that may be subject to the interests of third parties. Africo's business and operations may be materially adversely affected in the event that it is unable to access its mineral interests, is delayed in accessing these interests, or is in any way inhibited in carrying out its operational activities. Favourable prospects for the national economy now depend upon the maintenance of domestic peace and the continued receipt of substantial foreign aid to supplement government revenues.

***Political Stability***

Africo's Kalukundi Project in the DRC may be subject to the effects of political changes, war and civil conflict, changes in government policy, illegal mining activities, lack of law enforcement and labour unrest and the creation of new laws. These changes (which may include new or modified taxes or other government levies as well as other legislation) may impact the profitability and viability of its properties. The DRC is an impoverished country with physical and institutional infrastructure that is in a debilitated condition. It is in transition from a largely state-controlled economy to one based on free market principles, and from a non-democratic political system with a centralized ethnic power base to one based on more democratic principles. There can be no assurance that these changes will be effected or that the achievement of these objectives will not have material adverse consequences for Africo and its operations. Moreover, the northeast region of the DRC has undergone civil unrest and instability that could have an impact on political, social or economic conditions in the DRC generally. The effect of unrest and instability on political, social or economic conditions in the DRC could result in the impairment of the exploration, development and mining operations at those projects. Any such changes are beyond the control of Africo and may adversely affect its business.

***Effects of Inflation on Results of Operations***

The DRC has historically experienced relatively high rates of inflation. Accordingly, Africo's costs may be materially affected, which may adversely affect its business and operations.

***Government Regulation***

Africo's mineral exploration and planned development activities will be subject to various laws governing prospecting, mining, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. No assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit, suspend, terminate or curtail production or development. Government approvals and permits are currently, and may in the future be, required in connection with Africo's operations. Africo will use its best efforts to ensure that it is compliant with all applicable governmental regulation. Parties engaged in mining operations or in the exploration or development of mineral properties may be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed for violations of applicable laws or regulations. Amendments to current laws and regulations governing operations or more stringent implementation thereof could have a substantial adverse impact on Africo and cause increases in exploration expenses, capital expenditures or production costs or reduction in levels of production at producing properties or require abandonment or delays in development of new mining properties.

***Commodity Prices***

The development and success of Africo's projects will be primarily dependent on the future price of base and precious metals and for copper and cobalt in particular. Commodity prices are subject to significant fluctuation and are affected by a number of factors that are beyond the control of Africo. Such factors include, but are not limited

to, the sale or purchase of base or precious metals by various central banks and financial institutions, interest rates, exchange rates, inflation or deflation, fluctuation in the value of the United States dollar (the currency in which resource prices generally are quoted) and other currencies, global and regional supply and demand, speculative trading, the overall level of forward commodity sales, international or regional political and economic events or trends and the political and economic conditions of major producing countries throughout the world. The price of base and precious metals has fluctuated widely in recent years, and future serious price declines could cause the continued development of and commercial production from Africo's properties to be impracticable. Depending on the price of base and precious metals, projected cash flows from planned mining operations may not be sufficient and Africo could be forced to discontinue development and may lose its interest in, or may be forced to sell, some of its properties. Future production from Africo's mining properties is dependent on commodity prices that are adequate to make these properties economic.

In addition to adversely affecting Africo's reserve estimates and its financial condition, declining commodity prices can impact operations by requiring a reassessment of the feasibility of a particular project. Such a reassessment may be the result of a management decision or may be required under financing arrangements related to a particular project. Even if the Kalukundi Property is ultimately determined to be economically viable, the need to conduct such a reassessment may cause substantial delays or may interrupt operations until the reassessment can be completed.

***No Assurance of Titles, Boundaries or Water Rights***

Title to the Kalukundi Property in the name of Swanmines may be challenged or impugned and may be subject to prior unregistered agreements, transfers or claims. In addition, Africo may be unable to operate its properties as permitted or to enforce its rights with respect to its properties. Africo has taken reasonable steps to attempt to ensure that proper title to the Kalukundi Property held by Swanmines has been obtained and that all grants of mineral rights for its properties have been registered in the appropriate deeds offices. There is no guarantee that title to such mineral project and permits held by Swanmines will not be challenged or impugned. Despite the due diligence conducted by Africo, the records in the DRC are incomplete and there can be no assurance that Swanmines', and therefore Africo's, interest in such mineral project and permits will not be subject to challenge. There are risks associated with enforceability of various agreements made with entities controlled by the government of the DRC government, such as the Swanmines Agreement. In addition, although Africo BC has taken steps to verify legal title to the securities it holds directly in H&J and indirectly in Swanmines, there is no assurance that title to Africo BC's shareholdings in H&J or H&J's shareholdings in Swanmines may not be challenged or be subject to prior agreements or claims.

Africo requires licences and permits in order to access its mineral projects and anticipates that it will need the ready availability of water if its mineral projects become operational. Management believes that Africo's current surface rights and water rights are sufficient to carry on the activities of Africo's current work program. However, the need may arise for Africo to purchase or lease additional surface rights or obtain additional water rights in order to further explore and develop a particular mineral property, and its ability to further explore or develop such property may be dependent upon Africo's ability to secure such additional surface or water rights that may be required.

***Competition***

The mining industry is competitive in all of its phases. Africo will face strong competition from other mining companies in connection with the acquisition of properties producing, or capable of producing, precious and base metals. Many of these companies have greater financial resources, operational experience and technical capabilities than Africo. As a result of this competition, Africo may be unable to maintain or acquire additional attractive mining properties on terms it considers acceptable or at all. Consequently, Africo's revenues, operations and financial condition could be materially adversely affected.

***Foreign Investments and Operations***

Mineral exploration and mining in certain countries may be affected in varying degrees by political stability and government regulations relating to the mining industry and foreign investment. There can be no assurance that the

government of the DRC will not institute regulatory policies that adversely affect the exploration and development on the Kalukundi Property. Any changes in regulations or shifts in political conditions in these countries are beyond the control of Africo and may adversely affect its business. Investors should assess the political and regulatory risks related to Africo's foreign country investments. Operations may be affected in varying degrees by government regulations with respect to restrictions on production, price controls, export controls, foreign exchange controls, income taxes, expropriation of property, environmental legislation and mine safety.

***Currency Risks***

A significant portion of Africo's operating expenses will be incurred in Congolese francs, United States dollars and other foreign currencies. From time to time, Africo may borrow funds and will incur capital expenditures that are denominated in foreign currency. In addition, any revenue generated from operations may be in United States dollars. Accordingly, foreign currency fluctuations may adversely affect Africo's financial position and operating results.

***Dependence on Qualified Personnel***

Africo's success will depend to a significant degree upon the contributions of qualified technical personnel and its ability to attract and retain highly skilled personnel in the DRC and elsewhere. Competition for such personnel in the mining industry is intense, and Africo may not be successful in attracting and retaining qualified personnel locally or in obtaining the necessary work permits to hire qualified expatriates. Its inability to do so in the future may seriously harm its business and results of operations. Additionally, Africo will depend on its key management for the operation of its day-to-day activities and personal connections and relationships of its key management are important to the conduct of its business. If Africo were to lose a member of its key management, its business and results of operations might be adversely affected.

***Increased Labour Costs, Construction Costs and Availability of Mining Equipment***

Wages and related labour and consulting costs account for a large portion of Africo's costs. Accordingly, Africo's costs may be materially affected by increases in wages and related labour and consulting costs. A number of the items that Africo requires for mine construction are currently in high demand due to the increased level of activity in the global mining industry. If Africo cannot identify and procure new equipment on a timely basis, or identify and purchase suitable used equipment, this may result in delays to the Kalukundi Project construction schedule and, therefore, may also delay the start-up of mining operations and/or increase estimated costs. The amount of capital costs associated with the development of a mining property is adversely impacted by escalations in the price of items related to construction, including steel, fuel, concrete and other construction consumables. Such price escalations are caused by numerous factors beyond Africo's control.

***Conflicts of Interest***

The directors and officers of Africo will not be devoting all of their time to the affairs of Africo. The directors and officers of Africo are directors and officers of other companies, some of which are in the same business as Africo. The directors and officers of Africo are required by law to act in the best interests of Africo. They have the same obligations to the other companies in respect of which they act as directors and officers. Discharge by the directors and officers of their obligations to Africo may result in a breach of their obligations to the other companies and, in certain circumstances, this could expose Africo to liability to those companies. Similarly, discharge by the directors and officers of their obligations to the other companies could result in a breach of their obligation to act in the best interests of Africo. Such conflicting legal obligations may expose Africo to liability to others and impair its ability to achieve its business objectives. The directors will manage their conflict by disclosing it to the Board of Africo and, if necessary, abstaining from voting in their respective capacities as directors of Africo, all pursuant to the provisions of the *Canada Business Corporations Act*.

***Requirement for Permits and Licences and Obligations under the Swanmines Agreement***

The operations of Africo will require licences, permits and in some cases renewals of existing licences and permits from various governmental authorities. Management believes that Africo currently holds or has applied for certain of the necessary licences and permits to carry on the activities that it is currently conducting under applicable laws and regulations in respect of its properties, and also believes that Africo is complying in all material respects with the terms of such licences and permits. However, Africo's ability to obtain, sustain or renew such licences and permits or obtain all other required licences or permits on acceptable terms is subject to changes in regulations and policies and to the discretion of the applicable governmental authorities.

Africo BC, by virtue of its shareholdings in H&J, is required to perform certain obligations under the Swanmines Agreement including the requirement to arrange financing and commence mine building and operations on the Kalukundi Project within certain time constraints. Failure to complete such obligations in a timely manner may lead to a forfeiture of H&J's interest in Swanmines and indirectly, in the Kalukundi Project.

***Risk of Expropriation and Enforceability of Contracts with Government, Parastatal Organizations or Joint Venture Partners***

It is possible that the current system of exploration and mine permitting in the DRC may change, resulting in expropriation of Africo's properties without adequate compensation. In addition, there is a possibility that Africo's agreements with governments, parastatal organizations or joint venture partners may be unenforceable against these parties. While the risk may appear remote at this time, this risk should not be discounted.

***Future Mining Operations***

There is no assurance that Africo will produce revenue, operate profitably or provide a return on investment in the future from mining operations.

***Health Risks***

HIV/AIDS, malaria and other diseases represent a serious threat to maintaining a skilled workforce in the mining industry throughout Africa. HIV/AIDS, malaria and other diseases are a major healthcare challenge faced by Africo's operations in the DRC. There can be no assurance that Africo will not lose members of its workforce or workforce man-hours or incur increased medical costs as a result of these high health risks, which may have a material adverse effect on Africo's operations.

***Limited Business History***

Africo has only recently commenced operations and has no history of any operating earnings. The likelihood of the success of Africo must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the establishment of any business. There is no assurance that Africo can generate revenues, operate profitably, or provide a return on investment, or it will successfully implement its plans.

***Fluctuation in Market Value of Africo's Common Shares***

The market price of a publicly-traded stock is affected by many variables not directly related to the corporate performance of Africo, including the market in which it is traded, the strength of the economy generally, the availability and attractiveness of alternative investments, and the breadth of the public market for the stock. The effect of these and other factors on the market price of the common shares of Africo on The Toronto Stock Exchange in the future cannot be predicted.

## ITEM 4 DIVIDENDS

Africo has not declared nor paid any dividends and does not foresee the declaration or payment of dividends in the near future. Any decision to pay dividends on its shares will be made by the Board of Directors on the basis of Africo's earnings, financial requirements and other conditions existing at such future time.

## ITEM 5 DESCRIPTION OF CAPITAL STRUCTURE

### General Description of Capital Structure

Africo is authorized to issue an unlimited number of common shares. The common shares rank equally as to dividends, voting powers and participation in assets upon dissolution or winding-up. No common shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the common shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provision permitting or restricting the issuance of additional securities, or requiring a securityholder to contribute additional capital. As at December 31, 2006, 24,500,597 common shares of Africo were issued and outstanding.

### Loan Capital

Africo does not have any debt obligations outstanding.

## ITEM 6 MARKET FOR SECURITIES

### 6.1 Trading Price and Volume

Africo's common shares are listed on The Toronto Stock Exchange and trade under the symbol "ARL". The following table sets out the price ranges and volume traded on a monthly basis from the date of listing on December 15, 2006, through the financial year ended December 31, 2006, and for the months of January, February and March, 2007.

| Month | Trading Price High | / Low | Volume |
|---|---|---|---|
| December 15 to 31, 2006 | $5.00 | $3.96 | 547,902 |
| January 2007 | $3.85 | $2.74 | 2,031,714 |
| February 2007 | $4.75 | $3.01 | 1,457,253 |
| March 2007 | $3.95 | $3.45 | 1,556,491 |

## ITEM 7 ESCROWED SECURITIES

Africo does not have any escrowed securities.

## ITEM 8 DIRECTORS AND OFFICERS

### 8.1 Name, Occupation and Security Holding

| Director/Officer | Director or Officer Since | Principal occupation for the last five years |
|---|---|---|
| **DAVID W. ADAMSON**<br>*Director*<br>British Columbia, Canada | July 4, 2006 | Exploration Geologist; President, CEO and a director of Rubicon Minerals Corporation, a Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits. |

| Director/Officer | Director or Officer Since | Principal occupation for the last five years |
|---|---|---|
| **JOHN DIXON**[(1)]<br>*Director*<br>Tanzania | July 4, 2006 | President of Oryx Mining and Exploration, a Canadian company exploring for viable gold deposits in Africa (since July, 2006); Independent Geologist with Bastillion Resources (Pty) Ltd., an independent geological and mining consulting company specialising in Africa (1996 – 2006). |
| **ANTONY (TONY) HARWOOD**[(1)]<br>*President, Chief Executive Officer & Director*<br>England, United Kingdom | July 4, 2006 | President and CEO of Africo (since May 31, 2006); Vice President, Placer Dome Inc., a publicly listed international gold mining company (June 1998 to March 2006). |
| **LUKAS MARTHINUS (TINUS) MAREE**<br>*Director & Secretary*<br>British Columbia, Canada | July 4, 2006 | President, River Capital Partners Ltd., a private investment company (since January 2001); Director, River Group (since January 1998). |
| **CHRIS THEODOROPOULOS**<br>*Director & Chairman of the Board*<br>British Columbia, Canada | July 4, 2006 | Associate Counsel, Getz Prince Wells LLP, a law firm in Vancouver (since November 2003); independent legal and business consultant (1996 to November 2003). |
| **PETER W. TOMSETT**[(1)]<br>*Director*<br>British Columbia, Canada | July 4, 2006 | Consultant (January 2006 to present); an officer in various capacities (President and Chief Executive Officer from September 2004 to January 2006; Executive Vice-President, Asia Pacific and Africa from March 2004 to September 2004; Executive Vice-President, Asia Pacific from January 2001 to March 2004); and a director (September 2004 to January 2006) of Placer Dome Inc. |
| **MICHAEL O'BRIEN**<br>*Chief Financial Officer*[(2)]<br>British Columbia, Canada | See Note [(2)] below | Chief Financial Officer of Africo (March 2007 to present); acting Chief Financial Officer (December 2006 to March 2007); Consultant (August 2005 to February 2007); Chief Financial Officer and director of Irvin & Johnson Ltd (South Africa) (September 2005 to July 2006); Group Financial Manager of Irvin and Johnson Ltd (South Africa) (January 2003 to August 2005); Manager: Finance of Soekor Exploration and Production (Pty) Ltd (now part of PetroSA, South Africa)(August 1996 to September 2002). |

(1) Member of the Audit Committee.

(2) Mr. O'Brien was appointed acting Chief Financial Officer on December 1, 2006 and was appointed Chief Financial Officer of Africo in March 2007.

Directors of the Corporation are elected at each annual meeting of shareholders for a term of one year, serving until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time.

As of the date of this AIF, the directors and executive officers of the Corporation, as a group, owned, directly or indirectly, 281,141 common shares of the Corporation representing 1.1% of its outstanding common shares. Information as to ownership of shares has been provided by the directors and executive officers of Africo or has

been extracted from insider reports filed by these individuals and publicly available through the Internet at the Canadian System for Electronic Disclosure by Insiders (SEDI) at www.sedi.ca.

### 8.2 Cease Trade Orders, Bankruptcies, Penalties or Sanctions

Except as disclosed herein, none of the directors or executive officers of the Corporation, or any shareholder holding a sufficient number of securities of the Corporation to materially affect the control of the Corporation, is, as at the date of this AIF, or has been, within the ten years before the date of this AIF, a director or executive officer of any issuer, including the Corporation, that while that person was acting in such capacity:

(a) was the subject of a cease trade or similar order or an order that denied the relevant issuer access to any exemptions under securities legislation for a period of more than 30 consecutive days;

(b) was subject to an event that resulted, after the director or executive officer ceased to be a director or executive officer, in the issuer being the subject of a cease trade or similar order or an order that denied the relevant issuer access to any exemption under securities legislation for a period of more than 30 consecutive days; or

(c) within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets.

Lukas Marthinus (Tinus) Maree was a director of Energem Resources Inc. from July 2005 until May 2006. On March 7, 2006, the British Columbia Securities Commission ordered that all trading by the insiders in the securities of Energem cease until Energem filed comparative financial statements for the fiscal year ended November 30, 2005, related Management Discussion and Analysis, and an AIF for the fiscal year ended November 30, 2005. This cease trade order was revoked by the British Columbia Securities Commission on May 31, 2006.

### 8.3 Conflicts of Interest

Certain directors and officers of the Corporation are also directors, officers or shareholders of other companies that are similarly engaged in the business of acquiring, developing and exploiting natural resource properties. Such associations may give rise to conflicts of interest from time to time. The directors of the Corporation are required by law to act honestly and in good faith with a view to the best interests of the Corporation and to disclose any interest which they may have in any property or opportunity of the Corporation. If a conflict of interest arises at a meeting of the Board of Directors, any director in a conflict will disclose his or her interest and abstain from voting on such matter.

## ITEM 9 PROMOTERS

Rubicon is the promoter of Africo within the meaning of applicable securities legislation, by virtue of having taken the initiative in founding Africo. Prior to the Plan of Arrangement described in “Item 3.8 – Narrative Description of the Business – Reorganization”, Rubicon was the holder of approximately 39% of the outstanding shares of Africo BC. Upon completion of the Plan of Arrangement, Rubicon distributed its equity interest in Africo BC to its shareholders who acquired shares of Africo. As at the date of this AIF, Rubicon holds 42,749 common shares of Africo.

## ITEM 10 AUDIT COMMITTEE

The purpose of the Audit Committee of Africo’s Board of Directors is to provide assistance to the Board of Directors of Africo in fulfilling its legal and fiduciary obligations with respect to matters involving accounting, auditing, financial reporting, internal control and legal compliance functions of Africo. It is the objective of the Audit Committee to maintain communication among the Board of Directors of Africo, the external auditor and senior management of the Corporation.

**10.1 The Audit Committee's Charter**

The full text of the Charter of the Audit Committee, as adopted on July 7, 2006, is included as Schedule A to this AIF.

**10.2 Composition of the Audit Committee**

Antony Harwood, Peter Tomsett and John Dixon are members of the Audit Committee of Africo's Board of Directors. Messrs. Tomsett and Dixon are considered "independent" as that term is defined in applicable securities legislation, and all three of the Audit Committee members have the ability to read and understand financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of the issues that can reasonably be expected to be raised by Africo's financial statements.

**10.3 Relevant Education and Experience**

*Antony Harwood*

Dr. Harwood obtained his Bachelor of Science and PhD from Cardiff University in the United Kingdom. He was the managing director of Harwood International, a geological consulting company, from September 1993 to June 1998 and was a Vice-President of Placer Dome Inc., a publicly listed international gold mining company, from June 1998 to March 2006.

*Peter Tomsett*

Mr. Tomsett graduated with a Bachelor of Engineering (Honours) in Mining Engineering from the University of New South Wales, later attaining a Master of Science (Distinction) in Mineral Production Management from Imperial College, London. Mr. Tomsett was the President and Chief Executive Officer of Place Dome Inc. from September 2004 until its acquisition by Barrick Gold Corporation in January 2006.

*John Dixon*

John Dixon obtained a B.SC (Honours) in Geology and Applied Geology from the University of Natal in South Africa in 1987. He obtained his PhD from the University of Kwazulu-Natal in 2004. He is currently President of Oryx Mining and Exploration.

**10.4 External Auditor Service Fees**

Follows is a summary of the external auditor service fees relating to Africo's most recently completed financial year:

***Audit Fees***

As at the date of this AIF, PricewaterhouseCoopers LLC, Africo's external auditor, has billed Africo $54,342 for the audit of the fiscal year ended December 31, 2006.

***Audit Related Fees***

Our external auditor did not bill any fees in each of the last two fiscal years for assurance and related services that are reasonably related to the performance of the audit of Africo's financial statements and not included in the amount noted above under *Audit Fees*.

***Tax Fees***

For the fiscal year ended December 31, 2006, Africo paid its external auditor an aggregate $11,564 for professional services rendered pertaining to tax compliance, tax advice and tax planning.

***All Other Fees***

No fees were paid by Africo to its external auditor for the year ended December 31, 2006 for products and services provided by Africo's external auditor, other than services reported above.

**ITEM 11 LEGAL PROCEEDINGS**

Subsequent to its most recently completed year end, Africo BC was made aware that one of its former employees in the DRC, Mr. Alessandro Berardone, with whom Africo BC is in a labour dispute regarding the termination of his employment, had ex parte and without proper notice to Africo BC, obtained a default judgement against Africo BC for the payment of damages in the amount of US$3,000,400. Africo BC has initiated the appropriate legal steps to have the default judgement obtained by Mr. Berardone set aside. The case is scheduled to be heard in the Lubumbashi Court on April 5, 2007.

**ITEM 12 INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS**

Management is unaware of any material interest of any director or executive officer of the Corporation, or of any person that is the direct or indirect beneficial owner of, or who exercises control or direction over, more than ten percent of any class or series of the Corporation's outstanding voting securities, or any associate or affiliate of any such persons, in any transaction within the three most recently completed financial years or during the current financial year of the Corporation that has materially affected or will materially affect the Corporation or any of its affiliates.

**ITEM 13 TRANSFER AGENTS AND REGISTRARS**

The Corporation's registrar and transfer agent for its common shares is Computershare Investor Services Inc. with offices at:

| | |
|---|---|
| 510 Burrard Street<br>Vancouver, British Columbia V6C 3B9<br>Telephone: (604) 661-9400<br>Facsimile: (604) 661-9549 | 100 University Avenue, 11th Floor<br>Toronto, Ontario M5J 2Y1<br>Telephone: (416) 263-9200<br>Facsimile: 1-888-453-0330 |

**ITEM 14 MATERIAL CONTRACTS**

The following are the material contracts that Africo or Africo BC are parties to, directly or indirectly, other than those entered into in the ordinary course of business, which have been entered into within Africo's most recently completed financial year, or before the most recently completed financial year but that are still in effect.

1. The Swanmines Agreement and the various amendments. See "Item 3.2 – Narrative Description of the Business – Material Contracts".

2. The H&J Agreement. See "Item 3.2 – Narrative Description of the Business – Material Contracts".

**ITEM 15 INTERESTS OF EXPERTS**

**15.1 Names of Experts**

The following persons have prepared or certified reports included in a filing made under National Instrument 51-102 – *Continuous Disclosure Obligations* during Africo's most recently completed financial year and whose profession or business gives authority to the report:

John Hearne, BEng., MBA, MAusIMM
Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM.

**15.2 Interests of Experts**

Neither of Messrs. Hearne or Verbeek have any registered or beneficial interest, direct or indirect, in any securities or other properties of Africo, nor are they expected to be appointed or employed as directors, officers, or employees of Africo.

**ITEM 16 ADDITIONAL INFORMATION**

Additional information about Africo Resources Ltd. is available at the Corporation's website at www.africoresources.com and on SEDAR at www.sedar.com. Information about the Corporation, including directors' and officers' remuneration and indebtedness, principal holders of the Corporation's securities, and securities authorized for issuance under equity compensation plans, where applicable, is contained in Schedule K to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006, for the annual and special meeting of shareholders of Rubicon Minerals Corporation which was held on August 8, 2006.

Additional financial information about the Corporation is provided in the Corporation's audited consolidated financial statements for the fiscal year ended December 31, 2006, the notes thereto and the report of the Corporation's auditor thereon, as well as Management's Discussion and Analysis for the fiscal year then ended. Copies of these documents, together with copies of any interim financial statements of the Corporation for periods subsequent to the year ended December 31, 2006, copies of this AIF and copies of any documents or the pertinent pages of any documents incorporated by reference in this AIF, are available upon request to the Corporation's Chief Financial Officer at Suite 1540 - 800 West Pender Street, Vancouver, British Columbia V6C 2V6, provided that the Corporation may require payment of a reasonable charge if the request is made by a person who is not a security holder of the Corporation.

## SCHEDULE A

---

## AUDIT COMMITTEE CHARTER

---

PURPOSE

The Audit Committee (the "Committee") is a committee of the board of directors (the "Board") of Africo Resources Ltd. formerly CopperCo Resource Corp. (the "Company") the primary function of which is to assist the Board in its oversight of the nature and scope of the annual audit, management's reporting on internal accounting standards and practices, financial information and accounting systems and procedures and financial reporting and statements and to recommend, for approval of the Board, or to approve, the audited financial statements, interim financial statements and any other releases containing financial information.

The primary objectives of the Committee are as follows:

(a) To assist directors meet their responsibilities (especially for accountability) in respect of the preparation and disclosure of the financial statements of the Company and related matters.

(b) To oversee the work of the external auditors.

(c) To provide better communication between directors and external auditors.

(d) To enhance the external auditors' independence.

(e) To increase the credibility and objectivity of financial reports.

(f) To strengthen the role of the outside directors by facilitating in depth discussions between directors on the Committee, management and the external auditors.

RESPONSIBILITY OF MANAGEMENT AND EXTERNAL AUDITORS

The Committee's role is one of oversight. Management is responsible for preparing the Company's financial statements and other financial information and for the fair presentation of the information set forth in the financial statements in accordance with generally accepted accounting principles ("GAAP"). Management is also responsible for establishing internal controls and procedures and for maintaining the appropriate accounting and financial reporting principles and policies designed to assure compliance with accounting standards and all applicable laws and regulations.

The external auditors' responsibility is to audit the Company's financial statements and provide their opinion, based on their audit conducted in accordance with generally accepted auditing standards, that the financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company in accordance with GAAP.

MEMBERSHIP AND ORGANIZATION

(a) **Composition** - The Committee shall be comprised of not less than three independent members of the Board.

(b) **Independence** - None of the members of the Committee shall be members of management of the Company, and all of them shall be "unrelated directors" (as such term is used in the Report of the Toronto Stock Exchange on Corporate Governance in Canada) and "independent" (as such term is used in Multilateral Instrument 52-110 - Audit Committees ("MI 52-110").

(c) **Appointment and Removal of Committee Members** - Each member of the Committee shall be appointed by the Board on an annual basis and shall serve at the pleasure of the Board or until the earlier of: (a) the close of the next annual meeting of the shareholders of the Company at which the member's term of office expires; (b) the death of the member; or (c) the resignation, disqualification or removal of the member from the Committee or from the Board. The Board may fill the vacancy in the membership of the Committee.

(d) **Financial Literacy** - All of the members of the Committee shall be "financially literate" within the meaning used in MI 52-110 or a member who is not financially literate must become so within a reasonable period of time following his or her appointment.

(e) **Chair** - At the time of the annual appointment of the members of the Committee, the Board shall appoint a Chair of the Audit Committee. The Chair shall be a member of the Committee, preside over all Committee meetings, coordinate the Committee's compliance with this Charter, work with management to develop the Committee's annual work plan and provide reports of the Committee to the Board. The Chair may vote on any matter requiring a vote. In the case of an equality of votes, the Chair shall be entitled to a second or casting vote. The Chair shall report to the Board, as required by applicable law or as deemed necessary by the Committee or as requested by the Board, on matters arising at Committee meetings and, where applicable, shall present the Committee's recommendation to the Board for its approval.

FUNCTIONS AND RESPONSIBILITIES

The Committee shall have the functions and responsibilities set out below as well as any other functions that are specifically delegated to the Committee by the Board. In addition to these functions and responsibilities, the Committee shall perform the duties required of an audit committee by the British Columbia *Business Corporations Act*, by any requirements of stock exchanges on which the securities of the Company are listed, and all other applicable laws.

(a) **Oversee External Auditors** - The Committee shall oversee the work of the external auditors, including reviewing any significant disagreements between management and the external auditors in connection with the preparation of financial statements.

(b) **Internal Controls** - The Committee shall monitor the system of internal control. The Committee shall require management to implement and maintain appropriate systems of internal control in accordance with applicable laws, regulations and guidance, including internal control over financial reporting and disclosure and to review, evaluate and approve these procedures. At least annually, the Committee shall consider and review with management and the external auditors:

(1) the effectiveness of, or weaknesses or deficiencies in: the design or operation of the Company's internal controls (including computerized information system controls and security); the overall control environment for managing business risks; and accounting, financial and disclosure controls (including, without limitation, controls over financial reporting), non financial controls, and legal and regulatory controls and the impact of any identified weaknesses in internal controls on management's conclusions.

(2) any significant changes in internal control over financial reporting that are disclosed, or considered for disclosure, including those in the Company's periodic regulatory filings;

(3) any material issues raised by any inquiry or investigation by the Company's regulators;

(4) any related significant issues and recommendations of the external auditors together with management's responses thereto, including the timetable for implementation of recommendations to correct weaknesses in internal controls over financial reporting and disclosure controls.

(c) **Review Financial Statements** - The Committee shall review the annual and interim financial statements of the Company and related management's discussion and analysis ("MD&A") prior to their approval. The process should include but not be limited to:

(1) reviewing changes in accounting principles and policies, or in their application, which may have a material impact on the current or future years' financial statements;

(2) reviewing significant accruals, reserves or other estimates;

(3) reviewing any "related party" transactions, with related party having the meaning ascribed to it by Canadian securities regulations;

(4) reviewing accounting treatment of unusual or non-recurring transactions;

(5) ascertaining compliance with covenants under loan agreements;

(6) reviewing disclosure requirements for commitments and contingencies;

(7) reviewing unresolved differences between management and the external auditors;

(8) obtain explanations of significant variances with comparative reporting periods;

(9) reviewing any legal matters which could significantly impact the financial statements as reported on by the general counsel and meet with outside counsel whenever deemed appropriate; and

(10) reviewing audit response letters from the Company's legal counsel made under the Joint Policy Statement of the Canadian Bar Association and the Canadian Institute of Chartered Accountants.

(d) **Public Disclosure** - The Committee shall review the financial statements, MD&A, annual information forms ("AIF"), management information circulars and any prospectuses as well as all public disclosure containing audited or unaudited financial information (including, without limitation, any press releases disclosing earnings or financial results) before release and prior to Board approval.

(e) **Interim Financial Statements** - The Committee shall review the interim financial statements and disclosures, and obtain explanations from management as required. After completing its review of the interim financial statements, if advisable, the Committee shall, if so authorized by the Board, approve the interim financial statements and the related MD&A, or if not so authorized by the Board, then approve and recommend them for approval by the Board.

(f) **Hiring Policies** - The Committee shall review and approve the Company's hiring policies regarding the hiring of partners, employers and former partners and employees of the present and former external auditors of the Company. The Committee shall review candidates for the position of Chief Financial Officer of the Company and make recommendations to the Board with respect to the appointment of a Chief Financial Officer.

(g) **Appointment of External Auditors** - With respect to the appointment of external auditors by the Board, the Committee shall:

(1) recommend to the Board the appointment of the external auditors;

(2) recommend to the Board the terms of engagement of the external auditor, including the compensation of the auditors and a confirmation that the external auditors shall communicate directly to the Committee;

(3) on an annual basis, review and discuss with the external auditors all significant relationships such auditors have with the Company to determine the auditors' independence;

(4) review the performance of the external auditors;

(5) when there is to be a change in auditors, review the issues related to the change and the information to be included in the required notice to securities regulators of such change; and

(6) review and approve in advance any non-audit services to be provided to the Company or its subsidiaries by the external auditors and consider the impact on the independence of such auditors, including reviewing the range of services provided in the context of all consulting services bought by the Company. The Committee may delegate to one or more members the authority to approve non–audit services, provided that the member report to the Committee at the next scheduled meeting such pre–approval and the member comply with such other procedures as may be established by the Committee from time to time.

(h) **Evaluation and Rotation of Lead Partner** - At least annually, the Committee shall review the qualifications and performance of the lead partners of the external auditors. The Committee shall obtain a report from the external auditors annually verifying that the lead partner of the external auditors has served in that capacity for no more than five fiscal years of the Company and that the engagement team collectively possesses the experience and competence to perform an appropriate audit.

(i) **Review with External Auditors** - Review with external auditors (and internal auditor if one is appointed by the Company) their assessment of the internal controls of the Company, their written reports containing recommendations for improvement, and management's response and follow-up to any identified weaknesses. The Committee shall also review annually with the external auditors their plan for their audit and, upon completion of the audit, their reports upon the financial statements of the Company and its subsidiaries.

(j) **Risk Policies and Procedures** - The Committee shall review risk management policies and procedures of the Company (e.g. hedging, litigation and insurance), regarding current areas of great financial risk and whether management is managing these effectively.

(k) **Treatment of Complaints/Submissions** - The Committee shall review and approve the establishment by management of procedures for the receipt, retention and treatment of complaints received by the Company from employees or others, regarding accounting, internal accounting controls, or auditing matters.

(l) **Investigations** - The Committee shall have the authority to investigate any financial activity of the Company. All employees of the Company are to cooperate as requested by the Committee.

(m) **Retain Experts** - The Committee may retain independent counsel, persons having special expertise and/or obtain independent professional advice to assist in filling their responsibilities at the expense of the Company without any further approval of the Board. The Committee has the authority to set, and have the Company, pay the compensation for any such persons engaged by the Committee.

(n) **Advising Board** - The Committee shall ensure that the Board is aware of matters which may significantly impact the financial condition or affairs of the business.

(o) **Updates to Charter** - The Committee shall review and recommend to the Board any updates to the Audit Committee Charter. All changes to the Audit Committee Charter shall be approved by the Board.

EFFECTIVE DATE

This Policy will become effective on the date the Company becomes a public company as the result of a plan of arrangement under sections 288-299 of the *Business Corporations Act* (British Columbia) of Rubicon Minerals Corporation.

Approved and Adopted by the Board of the Company on July 7, 2006.