# Exhibit 18

LIONBRIDGE

STATE OF NEW YORK )
) ss
)
COUNTY OF NEW YORK )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the attached Mining Regulation articles.

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this 27th day of February, 2020.

KRISTEN DUFFY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01DU6121852
Qualified In Queens County
My Commission Expires 01-31-2021

## Article 180 (pp. 131, 132 of 584)

***CHAPTER IV:***
***MINING LICENSE RENEWAL***

**Article 180: Establishment of the application for a Mining License**

To obtain the renewal of its Mining License, the holder shall, no earlier than five years and no later than one year before the expiration date of the Mining License, file its request to the central or provincial Mining Registry, in accordance with the Renewal form to be obtained from the Mining Registry Office.

The Mining License Renewal form shall be completed and signed by the Mining License holder or its representative.

The following documents shall be attached to the Renewal form:

- a copy of the decision to grant the Mining License;
- the Mining Certificate;
- a 1/200,000 scale map showing the geographic location of the perimeter for which renewal is requested;
- the geographic coordinates of the summits in the perimeter for which renewal is requested as well as the number of squares including:
- the mining report and program;
- an updated feasibility study;
- the updated ESIA and ESMP;
- an undertaking to actively pursue exploitation and proof of regular development of the deposit;
- the financing plan for the mining works;
- proof of the existence of the financial resources necessary for the continued operation of the project;
- the notarized declaration of transfer of the 5% of units or shares to the State, in accordance with Article 144, paragraphs 2 to 4 of this Decree;
- an undertaking to comply with the specifications stated in this Decree;
- a tax certificate;
- a copy of the receipt for payment of the filing fees;
- proof that the project has entered the profitability phase.

## Article 390 (pp. 219, 200 of 584)

**Section II: Start of development and construction**

**Article 390: Operations certifying the start of development and construction pursuant to Mining Rights or a Permanent Quarrying License**

Pursuant to Article 197 of the Mining Code, the holder of Mining Rights or of a Permanent Quarrying License shall, as the case may be, within one year or three years from the issuance of its mining or quarrying title, perform the following operations:

- the filing of two copies of its approved Project Environmental and Social Project Management Plan, one at the provincial Mining Registry and the other at the Provincial Division of Mines where the mining perimeter is located;
- the submission of a summary of the Project Environmental and Social Management Plan to the local authorities and the explanation of the planned mitigation and rehabilitation measures;
- the creation of financial surety for the rehabilitation of the perimeter;
- the initiation of development and construction for an amount greater than five times the amount of surface fees payable for the first full year of the duration of the Mining License, Small Mine License or Mining Discharge License, as the case may be.

A Ministerial Order shall specify the works that is being considered as development and construction.

## Article 530 (p. 297 of 584)

**Article 530 bis: Special tax on excess profits**

For the application of Article 251 bis of the Mining Code, the EBITDA that serves as the basis of the special tax on excess profits consists of the difference between the amount of the EBITDA for the accounting year in question minus the amount of the EBITDA generated by the bankable feasibility study for the mining project for the same year, with the latter amount being increased by 25%.

Under these conditions, the holder is required to deposit a copy of the feasibility study for the mining project with the Tax Authority before the actual start of production of said project.

For projects already in the operational phase, this obligation must be fulfilled within ninety (90) days of the publication of these Regulations.

In the event that the feasibility study is updated during the extension of mining under Article 77 ter of the Mining Code or submitted as part of the renewal of a mining license under of Article 80 letter b of the Mining Code, the data relating to the price of raw or other materials and the EBITDA must be updated. This modified feasibility study must include forecasts for the project's EBITDA for each accounting year for each product. A copy of this feasibility study must be provided to the Tax Authority within sixty (60) days of the approval of this feasibility study, and it will be used to calculate the base of the special tax on excess profits.

Excess profits or super profits are calculated on the basis of the analytical EBITDA per product.

Article 251 bis shall not apply unless the effective average selling price of the product for the accounting year exceeds the average selling price of the product for that year as provided for in the feasibility study by more than 25%.

For the determination of excess profits, research and development expenses are not deductible. Similarly, the allocation of previous deficits is prohibited.

The holder is required to sign a declaration for the special tax on excess profits according to the model provided by the Tax Authority no later than

the date of the deadline scheduled for the filing of the statement of the Tax on profits.

## Articles 6, 7 (pp. 327, 328, 329 of 584)

### *Chapter II:*
### *TERMS OF FINANCIAL SURETY FOR THE REHABILITATION OF THE ENVIRONMENT*

**Article 6: Option of terms of financial surety for the rehabilitation of the environment**

Depending on its short- or long-term rehabilitation objectives and financial capacity, the holder of mining or quarrying rights has a choice between several financial surety methods for rehabilitation of the environment.

The holder may combine several types of financial surety listed in Article 7 below to cover the cost of mitigation and rehabilitation measures, provided that only one method is used for each payment.

The holder shall notify the Department responsible for the Protection of the Mining Environment of its choice of method for the first payment of the financial surety at least

ten business days before the date scheduled for the payment. It shall notify the same department of its choice of method for each subsequent payment of the financial surety at least ten business days before the date of the payment.

**Article 7: Accepted terms of financial surety for the rehabilitation of the environment**

The accepted terms of financial surety for the rehabilitation of the environment are as follows:

a) cash paid into the holder's environmental rehabilitation financial surety account opened with a commercial bank, a Savings Bank and Credit Union, or any other financial institution duly approved by the Central Bank of Congo;

b) a check made out to the order of one of the financial institutions referred to in letter a above for the holder's environmental rehabilitation financial surety account;

c) a guaranteed or term deposit certificate, in Congolese francs or in foreign currency, issued to the holder by a commercial bank, financial institution, or Savings Bank and Credit Union or any other financial institution approved by the Central Bank of Congo. This deposit certificate must have a duration of at least 12 months and be automatically renewable until the certificate of discharge from environmental obligations is issued to the holder and not include restrictions as regards collection during the term, subject to the order of confiscation by the competent court of law;

d) an irrevocable and unconditional letter of credit payable in Congolese francs or in foreign currency issued to the holder by a commercial bank, financial institution, or savings bank and credit union approved by the Central Bank of Congo;

e) an environmental rehabilitation bond or a financial security policy payable in Congolese francs or in foreign currency issued to the holder by a financial agent or institution legally empowered to act in that capacity;

f) a deposit provided by a third party payable in Congolese francs or foreign currency to the holder, subject to the order of confiscation by the competent court of law, in accordance with Law No. 73-021 of July 20, 1973 relating to the general regime for assets, land and real estate, and sureties as amended and supplemented by Law No. 80-008 of July 18, 1980.

If the holder uses one of the terms of financial surety specified in letters c, d, e, or f of this article for more than one payment, the amount of the last payment cumulative with the current value of the previous payments must be equal to the amount of the cumulative obligation of the holder with regard to payments of the environmental rehabilitation financial surety in accordance with this Directive.

## Chapter III (pp. 330, 331, 332 of 584)

***Chapter III:***
***TERMS OF PAYMENT OF THE FINANCIAL SURETY FOR THE REHABILITATION OF THE ENVIRONMENT***

**Article 10: Terms for the payment of the financial surety for the rehabilitation of the environment for prospecting projects of up to one year and for the exploitation of temporary quarries**

For the rehabilitation of either prospecting or quarrying product projects of up to one year, or temporary quarrying activities, the total amount of the financial surety for

rehabilitation of the environment shall be paid within 15 days of receipt of the approval of the Environmental Mitigation and Rehabilitation Plan by the holder.

**Article 11: Terms for the payment of the financial surety for the rehabilitation of the environment for prospecting of over one year**

For prospecting projects of over one year, the amount of the first payment of the financial surety for rehabilitation of the environment corresponds to the costs assessed for the rehabilitation of the ambient environment affected by the prospecting activities planned for the first year. For each following year until the expiration of the Prospecting License, on the anniversary date of the approval of the Environmental Plan, the holder of the Prospecting License shall pay a new sum corresponding to the assessed costs of the rehabilitation of the ambient environment affected by the prospecting activities planned for the year in question.

**Article 12: Terms for the payment of the financial surety for the rehabilitation of the environment for mining operations**

For mining operations, the total amount of the financial surety for rehabilitation of the environment shall be paid in accordance with a schedule established according to the lifespan of mining activities set forth in the holder's feasibility study, up to a maximum of fifteen years, as shown in Table IIA of this directive. The Department in charge of Protection of the Mining Environment shall notify the holder of the schedule and the amount of the payments on request after the approval of its Environmental Plan.

If necessary, the first payment shall be made within 30 days of the issuance of the mining title.

Each subsequent annual payment shall occur no later than the anniversary date of the approval of the Environmental Plan.

If the lifespan of the mining activity is less than five years, a single payment may on an exceptional basis be postponed and then added to the following payment. This condition cannot be applied in the last two years of installments payable.

For mining activities of over ten years, two consecutive payments may be postponed on an exceptional basis. No postponements are possible for the last three years payable.

**Article 13: The filing of the proof of payment of the financial surety for rehabilitation of the environment**

Within thirty days from the date of approval of its Environmental Plan, the holder shall file with the Department responsible for the Protection of the Mining Environment proof of payment of the financial surety for rehabilitation of the environment by one of the following means:

a) a copy of the payment receipt issued by the Central Bank of Congo;

b) a copy of the certificate of deposit prepared in accordance with Article 7 of this Directive;

c) a copy of the letter of credit prepared in accordance with Article 7 of this Directive;

d) proof of the bond established in accordance with Article 7 of this Directive.

**Article 180 (pp. 131, 132 of 584)**

***Chapitre IV :***
***DU RENOUVELLEMENT DU PERMIS D'EXPLOITATION***

**Article 180 : De l'établissement de la demande de Permis d'Exploitation**

Pour obtenir le renouvellement de son Permis d'Exploitation, le titulaire dépose au plus tôt dans les cinq ans et au plus tard un an avant la date de l'expiration du Permis d'Exploitation, sa demande auprès du Cadastre Minier central ou provincial, suivant le formulaire de Renouvellement à retirer auprès du Bureau du Cadastre Minier.

Le formulaire de Renouvellement du Permis d'Exploitation est rempli et signé par le titulaire du Permis d'Exploitation ou son mandataire.

Au formulaire de Renouvellement sont joints les documents suivants :

- une copie de la décision d'octroi du Permis d'Exploitation ;
- le Certificat d'Exploitation;
- une carte à l'échelle 1/200.000 sur laquelle est indiquée la situation géographique du périmètre dont le renouvellement est demandé ;

- les coordonnées géographiques des sommets du périmètre dont le renouvellement est demandé ainsi que le nombre des carrés y compris;
- le rapport et le programme des travaux d'exploitation ;
- une étude de faisabilité mise à jour ;
- l'EIES et le PGES mis à jour ;
- un acte d'engagement de poursuivre activement l'exploitation et la preuve de mise en valeur régulière du gisement ;
- le plan de financement des travaux d'exploitation ;
- la preuve de l'existence des ressources financières nécessaires à la poursuite d'exploitation du projet ;
- la déclaration notariée de cession des 5% des parts ou actions à l'Etat, conformément à l'article 144 alinéas 2 à 4 du présent Décret ;
- un acte d'engagement de se conformer au cahier de charge prévu dans le présent Décret ;
- une attestation fiscale ;
- une copie de la quittance ou du récépissé du paiement des frais de dépôt ;
- la preuve de l'entrée en phase de rentabilité du projet.

**Article 390 (pp. 219, 200 of 584)**

**Section II : Du commencement des travaux de développement et de construction**

**Article 390 : Des opérations attestant le commencement des travaux de développement et de construction en vertu d'un Droit Minier d'Exploitation ou d'une Autorisation d'Exploitation de Carrières Permanente**

En application des dispositions de l'article 197 du Code minier, le titulaire d'un Droit Minier d'Exploitation ou d'une Autorisation d'Exploitation de Carrières Permanente doit, selon le cas, dans un délai d'un an ou trois ans à partir de la délivrance de son titre minier ou de carrières, réaliser les opérations suivantes :

- le dépôt de deux copies de son Plan de Gestion Environnementale et Sociale du Projet approuvé dont une au Cadastre Minier provincial et l'autre à la Division provinciale des mines où le périmètre d'exploitation est situé ;

- la transmission d'un sommaire du Plan de Gestion Environnementale et Sociale du Projet aux autorités locales et l'explication des mesures d'atténuation et de réhabilitation prévues ;
- la constitution d'une sûreté financière pour la réhabilitation du périmètre ;
- l'engagement des travaux de développement et de construction pour un montant supérieur à cinq fois le montant des droits superficiaires exigibles pour la première année entière de la durée du Permis d'Exploitation, du Permis d'Exploitation de Petite Mine ou du Permis d'Exploitation des Rejets, selon le cas.

Un Arrêté du Ministre précise les travaux qui sont considérés comme des travaux de développement et de construction.

**Article 530 (p. 297 of 584)**

**Article 530 bis : De l'Impôt spécial sur les profits excédentaires**

Pour l'application de l'article 251 bis du Code minier, l'excédent brut d'exploitation qui sert d'assiette de l'impôt spécial sur les profits excédentaires est constitué par la différence entre le montant de l'excédent brut d'exploitation de l'exercice comptable considéré diminué du montant de l'excédent brut d'exploitation dégagé par l'étude de faisabilité bancable du projet minier pour cette même année, ce dernier montant augmenté de 25%.

Dans ces conditions, le titulaire est tenu de déposer une copie de l'étude de faisabilité du projet minier auprès de l'Administration des impôts avant l'entrée effective en production dudit projet.

Pour les projets déjà en phase d'exploitation, cette obligation doit être accomplie dans les nonante (90) jours de la publication du présent Règlement.

Pour le cas où l'étude de faisabilité est mise à jour lors de l'extension des travaux d'exploitation au titre de l'Article 77 ter du Code minier ou transmise dans le cadre du renouvellement d'un permis d'exploitation au titre de l'Article 80 littera b du Code minier, les données relatives au prix des matières premières ou des matériaux et à l'excédent brut d'exploitation devront être mises à jour. Cette étude de faisabilité modifiée devra inclure les prévisions d'excédent brut d'exploitation du projet pour chaque exercice comptable pour chaque produit. Une copie de cette étude de faisabilité devra être fournie à l'Administration Fiscale dans les soixante (60) jours de l'approbation de cette étude de faisabilité et sera utilisée pour calculer l'assiette de l'impôt spécial sur les profits excédentaires.

Les profits excédentaires ou super profits sont calculés sur la base de l'excédent brut d'exploitation analytique par produit.

L'article 251 bis ne s'appliquera que si le prix de vente moyen effectif du produit pour l'exercice comptable excède de plus de 25% le prix de vente moyen du produit pour cette année tel que prévu dans l'étude de faisabilité.

Pour la détermination des profits excédentaires, les dépenses de recherche et de développement ne sont pas déductibles. De même, l'imputation des déficits antérieurs est interdite.

Le titulaire est tenu de souscrire une déclaration de l'impôt spécial sur les profits excédentaires, selon le modèle fourni par l'Administration des Impôts, au plus tard à

la date de l'échéance prévue pour le dépôt de la déclaration de l'Impôt sur les bénéfices et profits.

**Articles 6, 7 (pp. 327, 328, 329 of 584)**

***Chapitre II :***
***DES MODALITES DE LA SURETÉ FINANCIÈRE DE RÉHABILITATION DE L'ENVIRONNEMENT***

**Article 6 : De l'option des modalités de la sûreté financière de réhabilitation de l'environnement**

En fonction de ses objectifs de réhabilitation à court ou à long terme et de sa capacité financière, le titulaire d'un droit minier ou de carrières a le choix entre plusieurs modalités de sûreté financière de réhabilitation de l'environnement.

Le titulaire peut associer plusieurs modalités de sûretés financières énumérées à l'article 7 ci-dessous pour couvrir le coût des mesures d'atténuation et de réhabilitation, à condition d'utiliser une seule modalité pour chaque versement.

Le titulaire notifie la Direction chargée de la Protection de l'Environnement Minier de son choix de modalité pour le premier versement de la sûreté financière au moins dix

jours ouvrables avant la date prévue pour la réalisation du versement. Il notifie le même service de son choix de modalité pour chaque versement subséquent de la sûreté financière au moins dix jours ouvrables avant la date de la réalisation du versement.

**Article 7 : Des modalités de la sûreté financière de réhabilitation de l'environnement acceptées**

Les modalités de la sûreté financière de réhabilitation de l'environnement acceptées sont les suivantes :

a) des espèces versées au compte de sûreté financière de réhabilitation de l'environnement du titulaire ouvert auprès d'une banque commerciale, d'une Caisse d'Epargne et de Crédit ou toutes autres institutions financières dûment agréées par la Banque Centrale du Congo ;

b) un chèque tiré à l'ordre d'une des institutions financières visées au littera a ci-dessus pour le compte de sûreté financière de réhabilitation de l'environnement du titulaire ;

c) un certificat de dépôt garanti ou à terme, en francs congolais ou en devises, émis en faveur du titulaire par une banque commerciale, une institution financière ou une Caisse d'Epargne et de Crédit ou toutes autres institutions financières agréées par la Banque Centrale du Congo. Ce certificat de dépôt doit avoir une durée d'au moins 12 mois et être automatiquement renouvelable jusqu'à la délivrance de l'attestation de libération des obligations environnementales au titulaire et ne pas comporter de restrictions quant à l'encaissement en cours de terme, sous réserve du prononcé de la confiscation par le tribunal compétent ;

d) une lettre irrévocable et inconditionnelle du crédit payable en francs congolais ou en devises émise en faveur du titulaire, par une banque commerciale, une institution financière, ou une caisse d'épargne et de crédit agréée par la Banque Centrale du Congo ;

e) une caution ou une police de sûreté financière de réhabilitation de l'environnement payable en francs congolais ou en devises émis en faveur du titulaire, par une compagnie ou une institution financière légalement habilitée pour agir en cette qualité ;

f) une caution fournie par un tiers payable en francs congolais ou en devises, en faveur du titulaire, sous réserve du prononcé de la confiscation par le tribunal compétent, conformément aux dispositions de la loi n° 73-021 du 20 juillet 1973

portant régime général des biens, régime foncier et immobilier et régime des sûretés telle que modifiée et complétée par la loi n° 80-008 du 18 juillet 1980.

Lorsque le titulaire utilise l'une des modalités de sûreté financière précisées aux litteras c, d, e ou f du présent article pour plusieurs versements, le montant du dernier versement cumulé avec la valeur actuelle des versements antérieurs doit être égal au montant de l'obligation cumulative du titulaire en matière de versements de la sûreté financière de réhabilitation de l'environnement conformément à la présente directive.

**Chapter III (pp. 330, 331, 332 of 584)**

***Chapitre III :***
***DES MODALITES DES VERSEMENTS DE LA SURETE FINANCIERE DE REHABILITATION DE L'ENVIRONNEMENT***

**Article 10 : Des modalités du versement de la sûreté financière de réhabilitation de l'environnement pour les projets de recherches d'un an au maximum et pour l'exploitation de carrières temporaire**

Pour les travaux de réhabilitation soit des projets de recherches minières ou des produits de carrières d'un an au maximum, soit des activités d'exploitation de carrières temporaire, le montant total de la sûreté financière de réhabilitation de

l'environnement est versé dans les 15 jours de la réception de l'approbation du Plan d'Atténuation et de Réhabilitation de l'environnement par le titulaire.

**Article 11 : Des modalités du versement de la sûreté financière de réhabilitation de l'environnement pour les travaux de recherches de plus d'un an**

Pour les projets de recherches de plus d'un an, le montant du premier versement de la sûreté financière de réhabilitation de l'environnement correspond aux coûts évalués pour les travaux de réhabilitation du milieu ambiant affecté par les activités de recherches planifiées pour la première année. Chaque année suivante et ce jusqu'à l'expiration du Permis de recherches, lors de la date d'anniversaire de l'approbation du Plan Environnemental, le titulaire du Permis de recherches verse une nouvelle somme qui correspond aux coûts évalués des travaux de réhabilitation du milieu ambiant affecté par les activités de recherches planifiées pour l'année considérée.

**Article 12 : Des modalités du versement de la sûreté financière de réhabilitation de l'environnement pour les travaux d'exploitation**

Pour les travaux d'exploitation, le montant total de la sûreté financière de réhabilitation de l'environnement est versé conformément à un échéancier établi en fonction de la durée de vie des activités d'exploitation prévue dans l'étude de faisabilité du titulaire, jusqu'à un maximum de quinze ans, comme il est présenté au Tableau IIA de la présente directive. La Direction chargée de la Protection de l'Environnement Minier notifie le titulaire du calendrier et du montant des versements sur demande après l'approbation de son Plan Environnemental.

Le cas échéant, le premier versement est effectué dans les 30 jours qui suivent la délivrance du titre d'exploitation.

Chaque versement annuel subséquent a lieu au plus tard à la date d'anniversaire de l'approbation du Plan Environnemental.

Lorsque la durée de vie de l'activité d'exploitation est inférieure à cinq ans, un seul versement peut être exceptionnellement reporté et celui-ci s'ajoute alors au versement suivant. Cette modalité ne peut s'appliquer dans les deux dernières années de versements exigibles.

Pour les activités d'exploitation de plus de dix ans, deux versements consécutifs peuvent être exceptionnellement reportés. Aucun report n'est possible pour les trois dernières années exigibles.

**Article 13 : Du dépôt de la preuve du versement de la sûreté financière de réhabilitation de l'environnement**

Dans un délai de trente jours à compter de la date de l'approbation de son Plan Environnemental, le titulaire dépose auprès de la Direction chargée de la Protection de l'Environnement Minier la preuve de versement de la sûreté financière de réhabilitation de l'environnement par l'un des moyens suivants :

a) la copie du récépissé du versement délivré par la Banque Centrale du Congo ;
b) la copie du certificat de dépôt établi conformément aux dispositions de l'article 7 de la présente directive ;
c) la copie de la lettre de crédit établie conformément aux dispositions de l'article 7 de la présente directive ;
d) la preuve de la caution établie conformément aux dispositions de l'article 7 de la présente directive.