# Exhibit 23

RUBICON

# RUBICON MINERALS CORPORATION

| | |
|---|---|
| **2006** | |
| **ANNUAL** | Notice of Annual and Special Meeting of Shareholders |
| **AND** | Directors' Report to the Shareholders |
| **SPECIAL** | Management Information Circular |
| **MEETING** | |
| | **Place**: The Metropolitan Hotel<br>645 Howe Street<br>Vancouver, BC CANADA |
| | **Time**: 2:00 p.m. (local time) |
| | **Date**: Tuesday, August 8, 2006 |

# RUBICON MINERALS CORPORATION

| CORPORATE DATA | |
|---|---|
| | **Head Office**<br>Suite 1540 - 800 West Pender Street<br>Vancouver, BC V6C 2V6<br>Telephone: (604) 623-3333<br>Facsimile: (604) 623-3355<br>E-mail: rubicon@rubiconminerals.com<br>Web site: www.rubiconminerals.com<br><br>**Directors & Officers**<br>J. Garfield MacVeigh, Director, Chairman of the Board<br>David W. Adamson, Director, President & CEO<br>William J. Cavalluzzo, VP Investor Relations<br>Robert G. Lewis, Chief Financial Officer<br>David R. Reid, Director<br>Philip S. Martin, Director<br>John R. Brodie, Director<br>Kevin D. Sherkin, Director<br>Christopher J. Bradbrook, Director<br><br>**Solicitors**<br>Davis & Company LLP<br>Barristers & Solicitors<br>2800 Park Place<br>666 Burrard Street<br>Vancouver, BC V6C 2Z7<br><br>**Auditors**<br>DeVisser Gray<br>Chartered Accountants<br>401 – 905 West Pender Street<br>Vancouver, BC V6C 1L6<br><br>**Registrar & Transfer Agent**<br>Computershare Investor Services Inc.<br>3rd Floor, 510 Burrard Street<br>Vancouver, BC V6C 3B9<br><br>**Listings**<br>Toronto Stock Exchange: *Trading Symbol: RMX*<br>American Stock Exchange: *U.S. AMEX Trading Symbol*: *RBY*<br>Registered under Section 20F of<br>U.S. Securities & Exchange Act of 1934 |

**RUBICON MINERALS CORPORATION**
Suite 1540 – 800 West Pender Street
Vancouver, BC Canada V6C 2T6
Telephone: (604) 623-3333
Facsimile: (604) 623-3355

July 7, 2006

Dear Rubicon Shareholder:

On November 21, 2005 and March 23, 2006, Rubicon announced its intentions to proceed with a reorganization of Rubicon which will have the result of dividing its present mineral resource assets between three separate public companies: Rubicon, Paragon Minerals Corporation ("**Paragon**") and CopperCo Resource Corp. ("**CopperCo**"). Upon the implementation of the corporate restructuring, Rubicon will continue to hold its current Red Lake, Alaska, Nevada and other interests, Paragon will hold Rubicon's current Newfoundland gold and base metal assets and CopperCo will hold all of the issued and outstanding shares of Africo Resources Ltd. ("**Africo**"), which holds mineral resource assets in Africa. CopperCo will also adopt Africo's existing name. Since the announcements, Rubicon has received independent financial advice and has completed reviews of financial, legal, tax, regulatory and other matters, and is now able to provide you with complete details of the proposed reorganization in the accompanying Management Information Circular (the "Circular").

You are invited to attend Rubicon's Special Meeting of Shareholders, to be held at the Metropolitan Hotel, 643 Howe Street, Vancouver, British Columbia, on Tuesday, the 8th day of August, 2006 at 2:00 p.m., at which time you will be asked to consider and vote upon the proposed reorganization. Rubicon will also hold its Annual Meeting of Shareholders at the same time, thereby avoiding any inconvenience to Shareholders of attending separate meetings which otherwise would have fallen within a short period of time.

In addition to retaining all of your common shares of Rubicon ("**Rubicon Common Shares**") currently held, you will receive shares in the two new companies as follows: the common shares of Paragon ("**Paragon Common Shares**") and CopperCo ("**CopperCo Common Shares**") will be distributed to shareholders of Rubicon in proportion to their present shareholdings in Rubicon on the basis of one Paragon Common Share for every 6 Rubicon Common Shares held and that number of CopperCo Common Shares obtained by multiplying the number of Rubicon Common Shares held by the Rubicon-CopperCo Exchange Ratio (which is currently estimated to be approximately 0.0922, or one CopperCo Common Share for approximately every 10.84 Rubicon Common Shares held). As explained in the Circular, however, that 10.84 number could be reduced, and the entitlement of Shareholders to receive CopperCo Common Shares could be correspondingly increased, in the event that Rubicon acquires and exercises certain conversion rights under a proposed Bridge Loan financing for Africo.

The reorganization is intended to enhance Shareholder value by improving the identification and the value of Rubicon's mineral properties, and by allowing shareholders to hold an interest in only those projects that interest them. The three separate public companies emerging from the reorganization will be owned by the existing Shareholders of Rubicon (and, in the case of CopperCo, also the existing shareholders of Africo), as well any new investors who participate in concurrent financings which are proposed for Paragon and CopperCo. Each resulting company will focus on separate resource locations and assets.

The reorganization of Rubicon will be implemented by a statutory Plan of Arrangement. When Rubicon's Shareholders have approved the Plan of Arrangement and all other conditions to closing have been met, final approval will be sought from the Supreme Court of the Province of British Columbia. Details of the Plan of Arrangement are set out in the accompanying Circular.

A summary of the proposed reorganization is provided on pages 1 to 5 of the accompanying Circular. For information on how you will receive your share certificates in the new companies, please see the sections entitled "Distribution of Share Certificates" in the Summary and in the main body of the Circular. For information regarding the tax consequences of the Arrangement, please see the sections entitled "Income Tax Considerations" in the Summary and in the main body of the Circular.

**Rubicon's Board of Directors recommends that you vote in favour of the Arrangement and all other matters to be considered at the Meeting.** Your attention is directed to the section entitled "The Arrangement – Reasons for the Arrangement" in the accompanying Circular where the Board of Directors' reasons for recommending the Plan of Arrangement are summarized.

If you are unable to attend the Meeting in person, please complete and return the enclosed form of Proxy so that your shares can be voted at the Meeting in accordance with your instructions.

Yours truly,

*"David W. Adamson"*

David W. Adamson
President and Chief Executive Officer

## NOTICE OF ANNUAL AND SPECIAL GENERAL MEETING OF SHAREHOLDERS

**NOTICE IS HEREBY GIVEN** that the Annual and Special General Meeting of Shareholders (the "**Meeting**") of **RUBICON MINERALS CORPORATION** ("**Rubicon**") will be held at the Metropolitan Hotel, 645 Howe Street, Vancouver, British Columbia, on Tuesday, August 8, 2006, at the hour of 2:00 p.m. (local time), for the following purposes:

1. to receive and consider the financial statements of Rubicon for the financial year ended December 31, 2005;
2. to appoint auditors of Rubicon for the ensuing year;
3. to determine the number of Directors at seven;
4. to elect Directors of Rubicon for the ensuing year;
5. to consider, pursuant to an interim order of the Supreme Court of British Columbia dated July 7, 2006 (the "**Interim Order**"), and, if thought fit, to pass, with or without variation, a special resolution (the "**Special Resolution**") to approve an arrangement (the "**Arrangement**") pursuant to section 288-299 of the British Columbia *Business Corporations Act* and certain related matters, the full text of such Special Resolution being set out in Schedule "E" to the Circular;
6. to consider and, if thought fit, to pass, an ordinary resolution to approve the Stock Option Plan of Paragon Minerals Corporation ("**Paragon**"), the full text of such ordinary resolution being set out in Schedule "F" to the Circular;
7. to consider and, if thought fit, to pass, an ordinary resolution to approve the Stock Option Plan of CopperCo Resource Corp. ("**CopperCo**"), the full text of such ordinary resolution being set out in Schedule "G" to the Circular;
8. to consider, and if thought fit, to pass an ordinary resolution to approve the Shareholder Rights Plan of Rubicon, the full text of such ordinary resolution being set out in Schedule "H" to the Management Information Circular dated July 7, 2006 accompanying this Notice of Meeting ("**Circular**"); and
9. to transact such further of other business as may properly come before the Meeting or any adjournment thereof.

**TAKE NOTICE** that pursuant to the Interim Order and the British Columbia *Business Corporations Act*, holders of common shares of Rubicon ("**shareholders**") may until 2:00 p.m. (Vancouver time) on August 3, 2006, give written notice of dissent to Rubicon by depositing such notice of dissent with Rubicon, or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 West Pender Street, Vancouver, British Columbia V6C 2V6, Attention: The President, with respect to the Special Resolution. As a result of giving a notice of dissent, a Shareholder may, on receiving a notice of intention to act under the Interim Order, require Rubicon to purchase all of its shares. This right is described in the Circular.

Accompanying this Notice of Meeting are the Circular, form of Proxy or Voting Instruction Form ("**VIF**") and Financial Information Request Form. Financial information concerning Rubicon is provided in Rubicon's Audited Consolidated Financial Statements and Management Discussion and Analysis for the financial year ended December 31, 2005, and its Interim Consolidated Financial Statements and Management Discussion and Analysis for the three months ended March 31, 2006, which are set out at Schedule "A" to the Circular.

Shareholders who are unable to attend the Meeting in person are requested to read the instructions on the reverse of the form of proxy or VIF enclosed (as applicable) and then to complete, date, sign and deliver the form of proxy or VIF (as applicable) in accordance with the instructions set out in the proxy of VIF (as applicable) and in the Circular. Please note that the form of proxy and VIF also explain how a Shareholder may, in certain circumstances, vote using the telephone or the internet.

**BY ORDER OF THE BOARD OF DIRECTORS**

(signed) "*David W. Adamson*"
President and Chief Executive Officer

Vancouver, BC
July 7, 2006

RUBICON

# RUBICON MINERALS CORPORATION

Suite 1540 - 800 West Pender Street
Vancouver, BC
V6C 2V6
Telephone: (604) 623-3333
Facsimile: (604) 623-3355
www.rubiconminerals.com

# MANAGEMENT INFORMATION CIRCULAR

containing information as at

July 7, 2006

unless otherwise noted

# MANAGEMENT INFORMATION CIRCULAR

(As at July 7, 2006, unless otherwise noted and in Canadian dollars except as indicated)

This Management Information Circular is being furnished in connection with the solicitation of proxies by management of Rubicon for use at the Annual and Special Meeting of Shareholders to be held at the time and place and for the purposes set forth in the accompanying Notice of Meeting and at any adjournment thereof.

It is anticipated that this Management Information Circular and the accompanying form of Proxy will be distributed to Shareholders on or about July 12, 2006. Unless otherwise indicated, information in this Management Information Circular is given as at July 7, 2006.

**See Schedule "M" – Risk Factors for certain considerations relevant to Shareholders regarding the Arrangement and their investment in the securities referred to in this Management Information Circular.**

The date of this Management Information Circular is July 7, 2006.

No person is authorized to give any information or to make any representation not contained in this Management Information Circular and, if given or made, such information or representation should not be relied upon as having been authorized. This Management Information Circular does not constitute an offer to sell, or a solicitation of an offer to acquire, any securities, or the solicitation of a proxy, by any person in any jurisdiction in which such an offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such an offer or proxy solicitation.

## TABLE OF CONTENTS


**SUMMARY** .......... **1**

**GLOSSARY OF NON-MINING TERMS** .......... **6**

**GLOSSARY OF MINING TERMS** .......... **12**

**INFORMATION CONCERNING FORWARD-LOOKING STATEMENTS** .......... **14**

**GENERAL PROXY INFORMATION** .......... **16**

**SOLICITATION OF PROXIES** .......... **16**

- Solicitation of Proxies by Management .......... 16
- Cost and Manner of Solicitation .......... 16

**APPOINTMENT AND REVOCATION OF PROXIES** .......... **16**

- Appointment of Proxy .......... 16
- Revocation of Proxy .......... 16
- Voting of Proxies and Exercise of Discretion by Proxyholders .......... 17
- Advice to Beneficial Holders of Common Shares .......... 17

**VOTING SECURITIES AND PRINCIPAL HOLDERS THEREOF** .......... **18**

- Voting Securities .......... 18
- Record Date .......... 19
- Principal Holders .......... 19

**INTEREST OF CERTAIN PERSONS OR COMPANIES IN MATTERS TO BE ACTED UPON** .......... **19**

- Proposed Plan of Arrangement .......... 19

**STATEMENT OF EXECUTIVE COMPENSATION** .......... **20**

- Executive Officers .......... 20
- Summary of Compensation .......... 20
- Long Term Incentive Plan Awards .......... 21
- Grant of Stock Options/SAR's .......... 21
- Exercise of Stock Options/Aggregate Year End Value .......... 22
- Termination of Employment, Change in Responsibilities and Employment Contracts .......... 23
- Composition of the Compensation Committee .......... 24
- Compensation of Directors .......... 24
- Report on Executive Compensation .......... 25
- Performance Graph .......... 26

**SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS** .......... **27**

**RUBICON STOCK OPTION PLAN** .......... **28**

- Adoption of Plan .......... 28
- Purpose of the Plan .......... 28
- General Description/Exchange Policies .......... 28

**INDEBTEDNESS OF DIRECTORS, EXECUTIVE OFFICERS AND OFFICERS** .......... **30**

**MANAGEMENT CONTRACTS** .......... **30**

**MATERIAL CONTRACTS** .......... **30**

**INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS** .......... **30**

**AUDIT COMMITTEE AND RELATIONSHIP WITH AUDITORS** .......... **31**

**DISCLOSURE OF CORPORATE GOVERNANCE PRACTICES** .......... **31**

**ANNUAL MEETING MATTERS TO BE ACTED ON** .......... **31**

**RECEIPT OF FINANCIAL STATEMENTS** .......... **31**

**APPOINTMENT OF AUDITORS** .......... **31**

**DETERMINATION OF NUMBER OF DIRECTORS** .......... **32**

**ELECTION OF DIRECTORS** .......... **32**

**PARTICULARS OF OTHER MATTERS TO BE ACTED ON** .......... **34**

**STOCK OPTION PLAN OF PARAGON** .......... **34**

**STOCK OPTION PLAN OF COPPERCO** .......... **34**

**THE ARRANGEMENT** .......... **35**

- General .......... 35
- Background to the Arrangement .......... 37
- Reasons for the Arrangement .......... 39
- Details of the Arrangement .......... 40
- Arrangement Agreement .......... 44
- Tax - Related Covenants .......... 44
- Approval of the Arrangement .......... 45
- Conditions to the Arrangement .......... 46
- Fairness of the Arrangement .......... 48
- Recommendation of Directors .......... 48
- Proposed Timetable for the Arrangement .......... 48
- Relationship between Rubicon, Paragon and CopperCo after the Arrangement .......... 49
- Effect of Arrangement on Certain Outstanding Securities of Rubicon .......... 49
- Distribution of Share Certificates .......... 50
- Treatment of Fractional Shares .......... 51
- Amendment .......... 51
- Termination .......... 51
- Expenses of the Arrangement .......... 51
- Rubicon Support Agreements .......... 52
- Africo Support Agreement .......... 53
- CopperCo/Africo Financing .......... 53

**SECURITIES LAW CONSIDERATIONS** .......... **53**

- Canadian Securities Laws .......... 53
- United States Securities Laws .......... 54

**INCOME TAX CONSIDERATIONS** .......... **56**

- Tax Ruling .......... 56
- Canadian Federal Income Tax Considerations .......... 56
- U.S. Federal Income Tax Considerations .......... 62
- Scope of this Disclosure .......... 63
- U.S. Federal Income Tax Consequences of the Arrangement .......... 64

Information Reporting; Backup Withholding Tax ..... 66

**RIGHTS OF DISSENT ..... 66**

**RISK FACTORS ..... 67**

**AMENDED AND RESTATED SHAREHOLDER RIGHTS PLAN ..... 67**

Confirmation by Shareholders ..... 67
Recommendation of the Board of Directors ..... 67
Purpose of the Rights Plan ..... 68
Summary Description of the Rights Plan ..... 69
Shareholder Approval ..... 72

**EXPERTS ..... 72**

**PROMOTERS ..... 73**

**LEGAL PROCEEDINGS ..... 73**

**OTHER BUSINESS ..... 73**

**SHAREHOLDER PROPOSALS ..... 73**

**GENERAL ..... 74**

**ADDITIONAL INFORMATION ..... 74**

**DIRECTORS APPROVAL ..... 74**

**AUDITORS CONSENT ..... 75**

**AUDITORS CONSENT ..... 76**

**AUDITORS' CONSENT ..... 77**

**AUDITORS' CONSENT ..... 78**

**INDEX TO SCHEDULES ..... 79**

**SCHEDULE A — FINANCIAL STATEMENTS**

**SCHEDULE B — INTERIM ORDER**
**SCHEDULE C — NOTICE OF HEARING OF PETITION FOR FINAL ORDER**

**SCHEDULE D — ARRANGEMENT AGREEMENT**
**SCHEDULE E — ARRANGEMENT RESOLUTION**

**SCHEDULE F — PARAGON STOCK OPTION PLAN RESOLUTION**
**SCHEDULE G — COPPERCO STOCK OPTION PLAN RESOLUTION**

**SCHEDULE H — SHAREHOLDER RIGHTS PLAN RESOLUTION**

**SCHEDULE I — INFORMATION CONCERNING RUBICON AFTER THE ARRANGEMENT**
**SCHEDULE J — INFORMATION CONCERNING PARAGON AFTER THE ARRANGEMENT**
**SCHEDULE K — INFORMATION CONCERNING COPPERCO AFTER THE ARRANGEMENT**

**SCHEDULE L — DISSENT RIGHTS**
**SCHEDULE M — RISK FACTORS**
**SCHEDULE N — DISCLOSURE OF CORPORATE GOVERNANCE PRACTICES**

# SUMMARY

*The following is a summary of certain information contained in this Management Proxy Circular and the schedules attached hereto. Capitalized words used in this Summary are defined in the Glossary of Terms. This Summary is provided for convenience of reference only. This Summary should be read in conjunction with, and is qualified by, the more detailed information and financial statements contained in the Notice of Meeting and the body of this Management Information Circular and the schedules attached hereto. Shareholders are urged to review this Management Information Circular in its entirety.*

*The disclosure in this Management Information Circular of a scientific and technical nature in Schedule "I" "Information Concerning Rubicon after the Arrangement", Schedule "J" " Information Concerning Paragon after the Arrangement", and Schedule "K" " Information Concerning CopperCo after the Arrangement" is based on the Technical Reports (as defined herein).*

*The information concerning Africo (including post-Arrangement CopperCo) contained in this Circular, and in particular in Schedule "K", has been based upon documents, records and information provided by Africo for inclusion in this Circular. Although Rubicon, Paragon and pre-Arrangement CopperCo have no knowledge that would indicate that any statements contained herein provided by Africo are untrue or incomplete, neither Rubicon, Paragon nor pre-Arrangement CopperCo assumes any responsibility for the accuracy of the information relating to Africo which is contained in this Management Information Circular or for any failure by Africo to disclose events which may have occurred or may affect the significance or accuracy of any such information but which are unknown to Rubicon, Paragon or pre-Arrangement CopperCo.*

## THE MEETING

### Time Date and Place

The Annual and Special General Meeting (the "**Meeting**") of the Shareholders of Rubicon will be held on Tuesday, August 8, 2006, at the Metropolitan Hotel, 645 Howe Street, Vancouver, BC, at 2:00 p.m. (local time).

### Purpose of the Meeting

At the Meeting, Shareholders will receive the audited consolidated financial statements of Rubicon for the fiscal year ended December 31, 2005 and will also be asked to consider, and if thought fit, to pass the resolutions approving or confirming the following matters:

- Appointment of Auditors for the ensuing year
- Determine the number of Directors at seven
- Election of Directors for the ensuing year
- Approval of the Rubicon Plan of Arrangement
- Approval of the Paragon Stock Option Plan
- Approval of the CopperCo Stock Option Plan
- Approval of the Rubicon Shareholder Rights Plan

### Meeting Record Date

Rubicon has fixed July 4, 2006 as the record date for determining the Shareholders entitled to receive notice of and vote at the Meeting. Notwithstanding the foregoing, holders of Rubicon Warrants who exercise their Rubicon Warrants on or before July 18, 2006 will also be entitled to vote Rubicon Common Shares issued on exercise of such warrants at the Meeting.

# THE ARRANGEMENT

## General

On November 21, 2005, Rubicon announced its intention to proceed with a reorganization of Rubicon by way of a statutory Plan of Arrangement, which will have the result of dividing its current mineral assets between three separate public companies: the currently existing Rubicon, and two newly-created companies, Paragon and CopperCo. On implementation of the corporate restructuring, Rubicon will continue to hold its Red Lake Properties, its Nevada, Alaska and other interests; Paragon will hold the exploration assets which Rubicon currently holds in the Province of Newfoundland and Labrador and the Territory of Nunavut; and CopperCo will hold all of the issued and outstanding Africo Shares (with Africo holding assets located in Africa). Rubicon currently owns 39.6% of the outstanding shares of Africo. CopperCo will also adopt Africo's existing corporate name.

Upon the Arrangement becoming effective, Shareholders of record on the Share Distribution Record Date will become shareholders of three separate companies: Rubicon, Paragon, and CopperCo. Every Shareholder will receive one New Rubicon Common Share for every one (1) Rubicon Common Share held on the Share Distribution Record Date, one (1) Paragon Common Share for every six (6) Rubicon Common Shares held on the Share Distribution Record Date, and that number of CopperCo Common Shares obtained by multiplying the number of Rubicon Common Shares held on the Share Distribution Record Date by the Rubicon-CopperCo Exchange Ratio (which is currently estimated to be approximately 0.0922, or one CopperCo Common Share for approximately every 10.84 Rubicon Common Shares held). However, if Rubicon exercises its conversion rights under the proposed Bridge Loan to Africo prior to the Effective Date, Shareholders would be entitled to receive a greater number of CopperCo Common Shares. The 10.84 number would, in such circumstances, be reduced by an as yet undetermined amount which would depend on the price at which CopperCo or Africo would be able to raise capital. See "The Arrangement – Details of the Arrangement – General" and Schedule "K", "Information Concerning CopperCo after the Arrangement – Funds Available."

## Reasons for the Arrangement

The reorganization is intended to enhance Shareholder value by improving the identification and valuation of Rubicon's mineral properties, and by allowing Rubicon to focus on the Red Lake properties, Paragon to focus on the Newfoundland properties, and CopperCo to focus on the African properties through Africo without impact or future dilution on the other Rubicon projects. See "The Arrangement – Reasons for the Arrangement".

## Approvals Necessary for the Arrangement

The reorganization will be implemented by the Plan of Arrangement which is subject to a number of approvals which must be obtained prior to implementation, including the following:

*Shareholder Approval*

Pursuant to the Interim Order and Section 289 of the BCBCA, the Arrangement requires the approval of the Shareholders of Rubicon and the Africo Shareholders. At the Meeting, the Shareholders will be asked to consider, and if thought fit, to pass the Arrangement resolution (the "**Arrangement Resolution**" ), the full text of which is set out at Schedule "E" to this Circular. Subject to any further order of the Court, the Interim Order provides that the Arrangement Resolution must be passed by Special Resolution of the Shareholders voting at the Meeting.

*Court Approval*

The implementation of the Arrangement is subject to approval by the Court. Prior to the mailing of this Circular, Rubicon obtained the Interim Order, a copy of which is attached as Schedule "B" to this Circular. Rubicon intends to apply for the Final Order once the Arrangement has been approved by the Shareholders. As set out in the Notice of Hearing of Petition for the Final Order, the hearing in respect of the Final Order is scheduled to take place at 9:45 a.m. (Vancouver time) on August 15, 2006 or so soon thereafter as counsel may be heard, or at such other date and time as the Court may direct, at the Law Courts, 800 Smithe Street, Vancouver, British Columbia. A copy of the Notice of Hearing of Petition for the Final Order is attached as Schedule "C" to this Circular. Any person affected

by the Arrangement, including any Shareholder of Rubicon, has the right to appear at such hearing and present evidence or argument, subject to the rules of the Court and any Court Order made. At the hearing for the Final Order, the Court will consider, among other things, the fairness of the Plan of Arrangement and the Shareholders' approval.

*Regulatory Approval*

The Arrangement is subject to prior approval of the TSX and AMEX. See "The Arrangement – Approval of the Arrangement".

**Conditions to the Arrangement Becoming Effective**

The implementation of the Arrangement is subject to a number of specified conditions, including completion of related financings and Shareholder, Court and regulatory approval. There can be no assurance that such conditions will be fulfilled. The Arrangement Agreement also provides that it may be terminated in certain circumstances prior to the Effective Date, notwithstanding the approval of the Arrangement by the Shareholders and the Court. See "The Arrangement – Conditions to the Arrangement" and "Termination".

**Tax Ruling**

The Arrangement is subject to an advance income tax ruling being obtained, prior to the Effective Date, from the Canada Revenue Agency confirming the Canadian federal income tax consequences of certain aspects of the Arrangement. See "The Arrangement – Income Tax Considerations – Tax Ruling."

**Effective Date**

The Arrangement will become effective once all of the conditions to proceed with the Arrangement have been satisfied or waived and the Board of Directors of Rubicon determines to make the Arrangement effective. If the requisite approvals of the Shareholders are obtained and the Court grants the Final Order, then Rubicon currently anticipates that the Effective Date will be on or about August 17, 2006. See "The Arrangement – Proposed Timetable for the Arrangement".

**Distribution of Share Certificates**

As soon as practicable following the Share Distribution Record Date (which is expected to be 7 Business Days following the Effective Date), holders of Rubicon Common Shares on the Share Distribution Record Date will receive certificates representing the Paragon Common Shares and CopperCo Common Shares. The Shareholders will not receive new certificates with respect to their New Rubicon Common Shares, so that their existing share certificates will represent their New Rubicon Common Shares. See "The Arrangement – Distribution of Share Certificates".

**Recommendations of Board of Directors**

The Board of Directors of Rubicon has reviewed the terms and conditions of the Arrangement and has concluded that the terms and conditions of the Arrangement are fair and reasonable and in the best interests of Rubicon and the Shareholders. The Board of Directors of Rubicon recommends that the Shareholders vote in favour of the Arrangement and all other matters to be considered at the Meeting. See "The Arrangement – Recommendation of the Board of Directors".

**Stock Exchange Listings**

*Rubicon*

The Rubicon Common Shares are currently listed and traded on the TSX and AMEX. Rubicon will apply to have the New Rubicon Common Shares listed on the TSX and AMEX, subject to Rubicon complying with the continued listing requirements of the TSX and AMEX.

*Paragon*

Paragon has applied to have its common shares listed for trading on Tier 2 of the TSX-V as soon as possible after the Effective Date. Listing will be subject to Paragon meeting the original listing requirements of the TSX-V. There are no assurances as to if, or when, the Paragon Common Shares will be listed or traded on the TSX-V indicated above, if ever.

*CopperCo*

CopperCo has applied to have its common shares listed for trading on the TSX as soon as possible after the Effective Date. Listing will be subject to CopperCo meeting the original listing requirements of the TSX. There are no assurances as to if, or when, the CopperCo Common Shares will be listed or traded on the TSX indicated above, if ever.

## INCOME TAX CONSIDERATIONS

### Canadian Federal Income Tax Considerations

In general, a Canadian resident holder of Rubicon Common Shares who holds such shares as capital property will not realize a capital gain or capital loss as a result of the Arrangement. The adjusted cost base of the Rubicon Common Shares will generally be allocated between the New Rubicon Common Shares and the Paragon Common Shares and CopperCo Common Shares based upon the relative fair market values of such shares at the time of the Arrangement. Following the Effective Date, Rubicon will advise holders of an appropriate proportionate allocation. See “Canadian Federal Income Tax Considerations”.

### U.S. Federal Income Tax Considerations

In general, the receipt of Paragon Common Shares and CopperCo Common Shares by a U.S. Holder (as defined below under “Income Tax Considerations – U.S. Federal Income Tax Considerations”) should result in taxable income for U.S. federal income tax purposes. See “Income Tax Considerations – U.S. Federal Income Tax Considerations”.

## RISK FACTORS

In evaluating the Arrangement, the Shareholders should carefully consider, in addition to the other information contained in this Circular, the risk factors associated with Paragon and CopperCo (see “Risk Factors”, “Information Concerning Paragon – Risk Factors”, “Information Concerning CopperCo – Risk Factors” and Schedule “M” “Risk Factors”). These risk factors are not a definitive list of all risk factors associated with Paragon and CopperCo and the business to be carried out by these new companies.

There are risk factors associated with the transaction including (i) the fact that market reaction to the Arrangement, the future trading price of the New Rubicon Common Shares and the respective trading prices of the Paragon Common Shares and CopperCo Common Shares, if listed, cannot be predicted; (ii) the fact that the transaction may give rise to significant adverse tax consequences to security holders of Rubicon and therefore each security holder is urged to consult his, her or its own tax advisor; (iii) uncertainty as to whether the Arrangement will have a positive impact on the entities involved in the transactions; (iv) the fact that the completion of the Arrangement will reduce the assets of Rubicon; and (v) the fact that there is no assurance that the required approvals will be received or that the Paragon Common Shares and CopperCo Common Shares will be listed on a stock exchange.

There are also risks associated with the businesses of Rubicon, Paragon and CopperCo that should be considered by investors, including (i) the need for additional capital, principally through equity financing and the risk that such funds may not be raised; (ii) the speculative nature of exploration and early stages of the properties; (iii) the effect of changes in commodity prices; (iv) regulatory risk that development will not be acceptable for social, environmental or other reasons; (v) reliance on the management of the respective companies; (vi) the potential for conflicts of interest, (vii) in the case of CopperCo, the risks of holding assets and conducting business in the DRC;

and (viii) other risks associated with the particular companies as described in greater detail elsewhere in this Circular.

## DISSENT RIGHTS

The Interim Order provides that the Shareholders will have the right to dissent from the Plan of Arrangement as provided in the Plan of Arrangement. If a Shareholder dissents and Rubicon proceeds with the Arrangement, such Shareholder will be entitled to be paid in cash the fair value that such Shareholder's Rubicon Common Shares had immediately before the passing of the resolution adopting the Arrangement, provided that such Dissenting Shareholder does not vote any of his, her or its Rubicon Common Shares in favour of the Arrangement Resolution, delivers written objection to the Plan of Arrangement to Rubicon no later than 2:00 p.m. (Pacific time) on August 3, 2006, and otherwise complies with the requirements of the Plan of Arrangement and the Interim Order. See "Rights of Dissent".

## INFORMATION CONCERNING RUBICON, PARAGON, AND COPPERCO

See Schedule "I" "Information Concerning Rubicon After the Arrangement" for a summary description of Rubicon assuming completion of the Arrangement.

See Schedule "J" "Information Concerning Paragon After the Arrangement" for a summary description of Paragon assuming completion of the Arrangement.

See Schedule "K" "Information Concerning CopperCo After the Arrangement" for a summary description of CopperCo assuming completion of the Arrangement.

## SELECTED PRO FORMA FINANCIAL INFORMATION

The following selected unaudited pro forma consolidated financial information for Rubicon is based on the assumptions described in the respective notes to the Rubicon Pro-Forma Balance Sheet as at March 31, 2006 attached to this Circular in Schedule "A".

| | | March 31, 2006 (unaudited) |
|---|---|---|
| Current Assets | $ | 3,161,558 |
| Investments | $ | 112,362 |
| Capital Assets | $ | 49,724 |
| Deferred Property Costs | $ | 16,706,865 |
| **Total Assets** | | 20,030,509 |
| Current Liabilities | $ | 772,259 |
| Non-controlling interest | $ | 428,237 |
| Shareholder equity | $ | 18,830,013 |
| **Total Liabilities and shareholders equity** | | 20,030,509 |

## GLOSSARY OF NON-MINING TERMS

Certain terms used in this Circular are defined as follows:

"***1933 Act***" means the *Securities Act of 1933* (United States);

"***Africo***" means Africo Resources Ltd., a corporation incorporated under the BCBCA in which Rubicon currently holds a 39.6% equity interest and whose main asset is its interest in the Kalukundi Copper-Cobalt Project in the DRC;

***"Africo Meeting"*** means the special meeting of the Africo Shareholders to be held to consider, among other matters, the Arrangement, and any postponement or adjournment thereof;

***"Africo Options"*** means the outstanding stock options of Africo entitling the holders to purchase Africo Shares in accordance with the terms and conditions thereof;

"***Africo Shareholder***" means a holder of Africo Shares;

"***Africo Shares***" means the common shares without par value in the capital of Africo as currently constituted;

***"Aggregate Exchange Trading Price"*** means the amount equal to the aggregate of the results obtained when the Trading Price of a New Rubicon Common Share and a Common Share of Paragon or CopperCo is multiplied by the respective Exchange Number for the company issuing the share;

"***AMEX***" means the American Stock Exchange;

***"Arrangement"*** means the statutory arrangement involving Rubicon, the Rubicon Shareholders, Paragon, CopperCo, Africo and the Africo Shareholders proposed under the provisions of sections 288 to 299 of the BCBCA, on the terms and conditions set out in this Plan of Arrangement or any amendment or variation thereto made in accordance with the terms of the Arrangement Agreement;

"***Arrangement Agreement***" means the arrangement agreement made as of the 6th day of July, 2006 between Rubicon, Paragon, CopperCo and Africo to which this Plan of Arrangement is attached as Appendix I, as the same may be supplemented or amended from time to time;

"***Assignment and Assumption Agreement***" means the assignment and assumption agreement among Rubicon and Paragon which more particularly describes the Paragon Transferred Assets which are to be transferred from Rubicon to Paragon;

***"Associate"*** has the meaning set out in subsection 1(1) of the *Securities Act* (British Columbia);

"***BCBCA***" means the *Business Corporations Act* (British Columbia);

"***Business Day***" means any day, which is not a Saturday, a Sunday, or a statutory holiday in British Columbia;

"***Bridge Loan***" means the bridge loan to be made by certain current Africo Shareholders or other investors to Africo in the principal amount of up to $5 million by way of issuance of convertible promissory notes, with such notes being payable on or before December 31, 2006, and the amounts outstanding under the notes being convertible at the lender's option, and in accordance with their terms, into common shares or such other securities of Africo or CopperCo as are offered pursuant to the Qualifying Financing at a price equal to 85% of the price at which common shares or other securities are offered in a Qualifying Financing;

***"CBCA"*** means the *Canada Business Corporations Act*;

"***Circular***" means this management information circular of Rubicon to be prepared and sent to the Shareholders in connection with the Meeting;

"***Compensation Options***" means the compensation options issued by Rubicon on August 16, 2005, with each option entitling the holder to purchase a unit consisting of one Rubicon Common Share and one-half of a warrant to purchase an additional Rubicon Common Share;

"***CopperCo***" means CopperCo Resource Corp., a corporation incorporated under the CBCA in order to facilitate the Arrangement;

"***CopperCo/Africo Financing***" means the equity financing which is proposed to be carried out by CopperCo or Africo, as the case may be, in the amount of $75 million, or such lesser amount as may be determined by the board of directors of Africo or CopperCo, as applicable;

"***CopperCo/Africo Special Warrants***" means special warrants which may be sold by CopperCo or Africo pursuant to the CopperCo/Africo Financing, with each CopperCo/Africo Special Warrant entitling the holder to receive, upon deemed exercise and for no additional consideration, one CopperCo Common Share;

"***CopperCo Commitment***" means the covenant of CopperCo described in section 3.2 of the Plan of Arrangement to issue CopperCo Common Shares to the holders of Rubicon Warrants who exercise their rights thereunder after the Effective Date to receive Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares;

***"CopperCo Common Shares"*** means the common shares in the capital of CopperCo which CopperCo is authorized to issue as the same are constituted on the date hereof and which are to be issued under the Arrangement (i) to holders of Rubicon Series 2 Special Shares in exchange for such Rubicon Series 2 Special Shares, (ii) to holders of CopperCo/Africo Special Warrants on the deemed exercise of the CopperCo/Africo Special Warrants, and (iii) to the Africo Shareholders other than Rubicon in exchange for the Remaining Africo Shares;

"***CopperCo Net Fair Market Value***" means an amount determined by the board of directors of Rubicon as of the Effective Date, as being an amount equal to the fair market value of the CopperCo Transferred Assets;

"***CopperCo Note***" means the demand, non-interest bearing promissory note to be issued by CopperCo to Rubicon having a principal amount and aggregate fair market value equal to the CopperCo Net Fair Market Value;

"***CopperCo Options***" means the rights (whether or not vested) to purchase CopperCo Common Shares which will be issued pursuant to the Plan of Arrangement;

"***CopperCo Preferred Shares***" means the special preferred shares of CopperCo which are to be issued under the Arrangement to Rubicon in exchange for the CopperCo Transferred Assets, which will have a value equal to the CopperCo Net Fair Market Value, and having the terms and conditions set out in Schedule "B" to the Plan of Arrangement;

"***CopperCo Stock Option Plan***" means the stock option plan as approved by the board of directors of CopperCo;

"***CopperCo Transferred Assets***" means the Rubicon Africo Shares, which are to be transferred by Rubicon to CopperCo pursuant to the Plan of Arrangement;

"***Court***" means the Supreme Court of the Province of British Columbia;

***"Dissenting Africo Shares"*** means Africo Shares held by an Africo Shareholder who has given a written notice of dissent to Africo, indicating that such Africo Shareholder wishes to exercise its rights of dissent in connection with the Arrangement;

***"Dissenting Rubicon Shares"*** means Rubicon Common Shares held by a Shareholder who has given a written notice of dissent to Rubicon, indicating that such Shareholder wishes to exercise its rights of dissent in connection with the Arrangement;

***"Dissenting Shares"*** means, collectively, Dissenting Rubicon Shares and Dissenting Africo Shares;

***"Disinterested Shareholders"*** means all of the shareholders other than the directors, senior officers and any person or company who beneficially owns, directly or indirectly, voting securities of the issuer or who exercises control or direction over voting securities of the issuer or a combination of both carrying more than 10% of the voting rights attached to all voting securities of the issuer;

"***DRC***" means the Democratic Republic of Congo;

"***Effective Date***" means the date on which the Arrangement becomes effective in accordance with the provisions of the Arrangement Agreement and the provisions of the BCBCA;

"***Effective Time***" means 12:01 am, Vancouver time, on the Effective Date;

***"Exchange Number"*** means the number or fraction, as the case may be, of a New Rubicon, Paragon or CopperCo Common Share to be received by a Rubicon Shareholder in exchange for every Rubicon Common Share pursuant to the General Exchange Ratio;

"***Exercise Price***" means the varying exercise prices of the outstanding Rubicon Options;

"***Final Order***" means the final order of the Court approving the Arrangement pursuant to the BCBCA;

***"General Exchange Ratio"*** means, for each Rubicon Common Share,

- one whole New Rubicon Common Share,
- one-sixth of a Paragon Common Share; and
- a fraction of a CopperCo Common Share equal to the Rubicon-CopperCo Exchange Ratio;

***"Holder"*** means, when not qualified by the adjective "registered", the person entitled to a share hereunder whether or not registered or entitled to be registered in respect thereof in the central securities register of Rubicon, Paragon, CopperCo or Africo, as the case may be;

"***Interim Order***" means the interim order of the Court, which, among other things, provides for the calling and holding of the Meeting, and certain other procedural matters, and caused to be issued a Notice of Hearing of Petition for the Final Order to approve the Arrangement;

"***ITA***" means the *Income Tax Act* (Canada), as amended;

"***Meeting***" means the annual and special meeting of the Shareholders to be held to consider, among other matters, the Arrangement, and any postponement or adjournment thereof;

"***Meetings***" means, collectively, the Meeting and the Africo Meeting;

"***Net Fair Market Value***" means an amount determined by the board of directors of Rubicon as of the Effective Date, as being an amount equal to the fair market value of certain assets;

"***New Rubicon Common Shares***" means common shares of Rubicon which Rubicon will be authorized to issue upon the Arrangement becoming effective and which are to be issued under the Arrangement to holders of Rubicon Common Shares in exchange for such Rubicon Common Shares;

"***New Rubicon Options***" means the rights (whether or not vested) to purchase New Rubicon Common Shares which will be issued pursuant to the Plan of Arrangement;

***"Original Exercise Price"*** means the original exercise price per share of a Rubicon Option;

"***Paragon***" means Paragon Minerals Corporation, a corporation incorporated under the CBCA in order to facilitate the Arrangement;

"***Paragon Commitment***" means the covenant of Paragon described in section 3.2 of the Plan of Arrangement to issue Paragon Common Shares to the holders of Rubicon Warrants who exercise their rights thereunder after the Effective Date to receive Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares;

***"Paragon Common Shares"*** means the common shares in the capital of Paragon which Paragon is authorized to issue as the same are constituted on the date hereof and which are to be issued under the Arrangement (i) to holders of Rubicon Series 1 Special Shares in exchange for such Rubicon Series 1 Special Shares, and (ii) to holders of Paragon Special Warrants and to holders of Paragon Flow-Through Special Warrants on the deemed exercise of such special warrants;

***"Paragon Contracts"*** means all agreements to which Rubicon currently is a party, which pertain to the mineral properties in the Provinces of Newfoundland and Labrador and the Territory of Nunavut and which will be assigned from Rubicon to Paragon pursuant to the Plan of Arrangement, such agreements being more particularly described in the Assignment and Assumption Agreement;

"***Paragon Financing***" means the non-brokered private placement equity financing of Paragon which is to be completed prior to the Effective Date, as more particularly described in Schedule "J" – "Information Concerning Paragon After the Arrangement – Funds Available – Private Placement Financing";

"***Paragon Flow-Through Special Warrants***" means flow-through special warrants which may be sold by Paragon pursuant to the Paragon Financing, with each Paragon Flow-Through Special Warrant entitling the holder to receive, upon exercise and for no additional consideration, one flow-through Paragon Common Share;

"***Paragon Net Fair Market Value***" means an amount determined by the Board of Directors of Rubicon as of the Effective Date, as being an amount equal to the fair market value of the Paragon Transferred Assets;

***"Paragon Note"*** means the demand, non-interest bearing promissory note to be issued by Paragon to Rubicon having a principal amount and aggregate fair market value equal to the Paragon Net Fair Market Value;

"***Paragon Options***" means the rights (whether or not vested) to purchase Paragon Common Shares which will be issued pursuant to the Plan of Arrangement;

"***Paragon Preferred Shares***" means the preferred shares of Paragon which are to be issued under the Arrangement to Rubicon in exchange for the Paragon Transferred Assets, which will have a value equal to the Paragon Net Fair Market Value and having the terms and conditions set out in Schedule "B" to the Plan of Arrangement;

"***Paragon Special Warrants***" means special warrants which may be sold by Paragon pursuant to the Paragon Financing, with each Paragon Special Warrant entitling the holder to receive, upon exercise and for no additional consideration, one Paragon Common Share;

"***Paragon Stock Option Plan***" means the stock option plan as approved by the board of directors of Paragon;

"***Paragon Transferred Assets***" means the Paragon Contracts and certain other related assets more particularly described in the Assignment and Assumption Agreement, all of which will be transferred by Rubicon to Paragon pursuant to the Plan of Arrangement;

"***Paragon Warrants***" means common share purchase warrants of Paragon, each entitling the holder to purchase one Paragon Common Share at a price of $1.00 per share for a term of two years from the date of issuance;

***"Person"*** means and includes an individual, sole proprietorship, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, trust, body corporate, a trustee, executor, administrator or other legal representative and the Crown or any agency or instrumentality thereof;

"***Plan of Arrangement***" means the plan of arrangement which is attached as Appendix I to the Arrangement Agreement, as such plan may be amended from time to time in accordance with section 6.1 of the Arrangement Agreement;

"***PUC***" means paid-up capital as defined in subsection 89 (1) of the ITA;

"***Qualifying Financing***" means the first issuance or issuances of common shares or other securities in Africo or CopperCo after the date of issuance of the promissory notes under the Bridge Loan, on a single day or multiple days in any 90 day period, resulting in gross proceeds of not less than $10,000,000;

"***Registrar***" means the Registrar of Companies appointed under the BCBCA;

***"Remaining Africo Shares"*** means the Africo Shares held by Africo Shareholders other than Rubicon immediately prior to the Effective Date;

"***Rubicon***"or "***the Company***" means Rubicon Minerals Corporation, a company incorporated under the BCBCA;

***"Rubicon Africo Shares"*** means the Africo Shares held by Rubicon immediately prior to the Effective Date;

"***Rubicon Commitment***" means the covenant of Rubicon described in section 3.2 of the Plan of Arrangement to issue Rubicon Common Shares to the holders of Rubicon Warrants who exercise their rights thereunder after the Effective Date to receive Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares;

"***Rubicon Common Shares***" means the common shares without par value in the capital of Rubicon as currently constituted;

"***Rubicon-CopperCo Exchange Ratio***" means the fraction which is obtained by dividing the number of Africo Shares held by Rubicon on the Share Distribution Record Date by the fully diluted number of Rubicon Common Shares outstanding on the Share Distribution Record Date;

"***Rubicon CopperCo Note***" means the demand, non-interest bearing promissory note to be issued by Rubicon to CopperCo having a principal amount and fair market value equal to the aggregate fair market value of the Rubicon Series 2 Special Shares;

"***Rubicon Options***" means the outstanding stock options of Rubicon entitling the holders to purchase Rubicon Common Shares in accordance with the terms and conditions thereof;

***"Rubicon Paragon Note"*** means the demand, non-interest bearing promissory note to be issued by Rubicon to Paragon having a principal amount and fair market value equal to the aggregate fair market value of the Rubicon Series 1 Special Shares;

***"Rubicon Property Share Requirements"*** means the maximum number of Rubicon Common Shares, if any, that would be required to be issued by Rubicon to exercise its rights to acquire any of the current mineral properties of Rubicon, where there has been no agreement by the vendor prior to the Effective Date to accept, following completion of the Arrangement, alternative or additional consideration in lieu of the Rubicon Common Shares which such vendor would have been entitled to receive if such agreement were not entered into;

***"Rubicon Series 1 Special Shares"*** means the Series 1 special shares of Rubicon which Rubicon will be authorized to issue upon the Arrangement becoming effective and which are to be issued under the Arrangement to holders of Rubicon Common Shares in exchange for such Rubicon Common Shares, and having the terms and conditions set out in Schedule "A" to the Plan of Arrangement;

***"Rubicon Series 2 Special Shares"*** means the Series 2 special shares of Rubicon which Rubicon will be authorized to issue upon the Arrangement becoming effective and which are to be issued under the Arrangement to holders of Rubicon Common Shares in exchange for such Rubicon Common Shares, and having the terms and conditions set out in Schedule "A" to the Plan of Arrangement;

"***Rubicon Special Shares***" means Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares;

"***Rubicon Stock Option Plan***" means the existing stock option plan of Rubicon;

"***Rubicon Warrants***" means the outstanding common share purchase warrants of Rubicon entitling the holders to purchase Rubicon Common Shares in accordance with the terms and conditions thereof, and includes the Compensation Options and the warrants which are issuable on exercise of the Compensation Options;

"***Security Holder***" means a holder of Rubicon Common Shares and/or Rubicon Warrants;

***"Share Distribution Record Date"*** means the close of business on a day to be fixed by the TSX and the TSX-V for the purpose of determining the Rubicon Shareholders entitled to receive New Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares under the Arrangement;

"***Shareholder***" means a holder of Rubicon Common Shares and "Shareholders" means more than one Shareholder;

"***Special Resolution***" means a resolution passed by a majority of not less than 2/3 of the votes cast by the Shareholders and by the Africo Shareholders, respectively, who vote in respect of such resolution at the respective Meetings;

"***Tax Proposals***" means all specific proposals to amend the ITA and Regulations publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof;

"***Tax Ruling***" means an advance income tax ruling from the Canada Revenue Agency confirming the Canadian federal income tax consequences of certain aspects of the Arrangement;

"***Technical Reports***" means the reports entitled "Exploration Activities of Rubicon Minerals Corporation on the McFinley Property, Red Lake, Ontario, for the period January 2005 to June 2005, NTS 52N/04" prepared by Marc Prefontaine, M.Sc., P.Geo. dated December 9, 2005; "Technical Report for the Golden Promise Property, Badger and Grand Falls Areas, NTS 12A/16 and 02D/13, Newfoundland and Labrador" prepared by Larry R. Pilgrim, B.Sc., P.Geo. dated January 6, 2006; "Technical Report for the JBP Linear Property, Gander and Gander River Areas, NTS 2D/15 and 2E/02, Newfoundland and Labrador", prepared by Larry R. Pilgrim, B.Sc., P.Geol., dated December 9, 2005; and "Kalukundi Project - Technical Report" prepared by John Hearne, BEng, MAusIMM, Julian Verbeek, B.Sc. (Hon.), PhD. (Geol.), MAusIMM and David Dodd, BSc (Hons), FSAIMM dated June, 2006;

***"Trading Price"*** means the weighted average price of the New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares, as the case may be, on the TSX or the TSX-V, as the case may be, for the First 5 trading days on which such shares trade on such stock exchange after the Effective Date;

"***Transfer Agent***" means Computershare Investor Services Inc;

"***TSX***" means the Toronto Stock Exchange;

"***TSX-V "***means the TSX Venture Exchange; and

"***Warrant Holder***" means a holder of Rubicon Warrants.

## GLOSSARY OF MINING TERMS

The following is a glossary of technical terms and abbreviations used in this Circular:

"***Ag***" means silver;

"***ankerite***" means a carbonate mineral with the chemical formula (Ca, Mg, Fe) $CO_3$;

"***Archean***" - means geological ages older than 2.4 billion years;

"***arsenopyrite***" means a sulphide of arsenic and iron having the chemical formula FeAsS;

"***Au***" gold;

"***breccia***" means rock consisting of fragments, more or less angular, in a matrix of finer-grained material or of cementing material;

"***chert***" means fine-grained or glassy crytocrystalline silica which is very hard and highly variable in colour, usually, but not exclusively sedimentary;

"***chip sample***" means a sample composed of continuous chips of rock collected over a specific surface line and distance;

"***clastic***" means a sedimentary rock composed primarily from fragments of pre-existing rocks or fossils;

"***Cu***" means copper;

"***disseminated***" means mineralization scattered through a volume of host rock;

"***EM***" means electromagnetic (a type of geophysical survey);

"***felsic***" means light-coloured silicate minerals such as quartz, feldspar and feldspathoids;

"***float***" means a rock which has been transported from its bedrock source;

"***flows***" means volcanic rocks which were formed on the surface of the earth;

"***grab sample***" means a selected sample taken from a specific location which is not necessarily representative;

"***hydrothermal alteration***" means alteration of a rock which involves heated or superheated water;

"***Indicated Mineral Resource***" means that part of a Mineral Resource for which quantity, grade or quality, densities, shape and physical characteristics, can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters, to support mine planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed;

"***Inferred Mineral Resource***" means that part of a Mineral Resource for which quantity and grade or quality can be estimated on the basis of geological evidence and limited sampling and reasonably assumed, but not verified, geological and grade continuity. The estimate is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes;

"***interflow***" means rocks that occur between flows;

"***intrusive***" means a body of igneous rock formed by the consolidation of magma intruded into other rocks, in contrast to lavas, which are extruded upon the surface;

"***IP***" means induced polarization (a type of geophysical survey);

"***komatiite***" means a rock with distinct textural features (e.g. spinifex texture) and chemical composition (i.e. high magnesium oxide, >18% MgO);

"***mafic***" means a term used to describe ferromagnesian-rich minerals and rocks;

"***magnetite***" means an oxide or iron, formula Fe3O4;

"***Measured Mineral Resource***" means that part of a Mineral Resource for which quantity, grade or quality, densities, shape, physical characteristics are so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters, to support production planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity;

"***Mineral Resource***" means a concentration or occurrence of natural, solid, inorganic or fossilized organic material in or on the Earth's crust in such form and quantity and of such a grade or quality that it has reasonable prospects for economic extraction. The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge;

"***Mineral Reserve***" means a Mineral reserve is the economically mineable part of a Measured or Indicated Mineral Resource demonstrated by at least a Preliminary Feasibility Study. This Study must include adequate information on mining, processing, metallurgical, economic and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified. A Mineral Reserve includes diluting materials and allowances for losses that may occur when the material is Mined;

"***net smelter return royalty***" means the gross revenues as a payment realized from the disposition of product after deduction of limited deductions, such as cost incurred for sampling and assaying, transportation, insurance, treatment penalties, taxes on product or its disposition. A net smelter return is a share of the net revenues generated from the sale of metal produced by a mine;

"***NSR***" means net smelter return royalty;

"***Ordovician***" means the geological period commencing 500 million years ago and lasting approximately 75 million years;

"***oz/ton***" means ounces per short ton;

"***patented mining claim***" means a grant from the Crown in fee simple or for a less estate made under the Great Seal, and includes leasehold patents and freehold patents;

"***Preliminary Feasibility Study***" means a comprehensive study of the viability of a mineral project that has advanced to a stage where the mining method, in the case of underground mining, or the pit configuration, in the case of an open pit, has been established, and where an effective methods of mineral processing has been determined. This Study must include a financial analysis based on reasonable assumptions of technical, engineering, operating, and economic factors and evaluation of other relevant factors which are sufficient for a Qualified Person acting reasonable, to determine if all or part of the Mineral Resource may be classified as a Mineral Reserve.

"***ppm***" means parts per million;

"***pyrite***" means an iron sulphide mineral with the chemical formula FeS2;

"***pyrrhotite***" means an iron bearing sulphide mineral having the chemical formula $Fe_{1-x}S$;

"***quartz-carbonate***" means a mineral containing the carbonyl ion $CO^{-3}$, as in the mineral calcite $CaCO_3$;

"***shear zone***" means an area of rock which has failed or sheared in response to applied stress;

"***stockwork***" means a small- to large-scale branching and cross-cutting series of fissures filled with mineral matter;

"***stratabound***" means contained within beds or layers of rock;

"***stratigraphic***" means the composition, sequence and correlation of stratified rocks;

"***trench***" means an excavated and/or blasted depression of rock forming a trench;

"***tuff***" means a volcaniclastic rock made up primarily of volcanic ash-size (<2 mm) volcanic material;

"***ultramafic***" means igneous rocks consisting mainly of ferromagnesian minerals to the exclusion of quartz, feldspar and feldspathoids;

"***unpatented mining claim***" means land or mining rights for which a patent, lease, license of occupation or any other form of Crown grant is not in effect;

"***volcanogenic***" means genetically associated with volcanism;

"***VMS***" means volcanogenic massive sulphide; and

"***Zn***" means zinc.

**Note to U.S. Readers:** All reserve and resource estimates contained in this Circular are calculated in accordance with National Instrument 43-101, Standards of Disclosure for Mineral Projects ("**NI 43-101**") of the Canadian Securities Administrators and CIM Standards. While the terms "mineral resource," "measured mineral resource," "indicated mineral resource," and "inferred mineral resource" are recognized and required by Canadian regulations, they are not defined terms under SEC standards in the United States. As such, information contained in this Circular concerning descriptions of mineralization and resources under Canadian standards may not be comparable to similar information made public by U.S. companies subject to the reporting and disclosure requirements of the SEC. "Indicated mineral resource" and "inferred mineral resource" have a great amount of uncertainty as to their existence and a great uncertainty as to their economic and legal feasibility. It cannot be assumed that all or any part of an "indicated mineral resource" or "inferred mineral resource" will ever be upgraded to a higher category of resource. Investors are cautioned not to assume that any part or all of mineral deposits in these categories will ever be converted into reserves.

## INFORMATION CONCERNING FORWARD-LOOKING STATEMENTS

This Circular contains statements that constitute "forward-looking statements" within the meaning of Section 21E of the *Securities Exchange Act* of 1934 (United States). Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Rubicon's actual results, performance or achievements, or developments in Rubicon's industry, to differ materially from the anticipated results, performance or achievements expressed or implied by such forward-looking statements. Forward looking statements are statements that are not historical facts and are generally, but not always, identified by the words "expects," "plans," "anticipates," "believes," "intends," "estimates," "projects," "potential" and similar expressions, or that events or conditions "will," "would," "may," "could" or "should" occur. Information inferred from the interpretation of drilling results and information concerning mineral resource estimates may also be deemed to be forward looking statements, as it constitutes a prediction of what might be found to be present when and if a project is actually developed. Forward-looking statements in this document include statements regarding: Rubicon's proposed Plan of Arrangement, including the proposed transactions involving Africo; the proposed transactions involving Toquima Minerals Corporation; Rubicon's expectations regarding drilling and exploration activities on properties in which

Rubicon has an interest; Rubicon's statements regarding estimates of resources on properties in which Rubicon has an interest; Rubicon's expectations regarding the amount and adequacy of its cash reserves in future periods; and the Rubicon's expectations regarding the amount of expenses in future periods. There can be no assurance that such statements will prove to be accurate. Actual results and future events could differ materially from those anticipated in such statements. Readers are cautioned not to place undue reliance on these forward-looking statements that speak only as of their respective dates. Important factors that could cause actual results to differ materially from Rubicon's expectations include, among others, risks related to fluctuations in mineral prices; uncertainties related to raising sufficient financing to fund planned work in a timely manner and on acceptable terms; changes in planned work resulting from weather, logistical, technical or other factors; the possibility that results of work will not fulfill expectations and realize the perceived potential of Rubicon's properties; uncertainties involved in the estimation of resources; the possibility that required permits may not be obtained on a timely manner or at all; the possibility that capital and operating costs may be higher than currently estimated and may preclude commercial development or render operations uneconomic; the possibility that the estimated recovery rates may not be achieved; risk of accidents, equipment breakdowns and labour disputes or other unanticipated difficulties or interruptions; the possibility of cost overruns or unanticipated expenses in the work program; the risk of environmental contamination or damage resulting from Rubicon's operations; and other risks and uncertainties discussed under the heading "Risk Factors" and elsewhere in this Circular and in other documents which Rubicon files from time to time with the TSX, AMEX, Canadian, United States and other securities regulators. Forward-looking statements are based on the beliefs, estimates and opinions of Rubicon's management on the date the statements are made. Rubicon undertakes no obligation to update these forward-looking statements in the event that management's beliefs, estimates or opinions, or other factors, should change.

These statements are based on a number of assumptions, including, among others, assumptions regarding general business and economic conditions, interest rates, the supply and demand for, deliveries of, and the level and volatility of prices of gold, cobalt, copper, and other metals and minerals, the timing of the receipt of regulatory, shareholder and governmental approvals for Rubicon's proposed transactions and exploration and development programs, the availability of financing for Rubicon's proposed transactions and exploration and development programs on reasonable terms, market competition, the accuracy of Rubicon's resource estimates (including with respect to size, grade and recoverability) and the geological, operational and price assumptions on which these are based, future commodity prices, the realization of synergies and transaction costs. The foregoing list of assumptions is not exhaustive. Events or circumstances could cause actual results to differ materially.

## GENERAL PROXY INFORMATION

## SOLICITATION OF PROXIES

### Solicitation of Proxies by Management

**This Circular is being furnished in connection with the solicitation of proxies by the management of Rubicon for use at the Annual and Special General Meeting of the shareholders of Rubicon to be held on Tuesday, August 8, 2006 (the "Meeting") at the time and place and for the purposes set forth in the accompanying Notice of Meeting and any adjournment thereof.**

### Cost and Manner of Solicitation

While it is expected that the solicitation will be primarily by mail, proxies may be solicited personally or by telephone, facsimile or electronically by the directors and regular employees of Rubicon or other proxy solicitation services. In accordance with National Instrument 54-101, arrangements have been made to forward solicitation materials to the beneficial owners of Rubicon Common Shares. All costs of solicitation will be borne by Rubicon.

## APPOINTMENT AND REVOCATION OF PROXIES

### Appointment of Proxy

A Shareholder entitled to vote at the Meeting may, by means of a properly executed and deposited proxy, appoint a proxyholder or one or more alternate proxyholders, who need not be Shareholders to attend and act at the Meeting for the Shareholder and on the Shareholder's behalf.

The individuals named in the enclosed form of proxy are the Chairman of the Board of Directors of Rubicon and the President and Chief Executive Officer of Rubicon (the "**Management Designees**"). **A SHAREHOLDER WISHING TO APPOINT SOME OTHER PERSON (WHO NEED NOT BE A SHAREHOLDER) TO REPRESENT HIM OR HER AT THE MEETING MAY DO SO BY INSERTING SUCH PERSON'S NAME IN THE BLANK SPACE PROVIDED IN THE FORM OF PROXY AND STRIKING OUT THE NAMES OF THE MANAGEMENT DESIGNEES OR BY COMPLETING ANOTHER FORM OF PROXY.** A proxy will not be valid unless the completed, dated and signed form of proxy is deposited with Computershare Investor Services Inc., not less than 48 hours (excluding Saturdays, Sundays and holidays) before the time for holding the Meeting or any adjournment thereof, or is delivered to the chair of the Meeting prior to the commencement of the Meeting or an adjourned meeting. Proxies may be sent to Computershare Investor Services Inc. using one of the following methods:

| | |
|---|---|
| **BY MAIL:** | Computershare Investor Services Inc.<br>9th Floor, 100 University Avenue<br>Toronto, Ontario M5J 2Y1 |
| **OR IF YOU HAVE A CONTROL NUMBER, A HOLDER ACCOUNT NUMBER AND AN ACCESS NUMBER ON THE FACE OF THE PROXY, YOU ARE ALTERNATIVELY ABLE TO VOTE:** | |
| **BY TELEPHONE:** | 1-866-732-8683, or |
| **BY INTERNET:** | www.computershare.com/proxy |

### Revocation of Proxy

A Shareholder who has given a proxy may revoke it by an instrument in writing duly executed by the Shareholder or by his attorney authorized in writing or, where the Shareholder is a corporation, by a duly authorized officer or

attorney of the corporation, and delivered either to the registered office of Rubicon, 2800 Park Place, 666 Burrard Street, Vancouver, British Columbia, V6C 2Z7, at any time up to and including the last business day preceding the day of the Meeting, or if adjourned, any reconvening thereof, or to the chair of the Meeting on the day of the Meeting or, if adjourned, any reconvening thereof or in any other manner provided by law. A revocation of a proxy does not affect any matter on which a vote has been taken prior to the revocation.

In addition, a proxy may be revoked by a Shareholder properly completing, executing and depositing another form of proxy bearing a later date at the offices of Computershare Investor Services Inc. within the time period and in the manner set out under the heading "Appointment of Proxy" above or by the Shareholder personally attending the Meeting, withdrawing his or her prior proxy and voting the Rubicon Common Shares.

**Voting of Proxies and Exercise of Discretion by Proxyholders**

Unless a poll is called for or required by law, voting at the Meeting will be by a show of hands. Rubicon Common Shares represented by a properly completed, executed and deposited proxy are only entitled to be voted on any poll and, where a choice with respect to any matter to be acted upon has been specified in the form of proxy, the Rubicon Common Shares will, on a poll, be voted or withheld from voting in accordance with the specification so made.

**IF A CHOICE WITH RESPECT TO ANY MATTER IS NOT CLEARLY SPECIFIED IN THE PROXY, THE MANAGEMENT DESIGNEES WILL VOTE THE RUBICON COMMON SHARES REPRESENTED BY THE PROXY "FOR" SUCH MATTER.**

**The enclosed form of proxy when properly completed, executed and deposited and not revoked confers discretionary authority upon the person appointed proxy thereunder to vote with respect to amendments or variations of matters identified in the accompanying Notice of Meeting, and with respect to other matters which may properly come before the Meeting.** In the event that amendments or variations to matters identified in the Notice of Meeting are properly brought before the Meeting or any further or other business is properly brought before the Meeting, it is the intention of the Management Designees to vote in accordance with their best judgment on such matters or business. At the date of this Circular, management knows of no such amendment, variation or other matter which may be presented to the Meeting.

**Advice to Beneficial Holders of Common Shares**

Only registered holders of common shares of Rubicon or the persons they validly appoint as their proxies are permitted to vote at the Meeting. However, in many cases, Rubicon Common Shares beneficially owned by a person (a "**Non-Registered Holder**") are registered either: (i) in the name of an intermediary (an "**Intermediary**") (including banks, trust companies, securities dealers or brokers and trustees or administrators of self-administered RRSP's, RRIF's, RESP's and similar plans) that the Non-Registered Holder deals with in respect of the Rubicon Common Shares, or (ii) in the name of a clearing agency (such as the Canadian Depository for Securities Limited) of which the Intermediary is a participant.

*Distribution to NOBOs*

In accordance with the requirements of the Canadian Securities Administrators and National Instrument 54-101, Communication with Beneficial Owners of Securities of a Reporting Issuer ("**NI-54-101**"), Rubicon will have caused its agent to distribute copies of the Notice of Meeting and this Circular (collectively, the "**meeting materials**") as well as a Voting Instruction Form directly to those Non-Registered Holders who have provided instructions to an Intermediary that such Non-Registered Holder does not object to the Intermediary disclosing ownership information about the beneficial owner ("**Non-Objecting Beneficial Owner**" or "**NOBO**").

*These securityholder materials are being sent to both registered and non-registered owners of the securities. If you are a non-registered owner, and Rubicon or its agent has sent these materials directly to you, your name and address and information about your holdings of securities, have been obtained in accordance with applicable securities regulatory requirements from the intermediary holding on your behalf.*

*By choosing to send these materials to you directly, Rubicon (and not the intermediary holding on your behalf) has assumed responsibility for (i) delivering these materials to you, and (ii) executing your proper voting instructions. Please return your voting instructions as specified in the request for Voting Instruction Form enclosed with mailings to NOBOs.*

The meeting materials distributed by Rubicon's agent to NOBOs include a scannable Voting Instruction Form. Please carefully review the instructions on the Voting Instruction Form for completion and deposit.

*Distribution to OBOs*

In addition, Rubicon will have caused its agent to deliver copies of the meeting materials to the clearing agencies and Intermediaries for onward distribution to those Non-Registered Shareholders who have provided instructions to an Intermediary that the beneficial owner objects to the Intermediary disclosing ownership information about the beneficial owner ("**Objecting Beneficial Owner**" or "**OBO**").

Intermediaries are required to forward the meeting materials to OBOs unless an OBO has waived his or her right to receive them. Intermediaries often use service companies such as ADP to forward the meeting materials to OBOs. Generally, those OBOs who have not waived the right to receive meeting materials will either:

(a) be given a form of proxy which has already been signed by the Intermediary (typically by a facsimile stamped signature), which is restricted as to the number of shares beneficially owned by the OBO, but which is otherwise uncompleted. This form of proxy need not be signed by the OBO. In this case, the OBO who wishes to submit a proxy should properly complete the form of proxy and deposit it with Computershare Investor Services Inc., in the manner set out above under "Appointment of Proxy," with respect to the Rubicon Common Shares beneficially owned by such OBO; or

(b) more typically, be given a voting registration form which is not signed by the Intermediary and which, when properly completed and signed by the OBO and returned to the Intermediary or its service company, will constitute authority and instructions (often called a "**proxy authorization form**") which the Intermediary must follow. Typically, the proxy authorization form will consist of a one page pre-printed form. Sometimes, instead of the one page pre-printed form, the proxy authorization form will consist of a regular printed proxy form accompanied by a page of instructions which contains a removable label containing a bar-code or other information. In order for the form of proxy to validly constitute a proxy authorization form, the OBO must remove the label from the instructions and affix it to the form of proxy, properly complete and sign the form of proxy and submit it to the Intermediary or its service company in accordance with the instructions of the Intermediary or its service company.

In either case, the purpose of this procedure is to permit the OBO to direct the voting of the shares he or she beneficially owns.

**Should a Non-Registered Holder who receives one of the above forms wish to vote at the Meeting in person, the Non-Registered Holder should strike out the names of the persons named in the form and insert the Non-Registered Holder's name in the blank space provided. In either case, Non-Registered Holders should carefully follow the instructions, including those regarding when and where the proxy or proxy authorization form is to be delivered.**

## VOTING SECURITIES AND PRINCIPAL HOLDERS THEREOF

### Voting Securities

The authorized share structure of Rubicon consists of an unlimited number of Rubicon Common Shares without par value. As at July 4, 2006, Rubicon has issued and outstanding 76,152,525 fully paid and non assessable Rubicon Common Shares, each Rubicon Common Share carrying the right to one vote. Rubicon has no other classes of voting securities.

**Record Date**

Any Shareholder of record at the close of business on July 4, 2006 (the "**Record Date**") who either personally attends the Meeting or who has submitted a properly executed and deposited form of proxy in the manner and subject to the provisions described above and which has not been revoked shall be entitled to vote or to have his or her shares voted at the Meeting. Notwithstanding the foregoing, holders of Rubicon Warrants who exercise their warrants on or before 4:30 p.m. (Vancouver time) on July 18, 2006 will also be entitled to vote the Rubicon Common Shares issued on exercise of such warrants at the Meeting. Upon exercise, such holders of Rubicon Warrants will be mailed a form of proxy which, once duly completed and returned to Computershare Investor Services Inc. in the manner and subject to the provisions described above, will enable them to vote such Rubicon Common Shares at the Meeting.

**Principal Holders**

To the knowledge of the directors and executive officers of Rubicon, as at July 4, 2006, there were no persons or companies who beneficially own, directly or indirectly, or exercise control or direction over Rubicon Common Shares carrying more than 10% of the voting rights attached to all outstanding Rubicon Common Shares.

## INTEREST OF CERTAIN PERSONS OR COMPANIES IN MATTERS TO BE ACTED UPON

Other than as disclosed below and elsewhere in this Circular, none of the directors or executive officers of Rubicon, no proposed nominee for election as a director of Rubicon, none of the persons who have been directors or executive officers of Rubicon since the commencement of Rubicon's last completed financial year and no associate or affiliate or any of the foregoing persons has any material interest, direct or indirect, by way of beneficial ownership of securities or otherwise, in any matter to be acted upon at the Meeting.

**Proposed Plan of Arrangement**

David W. Adamson, director, President and CEO of Rubicon, currently serves on Africo's board of directors as Rubicon's nominee, and was formerly also President and CEO of Africo. William J. Cavalluzzo, Vice-President, Investor Relations of Rubicon, until recently also served on Africo's board of directors as a Rubicon nominee. In those respective capacities Messrs. Adamson and Cavalluzzo were granted Africo Options on March 18, 2005, and accordingly will participate in the Arrangement as Africo optionholders, as well as Rubicon Shareholders and optionholders. Subsequent to the year ended December 31, 2005, Africo also granted Mr. Adamson additional stock options and resolved to pay Mr. Adamson a cash bonus in respect of services rendered to Africo. See Schedule "K", "Information Concerning CopperCo after the Arrangement – Executive Compensation".

Rubicon's Compensation Committee retained an independent executive compensation consultant in order to review the aforementioned compensation from Africo to determine if it was fair and appropriate. The results of this independent advice led Rubicon's Compensation Committee to form the view that the compensation was fair and appropriate, and that subject to no objections being raised regarding the option grants and their pricing by any applicable regulatory authority, Rubicon could support such awards. As at the date of this Circular, Rubicon has not been advised that any applicable regulatory authority has any objections to these grants.

It is expected that certain current members of the Board of Directors of Rubicon and senior management of Rubicon will assume positions with the Board of Directors and senior management of Paragon, and accordingly will be granted stock options and will receive other remuneration for their respective duties. See Schedule "J", "Information Regarding Paragon After the Arrangement – Directors and Officers of Paragon", "Executive Compensation" and "Proposed Executive Compensation".

## STATEMENT OF EXECUTIVE COMPENSATION

### Executive Officers

For the purposes of this Circular, the following terms have the following meanings:

(a) "**CEO**" of the Company means each individual who served as Chief Executive Officer of the Company or acted in a similar capacity during the most recently completed financial year;

(b) "**CFO**" of the Company means each individual who served as Chief Financial Officer of the Company or acted in a similar capacity during the most recently completed financial year;

(c) "**Executive Officer**" means any chairman or Vice-Chairman of the board of directors of the Company, where the functions of the office are performed on a full-time basis, the President, any Vice-President in charge of a principal business unit, division or function such as sales, finance or production and an officer of the Company or of a subsidiary of the Company who performed a policy-making function in respect of the Company, whether or not the officer is also a director of the Company or the subsidiary of the Company.

(d) "**Named Executive Officer**" means

(i) each Chief Executive Officer;

(ii) each Chief Financial Officer;

(iii) each of the Company's three most highly compensated executive officers, other than the CEO and CFO, who were serving as executive officers at the end of the most recently completed financial year and whose total salary and bonus exceeded $150,000; and

(iv) any additional individuals who would have been included under paragraph (iii) were it not for the fact that the individual was not serving as an officer of the Company at the end of the most recently completed financial year.

(e) "**Stock Appreciation Right**" ("**SAR**") means a right, granted by the Company or any of its subsidiaries, as compensation for services rendered or otherwise in connection with office or employment, to receive a payment of cash or an issue or transfer of securities based wholly or in part on changes in the trading price of publicly traded securities.

(f) "**Long-Term Incentive Plan**" ("**LTIP**") means any plan providing compensation intended to serve as incentive for performance to occur over a period longer than one financial year, whether the performance is measured by reference to financial performance of the Company or an affiliate of the Company, the price for the Company's securities, or any other measure, but does not include option or SAR plans or plans for compensation through restricted shares or restricted share units.

### Summary of Compensation

The following table sets forth all compensation paid by the Company and/or its subsidiaries for the financial years ended December 31, 2005, 2004 and 2003, in respect of the individuals who were, at December 31, 2005, the Chief Executive Officer, the Vice-President, Investor Relations and the Chief Financial Officer of the Company, and for an individual who was the Chief Financial Officer of the Company until August 24, 2005 (together the "**Named Executive Officers**").

## Summary Compensation Table

| | | Annual Compensation | | | Long Term Compensation | | | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Period | Salary ($) | Bonus ($) | Other Annual Compen-sation ($) | Securities Under Option/ SARs granted (#) | Restricted Shares or Restricted Share Units ($) | LTIP Payouts ($) | All Other Compensation ($) |
| **DAVID W.** | 2005 | 195,000[1] | - | - | 250,000[5] | - | - | 7,500[6] |
| **ADAMSON** | 2004 | 130,000[1] | 40,000[2] | - | - | - | - | - |
| *President & CEO* | 2003 | 78,000[1] | 60,000[3] | 265,000[4] | - | - | - | - |
| **WILLIAM J.** | 2005 | 130,000[7] | - | - | 250,000[5] | - | - | 7,500[6]- |
| **CAVALLUZZO** | 2004 | 60,000[7] | 25,000 | - | - | - | - | - |
| *Vice-President, Investor Relations* | 2003 | 60,000[7] | 35,000 | 274,000[4] | - | - | - | - |
| **PETER G. WONG**[8] | 2005 | 80,981[8] | - | - | 75,000[5] | - | - | 5,333[6] |
| *Former CFO* | 2004 | 90,000 | 10,000[2] | - | - | - | - | - |
| | 2003 | 3,913 | - | - | 300,000[9] | - | - | - |
| **ROBERT G.** | 2005 | 29,615[10] | - | - | 150,000[11] | - | - | - |
| **LEWIS**[10] | 2004 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| *CFO* | 2003 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

**Notes:**

(1) Salary paid pursuant to an Employment Agreement dated January 1, 2002. See "Termination of Employment, Change in Responsibilities and Employment Contracts" below for particulars.
(2) The bonus was awarded and accrued in 2004 and paid in 2005.
(3) The bonus was awarded and accrued in 2003 and paid in 2004.
(4) Represents the aggregate dollar value of the difference between the exercise price of stock options and the closing market price on the trading day immediately prior to exercise.
(5) Stock options granted on January 6, 2005 exercisable at $1.18 per share until January 6, 2010. The options were terminated on November 24, 2005, 90 days after Mr. Wong cessation of employment.
(6) David W. Adamson and William J. Cavalluzzo received director's fees from Africo Resources Ltd. Mr. Wong received consulting fees from Africo Resources Ltd. after ceasing to be CFO of Rubicon.
(7) Salary paid pursuant to Employment Agreement dated January 1, 2002. See "Termination of Employment, Change in Responsibilities and Employment Contracts" below for particulars.
(8) Mr. Wong was the CFO of Rubicon from December 10, 2003 until August 24, 2005. Salary paid pursuant to Employment Agreement dated December 1, 2003. See "Termination of Employment, Change in Responsibilities and Employment Contracts" below for particulars.
(9) Stock option granted on December 10, 2003 exercisable at $1.46 per share until December 10, 2013. The options were terminated on November 24, 2005, 90 days after Mr. Wong cessation of employment.
(10) Mr. Lewis was appointed the CFO of the Company on September 22, 2005. Salary paid pursuant to an Employment Agreement dated September 1, 2005. See "Termination of Employment, Change in Responsibilities and Employment Contracts" below for particulars.
(11) Stock option granted on September 12, 2005 exercisable at $0.74 per share until September 12, 2010.

### Long Term Incentive Plan Awards

The Company does not have a long term incentive plan for the Named Executive Officers.

### Grant of Stock Options/SAR's

The following table sets forth particulars of stock options granted to the Named Executive Officers during the financial year ended December 31, 2005.

**Options/SAR Grants During the Financial Year Ended December 31, 2005**

| Name | Securities Under Option/SARs Granted (#) | % of Total Options/SARs Granted to Employees in Financial Year | Exercise or Base Price ($/Security) | Market Value of Securities Underlying Options/SARs on the Date of Grant ($/Security) | Expiration Date |
|---|---|---|---|---|---|
| DAVID W. ADAMSON<br>*President & CEO* | 250,000(1) | 18.4% | $1.18 | $1.18 | January 6, 2010 |
| WILLIAM J. CAVALLUZZO<br>*Vice-President, Investor Relations* | 250,000(1) | 18.4% | $1.18 | $1.18 | January 6, 2006 |
| PETER G. WONG<br>*Former CFO* | 75,000(1) | 5.5% | $1.18 | $1.18 | January 6, 2010(2) |
| ROBERT G. LEWIS<br>*CFO* | 150,000(3) | 11.0% | $0.74 | $0.74 | September 12, 2010 |

**Notes:**

(1) These stock options were granted on January 6, 2005.
(2) The option was terminated on November 24, 2005, 90 days after Mr. Wong's cessation of employment.
(3) This stock option was granted on September 12, 2005.

The foregoing stock options were granted by the Board of Directors of Rubicon pursuant to the Rubicon Stock Option Plan which was previously approved by the Shareholders. The Board of Directors made the grants based upon the recommendations of the Compensation Committee after review of an independent report on executive compensation commissioned by the Board of Directors. Under the terms of the Rubicon Stock Option Plan, the options will terminate 90 days after the optionee ceases to be a director, senior officer, employee or consultant of the Company or a subsidiary, except by reason of the death of the optionee, in which case the optionee's personal representative may exercise the options by the earlier of one year following the date of death or the expiry date of the stock option.

**Exercise of Stock Options/Aggregate Year End Value**

The following table sets forth particulars of stock options exercised during the financial year ended December 31, 2005, and the financial year end value of unexercised stock options held by the Named Executive Officers as at December 31, 2005.

**Aggregated Option/SAR Exercises During the Financial Year Ended December 31, 2005
And Financial Year-End Option Values**

| Name | Securities Acquired on Exercise (#) | Aggregate Value Realized ($) | Unexercised Options at FY-End (#) Exercisable/Unexercisable | Value of Unexercised in the Money-Options at FY-End ($) Exercisable/Unexercisable |
|---|---|---|---|---|
| DAVID W. ADAMSON<br>*President & CEO* | Nil | N/A | 284,375 (exercisable)(1)<br>140,625 (unexercisable) | 29,750 (exercisable)(2)<br>Nil (unexercisable) |
| WILLIAM J. CAVALLUZZO<br>*Vice-President, Investor Relations* | Nil | N/A | 284,375 (exercisable)(1)<br>140,625 (unexercisable) | 29,750 (exercisable)(2)<br>Nil (unexercisable) |
| PETER G. WONG<br>*Former CFO* | Nil | N/A | Nil(3) | N/A |

| Name | Securities Acquired on Exercise (#) | Aggregate Value Realized ($) | Unexercised Options at FY-End (#) Exercisable/Unexercisable | Value of Unexercised in the Money-Options at FY-End ($) Exercisable/Unexercisable |
|---|---|---|---|---|
| ROBERT LEWIS<br>*CFO* | Nil | N/A | 21,428 (exercisable)(4)<br>128,572 (unexercisable) | 5,571 (exercisable)(2)<br>30,857 (unexercisable) |

**Notes:**

(1) Stock option granted on August 8, 2002 to purchase 175,000 Rubicon Common Shares at $0.83 per share. Stock option granted on January 6, 2005 to purchase 250,000 Rubicon Common Shares at $1.18 per share (56.25% not vested at December 31, 2005).
(2) Based on the difference between the closing price of $1.00 for the Rubicon Common Shares on the TSX on December 30, 2005 and the exercise price of the stock options.
(3) Peter Wong's stock options were terminated on November 24, 2005, 90 days after his cessation of employment.
(4) Stock option granted on September 12, 2005, to purchase Rubicon Common Shares at $0.74 per share, vesting in stages over a three year period from the date of grant (85.7% not vested at December 31, 2005).

## Termination of Employment, Change in Responsibilities and Employment Contracts

By an employment agreement dated January 1, 2002, the Company engaged the services of David W. Adamson as President and CEO, and to provide geological services to the Company, under which he received a salary of $78,000 per annum. Mr. Adamson's salary was increased to $130,000 per annum effective January 1, 2004 and to $195,000 effective January 1, 2005. This employment agreement has a term of three years and is automatically renewed for further terms of one year unless notice is given to terminate the agreement by either party. This agreement also provides that in the event of a significant change in the affairs of the Company such as a takeover bid, change of control of the Board of Directors of Rubicon, the sale, exchange or other disposition of a majority of the outstanding common shares of the Company, the merger or amalgamation or other corporate restructuring of the Company in a transaction or series of transactions in which the Company's members receive less than 51% of outstanding common shares of the new or continuing corporation ("**Significant Change**"), then at the option of Mr. Adamson exercisable at any time within 18 months after the date of the Significant Change, Mr. Adamson may elect to continue to be employed by the Company or give notice of termination in which event the Company shall pay Mr. Adamson an amount equal to two times the annual salary then in effect.

By an employment agreement dated January 1, 2002, the Company engaged the services of William J. Cavalluzzo as Vice-President, Investor Relations of the Company, under which he received a salary of $60,000 per annum. Mr. Cavalluzzo's salary was increased to $130,000 per annum effectively January 1, 2005. This employment agreement has a term of three years and automatically is renewed for further terms of one year unless notice is given to terminate the agreement by either party. This agreement also provides that in the event of a Significant Change, then at the option of Mr. Cavalluzzo exercisable at any time within 6 months after the date of the Significant Change, Mr. Cavalluzzo may elect to continue to be employed by the Company or give notice of termination, in which event the Company shall pay Mr. Cavalluzzo an amount equal to two times the annual salary then in effect.

By an employment agreement dated December 1, 2003, the Company engaged the services of Peter G. Wong as Chief Financial Officer of the Company under which he received a salary of $90,000 per annum. Mr. Wong's salary was increased to $125,000 per annum effective January 1, 2005. Mr. Wong resigned as Chief Financial Officer and employee of the Company on August 24, 2005.

By an employment agreement dated September 12, 2005, the Company engaged the services of Robert Lewis as Chief Financial Officer of the Company, under which he receives a salary of $100,000 per annum. This employment agreement has a term of three years and automatically is renewed for further terms of one year unless notice is given to terminate the agreement by either party. This employment agreement provides that in the event of a Significant Change, then at the option of Mr. Lewis exercisable at any time within 6 months after the date of the Significant Change, Mr. Lewis may elect to continue to be employed by the Company or give notice of termination in which event the Company shall pay Mr. Lewis an amount equal to two times the annual salary then in effect.

The aforementioned four individuals have agreed to waive the application of the aforementioned "Significant Change" provision with respect to the Arrangement, to the extent that the Arrangement may constitute a Significant Change.

The criteria used to determine the amount payable to the Named Executive Officers were based on industry standards and the Company's financial circumstances. The employment agreements with the Named Executive Officers and subsequent increases in salaries were accepted by the Board of Directors of Rubicon based on recommendations of the Compensation Committee.

**Composition of the Compensation Committee**

The Compensation Committee of the Company currently consists of Christopher J. Bradbrook (Chair), Philip S. Martin and John Brodie, FCA, all of whom are independent directors. David R. Reid resigned as Chair of the Compensation Committee on June 14, 2006, at which time Mr. Bradbrook was appointed as Chair. Other than as disclosed in this Circular, no member of the Compensation Committee had any material interest, direct or indirect, in any transaction since the commencement of the Company's most recently completed financial year or in any proposed transaction which has materially affected or would materially affect the Company or any of its subsidiaries.

**Compensation of Directors**

During the fiscal year ended December 31, 2005, the Company paid cash compensation, directly or indirectly, to directors of the Company other than the Named Executive Officers (the "**Other Directors**") as follows:

1. J. Garfield MacVeigh, Chairman of the Board of Directors of Rubicon: $120,000 for services as an officer and for providing geological services to the Company.

2. Michael J. Gray, former Vice-President Exploration and Corporate Secretary: $32,500 for services as an officer and for providing geological services to the Company. Mr. Gray resigned as a director of to the Company on January 27, 2005 and resigned his employment with to the Company effective April 15, 2005. He was paid $45,000 pursuant to a settlement agreement upon his resignation on April 15, 2005.

3. David R. Reid: The Company accrued or paid Davis & Company LLP, the Company's legal counsel $302,000 in legal fees net of a fee reduction to the Company's subsidiary, Toquima Minerals Corporation, for legal services. David R. Reid, a director of the Company, is a senior partner of Davis & Company LLP.

By an employment agreement dated August 1, 1996, the Company engaged the services of J. Garfield MacVeigh to act as President and CEO, and to provide geological services to the Company. Under the employment agreement, Mr. MacVeigh received a salary of $60,000 per annum for a term of three years ending on July 31, 1999, which has been automatically renewed annually on the anniversary date for further terms of one year each and now also applies to Mr. MacVeigh in his capacity as Chairman. Mr. MacVeigh's salary was increased to $85,000 per annum effective January 1, 2004 and to $120,000 effective January 1, 2005. This employment agreement provides that in the event of a Significant Change, then at the option of Mr. MacVeigh exercisable at any time within 6 months after the date of the Significant Change, Mr. MacVeigh may elect to continue to be employed by the Company or give notice of termination in which event, the Company shall pay Mr. MacVeigh an amount equal to two times the annual salary then in effect.

Other than as set out above, the Company has no pension plan and no standard or other arrangement for compensation to the Other Directors except for fees to the independent directors, and the granting of stock options.

The independent directors are paid a quarterly fee, in advance, of $3,000 plus $500 for each directors' meeting or committee meeting attended and an additional quarterly fee of $750 if they hold the position of chair of any committee. For the financial year ended December 31, 2005, the Company paid Philip S. Martin a total of $18,000, John R. Brodie, FCA a total of $18,000 and Kevin D. Sherkin a total of $14,000 in directors' fees.

Stock options were granted to the Other Directors by the Company during the financial year ended December 31, 2005, as follows:

| Name | Grant Date | Securities Under Option/SARs Granted | Exercise or Base Price ($/Security)(1) | Market Value of Securities Underlying Options/SARs on the Date of Grant ($/Security)(2) | Expiration Date |
|---|---|---|---|---|---|
| J. Garfield MacVeigh | January 6, 2005 | 250,000 | 1.18 | 1.18 | January 6, 2010 |
| Michael J. Gray | January 6, 2005 | 250,000 | 1.18 | 1.18 | January 6, 2010 |
| Philip S. Martin | January 6, 2005 | 150,000 | 1.18 | 1.18 | January 6, 2010 |
| David R. Reid | January 6, 2005 | 200,000 | 1.18 | 1.18 | January 6, 2010 |
| John R. Brodie, FCA | January 27, 2005 | 200,000 | 1.18 | 1.18 | January 27, 2010 |
| Kevin D. Sherkin | January 27, 2005 | 200,000 | 1.18 | 1.18 | January 27, 2010 |
| Christopher Bradbrook | December 14, 2005 | 200,000 | 0.86 | 0.86 | December 14, 2010 |

**Notes:**

(1) The exercise price of stock options is determined by the Board of Directors of Rubicon in accordance with the Rubicon Stock Option Plan. The exercise price shall be no less than the Market Price as defined in the Rubicon Stock Option Plan. Market Price means the last closing price of the shares on the TSX before the date of grant.
(2) Closing market price of the Company's shares at the TSX at the date of the grant.

During the year ended December 31, 2005, Philip S. Martin exercised stock options that had a market value that exceeded the exercise price by $48,750.

**Report on Executive Compensation**

The compensation of Rubicon's executive officers and the recommendations with respect to the Rubicon Stock Option Plan are determined by the Compensation Committee. Interested executives do not participate in decisions of the Compensation Committee regarding their remuneration. The Compensation Committee has, as part of its review and evaluation process, engaged independent third party executive compensation consultants and relied in part on reports prepared by such consultants.

In order to attract and retain key personnel, Rubicon employs a combination of base compensation and equity participation through the Rubicon Stock Option Plan. In establishing levels of remuneration and in granting stock options and bonuses, the executive's performance, level of expertise, responsibilities, length of service to Rubicon and comparable levels of remuneration paid to executives of other companies of comparable size and development within the industry are taken into consideration.

The Rubicon Stock Option Plan is administered by the Compensation Committee. The Rubicon Stock Option Plan is designed to give each option holder an interest in preserving and maximizing Shareholder value in the longer term, to enable Rubicon to attract and retain individuals with experience and ability, and to reward individuals for current performance and expected future performance. Stock option grants are considered when reviewing executive officer compensation packages as a whole.

*Base Salary*

In the Compensation Committee's view, paying base compensation that is competitive in the markets in which Rubicon operates is a first step to attracting and retaining talented, qualified and effective executives.

The base salary of each particular executive officer is determined by an assessment by the Compensation Committee of such executive officer's performance, a consideration of competitive compensation levels in companies similar to Rubicon and a review of the performance of Rubicon as a whole and the role such executive officer played in such company performance.

*Bonus*

Bonuses are performance based short-term financial incentives and will be paid based on certain indicators such as personal performance, team performance and/or Rubicon financial performance. Bonus levels will be determined by level of position with Rubicon.

*Long-Term Incentive*

Rubicon provides a long-term incentive by granting stock options to executive officers in accordance with the policies of the TSX. On May 6, 2003, the Board of Directors of Rubicon adopted the Rubicon Stock Option Plan to provide incentive to directors, officers, employees and consultants which was amended on April 19, 2004 to increase the number of shares reserved thereunder. Any options granted permit executive officers to acquire Rubicon Common Shares at an exercise price equal to the closing market price of such shares under option on the trading day immediately preceding the date on which the option was granted, less any discounts permitted under the policies of the stock exchange on which the Rubicon Common Shares are listed.

The objective of granting options is to encourage executive officers to acquire an ownership interest in Rubicon over a period of time, which acts as a financial incentive for such executive officer to consider the long-term interests of the Company and its shareholders.

*CEO Compensation*

The components of the CEO's compensation are the same as those that apply to all of Rubicon's executive officers, namely base compensation, performance bonuses and long-term incentives in the form of stock options. The general compensation philosophy of Rubicon for executive officers is to provide a level of compensation that is competitive within the North American marketplace and that will attract and retain individuals with the experience and qualifications necessary for Rubicon to be successful, and to provide long-term incentive compensation which aligns the interest of executives with those of shareholders and provide long-term incentives to members of senior management whose actions have a direct and identifiable impact on the performance of Rubicon and who have had a material responsibility for long-range strategy development and implementation.

In establishing the CEO's compensation, the Compensation Committee reviews salaries paid to other executive officers of Rubicon, salaries paid to other CEO's in the industry and the CEO's contribution to the affairs of Rubicon and makes recommendations to the Board of Directors of Rubicon.

See "Executive Compensation – Summary Compensation Table" above for more information on remuneration of Named Executive Officers.

The foregoing report has been submitted by: Christopher J. Bradbrook (Chair),
Philip S. Martin and John Brodie, FCA
Compensation Committee

**Performance Graph**

The following chart compares the yearly percentage change in the cumulative total Shareholder return on the Rubicon Common Shares against the cumulative total Shareholder return of the S&P/TSX Index (Total Return Index Value) and the TSX Gold and Precious Minerals Sub-Index (Total Return Index Value) for the fiscal periods 2000 through 2005, assuming a $100 initial investment with all dividends reinvested.




| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Rubicon Minerals Corporation | $100.00 | $219.23 | $434.62 | $550.00 | $465.38 | $384.62 |
| S&P/TSX Composite Index | $100.00 | $86.06 | $74.04 | $92.02 | $103.50 | $126.18 |
| S&P/TSX Composite – Precious Metals & Minerals Sub-index(1) | $100.00 | $103.74 | $150.44 | $213.24 | $177.22 | $202.15 |

**Note:**

(1) Each Index for years 2000 through 2005 is as at December 31.

## SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS

The following table sets forth details of Rubicon's compensation plans under which equity securities of Rubicon are authorized for issuance at December 31, 2005.

**Equity Compensation Plan Information as at December 31, 2005**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders(1) | 4,815,000 | $1.10 | 1,128,415 |
| Equity compensation plans not approved by security holders | N/A | N/A | N/A |
| **Total** | 4,815,000 | | 1,128,415 |

**Note:**

(1) As at December 31, 2005, of the 7,867,415 options which were reserved for the granting of options under the Rubicon Stock Option Plan, 1,924,000 had been granted and exercised, an additional 4,815,000 had been granted and remained outstanding and a remaining 1,128,415 were available for future grants. See "Rubicon Stock Option Plan - Adoption of Plan."

Rubicon has a stock option plan under which Rubicon Common Shares are authorized for issuance. See "Rubicon Stock Option Plan". Rubicon has no other form of compensation plan under which equity securities of Rubicon are

authorized for issuance to employees or non-employees in exchange for consideration in the form of goods and services.

## RUBICON STOCK OPTION PLAN

### Adoption of Plan

On May 6, 2003, the Board of Directors of Rubicon established the Rubicon Stock Option Plan which was approved by the Shareholders at the Annual General Meeting held on June 12, 2003 and by the TSX-V. The maximum number of Rubicon Common Shares initially reserved for issuance under the Rubicon Stock Option Plan was 6,120,225, being approximately 15% of the number of issued Rubicon Common Shares on the date of establishment of the Rubicon Stock Option Plan by the Board of Directors of Rubicon, which included Rubicon Common Shares which were reserved for issue for stock options granted before the establishment of the Rubicon Stock Option Plan. On April 19, 2004, the Board of Directors of Rubicon approved an amendment to increase the maximum number of Rubicon Common Shares reserved for the granting of stock options under the Rubicon Stock Option Plan to a total of 7,867,415 (being approximately 15% of the number of issued Rubicon Common Shares at April 19, 2004 and 13% of the number of Rubicon Common Shares issued and outstanding as at the date of this Circular). This amendment was passed by way of disinterested Shareholder vote at the 2004 Annual and Extraordinary General Meeting of Shareholders of Rubicon held on May 25, 2004. This increase in the maximum number of Common shares reserved under the Rubicon Stock Option Plan was effected in order that the Company can continue to provide incentives to its directors, officers, employees and consultants. The amendment was accepted for filing by the TSX on June 30, 2004.

As at July 4, 2006, there are stock options outstanding to purchase an aggregate of 4,206,372 Rubicon Common Shares, representing approximately 53% of the stock options available to be granted under the Rubicon Stock Option Plan and 5.5% of the Rubicon Common Shares issued and outstanding. As at the date of this Circular, there are stock options available for granting under the Rubicon Stock Option Plan which, if granted, would enable the holders to purchase an aggregate of 1,088,415 Rubicon Common Shares, representing approximately 14% of the Rubicon Common Shares reserved for the granting of stock options under the Rubicon Stock Option Plan and 1.4% of the Rubicon Common Shares issued and outstanding.

### Purpose of the Plan

The purpose of the Rubicon Stock Option Plan is to provide an incentive to the Company's directors, senior officers, employees and consultants to continue their involvement with the Company, to increase their efforts on the Company's behalf and to attract qualified new directors, senior officers and employees. The Company does not intend to provide financial assistance to facilitate the purchase of Rubicon Common Shares under the Rubicon Stock Option Plan.

### General Description/Exchange Policies

The Rubicon Stock Option Plan is administered by the Compensation Committee. A copy of the Rubicon Stock Option Plan is available online at www.sedar.com.

The following is a brief description of the principal terms of the Rubicon Stock Option Plan, as amended in 2004, which description is qualified in its entirety by the terms of the Rubicon Stock Option Plan:

1. The maximum number of Rubicon Common Shares that may be reserved for issuance of stock options granted under the Plan shall not exceed 7,867,415 Common shares.

2. The exercise price of the stock options, as determined by the Compensation Committee, may not be less than the market price. Under the rules of the TSX, the "market price" is the closing market price of the Rubicon Common Shares on the TSX at the time of the grant of an option.

3. Stock options under the Rubicon Stock Option Plan may be granted by the Compensation Committee to:

(a) a senior officer, director or employee of the Company or an affiliate of the Company;

(b) a consultant (other than an employee or director of the Company) providing consulting, technical, management or other services to the Company, or a consultant company excluding (unless an exemption from prospectus requirements is available under applicable securities laws) a consultant providing investor relations services; and

(c) an employee of a corporation providing management services to the Company, which management services are required for the ongoing successful operation of the business enterprise of the Company but excluding a person engaged in investor relations activities.

4. The term for exercise of stock options is a maximum of ten years from the date of grant provided that in the event of the optionee's death, the exercise period shall not exceed the lesser of one year from the date of the optionee's death and the expiry date of the stock option.

5. Stock options may only be exercised until the earlier of the expiry date and a period of not more than 90 days after the optionee ceases to be an employee, consultant, director, or senior officer of the Company or any related company or as a management company employee, except in the case of persons providing investor relations activities to the Company where the stock options may be exercised until the earlier of the expiry date and a period of not more than 30 days after the optionee's employment or position terminates. If an optionee's employment with the Company is terminated for just cause, the options terminate on the date of such termination of employment.

6. The Compensation Committee has complete discretion to set the terms of any vesting schedule of any options granted, including the discretion to permit partial vesting in stated percentage amounts based on the term of such options or to permit full vesting after a stated period of time has passed from the date of grant.

7. If there is any change in the number of Rubicon Common Shares outstanding through any declaration of a stock dividend or any consolidation, subdivision or reclassification of the Rubicon Common Shares, the number of shares available under the Rubicon Stock Option Plan, the shares subject to any option and the exercise price will be adjusted proportionately, subject to any approval required by the TSX. If the Company amalgamates, merges, or enters into a plan of arrangement with or into another corporation, the shares received on exercise of the options thereafter will reflect the shares that would have been received had the options been exercised immediately prior to the record date for the amalgamation, merger or plan of arrangement and the exercise price will be adjusted proportionately. If a Change of Control (as defined in the Rubicon Stock Option Plan) of the Company occurs, all options will become immediately exercisable. If a bona fide takeover bid (as defined in the British Columbia *Securities Act*) is made for the Rubicon Common Shares, optionees will be entitled to exercise any options they hold to permit the optionee to tender the shares received upon exercise of the options to the takeover bid.

8. Except in certain limited circumstances, the options are non-assignable and non-transferable. Upon the death of the optionee, the options are transferable to a person entitled to them through a will or the applicable laws of descent and distribution and may be exercised by such person until the earlier of the expiry of the term of the options or one year from the date of death of the optionee. If the optionee becomes disabled, the options may be exercised by any guardian of the optionee for a period of 90 days (30 days for optionees engaged in investor relations activities) from the date of termination of the optionee's employment or services resulting from the disability.

9. If any options are cancelled, surrendered, terminated or have expired without being exercised, new options may be granted under the Rubicon Stock Option Plan covering the shares not purchased under such lapsed options.

10. The decrease in the exercise price or an extension of the term of stock options previously granted to insiders requires approval by a "disinterested Shareholder vote" prior to exercise of such repriced stock options.

## INDEBTEDNESS OF DIRECTORS, EXECUTIVE OFFICERS AND OFFICERS

During the financial year ended December 31, 2005, no director, executive officer, officer, proposed management nominee for election as a director of Rubicon, nor any of their respective associates or affiliates, is, or has been at any time since the beginning of the last completed financial year, indebted to Rubicon or any subsidiary, nor has any such person been indebted to any other entity where such indebtedness is a subject of a guarantee, support agreement, letter of credit or similar arrangement or understanding, provided by Rubicon.

## MANAGEMENT CONTRACTS

Management functions of the Company or any subsidiary of the Company are not, to any substantial degree, performed by a person other than the directors or executive officers of the Company or its subsidiaries (if any).

## MATERIAL CONTRACTS

For particulars of the material contracts of the Company, other than those mentioned elsewhere in this Circular, to which the Company is a party, see Schedule “I” “Information Concerning Rubicon After the Arrangement – Material Contracts”.

For particulars of the material contracts of Paragon, other than those mentioned elsewhere in this Circular, to which Paragon is a party, see Schedule “J” “Information Concerning Paragon After the Arrangement – Material Contracts”.

For particulars of the material contracts of CopperCo, other than those mentioned elsewhere in this Circular, to which CopperCo is a party, see Schedule “K” “Information Concerning CopperCo After the Arrangement – Material Contracts”.

## INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS

For the purposes of this Circular, “**informed person**” means:

(a) a director or executive officer of the Company;

(b) a director or executive officer of a person or company that is itself an informed person or subsidiary of the Company;

(c) any person or company who beneficially owns, directly or indirectly, voting securities of the Company or who exercises control or direction over voting securities of the Company, or a combination of both, carrying more than 10% of the voting rights attached to all outstanding voting securities of the Company, other than voting securities held by the person or company as underwriter in the course of a distribution; and

(d) the Company if it has purchased, redeemed or otherwise acquired any of its own securities, for so long as it holds any of its securities.

Other than as set out elsewhere in this Circular or in the Management Information Circular of Rubicon dated May 17, 2005 (a copy of which is available online at www.sedar.com), no informed person, no proposed director of the Company and no associate or affiliate of any such informed person or proposed director, has any material interest, direct or indirect, in any material transaction since the commencement of the Company’s last completed financial year or in any proposed transaction, which, in either case, has materially affected or will materially affect the Company or any of its subsidiaries, except as follows:

**Private Placement - August 16, 2005**

On August 16, 2005, the Company closed a brokered private placement consisting of 9,232,000 units at $0.65 per unit, each unit consisting of one common share and one-half transferable common share purchase warrant. Each

whole warrant entitles the holder to purchase one common share at $0.85 per share until August 16, 2007. Of the subscribers to the private placement, seven were insiders and participated in the private placement as follows:

| Name | Relationship | Number of Units |
|---|---|---|
| J. Garfield MacVeigh | Director and Senior Officer | 10,000 |
| David W. Adamson | Director and Senior Officer | 7,700 |
| William J. Cavalluzzo | Senior Officer | 7,700 |
| Ian Russell | Senior Officer | 3,100 |
| Tizard Explorations Inc. | Associate of Philip S. Martin, Director | 100,000 |
| Kevin Sherkin | Director | 24,999 |

**Related Party Transactions**

For details of related party transactions during Rubicon's 2005 financial year and for the 3-month period ended March 31, 2006, see note 4 to Rubicon's 2005 Annual Audited Consolidated Financial Statements and note 3 to Rubicon's Interim Unaudited Financial Statements for the 3-month period ended March 31, 2006. Both of the foregoing documents are available online at www.sedar.com, and upon request, Rubicon will promptly provide a copy of such documents free of charge to any securityholder of Rubicon.

See also "Interest of Certain Persons or Companies in Matters to Be Acted Upon."

## AUDIT COMMITTEE AND RELATIONSHIP WITH AUDITORS

Multilateral Instrument 52-110 of the Canadian Securities Administrators ("**MI 52-110**") requires the Company to disclose annually in its Annual Information Form certain information concerning the constitution of its audit committee and its relationship with its independent auditors. Such information can be found in Items 6.A, 6.C, and 16.A and the full text of the Company's Audit Committee Charter can be found in Exhibit 16.1 of the Company's Form 20F, Annual Report, for the fiscal year ended December 31, 2005, which is available online at www.sedar.com and a copy will be provided free of charge to any security holder of the Company upon request. See also "Interest of Certain Persons or Companies in Matters to be Acted Upon".

## DISCLOSURE OF CORPORATE GOVERNANCE PRACTICES

Effective June 30, 2005, National Instrument 58-101 ("**Disclosure of Corporate Governance Practices**") ("**NI 58-101**"), was adopted by the Canadian Securities Administrators. NI 58-101 requires issuers to disclose their governance practices in accordance with that instrument. A discussion of Rubicon's governance practices within the context of NI 58-101 is set out in Schedule "N" to this Circular.

## ANNUAL MEETING MATTERS TO BE ACTED ON

## RECEIPT OF FINANCIAL STATEMENTS

The financial statements of Rubicon for the financial year ended December 31, 2005 and the auditor's report thereon will be presented to the meeting.

## APPOINTMENT OF AUDITORS

The shareholders of Rubicon will be asked to vote for the re-appointment of DeVisser Gray, Chartered Accountants, as auditors of Rubicon for the ensuing year. **Unless such authority is withheld, the Management Designees, if named as proxy, intend to vote the Rubicon Common Shares represented by any such proxy in favour of a resolution re-appointing DeVisser Gray, Chartered Accountants, as auditors for Rubicon for the ensuing year**, to hold office until the close of the next annual general meeting of shareholders or until the firm of DeVisser Gray, Chartered Accountants is removed from office or resigns. DeVisser Gray, Chartered Accountants, have been the auditors of Rubicon since June 26, 1996.

## DETERMINATION OF NUMBER OF DIRECTORS

The shareholders of Rubicon will be asked to consider and, if thought appropriate, to approve and adopt an ordinary resolution determining the number of directors at seven. **Unless otherwise directed, it is the intention of the Management Designees, if named as proxy, to vote in favour of the ordinary resolution to determine the number of directors of Rubicon.**

## ELECTION OF DIRECTORS

The Board of Directors of Rubicon presently consists of seven directors and it is intended to elect seven directors for the ensuing year.

The term of office of each of the present directors expires at the Meeting. The persons named below will be presented for election at the Meeting as management's nominees and unless such authority is withheld, the Management Designees intend to vote for the election of these nominees. Management does not contemplate that any of these nominees will be unable to serve as a director. Each director will hold office until the next annual general meeting of Rubicon or until his successor is elected or appointed, unless his office is earlier vacated in accordance with the Articles of Rubicon, or with the provisions of the BCBCA.

As at the date hereof, the members of the Audit Committee are John R. Brodie (Chair), Kevin D. Sherkin and Philip S. Martin. The members of the Corporate Governance Committee are Philip S. Martin (Chair), David R. Reid and Kevin D. Sherkin. The members of the Compensation Committee are Christopher J. Bradbrook (Chair), Philip S. Martin and John R. Brodie. The members of the Nominating Committee are Kevin D. Sherkin (Chair), Philip S. Martin and John R. Brodie. Rubicon does not have an Executive Committee of its board of directors.

The Board of Directors of Rubicon has determined that, in the interests of corporate governance and compliance, the Company will likely appoint a new independent Chairman in due course although no date for such change has been decided upon. Garfield MacVeigh is expected to remain as a director of the Company in the event this change is made.

The following table sets out the name of the nominees for election as directors, the province and country in which each is ordinarily resident, all offices of Rubicon now held by each of them, their present principal occupation or employment, the period of time for which each has been a director of Rubicon, the number of Rubicon Common Shares or any of its subsidiaries beneficially owned by each, directly or indirectly, or over which control or direction is exercised, as of July 4, 2006:

| Name, Position and Province & Country of Residence[(1)] | Present Principal Occupation or Employment[(1)] | Date First Appointed as a Director | No. of Common Shares Beneficially Held or Controlled[(1), (2)] |
|---|---|---|---|
| **J. GARFIELD MACVEIGH**<br>*Chairman of the Board & Director*<br>*British Columbia, Canada* | Exploration Geologist; Chairman of the Board and Director of Rubicon; President and Director of Rubicon Management Ltd. | March 6, 1996 | 1,303,095[(3)] |
| **DAVID W. ADAMSON**<br>*President, CEO & Director*<br>*British Columbia, Canada* | Exploration Geologist; President, CEO and Director of Rubicon; Director of Rubicon Management Ltd. | March 6, 1996 | 1,078,266[(3)] |
| **DAVID R. REID**<br>*Director*<br>*British Columbia, Canada* | Lawyer; Partner of Davis & Company LLP, Barristers & Solicitors | April 6, 2001 | 196,500 |
| **PHILIP S. MARTIN**<br>*Director*<br>*Ontario, Canada* | Principal, P.S. Martin & Associates, Financial Consultants | July 11, 2003 | 190,000 |

| Name, Position and Province & Country of Residence[(1)] | Present Principal Occupation or Employment[(1)] | Date First Appointed as a Director | No. of Common Shares Beneficially Held or Controlled[(1), (2)] |
|---|---|---|---|
| **JOHN R. BRODIE, FCA**<br>*Director*<br>*British Columbia, Canada* | Fellow Chartered Accountant (FCA), President of John R. Brodie Capital Inc. (private management services company) | January 27, 2005 | Nil |
| **KEVIN D. SHERKIN**<br>*Director*<br>*Ontario, Canada* | Lawyer, Managing Partner of Levine Sherkin Boussidan | January 27, 2005 | 99,160 |
| **CHRISTOPHER J. BRADBROOK**<br>*Director*<br>*Ontario, Canada* | President & CEO, New Gold Inc., October 2004 to present; previously Vice-President, Corporate Development of Goldcorp Inc. (TSX), from January 2001 to May 2004 | December 14, 2005 | Nil |

**Notes:**

(1) The information as to province and country of residence, present principal occupation or employment and the number of Rubicon Common Shares beneficially owned or controlled, is not within the knowledge of the management of Rubicon and has been furnished by the respective nominees. The information as to present province and country of residence, occupation or employment for Christopher J. Bradbrook is for the past five years.

(2) Does not include stock options held by the directors as follows:

| Option Holder | Number of Shares | Exercise Price | Expiry Date |
|---|---|---|---|
| J. Garfield MacVeigh | 250,000 | $1.18 | January 6, 2010 |
| David W. Adamson | 175,000 | $0.83 | August 8, 2007 |
| | 250,000 | $1.18 | January 6, 2010 |
| David R. Reid | 175,000 | $0.83 | August 8, 2007 |
| | 200,000 | $1.18 | January 6, 2010 |
| Philip S. Martin | 225,000 | $0.84 | July 18, 2007 |
| | 150,000 | $1.18 | January 6, 2010 |
| John R. Brodie | 150,000 | $1.18 | January 27, 2010 |
| Kevin D. Sherkin | 200,000 | $1.18 | January 27, 2010 |
| Christopher J. Bradbrook | 200,000 | $0.86 | December 14, 2010 |

Does not include warrants held by the directors as follows:

| Warrant Holder | Number of Shares | Exercise Price | Expiry Date |
|---|---|---|---|
| J. Garfield MacVeigh | 5,000 | $0.85 | August 16, 2007 |
| David W. Adamson | 3,850 | $0.85 | August 16, 2007 |
| Tizard Explorations Inc. (Philip S. Martin) | 50,000 | $0.85 | August 16, 2007 |
| Kevin D. Sherkin | 19,230 | $0.85 | August 16, 2007 |

(3) Included in the share positions of J. Garfield MacVeigh and David W. Adamson are those shares held directly and indirectly through personal holding corporations and 1/3 each of the issued shares of Rubicon Management Ltd. ("**RML**"), which owns 2,300,000 Rubicon Common Shares. The sole purpose of RML is to act as a holding company. RML does not actively conduct business, nor does it have a management relationship with Rubicon. The shareholders of RML may carry out a butterfly transaction which would result in the Rubicon Common Shares presently owned by RML being directly or indirectly owned as to 1/3 each by the three principals of RML.

**Unless otherwise directed, it is the intention of the Management Designees, if named as proxy, to vote in favour of the election of the foregoing nominees of management as directors of the Company for the ensuing year.**

Except as disclosed herein, to the best of knowledge of the management of Rubicon, no proposed director of Rubicon is, or within the 10 years before the date of this Circular has been, a director or executive officer of any company that, while that person was acting in that capacity:

(a) was the subject of a cease trade or similar order or an order that denied that company access to any exemption under securities legislation, for a period of more than 30 consecutive days;

(b) was subject to an event that resulted, after the director or executive officer ceased to be a director or executive officer, in Rubicon being the subject of a cease trade or similar order or an order that denied the relevant company access to any exemption under securities legislation, for a period of more than 30 consecutive days; or

(c) within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangements or compromise with creditors, or had a receiver manager or trustee appointed to hold its assets.

On August 30, 2005, David R. Reid became a director and officer of Harbour Pacific Minerals Inc. ("**Harbour Pacific**"), which has been subject to a cease trade order issued by the Alberta Securities Commission under the *Securities Act* (Alberta) since August 31, 1995. The cease trade order was imposed after Harbour Pacific failed to file and send to its shareholders its unaudited interim financial statements for the period ended April 30, 1995. The cease trade order against Harbour Pacific is still in effect, however David R. Reid joined the Board of Directors of Harbour Pacific to assist with the reactivation of Harbour Pacific.

No proposed director of Rubicon has, within the 10 years before the date of this Circular, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or became subject to or instituted any proceedings, arrangements or compromises with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the proposed director.

## PARTICULARS OF OTHER MATTERS TO BE ACTED ON

### STOCK OPTION PLAN OF PARAGON

The Board of Directors of Paragon has adopted a stock option plan as part of Paragon's conversion to a public company. For particulars of the plan, see Schedule "J" "Information Concerning Paragon After the Arrangement" – "Proposed Paragon Stock Option Plan". Accordingly, Rubicon's Disinterested Shareholders will be asked at the Meeting to pass the ordinary resolution set out in Schedule "F" of this Circular approving the Paragon Stock Option Plan. In this regard, a total of 3,104,146 Rubicon Common Shares will be withheld from voting at the Meeting, which include Rubicon Common Shares held by Rubicon's Disinterested Shareholders and the directors, senior officers and their associates of Paragon.

The Board of Directors of Rubicon is of a view that passing the ordinary resolution approving the Paragon Stock Option Plan is in the best interest of Rubicon and recommends that shareholders vote in favour of this ordinary resolution. **Unless otherwise directed, it is the intention of the Management Designees, if named as proxy, to vote in favour of this ordinary resolution.**

### STOCK OPTION PLAN OF COPPERCO

The Board of Directors of CopperCo has adopted a stock option plan, as part of CopperCo's conversion to a public company. For particulars of the plan, see Schedule "K", "Information Concerning CopperCo After the Arrangement" – "Proposed CopperCo Stock Option Plan". Accordingly, Rubicon's Disinterested Shareholders will be asked at the Meeting to pass the ordinary resolution set out in Schedule "G" of this Circular approving the CopperCo Stock Option Plan. In this regard, a total of 3,090,346 Rubicon Common Shares will be withheld from voting at the Meeting, which include Rubicon Common Shares held by Rubicon's Disinterested Shareholders and the directors, senior officers and their associates of CopperCo.

The Board of Directors of Rubicon is of a view that passing the ordinary resolution approving the CopperCo Stock Option Plan is in the best interest of Rubicon and recommends that shareholders vote in favour of this ordinary

resolution. **Unless otherwise directed, it is the intention of the Management Designees, if named as proxy, to vote in favour of this ordinary resolution.**

## THE ARRANGEMENT

### General

The purpose of the Arrangement is to reorganize Rubicon and its current assets into three separate public companies: Rubicon, Paragon and CopperCo. Pursuant to the Arrangement, a new company, Paragon will acquire all of Rubicon's Newfoundland and Nunavut exploration assets and another new company, CopperCo will acquire all of the issued and outstanding common shares of Africo (a private company in which Rubicon currently holds a 39.6% equity ownership interest). Rubicon will retain all of its other assets, including its Red Lake assets and its interest in Toquima Minerals Corporation ("**Toquima**"). Rubicon has entered into an agreement with Carlin Gold Corporation to sell Rubicon's interest in Toquima (for particulars, see note 6 to Rubicon's Interim Unaudited Consolidated Financial Statements at Schedule "A" to this Circular).

Each Rubicon Shareholder as at the Share Distribution Record Date will hold, immediately after completion of the Arrangement, one (1) New Rubicon Common Share for each one (1) Rubicon Common Share held prior to the Arrangement, one (1) Paragon Common Share for every six (6) Rubicon Common Shares held prior to the Arrangement and that number of CopperCo Common Shares obtained by multiplying the number of Rubicon Common Shares held on the Share Distribution Record Date by the Rubicon-CopperCo Exchange Ratio. In addition, each Africo Shareholder will hold, immediately after completion of the Arrangement one CopperCo Common Share for every Africo Share held prior to the Arrangement.

The Rubicon-CopperCo Exchange Ratio is a fraction which is obtained by dividing the number of Africo Shares held by Rubicon on the Share Distribution Record Date by the fully diluted number of Rubicon Common Shares outstanding on such date. As at the date of this Circular, Rubicon holds 7,747,101 Africo Shares, and the fully diluted number of Rubicon Common Shares is 84,011,690, which results in a Rubicon-CopperCo Exchange Ratio of approximately 0.0922, or one CopperCo Common Share for approximately every 10.84 Rubicon Common Shares held. However, if Rubicon were to exercise its conversion rights under the proposed Bridge Loan to Africo prior to the Effective Date, Shareholders would be entitled to receive a greater number of CopperCo Common Shares under the Arrangement, i.e., the aforementioned 0.0922 number would increase slightly and the aforementioned 10.84 number would decrease slightly, as a result of Rubicon holding a greater number of Africo Shares on the Share Distribution Record Date. These numbers cannot be determined at the date of this Circular, because the conversion terms of the Bridge Loan are based on the pricing of the CopperCo/Africo Financing, which pricing has not occurred at the date of this Circular (nor is there any assurance that the Bridge Loan or the CopperCo/Africo Financing will be completed). See Schedule "K", "Information Concerning CopperCo after the Arrangement – Funds Available."

The Arrangement will become effective on the Effective Date, subject to satisfaction of all applicable conditions. The disclosure of the principal features of the Arrangement as summarized below, is qualified in its entirety by reference to the full text of the Arrangement Agreement.

*Rubicon Minerals Corporation*

Rubicon was incorporated by registration of its memorandum and Articles under the BCBCA on March 6, 1996 under the name Rubicon Minerals Corporation. The Rubicon Common Shares are currently listed on the TSX under the trading symbol "RMX" and on AMEX under the trading symbol "RBY". Rubicon is a reporting issuer in British Columbia, Alberta, Ontario, Quebec, and the United States and files its annual information form, annual and interim financial statements, management discussion and analysis, and other continuous disclosure documents with the securities commissions or similar regulatory authorities in each such province and the United States Securities and Exchange Commission. These public disclosure documents are available under Rubicon's profile on the SEDAR website at www.sedar.com or on the United States Securities and Exchange Commissions website which can be accessed at www.sec.gov.

The diagram below shows Rubicon and its assets prior to the Arrangement:




Upon completion of the Arrangement, it is proposed that Rubicon will retain its interest in the Red Lake assets and the Nevada assets. It is further proposed that the New Rubicon Common Shares will continue to be listed on the TSX and AMEX, subject to Rubicon complying with the continued listing requirements of the TSX and AMEX. The Arrangement is subject to the prior approval of both the TSX and AMEX. There can, however, be no assurances as to whether Rubicon will be able to maintain its listing on either the TSX or AMEX. **For a further description of the business to be carried on by Rubicon following the completion of the Arrangement see Schedule "I" hereto.**

*Paragon Minerals Corporation*

Paragon was incorporated under the CBCA on July 4, 2006 for the purpose of carrying out the Arrangement. Upon completion of the Arrangement, it is proposed that Paragon will hold Rubicon's Newfoundland exploration assets, along with its Incognita property in Nunavut. **For a further description of the business to be carried on by Paragon following completion of the Arrangement see Schedule "J" hereto.**

Paragon will seek to have the Paragon Common Shares listed for trading on Tier 2 of the TSX-V as soon as possible after the Effective Date. Listing will be subject to Paragon meeting the original listing requirements of the TSX-V. There can, however, be no assurances as to if, or when, the Paragon Common Shares will be listed on the TSX-V.

*CopperCo Resource Corp.*

CopperCo was incorporated under the CBCA on July 4, 2006 for the purpose of carrying out the Arrangement. Upon completion of the Arrangement, it is proposed that CopperCo will hold all of the issued and outstanding Africo Shares. **For a further description of the business to be carried on by CopperCo following completion of the Arrangement see Schedule "K" hereto.**

CopperCo will seek to have the CopperCo Common Shares listed for trading on the TSX as soon as possible after the Effective Date. Listing will be subject to CopperCo meeting the original listing requirements of the TSX. If CopperCo is unsuccessful in having its shares listed on the TSX, CopperCo will apply to have the CopperCo Common Shares listed on the Alternative Investment Market ("**AIM**") of the London Stock Exchange. There can, however, be no assurances as to if, or when the CopperCo Common Shares will be listed on the TSX or AIM.

The diagram below shows companies and shareholders on successful completion of the Arrangement:




**Background to the Arrangement**

*General*

In May 2005, the Board of Directors and management of Rubicon began considering ways to realize the value of Rubicon's various assets and exploration properties in order to maximize Shareholder value. It was management's view that despite significant discoveries in the Newfoundland, the value of these assets was not being reflected in the Rubicon Common Share price. Management proposed to the Board of Directors of Rubicon the separation of Rubicon's Newfoundland exploration assets into a new publicly traded company as a means of realizing greater value for its Newfoundland assets.

Following initial approval from the Board of Directors of Rubicon, Rubicon issued a press release on June 8, 2005 announcing its intention to form a new company that would hold Rubicon's interest in its Newfoundland properties. Rubicon announced its intent to distribute its current Newfoundland assets to existing Rubicon Shareholders by way of a Plan of Arrangement.

In September, 2005, in order to properly consider potential value enhancement strategies, Rubicon commissioned an internal analysis by its financial advisor, Roman Friedrich & Company ("**RFC**"), as well as a third party independent analysis by Research Capital Corporation ("**RCC**") acting as independent financial advisor. The RFC and RCC analyses each considered technical, business, and financial data; financial forecasts; trading comparables; and trading history. Presentations of such analyses were completed and made the Board of Directors of Rubicon in early October of 2005. Both RFC and RCC concluded that Rubicon's asset value was not fully reflected in its share price.

RFC's and RCC's presentations were not formal valuations of Rubicon of any of its properties but rather were analyses for the Board of Directors of Rubicon of the potential for shareholder value enhancement through a separation of Rubicon's assets.

The Board of Directors of Rubicon met on October 11, 2005 to review a report prepared by management on the analyses of Rubicon's base and precious metal assets. After consideration of the management report and the analyses of RFC and RCC, the Board of Directors of Rubicon approved in principle a reorganization of Rubicon's

assets in order to seek to realize greater Shareholder value. Rubicon issued a news release on November 21, 2005 outlining the proposed corporate reorganization.

*Africo Negotiations and Support Agreement*

Since that time, Rubicon has been in discussions and negotiations with Africo regarding the structure and commercial terms of such a reorganization. Rubicon reached agreement with the Board of Directors of Africo on the broad outline and objectives of such a transaction on March 23, 2006. Subsequent discussions and negotiations took place regarding the exact structure, agreements and commercial terms. On May 15, 2006, five major shareholders of Africo (the "**Principal Africo Shareholders**") and Rubicon entered into a support agreement (the "**Africo Support Agreement**") pursuant to which the Principal Africo Shareholders agreed to support the Arrangement, on condition that the Arrangement Agreement be entered into by June 30, 2006. As at July 7, 2006, 4 of the 5 Principal Africo Shareholders have signed an amended and restated version of the Africo Support Agreement to, among other things, extend the termination date of the Africo Support Agreement to September 30, 2006 if the Effective Date of the Arrangement has not occurred by such time. Although Africo currently expects that the remaining Principal Shareholder will execute the amended and restated Africo Support Agreement, there can be no assurance that this will occur. See "Africo Support Agreement".

*Engagement of Research Capital Corporation*

On May 23, 2006, the Board of Directors of Rubicon retained RCC to provide financial advice and assistance to the Board in evaluating the Arrangement, including the preparation and delivery of an update of the presentation which RCC had given to the Board of Directors of Rubicon in October of 2005, as described above. The engagement agreement between RCC and the Board of Directors of Rubicon provides that RCC will receive a fee of Cdn.$100,000 for its services, will be reimbursed for its reasonable out-of-pocket expenses and will be indemnified by Rubicon against certain expenses, losses, claims, actions, damages and liabilities incurred in connection with the provision of its services. The fees payable to RCC are not contingent in whole or in part on the outcome of the Arrangement or the related transactions described in the Circular. RCC has represented to the Board of Directors of Rubicon that RCC is independent of all interested parties in the transaction.

*Updated RCC Presentation*

RCC delivered its updated analysis presentation (the "**Updated Presentation**") to the Board on June 14, 2006.

RCC made estimates of the implied equity values of Rubicon's three relevant asset classes, i.e. Rubicon's interest in Africo, its Red Lake and Nevada assets and its Newfoundland assets. For such purposes, RCC made certain assumptions with respect to Africo's Kalukundi project, and considered two different valuation scenarios. In the "base case" scenario, RCC assumed that 7.8Mt of reserves are brought into production and that no currently identified resources are converted into reserves. RCC also considered an "expanded case" scenario where an additional 5.0Mt of resources are proved-up to the reserve category and added to the existing 7.8Mt of reserves prior to start of production, for a total of 12.8Mt of reserves being mined over the life-of-mine at Kalukundi. RCC's analysis with respect to the Kalukundi project was based in part on the results of the completed feasibility study which Rubicon announced on May 23, 2006.

In its review of Rubicon's properties and related interests for purposes of preparing the Updated Presentation, RCC again considered and reviewed such matters as business and financial data; interviews with Rubicon's management; a review of companies comparable to Rubicon; and trading analysis. RCC undertook the following analysis and methodologies: a discounted cash flow analysis; a comparable companies analysis; an expenditure and market capitalization analysis; a share trading summary; a shareholder summary; a float turn-over analysis; a volume at price analysis; and a volume weighted average price analysis.

The Updated Presentation again concluded that Rubicon's asset value was not reflected in its share price. The Updated Presentation is not a formal valuation of Rubicon or any of its assets, but rather an updated analysis for the Board of Directors of Rubicon of the potential for shareholder value enhancements through a separation of Rubicon's assets (as proposed under the Plan of Arrangement).

*Rubicon Support Agreements and Arrangement Agreement*

Rubicon has recently been in discussions with certain significant Shareholders ("**Significant Rubicon Shareholders**") in order to obtain their formal support for the Arrangement by way of support agreements. As of the date of this Circular, seven such support agreements have been entered into with Shareholders holding in the aggregate 13,494,685 Rubicon Common Shares, or approximately 17.7% of the currently issued and outstanding Rubicon Common Shares.

On July 6, 2006, after reaching agreement on the remaining business, tax, regulatory and other issues, Rubicon, Africo, Paragon and CopperCo entered into the Arrangement Agreement. See "The Arrangement – Rubicon Support Agreements" and "Arrangement Agreement."

**Reasons for the Arrangement**

The Board of Directors of Rubicon has concluded that the proposed corporate reorganization pursuant to the Arrangement is in the best interests of Rubicon and its Shareholders, and is designed to enhance Shareholder value, for the following primary reasons:

1. Rubicon believes its current interest in Africo is not reflected in the Rubicon Common Share price and that this asset can be more effectively managed within its own company. Rubicon also believes that the interest in Africo could generate significant Shareholder value provided that Africo achieves its milestones of feasibility, resource expansion and production of the Kalukundi Copper-Cobalt deposit located in the DRC;

2. The formation of CopperCo and the distribution under the Arrangement of CopperCo Common Shares to the Shareholders will give them a direct interest in a company whose primary focus, through Africo, will be to advance the Kalukundi Copper-Cobalt deposit to production;

3. Rubicon believes that it has advanced its Newfoundland assets to the point where they can be more effectively explored within a new company. A new public company will facilitate separate fundraising, exploration and development strategies that will be required to move these properties forward;

4. The formation of Paragon and the distribution under the Arrangement of Paragon Common Shares to the Shareholders will give them a direct interest in a more aggressive exploration company whose primary focus will be to advance and develop gold and base metal projects in Atlantic Canada;

5. The ownership of the Newfoundland exploration assets by Paragon and the African assets by CopperCo, through Africo its wholly-owned subsidiary, will enable them to be more appropriately valued in the public market. The separation of these assets from Rubicon will allow a more accurate valuation of Rubicon, Paragon and CopperCo on a standalone basis against similar mineral exploration and development companies and industry benchmarks. The Board of Directors of Rubicon believes this should enhance the likelihood that each entity will achieve appropriate market recognition, and allow the holders of Paragon Common Shares, CopperCo Common Shares and New Rubicon Common Shares to realize value which should be attributed to the separate companies;

6. As separate public companies, Paragon and CopperCo will have direct access to public and private capital markets and will be able to issue debt and equity to fund exploration of their respective mineral properties;

7. As separate public companies, Paragon and CopperCo will be able to establish equity based compensation programs that should enable them to better attract, motivate and retain key employees; and

8. Rubicon will continue to be a leading exploration company in the Red Lake Gold Camp and will continue its focus on the exploration and development of its Red Lake gold properties.

David W. Adamson is a Director of Africo (as one of Rubicon's two representatives on the Africo board) and in such capacity has received certain compensation described in "Interest of Certain Persons or Companies in Matters to Be Acted Upon." Mr. Adamson declared his interest in such matters to the Board of Directors of Rubicon at the

meeting which was held to consider and approve the Arrangement, and abstained from voting on the Rubicon directors' resolutions approving the Arrangement and all related matters. See also Schedule "K", "Information Concerning CopperCo After the Arrangement – Executive Compensation."

**Details of the Arrangement**

*The following description of the Arrangement is qualified in its entirety by reference to the full text of the Arrangement Agreement, a copy of which is annexed as Schedule "D" to this Circular, and the Plan of Arrangement, which forms Appendix I to the Arrangement Agreement. Each of these documents should be read carefully in its entirety.*

Pursuant to the Plan of Arrangement, save and except for Dissenting Shares, the following principal steps will occur and be deemed to occur in the following chronological order as part of the Arrangement:

(a) Rubicon's authorized share structure shall be amended by:

(i) altering the name of the unlimited number of common shares without par value to be an unlimited number of Class A Common shares without par value;

(ii) creating the following three new classes of shares:

A. an unlimited number of common shares without par value;

B. an unlimited number of series 1 special shares with a par value equal to the net book value of the Paragon Transferred Assets; and

C. an unlimited number of series 2 special shares with a par value equal to the net book value of the Rubicon Africo Shares.

The shares of Rubicon described above shall have the rights and restrictions set out in Rubicon's Articles. Rubicon's Articles shall be amended by adding, as Article 26 of the Articles, the rights and restrictions set out in Schedule "A" of the Plan of Arrangement;

(b) Rubicon's central securities register for the Rubicon Common Shares shall be redesignated as the central securities register for the Class A Common shares;

(c) Paragon's authorized share structure shall be amended by creating a new class of shares consisting of an unlimited number of special preferred shares and having the rights and restrictions set out in Paragon's Articles. Paragon's Articles shall be amended by adding the rights and restrictions set out in Schedule "B" of the Plan of Arrangement;

(d) CopperCo's authorized share structure shall be amended by creating a new class of shares consisting of an unlimited number of special preferred shares and having the rights and restrictions set out in CopperCo's Articles. CopperCo's Articles shall be amended by adding the rights and restrictions set out in Schedule "B" of the Plan of Arrangement;

(e) Each Rubicon Common Share (renamed as Class A Common Shares) issued and outstanding on the Effective Date (other than Dissenting Shares) will be exchanged for one New Rubicon Common Share, one Rubicon Series 1 Special Share and one Rubicon Series 2 Special Share. The PUC of the New Rubicon Common Shares, the Rubicon Series 1 Special Shares and the Series 2 Special Shares will be determined as follows:

(i) the amount of the PUC of the Rubicon Series 1 Special Shares will be equal to their par value;

(ii) the amount of the PUC of the Rubicon Series 2 Special Shares will be equal to their par value; and

(iii) the amount of the PUC of the New Rubicon Common Shares will be equal to the PUC of the Rubicon Common Shares (renamed as Class A Common Shares) minus the aggregate of the PUC of the Rubicon Series 1 and 2 Special Shares;

Each Rubicon Shareholder shall cease to be the holder of the Rubicon Common Shares (renamed as Class A Common Shares) so exchanged and shall become the holder of the number of New Rubicon Common Shares, Rubicon Series 1 Special Shares and Series 2 Special Shares issued to such Rubicon Shareholder. The name of such Rubicon Shareholder shall be removed from the central securities register for Rubicon Common Shares in respect of the Rubicon Common Shares so exchanged and shall be added to the central securities register of New Rubicon Common Shares, Rubicon Series 1 Special Shares and Series 2 Special Shares respectively, so issued to such Rubicon Shareholder;

(f) Each outstanding whole Rubicon Option will be exchanged for one whole New Rubicon Option, one sixth of a Paragon Option and a fraction of a CopperCo Option equal to the Rubicon-CopperCo Exchange Ratio. The exercise price of each of the new options received as a result of such exchange will be determined as set out in "Effect of Arrangement on Certain Outstanding Securities of Rubicon – Stock Options";

(g) The Rubicon Common Shares (renamed as Class A Common Shares) exchanged for New Rubicon Common Shares, the Rubicon Series 1 Special Shares and the Rubicon Series 2 Special Shares shall be cancelled and the appropriate entry shall be made in Rubicon's central securities register;

(h) Each holder of Rubicon Series 1 Special Shares will transfer, with good and marketable title free and clear of all encumbrances, such shares to Paragon;

(i) Each holder of Rubicon Series 2 Special Shares will transfer, with good and marketable title free and clear of all encumbrances, such shares to CopperCo;

(j) As consideration for the Rubicon Series 1 Special Shares transferred to it, Paragon will issue to the holders of such Rubicon Series 1 Special Shares, Paragon Common Shares on the basis of one Paragon Common Share for every six whole Rubicon Series 1 Special Shares held by a respective holder. The stated capital account maintained in respect of Paragon Common Shares shall be increased by an amount equal to the PUC of the transferred Rubicon Series 1 Special Shares. In connection with such sale and transfer, each holder of Rubicon Series 1 Special Shares so sold and transferred shall cease to be the holder of the Rubicon Series 1 Special Shares so sold and transferred and shall become the holder of the number of Paragon Common Shares issued to such holder. The name of such holder shall be removed from the central securities register of Rubicon Series 1 Special Shares in respect of the Rubicon Series 1 Special Shares so sold and transferred and shall be added to the central securities register of Paragon as the holder of the number of Paragon Common Shares so issued to such holder, and Paragon shall be and shall be deemed to be the transferee of the Rubicon Series 1 Special Shares so transferred and the name of Paragon shall be entered in the central securities register of Rubicon Series 1 Special Shares so sold and transferred to Paragon;

(k) As consideration for the Rubicon Series 2 Special Shares transferred to it, CopperCo will issue to the holders of such Rubicon Series 2 Special Shares, that number of CopperCo Common Shares obtained by multiplying the number of Rubicon Series 2 Special Shares held by a respective holder by the Rubicon-CopperCo Exchange Ratio. The stated capital account maintained in respect of CopperCo Common Shares shall be increased by an amount equal to the PUC of the transferred Rubicon Series 2 Special Shares. In connection with such sale and transfer, each

holder of Rubicon Series 2 Special Shares so sold and transferred shall cease to be the holder of the Rubicon Series 2 Special Shares so sold and transferred and become the holder of the number of CopperCo Common Shares issued to such holder. The name of such holder shall be removed from the central securities register of Rubicon Series 2 Special Shares in respect of the Rubicon Series 2 Special Shares so sold and transferred and shall be added to the central securities register of CopperCo as the holder of the number of CopperCo Common Shares so issued to such holder and CopperCo shall be and shall be deemed to be the transferee of the Rubicon Series 2 Special Shares so transferred and the name of CopperCo shall be entered in the central securities register of Rubicon Series 2 Special Shares so sold and transferred to CopperCo;

(l) Rubicon will sell and transfer the Paragon Transferred Assets to Paragon in consideration for the issuance by Paragon of 1,000 Paragon Preferred Shares. Rubicon shall take all such actions and deliver all such documents as may be required to convey title to the Paragon Transferred Assets to Paragon;

(m) Rubicon will sell and transfer the CopperCo Transferred Assets to CopperCo in consideration for the issuance by CopperCo of 1,000 CopperCo Preferred Shares. Rubicon shall take all such actions and deliver all such documents as may be required to convey title to the CopperCo Transferred Assets to CopperCo;

(n) Rubicon will purchase for cancellation the Rubicon Series 1 Special Shares held by Paragon in consideration of the issuance by Rubicon of the Rubicon Paragon Note. The repurchased Rubicon Series 1 Special Shares shall be cancelled and the appropriate entry made on the central securities register for the Series 1 Special Shares;

(o) Rubicon will purchase for cancellation the Rubicon Series 2 Special Shares held by CopperCo in consideration of the issuance by Rubicon of the Rubicon CopperCo Note. The repurchased Rubicon Series 2 Special Shares shall be cancelled and the appropriate entry made on the central securities register for the Series 2 Special Shares;

(p) The authorized share structure of Rubicon shall be amended by eliminating the unlimited number of Class A Common Shares without par value, the unlimited number of Series 1 Special Shares and the unlimited number of Series 2 Special Shares, none of which are issued. Rubicon's Articles shall be amended by deleting Article 26 of the Articles (for greater certainty, notwithstanding such deletion of Article 26, the New Rubicon Common Shares shall continue to exist immediately upon completion of the Arrangement, as evidenced by Rubicon's Notice of Articles in effect at such time);

(q) Paragon will purchase for cancellation the 1,000 Paragon Preferred Shares held by Rubicon in consideration for the issuance by Paragon to Rubicon of the Paragon Note having a principal amount and fair market value equal to the aggregate fair market value of the 1,000 Paragon Preferred Shares purchased for cancellation. The repurchased Paragon Preferred Shares shall be cancelled and the appropriate entry made on the central securities register for the Paragon Preferred Shares;

(r) The authorized share structure of Paragon shall be amended by eliminating the Paragon Preferred Shares, none of which are issued. Paragon's Articles shall be amended by deleting sections 1.1 to 1.5 of the Articles which contain the rights and restrictions attached to the Paragon Preferred Shares;

(s) CopperCo will purchase for cancellation the 1,000 CopperCo Preferred Shares held by Rubicon in consideration for the issuance by CopperCo to Rubicon of the CopperCo Note having a principal amount and fair market value equal to the aggregate fair market value of the 1,000 CopperCo Preferred Shares purchased for cancellation. The repurchased CopperCo Preferred Shares shall be

cancelled and the appropriate entry made on the central securities register for the CopperCo Preferred Shares;

(t) The authorized share structure of CopperCo shall be amended by eliminating the CopperCo Preferred Shares; none of which are issued. CopperCo's Articles shall be amended by deleting sections 1.1 to 1.5 of the Articles which contain the rights and restrictions attached to the CopperCo Preferred Shares;

(u) Rubicon will pay the principal amount of the Rubicon Paragon Note by transferring to Paragon the Paragon Note which will be accepted by Paragon as full payment, satisfaction and discharge of Rubicon's obligation under the Rubicon Paragon Note and simultaneously Paragon will pay the principal amount of the Paragon Note by transferring to Rubicon the Rubicon Paragon Note which will be accepted by Rubicon as full payment, satisfaction and discharge of Paragon's obligation under the Paragon Note. The Rubicon Paragon Note and the Paragon Note will both thereupon be cancelled;

(v) Rubicon will pay the principal amount of the Rubicon CopperCo Note by transferring to CopperCo the CopperCo Note which will be accepted by CopperCo as full payment, satisfaction and discharge of Rubicon's obligation under the Rubicon CopperCo Note and simultaneously CopperCo will pay the principal amount of the CopperCo Note by transferring to Rubicon the Rubicon CopperCo Note which will be accepted by Rubicon as full payment, satisfaction and discharge of CopperCo's obligation under the CopperCo Note. The Rubicon CopperCo Note and the CopperCo Note will both thereupon be cancelled;

(w) the Paragon Flow-Through Special Warrants issued pursuant to the Paragon Financing shall be automatically exercised, through no further action on the part of the holder and for no additional consideration, into flow-through Paragon Common Shares on the basis of one flow-though Paragon Common Share for each Paragon Flow-Through Special Warrant exercised, and the names of the holders of the Paragon Flow-Through Special Warrants shall be added to the central securities register of Paragon as the holders of the number of Paragon Common Shares issued to such holders;

(x) the Paragon Special Warrants issued pursuant to the Paragon Financing shall be automatically exercised, through no further action on the part of the holder and for no additional consideration, into Paragon Common Shares and Paragon Warrants, on the basis of one Paragon Common Share and one Paragon Warrant for each Paragon Special Warrant exercised, and the names of the holders of the Paragon Special Warrants shall be added to the central securities register of Paragon as the holders of the number of Paragon Common Shares issued to such holders;

(y) The CopperCo/Africo Special Warrants issued pursuant to the CopperCo/Africo Financing shall be automatically exercised, through no further action on the part of the holder and for no additional consideration, into CopperCo Common Shares, on the basis of one CopperCo Common Share for each CopperCo/Africo Special Warrant exercised, and the names of the holders of the CopperCo/Africo Special Warrants shall be added to the central securities register of CopperCo as the holders of the number of CopperCo Common Shares issued to such holders;

(z) Each holder of the Remaining Africo Shares will transfer, with good and marketable title free and clear of all encumbrances, such shares to CopperCo;

(aa) As consideration for the Remaining Africo Shares transferred to it, CopperCo will issue to the holders of such Remaining Africo Shares, CopperCo Common Shares on the basis of one CopperCo Common Share for every whole Remaining Africo Shares held by a respective holder. The stated capital account maintained in respect of CopperCo Common Shares shall be increased to the maximum amount permitted under the ITA. In connection with such sale and transfer, each holder of Remaining Africo Shares so sold and transferred shall cease to be the holder of the

Remaining Africo Shares so sold and transferred and become the holder of the number of CopperCo Common Shares issued to such holder. The name of such holder shall be removed from the central securities register of Africo Shares in respect of the Remaining Africo Shares so sold and transferred and shall be added to the central securities register of CopperCo as the holder of the number of CopperCo Common Shares so issued to such holder and CopperCo shall be and shall be deemed to be the transferee of the Remaining Africo Shares so transferred and the name of CopperCo shall be entered in the central securities register of Africo Shares so sold and transferred to CopperCo;

(bb) Each outstanding whole Africo Option will be exchanged for one whole CopperCo Option. The exercise price of each of the new CopperCo Options received on such exchange will be identical to the exercise price for the Africo Option which was exchanged for such CopperCo Option;

(cc) The name of Africo will be changed to Africo Resources (B.C.) Ltd.; and

(dd) The name of CopperCo will be changed to Africo Resources Ltd.

**Arrangement Agreement**

Rubicon has entered into the Arrangement Agreement for the purpose of carrying out the Plan of Arrangement and consummating the transactions contemplated by the Plan of Arrangement. The Arrangement Agreement contains covenants, conditions and termination provisions by which the parties to the Arrangement Agreement are bound. The parties to the Arrangement Agreement have also made certain representations and warranties to each other and have agreed to certain other terms and conditions which are standard in a transaction of the nature embodied by the Arrangement.

In addition, the Arrangement Agreement provides that it may be amended by Rubicon before or after the Meeting without further notice to, or the approval of, the Shareholders. The Board of Directors of Rubicon considers it appropriate to retain the flexibility not to proceed with the Arrangement should some event occur after the Meeting and prior to the Effective Date which in the opinion of the Board of Directors of Rubicon makes it inappropriate to complete the Arrangement. The full text of the Arrangement Agreement is attached as Schedule "D" to this Circular and the Plan of Arrangement is attached as Appendix I to the Arrangement Agreement.

Shareholders should be aware that by passing the Special Resolution approving the Arrangement, the Shareholders will also be giving authority to the Board of Directors of Rubicon to use its best judgment to proceed with and cause Rubicon to complete the Arrangement in the event of any variation of, or amendments to, the Arrangement Agreement and/or the terms and conditions of the Paragon Financing by Rubicon and the Africo Financing by Africo - without any requirement to seek or obtain any further approval of the Shareholders. Any such variation of the terms and conditions of the Arrangement Agreement or the may result in further dilution of Paragon and CopperCo, in excess of the dilution currently assumed and otherwise disclosed in this Circular.

**Tax - Related Covenants**

In order to realize the tax objectives of the Arrangement, neither CopperCo nor any successor thereof will for a period of two years from the Effective Date initiate a request for approval by its shareholders of a modification of the Articles of CopperCo to remove the Director Election Requirements (as defined below). However, CopperCo (or any successor) will not be in breach of this covenant if (i) a shareholder proposal is made under section 137 of the CBCA for such purpose, (ii) a meeting is requisitioned under section 143 or section 144 of the CBCA to consider such matter, or (iii) there is a genuine risk that a proceeding for an oppression remedy under the CBCA in such regard would be successful. Further, in the event of a shareholder proposal or requisition referred to in (i) or (ii) above, CopperCo (or any successor) will not take any action to encourage a vote in favour of the removal of the Director Election Requirements unless such action is either: (A) required by law, or (B) determined in good faith by the Board of Directors of CopperCo (or the board of directors of any successor) to be consistent with the discharge of such board's fiduciary duties in the circumstances.

Also in furtherance of the tax objectives of the Arrangement, each party has covenanted as follows:

(a) in the event that the condition precedent with respect to the Tax Ruling is satisfied, that such party will not take any action, omit to take any action or enter into any transaction that could cause the Plan of Arrangement or any related transaction to be taxed in a manner inconsistent with that provided for in the Tax Ruling without (i) obtaining a supplementary tax ruling or an opinion of a nationally recognized accounting firm or law firm that such actions, omissions or transactions will not have such effect in respect of the Tax Ruling or the obtaining thereof and (ii) for a period of three years after the Effective Date, obtaining the consent of each of Rubicon, CopperCo, Paragon and Africo, such consent not to be unreasonably withheld or delayed;

(b) in the event that the condition precedent with respect to the Tax Ruling is waived, but it is agreed by the parties that as a condition of such waiver Rubicon shall obtain an opinion of a nationally recognized accounting firm or law firm, that such party will not take any action, omit to take any action or enter into any transaction that could cause the Plan of Arrangement or any related transaction to be taxed in a manner inconsistent with that provided for in the opinion without (i) obtaining a supplementary opinion of a nationally recognized accounting firm or law firm that such actions, omissions or transactions will not have such effect in respect of the opinion and (ii) for a period of three years after the Effective Date, obtaining the consent of each of Rubicon, CopperCo, Paragon and Africo, such consent not to be unreasonably withheld or delayed;

(c) to file its tax returns and section 85 elections pursuant to the ITA and to make adjustments to its capital account in accordance with the terms of the Plan of Arrangement following the Effective Date; and

(d) to cooperate in the preparation and filing, in the form and within the time limits prescribed in the ITA, of all elections under the ITA as contemplated in the Plan of Arrangement and the Arrangement Agreement (and any similar elections that may be required under applicable provincial or foreign legislation). Where an agreed amount is to be included in any such election, such amount will be within the range contemplated by the ITA (or applicable provincial or foreign legislation) and will be the amount contemplated by the Plan of Arrangement and the Arrangement Agreement, such that the particular transfer will take place on an income tax-deferred basis.

**Approval of the Arrangement**

The Arrangement is subject to a number of approvals which must be obtained prior to implementation, including Shareholder, Court, and regulatory approvals as follows:

*Shareholder Approval*

As provided in the Interim Order, in order for the Arrangement to become effective, the Arrangement Resolution must be passed, with or without variation, by the Shareholders by Special Resolution. The full text of the Arrangement Resolution is substantially set out in Schedule “E” of this Management Information Circular under “Arrangement Resolution”. The approval of the Arrangement by Special Resolution of the Africo Shareholders is also required.

*Court Approval*

A statutory arrangement under the BCBCA requires Court approval. Prior to the mailing of this Circular, Rubicon obtained the Interim Order which, among other things, provides for the calling and holding of the Meeting, and certain other procedural matters, and caused to be issued a Notice of Hearing of Petition for the Final Order to approve the Arrangement. The Interim Order does not constitute approval of the Arrangement by the Court. A copy of the Interim Order and the Notice of Hearing of Petition for the Final Order are set forth in Schedules “B” and “C”, respectively, to this Circular.

As set out in the Notice of Hearing of Petition, the hearing in respect of the Final Order is scheduled to take place at 9:45 a.m. (Vancouver time) on August 15, 2006, or so soon thereafter as counsel may be heard, or at such other date and time as the Court may direct at the Law Courts, 800 Smithe Street, Vancouver, British Columbia, subject to approval of the Arrangement by the Shareholders. Any person affected by the Agreement, including any Shareholder, has the right to appear at such hearing and present evidence or argument, subject to the rules of the Court and any Court Order made. The Interim Order provides that any person wishing to appear in opposition to the petition for the Final Order must give Rubicon notice of such person's intention to do so on or before 4:00 p.m. on August 11, 2006.

The authority of the Court is very broad under section 291 of the BCBCA. Rubicon has been advised by its legal counsel that the Court may make any inquiry it considers appropriate and may make any order it considers appropriate with respect to the Arrangement. The Court will consider, among other things, the fairness and reasonableness to the Shareholders of the Arrangement in its entirety. The Court may approve the Arrangement either as proposed or as amended in any manner the Court may direct, subject to compliance with such terms and conditions, if any, as the Court considers fit. The Court will be advised, prior to the hearing, that the Court's approval of the Arrangement will form the basis for an exemption from registration requirements of the 1933 Act pursuant to Section 3(a)(10) thereof with respect to the New Rubicon Common Shares, the Paragon Common Shares and the CopperCo Common Shares to be distributed pursuant to the Arrangement.

*Regulatory Approval*

The Arrangement is subject to prior approval of the TSX, TSX-V and AMEX.

*Consequences if Approvals Not Obtained*

If the Arrangement is not approved by the Shareholders or the Court in the manner described above, the Arrangement will not be completed.

**Conditions to the Arrangement**

In addition to Shareholder, Court and regulatory approval, the Arrangement Agreement provides that the implementation of the Arrangement is subject to satisfaction of various conditions on or prior to the Effective Date, certain of which are summarized below:

(a) the Interim Order shall have been granted in form and substance satisfactory to Rubicon and Africo, acting reasonably;

(b) the Arrangement, with or without amendment, shall have been approved at the Meetings by the Rubicon and Africo Shareholders in accordance with the Interim Order;

(c) the Final Order shall have been granted in form and substance satisfactory to Rubicon and Africo, acting reasonably;

(d) the TSX and AMEX will have conditionally accepted the Arrangement and confirmed that the New Rubicon Common Shares and the Rubicon Series 1 and Series 2 Special Shares have been conditionally approved for listing on the TSX and AMEX, and the TSX will have confirmed that the CopperCo Common Shares have been conditionally approved for listing on the TSX;

(e) the TSX-V will have confirmed that the Paragon Common Shares have been conditionally listed on Tier 1 or Tier 2 of the TSX-V;

(f) all other consents, orders, rulings, approvals and assurances, including regulatory and judicial approvals and orders required, necessary or desirable for the Arrangement to become effective shall have been obtained or received from the Persons, authorities or bodies having jurisdiction in the circumstances, in a form acceptable to Rubicon and Africo, acting reasonably;

(g) notices of dissent shall not have been delivered by Rubicon Shareholders holding such number of Rubicon Common Shares that, in Rubicon's opinion, completion of the Arrangement would not be in the best interests of Rubicon;

(h) notices of dissent shall not have been delivered by Africo Shareholders holding such number of Africo Shares that, in Africo's opinion, completion of the Arrangement would not be in the best interests of Africo;

(i) Paragon shall have completed the Paragon Financing, subject only to any requirement under the terms of the Financing to complete the Arrangement;

(j) CopperCo or Africo shall have completed the CopperCo/Africo Financing for gross proceeds of at least $75 million, or such lesser amount as may be determined by the Board of CopperCo or Africo, as the case may be, subject only to any requirement under the terms of the CopperCo/Africo Financing to complete the Arrangement;

(k) any Person who will hold, together with any Associates of such Person, immediately before or immediately after completion of the Arrangement, 10% or more of the outstanding New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares shall have executed a certificate or other document representing that such Person and its Associates will not sell any such shares as part of the same series of transactions comprising the Arrangement;

(l) the Articles of CopperCo shall provide that each director of CopperCo must be elected by a resolution passed by not less than two-thirds of the number of votes attaching to the shares represented in person or by valid proxy at the meeting of CopperCo shareholders at which the resolution is voted upon and carrying the right to vote on the resolution, as determined and certified by the scrutineers for that meeting or signed by all the shareholders entitled to vote on that resolution (the "**Director Election Requirements**");

(m) the Tax Ruling shall have been obtained in form and substance satisfactory to Rubicon, Africo and the auditors of Africo and their counsel and CopperCo, acting reasonably;

(n) there shall not be in force any order or decree restraining or enjoining the consummation of the transaction contemplated by this Agreement; and

(o) the Arrangement Agreement shall not have been terminated.

Except for the conditions set forth at 1.1(a), (b), (c), (k) and (l) above, any of the foregoing conditions may be waived.

If any of the conditions set out in the Arrangement Agreement are not fulfilled or performed, Rubicon may terminate the Arrangement Agreement. As soon as practicable after the fulfillment of the conditions contained in the Arrangement Agreement, the Board of Directors of Rubicon intends to cause a certified copy of the Final Order to be filed with the Registrar under the BCBCA, together with such other material as may be required by the Registrar in order that the Arrangement will become effective.

Management of Rubicon believes that all material consents, orders, rulings, approvals and assurances required to complete the Arrangement will be obtained prior to the Effective Date in the normal course upon application therefor. There can, however, be no assurance that all of the conditions to the Arrangement will be fulfilled prior to the Effective Date. The fulfillment of certain of the conditions may be waived by mutual agreement of Rubicon, Paragon and CopperCo.

Notwithstanding the fulfillment, or waiver, of the foregoing and other conditions, the Board of Directors of Rubicon may decide at any time before or after the Meeting and prior to the Effective Date not to proceed with the Arrangement, in which event the Arrangement Agreement will be terminated without any further action on the part

of the Shareholders or the Court. The Board of Directors of Rubicon considers it appropriate to retain the flexibility not to proceed with the Arrangement should some event occur prior to the Arrangement becoming effective which in the opinion of the Board of Directors of Rubicon makes it inappropriate to complete the Arrangement. The Arrangement Resolution to be considered and passed by the Shareholders at the Meeting authorizes such action by the Board of Directors of Rubicon. Africo also has similar termination rights – see "Termination".

**Fairness of the Arrangement**

The Arrangement was determined to be fair to the Shareholders by management and the Board of Directors of Rubicon based upon the following factors, among others:

1. the procedures by which the Arrangement will be approved, including the requirement for sixty-six and two thirds Shareholder approval, approval by the Court after a hearing at which fairness will be considered, and regulatory approval;

2. the proposed listing of the Paragon Common Shares on the TSX-V and the CopperCo Common Shares on the TSX, and the proposed continued listing of the New Rubicon Common Shares on the TSX and AMEX;

3. the opportunity for Shareholders who are opposed to the Arrangement, upon compliance with certain conditions, to dissent from the approval of the Arrangement in accordance with the Interim Order, and to be paid fair value for their Rubicon Common Shares;

4. Rubicon commissioned an internal analysis by its financial advisor RFC, as well as the Updated Presentation by RCC, acting as independent financial advisor. In the Updated Presentation, RCC concluded that Rubicon's asset value is not fully reflected in its share price and that Rubicon is currently trading below the combined value of its various assets; and

5. each Shareholder on the Share Distribution Record Date will participate in the Arrangement on a *pro rata* basis and, upon completion of the Arrangement and, except for dilution occurring via the Paragon and CopperCo/Africo Financings, will continue to hold the same *pro rata* interest that the Shareholder held in Rubicon prior to completion of the Arrangement, as a result of the Shareholder's holdings of New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares.

**Recommendation of Directors**

The Board of Directors of Rubicon approved and recommended and authorized the submission of the Arrangement to its Shareholders and the Court for approval. **The Board of Directors of Rubicon has concluded that the Arrangement is in the best interests of Rubicon and its Shareholders, and recommends that the Shareholders vote in favour of the Special Resolution proposed to be passed at the Meeting as set forth in Schedule "E".** David W. Adamson, a Director and Rubicon's President and CEO, abstained from voting on the foregoing resolutions on account of certain interests which Mr. Adamson has in the proposed transactions – see "The Arrangement – Reasons for the Arrangement".

**Unless otherwise directed, it is the intention of the Management Designees, if named as proxy, to vote in favour of the Special Resolution.**

In reaching this conclusion, the Board of Directors of Rubicon considered the benefits to Rubicon and its Shareholders as well as the financial position, opportunities and the outlook for the future potential and operating performance of Rubicon, Paragon and CopperCo, respectively.

**Proposed Timetable for the Arrangement**

The anticipated timetable for the completion of the Arrangement and the key dates proposed are as follows:

| | |
|---|---|
| Interim Court Order | Friday, July 7, 2006 |
| Annual General & Special Meeting | Tuesday, August 8, 2006 |

| | |
|---|---|
| Final Court Order | Tuesday, August 15, 2006 |
| Effective Date | Thursday, August 17, 2006 |
| Share Distribution Record Date | Monday, August 28, 2006 |
| Mailing of Certificates | Friday, September 1, 2006 |

Upon receipt of Shareholder, Court and regulatory approvals, and satisfaction of all other conditions set forth in the Arrangement Agreement, the Board of Directors of Rubicon intends to make the Arrangement effective. Making the Arrangement effective will be subject to obtaining the Final Order of the Court. If the Final Order approving the Arrangement is granted on August 15 it is expected that the Effective Date will be on or about August 17, 2006. Rubicon will announce the Effective Date and related matters via news release following receipt of the Final Order. The Boards of Directors of Rubicon, Paragon, CopperCo and Africo will determine the exact Effective Date depending on when all the conditions to the completion of the Arrangement are satisfied. Notice of the actual Share Distribution Record Date and Effective Date will be given to Shareholders through a news release and a TSX Bulletin when all the conditions to the Arrangement have been met or the Court and the Boards of Directors of Rubicon and Africo are of the view that all transactions will be completed.

**Relationship between Rubicon, Paragon and CopperCo after the Arrangement**

Two of the directors of Paragon, Garfield MacVeigh and David Adamson, are directors of Rubicon and four of the proposed officers of Paragon are also officers or employees of Rubicon: Michael Vande Guchte, President, CEO and a director of Paragon, is currently Manager Corporate Development for Rubicon; Garfield McVeigh, Vice-President Exploration for Paragon is currently Chairman of the Board of Directors of Rubicon; Robert G. Lewis, Chief Financial Officer and Secretary of Paragon, holds the position of Chief Financial Officer at Rubicon; and William J. Cavalluzzo is Vice-President Investor Relations for Paragon and Rubicon. See "Information Concerning Paragon After the Arrangement – Proposed Directors and Officers of Paragon".

One of the directors of CopperCo, David Adamson, is also a director, President and CEO of Rubicon. See "Information Concerning CopperCo After the Arrangement – Proposed Directors and Officers of CopperCo."

**Effect of Arrangement on Certain Outstanding Securities of Rubicon**

*Share Purchase Warrants*

After the Effective Date, each whole Rubicon Warrant outstanding on the Effective Date (as well as each whole Rubicon Warrant which is issuable on exercise of the Compensation Options) will entitle the holder thereof to receive, upon exercise on or after the Effective Date, from Rubicon pursuant to the Rubicon Commitment one New Rubicon Common Share, from Paragon pursuant to the Paragon Commitment one-sixth (1/6) of a Paragon Common Share and from CopperCo pursuant to the CopperCo Commitment a fraction of a CopperCo Common Share equal to the Rubicon-CopperCo Exchange Ratio at an aggregate exercise price equal to the exercise price provided for in the certificate representing such Rubicon Warrant, subject to the terms and conditions contained in such certificate. Holders of Rubicon Warrants will not be permitted to exercise Rubicon Warrants to purchase New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares separately from each other.

Rubicon, acting as agent for Paragon and CopperCo, will distribute the net proceeds from the exercise of any Rubicon Warrants after the Effective Date such that Rubicon will receive 51.2% of the net proceeds per New Rubicon Common Share issued, Paragon will receive 5.8% of the net proceeds per Paragon Common Share issued and CopperCo will receive, on behalf of Rubicon, 43% of the net proceeds per CopperCo Common Share issued (following which CopperCo will remit any such amount received to Rubicon). For the purposes of this provision, Rubicon will not acquire any beneficial ownership in the Paragon Common Shares or the CopperCo Common Shares issued upon the exercise of the Rubicon Warrants.

From the Effective Time, certificates representing Rubicon Warrants which were outstanding on the Effective Date will represent rights to purchase the same number of New Rubicon Common Shares as represented by the certificate, a number of Paragon Common Shares which is one-sixth of the number represented by the certificate

and a number of CopperCo Common Shares which is equal to the number represented by the certificate multiplied by the Rubicon-CopperCo Exchange Ratio. Rubicon, Paragon and CopperCo will not issue new warrant certificates representing such rights.

*Stock Options*

Each outstanding whole Rubicon Option will be exchanged for one whole New Rubicon Option, one sixth of a Paragon Option and a fraction of a CopperCo Option equal to the Rubicon-CopperCo Exchange Ratio. The exercise price (the "**Adjusted Exercise Price**") of each of the New Rubicon Options, the Paragon Options and the CopperCo Options issued under the Plan of Arrangement will be determined in accordance with the following formula and rounded up to the nearest whole cent:

$$\text{Adjusted Exercise Price} = \text{Trading Price} \times \frac{\text{Original Exercise Price}}{\text{Aggregate Exchange Trading Price}}$$

With respect to any such CopperCo Options, the funds representing the exercise price shall be delivered to CopperCo, which in turn shall remit such funds to Rubicon. It shall be a condition of issuance of any such Paragon Options and CopperCo Options that, to the extent that the holder is not an employee, consultant, director or senior officer of Paragon or CopperCo, as the case may be, such options shall expire on termination of the holder's position as an employee, consultant, director or senior officer of Rubicon, according to the terms of the grant of such holder's Rubicon Options which existed prior to the Effective Date.

*Unexercised New Rubicon Options, Paragon Options or CopperCo Options*

Any Rubicon Warrants referred to in section 3.2 of the Plan of Arrangement and any New Rubicon Options, Paragon Options or CopperCo Options referred to in section 3.3 of the Plan of Arrangement which expire according to their terms without being exercised by the holders shall be exercisable by Rubicon, at Rubicon's election, for a period of 30 days following the relevant expiry date. If Rubicon exercises any such Rubicon Warrants, New Rubicon Options, Paragon Options or CopperCo Options during such 30-day period, the consideration paid by Rubicon on exercise shall be delivered, received and remitted, as the case may be, as set out in sections 3.2 and 3.3 of the Plan of Arrangement, *mutatis mutandis*.

*Rubicon Property Share Issuances*

Under the terms of the property option agreements which Rubicon is assigning to Paragon and which include, as payment or part payment, an obligation to issue Rubicon Common Shares, the agreements specifically provide that upon completion of the Arrangement, the property vendors will be entitled to receive a specified number of Paragon Common Shares instead of the Rubicon Common Shares to which they would have otherwise been entitled. Rubicon has covenanted under the Arrangement Agreement that Rubicon will use all reasonable efforts to ensure that, immediately prior to the Effective Date, Rubicon will not have any Rubicon Property Share Requirements, except as described above.

**Distribution of Share Certificates**

Pursuant to the Plan of Arrangement, the close of business on that day which is seven Business Days after the Effective Date is expected to be established as the Share Distribution Record Date for purposes of determining Shareholders who will be entitled to receive certificates representing Paragon Common Shares and CopperCo Common Shares. After the Share Distribution Record Date, the share certificates representing, on their face, Rubicon Common Shares will be deemed to represent only New Rubicon Common Shares. Before the Share Distribution Record Date, the share certificates representing, on their face, Rubicon Common Shares will be deemed under the Plan of Arrangement to represent the New Rubicon, Paragon and CopperCo Common Shares. **No new share certificates will be issued for the New Rubicon Common Shares issued pursuant to the Arrangement and therefore holders of Rubicon Common Shares must retain their certificates as evidence of their ownership of New Rubicon Common Shares.** As soon as practicable after the Share Distribution Record Date, new share certificates representing the Paragon Common Shares and CopperCo Common Shares will be sent to all holders of record on the Share Distribution Record Date of Rubicon Common Shares. Certificates representing, on

their face, Rubicon Common Shares will constitute good delivery in connection with the sale of New Rubicon Common Shares completed through the facilities of the TSX after the Share Distribution Record Date.

**Treatment of Fractional Shares**

Under the Arrangement, no fractional shares will be issued and fractional interests in Rubicon Special Shares (which will be exchanged for Paragon Common Shares and CopperCo Common Shares) will be rounded down to the nearest whole Rubicon Special Share.

**Amendment**

Subject to any mandatory applicable restrictions under the BCBCA or the Final Order, the Arrangement Agreement may, at any time and from time to time before or after the holding of the Meeting, but not later than the Effective Date, be amended by written agreement of the parties without, subject to applicable law, further notice to or authorization on the part of the Rubicon Shareholders or the Africo Shareholders.

**Termination**

The Arrangement Agreement and the Plan of Arrangement may, at any time before or after the holding of the Meetings but prior to the Effective Date, be unilaterally terminated by the Board of Directors of Rubicon without further notice to, or action on the part of, its Shareholders or Africo Shareholders for whatever reason the Board of Directors of Rubicon may consider appropriate. The Arrangement Agreement and the Plan of Arrangement may also, at any time before or after the holding of the Meetings but prior to the Effective Date, be unilaterally terminated by the board of directors of Africo without further notice to, or action on the part of, the Africo Shareholders or the Rubicon Shareholders for whatever reasons the board of directors of Africo may consider appropriate. The Arrangement Agreement shall also terminate without any further action by the parties if the Effective Date has not occurred on or before September 30, 2006, unless otherwise agreed by the parties.

**Expenses of the Arrangement**

Except as may be agreed to separately among the parties or between certain parties, all expenses incurred in connection with the Arrangement will be borne and allocated as follows:

(a) except as otherwise set out below, each party shall be responsible for the fees and disbursements (including taxes) of its professional and other service providers;

(b) Africo (and, after the Effective Date, CopperCo) shall be responsible for paying, or reimbursing Rubicon for, the TSX listing application fee and listing fee for CopperCo (and in this regard, it is acknowledged that Rubicon has paid the listing application fee of $10,700 (including GST) and that Africo (or, after the Effective Date, CopperCo) will pay the listing fee); and

(c) Africo (and, after the Effective Date, CopperCo) shall reimburse Rubicon for all audit, accounting and legal fees and disbursements (including taxes) incurred by Rubicon's legal counsel and auditors in connection with:

  (i) the incorporation and organization of CopperCo and all other legal services provided to CopperCo, including preparing and pursuing the TSX listing application of CopperCo, up to a maximum of $40,000; and

  (ii) preparing financial statements and providing accounting and auditing services for CopperCo, up to a maximum of $10,000,

  it being acknowledged that nothing in this clause (c) shall be interpreted as requiring Africo (or, after the Effective Date, CopperCo) to reimburse Rubicon for any costs incurred by Rubicon for tax advice rendered to Rubicon.

**Rubicon Support Agreements**

In each of the Rubicon Support Agreements which exists as of the date of this Circular, each Significant Rubicon Shareholder has agreed that he, she or it, as the case may be, will:

- at the Meeting, vote or cause to be voted his, her or its Rubicon Common Shares, in favour of the Arrangement;
- not take any action of any kind that may reasonably be expected to reduce the likelihood of success of, or delay or interfere with, the Arrangement; and
- not seek to exercise any right of dissent in connection with the Arrangement.

The Rubicon Support Agreements will terminate on the earlier of (i) a date agreed to by the parties in writing; (ii) the Effective Date; (iii) September 15, 2006, if the Effective Date has not occurred prior to such date; (iv) the date the Rubicon Support Agreement is terminated upon Rubicon receiving a Superior Proposal (as defined below) and the Board of Directors of Rubicon believes, in good faith and after consultation with financial advisors and outside counsel, that the Acquisition Transaction (as defined below) is a Superior Proposal; (v) July 31, 2006, if the Arrangement Agreement has not been executed and delivered by all parties to it prior to such date; and (vi) the date the Arrangement Agreement terminates.

A "**Superior Proposal**" means an offer or proposal for an Acquisition Transaction made to Rubicon in writing:

(a) to purchase or otherwise acquire, directly or indirectly (including by means of a take-over bid, amalgamation, plan of arrangement, business combination, sale of assets or similar transaction), all of the shares in the capital of Rubicon or all or substantially all of the assets of Rubicon;

(b) that to the extent it offers cash consideration, is financed to the extent Rubicon determines in good faith is required to enable completion of the Acquisition Transaction or is from a person (or persons acting jointly or in concert) who Rubicon's Board determines in good faith after reasonable investigation has the financial resources or access thereto sufficient to complete the Acquisition Transaction (subject to usual terms and conditions on the draw down of such financing); and

(c) that Rubicon's Board determines in good faith after consultation with its independent financial advisors would, if consummated in accordance with its terms, result in a transaction more favourable to the shareholders of Rubicon than the Arrangement, having regard to all circumstances.

An "**Acquisition Transaction**" means:

(a) any merger, amalgamation, arrangement, share exchange, take-over bid, tender offer, issuer bid, recapitalization, consolidation or business combination involving, directly or indirectly, Rubicon or any of its subsidiaries;

(b) any direct or indirect acquisition of assets representing 20% or more of the book value (on a consolidated basis) of the assets of Rubicon and its subsidiaries (or any lease, long-term supply agreement, exchange, mortgage, pledge or other arrangement having a similar economic effect) in a single transaction or a series of related transactions; or

(c) any direct or indirect acquisition of beneficial ownership of 20% of more of the Rubicon Common Shares in a single transaction or series of related transactions; provided that an Acquisition Transaction will not include the Arrangement.

See "The Arrangement – Background to the Arrangement – Rubicon Support Agreements and Arrangement Agreement."

**Africo Support Agreement**

As of the date of this Circular, the Principal Africo Shareholders and Rubicon together own approximately 85% of the issued and outstanding shares of Africo. The Principal Africo Shareholder who had not, as at the date of this Circular, executed the amended and restated Africo Support Agreement owns approximately 7.4% of the issued and outstanding shares of Africo.

Assuming that all of the Principal Africo Shareholders sign the amended and restated Africo Support Agreement, each Principal Africo Shareholder and Rubicon will have agreed as follows:

- at the annual and special general meeting of Africo being held to consider the Arrangement (the "**Africo Meeting**") or in any other circumstances upon which a vote or other approval with respect to the Arrangement is sought, to vote or cause to be voted their Africo Shares in favour of the Arrangement;
- not to take any action of any kind that may reasonably be expected to reduce the likelihood of success of, or delay or interfere with, the Arrangement;
- to use all reasonable commercial efforts to assist Rubicon to successfully complete the Arrangement;
- to exercise the voting rights attaching to the Africo Shares held by such Principal Africo Shareholder to oppose any action that might reduce the likelihood of success of, or delay or interfere with, the Arrangement; and
- not to seek to exercise any right of dissent provided under any applicable laws or otherwise (including any rights of dissent granted by way of contract or court order) in connection with the Arrangement or any other corporate transaction related to the Arrangement which is approved at the Africo Meeting or the Meeting.

Assuming that all of the Principal Africo Shareholders sign the amended and restated Africo Support Agreement, it shall terminate on the earlier of (i) a date agreed to by the parties in writing, (ii) the Effective Date, (iii) September 30, 2006, if the Effective Date has not occurred prior to such date, and (iv) the date the Arrangement Agreement terminates. See "The Arrangement – Background to the Arrangement – Africo Negotiations and Support Agreement."

**CopperCo/Africo Financing**

It is one of the conditions to completion of the Arrangement that the CopperCo/Africo Financing be completed. See "The Arrangement – Conditions to the Arrangement." It is expected that the CopperCo/Africo Financing will be structured as a brokered private placement of special warrants of CopperCo, or of Africo, with the special warrants subsequently being automatically exchanged under the Arrangement for CopperCo Common Shares. For further discussion of the CopperCo/Africo Financing, see Schedule "K", "Information Concerning CopperCo after the Arrangement – Funds Available". In consultations with the TSX, Rubicon has agreed that it will issue a news release disclosing the specific terms of the CopperCo/Africo Financing once they are known, and in any event at least 5 business days before the closing of such financing.

## SECURITIES LAW CONSIDERATIONS

**Canadian Securities Laws**

The issuance pursuant to the Arrangement of the New Rubicon Common Shares, the Paragon Common Shares and the CopperCo Common Shares, including the issuance of Paragon Common Shares and CopperCo Common Shares upon the exercise of Rubicon Options and Warrants after the Effective Date, as well as all other issuances, trades and exchanges of securities under the Arrangement, will be made pursuant to exemptions from the registration and prospectus requirements contained in applicable Canadian provincial securities legislation or, where required, exemption orders or rulings from various securities commissions and regulatory authorities in the provinces and territories of Canada where registered Shareholders are resident. Rubicon is currently a "reporting issuer" under the applicable securities legislation in the Provinces of British Columbia, Alberta, Ontario and Quebec. Under Canadian Securities Administrators National Instrument 45-102, "Resale of Securities", the New Rubicon Common

Shares, Paragon Common Shares and CopperCo Common Shares received by Shareholders in connection with the Arrangement may be resold through registered dealers in Canadian provinces or territories without any "hold period" restriction (provided that no unusual effort is made to prepare the market or create a demand for these securities, no extraordinary commission or consideration is paid in respect of the sale and, if the seller is an insider or officer of the issuer, the seller has no reasonable grounds to believe that the issuer is in default of securities legislation). Resales of New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares will, however, be subject to resale restrictions where the sale is made from the holdings of any Person or combination of Persons holding a sufficient number of New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares, as the case may be, to affect materially the control of Rubicon, Paragon or CopperCo, respectively.

**The forgoing discussion is only a general overview of the requirements of Canadian Securities Laws for the resale of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares.** Holders of New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares should seek legal advice prior to any resale of such securities to ensure the resale is made in compliance with the requirements of applicable securities legislation. Resales of securities acquired in connection with the Arrangement may be required to be made through properly registered securities dealers.

**United States Securities Laws**

The issue of the New Rubicon Common Shares, the Paragon Common Shares and the CopperCo Common Shares in connection with the Arrangement will not be registered under the 1933 Act or the securities laws of any state of the United States and will be effected in reliance upon the exemption from registration provided by Section 3(a)(10) of the 1933 Act and exemptions provided under the securities laws of each state of the United States. Section 3(a)(10) of the 1933 Act exempts from registration a security which is issued in exchange for outstanding securities where the terms and conditions of such issuance and exchange are approved, after hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange have a right to appear, by a court or by a governmental authority expressly authorized by law to grant such approval. Accordingly, the Final Order will, if granted, constitute the basis for the exemption from the registration requirements of the 1933 Act with respect to the above-named securities issued in connection with the Arrangement.

The New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares which are issuable upon exercise of the Rubicon Warrants after the Effective Date have not been registered under the 1933 Act or the securities laws of any state of the United States. As a result, such Rubicon Warrants may not be exercised by or on behalf of a U.S. person or in the United States, as these terms are defined in Rule 902 of Regulation S under the 1933 Act, unless the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares issuable upon exercise of such Rubicon Warrants are registered under the 1933 Act and the securities laws of all applicable states of the United States or an exemption from such registration is available. Unless the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares issuable upon exercise of the Rubicon Warrants are registered or exempt under the 1933 Act, holders of the Rubicon Warrants who are U.S. persons or resident in the United States must either resell the Rubicon Warrants to persons outside the United States or permit the Rubicon Warrants to expire.

The New Rubicon Common Shares issuable upon exercise of Rubicon Options after the Effective Date have not been registered under the 1933 Act or the securities laws of any state of the United States. As a result, such Rubicon Options may not be exercised by or on behalf of a U.S. person or in the United States, as these terms are defined in Rule 902 of Regulation S under the 1933 Act, unless the New Rubicon Common Shares issuable upon exercise of such Rubicon Options are registered under the 1933 Act and the securities laws of all applicable states of the United States or an exemption from such registration is available. Unless the New Rubicon Common Shares issuable upon exercise of Rubicon Options are registered or exempt under the 1933 Act, holders of Rubicon Options who are U.S. persons or resident in the United States may not be able to exercise their Rubicon Options and may be required to permit their Rubicon Options to expire.

The New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares received pursuant to the Arrangement will not be registered under the 1933 Act in reliance upon the exemption provided by Section 3(a)(10) thereof. The restrictions on resale imposed by the 1933 Act will depend on whether the holder of

Rubicon, Paragon or CopperCo securities, respectively, is or, following the Arrangement, will be an "affiliate" of the issuer of such securities. As defined in Rule 144 under the 1933 Act, an "affiliate" of an issuer is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such issuer.

Persons who are not, and following the Arrangement will not be, affiliates of Rubicon, Paragon or CopperCo, respectively, may resell their securities of such issuer in the United States without restriction under the 1933 Act and, provided the recognized securities manual exemption or other exemption is available, under the securities laws of the states of the United States.

Persons who are or after the Arrangement will be an affiliate of Rubicon, Paragon or CopperCo respectively, may not resell their securities of such issuer in the absence of registration under the 1933 Act, unless such sales comply with the exemption from registration contained in Rule 145(d) under the 1933 Act, or unless registration is not required pursuant to the exclusion from registration provided by Regulation S under the 1933 Act.

In general, under Rule 145(d) as currently in effect, persons who are or after the Arrangement will be affiliates of Rubicon, Paragon or CopperCo, respectively, will be entitled to resell in the United States during any three-month period that number of securities of the issuer that does not exceed the greater of one percent of the then outstanding class of securities or, if such securities are listed on a United States securities exchange or traded on NASDAQ, the average weekly trading volume of such securities during the four-week period preceding the date of sale, subject to certain restrictions on manner of sale, aggregation rules and the availability of public information about the issuer. Affiliates of Rubicon, Paragon or CopperCo, respectively, who are not affiliates of the issuer following the Arrangement, and who hold their securities of such issuer for a period of one year after the Arrangement, may resell such securities without regard to the volume and manner of sale limitations set forth in the preceding sentence, subject to the availability of certain public information about the applicable issuer. Affiliates of Rubicon, Paragon or CopperCo, respectively, who are not affiliates of the issuer following the Arrangement, have not been affiliates during the three months preceding the date of sale, and who hold their securities of such issuer for a period of two years after the Arrangement, may resell such securities without any restrictions under the 1933 Act and, provided the recognized securities manual exemption or other exemption is available, under the securities laws of the states of the United States.

Subject to certain limitations, all holders of New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares and Rubicon Warrants outstanding after the Effective Date may immediately resell such securities outside the United States without registration under the 1933 Act pursuant to Regulation S under the 1933 Act. Generally, subject to certain limitations, holders of Rubicon, Paragon or CopperCo securities following the Arrangement who are not affiliates of the respective issuer, or who are affiliates of such issuer solely by virtue of their status as an officer or director of the issuer may, under the securities laws of the United States, resell their securities of such issuer in an "offshore transaction" (which would include a sale through the TSX or the TSX-V) if neither the seller, an affiliate of the seller, nor any person acting on their behalf engages in any "directed selling efforts" in the United States. For the purposes of Regulation S, "directed selling efforts" means "any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered" in the resale transaction. Certain additional restrictions and qualifications are applicable to holders of Rubicon, Paragon or CopperCo securities who are affiliates of such issuer.

The New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares issuable upon exercise of Rubicon Warrants after the Effective Date have not been registered under the 1933 Act or the securities laws of any state of the United States and may not be offered or sold in the United States unless registered under the 1933 Act and the securities laws of all applicable states of the United States or an exemption from such registration requirements is available.

The New Rubicon Common Shares issuable upon exercise of Rubicon Options after the Effective Date have not been registered under the 1933 Act or the securities laws of any state of the United States and may not be offered or sold in the United States unless registered under the 1933 Act and the securities laws of all applicable states of the United States or an exemption from such registration requirements is available.

**The foregoing discussion is only a general overview of the requirements of U.S. Securities Laws for the resale of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares.** Holders of New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares should seek legal advice prior to any resale of such securities to ensure that the resale is made in compliance with the requirements of applicable securities legislation. Resales of securities acquired in connection with the Arrangement may be required to be made through properly registered securities dealers.

## INCOME TAX CONSIDERATIONS

### Tax Ruling

The respective obligations of Rubicon, Paragon, CopperCo and Africo to complete the Arrangement are subject to, among other things, the Tax Ruling having been obtained in form and substance satisfactory to Rubicon, Africo and their counsel, and the auditors of Africo and CopperCo, acting reasonably. The purpose of the Tax Ruling would be to provide comfort to the parties that, based on the current provisions of the ITA, the regulations thereunder, and the Tax Proposals, the Arrangement will be treated for purposes of the ITA as a tax-deferred "butterfly" reorganization pursuant to paragraph 55(3)(b) of the ITA with no material Canadian federal income tax payable by any of Rubicon, Africo, Paragon, CopperCo or the Shareholders or Africo Shareholders who hold their Rubicon Common Shares or Africo Shares, as the case may be, as capital property. There can be no assurance that Rubicon will be able to obtain the Tax Ruling. Rubicon has received a favourable opinion from Davis & Company LLP, its Canadian legal counsel, with respect to the aforementioned tax issues. However, Rubicon, the other parties to the Arrangement Agreement and their professional advisors have determined that it would be prudent in the circumstances to apply for and obtain the Tax Ruling.

### Canadian Federal Income Tax Considerations

*General*

In the opinion of Davis & Company LLP, Canadian legal counsel to Rubicon, the following is a summary as of the date hereof of the principal Canadian federal income tax considerations arising as a result of the Arrangement generally applicable to Shareholders and Warrant Holders (collectively, "**Securityholders**") who, at all relevant times and for purposes of the ITA hold Rubicon Common Shares and Rubicon Warrants as capital property and deal at arm's length with, and are not affiliated with, Rubicon.

Rubicon Common Shares and Rubicon Warrants will generally be considered to be held as capital property by a Securityholder provided that the Securityholder does not hold the Rubicon Common Shares or Rubicon Warrants in the course of carrying on a business and has not acquired them in one or more transactions considered to be an adventure in the nature of trade. Certain Shareholders resident in Canada whose Rubicon Common Shares might not otherwise be considered capital property may make an irrevocable election in accordance with subsection 39(4) of the ITA to have the Rubicon Common Shares and every "Canadian security" (as defined in the ITA) owned by such Shareholder in the taxation year of the election and in all subsequent taxation years deemed to be capital property. A Shareholder who is not resident in Canada cannot elect under subsection 39(4) of the ITA. **Shareholders contemplating making such an election should first consult their own tax advisors as such an election will affect the income tax treatment for other Canadian securities held. The consequences of the Arrangement to Securityholders whose Rubicon Common Shares do not constitute capital property will be significantly different than those described below and such Securityholders should consult their own tax advisors regarding this matter.**

Rubicon Common Shares held by "financial institutions" (as defined for purposes of the mark-to-market rules in section 142.2 of the ITA), including banks, trust companies, credit unions, insurance companies, registered securities dealers and corporations controlled by one or more of the foregoing, will generally not be held as capital property and will be subject to special "mark-to-market rules". This summary does not otherwise take into account the mark-to-market rules and Securityholders that are "financial institutions" for the purposes of these rules should consult their own tax advisors.

This summary is based upon the provisions of the ITA in force on the date hereof and the regulations enacted pursuant thereto, all specific proposals to amend the ITA and the regulations publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof (the "**Tax Proposals**"), and counsel's understanding of the current published administrative practices of the Canada Revenue Agency (the "**CRA**"). No assurances can be given that the Tax Proposals will be enacted as proposed, if at all. This summary does not otherwise take into account or anticipate any changes in law, whether by legislative, governmental or judicial decision or actions, or changes in the administrative practices of the CRA, nor does it take into account or consider any provincial, territorial or foreign income tax considerations. Provincial and territorial income tax legislation varies in Canada and in some cases differs from federal income tax legislation.

**This summary is of general nature only and is not exhaustive of all possible Canadian federal income tax considerations. This summary is not intended to be, nor should it be construed to be, legal or tax advice to any Securityholder, and no representation with respect to the Canadian income tax consequences to any such Securityholder is made. Accordingly, Securityholders should consult their own tax advisors for advice with respect to their particular circumstances.**

*Securityholders Resident in Canada*

The following summary applies to a Securityholder who, at all relevant times, for purposes of the ITA is or is deemed to be resident in Canada (a "**Canadian Resident**").

Exchange of Rubicon Common Shares for New Rubicon Common Shares and Rubicon Special Shares

Under the Arrangement, a Shareholder will receive one New Rubicon Common Share, one Rubicon Series 1 Special Share and one Rubicon Series 2 Special Share in exchange for each of the Shareholder's Rubicon Common Shares.

A Shareholder who receives New Rubicon Common Shares and Rubicon Special Shares in exchange for Rubicon Common Shares, will be deemed to have disposed of such Shareholder's Rubicon Common Shares for proceeds of disposition equal to the adjusted cost base of such shares at the time of the exchange. Accordingly, neither a capital gain nor a capital loss will be realized on the exchange.

The cost of the New Rubicon Common Shares and Rubicon Special Shares received by a Shareholder will be equal, in aggregate, to the adjusted cost base of the Rubicon Common Shares exchanged by that Shareholder. If any part of the purchase price of a Shareholder's Rubicon Common Shares was denominated in United States currency, the cost of the New Rubicon Common Shares and Rubicon Special Shares will be determined based on the United States-Canadian dollar exchange rate on the date the Rubicon Common Shares were purchased rather than the exchange rate on the Effective Date.

Under the ITA, each of the Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares will be treated as a separate class of shares. The aggregate adjusted cost base of the New Rubicon Common Shares and the Rubicon Special Shares will be apportioned among the New Rubicon Common Shares, Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares based on the relative fair market value of each class of shares. Following the Effective Date, Rubicon will advise Shareholders of an appropriate proportionate allocation.

If a Shareholder acquires New Rubicon Common Shares after the Effective Date at a time when the Shareholder owns other New Rubicon Common Shares, the cost of the newly acquired New Rubicon Common Shares will be averaged with the adjusted cost base of any other New Rubicon Common Shares held by the Shareholder at that time for the purpose of determining thereafter the adjusted cost base of each New Rubicon Common Share held by such Shareholder.

Exchange of Rubicon Special Shares for Paragon Common Shares and CopperCo Common Shares

*Disposition of Rubicon Special Shares*

Under the Arrangement, each Shareholder will:

- transfer such Shareholder's Rubicon Series 1 Special Shares to Paragon in exchange for Paragon Common Shares;

- transfer such Shareholder's Rubicon Series 2 Special Shares to CopperCo in exchange for CopperCo Common Shares; and

As a result of each exchange, a Shareholder will, unless such Shareholder chooses to include any portion of the capital gain or capital loss otherwise determined in respect of a disposition of Rubicon Special Shares in computing the Shareholder's income for the taxation year in which the exchange occurs, be deemed to have:

- disposed of Rubicon Series 1 Special Shares for proceeds of disposition equal to the adjusted cost base of such shares immediately before the exchange, and to have acquired Paragon Common Shares at a cost equal to such proceeds of disposition;

- disposed of Rubicon Series 2 Special Shares for proceeds of disposition equal to the adjusted cost base of such shares immediately before the exchange, and to have acquired CopperCo Common Shares at a cost equal to such proceeds of disposition; and

If a Shareholder acquires Paragon Common Shares after the Effective Date at a time when the Shareholder owns other Paragon Common Shares, the cost of the newly acquired Paragon Common Shares will be averaged with the adjusted cost base of any other Paragon Common Shares held by the Shareholder at that time for the purpose of determining thereafter the adjusted cost base of each Paragon Common Share held by such Shareholder. Similarly, the cost of any CopperCo Common Shares acquired after the Effective Date will be averaged with the adjusted cost base of any other CopperCo Common Shares, as the case may be, held by the Shareholder at that time for the purpose of determining thereafter the adjusted cost base of each CopperCo Common Share, as the case may be, held by the Shareholder.

*Deferred Income Plans – Eligibility for Investment*

The New Rubicon Common Shares will be a qualified investment for a registered retirement savings plan (an "**RRSP**"), a registered retirement income fund (a "**RRIF**"), a registered education savings plan (an "**RESP**") or a deferred profit sharing plan (a "**DPSP**") (collectively, "**Deferred Income Plans**") because a class of shares of Rubicon is listed on a prescribed stock exchange.

Once the CopperCo Common Shares and the Paragon Common Shares are listed on the TSX or the TSX-V, the Paragon Common Shares and CopperCo Common Shares will also be qualified investments for Deferred Income Plans because a condition of the Arrangement is that the Paragon Common Shares and CopperCo Common Shares must be listed on the TSX or Tier 1 or 2 of the TSX-V as soon as possible after the Effective Date.

<u>Holding and Disposing of New Rubicon, Paragon and CopperCo Common Shares</u>

*Dividends*

Dividends received or deemed to be received by a Shareholder on New Rubicon Common Shares, Paragon Common Shares, or CopperCo Common Shares will be required to be included in computing the Shareholder's income for the purposes of the ITA. Dividends or deemed dividends received by a Shareholder who is an individual will be subject to the gross-up and dividend tax credit rules generally applicable to taxable dividends received by a Canadian Resident individual from taxable Canadian corporations. A Shareholder that is a corporation will generally be entitled to deduct the amount of such dividends in computing its taxable income. Certain corporations will pay a 33-1/3% refundable tax under Part IV of the ITA on such dividends.

*Dispositions*

A Shareholder who disposes of or is deemed to have disposed of a New Rubicon Common Share, Paragon Common Share or CopperCo Common Share will realize a capital gain, or incur a capital loss, as the case may be, equal to the amount by which the proceeds of disposition in respect of the applicable common share exceeds or is exceeded by

the aggregate of the adjusted cost base of such common share, respectively, and any reasonable expenses associated with the disposition. One-half of any capital gain (a "taxable capital gain") must be included in income and one-half of any capital loss may be used to offset taxable capital gains incurred in the year, in any of the three prior years or in any subsequent year in the circumstances and to the extent provided in the ITA.

In the case of a Shareholder that is a corporation, the amount of any capital loss otherwise determined resulting from the disposition or deemed disposition of a New Rubicon, Paragon Common Shares or CopperCo Common Share may be reduced by the amount of dividends previously received or deemed to have been received thereon in accordance with detailed rules contained in the ITA. Analogous rules apply where a corporation is a member of a partnership or a beneficiary of a trust that owns New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares, as the case may be, or where a partnership or trust, of which a corporation is a member or beneficiary, itself is a member of a partnership or a beneficiary of a trust that owns New Rubicon, Paragon Common Shares or CopperCo Common Shares, as the case may be. Shareholders to whom these rules may be relevant should consult their own tax advisors.

Capital gains realized by an individual or trust, other than certain specified trusts, may give rise to alternative minimum tax under the ITA.

A Shareholder that is, throughout the relevant taxation year, a "Canadian-controlled private corporation" (as defined in the ITA) may be liable to pay an additional refundable tax of 6 2/3% on its "aggregate investment income" for the year, which is defined to include an amount in respect of taxable capital gains.

Dissenting Shareholders

A dissenting Shareholder who receives a payment from Rubicon equal to the fair market value of such Shareholder's Rubicon Common Shares as a result of the exercise of such Shareholder's dissent rights will be deemed to have received a taxable dividend equal to the amount by which the payment (other than an amount in respect of interest, if any, awarded by a court) exceeds the paid-up capital of such shares, except to the extent that, in the case of a corporation, such deemed dividend is included in the proceeds of disposition of the Rubicon Common Shares pursuant to subsection 55(2) of the ITA.

Deemed dividends received by a Dissenting Shareholder will be included in computing such dissenting Shareholder's income for purposes of the ITA. The gross-up and dividend tax credit rules normally applicable to taxable dividends paid by taxable Canadian corporations will apply to deemed dividends received by individuals. Subject to the potential application of subsection 55(2) of the ITA, deemed dividends received by a corporation will normally be deductible in computing taxable income. Certain corporations may be liable to pay a 33 1/3 % refundable tax under Part IV of the ITA on such deemed dividends.

Subsection 55(2) of the ITA provides that where a corporate Shareholder is deemed to receive a dividend under the circumstances described above, all or part of such deemed dividend may be treated as proceeds of disposition of the Rubicon Common Shares and not as a dividend, for the purposes of computing a dissenting Shareholder's capital gain on the disposition of such shares. Dissenting Shareholders that are corporations should consult their own tax advisors with respect to the potential application of these provisions.

A dissenting Shareholder will also be considered to have disposed of such Shareholder's Rubicon Common Shares for proceeds of disposition equal to the amount paid to such dissenting Shareholder less an amount in respect of interest, if any, awarded by a court and the amount of any deemed dividend not included in the proceeds of disposition of Rubicon Common Shares pursuant to subsection 55(2) of the ITA, thereby giving rise to a capital gain or capital loss to the dissenting Shareholder calculated in accordance with the provisions of the ITA. The general tax treatment of capital gains and losses is discussed above under "Securityholders Resident in Canada – Holding and Disposing of New Rubicon, Paragon Common Shares and CopperCo Common Shares".

Any interest awarded to a dissenting Shareholder by a court will be included in the dissenting Shareholder's income for purposes of the ITA.

Canadian Resident Warrant Holders

The Rubicon Warrants' current contractual agreements include provisions that adjust the terms of the Rubicon Warrants upon Rubicon completing certain transactions such as the Arrangement. As a result, after the Effective Date, each whole Rubicon Warrant will entitle the holder to receive, upon exercise, one New Rubicon Common Share, one-sixth of a Paragon Common Share and a fraction of a CopperCo Common Share equal to the Rubicon – CopperCo Exchange Ratio.

Provided that the current contractual rights to a Warrant Holder are not disposed of as a consequence of the Arrangement, a Warrant Holder will not realize a gain or loss as a consequence of the Arrangement.

A Warrant Holder will not realize a gain or loss upon the exercise of a Rubicon Warrant. The Warrant Holder's cost of New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares acquired by exercising Rubicon Warrants will be equal to the aggregate of the adjusted cost base of the Rubicon Warrants plus the exercise price paid for the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares. The aggregate cost of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares acquired on the exercise of Rubicon Warrants will be allocated among the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares acquired on the exercise of the Rubicon Warrant. The ITA does not define an appropriate allocation method. Warrant Holders should consult their tax advisors as to an appropriate allocation method. The cost of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares acquired on the exercise of Rubicon Warrants will be averaged with the adjusted cost base of any other New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares, respectively, owned by the Warrant Holder at that time.

In the event of an expiry of an unexercised Rubicon Warrant, the Warrant Holder will realize a capital loss equal to the adjusted cost base of the Rubicon Warrant to the Warrant Holder.

Securityholders Not Resident in Canada

The following portion of the summary applies to a Securityholder who, for purposes of the ITA has not been and will not be resident or deemed to be resident in Canada (a "**Non-Resident**") at any time while such Securityholder has held Rubicon Common Shares or Rubicon Warrants and, except as specifically discussed below, to whom such shares and warrants are not "taxable Canadian property" (as defined in the ITA). In addition, this portion of the summary does not apply to a Non-Resident that is an insurer carrying on business in Canada and elsewhere.

Generally, Rubicon Common Shares will not be taxable Canadian property at a particular time provided that such shares are listed on a prescribed stock exchange (which exchanges currently include the TSX and the AMEX), the Non-Resident Shareholder does not use or hold, and is not deemed to use or hold, the Rubicon Common Shares in connection with carrying on a business in Canada and the Non-Resident Shareholder, persons with whom such Non-Resident Shareholder does not deal at arm's length, or the Shareholder together with such persons, has not owned 25% or more of the issued shares of any class or series of the capital stock of Rubicon at any time within five years preceding the particular time. Generally, Rubicon Warrants will be not be taxable Canadian property provided that such Warrant Holder does not and has not owned Rubicon Common Shares which are or were taxable Canadian property to the Warrant Holder.

**Non-Resident Securityholders whose Rubicon Common Shares or Rubicon Warrants are taxable Canadian property should consult their own advisors.**

Disposition of Rubicon Common Shares under the Arrangement

Generally, a Non-Resident Shareholder will not be subject to income tax under the ITA as a consequence of the Arrangement.

Provided that the Rubicon Common Shares and the Rubicon Special Shares are listed on a prescribed stock exchange (including the TSX and AMEX) at the time of disposition, no clearance certificate will be required under section 116 of the ITA prior to the disposition of any such shares.

If the Rubicon Common Shares were taxable Canadian property to a Non-Resident Shareholder, then the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares will also be taxable Canadian property. Provided that the Rubicon Special Shares are listed on a prescribed stock exchange on or before the time that they are exchanged for Paragon Common Shares and CopperCo Common Shares, the exchange of Rubicon Special Shares for the Paragon Common Shares and CopperCo Common Shares will not result in the Paragon Common Shares and CopperCo Common Shares being deemed to be "taxable Canadian property" as defined in the ITA.

Holding or Disposing of New Rubicon, Paragon Common Shares and CopperCo Common Shares

*Dividends*

Dividends on New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares that are paid or credited or deemed to be paid or credited to a Non-Resident will be subject to Canadian withholding tax at the rate of 25% of the gross amount of such dividends. This rate may be reduced under an applicable tax treaty or convention. In the case of a beneficial owner of dividends who is a resident of the U.S. for the purposes of the Canada-United States Income Tax Convention, as amended (the "**Tax Treaty**"), the rate of Canadian withholding tax generally will be reduced to 15% of the gross amount of such dividends if the recipient of the dividend is the beneficial owner thereof. In addition, under the Tax Treaty, dividends paid or credited or deemed to be paid or credited to certain Non-Resident Shareholders that are U.S. tax exempt organizations generally will not be subject to Canadian withholding tax.

*Dispositions*

A Non-Resident Shareholder will not be subject to tax under the ITA in respect of any capital gain realized by such Non-Resident Shareholder on a disposition of New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares after the Arrangement, unless at the time of disposition the particular shares are "taxable Canadian property" (as defined in the ITA) to the Non-Resident Shareholder and the Shareholder is not entitled to relief under an applicable income tax treaty or convention. Provided that the New Rubicon, Paragon Common Shares or CopperCo Common Shares are then listed on a prescribed stock exchange (including the TSX, AMEX and Tiers 1 and 2 of the TSX-V), the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares generally will not constitute taxable Canadian property of a Non-Resident Shareholder, unless the Rubicon Common Shares or the Rubicon Special Shares were taxable Canadian property to the Shareholder immediately prior to the Arrangement or unless at any time during the 60-month period immediately preceding the disposition, the Non-Resident Shareholder, persons with whom the Non-Resident Shareholder did not deal at arm's length, or the Non-Resident Shareholder together with all such persons, owned or was considered to own 25% or more of the issued shares of any class or series of shares of the capital stock of New Rubicon, Paragon or CopperCo, as the case may be.

If the New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares are taxable Canadian property to a Non-Resident Shareholder that is a resident of the U.S. for the purposes of the Tax Treaty at the time of disposition, any capital gain realized on the disposition or deemed disposition of such common shares will, according to the Tax Treaty, generally not be subject to Canadian federal income tax unless the value of the Rubicon Common Shares at the time of the disposition of such common shares is derived principally from "real property situated in Canada" within the meaning set out in the Tax Treaty.

Provided that the New Rubicon, Paragon and CopperCo Common Shares are listed on a prescribed Stock Exchange (including the TSX, AMEX and Tiers 1 and 2 of the TSX-V) at the time of disposition, no clearance certificate will be required under section 116 of the ITA prior to the disposition of any such shares.

Dissenting Non-Resident Shareholders

A Non-Resident Shareholder who exercises dissent rights and receives a payment from Rubicon for its Rubicon Common Shares as a result of the exercise of such Shareholder's dissent rights will be deemed to have received a

taxable dividend equal to the amount by which the payment (other than an amount, if any, in respect of interest awarded by a court) exceeds the paid-up capital of such shares.

A dissenting Non-Resident Shareholder will also be considered to have disposed of its Rubicon Common Shares for proceeds of disposition equal to the amount paid to such dissenting Non-Resident Shareholder less an amount in respect of interest, if any, awarded by the Court and the amount of any deemed dividend, except that no capital gain or loss will be realized on the disposition of such Shareholder's Rubicon Common Shares for purposes of the ITA provided such Rubicon Common Shares are not "taxable Canadian property" to such Shareholder at the time of disposition.

Dissenting Non-Resident Shareholders will be subject to withholding tax under the ITA in respect of deemed dividends and interest arising from the disposition of such Shareholder's Rubicon Common Shares. The applicable withholding tax rate is 25% in respect of such amounts, although such rate may be reduced under the provisions of an applicable income tax treaty. Under the Tax Treaty, the withholding tax rate generally applicable to interest beneficially owned by residents of the U.S. is 10% and, as discussed above, the withholding tax rate generally applicable to dividends beneficially owned by residents of the U.S. is 15%.

Non-Resident Warrant Holders

A Non-Resident Warrant Holder whose Rubicon Warrants are not considered taxable Canadian property will not be subject to Canadian income tax in respect of the Arrangement. A description of the tax consequences of exercising Rubicon Warrants is discussed above under "Securityholders Resident in Canada – Canadian Resident Warrant Holders".

**U.S. Federal Income Tax Considerations**

The following is a summary of the anticipated material U.S. federal income tax consequences to U.S. Holders (as defined below) arising from and relating to the Arrangement.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential U.S. federal income tax consequences that may apply to a U.S. Holder as a result of the Arrangement. In addition, this summary does not take into account the individual facts and circumstances of any particular U.S. Holder that may affect the U.S. federal income tax consequences of the Arrangement to such U.S. Holder. Accordingly, this summary is not intended to be, and should not be construed as, legal or U.S. federal income tax advice with respect to any U.S. Holder. Each U.S. Holder should consult its own tax advisor regarding the U.S. federal income, U.S. state and local, and foreign tax consequences of the Arrangement.

No legal opinion from U.S. legal counsel or ruling from the Internal Revenue Service (the "**IRS**") has been requested, or will be obtained, regarding the U.S. federal income tax consequences of the Arrangement to U.S. Holders. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions taken in this summary. In addition, because the authorities on which this summary is based are subject to various interpretations, the IRS and the U.S. courts could disagree with one or more of the positions taken in this summary.

**Notice Pursuant to IRS Circular 230:** Anything contained in this summary concerning any U.S. federal tax issue is not intended or written to be used, and it cannot be used by a U.S. Holder, for the purpose of avoiding U.S. federal tax penalties under the Code (as defined below). This summary was written to support the promotion or marketing of the transactions or matters addressed by this Circular (including the Arrangement). Each U.S. Holder should seek U.S. federal tax advice, based on such U.S. Holder's particular circumstances, from an independent tax advisor.

**Scope of this Disclosure**

*Authorities*

This summary is based on the Internal Revenue Code of 1986, as amended (the "**Code**"), Treasury Regulations, published rulings of the IRS, published administrative positions of the IRS, and U.S. court decisions that are applicable and, in each case, as in effect and available, as of the date of this Circular. Any of the authorities on which this summary is based could be changed in a material and adverse manner at any time, and any such change could be applied on a retroactive basis. This summary does not discuss the potential effects, whether adverse or beneficial, of any proposed legislation that, if enacted, could be applied on a retroactive basis.

*U.S. Holders*

For purposes of this summary, a "U.S. Holder" is a beneficial owner of Rubicon Common Shares that, for U.S. federal income tax purposes, is (a) an individual who is a citizen or resident of the U.S., (b) a corporation, or any other entity classified as a corporation for U.S. federal income tax purposes, that is created or organized in or under the laws of the U.S., any state in the U.S., or the District of Columbia, (c) an estate if the income of such estate is subject to U.S. federal income tax regardless of the source of such income, or (d) a trust if (i) such trust has validly elected to be treated as a U.S. person for U.S. federal income tax purposes or (ii) a U.S. court is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of such trust.

*Non-U.S. Holders*

A "non-U.S. Holder" is a beneficial owner of Rubicon Common Shares other than a U.S. Holder. This summary does not address the U.S. federal income tax consequences of the Arrangement to non-U.S. Holders. Accordingly, non-U.S. Holders should consult their own tax advisors regarding the U.S. federal income, U.S. state and local, and foreign tax consequences (including the potential application and operation of any income tax treaties) of the Arrangement.

*U.S. Holders Subject to Special U.S. Federal Income Tax Rules Not Addressed*

This summary does not address the U.S. federal income tax consequences of the Arrangement to U.S. Holders that are subject to special provisions under the Code, including the following U.S. Holders: (a) U.S. Holders that are tax-exempt organizations, qualified retirement plans, individual retirement accounts, or other tax-deferred accounts; (b) U.S. Holders that are financial institutions, insurance companies, real estate investment trusts, or regulated investment companies; (c) U.S. Holders that are dealers in securities or currencies or U.S. Holders that are traders in securities that elect to apply a mark-to-market accounting method; (d) U.S. Holders that have a "functional currency" other than the U.S. dollar; (e) U.S. Holders that are liable for the alternative minimum tax under the Code; (f) U.S. Holders that own Rubicon Common Shares as part of a straddle, hedging transaction, conversion transaction, constructive sale, or other arrangement involving more than one position; (g) U.S. Holders that acquired Rubicon Common Shares in connection with the exercise of employee stock options or otherwise as compensation for services; (h) U.S. Holders that hold Rubicon Common Shares other than as a capital asset within the meaning of Section 1221 of the Code; or (i) U.S. Holders that own (directly, indirectly, or constructively) 10% or more of the total combined voting power of all classes of shares of Rubicon entitled to vote. U.S. Holders that are subject to special provisions under the Code, including U.S. Holders described immediately above, should consult their own tax advisors regarding the U.S. federal income tax consequences of the Arrangement.

If an entity that is classified as a partnership for U.S. federal income tax purposes holds Rubicon Common Shares, the U.S. federal income tax consequences of the Arrangement to such partnership and the partners of such partnership generally will depend on the activities of the partnership and the status of such partners. Partners of entities that are classified as partnerships for U.S. federal income tax purposes should consult their own tax advisors regarding the U.S. federal income tax consequences of the Arrangement.

*Tax Consequences in Other Jurisdictions Not Addressed*

This summary does not address the U.S. state or local tax consequences, or the tax consequences in jurisdictions other than the U.S., of the Arrangement to U.S. Holders. Each U.S. Holder should consult its own tax advisor regarding the U.S. state and local and foreign tax consequences of the Arrangement.

*Transactions Not Addressed*

This summary does not address the U.S. federal income tax consequences to U.S. Holders of transactions entered into prior to, concurrently with, or subsequent to the Arrangement (regardless of whether any such transaction is undertaken in connection with the Arrangement), including, but not limited to, the following transactions: (a) any exercise of any stock option, warrant, or other right to acquire Rubicon Common Shares; (b) any conversion of any note, debenture, or other debt instrument of Rubicon; and (c) any conversion of any stock option, warrant, or other right to acquire Rubicon Common Shares into a stock option, warrant, or other right to acquire Paragon Common Shares or CopperCo Common Shares.

**U.S. Federal Income Tax Consequences of the Arrangement**

The Arrangement will be effected under applicable provisions of Canadian corporate law, which are technically different from analogous provisions of U.S. corporate law. Therefore, the U.S. federal income tax consequences of certain aspects of the Arrangement are not certain. This summary assumes that (a) the renaming and redesignation of the Rubicon Common Shares as Rubicon Class A Common Shares, (b) the exchange by the Shareholders of the Rubicon Class A Common Shares for New Rubicon Common Shares, Rubicon Series 1 Special Shares, and Rubicon Series 2 Special Shares (followed by the cancellation of the Rubicon Class A Common Shares), (c) the transfer by the Shareholders of the Rubicon Series 1 Special Shares to Paragon in exchange for Paragon Common Shares and the Rubicon Series 2 Special Shares to CopperCo in exchange for CopperCo Common Shares, and (d) Rubicon's acquisition of the Rubicon Series 1 Special Shares held by Paragon and the Rubicon Series 2 Special Shares held by CopperCo (followed by the cancellation of the Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares) will properly be treated, under the step-transaction doctrine or otherwise, as the distribution by Rubicon of the Paragon Common Shares and the CopperCo Common Shares to the Shareholders under Section 301 of the Code.

There can be no assurance that the IRS will not challenge this U.S. federal income tax treatment of the Arrangement or that, if challenged, a U.S. court would not agree with the IRS. Each U.S. Holder should consult its own tax advisor regarding the proper treatment of the Arrangement for U.S. federal income tax purposes.

*Distribution of Paragon Common Shares and CopperCo Common Shares*

Subject to the "passive foreign investment company" rules discussed below, U.S. Holders will be required to include the fair market value of the Paragon Common Shares and CopperCo Common Shares received pursuant to the Arrangement in gross income as a dividend to the extent of the current or accumulated "earnings and profits" of Rubicon. Rubicon does not expect that any such dividend will qualify for the reduced U.S. federal income tax rates applicable to "qualified dividend income" under Section 1(h)(11) of the Code. In addition, any such dividend generally will not be eligible for the "dividends received deduction" in the case of corporate U.S. Holders. To the extent that the fair market value of the Paragon Common Shares and CopperCo Common Shares exceeds the current and accumulated "earnings and profits" of Rubicon, the distribution of the Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement will be treated (a) first, as a tax-free return of capital to the extent of a U.S. Holder's tax basis in the Rubicon Common Shares and, (b) thereafter, as gain from the sale or exchange of such Rubicon Common Shares. Preferential tax rates apply to long-term capital gains of a U.S. Holder that is an individual, estate, or trust. There are currently no preferential tax rates for long-term capital gains of a U.S. Holder that is a corporation.

A U.S. Holders' initial tax basis in the Paragon Common Shares and CopperCo Common Shares received pursuant to the Arrangement will be equal to the fair market value of such Paragon Common Shares and CopperCo Common Shares on the date of distribution. A U.S. Holder's holding period for the Paragon Common Shares and CopperCo Common Shares received pursuant to the Arrangement will begin on the day after the date of distribution.

*Dissenting U.S. Holders*

A U.S. Holder that exercises the right to dissent from the Arrangement and is paid cash for all of such U.S. Holder's Rubicon Common Shares generally will recognize gain or loss in an amount equal to the difference, if any, between (a) the amount of cash received by such U.S. Holder in exchange for the Rubicon Common Shares (other than amounts, if any, that are or are deemed to be interest for U.S. federal income tax purposes, which amounts will be taxed as ordinary income) and (b) the tax basis of such U.S. Holder in the Rubicon Common Shares surrendered.

Subject to the "passive foreign investment company" rules discussed below, such gain or loss generally will be capital gain or loss, which will be long-term capital gain or loss if the Rubicon Common Shares are held for more than one year. Preferential tax rates apply to long-term capital gains of a U.S. Holder that is an individual, estate, or trust. There are currently no preferential tax rates for long-term capital gains of a U.S. Holder that is a corporation. Deductions for capital losses are subject to complex limitations under the Code.

*Potential Application of the PFIC Rules to the Arrangement*

Qualification of Rubicon, Paragon, and CopperCo as a PFIC

A foreign corporation generally will be a "passive foreign investment company" under Section 1297 of the Code (a "PFIC") if, for a taxable year, (a) 75% or more of the gross income of the foreign corporation for such taxable year is passive income or (b) on average, 50% or more of the assets held by the foreign corporation either produce passive income or are held for the production of passive income, based on the fair market value of such assets (or on the adjusted tax basis of such assets, if the foreign corporation is not publicly traded and either is a "controlled foreign corporation" or makes an election). "Passive income" includes, for example, dividends, interest, certain rents and royalties, certain gains from the sale of stock and securities, and certain gains from commodities transactions.

Rubicon believes that it was a PFIC for one or more prior taxable years. Based on currently available information, Rubicon anticipates that it will be a PFIC for the current taxable year and that Paragon and CopperCo each will be a PFIC for the current taxable year. Whether Rubicon, Paragon, or CopperCo will be a PFIC for the current taxable year depends on the assets and income of Rubicon, Paragon, or CopperCo, respectively, over the course of such taxable year and, as a result, cannot be predicted with certainty as of the date of this Circular. The determination of whether Rubicon, Paragon, or CopperCo qualifies as a PFIC for a taxable year depends, in part, on the application of complex U.S. federal income tax rules, which are subject to differing interpretations. Accordingly, there can be no assurance that the IRS will not challenge the determination made by the Rubicon concerning its PFIC status or the PFIC status of Paragon or CopperCo.

Effect of PFIC Rules on the Distribution of Paragon Common Shares and CopperCo Common Shares

If Rubicon is a PFIC or was a PFIC at any time during a U.S. Holder's holding period for the Rubicon Common Shares, the effect of the PFIC rules on a U.S. Holder will depend on whether such U.S. Holder has made a timely and effective election to treat Rubicon as a "qualified electing fund" or "QEF" under Section 1295 of the Code (a "QEF Election"). In this summary, a U.S. Holder that has made a timely and effective QEF Election is referred to as an "Electing Shareholder" and a U.S. Holder that has not made a timely and effective QEF Election is referred to as a "Non-Electing Shareholder."

The QEF Election was not available to U.S. Holders for any prior taxable year for which Rubicon was a PFIC, because Rubicon did not satisfy the record keeping and information disclosure requirements that apply to a QEF. If Rubicon is a PFIC for the current taxable year, Rubicon does not intend to satisfy the record keeping and information disclosure requirements that apply to a QEF in the event that a U.S. Holder wishes to make a QEF Election.

With respect to a Non-Electing Shareholder, the rules under Section 1291 of the Code will apply to gain recognized on the disposition of Rubicon Common Shares and "excess distributions" (generally, distributions received in the current taxable year that are in excess of 125% of the average distributions received during the three preceding years or, if shorter, the U.S. Holder's holding period for the Rubicon Common Shares) received on the Rubicon

Common Shares. Any such gain or excess distribution must be rateably allocated to each day in a Non-Electing Shareholder's holding period for the Rubicon Common Shares. The amount of any such gain or excess distribution allocated to prior years of such Non-Electing Shareholder's holding period for the Rubicon Common Shares (other than years prior to the first taxable year of Rubicon beginning after December 31, 1986 for which Rubicon was not a PFIC) will be subject to U.S. federal income tax at the highest tax rate applicable to ordinary income in each such prior year. A Non-Electing Shareholder will be required to pay interest on the resulting tax liability for each such prior year, calculated as if such tax liability had been due in each such prior year. The amount of any such gain or excess distribution allocated to the current year of such Non-Electing Shareholder's holding period for the Rubicon Common Shares will be treated as ordinary income in the current year, and no interest charge will be incurred with respect to the resulting tax liability for the current year.

If the distribution of the Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement constitutes an "excess distribution" with respect to a Non-Electing Shareholder, such Non-Electing Shareholder will be subject to the rules of Section 1291 of the Code discussed above upon the receipt of the Paragon Common Shares and CopperCo Common Shares. In addition, the distribution of the Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement may be treated, under proposed Treasury Regulations, as the "indirect disposition" by a Non-Electing Shareholder of such Non-Electing Shareholder's indirect interest in Paragon and CopperCo, which generally would be subject to the rules of Section 1291 of the Code discussed above.

Electing Shareholders generally will not be subject to the rules of Section 1291 of the Code discussed above upon the receipt of the Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement. In addition, if a mark-to-market election under Section 1296 of the Code (a "Mark-to-Market Election") is made by a U.S. Holder, such U.S. Holder generally will not be subject to the rules of Section 1291 of the Code discussed above upon the receipt of the Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement. However, if a U.S. Holder makes a Mark-to-Market election after the beginning of such U.S. Holder's holding period for the Rubicon Common Shares and such U.S. Holder has not made a timely and effective QEF Election, the rules of Section 1291 of the Code discussed above may apply to the distribution of Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement.

The PFIC rules are complex, and each U.S. Holder should consult its own tax advisor regarding the PFIC rules and how the PFIC rules may affect the U.S. federal income tax consequences of the Arrangement. In particular, each U.S. Holder should consult its own tax advisor regarding the availability of, and procedure for making, a QEF Election or a Mark-to-Market Election.

**Information Reporting; Backup Withholding Tax**

The distribution within the U.S., or by a U.S. payor or U.S. middleman, of the Paragon Common Shares and CopperCo Common Shares pursuant to the Arrangement generally will be subject to information reporting and backup withholding tax, at the rate of 28%, if a U.S. Holder (a) fails to furnish such U.S. Holder's correct U.S. taxpayer identification number (generally on Form W-9), (b) furnishes an incorrect U.S. taxpayer identification number, (c) is notified by the IRS that such U.S. Holder has previously failed to properly report items subject to backup withholding tax, or (d) fails to certify, under penalty of perjury, that such U.S. Holder has furnished its correct U.S. taxpayer identification number and that the IRS has not notified such U.S. Holder that it is subject to backup withholding tax. However, U.S. Holders that are corporations generally are excluded from these information reporting and backup withholding tax rules. Any amounts withheld under the U.S. backup withholding tax rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, or will be refunded, if such U.S. Holder furnishes required information to the IRS. Each U.S. Holder should consult its own tax advisor regarding the information reporting and backup withholding tax rules.

## RIGHTS OF DISSENT

Pursuant to the terms of the Interim Order and the Plan of Arrangement, Rubicon has granted the Shareholders who object to the Arrangement Resolution the right to dissent (the "**Dissent Right**") in respect of the Arrangement. The Dissent Right is granted and set out in full in Article 5 of the Plan of Arrangement and is summarized in

Schedule "L" hereto, "Dissent Rights". **Schedule "L" is only a summary and Shareholders are referred to the full text of Article 5 of the Plan of Arrangement.**

In the event that a Shareholder fails to perfect or effectively withdraws that Shareholder's claim under the Dissent Right or forfeits that Shareholder's right to make a claim under the Dissent Right or his or her rights as a Shareholder are otherwise reinstated, each Rubicon Common Share held by that Shareholder will thereupon be deemed to have been exchanged in accordance with the terms of the Arrangement as of the Effective Date.

**Shareholders who wish to exercise Dissent Rights should review the dissent procedures summarized in Schedule "L" and set out in full in Article 5 of the Plan of Arrangement and seek legal advice, as failure to adhere strictly to the Dissent Right requirements may result in the loss or unavailability of any right to dissent.**

The obligation of Rubicon to complete the Arrangement is subject to the condition that notices of dissent shall not have been delivered by Shareholders holding such number of Rubicon Common Shares that, in Rubicon's opinion, completion of the Arrangement would not be in the best interests of Rubicon.

## RISK FACTORS

In evaluating the Arrangement, Shareholders should carefully consider, in addition to the other information contained in this Circular, the risk factors which apply to Rubicon, and which will apply to Paragon and CopperCo as appropriate after the Effective Date. **See Schedule "M" – Risk Factors for certain considerations relevant to Shareholders regarding the Arrangement and their investment in the securities referred to in this Circular.** These risk factors are not a definitive list of all risk factors associated with the respective businesses to be carried out by Rubicon, Paragon and CopperCo.

## AMENDED AND RESTATED SHAREHOLDER RIGHTS PLAN

At the Meeting, the shareholders will be asked to approve, ratify and confirm, with or without variation, the adoption of an amended and restated shareholder rights plan (the "**Rights Plan**"), which is intended to replace and update the Shareholder Rights Plan originally adopted by Rubicon on February 11, 2002. The terms and conditions of the Rights Plan are set out in the Amended and Restated Shareholder Rights Plan Agreement (the "**Rights Agreement**") made as of June 14, 2006, between the Company and Computershare Investor Services Inc. (the "**Rights Agent**"). The Rights Agreement can be viewed online at www.sedar.com, as Schedule "A" to the Company's Material Change Report dated June 16, 2006 filed with respect to the adoption of the Rights Plan. The Company will also deliver a copy of the Rights Agreement to any Shareholder who requests one, at no charge to the Shareholder.

### Confirmation by Shareholders

While the Rights Plan became effective upon the entering into of the Rights Agreement on June 14, 2006, the Rights will terminate if the Rights Agreement is not approved, with or without variation, at the Meeting by a majority of the votes cast by "independent" holders of Rubicon Common Shares who vote in respect of approval of the Rights Agreement at the Meeting. In effect, all Shareholders will be considered "independent" provided that they are not, at the relevant time, making a takeover bid for the Rubicon Common Shares.

### Recommendation of the Board of Directors

In adopting the Rights Plan, the Board of Directors of Rubicon considered the appropriateness of establishing a shareholders' rights plan and concluded that it was in the best interests of the Company and its Shareholders to adopt such a plan. Accordingly, the Board of Directors of Rubicon recommends that Shareholders approve the Rights Agreement by voting in favour of the resolution set out below.

**Purpose of the Rights Plan**

The Board of Directors of Rubicon has adopted the Rights Plan in recognition that takeover bids may not always result in shareholders receiving equal treatment or fair and full value for their common shares. The Rights Plan was adopted to provide the Board of Directors of Rubicon with sufficient time to consider any takeover bid made for the Rubicon Common Shares and, if appropriate, to explore and develop alternatives to maximize Shareholder value and to ensure that any such offer would be made to all shareholders and treat all shareholders equally. Neither at the date of the adoption of the Rights Plan nor at the date of this Circular was the Board of Directors of Rubicon aware of any pending or threatened takeover bid or offer for the Rubicon Common Shares. It was not the intention of the Board of Directors of Rubicon in adopting the Rights Plan to secure the continuance in office of the existing members of the Board of Directors of Rubicon or to avoid an acquisition of control of the Company in a transaction that is considered to be fair and in the best interests of the shareholders.

The Board of Directors of Rubicon believes that under the rules relating to takeover bids in Canada, there may be insufficient time allowed for directors to fully assess offers and develop alternatives for shareholders such as possible higher offers or corporate restructurings. The result may be that shareholders fail, in the absence of a Shareholder rights plan, to realize the maximum value for their common shares. Although amendments to the takeover bid legislation which were adopted in all Canadian provinces except Quebec in 2001, and in Quebec in 2003 (the "**Zimmerman Amendments**"), extended the minimum period for which a takeover bid must remain open to thirty-five (35) days, the Board of Directors of Rubicon believes that this time period may not be sufficient in all circumstances. This view is supported by the fact that rights plans have continued to be implemented by Canadian public companies since the time that the Zimmerman Amendments came into force. In addition, the Board of Directors of Rubicon is concerned that, while securities legislation has addressed many concerns relating to unequal treatment of shareholders, there remains the possibility that control or effective control of the Company may be acquired pursuant to a private agreement in which a small number of shareholders dispose of common shares at a premium to market price which is not shared with the other shareholders. Also, a person may slowly accumulate common shares through stock exchange acquisitions which may result, over time, in an acquisition of control without payment of fair value for control or fair sharing of any control premium among all shareholders. The Rights Plan addresses these concerns by applying to all acquisitions of 20% or more of the common shares of the Company. The Board of Directors of Rubicon is of the view that the Rights Plan will encourage persons seeking to acquire control of the Company to do so by means of a public takeover bid or offer available to all shareholders of the Company for all of the outstanding common shares. The Board of Directors of Rubicon believes that the Rights Plan will likely deter unfair, coercive bid tactics and strategies that do not treat all shareholders of the Company equally. The leading decisions of Canadian securities regulatory authorities and courts indicate that a shareholder rights plan can be appropriately used for these purposes.

The objective of enhancing Shareholder value in the context of an unsolicited takeover bid requires that the board of directors has reasonable time to make the necessary assessments both of the bid which is on the table and of the other available alternatives. In responding to a *bona fide* takeover bid, the directors, as the representatives of the Company, have the responsibility to assess the takeover bid and to consider the bid in light of the best interests of the Company and its shareholders. The Board of Directors of Rubicon's access to all material information regarding the Company and familiarity with the Company's corporate strategies and alternatives ensures that the Board of Directors of Rubicon is well positioned to assess any takeover bid and the availability of higher value alternative transactions. This may result in the Rights Plan remaining in place for a period of time while the Board of Directors of Rubicon develops or assesses higher value alternatives, even if a majority of the outstanding common shares of the Company have been tendered to a bid.

Over the past few years, unsolicited takeover bids have been made for the shares of a number of Canadian public corporations. Many of these corporations had a shareholder rights plan in place which was used by the board of directors of the target corporation to gain time to seek alternatives to the bid, with the objective of enhancing Shareholder value. In most cases, a change of control ultimately occurred at a price in excess of the original bid price (e.g., in the Chapters Inc., Second Cup Ltd. and Placer Dome Inc. transactions); accordingly, the existence of a shareholder rights plan should not prevent, and is not intended to prevent, unsolicited takeover bids for the Company's common shares.

Canadian securities regulators have concluded in decisions relating to shareholder rights plans that in the face of a takeover bid, a target corporation's board of directors will not be permitted to keep a shareholder rights plan in place solely to prevent a bid. However, the Board of Directors of Rubicon will be allowed to keep a plan in place if the Board of Directors of Rubicon is actively seeking alternatives to a takeover bid, and if there is a real and substantial possibility that the Board of Directors of Rubicon can increase Shareholder choice and maximize Shareholder value.

The Rights Plan does not affect in any way the financial condition of the Company or interfere with its business plans. The initial issuance of the Rights (as defined below) is not dilutive and will not affect reported earnings or cash flow per common share until and unless the Rights separate from the underlying common shares and become exercisable (however, the Company considers the likelihood of such an event occurring to be remote). The adoption of the Rights Plan will not lessen or affect the duty of the Board of Directors of Rubicon to act honestly and in good faith and in the best interests of the Company.

**Summary Description of the Rights Plan**

The following is a summary description of the operation of the Rights Plan. This summary is qualified in its entirety by reference to the text of the Rights Agreement. Capitalized terms used but not defined below have the meanings ascribed to them in the Rights Agreement.

*The Rights*

The Rights were issued pursuant to the Rights Agreement. Each Right entitles the registered holder thereof to purchase from the Company on the occurrence of certain events, one Rubicon Common Share at the price of CDN$30 per share, subject to adjustment (the "**Exercise Price**"). However, if a Flip-in Event (as defined below) occurs, each Right would then entitle the registered holder to receive, upon payment of the Exercise Price, that number of Rubicon Common Shares that have a market value at the date of that occurrence equal to twice the Exercise Price. The Rights are not exercisable until the Separation Time (as defined below).

*Overview of the Rights Plan*

The Rights Plan utilizes the mechanism of the Permitted Bid (as defined below) to ensure that a person seeking control of the Company provides both the Company's shareholders and the Board of Directors of Rubicon with sufficient time to evaluate the bid. The purpose of the Permitted Bid mechanism is to allow a potential bidder to avoid the dilutive features of a Rights Plan by making a bid in conformity with the conditions specified in the Permitted Bid provisions. If a person makes a takeover bid that is a Permitted Bid, the Rights Plan will not affect the transaction in any respect.

The Rights Plan should not deter a person seeking to acquire control of the Company if that person is prepared to make a takeover bid pursuant to the Permitted Bid requirements or is prepared to negotiate with the Board of Directors of Rubicon. Otherwise, a person will likely find it impractical to acquire 20% or more of the outstanding Rubicon Common Shares because the Rights Plan will substantially dilute the holdings of a person or group that seeks to acquire such an interest other than by means of a Permitted Bid or on terms approved by the Board of Directors of Rubicon. When a person or group or their transferees become an Acquiring Person, the Rights Beneficially Owned by those persons become void, thereby permitting their holdings to be diluted. The possibility of such dilution is intended to encourage such a person to make a Permitted Bid or to seek to negotiate with the Board of Directors of Rubicon the terms of an offer which is fair to all shareholders.

The Rights Plan will not prevent shareholders from disposing of their Rubicon Common Shares through any takeover bid for the Company. The directors will continue to be bound to consider fully and fairly any *bona fide* takeover bid or offer for the Rubicon Common Shares of the Company and to discharge that responsibility with a view to the best interests of the shareholders.

Shareholder rights plans have been adopted by a large number of publicly held companies in Canada and the United States. The terms of the Rights Plan are similar to those adopted in recent years by other Canadian public companies.

*Trading of Rights*

Until the Separation Time (as defined below), the Rights will be evidenced only by the register maintained by the Rights Agent and outstanding share certificates. The Rights Plan provides that, until the Separation Time, the Rights will be transferred with and only with the associated common shares. Until the Separation Time, or earlier termination or expiration of the Rights, each new share certificate issued after the Record Time, upon transfer of existing common shares or the issuance of additional common shares, will display a legend incorporating the terms of the Rights Agreement by reference. As soon as practicable following the Separation Time, separate certificates evidencing the Rights ("**Rights Certificates**") will be mailed to the holders of common shares as of the close of business at the Separation Time, and thereafter the Rights Certificates alone will evidence the Rights.

*Acquiring Person and Flip-in Event*

An Acquiring Person is, generally, a person who beneficially owns 20% or more of the outstanding common shares of the Company. The Rights Agreement provides certain exceptions to that rule, including a person who acquires 20% or more of the outstanding common shares through a Permitted Bid Acquisition, an Exempt Acquisition or in its capacity as Investment Manager, Trust Company, Crown Agency, Statutory Body or Plan Administrator, provided in these latter instances that the person is not making or proposing to make a take-over bid. The term Acquiring Person does not include the Company or any subsidiary of the Company. If a person becomes an Acquiring Person (a "**Flip-in Event**"), each Right will generally convert into the right to purchase from the Company, upon exercise, a number of common shares having an aggregate Market Price on the date of the Flip-in Event equal to twice the Exercise Price for an amount in cash equal to the Exercise Price.

*Separation Time*

The "Separation Time" is the close of business on the tenth day after the earlier of (i) the "Stock Acquisition Date", which is generally the first date of public announcement of facts indicating that a person has become an Acquiring Person; (ii) the date of commencement of, or first public announcement of the intent of any person (other than the Company or any subsidiary of the Company) to commence a Take-over Bid (other than a Permitted Bid or a Competing Permitted Bid); and (iii) the date on which a Take-over Bid ceases to be a Permitted Bid or Competing Permitted Bid. In any of the above cases, the Separation Time can be such later time as may from time to time be determined by the Board of Directors of Rubicon acting in good faith. If a Take-over Bid expires, is cancelled, terminated or otherwise withdrawn prior to the Separation Time, such Take-over Bid shall be deemed never to have been made.

*Permitted Bid*

A Flip-in Event does not occur if a take-over bid is a Permitted Bid. A Permitted Bid is a Take-over Bid, made by means of a take-over bid circular, which, among other things:

(a) is made for any and all voting shares to all holders of record of common shares as registered on the books of the Company (other than the Offeror);

(b) contains, and the take-up and payment for common shares tendered or deposited is subject to, an irrevocable and unqualified condition that no common shares will be taken up or paid for pursuant to the Take-over Bid:

   (i) prior to the close of business on the 60th day following the date of the Takeover Bid; and

   (ii) unless at such date more than 50% of the then outstanding common shares held by Independent Shareholders have been deposited under the bid and not withdrawn;

(c) contains irrevocable and unqualified provisions that, unless the Take-over Bid is withdrawn, all common shares may be deposited pursuant to the Take-over Bid at any time prior to the close of business on the date of first take-up or payment for common shares under the bid and that all

common shares deposited pursuant to the Take-over Bid may be withdrawn at any time prior to the close of business on such date; and

(d) contains an irrevocable and unqualified provision that, if the condition referred to in clause (b) (ii) is satisfied, the Offeror will make a public announcement of that fact and the Take-over Bid will remain open for deposits and tenders of common shares for a period of not less than 10 business days from the date of such public announcement.

The Rights Plan also provides for a "Competing Permitted Bid", which is a Take-over Bid made while another Permitted Bid is outstanding, that satisfies all of the requirements of a Permitted Bid other than the requirements of clause (b) (i). The Competing Permitted Bid must expire no earlier than the later of: (i) the date on which common shares may be taken up under the Permitted Bid which preceded the Competing Permitted Bid; and (ii) 35 days following the date of commencement of the Competing Permitted Bid.

*Take-over Bid*

A "Take-over Bid" is defined in the Rights Plan as an offer to acquire common shares or other securities convertible into common shares, where the common shares subject to the offer to acquire, together with the common shares into which the securities subject to the offer to acquire are convertible, and the Offeror's Securities, constitute in the aggregate 20% or more of the outstanding common shares at the date of the offer.

*Waiver*

If a potential Offeror does not wish to make a Permitted Bid, it can negotiate with, and obtain the prior approval of, the Board of Directors of Rubicon to make a bid pursuant to a take-over bid circular on terms which the Board of Directors of Rubicon considers fair to all shareholders. In such circumstances, the Board of Directors of Rubicon may waive the application of the Rights Plan to the transaction, thereby allowing such bid to proceed without dilution to the Offeror, and the Board of Directors of Rubicon will be deemed to have waived the application of the Rights Plan to all other contemporaneous bids made by way of take-over bid circular. Waivers relating to take-over bids made otherwise than pursuant to a take-over bid circular delivered to all holders of Rubicon Common Shares require approval of the shareholders, except in the case of inadvertent triggering of the application of the Rights Plan.

*Amendments*

The Company may from time to time make amendments to the Rights Agreement which are required in order to correct any clerical or typographical error or which are required to maintain the validity of the Rights Agreement as a result of any change in any applicable legislation, regulations or rules thereunder. The Company may also, prior to approval of the Rights Plan by the shareholders at the Meeting, supplement or amend the Rights Agreement without the approval of any holders of Rights or common shares to make any changes which the Board of Directors of Rubicon may deem necessary or desirable, provided that no such supplement or amendment shall be made to the provisions relating to the Rights Agent except with the concurrence of the Rights Agent. Any supplement, amendment or variance made after the date of approval of the Rights Plan but prior to the Separation Time may only be made with the prior consent of the Independent Shareholders, provided that no such supplement, amendment or variance shall be made to the provisions relating to the Rights Agent except with the concurrence of the Rights Agent. Any supplement or amendment made on or after the Separation Time may only be made with the prior consent of the holders of Rights, provided that no such supplement, amendment or variance shall be made to the provisions relating to the Rights Agent except with the concurrence of the Rights Agent. In addition, any amendment to the Rights Agreement is subject to the prior written consent of the TSX.

*Term*

The Rights Plan became effective on June 14, 2006, and will terminate if not ratified by a resolution passed by a majority of greater than 50 per cent of the votes cast by independent holders of Rubicon Common Shares who vote in respect of approval of the Rights Agreement at the Meeting. A Shareholder will be considered "**independent**" and considered eligible to vote for this purpose as long as the Shareholder has not commenced, or announced an

intention to commence, a take-over bid for Rubicon Common Shares and is not an associate or affiliate of, or acting jointly or in concert with, any other person who has done so. Unless earlier redeemed by the Board of Directors of Rubicon, the Rights expire on the close of the Company's 2011 annual meeting, unless reconfirmed at such meeting. If reconfirmed at the Company's 2011 annual meeting, unless earlier redeemed by the Board of Directors of Rubicon, the Rights Plan will expire at the close of the 2016 annual meeting.

*2006 Amendments*

The amendments to the Rights Agreement approved by the Board of Directors of Rubicon on June 14, 2006 are limited in number and effect. The amendments include (i) replacing references to *Company Act* (British Columbia) with references to the *Business Corporations Act* (British Columbia), reflecting British Columbia's adoption in 2004 of the *Business Corporations Act* (British Columbia) to replace the *Company Act* (British Columbia); (ii) amendments of a technical nature designed to bring the Rights Plan up-to-date with respect to prevailing current practice; and (iii) the correction of certain typographical and similar errors; and (iv) inserting a clause under the "adjustment" provisions of the Rights Agreement to the effect that no special adjustments and no additional issuances of securities will be triggered under the Rights Plan as a result of the Plan of Arrangement.

**Shareholder Approval**

The shareholders of the Company will be asked to consider and, if thought appropriate, to approve, adopt and ratify an ordinary resolution in substantially the form set out in Schedule "H" hereto approving the Rights Plan.

The Board of Directors of Rubicon is of the view that passing the ordinary resolution approving the Rights Plan is in the best interests of Rubicon and recommends that Shareholders vote in favour of this ordinary resolution**. Unless otherwise directed, it is the intention of the Management Designees, if named as proxy, to vote in favour of this ordinary resolution.**

## EXPERTS

Davis & Company LLP, Canadian counsel to Rubicon, and Dorsey & Whitney LLP, U.S. counsel to Rubicon have prepared the respective summaries of the Canadian and United States Federal Income Tax considerations generally applicable to the holders of Rubicon Common Shares disclosed under the heading "Income Tax Considerations" of this Circular.

The summary of the McFinley Property disclosed in Schedule "I" of this Circular under the heading "Information Concerning Rubicon After the Arrangement – Principal Properties" was taken from a NI 43-101 report entitled "An Update on Exploration Activities of Rubicon Minerals Corporation on the McFinley Property" dated December 9, 2005 and prepared for Rubicon by Marc Prefontaine, M.Sc. P. Geo, an independent consulting geologist and member of the Association of Engineers and Geoscientists of British Columbia.

The summary of the JBP Linear Property disclosed in Schedule "J" of this Circular under "Information Concerning Paragon After the Arrangement – Principal Properties" was taken from a NI 43-101 report entitled "Technical Report for the JBP Linear Property" dated December 9, 2005 and prepared for Rubicon by Larry Pilgrim, P. Geol, an independent consulting geologist and member of the Association of Engineers, Geologists of Newfoundland and Labrador.

The summary of the Golden Promise Property disclosed in Schedule "J" of this Circular under "Information Concerning Paragon After the Arrangement – Principal Properties" was taken from a NI 43-101 report entitled "Technical Report for the Golden Promise Property" dated December 9, 2005 and prepared for Rubicon by Larry Pilgrim, P. Geol, an independent consulting geologist and member of the Association of Engineers, Geologists of Newfoundland and Labrador.

The summary of the Kalukundi project disclosed in Schedule "K" to this Circular under "Information Concerning CopperCo After the Arrangement – Principal Properties" was taken from a NI 43-101 report entitled "Kalukundi Project – Technical Report" dated June, 2006 and prepared for Africo by John Hearne, an independent consulting mining engineer registered with the AUSIMM, Julian Verbeek, an independent consulting geologist registered with

the AUSIMM and SACNASP, and David Dodd, an independent consulting extractive metallurgist registered with the SAIMM.

Except as noted below, none of the aforementioned experts has received a direct or indirect interest in the property of Rubicon or any associate or affiliate of Rubicon. Copies of the four technical reports described above may be viewed on written request to Rubicon or on SEDAR at www.sedar.com.

As at the date hereof, the aforementioned persons, and the directors, officers, employees and partners, as applicable, of each of the aforementioned entities beneficially own, directly or indirectly, in the aggregate, less than one percent of the securities of Rubicon.

David R. Reid is a Director of Rubicon and a partner at Davis & Company LLP, Canadian legal counsel to Rubicon. Other than Mr. Reid, neither the aforementioned persons, nor any director, officer, employee or partner, as applicable, of the aforementioned entities is currently expected to be elected, appointed or employed as a director, officer or employee of Rubicon or of any associate or affiliate of Rubicon.

## PROMOTERS

Rubicon is the promoter of Paragon and CopperCo. Rubicon took the initiative in the organization of Paragon and CopperCo and accordingly, may be considered to be the promoter of the two new companies within the meaning of applicable securities legislation. Rubicon may hold Paragon Common Shares immediately following the Arrangement if Rubicon exercises its right to participate in the Paragon Financing. See Schedule “J”, “Information Concerning Paragon after the Arrangement – Funds Available – Private Placement Financing.” Although Rubicon intends to exercise its conversion right under the Bridge Loan prior to the Effective Date (in which case the securities received on such exercise would be distributed to the Shareholders pursuant to the Arrangement), if Rubicon does not exercise its conversion right prior to the Effective Date, Rubicon could hold CopperCo Common Shares, or the right to receive CopperCo Common Shares, immediately following the Arrangement. See Schedule “K”, “Information Concerning CopperCo after the Arrangement – Funds Available.”

## LEGAL PROCEEDINGS

Neither Rubicon, Paragon, nor CopperCo is party to any material legal proceedings, and each company is not aware of any such proceedings known to be contemplated.

## OTHER BUSINESS

**Management of Rubicon knows of no matters to come before the Meeting other than those referred to in the Notice of Meeting accompanying this Circular. However, if any other matters properly come before the Meeting, it is the intention of the Management Designees to vote the same in accordance with their best judgment of such matters**.

## SHAREHOLDER PROPOSALS

ANY SHAREHOLDER WHO INTENDS TO PRESENT A PROPOSAL AT RUBICON’S 2007 ANNUAL GENERAL MEETING OF SHAREHOLDERS MUST SEND THE PROPOSAL TO RUBICON’S CORPORATE SECRETARY AT THE REGISTERED OFFICE OF RUBICON, 2800 – 666 BURRARD STREET, VANCOUVER, BC V6C 2Z7. IN ORDER FOR THE PROPOSAL TO BE INCLUDED IN RUBICON’S PROXY MATERIALS SENT TO THE SHAREHOLDERS, IT MUST BE RECEIVED BY RUBICON NO LATER THAN MARCH 29, 2007 AND MUST COMPLY WITH THE REQUIREMENTS OF SECTION 188 OF THE *BUSINESS CORPORATIONS ACT* (BRITISH COLUMBIA). RUBICON IS NOT OBLIGATED TO INCLUDE ANY SHAREHOLDER PROPOSAL IN ITS PROXY MATERIALS FOR THE 2007 ANNUAL AND GENERAL MEETING IF THE PROPOSAL IS RECEIVED AFTER THE MARCH 29, 2007 DEADLINE.

## GENERAL

**Unless otherwise directed, it is the intention of the Management Designees to vote proxies in favour of the resolutions set forth herein.** All ordinary resolutions require, for the passing of the same, a simple majority of the votes cast in favour at the Meeting by the holders of Rubicon Common Shares. All special resolutions require, for its passing of the same, a two-thirds majority of the votes cast in favour at the Meeting by the holders of Rubicon Common Shares.

## ADDITIONAL INFORMATION

Additional information concerning Rubicon is available on SEDAR at www.sedar.com. Financial information concerning Rubicon is provided in Rubicon's comparative financial statements and Management Discussion and Analysis for the financial year ended December 31, 2005.

Shareholders wishing to obtain a copy of Rubicon's financial statements and Management's Discussion and Analysis may contact the Company as follows:

Rubicon Minerals Corporation
Suite 1540 - 800 West Pender Street
Vancouver, BC
V6C 2V6
Telephone: (604) 623-3333
Facsimile: (604) 623-3355
Website: www.rubiconminerals.com

## DIRECTORS APPROVAL

The content and sending of this Circular have been approved by the Board of Directors of Rubicon. The foregoing contains no untrue statement of a material fact and does not omit to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made.

BY ORDER OF THE BOARD OF DIRECTORS

(signed) "*David W. Adamson*"

President & CEO

Vancouver, BC
July 7, 2006

## AUDITORS CONSENT

**Re: Rubicon Minerals Corporation ("the Company")**

We have read the Management Information Circular of the Company dated July 7, 2006 relating to the Company's proposed spin-off of interests in certain exploration assets located in Newfoundland and the Democratic Republic of Congo, and related transactions. We confirm that we have complied with Canadian generally accepted standards for an auditor's involvement with Management Information Circulars.

We consent to the use in the above-mentioned Management Information Circular of our report to the shareholders of the Company in respect to the Company's balance sheets as at December 31, 2005 and 2004, and the statements of operations and deficit and cash flows for each of the years in the three year period ended December 31, 2005. Our report was dated March 24, 2006.

Yours truly,

***(signed) DeVisser Gray***

Chartered Accountants

Vancouver, British Columbia

July 7, 2006

## AUDITORS CONSENT

**Re: CopperCo Resources Corp. ("the Company")**

We have read the Management Information Circular of Rubicon Minerals Corporation ("Rubicon") dated July 7, 2006 relating to Rubicon's proposed spin-off of interests in certain exploration assets located in Newfoundland and the Democratic Republic of Congo, and related transactions. We confirm that we have complied with Canadian generally accepted standards for an auditor's involvement with Management Information Circulars.

We consent to the use in the above-mentioned Management Information Circular of our report to the directors of the Company in respect to the Company's balance sheet as at July 4, 2006. Our report was dated July 7, 2006.

Yours truly,

***(signed) DeVisser Gray***

Chartered Accountants

Vancouver, British Columbia

July 7, 2006

## AUDITORS' CONSENT

**Re: Paragon Minerals Corporation ("the Company")**

We have read the Management Information Circular of Rubicon Minerals Corporation ("Rubicon") dated July 7, 2006 relating to Rubicon's proposed spin-off of interests in certain exploration assets located in Newfoundland and the Democratic Republic of Congo, and related transactions. We confirm that we have complied with Canadian generally accepted standards for an auditor's involvement Management Information Circulars.

We consent to the use in the above-mentioned Management Information Circular of our report to the directors of the Company in respect to the Company's balance sheet as at July 4, 2006. Our report was dated July 7, 2006.

Yours truly,

***(signed) DeVisser Gray***

Chartered Accountants

Vancouver, British Columbia

July 7, 2006

## AUDITORS' CONSENT

We have read the Management Information Circular (the "Circular") of Rubicon Minerals Corporation ("Rubicon") dated July 7, 2006 relating to the proposed plan of arrangement involving Rubicon, Paragon Minerals Corporation, CopperCo Resource Corp. and Africo Resources Ltd. We have complied with Canadian generally accepted standards for an auditor's involvement with offering documents.

We consent to the use, through incorporation by reference in the above-mentioned Circular, of our report dated May 29, 2006 to the shareholders of Africo Resources Ltd. ("Africo") on the following financial statements:

- Consolidated balance sheets of Africo as at December 31, 2005 and 2004.
- Consolidated statements of operations, deficit and cash flows for the periods ended December 31, 2004 and 2005

***(signed) Pricewaterhouse Coopers LLP***

Chartered Accountants

Vancouver, British Columbia

July 7, 2006

## INDEX TO SCHEDULES

| | | Page |
|---|---|---|
| Schedule A | Financial Statements | A-1 |

- Audited Consolidated Financial Statements of Rubicon for the financial years ended December 31, 2005, 2004 and 2003 and the auditor's report thereon
- Management Discussion and Analysis of Rubicon for the fiscal year ended December 31, 2005
- Interim Consolidated Financial Statements of Rubicon for the three months ended March 31, 2006
- Management Discussion and Analysis of Rubicon for the three months ended March 31, 2006
- Pro-forma Consolidated Balance Sheet of Rubicon as at March 31, 2006
- Pro-forma Balance Sheet of Paragon as at March 31, 2006
- Pro-forma Balance Sheet of CopperCo as at March 31, 2006
- Audited Financial Statements of Africo for the financial years ended December 31, 2005 and 2004
- Interim Financial Statements of Africo for the three months ended March 31, 2006
- Audited Balance Sheet of Paragon as at July 4, 2006
- Audited Balance Sheet of CopperCo as at July 4, 2006

| | | |
|---|---|---|
| Schedule B | Interim Order | B-1 |
| Schedule C | Notice of Hearing of Petition for Final Order | C-1 |
| Schedule D | Arrangement Agreement | D-1 |
| Schedule E | Arrangement Resolution | E-1 |
| Schedule F | Paragon Stock Option Plan Resolution | F-1 |
| Schedule G | CopperCo Stock Option Plan Resolution | G-1 |
| Schedule H | Shareholder Rights Plan Resolution | H-1 |
| Schedule I | Information Concerning Rubicon after the Arrangement | I-1 |
| Schedule J | Information Concerning Paragon after the Arrangement | J-1 |
| Schedule K | Information Concerning CopperCo after the Arrangement | K-1 |
| Schedule L | Dissent Rights | L-1 |
| Schedule M | Risk Factors | M-1 |
| Schedule N | Disclosure of Corporate Governance Practices | N-1 |

**TABLE OF CONTENTS**


SCHEDULE A FINANCIAL STATEMENTS ..... A-1

SCHEDULE B INTERIM ORDER ..... B-1

SCHEDULE C NOTICE OF HEARING OF PETITION FOR FINAL ORDER ..... C-1

SCHEDULE D ARRANGEMENT AGREEMENT ..... D-1

SCHEDULE E ARRANGEMENT RESOLUTION ..... E-1

SCHEDULE F PARAGON STOCK OPTION PLAN RESOLUTION ..... F-1

SCHEDULE G COPPERCO STOCK OPTION PLAN RESOLUTION ..... G-1

SCHEDULE H SHAREHOLDER RIGHTS PLAN RESOLUTION ..... H-1

SCHEDULE I INFORMATION CONCERNING RUBICON AFTER THE ARRANGEMENT ..... I-1

SCHEDULE J INFORMATION CONCERNING PARAGON AFTER THE ARRANGEMENT ..... J-1

SCHEDULE K INFORMATION CONCERNING COPPERCO AFTER THE ARRANGEMENT ..... K-1

SCHEDULE L DISSENT RIGHTS ..... L-1

SCHEDULE M RISK FACTORS ..... M-1

SCHEDULE N DISCLOSURE OF CORPORATE GOVERNANCE PRACTICES ..... N-1

**SCHEDULE "A"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**FINANCIAL STATEMENTS**

- Audited Consolidated Financial Statements of Rubicon for the financial years ended December 31, 2005, 2004 and 2003 and the auditor's report thereon
- Interim Unaudited Consolidated Financial Statements of Rubicon for the three months ended March 31, 2006
- Management's Discussion and Analysis of Rubicon for the fiscal year ended December 31, 2005
- Management's Discussion and Analysis of Rubicon for the three months ended March 31, 2006
- Pro-forma Consolidated Balance Sheets of Rubicon as at March 31, 2006
- Pro-forma Balance Sheet of Paragon as at March 31, 2006
- Pro-forma Balance Sheet of CopperCo as at March 31, 2006
- Audited Financial Statements of Africo for the financial years ended December 31, 2005 and 2004
- Interim Financial Statements of Africo for the three months ended March 31, 2006
- Audited Balance Sheet of Paragon as at July 4, 2006
- Audited Balance Sheet of CopperCo as at July 4, 2006

# RUBICON MINERALS CORPORATION

Consolidated Financial Statements
(Stated in Canadian Dollars)

December 31, 2005
and
December 31, 2004

**RUBICON MINERALS CORPORATION**

**MANAGEMENT'S RESPONSIBILITY FOR FINANCIAL REPORTING**

The accompanying consolidated financial statements of the company have been prepared by management in accordance with accounting principles generally accepted in Canada and reconciled to accounting principles generally accepted in the United States as set out in note 13, and contain estimates based on management's judgment. Management maintains an appropriate system of internal controls to provide reasonable assurance that transactions are authorized, assets safeguarded, and proper records maintained.

The Company's independent auditors, Devisser Gray, Chartered Accountants, are appointed by the shareholders to conduct an audit in accordance with generally accepted auditing standards in Canada and the Public Company Accounting Oversight Board (United States), and their report follows.

The Audit Committee of the Board of Directors has met with the company's independent auditors to review the scope and results of the annual audit, and to review the financial statements and related financial reporting matters prior to submitting the financial statements to the Board for approval.

"*David Adamson*"
David Adamson
President

"*Robert Lewis*"
Robert Lewis
Chief Financial Officer

DE VISSER GRAY
CHARTERED ACCOUNTANTS

401 - 905 West Pender Street
Vancouver, BC Canada
V6C 1L6

Tel: (604) 687-5447
Fax: (604) 687-6737

## AUDITORS' REPORT

To the Shareholders of Rubicon Minerals Corporation

We have audited the consolidated balance sheets and consolidated statements of mineral property costs of Rubicon Minerals Corporation as at December 31, 2005 and 2004 and the consolidated statements of operations and deficit and cash flows for each of the years in the three year period ended December 31, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in Canada and the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statements are free of materials misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2005 and 2004 and the results of its operations and cash flow for each of the years in the three year period ended December 31, 2005 in accordance with generally accepted accounting principles in Canada.

"De Visser Gray"
**CHARTERED ACCOUNTANTS**

Vancouver, British Columbia
March 24, 2006, except as at note 14, which is as at March 29, 2006

## COMMENTS BY AUDITORS FOR U.S. READERS ON CANADA - U.S. REPORTING CONFLICT

In the United States, reporting standards for auditors require the addition of an explanatory paragraph (following the opinion paragraph) when the financial statements are affected by significant uncertainties and contingencies such as those referred to in note 1 to these consolidated financial statements. Although we conducted our audits in accordance with both Canadian and U.S. generally accepted auditing standards, our report to the shareholders dated March 24, 2006 is expressed in accordance with Canadian reporting standards which do not require a reference to such matters when the uncertainties are adequately disclosed in the consolidated financial statements.

"De Visser Gray"
**CHARTERED ACCOUNTANTS**

Vancouver, British Columbia
March 24, 2006, except as at note 14, which is as at March 29, 2006

# RUBICON MINERALS CORPORATION

Consolidated Balance Sheets
*(Stated in Canadian Dollars)*

| | As at December 31 | |
|---|---|---|
| | **2005** | **2004** |
| Assets | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 2,810,503 | $ 6,941,848 |
| Amounts receivable | 927,210 | 263,731 |
| Prepaid expenses | 23,373 | 64,202 |
| | 3,761,086 | 7,269,781 |
| **Investments** (note 5) | 6,546,411 | 3,177,783 |
| **Equipment** (note 6) | 51,228 | 56,604 |
| **Mineral property costs** (note 7) | 22,961,644 | 19,815,494 |
| | $ 33,320,369 | $ 30,319,662 |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued liabilities | $ 519,961 | $ 897,397 |
| **Non-controlling interest** | 407,479 | 474,340 |
| **Shareholders' equity** | | |
| Share capital (note 8(a)) | 45,610,692 | 39,184,721 |
| Contributed surplus (note 8(b)) | 2,623,780 | 1,960,463 |
| Deficit | (15,841,543) | (12,197,259) |
| | 32,392,929 | 28,947,925 |
| | $ 33,320,369 | $ 30,319,662 |

*See accompanying notes to the consolidated financial statements*

Continuance of Operations (note 1)
Commitments (Note 10)
Subsequent events (Note 14)

Approved by the Board of Directors:

"David Adamson" — David Adamson, Director

"John Brodie" — John R. Brodie, FCA, Director

# RUBICON MINERALS CORPORATION

Consolidated Statements of Operations and Deficit
*(Stated in Canadian Dollars)*

| | For the years ended December 31 | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| **Expenses** | | | |
| Amortization | $ 17,412 | $ 19,130 | $ 12,543 |
| Consulting | 138,847 | 187,032 | 124,726 |
| General mineral exploration | 283,391 | 214,962 | 201,527 |
| Investor relations | 496,172 | 354,539 | 413,911 |
| Office | 200,922 | 220,635 | 119,189 |
| Professional fees | 304,741 | 238,463 | 186,221 |
| Rent | 84,418 | 59,127 | 68,634 |
| Salaries | 629,701 | 528,836 | 335,142 |
| Stock-based compensation (notes 3 and 8(b)) | 683,671 | 983,380 | 556,046 |
| Telephone | 17,946 | 15,121 | 7,910 |
| IPO costs of subsidiary | 2,913 | 411,188 | - |
| Re-organization costs (note 2) | 129,210 | - | - |
| Transfer agent and regulatory filing fees | 112,797 | 130,095 | 153,341 |
| Travel and accommodation | 28,804 | 35,225 | 28,417 |
| Write-off of mineral property costs | 1,715,674 | 1,713,144 | 231,388 |
| **Loss before other items** | (4,846,619) | (5,110,877) | (2,438,995) |
| Corporate capital tax expense | - | - | (47,012) |
| Interest and miscellaneous income | 82,232 | 150,018 | 153,910 |
| Option and administration fees in excess of property costs | 119,606 | - | - |
| Gain on sale of investments | 76,765 | 694,769 | 19,703 |
| Gain on settlement of debt | 101,251 | - | - |
| Loss on equity investment | (288,323) | (25,000) | - |
| Future income tax recovery (note 8(a)) | 1,043,943 | - | - |
| Allocation of subsidiary's loss to minority interest | 66,861 | 208,254 | - |
| **Net loss for the year** | (3,644,284) | (4,082,836) | (2,312,394) |
| **Deficit, beginning of year** | (12,197,259) | (8,114,423) | (5,802,029) |
| **Deficit, end of year** | $ (15,841,543) | $ (12,197,259) | $ (8,114,423) |
| **Basic and diluted loss per common share** | $ (0.06) | $ (0.08) | $ (0.05) |
| Weighted average number of common shares outstanding | 60,223,727 | 52,919,912 | 43,240,383 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Consolidated Statements of Cash Flows

*(Stated in Canadian Dollars)*

| | For the years ended December 31 | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| **Cash Provided by (Used for):** | | | |
| **Operating Activities** | | | |
| Net loss for the year | $ (3,644,284) | $ (4,082,836) | $ (2,312,394) |
| Adjustment for items which do not involve cash: | | | |
| Amortization | 17,412 | 19,130 | 12,543 |
| Stock-based compensation | 683,671 | 1,100,980 | 556,046 |
| Write-off of mineral property costs | 1,715,674 | 1,713,144 | 231,388 |
| Gain on sale of investments | (76,765) | (694,769) | (19,703) |
| Loss on equity investment | 288,323 | 25,000 | - |
| Future income tax recovery | (1,043,943) | - | - |
| Allocation of subsidiary's loss to minority interest | (66,861) | (208,254) | - |
| | (2,126,773) | (2,127,605) | (1,532,120) |
| Changes in non-cash working capital components: | | | |
| Prepaid expenses | 40,829 | (43,798) | (14,948) |
| Amounts receivable | (663,479) | 689,334 | (768,668) |
| Accounts payable and accrued liabilities | (525,011) | (46,049) | (85,553) |
| | (3,274,434) | (1,528,118) | (2,401,289) |
| **Investing Activities*** | | | |
| Mineral property costs | (6,354,538) | (8,599,220) | (9,317,324) |
| Purchase of equipment | (12,036) | (31,631) | (17,692) |
| Purchase of investments | (4,151,793) | (4,004,193) | (300,000) |
| Proceeds on sales of investments | 804,233 | 2,489,294 | 33,737 |
| Cash acquired in capital transaction | - | - | 714,031 |
| | (9,714,134) | (10,145,750) | (8,887,248) |
| **Financing Activities*** | | | |
| Common shares issued for cash | 8,200,368 | 3,628,330 | 17,700,909 |
| Share issue costs | (902,328) | (413,658) | (1,238,338) |
| Recovery of property costs incurred | 1,495,182 | 3,857,365 | 4,677,732 |
| Management and administration fees received | 64,001 | 241,605 | 290,342 |
| | 8,857,223 | 7,313,642 | 21,430,645 |
| **Net cash (used) provided during the year** | (4,131,345) | (4,360,226) | 10,142,108 |
| **Cash and cash equivalents, beginning of year** | 6,941,848 | 11,302,074 | 1,159,966 |
| **Cash and cash equivalents, end of year** | $ 2,810,503 | $ 6,941,848 | $ 11,302,074 |

During the year, the Company paid and received interest as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Interest received | $ 69,128 | $ 157,149 | $ 134,626 |
| Interest paid | $ 26,249 | $ 1,137 | $ 2,874 |

****Supplemental Disclosure of Non-Cash Investing and Financing Activities** – Refer to Note 11.*

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Consolidated Statements of Mineral Property Costs

*(Stated in Canadian Dollars)*

| | Balance December 31 2003 | Gross Expenditures 2004 | Write-off or Recovery 2004 | Balance December 31 2004 | Gross Expenditures 2005 | Write-off or Recovery 2005 | Balance December 31 2005 |
|---|---|---|---|---|---|---|---|
| **CANADA** | | | | | | | |
| **ONTARIO** | | | | | | | |
| **RED LAKE MINING DIVISION** | | | | | | | |
| **McFinley Property** | | | | | | | |
| Acquisition and option payments | $ 2,766,606 | $ 360,092 | $ - | $ 3,126,698 | $ 265,742 | $ - | $ 3,392,440 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 1,188,210 | 80,818 | - | 1,269,028 | 141,655 | - | 1,410,683 |
| Drilling | 1,876,454 | 1,731,442 | - | 3,607,896 | 2,067,733 | - | 5,675,629 |
| Geophysical | 99,802 | 1,345 | - | 101,147 | - | - | 101,147 |
| Travel and accommodation | 96,221 | 40,529 | - | 136,750 | 46,291 | - | 183,041 |
| Other | 29,659 | 1,637 | - | 31,296 | 760 | - | 32,056 |
| | 6,056,952 | 2,215,863 | - | 8,272,815 | 2,522,181 | - | 10,794,996 |
| **Other Red Lake Properties** | | | | | | | |
| Acquisition and option payments | 595,957 | 73,768 | (230,862) | 438,863 | 112,564 | (77,750) | 473,677 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 614,503 | 289,371 | (167,157) | 736,717 | 360,778 | (142,682) | 954,813 |
| Drilling | 548,862 | 676,490 | (628,929) | 596,423 | 593,823 | (567,127) | 623,119 |
| Geophysical | 297,088 | 78,641 | (95,419) | 280,310 | - | - | 280,310 |
| Travel and accommodation | 40,783 | 47,339 | (18,652) | 69,470 | 24,083 | (13,890) | 79,663 |
| Other | 3,118 | - | (137) | 2,981 | 32,511 | (18) | 35,474 |
| *Administration fees (earned)* | (370,962) | - | (65,082) | (436,044) | - | (23,650) | (459,694) |
| | 1,729,349 | 1,165,609 | (1,206,238) | 1,688,720 | 1,123,759 | (825,117) | 1,987,362 |
| **McCuaig JV Project** | | | | | | | |
| Acquisition and option payments | 79,940 | 24,000 | - | 103,940 | 6,000 | - | 109,940 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 414,334 | 57,552 | (32,385) | 439,501 | 12,438 | (2,569) | 449,370 |
| Drilling | 992,186 | 252,436 | (100,975) | 1,143,647 | 582 | - | 1,144,229 |
| Geophysical | 27,682 | - | (257) | 27,425 | - | - | 27,425 |
| Travel and accommodation | 27,192 | 7,904 | (2,904) | 32,192 | - | - | 32,192 |
| Other | 1,400 | 1,000 | (400) | 2,000 | - | - | 2,000 |
| *Administration fees (earned)* | (16,886) | - | (10,492) | (27,378) | - | (257) | (27,635) |
| | 1,525,848 | 342,892 | (147,413) | 1,721,327 | 19,020 | (2,826) | 1,737,521 |
| **English Royalty Division** | | | | | | | |
| Acquisition and option payments | 525,438 | 249,952 | (604,058) | 171,332 | 44,575 | (140,907) | 75,000 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 86,420 | 158,449 | - | 244,869 | 113,879 | - | 358,748 |
| Travel and accommodation | 2,328 | 3,201 | - | 5,529 | 3,590 | - | 9,119 |
| Other | 23 | 84 | - | 107 | - | - | 107 |
| | 614,209 | 411,686 | (604,058) | 421,837 | 162,044 | (140,907) | 442,974 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Consolidated Statements of Mineral Property Costs

*(Stated in Canadian Dollars)*

| | Balance December 31 2003 | Gross Expenditures 2004 | Write-off or Recovery 2004 | Balance December 31 2004 | Gross Expenditures 2005 | Write-off or Recovery 2005 | Balance December 31 2005 |
|---|---|---|---|---|---|---|---|
| **ONTARIO** *(continued)* | | | | | | | |
| **Other Ontario Properties** | | | | | | | |
| Acquisition and option payments | $ 41,310 | $ - | $ (41,310) | $ - | $ - | $ - | $ - |
| Exploration costs | | - | | - | - | - | - |
| Geological and geochemical | 22,722 | - | (22,722) | - | - | - | - |
| Geophysical | 56,362 | - | (56,362) | - | - | - | - |
| Travel and accommodation | 1,322 | - | (1,322) | - | - | - | - |
| | 121,716 | - | (121,716) | - | - | - | - |
| **NEWFOUNDLAND GOLD PROPERTIES** | | | | | | | |
| **StarTrack Trend Properties** | | | | | | | |
| Acquisition and option payments | 308,578 | 86,408 | (150,744) | 244,242 | - | - | 244,242 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 429,479 | 90,306 | (72,340) | 447,445 | 41,030 | - | 488,475 |
| Drilling | - | 224,058 | (100,000) | 124,058 | - | - | 124,058 |
| Geophysical | 57,197 | - | (56,715) | 482 | - | - | 482 |
| Travel and accommodation | 10,026 | 1,277 | (734) | 10,569 | 231 | (38) | 10,762 |
| Other | 450 | 3,130 | - | 3,580 | - | - | 3,580 |
| | 805,730 | 405,179 | (380,533) | 830,376 | 41,261 | (38) | 871,599 |
| **Golden Promise Trend Properties** | | | | | | | |
| Acquisition and option payments | 289,611 | 219,495 | (360,680) | 148,426 | 141,912 | (87,000) | 203,338 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 238,642 | 622,733 | (608,021) | 253,354 | 292,631 | (141,209) | 404,776 |
| Drilling | 108,505 | 392,168 | (328,608) | 172,065 | 16,218 | (9,824) | 178,459 |
| Geophysical | 117,321 | - | (62,742) | 54,579 | 750 | - | 55,329 |
| Travel and accommodation | 6,355 | 16,188 | (14,807) | 7,736 | 7,402 | (4,389) | 10,749 |
| Other | - | 296 | (296) | - | 71 | (71) | - |
| *Administration fees (earned)* | (74,203) | - | (104,641) | (178,844) | - | (11,857) | (190,701) |
| | 686,231 | 1,250,880 | (1,479,795) | 457,316 | 458,984 | (254,350) | 661,950 |
| **Avalon Trend Properties** | | | | | | | |
| Acquisition and option payments | 102,566 | 109,725 | (52,508) | 159,783 | 30,044 | (120,889) | 68,938 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 296,213 | 339,711 | (380,247) | 255,677 | 49,427 | (109,299) | 195,805 |
| Drilling | - | 263,443 | (263,443) | - | 7,163 | (7,163) | - |
| Travel and accommodation | 4,497 | 2,115 | (2,433) | 4,179 | 437 | (561) | 4,055 |
| Other | - | 1,366 | (641) | 725 | 418 | (1,143) | - |
| *Administration fees (earned)* | - | - | (42,671) | (42,671) | | 26,220 | (16,451) |
| | 403,276 | 716,360 | (741,943) | 377,693 | 87,489 | (212,835) | 252,347 |
| **Glenwood-Botwood Trend Properties** | | | | | | | |
| Acquisition and option payments | 323,842 | 246,707 | (168,199) | 402,350 | 306,750 | (33,568) | 675,532 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 581,843 | 502,002 | (68,856) | 1,014,989 | 767,521 | (241,759) | 1,540,751 |
| Drilling | | 395,568 | (104,467) | 291,101 | 374,997 | - | 666,098 |
| Geophysical | 236,806 | 39,279 | (20,056) | 256,029 | 34,158 | (31,158) | 259,029 |
| Travel and accommodation | 5,849 | 5,534 | (1,357) | 10,026 | 5,215 | - | 15,241 |
| *Administration fees (earned)* | (39,887) | - | (3,026) | (42,913) | - | (24,811) | (67,724) |
| | 1,108,453 | 1,189,090 | (365,961) | 1,931,582 | 1,488,641 | (331,296) | 3,088,927 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Consolidated Statements of Mineral Property Costs

*(Stated in Canadian Dollars)*

| | Balance December 31 2003 | Gross Expenditures 2004 | Write-off or Recovery 2004 | Balance December 31 2004 | Gross Expenditures 2005 | Write-off or Recovery 2005 | Balance December 31 2005 |
|---|---|---|---|---|---|---|---|
| **NEWFOUNDLAND GOLD PROPERTIES** *(continued)* | | | | | | | |
| **New World Trend Property** | | | | | | | |
| Acquisition and option payments | $ 16,090 | $ 53,600 | $ - | $ 69,690 | $ 37,850 | $ - | $ 107,540 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 233,879 | 69,566 | - | 303,445 | 27,013 | - | 330,458 |
| | | 567 | - | 567 | 1,583 | - | 2,150 |
| Travel and accommodation | 1,817 | 43 | - | 1,860 | 14 | - | 1,874 |
| | 251,786 | 123,776 | - | 375,562 | 66,460 | - | 442,022 |
| **GNP Trend Property** | | | | | | | |
| Acquisition and option payments | 34,171 | - | (34,171) | - | - | - | - |
| Exploration costs | | | | | | | |
| Geological and geochemical | 27,257 | - | (27,257) | - | - | - | - |
| Travel and accommodation | 3,373 | - | (3,373) | - | - | - | - |
| | 64,801 | - | (64,801) | - | - | - | - |
| **Base Metal Properties** | | | | | | | |
| Acquisition and option payments | 284,891 | 44,599 | (239,798) | 89,692 | 36,790 | (76,493) | 49,989 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 390,408 | 8,994 | (150,631) | 248,771 | 125,460 | (4,500) | 369,731 |
| Drilling | 516,168 | 66,542 | (290,976) | 291,734 | 193,164 | - | 484,898 |
| Geophysical | 169,902 | - | (87,265) | 82,637 | - | - | 82,637 |
| Travel and accommodation | 33,270 | 1,193 | (12,476) | 21,987 | - | - | 21,987 |
| Other | 9,094 | - | (8,869) | 225 | - | - | 225 |
| *Administration fees (earned)* | (84,947) | - | 84,947 | - | - | - | - |
| | 1,318,786 | 121,328 | (705,068) | 735,046 | 355,414 | (80,993) | 1,009,467 |
| **BRITISH COLUMBIA** | | | | | | | |
| **Axelgold and Thumb Peak** | | | | | | | |
| Acquisition and option payments | 435,838 | - | (435,838) | - | - | - | - |
| Exploration costs | | | | | | | |
| Geological and geochemical | 58,715 | 601 | (59,316) | - | - | - | - |
| Drilling | 1,099 | 151 | (1,250) | - | - | - | - |
| Travel and accommodation | 2,943 | - | (2,943) | - | - | - | - |
| *Administration fees (earned)* | (63,860) | - | 63,860 | - | - | - | - |
| | 434,735 | 752 | (435,487) | - | - | - | - |
| **NUNAVUT, BAFFIN ISLAND** | | | | | | | |
| Incognita Joint Venture Property | | | | | | | |
| Acquisition and option payments | 84,048 | 65,000 | (149,048) | - | - | - | - |
| Exploration costs | | | | | | | |
| Geological and geochemical | 87,097 | (66,677) | (20,420) | - | - | - | - |
| Drilling | 32,758 | 97,050 | (129,808) | - | - | - | - |
| Geophysical | 14,151 | - | (14,151) | - | - | - | - |
| Travel and accommodation | 4,294 | 8,000 | (12,294) | - | - | - | - |
| Other | 354 | 22,178 | (22,532) | - | - | - | - |
| *Administration fees (earned)* | (197,608) | - | 197,608 | - | - | - | - |
| | 25,094 | 125,551 | (150,645) | - | - | - | - |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Consolidated Statements of Mineral Property Costs
*(Stated in Canadian Dollars)*

| | Balance December 31 2003 | Gross Expenditures 2004 | Write-off or Recovery 2004 | Balance December 31 2004 | Gross Expenditures 2005 | Write-off or Recovery 2005 | Balance December 31 2005 |
|---|---|---|---|---|---|---|---|
| **UNITED STATES OF AMERICA** | | | | | | | |
| **ALASKA** | | | | | | | |
| **Palmer Property** | | | | | | | |
| Acquisition and option payments | $ 908,389 | $ 136,566 | $ - | $ 1,044,955 | $ 105,480 | $ (941,020) | $ 209,415 |
| Exploration costs | | | | | | | |
| Geological and geochemical | 209,932 | 161,300 | - | 371,232 | 3,609 | - | 374,841 |
| Drilling | 682,215 | - | - | 682,215 | - | - | 682,215 |
| Travel and accommodation | 18,003 | - | - | 18,003 | - | - | 18,003 |
| Other | 18,013 | - | - | 18,013 | - | - | 18,013 |
| *Administration fees (earned)* | (76,483) | - | - | (76,483) | - | - | (76,483) |
| | 1,760,069 | 297,866 | - | 2,057,935 | 109,089 | (941,020) | 1,226,004 |
| **ARIZONA** | | | | | | | |
| **Yuma King Property** | | | | | | | |
| Acquisition and option payments | - | 54,202 | - | 54,202 | 6,340 | (60,542) | - |
| Exploration costs | | | | | | | |
| Geological and geochemical | - | 16,484 | - | 16,484 | 23 | (16,507) | - |
| Travel and accommodation | - | 1,188 | - | 1,188 | 210 | (1,398) | - |
| | - | 71,874 | - | 71,874 | 6,573 | (78,447) | - |
| **NEVADA** | | | | | | | |
| **Other Properties** | | | | | | | |
| Acquisition and option payments | 369,783 | 419,572 | (23,505) | 765,850 | 140,110 | (614,317) | 291,643 |
| Exploration costs | | | | | | | |
| Geological and geochemical | - | 118,794 | (11,233) | 107,561 | 72,608 | (25,337) | 154,832 |
| | 369,783 | 538,366 | (34,738) | 873,411 | 212,718 | (639,654) | 446,475 |
| **Mineral Property Costs** | $ 17,276,818 | $ 8,977,072 | $ (6,438,396) | $ 19,815,494 | $ 6,653,633 | $(3,507,483) | $ 22,961,644 |

**Property Costs Written-off**

The composition of the write-off figures by property classification is as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Other Red Lake Properties | $ - | $ 226,527 | $ 6,457 |
| Other Ontario | - | 121,716 | - |
| Avalon Trend Properties | 195,554 | - | - |
| Golden Promise Trend Properties | 6,186 | - | - |
| Newfoundland Base Metal Properties | - | 231,980 | 196,841 |
| Other Newfoundland Properties | 38 | 493,817 | 26,695 |
| Nunavut Properties | - | 150,645 | - |
| British Columbia Properties | - | 435,487 | - |
| Other Properties | 1,513,896 | 52,972 | 1,395 |
| Total costs written-off | 1,715,674 | 1,713,144 | 231,388 |
| Aggregate cost recoveries and administration fees received | 1,791,809 | 4,725,252 | 4,968,074 |
| Gross write-offs and recoveries | $ 3,507,483 | $6,438,396 | $ 5,199,462 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 1. NATURE AND CONTINUANCE OF OPERATIONS

The Company is incorporated in British Columbia, Canada and is primarily involved in the acquisition and exploration of mineral property interests in Canada, in the United States and in the Democratic Republic of Congo. At the date of these financial statements, the Company has not been able to identify a known body of commercial grade ore on any of its properties and the ability of the Company to recover the costs it has incurred to date on these properties is dependent upon the Company being able to identify a commercial ore body, to finance its exploration and development costs and to resolve any environmental, regulatory, or other constraints which may hinder the successful development of the property.

These consolidated financial statements have been prepared assuming the Company will continue on a going-concern basis. The Company has incurred losses since inception and has an accumulated operating deficit of $15.8 million at December 31, 2005 (2004 - $12.2 million). The ability of the Company to continue as a going-concern depends upon its ability to develop profitable operations and to continue to raise adequate equity financing to fund its exploration and administrative expenses.

There can be no assurance that the Company will be able to continue to raise funds in which case the Company may be unable to meet its obligations. Should the Company be unable to continue as a going-concern, the net realizable values of its assets may be materially less than the amounts recorded on the balance sheets.

## 2. PROPOSED RE-ORGANIZATION

On November 21, 2005, the Company announced that it intended to complete a corporate restructuring which would have the result of dividing its existing portfolio of mineral properties into three separate public companies. Following the corporate restructuring the Company is to continue to hold its Ontario properties and USA properties (subsequently superceded by the proposed disposition of the USA properties under the agreement with Carlin Gold Corp. and related Plan of Arrangement announced subsequent to the year end – refer to note 14). One of the newly-created companies is to hold all of the Company's Newfoundland properties. The other newly created company is to hold all of the Company's investment in Africo Resources Ltd. The proposed reorganization of the Company will be accomplished by way of a statutory Plan of Arrangement and is subject to shareholder, regulatory and court approvals.

## 3. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting and Consolidation

These consolidated financial statements are prepared in accordance with generally accepted accounting principles ("GAAP") in Canada. As described in note 13, these principles differ in certain respects from principles and practices generally accepted in the United States ("US") and requirements promulgated by the Securities and Exchange Commission. Summarized below are those policies considered particularly significant to the Company. References to the Company included herein are inclusive of the accounts of the parent company and its 60.4%-owned subsidiary, Toquima Minerals Corporation ("Toquima"). The investment in Africo Resources Ltd. is accounted for on the equity basis.

All intercompany balances have been eliminated.

### Use of Estimates

The preparation of financial statements in conformity with Canadian generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of any contingent assets and liabilities as at the date of the financial statements, as well as the reported amounts of revenues earned and expenses incurred during the period. Actual results could differ from those estimates.

The Company's investments in marketable securities are items that, due to expected market volume and price fluctuations, may yield net realizable values that are materially different from their current book values at any point in time. Other items involving substantial measurement uncertainty are the carrying costs of mineral property interests and the determination of stock-based compensation.

### Cash and Cash Equivalents

Cash and cash equivalents are comprised of cash and short-term notes and bank deposits with an original maturity of three months or less.

## 3. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Investments

The Company's investments are carried at cost and considered non-current assets as the Company intends to hold them for a period of greater than one year. If there is a loss in value that is other than temporary, the investments are written-down to their estimated market values.

### Equipment

Equipment is recorded and amortized over their estimated useful economic lives using declining balance method at annual rates of 20% for office furniture and equipment, 30% for computer equipment and 50% for software.

### Mineral Property Costs

The Company records its interest in mineral properties at cost. Acquisition, option payments and direct exploration costs are deferred until the properties are placed into production, sold or abandoned, at which time these deferred costs will be amortized on a unit-of-production basis, charged to operations if sold, or written-off.

Mineral property cost includes any cash consideration and advance royalties paid, and the fair market value of shares issued, if any, on the acquisition of mineral property interests. Properties acquired under option agreements, whereby payments are made at the sole discretion of the Company, are recorded in the accounts when the payments are made. The recorded amounts of property claim acquisition, option payments and direct exploration costs represent actual expenditures incurred and are not intended to reflect present or future values.

The Company's management reviews capitalized costs on its property interests on a periodic and annual basis for impairment in value based upon current exploration results and upon management's assessment of the future probability of profitable revenues from the property or from the sale of the property. Management's assessment of the property's estimated current fair market value may also be based upon a review of other property transactions that have occurred in the same geographic area as that of the property under review.

Administration and management fees earned, which generally range from 8% to 10% of the allowable expenditures associated with exploration on certain properties, are offset against the historical costs deferred on those properties. Administrative costs are expensed as incurred.

### Asset Retirement Obligations

The fair value of a liability for an asset retirement obligation is recognized on an undiscounted cash flow basis when a reasonable estimate of the fair value of the obligation can be made. The asset retirement obligation is recorded as a liability with a corresponding increase to the carrying amount of the related long-lived asset. Subsequently, the asset retirement cost is allocated to expense using a systematic and rational method and is adjusted to reflect period-to-period changes in the liability resulting from the passage of time and from revisions to either expected payment dates or the amounts comprising the original estimate of the obligation. As at December 31, 2005, the Company does not have any asset retirement obligations.

### Foreign Currency Translation

The Canadian dollar is the functional currency of all of the Company's operations which are classified as integrated for foreign currency translation purposes, and under this method translation gains or losses are included in the determination of net income or loss. Monetary assets and liabilities have been translated into Canadian dollars at the exchange rate in effect at balance sheet date. Non-Monetary assets, liabilities, revenues and expenses have been translated into Canadian dollars at the rate of exchange prevailing on the respective dates.

### Joint Ventures

The Company conducts some of its mineral property exploration activities in conjunction with other companies in unincorporated joint ventures. The Company accounts for its interests in joint ventures using the proportionate consolidation method.

## 3. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Financial Instruments and Financial Risk

The Company's financial instruments consists of cash, amounts receivable, accounts payable and accrued liabilities, the fair values of which approximate their carrying amounts due to the short-term nature of these instruments.

### Share Capital

Common shares issued for non-monetary consideration are recorded at their fair market value based upon the lower of the trading price of the Company's shares on the Toronto Stock Exchange on the date of the agreement to issue the shares or the date of share issuance. Flow-through shares are common shares which are issued under an agreement that, as provided for in the Canadian Income Tax Act, the Company transfers to the purchaser of the shares the benefits of the exploration expenditures that are financed by the proceeds of the share issue.

### Stock-based Compensation

The Company follows the Recommendations of the Canadian Institute of Chartered Accountants ("CICA") in connection with accounting for stock option-based compensation. The standard now requires that all stock option-based awards made to consultants and employees be recognized in these consolidated financial statements and measured using a fair value-based method.

Consideration received on the exercise of stock options and compensation options and warrants is recorded as share capital and the related contributed surplus originally recognized when the options were granted, is transferred to share capital.

### Income Taxes

The Company accounts for the tax consequences of the differences in the carrying amounts of assets and liabilities and their tax bases using tax rates expected to apply when these temporary differences are expected to be settled. When the future realization of income tax assets does not meet the test of being more likely than not to occur, a valuation allowance in the amount of the potential future benefit is taken and no net asset is recognized. The Company has taken a valuation allowance against all such potential tax assets.

Except for flow-through share issues, the Company's accounting policy for future income taxes currently had no effect on the financial statements of any of the fiscal years presented.

### Flow-through Shares

The Company has adopted the guidance of the CICA provided in Abstract #146 issued by its Emerging Issues Committee, which is effective for all flow-through share transactions initiated after March 19, 2004. Canadian tax legislation permits a company to issue securities referred to as flow-through shares whereby the investor may claim the tax deductions arising from the related resource expenditures. When resource expenditures are renounced to the investors and the Company has reasonable assurance that the expenditures will be completed, a future income tax liability is recognized and shareholders' equity is reduced.

If the Company has sufficient unused tax loss carry-forwards to offset all or part of this future income tax liability and no future income tax assets have been previously recognized for these carry-forwards, a portion, of such unrecognized losses, is recorded as income up to the amount of the future income tax liability that was previously recognized on the renounced expenditures

### Loss per share

Loss per share has been calculated using the weighted-average number of common shares outstanding during each year. Diluted loss per share is not presented as it is anti-dilutive to the loss per share figures.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 4. RELATED PARTY TRANSACTIONS

During 2005, the Company paid or accrued legal fees to a law firm, of which a partner is a director of the Company, aggregating to $379,857 (2004 - $664,277; 2003 - $291,791), including amounts paid or accrued by the Company's subsidiary, Toquima, amounting to $28,807 (2004 - $254,471). The fees are recorded within professional expenses, IPO costs of subsidiary (Toquima), mineral property acquisition costs, investments and share issue costs in these financial statements. As at December 31, 2005, this law firm is owed $9,884 (2004 - $277,521; 2003 - $62,569). These amounts are included in accounts payable and accrued liabilities and represent the unpaid portion of the legal fees as of the respective dates. In addition, during 2005, this law firm also billed nil (2004 - $53,920) in legal fees to Africo Resources Ltd., a long-term investment of the Company, accounted for by the equity method. During 2005, this firm agreed to settle debts of Toquima resulting in a reduction of fees payable of $77,234. All these transactions were recorded at their fair value amounts and were incurred in the normal course of business.

During 2004, the Company completed an option agreement with TLC Ventures Corp. ("TLC") , whereby TLC can acquire a 100% interest in the Point Leamington Property located on the island of Newfoundland in exchange for a total of 300,000 common shares of TLC and $250,000 in cash, both payable over 3 years. The Company and TLC had a common director at the time the Company entered into this option agreement. The option agreement was incurred in the normal course of business and all payments are recorded at their fair value amounts.

## 5. INVESTMENTS

The Company owns common shares in public and private companies as follows:

| | 2005 | | 2004 | |
|---|---|---|---|---|
| | Aggregate Cost | Market Value | Aggregate Cost | Market Value |
| | $ | $ | $ | $ |
| Public companies | 361,978 | 351,416 | 814,414 | 611,927 |
| Private company (a) | 6,184,433 | - * | 2,363,369 | - * |
| | 6,546,411 | 351,416 | 3,177,783 | 611,927 |

* - *The fair value of each outstanding common share of this private company is not readily determinable*

### (a) Investment in Africo Resources Ltd. ("Africo")

During 2004, the Company acquired a 60% interest in Africo, a British Columbia private company that controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo. During 2004, the Company resold part of its investment for a gain of $684,174. As at December 31, 2005, the Company owned 37.4% of Africo (2004 – 35.6%).

Changes in the investment are summarized as follows:

| | 2005 | 2004 |
|---|---|---|
| Balance, beginning of the year | $ 2,363,369 | $ - |
| Changes during the year: | | |
| Net participation in Africo equity financings | 4,109,387 | 3,748,585 |
| Partial sale of investment | - | (1,533,332) |
| Other investment costs | - | 173,116 |
| Equity interest in losses of Africo | (288,323) | (25,000) |
| Balance, end of the year | $ 6,184,433 | $ 2,363,369 |

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 6. EQUIPMENT

| | | | December 31 2005 | | | December 31 2004 |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net Book Value | Cost | Accumulated Amortization | Net Book Value |
| Furniture and fixtures | $ 52,570 | $ 37,332 | $ 15,238 | $ 52,570 | $ 33,523 | $ 19,047 |
| Computer equipment | 108,558 | 74,251 | 34,307 | 97,238 | 61,975 | 35,263 |
| Software | 5,731 | 4,048 | 1,683 | 5,016 | 2,722 | 2,294 |
| | $ 166,859 | $ 115,631 | $ 51,228 | $ 154,824 | $ 98,220 | $ 56,604 |

## 7. PROPERTY INTERESTS

The following is a summary of the Company's principal property interests, segregated by geographical location. It is not a comprehensive listing of all past or present property interests.

**CANADA**
**ONTARIO**
**RED LAKE MINING DIVISION**

### McFinley Gold Property

Pursuant to the terms of two separate agreements in fiscal 2002, the Company acquired an aggregate of 16 patented claims, 25 licences of occupation, and one mineral lease.

### Water Claims Agreement ("Water Claims")

The Company optioned the Water Claims (25 licences of occupation and one mineral lease) in January 2002 from Dominion Goldfields Corporation ("DGC") by agreeing to pay $800,000, issue 260,000 shares and complete US$1,300,000 of exploration prior to March 31, 2006. During 2004 the Company completed its acquisition of the Water Claims after meeting all the required payments and expenditures. The Water Claims are subject to a NSR royalty of 2%, for which advance royalties of US$50,000 are due annually (to a maximum of US$1,000,000 prior to commercial production).

The Company has the option to acquire a 0.5% NSR royalty for US$675,000 at any time. Upon a positive production decision the Company would be required to make an additional advance royalty payment of US$675,000, which would be deductible from commercial production royalties as well as certain of the maximum US$1,000,000 in advance royalty payments described above.

### Land Claims Agreement ("Land Claims")

The Company purchased the Land Claims (16 patented claims) from DGC in July 2002 for Cdn$500,000 and the issuance of 500,000 common shares. The Company also issued to the vendor 100,000 stock options (exercise price of $1.15 per common share, expiring July 2007). The Land Claims are subject to a sliding NSR royalty of 2-3%, for which advance royalties of Cdn$75,000 are due annually (to a maximum of Cdn$1,500,000 prior to commercial production). The Company has the option to acquire a 0.5% NSR royalty for Cdn$1,000,000 at any time. Upon a positive production decision the Company would be required to make an additional advance royalty payment of Cdn$1,000,000, which would be deductible from commercial production royalties as well as certain of the maximum Cdn$1,500,000 in advance royalty payments described above.

### Other Red Lake Properties

#### Manitou Property

During the year, the Company optioned the Manitou Property, consisting of 301 unpatented mining claims located in the Harper Lake and Lower Manitou Lake Townships, Kenora Mining Division, Ontario. The Company has the right to acquire a 100% interest in the property by making payments of $210,000 ($15,000 paid) cash and 70,000 shares over three years.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 7. PROPERTY INTERESTS *(continued)*

**Option Agreement with Goldcorp Inc.**

During 2003, the Company granted an option to Goldcorp Inc. ("Goldcorp") to earn up to a 70% interest the Sidace Lake, Red Lake North and Adams Lake Properties, whereby Goldcorp must spend $5,000,000 in exploration expenditures. Goldcorp did not fulfill the expenditure requirement for 2005 and so the option terminated at December 31, 2005.

The Sidace Lake and Red Lake North Properties are comprised of 45 unpatented claims (319 units) (staked claims, and portions of the Coli Lake Agreement, Red Lake East Agreement and East Bay Agreement) in the Black Bear Lake, Coli Lake and Sobeski Lake areas. The Planet claims are subject to a sliding scale NSR of 2.0% to 2.5% depending on the price of gold.

The Adams Lake Property optioned to Goldcorp Inc. is comprised of 34 unpatented claims (224 units) in the Balmer and Bateman townships (consisting of staked claims and a portion of the Red Lake East Agreement). The property is subject to a sliding scale NSR of 1.75% to 2.0% depending on the price of gold.

**DMC Properties**

**Meunier Property**

The Company has a 100% interest in 118 unpatented claims (222 units), which it acquired by spending $350,000 on exploration expenditures and making option payments of $75,000. The property is subject to NSR royalty of 2.5% on 38 claims (the Company can purchase a 1.5% NSR royalty for $1.5 million), a 2% NSR royalty on 54 claims (the Company can purchase a 1% NSR royalty for $1.0 million), and a 1% NSR royalty on 27 claims. Annual advance royalty payments of $25,000 are due by April 15th of each year.

**Red Lake West Property**

The Company acquired a 100% interest in 16 unpatented claims (90 units) in Dome and McDonough townships. The property is subject to a sliding scale NSR royalty of 1.75% to 2.0% depending on the price of gold.

**Red Lake East Property**

The Company acquired a 100% interest in 95 unpatented claims (454 units) in the McDonough, Balmer and Bateman townships. The property is subject to a sliding scale NSR royalty of 1.75% to 2.0% depending on the price of gold.

**Option agreement with Agnico-Eagle Mines Ltd.**

On September 23, 2005, the Company signed a letter agreement with Agnico-Eagle Mines Ltd. ("Agnico-Eagle") whereby Agnico-Eagle has the right to earn a 51% interest in a portion of the DMC properties (totaling 130 claims, 263 units) by incurring exploration expenditures of $2.25 million over 3 years including $500,000 in year one and making cash payments to the Company of $110,000 including $25,000 in year one. Upon vesting, Agnico-Eagle can increase its interest up to 65% by incurring $1 million of exploration expenditures for each 1%.

**Slate Bay Property**

The Company acquired a 100% interest in 28 unpatented claims (146 units) located in Todd township. The property is subject to a sliding scale NSR royalty of 1.75% to 2.0% depending on the price of gold.

**Option Agreement with Kings' Bay Gold Corp. ("Kings Bay")**

During 2005, the Company optioned the property to King's Bay whereby King's Bay could earn a 51% interest in the property by spending $2.75 million in exploration costs, issuing 25,000, and $90,000 worth, of King Bay shares and paying $100,000 cash. Subsequent to the year end, Kings Bay terminated the option. Refer to note 14.

**7. PROPERTY INTERESTS** *(continued)*

**Humlin Property**

The Company acquired a 100% interest in 9 unpatented claims (216 units) located in Fairlie Township. The property is subject to a sliding scale NSR of 1.75% to 2.0% depending on the price of gold, including the underlying Hammell agreement.

**East Bay Property**

The Company has two option agreements to acquire a 100% interest in 83 unpatented mining claim units as follows:

**Herbert Option**

The Company acquired a 40% interest in 23 unpatented claims (42 units) located in the Bateman and Blackbear townships. The Company has the option to acquire the remaining 60% interest by making cash payments of $87,000 ($39,000 paid) and issuing 60,000 common shares (60,000 issued). The property is subject to a 2% NSR royalty, of which the Company may purchase 50% for $1.0 million.

**Seargeant Property**

The Company has an option to acquire a 100% interest in 2 unpatented claims (2 units) located in the Blackbear township by making cash payments of $55,000 ($35,000 paid) by October 20, 2006. The property is subject to a 2% NSR royalty of which the Company may purchase 50% for $750,000.

**McCuaig JV Property**

The Company earned a 60% interest in 3 unpatented claims (10 units) in Dome Township for which the Company paid $25,000 and incurred total exploration expenditures of $972,000. The property is subject to a 2% NSR royalty of which the Company purchased 50% in the ERD acquisition in March 2003. The Company may, with its joint venture partner, purchase 50% of the NSR royalty for $200,000 and also retains a right of first refusal on the remaining NSR royalty.

**Option Agreement with Redstar Resources Corporation ("Redstar")**

During 2002, the Company granted Redstar the right to earn up to a 70% interest in several of Rubicon's properties (a total of 221 claim units) at the western end of the Red Lake gold camp. The optioned properties included Pipestone North, Pipestone South, Pipestone East and Wolf Bay properties in which the Company has a 100% interest.

Pursuant to the terms of this agreement, during 2004, Redstar issued 250,000 shares to the Company and completed $450,000 worth of exploration expenditures.

During 2005, the Company renegotiated the option agreement with Redstar, whereby under the new agreement Redstar made an initial cash and share payment of $9,000 and 250,000 Redstar shares. Redstar was then required to make additional cash payments of $84,000, issue an additional $75,000 in Redstar shares and complete an additional $1,100,000 in exploration expenditures over a four year period to earn a 51% interest in the properties.

Redstar can increase its interest to 60% by funding total exploration expenditures of $3 million over eight years and can increase its interest to 70% by funding a bankable feasibility study and arranging project financing for a mine. Redstar is also responsible for making all cash payments to the underlying property vendors.

**7. PROPERTY INTERESTS** *(continued)*

**English Royalty Division ("ERD")**

During 2003, the Company acquired the underlying interests in 74 mineral properties for cash consideration of $500,000 and share consideration of 25,000 shares valued at $287,500. Most of the properties had option agreements with third parties, including 14 with the Company. Accordingly, this agreement reduced the Company's aggregate property payments due under these pre-existing options by $414,000.

Properties included in the ERD are not explored by the Company but are held for the purpose of earning option and royalty income and deriving potential increases in value from successful exploration by optionees. The Company continues to add properties to the ERD with new option agreements and drop properties that it is unable to option after reasonable efforts. At December 31, 2005, the ERD included 33 (2004 – 51) properties with option agreements.

During 2003, 2004 and 2005, the Company recorded cash and share receipts (before costs) of $1,140,273 in connection with third party option payments received pursuant to the ERD.

**NEWFOUNDLAND**

**Golden Promise Trend Properties**

The Company has a 100% interest in approximately 2,353 claims acquired by staking. In addition, the Company has entered into four option agreements to earn a 100% interest in 489 claims by making cumulative cash payments of $382,000 ($297,000 paid) and common share issuances of 170,000 (170,000 issued or cash in lieu paid). The properties are subject to 2.0% – 2.5% NSR royalties on the optioned claims and the Company has the right to buy back 1.0% - 1.5% of the NSR royalties for $1 million - $1.5 million at any time.

**Option Agreement with Placer Dome (CLA) Limited ("Placer")**

In August 2003, the Company optioned a 70% interest in 23 mineral licenses known as the Golden Promise, Mercer, Three Angle Pond, Badger and Tom Joe Properties to Placer. During 2005, Placer terminated the agreement after incurring $1.8 million of exploration expenditures.

**Option Agreement with Crosshair Exploration and Mining Corp. ("Crosshair")**

The Company has optioned a 60% interest in eleven mineral licenses known as the Victoria Lake Option (South Golden Promise, Barren Lake and Victoria Lake properties) to Crosshair in consideration for Crosshair incurring $1.75 million in exploration expenditures and issuing 400,000 common shares (300,000 issued) to the Company.

**Glenwood-Botwood Gold Trend**

The Company has a 100% interest in 1187 claims (reduced from 1912) acquired by staking. In addition, the Company has entered into ten option agreements to earn a 100% interest in a total of 680 claims (reduced from 879) for aggregate consideration of $973,360 in cash ($533,860 paid) and the issuance of 422,000 common shares, (251,000 issued or cash in lieu paid). The properties are subject to NSR royalties varying from 2-3% of which 50%- 60% can be purchased for varying amounts between $1 million to $3.0 million at any time. Annual advanced royalty payments that vary from $7,500 to $25,000 must be made on several properties starting in 2007. Claims subject to option agreements with third parties are as follows:

**Huxter Lane Joint Venture Agreement with Meridian Gold Inc. ("Meridian")**

During the year ended December 31, 2004, the Company optioned four mineral licenses known as the Huxter Lane Property to Meridian. Under the terms of the agreement, Meridian can earn a 55% interest in this 1350 hectare property by spending $1,000,000 over a period of three years, make the underlying cash payments to the vendor and by paying the Company approximately $61,400. Meridian may earn an additional 10% by funding the project to a bankable feasibility study and an additional 5% (for a total interest of 70%) by funding all costs to a positive production decision.

**7. PROPERTY INTERESTS** *(continued)*

**Wings Point and Glenwood Option Agreements with Crosshair Exploration Mining Corp. ("Crosshair")**

The Company optioned a 60% interest in the Wings Point Property and the Glenwood Break Property to Crosshair. During 2005, Crosshair terminated its option on the project.

**Avalon Gold Trend – Berg Property**

The Company acquired a 100% interest in 271 claims (6775 hectares) for aggregate cash consideration of $75,000. The property is subject to a 2% NSR royalty, of which the Company may purchase 50% for $1.5million. Annual advance royalty payments of $15,000 per year begin in November 2007.

**Avalon Option Agreement with IAMGold Corporation ("IAMGOLD")**

In February 2004, the Company entered into an agreement with IAMGold Corporation ("IAMGold"), whereby IAMGold could earn an initial 55% interest in the Avalon claims. During 2005, IAMGold terminated its option on the project after incurring a total of approximately $600,000 of exploration expenditures and making $42,750 of underlying property payments.

**New World Gold Trend**

The Company acquired a 100% interest in 231 claims (reduced from 455) for aggregate cash consideration of $57,000 (paid) and the issuance of an aggregate of 45,000 common shares (issued). The property is subject to a 2.0% NSR royalty, of which the Company may purchase 50% for $1 million. Annual advanced royalty payments of $15,000 are required starting on April 19, 2007.

**Star Track Gold Trend**

The Company has an option to acquire a 100% interest in 158 claims (3950 hectares). Cash payments of $62,000 and share payments of 150,000 have been issued. An amending agreement allows for a postponed final payment later in 2006. The property is subject to a 2% NSR of which 50% can be purchased for $1,000,000. No work was conducted on the property in 2005.

**Base Metal Properties**

**Point Leamington Property**

The Company acquired a 100% interest in a mining lease in the Point Leamington area for which the Company paid an aggregate of $33,532 and issued 100,000 common shares. The property is subject to a 2% NSR royalty, of which the Company may purchase 25% for $500,000.

**Option Agreement with TLC Ventures Corp. ("TLC")**

During 2004, the Company completed an option agreement with TLC, whereby TLC can acquire a 100% interest in the Point Leamington Property in exchange for a total of 225,000 common shares of TLC and $200,000 in cash, both payable over 3 years. As at December 31, 2005, the Company had received 225,000 common shares and $175,000 in cash. If TLC were to sell the property during the option period, the Company would receive 50% of the gross proceeds in excess of consideration already paid by TLC. The Company retains the right of first refusal to purchase a 2% NSR royalty.

**Seal Bay Property**

The Company has completed exploration expenditures of $205,000 in 2005 (total $700,000) to earn a 51% interest according to an amended agreement dated July 15, 2002 and is in the process of formalizing a joint venture with the optionor.

**West Cleary Property**

The Company holds a 51% interest in one mineral license.

**7. PROPERTY INTERESTS** *(continued)*

**Victoria Lake 10188M Property**

The Company can earn 100% interest in the property (2 mineral licenses, 139 claims) by making cash payments totaling $60,000 ($15,000 paid) and 40,000 Company shares (5,000 paid). The agreement is subject to a 2.5% NSR of which 1.5% can be purchased by the Company for $1.5 million with a right of first refusal on the remaining 1.0%.

**Harpoon Property**

The Company can acquire a 100% interest in the 5 mineral licences (225 claims) by completing option payments totaling $95,000 ($25,000 paid) and 10,000 common shares (10,000 paid) over 3 years. The property is subject to a 2.0% NSR of which 1.0% can be purchased by the Company for $1.0 million with a right of first refusal on the remaining 1.0%.

**UNITED STATES OF AMERICA**

**Alaska - Palmer Property**

The Company's controlled subsidiary, Toquima, has an exclusive 99 year mining lease on 340 federal mining claims located near Haines, Alaska.

To maintain the lease, Toquima is required to make annual advance royalty payments of US$42,500 and pay annual assessment fees to the Federal Bureau of Land Management of US$34,000. The Company was also required to issue a total of 200,000 common shares (issued). The lease is subject to a 2.5% net smelter return ("NSR") royalty of which Toquima may purchase portions up to a maximum of 1.5% as follows: 0.5% for US$1 million at any time before the sixth anniversary of the date of the mineral lease; 0.5% for US$2 million before the seventh anniversary; and 0.5% for US$3 million before the tenth anniversary. Toquima has a right of first refusal to purchase the NSR or any portion thereof at any time during the term of the lease.

**Nevada Properties**

Toquima has option agreements to acquire 100% interests in 9 properties in Nevada, USA for various payments of cash and shares of its subsidiary Toquima. During 2005, Toquima granted the following options: to Newmont Mining Corp., the option to earn a 60% interest in the LHT property, to Romarco Minerals Inc., the option to earn a 60% interest in the Pine Grove property, and to Piedmont Mining Corp., the option to earn a 51% interest in the Dome/HiHo property .

Subsequent to December 31, 2005, Toquima announced an agreement with Carlin Gold Corporation ("Carlin"), whereby Carlin will issue 6,772,226 common shares to Toquima's shareholders on a pro-rata basis in respect to the acquisition of Toquima's mineral property interests in Nevada. Concurrently, pursuant to a Plan of Arrangement, Toquima's current shareholders will receive 5,540,913 special warrants exchangeable to acquire an equal number of common shares of a new company, Constantine Metal Resources Ltd. ("Constantine"), in the event of Constantine completing an Initial Public Offering ("IPO") under certain specified conditions. Constantine will, prior to this transaction, acquire Toquima's interest in the Alaskan Palmer property. Should the IPO not complete under the conditions specified, the special warrants will become exercisable to acquire common shares of Carlin and Constantine will become a subsidiary of Carlin through Carlin's ownership of the common shares of Toquima.

These transactions remain subject to the approval of Toquima's shareholders and regulatory consents.

Refer also to note 14(d).

At December 31, 2005, the Company has adjusted downward on a pro-rata basis the carrying amounts of the Palmer and Nevada properties in its accounts to reflect the Constantine and/or Carlin shares that will ultimately be received in exchange for these interests, plus the current $407,479 non-controlling interest in the net assets of Toquima, which will also be eliminated upon the disposition of that company. The adjusted $1,265,000 net carrying amount reflects approximately 7.9 million shares at $0.16 per share based on the trading price of Carlin shares on January 12, 2006, which was the date that the managements of Toquima and Carlin signed a Letter of Understanding in respect to the Plan of Arrangement.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 8. SHARE CAPITAL

a) Authorized share capital consists of an unlimited number of common shares without par value.

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Number of Shares | $ | Number of Shares | $ | Number of Shares | $ |
| Balance, beginning of year | 55,006,031 | 39,184,721 | 52,184,631 | 35,911,629 | 34,032,251 | 18,737,677 |
| Private placements (1) and (2) | 10,232,000 | 6,420,989 | 2,093,412 | 2,398,702 | 13,979,329 | 14,389,958 |
| Mineral properties | 159,000 | 151,520 | 123,827 | 164,372 | 602,811 | 711,381 |
| Stock options exercised (3) | 300,000 | 338,087 | 79,000 | 80,685 | 1,547,500 | 583,125 |
| Warrants exercised | 482,493 | 559,318 | 525,161 | 629,333 | 2,022,740 | 1,489,488 |
| Flow-through renunciation (4) | - | (1,043,943) | - | - | - | - |
| Balance, end of year | 66,179,524 | 45,610,692 | 55,006,031 | 39,184,721 | 52,184,631 | 35,911,629 |

(1) *1,000,000 (2004 - 2,093,412; 2003 - 2,000,000) shares were issued under flow-through share purchase agreements.*
(2) *Net of issue costs of$979,811 (2004 - $532,075; 2003 – 1,238,338).*
(3) *Inclusive of the original $97,837 (2004 - $12,465; 2003 – nil) fair value of these options re-allocated from contributed surplus to share capital on exercise.*
(4) *The Company renounced $2,930,777 in flow through expenditures in February 2005 to investors with an effective date of December 31, 2004. Under Canadian GAAP, the Company is required to reduce share capital by an amount based on the temporary taxable differences created by the renunciation. The amount of $1,043,943 was based on a tax rate of 35.62% applied to the temporary difference of $2,930,777. See Note 3.*

b) Stock Options

The Company has an incentive stock option plan authorizing the Company to issue up to 7,877,415 incentive stock options to directors, officers, employees and consultants of the Company. No specific vesting terms are required. The term of each grant shall be no greater than 10 years from the date of grant. The option price shall be no less than the fair market value of the Company's shares on the date of the grant.

The following is a summary of the changes in the Company's outstanding stock options for 2005, 2004 and 2003.

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| | | $ | | $ | | $ |
| Balance at beginning of year (1) | 3,486,625 | 1.11 | 2,440,000 | 1.00 | 3,117,500 | 0.67 |
| Granted | 2,310,000 | 1.10 | 1,435,000 | 1.35 | 895,000 | 1.06 |
| Exercised | (300,000) | 0.79 | (79,000) | 0.86 | (1,547,500) | 0.38 |
| Expired/Cancelled | (681,625) | 1.29 | (309,375) | 1.31 | (25,000) | 0.46 |
| Outstanding at end of fiscal year (1) and (2) | 4,815,000 | 1.10 | 3,486,625 | 1.11 | 2,440,000 | 1.00 |
| Exercisable at end of fiscal year | 3,349,288 | 1.10 | 3,486,625 | 1.11 | 2,440,000 | 1.00 |

(1) *125,000 options granted to a director in 2003 were incorrectly cancelled in 2003. These options are now shown as outstanding as at* December 31, 2003 and 2004.
(2) *At December 31, 2005, the weighted-average remaining contractual life of stock options outstanding is 3.0 years (2004 – 3.88).*

The Company has recorded stock-based compensation included with financial statement line items, as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Balance at beginning of year | $ 1,960,463 | $ 753,531 | $ 197,485 |
| Stock-based compensation | 683,671 | 1,100,980 | 556,046 |
| Share issuance costs | 77,483 | 118,417 | - |
| Fair value of stock options allocated to shares issued on exercise | (97,837) | (12,465) | - |
| Balance at end of year | $ 2,623,780 | $ 1,960,463 | $ 753,531 |

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 8. SHARE CAPITAL *(continued)*

The fair value of employee options, agents options and agents warrants included in the expense figures, has been estimated using the Black-Scholes Option Pricing Model based on the following weighted average assumptions:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Risk-free interest rate (%) | 3.6% | 4.5% - 5% | 5% |
| Expected life (years) | 4.6 years | 2 – 5 years | 2 – 10 years |
| Expected volatility (%) | 40% | 65% -80% | 50% |
| Expected dividend yield (%) | 0% | 0% | 0% |

Option pricing models require the input of highly subjective assumptions, particularly as to the expected price volatility of the stock. Changes in these assumptions can materially affect the fair value estimate and therefore it is management's view that the existing models do not necessarily provide a single reliable measure of the fair value of the Company's stock option grants

c) Summary of stock options and warrants outstanding:

| December 31, 2005 | | | | |
|---|---|---|---|---|
| Type of Issue | | Number Outstanding | Weighted Average Price | Weighted Average Life |
| | | | $ | Years |
| Stock Options | | 100,000 | 0.67 | 4.67 |
| | | 150,000 | 0.74 | 4.70 |
| | | 1,000,000 | 0.83 | 1.48 |
| | | 225,000 | 0.84 | 1.55 |
| | | 200,000 | 0.86 | 4.96 |
| | | 20,000 | 0.99 | 1.48 |
| | | 100,000 | 1.15 | 1.52 |
| | | 200,000 | 1.16 | 1.44 |
| | | 20,000 | 1.17 | 7.81 |
| | | 1,750,000 | 1.18 | 3.58 |
| | | 370,000 | 1.21 | 4.00 |
| | | 680,000 | 1.48 | 3.08 |
| Total Stock Options | (1) | 4,815,000 | 1.10 | 3.00 |
| Warrants and Agent Options | | 298,634 | 1.40 | 1.01 |
| | (3) | 244,648 | 0.693 | 1.62 |
| | | 4,616,000 | 0.85 | 1.62 |
| Total Warrants and Agent Options | (1)(2) | 5,159,282 | 0.87 | 1.59 |

(1) Subsequent to December 31, 2005, additional options were granted and options and warrants were exercised, cancelled or expired. See note 13.
(2) Warrants include compensation options and warrants paid to financing agents.
(3) Agent compensation options include options for 244,648 units exercisable for $0.693 consisting of 1 share and ½ share purchase warrant with an expiry of 1.62 years from year end.

## 9. COMPARATIVE FIGURES

Certain of the prior years' figures have been reclassified to conform with the current year's financial statement presentation.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 10. COMMITMENTS

a) At December 31, 2005, the Company has $383,418 in remaining lease payments for the use of its Vancouver office to September, 2010.

b) At December 31, 2005, the Company is committed to incur $112,497 (2004 – 2,930,777; 2003 - $1,174,832) in eligible exploration expenditures prior to December 31, 2006 in order to complete obligations entered into pursuant to flow-through share purchase agreements.

c) The Company is required to make certain cash and share option payments and incur exploration costs to maintain its mineral properties in good standing (Note 7). These payments and costs are at the Company's discretion and are based upon available financial resources and the exploration merits of the mineral properties which are evaluated on a periodic basis.

## 11. SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITIES

During the fiscal year ended December 31, 2005, the Company issued 159,000 (2004 – 123,827; 2003 - 602,811) of its common shares at a value of $151,520 (2004 - $164,372; 2003 - $711,381) for mineral properties, and received common shares of other companies valued at $232,626 (2004 - $626,282; 2003 - $340,748) pursuant to the terms of property and joint venture agreements. Included in accounts payable and accrued liabilities at December 31, 2005 is $147,575 (2004 - $213,480; 2003 - $210,011) of mineral property costs.

## 12. INCOME TAXES

A reconciliation of income taxes at statutory rates is as follows:

| | 2005 | 2004 |
|---|---|---|
| | $ | $ |
| Net loss for the year | (3,644,284) | (4,082,836) |
| Expected income recovery | (1,290,219) | (1,445,373) |
| Net adjustment for amortization, deductible and non-deductible amounts | 684,483 | 784,755 |
| Unrecognized benefit of current non-capital loss | 605,736 | 660,618 |
| Total income taxes | - | - |

The significant components of the Company's future income tax assets are as follows:

| | 2005 | 2004 |
|---|---|---|
| | $ | $ |
| Future income tax assets: | | |
| Net mineral property carrying amounts in excess of tax pools | (7,782,757) | (5,195,884) |
| Equipment tax pool in excess of carrying value | 116,922 | 99,510 |
| Non-capital loss carryforwards | 8,155,257 | 5,365,934 |
| | 489,422 | 269,560 |
| Valuation allowance | (489,422) | (269,560) |
| Net future tax assets | - | - |

The Company has non-capital losses of approximately $8 million (2004 - $5.4 million), which are available to reduce future taxable income in Canada and the United States and which expire between 2006 and 2025. Subject to certain restrictions the Company also has mineral property expenditures of approximately $17 million (2004 - $15.1 million) available to reduce taxable income in future years. The Company has not recognized any future benefit for these tax losses and resource deductions, as it is not considered likely that they will be utilized.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 13. DIFFERENCES BETWEEN CANADIAN AND UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP)

Under Canadian GAAP applicable to junior mining exploration companies, mineral exploration expenditures may be deferred on prospective properties until such time as it is determined that further exploration is not warranted, at which time the property costs are written-off. Under US GAAP, all exploration expenditures must be expensed until an independent feasibility study has determined that the property is capable of economic commercial production. The following items (a) to (g) provide a summary of the impact on line items in these financial statements that would result from the application of US accounting principles to mineral property costs, and also the impact of flow-through share issuances as described at note 13 h) ii).

| | December 31 | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| **a) Assets** | | | |
| **Mineral Property Costs** | | | |
| Mineral property costs following Canadian GAAP | $ 22,961,644 | $ 19,815,494 | $ 17,276,818 |
| Less balance of deferred mineral property costs | (22,961,644) | (19,815,494) | (17,276,818) |
| Mineral property costs following US GAAP | $ - | $ - | $ - |
| **b) Operations** | | | |
| Net loss following Canadian GAAP | $ (3,644,284) | $ (4,082,836) | $ (2,312,394) |
| Mineral property costs expensed under US GAAP | (4,861,824) | (4,251,820) | (5,250,093) |
| Mineral property costs written-off under Canadian GAAP | 1,715,674 | 1,713,144 | 231,388 |
| Income from sale of tax benefits under US GAAP | 140,000 | 367,665 | 480,000 |
| Future income tax recovery under Canadian GAAP | (1,043,943) | - | - |
| Net loss under US GAAP | $ (7,694,377) | $ (6,253847) | $ (6,851,099) |
| **c) Loss Per Share** | | | |
| Loss per share and diluted loss per share under U.S. GAAP | $ (0.11) | $ (0.12) | $ (0.16) |
| **d) Deficit** | | | |
| Closing deficit following Canadian GAAP | $ (15,841,543) | $ (12,197,259) | $ (8,114,423) |
| Adjustment to deficit for accumulated costs expensed under US GAAP, net of historical income and other items | (22,859,486) | (18,809,393) | (16,638,382) |
| Closing deficit under US GAAP | $ (38,701,029) | $ (31,006,652) | $ (24,752,805) |
| **e) Cash Flows – Operating Activities** | | | |
| Cash applied to operations under Canadian GAAP | $ (3,274,434) | $ (1,528,118) | $ (2,401,289) |
| Add net loss following Canadian GAAP | 3,644,284 | 4,082,836 | 2,312,394 |
| Less net loss following US GAAP | (7,694,377) | (6,253,847) | (6,851,099) |
| Less write downs taken under Canadian GAAP | (1,715,674) | (1,713,144) | (231,388) |
| Add non-cash property expenditures (recoveries) expensed under US GAAP | 66,469 | (248,430) | 900,843 |
| Cash applied to operations under US GAAP | $ (8,973,732) | $ (5,660,703) | $ (6,270,539) |
| **f) Cash Flows – Investing Activities** | | | |
| Cash applied to investments under Canadian GAAP | $ (9,714,134) | $ (10,145,750) | $ (8,887,248) |
| Add cash property costs expensed under US GAAP – net | 6,354,538 | 8,599,220 | 9,317,324 |
| Cash applied to investments under US GAAP | $ (3,359,596) | $ (1,546,530) | $ 430,076 |
| **g) Cash Flows – Financing Activities** | | | |
| Cash received from financing activities under Canadian GAAP | $ 8,857,223 | $ 7,313,642 | $ 21,430,645 |
| Add income tax recovery recorded as share issue costs under Canadian GAAP | 1,043,943 | - | - |
| Less exploration recoveries included in income under US GAAP | (1,559,183) | (4,098,970) | (4,968,074) |
| Less premiums on flow-through share issuances included in income | (140,000) | (367,665) | (480,000) |
| Cash received from financing activities under US GAAP | $ 8,201,983 | $ 2,847,007 | $ 15,982,571 |

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements
(Stated in Canadian Dollars)

## 13. DIFFERENCES BETWEEN CANADIAN AND UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) *(continued)*

### OTHER DIFFERENCES BETWEEN CANADIAN AND US GAAP

h) **Stockholders' Equity**

i) **Accumulated Other Comprehensive Income**

Under SFAS 130, the Company is required to record certain gains and losses as a component of Stockholder's Equity, with the current changes in the component balances comprising the balance sheet figure disclosed in a separate statement or in a financial statement note. The only item in the Company's financial statements impacting Comprehensive Income is the unrealized gains and losses on the Company's non-current investments.

The following provides the continuity of Accumulated Other Comprehensive Income or Loss under US GAAP:

| | | |
|---|---|---|
| Accumulated Other Comprehensive Income – December 31, 2002 | $ | (313) |
| Other Comprehensive Income – 2003* | | 36,491 |
| Accumulated Other Comprehensive Income – December 31, 2003 | | 36,178 |
| Other Comprehensive Loss – 2004* | | (238,665) |
| Accumulated Other Comprehensive Loss – December 31, 2004 | | (202,487) |
| Other Comprehensive Loss – 2005* | | 191,925 |
| Accumulated Other Comprehensive Loss – December 31, 2005 | $ | (10,562) |

* - *figures are inclusive of any amounts previously recognized in comprehensive income that are included in operations currently*

ii) **Flow-Through Shares**

Under US GAAP, a liability is recognized on the sale of flow-through shares for the premium obtained by the Company, if any, of the sale price per share over the market value at the time of issuance. Under Canadian GAAP, no such premium is recognized. Upon renunciation of the flow-through share proceeds to investors, the liability under US GAAP is reversed and the Company recognizes a deferred tax benefit for this amount. The Company follows the policy of renouncing fully to investors the proceeds of all flow-through financings received during the year, whether the underlying exploration expenditures have been incurred or not, as at its fiscal year end, which coincides with the personal taxation year of individuals in Canada. Accordingly, the Company under a pro-forma application of US GAAP would have recognized the following amounts of deferred tax benefits, amounts included in current operations, in connection with issuances of flow-through shares:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Deferred tax benefit | $ 140,000 | $ 367,665 | $ 480,000 |

Refer also to note 13(b).

Inclusive of the reversal of the Canadian GAAP treatment of flow through shares, the Company's share capital balance under Canadian GAAP would be impacted as follows by the pro-forma application of this US GAAP standard:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Share capital under Canadian GAAP | $ 45,610,692 | $ 39,184,721 | $ 35,911,629 |
| Previous years' amounts included in income under US GAAP | (1,006,101) | (638,436) | (158,436) |
| Deferred tax benefit included in income under US GAAP | (140,000) | (367,665) | (480,000) |
| Future tax recovery under Canadian GAAP relating to flow through shares | 1,043,943 | - | - |
| Share capital under US GAAP | $ 45,508,534 | $ 38,178,620 | $ 35,273,193 |

## 13. DIFFERENCES BETWEEN CANADIAN AND UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) *(continued)*

### OTHER DIFFERENCES BETWEEN CANADIAN AND US GAAP *(continued)*

iii) **Investments**

Under Canadian GAAP, no write-down to market values is required if an investment is considered by management to be held for the long-term, unless there has been an other-than-temporary decline in the value of that investment. Under US SFAS 115, the investments held by the Company are considered to be "available for sale securities" and are required to be reported at fair value, with any unrealized holding gains and losses included in current Other Comprehensive Income, a component of Stockholder's Equity.

The following provides reconciliation to US GAAP of a pro-forma application of SFAS 115 to these financial statements:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Investments under Canadian GAAP | $ 6,546,411 | $ 3,177,783 | $ 366,833 |
| Net other Comprehensive Income adjustments under US GAAP – 1999 – 2002* | (313) | (313) | (313) |
| Other Comprehensive Income under US GAAP – 2003* | 36,491 | 36,491 | 36,491 |
| Other Comprehensive Loss under US GAAP – 2004* | (238,665) | (238,665) | - |
| Other Comprehensive Income under US GAAP – 2005* | 191,925 | - | - |
| Investments under US GAAP | $ 6,535,849 | $ 2,975,296 | $ 403,011 |

* - *figures are inclusive of any amounts previously recognized in comprehensive income that are included in operations currently*

## 14. SUBSEQUENT EVENTS

In addition to items disclosed elsewhere in these notes, the following occurred during the period subsequent to December 31, 2005:

a) On March 3, 2006, Kings Bay Gold Corp. terminated its option on the Slate Bay, Ontario property. Refer to note 7.

b) On January 18, 2006, the Company entered into an option agreement on the Lake Douglas West property, Lake Douglas area, Central Newfoundland, Newfoundland, pursuant to which it can acquire a 100% interest in the property by making cash payments totaling $50,000 over 5 years. The property is subject to a 2% NSR royalty, of which the Company may purchase 1.0% for $1,000,000 and will have a right of first refusal on the balance.

c) On January 18, 2006, the Company entered into an option agreement on the Lake Douglas East property, Lake Douglas area, Central Newfoundland, Newfoundland, pursuant to which it can acquire a 100% interest in the property by making cash payments totaling $470,000 over 5 years and share payments of 175,000 shares of the Company over 5 years. The property is subject to a 2% NSR royalty, of which the Company may purchase 1.0% for $1,000,000 and will have a right of first refusal on the balance.

d) The Company's loans to its controlled subsidiary Toquima were settled by the receipt of 1,903,977 common shares at $0.35 per share, in anticipation of the transactions disclosed in note 7.

e) The Company issued 120,960 common shares on exercise of warrants at prices ranging from $0.693 to $0.85 per share for cash proceeds of $101,639, issued 70,000 common shares on exercise of stock options at $0.83 per share for cash proceeds of $58,100 and issued 55,000 common shares pursuant to mineral property agreements, at prices ranging from $1.19 to $1.21 per share.

f) Subject to regulatory consent, the Company entered into an agreement whereby an underwriting syndicate has agreed to purchase, by private placement, 6,800,000 common shares of the Company at $1.48 per share for aggregate proceeds of approximately $10 million. The underwriters have the right to purchase up to an additional 1.0 million shares at $1.48 until one business day prior to Closing, and the Company will pay a cash commission of 6% of the aggregate proceeds raised.

RUBICON

# RUBICON MINERALS CORPORATION

## Interim Consolidated Financial Statements

## First Quarter Ended March 31, 2006

**(Unaudited)**

The Company's auditor has not performed a review of these Interim Consolidated Financial Statements

Amended July 6th, 2006, to reflect adjustment to loss on equity investment in Africo Resources Ltd.

Suite 1540 – 800 West Pender Street, Vancouver BC V6C 2V6
Tel: 604.623.3333 Toll free: 1.866.365.4706 Fax: 604.623.3355 E-mail: rubicon@rubiconminerals.com
www.rubiconminerals.com

# RUBICON MINERALS CORPORATION

Interim Consolidated Balance Sheets
*(Stated in Canadian Dollars)*

| | March 31 Unaudited 2006 | December 31 Audited 2005 |
|---|---|---|
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 2,598,036 | $ 2,810,503 |
| Amounts receivable | 886,807 | 927,210 |
| Prepaid expenses | 93,769 | 23,373 |
| | 3,578,612 | 3,761,086 |
| **Investments** (note 4) | 6,102,904 | 6,546,411 |
| **Equipment** (note 5) | 49,724 | 51,228 |
| **Mineral property costs** (note 6) | 23,361,761 | 22,961,644 |
| | $ 33,093,001 | $ 33,320,369 |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued liabilities | $ 772,258 | $ 519,961 |
| **Non-controlling interest** | 428,237 | 407,479 |
| **Shareholders' equity** | | |
| Share capital (note 7(a)) | 45,840,598 | 45,610,692 |
| Contributed surplus (note 7(b)) | 2,631,400 | 2,623,780 |
| Deficit | (16,579,493) | (15,841,543) |
| | 31,892,505 | 32,392,929 |
| | $ 33,093,001 | $ 33,320,369 |

*See accompanying notes to the consolidated financial statements*

Continuance of Operations (note 1)
Commitments (Note 9)
Subsequent events (Note 11)

Approved by the Board of Directors:

*"David Adamson"*

David Adamson
Director

*"John R. Brodie"*

John R. Brodie, FCA
Director

# RUBICON MINERALS CORPORATION

Interim Consolidated Statements of Operations and Deficit
Unaudited
*(Stated in Canadian Dollars)*

| | For the 3 months ended March 31 2006 | 2005 |
|---|---|---|
| **Expenses** | | |
| Amortization | $ 3,499 | $ 3,922 |
| Consulting | 28,290 | 41,881 |
| Foreign exchange (gain) loss | (55,144) | 13,426 |
| General mineral exploration | 70,428 | 10,010 |
| Investor relations | 79,499 | 73,410 |
| Office | 42,437 | 26,599 |
| Professional fees | 94,904 | 43,640 |
| Rent | 20,844 | 19,389 |
| Salaries | 172,922 | 149,303 |
| Stock-based compensation (notes 3 and 7(b)) | 88,358 | 983,525 |
| Telephone | 4,719 | 2,751 |
| Re-organization costs (note 2) | 61,471 | - |
| Transfer agent and regulatory filing fees | 21,856 | 68,128 |
| Travel and accommodation | 4,497 | 10,048 |
| Write-off of mineral property costs | - | 36,315 |
| **Loss before other items** | (638,580) | (1,482,347) |
| Interest and miscellaneous income | 19,576 | 34,416 |
| Gain on sale of investments | 99,589 | 116,434 |
| Gain on settlement of debt | 14,559 | - |
| Loss on equity investment | (689,736) | (25,000) |
| Future income tax recovery (note 7(a)) | 477,400 | 1,043,943 |
| Allocation of subsidiary's (income) loss to minority interest | (20,758) | 13,090 |
| **Net loss for the period** | (737,950) | (299,464) |
| **Deficit, beginning of the period** | (15,841,543) | (12,197,259) |
| **Deficit, end of the period** | $ (16,579,493) | $ (12,496,723) |
| **Basic and diluted loss per common share** | $ (0.011) | $ (0.005) |
| Weighted average number of common shares outstanding | 66,385,705 | 56,275,401 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Interim Consolidated Statements of Cash Flows
Unaudited
*(Stated in Canadian Dollars)*

| | For the 3 months ended March 31 | |
|---|---|---|
| | **2006** | **2005** |
| **Cash Provided by (Used for):** | | |
| **Operating Activities** | | |
| Net loss for the period | $ (737,950) | $ (299,464) |
| Adjustment for items which do not involve cash: | | |
| Amortization | 3,499 | 3,922 |
| Stock-based compensation | 88,358 | 983,525 |
| Write-off of mineral property costs | - | 46,325 |
| Gain on sale of investments | (99,589) | (116,434) |
| Gain on settlement of debt | (14,559) | - |
| Loss on equity investment | 689,736 | 25,000 |
| Future income tax recovery | (477,400) | (1,043,943) |
| Allocation of subsidiary's loss to minority interest | 20,758 | (13,090) |
| | (527,147) | (414,159) |
| Changes in non-cash working capital components: | | |
| Prepaid expenses | (70,396) | (48,344) |
| Amounts receivable | 40,403 | (409,112) |
| Accounts payable and accrued liabilities | (44,593) | 132,161 |
| | (601,733) | (739,454) |
| **Investing Activities*** | | |
| Mineral property costs | (788,002) | (3,329,688) |
| Purchase of equipment | (5,221) | (610) |
| Purchase of investments | (495,844) | (1,179,025) |
| Proceeds on sales of investments | 362,931 | 200,558 |
| | (926,136) | (4,308,765) |
| **Financing Activities*** | | |
| Common shares issued for cash | 559,687 | 2,199,568 |
| Share issue costs | (2,469) | (126,898) |
| Recovery of property costs incurred | 715,503 | 525,261 |
| Management and administration fees received | 42,681 | 37,467 |
| | 1,315,402 | 2,635,398 |
| **Net cash (used) provided during the period** | (212,467) | (2,412,821) |
| **Cash and cash equivalents, beginning of the period** | 2,810,503 | 6,941,848 |
| **Cash and cash equivalents, end of the period** | $ 2,598,036 | $ 4,529,027 |

During the period, the Company paid and received interest as follows:

| | | |
|---|---|---|
| Interest received | $ 13,122 | $ 25,705 |
| Interest paid | $ - | $ - |

***Supplemental Disclosure of Non-Cash Investing and Financing Activities** – Refer to Note 10.

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Interim Consolidated Statements of Mineral Property Costs
Unaudited
*(Stated in Canadian Dollars)*

| | Balance December 31 2005 | Gross Expenditures 2006 | Write-off or Recovery 2006 | Balance March 31 2006 |
|---|---|---|---|---|
| **CANADA** | | | | |
| **ONTARIO** | | | | |
| **RED LAKE MINING DIVISION** | | | | |
| **McFinley Property** | | | | |
| Acquisition and option payments | $ 3,392,440 | $ - | $ - | $ 3,392,440 |
| Exploration costs | | | | |
| Geological and geochemical | 1,410,683 | 9,252 | - | 1,419,935 |
| Drilling | 5,675,629 | - | - | 5,675,629 |
| Geophysical | 101,147 | - | - | 101,147 |
| Travel and accommodation | 183,041 | - | - | 183,041 |
| Other | 32,056 | - | - | 32,056 |
| | 10,794,996 | 9,252 | - | 10,804,248 |
| **Other Red Lake Properties** | | | | |
| Acquisition and option payments | 473,677 | 45,750 | (34,000) | 485,427 |
| Exploration costs | | | | |
| Geological and geochemical | 954,813 | 36,407 | (824) | 990,396 |
| Drilling | 623,119 | 577,063 | (588,087) | 612,095 |
| Geophysical | 280,310 | - | - | 280,310 |
| Travel and accommodation | 79,663 | 9,457 | - | 89,120 |
| Other | 35,474 | 1,237 | (8,202) | 28,509 |
| Administration fees (earned) | (459,694) | - | (38,225) | (497,919) |
| | 1,987,362 | 669,914 | (669,338) | 1,987,938 |
| **McCuaig JV Project** | | | | |
| Acquisition and option payments | 109,940 | - | - | 109,940 |
| Exploration costs | | | | |
| Geological and geochemical | 449,370 | - | - | 449,370 |
| Drilling | 1,144,229 | - | - | 1,144,229 |
| Geophysical | 27,425 | - | - | 27,425 |
| Travel and accommodation | 32,192 | - | - | 32,192 |
| Other | 2,000 | 3,949 | - | 5,949 |
| Administration fees (earned) | (27,635) | - | - | (27,635) |
| | 1,737,521 | 3,949 | - | 1,741,470 |
| **English Royalty Division** | | | | |
| Acquisition and option payments | 75,000 | 21,428 | (41,226) | 55,202 |
| Exploration costs | | | | |
| Geological and geochemical | 358,748 | - | - | 358,748 |
| Travel and accommodation | 9,119 | - | - | 9,119 |
| Other | 107 | - | - | 107 |
| | 442,974 | 21,428 | (41,226) | 423,176 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Interim Consolidated Statements of Mineral Property Costs
Unaudited
*(Stated in Canadian Dollars)*

| | Balance December 31 2005 | Gross Expenditures 2006 | Write-off or Recovery 2006 | Balance March 31 2006 |
|---|---|---|---|---|
| **NEWFOUNDLAND GOLD PROPERTIES** | | | | |
| **Star Track Trend Properties** | | | | |
| Acquisition and option payments | $ 244,242 | $ - | $ - | $ 244,242 |
| Exploration costs | | | | |
| Geological and geochemical | 488,475 | 11,102 | - | 499,577 |
| Drilling | 124,058 | - | - | 124,058 |
| Geophysical | 482 | - | - | 482 |
| Travel and accommodation | 10,762 | 29 | - | 10,791 |
| Other | 3,580 | - | - | 3,580 |
| | 871,599 | 11,131 | - | 882,730 |
| **Golden Promise Trend Properties** | | | | |
| Acquisition and option payments | 203,338 | (2,100) | - | 201,238 |
| Exploration costs | | | | |
| Geological and geochemical | 404,776 | 20,386 | - | 425,162 |
| Drilling | 178,459 | - | - | 178,459 |
| Geophysical | 55,329 | - | - | 55,329 |
| Travel and accommodation | 10,749 | - | - | 10,749 |
| Administration fees (earned) | (190,701) | - | - | (190,701) |
| | 661,950 | 18,286 | - | 680,236 |
| **Avalon Trend Properties** | | | | |
| Acquisition and option payments | 68,938 | - | - | 68,938 |
| Exploration costs | | | | |
| Geological and geochemical | 195,805 | 2,047 | (2,080) | 195,772 |
| Drilling | - | - | - | - |
| Travel and accommodation | 4,055 | - | - | 4,055 |
| Administration fees (earned) | (16,451) | | - | (16,451) |
| | 252,347 | 2,047 | (2,080) | 252,314 |
| **Glenwood-Botwood Trend Properties** | | | | |
| Acquisition and option payments | 675,532 | 20,260 | - | 695,792 |
| Exploration costs | | | | |
| Geological and geochemical | 1,540,751 | 114,995 | (34,309) | 1,621,437 |
| Drilling | 666,098 | 10,097 | - | 676,195 |
| Geophysical | 259,029 | 6,384 | (6,384) | 259,029 |
| Travel and accommodation | 15,241 | 2,515 | - | 17,756 |
| Other | - | 3,925 | (1,000) | 2,925 |
| Administration fees (earned) | (67,724) | - | (2,803) | (70,527) |
| | 3,088,927 | 158,176 | (44,496) | 3,202,607 |
| **New World Trend Property** | | | | |
| Acquisition and option payments | 107,540 | - | - | 107,540 |
| Exploration costs | | | | |
| Geological and geochemical | 330,458 | 3,297 | - | 333,755 |
| Drilling | 2,150 | - | - | 2,150 |
| Geophysical | - | 21,974 | - | 21,974 |
| Travel and accommodation | 1,874 | - | - | 1,874 |
| | 442,022 | 25,271 | - | 467,293 |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Interim Consolidated Statements of Mineral Property Costs
Unaudited
*(Stated in Canadian Dollars)*

| | Balance December 31 2005 | Gross Expenditures 2006 | Write-off or Recovery 2006 | Balance March 31 2006 |
|---|---|---|---|---|
| **NEWFOUNDLAND (continued)** | | | | |
| **Base Metal Properties** | | | | |
| Acquisition and option payments | $ 49,989 | $ 74,423 | $ - | $ 124,412 |
| Exploration costs | | | | |
| Geological and geochemical | 369,731 | 24,198 | - | 393,929 |
| Drilling | 484,898 | 61,628 | - | 546,526 |
| Geophysical | 82,637 | - | - | 82,637 |
| Travel and accommodation | 21,987 | - | - | 21,987 |
| Other | 225 | - | - | 225 |
| | 1,009,467 | 160,249 | - | 1,169,716 |
| **UNITED STATES OF AMERICA** | | | | |
| **ALASKA** | | | | |
| **Palmer Property** | | | | |
| Acquisition and option payments | 209,415 | 12,266 | - | 221,681 |
| Exploration costs | | | | |
| Geological and geochemical | 374,841 | - | - | 374,841 |
| Drilling | 682,215 | - | - | 682,215 |
| Travel and accommodation | 18,003 | - | - | 18,003 |
| Other | 18,013 | - | - | 18,013 |
| Administration fees (earned) | (76,483) | | - | (76,483) |
| | 1,226,004 | 12,266 | - | 1,238,270 |
| **NEVADA** | | | | |
| **Other Properties** | | | | |
| Acquisition and option payments | 291,643 | 46,518 | (11,545) | 326,616 |
| Exploration costs | | | | |
| Geological and geochemical | 154,832 | 12,076 | - | 166,908 |
| Other | - | 18,239 | - | 18,239 |
| | 446,475 | 76,833 | (11,545) | 511,763 |
| **Mineral Property Costs** | $ 22,961,644 | $ 1,168,802 | $ (768,685) | $ 23,361,761 |

**Property Costs Written-off or Recovered**

The composition of the write-off figures by property classification is as follows:

| | 2006 |
|---|---|
| Total costs written-off | $ - |
| Aggregate cost recoveries and administration fees received | (768,685) |
| Gross write-offs and recoveries | $ (768,685) |

*See accompanying notes to the consolidated financial statements*

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements – Unaudited
March 31, 2006
(Stated in Canadian Dollars)

## 1. NATURE AND CONTINUANCE OF OPERATIONS

The Company is incorporated in British Columbia, Canada and is primarily involved in the acquisition and exploration of mineral property interests in Canada, in the United States and in the Democratic Republic of Congo. At the date of these financial statements, the Company has not been able to identify a known body of commercial grade ore on any of its properties and the ability of the Company to recover the costs it has incurred to date on these properties is dependent upon the Company being able to identify a commercial ore body, to finance its exploration and development costs and to resolve any environmental, regulatory, or other constraints which may hinder the successful development of the property. The Company is in the development stage.

These consolidated financial statements have been prepared assuming the Company will continue on a going-concern basis. The Company has incurred losses since inception and has an accumulated operating deficit of $16 million at March 31, 2006. The ability of the Company to continue as a going-concern depends upon its ability to develop profitable operations and to continue to raise adequate equity financing to fund its exploration and administrative expenses.

PROPOSED RE-ORGANIZATION

On November 21, 2005, the Company announced that it intended to complete a corporate restructuring which would have the result of dividing its existing portfolio of mineral properties into three separate public companies. Following the corporate restructuring the Company is to continue to hold its Ontario properties and USA properties (subsequently superceded by the proposed disposition of the USA properties under the agreement with Carlin Gold Corp. and related plan of arrangement announced on February 9, 2006 – refer to note 6). One of the newly-created companies is to hold all of the Company's Newfoundland properties. The other newly created company is to hold all of the Company's investment in Africo Resources Ltd. The proposed reorganization of the Company will be accomplished by way of a statutory plan of arrangement and is subject to shareholder, regulatory and court approvals.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Accounting and Consolidation

These interim consolidated financial statements have been prepared by management in accordance with generally accepted accounting principles ("GAAP") in Canada and follow the same accounting principles and method of computation as the consolidated financial statements for the fiscal year ended December 31, 2005. These interim consolidated financial statements do not conform in all respects to the requirements of generally accepted accounting principles for annual financial statements and should be read in conjunction with the consolidated financial statements and the accompanying notes for the year ended December 31, 2005. References to the Company included herein are inclusive of the accounts of the parent company and its 60.4% owned subsidiary - Toquima Minerals Corporation. The investment in Africo Resources Ltd. is accounted for on the equity basis. All inter-company balances have been eliminated.

## 3. RELATED PARTY TRANSACTIONS

For the three months ended March 31, 2006, the Company paid or accrued legal fees to a law firm, of which a partner is a director of the Company, aggregating to $102,550 (2004 - $40,000). As at March 31, 2006, this law firm is owed $114,067 (2005 - $107,373). All these transactions were recorded at their fair value amounts and were incurred in the normal course of business.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements – Unaudited
March 31, 2006
(Stated in Canadian Dollars)

## 4. INVESTMENTS

The Company owns common shares in public and private companies as follows:

| | March 31, 2006 | | December 31, 2005 | |
|---|---|---|---|---|
| | Aggregate Cost | Market Value | Aggregate Cost | Market Value |
| | $ | $ | $ | $ |
| Public companies | 112,362 | 146,545 | 361,978 | 351,416 |
| Private company (a) | 5,990,542 | - * | 6,184,433 | - * |
| | 6,102,904 | 146,545 | 6,546,411 | 351,416 |

* - *The fair value of each outstanding common share of this private company is not readily determinable*

Investment in Africo Resources Ltd. ("Africo")

The Company has acquired a 38.8% interest in Africo (39.61% subsequent to period end), a British Columbia private company that controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo.

Changes in the investment are summarized as follows:

| | 3 Months Ended March 31, 2006 | Year ended December 31 2005 |
|---|---|---|
| Balance, beginning of the period | $ 6,184,433 | $ 2,363,369 |
| Changes during the period: | | |
| Net participation in Africo equity financings | - | 4,109,387 |
| Purchase of shares | 495,845 | - |
| Equity interest in losses of Africo | (689,736) | (288,323) |
| Balance, end of the period | $ 5,990,542 | $ 6,184,433 |

## 5. EQUIPMENT

| | | | March 31 2006 | December 31 2005 |
|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net Book Value | Net Book Value |
| Furniture and fixtures | $ 52,570 | $ 38,095 | $ 14,475 | $ 15,238 |
| Computer equipment | 109,985 | 76,209 | 33,776 | 34,307 |
| Software | 5,731 | 4,258 | 1,473 | 1,683 |
| | $ 168,286 | $ 118,562 | $ 49,724 | $ 51,228 |

## 6. PROPERTY INTERESTS

The following changes occurred in the Company's principal property interests during the 3 months ended March 31, 2006.

### Slate Bay Property, Ontario

On March 3, 2006, Kings Bay Gold Corp. terminated its option on the Slate Bay, Ontario property.

### Lake Douglas Properties, Newfoundland

On January 18, 2006, the Company entered into an option agreement on the Lake Douglas West property, Lake Douglas area, Central Newfoundland, Newfoundland, pursuant to which it can acquire a 100% interest in the property by making cash payments totaling $50,000 over 5 years. The property is subject to a 2% NSR royalty, of which the Company may purchase 1.0% for $1,000,000 and will have a right of first refusal on the balance.

On January 18, 2006, the Company entered into an option agreement on the Lake Douglas East property, Lake Douglas area, Central Newfoundland, Newfoundland, pursuant to which it can acquire a 100% interest in the property by making cash payments totaling $470,000 over 5 years and share payments of 175,000 shares of the Company over 5 years. The property is subject to a 2% NSR royalty, of which the Company may purchase 1.0% for $1,000,000 and will have a right of first refusal on the balance.

### Palmer Property, Alaska and Nevada Properties (Carlin Gold Plan of Arrangement)

On February 15, 2006 Toquima announced an agreement with Carlin Gold Corporation ("Carlin"), whereby Carlin will issue 6,772,226 common shares to Toquima's shareholders on a pro-rata basis in respect to the acquisition of Toquima's mineral property interests in Nevada. Concurrently, pursuant to a plan of arrangement, Toquima's current shareholders will receive 5,540,913 special warrants exchangeable to acquire an equal number of common shares of a new company, Constantine Metal Resources Ltd. ("Constantine"), in the event of Constantine completing an Initial Public Offering ("IPO") under certain specified conditions. Constantine will, prior to this transaction, acquire Toquima's interest in the Alaskan Palmer property. At that time, the Company will own approximately 13% of Carlin and 26% of Constantine. Should the IPO not complete under the conditions specified, the special warrants will become exercisable to acquire common shares of Carlin and Constantine will become a subsidiary of Carlin through Carlin's ownership of the common shares of Toquima. In this case, Rubicon will own approximately 20% of Carlin.

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements – Unaudited
March 31, 2006
(Stated in Canadian Dollars)

## 7. SHARE CAPITAL

a) Authorized share capital consists of an unlimited number of common shares without par value.

| | 3 Months Ended March 31, 2006 | | Year Ended December 31, 2005 | |
|---|---|---|---|---|
| | Number of Shares | $ | Number of Shares | $ |
| Balance, beginning of period | 66,179,524 | 45,610,692 | 55,006,031 | 39,184,721 |
| Private placements (1) and (2) | - | - | 10,232,000 | 6,420,989 |
| Mineral properties | 55,000 | 66,881 | 159,000 | 151,520 |
| Stock options exercised (3) | 114,376 | 146,176 | 300,000 | 338,087 |
| Warrants, and agents options exercised (4) | 573,943 | 494,249 | 482,493 | 559,318 |
| Flow-through renunciation (5) | - | (477,400) | - | (1,043,943) |
| Balance, end of period | 66,922,843 | 45,840,598 | 66,179,524 | 45,610,692 |

1. *Nil (2005 full year - 1,000,000) shares were issued under flow-through share purchase agreements.*
2. *Net of issue costs of nil (2005 full year - $979,811).*
3. *Inclusive of the original $43,906 (2005 full year - $97,837) fair value of these options re-allocated from contributed surplus to share capital on exercise.*
4. *Inclusive of the original $36,832 (2005 full year - nil) fair value of agents options and warrants re-allocated from contributed surplus to share capital on exercise.*
5. *The Company renounced $1.4 million in flow through expenditures in March 2006 to investors with an effective date of December 31, 2005. Under Canadian GAAP, the Company is required to reduce share capital by an amount based on the temporary taxable differences created by the renunciation. The amount of $477,400 was based on a tax rate of 34.1% applied to the temporary difference of $1.4 million. See Note 3.*

b) Stock Options

The following is a summary of the changes in the Company's outstanding stock options.

| | 3 Months Ended March 31, 2006 | | Year Ended December 31, 2005 | |
|---|---|---|---|---|
| | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| | | $ | | $ |
| Balance at beginning of period (1) | 4,815,000 | 1.10 | 3,486,625 | 1.11 |
| Granted | - | - | 2,310,000 | 1.10 |
| Exercised | (114,376) | 0.89 | (300,000) | 0.79 |
| Expired/Cancelled | - | - | (681,625) | 1.29 |
| Outstanding at end of period (1) | 4,700,624 | 1.10 | 4,815,000 | 1.10 |

(1) *At March 31, 2006, the weighted-average remaining contractual life of stock options outstanding is 2.79 years (December 31 2005 –3.0).*

# RUBICON MINERALS CORPORATION

Notes to the Consolidated Financial Statements – Unaudited
March 31, 2006
(Stated in Canadian Dollars)

## 7. SHARE CAPITAL *(continued)*

The following is a summary of changes in contributed surplus which consists entirely of stock based compensation transactions.

| | 3 Months Ended March 31,2006 | Year Ended December 31, 2005 |
|---|---|---|
| Balance at beginning of period | $ 2,623,780 | $ 1,960,463 |
| Stock-based compensation | 88,358 | 683,671 |
| Share issuance costs | - | 77,483 |
| Fair value of stock options allocated to shares issued on exercise | (80,738) | (97,837) |
| Balance at end of period | $ 2,631,400 | $ 2,623,780 |

The fair value of employee options, agents options and agents warrants granted during the period has been estimated using the Black-Scholes Option Pricing Model based on the following weighted average assumptions:

| | 3 Months Ended March 31,2006 | Year Ended December 31, 2005 |
|---|---|---|
| Risk-free interest rate (%) | - | 3.6% |
| Expected life (years) | - | 4.6 years |
| Expected volatility (%) | - | 40% |
| Expected dividend yield (%) | - | 0% |

Option pricing models require the input of highly subjective assumptions, particularly as to the expected price volatility of the stock. Changes in these assumptions can materially affect the fair value estimate and therefore it is management's view that the existing models do not necessarily provide a single reliable measure of the fair value of the Company's stock option grants.

c) Summary of stock options outstanding:

| March 31, 2006 | | | |
|---|---|---|---|
| Type of Issue | Number Outstanding | Weighted Average Price | Weighted Average Life |
| | | $ | Years |
| Stock Options | 100,000 | 0.67 | 4.42 |
| | 150,000 | 0.74 | 4.45 |
| | 910,000 | 0.83 | 1.26 |
| | 225,000 | 0.84 | 1.30 |
| | 200,000 | 0.86 | 4.71 |
| | 11,250 | 0.99 | 1.23 |
| | 100,000 | 1.15 | 1.27 |
| | 200,000 | 1.16 | 1.19 |
| | 20,000 | 1.17 | 7.56 |
| | 1,750,000 | 1.18 | 3.34 |
| | 354,374 | 1.21 | 3.76 |
| | 680,000 | 1.48 | 2.83 |
| Total Stock Options | 4,700,624 | 1.10 | 2.79 |

# RUBICON MINERALS CORPORATION
Notes to the Consolidated Financial Statements – Unaudited
March 31, 2006
(Stated in Canadian Dollars)

## 7. SHARE CAPITAL *(continued)*

d) Summary of warrants outstanding:

| March 31, 2006 | | | | |
|---|---|---|---|---|
| Type of Issue | | Number Outstanding | Weighted Average Price | Weighted Average Life |
| Warrants and | | | | 0.77 |
| Agent Options | | 298,634 | 1.40 | |
| | (1) | 50,795 | 0.693 | 1.38 |
| | | 4,332,837 | 0.85 | 1.38 |
| Total Warrants and Agent Options | | 4,682,266 | 0.87 | 1.34 |

1) Agent compensation options include options for 50,795 units exercisable for $0.693 consisting of 1 share and ½ share purchase warrant with an expiry of 1.38 years from the period end.

## 8. COMPARATIVE FIGURES

Certain of the prior years' figures have been reclassified to conform with the current year's financial statement presentation.

## 9. COMMITMENTS

At March 31, 2005, the Company has $363,553 in remaining lease payments for the use of its Vancouver office to September, 2010.

The Company is required to make certain cash and share option payments and incur exploration costs to maintain its mineral properties in good standing. These payments and costs are at the Company's discretion and are based upon available financial resources and the exploration merits of the mineral properties which are evaluated on a periodic basis.

## 10. SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITIES

During the period ended March 31, 2006, the Company issued 55,000 (2005 full year – 159,000) of its common shares at a value of $69,350 (2005 full year - $151,520) for mineral properties, and received common shares of other companies valued at $10,500 (2005 full year - $232,626) pursuant to the terms of property agreements. Included in accounts payable and accrued liabilities at March 31, 2006 is $311,499 (December 31, 2005 - $147,575) of mineral property costs.

## 11. SUBSEQUENT EVENTS

In addition to items disclosed elsewhere in these notes, the following occurred during the period subsequent to March 31, 2006:

Private Placement

On April 12, 2006, the Company closed a brokered private placement, issuing 7,640,560 common shares at $1.48 per share for gross proceeds of $11,308,028. The underwriters were paid a cash commission of $678,481 (6% of gross proceeds).

## 11. SUBSEQUENT EVENTS *(continued)*

Red Lake North Property

On April 18, 2006 the Company signed an option agreement with Solitaire Minerals Corporation "Solitaire" whereby Solitaire has the option to acquire a 55% interest in the Company's Red Lake North Property by spending $2.5 million in exploration costs over a four year period, including a firm commitment to spend $275,000 in exploration in the first year of the agreement. Solitaire is required to make a $5000 cash payment (completed) and issue 50,000 of its common shares to the company. The agreement is subject to regulatory approval.

Humlin Property

On April 18, 2006, the Company signed an option agreement with Solitaire Minerals Corporation, whereby Solitaire has the option to acquire a 55% interest in the Company's Humlin Property by spending $2.5 million in exploration costs over a four year period, including a firm commitment to spend $250,000 in exploration in the first year of the agreement. Solitaire is required to make a $5000 cash payment (completed) and issue 50,000 of its common shares to the Company. The agreement is subject to regulatory approval.

Golden Promise Property

On May 01, 2006 the Company signed an option agreement with Crosshair Exploration and Mining Corporation ("Crosshair") whereby Crosshair can earn a 60% interest in the Company's Golden Promise project in Newfoundland by issuing 80,000 Crosshair common shares, incurring $4 million in exploration expenditures and by paying all underlying property payments, all over a 4 year period. The agreement is subject to regulatory approval.

RUBICON

# RUBICON MINERALS CORPORATION

## FISCAL YEAR ENDED DECEMBER 31, 2005

## Management's Discussion & Analysis

Suite 1540 – 800 West Pender Street, Vancouver BC V6C 2V6
Tel: 604.623.3333 Toll free: 1.866.365.4706 Fax: 604.623.3355 E-mail: rubicon@rubiconminerals.com
www.rubiconminerals.com

**RUBICON MINERALS CORPORATION – MD&A December 31, 2005**

## INTRODUCTION

This Management Discussion and Analysis ("MD&A") dated March 26, 2005 (except in regard to the March 29th announcement of a financing – see Liquidity below) includes financial information from, and should be read in conjunction with, the audited annual financial statements for the fiscal year ended December 31, 2005. Please refer to the cautionary notices at the end of this MD&A. Rubicon Minerals Corporation (the "Company") reports its financial position, results of operations and cash flows in accordance with Canadian generally accepted accounting principles ("GAAP") in Canadian dollars. Please see note 10 of the audited consolidated financial statements of the Company for a reconciliation between Canadian and United States GAAP.

Rubicon Minerals Corporation is a Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits. In addition the Company selectively invests in other mineral exploration and resource companies which the Company deems to be of merit.

The Company's key assets are in the Red Lake gold camp, in the Province of Ontario and a number of district-scale gold exploration properties in the Province of Newfoundland and Labrador. The Company also has a 60.4% investment in a subsidiary named Toquima Minerals Corporation ("Toquima") that holds gold and base metal exploration properties in the States of Nevada and Alaska in the United States. The Company also has a 38.8% interest in Africo Resources Ltd., a private B.C. Company that controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo. The Company does not have any assets or mineral properties that are in production or that contain a reserve.

The Company is a reporting issuer in the provinces of British Columbia, Alberta, Ontario and Quebec in Canada as well as with the SEC in the United States. The Company's common shares trade on the TSX in Canada under the symbol 'RMX' and on the American Stock Exchange in the United States under the symbol 'RBY'.

## HIGHLIGHTS

### Re-organization

On November 21, 2005, the Company announced a corporate restructuring which would have the result of dividing its existing portfolio of mineral properties into three separate public companies. Following the corporate restructuring, the Company will continue to hold the Ontario properties and USA properties (subject to the Carlin Gold – Toquima agreement – see below under Toquima). One of the newly created companies will hold all of the Company's Newfoundland properties. The other newly created company will hold all of the Company's investment in Africo Resources Ltd. Management expects that the Africo shares will only be held temporarily in this company and will further be distributed to the shareholders of Rubicon as described in the following paragraph. The proposed reorganization of the Company will be accomplished by way of a statutory plan of arrangement and is subject to shareholder, regulatory and court approvals.

In March of 2006 the board of directors of Africo informed Rubicon that Africo intends to expeditiously carry out a public offering of its securities. In conjunction with this, Africo will undertake, on a best efforts basis, to raise sufficient funds to allow it to commence development of the Kalukundi deposit, pursuant to and contingent upon, completion of a bankable feasibility study. As part of the public offering process, Africo has agreed to assist Rubicon in the distribution of its Africo shareholdings to Rubicon's shareholders. Upon completion of these transactions, Rubicon's shareholders will hold their interest in Africo directly which Rubicon's management feels will maximize the investment's value.

### Red Lake exploration

McFinley Property

The Company spent $2.5 million on its 100% owned McFinley property during the fiscal year ended December 31, 2005. A 43-101 technical report was completed on the property in December 2005 and is available on www.sedar,com

During the first quarter of 2005, the Company completed a 7,491 metre diamond drilling program on the McFinley property. Drilling doubled the extent of the Phoenix Zone. Mineralization within the main lens (PZ-1) now extends for 500 metres in strike length and to a depth of more than 200 metres below surface. Significant intercepts include:

- 17.24 g/t gold over 2.15 metres (PZ-59)
- 34.17 g/t gold over 1.20 metres (included in PZ-58)
- 8.89 g/t gold over 2.40 metres (PZ-77)

- 12.55 g/t gold over 1.15 metres (PZ-80)

Several new zones/lenses are identified in both the hanging wall and footwall to the main lens of mineralization. Highlight drill intersections include:

- 53.27 g/t gold over 1.60 metres (PZ-81)
- 20.18 g/t gold over 1.30 metres (PZ-76)
- 11.04 g/t gold over 2.00 metres (PZ-75)

During the 2005 winter exploration program, a previously unknown, gold bearing, carbonate, ankerite replacement zone (CARZ) was discovered. This new zone of mineralization is located 75 metres structurally above the main Phoenix Zone. It is a complex, 20 to 30 metre thick zone of carbonate, ankerite replacement, containing numerous colloform banded 'snowbank' veins up to 5 metres thick. These veins are variably silicified and mineralized over thicknesses up to 14 metres, with fine grained, needle arsenopyrite. The structural control on the CARZ is not clear, however a flat lying (30°- 40 °), west-dipping fault, located at the base of the zone may play a significant role. Intersections include:

- 5.16 g/t gold over 8.95 metres (incl. 29.50 g/t over 0.45 metres) (PZ-82)
- 6.00 g/t gold over 7.70 metres (PZ-83)
- 5.22 g/t gold over 6.50 metres (PZ-84)
- 1.93 g/t gold over 14.0 metres (PZ-92)

Alteration and mineralization associated with the newly discovered zone, located 75 metres structurally above the main Phoenix lens, now extends over a 120 metre strike length, 60 metres down dip and remains open. Chemically reactive massive colloform-crustiform ankerite veins are an important host of ore in Goldcorp's High-Grade Zone, and the identification of this style of mineralization in the Phoenix Zone area further confirms the similarities between the two gold systems.

Please see the Company's press releases dated May 4, 2005 and the Company's website for additional details.

The Company plans to continue exploration on the project in the summer of 2006. Exploration will focus on expanding the current limits of mineralization and to investigate potential for development of multiple gold zones similar to those found at Goldcorp's high-grade zone.

**Other Red Lake properties**

The Company spent $1.1 million in exploration which was primarily funded by partners who optioned into the Company's properties.

DMC Property

In November, 2005, the Company signed an option agreement on its DMC property whereby Agnico-Eagle Mines Ltd. has the option to acquire a 51% interest in the property by spending $2.25 million in exploration costs over a three year period, including a firm commitment to spend $500,000 in exploration in the first year of the agreement (completed). Agnico-Eagle Mines Ltd. is required to make cash payments totaling $110,000 including a $25,000 firm commitment in the first year (completed). Upon vesting, Agnico Eagle will have a further option to increase its interest up to 65%.

Slate Bay Property

The Company optioned its Slate Bay project in Red Lake whereby King's Bay Gold had the option to acquire a 51% interest in the property by spending $2.75 million in exploration costs over a four year period, commencing March 1, 2005 and including a firm commitment to spend $250,000 in exploration costs in the first year of the agreement. Kings Bay Gold made an initial payment of 25,000 of its common shares to the Company. Subsequent to the year end, Kings Bay terminated the option.

King's Bay Gold Corporation funded a five hole (1498 m) drill program that commenced in August of 2005 on the Slate Bay property. Drilling confirmed the presence of ultramafic stratigraphy in the western portion of the property and returned anomalous sub-economic gold values. Further drilling is recommended.

Red Lake North Property

In the first quarter of 2005, Goldcorp Inc. funded drill program consisting of three holes (738 metres) on the Red Lake North Property. The program was reconnaissance in nature, consisting of widely spaced holes, ranging in length from 167 metres to 288 metres. Drillholes confirmed the southwest strike continuation of Sidace Lake area stratigraphy along the northern margin of the Blackbear Intrusion now know to track the length of the Red Lake North property for a distance of >10 km. Moderate potassium alteration up to 190 m thick with variable development of quartz-sericite, quartz-sericite-biotite, and sericite-biotite-amphibole schist alteration compares favourably with that observed in the main Sidace Lake gold zones, albeit somewhat weaker in intensity. In March, 2006, Planet Exploration Inc. announced further encouraging results from its Sidace Lake Property which is immediately adjacent to the Red Lake north property. Further close-spaced detailed drilling is required to define the alteration within the stratigraphy.

Adams Lake Property

Goldcorp Inc. funded a drill program consisting of two holes (612 metres) in late March 2005 on the northern portion of the Adams Lake property, Balmer and Bateman Townships, within the Red Lake Mining Division, Ontario. Drilling confirmed the presence of the Pindar Creek ultramafic rocks of the Balmer stratigraphy. Anomalous sub-economic gold values were returned.

In August 2005, Goldcorp Inc. funded a drill program consisting of a further five holes (1,346.8 metres) on the property. The program was shut down early due to swampy ground conditions preventing access to planned targets and it is recommended that they be drilled during the winter.

Goldcorp failed to meet their expenditure commitment in 2005 and thus their option at Adams Lake and Red Lake North was terminated. Rubicon retains a 100% interest and considers both projects to be strategically located in the camp. The company will review plans for both properties and will consider new partnerships to advance them

West Red Lake Property

The Company and Redstar Resources Corp. renegotiated a previous option agreement on this property. Under the new agreement, Redstar is required to make a $25,000 cash payment in total to Rubicon and to a third party, issue 250,000 of its common shares to Rubicon by February 28, 2005. Over a four year period, Redstar must make additional cash payments of $175,000 and issue an additional $75,000 in common shares and complete $1.1 million in work expenditures to earn a 51% interest in the property. Redstar can elect to earn an additional 9% by spending an additional $3 million. Redstar is currently operating the exploration programs on the properties. Ongoing exploration is currently taking place.

Manitou Property

The Company optioned the Manitou Property consisting of 301 unpatented mining claims located in the Harper Lake and Lower Manitou Lake Townships, Kenora Mining Division, Ontario on June 30, 2005. The Company has the right to acquire 100% interest in the property by making $210,000 ($15,000 paid) cash payments and 70,000 shares over three years. The property was optioned based on 2004 channel sampling performed on the Dryden-Red Lake showing that returned assays of 54 g/t Au over 30cm, 16 g/t Au over 50cm and 17 g/t over 22cm and were followed up by grab samples by Rubicon geologists that returned values of 233 g/t Au, 36 g/t Ag and 0.6% Zn and 120 Au, 14 g/t Ag and 0.25% Zn.

Gold mineralization is observed in shear zone hosted quartz veins and the surrounding wall rock within the shear zones. Associated sulphides include chalcopyrite, pyrite, sphalerite and galena. During the summer and late fall of 2005, $104,000 of work conducted on the property included initial prospecting, geological mapping, soil sampling and local trenching. Based on anomalous results returned, the Company feels that further work is warranted at the Dryden/Red Lake showings.

English Royalty Division ("ERD")

During 2003, the Company acquired rights to cash and share option payments and contractual interests in an initial portfolio of 63 mineral interests, mainly in the Red Lake district of Ontario, from prospector Perry English, in exchange for $500,000 and 250,000 of the Company's shares. A yearly bonus is currently paid to Mr. English amounting to 20% of cash option receipts and 15% of the value of share option receipts. The Company continues to engage Mr. English to acquire additional mineral properties of merit for optioning to third parties. In addition, the initial portfolio of mineral properties in the ERD included 14 mineral properties previously optioned to the Company which it now owns through the ERD. As a result, the Company has saved $231,000 in option payments to the end of 2005.

As at December 31, 2004, the Company had spent a total of $1.4 million on acquisition and maintenance costs and recovered $1.0 million from option receipts, leaving a net carrying cost of $0.41 million (excluding saved option payments).

During 2005, the company spent $162,000 on acquisition and maintenance costs and recovered $141,000. As at December 31, 2005, the English Royalty Division properties had a carrying cost of $0.44 million (excluding saved option payments which Rubicon would otherwise have to have made).

Due to the acquisition of several new properties in late 2005, the expected payback of ERD costs in 2005 is now anticipated to occur during 2006. Since year-end, 9 new property agreements have been entered into, which offset these costs.

## Newfoundland exploration

Overall, the Company spent $2.4 million in acquisition and exploration in Newfoundland, of which $435,000 was funded by partners Placer Dome and Meridian Gold. Highlights from the significant properties are as follows:

### Golden Promise Trend Properties

#### Golden Promise project

During the 1st quarter of 2005, Placer Dome (Canada) Inc. ("Placer") funded a $0.2 million geochemical program (1,650 samples) on the Golden Promise gold project. This program has defined several new targets throughout the property that require follow-up testing via trenching. Placer notified the Company in March 2005 that it has elected to withdraw from the exploration agreement covering the Golden Promise gold project. The property now reverts 100% back to the Company.

Since 2003, Placer has spent in excess of $1.7 million on exploration of the Golden Promise gold project and the project has greatly benefited from Placer's involvement. The exploration programs included diamond drilling at Jaclyn and a preliminary evaluation of the approximately 580 square km including regional prospecting, geological mapping, soil geochemistry and a high resolution airborne magnetic and electromagnetic survey that identified numerous new gold targets.

During the 3rd quarter of 2005, a trenching program was completed that was designed to follow-up on elevated Au values from soils collected on the Rushy Pond grid on the eastern part of the Golden Promise Property. In total 7 trenches were excavated each encountering bedrock. One trench exposed minor quartz veining and sulphides while the others exposed no significant mineralization or alteration. Assays have been returned for channel samples collected during the program and no significant values were obtained. No further work is planned for the Rushy Pond grid. The Company continues to complete prospecting and soil sampling over various parts of the Golden Promise Property.

The Company completed a 43-101 technical report on the Golden Promise property in December, 2005 which is available on the Sedar website at www.sedar.com. The Company is evaluating options including expressions of interest from third parties to further expand the area of known mineralization within the Jacklyn-Christopher area.

#### South Golden Promise Property

The property comprises 8 map-staked licences (1072 claims) that are currently registered to Crosshair Exploration and Mining Corporation ("Crosshair") who are earning a 60% interest in the claims. A 2005 trenching program at the Snow White prospect was successful in exposing a composite quartz vein system over a strike length of 170 m, locally up to 5 m wide and open in all directions. The trenching returned grades of up to 232.0 g/t Au in grab samples and up to 29.7 g/t Au over 0.5 metre in channel samples. Crosshair is planning a diamond drill program to test the Snow White occurrence during the first half of 2006.

### Glenwood-Botwood Trend Properties

#### H-Pond Project

In 2004, the Company's exploration program on its 100% controlled H-Pond project, located 10 kilometres from the town of Gander, led to the discovery of multiple, thick, extensively veined and altered, gold-bearing zones interpreted to extend over a minimum distance of four kilometres based on diamond drilling, trenching, gold bearing float and gold in-soil anomalies. The Company considers H-Pond to represent a significant early stage gold discovery that merits additional drilling.

During 2005, the Company completed a 20 hole, 3,552 metre diamond drilling program that intersected additional high grade gold. The 2005 drilling extended the mineralized zone over a strike length to 450 metres and to a vertical depth of 250 metres. Twelve of the twenty holes that have tested the H-Pond prospect contained visible gold. Significant intercepts include:

- Hole HP-05-09 - 9.02 g/t Au over 0.8 m (including 15.02 g/t over 0.4 m)
- Hole HP-05-11 - 6.91 g/t Au over 1.85 m (including 31.75 g/t over 0.35 m)
- Hole HP-05-15 - 9.79 g/t Au over 1.15 m (including 14.40 g/t over 0.5 m)

At the Pocket Pond Prospect, located 3 km south of the H-Pond prospect, a single drill hole intersected a visible gold bearing quartz vein that correlates with gold bearing quartz veining exposed by surface trenching. Significant results include 5.27 g/t gold over 1.55 metre (including 13.90 g/t gold over 0.55 metre) and 0.50 g/t gold over 3.2 metres

Additional activities on the H-Pond project in 2005 included:

- Continued prospecting on the property in 2005 led to the discovery of a new gold float occurrence located 2.7 kilometres north-northwest of the previously drilled H-Pond prospect. Samples of the large (80 cm by 75 cm by 65 cm) angular gold bearing boulder collected by Rubicon prospectors assayed 25.68 oz/t gold (798.87 g/t), 18.39 oz/t gold (572.03 g/t), 16.38 oz/t gold (509.40 g/t), 17.12 oz/t gold, (532.60 g/t) and 8.00 oz/t gold (248.68 g/t).

- Channel sampling and geological mapping of 2004 trenches in the Lachlan area (~6 kilometres south of the H-Pond discovery). A total of 140 channel samples were collected. The highest gold value were 962 ppb Au over 1.0 m, 790 ppb Au over 1.0 m, 715 ppb Au over 0.5 m, and 645 ppb Au over 0.5 m. There are no immediate plans for follow-up work at the Lachlan area, which comprises a small portion of the H-Pond project.

- A 2-week geological mapping program completed on the H-Pond trend focused on gathering more structural information and characterizing the morphology and nature of mineralized quartz veins and the host bedrock.

- The Company completed a 43-101 technical report on the H-Pond project (JBP Linear property) in December 2005 and it is available on the Sedar website at www.sedar.com

This new gold float occurrence is a further indication that the H-Pond system is extensively developed on Rubicon claims. Rubicon controls approximately 35 kilometres of strike potential along this prospective belt. Drilling and trenching is planned for H-Pond prospect and the new discovery area in 2006.

Huxter Lane project

In December 2004, the Company optioned four mineral licenses known as the Huxter Lane Property to Meridian Gold Company. Under the terms of the agreement, Meridian can earn a 55% interest in this 1350 hectare property by spending $1,000,000 over a period of three years, make the underlying cash payments to the vendor and by paying the Company approximately $61,400. Meridian may earn an additional 10% by funding the project to a bankable feasibility study and an additional 5% (for a total interest of 70%) by funding all costs to a positive production decision. The target is an intrusive-related gold deposit.

During 2005, Meridian Gold funded and Rubicon operated a systematic program of soil sampling, prospecting, trenching and IP ground geophysical surveying on the Huxter Lane Property. Highlights of sampling to date include several soil samples >100 ppb gold. Samples from prospecting have returned values up to 4 g/t gold. Trenching and channel sampling programs carried out in the fall of 2005 by Rubicon has uncovered widespread mineralization in trenches over an area of approximately 550 metres in the porphyry as well as contact zones between the porphyry and ultramafic. Highlights of channel sampling to date include: 6.87 g/t Au over 2.6 m, 6.08 g/t Au over 2.9 m and 4.19 g/t Au over 3.2 m. Two channel samples from the Mosquito Hill Occurrence returned 15.3 g/t over 0.8 metres and 12.6 g/t over 0.45 meters.

Proposed work during 2006 includes flying of a high-resolution airborne magnetic/electromagnetic survey over the entire property and completion of a diamond drill program targeting the mineralization discovered through trenching at Mosquito Hill.

Avalon Trend properties - Berg Project

In January 2005, IAMGold notified the Company of its decision to terminate its option on this project. The Company is seeking a new partner to advance this project.

Base Metal Properties - Seal Bay Property

The Company completed a 4 hole, 1124 metre diamond drill program in November-December 2005. Highlights include:

Drill hole SB05-10ext:- 101 ppm Cu, 363 ppm Pb, 2162 ppm Zn, 111 ppb Au, 10.7 g/t Ag over 10.5 metres.
Drill hole SB05-16ext - 188 ppm Cu, 3.5 ppm Pb, 199 ppm Zn, 5 ppb Au and 0.2 g/t Ag over 16.5 metres.

The Company has earned a 51% interest in the property as required by an amended Seal Bay agreement dated July 15th, 2002. A Joint Venture is currently being formalized.

**Investments**

Africo Resources Ltd.

At December 31, 2005, the Company held a 37.4% interest in Africo Resources Ltd. ("Africo"), a private B.C. company that controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo (the Kalukundi deposit). The Company accounts for this investment on an equity basis.

During the year, Rubicon invested a further $4.2 million through Africo private placements to bring its ownership in Africo to 7.3 million shares or 37.4%. An additional 284,401 shares were purchased in January 2006 to bring the investment to 7.6 million shares, 38.8% with an average investment cost per share of $0.92.

In February, 2006, the Company received a new 43-101 compliant mineral resource statement from Africo Resources Ltd. prepared by RSG Global Ltd. of Perth, Australia, for the Kalukundi deposit (see Sedar filings for technical report). The new estimate, which updates the previously released Inferred Resource, is based on incorporation of 61 additional drill holes which comprise part of the ongoing feasibility study.

Highlights of report

Measured & Indicated category: 12.15 million tonnes grading 2.45% copper and 0.61% cobalt between surface and 200 metres below surface. Of these combined categories, 79.4% of the resources are classified as Measured Resources.

Inferred Category: 15.02 million tonnes grading 2.63% copper and 0.58% cobalt between surface and 200 metres below surface.

Independent consultant, RSG Global, indicates there is exploration potential for approximately 16 million tonnes of additional resources by carrying out further drilling below 200 metres.

In addition to the reported resources, there exists a number of other areas of surface oxide mineralization on the property, not yet evaluated. These are considered to be high priority drill targets by Africo and are thought to hold potential for additional resources. Thus, Africo is planning to undertake additional drilling to further assess the resource base below 200 metres.

The resource statement contained herein was prepared by Dr. Julian Verbeek MAusIMM, Principal Consultant for RSG Global of Perth, Australia, in accordance with National Instrument 43-101. Rubicon Minerals' qualified person, as defined by National Instrument 43-101, is David Adamson, PhD, President and CEO of Rubicon Minerals Corporation. See the news release dated February 8, 2006, filed on Sedar and our web-site for additional information on this report.

The resource reported above forms part of an ongoing feasibility study on the Kalukundi deposit which is expected to be delivered before the end of April, 2006.

Toquima Minerals Corporation (60.4% owned subsidiary)

Palmer Property, Alaska

Due to lack of funding, no exploration was carried out on the Palmer property in 2005.

Nevada properties

Accomplishments in 2005

- Signed joint venture agreement with Newmont Mining Company for the LHS property, Pershing County. Newmont completed a 22-hole, 12,285 foot reverse circulation drill program on the property.
- Signed joint venture agreement with Romarco Minerals Corporation for the Pine Grove property, Lyon County.
- Signed joint venture agreement with Piedmont Mining Company for the Dome-HiHo property, Lander County. Piedmont completed a 14 hole, 5,315 ft drill program on the HiHo portion of the property in November 2005.
- Completed a 505 sample soil geochemistry program at Willow-Currant property, Elko County.
- Completed a 194 sample stream sediment geochemistry program on the Swales Mountain property, Elko County.

Subsequent to December 31, 2005

- Newmont returned the LHS property in February 2006.
- Romarco completed a Phase I drill program at Pine Grove in February 2006

Plan of Arrangement

On February 8, 2006 the Rubicon agreed to a plan of arrangement whereby all of the Company's shares of Toquima Minerals Inc. will be acquired by Carlin Gold Corp. ("Carlin"). Consideration to Rubicon will consist of 4.3 million shares of Carlin (approximately 13% of outstanding Carlin shares after the arrangement) and 3.5 million shares (26%) of a new company ("Newco") that will own Toquima's Palmer, Alaska project. Should "Newco" be unable to complete an initial public offering, Rubicon will receive 3.5 million more Carlin shares (7%) of Carlin, instead of the "Newco" shares and the Palmer property will remain a property of Carlin through its subsidiaries. The plan of arrangement is subject to court and regulatory approval.

## RISKS AND UNCERTAINTIES

The success of the Company depends upon a number of factors, many of which are beyond our control. Typical risk factors and uncertainties, among others, include political risks, financing risks, title risks, commodity prices, exchange rate risks, operating and environmental hazards encountered in the exploration, development and mining business and changing laws and public policies. Risk factors are more fully described in our Annual Information Form, on file at www.sedar.com .

Additional information on the Company, including our Annual Information Form and other public filings, are available on SEDAR at www.sedar.com

## SELECTED ANNUAL INFORMATION (based on Canadian GAAP)

| Fiscal Year ended | 2005 | 2004 | 2003 |
|---|---|---|---|
| Interest and miscellaneous income | $82,232 | $150,018 | $153,910 |
| Gain on sale of investments | $76,765 | $694,769 | $19,703 |
| Net loss | $3,644,284 | $4,082,836 | $2,312,394 |
| Basic and diluted net loss per share | $0.06 | $0.08 | $0.05 |
| Total assets | $33,320,369 | $30,319,662 | $29,963,297 |
| Total long-term financial Liabilities (Non-controlling interest) | $407,479 | $474,340 | $682,594 |
| Cash dividends | Nil | Nil | Nil |

The major factors that caused significant variations in net loss were the recording of stock-based compensation when stocks options were granted, the write-down of properties based on a periodic review of such properties, gains on sales of investments and tax recoveries recorded on the renunciation of exploration expenditures to flow-through share holders. The flow-through share tax recovery was recorded for the first time in 2005 due to pronouncement EIC-146 issued by the CICA in 2004 and adopted by the Company in 2005. None of these factors have identifiable trends.

## OPERATING RESULTS

### Fiscal year ended December 31, 2005 compared to Fiscal year ended December 31, 2004

For the fiscal year 2005, the Company incurred a net loss of $3.6 million ($0.06 per share) compared to a net loss of $4.1 million ($0.07 per share) incurred in fiscal year 2004, a decrease in net loss of $.5 million.

Significant items making up this decrease were as follows:

- Investor relations expense increased by $140,000 due to a combination of the engagement of Renmark Financial for investor relations services, salary increases for the Vice President Investor Relations and increased travel and conference costs.
- Salary expense was higher by $100,000 due to a combination of a payment, pursuant to a settlement agreement, to Michael Gray, the former Vice-President Exploration, new director's fees for independent directors and hiring fees for the new CFO and accountant.
- Stock based compensation was down by 300,000 due to lower fair values and later vesting in current agreements.
- Re-organization costs represent the costs associated with the planned split up of the company as discussed below under re-organization.
- Property write-offs were unchanged.
- Option receipts and administration fees in excess of property costs represent amounts received from optionees of the Company's properties, in excess of costs incurred to date by Rubicon.
- Gain on sale of investments was down by $600,000. In the current year this represented sale of junior mining stocks received from optionees of the Companies properties including ERD properties. In the prior year the gain was from the sale of Africo shares only.
- Gain on settlement of debt of $100,000 was a consequence of a reduction of legal fees charged to the subsidiary, Toquima Minerals Corp. for its IPO that was not completed.
- Increase in loss on equity investment of $263,000 represents the Company's percent interest in the estimated losses of Africo Resources Ltd.
- The $1million, non-cash, future income tax recovery item recorded in 2005 reflects the reinstatement of unrecorded prior tax loss benefits, due to the renunciation, in February 2005, of flow-through share expenditures.

### Fiscal year ended December 31, 2004 compared to Fiscal year ended December 31, 2003

For the fiscal year 2004, the Company incurred a net loss of $4.1 million ($0.07 per share) compared to a net loss of $2.3 million ($0.05 per share) incurred in fiscal year 2003, an increase in net loss of $1.8 million.

Significant items making up this increased loss were as follows:

- The Company wrote off $1.7 million in deferred property costs during fiscal year 2004 compared to $0.2 million in fiscal 2003, an increase of $1.5 million. Write-offs are taken, of the costs of particular properties, whenever the company concludes, based on results of exploration or other economic factors, that further work is not warranted.
- Salary expense increased in fiscal year 2004 by $0.2 million with the hiring of additional staff and salary increases. The Company notes that, due to the competitive market driven by high commodity prices and demands, that incentives for key employees forms an important element in maintaining its competitive advantage. In making these determinations, the board of Directors has relied, in part, on external third party recommendations.
- Office expense increased in fiscal year 2004 by $0.1 million due primarily to new Director and Officer's insurance costs.
- Stock based compensation increased in fiscal year 2004 by $0.4 million partly with the granting of a higher number of employee options (1,435,000 share options in fiscal year 2004 versus 895,000 share options in fiscal year 2003) and partly due to a higher fair value of the options granted. The increase in consulting fees was primarily due to the stock based compensation for options granted to a consultant.
- The higher operating expenses were partly offset by an increase in gain on the sale of investments. The Company recorded a gain of $0.7 million in fiscal year 2004 compared to $19,703 in fiscal year 2003, an increase of $0.7 million. Most of the gain was generated from the resale of part of its initial investment in shares of Africo Resources Ltd.
- The Toquima IPO costs included a substantial amount of legal, professional fees and other costs associated with the proposed listing of Toquima on the TSX Venture Exchange. The listing was not completed.

**SUMMARY OF QUARTERLY RESULTS (Based on Canadian GAAP)**

| Quarter | 2005 Fourth | 2005 Third | 2005 Second | 2005 First | 2004 Fourth | 2004 Third | 2004 Second | 2004 First |
|---|---|---|---|---|---|---|---|---|
| Interest and miscellaneous income | $ 26,202 | $ 6,637 | $ 14,977 | $ 34,416 | $ 32,033 | $ 27,484 | $ 41,140 | $ 49,361 |
| Gain (loss) on sale of investments | $ (20,592) | $(19,077) | $ - | $116,434 | $ 14,747 | $682,161 | $ (2,139) | $ - |
| Net loss | $ 1,637,596 | $ 647,715 | $657,611 | $299,464 | $2,043,399 | $377,943 | $675,878 | $985,616 |
| Basic and fully diluted net loss per share | $ .01 | $ 0.01 | $ 0.01 | $ 0.01 | $ 0.03 | $ 0.01 | $ 0.01 | $ 0.02 |

(see Selected Annual Information, above, for factors causing variations)

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity and Capital Resources – Fiscal year ended December 31, 2005

The Company had working capital of $3.2 million as at December 31, 2005 compared to $6.4 million as at December 31, 2004.

During fiscal year 2005, the Company issued 10,232,000 common shares raising $6.5 million (net of cash costs of $.9 million), issued 482,493 common shares from the exercise of warrants for cash proceeds of $0.6 million and issued 300,000 common shares from the exercise of options for cash proceeds of $0.3 million for total net cash proceeds of $7.3 million ($3.2 million – fiscal year 2004).

Included in the above are 1 million flow-through shares issued for gross proceeds of $1.4. All these funds were restricted to expenditures on exploration. At year end, the amount of $112,500 remained restricted for this purpose.

Other sources of funds included recovery of exploration costs from optionees of the Company's properties and option payments - $1.4 million and the sale of junior mining stocks that the Company had received as option payments - $0.8 million.

On March 29, 2006, the Company announced that it had entered into an agreement with underwriters to issue 6.8 million commons shares at $1.48 per share on a bought deal basis for gross proceeds of approximately $10 million (Note 14(f)), subject to regulatory approvals. When this financing closes, the Company will have sufficient funds to meet its working capital requirements for the next 12 months and to continue exploring its properties, further invest in Africo Resources and fund the re-organization of the Company as discussed below.

### Liquidity and Capital Resources – Fiscal year ended December 31, 2004

The Company had a working capital position (excluding minority interest amount of $0.5 million) of $6.4 million as at December 31, 2004 compared to $11.6 million (excluding minority interest amount of $0.7 million) as at December 31, 2003. The working capital position also does not include $3.2 million (at cost) in investments in a number of publicly listed and private companies ($0.4 million – December 31, 2003) and the final tranche of a flow-through financing of $1.2 million (net of costs) completed in January 2005.

During fiscal year 2004, the Company issued 2,093,412 flow through common shares raising $2.5 million (net of cash costs of $0.4 million), issued 525,161 common shares from the exercise of warrants for cash proceeds of $0.6 million and issued 79,000 common shares from the exercise of options for cash proceeds of $0.1 million for total net cash proceeds of $3.2 million ($16.5 million – fiscal year 2003).

The Company also disposed of part of its investments, including part of its initial purchase of Africo Resources Ltd. ("Africo") shares for proceeds of $2.5 million.

### Investing Activities – Fiscal year ended December 31, 2005

For the fiscal year 2005, the Company spent $6 million on mineral property acquisition and exploration. Of that amount the Company recovered $1.4 million of exploration expenditures and option payment from optionees of the Company's properties. In addition, the Company issued 159,000 common shares valued at $152,000 and paid $.5 million cash both as option payments to vendors.

The Company invested an additional $4.0 million to acquire common shares in Africo to maintain its equity percent interest in Africo at close to 38%.

**Investing Activities – Fiscal year ended December 31, 2004**

For the fiscal year 2004, the Company spent $9.1 million in exploration costs and cash option payments (including $0.8 million spent by Toquima). The Company used $5.0 million from its working capital reserve, recovered $3.9 million (45% of total exploration costs, excluding Toquima) from joint venture partners and other parties and received $0.2 million in management fees. In addition, the Company issued 123,827 common shares valued at $0.2 million to pay property share option payments to vendors and received $0.6 million in common shares from option holders.

The Company invested $4.0 million (including due diligence costs) to acquire common shares in Africo and subsequently sold part of its investment in Africo for cash proceeds of $2.3 million with a net gain of $0.7 million. The Company as at December 31, 2004 held 35.6% of Africo at a carried cost of $2.4 million.

## OFF-BALANCE SHEET ARRANGEMENTS

The Company does not have any off-balance sheet arrangements other than what is disclosed under commitments in note 9 of the consolidated financial statements of the Company.

## TRANSACTIONS WITH RELATED PARTIES

Legal services

David Reid is a director of the Company and a partner at the law firm Davis & Company. For the fiscal year ended December 31, 2005, Davis & Company invoiced the Company $302,000 net of a fee reduction granted to the Company's subsidiary Toquima, in relation to the planned IPO that was not completed.

Point Leamington property

During 2004, the Company completed an option agreement with TLC Ventures Corp. ("TLC") whereby TLC can acquire a 100% interest in the Company's Point Leamington Property. At the time of the transaction, the Company and TLC had one common director. The Company and TLC negotiated the agreement based on commercial terms.

Transactions with Africo Resources Ltd., an equity accounted investment, consisted of share purchases mentioned previously and reimbursement by Africo of $101,000 in administrative service costs and feasibility costs.

See note 4, "Related Party Transactions", in the consolidated financial statements for additional information on related party transactions with the Company for 2005.

## FOURTH QUARTER

The Company incurred a net loss of $1.6 million for the quarter ended December 31, 2005 compared to a loss of $2.0 million in the comparative quarter. Both last quarters had unusually high write-offs of mineral property costs (see Note 7 to the financial statements under USA properties).

The Company had working capital of $3.2 million as at December 31, 2005 compared to $4.5 million as at September 30, 2005. The Company issued no shares during the fourth quarter, recovered $250,000 of property costs through option receipts and joint venture invoices, received $119,000 from sales of investments and spent $900,000 on exploration costs, primarily on its Seal Bay, Golden Promise, McFinley and DMC projects.

## CRITICAL ACCOUNTING ESTIMATES

The Company's accounting policies are described in Note 2 of the consolidated financial statements for the year ended December 31, 2005. The Company considers the following policies to be most critical in understanding its financial results:

Use of estimates

The preparation of financial statements in conformity with generally accepted accounting policies requires management of the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates are based on past experience, industry trends and known commitments and events. By their nature, these estimates are subject to measurement uncertainty and the effects on the financial statements of changes in such estimates in future periods could be significant. Actual results will likely differ from those estimates.

Carrying value of deferred property interests

The Company has capitalized the cost of acquiring mineral property interests and on-going exploration and maintenance costs. Capitalized property costs are expensed in the period in which the Company determines that the mineral property interests have no future economic value. Capitalized property costs may also be written down if future cash flow, including potential sales proceeds and option payments, related to the property are estimated to be less than the carrying value of the property. The Company reviews the carrying value of its mineral properties periodically, and whenever events or changes in circumstances indicate the carrying value may not be recoverable, reductions in the carrying value of each property would be recorded to the extent that the carrying value of the investment exceeds the property's estimated fair value.

Under US GAAP, all exploration costs are expensed.

Stock-based compensation

The Company has adopted the fair value based method of accounting for stock option and compensatory warrant awards granted to directors, employees and consultants. Under this method, the fair value of stock options is calculated and expensed or recorded as share issue costs at the date of grant, with the offsetting credit to contributed surplus. If the stock options are exercised, the proceeds are credited to share capital.

The Company uses the Black-Scholes option pricing model to calculate the fair value of stock options and compensatory warrants granted. This model is subject to various assumptions. The assumptions the Company makes will likely change from time to time. At the time the fair value is determined, the methodology the Company uses is based on historical information, as well as anticipated future events.

## CHANGES IN ACCOUNTING POLICIES INCLUDING INITIAL ADOPTION

Comprehensive Income, CICA Handbook Section 1530

Section 1530 introduces new standards for reporting and display of comprehensive income. Comprehensive income is the change in equity (net assets) of an enterprise during a reporting period from transactions and other events and circumstances from non-owner sources. It includes all changes in equity during a period except those resulting from investments by owners and distributions to owners.

Section 1530 applies to interim and annual financial statements relating to fiscal years beginning on or after October 1, 2006. Earlier adoption is permitted only as of the beginning of a fiscal year ending on or after December 31, 2004. The Company plans to adopt this standard for its fiscal year ending December 31, 2007. Financial statements of prior periods are required to be restated for certain comprehensive income items. In addition, an enterprise is encouraged but not required to present reclassification adjustments, in comparative financial statements provided for earlier periods.

An entity adopting this Section for a fiscal year beginning before October 1, 2006 must also adopt Section 3855 – Financial Instruments – Recognition and Measurement.

The expected effect of this new accounting policy on the Company's financial statements cannot be reasonably determined at this time but it is not expected to have a significant impact on the Company's business.

Equity, CICA Handbook Section 3251

Section 3251 replaces Section 3250 – Surplus. It establishes standards for the presentation of equity and changes in equity during a reporting period.

Section 3151 applies to interim and annual financial statements relating to fiscal years beginning on or after October 1, 2006. Earlier adoption is permitted only as of the beginning of a fiscal year ending on or after December 31, 2004. The Company plans to adopt this standard for its fiscal year ending December 31, 2007. Financial statements of prior periods are required to be restated for certain specified adjustments. For all other items, comparative financial statements presented are not restated, but an adjustment to the opening balance of accumulated other comprehensive income may be required.

An entity adopting this Section for a fiscal year beginning before October 1, 2006 must also adopt Section 3855 – Financial Instruments – Recognition and Measurement, Section 3865 – Hedges and Section 1530 – Comprehensive Income.

The expected effect of this new accounting policy on the Company's financial statements cannot be reasonably determined at this time but it is not expected to have a significant impact on the Company's business.

Flow-through share renunciations, CICA Emerging Issues Committee - 146

In March of 2004, the CICA Emerging Issues Committee issued its recommendation for accounting treatment of the renunciation of flow-through shares. The recommendations were to take immediate effect and the Company adopted them at that time.

The consensus reached was that a future income tax liability should be recognized upon the renunciation of flow-through shares and shareholder equity should be reduced. In the case where a company has written-down future tax assets arising from loss carryforwards or deductible temporary differences, then those write-downs should be reversed in the amount of the future tax liability arising from the renunciation. The credit side of the entry is recorded on the income statement.

Pursuant to this new policy, the Company recorded a $1 million future income tax recovery upon renouncing exploration expenditures in February of 2005.

## DISCLOSURE OF OUTSTANDING SHARE DATA

As at March 26, 2006, the Company had the following common shares, stock options, warrants and agent warrants outstanding:

| | |
|---|---|
| Common shares | 66,571,837 |
| Stock options | 4,745,000 |
| Warrants | 4,898,101 |
| Agent's options for units (1) | 50,795 |
| Warrants embedded in agent's options (1) | 25,398 |
| Fully diluted shares outstanding | 76,291,130 |

(1) Agents options include 1 common share and 1/2 share purchase warrant

### CAUTIONARY NOTICES

The Company's audited consolidated financial statements for the fiscal year ended December 31, 2005 and this accompanying MD&A include certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 of the United States. Other than statements of historical fact, all statements in these documents, including without limitation, statements regarding potential mineralization and resources, future plans and objectives of the Company, are forward looking statements that involve various known and unknown risks, uncertainties and other factors. There can be no assurance that such statements will prove to be accurate. Actual results and future events could differ materially from those anticipated in such statements. Readers are cautioned not to place undue reliance on these forward-looking statements that speak only as of their respective dates. Important factors that could cause actual results to differ materially from the Company's expectations include among ,other others, the ongoing results of current exploration activities, feasibility studies, on-going engineering work, changes in project parameters, and future metal prices, as well as those factors discussed under the heading "Risk Factors" and elsewhere in the Company's documents filed from time to time with the Toronto Stock Exchange, Canadian, United States and other securities regulators. All subsequent written and oral forward-looking statements attributable to the Company or persons acting on its behalf are expressly qualified in their entirety by this notice.

Work on the Projects was carried out or reviewed under the supervision of the following Qualified Persons as defined under NI 43-101: David Adamson, Ph.D. for Africo Resources Ltd., Marc Prefontaine., P.Geo., for the McFinley Project, Terry Bursey, B.Sc.Hons., P.Geol., for the Adams Lake, Red Lake North, DMC and Manitou Projects and David Copeland, M.Sc., P.Geol., for the Newfoundland projects.

RUBICON

# RUBICON MINERALS CORPORATION

## Management's Discussion & Analysis

## First Quarter Ended March 31, 2006

Amended July 6th, 2006, to reflect adjustment to loss on equity investment in Africo Resources Ltd.

Suite 1540 – 800 West Pender Street, Vancouver BC V6C 2V6
Tel: 604.623.3333 Toll free: 1.866.365.4706 Fax: 604.623.3355 E-mail: rubicon@rubiconminerals.com
www.rubiconminerals.com

## INTRODUCTION

This Management Discussion and Analysis ("MD&A") dated May 9, 2006 includes financial information from, and should be read in conjunction with, the amended interim consolidated financial statements for the 3 months ended March 31, 2006. It is further assumed that the reader has access to the audited consolidated financial statements for the year ended December 31, 2005 and the MD&A for the year ended December 31, 2005. Please refer to the cautionary notices at the end of this MD&A especially in regard to forward looking statements. Rubicon Minerals Corporation (the "Company") reports its financial position, results of operations and cash flows in accordance with Canadian generally accepted accounting principles ("GAAP") in Canadian dollars.

Rubicon Minerals Corporation is a Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits. In addition, the Company selectively invests in other mineral exploration and resource companies which the Company deems to be of merit.

The Company's key assets are in the Red Lake gold camp, in the Province of Ontario and a number of district-scale gold exploration properties in the Province of Newfoundland and Labrador. The Company also has a 60.4% investment in a subsidiary named Toquima Minerals Corporation ("Toquima") that holds gold and base metal exploration properties in the States of Nevada and Alaska in the United States. The Company also has a 39.6% interest in Africo Resources Ltd., a private B.C. Company that controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo. The Company does not have any assets or mineral properties that are in production or that contain a reserve.

The Company is a reporting issuer in the provinces of British Columbia, Alberta, Ontario and Quebec in Canada as well as with the SEC in the United States. The Company's common shares trade on the TSX in Canada under the symbol 'RMX' and on the American Stock Exchange in the United States under the symbol 'RBY'.

## HIGHLIGHTS

### Re-organization

On November 21, 2005, the Company announced a corporate restructuring which would have the result of dividing its existing portfolio of mineral properties into three separate public companies. Following the corporate restructuring, the Company will continue to hold the Ontario properties and USA properties (subject to the Carlin Gold – Toquima agreement – see below under Toquima). One of the newly created companies will hold all of the Company's Newfoundland properties. The other newly created company will hold all of the Company's investment in Africo Resources Ltd. Management expects that the Africo shares will only be held temporarily in this company and will further be distributed to the shareholders of Rubicon as described in the following paragraph. The proposed reorganization of the Company will be accomplished by way of a statutory plan of arrangement and is subject to shareholder, regulatory and court approvals.

In March of 2006 the board of directors of Africo informed Rubicon that Africo intends to expeditiously carry out a public offering of its securities. In conjunction with this, Africo will undertake, on a best efforts basis, to raise sufficient funds to allow it to commence development of the Kalukundi deposit, pursuant to and contingent upon, completion of a bankable feasibility study. As part of the public offering process, Africo has agreed to assist Rubicon in the distribution of its Africo shareholdings to Rubicon's shareholders. Upon completion of these transactions, Rubicon's shareholders will hold their interest in Africo directly which Rubicon's management feels will maximize the investment's value.

### Red Lake Exploration

#### McFinley Property

The 100% owned McFinley Property was on care and maintenance during the first quarter of 2006. The company is formulating plans for a summer exploration program to follow up on the discovery of the Carbonate Altered Zone

("CARZ") made during the 2005 winter exploration program. Exploration plans include surface trenching and drilling to define the extent of the CARZ.

**Other Red Lake properties**

The Company spent $674,000 on exploration primarily partner funded on optioned properties.

DMC Property

Agnico-Eagle Mines Ltd. funded an 11 hole (3832m) drill program that commenced in February of 2006 on the DMC property. Agnico has fulfilled their first year commitment by spending in excess of $500,000 during the winter drill program.

Drilling identified gold mineralization in conjunction with biotite, fuchsite, arsenopyrite, pyrite alteration plus carbonate and quartz veining within host mafic/ultramafic rocks of the Balmer Assemblage indicative of a widespread gold bearing system. Intercepts include 2.41 g/t gold over 9.0 metres (including 5.27 g/t gold over 1 metre and 3.32 g/t gold over 3.5 metres), 3.41 g/t gold over 3.5 metres and 4.60 g/t gold over 1 metre. The dominant control on the mineralization and alteration appear to be associated with the intersection between northeast-trending and west-northwest-trending structures. Currently an ongoing program of data analysis (3D lithogeochemical and structural modeling) is taking place to formulate plans for a follow-up drill program in the winter of 2007.

Slate Bay Property

No work was conducted on the 100% owned Slate Bay Property in the first quarter of 2006.

Red Lake North Property

The company signed an option agreement on its Red Lake North Property on April 18, 2006 whereby Solitaire Minerals Corporation has the option to acquire a 55% interest in the property by spending $2.5 million in exploration costs over a four year period, including a firm commitment to spend $275,000 in exploration in the first year of the agreement. Solitaire is required to make a $5000 cash payment (completed) and issue 50,000 of its common shares to the company. Exploration programs are planned for late summer / early fall and will be drill focused.

Humlin Property

The company signed an option agreement on its Humlin Property on April 18, 2006 whereby Solitaire Minerals Corporation has the option to acquire a 55% interest in the property by spending $2.5 million in exploration costs over a four year period, including a firm commitment to spend $250,000 in exploration in the first year of the agreement. Solitaire is required to make a $5000 cash payment (completed) and issue 50,000 of its common shares to the company. Exploration programs will include summer surface exploration and a winter 2007 drill program.

Adams Lake Property

No work was conducted on the 100% owned Adams Lake Property in the first quarter of 2006.

West Red Lake Property

Redstar fulfilled it's second year option agreement requirements on the West Red Lake Properties by making a $25,000 cash payment in total to Rubicon and to a third party and issuing 250,000 of its common shares to Rubicon in February 2006. Over the final two years of the option agreement (prior to February 28, 2008), Redstar must make additional cash payments totaling $150,000 and issue an additional $50,000 in common shares and complete $1.1 million in work expenditures by February 28, 2009 to earn a 51% interest in the property. Redstar can elect to earn an additional 9% by spending an additional $3 million. Redstar is currently operating the exploration programs on the properties. Ongoing exploration is currently taking place.

Manitou Property

No work was conducted on the 100% owned Manitou Property in the first quarter of 2006.

English Royalty Division ("ERD")

During 2003, the Company acquired rights to cash and share option payments and contractual interests in an initial portfolio of 63 mineral interests, mainly in the Red Lake district of Ontario, from prospector Perry English, in exchange for $500,000 and 250,000 of the Company's shares. A yearly bonus is currently paid to Mr. English calculated using a sliding scale based on receipts, equaling 10% to 20% of cash option receipts and 7.5% to 15% of the value of share option receipts. The Company continues to engage Mr. English to acquire additional mineral properties of merit for optioning to third parties. In addition, the initial portfolio of mineral properties in the ERD included 14 mineral properties previously optioned to the Company which it now owns through the ERD. As a result, the Company has saved $247,000 in option payments to the end of Q1 2006.

Since inception of the ERD, the Company has spent approximately $1.63 million, in cash and shares, including the initial purchase price, on prospecting, acquisition and marketing of properties. Up to March 31, 2006 the Company had received approximately $1.18 million in cash and shares pursuant to ERD options leaving a net carrying cost of $420,000 after expensing $30,000 of costs. These totals exclude the previously mentioned $247,000 saved by Rubicon from cancelled option payments.

Since year-end, 9 new property agreements have been entered into.

**Newfoundland Exploration**

NEW PROPERTIES

Lake Douglas Property

During January 2006, the Company acquired the right to earn a 100% interest in the Lake Douglas property. The Company can earn a 100% interest in two property agreements (Lake Douglas West and Lake Douglas East) by making cash payments totaling to $520,000 and issuing 175,000 common shares, all over 5 years.

The Lake Douglas property was optioned following the discovery of moderate-sized (30 cm by 20 cm by 15 cm), angular, massive sulphide boulders (float) west of Lake Douglas. The angularity, nature and distribution of the float is interpreted by Rubicon to indicate that the float is locally derived. In total, two boulders of massive galena and sphalerite (samples LD-05-01 and 02) and one boulder of massive pyrite (sample LD-05-03) were collected. Assays include:

| Sample No. | Zinc % | Lead % | Gold g/t | Silver g/t | Copper % |
|---|---|---|---|---|---|
| LD-05-01 | 19.60 | 15.70 | 1.57 | 157.5 | 0.49 |
| LD-05-02 | 11.80 | 23.80 | 0.07 | 253.4 | - |
| LD-05-03 | 0.43 | 0.04 | 1.11 | 42.5 | 0.25 |

Work completed on the property during the first quarter of 2006 comprised compilation of historic exploration data with no field activities having taken place. Exploration plans for 2006 are being finalized by the company.

CROSSHAIR OPTION (Golden Promise Property)

On May 1 2006 the Company signed an option agreement with Crosshair Exploration and Mining Corporation ("Crosshair") whereby Crosshair can earn a 60% interest in the Company's Golden Promise project by issuing 80,000 Crosshair common shares, incurring $4 million in exploration expenditures and by paying all underlying property payments, all over a 4 year period. This funding will significantly accelerate the exploration of this property.

EXPLORATION

JBP Linear Property (H-Pond Project- Glenwood-Botwood Gold Trend)

During the quarter, the Company collected 959 soil samples in the area of the new high grade float discovery located approximately 2.7 kilometres north-northeast of the H-Pond prospect. Assays for the soil samples are pending. Exploration plans are to locate the bedrock source of the high grade float with follow-up trenching in 2006. Rubicon controls approximately 35 kilometres of strike potential along H-Pond system and plans further trenching and drilling on the property in 2006.

Linear Property (Glenwood-Botwood Gold Trend)

The Company completed a due diligence exploration program on the property which consisted of grid re-establishment and positioning, collecting 159 soil samples, re-logging of all historic diamond drill core. The work was designed to assist in defining and confirming historical exploration work on the property. The company has negotiated an option agreement with the vendors delaying payments until August 2006, based on the anticipated "spin-off" of the Newfoundland assets into a new company.

West Cleary Property (Base Metals Group)

During the quarter the Company completed two diamond drill holes targeting IP chargeability anomalies. The first hole encountered only minor mineralization. The second hole intersected a veined zone with a semi-massive to massive section of sulphides. Assays up to 6.21 % Zn, 1.02% Cu, 1.42% Pb and 12.2 ppm Ag over 0.22 m (32.68 to 32.90 m) were obtained from the second hole. The company has earned a 51% interest in the property and the property is now subject to a joint venture agreement with Falconbridge Ltd.

Huxter Lane Property (Glenwood-Botwood Gold Trend - 55-70% optioned to Meridian Gold Corp.)

Proposed work for 2006 includes a high-resolution airborne magnetic/electromagnetic survey over the property and a minimum 1000 meter diamond drill program targeting the Mosquito Hill mineralization. The work will be funded by option partner, Meridian Gold.

New World Gold Trend

The Company plans to complete a ~770 line kilometre combined magnetic and electromagnetic airborne geophysical survey over the property early in the second quarter of 2006. The survey will cover the New World Trend and Dunnage-Coaker Corridor Trend of gold mineralization located by previous prospecting. It is hoped that the airborne survey will help define the stratigraphic and structural setting of gold mineralization at New World and help with drill target selection. An 800 metre program of diamond drilling is planned for the New World Property in the 3rd quarter of 2006. No work was conducted on the property during the first quarter of 2006.

The Company has built an extensive portfolio of gold and base metal mineral properties in Newfoundland, and is actively seeking exploration partners to advance the projects to a discovery.

**Investments**

Africo Resources Ltd.

At March 31, 2006, the Company held a 38.8% interest in Africo Resources Ltd. ("Africo"), a private B.C. company that controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo (the Kalukundi deposit). The Company accounts for this investment on an equity basis.

Amendments due to change in estimate of losses of Africo

In accordance with the equity method, the Company records its proportionate share of the losses of Africo Resources. In previously filed statements, the Company had used unaudited, management prepared, draft financial statements of Africo to estimate the Company's share of Africo's losses. Africo recently completed audits of its 2004 and 2005 years and a review of its first quarter in 2006. As a result, Rubicon's cumulative equity interest in the losses of Africo to March 31, 2006 increased by CAD$431,000. Significant items, that had not been included in previous Africo statements, included charges for stock based compensation and a write-off of mineral properties (not Kalukundi).

Other activity in the quarter

During the quarter, Rubicon made a further share purchase for $496 thousand to bring its ownership in Africo to 7.6 million shares or 38.8%. An additional 150,000 shares were purchased in April 2006 to bring the investment to 7.75 million shares or 39.6% with an average investment cost per share of $0.95.

In February, 2006, the Company received a new 43-101 compliant mineral resource statement from Africo Resources Ltd. prepared by RSG Global Ltd. of Perth, Australia, for the Kalukundi deposit. The new estimate, which updates the previously released Inferred Resource, is based on incorporation of 61 additional drill holes which comprise part of the ongoing feasibility study.

Highlights of report

Measured & Indicated category: 12.15 million tonnes grading 2.45% copper and 0.61% cobalt between surface and 200 metres below surface. Of these combined categories, 79.4% of the resources are classified as Measured Resources.

Inferred Category: 15.02 million tonnes grading 2.63% copper and 0.58% cobalt between surface and 200 metres below surface.

Independent consultant, RSG Global, indicates there is exploration potential for approximately 16 million tonnes of additional resources by carrying out further drilling below 200 metres.

In addition to the reported resources, there exists a number of other areas of surface oxide mineralization on the property, not yet evaluated. These are considered to be high priority drill targets by Africo and are thought to hold potential for additional resources. Thus, Africo is planning to undertake additional drilling to further assess the resource base below 200 metres.

The resource statement contained herein was prepared by Dr. Julian Verbeek MAusIMM, Principal Consultant for RSG Global of Perth, Australia, in accordance with National Instrument 43-101. Rubicon Minerals' qualified person, as defined by National Instrument 43-101, is David Adamson, PhD, President and CEO of Rubicon Minerals Corporation. See the news release dated February 8, 2006, filed on Sedar and our web-site for additional information on this report.

The resource reported above forms part of an ongoing feasibility study on the Kalukundi deposit which is required to be delivered to the government of the DRC on or before May 18, 2006.

Toquima Minerals Corporation (60.4% owned subsidiary)

Plan of Arrangement

On February 16, 2006, Toquima announced agreement to a plan of arrangement whereby all of the Company's shares of Toquima Minerals Inc. will be acquired by Carlin Gold Corp. ("Carlin"). Consideration to Rubicon will consist of 4.3 million shares of Carlin (approximately 13% of outstanding Carlin shares after the arrangement) and 3.5 million shares (26%) of Constantine Metal Resources Ltd. "Constantine" that will own Toquima's Palmer, Alaska project. Should Constantine be unable to complete an initial public offering, Rubicon will receive 3.5 million

more Carlin shares (7%) of Carlin, instead of the Constantine shares and the Palmer property will remain a property of Carlin through its subsidiaries. The plan of arrangement is subject to court and regulatory approval.

Toquima Share for Debt

Toquima's debt to Rubicon Minerals Corporation will be extinguished in exchange for 1,903,977 common shares at a deemed price of Cdn$0.35 per share for a total value of Cdn$666,392. It has also settled a portion of the debt to the president of Toquima, by issuing 129,163 common shares at a deemed price of Cdn$0.35 per share for a total value of Cdn$45,207.

Toquima's directors resolved to issue a total of 335,000 common shares at a deemed price of Cdn$0.35 per share, in respect to accrued obligations contained in four Nevada property agreements

Palmer Property, Alaska

No exploration was carried out on the Palmer property in the first quarter but upon successful completion of the plan of arrangement, and IPO of Constantine, further exploration and drilling is planned for the summer and fall of 2006.

Nevada properties

Pine Grove Property, Lyon County, Nevada

Toquima's joint venture partner Romarco Minerals Inc completed a 4 hole, 5,425 foot Phase 1 drill program in early 2006, to test two vein targets on the east side of the property. Early assay results from PG-32 include the following:

10 feet (965-975) @ 5.025 g/t Au
360 feet (1080-1440ft) @ 0.959 g/t Au

Romarco is awaiting final results for all holes. Phase II drilling is currently scheduled for the third quarter of 2006 and will follow up on Phase I drill results and test the area in and around the Rockland Mine.

LHS Property, Pershing County, Nevada

Newmont returned the LHS property in February 2006, thereby terminating the joint venture. Toquima is currently evaluating its options as to how to proceed at LHS.

## RISKS AND UNCERTAINTIES

The success of the Company depends upon a number of factors, many of which are beyond our control. Typical risk factors and uncertainties, among others, include political risks, financing risks, title risks, commodity prices, exchange rate risks, operating and environmental hazards encountered in the exploration, development and mining business and changing laws and public policies. Risk factors are more fully described in our Annual Information Form, on file at www.sedar.com .

Additional information on the Company, including our Annual Information Form and other public filings, are available on SEDAR at www.sedar.com

## OPERATING RESULTS

### 3 Months Ended March 31, 2006 compared to the 3 Months Ended March 31, 2005

For the 3 months ended March 31, 2006, the Company incurred a net loss of $738 thousand ($0.011 per share) compared to a net loss of $299 thousand ($0.005 per share) incurred in the 3 months ended March 31, 2005, an increase in net loss of $7 thousand.

Significant items making up this increase were as follows:

- Consulting costs were lower by $13,000 due to a compensation review done in the prior year.
- Professional fees increased by $51,000 due to higher legal fees due to work on new corporate governance rules, revisions to the shareholder rights plan and general tax planning advice. Audit costs were higher due to a catch up in audit fees that were under accrued in the prior year and the commensurate additional increase in the current quarter's audit accrual.
- Salary expense was higher by $22,000 due to increased salaries and a hiring fee for junior staff.
- Stock based compensation was down by $895,000 as no stock options were granted in the current quarter.
- Re-organization costs represent the costs associated with the planned split up of the Company as discussed below under re-organization.
- Transfer agents and filing fees were down by $46,000 due to prior years transfer agent costs associated with the January 2005 financing and deferral in the current year of part of AMEX annual fee.
- No mineral property amounts were written off in the current quarter whereas $36,000 was written off in the prior year.
- Debt settlement gain in the current quarter represents accounting fees forgiven Toquima in relation to its failed IPO of the prior year.
- Loss on equity investment was higher by $665,000 due mostly to adjustments to the Company's proportion of cumulative losses of Africo Resources Ltd. as discussed above under Investments – Africo Resources Ltd.
- Future income tax recovery decreased by $567,000 due to the smaller amount renounced to investors in the current year.

## SUMMARY OF QUARTERLY RESULTS (Based on Canadian GAAP)

| Quarter | 2006 First | 2005 Fourth | 2005 Third | 2005 Second | 2005 First | 2004 Fourth | 2004 Third | 2004 Second |
|---|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ | $ |
| Interest and miscellaneous income | 19,567 | 26,202 | 6,637 | 14,977 | 34,416 | 32,033 | 27,484 | 41,140 |
| Gain (loss) on sale of investments | 99,589 | (20,592) | (19,077) | - | 116,434 | 14,747 | 682,161 | (2,139) |
| Net loss | 739,950 | 1,637,596 | 647,715 | 657,611 | 299,464 | 2,043,399 | 377,943 | 675,878 |
| Basic and fully diluted net loss per share | 0.011 | 0.03 | 0.01 | 0.01 | 0.005 | 0.03 | 0.01 | 0.01 |

The major factors that caused significant variations in net loss were the recording of stock-based compensation when stocks options were granted, the write-down of properties based on a periodic review of such properties, gains on sales of investments and tax recoveries recorded on the renunciation of exploration expenditures to flow-through shareholders. None of these factors have identifiable trends.

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity and Capital Resources

The Company had working capital of $2.9 million as at March 31, 2006 compared to $3.24 million as at December 31, 2005.

During the first quarter, the Company issued 573,946 common shares from the exercise of warrants and agents options for cash proceeds of $457,416 and issued 114,376 common shares from the exercise of options for cash proceeds of $102,270 for total net cash proceeds of $559,686 ($2.2 million – Q1 – 2005 which included a $1.4 million financing).

Other sources of funds included recovery of exploration costs from optionees of the Company's properties and option payments - $768,000 in the first quarter and the sale of junior mining stocks that the Company had received as option payments for proceeds of $363,000.

Cash outflows in the comparative period of the prior year were significantly higher ($2.2 million) due to $2.2 million spent in the prior year on a drill program on the McFinley property, $1 million on other exploration

programs and $1.1 million invested in Africo Resources Ltd. shares. This was partially offset by a flow-through financing in January of 2005 for $1.4 million.

On April 12, 2006, the Company closed a brokered private placement for 7,640,560 common shares at $1.48 per share for net proceeds of $10.6 million net of a 6% commission to the underwriters. Proceeds of the financing will be used to fund ongoing exploration on the Company's Red Lake properties, costs associated with the plan of arrangement and general working capital. The Company has sufficient funds to meet its working capital requirements and other requirements for the next 12 to 24 months.

## OFF-BALANCE SHEET ARRANGEMENTS

The Company does not have any off-balance sheet arrangements other than what is disclosed under commitments in note 9 of the interim consolidated financial statements of the Company.

## TRANSACTIONS WITH RELATED PARTIES

David Reid is a director of the Company and a partner at the law firm Davis & Company. For the three months ended March 31, 2006, the company recorded or accrued legal fees to Davis and Company amounting to $125,000.

Africo Resources Ltd. is an investment of the Company accounted for as an equity investment. At March 31, 2006, the Company is owed $30,000 by Africo for reimbursable administrative expenditures made on Africo's behalf. See note 3, "Related Party Transactions", in the interim consolidated financial statements for additional information on related party transactions with the Company for the first quarter.

## CRITICAL ACCOUNTING ESTIMATES

The Company's accounting policies are described in Note 2 of the interim consolidated financial statements. The Company considers the following policies to be most critical in understanding its financial results:

### Use of estimates

The preparation of financial statements in conformity with generally accepted accounting policies requires management of the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. These estimates are based on past experience, industry trends and known commitments and events. By their nature, these estimates are subject to measurement uncertainty and the effects on the financial statements of changes in such estimates in future periods could be significant. Actual results will likely differ from those estimates.

### Carrying value of mineral property interests

The Company has capitalized the cost of acquiring mineral property interests and on-going exploration and maintenance costs. Capitalized property costs are expensed in the period in which the Company determines that the mineral property interests have no future economic value. Capitalized property costs may also be written down if future cash flow, including potential sales proceeds and option payments, related to the property are estimated to be less than the carrying value of the property. The Company reviews the carrying value of its mineral properties periodically, and whenever events or changes in circumstances indicate the carrying value may not be recoverable, reductions in the carrying value of each property would be recorded to the extent that the carrying value of the investment exceeds the property's estimated fair value.

Under US GAAP, all exploration costs are expensed.

### Stock-based compensation

The Company has adopted the fair value based method of accounting for stock option and compensatory warrant awards granted to directors, employees and consultants. Under this method, the fair value of stock options is

calculated and expensed or recorded as share issue costs at the date of grant, with the offsetting credit to contributed surplus. If the stock options are exercised, the proceeds are credited to share capital.

The Company uses the Black-Scholes option pricing model to calculate the fair value of stock options and compensatory warrants granted. This model is subject to various assumptions. The assumptions the Company makes will likely change from time to time. At the time the fair value is determined, the methodology the Company uses is based on historical information, as well as anticipated future events.

**CHANGES IN ACCOUNTING POLICIES INCLUDING INITIAL ADOPTION**

Comprehensive Income, CICA Handbook Section 1530

Section 1530 introduces new standards for reporting and display of comprehensive income. Comprehensive income is the change in equity (net assets) of an enterprise during a reporting period from transactions and other events and circumstances from non-owner sources. It includes all changes in equity during a period except those resulting from investments by owners and distributions to owners.

Section 1530 applies to interim and annual financial statements relating to fiscal years beginning on or after October 1, 2006. Earlier adoption is permitted only as of the beginning of a fiscal year ending on or after December 31, 2004. The Company plans to adopt this standard for its fiscal year ending December 31, 2007. Financial statements of prior periods are required to be restated for certain comprehensive income items. In addition, an enterprise is encouraged but not required to present reclassification adjustments, in comparative financial statements provided for earlier periods.

An entity adopting this Section for a fiscal year beginning before October 1, 2006 must also adopt Section 3855 – Financial Instruments – Recognition and Measurement.

The expected effect of this new accounting policy on the Company's financial statements cannot be reasonably determined at this time but it is not expected to have a significant impact on the Company's business.

Equity, CICA Handbook Section 3251

Section 3251 replaces Section 3250 – Surplus. It establishes standards for the presentation of equity and changes in equity during a reporting period.

Section 3151 applies to interim and annual financial statements relating to fiscal years beginning on or after October 1, 2006. Earlier adoption is permitted only as of the beginning of a fiscal year ending on or after December 31, 2004. The Company plans to adopt this standard for its fiscal year ending December 31, 2007. Financial statements of prior periods are required to be restated for certain specified adjustments. For all other items, comparative financial statements presented are not restated, but an adjustment to the opening balance of accumulated other comprehensive income may be required.

An entity adopting this Section for a fiscal year beginning before October 1, 2006 must also adopt Section 3855 – Financial Instruments – Recognition and Measurement, Section 3865 – Hedges and Section 1530 – Comprehensive Income.

The expected effect of this new accounting policy on the Company's financial statements cannot be reasonably determined at this time but it is not expected to have a significant impact on the Company's business.

Flow-through share renunciations, CICA Emerging Issues Committee - 146

In March of 2004, the CICA Emerging Issues Committee issued its recommendation for accounting treatment of the renunciation of flow-through shares. The recommendations were to take immediate effect and the Company adopted them at that time.

The consensus reached was that a future income tax liability should be recognized upon the renunciation of flow-through shares and shareholder equity should be reduced. In the case where a company has written-down future tax assets arising from loss carryforwards or deductible temporary differences, then those write-downs should be reversed in the amount of the future tax liability arising from the renunciation. The credit side of the entry is recorded on the income statement.

Pursuant to this new policy, the Company recorded a $477,400 (2005 - $1 million) future income tax recovery upon renouncing exploration expenditures in March of 2006.

## OUTSTANDING SHARE DATA

As at May 9, 2006, the Company had the following common shares, stock options, warrants and agent warrants outstanding:

| | |
|---|---|
| Common shares | 67,112,219 |
| Stock options | 4,651,248 |
| Warrants | 4,491,471 |
| Agent's options for units (1) | 50,795 |
| Warrants embedded in agent's options (1) | 25,398 |
| Fully diluted shares outstanding | 76,331,131 |

(1) Agents options include 1 common share and 1/2 share purchase warrant

## CAUTIONARY NOTICES

The Company's MD&A contains statements that constitute "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements, or developments in our industry, to differ materially from the anticipated results, performance or achievements expressed or implied by such forward-looking statements. Forward looking statements are statements that are not historical facts and are generally, but not always, identified by the words "expects," "plans," "anticipates," "believes," "intends," "estimates," "projects," "potential" and similar expressions, or that events or conditions "will," "would," "may," "could" or "should" occur. Information inferred from the interpretation of drilling results and information concerning mineral resource estimates may also be deemed to be forward looking statements, as it constitutes a prediction of what might be found to be present when and if a project is actually developed. Forward-looking statements in this document include statements regarding: the Company's proposed reorganization; the proposed transactions involving Africo; the proposed transactions involving Toquima; the Company's expectations regarding drilling and exploration activities on properties in which the Company has an interest; the Company's statements regarding estimates of resources on properties in which the Company has an interest; the Company's expectations regarding the amount and adequacy of its cash reserves in future periods; and the Company's expectations regarding the amount of expenses in future periods . There can be no assurance that such statements will prove to be accurate. Actual results and future events could differ materially from those anticipated in such statements. Readers are cautioned not to place undue reliance on these forward-looking statements that speak only as of their respective dates. Important factors that could cause actual results to differ materially from the Company's expectations include among others, risks related to fluctuations in mineral prices; uncertainties related to raising sufficient financing to fund planned work in a timely manner and on acceptable terms; changes in planned work resulting from weather, logistical, technical or other factors; the possibility that results of work will not fulfill expectations and realize the perceived potential of the Company's properties; uncertainties involved in the estimation of resources; the possibility that required permits may not be obtained on a timely manner or at all; the possibility that capital and operating costs may be higher than currently estimated and may preclude commercial development or render operations uneconomic; the possibility that the estimated recovery rates may not be achieved; risk of accidents, equipment breakdowns and labour disputes or other unanticipated difficulties or interruptions; the possibility of cost overruns or unanticipated expenses in the work program; the risk of environmental contamination or damage resulting from the Company's operations; and other risks and uncertainties discussed under the heading "Risk Factors" and elsewhere in the Company's documents filed from time to time with the Toronto Stock Exchange, Canadian, United States and other securities regulators. Forward-looking statements are based on the beliefs, estimates and opinions of the Company's management on the date the statements are made. The Company

undertakes no obligation to update these forward-looking statements in the event that management's beliefs, estimates or opinions, or other factors, should change.

This MD&A uses the terms “inferred resources”, “indicated resources”, “measured resources”, and “mineral resources”. The Company advises readers that although these terms are recognized and required by Canadian securities regulations (under National Instrument 43-101 “Standards of Disclosure for Mineral Projects”), the US Securities and Exchange Commission does not recognize these terms. Readers are cautioned not to assume that any part or all of the mineral deposits in these categories will ever be converted into reserves. In addition, “inferred resources” have a great amount of uncertainty as to their existence, and economic and legal feasibility. It cannot be assumed that any part of an Indicated or Inferred Mineral Resource will ever be upgraded to a higher category. Under Canadian rules, estimates of Inferred Mineral Resources may not form the basis of feasibility or pre-feasibility studies, or economic studies except for a Preliminary Assessment as defined under National Instrument 43-101. Readers are cautioned not to assume that part or all of an inferred resource exists, or is economically or legally mineable.

**Rubicon Minerals Corporation**
**Pro-forma Consolidated Balance Sheet**
**March 31, 2006**
**(Unaudited - see Compilation Report)**

**DE VISSER GRAY**
**CHARTERED ACCOUNTANTS**

401 - 905 West Pender Street
Vancouver, BC Canada
V6C 1L6

Tel: (604) 687-5447
Fax: (604) 687-6737

## COMPILATION REPORT

TO THE DIRECTORS OF RUBICON MINERALS CORPORATION

We have read the accompanying unaudited pro-forma consolidated balance sheet of Rubicon Minerals Corporation ("Rubicon") as at March 31, 2006, and have performed the following procedures.

1. Compared the figures in the column captioned "Rubicon Minerals Corporation"to the unaudited financial statements of Rubicon as at March 31, 2006 and found them to be in agreement.

2. Made enquiries of certain officials who have responsibility for financial and accounting matters about the basis for determination of the pro-forma adjustments. The officials described to us the basis for determination of the pro-forma adjustments.

3. Read the notes to the pro-forma statement, and found them to be consistent with the basis described to us for determination of the pro-forma adjustments,

4. Recalculated the application of the pro-forma adjustments to the amounts in the column captioned "Rubicon Minerals Corporation Pro-forma" and found the amounts to be arithmetically correct.

A pro-forma financial statement is based on management assumptions and adjustments which are inherently subjective. The foregoing procedures are substantially less than either an audit or a review, the objective of which is the expression of assurance with respect to management's assumptions, the pro-forma adjustments, and the application of the adjustments to the historical financial information. Accordingly, we express no such assurance. The foregoing procedures would not necessarily reveal matters of significance to the pro-forma financial statement, and we therefore make no representation about the sufficiency of the procedures for the purposes of a reader of such statements.

"De Visser Gray"

**CHARTERED ACCOUNTANTS**

Vancouver, Canada
July 7, 2006

**Rubicon Minerals Corporation**
**Pro-Forma Consolidated Balance Sheet**
**March 31, 2006**
**(Unaudited - See Compilation Report)**

| | Rubicon Minerals Corporation | Pro-forma adjustments Note 2 | | Rubicon Minerals Corporation |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | 2,598,036 | (400,000) | (j) | 2,198,036 |
| Amounts receivable | 886,807 | (17,054) | (c) | 869,753 |
| Prepaid expenses | 93,769 | | | 93,769 |
| | 3,578,612 | | | 3,161,558 |
| Investments | 6,102,904 | (5,990,542) | (c) | 112,362 |
| Notes receivable - CopperCo | | 5,990,542 | (g) | |
| | | (5,990,542) | (i) | |
| Notes receivable - Paragon | | 6,671,950 | (f) | |
| | | (6,671,950) | (h) | |
| Preferred shares - CopperCo | | 5,990,542 | (c) | |
| | | (5,990,542) | (g) | |
| Preferred shares - Paragon | | 6,671,950 | (c) | |
| | | (6,671,950) | (f) | |
| Equipment | 49,724 | | | 49,724 |
| Mineral property costs | 23,361,761 | (6,654,896) | (c) | 16,706,865 |
| **TOTAL ASSETS** | 33,093,001 | | | 20,030,509 |

See notes to pro-forma financial statement

**Rubicon Minerals Corporation**
**Pro-Forma Consolidated Balance Sheet**
**March 31, 2006**
**(Unaudited - See Compilation Report)**

| | | | | |
|---|---|---|---|---|
| **LIABILITIES** | | | | |
| **Current liabilities** | | | | |
| Accounts payable and accrued liabilities | 772,259 | | | 772,259 |
| Note payable - CopperCo | | 5,990,542 | (g) | |
| | | (5,990,542) | (i) | |
| Note payable - Paragon | | 6,654,896 | (f) | |
| | | (6,654,896) | (h) | |
| **Non-controlling interest** | 428,237 | | | 428,237 |
| **SHAREHOLDER'S EQUITY** | | | | |
| **Share Capital** | 45,840,598 | (45,840,598) | (a) | |
| New common shares | | 33,178,106 | (a) | 33,178,106 |
| Special common shares - Paragon | | 6,671,950 | (a) | |
| | | (6,671,950) | (f) | |
| Special common shares - CopperCo | | 5,990,542 | (a) | |
| | | (5,990,542) | (g) | |
| Contributed surplus | 2,631,400 | | | 2,631,400 |
| Deficit | (16,579,493) | (400,000) | (j) | (16,979,493) |
| | 31,892,505 | | | 18,830,013 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | 33,093,001 | | | 20,030,509 |

See notes to pro-forma financial statement

**Rubicon Minerals Corporation**
**Notes to Pro-Forma Consolidated Balance Sheet**
**March 31, 2006**
**(Unaudited - See Compilation Report)**

## 1. Basis of presentation

This unaudited pro-forma consolidated balance sheet has been compiled for purposes of inclusion in the Management Information Circular of Rubicon Minerals Corporation ("Rubicon" or "the Company") dated July 7, 2006 relating to the reorganization of certain existing mineral property interests into separate corporate entities. A pro-forma presentation of operations for the period ending March 31, 2006 is not considered practicable in this circumstance nor would it provide any meaningful information to a financial statement reader.

This pro-forma consolidated balance sheet has been derived from the unaudited consolidated balance sheet of Rubicon as at March 31, 2006 and gives effect to the Company's proposed Plan of Arrangement ("the Arrangement") under the Business Corporations Act (British Columbia),as described herein. As a preliminary step in the completion of the Arrangement, on July 4, 2006 the directors of the Rubicon and Africo Resources Ltd. ("Africo") incorporated two controlled subsidiaries, Paragon Minerals Corporation ("Paragon") and CopperCo Resource Corp. ("CopperCo"), respectively. Upon completion of the Arrangement, Rubicon's existing mineral property interests will be owned by the three companies as follows:

- CopperCo will own the Company's current interest in Africo, a private British Columbia company which controls an option to acquire a 75% interest in a copper-cobalt resource located in the Democratic Republic of Congo.
- Paragon will own the Company's mineral exploration rights and interests in Newfoundland and Nunavut, and
- Rubicon will retain all other assets and its current name.

The pro-forma consolidated balance sheet has been prepared as if the reorganization of Rubicon into three separate entities occurred on March 31, 2006 and that the adjustments disclosed in Note 2 had occurred on the same date. In the opinion of management, the pro-forma consolidated balance sheet include all the adjustments necessary for fair presentation in accordance with Canadian generally accepted accounting principles, inclusive of the effect of the assumptions disclosed in note 3.

This pro-forma consolidated balance sheet is not intended to reflect the financial position that would have resulted if the events reflected herein had occurred on the dates indicated. Further, this pro-forma consolidated balance sheet is not necessarily indicative of the financial position that may be attained in the future. This pro-forma financial statement should be read in conjunction with Rubicon's audited December 31, 2005 annual and unaudited March 31, 2006 interim financial statements included elsewhere in this Management Information Circular.

## 2. Pro-forma adjustments

The pro-forma consolidated balance sheet give effect to the following transactions as if they had occurred at March 31, 2006:

(a) Rubicon reorganizes its share capital such that all existing shareholders surrender their shares for cancellation and receive in exchange for each common share three shares, comprised of one New common share of Rubicon and two special shares, each having an assigned par value allocated pro-rata based on the fair value of the assets that are to be transferred from Rubicon to CopperCo and Paragon, respectively.

2. **Pro-forma adjustments** *(continued)*

(b) CopperCo and Paragon are reorganized such that a special class of preferred shares are created in each company.

(c) Rubicon sells certain assets, described further in note 3, to each of CopperCo and Paragon and takes back as consideration 1000 of the preferred shares described in (b) above in each of CopperCo and Paragon.

(d) All Rubicon shareholders transfer to Paragon all of their special shares of Rubicon relating to the Paragon assets and take back as consideration, for every 6 such special shares of Rubicon, one common share of Paragon.

(e) All Rubicon shareholders transfer to CopperCo all of their special shares of Rubicon relating to the CopperCo assets and take back as consideration, for every one special share of Rubicon, common shares of CopperCo on the basis of the percentage derived from dividing the common shares of Africo owned by Rubicon by the number of Rubicon new common shares outstanding. The non-Rubicon shareholders of Africo then transfer their shares of Africo to CopperCo and take back shares of CopperCo as consideration on a one-for-one basis.

(f) Rubicon redeems the special shares relating to the Paragon assets, now held by Paragon, and issues a note to Paragon equal to the aggregate par value of these shares. Paragon redeems the 1000 preferred share issued to Rubicon in (c) above and issues a note to Rubicon for the redemption value of these shares, which is equal to the fair value of the investment in Africo

(g) Rubicon redeems the special shares relating to the investment in Africo, now held by CopperCo, and issues a note to CopperCo equal to the aggregate par value of these shares. CopperCo redeems the 1000 preferred share issued to Rubicon in (c) above and issues a note to Rubicon for the redemption value of these shares, which is equal to the fair value of Rubicon's investment in Africo.

(h) Both Paragon and Rubicon agree to cancel the outstanding notes due to each other in full settlement of the (offsetting) amounts to each company.

(i) Both CopperCo and Rubicon agree to cancel the outstanding notes due to each other in full settlement of the (offsetting) amounts to each company.

(j) Estimated costs to complete the Arrangement of $450,000 are to be incurred by Rubicon and CopperCo jointly, with CopperCo agreeing to reimburse Rubicon for up to $50,000 of this amount.

3. **Pro-forma assumptions**

- Pursuant to the Arrangement, the assets to be transferred to the new public entities are presented as follows in the accounts of Rubicon at March 31, 2006:

| | $ |
|---|---|
| Assets transferred to Paragon: | 17,054 |
| Amounts receivable - security deposits | 6,654,896 |
| Carrying cost of Newfoundland/Nunavut exploration rights | 6,671,950 |
| | |
| Assets transferred to CopperCo: | |
| Cash and cash equivalents | |
| 7,747,101 common shares of Africo Resources Ltd. | 5,990,542 |

3. **Pro-forma assumptions** (continued)

- As there had been no substantive change in the beneficial ownership of these assets at the time that they are vended to the new corporate entities, the transactions are recorded using the historical carrying values of the assets in the accounts of Rubicon.

**Paragon Minerals Corporation**
**Pro-forma Balance Sheet**
**March 31, 2006**
**(Unaudited - see Compilation Report)**

# DE VISSER GRAY
## CHARTERED ACCOUNTANTS

401 - 905 West Pender Street
Vancouver, BC Canada
V6C 1L6

Tel: (604) 687-5447
Fax: (604) 687-6737

### COMPILATION REPORT

TO THE DIRECTORS OF PARAGON MINERALS CORPORATION

We have read the accompanying unaudited pro-forma consolidated balance sheet of Paragon Minerals Corporation ("Paragon") as at March 31, 2006, and have performed the following procedures.

1. Compared the figures in the column captioned "Paragon Minerals Corporation"to the audited balance sheet of Paragon as at July 4, 2006 and found them to be in agreement.

2. Made enquiries of certain officials who have responsibility for financial and accounting matters about the basis for determination of the pro-forma adjustments. The officials described to us the basis for determination of the pro-forma adjustments.

3. Read the notes to the pro-forma statements, and found them to be consistent with the basis described to us for determination of the pro-forma adjustments,

4. Recalculated the application of the pro-forma adjustments to the amounts in the column captioned "Paragon Minerals Corporation Pro-forma" and found the amounts to be arithmetically correct.

A pro-forma financial statement is based on management assumptions and adjustments which are inherently subjective. The foregoing procedures are substantially less than either an audit or a review, the objective of which is the expression of assurance with respect to management's assumptions, the pro-forma adjustments, and the application of the adjustments to the historical financial information. Accordingly, we express no such assurance. The foregoing procedures would not necessarily reveal matters of significance to the pro-forma financial statement, and we therefore make no representation about the sufficiency of the procedures for the purposes of a reader of such a statement.

*"De Visser Gray"*

**CHARTERED ACCOUNTANTS**

Vancouver, Canada
July 7, 2006

**Paragon Minerals Corporation**
**Pro-Forma Balance Sheet**
**March 31, 2006 ***
**(Unaudited - See Compilation Report)**

| | Paragon Minerals Corporation $ | Pro-forma adjustments Note 2 (a) $ | | Paragon Minerals Corporation Pro-forma $ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | | 3,000,000 | (f) | |
| | | (150,000) | (h) | 2,850,000 |
| Amounts receivable | | 17,054 | (b) | 17,054 |
| Mineral property rights | | 6,654,896 | (b) | |
| | | 125,000 | (g) | 6,779,896 |
| Due from Rubicon Minerals Corporation | | 6,671,950 | (d) | |
| | | (6,671,950) | (e) | |
| Investment in Rubicon Minerals Corporation | | 6,671,950 | (c) | |
| | | (6,671,950) | (d) | - |
| **Total Assets** | - | | | 9,646,950 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| Note payable - Rubicon Minerals Corporation | | 6,671,950 | (d) | |
| | | (6,671,950) | (e) | |
| Share Capital | | | | |
| Common | | 6,671,950 | (c) | |
| | | 3,000,000 | (f) | |
| | | 125,000 | (g) | |
| | | (150,000) | (h) | 9,646,950 |
| Preferred | | 6,671,950 | (b) | |
| | | (6,671,950) | (d) | - |
| **Total liabilities and shareholders' equity** | - | | | 9,646,950 |

* - *note the Company was not incorporated until July 4, 2006*

**Paragon Minerals Corporation**
**Notes to Pro-Forma Balance Sheet**
**March 31, 2006**
**(Unaudited - See Compilation Report)**

## 1. Basis of presentation

The unaudited pro-forma consolidated balance sheet has been compiled for purposes of inclusion in the Management Information Circular of Rubicon Minerals Corporation ("Rubicon") dated July 7, 2006 relating to the reorganization of certain existing mineral property interests into separate corporate entities by a Plan of Arrangement ("the Arrangement"). Paragon Minerals Corporation ("Paragon"or "the Company") has been incorporated under the Canada Business Corporations Act on July 4, 2006 with no currently-issued share capital and will own all of Rubicon's mineral exploration rights and interests in Newfoundland and Nunavut.

This pro-forma consolidated balance sheet has been prepared as if the reorganization of Rubicon into three separate entities occurred on March 31, 2006 and that the adjustments disclosed in Note 2 had occurred on the same date. In the opinion of management, the pro-forma consolidated balance sheet includes all the adjustments necessary for fair presentation in accordance with Canadian generally accepted accounting principles, inclusive of the effect of the assumptions disclosed in note 3. A pro-forma presentation of operations for the period ending March 31, 2006 is not considered practicable in this circumstance nor would it provide any meaningful information to a financial statement reader.

This pro-forma consolidated balance sheet is not necessarily reflective of the financial position that would have resulted if the events described herein under the Arrangement had occurred on March 31, 2006, but rather expresses the pro-forma results of specific transactions currently proposed. Further, this pro-forma consolidated balance sheet is not necessarily indicative of the financial position that may be attained in the future.

## 2. Pro-forma adjustments

The pro-forma consolidated balance sheet give effect to the following transactions as if they had occurred at March 31, 2006:

(a) Paragon share capital is reorganized such that a special class of preferred shares is created.

(b) Rubicon sells certain assets, described further in note 3, to Paragon and takes back as consideration 1000 of the preferred shares described in (a) above.

(c) All Rubicon shareholders transfer to Paragon all of their special shares of Rubicon relating to the Paragon assets and take back as consideration, for every 6 such special shares of Rubicon, one common share of Paragon.

(d) Rubicon redeems the special shares relating to the Paragon assets, now held by Paragon, and issues a note to Paragon equal to the aggregate par value of these shares. Paragon redeems the 1000 preferred share issued to Rubicon in (b) above and issues a note to Rubicon for the redemption value of these shares, which is equal to the fair value of the Paragon assets.

(e) Both Paragon and Rubicon agree to cancel the outstanding notes due to each other in full settlement of the (offsetting) amounts to each company.

(f) Paragon completes a non-brokered private placement financing to raise $3.0 million by the issuance of an aggregate of 5,333,333 common shares.

(g) Paragon issues to Altius Resources Inc. 250,000 common shares in connection with the South Tally Pond property acquisition, as more fully described at Note 4.

(h) Estimated total costs to complete these transactions of $150,000.

## 3. Pro-forma assumptions

- Pursuant to the Arrangement, the assets to be transferred to Paragon are as follows:

| | $ |
|---|---|
| Amounts receivable - security deposits | 17,054 |
| Carrying cost of rights | 6,654,896 |
| | 6,671,950 |

- As there had been no substantive change in the beneficial ownership of these assets at the time that they are vended to the new corporate entities, the transactions are recorded using the historical carrying values of the assets in the accounts of Rubicon.

Paragon will assume the position of Rubicon in various property acquisition agreements in respect to these Newfoundland property interests. To maintain these assets, Paragon will be obligated to complete the terms of various property agreements, comprised generally of making future cash payments, completing exploration work obligations, and issuing common shares to property optioners. Readers should refer to the December 31, 2005 annual and March 31, 2006 interim financial statements of Rubicon, as well as Rubicon's current Management Information Circular, for further details of the various Newfoundland and Nunavut property interests being transferred to Paragon.

- The pro-forma financial statement reflects the assumption that Paragon will acquire, by election, a tax basis in its property interests acquired equal to their aggregate carrying amount for accounting purposes, and that accordingly no liability for future income taxes is applicable.

## 4. Share Capital

| | Number of Shares | $ |
|---|---|---|
| Issued on exchange of Rubicon shares (note 2-c) | 12,692,087 | 6,671,950 |
| Completion of concurrent private placement financing * | 5,333,333 | 3,000,000 |
| Acquisition option payment * | 250,000 | 125,000 |
| Estimated total costs to complete the Arrangement | - | (150,000) |
| Pro-forma issued and outstanding, March 31, 2006 | 18,275,420 | 9,646,950 |

* The Company proposes to complete a non-brokered private placement financing to raise a minimum of $3.0 million by the issuance of a minimum of 3,333,333 flow-through common shares at a price of $0.60 per share and 2,000,000 non-flow through units at a price of $0.50 per share. Each unit is to consist of a non-flow through common share and one share purchase warrant, exercisable to acquire an additional non-flow through common share for $1.00 for a period of two years. In consideration for the participation of Altius Resources Inc. ("Altius") in this financing Paragon has agreed to acquire from Altius a 100% interest in the South Tally Pond property, located in Newfoundland, in consideration for 1,000,000 common shares, of which the initial tranche of 250,000 shares is due on the effective date of the transactions comprising the Arrangement.

**CopperCo Resource Corp.**
**Pro-forma Consolidated Balance Sheet**
**March 31, 2006**
**(Unaudited - see Compilation Report)**

# DE VISSER GRAY
## CHARTERED ACCOUNTANTS

401 - 905 West Pender Street
Vancouver, BC Canada
V6C 1L6

Tel: (604) 687-5447
Fax: (604) 687-6737

**COMPILATION REPORT**

TO THE DIRECTORS OF COPPERCO RESOURCE CORP.

We have read the accompanying unaudited pro-forma consolidated balance sheet of CopperCo Resource Corp. ("CopperCo") as at March 31, 2006, and have performed the following procedures.

1. Compared the figures in the column captioned "CopperCo" to the audited financial statements of CopperCo as at May 18, 2006 and found them to be in agreement.

2. Compared the figures in the column captioned "Africo Resources Ltd." to the unaudited financial statements of that company at that date and found them to be in agreement.

3. Made enquiries of certain officials who have responsibility for financial and accounting matters about the basis for determination of the pro-forma adjustments. The officials described to us the basis for determination of the pro-forma adjustments.

4. Read the notes to the pro-forma statements, and found them to be consistent with the basis described to us for determination of the pro-forma adjustments.

5. Recalculated the application of the pro-forma adjustments to the amounts in the column captioned "CopperCo Pro-forma" and found the amounts to be arithmetically correct.

A pro-forma financial statement is based on management assumptions and adjustments which are inherently subjective. The foregoing procedures are substantially less than either an audit or a review, the objective of which is the expression of assurance with respect to management's assumptions, the pro-forma adjustments, and the application of the adjustments to the historical financial information. Accordingly, we express no such assurance. The foregoing procedures would not necessarily reveal matters of significance to the pro-forma financial statement, and we therefore make no representation about the sufficiency of the procedures for the purposes of a reader of such a statement.

"De Visser Gray"

**CHARTERED ACCOUNTANTS**

Vancouver, Canada
July 7, 2006

**CopperCo Resource Corp.**
**Pro-Forma Consolidated Balance Sheet**
**March 31, 2006 ***
**(Unaudited - See Compilation Report)**

| | CopperCo U.S. $ | Africo Resources Ltd. U.S. $ | Pro-forma adjustments Note 2 U.S. $ | | CopperCo Pro-forma U.S. $ |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash | - | 1,835,219 | | | 1,835,219 |
| Accounts receivable | - | 49,245 | | | 49,245 |
| Mineral property rights | - | 4,397,372 | | | 4,397,372 |
| Due from Rubicon Minerals Corporation | - | - | 5,128,889 | (d) | |
| | | | (5,128,889) | (e) | |
| Loans Receivable | - | 7,444,841 | | | 7,444,841 |
| Investment | - | 645,900 | | | 645,900 |
| Investment in Africo Resources Ltd. | - | - | 5,128,889 | (b) | |
| | | | 8,178,295 | (c) | |
| | | | (13,307,184 | (f) | - |
| Investment in Rubicon Minerals Corporation | - | - | 5,128,889 | (c) | |
| | | | (5,128,889) | (d) | - |
| **Total Assets** | - | 14,372,577 | | | 14,372,577 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| Accounts payable and accrued liabilities | - | 257,434 | | | 257,434 |
| Note payable - Rubicon Minerals | - | - | 5,128,889 | (d) | |
| | | | (5,128,889) | (e) | - |
| Future income tax liabiltiy | - | 1,758,949 | | | 1,758,949 |
| Share Capital | | | | | |
| Common | - | 13,307,184 | 5,128,889 | (c) | |
| | | | 8,178,295 | (c) | |
| | | | (13,307,184 | (f) | 13,307,184 |
| Preferred | - | - | 5,128,889 | (b) | |
| | | | (5,128,889) | (d) | - |
| Contributed surplus | - | 784,329 | | | 784,329 |
| Deficit | - | (1,735,319) | | | (1,735,319) |
| **Total liabilities and shareholders' equity** | - | 14,372,577 | | | 14,372,577 |

** - note the Company was not incorporated until July 4, 2006*

**CopperCo ResourcesCorp.**
**Notes to Pro-Forma Consolidated Balance Sheet**
**March 31, 2006**
**(Unaudited - See Compilation Report)**

1. **Basis of presentation**

This unaudited pro-forma consolidated balance sheet has been compiled for purposes of inclusion in the Management Information Circular of Rubicon Minerals Corporation ("Rubicon") dated July 7, 2006 relating to the reorganization of certain existing mineral property interests into separate corporate entities. CopperCo was incorporated in on July 4, 2006 under the Canada Business Corporations Act with no currently-issued share capital, and will own Rubicon's mineral exploration rights and interests in the Democratic Republic of Congo by acquiring a 100% interest in the outstanding common shares of Africo Resources Ltd ("Africo"). Rubicon and the other current shareholders of Africo are thereafter to own the common shares of CopperCo in the same proportions as their current respective interests in the outstanding common shares of Africo.

This pro-forma consolidated balance sheet has been prepared as if the reorganization of Rubicon into three separate entities has occurred on March 31, 2006 and that the adjustments disclosed in Note 2 had occurred on the same date. In the opinion of management, the pro-forma consolidated balance sheet includes all the adjustments necessary for fair presentation in accordance with Canadian generally accepted accounting principles, inclusive of the effect of the assumptions disclosed in note 3.

This pro-forma consolidated balance sheet is not necessarily reflective of the financial position that would have resulted if the events described herein under the Arrangement had occurred on March 31, 2006, but rather expresses the pro-forma results of specific transactions currently proposed. Further, this pro-forma consolidated balance sheet is not necessarily indicative of the financial position that may be attained in the future.

The pro-forma financial statement should be read in conjunction with the audited financial statements of Africo as at and for the periods ended December 31, 2004 and 2005 and also the unaudited financial statements of that company as at and for the three month period ended March 31, 2006, all of which are included elsewhere in this Management Information Circular. The pro-forma balance sheet presented here is representative of Africo's March 31, 2006 balance sheet but does not include the important financial statement note disclosures found in these separate-entity financial statements of Africo, all of which would be applicable to CopperCo on a pro-forma basis.

2. **Pro-forma adjustments**

The pro-forma consolidated balance sheet gives effect to the following transactions as if they had occurred at March 31, 2006:

(a) The share capital of CopperCo is reorganized such that a special class of preferred shares is created.

(b) Rubicon sells certain assets, described further in note 3, to CopperCo and takes back as consideration 1000 of the preferred shares described in (a) above.

(c) All Rubicon shareholders transfer to CopperCo all of their special shares of Rubicon relating to the value of Rubicon's investment in Africo and take back as consideration, for every one special share of Rubicon, common shares of CopperCo on the basis of the percentage derived from dividing the common shares of Africo owned by Rubicon by the number of Rubicon new common shares outstanding. The non-Rubicon shareholders of Africo then transfer their shares of Africo to CopperCo and take back shares of CopperCo as consideration on a one-for-one basis.

## 2. Pro-forma adjustments *(continued)*

(d) Rubicon redeems the special shares relating to the CopperCo assets (the investment in, or common shares of, Africo, now held by CopperCo) and issues a note to CopperCo equal to the aggregate par value of these shares. CopperCo redeems the 1000 preferred share issued to Rubicon in (b) above and issues a note to Rubicon for the redemption value of these shares, which is equal to the fair value of Rubicon's previous investment in Africo.

(e) Both CopperCo and Rubicon agree to cancel the outstanding notes due to each other in full settlement of the (offsetting) amounts due to each company.

(f) CopperCo's investment in Africo and share capital issued in this connection is eliminated on the consolidation of Africo and CopperCo; principles applicable to reverse-take-over accounting are applied and for accounting purposes Africo is considered to have acquired CopperCo, a company having only nominal net assets, in a capital transaction.

## 3. Pro-forma assumptions

- Pursuant to the Arrangement, the assets to be transferred by Rubicon to CopperCo are as follows:

| | |
|---|---|
| 7,747,101 Common shares of Africo Resources Ltd. | CDN$5,990,542 or<br>U.S.$5,128,889 * |

- The assets transferred are recorded herein using carrying amounts as there has been no change in their beneficial ownership.

  ** representative of the Canadian dollar carrying value of Rubicon's investment in Africo subject to a 'translation of convenience' to U.S. dollars at March 31, 2006*

- At the date of the Management Information Circular terms of proposed 'bridge' convertible debt financing from certain current shareholders of Africo of up to CDN $5 million and additional brokered private placement financing of up to CDN $75 million, to be completed in conjunction with the Arrangement had not been finalized, particularly in respect to price per unit or number of common shares to be issued. Accordingly, and consistent with the requirement that a fair and meaningful pro-forma presentation include issued share capital figures, no provisions for any such financing have been reflected herein. Further, estimated costs to complete the Arrangement of approximately CDN$450,000 are to be incurred by CopperCo and Rubicon jointly, with CopperCo agreeing to reimburse Rubicon for up to CDN$50,000 of this amount. CopperCo is also expected to separately incur an additional CDN$125,000 in costs in connection with the completion of the Arrangement. As the costs to be incurred by CopperCo are likely, for accounting purposes, to be offset against the still-undetermined financing amount, no provision for such costs has been included in this pro-forma financial statement.

**AFRICO RESOURCES LTD.**

Consolidated Financial Statements
(Stated in US Dollars)

December 31, 2004

PRICEWATERHOUSECOOPERS

**PricewaterhouseCoopers LLP**
**Chartered Accountants**
PricewaterhouseCoopers Place
250 Howe Street, Suite 700
Vancouver, British Columbia
Canada V6C 3S7
Telephone +1 604 806 7000
Facsimile +1 604 806 7806

## INDEPENDENT AUDITORS' REPORT

To the Shareholders of Africo Resources Ltd.

We have audited the consolidated balance sheet of Africo Resources Ltd. as at December 31, 2004 and the consolidated statements of operations and deficit and cash flows for the period from January 7, 2004 (date of incorporation) until December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards in Canada. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2004 and the results of its operations and cash flows for the period from January 7, 2004 until December 31, 2004 in accordance with generally accepted accounting principles in Canada.

PricewaterhouseCoopers LLP

**Chartered Accountants**
Vancouver, British Columbia, Canada
May 26, 2006

PricewaterhouseCoopers refers to the Canadian firm of PricewaterhouseCoopers LLP and the other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.

# AFRICO RESOURCES LTD.

Consolidated Balance Sheet

*(Stated in US Dollars)*

| | | December 31, 2004 |
|---|---|---|
| **ASSETS** | | |
| **Current** | | |
| Cash and cash equivalents | $ | 143,407 |
| Accounts receivable | | 54,202 |
| **Total Current Assets** | | 197,609 |
| | | |
| **Investment** (note 4) | | 487,882 |
| **Loan receivable** (note 5) | | 2,598,813 |
| **Mineral properties** (note 6) | | 3,255,707 |
| **Total Assets** | $ | 6,540,011 |
| | | |
| **LIABILITIES** | | |
| **Current** | | |
| Accounts payable and accrued liabilities | $ | 385,766 |
| Notes payable | | 40,917 |
| **Total current liabilities** | | 426,683 |
| | | |
| **Future income tax liability** (note 8) | | 1,302,283 |
| **Total liabilities** | | 1,728,966 |
| | | |
| **Shareholders' equity** | | |
| Share capital (note 7) | | 4,882,316 |
| Deficit | | (71,271) |
| **Total shareholders' equity** | | 4,811,045 |
| **Total liabilities and shareholders' equity** | $ | 6,540,011 |

*See accompanying notes to the consolidated financial statements*

*Nature of operations and going concern (note 1)*

*Subsequent events (note 9)*

Approved by the Board of Directors:

David Adamson
Director

Chris Theodropoulos,
Director

# AFRICO RESOURCES LTD.

Consolidated Statements of Operations and Deficit
*(Stated in US Dollars)*

| | | Year ended December 31, 2004 |
|---|---|---|
| **Expenses** | | |
| Management and consulting fees | $ | 41,168 |
| General and administrative | | 3,189 |
| Professional fees | | 113,111 |
| Telephone | | 2,589 |
| **Loss before other items:** | | (160,057) |
| Foreign Exchange gain | | 125,904 |
| Loss on equity accounted investment (note 4) | | (37,118) |
| **Loss for the year** | | (71,271) |
| **Deficit, beginning of year** | | - |
| **Deficit, end of year** | $ | (71,271) |

*See accompanying notes to the consolidated financial statements*

# AFRICO RESOURCES LTD.

Consolidated Statement of Cash Flows

*(Stated in US Dollars)*

| | | Year ended December 31, 2004 |
|---|---|---|
| **Operating Activities** | | |
| Net loss for the year | $ | (71,271) |
| Adjustment for items which do not involve cash: | | |
| Loss on equity accounted investment | | 37,118 |
| Unrealised foreign exchange gains | | (5,997) |
| | | (40,150) |
| Changes in non-cash working capital components: | | |
| Accounts receivable | | (34,202) |
| Accounts payable and accrued liabilities | | 97,861 |
| Notes payable | | 40,917 |
| **Cash received from operating activities** | | 64,426 |
| **Investing Activities** | | |
| Loan receivable | | (2,330,908) |
| Purchase of investments | | (525,000) |
| **Cash used in investing activities** | | (2,855,908) |
| **Financing Activities** | | |
| Common shares issued for cash | | 2,928,892 |
| **Cash provided by financing activities** | | 2,928,892 |
| **Net increase in cash during the year** | | 137,410 |
| **Cash and cash equivalents, beginning of year** | | - |
| **Unrealised foreign currency gains included in cash at year end** | | 5,997 |
| **Cash and cash equivalents, end of year** | $ | 143,407 |

**Supplemental Disclosure of Non-Cash Investing and Financing Activities**

| | | |
|---|---|---|
| **Investing and financing activities** | | |
| Common shares issued for mineral property acquisition | $ | 1,953,424 |

*See accompanying notes to the consolidated financial statements*

# AFRICO RESOURCES LTD.

Notes to the Consolidated Financial Statements
*(Stated in US Dollars)*

## 1. NATURE OF OPERATIONS AND GOING CONCERN

The Company was incorporated on January 7, 2004 under the laws of the province of British Columbia, Canada, and is engaged in exploring, acquiring and developing precious metal and base metal properties. The Company holds a 24% interest in H&J Swanepoel Family Trust s.p.r.l. (H&J), which in turn holds the right to earn a 75% interest in the Kalukundi copper / cobalt project in the Democratic Republic of the Congo (the Kalukundi project) through its 75% ownership of Swanmines s.p.r.l. (Swanmines). The Company can increase its interest in H&J to 100% subject to certain obligations described in note 6 below.

The recoverability of the cost of mineral properties and related deferred exploration expenditures is dependent upon the discovery of economically recoverable reserves, preservation of the Company's interest in the underlying mineral claims, the ability of the company to obtain necessary financing to complete the project, and future profitable production or alternatively, upon the Company's ability to dispose of its interests on an advantageous basis. Changes in future conditions could require material reduction in the carrying amounts of the loan receivable, investments, mineral properties and related fixed assets.

The mineral properties are also subject to title and sovereign risks, including political and economic instability, government regulations relating to mining, military repression, civil disorder, currency fluctuations and inflation, all or any of which may impede the Company's activities or may result in the impairment or loss of part or all of the Company's interest in the properties.

The viability of the Kalukundi project and the ability for the company to continue as a going concern are dependent on future financing. The company is committed to making certain payments related to Kalukundi (see note 6) and may elect to make certain other payments regarding Kamanasi (see note 9). Based on studies to date, discussions with equity partners and potential debt providers, management believes that a viable financing strategy can be concluded to fund the feasibility study for Kalukundi and its initial development.

If financing is not achieved, the Company may not be able to meet its obligations as they become due. These financial statements have been prepared on the going concern basis that assumes continuity of operations and realization and settlement of liabilities in the normal course of business. A different basis of measurement may be appropriate if the going concern assumption does not prevail.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting and Consolidation

The consolidated financial statements are prepared in accordance with generally accepted accounting principles accepted in Canada. A summary of the Company's significant accounting policies is set out below:

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Basis of consolidation

These consolidated financial statements include the accounts of the Company and its 100% owned subsidiary, Seven Season Trading 146 (Pty) Ltd, a South African company providing operating services to the group. All significant inter-company balances and transactions have been eliminated upon consolidation.

### Use of Estimates

The preparation of financial statements in conformity with Canadian generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of any contingent assets and liabilities as at the date of the financial statements, as well as the reported amounts of revenues earned and expenses incurred during the period. Key estimates relate to the recoverability of loans receivable, investments, mineral property carrying values and to future income taxes. Actual results could differ from those estimates

### Foreign Currency Translation

The functional currency of the company is US dollars and for its subsidiary, South African Rands. The company has limited exposure to fluctuations between the US dollar and other currencies because the majority of its transactions and inter-company balances are designated in US dollars.

The Company follows the temporal method of accounting for the translation of integrated foreign currency denominated amounts into US dollars. Under this method monetary assets and liabilities are translated into US dollars at the exchange rate in effect at balance sheet date; non-monetary assets and liabilities are recorded at historical rates; and revenues and expenses are translated at approximate exchange rates prevailing on the dates of the respective transactions, except for amortization which is recorded at historical rates.

Gains or losses on translation are included in the consolidated statement of operations in the period to which they relate.

### Cash and cash equivalents

Cash and cash equivalents comprise cash and short-term notes and bank deposits with an original maturity of three months or less.

### Investments

The Company's investment in H&J is accounted for using the equity method. Under this method the investment is initially recorded at cost and the carrying value is adjusted to reflect the company's pro rata share of earnings or losses. Investments also reflect any amount written off for an impairment in value that is considered to be other than temporary.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Mineral Properties and Related Expenditures

Acquisition, option payments and direct exploration costs are deferred until the properties are placed into production, sold or abandoned, at which time these deferred costs will either be amortized on a unit-of-production basis, charged to operations if sold, or written-off.

Mineral property cost includes any cash consideration and advance royalties paid, and the fair market value of shares issued in connection with the acquisition of mineral property interests. Properties acquired under option agreements, whereby payments are made at the sole discretion of the Company, are recorded in the accounts when the payments are made. The recorded amounts of property claim acquisition, option payments and direct exploration costs represent actual expenditures incurred and are not intended to reflect present or future values.

The Company reviews capitalized costs on its property interests on a periodic and annual basis for impairment in value based upon current exploration results and upon management's assessment of the future probability of profitable operations from the property or from the sale of the property. Management's assessment of a property's estimated current fair market value may also be based upon a review of other property transactions that have occurred in the same geographic area as that of the property under review.

### Share Capital

Common shares issued for non-monetary consideration are recorded at management's estimate of fair market value.

### Income Taxes

The Company accounts for tax consequences of the differences in the carrying amounts of assets and liabilities and their tax bases using tax rates expected to apply when these temporary differences are expected to be settled. When the future realization of income tax assets does not meet the test of being more likely than not to occur, a valuation allowance in the amount of the potential future benefit is taken and no net future income asset is recognized. The Company has taken a valuation allowance against all such potential tax assets.

### Financial Instruments

The Company's financial instruments consist of a loan receivable, accounts receivables, accounts payables, and notes payable, the fair values of which approximate their carrying amounts due to the short-term nature of these instruments.

## 3. RELATED PARTY TRANSACTIONS

A shareholder, Rubicon Minerals Corp., received management fees amounting to $64,281, which included $25,493 in respect of rights granted to the Company for certain legal and due diligence documents. The balance owing to Rubicon Minerals Corp. and included in accounts payable at the year end amounted to $68,781. Other related party transactions are disclosed elsewhere in these financial statements.

# AFRICO RESOURCES LTD.

Notes to the Consolidated Financial Statements
*(Stated in US Dollars)*

## 4. INVESTMENTS

| | December 31, 2004 |
|---|---|
| **H&J Swanepoel Family Trust s.p.r.l.** | |
| Shares at cost | $ 525,000 |
| Equity loss of investment | (37,118) |
| **Total investment** | $ 487,882 |

During 2004 the company acquired a 24% interest in H&J Swanepoel Family Trust s.p.r.l. (H&J), a Democratic Republic of the Congo (DRC) corporate entity. H&J holds the right to earn a 75% interest in the Kalukundi copper / cobalt project in the Democratic Republic of the Congo (the Kalukundi project) through its 75% ownership of Swanmines. The remaining interest in Swanmines is held by Gecamines, which is the government controlled mining entity in the DRC. The purchase of the interest in H&J was made through a series of staged cash payments totaling $525,000.

The company can increase its holding in H&J to 100% by making the following payments:

a) $250,000 by May 2005 (12% interest) – paid in May 2005.

b) $250,000 by May 2006 (12% interest) – paid in May 2006.

c) $1,250,000 by May 2007, subject to completion by the Company of a feasibility study with an estimated cost of $6 million which is required in fulfillment of H&J's obligations under Swanmines' exploration license.

The company has accounted for this investment on the equity basis since inception on the basis that it is considered to have exercised significant influence over H&J from the date of its initial investment.

## 5. LOAN RECEIVABLE

The loan receivable comprises a loan to Swanmines, to fund operating expenses and the feasibility study in respect of the Kalukundi project (see note 6). The loan is without interest or fixed terms of repayment and recoverability is wholly dependent on the viability of the Kalukundi project.

## 6. MINERAL PROPERTIES

| | Kalukundi DRC |
|---|---|
| Acquisition costs and option payments (note 7) | 1,953,424 |
| Future income tax component | 1,302,283 |
| **Balance, 31 December 2004** | 3,255,707 |

During the year ended December 31, 2004 the company issued 5,033,585 shares with a fair value of CAD $2,516,793 for services rendered in introducing, among other things, the H&J transaction to the company.

## 6. MINERAL PROPERTIES *(continued)*

In addition to the services provided in introducing the company to the H&J transaction, the consideration paid above also entitles the company to the following:

i) A 100% interest in the Mporokoso gold project in Zambia together with the exclusive right and option to purchase up to an undivided 100% interest in three additional exploration license applications, all of which are subject to existing joint venture agreements.

ii) A 100% interest in the exclusive prospecting order covering the Snake's Head PGE project in Zimbabwe.

iii) A 100% interest in the mining claims covering the Electra gold project in Zimbabwe.

iv) A 100% interest in three exclusive prospecting orders related to gold projects in Northern Zimbabwe.

No portion of the acquisition costs has been allocated to these additional properties.

**Royalties:**

The Company's mineral properties are subject to the following royalties:

In respect of the Kalukundi project, Swanmines is subject to a royalty of 2.5% of gross revenues, payable to Gecamines. A further Net Smelter Returns royalty of 2% is payable to the Government in terms of the Mining Code of the Democratic Republic of the Congo.

In respect all of the properties acquired as part of the H&J transaction:

A 0.5% Net Smelter Returns royalty is payable to Resource Marketing Services Ltd (RMS), which may be payable in shares of the company.

A 0.5% Net Smelter Returns royalty payable to Rubicon Minerals Corp. (Rubicon), or right of first refusal on any interests in the above properties, rights, assets, and opportunities which the Company wishes to sell.

# AFRICO RESOURCES LTD.

Notes to the Consolidated Financial Statements
*(Stated in US Dollars)*

## 7. SHARE CAPITAL

**Authorised:**

Unlimited common shares without par value

| **Issued:** | **Number of Shares** | **Amount** |
|---|---|---|
| Private placements | 7,547,171 | 2,928,892 |
| For mineral properties (note 6) | 5,033,585 | 1,953,424 |
| Balance, December 31, 2004 | 12,580,756 | 4,882,316 |

During the year the company issued 12,580,756 common shares at CAD$0.50 (average USD$0.39) per common share for aggregate gross proceeds of $4,882,316 comprising cash of $2,928,892 and mineral properties valued at $1,953,424. Cash proceeds were primariiy used to finance operations and the initial stages of a $6 million feasibility study on the Kalukundi project in the DRC.

## 8. INCOME TAXES

A reconciliation of income taxes at statutory rates with the reported taxes is as follows:

| | **Year ended December 31, 2004** |
|---|---|
| **Statutory rate** | 35.62% |
| Income tax recovery computed at statutory rate | (25,387) |
| Non-deductible expenses for tax purposes | 29,103 |
| Foreign income subject to different tax rates | 352 |
| Other | (9,777) |
| Change in valuation allowance | 5,709 |
| Income tax expense | - |

## 8. INCOME TAXES *(continued)*

Future income taxes arise from temporary differences in the recognition of income and expenses for financial reporting and tax purposes. The significant components of the future income tax assets and liabilities are as follows:

| | Year ended December 31, 2004 |
|---|---|
| **Future income tax assets** | |
| Tax losses | 5,709 |
| Less valuation allowance | (5,709) |
| **Net future income tax assets** | - |
| **Future income tax liabilities** | |
| Mineral Properties | (1,302,283) |
| **Net future income tax liabilities** | (1,302,283) |

At December 31, 2004, the Company had non-capital losses of approximately $17,015 available to reduce future taxable income. Of this amount, $10,754 will expire in seven years.

## 9. SUBSEQUENT EVENTS

In addition to items disclosed elsewhere in these notes, the following occurred during the period subsequent to December 31, 2004 and up until May 26, 2006:

Share Capital

**Shares issued**

During 2005 the company completed two private placements resulting in the issuance of 6,778,383 common shares at a price of CAD$1.50 (average USD$1.21) per share for aggregate gross proceeds of $8,321,622. In addition the company issued 200,000 shares to a director at an estimated fair market value of CAD$1.75 (USD$1.51) per share for services rendered that resulted in the company securing greater rights in the Kalukundi project than had originally been anticipated.

Proceeds from the share placements in 2005 will be used to finance operations and the ongoing $6 million feasibility study on the Kalukundi project in the DRC.

**Options**

During the 2005 the Company adopted an incentive plan in which common shares totalling up to 20% of the issued shares of the Company have been made available for the Company to grant incentive stock options to certain directors, officers, employees and consultants of the Company.

**9. SUBSEQUENT EVENTS** *(continued)*

During 2005 the Company granted 1,025,000 stock options, at a price of CAD$0.75, and 200,000 options at a price of CAD$1.50 per share, to officers, employees and consultants.

During 2006 the Company granted / ratified a further 325,000 options at a price of CAD$1.75 and 770,000 options at a price of CAD$2.50 per share to officers, employees and consultants.

Mineral properties

**H&J Investment**

In May 2005 the Company increased its holding in H&J from 24% to 36% by making a further $250,000 payment as described in note 4. In May 2006 the Company increased its holding in the H&J from 36% to 48% by making a further $250,000 payment as described in note 4.

On May 18, 2006 the Company completed the feasibility study for the Kalukundi project thereby fulfilling H&J's obligation in respect of the project and earned its interest in the project. The Company is required to submit a production decision and financing plan by November 18, 2006.

**Kamanasi**

In June 2005 the company entered into an due diligence-option agreement with La Congolaises des mines et de developpement s.p.r.l. (COMIDE) to form a Joint Venture to explore for, and exploit viable deposits of Copper and Cobalt and other base or precious metals and minerals on the Kamasani Properties.

At the date of finalization of this report the Company has not been able to establish certain matters in respect of title and has not finalized negotiations concerning the property. Costs associated with the property of $683,403 were written off during 2005.

# AFRICO RESOURCES LTD.

Consolidated Financial Statements
(Stated in US Dollars)

December 31, 2005

PRICEWATERHOUSECOOPERS

**PricewaterhouseCoopers LLP**
**Chartered Accountants**
PricewaterhouseCoopers Place
250 Howe Street, Suite 700
Vancouver, British Columbia
Canada V6C 3S7
Telephone +1 604 806 7000
Facsimile +1 604 806 7806

**INDEPENDENT AUDITORS' REPORT**

To the Shareholders of Africo Resources Ltd.

We have audited the consolidated balance sheet of Africo Resources Ltd. as at December 31, 2005 and 2004 and the consolidated statements of operations and deficit and cash flows for the periods then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards in Canada. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2005 and 2004 and the results of its operations and cash flows for the periods then ended in accordance with generally accepted accounting principles in Canada.

PricewaterhouseCoopers LLP

**Chartered Accountants**

Vancouver, British Columbia, Canada

May 29, 2006

PricewaterhouseCoopers refers to the Canadian firm of PricewaterhouseCoopers LLP and the other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.

# AFRICO RESOURCES LTD.

Consolidated Balance Sheet

*(Stated in US Dollars)*

| | December 31, 2005 | December 31, 2004 |
|---|---|---|
| **ASSETS** | | |
| **Current** | | |
| Cash and cash equivalents | $ 2,640,707 | $ 143,407 |
| Accounts receivable | 45,535 | 54,202 |
| **Total Current Assets** | 2,686,242 | 197,609 |
| | | |
| **Investment** (note 4) | 669,046 | 487,882 |
| **Loans receivable** (note 5) | 6,928,716 | 2,598,813 |
| **Mineral properties** (note 6) | 4,397,372 | 3,255,707 |
| **Total Assets** | $ 14,681,376 | $ 6,540,011 |
| | | |
| **LIABILITIES** | | |
| **Current** | | |
| Accounts payable and accrued liabilities | $ 437,810 | $ 385,766 |
| Notes payable | - | 40,917 |
| **Total current liabilities** | 437,810 | 426,683 |
| | | |
| **Future income tax liability** (note 8) | 1,758,949 | 1,302,283 |
| **Total Liabilities** | 2,196,759 | 1,782,966 |
| | | |
| **Shareholders' equity** | | |
| Share capital (note 7) | 13,307,184 | 4,882,316 |
| Contributed Surplus (note 7) | 784,329 | - |
| Deficit | (1,606,896) | (71,271) |
| **Total Shareholders' Equity** | 12,484,617 | 4,811,045 |
| **Total Liabilities and Shareholders' Equity** | $ 14,681,376 | $ 6,540,011 |

*See accompanying notes to the consolidated financial statements*

*Nature of operations and going concern (note 1)*

*Subsequent events (note 9)*

Approved by the Board of Directors:

David Adamson
Director

Chris Theodropoulos,
Director

# AFRICO RESOURCES LTD.

Consolidated Statements of Operations and Deficit
*(Stated in US Dollars)*

| | Year ended December 31, 2005 | Year ended December 31, 2004 |
|---|---|---|
| **Expenses** | | |
| Management and consulting fees | $ 351,057 | $ 41,168 |
| General and administrative costs | 19,992 | 3,189 |
| Professional fees | 128,059 | 113,111 |
| Stock based compensation (Note 7) | 401,575 | - |
| Telephone | 803 | 2,589 |
| Travel and accommodation | 53,755 | - |
| **Loss before other items:** | (955,241) | (160,057) |
| Write-down of mineral properties | (683,403) | - |
| Foreign exchange gain | 168,821 | 125,904 |
| Interest and other income | 3,034 | - |
| Loss on equity accounted investment (note 4) | (68,836) | (37,118) |
| **Loss for the year** | (1,535,625) | (71,271) |
| **Deficit, beginning of year** | (71,271) | - |
| **Deficit, end of year** | $ (1,606,896) | $ (71,271) |

*See accompanying notes to the consolidated financial statements*

# AFRICO RESOURCES LTD.

Consolidated Statement of Cash Flows

*(Stated in US Dollars)*

| | Year ended December 31, 2005 | Year ended December 31, 2004 |
|---|---|---|
| **Operating Activities** | | |
| Net loss for the year | $ (1,535,625) | $ (71,271) |
| Adjustment for items which do not involve cash: | | |
| Stock based compensation | 401,575 | - |
| Loss on equity accounted investment | 68,836 | 37,118 |
| Unrealised foreign exchange gains | (95,298) | (5,997) |
| Write-off of mineral properties | 683,403 | - |
| | (477,109) | (40,150) |
| Changes in non-cash working capital components: | | |
| Accounts receivable | 8,667 | (34,202) |
| Accounts payable and accrued liabilities | (171,251) | 97,861 |
| Notes payable | (40,917) | 40,917 |
| **Cash used in operating activities** | (680,610) | 64,426 |
| **Investing Activities** | | |
| Deferred mineral property costs | (653,883) | - |
| Purchase of investments | (250,000) | (525,000) |
| Loans receivable | (4,193,926) | (2,330,908) |
| **Cash used in investing activities** | (5,097,809) | (2,855,908) |
| **Financing Activities** | | |
| Common shares issued for cash – net of share issue expenses | 8,180,421 | 2,928,892 |
| **Cash provided by financing activities** | 8,180,421 | 2,928,892 |
| **Net increase in cash and cash equivalents during the year** | 2,402,002 | 137,410 |
| **Cash and cash equivalents, beginning of year** | 143,407 | - |
| **Unrealised foreign currency gains included in cash at year end** | 95,298 | 5,997 |
| **Cash and cash equivalents, end of year** | $ 2,640,707 | $ 143,407 |

**Supplemental Disclosure of Non-Cash Investing and Financing Activities**

| | | |
|---|---|---|
| **Investing and financing activities** | | |
| Common shares issued for mineral property acquisition | $ 302,245 | $ 1,953,424 |

*See accompanying notes to the consolidated financial statements*

## 1. NATURE OF OPERATIONS AND GOING CONCERN

The Company is incorporated under the laws of the province of British Columbia, Canada, and is a mineral resource company engaged in exploring, acquiring and developing precious metal and base metal properties. The Company holds a 36% (2004 - 24%) interest in H&J Swanepoel Family Trust s.p.r.l. (H&J), which in turn holds the right to earn a 75% interest in the Kalukundi copper / cobalt project (the Kalukundi project) in the Democratic Republic of the Congo (DRC) through its 75% ownership of Swanmines s.p.r.l. (Swanmines). The Company can increase its interest in H&J to 100% subject to certain obligations described in note 6 below. During the year the company acquired an option to earn a 70% interest in the Kamasani copper / cobalt joint venture in the Democratic Republic of the Congo, in an area adjacent to the Kalukundi project, subject to certain obligations as described in note 6 below. At the date of these financial statements the Company was still in negotiations concerning this property.

The recoverability of the cost of mineral properties and related deferred exploration expenditures is dependent upon the discovery of economically recoverable reserves, preservation of the Company's interest in the underlying mineral claims, the ability of the company to obtain necessary financing to complete the project, and future profitable production or alternatively, upon the Company's ability to dispose of its interests on an advantageous basis. Changes in future conditions could require material reduction in the carrying amounts of loan receivable, investments, mineral properties and related fixed assets.

The mineral properties are also subject to title and sovereign risks, including political and economic instability, government regulations relating to mining, military repression, civil disorder, currency fluctuations and inflation, all or any of which may impede the Company's activities or may result in the impairment or loss of part or all of the Company's interest in the properties.

The viability of the Kalukundi project and the ability for the company to continue as a going concern are dependent on future financing. The company is committed to making certain payments related to Kalukundi and may elect to make certain other payments regarding Kamanasi (see note 6). Based on studies to date, discussions with equity partners and potential debt providers, management believes that a viable financing strategy can be concluded to fund the feasibility study for Kalukundi and its initial development.

If financing is not achieved, the Company may not be able to meet its obligations as they become due. These financial statements have been prepared on the going concern basis that assumes continuity of operations and realization and settlement of liabilities in the normal course of business. A different basis of measurement may be appropriate if the going concern assumption does not prevail.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting and Consolidation

The consolidated financial statements are prepared in accordance with generally accepted accounting principles accepted in Canada. A summary of the Company's significant accounting policies is set out below:

2. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** *(continued)*

**Basis of consolidation**

These consolidated financial statements include the accounts of the Company and its 100% owned subsidiary, Seven Season Trading 146 (Pty) Ltd, a South African company providing operating services to the group. All significant inter-company balances and transactions have been eliminated upon consolidation.

**Use of Estimates**

The preparation of financial statements in conformity with Canadian generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of any contingent assets and liabilities as at the date of the financial statements, as well as the reported amounts of revenues earned and expenses incurred during the period. Key estimates relate to the recoverability of loans receivable, investments, mineral property carrying values and future income taxes. Actual results could differ from those estimates.

**Foreign Currency Translation**

The functional currency of the company is US dollars and for its subsidiary, South African Rands. The company has limited exposure to fluctuations between the US dollar and other currencies because the majority of its transactions and inter-company balances are designated in US dollars.

The Company follows the temporal method of accounting for the translation of integrated foreign currency denominated amounts into US dollars. Under this method monetary assets and liabilities are translated into US dollars at the exchange rate in effect at balance sheet date; non-monetary assets and liabilities are recorded at historical rates; and revenues and expenses are translated at approximate exchange rates prevailing on the dates of the respective transactions, except for amortization which is recorded at historical rates.

Gains or losses on translation are included in the consolidated statement of operations in the period to which they relate.

**Cash and cash equivalents**

Cash and cash equivalents comprise cash and short-term notes and bank deposits with an original maturity of three months or less.

**Investment**

The Company's investment in H&J Swanepoel family trust s.p.r.l is accounted for using the equity method. Under this method the investment is initially recorded at cost and the carrying value is adjusted to reflect the company's pro rata share of earnings or losses.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(continued)*

### Mineral Properties and Related Expenditures

Acquisition, option payments and direct exploration costs are deferred until the properties are placed into production, sold or abandoned, at which time these deferred costs will either be amortized on a unit-of-production basis, charged to operations if sold, or written-off.

Mineral property cost includes any cash consideration and advance royalties paid, and the fair market value of shares issued on the acquisition of mineral property interests. Properties acquired under option agreements, whereby payments are made at the sole discretion of the Company, are recorded in the accounts when the payments are made. The recorded amounts of property claim acquisition, option payments and direct exploration costs represent actual expenditures incurred and are not intended to reflect present or future values.

The Company reviews capitalized costs on its property interests on a periodic and annual basis for impairment in value based upon current exploration results and upon management's assessment of the future probability of profitable operations from the property or from the sale of the property. Management's assessment of a property's estimated current fair market value may also be based upon a review of other property transactions that have occurred in the same geographic area as that of the property under review.

### Share Capital

Common shares issued for non-monetary consideration are recorded at management's estimate of fair market value.

### Income Taxes

The Company accounts for tax consequences of the differences in the carrying amounts of assets and liabilities and their tax bases using tax rates expected to apply when these temporary differences are expected to be settled. When the future realization of income tax assets does not meet the test of being more likely than not to occur, a valuation allowance in the amount of the potential future benefit is taken and no future income net asset is recognized. The Company has taken a valuation allowance against all such potential tax assets.

### Financial Instruments

The Company's financial instruments consist of a loan receivable, accounts receivables, accounts payables, and notes payable, the fair values of which approximate their carrying amounts due to the short-term nature of these instruments.

### Stock-based Compensation

All stock option-based awards made to consultants and employees are recognized in these consolidated financial statements and measured using a fair value-based method.

Consideration received on the exercise of stock options and compensation warrants is recorded as share capital. The related contributed surplus originally recognized when the options were granted, is transferred to share capital.

**AFRICO RESOURCES LTD.**
Notes to the Consolidated Financial Statements
*(Stated in US Dollars)*

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(continued)*

**Variable interest entities (VIE's)**

The company has adopted the new accounting guideline which requires the consolidation of VIEs by the primary beneficiary. The primary beneficiary is the enterprise that will absorb or receive the majority of the VIEs expected losses, expected residual returns, or both. A VIE is an entity where (a) its equity investment at risk is insufficient to permit the entity to finance its activities without additional subordinated support from others and/or where certain essential characteristics of a controlling financial interest are not met, and (b) it does not meet specified exemption criteria. The adoption of the new accounting guideline relating to VIEs did not have a material effect on the Company.

## 3. RELATED PARTY TRANSACTIONS

The following consulting fees were paid to Directors and organizations having common Directors for services rendered to the company:

| | |
|---|---|
| D Adamson | $6,435 |
| B Cavalluzzo | $6,435 |
| River Capital Partners Ltd (L M Maree) | $92,920 |
| J Swanepoel | $85,345 |
| 143 Investments Ltd (C Theodropoulos) | $83,571 |

J Swanepoel owed the company a net amount of $22,079 at the year-end. The company owed D Adamson $6,435, and B Cavlluzzo $6,435 at the year end.

A shareholder, Rubicon Minerals Corp. received management fees amounting to $62,138. The balance owing to Rubicon Minerals Corp. and included in accounts payable at the year-end amounted to $17,536.

A bonus share issue of 200,000 shares with an estimated fair value of CAD$1.75 each was made to a Director, J Swanepoel in December 2005 in respect of services rendered that resulted in the company securing greater rights to the Kalukundi project than had originally been anticipated.

Other related party transactions are disclosed elsewhere in these financial statements.

## 4. INVESTMENT

At the year end the company held a 36% (2004 – 24%) interest in H&J Swanepoel Family Trust s.p.r.l. (H&J) This investment has been accounted for using the equity basis of accounting.

| | 2005 | 2004 |
|---|---|---|
| **H&J Swanepoel Family Trust s.p.r.l.** | | |
| Shares at cost | $ 775,000 | $ 525,000 |
| Cumulative equity losses of investment | (105,954) | (37,118) |
| **Total investment** | $ 669,046 | $ 487,882 |

During the year the year ended December 31, 2005 the company paid $250,000 to increase its share from 24% to 36% of H&J. H&J holds the right to earn a 75% interest in the Kalukundi copper / cobalt project in the Democratic Republic of the Congo (the Kalukundi project) through its 75% ownership of Swanmines. The remaining interest in Swanmines is held by Gecamines, which is the government controlled mining entity in the DRC.

**AFRICO RESOURCES LTD.**
Notes to the Consolidated Financial Statements
*(Stated in US Dollars)*

## 4. INVESTMENT, *(continued)*

The acquisition of the Company's initial interest was made in the prior year through a series of staged cash payments totalling $525,000.

The company can increase its holding in H&J to 100% by making the following payments:

a) $250,000 by May 2006 (12% interest) – paid May 2006.

b) $1,250,000 by May 2007, subject to completion by the Company of a feasibility study with an estimated cost of $6 million, which is required in fulfillment of H&J's obligations under Swanmines exploration license.

## 5. LOANS RECEIVABLE

Included in loans receivable is a loan to Swanmines, of $6,882,931 to fund operating expenses and the feasibility study in respect of the Kalukundi project (see note 6). The loan is without interest or fixed terms of repayment and recoverability of this loan is dependent on the viability of the Kalukundi project.

## 6. MINERAL PROPERTIES

| For the Year ended 31 December 2004 | Kalukundi Congo | | Total |
|---|---|---|---|
| **Balance beginning of year** | - | | - |
| Acquisition costs and option payments | 1,953,424 | $ | 1,953,424 |
| Future income tax component | 1,302,283 | | 1,302,283 |
| **Total costs incurred during the year** | 3,255,707 | | 3,255,707 |
| **Balance 31 December 2004** | 3,255,707 | $ | 3,255,707 |

| For the Year ended 31 December 2005 | Kamasani Congo | Kalukundi Congo | | Total |
|---|---|---|---|---|
| **Balance beginning of year** | - | 3,255,707 | | 3,255,707 |
| Acquisition costs and option payments | 502,909 | 302,245 | $ | 805,154 |
| Exploration costs | | | | |
| Feasibility Costs | 150,974 | - | | 150,974 |
| Consulting fees | 29,520 | - | | 29,520 |
| Stock based compensation (note 7) | - | 382,754 | | 382,754 |
| Future income tax component | - | 456,666 | | 456,666 |
| **Total costs incurred during the year** | 683,403 | 1,141,665 | | 1,825,068 |
| **Property write-offs** | (683,403) | - | | (683,403) |
| **Balance 31 December 2005** | - | 4,397,372 | $ | 4,397,372 |

## 6. MINERAL PROPERTIES *(continued)*

The Company's significant mineral properties are as follows:

**Kalukundi**

During the year ended December 31, 2004 the company issued 5,033,585 shares with a fair value of CAD $2,516,793 for services rendered in introducing, among other things, the H&J transaction to the company.

During 2005 the company issued an additional 200,000 shares with a book value of $302,245 to a Director in respect of services rendered that resulted in the company securing greater rights in the project that had originally been anticipated.

In addition to the services provided in introducing the company to the H&J transaction, the consideration paid above also entitles the company to the following:

i) A 100% interest in the Mporokoso gold project in Zambia together with the exclusive right and option to purchase up to an undivided 100% interest in three additional exploration license applications, all of which are subject to existing joint venture agreements between Placer Dome and an entity controlled by the seller.

ii) A 100% interest in the exclusive prospecting order covering the Snake's Head PGE project in Zimbabwe.

iii) A 100% interest in the mining claims covering the Electra gold project in Zimbabwe.

iv) A 100% interest in three exclusive prospecting orders related to gold projects in Northern Zimbabwe.

No portion of the acquisition costs has been allocated to these additional properties.

**Kamasani**

In June 2005 the company entered into an due diligence-option agreement with La Congolaises des mines et de developpement s.p.r.l. (COMIDE) to form a Joint Venture to explore for, and exploit viable deposits of Copper and Cobalt and other base or precious metals and minerals on the Kamasani Properties.

As of the date of these financial statements, the Company has not been able to establish matters in respect of title and has not finalized negotiations concerning the property. Costs associated with this property of $683,403 were written off during the period.

## 6. MINERAL PROPERTIES *(continued)*

**Royalties**

The Company's mineral properties are subject to the following royalties:

In respect of the Kalukundi project, Swanmines is subject to a royalty of 2.5% of gross revenues, payable to Gecamines. A further Net Smelter Returns royalty of 2% is payable to the Government in terms of the Mining Code of the Democratic Republic of the Congo.

In respect all of the properties acquired as part of the H&J transaction:

- A 0.5% Net Smelter Returns royalty is payable to Resource Marketing Services Ltd (RMS) which may be payable in shares of the company.

- A 0.5% Net Smelter Returns royalty payable to Rubicon Minerals Corp. (Rubicon), or right of first refusal on any interests in the above properties, rights, assets, and opportunities which the Company wishes to sell.

## 7. SHARE CAPITAL

**Authorised:**

Unlimited common shares without par value

| **Issued:** | **Number of Shares** | **Amount** |
|---|---|---|
| Private placements | 7,547,171 | $ 2,928,892 |
| For mineral properties (note 6) | 5,033,585 | 1,953,424 |
| Balance, December 31, 2004 | 12,580,756 | 4,882,316 |
| | | |
| Private placements | 6,778,383 | 8,231,622 |
| For mineral properties (note 6) | 200,000 | 302,245 |
| Share issuance costs | - | (108,999) |
| Balance, December 31, 2005 | 19,559,139 | $ 13,307,184 |

During the year ended December 31, 2005 the company completed two private placements resulting in the issuance of 6,778,383 common shares at CAD$1.50 (average of USD$1.21) per share for aggregate gross proceeds of $8,231,622. In addition the company issued 200,000 shares to a director at an estimated fair market value of CAD$1.75 (USD$1.51) per share for services rendered that resulted in the company securing greater rights in the Kalukundi project than had originally been anticipated.

Proceeds from the share placements in 2005 will be used to finance operations and the ongoing $6 million feasibility study on the Kalukundi project in the DRC.

## 7. SHARE CAPITAL, *(continued)*

### Options outstanding

During the year the Company adopted an incentive plan in which common shares totalling up to 20% of the issued shares of the Company have been made available for the Company to grant incentive stock options to certain directors, officers, employees and consultants of the Company.

A summary of changes to stock options during the period are as follows:

| Options | 2005 | |
|---|---|---|
| | Number of shares | Weighted-average exercise price |
| Outstanding at beginning of year | - | - |
| Granted | 1,225,000 | CAD$ 0.87 |
| Outstanding and exercisable at end of year | 1,225,000 | CAD$ 0.87 |

Stock options outstanding and exercisable at December 31, 2005 were as follows:

| Number outstanding | Weighted average remaining useful life (years) | Weighted average exercise price |
|---|---|---|
| 1,025,000 | 4.3 | CAD$ 0.75 |
| 200,000 | 4.5 | CAD$ 1.50 |
| 1,225,000 | 4.3 | CAD$ 0.87 |

During 2005 the Company granted 1,225,000 stock options, at a price of CAD$0.75, and CAD$1.50 per share, to officers, employees and consultants. Stock based compensation expense of $401,575 has been recorded in operations in respect of the stock options granted to officers and employees and $382,754 has been recorded in mineral properties in respect of the stock options granted to consultants involved in the Kalukundi project. The total amount credited to contributed surplus during the year in respect of stock options awarded amounted to $784,329. The options vest immediately.

The stock based compensation expense was estimated using the Black-Scholes option-pricing model. Assumptions used in the pricing model are as follows:

| | | |
|---|---|---|
| Dividend Yield | : | 0% |
| Average risk free interest rate | : | 4.1% |
| Expected volatility | : | 0% |
| Expected life of option | : | 5 years |

## 8. INCOME TAXES

A reconciliation of income taxes at statutory rates with the reported taxes is as follows:

| | Year ended December 31, 2005 | Year ended December 31, 2004 |
|---|---|---|
| **Statutory rate** | 34.87% | 35.62% |
| Income tax recovery computed at statutory rate | (535,472) | (25,387) |
| Non-deductible expenses for tax purposes | 156,725 | 29,103 |
| Foreign income subject to different tax rates | 438 | 352 |
| Other | 31,934 | (9,777) |
| Change in valuation allowance | 346,375 | 5,709 |
| Income tax expense | - | - |

Future income taxes arise from temporary differences in the recognition of income and expenses for financial reporting and tax purposes. The significant components of the future income tax assets and liabilities are as follows:

| | Year ended December 31, 2005 | Year ended December 31, 2004 |
|---|---|---|
| **Future income tax assets** | | |
| Tax losses | 112,917 | 5,709 |
| Other temporary differences | 281,989 | - |
| Less valuation allowance | (394,906) | (5,709) |
| **Net future income tax assets** | - | - |
| **Future income tax liabilities** | | |
| Mineral properties | (1,758,949) | (1,302,283) |
| **Net future income tax liabilities** | (1,758,949) | (1,302,283) |

At December 31, 2005, the Company had non-capital losses of approximately $332,999 (2004 - $17,015) available to reduce future taxable income. Of this amount, $319,423 (2004 - $10,754) will expire in periods ranging from nine to ten years. In addition the company has approximately $700,958 of resource and other tax pools available to offset future income.

## 9. SUBSEQUENT EVENTS

In addition to items disclosed elsewhere in these notes, the following occurred during the period subsequent to December 31, 2005 and up to May 29, 2006:

**Options**

During 2006 the Company granted / ratified 325,000 options at a price of CAD$1.75 and 770,000 options at a price of CAD$2.50 per share to officers, employees and consultants.

Mineral properties

**H&J Investment**

In May 2006 the Company increased its holding in H&J from 36% to 48% by making a further $250,000 payment as described in note 4.

On May 18, 2006 the Company completed the feasibility study for the Kalukundi project thereby fulfilling H&J's obligation in respect of the project and earned its interest in the project. The Company is required to submit a production decision and financing plan by November 18, 2006.

# AFRICO RESOURCES LTD.

Interim Consolidated Financial Statements
(Stated in US Dollars)
Unaudited

First quarter ended March 31, 2006

# AFRICO RESOURCES LTD.

Interim Consolidated Balance Sheet
*(Stated in US Dollars)*
*Unaudited*

| | | March 31, 2006 | | December 31, 2005 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current** | | | | |
| Cash and cash equivalents | $ | 1,835,219 | $ | 2,640,707 |
| Accounts receivable | | 49,245 | | 45,535 |
| Total Current Assets | | 1,884,464 | | 2,686,242 |
| **Loans receivable** (note 3) | | 7,491,508 | | 6,928,716 |
| **Investment** (note 4) | | 645,900 | | 669,046 |
| **Mineral properties** | | 4,397,372 | | 4,397,372 |
| **Total Assets** | $ | 14,419,244 | $ | 14,681,376 |
| **LIABILITIES** | | | | |
| **Current** | | | | |
| Accounts payable and accrued liabilities | $ | 365,277 | $ | 437,810 |
| **Total current liabilities** | | 365,277 | | 437,810 |
| **Future income tax liability** | | 1,758,949 | | 1,758,949 |
| **Total Liabilities** | | 2,124,226 | | 2,196,759 |
| **Shareholders' equity** | | | | |
| Share capital | | 13,307,184 | | 13,307,184 |
| Contributed Surplus | | 784,329 | | 784,329 |
| Deficit | | (1,796,495) | | (1,606,896) |
| **Total Shareholders' Equity** | | 12,295,018 | | 12,484,617 |
| **Total Liabilities and Shareholders' Equity** | $ | 14,419,244 | $ | 14,681,376 |

*See accompanying notes to the interim consolidated financial statements*

*Subsequent events (note 5)*

Approved by the Board of Directors:

David Adamson
Director

Chris Theodoropoulos
Director

# AFRICO RESOURCES LTD.

Interim Consolidated Statements of Operations and Deficit
*(Stated in US Dollars)*
*Unaudited*

| | Three months ended March 31, 2006 | Three months ended March 31, 2005 |
|---|---|---|
| **Expenses** | | |
| Management and consulting fees | $ 151,028 | $ 57,030 |
| General and administrative costs | 15,227 | 11,072 |
| Professional fees | 13,139 | 2,094 |
| Stock based compensation | - | 401,575 |
| Travel and accommodation | 23,640 | - |
| **Loss before other items:** | (203,034) | (471,771) |
| Foreign exchange gain | 6,708 | 12,163 |
| Interest and other income | 29,873 | 4 |
| Loss on equity accounted investment (note 4) | (23,146) | (21,540) |
| **Loss for the period** | (189,599) | (481,144) |
| **Deficit, beginning of the period** | (1,606,896) | (71,272) |
| **Deficit, end of the period** | $ (1,796,495) | $ (552,416) |

*See accompanying notes to the interim consolidated financial statements*

# AFRICO RESOURCES LTD.

Interim Consolidated Statement of Cash Flows
*(Stated in US Dollars)*
*Unaudited*

| | Three months ended March 31, 2006 | Three months ended March 31, 2005 |
|---|---|---|
| **Operating Activities** | | |
| Net loss for the period | $ (189,599) | $ (481,144) |
| Adjustment for items which do not involve cash: | | |
| Stock based compensation | - | 401,575 |
| Loss on equity accounted investment | 23,146 | 21,540 |
| Unrealised foreign exchange gains | (11,694) | (21,076) |
| | (178,147) | (79,105) |
| Changes in non-cash working capital components: | | |
| Accounts receivable | (3,710) | (172,221) |
| Accounts payable and accrued liabilities | (72,533) | 38,102 |
| Notes payable | - | (40,917) |
| **Cash used in operating activities** | (254,390) | (254,141) |
| **Investing Activities** | | |
| Loans receivable | (562,792) | (960,171) |
| **Cash used in investing activities** | (562,792) | (960,171) |
| **Financing Activities** | | |
| Common shares issued for cash | - | 1,314,852 |
| **Cash provided by financing activities** | - | 1,314,852 |
| **Net increase in cash during the period** | (817,182) | 100,540 |
| **Cash and cash equivalents, beginning of the period** | 2,640,707 | 143,407 |
| **Unrealised foreign currency gains included in cash** | 11,694 | 21,076 |
| **Cash and cash equivalents, end of the period** | $ 1,835,219 | $ 265,023 |

*See accompanying notes to the interim consolidated financial statements*

## 1. BASIS OF PRESENTATION

The unaudited interim consolidated financial statements are prepared in accordance with generally accepted accounting principles accepted in Canada using the same accounting policies and methods of application as those disclosed in Note 2 to the Company's consolidated financial statements for the year ended December 31, 2005.

These interim consolidated financial statements do not contain all of the information required by generally accepted accounting principles for annual financial statements and therefore should be read in conjunction with the Company's consolidated financial statements for the year ended December 31, 2005.

## 2. RELATED PARTY TRANSACTIONS

The following consulting fees were paid to Directors and organisations with common Directors during the three months ended March 31,2006 for services rendered to the company:

| | |
|---|---|
| River Capital Partners Ltd (L M Maree) | $26,283 (2005 - $23,230) |
| J Swanepoel | $14,953 (2005 - $21,336) |
| 143 Investments Ltd (C Theodoropoulos) | $26,303 (2005 - $20,892) |
| W Cavalluzzo | $6,435 (2005 - $Nil) |
| D Adamson | $6,435 (2005 - $Nil) |

J Swanepoel owed the company a net amount of $15,644 at March 31, 2006 (December 2005 - $22,079), which is included in loans receivable. The company owed River Capital Partners Ltd $8,761, 143 Investments Ltd $8,761, D Adamson $12,870, and W Cavalluzzo $12,870 at March 31, 2006.

Rubicon Minerals Corp., which owns 39.6% of the company, received management fees during the period amounting to $43,654 (2005 - $15,534)

## 3. LOANS RECEIVABLE

Included in loans receivable is a loan to a related party, Swanmines s.p.r.l., of $7,445,741 (December 2005 – $6,882,931) to fund operating expenses and the feasibility study in respect of the Kalukundi project. The loan is without interest or fixed terms of repayment and recoverability of this loan is dependent on the viability of the Kalukundi project.

## 4. INVESTMENT

At the period end the company held a 36% (2005 – 36%) interest in H&J Swanepoel Family Trust s.p.r.l. (H&J) This investment has been accounted for using the equity basis of accounting.

| | March 31, 2006 | December 31, 2005 |
|---|---|---|
| **H&J Swanepoel Family Trust s.p.r.l.** | | |
| Shares at cost | $ 775,000 | $ 775,000 |
| Cumulative equity losses on investment recognized | (129,100) | (105,954) |
| **Total investment** | $ 645,900 | $ 669,046 |

## 5. SUBSEQUENT EVENTS

The following occurred during the period subsequent March 31, 2005 and up to June 16, 2006:

**Options**

The Company granted 325,000 options at a price of CAD$1.75 and 770,000 options at a price of CAD$2.50 per share to officers, employees and consultants.

Mineral properties

**H&J Investment**

In May 2006 the Company increased its holding in H&J from 36% to 48% by making a further $250,000 payment as described in note 4 to the Company's consolidated financial statements for the year ended December 31 2005.

On May 18, 2006 the Company completed the feasibility study for the Kalukundi project thereby fulfilling H&J's obligation in respect of the project and earned its interest in the project. The Company is required to submit a production decision and financing plan by November 18, 2006.

**Paragon Minerals Corporation**

Balance Sheet

As at the date of incorporation on July 4, 2006

DE VISSER GRAY
CHARTERED ACCOUNTANTS

401 - 905 West Pender Street
Vancouver, BC Canada
V6C 1L6

Tel: (604) 687-5447
Fax: (604) 687-6737

**AUDITORS' REPORT**

To the directors of Paragon Minerals Corporation

We have audited the balance sheet of Paragon Minerals Corporation as at July 4, 2006. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with generally accepted auditing standards in Canada. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, this financial statement presents fairly, in all material respects, the financial position of the Company as at July 4, 2006 in accordance with generally accepted accounting principles in Canada.

"De Visser Gray"

**CHARTERED ACCOUNTANTS**

Vancouver, British Columbia
July 7, 2006

# Paragon Minerals Corporation
## Balance Sheet
## As at July 4, 2006

| | $ |
|---|---|
| **ASSETS** | Nil |
| **LIABILITIES** | Nil |
| **SHAREHOLDERS' EQUITY** (note 3) | Nil |

Refer to notes 1 and 2

**Paragon Minerals Corporation**
**Notes to Balance Sheet**
**July 4, 2006**

## 1. Incorporation and continuance of operations

The Company (or "Paragon") was incorporated with no currently-issued share capital under the Canada Business Corporations Act on July 4, 2006 as a controlled subsidiary of Rubicon Minerals Corporation. ("Rubicon"), and is to become a public company controlled by the shareholders of Rubicon upon completion of a Plan of Arrangement ("the Arrangement") involving Rubicon, Paragon, CopperCo Resource Corp. and Africo Resources Ltd. ("Africo").

These financial statements have been prepared in accordance with Canadian generally accepted accounting principles applicable to a going concern, which assume that the Company will be able to realize its assets and discharge its liabilities in the normal course of operations. The Company is recently incorporated, has no source of operating revenues and its capacity to operate as a going concern in the near-term will depend on the completion of the Arrangement and its continuing ability to raise equity financing thereafter on terms which are acceptable to the Company.

## 2. Nature of operations

The Company has been incorporated for the purpose of acquiring Rubicon's interest in various mineral property rights located in Newfoundland and Nunavut, Canada in consideration for the distribution, pursuant to the terms of the Arrangement, of common shares to the current shareholders of Rubicon on the basis of one common share of Paragon issued in exchange for each six common shares of Rubicon that are currently outstanding. The result of this exchange will be that these shareholders will own shares of Paragon in identical proportion to their current shareholdings of Rubicon. The Company also proposes to complete a non-brokered private placement financing to raise a minimum of $3.0 million by the issuance of a minimum of 3,333,333 flow-through common shares at a price of $0.60 per share and 2,000,000 non-flow through units at a price of $0.50 per share. Each unit is to consist of a non-flow through common share and one share purchase warrant, exercisable to acquire an additional non-flow through common share for $1.00 for a period of two years. In consideration for the participation of Altius Resources Inc. ("Altius") in this financing Paragon has agreed to acquire from Altius a 100% interest in the South Tally Pond property, located in Newfoundland, in consideration for 1,000,000 common shares, of which the initial tranche of 250,000 shares is due on the effective date of the transactions comprising the Arrangement.

Paragon intends to obtain from the TSX Venture Exchange approval for its common shares to list for trading on that exchange upon the completion of the Arrangement, which is dependent upon the approval of the shareholders of Rubicon and Africo.

The Company's principal business activity upon the successful completion of the Arrangement will be the exploration of the Newfoundland and Nunavut mineral property interests acquired from Rubicon.

## 3. Share Capital

(a) Authorized:

Unlimited number of common shares without nominal or par value.

(b) Issued at July 4, 2006:

Nil

**CopperCo Resource Corp.**

Balance Sheet

As at the date of incorporation on July 4, 2006

# DE VISSER GRAY
CHARTERED ACCOUNTANTS

401 - 905 West Pender Street
Vancouver, BC Canada
V6C 1L6

Tel: (604) 687-5447
Fax: (604) 687-6737


**AUDITORS' REPORT**

To the directors of CopperCo Resource Corp.

We have audited the balance sheet of CopperCo Resource Corp. as at July 4, 2006. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with generally accepted auditing standards in Canada. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, this financial statement presents fairly, in all material respects, the financial position of the Company as at July 4, 2006 in accordance with generally accepted accounting principles in Canada.

"De Visser Gray"

**CHARTERED ACCOUNTANTS**

Vancouver, British Columbia
July 7, 2006

**CopperCo Resource Corp.**
**Balance Sheet**
**As at July 4, 2006**

| | $ |
|---|---|
| **ASSETS** | Nil |
| **LIABILITIES** | Nil |
| **SHAREHOLDERS' EQUITY** (note 3) | Nil |

Refer to notes 1 and 2

**CopperCo Resource Corp.**
**Notes to Balance Sheet**
**July 4, 2006**

## 1. Incorporation and continuance of operations

The Company (or "CopperCo") was incorporated with no currently-issued share capital under the Canada Business Corporations Act on July 4, 2006 controlled by the current directors of Africo Resources Ltd. ("Africo") and is to become a public company controlled initially by the current shareholders of Africo upon completion of a Plan of Arrangement ("the Arrangement") involving CopperCo, Africo, Paragon Minerals Corporation and Rubicon Minerals Corporation, a Canadian public company. As further described in note 2 below, Africo will become the wholly-owned subsidiary of the Company pursuant to the Arrangement.

These financial statements have been prepared in accordance with Canadian generally accepted accounting principles applicable to a going concern, which assume that the Company will be able to realize its assets and discharge its liabilities in the normal course of operations. The Company is recently incorporated and neither it nor Africo has any source of operating revenues, and its capacity to operate as a going concern in the near-term will depend on the completion of the Arrangement and its ability thereafter to raise equity financing on terms that are acceptable to the Company.

## 2. Nature of operations

CopperCo has been incorporated for the purpose of issuing, to the current shareholders of Rubicon, common shares such that the shareholders of Rubicon with collectively hold the same percentage equity interest in CopperCo as Rubicon currently holds in Africo. The current shareholders of Africo, other than Rubicon, are to similarly exchange their shareholdings of Africo for common shares of CopperCo such that their current interest in the net assets of Africo is maintained. CopperCo will in this manner acquire all of the common shares of Africo, which will constitute a reverse take-over and result in Africo being considered the acquirer and continuing entity for accounting purposes. This financial statement should therefore be read in conjunction with the December 31, 2004 and 2005 annual audited and March 31, 2006 interim financial statements of Africo, as well as the pro-forma March 31, 2006 balance sheet of CopperCo and the details of the Arrangement, all of which are included elsewhere in Rubicon's Management Information Circular.

CopperCo intends to obtain from the TSX Venture Exchange approval for its common shares to list for trading on that exchange upon completion of the Arrangement, which is dependent upon the approval of the shareholders of Rubicon and Africo and upon receipt of convertible debt and other private placement financing adequate, in the judgement of CopperCo's management, to fund CopperCo's business objectives.

The Company's principal business activity upon the successful completion of the Arrangement is to be the exploration of the mineral property rights and interests controlled by Africo and located in the Democratic Republic of Congo.

## 3. Share capital

(a) Authorized:

Unlimited number of common shares without nominal or par value.

(b) Issued at July 4, 2006:

Nil

**SCHEDULE "B"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**INTERIM ORDER**

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY
JUL - 7 2006

S-064371

NO.
VANCOUVER REGISTRY

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF SECTION 291 OF THE
*BUSINESS CORPORATIONS ACT*,
S.B.C. 2002, c.57, AS AMENDED

AND

IN THE MATTER OF A PROPOSED ARRANGEMENT AMONG
RUBICON MINERALS CORPORATION, PARAGON MINERALS CORPORATION,
COPPERCO RESOURCE CORP., AND AFRICO RESOURCES LTD.
AND THEIR RESPECTIVE SHAREHOLDERS

RUBICON MINERALS CORPORATION, PARAGON MINERALS CORPORATION AND
COPPERCO RESOURCE CORP.

PETITIONERS

AFRICO RESOURCES LTD.

RESPONDENT

## INTERIM ORDER

| | |
|---|---|
| BEFORE THE HONOURABLE<br>MADAM JUSTICE LOO | FRIDAY, THE 7TH DAY<br>OF JULY, 2006 |

**THIS APPLICATION** of the Petitioners coming on for hearing without notice at Vancouver, British Columbia, on the 7th day of July, 2006, and on hearing J. Brent MacLean, counsel for the Petitioners; and upon reading the Petition herein dated the 7th day of July, 2006 and filed and the Affidavit of David W. Adamson, sworn on the 7th day of July, 2006 and filed; and upon being advised that the Respondent Africo Resources Ltd. is aware of the terms of the Interim Order being sought and does not object to this application:

THIS COURT ORDERS THAT:

**MEETING OF THE SHAREHOLDERS OF THE RUBICON MINERALS CORPORATION**

1. The Petitioner, Rubicon Minerals Corporation ("**Rubicon**"), is directed to convene an annual and special meeting (the "**Rubicon Special Meeting**") of its shareholders to be held on Tuesday, the 8th day of August, 2006 at 2:00 p.m. at the Metropolitan Hotel, 645 Howe Street, Vancouver, British Columbia, to be held for the purpose, inter alia, of considering and, if deemed advisable, approving with or without modification a plan of arrangement (the "**Arrangement**") substantially in the form attached as Exhibit "I" to the arrangement agreement (the "**Arrangement Agreement**") attached as Exhibit "B " to the Affidavit of David W. Adamson , which Arrangement is proposed to be made among the Petitioners, Africo Resources Ltd. ("**Africo**") and their respective shareholders.

**RECORD DATE**

2. The record date for determination of the shareholders of Rubicon, entitled to receive notice of and attend and vote at the Rubicon Special Meeting is 5:00 p.m. on the 4th day of July, 2006 (the "**Rubicon Record Date**").

**NOTICE OF RUBICON SPECIAL MEETING**

3. Good and sufficient notice of the Rubicon Special Meeting, for all purposes, will be given by Rubicon by mailing, by prepaid first class mail, not less than 21 days before the day appointed for the Rubicon Special Meeting:

(a) a Notice calling the Rubicon Special Meeting;

(b) an instrument of proxy; and,

(c) the Management Information Circular, appending, *inter alia*, the Notice of Hearing of Petition herein (the "**Notice of Hearing**") and this Interim Order (the "**Management Information Circular**"),

(collectively, the "**Rubicon Mailed Materials**"),

in substantially the form attached as Exhibits "C", "D" and "E" respectively to the Affidavit of David W. Adamson, with such amendments thereto as counsel for the Petitioners may advise are necessary or desirable, provided such amendments are not inconsistent with the terms of this Interim Order.

4. The Rubicon Mailed Materials will be mailed by prepaid first class mail addressed to the following persons:

(a) the shareholders of Rubicon at their registered addresses, as they appear on the Central Securities Register of Rubicon on the Rubicon Record Date; and

(b) the directors and auditors of Rubicon.

5. Delivery of the Rubicon Mailed Materials as ordered herein shall constitute compliance with the requirements of section 290(1)(a) of the *Business Corporations Act*.

6. The accidental omission to give notice of the Rubicon Special Meeting to, or the non-receipt of such notice by one or more of the persons entitled thereof, will not invalidate any resolution passed or proceedings taken at the Rubicon Special Meeting.

**PROCEEDINGS OF THE RUBICON SPECIAL MEETING**

7. The Chair of the Rubicon Special Meeting will be an officer or director of Rubicon, who will be appointed by the directors of Rubicon for that purpose.

8. The Chair of the Rubicon Special Meeting is at liberty to call on the assistance of legal counsel to Rubicon at any time and from time to time, as the Chair of the Rubicon Special Meeting may deem necessary or appropriate, during the Rubicon Special Meeting, and such legal counsel is entitled to attend the Rubicon Special Meeting for this purpose.

9. The Rubicon Special Meeting shall otherwise be conducted in accordance with the provisions of the *Business Corporations Act* and the Articles of Rubicon, subject to the terms of this Interim Order.

## QUORUM AND VOTING

10. The quorum for the transaction of business by shareholders of Rubicon at the Rubicon Special Meeting will be the quorum of shareholders required by the Articles of Rubicon.

11. The vote of the shareholders of Rubicon required to adopt the resolution in respect of the Arrangement (the "**Arrangement Resolution**") at the Rubicon Special Meeting will be the affirmative vote of not less than two-thirds of the votes cast by shareholders of Rubicon who vote in person or by proxy on the Arrangement Resolution.

## ADJOURNMENT OF RUBICON SPECIAL MEETING

12. The Rubicon Special Meeting may be adjourned for any reason upon the approval of the Chair of the Rubicon Special Meeting, and if the Rubicon Special Meeting is adjourned, it will be reconvened at a place and time to be designated by the Chair of the Rubicon Special Meeting to a date which is not more than 30 days thereafter.

## RUBICON DISSENT RIGHTS

13. Each registered shareholder of Rubicon is granted the right of dissent in respect of the Arrangement set out in Article 5 of the Arrangement Agreement appended hereto as Schedule "I".

## MEETING OF THE SHAREHOLDERS OF AFRICO

14. The Respondent Africo is directed to convene a special meeting (the "**Africo Special Meeting**") of its shareholders to be held on Friday, the 11th day of August, 2006 at 1:30 p.m., or such other date as Africo may appoint, at Suite 1810, 1111 West Georgia Street, Vancouver, British Columbia, to be held for the purpose of considering and, if deemed advisable, approving with or without modification the Arrangement.

## RECORD DATE

15. The record date for determination of shareholders of Africo entitled to receive notice of and attend and vote at the Africo Special Meeting is 5:00 p.m. on the 4th day of July, 2006 (the "**Africo Record Date**").

## NOTICE OF AFRICO SPECIAL MEETING

16. Good and sufficient notice of the Africo Special Meeting for all purposes will be given by Africo by mailing by pre-paid first class mail, not less than 21 days before the day appointed for the Africo Special Meeting:

(a) a notice calling the Africo Special Meeting which shall comply with the requirements of the *Business Corporation Act*; and

(b) the Management Information Circular.

(collectively, the "Africo Mailed Materials").

17. The Africo Mailed Materials will be mailed by pre-paid first class mail addressed to the following persons:

(a) the shareholders of Africo at their registered addresses, as they appear on the Central Securities Register of Africo on the Africo Record Date; and,

(b) the directors and auditors of Africo.

18. Delivery of the Africo Mailed Materials as ordered herein shall constitute compliance with the requirements of 290(1)(a) of the *Business Corporations Act*.

19. The accidental omission to give notice of the Africo Special Meeting to, or the non-receipt of such notice by one or more of the persons entitled thereof, will not invalidate any resolution passed or proceedings taken at the Africo Special Meeting.

## PROCEEDINGS OF THE AFRICO SPECIAL MEETING

20. The Chair of the Africo Special Meeting will be an officer or director of Africo, who will be appointed by the directors of Africo for that purpose.

21. The Chair of the Africo Special Meeting is at liberty to call on the assistance of legal counsel to Africo at any time and from time to time, as the Chair of the Africo Special Meeting may deem necessary or appropriate, during the Africo Special Meeting, and such legal counsel is entitled to attend the Africo Special Meeting for this purpose.

22. The Africo Special Meeting shall otherwise be conducted in accordance with the provisions of the *Business Corporations Act* and the Articles of Africo, subject to the terms of this Interim Order.

## QUORUM AND VOTING

23. The quorum for the transaction of business by shareholders of Africo at the Africo Special Meeting will be the quorum of shareholders required by the Articles of Africo.

24. The vote of the shareholders of Africo required to adopt the resolution in respect of the Arrangement (the "**Arrangement Resolution**") at the Africo Special Meeting will be the affirmative vote of not less than two-thirds of the votes cast by shareholders of Africo who vote in person or by proxy on the Arrangement Resolution.

## ADJOURNMENT OF AFRICO SPECIAL MEETING

25. The Africo Special Meeting may be adjourned for any reason upon the approval of the Chair of the Africo Special Meeting, and if the Africo Special Meeting is adjourned, it will be reconvened at a place and time to be designated by the Chair of the Africo Special Meeting to a date which is not more than 30 days thereafter.

**AFRICO DISSENT RIGHTS**

26. Each registered shareholder of Africo is granted the right of dissent in respect of the Arrangement set out in Article 6 of the Arrangement Agreement appended hereto as Schedule "II".

**SERVICE OF NOTICE OF HEARING**

27. Delivery of the Notice of Hearing as herein set out will be good and sufficient service of the Notice of Hearing upon all those shareholders of Rubicon and Africo who may wish to appear in these proceedings and no other form of service need be made. Service of the Rubicon Mailed Materials on the shareholders of Rubicon shall be deemed to be effected on the second day following the day on which the Rubicon Mailed Materials are mailed to the shareholders of Rubicon. Service of the Africo Mailed Materials on the shareholders of Africo shall be deemed to be effected on the second day following the day on which the Africo Mailed Materials are mailed to the shareholders of Africo.

28. Service of the Notice of Hearing herein upon the option holders and warrant holders of Rubicon and the auction holders of Africo shall be made by the Petitioner Rubicon posting the Management Information Circular on the System for Electronic Document Analysis and Retrieval ("SEDAR") website maintained by the Canadian Securities Administrators. Service of the Notice of Hearing on the option holders and warrant holders of Rubicon and the option holders of Africo shall be deemed to be effected on the second day following the day on which the management information circular is posted on the SEDAR website.

29. The Petitioners are not required to serve the Petition, any affidavits filed in support of the Petition, any motions filed by the Petitioners, including affidavits filed in support of such motions, or any orders made on application by the Petitioners, including this Interim Order, on any shareholder, option holder or warrant holder of the Petitioners or Africo except on written request.

30. The Petitioners and Africo are at liberty to serve the Notice of Hearing on persons outside the jurisdiction of this Honourable Court in the manner specified in this Interim Order.

## FINAL APPLICATION

31. Upon the approval, by special resolution, of the shareholders of Rubicon of the Arrangement, the Petitioners may apply (the "Application") for the Final Order and declaration of fairness sought in the Petition herein on Tuesday, August 15, 2006 at 9:45 a.m. or so soon thereafter as the Application may be heard or at such other date and time as this Honourable Court may direct.

32. In the event that the hearing of the Application is adjourned, only those persons who filed and delivered an Appearance in accordance with this Interim Order need be served and provided with notice of the adjourned hearing date.

33. Any shareholder of a Petitioner or the Respondent Africo and any holder of options, warrants or other securities of a Petitioner or the Respondent Africo may appear and make representations at the hearing of the Petition herein (the "**Hearing**"), provided that such shareholder or other security holder shall file an Appearance, in the form prescribed by the Rules of Court of the Supreme Court of British Columbia, with this Honourable Court and deliver a copy of the filed Appearance, together with a copy of all material on which such applicant intends to rely at the Hearing, including an outline of such applicant's proposed submissions, to the solicitors for the Petitioners at their address for delivery set out in the Petition, on or before 4:00 p.m. on Friday, the 11th day of August, 2006, subject to the direction of this Honourable Court.

34. If the Hearing is adjourned, only those persons who have filed and delivered an Appearance, in accordance with the immediately foregoing paragraph, need be served with notice of the adjourned date.

35. The Petitioners, the Respondent Africo or any other person or entity affected, are entitled, at any time, to seek leave to vary this Interim Order.

36. Rules 44 and 51A will not apply for any further applications in respect of this proceeding including the Application and any application to vary this Interim Order.

BY THE COURT

REGISTRAR

APPROVED AS TO FORM:

Counsel for the Petitioners
(J. Brent MacLean)

ENTERED
JUL 0 7 2006
VANCOUVER REGISTRY
VOL S1392 FOL 80

fractional shares warrants or options, including shares issuable or transferable upon the exercise of any Rubicon Warrants or Options after the Effective Date, will be issued, and no cash will be paid in lieu thereof, by Rubicon, Paragon or CopperCo. Any fractions resulting (including, but not limited to, fractions resulting after the application of the Rubicon-CopperCo Exchange Ratio) will be rounded down to the nearest whole number. No subscription for a fraction of a Paragon or CopperCo Common Share will be accepted with respect to the exercise of Rubicon Warrants and Rubicon Options as set out in paragraph 3.2 and 3.3, respectively above.

### 4.6 Interim Period

From the Share Distribution Record Date to the Effective Date, share certificates representing Rubicon Common Shares issued and outstanding on the Share Distribution Record Date and not subject to Article 5 hereof, shall also be deemed for all purposes to represent New Rubicon Shares, Paragon Common Shares and CopperCo Common Shares issued in connection with the Arrangement.

## ARTICLE 5 - RIGHTS OF DISSENT AND APPRAISAL FOR RUBICON SHAREHOLDERS

### 5.1 Rubicon Dissent Right

Notwithstanding section 3.1 hereof, Rubicon Shareholders may exercise rights of dissent (the "Rubicon Dissent Right") in connection with the Arrangement pursuant to the Interim Order and this Article 5.

### 5.2 Rubicon Notice of Dissent

A Shareholder who wishes to exercise a Rubicon Dissent Right must give written notice of dissent ("Notice of Dissent") to Rubicon by depositing such Notice of Dissent with Rubicon, or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 West Pender Street, Vancouver, British Columbia, V6C 2V6, marked to the attention of the President, not later than 2:00 p.m. (local time) on August 3, 2006. A Rubicon Shareholder who has given a Notice of Dissent in accordance with this section 5.2 is herein referred to as a "Rubicon Dissenting Shareholder". A Rubicon Shareholder who wishes to dissent must prepare a separate notice of dissent for (i) the Rubicon Shareholder, if the Rubicon Shareholder is dissenting on its own behalf and (ii) each person who beneficially owns shares in the Rubicon Shareholder's name and on whose behalf the Rubicon Shareholder is dissenting. To be valid, a Notice of Dissent must:

(a) identify in each Notice of Dissent the person on whose behalf dissent is being exercised;

(b) set out the number of Rubicon Common Shares in respect of which the Rubicon Shareholder is exercising the Rubicon Dissent Right (the "Notice Shares"), which number cannot be less than all of the Rubicon Common Shares held by the beneficial holder on whose behalf the Rubicon Dissent Right is being exercised;

(c) if the Notice Shares constitute all of the shares of which the Rubicon Dissenting Shareholder is both the registered owner and beneficial owner and the Rubicon Dissenting Shareholder owns no other shares of Rubicon as beneficial owner, a statement to that effect;

(d) if the Notice Shares constitute all of the shares of which the Rubicon Dissenting Shareholder is both the registered and beneficial owner but the Rubicon Dissenting Shareholder owns other shares of Rubicon as beneficial owner, a statement to that effect, and

(i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) a statement that Notices of Dissent are being or have been sent in respect of all those other shares; and

(e) if dissent is being exercised by the Rubicon Dissenting Shareholder on behalf of a beneficial owner who is not the Rubicon Dissenting Shareholder, a statement to that effect, and

(i) the name and address of the beneficial owner, and

(ii) a statement that the Rubicon Dissenting Shareholder is dissenting in relation to all of the shares beneficially owned by the beneficial owner that are registered in the Rubicon Dissenting Shareholder's name.

### 5.3 Right of Dissenting Shareholder

The giving of a Notice of Dissent does not deprive a Rubicon Shareholder of his or her right to vote at the Rubicon Meeting on the Special Resolution approving the Arrangement. A vote against the Special Resolution or the execution or exercise of a proxy with instructions to vote against the Special Resolution does not constitute a Notice of Dissent.

### 5.4 When Rubicon Dissent Right Not Available

A Rubicon Shareholder is not entitled to exercise a Rubicon Dissent Right with respect to any Rubicon Common Shares if a Rubicon Shareholder votes (or instructs or is deemed, by submission of any incomplete proxy, to have instructed his or her proxyholder to vote) in favour of the Special Resolution approving the Arrangement. However, a Rubicon Shareholder may vote as a proxy for a Shareholder whose proxy required an affirmative vote, without affecting his or her right to exercise the Rubicon Dissent Right in respect of the Rubicon Common Shares of which he or she is the registered holder.

## 5.5 Notice to Proceed

If Rubicon intends to act on the authority of the Special Resolution approving the Arrangement, it must send a notice (the "Notice to Proceed") to the Rubicon Dissenting Shareholder promptly after the later of:

(a) the date on which Rubicon forms the intention to proceed, and

(b) the date on which the Notice of Dissent was received.

If Rubicon has acted on the authority of that Special Resolution it must promptly send a Notice to Proceed to the Rubicon Dissenting Shareholder. The Notice to Proceed must be dated not earlier than the date on which it is sent and state that Rubicon intends to act or has acted on the authority of the Special Resolution and advise the Rubicon Dissenting Shareholder of the manner in which dissent is to be completed under section 5.7 hereof.

## 5.6 Entitlement to Payment of Fair Value

On receiving a Notice to Proceed in accordance with section 5.5 hereof, the Rubicon Dissenting Shareholder is entitled to require Rubicon to purchase all of the Rubicon Common Shares in respect of which the Notice of Dissent was given.

## 5.7 Demand for Payment of Fair Value

A Rubicon Dissenting Shareholder who receives a Notice to Proceed is bound to sell its Rubicon Common Shares to Rubicon and must send to Rubicon within one month after the date of the Notice to Proceed:

(a) a written statement that the Rubicon Dissenting Shareholder requires Rubicon to purchase all of the Notice Shares;

(b) the certificates representing the Notice Shares, and

(c) if dissent is being exercised by the Rubicon Shareholder on behalf of a beneficial owner who is not the Rubicon Dissenting Shareholder, a written statement signed by the beneficial owner setting out whether the beneficial owner is the beneficial owner of other shares of Rubicon and if so, setting out:

(i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) that dissent is being exercised in respect of all of those other shares, whereupon Rubicon is bound to purchase them in accordance with the Notice of Dissent.

### 5.8 Payment for Notice Shares

Rubicon and the Rubicon Dissenting Shareholder may agree on the amount of the payout value of the Notice Shares and in that event, Rubicon must either promptly pay that amount to the Rubicon Dissenting Shareholder or send a notice to the Rubicon Dissenting Shareholder that Rubicon is unable lawfully to pay Rubicon Dissenting Shareholders for their share as Rubicon is insolvent or if the payment would render Rubicon insolvent.

### 5.9 Application to Court to Fix Payout Value

If Rubicon and the Rubicon Dissenting Shareholder do not agree on the amount of the payout value of the Notice Shares the Rubicon Dissenting Shareholder or Rubicon may apply to the court and the court may:

(a) determine the payout value of the Notice Shares or order that the payout value of the Notice Shares be established by arbitration or by reference to the registrar or a referee of the court;

(b) join in the application each Rubicon Dissenting Shareholder who has not agreed with Rubicon on the amount of the payout value of the Notice Shares; and

(c) make consequential orders and give directions it considers appropriate.

Promptly after a determination of the payout value of the Notice Shares has been made, Rubicon must either pay that amount to the Rubicon Dissenting Shareholder or send a notice to the Rubicon Dissenting Shareholder that Rubicon is unable lawfully to pay Rubicon Dissenting Shareholders for their shares as Rubicon is insolvent or if the payment would render Rubicon insolvent. If the Rubicon Dissenting Shareholder receives a notice that Rubicon is unable to lawfully pay Rubicon Dissenting Shareholders for their shares the Rubicon Dissenting Shareholder may within 30 days after receipt of the notice, withdraw his or her Notice of Dissent. If the Notice of Dissent is not withdrawn the Rubicon Dissenting Shareholder remains a claimant against Rubicon to be paid as soon as Rubicon is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors of Rubicon but in priority to its shareholders.

### 5.10 Deemed Notice

Any notice required to be given by Rubicon or a Rubicon Dissenting Shareholder to the other in connection with the exercise of the Dissent Right, will be deemed to have been given and received, if delivered, on the day of delivery, if mailed, on the earlier of the date of receipt or the second business day after the day of mailing, or, if sent by telecopier or other similar form of transmission, the first business day after the date of transmittal.

### 5.11 Consequences of Exercising Rubicon Dissent Rights

A Rubicon Shareholder who:

(a) properly exercises the Rubicon Dissent Right by complying with all of the procedures (the "Dissent Procedures") required to be complied with by a Rubicon Dissenting Shareholder, will:

(i) be bound by the provisions of this Article 5;

(ii) be deemed not to have participated in the Arrangement; and

(iii) cease to have any rights as a Shareholder other than the right to be paid the payout value of the Notice Shares by Rubicon in accordance with the Dissent Procedures and is deemed to have disposed of his shares immediately prior to the Effective Date; or

(b) seeks to exercise the Rubicon Dissent Right, but:

(i) who for any reason does not properly comply with each of the Dissent Procedures required to be complied with by a Rubicon Dissenting Shareholder, or

(ii) subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent;

will be deemed to have participated in the Arrangement on the same basis as each non-dissenting Shareholder and will receive his or her pro rata portion of the New Rubicon, Paragon and CopperCo Common Shares based upon the number of Rubicon Common Shares of which such Dissenting Shareholder is the registered holder. Rubicon may in its sole discretion waive any non-compliance by a shareholder with any of the provisions of this Article 5 in order to give effect to a shareholder's Rubicon Dissent Rights.

### 5.12 Abandonment of Dissent

A Rubicon Dissenting Shareholder may not withdraw a Notice of Dissent without the consent of Rubicon. A Rubicon Dissenting Shareholder may, with the written consent of Rubicon, at any time prior to the payment to the Rubicon Dissenting Shareholder of the full amount of money to which the Rubicon Dissenting shareholder is entitled under this Article 5, abandon such Rubicon Dissenting Shareholder's dissent to the Arrangement by giving written notice to Rubicon withdrawing the Notice of Dissent by depositing such notice with Rubicon or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 Pender Street, Vancouver, British Columbia, V6C 2V6, marked to the attention of the President, and will then be deemed to have participated in the Arrangement on the same basis as each non-dissenting Shareholder and will receive such number of New Rubicon, Paragon and CopperCo Common Shares to which he or she is entitled.

### 5.13 Reservation of New Rubicon, Paragon and CopperCo Common Shares

If a Rubicon Shareholder exercises the Rubicon Dissent Right, Rubicon shall on the Effective Date set aside and not distribute that portion of the New Rubicon, Paragon and CopperCo Common Shares which is attributable to the Rubicon Common Shares for which Dissent Rights have been exercised. If a Rubicon Shareholder exercises the Rubicon Dissent Right, but, as set out in subsection 5.11(b), does not properly comply with the Dissent Procedures or, subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent, then Rubicon shall distribute to such Shareholder his or her pro rata portion of the New Rubicon, Paragon and CopperCo Common Shares. If a Rubicon Shareholder duly complies with the Dissent Procedures as set out in subsection 5.11(a), then Rubicon shall retain the portion of the New Rubicon, Paragon and CopperCo Common Shares attributable to such Rubicon Shareholder (the "Non-Distributed New Rubicon, Paragon and CopperCo Shares"), and the Non-Distributed New Rubicon, Paragon and CopperCo Shares will be dealt with as determined by the Board of Directors of Rubicon in its discretion.

## ARTICLE 6 - RIGHTS OF DISSENT AND APPRAISAL FOR AFRICO SHAREHOLDERS

### 6.1 Africo Dissent Right

Notwithstanding section 3.1 hereof, Africo Shareholders may exercise rights of dissent (the "Africo Dissent Right") in connection with the Arrangement pursuant to the Interim Order and this Article 6.

### 6.2 Africo Notice of Dissent

A Shareholder who wishes to exercise an Africo Dissent Right must give written notice of dissent ("Notice of Dissent") to Africo by depositing such Notice of Dissent with Africo, or mailing it to Africo by registered mail, at its registered office at 2800 - 666 Burrard Street, Vancouver, British Columbia, V6C 2Z7, marked to the attention of the President, not later than 5:00 p.m. (local time), August 8, 2006. An Africo Shareholder who has given a Notice of Dissent in accordance with this section 6.2 is herein referred to as an "Africo Dissenting Shareholder". An Africo Shareholder who wishes to dissent must prepare a separate notice of dissent for (i) the Africo Shareholder, if the Shareholder is dissenting on its own behalf and (ii) each person who beneficially owns shares in the Africo Shareholder's name and on whose behalf the Shareholder is dissenting. To be valid, a Notice of Dissent must:

(a) identify in each Notice of Dissent the person on whose behalf dissent is being exercised;

(b) set out the number of Africo Common Shares in respect of which the Africo Shareholder is exercising the Africo Dissent Right (the "Notice Shares"), which number cannot be less than all of the Africo Common Shares held by the beneficial holder on whose behalf the Africo Dissent Right is being exercised;

### 5.13 Reservation of New Rubicon, Paragon and CopperCo Common Shares

If a Rubicon Shareholder exercises the Rubicon Dissent Right, Rubicon shall on the Effective Date set aside and not distribute that portion of the New Rubicon, Paragon and CopperCo Common Shares which is attributable to the Rubicon Common Shares for which Dissent Rights have been exercised. If a Rubicon Shareholder exercises the Rubicon Dissent Right, but, as set out in subsection 5.11(b), does not properly comply with the Dissent Procedures or, subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent, then Rubicon shall distribute to such Shareholder his or her pro rata portion of the New Rubicon, Paragon and CopperCo Common Shares. If a Rubicon Shareholder duly complies with the Dissent Procedures as set out in subsection 5.11(a), then Rubicon shall retain the portion of the New Rubicon, Paragon and CopperCo Common Shares attributable to such Rubicon Shareholder (the "Non-Distributed New Rubicon, Paragon and CopperCo Shares"), and the Non-Distributed New Rubicon, Paragon and CopperCo Shares will be dealt with as determined by the Board of Directors of Rubicon in its discretion.

## ARTICLE 6 - RIGHTS OF DISSENT AND APPRAISAL FOR AFRICO SHAREHOLDERS

### 6.1 Africo Dissent Right

Notwithstanding section 3.1 hereof, Africo Shareholders may exercise rights of dissent (the "Africo Dissent Right") in connection with the Arrangement pursuant to the Interim Order and this Article 6.

### 6.2 Africo Notice of Dissent

A Shareholder who wishes to exercise an Africo Dissent Right must give written notice of dissent ("Notice of Dissent") to Africo by depositing such Notice of Dissent with Africo, or mailing it to Africo by registered mail, at its registered office at 2800 - 666 Burrard Street, Vancouver, British Columbia, V6C 2Z7, marked to the attention of the President, not later than 5:00 p.m. (local time), August 8, 2006. An Africo Shareholder who has given a Notice of Dissent in accordance with this section 6.2 is herein referred to as an "Africo Dissenting Shareholder". An Africo Shareholder who wishes to dissent must prepare a separate notice of dissent for (i) the Africo Shareholder, if the Shareholder is dissenting on its own behalf and (ii) each person who beneficially owns shares in the Africo Shareholder's name and on whose behalf the Shareholder is dissenting. To be valid, a Notice of Dissent must:

(a) identify in each Notice of Dissent the person on whose behalf dissent is being exercised;

(b) set out the number of Africo Common Shares in respect of which the Africo Shareholder is exercising the Africo Dissent Right (the "Notice Shares"), which number cannot be less than all of the Africo Common Shares held by the beneficial holder on whose behalf the Africo Dissent Right is being exercised;

(c) if the Notice Shares constitute all of the shares of which the Africo Dissenting Shareholder is both the registered owner and beneficial owner and the Africo Dissenting Shareholder owns no other shares of Rubicon as beneficial owner, a statement to that effect;

(d) if the Notice Shares constitute all of the shares of which the Africo Dissenting Shareholder is both the registered and beneficial owner but the Africo Dissenting Shareholder owns other shares of Rubicon as beneficial owner, a statement to that effect, and

(i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) a statement that Notices of Dissent are being or have been sent in respect of all those other shares; and

(e) if dissent is being exercised by the Africo Dissenting Shareholder on behalf of a beneficial owner who is not the Africo Dissenting Shareholder, a statement to that effect, and

(i) the name and address of the beneficial owner, and

(ii) a statement that the Dissenting Africo Shareholder is dissenting in relation to all of the shares beneficially owned by the beneficial owner that are registered in the Dissenting Africo Shareholder's name.

### 6.3 Right of Dissenting Shareholder

The giving of a Notice of Dissent does not deprive an Africo Shareholder of his or her right to vote at the Africo Meeting on the Special Resolution approving the Arrangement. A vote against the Special Resolution or the execution or exercise of a proxy with instructions to vote against the Special Resolution does not constitute a Notice of Dissent.

### 6.4 When Africo Dissent Right Not Available

An Africo Shareholder is not entitled to exercise an Africo Dissent Right with respect to any Africo Common Shares if an Africo Shareholder votes (or instructs or is deemed, by submission of any incomplete proxy, to have instructed his or her proxyholder to vote) in favour of the Special Resolution approving the Arrangement. However, an Africo Shareholder may vote as a proxy for an Africo Shareholder whose proxy required an affirmative vote, without affecting his or her right to exercise the Africo Dissent Right in respect of the Africo Common Shares of which he or she is the registered holder.

### 6.5 Notice to Proceed

If Africo intends to act on the authority of the Special Resolution approving the Arrangement, it must send a notice (the "Notice to Proceed") to the Africo Dissenting Shareholder promptly after the later of:

(a) the date on which Africo forms the intention to proceed, and

(b) the date on which the Notice of Dissent was received.

If Africo has acted on the authority of that Special Resolution it must promptly send a Notice to Proceed to the Africo Dissenting Shareholder. The Notice to Proceed must be dated not earlier than the date on which it is sent and state that Africo intends to act or has acted on the authority of the Special Resolution and advise the Dissenting Shareholder of the manner in which dissent is to be completed under section 6.7 hereof.

### 6.6 Entitlement to Payment of Fair Value

On receiving a Notice to Proceed in accordance with section 6.5 hereof, the Africo Dissenting Shareholder is entitled to require Africo to purchase all of the Africo Common Shares in respect of which the Notice of Dissent was given.

### 6.7 Demand for Payment of Fair Value

An Africo Dissenting Shareholder who receives a Notice to Proceed is bound to sell its Africo Common Shares to Africo and must send to Africo within one month after the date of the Notice to Proceed:

(a) a written statement that the Africo Dissenting Shareholder requires Africo to purchase all of the Notice Shares;

(b) the certificates representing the Notice Shares, and

(c) if dissent is being exercised by the Africo Shareholder on behalf of a beneficial owner who is not the Africo Dissenting Shareholder, a written statement signed by the beneficial owner setting out whether the beneficial owner is the beneficial owner of other shares of Africo and if so, setting out:

(i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) that dissent is being exercised in respect of all of those other shares, whereupon Africo is bound to purchase them in accordance with the Notice of Dissent.

### 6.8 Payment for Notice Shares

Africo and the Africo Dissenting Shareholder may agree on the amount of the payout value of the Notice Shares and in that event, Africo must either promptly pay that amount to the Africo Dissenting Shareholder or send a notice to the Africo Dissenting Shareholder that Africo is unable lawfully to pay Africo Dissenting Shareholders for their share as Africo is insolvent or if the payment would render Africo insolvent.

### 6.9 Application to Court to Fix Payout Value

If Africo and the Africo Dissenting Shareholder do not agree on the amount of the payout value of the Notice Shares the Africo Dissenting Shareholder or Africo may apply to the court and the court may:

(a) determine the payout value of the Notice Shares or order that the payout value of the Notice Shares be established by arbitration or by reference to the registrar or a referee of the court;

(b) join in the application each Africo Dissenting Shareholder who has not agreed with Rubicon on the amount of the payout value of the Notice Shares; and

(c) make consequential orders and give directions it considers appropriate.

Promptly after a determination of the payout value of the Notice Shares has been made, Rubicon must either pay that amount to the Africo Dissenting Shareholder or send a notice to the Africo Dissenting Shareholder that Rubicon is unable lawfully to pay Africo Dissenting Shareholders for their shares as Rubicon is insolvent or if the payment would render Rubicon insolvent. If the Africo Dissenting Shareholder receives a notice that Rubicon is unable to lawfully pay Africo Dissenting Shareholders for their shares the Africo Dissenting Shareholder may within 30 days after receipt of the notice, withdraw his or her Notice of Dissent. If the Notice of Dissent is not withdrawn the Dissenting Shareholder remains a claimant against Rubicon to be paid as soon as Rubicon is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors of Rubicon but in priority to its shareholders.

### 6.10 Deemed Notice

Any notice required to be given by Rubicon or an Africo Dissenting Shareholder to the other in connection with the exercise of the Dissent Right, will be deemed to have been given and received, if delivered, on the day of delivery, if mailed, on the earlier of the date of receipt or the second business day after the day of mailing, or, if sent by telecopier or other similar form of transmission, the first business day after the date of transmittal.

**6.13 Reservation of CopperCo Common Shares**

If an Africo Shareholder exercises the Dissent Right, Africo shall on the Effective Date set aside and not distribute that portion of the CopperCo Common Shares which is attributable to the Africo Common Shares for which Dissent Rights have been exercised. If an Africo Shareholder exercises the Dissent Right, but, as set out in subsection 6.11(b), does not properly comply with the Dissent Procedures or, subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent, then Africo shall distribute to such Africo Shareholder his or her pro rata portion of the CopperCo Common Shares. If an Africo Shareholder duly complies with the Dissent Procedures as set out in subsection 6.11(a), then Africo shall retain the portion of the CopperCo Common Shares attributable to such Africo Shareholder (the "Non-Distributed CopperCo Shares"), and the Non-Distributed CopperCo Shares will be dealt with as determined by the Board of Directors of Africo in its discretion.

**SCHEDULE "C"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**NOTICE OF HEARING OF PETITION FOR FINAL ORDER**

VANCOUVER
JUL 7 2006 C
REGISTRY

S-064371

NO.
VANCOUVER REGISTRY

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF SECTION 291 OF THE
*BUSINESS CORPORATIONS ACT,*
S.B.C. 2002, c.57, AS AMENDED

AND

IN THE MATTER OF A PROPOSED ARRANGEMENT AMONG
RUBICON MINERALS CORPORATION, PARAGON MINERALS CORPORATION,
COPPERCO RESOURCE CORP., AND AFRICO RESOURCES LTD.
AND THEIR RESPECTIVE SHAREHOLDERS

RUBICON MINERALS CORPORATION, PARAGON MINERALS CORPORATION AND
COPPERCO RESOURCE CORP.

PETITIONERS

AFRICO RESOURCES LTD.

RESPONDENT

**NOTICE OF HEARING OF PETITION**

TO: The Respondent, Africo Resources Ltd.

TAKE NOTICE that the application of the Petitioners dated Friday, July 7, 2006 will be heard in chambers at the courthouse at 800 Smithe Street, in the Province of British Columbia, on Tuesday, August 15, 2006 at the hour of 9:45 a.m.

1. This matter is unopposed.

2. The hearing will take 30 minutes.

3. This matter is not within the jurisdiction of a Master because the application may require exercise of the inherent jurisdiction of a Justice of this Honourable Court.

July 7, 2006
Dated

Davis & Company LLP (J. Brent MacLean)
Solicitor for the Petitioners

This Notice of Hearing was prepared by J. Brent MacLean of the law firm of Davis & Company LLP whose place of business is 2800 Park Place, 666 Burrard Street, Vancouver, BC V6C 2Z7.

No. ______________
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF SECTION 291 OF THE
*BUSINESS CORPORATIONS ACT,*
S.B.C. 2002, c.57, AS AMENDED

AND

IN THE MATTER OF A PROPOSED ARRANGEMENT AMONG
RUBICON MINERALS CORPORATION, PARAGON MINERALS
CORPORATION,
COPPERCO RESOURCE CORP., AND AFRICO RESOURCES LTD.
AND THEIR RESPECTIVE SHAREHOLDERS

RUBICON MINERALS CORPORATION, PARAGON MINERALS
CORPORATION AND COPPERCO RESOURCE CORP.

PETITIONERS

AFRICO RESOURCES LTD.

RESPONDENT

---

# NOTICE OF HEARING

---

DAVIS & COMPANY LLP
Barristers & Solicitors
2800 Park Place
666 Burrard Street
Vancouver, BC V6C 2Z7

Tel. No. 604.687.9444
Fax No. 604.687.1612

File No. 50233-00001 BZM/kat

**SCHEDULE "D"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**ARRANGEMENT AGREEMENT**

# ARRANGEMENT AGREEMENT

**THIS ARRANGEMENT AGREEMENT** made as of the 6th day of July, 2006.

**AMONG:**

**RUBICON MINERALS CORPORATION**, a company incorporated under the laws of the Province of British Columbia and having a head office at 1540, 800 West Pender Street Vancouver, BC V6C 2V6

(hereinafter referred to as "**Rubicon**")

**AND:**

**PARAGON MINERALS CORPORATION**, a company incorporated under the federal laws of Canada and having its registered office at 2800 Park Place, 666 Burrard Street, Vancouver, BC V6C 2Z7

(hereinafter referred to as "**Paragon**")

**AND:**

**COPPERCO RESOURCE CORP.**, a company incorporated under the federal laws of Canada and having its registered office at 2800 Park Place, 666 Burrard Street, Vancouver, BC V6C 2Z7

(hereinafter referred to as "**CopperCo**")

**AND:**

**AFRICO RESOURCES LTD.**, a company incorporated under the laws of the Province of British Columbia and having its registered and records offices at 2800 Park Place, 666 Burrard Street Vancouver, BC V6C 2Z7

(hereinafter referred to as "**Africo**")

**WHEREAS:**

A. Rubicon, Paragon, CopperCo and Africo have agreed to proceed with a proposed transaction by way of a plan of arrangement whereby Rubicon will reorganize its share capital, certain assets of Rubicon will be transferred to Paragon and CopperCo, and a series of exchanges of securities will take place with the result that the current shareholders of Rubicon will retain their current shareholdings in Rubicon and will acquire shares in Paragon and CopperCo, and the current shareholders of Africo will acquire shares in CopperCo, all pursuant to certain specified share exchange ratios, and all as more particularly set out herein;

B. Rubicon proposes to convene a meeting of its shareholders to consider the Arrangement under Division 5 of Part 9 of the *Business Corporations Act* (British Columbia), on the terms and conditions set forth in the Plan of Arrangement attached as Appendix I hereto;

C. Africo proposes to convene a meeting of its shareholders to consider the Arrangement under Division 5 of Part 9 of the *Business Corporations Act* (British Columbia), on the terms and conditions set forth in the Plan of Arrangement attached as Appendix I hereto; and

D. Each of the parties to this Agreement has agreed to participate in and support the Arrangement.

**NOW THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the premises and the respective covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties hereto covenant and agree as follows:

## ARTICLE 1 - INTERPRETATION

### 1.1 Definitions

In this Agreement, including the recitals hereto, unless there is something in the subject matter or context inconsistent therewith, the following capitalized words and terms shall have the following meanings:

(a) "**1933 Act**" means the United States Securities Act of 1933, as amended;

(b) "**Affiliate**" in respect of any person means any other person that, directly or through one or more intermediaries, controls or is controlled by or is under common control with such person and, for the purpose of this definition, "control" means the direct or indirect possession of the power to direct or cause the direction of the management and policies of another, whether through the ownership of voting securities, by contract or otherwise. When used in relation to a business, "Affiliate" means, for periods both before and after the Effective Date, Affiliates as determined after giving effect to the Arrangement;

(c) "**Arrangement Agreement**" or "**this Agreement**" means this arrangement agreement, including all appendices, schedules and exhibits hereto, as the same may be supplemented or amended from time to time;

(d) **"Associate"** has the meaning set out in subsection 1(1) of the *Securities Act* (British Columbia);

(e) "**Final Order**" means the final order of the Court contemplated by section 4.6 hereof;

(f) "**the Hearing**" means the Court hearing at which the Final Order will be sought;

(g) "**Indemnified Person**" means each person entitled to indemnification under Article 6;

(h) "**Indemnity Payment**" means any amount required to be paid by an Indemnifier pursuant to Article 6;

(i) "**Indemnifier**" means any party who is obligated to provide indemnification under Article 6;

(j) "**Interim Order**" means the interim order of the Court made pursuant to the application contemplated by section 4.6 hereof;

(k) "**Loss**" means any loss, liability, damage, cost, expense, charge, fine, penalty or assessment of whatever nature or kind, including Taxes, the reasonable out-of-pocket costs and expenses of any action, suit, proceeding, demand, assessment, judgment, settlement or compromise relating thereto, fines and penalties and reasonable legal fees (on a solicitor and its own client basis) and expenses incurred in connection therewith, excluding loss of profits and consequential damages;

(l) "**Person**" means and includes an individual, sole proprietorship, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, trust, body corporate, a trustee, executor, administrator or other legal representative and the Crown or any agency or instrumentality thereof;

(m) "**Plan of Arrangement**" means the plan of arrangement which is attached as Appendix I hereto and any amendment or variation thereto made in accordance with section 7.1 hereof;

(n) "**Representatives**" means, collectively, the directors, officers, employees and agents of a party at any time and their respective heirs, executors, administrators and other legal representatives;

(o) "**Rubicon Property Share Requirements**" means the maximum number of Rubicon Common Shares, if any, that would be required to be issued by Rubicon to exercise its rights to acquire any of the current mineral properties of Rubicon, where there has been no agreement by the vendor prior to the Effective Date to accept, following completion of the Arrangement, alternative or additional consideration in lieu of the Rubicon Common Shares which such vendor would have been entitled to receive if such agreement were not entered into;

(p) "**Securityholder**" means a holder of securities of one of the parties to this Agreement, as the context requires;

(q) "**Special Resolution**" means a resolution passed by a majority of not less than two thirds of the votes cast by the Rubicon Shareholders and by the Africo

Shareholders, respectively, who vote in respect of such resolution at the respective Meetings;

(r) "**Subsidiary**" means, with respect to a specified body corporate, a body corporate of which more than 50% of the outstanding shares ordinarily entitled to elect a majority of directors thereof, whether or not shares of any other class or classes shall or might be entitled to vote upon the happening of any event or contingency, are at the time owned, directly or indirectly, by such specified body corporate, and includes a body corporate in like relation to a subsidiary;

(s) "**Tax Gross-Up**" means, with respect to any particular Indemnity Payment, such additional amount as is necessary to place the Indemnified Person in the same after tax position as it would have been in had such Indemnity Payment been received tax free. The Tax Gross-Up amount will be calculated by using the applicable combined federal and provincial income tax rate and/or the foreign tax rate applicable to the Indemnified Person and, except as provided in Section 6.5 "Tax Effect", without regard to any losses, credits, refunds or deductions that the Indemnified Person may have that could affect the amount of tax payable on any such Indemnity Payment;

(t) "**Tax Proposals**" means all specific proposals to amend the ITA and the regulations thereunder that have been publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date of this Agreement; and

(u) "**Tax Ruling**" means the advance income tax ruling from the Canada Revenue Agency confirming the Canadian federal income tax consequences of certain aspects of the Arrangement; and

(v) "**Taxes**" includes all applicable present and future income taxes, capital taxes, stamp taxes, charges to tax, withholdings, sales and use taxes, value added taxes and goods and services taxes and all penalties, interest and other payments on or in respect thereof.

All capitalized words used in this Agreement and not otherwise defined herein shall have the meanings set forth in the Plan of Arrangement.

### 1.2 Headings

The division of this Agreement into articles, sections and other portions and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "this Agreement", "hereof" and "hereunder" and similar expressions refer to this Agreement (including the appendices hereto) as a whole and not to any particular article, section or other portion hereof and includes any agreement, document or instrument supplementary or ancillary hereto.

### 1.3 Construction

In this Agreement, unless something in the context is inconsistent therewith:

(a) the words “include” or “including” when following any general term or statement are not to be construed as limiting the general term or statement to the specific items or matters set forth or to similar items or matters, but rather as permitting it to refer to all other items or matters that could reasonably fall within its broadest possible scope;

(b) a reference to a statute shall be deemed to include every regulation made pursuant thereto, all amendments to the statute or to any such regulation enforced from time to time, and any statute or regulation that supplements or supersedes such statute or any such regulation;

(c) a reference to time or date is to the local time or date in Vancouver, British Columbia, unless specifically indicated otherwise;

(d) reference to a particular corporation includes the corporation derived from the amalgamation of the particular corporation, or of a corporation to which such reference is extended by this paragraph (d), with one or more other corporations;

(e) a word importing the masculine gender includes the feminine or neuter and a word importing the singular includes the plural and vice versa; and

(f) a reference to “approval”, “authorization”, “consent”, “designation” or “notice” means written approval, authorization, consent, designation or notice unless specifically indicated otherwise.

### 1.4 Date for Any Action

In the event that any date on which any action is required to be taken hereunder by any of the parties hereto is not a Business Day in the place where the action is required to be taken, such action shall be required to be taken on the next succeeding day which is a Business Day at such place, unless otherwise agreed to.

### 1.5 Currency

All sums of money which are referred to in this Agreement are expressed in lawful money of Canada unless otherwise specified.

### 1.6 Accounting Principles

Whenever in this Agreement reference is made to generally accepted accounting principles, such reference shall be deemed to be to the Canadian generally accepted accounting principles from time to time approved by the Canadian Institute of Chartered Accountants, or any successor thereto, applicable as at the date on which a calculation is made or required to be made in accordance with generally accepted accounting principles.

### 1.7 Appendix

The attached Appendix I, entitled "Plan of Arrangement", shall be deemed to be incorporated into and form part of this Agreement.

### 1.8 Entire Agreement

This Agreement, together with the appendices, agreements and other documents herein or therein referred to, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, among the parties with respect to the subject matter hereof.

## ARTICLE 2 - EFFECTIVE DATE OF ARRANGEMENT

### 2.1 Arrangement

Rubicon, Paragon, CopperCo and Africo agree to effect the Arrangement pursuant to the provisions of sections 288 to 299 of the BCBCA on the terms and subject to the conditions contained in this Agreement and the Plan of Arrangement.

### 2.2 Effective Time of Arrangement

The Arrangement shall become effective at 12:01 a.m. on the Effective Date.

### 2.3 Commitment to Effect Arrangement

Subject to satisfaction of the terms and conditions of this Agreement and termination pursuant to Article 7, the parties shall each use all reasonable efforts and do all things reasonably required to cause the Arrangement to become effective on the Effective Date and, in conjunction therewith, to cause the transactions contemplated by the Plan of Arrangement to be completed on or prior to the Effective Date. Without limiting the generality of the foregoing, the Applicants (as defined in Section 4.6) shall proceed forthwith to apply for the Interim Order and, upon obtainment thereof, Rubicon shall call the Rubicon Meeting and mail the Circular to the Rubicon Shareholders and Africo shall call the Africo Meeting.

### 2.4 Filing of Final Order

Subject to the rights of termination contained in Article 7 hereof, upon the Rubicon Shareholders and the Africo Shareholders each approving the Arrangement by Special Resolution in accordance with the provisions of the Interim Order and the BCBCA, the Applicants obtaining the Final Order and the other conditions contained in Article 5 hereof being satisfied or waived, Rubicon, Paragon, CopperCo and Africo shall send a copy of the Final Order together with such other documents as may be required by the Registrar to be filed pursuant to sections 288 to 299 of the BCBCA in order to make the Arrangement effective on the Effective Date. Upon the Arrangement becoming effective, Rubicon, Paragon, CopperCo and Africo shall exchange such other documents as may be necessary or desirable in connection with the completion of the transactions contemplated by this Agreement and the Plan of Arrangement.

### 2.5 United States Section 3(a)(10) Exemption

The parties agree that the Arrangement will be carried out with the intention that all securities issued on completion of the Arrangement to Securityholders of Rubicon, Africo, CopperCo or Paragon who are residents of the United States will be issued by Rubicon, Paragon and CopperCo in reliance on the exemption from the registration requirements of the 1933 Act provided by Section 3(a)(10) of the 1933 Act (the "**Section 3(a)(10) Exemption**"). In order to ensure the availability of the Section 3(a)(10) Exemption, the parties agree that the Arrangement will be carried out on the following basis;

(a) the Arrangement will be subject to the approval of the Court;

(b) the Court will be advised as to the intention of the parties to rely on the Section 3(a)(10) Exemption prior to the Hearing;

(c) the Court will be required to satisfy itself as to the fairness of the Arrangement;

(d) the Final Order will expressly state that the Arrangement is approved by the Court as being fair to the Rubicon Securityholders and the Africo Securityholders to whom securities will be issued;

(e) Rubicon and Africo will ensure that each Securityholder entitled to receive securities on completion of the Arrangement will be given adequate notice advising them of their right to attend the Hearing and providing them with sufficient information necessary for them to exercise that right;

(f) the Rubicon Shareholders and the Africo Shareholders will be advised that the securities issued in the Plan of Arrangement have not been registered under the 1933 Act and will be issued by Rubicon, Paragon and CopperCo in reliance on the exemption from the registration requirements of the 1933 Act provided by Section 3(a)(10) of the 1933 Act and may be subject to restrictions on resale under the securities laws of the United States, including, as applicable, Rules 144 and 145 under the 1933 Act with respect to affiliates;

(g) the Interim Order approving the Meetings to approve the Arrangement will specify that each Securityholder will have the right to appear before the Court at the Hearing so long as such Securityholder enters an appearance within a reasonable time; and

(h) the Final Order shall include a statement to the following effect:

> "This Order will serve as a basis of a claim to an exemption, pursuant to section 3(a)(10) of the *United States Securities Act of 1933* from the registration requirements otherwise imposed by that Act, regarding the distribution of securities of Rubicon, Paragon and CopperCo, pursuant to the Plan of Arrangement."

## ARTICLE 3 - REPRESENTATIONS AND WARRANTIES

**3.1 Representations and Warranties of Rubicon, Paragon, CopperCo and Africo**

Each of the parties represents and warrants to each other as follows:

(a) in the case of Rubicon and Africo, it is a corporation duly incorporated or continued and validly subsisting under the laws of the Province of British Columbia and has full capacity and authority to enter into this Agreement and, subject to obtaining the requisite approvals contemplated hereby, to perform its obligations hereunder;

(b) in the case of Paragon and CopperCo, it is a corporation duly incorporated and validly subsisting under the federal laws of Canada and has full capacity and authority to enter into this Agreement and, subject to obtaining the requisite approvals contemplated hereby, to perform its obligations hereunder;

(c) it has taken all corporate actions necessary to authorize the execution and delivery of this Agreement, and this Agreement has been duly authorized by it;

(d) neither the execution and delivery of this Agreement nor the performance of any of its covenants and obligations hereunder will constitute a material default under, or be in any material contravention or breach of:

(i) any provision of its constating documents or governing documents;

(ii) any judgment, decree, order, law, statute, rule or regulation applicable to it; or

(iii) any agreement or instrument to which it is a party or by which it is bound;

(e) no dissolution, winding-up, bankruptcy, liquidation or similar proceedings have been commenced or are pending or proposed in respect of it;

(f) it has the requisite organizational power and authority and all necessary governmental approvals to own, lease and operate the properties and assets it currently owns, operates or holds under lease and to carry on its business as it is now being conducted;

(g) its current and fully diluted share capital are as described in the Circular;

(h) it does not have any liabilities or obligations other than such liabilities or obligations disclosed in the Circular, including the financial statements included therein;

(i) other than as disclosed in the Circular, there is no claim, action, proceeding or investigation pending or, to its knowledge, threatened against it, any of its Subsidiaries, or any of its properties or assets before any court, arbitrator or

governmental authority, which, if adversely determined, could result in, individually or in the aggregate, a material adverse change or prevent or materially delay the consummation of the Arrangement; and

(j) none of the information supplied by it for inclusion in the Circular contains any untrue statement of a material fact, or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

## ARTICLE 4 - COVENANTS

### 4.1 Covenants of Rubicon

Rubicon hereby covenants and agrees with Paragon, CopperCo and Africo as follows:

(a) until the Effective Date, Rubicon and each of its Subsidiaries shall carry on their business in the ordinary course and shall not enter into any transaction or incur any obligation or liability out of the ordinary course of its business, except for transactions which have already been publicly disclosed and except as contemplated in this Agreement;

(b) except for transactions which have already been publicly disclosed and except as contemplated in this Agreement, until the Effective Date, Rubicon shall not, and shall not suffer or permit any of its Subsidiaries to, merge into or with, or amalgamate, consolidate or enter into any other corporate reorganization with, any other corporation or Person or perform any act or enter into any transaction or negotiation which reasonably could be expected to, directly or indirectly, interfere or be inconsistent with the completion of the Arrangement or other transactions contemplated by this Agreement;

(c) Rubicon shall, in a timely and expeditious manner, file the Circular in all jurisdictions where the Circular is required to be filed by Rubicon and mail or cause to be mailed the Circular to the Shareholders, the directors of Rubicon and the auditors of Rubicon and any other person who is entitled to receive the Circular, all in accordance with the terms of the Interim Order and applicable law;

(d) Rubicon shall perform the obligations required to be performed by it, and shall enter into all agreements required to be entered into by it under this Agreement and the Plan of Arrangement and shall do all such other acts and things as may be necessary or desirable in order to carry out and give effect to the Arrangement and related transactions as described in the Circular and, without limiting the generality of the foregoing, Rubicon shall seek:

(i) the approval of the Rubicon Shareholders required for the implementation of the Arrangement;

(ii) the Interim Order and the Final Order as provided for in section 4.6; and

(iii) such other consents, orders, rulings, approvals and assurances as counsel may advise are necessary or desirable for the implementation of the Arrangement, including those referred to in section 5.1;

(e) Rubicon will convene the Rubicon Meeting as soon as practicable and will solicit proxies to be voted at the Rubicon Meeting in favour of the Arrangement and all other resolutions referred to in the Circular;

(f) Rubicon will use all reasonable efforts to cause each of the conditions precedent set out in sections 5.1 and 5.2 to be complied with on or before the Effective Date; and

(g) Rubicon will use all reasonable efforts to ensure that immediately prior to the Effective Date, Rubicon will not have any Rubicon Property Share Requirements.

### 4.2 Covenants of Africo

Africo hereby covenants and agrees with Rubicon, Paragon and CopperCo as follows:

(a) until the Effective Date, Africo and each of its Subsidiaries shall carry on their business in the ordinary course and shall not enter into any transaction or incur any obligation or liability out of the ordinary course of its business, (i) except for transactions which have already been publicly disclosed; (ii) except as contemplated in this Agreement; and (iii) except for:

(A) the exercise by Africo of its right to acquire the remaining shares of H & J Swanepoel Famille Trust s.p.r.l.;

(B) the issuance by Africo of promissory or convertible notes up to an aggregate principal amount of $5 million in order to carry out the Bridge Loan;

(C) such other additional equity financing that the Africo Board of Directors may approve; and

(D) such other transactions as may unanimously be agreed upon by the Africo Board of Directors (including Rubicon's representative on such Board);

(b) except for transactions which have already been publicly disclosed and except as contemplated in this Agreement, until the Effective Date, Africo shall not, and shall not suffer or permit any of its Subsidiaries to, merge into or with, or amalgamate, consolidate or enter into any other corporate reorganization with, any other corporation or Person or perform any act or enter into any transaction or negotiation which reasonably could be expected to, directly or indirectly, interfere or be inconsistent with the completion of the Arrangement or other transactions contemplated by this Agreement;

(c) Africo shall, in a timely and expeditious manner, mail, deliver or cause to be mailed or delivered the Circular and all proxy and meeting materials required by the BCBCA to the Africo Shareholders (and any other person to whom Africo may be required to deliver the Circular) all in accordance with the terms of the Interim Order and applicable law;

(d) Africo shall perform the obligations required to be performed by it, and shall enter into all agreements required to be entered into by it under this Agreement and the Plan of Arrangement and shall do all such other acts and things as may be necessary or desirable in order to carry out and give effect to the Arrangement and related transactions as described in the Circular and, without limiting the generality of the foregoing, Africo shall seek:

(i) the approval of the Africo Shareholders required for the implementation of the Arrangement; and

(ii) such other consents, orders, rulings, approvals and assurances as counsel may advise are necessary or desirable for the implementation of the Arrangement, including those referred to in section 5.1;

(e) Africo will convene the Africo Meeting as soon as practicable; and

(f) Africo will use all reasonable efforts to cause each of the conditions precedent set out in sections 5.1 and 5.2 to be complied with on or before the Effective Date.

### 4.3 Covenants of Paragon

Paragon hereby covenants and agrees with Rubicon, CopperCo and Africo as follows:

(a) except as otherwise contemplated in this Agreement, until the Effective Date, Paragon shall not merge, and shall not suffer or permit any of its Subsidiaries to, merge into or with, or amalgamate or consolidate, or enter into any other corporate reorganization with, any other corporation or Person, perform any act or enter into any transaction or negotiation which reasonably could be expected to, directly or indirectly, interfere or be inconsistent with the completion of the Arrangement or other transactions contemplated by this Agreement;

(b) Paragon shall perform the obligations required to be performed by it, and shall enter into all agreements required to be entered into by it under this Agreement and the Plan of Arrangement and shall do all such other acts and things as may be necessary or desirable in order to carry out and give effect to the Arrangement and related transactions as described in the Circular and, without limiting the generality of the foregoing, Paragon shall seek and cooperate with Rubicon, CopperCo and Africo in seeking:

(i) the Interim Order and the Final Order as provided for in section 4.6, and

(ii) such other consents, orders, rulings, approvals and assurances as counsel may advise are necessary or desirable for the implementation of the Arrangement, including those referred to in section 5.1; and

(c) Paragon will use all reasonable efforts to cause each of the conditions precedent set out in sections 5.1 and 5.2 to be complied with on or before the Effective Date.

**4.4 Covenants of CopperCo**

CopperCo hereby covenants and agrees with Rubicon, Paragon and Africo as follows:

(a) except as otherwise contemplated in this Agreement or as may be reasonably required to carry out the spirit and intent of the Agreement, until the Effective Date, CopperCo shall not merge, and shall not suffer or permit any of its Subsidiaries to, merge into or with, or amalgamate or consolidate, or enter into any other corporate reorganization with, any other corporation or Person, perform any act or enter into any transaction or negotiation which reasonably could be expected to, directly or indirectly, interfere or be inconsistent with the completion of the Arrangement or other transactions contemplated by this Agreement;

(b) CopperCo shall perform the obligations required to be performed by it, and shall enter into all agreements required to be entered into by it under this Agreement and the Plan of Arrangement and shall do all such other acts and things as may be necessary or desirable in order to carry out and give effect to the Arrangement and related transactions as described in the Circular and, without limiting the generality of the foregoing, CopperCo shall seek and cooperate with Rubicon, Paragon and Africo in seeking:

(i) the Interim Order and the Final Order as provided for in section 4.6, and

(ii) such other consents, orders, rulings, approvals and assurances as counsel may advise are necessary or desirable for the implementation of the Arrangement, including those referred to in section 5.1;

(c) CopperCo will use all reasonable efforts to cause each of the conditions precedent set out in sections 5.1 and 5.2 to be complied with on or before the Effective Date;

(d) in connection with the condition precedent set out at subsection 5.1(l) (the "Director Election Requirements") and in order to realize the related tax objectives of the Arrangement, neither CopperCo nor any successor thereof will for a period of two years from the Effective Date initiate a request for approval by its shareholders of a modification of the Articles of CopperCo to remove the Director Election Requirements, it being understood, however, that CopperCo (or any successor) will not be in breach of this covenant if (i) a shareholder proposal is made under Section 137 of the CBCA for such purpose, (ii) a meeting is requisitioned under Section 143 or Section 144 of the CBCA to consider such

matter, or (iii) there is a genuine risk that a proceeding for an oppression remedy under the CBCA in such regard would be successful. Further, in the event of a shareholder proposal or requisition referred to in (i) or (ii) above, CopperCo (or any successor) will not take any action to encourage a vote in favour of the removal of the Director Election Requirements unless such action is either: (A) required by law, or (B) determined in good faith by the CopperCo Board of Directors (or the Board of Directors of any successor) to be consistent with the discharge of such board's fiduciary duties in the circumstances; and

(e) the Board of Directors of CopperCo existing immediately upon completion of the Arrangement shall consist of the directors of Africo who are elected at Africo's 2006 Annual General Meeting, plus such other directors of Africo as may be appointed following such annual general meeting and prior to the Effective Date.

### 4.5 Mutual Tax-Related Covenants

Each party covenants and agrees with each other party as follows:

(a) in the event that the condition precedent in Section 5.1(m) is satisfied, that such party will not take any action, omit to take any action or enter into any transaction that could cause the Plan of Arrangement or any related transaction to be taxed in a manner inconsistent with that provided for in the Tax Ruling without (i) obtaining a supplementary tax ruling or an opinion of a nationally recognized accounting firm or law firm that such actions, omissions or transactions will not have such effect in respect of the Tax Ruling or the obtaining thereof and (ii) for a period of three years after the Effective Date, obtaining the consent of each of Rubicon, CopperCo, Paragon and Africo, such consent not to be unreasonably withheld or delayed;

(b) in the event that the condition precedent in Section 5.1(m) is waived, but it is agreed by the parties that as a condition of such waiver Rubicon shall obtain an opinion of a nationally recognized accounting firm or law firm, that such party will not take any action, omit to take any action or enter into any transaction that could cause the Plan of Arrangement or any related transaction to be taxed in a manner inconsistent with that provided for in the opinion without (i) obtaining a supplementary opinion of a nationally recognized accounting firm or law firm that such actions, omissions or transactions will not have such effect in respect of the opinion and (ii) for a period of three years after the Effective Date, obtaining the consent of each of Rubicon, CopperCo, Paragon and Africo, such consent not to be unreasonably withheld or delayed;

(c) to file its tax returns and section 85 elections pursuant to the ITA and to make adjustments to its capital account in accordance with the terms of the Plan of Arrangement following the Effective Date; and

(d) to cooperate in the preparation and filing, in the form and within the time limits prescribed in the ITA, of all elections under the ITA as contemplated in the Plan

of Arrangement and this Agreement (and any similar elections that may be required under applicable provincial or foreign legislation). Where an agreed amount is to be included in any such election, such amount will be within the range contemplated by the ITA (or applicable provincial or foreign legislation) and will be the amount contemplated by the Plan of Arrangement and this Agreement, such that the particular transfer will take place on an income tax-deferred basis.

### 4.6 Interim Order and Final Order

Rubicon, Paragon and CopperCo (collectively the "Applicants") covenant and agree that they will, as soon as reasonably practicable, apply to the Court pursuant to section 291 of the BCBCA for the Interim Order. Africo covenants and agrees that it shall support the Applicants at the application for the Interim Order and the Hearing as a respondent. The Interim Order shall provide for, among other things, the calling and holding of the Meetings for the purpose of, among other matters, considering and, if deemed advisable, approving the Arrangement. The Applicants covenant and agree that, if the approval of the Arrangement by the Rubicon and Africo Shareholders as set forth in the Interim Order is obtained by Rubicon and Africo, as soon as practicable thereafter the Applicants will take the necessary steps to submit the Arrangement to the Court and apply for the Final Order in such fashion as the Court may direct.

## ARTICLE 5 - CONDITIONS

### 5.1 Mutual Conditions Precedent

The respective obligations of each party hereto to complete the transactions contemplated by this Agreement, and the obligation of Rubicon and Africo to file a copy of the Final Order and other documents (if any) required to give effect to the Arrangement with the Registrar, shall be subject to the satisfaction, on or before the Effective Date, of the following conditions:

(a) the Interim Order shall have been granted in form and substance satisfactory to Rubicon and Africo, acting reasonably;

(b) the Arrangement, with or without amendment, shall have been approved at the Meetings by the Rubicon and Africo Shareholders in accordance with the Interim Order;

(c) the Final Order shall have been granted in form and substance satisfactory to Rubicon and Africo, acting reasonably;

(d) the TSX and AMEX will have conditionally accepted the Arrangement and confirmed that the New Rubicon Common Shares and the Rubicon Series 1 and Series 2 Special Shares have been conditionally listed on the TSX and AMEX, and the TSX will have confirmed that the CopperCo Common Shares have been conditionally listed on the TSX;

(e) the TSX-V will have confirmed that the Paragon Common Shares have been conditionally listed on Tier 1 or Tier 2 of the TSX-V;

(f) all other consents, orders, rulings, approvals and assurances, including regulatory and judicial approvals and orders required, necessary or desirable for the Arrangement to become effective shall have been obtained or received from the Persons, authorities or bodies having jurisdiction in the circumstances, in a form acceptable to Rubicon and Africo, acting reasonably;

(g) notices of dissent shall not have been delivered by Rubicon Shareholders holding such number of Rubicon Common Shares that, in Rubicon's opinion, completion of the Arrangement would not be in the best interests of Rubicon;

(h) notices of dissent shall not have been delivered by Africo Shareholders holding such number of Africo Shares that, in Africo's opinion, completion of the Arrangement would not be in the best interests of Africo;

(i) Paragon shall have completed the Paragon Financing, subject only to any requirement under the terms of the Financing to complete the Arrangement;

(j) CopperCo or Africo shall have completed the CopperCo/Africo Financing for gross proceeds of at least $75 million, or such lesser amount as may be determined by the Board of CopperCo or Africo, as the case may be, subject only to any requirement under the terms of the CopperCo/Africo Financing to complete the Arrangement;

(k) any Person who will hold, together with any Associates of such Person, immediately before or immediately after completion of the Arrangement, 10% or more of the outstanding New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares shall have executed a certificate or other document representing that such Person and its Associates will not sell any such shares as part of the same series of transactions comprising the Arrangement;

(l) the Articles of CopperCo shall provide that each director of CopperCo must be elected by a resolution passed by not less than two-thirds of the number of votes attaching to the shares represented in person or by valid proxy at the meeting of CopperCo shareholders at which the resolution is voted upon and carrying the right to vote on the resolution, as determined and certified by the scrutineers for that meeting or signed by all the shareholders entitled to vote on that resolution;

(m) the Tax Ruling shall have been obtained, in form and substance satisfactory to Rubicon, Africo and their counsel and the auditors of Africo and CopperCo, acting reasonably;

(n) there shall not be in force any order or decree restraining or enjoining the consummation of the transaction contemplated by this Agreement; and

(o) this Agreement shall not have been terminated under Article 7.

Except for the conditions set forth in subsections 5.1(a), (b), (c), (k) and (l) any of the foregoing conditions may be waived.

### 5.2 Conditions and Obligations of Each Party

The obligation of each of Rubicon, Paragon, CopperCo and Africo to complete the transactions contemplated by this Agreement is further subject to the condition, which may be waived by any such party without prejudice to its right to rely on any other condition in favour of such party, that each and every one of the covenants of the other party hereto to be performed on or before the Effective Date pursuant to the terms of this Agreement shall have been duly performed by such party and that, except as affected by the transactions contemplated by this Agreement, the representations and warranties of the other party hereto shall be true and correct in all material respects as at the Effective Date, with the same effect as if such representations and warranties had been made at and as of such time.

## ARTICLE 6 - INDEMNITIES

### 6.1 Indemnity by Rubicon

Rubicon will indemnify and hold harmless each other party and its Representatives against any Loss suffered or incurred by any such Indemnified Person resulting from:

(a) a breach of a representation or warranty herein or pursuant hereto by Rubicon as if made without any qualification as to the knowledge of Rubicon; and

(b) a breach of a covenant herein or pursuant hereto by Rubicon.

### 6.2 Indemnity by Paragon

Paragon will indemnify and hold harmless each other party and its Representatives against any Loss suffered or incurred by any such Indemnified Person resulting from:

(a) a breach of a representation or warranty herein or pursuant hereto by Paragon as if made without any qualification as to the knowledge of Paragon; and

(b) a breach of a covenant herein or pursuant hereto by Paragon.

### 6.3 Indemnity by CopperCo

CopperCo will indemnify and hold harmless each other party and its Representatives against any Loss suffered or incurred by any such Indemnified Person resulting from:

(a) a breach of a representation or warranty herein or pursuant hereto by CopperCo as if made without any qualification as to the knowledge of CopperCo; and

(b) a breach of a covenant herein or pursuant hereto by CopperCo.

### 6.4 Indemnity by Africo

Africo will indemnify and hold harmless each other party and its Representatives against any Loss suffered or incurred by any such Indemnified Person resulting from:

(a) a breach of a representation or warranty herein or pursuant hereto by Africo as if made without any qualification as to the knowledge of Africo; and

(b) a breach of a covenant herein or pursuant hereto by Africo.

### 6.5 Tax Effect

If any Indemnity Payment received by an Indemnified Person would constitute income for tax purposes to such Indemnified Person, the Indemnifier will pay a Tax Gross-Up to the Indemnified Person at the same time and on the same terms, as to interest and otherwise, as the Indemnity Payment. The amount of any Loss for which indemnification is provided will be adjusted to take into account any tax benefit realizable by the Indemnified Person or any of its Affiliates by reason of the Loss for which indemnification is so provided or the circumstances giving rise to such Loss. For purposes of this Section, any tax benefit will be taken into account at such time as it is received by the Indemnified Person or its Affiliate. Notwithstanding the foregoing provisions of this Section, if an Indemnity Payment would otherwise be included in the Indemnified Person's income, the Indemnified Person covenants and agrees to make all such elections and take such actions as are available, acting reasonably, to minimize or eliminate Taxes with respect to the Indemnity Payment.

## ARTICLE 7 - AMENDMENT AND TERMINATION

### 7.1 Amendment

Subject to any mandatory applicable restrictions under the BCBCA or the Final Order, this Agreement may, at any time and from time to time before or after the holding of the Meeting, but not later than the Effective Date, be amended by written agreement of the parties hereto without, subject to applicable law, further notice to or authorization on the part of the Rubicon Shareholders or the Africo Shareholders. Without limiting the generality of the foregoing, any such amendment may:

(a) change the time for performance of any of the obligations or acts of the parties;

(b) waive any inaccuracies or modify any representation contained herein or in any document to be delivered pursuant hereto;

(c) waive compliance with or modify any of the covenants herein contained or waive or modify performance of any of the obligations of the parties; or

(d) make such alterations in this Agreement as the parties may consider necessary or desirable in connection with the Interim Order or in order to ensure the tax efficacy of the Arrangement.

### 7.2 Termination by Rubicon

Notwithstanding any other provision to the contrary herein, this Agreement may, at any time before or after the holding of the Meetings but prior to the Effective Date, be unilaterally terminated by the Board of Directors of Rubicon without further notice to, or action on the part of, the Rubicon Shareholders or the Africo Shareholders for whatever reasons the Board of Directors of Rubicon may consider appropriate, and nothing expressed or implied herein or in the Plan of Arrangement shall be construed as fettering the absolute discretion of the Board of Directors of Rubicon to elect to terminate this Agreement and discontinue efforts to effect the Arrangement for whatever reasons it may consider appropriate.

### 7.3 Termination by Africo

Notwithstanding any other provision to the contrary herein, this Agreement may, at any time before or after the holding of the Meetings but prior to the Effective Date, be unilaterally terminated by the Board of Directors of Africo without further notice to, or action on the part of, the Africo Shareholders or the Rubicon Shareholders for whatever reasons the Board of Directors of Africo may consider appropriate, and nothing expressed or implied herein or in the Plan of Arrangement shall be construed as fettering the absolute discretion of the Board of Directors of Africo to elect to terminate this Agreement and discontinue efforts to effect the Arrangement for whatever reasons it may consider appropriate.

### 7.4 Termination on Non-Occurrence of Effective Date

This Agreement shall terminate without any further action by the parties if the Effective Date shall not have occurred on or before September 30, 2006, unless otherwise agreed by the parties.

### 7.5 Effect of Termination

Upon the termination of this Agreement pursuant to sections 7.2, 7.3 or 7.4 hereof, except for the obligations set out at section 11.6, no party shall have any liability or further obligation to any other party hereunder.

## ARTICLE 8 - PARAGON FINANCING

The parties hereby acknowledge and agree that Paragon proposes to carry out a non-brokered private placement financing (the "Paragon Financing") in connection with the Arrangement, and that certain securities to be issued by Paragon under the Paragon Financing will be exchanged for Paragon Common Shares under the Arrangement, all as more particularly described in the Plan of Arrangement. The parties further acknowledge and agree that the final terms and conditions of the Paragon Financing may be negotiated by Paragon, subject to acceptance by the TSX or the TSX - V as applicable.

## ARTICLE 9 - COPPERCO/AFRICO FINANCING

The parties hereby acknowledge and agree that CopperCo, or alternatively Africo, proposes to carry out a brokered private placement financing (the "CopperCo/Africo Financing") in

connection with the Arrangement, and that certain securities to be issued by CopperCo under the CopperCo/Africo Financing will be exchanged for CopperCo Common Shares under the Arrangement, all as more particularly described in the Plan of Arrangement. The parties further acknowledge and agree that the final terms and conditions of the CopperCo/Africo Financing may be negotiated by CopperCo, subject to acceptance by the TSX.

## ARTICLE 10 - MERGER

### 10.1 Merger of Conditions

The conditions set out in sections 5.1 and 5.2 shall be conclusively deemed to have been satisfied, waived or released on the Effective Date.

### 10.2 Merger of Representations, Warranties and Covenants

The provisions of sections 3.1, 4.1, 4.2, 4.3, 4.4, 4.5 and 4.6 shall be conclusively deemed to have been satisfied in all respects on the Effective Date and shall accordingly merge in and not survive the effectuation of the Arrangement.

## ARTICLE 11 - GENERAL

### 11.1 Notices

All notices which may be or are required to be given pursuant to any provision of this Agreement shall be given or made in writing and shall be deemed to be validly given if served personally or by facsimile, in each case to the attention of the senior officer at the following addresses or at such other addresses as shall be specified by the parties by like notice:

**If to Rubicon:**

Rubicon Minerals Corporation
Suite 1540, 800 West Pender Street
Vancouver, BC V6C 2V6
Attention: David W. Adamson, President
Facsimile: (604) 623-3355

**with a copy to:**

Davis & Company LLP
2800 Park Place
666 Burrard Street
Vancouver, BC V6C 2Z7
Attention: David R. Reid
Facsimile: (604) 687-1612

**If to Paragon:**

Paragon Minerals Corporation
Suite 1540, 800 West Pender Street
Vancouver, BC V6C 2V6
Attention: President
Facsimile: (604) 623-3355

**with a copy to:**

Davis & Company LLP
2800 Park Place
666 Burrard Street
Vancouver, BC V6C 2Z7
Attention: David R. Reid
Facsimile: (604) 687-1612

**If to Africo or CopperCo:**

Africo Resources Ltd./CopperCo Resource Corp. (as applicable)
c/o Getz Prince Wells
1810 - 1111 West Georgia Street
Vancouver, BC V6E 4M3
Attention: Chris Theodoropoulos, Chairman
Facsimile: (604) 685-9798

**With a copy to:**

Getz Prince Wells
1810 - 1111 West Georgia Street
Vancouver, BC V6E 4M3
Attention: Drew Wells
Facsimile: (604) 685-9798

Any notice that is delivered shall be deemed to be delivered on the date of delivery to such address if delivered on a Business Day prior to 5:00 p.m. (local time at the place of receipt) or on the next Business Day if delivered after 5:00 p.m. or on a non-Business Day. Any notice delivered by facsimile transmission shall be deemed to be delivered on the date of transmission if delivered on a Business Day prior to 5:00 p.m. (local time at the place of receipt) or the next Business Day if delivered after 5:00 p.m. or on a non-Business Day.

**11.2 Assignment**

No party may assign its rights or obligations under this Agreement or the Arrangement without the prior written consent of the other parties hereto.

**11.3 Binding Effect**

This Agreement and the Plan of Arrangement shall be binding upon and shall enure to the benefit of the parties hereto and their respective successors and permitted assigns.

**11.4 Waiver**

Any waiver or release of any of the provisions of this Agreement, to be effective, must be in writing executed by the party or parties granting the same.

**11.5 Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of British Columbia and the laws of Canada applicable therein and shall be treated in all respects as a British Columbia contract.

**11.6 Expenses**

Except as may be agreed to separately among the parties or between certain parties, all expenses incurred in connection with the transactions described and contemplated by this Agreement shall be borne and allocated as follows:

(a) except as otherwise set out below, each party shall be responsible for the fees and disbursements (including taxes) of its professional and other service providers;

(b) Africo (and, after the Effective Date, CopperCo) shall be responsible for paying, or reimbursing Rubicon for, the TSX listing application fee and listing fee for CopperCo (and in this regard, it is acknowledged that Rubicon has paid the listing application fee of $10,700 (including GST) and that Africo (or, after the Effective Date, CopperCo) will pay the listing fee); and

(c) Africo (and, after the Effective Date, CopperCo) shall reimburse Rubicon for all audit, accounting and legal fees and disbursements (including taxes) incurred by Rubicon's legal counsel and auditors in connection with:

(i) the incorporation and organization of CopperCo and all other legal services provided to CopperCo, including preparing and pursuing the TSX listing application of CopperCo, up to a maximum of $40,000; and

(ii) preparing financial statements and providing accounting and auditing services for CopperCo, up to a maximum of $10,000,

it being acknowledged that nothing in this clause (c) shall be interpreted as requiring Africo (or, after the Effective Date, CopperCo) to reimburse Rubicon for any costs incurred by Rubicon for tax advice rendered to Rubicon.

**11.7 Counterparts**

This Agreement may be executed by facsimile and in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the date first written above.

**RUBICON MINERALS CORPORATION**

Per: *"David Adamson"* (signed)
Authorized Signatory

**PARAGON MINERALS CORPORATION**

Per: *"David Adamson"* (signed)
Authorized Signatory

**COPPERCO RESOURCE CORP.**

Per: *"Chris Theodoropoulos"* (signed)
Authorized Signatory

**AFRICO RESOURCES LTD.**

Per: *"Chris Theodoropoulos"* (signed)
Authorized Signatory

**Appendix I to Arrangement Agreement made as of the 6th day of July, 2006, among Rubicon Minerals Corporation, Paragon Minerals Corporation, CopperCo Resource Corp. and Africo Resources Ltd.**

## PLAN OF ARRANGEMENT UNDER SECTIONS 288 - 299

## OF THE *BUSINESS CORPORATIONS ACT* (BRITISH COLUMBIA)

## ARTICLE 1 - INTERPRETATION

### 1.1 Definitions

In this Plan of Arrangement, unless there is something in the subject matter or context inconsistent therewith, the following capitalized words and terms shall have the following meanings:

(a) "**Africo**" means Africo Resources Ltd., a corporation incorporated under the BCBCA;

(b) "**Africo Meeting**" means the special meeting of the Africo Shareholders to be held to consider, among other matters, the Arrangement, and any postponement or adjournment thereof;

(c) "**Africo Options**" means the outstanding stock options of Africo entitling the holders to purchase Africo Shares in accordance with the terms and conditions thereof;

(d) "**Africo Shareholder**" means a holder of Africo Shares;

(e) "**Africo Shares**" means the common shares without par value in the capital of Africo as currently constituted;

(f) "**Aggregate Exchange Trading Price**" means the amount equal to the aggregate of the results obtained when the Trading Price of a New Rubicon Common Share and a Common Share of Paragon or CopperCo is multiplied by the respective Exchange Number for the company issuing the share;

(g) "**AMEX**" means the American Stock Exchange;

(h) "**Arrangement**" means the statutory arrangement involving Rubicon, the Rubicon Shareholders, Paragon, CopperCo, Africo and the Africo Shareholders proposed under the provisions of sections 288 to 299 of the BCBCA, on the terms and conditions set out in this Plan of Arrangement or any amendment or variation thereto made in accordance with the terms of the Arrangement Agreement;

(i) "**Arrangement Agreement**" means the arrangement agreement made as of the 6th day of July 2006 between Rubicon, Paragon, CopperCo and Africo to which this

Plan of Arrangement is attached as Appendix I, as the same may be supplemented or amended from time to time;

(j) "**Assignment and Assumption Agreement**" means the assignment and assumption agreement among Rubicon and Paragon which more particularly describes the Paragon Transferred Assets which are to be transferred from Rubicon to Paragon;

(k) "**BCBCA**" means the *Business Corporations Act* (British Columbia);

(l) "**Business Day**" means any day, which is not a Saturday or a Sunday, or a statutory holiday in British Columbia;

(m) "**Bridge Loan**" means the bridge loan to be made by certain current Africo Shareholders and other investors to Africo in the principal amount of up to $5 million by way of issuance of convertible promissory notes, with such notes being payable on or before December 31, 2006, and the amounts outstanding under the notes being convertible at the lender's option, and in accordance with their terms, into common shares or such other securities of Africo or CopperCo as are offered pursuant to the Qualifying Financing at a price equal to 85% of the price at which common shares or other securities are offered in a Qualifying Financing;

(n) "**CBCA**" means the *Canada Business Corporation Act*;

(o) "**Circular**" means the definitive form, together with any amendments thereto, of the management proxy circular of Rubicon to be prepared and sent to the Rubicon Shareholders in connection with the Rubicon Meeting;

(p) "**Compensation Options**" means the compensation options issued by Rubicon on August 16, 2005, with each option entitling the holder to purchase a unit consisting of one Rubicon Common Share and one-half of a warrant to purchase an additional Rubicon Common Share;

(q) "**CopperCo**" means CopperCo Resource Corp., a corporation incorporated under the CBCA in order to facilitate the Arrangement;

(r) "**CopperCo Commitment**" means the covenant of CopperCo described in section 3.2 to issue CopperCo Common Shares to the holders of Rubicon Warrants who exercise their rights thereunder after the Effective Date to receive Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares;

(s) "**CopperCo Common Shares**" means the common shares in the capital of CopperCo which CopperCo is authorized to issue as the same are constituted on the date hereof and which are to be issued under the Arrangement (i) to holders of Rubicon Series 2 Special Shares in exchange for such Rubicon Series 2 Special Shares, (ii) to holders of CopperCo/Africo Special Warrants on the deemed

exercise of the CopperCo/Africo Special Warrants, and (iii) to the Africo Shareholders other than Rubicon in exchange for the Remaining Africo Shares;

(t) "**CopperCo Net Fair Market Value**" means an amount determined by the Board of Directors of Rubicon as of the Effective Date, as being an amount equal to the fair market value of the CopperCo Transferred Assets;

(u) "**CopperCo Note**" means the demand, non-interest bearing promissory note to be issued by CopperCo to Rubicon having a principal amount and aggregate fair market value equal to the CopperCo Net Fair Market Value;

(v) "**CopperCo Options**" means the rights (whether or not vested) to purchase CopperCo Common Shares which will be issued pursuant to the Plan of Arrangement;

(w) "**CopperCo Preferred Shares**" means the special preferred shares of CopperCo which are to be issued under the Arrangement to Rubicon in exchange for the CopperCo Transferred Assets, which will have a value equal to the CopperCo Net Fair Market Value and having the terms and conditions set out in Schedule B to this Plan of Arrangement;

(x) "**CopperCo/Africo Special Warrants**" means special warrants which may be sold by CopperCo or Africo pursuant to the CopperCo/Africo Financing, with each CopperCo/Africo Special Warrant entitling the holder to receive, upon deemed exercise and for no additional consideration, one CopperCo Common Share;

(y) "**CopperCo Transferred Assets**" means the Rubicon Africo Shares, which are to be transferred by Rubicon to CopperCo pursuant to the Plan of Arrangement;

(z) "**Court**" means the Supreme Court of the Province of British Columbia;

(aa) "**Dissenting Africo Shares**" means Africo Shares held by an Africo Dissenting Shareholder, as described in Article 6;

(bb) "**Dissenting Rubicon Shares**" means Rubicon Common Shares held by a Rubicon Dissenting Shareholder, as described in Article 5;

(cc) "**Dissenting Shares**" means, collectively, Dissenting Rubicon Shares and Dissenting Africo Shares;

(dd) "**Effective Date**" means the date on which the Arrangement becomes effective in accordance with the provisions of the Arrangement Agreement and the provisions of the BCBCA;

(ee) "**Effective Time**" means 12:01 am, Vancouver time, on the Effective Date;

(ff) "**Exchange Number**" means the number or fraction, as the case may be, of a New Rubicon, Paragon or CopperCo Common Share to be received by a Rubicon Shareholder in exchange for every Rubicon Common Share pursuant to the General Exchange Ratio;

(gg) "**Exercise Price**" means the varying exercise prices of the outstanding Rubicon Options;

(hh) "**Final Order**" means the final order of the Court approving the Arrangement pursuant to the BCBCA;

(ii) "**General Exchange Ratio**" means, for each Rubicon Common Share,

- one whole New Rubicon Common Share,
- one-sixth of a Paragon Common Share; and
- a fraction of a CopperCo Common Share equal to the Rubicon-CopperCo Exchange Ratio;

(jj) "**holder**" means, when not qualified by the adjective "registered", the person entitled to a share hereunder whether or not registered or entitled to be registered in respect thereof in the central securities register of Rubicon, Paragon, CopperCo or Africo, as the case may be;

(kk) "**ITA**" means the *Income Tax Act* (Canada), as amended;

(ll) "**Meetings**" means, collectively, the Africo Meeting and the Rubicon Meeting;

(mm) "**Net Fair Market Value**" means an amount determined by the Board of Directors of Rubicon as of the Effective Date, as being an amount equal to the fair market value of certain assets;

(nn) "**New Rubicon Common Shares**" means common shares of Rubicon which Rubicon will be authorized to issue upon the Arrangement becoming effective and which are to be issued under the Arrangement to holders of Rubicon Common Shares in exchange for such Rubicon Common Shares;

(oo) "**New Rubicon Options**" means the rights (whether or not vested) to purchase New Rubicon Common Shares which will be issued pursuant to the Plan of Arrangement;

(pp) "**Original Exercise Price**" means the original exercise price per share of a Rubicon Option;

(qq) "**Paragon**" means Paragon Minerals Corporation, a corporation incorporated under the CBCA in order to facilitate the Arrangement;

(rr) "**Paragon Commitment**" means the covenant of Paragon described in section 3.2 to issue Paragon Common Shares to the holders of Rubicon Warrants who exercise their rights thereunder after the Effective Date to receive Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares;

(ss) "**Paragon Common Shares**" means the common shares in the capital of Paragon which Paragon is authorized to issue as the same are constituted on the date hereof and which are to be issued under the Arrangement (i) to holders of Rubicon Series 1 Special Shares in exchange for such Rubicon Series 1 Special Shares, and (ii) to holders of Paragon Special Warrants and to holders of Paragon Flow-Through Special Warrants on the deemed exercise of such special warrants;

(tt) "**Paragon Contracts**" means all agreements to which Rubicon currently is a party, which pertain to the mineral properties in the Provinces of Newfoundland and Labrador and the Territory of Nunavut and which will be assigned from Rubicon to Paragon pursuant to the Plan of Arrangement, such agreements being more particularly described in the Assignment and Assumption Agreement;

(uu) "**Paragon Flow-Through Special Warrants**" means flow-through special warrants which may be sold by Paragon pursuant to the Paragon Financing, with each Paragon Flow-Through Special Warrant entitling the holder to receive, upon exercise and for no additional consideration, one flow-through Paragon Common Share;

(vv) "**Paragon Net Fair Market Value**" means an amount determined by the Board of Directors of Rubicon as of the Effective Date, as being an amount equal to the fair market value of the Paragon Transferred Assets;

(ww) "**Paragon Note**" means the demand, non-interest bearing promissory note to be issued by Paragon to Rubicon having a principal amount and aggregate fair market value equal to the Paragon Net Fair Market Value;

(xx) "**Paragon Options**" means the rights (whether or not vested) to purchase Paragon Common Shares which will be issued pursuant to the Plan of Arrangement;

(yy) "**Paragon Preferred Shares**" means the preferred shares of Paragon which are to be issued under the Arrangement to Rubicon in exchange for the Paragon Transferred Assets, which will have a value equal to the Paragon Net Fair Market Value and having the terms and conditions set out in Schedule B to this Plan of Arrangement;

(zz) "**Paragon Special Warrants**" means special warrants which may be sold by Paragon pursuant to the Paragon Financing, with each Paragon Special Warrant entitling the holder to receive, upon exercise and for no additional consideration, one Paragon Common Share and one Paragon Warrant;

(aaa) "**Paragon Transferred Assets**" means the Paragon Contracts and certain other related assets more particularly described in the Assignment and Assumption Agreement, all of which will be transferred by Rubicon to Paragon pursuant to the Plan of Arrangement;

(bbb) "**Paragon Warrants**" means common share purchase warrants of Paragon, each entitling the holder to purchase one Paragon Common Share at a price of $1.00 per share for a term of two years from the date of issuance;

(ccc) "**Plan of Arrangement**" means this plan of arrangement, as it may be amended from time to time in accordance with section 7.1 of the Arrangement Agreement;

(ddd) "**PUC**" means paid-up capital as defined in subsection 89 (1) of the ITA;

(eee) "**Qualifying Financing**" means the first issuance or issuances of common shares or other securities in Africo or CopperCo after the date of issuance of the promissory notes under the Bridge Loan, on a single day or multiple days in any 90 day period, resulting in gross proceeds of not less than $10,000,000;

(fff) "**Registrar**" means the Registrar of Companies appointed under the BCBCA;

(ggg) "**Remaining Africo Shares**" means the Africo shares held by Africo Shareholders other than Rubicon immediately prior to the Effective Date;

(hhh) "**Rubicon**" means Rubicon Minerals Corporation, a company incorporated under the BCBCA;

(iii) "**Rubicon Africo Shares**" means the Africo Shares held by Rubicon immediately prior to the Effective Date;

(jjj) "**Rubicon Commitment**" means the covenant of Rubicon described in section 3.2 to issue Rubicon Common Shares to the holders of Rubicon Warrants who exercise their rights thereunder after the Effective Date to receive Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares;

(kkk) "**Rubicon Common Shares**" means the common shares without par value in the capital of Rubicon as currently constituted;

(lll) "**Rubicon-CopperCo Exchange Ratio**" means the fraction which is obtained by dividing the number of Africo Shares held by Rubicon on the Share Distribution Record Date by the fully diluted number of Rubicon Common Shares outstanding on the Share Distribution Record Date;

(mmm) "**Rubicon CopperCo Note**" means the demand, non-interest bearing promissory note to be issued by Rubicon to CopperCo having a principal amount and fair market value equal to the aggregate fair market value of the Rubicon Series 2 Special Shares;

(nnn) "**Rubicon Meeting**" means the annual and special meeting of the Rubicon Shareholders to be held to consider, among other matters, the Arrangement, and any postponement or adjournment thereof;

(ooo) "**Rubicon Options**" means the outstanding stock options of Rubicon entitling the holders to purchase Rubicon Common Shares in accordance with the terms and conditions thereof;

(ppp) "**Rubicon Paragon Note**" means the demand, non-interest bearing promissory note to be issued by Rubicon to Paragon having a principal amount and fair market value equal to the aggregate fair market value of the Rubicon Series 1 Special Shares;

(qqq) "**Rubicon Series 1 Special Shares**" means the Series 1 special shares of Rubicon which Rubicon will be authorized to issue upon the Arrangement becoming effective and which are to be issued under the Arrangement to holders of Rubicon Common Shares in exchange for such Rubicon Common Shares, and having the terms and conditions set out in Schedule A to this Plan of Arrangement;

(rrr) "**Rubicon Series 2 Special Shares**" means the Series 2 special shares of Rubicon which Rubicon will be authorized to issue upon the Arrangement becoming effective and which are to be issued under the Arrangement to holders of Rubicon Common Shares in exchange for such Rubicon Common Shares, and having the terms and conditions set out in Schedule A to this Plan of Arrangement;

(sss) "**Rubicon Shareholder**" means a holder of Rubicon Common Shares;

(ttt) "**Rubicon Stock Option Plan**" means the existing stock option plan of Rubicon;

(uuu) "**Rubicon Warrants**" means the outstanding common share purchase warrants of Rubicon entitling the holders to purchase Rubicon Common Shares in accordance with the terms and conditions thereof, and includes the Compensation Options and the warrants which are issuable on exercise of the Compensation Options;

(vvv) "**Share Distribution Record Date**" means the close of business on a day to be fixed by the TSX for the purpose of determining the Rubicon Shareholders entitled to receive New Rubicon Common Shares, CopperCo Common Shares and Paragon Common Shares under the Arrangement;

(www) "**Trading Price**" means the weighted average price of the New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares, as the case may be, on the TSX or the TSX-V, as the case may be, for the First 5 trading days on which such shares trade on such stock exchange after the Effective Date;

(xxx) "**Transfer Agent**" means Computershare Investor Services Inc;

(yyy) "**TSX**" means the Toronto Stock Exchange; and

(zzz) "**TSX-V**" means the TSX Venture Exchange.

**1.2 Interpretation Not Affected By Headings**

The division of this Plan of Arrangement into articles, sections, and other portions, and the insertion of headings are for the convenience of reference only and shall not affect the construction or interpretation of this Plan of Arrangement. The terms "this Plan of Arrangement", "hereof", "herein", "hereunder" and similar expressions refer to this Plan of Arrangement as a whole and not to any particular article, section, subsection, paragraph or part hereof. Unless something in the subject matter or context is inconsistent therewith, all references herein to articles, sections and other portions are to articles, sections and other portions to this Plan of Arrangement.

**1.3 Number and Gender**

In this Plan of Arrangement, words importing the singular number only shall include the plural and vice versa, and words importing the masculine gender shall include the feminine and neuter genders, and words importing persons shall include individuals, partnerships, associations, trusts, unincorporated organizations and corporations.

**1.4 Statutes**

A reference to a statute shall be deemed to include every regulation made pursuant thereto, all amendments to the statute or to any such regulation enforced from time to time, and any statute or regulation that supplements or supersedes such statute or any such regulation.

**1.5 Currency**

All references to currency herein are to lawful money of Canada unless otherwise specified herein.

**1.6 Undefined Terms**

Any undefined capitalized terms in this Plan of Arrangement shall have the meanings ascribed to them in the Arrangement Agreement.

## ARTICLE 2 - ARRANGEMENT AGREEMENT

**2.1 Arrangement Agreement**

This Plan of Arrangement is made pursuant and subject to the provisions of the Arrangement Agreement.

## ARTICLE 3 - THE ARRANGEMENT

### 3.1 The Arrangement

On the Effective Date, save and except for Dissenting Shares, the following shall occur and be deemed to occur in the following chronological order, unless otherwise noted, without further act or formality and with each transaction or event being deemed to occur immediately after the occurrence of the transaction or event immediately preceding it:

(a) Rubicon's authorized share structure shall be amended by:

(i) altering the name of the unlimited number of common shares without par value to be an unlimited number of Class A Common shares without par value;

(ii) creating the following three new classes of shares:

A. an unlimited number of common shares without par value;

B. an unlimited number of series 1 special shares with a par value equal to the net book value of the Paragon Transferred Assets; and

C. an unlimited number of series 2 special shares with a par value equal to the net book value of the Rubicon Africo Shares.

The shares of Rubicon described above shall have the rights and restrictions set out in Rubicon's Articles. Rubicon's Articles shall be amended by adding, as Article 26 of the Articles, the rights and restrictions set out in Schedule A hereto;

(b) Rubicon's central securities register for the Rubicon Common Shares shall be redesignated as the central securities register for the Class A Common shares;

(c) Paragon's authorized share structure shall be amended by creating a new class of shares consisting of an unlimited number of special preferred shares and having the rights and restrictions set out in Paragon's Articles. Paragon's Articles shall be amended by adding the rights and restrictions set out in Schedule B hereto;

(d) CopperCo's authorized share structure shall be amended by creating a new class of shares consisting of an unlimited number of special preferred shares and having the rights and restrictions set out in CopperCo's Articles. CopperCo's Articles shall be amended by adding the rights and restrictions set out in Schedule B hereto;

(e) Each Rubicon Common Share (renamed as Class A Common Shares) issued and outstanding on the Effective Date (other than Dissenting Shares) will be exchanged for one New Rubicon Common Share, one Rubicon Series 1 Special Share and one Rubicon Series 2 Special Share. The PUC of the New Rubicon

Common Shares, the Rubicon Series 1 Special Shares and the Series 2 Special Shares will be determined as follows:

(i) the amount of the PUC of the Rubicon Series 1 Special Shares will be equal to their par value;

(ii) the amount of the PUC of the Rubicon Series 2 Special Shares will be equal to their par value; and

(iii) the amount of the PUC of the New Rubicon Common Shares will be equal to the PUC of the Rubicon Common Shares (renamed as Class A Common Shares) minus the aggregate of the PUC of the Rubicon Series 1 and 2 Special Shares;

Each Rubicon Shareholder shall cease to be the holder of the Rubicon Common Shares (renamed as Class A Common Shares) so exchanged and shall become the holder of the number of New Rubicon Common Shares, Rubicon Series 1 Special Shares and Series 2 Special Shares issued to such Rubicon Shareholder. The name of such Rubicon Shareholder shall be removed from the central securities register for Rubicon Common Shares in respect of the Rubicon Common Shares so exchanged and shall be added to the central securities register of New Rubicon Common Shares, Rubicon Series 1 Special Shares and Series 2 Special Shares respectively, so issued to such Rubicon Shareholder;

(f) Each outstanding whole Rubicon Option will be exchanged for one whole New Rubicon Option, one sixth of a Paragon Option and a fraction of a CopperCo Option equal to the Rubicon-CopperCo Exchange Ratio. The exercise price of each of the new options received as a result of such exchange will be determined as set out in section 3.3 below;

(g) The Rubicon Common Shares (renamed as Class A Common Shares) exchanged for New Rubicon Common Shares, the Rubicon Series 1 Special Shares and the Rubicon Series 2 Special Shares shall be cancelled and the appropriate entry shall be made in Rubicon's central securities register;

(h) Each holder of Rubicon Series 1 Special Shares will transfer, with good and marketable title free and clear of all encumbrances, such shares to Paragon;

(i) Each holder of Rubicon Series 2 Special Shares will transfer, with good and marketable title free and clear of all encumbrances, such shares to CopperCo;

(j) As consideration for the Rubicon Series 1 Special Shares transferred to it, Paragon will issue to the holders of such Rubicon Series 1 Special Shares, Paragon Common Shares on the basis of one Paragon Common Share for every six whole Rubicon Series 1 Special Shares held by a respective holder. The stated capital account maintained in respect of Paragon Common Shares shall be increased by an amount equal to the PUC of the transferred Rubicon Series 1

Special Shares. In connection with such sale and transfer, each holder of Rubicon Series 1 Special Shares so sold and transferred shall cease to be the holder of the Rubicon Series 1 Special Shares so sold and transferred and shall become the holder of the number of Paragon Common Shares issued to such holder. The name of such holder shall be removed from the central securities register of Rubicon Series 1 Special Shares in respect of the Rubicon Series 1 Special Shares so sold and transferred and shall be added to the central securities register of Paragon as the holder of the number of Paragon Common Shares so issued to such holder, and Paragon shall be and shall be deemed to be the transferee of the Rubicon Series 1 Special Shares so transferred and the name of Paragon shall be entered in the central securities register of Rubicon Series 1 Special Shares so sold and transferred to Paragon;

(k) As consideration for the Rubicon Series 2 Special Shares transferred to it, CopperCo will issue to the holders of such Rubicon Series 2 Special Shares, that number of CopperCo Common Shares obtained by multiplying the number of Rubicon Series 2 Special Shares held by a respective holder by the Rubicon-CopperCo Exchange Ratio. The stated capital account maintained in respect of CopperCo Common Shares shall be increased by an amount equal to the PUC of the transferred Rubicon Series 2 Special Shares. In connection with such sale and transfer, each holder of Rubicon Series 2 Special Shares so sold and transferred shall cease to be the holder of the Rubicon Series 2 Special Shares so sold and transferred and become the holder of the number of CopperCo Common Shares issued to such holder. The name of such holder shall be removed from the central securities register of Rubicon Series 2 Special Shares in respect of the Rubicon Series 2 Special Shares so sold and transferred and shall be added to the central securities register of CopperCo as the holder of the number of CopperCo Common Shares so issued to such holder and CopperCo shall be and shall be deemed to be the transferee of the Rubicon Series 2 Special Shares so transferred and the name of CopperCo shall be entered in the central securities register of Rubicon Series 2 Special Shares so sold and transferred to CopperCo;

(l) Rubicon will sell and transfer the Paragon Transferred Assets to Paragon in consideration for the issuance by Paragon of 1,000 Paragon Preferred Shares. Rubicon shall take all such actions and deliver all such documents as may be required to convey title to the Paragon Transferred Assets to Paragon;

(m) Rubicon will sell and transfer the CopperCo Transferred Assets to CopperCo in consideration for the issuance by CopperCo of 1,000 CopperCo Preferred Shares. Rubicon shall take all such actions and deliver all such documents as may be required to convey title to the CopperCo Transferred Assets to CopperCo;

(n) Rubicon will purchase for cancellation the Rubicon Series 1 Special Shares held by Paragon in consideration of the issuance by Rubicon of the Rubicon Paragon Note. The repurchased Rubicon Series 1 Special Shares shall be cancelled and

the appropriate entry made on the central securities register for the Series 1 Special Shares;

(o) Rubicon will purchase for cancellation the Rubicon Series 2 Special Shares held by CopperCo in consideration of the issuance by Rubicon of the Rubicon CopperCo Note. The repurchased Rubicon Series 2 Special Shares shall be cancelled and the appropriate entry made on the central securities register for the Series 2 Special Shares;

(p) The authorized share structure of Rubicon shall be amended by eliminating the unlimited number of Class A Common Shares without par value, the unlimited number of Series 1 Special Shares and the unlimited number of Series 2 Special Shares, none of which are issued. Rubicon's Articles shall be amended by deleting Article 26 of the Articles (for greater certainty, notwithstanding such deletion of Article 26, the New Rubicon Common Shares shall continue to exist immediately upon completion of the Arrangement, as evidenced by Rubicon's Notice of Articles in effect at such time);

(q) Paragon will purchase for cancellation the 1,000 Paragon Preferred Shares held by Rubicon in consideration for the issuance by Paragon to Rubicon of the Paragon Note having a principal amount and fair market value equal to the aggregate fair market value of the 1,000 Paragon Preferred Shares purchased for cancellation. The repurchased Paragon Preferred Shares shall be cancelled and the appropriate entry made on the central securities register for the Paragon Preferred Shares;

(r) The authorized share structure of Paragon shall be amended by eliminating the Paragon Preferred Shares, none of which are issued. Paragon's Articles shall be amended by deleting sections 1.1 to 1.5 of the Articles which contain the rights and restrictions attached to the Paragon Preferred Shares;

(s) CopperCo will purchase for cancellation the 1,000 CopperCo Preferred Shares held by Rubicon in consideration for the issuance by CopperCo to Rubicon of the CopperCo Note having a principal amount and fair market value equal to the aggregate fair market value of the 1,000 CopperCo Preferred Shares purchased for cancellation. The repurchased CopperCo Preferred Shares shall be cancelled and the appropriate entry made on the central securities register for the CopperCo Preferred Shares;

(t) The authorized share structure of CopperCo shall be amended by eliminating the CopperCo Preferred Shares; none of which are issued. CopperCo's Articles shall be amended by deleting sections 1.1 to 1.5 of the Articles which contain the rights and restrictions attached to the CopperCo Preferred Shares;

(u) Rubicon will pay the principal amount of the Rubicon Paragon Note by transferring to Paragon the Paragon Note which will be accepted by Paragon as full payment, satisfaction and discharge of Rubicon's obligation under the

Rubicon Paragon Note and simultaneously Paragon will pay the principal amount of the Paragon Note by transferring to Rubicon the Rubicon Paragon Note which will be accepted by Rubicon as full payment, satisfaction and discharge of Paragon's obligation under the Paragon Note. The Rubicon Paragon Note and the Paragon Note will both thereupon be cancelled;

(v) Rubicon will pay the principal amount of the Rubicon CopperCo Note by transferring to CopperCo the CopperCo Note which will be accepted by CopperCo as full payment, satisfaction and discharge of Rubicon's obligation under the Rubicon CopperCo Note and simultaneously CopperCo will pay the principal amount of the CopperCo Note by transferring to Rubicon the Rubicon CopperCo Note which will be accepted by Rubicon as full payment, satisfaction and discharge of CopperCo's obligation under the CopperCo Note. The Rubicon CopperCo Note and the CopperCo Note will both thereupon be cancelled;

(w) the Paragon Flow-Through Special Warrants issued pursuant to the Paragon Financing shall be automatically exercised, through no further action on the part of the holder and for no additional consideration, into flow-through Paragon Common Shares on the basis of one flow-though Paragon Common Share for each Paragon Flow-Through Special Warrant exercised, and the names of the holders of the Paragon Flow-Through Special Warrants shall be added to the central securities register of Paragon as the holders of the number of Paragon Common Shares issued to such holders;

(x) the Paragon Special Warrants issued pursuant to the Paragon Financing shall be automatically exercised, through no further action on the part of the holder and for no additional consideration, into Paragon Common Shares and Paragon Warrants, on the basis of one Paragon Common Share and one Paragon Warrant for each Paragon Special Warrant exercised, and the names of the holders of the Paragon Special Warrants shall be added to the central securities register of Paragon as the holders of the number of Paragon Common Shares issued to such holders;

(y) The CopperCo/Africo Special Warrants issued pursuant to the CopperCo/Africo Financing shall be automatically exercised, through no further action on the part of the holder and for no additional consideration, into CopperCo Common Shares, on the basis of one CopperCo Common Share for each CopperCo/Africo Special Warrant exercised, and the names of the holders of the CopperCo/Africo Special Warrants shall be added to the central securities register of CopperCo as the holders of the number of CopperCo Common Shares issued to such holders;

(z) Each holder of the Remaining Africo Shares will transfer, with good and marketable title free and clear of all encumbrances, such shares to CopperCo;

(aa) As consideration for the Remaining Africo Shares transferred to it, CopperCo will issue to the holders of such Remaining Africo Shares, CopperCo Common Shares on the basis of one CopperCo Common Share for every whole Remaining Africo

Shares held by a respective holder. The stated capital account maintained in respect of CopperCo Common Shares shall be increased to the maximum amount permitted under the ITA. In connection with such sale and transfer, each holder of Remaining Africo Shares so sold and transferred shall cease to be the holder of the Remaining Africo Shares so sold and transferred and become the holder of the number of CopperCo Common Shares issued to such holder. The name of such holder shall be removed from the central securities register of Africo Shares in respect of the Remaining Africo Shares so sold and transferred and shall be added to the central securities register of CopperCo as the holder of the number of CopperCo Common Shares so issued to such holder and CopperCo shall be and shall be deemed to be the transferee of the Remaining Africo Shares so transferred and the name of CopperCo shall be entered in the central securities register of Africo Shares so sold and transferred to CopperCo;

(bb) Each outstanding whole Africo Option will be exchanged for one whole CopperCo Option. The exercise price of each of the new CopperCo Options received on such exchange will be identical to the exercise price for the Africo Option which was exchanged for such CopperCo Option;

(cc) The name of Africo will be changed to Africo Resources (B.C.) Ltd.; and

(dd) The name of CopperCo will be changed to Africo Resources Ltd.

### 3.2 Treatment of Rubicon Warrants

After the Effective Date, each whole Rubicon Warrant outstanding on the Effective Date (as well as each whole Rubicon Warrant which is issuable on exercise of the Compensation Options) will entitle the holder thereof to receive, upon exercise on or after the Effective Date, from Rubicon pursuant to the Rubicon Commitment one New Rubicon Common Share, from Paragon pursuant to the Paragon Commitment one-sixth (1/6) of a Paragon Common Share and from CopperCo pursuant to the CopperCo Commitment a fraction of a CopperCo Common Share equal to the Rubicon-CopperCo Exchange Ratio at an aggregate exercise price equal to the exercise price provided for in the certificate representing such Rubicon Warrant, subject to the terms and conditions contained in such certificate. Holders of Rubicon Warrants will not be permitted to exercise Rubicon Warrants to purchase New Rubicon Common Shares, Paragon Common Shares or CopperCo Common Shares separately from each other.

Rubicon, acting as agent for Paragon and CopperCo, will distribute the net proceeds from the exercise of any Rubicon Warrants after the Effective Date such that Rubicon will receive 51.2% of the net proceeds per New Rubicon Common Share issued, Paragon will receive 5.8% of the net proceeds per Paragon Common Share issued and CopperCo will receive, on behalf of Rubicon, 43% of the net proceeds per CopperCo Common Share issued (following which CopperCo will remit any such amount received to Rubicon). For the purposes of this section 3.2, Rubicon will not acquire any beneficial ownership in the Paragon Common Shares or the CopperCo Common Shares issued upon the exercise of the Rubicon Warrants.

From the Effective Time, certificates representing Rubicon Warrants which were outstanding on the Effective Date will represent rights to purchase the same number of New Rubicon Common Shares as represented by the certificate, a number of Paragon Common Shares which is one - sixth of the number represented by the certificate and a number of CopperCo Common Shares which is equal to the number represented by the certificate multiplied by the Rubicon-CopperCo Exchange Ratio. Rubicon, Paragon and CopperCo will not issue new warrant certificates representing such rights.

### 3.3 Treatment of Rubicon Options

The exercise price (the "**Adjusted Exercise Price**") of each of the New Rubicon Options, the Paragon Options and the CopperCo Options issued under the exchange at step 3.1(f) above will be determined in accordance with the following formula and rounded up to the nearest whole cent:

$$\text{Adjusted Exercise Price} = \text{Trading Price} \times \frac{\text{Original Exercise Price}}{\text{Aggregate Exchange Trading Price}}$$

With respect to any such CopperCo Options, the funds representing the exercise price shall be delivered to CopperCo, which in turn shall remit such funds to Rubicon. It shall be a condition of issuance of any such Paragon Options and CopperCo Options that, to the extent that the holder is not an employee, consultant, director or senior officer of Paragon or CopperCo, as the case may be, such options shall expire on termination of the holder's position as an employee, consultant, director or senior officer of Rubicon, according to the terms of the grant of such holder's Rubicon Options which existed prior to the Effective Date.

### 3.4 Unexercised Warrants and Options

Any Rubicon Warrants referred to in section 3.2 and any New Rubicon Options, Paragon Options or CopperCo Options referred to in section 3.3 which expire according to their terms without being exercised by the holders shall be exercisable by Rubicon, at Rubicon's election, for a period of 30 days following the relevant expiry date. If Rubicon exercises any such Rubicon Warrants, New Rubicon Options, Paragon Options or CopperCo Options during such 30-day period, the consideration paid by Rubicon on exercise shall be delivered, received and remitted, as the case may be, as set out in sections 3.2 and 3.3, *mutatis mutandis*.

### 3.5 Fees , Etc.

Rubicon agrees to pay any reasonable fee (including the fees of CopperCo's Registrar and Transfer Agent) in connection with the issuance of CopperCo Common Shares pursuant to the exercise of the Rubicon Warrants or Rubicon Options, as the case may be, pursuant to sections 3.2 and 3.3 above.

### 3.6 Deemed Fully Paid and Non-Assessable Shares

All New Rubicon Common Shares, Rubicon Class A Shares, Rubicon Series 1 Special Shares, Rubicon Series 2 Special Shares, Paragon Common Shares and CopperCo Common Shares issued pursuant hereto shall be deemed to be validly issued and outstanding as fully paid and non-assessable shares for all purposes of the BCBCA or the CBCA, as the case may be.

### 3.7 Arrangement Effectiveness

On the Effective Date, the Arrangement shall become finally and conclusively binding on the Shareholders and each of Rubicon, Paragon and CopperCo.

### 3.8 Supplementary Actions

Notwithstanding that the transaction and events set out in section 3.1 shall occur and shall be deemed to occur in the order therein set out without any act or formality, each of Rubicon, Paragon and CopperCo shall be required to make, do and execute or cause and procure to be made, done and executed all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may be required to further document or evidence any of the transactions or events set out in section 3.1, including without limitation, any resolutions of directors authorizing the issue, transfer or purchase for cancellation of shares, any share transfer powers evidencing the transfer of shares and any receipt therefor, any promissory notes and receipts therefore and any necessary additions to or deletions from share registers.

### 3.9 Share Distribution Record Date

In subsections 3.1(e), (j) and (k) above, the references to Rubicon Shareholders (including references to holders of Rubicon Series 1 and Series 2 Special Shares) shall mean the Rubicon Shareholders on the Share Distribution Record Date, subject to the provisions of Article 5.

### 3.10 Deemed Time for Redemption

In addition to the chronological order in which the transactions and events set out in section 3.1 shall occur and shall be deemed to occur, the time on the Effective Date for the redemption of the Rubicon Series 1 and 2 Special Shares set out in subsections 3.1(a), (n) and (o) shall occur and shall be deemed to occur immediately after the listing of the Rubicon Series 1 and 2 Special Shares on the TSX or the TSX-V, as the case may be, on the Effective Date.

### 3.11 Section 85 Elections

The parties shall make, and do all such further acts and things to assist in making, elections under section 85 of the ITA in connection with the transfers of the Paragon Transferred Assets and the CopperCo Transferred Assets described in subsections 3.1(l) and (m) respectively. In addition, CopperCo will offer to holders of the Remaining Africo Shares the option of making elections under section 85 of the ITA in connection with the transfer of the Remaining Africo Shares to CopperCo in return for CopperCo Common Shares as described in sections 3.1(z) and (aa). On acceptance of CopperCo's offer by a particular Remaining Africo Shareholder,

CopperCo will do all such further acts and things to make, and assist in making, the election under section 85 of the ITA.

### 3.12 Assignment and Assumption of Promissory Notes under Bridge Loan

To the extent that any promissory notes issued by Africo under the Bridge Loan have not been converted prior to the Effective Date and remain outstanding after the Effective Date, such promissory notes shall be deemed to be assigned by Africo to CopperCo under the Arrangement and CopperCo shall accordingly assume any share issuance obligations under such promissory notes.

## ARTICLE 4 - CERTIFICATES AND DOCUMENTATION

### 4.1 Rubicon Common Share Certificates

From and after the Effective Time, share certificates representing Rubicon Common Shares shall for all purposes be deemed to be share certificates representing New Rubicon Common Shares, and no new share certificates shall be issued with respect to the New Rubicon Common Shares issued in connection with the Arrangement.

### 4.2 Rubicon Special Share Certificates

Recognizing that all of the Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares issued to the Shareholders will immediately be transferred to Paragon and CopperCo in exchange for Paragon and CopperCo Common Shares, Rubicon will not issue certificates representing the Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares.

### 4.3 Paragon and CopperCo Preferred Share Certificates

Recognizing that all of the Paragon and CopperCo Preferred Shares issued to Rubicon will immediately be repurchased for cancellation, each of Paragon and CopperCo will not issue certificates representing their respective Paragon and CopperCo Preferred Shares.

### 4.4 Paragon and CopperCo Common Share Certificates

As soon as practicable after the Effective Time, Paragon and CopperCo shall cause to be issued to the registered holders of Paragon and CopperCo Common Shares at the close of business on the Share Distribution Record Date, share certificates representing in the aggregate number of the Paragon and CopperCo Common Shares to which such holders are entitled as at the Share Distribution Record Date and shall cause such certificates to be delivered or mailed to such holder in accordance with the terms hereof.

### 4.5 Fractional Shares, Warrants and Options

No fractional Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares will be issued and the number of Rubicon Series 1 Special Shares and Rubicon Series 2 Special Shares to which each Shareholder will be entitled shall be rounded down to the next whole number. No fractional shares warrants or options, including shares issuable or transferable upon the exercise

of any Rubicon Warrants or Options after the Effective Date, will be issued, and no cash will be paid in lieu thereof, by Rubicon, Paragon or CopperCo. Any fractions resulting (including, but not limited to, fractions resulting after the application of the Rubicon-CopperCo Exchange Ratio) will be rounded down to the nearest whole number. No subscription for a fraction of a Paragon or CopperCo Common Share will be accepted with respect to the exercise of Rubicon Warrants and Rubicon Options as set out in paragraph 3.2 and 3.3, respectively above.

### 4.6 Interim Period

From the Share Distribution Record Date to the Effective Date, share certificates representing Rubicon Common Shares issued and outstanding on the Share Distribution Record Date and not subject to Article 5 hereof, shall also be deemed for all purposes to represent New Rubicon Shares, Paragon Common Shares and CopperCo Common Shares issued in connection with the Arrangement.

## ARTICLE 5 - RIGHTS OF DISSENT AND APPRAISAL FOR RUBICON SHAREHOLDERS

### 5.1 Rubicon Dissent Right

Notwithstanding section 3.1 hereof, Rubicon Shareholders may exercise rights of dissent (the "Rubicon Dissent Right") in connection with the Arrangement pursuant to the Interim Order and this Article 5.

### 5.2 Rubicon Notice of Dissent

A Shareholder who wishes to exercise a Rubicon Dissent Right must give written notice of dissent ("Notice of Dissent") to Rubicon by depositing such Notice of Dissent with Rubicon, or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 West Pender Street, Vancouver, British Columbia, V6C 2V6, marked to the attention of the President, not later than 2:00 p.m. (local time) on August 3, 2006. A Rubicon Shareholder who has given a Notice of Dissent in accordance with this section 5.2 is herein referred to as a "Rubicon Dissenting Shareholder". A Rubicon Shareholder who wishes to dissent must prepare a separate notice of dissent for (i) the Rubicon Shareholder, if the Rubicon Shareholder is dissenting on its own behalf and (ii) each person who beneficially owns shares in the Rubicon Shareholder's name and on whose behalf the Rubicon Shareholder is dissenting. To be valid, a Notice of Dissent must:

(a) identify in each Notice of Dissent the person on whose behalf dissent is being exercised;

(b) set out the number of Rubicon Common Shares in respect of which the Rubicon Shareholder is exercising the Rubicon Dissent Right (the "Notice Shares"), which number cannot be less than all of the Rubicon Common Shares held by the beneficial holder on whose behalf the Rubicon Dissent Right is being exercised;

(c) if the Notice Shares constitute all of the shares of which the Rubicon Dissenting Shareholder is both the registered owner and beneficial owner and the Rubicon

Dissenting Shareholder owns no other shares of Rubicon as beneficial owner, a statement to that effect;

(d) if the Notice Shares constitute all of the shares of which the Rubicon Dissenting Shareholder is both the registered and beneficial owner but the Rubicon Dissenting Shareholder owns other shares of Rubicon as beneficial owner, a statement to that effect, and

(i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) a statement that Notices of Dissent are being or have been sent in respect of all those other shares; and

(e) if dissent is being exercised by the Rubicon Dissenting Shareholder on behalf of a beneficial owner who is not the Rubicon Dissenting Shareholder, a statement to that effect, and

(i) the name and address of the beneficial owner, and

(ii) a statement that the Rubicon Dissenting Shareholder is dissenting in relation to all of the shares beneficially owned by the beneficial owner that are registered in the Rubicon Dissenting Shareholder's name.

### 5.3 Right of Dissenting Shareholder

The giving of a Notice of Dissent does not deprive a Rubicon Shareholder of his or her right to vote at the Rubicon Meeting on the Special Resolution approving the Arrangement. A vote against the Special Resolution or the execution or exercise of a proxy with instructions to vote against the Special Resolution does not constitute a Notice of Dissent.

### 5.4 When Rubicon Dissent Right Not Available

A Rubicon Shareholder is not entitled to exercise a Rubicon Dissent Right with respect to any Rubicon Common Shares if a Rubicon Shareholder votes (or instructs or is deemed, by submission of any incomplete proxy, to have instructed his or her proxyholder to vote) in favour of the Special Resolution approving the Arrangement. However, a Rubicon Shareholder may vote as a proxy for a Shareholder whose proxy required an affirmative vote, without affecting his or her right to exercise the Rubicon Dissent Right in respect of the Rubicon Common Shares of which he or she is the registered holder.

### 5.5 Notice to Proceed

If Rubicon intends to act on the authority of the Special Resolution approving the Arrangement, it must send a notice (the "Notice to Proceed") to the Rubicon Dissenting Shareholder promptly after the later of:

(a) the date on which Rubicon forms the intention to proceed, and

(b) the date on which the Notice of Dissent was received.

If Rubicon has acted on the authority of that Special Resolution it must promptly send a Notice to Proceed to the Rubicon Dissenting Shareholder. The Notice to Proceed must be dated not earlier than the date on which it is sent and state that Rubicon intends to act or has acted on the authority of the Special Resolution and advise the Rubicon Dissenting Shareholder of the manner in which dissent is to be completed under section 5.7 hereof.

**5.6 Entitlement to Payment of Fair Value**

On receiving a Notice to Proceed in accordance with section 5.5 hereof, the Rubicon Dissenting Shareholder is entitled to require Rubicon to purchase all of the Rubicon Common Shares in respect of which the Notice of Dissent was given.

**5.7 Demand for Payment of Fair Value**

A Rubicon Dissenting Shareholder who receives a Notice to Proceed is bound to sell its Rubicon Common Shares to Rubicon and must send to Rubicon within one month after the date of the Notice to Proceed:

(a) a written statement that the Rubicon Dissenting Shareholder requires Rubicon to purchase all of the Notice Shares;

(b) the certificates representing the Notice Shares, and

(c) if dissent is being exercised by the Rubicon Shareholder on behalf of a beneficial owner who is not the Rubicon Dissenting Shareholder, a written statement signed by the beneficial owner setting out whether the beneficial owner is the beneficial owner of other shares of Rubicon and if so, setting out:

(i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) that dissent is being exercised in respect of all of those other shares, whereupon Rubicon is bound to purchase them in accordance with the Notice of Dissent.

**5.8 Payment for Notice Shares**

Rubicon and the Rubicon Dissenting Shareholder may agree on the amount of the payout value of the Notice Shares and in that event, Rubicon must either promptly pay that amount to the Rubicon Dissenting Shareholder or send a notice to the Rubicon Dissenting Shareholder that Rubicon is unable lawfully to pay Rubicon Dissenting Shareholders for their share as Rubicon is insolvent or if the payment would render Rubicon insolvent.

### 5.9 Application to Court to Fix Payout Value

If Rubicon and the Rubicon Dissenting Shareholder do not agree on the amount of the payout value of the Notice Shares the Rubicon Dissenting Shareholder or Rubicon may apply to the court and the court may:

(a) determine the payout value of the Notice Shares or order that the payout value of the Notice Shares be established by arbitration or by reference to the registrar or a referee of the court;

(b) join in the application each Rubicon Dissenting Shareholder who has not agreed with Rubicon on the amount of the payout value of the Notice Shares; and

(c) make consequential orders and give directions it considers appropriate.

Promptly after a determination of the payout value of the Notice Shares has been made, Rubicon must either pay that amount to the Rubicon Dissenting Shareholder or send a notice to the Rubicon Dissenting Shareholder that Rubicon is unable lawfully to pay Rubicon Dissenting Shareholders for their shares as Rubicon is insolvent or if the payment would render Rubicon insolvent. If the Rubicon Dissenting Shareholder receives a notice that Rubicon is unable to lawfully pay Rubicon Dissenting Shareholders for their shares the Rubicon Dissenting Shareholder may within 30 days after receipt of the notice, withdraw his or her Notice of Dissent. If the Notice of Dissent is not withdrawn the Rubicon Dissenting Shareholder remains a claimant against Rubicon to be paid as soon as Rubicon is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors of Rubicon but in priority to its shareholders.

### 5.10 Deemed Notice

Any notice required to be given by Rubicon or a Rubicon Dissenting Shareholder to the other in connection with the exercise of the Dissent Right, will be deemed to have been given and received, if delivered, on the day of delivery, if mailed, on the earlier of the date of receipt or the second business day after the day of mailing, or, if sent by telecopier or other similar form of transmission, the first business day after the date of transmittal.

### 5.11 Consequences of Exercising Rubicon Dissent Rights

A Rubicon Shareholder who:

(a) properly exercises the Rubicon Dissent Right by complying with all of the procedures (the "Dissent Procedures") required to be complied with by a Rubicon Dissenting Shareholder, will:

(i) be bound by the provisions of this Article 5;

(ii) be deemed not to have participated in the Arrangement; and

(iii) cease to have any rights as a Shareholder other than the right to be paid the payout value of the Notice Shares by Rubicon in accordance with the Dissent Procedures and is deemed to have disposed of his shares immediately prior to the Effective Date; or

(b) seeks to exercise the Rubicon Dissent Right, but:

(i) who for any reason does not properly comply with each of the Dissent Procedures required to be complied with by a Rubicon Dissenting Shareholder, or

(ii) subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent;

will be deemed to have participated in the Arrangement on the same basis as each non-dissenting Shareholder and will receive his or her pro rata portion of the New Rubicon, Paragon and CopperCo Common Shares based upon the number of Rubicon Common Shares of which such Dissenting Shareholder is the registered holder. Rubicon may in its sole discretion waive any non-compliance by a shareholder with any of the provisions of this Article 5 in order to give effect to a shareholder's Rubicon Dissent Rights.

**5.12 Abandonment of Dissent**

A Rubicon Dissenting Shareholder may not withdraw a Notice of Dissent without the consent of Rubicon. A Rubicon Dissenting Shareholder may, with the written consent of Rubicon, at any time prior to the payment to the Rubicon Dissenting Shareholder of the full amount of money to which the Rubicon Dissenting shareholder is entitled under this Article 5, abandon such Rubicon Dissenting Shareholder's dissent to the Arrangement by giving written notice to Rubicon withdrawing the Notice of Dissent by depositing such notice with Rubicon or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 Pender Street, Vancouver, British Columbia, V6C 2V6, marked to the attention of the President, and will then be deemed to have participated in the Arrangement on the same basis as each non-dissenting Shareholder and will receive such number of New Rubicon, Paragon and CopperCo Common Shares to which he or she is entitled.

**5.13 Reservation of New Rubicon, Paragon and CopperCo Common Shares**

If a Rubicon Shareholder exercises the Rubicon Dissent Right, Rubicon shall on the Effective Date set aside and not distribute that portion of the New Rubicon, Paragon and CopperCo Common Shares which is attributable to the Rubicon Common Shares for which Dissent Rights have been exercised. If a Rubicon Shareholder exercises the Rubicon Dissent Right, but, as set out in subsection 5.11(b), does not properly comply with the Dissent Procedures or, subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent, then Rubicon shall distribute to such Shareholder his or her pro rata portion of the New Rubicon, Paragon and CopperCo Common Shares. If a Rubicon Shareholder duly complies with the Dissent Procedures as set out in subsection 5.11(a), then Rubicon shall retain the portion of the New

Rubicon, Paragon and CopperCo Common Shares attributable to such Rubicon Shareholder (the "Non-Distributed New Rubicon, Paragon and CopperCo Shares"), and the Non-Distributed New Rubicon, Paragon and CopperCo Shares will be dealt with as determined by the Board of Directors of Rubicon in its discretion.

## ARTICLE 6 - RIGHTS OF DISSENT AND APPRAISAL FOR AFRICO SHAREHOLDERS

### 6.1 Africo Dissent Right

Notwithstanding section 3.1 hereof, Africo Shareholders may exercise rights of dissent (the "Africo Dissent Right") in connection with the Arrangement pursuant to the Interim Order and this Article 6.

### 6.2 Africo Notice of Dissent

A Shareholder who wishes to exercise an Africo Dissent Right must give written notice of dissent ("Notice of Dissent") to Africo by depositing such Notice of Dissent with Africo, or mailing it to Africo by registered mail, at its registered office at 2800 - 666 Burrard Street, Vancouver, British Columbia, V6C 2Z7, marked to the attention of the President, not later than 5:00 p.m. (local time), August 8, 2006. An Africo Shareholder who has given a Notice of Dissent in accordance with this section 6.2 is herein referred to as an "Africo Dissenting Shareholder". An Africo Shareholder who wishes to dissent must prepare a separate notice of dissent for (i) the Africo Shareholder, if the Shareholder is dissenting on its own behalf and (ii) each person who beneficially owns shares in the Africo Shareholder's name and on whose behalf the Shareholder is dissenting. To be valid, a Notice of Dissent must:

(a) identify in each Notice of Dissent the person on whose behalf dissent is being exercised;

(b) set out the number of Africo Common Shares in respect of which the Africo Shareholder is exercising the Africo Dissent Right (the "Notice Shares"), which number cannot be less than all of the Africo Common Shares held by the beneficial holder on whose behalf the Africo Dissent Right is being exercised;

(c) if the Notice Shares constitute all of the shares of which the Africo Dissenting Shareholder is both the registered owner and beneficial owner and the Africo Dissenting Shareholder owns no other shares of Rubicon as beneficial owner, a statement to that effect;

(d) if the Notice Shares constitute all of the shares of which the Africo Dissenting Shareholder is both the registered and beneficial owner but the Africo Dissenting Shareholder owns other shares of Rubicon as beneficial owner, a statement to that effect, and

    (i) the names of the registered owners of those other shares,

(ii) the number of those other shares that are held by each of those registered owners, and

(iii) a statement that Notices of Dissent are being or have been sent in respect of all those other shares; and

(e) if dissent is being exercised by the Africo Dissenting Shareholder on behalf of a beneficial owner who is not the Africo Dissenting Shareholder, a statement to that effect, and

(i) the name and address of the beneficial owner, and

(ii) a statement that the Dissenting Africo Shareholder is dissenting in relation to all of the shares beneficially owned by the beneficial owner that are registered in the Dissenting Africo Shareholder's name.

**6.3 Right of Dissenting Shareholder**

The giving of a Notice of Dissent does not deprive an Africo Shareholder of his or her right to vote at the Africo Meeting on the Special Resolution approving the Arrangement. A vote against the Special Resolution or the execution or exercise of a proxy with instructions to vote against the Special Resolution does not constitute a Notice of Dissent.

**6.4 When Africo Dissent Right Not Available**

An Africo Shareholder is not entitled to exercise an Africo Dissent Right with respect to any Africo Common Shares if an Africo Shareholder votes (or instructs or is deemed, by submission of any incomplete proxy, to have instructed his or her proxyholder to vote) in favour of the Special Resolution approving the Arrangement. However, an Africo Shareholder may vote as a proxy for an Africo Shareholder whose proxy required an affirmative vote, without affecting his or her right to exercise the Africo Dissent Right in respect of the Africo Common Shares of which he or she is the registered holder.

**6.5 Notice to Proceed**

If Africo intends to act on the authority of the Special Resolution approving the Arrangement, it must send a notice (the "Notice to Proceed") to the Africo Dissenting Shareholder promptly after the later of:

(a) the date on which Africo forms the intention to proceed, and

(b) the date on which the Notice of Dissent was received.

If Africo has acted on the authority of that Special Resolution it must promptly send a Notice to Proceed to the Africo Dissenting Shareholder. The Notice to Proceed must be dated not earlier than the date on which it is sent and state that Africo intends to act or has acted on the authority of the Special Resolution and advise the Dissenting Shareholder of the manner in which dissent is to be completed under section 6.7 hereof.

### 6.6 Entitlement to Payment of Fair Value

On receiving a Notice to Proceed in accordance with section 6.5 hereof, the Africo Dissenting Shareholder is entitled to require Africo to purchase all of the Africo Common Shares in respect of which the Notice of Dissent was given.

### 6.7 Demand for Payment of Fair Value

An Africo Dissenting Shareholder who receives a Notice to Proceed is bound to sell its Africo Common Shares to Africo and must send to Africo within one month after the date of the Notice to Proceed:

(a) a written statement that the Africo Dissenting Shareholder requires Africo to purchase all of the Notice Shares;

(b) the certificates representing the Notice Shares, and

(c) if dissent is being exercised by the Africo Shareholder on behalf of a beneficial owner who is not the Africo Dissenting Shareholder, a written statement signed by the beneficial owner setting out whether the beneficial owner is the beneficial owner of other shares of Africo and if so, setting out:

 (i) the names of the registered owners of those other shares,

 (ii) the number of those other shares that are held by each of those registered owners, and

 (iii) that dissent is being exercised in respect of all of those other shares, whereupon Africo is bound to purchase them in accordance with the Notice of Dissent.

### 6.8 Payment for Notice Shares

Africo and the Africo Dissenting Shareholder may agree on the amount of the payout value of the Notice Shares and in that event, Africo must either promptly pay that amount to the Africo Dissenting Shareholder or send a notice to the Africo Dissenting Shareholder that Africo is unable lawfully to pay Africo Dissenting Shareholders for their share as Africo is insolvent or if the payment would render Africo insolvent.

### 6.9 Application to Court to Fix Payout Value

If Africo and the Africo Dissenting Shareholder do not agree on the amount of the payout value of the Notice Shares the Africo Dissenting Shareholder or Africo may apply to the court and the court may:

(a) determine the payout value of the Notice Shares or order that the payout value of the Notice Shares be established by arbitration or by reference to the registrar or a referee of the court;

(b) join in the application each Africo Dissenting Shareholder who has not agreed with Rubicon on the amount of the payout value of the Notice Shares; and

(c) make consequential orders and give directions it considers appropriate.

Promptly after a determination of the payout value of the Notice Shares has been made, Rubicon must either pay that amount to the Africo Dissenting Shareholder or send a notice to the Africo Dissenting Shareholder that Rubicon is unable lawfully to pay Africo Dissenting Shareholders for their shares as Rubicon is insolvent or if the payment would render Rubicon insolvent. If the Africo Dissenting Shareholder receives a notice that Rubicon is unable to lawfully pay Africo Dissenting Shareholders for their shares the Africo Dissenting Shareholder may within 30 days after receipt of the notice, withdraw his or her Notice of Dissent. If the Notice of Dissent is not withdrawn the Dissenting Shareholder remains a claimant against Rubicon to be paid as soon as Rubicon is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors of Rubicon but in priority to its shareholders.

### 6.10 Deemed Notice

Any notice required to be given by Rubicon or an Africo Dissenting Shareholder to the other in connection with the exercise of the Dissent Right, will be deemed to have been given and received, if delivered, on the day of delivery, if mailed, on the earlier of the date of receipt or the second business day after the day of mailing, or, if sent by telecopier or other similar form of transmission, the first business day after the date of transmittal.

### 6.11 Consequences of Exercising Africo Dissent Rights

An Africo Shareholder who:

(a) properly exercises the Africo Dissent Right by complying with all of the procedures (the "Dissent Procedures") required to be complied with by an Africo Dissenting Shareholder, will:

(i) be bound by the provisions of this Article 6;

(ii) be deemed not to have participated in the Arrangement; and

(iii) cease to have any rights as a Shareholder other than the right to be paid the payout value of the Notice Shares by Africo in accordance with the Dissent Procedures and is deemed to have disposed of his shares immediately prior to the Effective Date; or

(b) seeks to exercise the Africo Dissent Right, but:

(i) who for any reason does not properly comply with each of the Dissent Procedures required to be complied with by an Africo Dissenting Shareholder, or

(ii) subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent;

will be deemed to have participated in the Arrangement on the same basis as each non-dissenting Shareholder and will receive his or her pro rata portion of the CopperCo Common Shares based upon the number of Africo Common Shares of which such Dissenting Shareholder is the registered holder. Africo may in its sole discretion waive any non-compliance by a shareholder with any of the provisions of this Article 6 in order to give effect to a shareholder's Africo Dissent Rights.

**6.12 Abandonment of Dissent**

An Africo Dissenting Shareholder may not withdraw a Notice of Dissent without the consent of Africo. An Africo Dissenting Shareholder may, with the written consent of Africo, at any time prior to the payment to the Africo Dissenting Shareholder of the full amount of money to which the Dissenting shareholder is entitled under this Article 6, abandon such Africo Dissenting Shareholder's dissent to the Arrangement by giving written notice to Africo withdrawing the Notice of Dissent by depositing such notice with Africo or mailing it to Africo by registered mail, at its registered office at 2800 - 666 Burrard Street, Vancouver, British Columbia, V6C 2Z7, marked to the attention of the President, and will then be deemed to have participated in the Arrangement on the same basis as each non-dissenting shareholder and will receive such number of CopperCo Common Shares to which he or she is entitled.

**6.13 Reservation of CopperCo Common Shares**

If an Africo Shareholder exercises the Dissent Right, Africo shall on the Effective Date set aside and not distribute that portion of the CopperCo Common Shares which is attributable to the Africo Common Shares for which Dissent Rights have been exercised. If an Africo Shareholder exercises the Dissent Right, but, as set out in subsection 6.11(b), does not properly comply with the Dissent Procedures or, subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent, then Africo shall distribute to such Africo Shareholder his or her pro rata portion of the CopperCo Common Shares. If an Africo Shareholder duly complies with the Dissent Procedures as set out in subsection 6.11(a), then Africo shall retain the portion of the CopperCo Common Shares attributable to such Africo Shareholder (the "Non-Distributed CopperCo Shares"), and the Non-Distributed CopperCo Shares will be dealt with as determined by the Board of Directors of Africo in its discretion.

**SCHEDULE A
TO PLAN OF ARRANGEMENT BEING APPENDIX I
TO THE ARRANGEMENT AGREEMENT**

**MADE AS OF THE 6th DAY OF JULY, 2006,
AMONG
RUBICON MINERALS CORPORATION,
PARAGON MINERALS CORPORATION,
COPPERCO RESOURCE CORP.
AND AFRICO RESOURCES LTD.
(Paragraph 3.1 (a) Plan of Arrangement)**

## ARTICLE 26 - SPECIAL RIGHTS AND RESTRICTIONS ATTACHING TO THE NEW RUBICON COMMON SHARES, RUBICON CLASS A COMMON SHARES, SERIES 1 SPECIAL SHARES AND SERIES 2 SPECIAL SHARES

*SPECIAL RIGHTS AND RESTRICTIONS ATTACHING TO THE COMMON SHARES*

The common shares (the "Common Shares") shall have attached thereto the following special rights and restrictions:

**26.1.1 Voting**

The holders of the Common Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Company and shall have one vote for each Common Share held at all meetings of the shareholders of the Company, except meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series.

**26.1.2 Dividends**

Subject to the prior rights of the holders of any other shares ranking senior to the Common Shares with respect to priority in the payment of dividends, the holders of Common Shares shall be entitled to receive dividends and the Company shall pay dividends thereon, as and when declared by the Board of Directors of the Company out of moneys property applicable to the payment of dividends, in such amount and in such form as the Board of Directors of the Company may from time to time determine and all dividends which the Board of Directors of the Company may declare on the Common Shares shall be declared and paid in equal amounts per share on all Common Shares at the time outstanding.

**26.1.3 Liquidation, Dissolution or Winding-Up**

In the event of the dissolution, liquidation or winding-up of the Company, whether voluntary or involuntary, or any other distribution of assets of the Company among its shareholders for the

purpose of winding-up its affairs, subject to the prior rights of any other shares ranking senior to the Common Shares with respect to priority in the distribution of assets upon dissolution, liquidation, winding-up or distribution for the purpose of winding-up, the holders of the Common Shares shall be entitled to receive the remaining property and assets of the Company.

*SPECIAL RIGHTS AND RESTRICTIONS ATTACHING TO THE CLASS A COMMON SHARES*

The class A common shares (the "Class A Shares") shall have attached thereto the following special rights and restrictions:

**26.2.1 Voting**

The holders of the Class A Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Company and shall have one vote for each Class A Share held at all meetings of the shareholders of the Company, except meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series.

**26.2.2 Dividends**

Subject to the prior rights of any other shares ranking senior to the Class A Shares with respect to priority in the payment of dividends, the holders of Class A Shares shall before dividends are paid on the Common Shares be entitled to receive dividends in the aggregate amount of one hundred dollars ($100.00) and the Company shall pay dividends thereon, as and when declared by the Board of Directors of the Company out of monies property applicable to the payment of dividends, and after such dividends have been paid, the holders of the Class A Shares shall be entitled to receive dividends in such amount and in such form as the Board of Directors of the Company may from time to time determine and all dividends which the Board of Directors of the Company may declare on the Class A Shares shall be declared and paid in equal amounts per share on all Class A Shares at the time outstanding.

**26.2.3 Liquidation, Dissolution or Winding-Up**

In the event of the dissolution, liquidation or winding-up of the Company, whether voluntary or involuntary, or any other distribution of assets of the Company among its shareholders for the purpose of winding-up its affairs, subject to the prior rights of any other shares ranking senior to the Class A Shares with respect to priority in the distribution of assets upon dissolution, liquidation, winding-up or distribution for the purpose of winding-up, the holders of the Class A Shares shall be entitled to receive the remaining property and assets of the Company.

*SPECIAL RIGHTS AND RESTRICTIONS ATTACHING TO THE SERIES 1 SPECIAL SHARES*

The series 1 special shares (the "Series 1 Special Shares") with a par value equal to the net book value of certain assets transferred by the Company to Paragon Minerals Corporation shall have attached thereto the following special rights and restrictions:

**26.3.1 Voting**

The holders of Series 1 Special Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Company and shall have one vote for each Series 1 Special Share held at all meetings of the shareholders of the Company, except meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series.

**26.3.2 Dividends**

Subject to the rights, privileges, restrictions and conditions attaching to shares of any class of the Company ranking prior to the Series 1 Special Shares, the holders thereof are entitled to receive such dividends payable in money, property, or by the issue of fully paid shares of the Company, as may be declared by the Board of Directors, and to receive on an equal basis share for share with the holders of the Common Shares and the Series 2 Special Shares the remaining property of the Company upon the liquidation or winding up thereof.

The Directors of the Company may determine at any time and from time to time, with respect to all or portion of any dividend on the Series 1 Special Shares of the Company that such dividend shall be payable in money or, in the case of electing holders whose addresses on the books of the Company are in Canada, and in jurisdictions specified by the Directors outside Canada, by the issue of fully paid Series 1 Special Shares of the Company having a value, as determined by the Directors, that is substantially equivalent, as of the date or period of days determined by the Directors, to the cash amount of such dividend, provided that the Directors may (but need not) value the Series 1 Special Shares to be issued in payment of the dividend at a discount from or premium to the relevant market value thereof of up to 5%, in either case.

With respect to fractional shares that may result from any such stock dividend the Company shall issue to an agent for shareholders appointed by the Company a number of whole shares representing in the aggregate the fractional shares of all electing shareholders, unless the Directors of the Company otherwise determine, for instance by the payment of cash in lieu of fractional share interests that may result from any such stock dividend. In any event, no certificates representing fractional share interests will be issued by the Company.

**26.3.3 Redemption**

(a) The Company may, subject to the requirements of the *Business Corporations Act* (British Columbia), upon giving notice in the manner as hereinafter provided, redeem at any time the whole, or from time to time any part, of the then outstanding Series 1 Special Shares by payment in cash, promissory note or property of $♦ for each share of any amount (the "Redemption Amount") calculated as:

(i) the fair market value of the assets to be transferred by the Company to Paragon Minerals Corporation under the Plan of Arrangement divided by the number of Series 1 Special Shares issued by the Company under the Plan of Arrangement **(Note: the dollar amount to be inserted in this**

**Clause 26.3.3 will be determined and inserted in these share provisions immediately prior to making the required filing with the British Columbia Registrar of Companies to effect the Plan of Arrangement)**; plus

(ii) all declared and unpaid non-cumulative cash dividends thereon.

(b) In the case of redemption of Series 1 Special Shares under the provisions of sub-clause 26.3.3(a) hereof, the Company shall, unless waived in writing by the holders of all of the Series 1 Special Shares, at least 14 days before the date specified for redemption deliver or mail to each person who at the date of mailing is a registered holder of Series 1 Special Shares to be redeemed a notice in writing of the intention of the Company to redeem such Series 1 Special Shares. Such notice shall be delivered or mailed by letter, postage prepaid, addressed to each such shareholder at his address as it appears on the records of the Company or in the event of the address of any such shareholder not so appearing then to the last known address of such shareholder or if delivered, delivered to each such shareholder at such address; provided, however, that accidental failure to give any such notice to one or more of such shareholders shall not affect the validity of such redemption. Such notice shall set out the Redemption Amount and the date on which redemption is to take place and if part only of the shares held by the person to whom it is addressed is to be redeemed the number thereof to be so redeemed; provided, however, that if a part only of the Series 1 Special Shares for the time being outstanding is to be redeemed, the shares so to be redeemed shall be selected by lot in such manner as the directors in their discretion shall decide or if the directors so determine may be redeemed pro rata (disregarding fractions) unless otherwise agreed in writing by the holders of all of the Series 1 Special Shares. On or after the date so specified for redemption, the Company shall pay or cause to be paid to or to the order of the registered holders of the Series 1 Special Shares to be redeemed the Redemption Amount thereof on presentation and surrender at the registered office of the Company or any other place designated in such notice of the certificates representing the Series 1 Special Shares called for redemption. Such payment shall be made by cheque payable at par at any branch of the Company's bankers in Canada or by promissory note. If less than all of the Series 1 Special Shares represented by any certificate are redeemed the holder shall be entitled to receive a new certificate for that number of Series 1 Special Shares represented by the original certificate which are not redeemed. From and after the date specified for redemption in any such notice the holders of the Series 1 Special Shares called for redemption shall cease to be entitled to dividends and shall not be entitled to exercise any of the rights of shareholders in respect thereof unless payment of the Redemption Amount shall not be made upon presentation of certificates in accordance with the foregoing provisions, in which case the rights of shareholders shall remain unaffected. The Company shall have the right at any time after the mailing of notice of its intention to redeem any Series 1 Special Shares to deposit the Redemption Amount of the shares, either in cash or promissory note, so called for redemption or of such of the said shares

represented by certificates as have not at the date of such deposit been surrendered by the holders thereof in connection with such redemption to a special account in any chartered bank or in any trust company in Canada, named in such notice, to be paid without interest to or to the order of the respective holders of such Series 1 Special Shares called for redemption upon presentation and surrender to such bank or trust company of the certificates representing the same. Upon such deposit being made or upon the date specified for redemption in such notice, whichever is the later, the Series 1 Special Shares in respect whereof such deposit shall have been made shall be redeemed and the rights of the holders thereof after such deposit or such redemption date, as the case may be, shall be limited to receiving without interest their proportionate part of the total Redemption Amount so deposited against presentation and surrender of the said certificates held by them respectively and any interest on the amount so deposited shall be for the account of the Company. If any part of the total Redemption Amount so deposited has not been paid to or to the order of the respective holders of the Series 1 Special Shares which were called for redemption within two years after the date upon which such deposit was made or the date specified for redemption in the said notice, whichever is the later such balance remaining in the said special account shall be returned to the Company without prejudice to the rights of the holders of the shares being redeemed to claim the Redemption Amount without interest from the Company.

**26.3.4 Retraction**

Any holder of Series 1 Special Shares shall be entitled to require the Company to redeem, subject to the requirements of the *Business Corporations Act* (British Columbia), at any time or times all or any of the Series 1 Special Shares registered in the name of such holder on the books of the Company by tendering to the Company at the registered office of the Company a share certificate or certificates representing the Series 1 Special Shares which the registered holder desires to have the Company redeem together with a notice in writing specifying (i) that the registered holder desires to have the Series 1 Special Shares represented by such certificate or certificates redeemed by the Company and (ii) the business day ("Retraction Date") on which the holder desires to have the Company redeem such Series 1 Special Shares. The Retraction Date shall not be less than 30 days after the day on which the notice in writing is given to the Company without the consent of the Company. Upon receipt of a share certificate or certificates representing the Series 1 Special Shares which the registered holder desires to have the Company redeem together with such notice, the Company shall on the Retraction Date redeem such Series 1 Special Shares, by paying to such registered holder the Redemption Amount for each such Special Preferred Share being redeemed. Such payment shall be made by a promissory note or a cheque payable at par at any branch of the Company's bankers for the time being in Canada. If less than all of the Series 1 Special Shares represented by any certificate are redeemed, the holder shall be entitled to receive a new certificate for that number of Series 1 Special Shares represented by the original certificate or certificates which are not redeemed. The said Series 1 Special Shares shall be redeemed on the Retraction Date and from and after the Retraction Date the holder of such shares shall cease to be entitled to dividends and shall not be entitled to exercise any of the rights of holders of Series 1 Special Shares in respect thereof unless payment

of the Redemption Amount is not made on the Retraction Date, in which event the rights of the holder of the Series 1 Special Shares shall remain unaffected.

**26.3.5 Liquidation, Dissolution or Winding-Up**

In respect of the declaration and payment of dividends and upon the liquidation, dissolution or winding up of the Company the Series 1 Special Shares shall rank *pari passu* with the Series 2 Special Shares and Common Shares of the Company.

**26.3.6 Amount Specified**

For the purposes of subsection 191(4) of the *Income Tax Act (Canada)*, the amount specified in respect of each Series 1 Special Share is $♦. **(Note: this amount will be the same as the amount in Clause 26.3.3 above.)**

*SPECIAL RIGHTS AND RESTRICTIONS ATTACHING TO THE SERIES 2 SPECIAL SHARES*

The series 2 special shares (the "Series 2 Special Shares") with a par value equal to the net book value of certain assets transferred by the Company to CopperCo Resource Corp. shall have attached thereto the following special rights and restrictions:

**26.4.1 Voting**

The holders of Series 2 Special Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Company and shall have one vote for each Series 2 Special Share held at all meetings of the shareholders of the Company, except meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series.

**26.4.2 Dividends**

Subject to the rights, privileges, restrictions and conditions attaching to shares of any class of the Company ranking prior to the Series 2 Special Shares, the holders thereof are entitled to receive such dividends payable in money, property, or by the issue of fully paid shares of the Company, as may be declared by the Board of Directors, and to receive on an equal basis share for share with the holders of the Common Shares and the Series 1 Special Shares the remaining property of the Company upon the liquidation or winding up thereof.

The Directors of the Company may determine at any time and from time to time, with respect to all or portion of any dividend on the Series 2 Special Shares of the Company that such dividend shall be payable in money or, in the case of electing holders whose addresses on the books of the Company are in Canada, and in jurisdictions specified by the Directors outside Canada, by the issue of fully paid Series 2 Special Shares of the Company having a value, as determined by the Directors, that is substantially equivalent, as of the date or period of days determined by the Directors, to the cash amount of such dividend, provided that the Directors may (but need not) value the Series 2 Special Shares to be issued in payment of the dividend at a discount from or premium to the relevant market value thereof of up to 5%, in either case.

With respect to fractional shares that may result from any such stock dividend the Company shall issue to an agent for shareholders appointed by the Company a number of whole shares representing in the aggregate the fractional shares of all electing shareholders, unless the Directors of the Company otherwise determine, for instance by the payment of cash in lieu of fractional share interests that may result from any such stock dividend. In any event, no certificates representing fractional share interests will be issued by the Company.

**26.4.3 Redemption**

(a) The Company may, subject to the requirements of the *Business Corporations Act* (British Columbia), upon giving notice in the manner as hereinafter provided, redeem at any time the whole, or from time to time any part, of the then outstanding Series 2 Special Shares by payment in cash, promissory note or property of $♦ for each share of any amount (the "Redemption Amount") calculated as:

(i) the fair market value of the assets to be transferred by the Company to CopperCo Resource Corp. under the Plan of Arrangement divided by the number of Series 2 Special Shares issued by the Company under the Plan of Arrangement **(Note: the dollar amount to be inserted in this Clause 26.4.3 will be determined and inserted in these share provisions immediately prior to making the required filing with the British Columbia Registrar of Companies to effect the Plan of Arrangement)**; plus

(ii) all declared and unpaid non-cumulative cash dividends thereon.

(b) In the case of redemption of Series 2 Special Shares under the provisions of sub-clause 26.4.3(a) hereof, the Company shall, unless waived in writing by the holders of all of the Series 2 Special Shares, at least 14 days before the date specified for redemption deliver or mail to each person who at the date of mailing is a registered holder of Series 2 Special Shares to be redeemed a notice in writing of the intention of the Company to redeem such Series 2 Special Shares. Such notice shall be delivered or mailed by letter, postage prepaid, addressed to each such shareholder at his address as it appears on the records of the Company or in the event of the address of any such shareholder not so appearing then to the last known address of such shareholder or if delivered, delivered to each such shareholder at such address; provided, however, that accidental failure to give any such notice to one or more of such shareholders shall not affect the validity of such redemption. Such notice shall set out the Redemption Amount and the date on which redemption is to take place and if part only of the shares held by the person to whom it is addressed is to be redeemed the number thereof to be so redeemed; provided, however, that if a part only of the Series 2 Special Shares for the time being outstanding is to be redeemed, the shares so to be redeemed shall be selected by lot in such manner as the directors in their discretion shall decide or if the directors so determine may be redeemed pro rata (disregarding fractions) unless otherwise agreed in writing by the holders of all of the Series 2 Special

Shares. On or after the date so specified for redemption, the Company shall pay or cause to be paid to or to the order of the registered holders of the Series 2 Special Shares to be redeemed the Redemption Amount thereof on presentation and surrender at the registered office of the Company or any other place designated in such notice of the certificates representing the Series 2 Special Shares called for redemption. Such payment shall be made by cheque payable at par at any branch of the Company's bankers in Canada or by promissory note. If less than all of the Series 2 Special Shares represented by any certificate are redeemed the holder shall be entitled to receive a new certificate for that number of Series 2 Special Shares represented by the original certificate which are not redeemed. From and after the date specified for redemption in any such notice the holders of the Series 2 Special Shares called for redemption shall cease to be entitled to dividends and shall not be entitled to exercise any of the rights of shareholders in respect thereof unless payment of the Redemption Amount shall not be made upon presentation of certificates in accordance with the foregoing provisions, in which case the rights of shareholders shall remain unaffected. The Company shall have the right at any time after the mailing of notice of its intention to redeem any Series 2 Special Shares to deposit the Redemption Amount of the shares, either in cash or promissory note, so called for redemption or of such of the said shares represented by certificates as have not at the date of such deposit been surrendered by the holders thereof in connection with such redemption to a special account in any chartered bank or in any trust company in Canada, named in such notice, to be paid without interest to or to the order of the respective holders of such Series 2 Special Shares called for redemption upon presentation and surrender to such bank or trust company of the certificates representing the same. Upon such deposit being made or upon the date specified for redemption in such notice, whichever is the later, the Series 2 Special Shares in respect whereof such deposit shall have been made shall be redeemed and the rights of the holders thereof after such deposit or such redemption date, as the case may be, shall be limited to receiving without interest their proportionate part of the total Redemption Amount so deposited against presentation and surrender of the said certificates held by them respectively and any interest on the amount so deposited shall be for the account of the Company. If any part of the total Redemption Amount so deposited has not been paid to or to the order of the respective holders of the Series 2 Special Shares which were called for redemption within two years after the date upon which such deposit was made or the date specified for redemption in the said notice, whichever is the later such balance remaining in the said special account shall be returned to the Company without prejudice to the rights of the holders of the shares being redeemed to claim the Redemption Amount without interest from the Company.

**26.4.4 Retraction**

Any holder of Series 2 Special Shares shall be entitled to require the Company to redeem, subject to the requirements of the *Business Corporations Act* (British Columbia), at any time or times all or any of the Series 2 Special Shares registered in the name of such holder on the books

of the Company by tendering to the Company at the registered office of the Company a share certificate or certificates representing the Series 2 Special Shares which the registered holder desires to have the Company redeem together with a notice in writing specifying (i) that the registered holder desires to have the Series 2 Special Shares represented by such certificate or certificates redeemed by the Company and (ii) the business day ("Retraction Date") on which the holder desires to have the Company redeem such Series 2 Special Shares. The Retraction Date shall not be less than 30 days after the day on which the notice in writing is given to the Company without the consent of the Company. Upon receipt of a share certificate or certificates representing the Series 2 Special Shares which the registered holder desires to have the Company redeem together with such notice, the Company shall on the Retraction Date redeem such Series 2 Special Shares, by paying to such registered holder the Redemption Amount for each such Special Preferred Share being redeemed. Such payment shall be made by a promissory note or a cheque payable at par at any branch of the Company's bankers for the time being in Canada. If less than all of the Series 2 Special Shares represented by any certificate are redeemed, the holder shall be entitled to receive a new certificate for that number of Series 2 Special Shares represented by the original certificate or certificates which are not redeemed. The said Series 2 Special Shares shall be redeemed on the Retraction Date and from and after the Retraction Date the holder of such shares shall cease to be entitled to dividends and shall not be entitled to exercise any of the rights of holders of Series 2 Special Shares in respect thereof unless payment of the Redemption Amount is not made on the Retraction Date, in which event the rights of the holder of the Series 2 Special Shares shall remain unaffected.

**26.4.5 Liquidation, Dissolution or Winding-Up**

In respect of the declaration and payment of dividends and upon the liquidation, dissolution or winding up of the Company the Series 2 Special Shares shall rank *pari passu* with the Series 1 Special Shares and the Common Shares of the Company.

**26.4.6 Amount Specified**

For the purposes of subsection 191(4) of the *Income Tax Act (Canada)*, the amount specified in respect of each Series 2 Special Share is $♦. **(Note: this amount will be the same as the amount in Clause 26.4.3 above.)**

# SCHEDULE B TO PLAN OF ARRANGEMENT BEING APPENDIX I TO THE ARRANGEMENT AGREEMENT MADE AS OF THE 6TH DAY OF JULY, 2006, AMONG RUBICON MINERALS CORPORATION, PARAGON MINERALS CORPORATION, COPPERCO RESOURCE CORP. AND AFRICO RESOURCES LTD.

**(Paragraphs 3.1 (c) and (d) of Plan of Arrangement)**

## PROVISIONS ATTACHING TO THE SPECIAL PREFERRED SHARES

The rights, privileges, restrictions and conditions attaching to the Special Preferred Shares are as follows:

### 1.1 Voting

The holders of the Special Preferred Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Company and shall have one vote for each Special Preferred Share held at all meetings of the shareholders of the Company, except meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series.

### 1.2 Dividends

Subject to the rights, privileges, restrictions and conditions attaching to shares of any class of the Company ranking prior to the Special Preferred Shares, the holders thereof are entitled to receive such dividends payable in money, property, or by the issue of fully paid shares of the Company, as may be declared by the Board of Directors and to receive on an equal basis share for share with the holders of the Common Shares the remaining property of the Company upon the liquidation or winding up thereof.

The Directors of the Company may determine at any time and from time to time, with respect to all or portion of any dividend on the Special Preferred Shares of the Company that such dividend shall be payable in money or, in the case of electing holders whose addresses on the books of the Company are in Canada, and in jurisdictions specified by the Directors outside Canada, by the issue of fully paid Special Preferred Shares of the Company having a value, as determined by the Directors, that is substantially equivalent, as of the date or period of days determined by the Directors, to the cash amount of such dividend, provided that the Directors may (but need not) value the Special Preferred Shares to be issued in payment of the dividend at a discount from or premium to the relevant market value thereof of up to *5%,* in either case.

With respect to fractional shares that may result from any such stock dividend the Company shall issue to an agent for shareholders appointed by the Company a number of whole shares representing in the aggregate the fractional shares of all electing shareholders, unless the

Directors of the Company otherwise determine, for instance by the payment of cash in lieu of fractional share interests that may result from any such stock dividend. In any event, no certificates representing fractional share interests will be issued by the Company.

**1.3 Redemption**

(a) The Company may, subject to the requirements of the *Canada Business Corporations Act*, upon giving notice in the manner as hereinafter provided, redeem at any time the whole, or from time to time any part, of the then outstanding Special Preferred Shares by payment in cash, promissory note or property of $• for each share of any amount (the “Redemption Amount”) calculated as:

(i) the fair market value of the property first received by the Company in consideration for issuing the Special Preferred Shares; plus

(ii) all declared and unpaid non-cumulative cash dividends thereon, divided by the number of Special Preferred Shares first issued for such property.

(b) In the case of redemption of Special Preferred Shares under the provisions of sub-clause 3(a) hereof, the Company shall, unless waived in writing by the holders of all of the Special Preferred Shares, at least 14 days before the date specified for redemption deliver or mail to each person who at the date of mailing is a registered holder of Special Preferred Shares to be redeemed a notice in writing of the intention of the Company to redeem such Special Preferred Shares. Such notice shall be delivered or mailed by letter, postage prepaid, addressed to each such shareholder at his address as it appears on the records of the Company or in the event of the address of any such shareholder not so appearing then to the last known address of such shareholder or if delivered, delivered to each such shareholder at such address; provided, however, that accidental failure to give any such notice to one or more of such shareholders shall not affect the validity of such redemption. Such notice shall set out the Redemption Amount and the date on which redemption is to take place and if part only of the shares held by the person to whom it is addressed is to be redeemed the number thereof to be so redeemed; provided, however, that if a part only of the Special Preferred Shares for the time being outstanding is to be redeemed, the shares so to be redeemed shall be selected by lot in such manner as the directors in their discretion shall decide or if the directors so determine may be redeemed pro rata (disregarding fractions) unless otherwise agreed in writing by the holders of all of the Special Preferred Shares. On or after the date so specified for redemption, the Company shall pay or cause to be paid to or to the order of the registered holders of the Special Preferred Shares to be redeemed the Redemption Amount thereof on presentation and surrender at the registered office of the Company or any other place designated in such notice of the certificates representing the Special Preferred Shares called for redemption. Such payment shall be made by cheque payable at par at any branch of the Company’s bankers in Canada. If less than all of the Special Preferred Shares represented by any certificate are redeemed the

holder shall be entitled to receive a new certificate for that number of Special Preferred Shares represented by the original certificate which are not redeemed. From and after the date specified for redemption in any such notice the holders of the Special Preferred Shares called for redemption shall cease to be entitled to dividends and shall not be entitled to exercise any of the rights of shareholders in respect thereof unless payment of the Redemption Amount shall not be made upon presentation of certificates in accordance with the foregoing provisions, in which case the rights of shareholders shall remain unaffected, the Company shall have the right at any time after the mailing of notice of its intention to redeem any Special Preferred Shares to deposit the Redemption Amount of the shares so called for redemption or of such of the said shares represented by certificates as have not at the date of such deposit been surrendered by the holders thereof in connection with such redemption to a special account in any chartered bank or in any trust company in Canada, named in such notice, to be paid without interest to or to the order of the respective holders of such Special Preferred Shares called for redemption upon presentation and surrender to such bank or trust company of the certificates representing the same. Upon such deposit being made or upon the date specified for redemption in such notice, whichever is the later, the Special Preferred Shares in respect whereof such deposit shall have been made shall be redeemed and the rights of the holders thereof after such deposit or such redemption date, as the case may be, shall be limited to receiving without interest their proportionate part of the total Redemption Amount so deposited against presentation and surrender of the said certificates held by them respectively and any interest on the amount so deposited shall be for the account of the Company. If any part of the total Redemption Amount so deposited has not been paid to or to the order of the respective holders of the Special Preferred Shares which were called for redemption within two years after the date upon which such deposit was made or the date specified for redemption in the said notice, whichever is the later such balance remaining in the said special account shall be returned to the Company without prejudice to the rights of the holders of the shares being redeemed to claim the Redemption Amount without interest from the Company.

**1.4 Retraction**

Any holder of Special Preferred Shares shall be entitled to require the Company to redeem, subject to the requirements of the *Canada Business Corporations Act*, at any time or times all or any of the Special Preferred Shares registered in the name of such holder on the books of the Company by tendering to the Company at the registered office of the Company a share certificate or certificates representing the Special Preferred Shares which the registered holder desires to have the Company redeem together with a notice in writing specifying (i) that the registered holder desires to have the Special Preferred Shares represented by such certificate or certificates redeemed by the Company and (ii) the business day ("Retraction Date") on which the holder desires to have the Company redeem such Special Preferred Shares. The Retraction Date shall not be less than 30 days after the day on which the notice in writing is given to the Company without the consent of the Company. Upon receipt of a share certificate or certificates representing the special Preferred Shares which the registered holder desires to have the

Company redeem together with such notice, the Company shall on the Retraction Date redeem such Special Preferred Shares, by paying to such registered holder the Redemption Amount for each such Special Preferred Share being redeemed. Such payment shall be made by a cheque payable at par at any branch of the Company's bankers for the time being in Canada. If less than all of the Special Preferred Shares represented by any certificate are redeemed, the holder shall be entitled to receive a new certificate for that number of Special Preferred Shares represented by the original certificate or certificates which are not redeemed. The said Special Preferred Shares shall be redeemed on the Retraction Date and from and after the Retraction Date the holder of such shares shall cease to be entitled to dividends and shall not be entitled to exercise any of the rights of holders of Special Preferred Shares in respect thereof unless payment of the Redemption Amount is not made on the Retraction Date, in which event the rights of the holder of the Special Preferred Shares shall remain unaffected.

**1.5 Liquidation, Dissolution or Winding-Up**

In respect of the declaration and payment of dividends and upon the liquidation, dissolution or winding up of the Company the Special Preferred Shares shall rank ahead of and in priority to the Common Shares of the Company.

**1.6 Amount Specified**

For the purpose of subsection 191(4) of the *Income Tax Act (Canada)*, the amount specified in respect of each Special Preferred Share is $•. **(Note: this amount will be the same as the amount in Clause 1.3(a) above.)**

**SCHEDULE "E"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**ARRANGEMENT RESOLUTION**

**Arrangement Under Sections 288-299 of the *Business Corporations Act* (British Columbia)**

**"BE IT RESOLVED, AS A SPECIAL RESOLUTION, THAT:**

1. the arrangement (the "Arrangement") under sections 288-299 of the *Business Corporations Act* (British Columbia) substantially as set forth in the Plan of Arrangement attached as Appendix I to Schedule "E" to the Management Information Circular dated July 7, 2006 of Rubicon Minerals Corporation dated effective July 6, 2006 (the "Circular") is hereby approved and authorized;

2. the Arrangement Agreement made as of the 6th day of July, 2006 among Rubicon Minerals Corporation, Paragon Minerals Corporation, CopperCo Resource Corp. and Africo Resources Ltd. attached as Schedule "E" to the Circular is hereby confirmed, ratified and approved;

3. the board of directors of Rubicon Minerals Corporation be and is hereby granted the authority to use its best judgment to proceed with and cause Rubicon Minerals Corporation to complete the Arrangement in the event of any variation of, or amendments to the Arrangement Agreement, without further approval by the shareholders of Rubicon Minerals Corporation, provided that any variation or amendments are accepted by the Toronto Stock Exchange and the American Stock Exchange in conjunction with the listing of the shares of Paragon Minerals Corporation on the TSX Venture Exchange and CopperCo Resource Corp. on the TSX (or in the alternative the Alternative Investment Market (AIM) of the London Stock Exchange);

4. notwithstanding that this special resolution has been passed by the shareholders of Rubicon Minerals Corporation or has received the approval of the Supreme Court of British Columbia, the board of directors of Rubicon Minerals Corporation may amend or decide not to proceed with the Arrangement or revoke this special resolution at any time prior to the filing of the certified copy of the court order approving the Arrangement with the Registrar of Companies for British Columbia without further approval of the shareholders of Rubicon Minerals Corporation; and

5. any one director or officer of Rubicon Minerals Corporation is hereby authorized, for and on behalf of Rubicon Minerals Corporation to execute and deliver all documents and instruments and take all such other actions as may be necessary or desirable to implement this special resolution and the matters authorized hereby, such determination to be conclusively evidenced by the execution and delivery of any such documents or instruments and the taking of any such actions.

**SCHEDULE "F"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**PARAGON STOCK OPTION PLAN RESOLUTION**

**"RESOLVED, AS AN ORDINARY RESOLUTION, THAT:**

1. the "fixed numbered" Stock Option Plan (the "**Plan**") of Paragon Minerals Corporation (the "**Company**") adopted by the Board of Directors of the Company on July 5, 2006 be and is hereby approved, ratified and confirmed;

2. the Company be and is hereby authorized to grant stock options up to a maximum of common shares of the Company which is equal to 20% of the issued and outstanding Capital of the Company on the date of the initial listing of the Common Shares of the Company on a stock exchange, which is to include all common shares of the Company then reserved for issue for stock options granted by the Company prior to such initial listing date;

3. the granting of stock options to insiders of the Company under the Plan be and is hereby approved;

4. the Board of Directors of the Company is hereby authorized to make such amendments to the Plan as it may, in its sole discretion, determine are necessary, desirable or useful, as may be required by the stock exchange on which the shares of the Company are listed or as relate to matters of a housekeeping nature from time to time without the further approval of or further authority from the shareholders of the Company; and

5. any director or senior officer of the Company be and is hereby authorized, for or on behalf of the Company, to execute and deliver all documents and instruments and to take such other actions as such director or senior officer may determine to be necessary or desirable to implement this ordinary resolution and the matters authorized hereby, such determination to be conclusively evidenced by the execution and delivery of any such documents or instruments and the taking of any such actions".

**SCHEDULE "G"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**COPPERCO STOCK OPTION PLAN RESOLUTION**

**"RESOLVED, AS AN ORDINARY RESOLUTION, THAT:**

1. the "fixed number" Stock Option Plan (the "**Plan**") of CopperCo Resource Corp. (the "**Company**") adopted by the Board of Directors of the Company on July 5, 2006 be and is hereby approved, ratified and confirmed;

2. the Company be and is hereby authorized to grant stock options up to a maximum of common shares of the Company which is equal to 20% of the issued and outstanding capital of the Company on the date of the initial listing of the Common shares of the Company on a stock exchange, which is to include all Common shares of the Company then reserved for issue for stock options granted by the Company prior to such initial listing date;

3. the granting of stock options to insiders of the Company be and is hereby approved;

4. the Board of Directors of the Company is hereby authorized to make such amendments to the Plan as it may, in its sole discretion, determine are necessary, desirable or useful, as may be required by the stock exchange on which the shares of the Company are listed or as relate to matters of a housekeeping nature from time to time without the further approval of or further authority from the shareholders of the Company; and

5. any director or senior officer of the Company be and is hereby authorized, for or on behalf of the Company, to execute and deliver all documents and instruments and to take such other actions as such director or senior officer may determine to be necessary or desirable to implement this ordinary resolution and the matters authorized hereby, such determination to be conclusively evidenced by the execution and delivery of any such documents or instruments and the taking of any such actions".

**SCHEDULE "H"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

**SHAREHOLDER RIGHTS PLAN RESOLUTION**

**"RESOLVED, AS AN ORDINARY RESOLUTION, THAT:**

1. the Amended and Restated Shareholder Rights Plan, upon the terms and conditions set forth in the Amended and Restated Shareholder Rights Plan Agreement (the "**Agreement**") dated June 14, 2006, between Rubicon Minerals Corporation (the "**Company**") and Computershare Investor Services Inc., as Rights Agent, as the same may be amended prior to the date of the Annual and Special Meeting, is hereby approved, ratified and confirmed; and

2. any director or officer of the Company be and is hereby authorized to execute and deliver in the name of and on behalf of the Corporation all such certificates, instruments, agreements, notices and other documents and to do all such other acts and things as in the opinion of such person may be necessary or desirable in connection with the Agreement and the performance by the Company of its obligations thereunder."

**SCHEDULE "I"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

## INFORMATION CONCERNING RUBICON AFTER THE ARRANGEMENT

NOTICE TO READER ..... 1
INCORPORATION BY REFERENCE ..... 1
COMPANY PROFILE ..... 2
CORPORATE STRUCTURE & DESCRIPTION OF BUSINESS ..... 2
SELECTED YEAR-END AUDITED FINANCIAL INFORMATION ..... 2
DESCRIPTION OF MINERAL PROPERTIES ..... 3
MARKET FOR SECURITIES ..... 18
DIRECTORS AND OFFICERS ..... 19
PRIOR SALES ..... 19
STOCK EXCHANGE PRICE ..... 20
OUTSTANDING OPTIONS ..... 20
CONSOLIDATED CAPITALIZATION ..... 21
STOCK OPTION PLAN ..... 21
RISK FACTORS ..... 21
AUDITOR, REGISTRAR AND TRANSFER AGENT ..... 21
MATERIAL CONTRACTS ..... 22
OTHER MATERIAL FACTS ..... 22

## NOTICE TO READER

**The following is a summary of the business of Rubicon after the Arrangement and should be read together with the more detailed information and financial data and statements contained elsewhere in this schedule and in the Circular. Except where otherwise indicated herein, all of the disclosure in this schedule is made on the basis that the Arrangement has been completed as described in the Circular.**

## INCORPORATION BY REFERENCE

Information concerning Rubicon may be found in this Circular and in Rubicon's Annual Report on Form 20F (the "Annual Report") for the year ended December 31, 2005, which is dated March 30, 2006. The Annual Report may be viewed on the SEDAR website at www.sedar.com and upon request. Rubicon will promptly provide a copy of such Annual Report free of charge to any Rubicon securityholder. The Annual Report, as well as the following additional documents, are incorporated herein by reference and form an integral part of this Circular:

(a) material change report, dated April 18, 2006, announcing the closing of a brokered private placement financing to raise gross proceeds of $11,308,208;

(b) news release, dated May 2, 2006, announcing an option agreement with Crosshair Exploration & Mining Corporation on the Golden Promise Project;

(c) news release, dated May 23, 2006, announcing the results of the Kalukundi feasibility study;

(d) material change report, dated June 2, 2006, announcing the results of the Kalukundi feasibility study;

(e) news release, dated June 7, 2006, announcing the board of directors of Africo has appointed Dr. Anthony Harwood as new Chief Executive Officer of Africo and that Africo has entered into a support agreement with a number of its major shareholders in which they agree to vote in favour of the Plan of Arrangement;

(f) news release, dated June 15, 2006, announcing that the board of directors of Rubicon has adopted an amended and restated Shareholder Rights Plan;

(g) material change report, dated June 16, 2006. announcing that the board of directors of Rubicon has adopted an amended and restated Shareholder Rights Plan;

(h) material change report, dated June 16, 2006 announcing that Africo appointed Dr. Antony Harwood as President and Chief Executive Officer and that a number of significant shareholders of Africo have entered into an agreement to vote in support of Rubicon's proposed plan of arrangement;

(i) material change report, dated June 19, 2006. announcing that the board of directors of Africo has appointed Dr. Anthony Harwood as new Chief Executive Officer of Africo and that Africo has entered into a support agreement with a number of its major shareholders in which they agree to vote in favour of the Plan of Arrangement;

(j) news release, dated June 22, 2006, announcing that Paragon has entered into an agreement with Altius Resources Inc. under which Altius Resources Inc. will subscribe for 2.5 million flow through special warrants as part of a non-brokered private placement financing to raise a minimum of $3 million and a maximum of $3.7 million; and

(k) material change report, dated June 27, 2006, announcing that that Paragon has entered into an agreement with Altius Resources Inc. under which Altius Resources Inc. will subscribe for 2.5 million flow through special warrants as part of a non-brokered private placement financing to raise a minimum of $3 million and a maximum of $3.7 million.

## COMPANY PROFILE

Rubicon is considering changing the focus of its business to concentrate on the development of its Red Lake assets in Ontario its assets in Nevada and Alaska. Rubicon's business previously conducted was the acquisition and development of gold and base metal projects in other Canadian Provinces and in a number of countries. Pursuant to the Plan of Arrangement, Rubicon will dispose of all of its mining interests other than the Red Lake, Nevada and Alaska assets. See "The Arrangement" in the Circular.

Rubicon's ongoing business objective will be the continuing development of its Red Lake properties. The Rubicon Common Shares will continue to be listed and traded on the TSX and AMEX, subject to Rubicon complying with the listing requirements of the TSX and AMEX.

## CORPORATE STRUCTURE & DESCRIPTION OF BUSINESS

See "History and Development of the Company" and "Business Overview" at pages 19-20 of the Annual Report.

## SELECTED YEAR-END AUDITED FINANCIAL INFORMATION

Rubicon's consolidated audited financial statements for the years ended December 31, 2005 and 2004 are attached to this Circular as Schedule A.

## DESCRIPTION OF MINERAL PROPERTIES

Following completion of the Arrangement, Rubicon will continue to hold the following mineral properties:

*Red Lake Assets*

- 100% interest in the McFinley Property located in the Red Lake Mining Division;
- 100% interest in the McFinley Water Claims Agreement;
- 100% interest in the DMC Property under option (up to 65%) to Agnico-Eagle Mines Ltd. located in the Red Lake Mining Division;
- 60% interest in the McCuaig Red Lake Joint Venture Property with 40% partner Golden Tag Resources located in the Red Lake Mining Division;
- 100% interest in the Red Lake North property currently under option (up to 55%) to Solitaire Minerals Corp. located in the Red Lake Mining Division;
- 100% interest in the Adams Lake property located in the Red Lake Mining Division;
- 100% interest the Slate Bay project located in the Red Lake Mining Division;
- 100% interest in the 79 claim units and an option to earn 100% in 44 claim units in the East Bay property located in the Red Lake Mining Division;
- 100% interest in the Humlin project currently under option (up to 55%) to Solitaire Minerals Corp. located in the Red Lake Mining Division;
- 100% interest in the Red Lake West End properties currently under option to Redstar Resources Corp;
- variable interests in over 60 mineral properties collectively known as the ERD properties located mainly in the Red Lake and Birch/Uchi Greenstone Belts, of Northwestern Ontario; and
- an option to earn 100% interest in the Manitou property located in the Kenora Mining Division.

The above properties are subject to underlying agreements, the terms and conditions of which are disclosed under each separate property description under this section.

*Nevada-USA Interests*

- 60 % interest in Nevada-based Toquima Minerals Corporation. Rubicon has entered into an agreement with Carlin Gold Corporation to sell Rubicon's interest in Toquima. See note 6 to Rubicon's Interim Unaudited Consolidated Financial Statements at Schedule A to this Circular.

**Principal Property: McFinley Property**

The McFinley Property is considered to be material to Rubicon. Accordingly, technical reports relating to the McFinley property have been filed with the TSX and applicable securities regulatory authorities pursuant to Canadian Securities Administrators NI 43-101.

*Property Description and Ownership*

The McFinley Property is located in the southwestern part of Bateman Township within the Red Lake Mining Division of northwestern Ontario. The McFinley shaft is located at 51º 07' 26'' N and 45º 44' 26'' W. The McFinley Property is subject to option agreements that have allowed Rubicon to earn a 100% interest in an area that covers approximately 505.43 Ha. The property was acquired in two separate agreements during 2002: 1) the water covered areas, held as 25 Licenses of Occupation and one Mining Lease, were optioned from Dominion Goldfields Corporation ("**DGC**") in January 2002 and 2) land portions of the property, held as nine patented claims, were later optioned by agreement in June 2002. The mining rights of patent claims were optioned from DGC and the surface rights of the same patent claims were optioned from DGC's subsidiary 1519369 Ontario Ltd. Collectively, all of these titles are now referred to as the McFinley Property (in this section the "**Property**"). The various licenses of occupation, mining lease and patents claims comprising the Property are contiguous, surveyed and in good standing.

Rubicon Obligations on Licenses of Occupation and Mining Lease

Rubicon optioned 25 licenses of occupation and one mineral lease ("Water Portion") in January 2002 from DGC by agreeing to pay $800,000, issue 260,000 shares and complete U.S. $1,300,000 of exploration prior to March 31, 2006. During 2004, Rubicon completed its acquisition of these water claims after meeting all the required payments and expenditures. These claims are subject to a NSR royalty of 2%, for which advance royalties of U.S. $50,000 are due annually (to a maximum of U.S. $1,000,000 prior to commercial production). Rubicon has the option to acquire a 0.5% NSR royalty for U.S. $675,000 at any time. Upon a positive production decision the Company would be required to make an additional advance royalty payment of U.S. $675,000, which would be deductible from commercial production royalties as well as certain of the maximum U.S. $1,000,000 in advance royalty payments described above.

Rubicon Obligations on Patented Claims

Rubicon purchased 16 patented claims ("Land Claims") from DGC in July 2002 for $500,000 ($425,000 paid as of December 31, 2002 and $75,000 paid prior to June 2003) and issued 500,000 Rubicon Common Shares. The Company also issued to the vendor 100,000 stock options. The Land Claims are subject to a NSR royalty of 2-3%, for which advance royalties of $75,000 are due annually (to a maximum of $1,500,000 prior to commercial production). Rubicon has the option to acquire a 0.5% NSR royalty for $1,000,000 at any time. Upon a positive production decision Rubicon would be required to make an additional advance royalty payment of $1,000,000, which would be deductible from commercial production royalties as well as certain of the maximum $1,500,000 in advance royalty payments described above.

The following is a tabular summary of the mineral tenures comprising the Property:

**Mining Lease**

| License | Description | Township | Hectares |
|---|---|---|---|
| 104721 | KRL503297 - 503299, 526262 | Bateman | 56.033 |
| | | | **56.033** |

**Licenses of Occupation**

| License | Description | Township | Hectares |
|---|---|---|---|
| 3186 | KRL2155 | Bateman | 9.9153 |
| 3187 | KRL2156 | Bateman | 13.678 |
| 3289 | K1498 | Bateman | 11.048 |
| 3290 | K1499 | Bateman | 2.428 |
| 3370 | K1493 | Bateman | 5.018 |
| 3371 | K1494 | Bateman | 18.737 |
| 3372 | K1495 | Bateman | 10.117 |

| License | Description | Township | Hectares |
|---|---|---|---|
| 3380 | K1497 | Bateman | 6.111 |
| 3381 | KRL246 | Bateman | 4.330 |
| 3382 | KRL247 | Bateman | 4.532 |
| 10830 | KRL11038-39 | Bateman | 28.672 |
| 10499 | K11487 | Bateman | 5.738 |
| 10834 | KRL11031 | Bateman | 17.887 |
| 10835 | K954 (rec. as KRL18152) | Bateman | 9.267 |
| 10836 | K955 (rec. as KRL18515) | Bateman | 9.955 |
| 10952 | KRL18514 | Bateman | 17.478 |
| 11111 | KRL18735 | Bateman | 12.226 |
| 11112 | KRL18457 | Bateman | 10.967 |
| 11114 | KRL18373 | Bateman | 7.734 |
| 11115 | KRL18374 | Bateman | 19.688 |
| 11116 | KRL18375 | Bateman | 22.869 |
| 11117 | KRL18376 | Bateman | 15.018 |
| 10495 | KRL11483 | Bateman | 6.718 |
| 10496 | K11482 | Bateman | 5.637 |
| 10497 | K11481 | Bateman | 14.148 |
| | | | **289.916** |

**Patented Claims**

| Claim No. | Parcel | Township | Hectares |
|---|---|---|---|
| K1498 | 992 | Bateman | 11.048 |
| K1499 | 993 | Bateman | 2.428 |
| K1493 | 994 | Bateman | 5.018 |
| K1494 | 995 | Bateman | 18.738 |
| K1495 | 996 | Bateman | 10.117 |
| KRL246 | 997 | Bateman | 4.33 |
| KRL247 | 998 | Bateman | 4.532 |
| K1497 | 999 | Bateman | 6.111 |
| KRL11481 | 1446 | Bateman | 14.148 |
| KRL11482 | 1447 | Bateman | 5.637 |
| KRL11483 | 1448 | Bateman | 6.718 |
| KRL11487 | 1452 | Bateman | 5.738 |
| K954 (Recorded as KRL 18152) | 1977 | Bateman | 9.268 |
| K955 (Recorded as KRL 18515) | 1978 | Bateman | 9.955 |
| KRL18457 | 2449 | Bateman | 10.967 |
| KRL18735 | 2450 | Bateman | 12.226 |
| | | | **136.979** |

*Accessibility, Climate, Local Resources, Infrastructure and Physiography*

The Property is an area of subdued topography of less than 15 metres elevation above lake elevation. Land areas are largely covered with spruce, poplar and birch trees with minor swamp. A portion of the property is covered by the East Bay of Red Lake with McFinley Island, directly to the north of McFinley Peninsula, representing the largest Island on the Property. The property is covered by 2 to 10 metres of glacial overburden with bedrock outcrop mostly restricted to shoreline exposures. Lakes are relatively shallow with water depths rarely greater than 5 to 15 metres. Recent seismic surveys of lake areas indicate average accumulations of 10 to 20 metres of lake

sediments and overburden beneath lake bottom, with troughs up to 80 - 100 metres deep along the structural trend underlying East Bay.

Annual mean precipitation for the region is 640 millimetres which includes mean average snowfall of 378 millimetres. Mean average temperature is 0.9 degrees Celsius with mean winter temperatures (October to April) of -9 degrees and mean summer temperatures of +14 degrees. Temperatures can reach summer highs of 35 degrees and winter lows of -40 degrees. Weather conditions allow drilling from the ice of Red Lake during January to early April. Municipal winter snow clearance extends to the end of paved roads near Cochenour and the site access road can be easily maintained by local road contractors.

The Property is accessible via an eight-kilometre gravel road from paved roads servicing the village of Cochenour and the surrounding communities of Balmertown and Red Lake. Situated on East Bay, the Property is also easily accessible via the waters of Red Lake. The region is serviced by Highway 105 which connects with TransCanada Highway #17 in Vermillion Bay. The area has daily scheduled Bus Services and daily scheduled flights from Winnipeg, Kenora and Thunder Bay.

The Red Lake District has a long mining history and there are currently two major mines in operation in Balmertown, Barrick Gold Corporation's ("Barrick") Campbell Mine and Goldcorp Inc.'s ("Goldcorp") Red Lake Mine. The District can support year-round mineral exploration and mining operations.

Electrical power on the McFinley Peninsula is currently supplied by a diesel generator. An electric power transmission line extends to the Abino Property of Goldcorp which adjoins the Property to the south, a distance of about 2 kilometres from the McFinley shaft. Water is pumped from the nearby East Bay of Red Lake and potable water is trucked to site.

*Geology and Mineralization*

The McFinley Property is underlain by rocks of the Archean Red Lake greenstone belt, part of the Uchi Subprovince, Superior Province, Canadian Shield. Many previous workers including Horwood (1945), Pirie (1981), Andrews and Wallace (1983), Hugon et. al. (1986) and Sanborne-Barrie et. al. (2001) have described the geology of the area. The geology is summarized below and updated with respect to the Property.

The Red Lake greenstone belt ("**RLGB**") is an accumulation of Archean-age metavolcanic, meta-sedimentary and intrusive rocks that record a volcanic history that spans 300 Ma, and is represented by seven volcano-sedimentary assemblages (Sanborn-Barrie et al., 2001). The Property lies in the lowermost Balmer assemblage. The Balmer assemblage consists of tholeiitic and komatiitic flows and Ultramafic intrusive rocks intercalated with 2.98 – 2.96 billion year old (Ga) felsic volcanic, clastic, and chemical sedimentary rocks. It is host to largest of the Red Lake District current and past-producing gold mines. Six successive, younger stratigraphic assemblages have been documented:

- The Ball assemblage (2.94 – 2.92 Ga) consisting of crustally contaminated komatiite, tholeiitic basalt, calc-alkaline felsic volcanic rocks, and stromatolitic carbonate.
- The Slate Bay assemblage (less than 2.91 Ga.), composed of quartz-rich wacke and conglomerate.
- The Bruce Channel assemblage (2.89 Ga.), composed of intermediate pyroclastic volcanic and sedimentary rocks.
- The newly recognized, ca. 2.85 Ga Trout Bay assemblage (Sanborn-Barrie et al., 2001) consisting of basalt overlain by clastic rocks, intermediate tuff and chert-magnetite iron-formation.
- The Huston assemblage (<2.89 Ga. and >2.74 Ga.) consisting of a regionally extensive unit of polymictic conglomerate, locally associated with wacke and argillite, that marks an angular unconformity between Mesoarchean and Neoarchean strata.

- The uppermost stratigraphic package, the Confederation assemblage (2.75 – 2.73 Ga.), consisting of calk-alkaline and tholeiitic felsic, intermediate, and mafic volcanic rocks, which locally exhibit volcanogenic-massive-sulphide-style alteration and mineralization.

Felsic plutons that are synvolcanic with Confederation volcanic rocks intrude all the major assemblages. The weakly to moderately foliated Dome stock (2.72 Ga.), which occupies the core of RLGB, provides a minimum age for timing of the last penetrative deformation event (Corfu and Andrews, 1987; Sanborn-Barrie et al., 2000). The Felsic Intrusion on the Abino property to the south of McFinley also records a date of 2.72 Ga. Post-tectonic batholiths were intruded along the margins of the RLGB ca 2.70 Ga.

Regional metamorphism varies from greenschist grade in the core of the RLGB to amphibolite grade near batholith margins. Polyphase deformation of the RLGB involved an early non-penetrative deformation (D0), which uplifted pre-Confederation and Huston age rocks, and at least two episodes of post-Confederation deformation (D1 and D2), reflected in folds and fabrics of low to moderate finite strain (Sanborn-Barrie et al., 2000). Overall, strain in the RLGB is low, but local high strain zones do occur, typically in areas of strong alteration with locally associated gold mineralization. Previous workers identified five major shear or deformation zones within which major gold deposits of the camp occur. Recent work (Sanborn-Barrie et al., 2000) has questioned the validity and usefulness of the deformation zone concept in the camp.

The “East Bay Trend” can be traced to the southwest to the Cochenour Willans mine area where it meets the north-northwest trending ‘‘Mine Trend” of the Goldcorp-Campbell-Cochenour Mines. The East Bay Deformation Zone (EBDZ) constitutes a continuous and highly disturbed “break” or ‘‘structural domain’’. Very significant changes occur in structural fabrics across the EBDZ while within the EBDZ fabrics are dominantly NNE trending representative of fabric development during both D1 and D2. The EBDZ trend may have also influenced early basin development (D0) in the RLGB.

Significant gold mineralization on the Property is found in many diverse geological settings, including:

- Sulphidized and quartz-veined, banded iron formation;
- Base metal-rich, breccias and quartz veins along D2-aged discrete shear zones (D-Vein Type);
- Arsenopyrite-quartz veins in C-Zone type mineralization at ultramafic contacts where D2 shears intersect the contact and develop apparent folds or shear duplex structures in areas of strong, lithologically-defined, competency contrasts;
- Disseminated arsenopyrite and/or silica replacement zones, cross-cutting stratigraphy;
- Silicified and biotite altered ± sulphide mineralized zones in basalt;
- Felsic intrusive and feldspar porphyry intrusive rocks within ultramafic rocks of the East Bay Serpentinite (MAC3);
- D2 conjugate shear structures which crosscut the trend of the EBDZ (MAC4);
- Thick gold-bearing silicified, carbonate-ankerite replacement zones, with delicate, colloform banded snowbank veins, and fine-needle arsenopyrite (CARZ Zone);
- Sheared biotized veined arsenopyrite-rich zones near the mafic/ultramafic contact with local native gold and trace base metals (Phoenix Zone).

Surface exploration on the McFinley Property commenced in the 1920’s and continued intermittently up to 1980. Initial underground exploration was conducted in 1956 on McFinley Peninsula and this area was the focus of continued underground development work during the period 1982 -1989 by McFinley Mines Limited. The 1982-

1989 program of exploration included over 200,000 feet of diamond drilling, the refurbishment of a 428-foot vertical shaft and underground development on the 150-, 275- and 400-foot levels. Test-stoping was commenced and a test milling facility capable of processing 150 tons per day was constructed. A bulk sampling operation was in progress on closure of the operation in early 1989. Only limited tonnage was ever milled. Surface stockpiles from underground mining development and test-stoping remain on site. The mine workings are currently flooded; however, the head frame, hoist and camp infrastructure remain in place.

The 1982-1989 exploration program resulted in the estimation of an Inferred Mineral Resource of 334,007 tons at a grade of 0.20 Au opt to a depth of 400 feet (Technical Report NI 43-101, prepared by Mr. Hogg dated October 2002). Deeper drilling encountered similar mineralization with locally interesting gold grades to depths of at least 1,700 feet below surface. The deeper area is considered an area of geological and exploration interest. Additional auriferous mineralization was encountered at the contact of, and within, the talc chlorite schist in water-covered areas underlying the East Bay Trend in the vicinity of the workings. These remained to be further explored upon closure of the mine.

Following acquisition in 2002, Rubicon has aggressively explored the Property. Exploration during the period 2002 - 2005 has included 75,000 square feet of trenching and stripping, 42,104 metres (185 holes) of surface diamond drilling, airborne geophysics, ground magnetometer and seismic surveys, and compilation and interpretation of historical information. Selected holes from the over 60,000 metres of previously drilled core have been relogged. A more detailed description of this early exploration work can be found in previous 43-101 Technical Reports prepared by Marc Prefontaine (2005), Darwin Green (2005), I.R. Cunningham-Dunlop (2004), and D.M. Rigg and G. Hogg (2003) and G. Hogg (2002).

*Phoenix Zone*

Exploration by Rubicon has steadily advanced the Property, culminating with the early stage discovery in 2004 of a significant new zone of classic Red Lake style high-grade gold mineralization – the Phoenix Zone. The Phoenix Zone, defined as the overall mineralized system, currently has a strike length of 500 metres and a depth extent of 200 metres below surface. The higher grade core of the Phoenix Zone is currently drilled on 15- to 30-metre centres over a strike length of 300 metres and over a depth extent of 150 metres and plunges gently to the southwest. The zone is situated at the north end of McFinley Island 2 km north of the existing mine site. To date, a total of 97 holes (17,005 metres), have been drilled in the Phoenix Zone area. A NI 43-101 compliant Mineral Resource has not been calculated for the Phoenix Zone.

The Phoenix Zone is located in the immediate hanging wall section to the west-dipping contact of the East Bay Serpentinite, and is hosted by highly deformed and veined biotitic basalts with a strong D2 shear fabric. The zone typically lies between two northwest dipping faults, the ‘Phoenix Fault’ and the ‘Footwall Fault’ and appears to be related to a NNW trending, Northeast dipping Fault zone.

Within the zone, strongly biotite altered basalt displays a dense network of narrow white, foliation-parallel quartz-carbonate veins, followed by late quartz-carbonate-ankerite-chlorite-amphibole breccia veins that are flooded with grey replacement quartz, and occasional late cross-cutting white to smokey grey quartz veins (often bearing visible gold). Mineralization consists of 3-5% aspy as fine acicular needles and coarser foliation parallel stringers/masses throughout the biotized host rock, accompanied by 3-5% po (locally 10%) and trace amounts of gal/sph/cpy.

Current ideas are that mineralization is controlled and/or modified by shallow west dipping faults and that the highest grade lenses or shoots lie near the intersection of the Northwest dipping Phoenix Fault, Footwall Fault and the ultramafic contact. Based on recent interpretations, the NNW trending, northeast dipping fault zone, north of the Phoenix Zone may play an important role in controlling the overall plunge of mineralization.

The overall thickness of the deformed biotized basalt halo varies up to 40 metres and can be highly anomalous in gold, while the narrower aspy-rich veined zone is confined to 2-10 metres. Within this, individual veins attain a thickness of 0.5 to 2.5 metres. The late gold bearing quartz veins often display fine pinheads of gold with occasional smears and clots to 3 mm across. This is accompanied locally by fracture-controlled aspy/gal/sph/cpy.

The visible gold appears to be related to the portions of the vein with the strongest quartz flooding/replacement and has not been observed within the enclosing basalt to date.

A sericitic quartz porphyry dike and a porphyritic diorite dike also appear to be intimately associated with the zones and may be following the same conduit as the mineralizing fluids. The quartz porphyry occasionally appears mineralized itself, whereas diorite clearly post-dates mineralization. The large quartz porphyry dike observed in the drill holes on Section 0+50S and also present in the new surface trench appears to be running perpendicular to stratigraphy and may be related to the NNW structural zone, north of the main Phoenix Zone mineralization. The table below presents some of the highlights from drilling within the Phoenix Zone.

| Hole No. | From (m) | To (m) | Au g/t | Core Length (m) |
|---|---|---|---|---|
| **PZ-02** | 45.10 | 52.30 | **6.76** | **7.20** |
| Incl. | 45.10 | 47.90 | **14.99** | **2.80** |
| **PZ-03** | 55.10 | 59.90 | **15.46** | **4.80** |
| Incl. | 58.00 | 59.90 | **33.31** | **1.90** |
| **PZ-08** | 52.17 | 55.20 | **5.37** | **3.03** |
| **PZ-09** | 68.85 | 72.10 | **8.87** | **3.25** |
| **PZ-10** | 91.75 | 109.15 | **1.96** | **17.40** |
| Incl. | 108.15 | 109.15 | **10.40** | **1.00** |
| **PZ-12** | 136.46 | 137.86 | **28.66** | **1.40** |
| **PZ-21** | 48.46 | 50.75 | **11.06** | **2.29** |
| | 69.85 | 71.90 | **13.95** | **2.05** |
| **PZ-23** | 74.95 | 78.05 | **70.10** | **3.10** |
| **PZ-25** | 112.35 | 120.35 | **8.42** | **8.00** |
| Incl. | 116.30 | 119.80 | **15.81** | **3.50** |
| **PZ-26** | 109.82 | 113.00 | **8.55** | **3.18** |
| **PZ-30** | 79.55 | 81.30 | **10.06** | **1.75** |
| **PZ-34** | 118.10 | 119.30 | **20.54** | **1.20** |
| **PZ-43** | 124.40 | 125.80 | **15.16** | **1.40** |
| **PZ-47** | 119.00 | 124.30 | **9.01** | **4.50** |
| Incl. | 122.60 | 124.30 | **22.24** | **1.70** |
| **PZ-48** | 61.00 | 90.45 | **2.21** | **29.45** |
| Incl. | 88.09 | 89.56 | **33.22** | **1.47** |
| **PZ-51** | 66.30 | 71.60 | **2.86** | **5.30** |
| Incl. | 66.30 | 67.90 | **6.82** | **1.60** |
| **PZ-57** | 50.00 | 56.05 | **2.65** | **6.05** |
| Incl. | 54.98 | 56.05 | **11.47** | **1.07** |
| **PZ-58** | 73.50 | 73.80 | **136.50** | **0.30** |
| **PZ-59** | 44.10 | 52.60 | **6.02** | **8.50** |
| Incl. | 47.60 | 49.75 | **17.24** | **2.15** |
| **PZ-60** | 83.70 | 91.30 | **2.21** | **7.60** |
| Incl. | 89.65 | 91.30 | **6.24** | **1.65** |
| **PZ-66** | 136.80 | 137.30 | **37.50** | **0.50** |
| **PZ-69** | 134.55 | 136.40 | **9.50** | **1.85** |
| **PZ-75** | 39.00 | 41.00 | **11.04** | **2.00** |
| **PZ-76** | 73.30 | 75.60 | **12.64** | **2.30** |
| Incl. | 73.60 | 74.90 | **20.18** | **1.30** |
| **PZ-77** | 28.95 | 31.35 | **8.89** | **2.40** |
| **PZ-80** | 54.20 | 55.35 | **12.55** | **1.15** |
| **PZ-81** | 121.40 | 123.00 | **53.27** | **1.60** |
| **PZ-82** | 8.65 | 17.60 | **5.16** | **8.95** |
| Incl | 8.65 | 9.10 | **29.50** | **0.45** |

| Hole No. | From (m) | To (m) | Au g/t | Core Length (m) |
|---|---|---|---|---|
| **PZ-83** | 7.90 | 19.00 | **4.51** | **11.10** |
| Incl. | 10.20 | 17.90 | **6.00** | **7.70** |
| And | 15.80 | 17.90 | **8.72** | **2.10** |
| **PZ-84** | 10.85 | 17.35 | **5.22** | **6.50** |
| **PZ-92** | 21.65 | 35.65 | **1.93** | **14.00** |

*CARZ (Carbonate Altered Zone)*

During the 2005 winter exploration program a previously unknown, gold bearing, Carbonate, Ankerite replacement zone ("CARZ") was discovered. This new zone of mineralization is located 75 metres structurally above the main Phoenix Zone. It is a complex, 20 to 30 metre thick zone of carbonate, ankerite replacement, containing numerous colloform banded 'snowbank' veins up to 5 metres thick. These veins are variably silicified and mineralized over thicknesses up to 14 metres, with fine grained, needle arsenopyrite. The structural control on the CARZ is not clear, however a flat lying (30º- 40 º), west dipping fault, located at the base of the zone may play a significant role.

Mineralization within the CARZ, is currently defined over a 120 metre strike length and 60 metres down dip and remains open. The table below presents some of the highlights from drilling within the CARZ.

| Hole No. | From (m) | To (m) | Au g/t | Core Length (m) |
|---|---|---|---|---|
| **PZ-82** | 8.65 | 17.60 | 5.16 | 8.95 |
| Incl | 8.65 | 9.10 | 29.50 | 0.45 |
| PZ-83 | 7.90 | 19.00 | 4.51 | 11.10 |
| Incl. | 10.20 | 17.90 | 6.00 | 7.70 |
| And | 15.80 | 17.90 | 8.72 | 2.10 |
| **PZ-84** | 10.85 | 17.35 | 5.22 | 6.50 |
| **PZ-92** | 21.65 | 35.65 | 1.93 | 14.00 |

Both the Phoenix Zone and CARZ show striking similarities to the ore zones present at the neighbouring Campbell and Red Lake mines in terms of geologic setting (Balmer formation near mafic/ultramafic contact with cross-cutting 340 degree structures), style of alteration, veining, and mineralization (aspy mineralization within sheared biotized veined basalts, silicified Carbonate/Ankerite Zones), and the size and orientation of lenses (short dip length, very long plunge length).

*Recommendations*

It has been recommended that further exploration on the Property be carried out in a three phase approach.

Phase 1

It has been recommended that trenching takes place on the CARZ. A detailed trenching, mapping and sampling program has been recommended to better understand the structural controls and distribution of gold mineralization within the CARZ. Currently the CARZ is defined over a strike length of 120 metres and 60 metres down dip. Based on current information, the CARZ is still open at depth and along strike.

Phase 2

A Phase 2 drilling program has been recommended to follow up on the Phase 1 trenching results. The program would focus specifically on expanding the known limits of the CARZ. Based on the location of the CARZ, further delineation can be carried out from McFinley Island and can be completed during the summer months.

Phase 3

A 2007 winter drilling program has been recommended to test for the extension of the Phoenix Zone, the CARZ, and other regional analogs to the Phoenix Zone. A number of holes have been recommended to follow up on a deeper extension of the main Phoenix Zone to the southwest. It has also been recommended that a number of holes target some of the deeper gold intercepts encountered directly down-dip of the main Phoenix Zone. This is an area that has the potential to host gold mineralization that may occur parallel to the main Phoenix Zone. Other targets include drilling to the northeast of the Phoenix Zone at depth. Based on current thinking, the north-northwest trending, northeast dipping structure that occurs to the north of the Phoenix zone may actually be the major structure controlling mineralization. Individual gold zones may have plunges to the southwest; however, the enveloping surface of the gold zones may dip to the northeast, stepping down in a 'ladder-like' fashion. Drilling from the ice will be required to follow up on the potential down plunge of the CARZ. This will be contingent on the summer results from this target.

*Proposed Budget*

A total budget of CAN$1,500,000 has been recommended for this phased exploration program. It has been recommended that CAN$75,000 be allocated for the Phase 1 trenching program. A total of 2800 metres of drilling, totalling CAN$425,000 has been recommended for the Phase 2 CARZ drilling. 6700 metres of drilling, totalling CAN$1,000,000 has been recommended for the Phoenix Zone, CARZ and regional targets during the Phase 3 winter program. Drilling costs are based on an all-in cost of CAN$150 per metre. This estimate is based on previous drilling costs in the area.

| Phase | Item | Cost | | |
|---|---|---|---|---|
| **Phase I** | **CARZ Trenching** | | | |
| | Backhoe | $40,000 | | |
| | Geologist | $7,500 | | |
| | Geologist | $7,500 | **Phase I Total Cost** | **$75,000** |
| | Washing/Sampling | $10,000 | | |
| | Assays | $5,000 | | |
| | Field Costs | $5,000 | | |
| | Total - | **$75,000** | | |
| **Phase II** | **CARZ Drilling** | | | |
| | Drilling (2800m) | $340,000 | | |
| | Geologist | $15,000 | | |
| | Geologist | $15,000 | **Phase II Total Cost** | **$425,000** |
| | Assays | $25,000 | | |
| | Field Costs | $30,000 | | |
| | | **$425,000** | | |
| **Phase III** | **Phoenix Zone/CARZ/Regional Drilling** | | | |
| | Drilling (6700m) | $750,000 | | |
| | Geologist | $25,000 | | |
| | Geologist | $20,000 | **Phase III Total Cost** | **$1,000,000** |
| | Geologist | $20,000 | | |
| | Assays | $85,000 | | |
| | Field Costs | $100,000 | | |
| | | **$1,000,000** | | |
| | | | **Grand Total** | **$1,500,000** |

The Company plans to carry out the proposed Phase 1 and Phase 2 exploration programs during 2006.

**Other Properties**

*DMC Property*

The Company has optioned up to a 65% interest in its 263 claim units known as the DMC property to Agnico-Eagle Mines Ltd. ("Agnico"). An option agreement was signed on January 20, 2006 pursuant to which Agnico must spend $2,250,000 in exploration expenditures and make $110,000 in cash payments over 3 years to earn an initial 51% interest. The first year includes a firm committed $500,000 expenditure and $25,000 cash payment. Thereafter it may elect within one year of vesting, to increase its interest by earning one additional percent for each one million dollars expended, up to a maximum of $14 million (65% interest in the property). Underlying property obligations on 136 of the 263 claim units (Meunier claims) include an advance royalty of $25K, paid annually to David Meunier, a NSR royalty of 1% on 44 units and a 2% NSR with a 1% buy-down for $1M on the remaining 92 claim units and a 0.5% NSR with a buyout for $500K on 38 claim units. An additional sliding scale NSR royalty, of 1.75% at a gold price less than $450 per ounce and 2% at a gold price equal to or greater than $450 per ounce, is held by AngloGold (Canada) Exploration Company on the entire property.

Access to the property is by boat and logging roads in the summer and ice roads in the winter. The DMC area is underlain by Balmer assemblage rocks consisting of mafic to ultramafic flows and intrusions, and minor sediments that are unconformably overlain by huston and confederation assemblage conglomerate, felsic crystal tuff, argillite and wacke. A number of blind granodiorite intrusive rocks are present. Stratigraphy youngs from east to west across the DMC area, with the base of the section marked by a package of variolitic, tholeiitic pillow basalt of unknown stratigraphic thickness that is discontinuously overlain by chert-magnetite iron formation. These, in turn, are overlain in apparent stratigraphic sequence by a package of dominantly massive to locally pillowed and flow brecciated basaltic komatiite to komatiite flows (and possible sills) with locally preserved spinifex textures, and minor tholeiitic basalt. The contact between the two volcanic packages is occupied by a thick (~ 150 metres), variably talc and Fe-carbonate altered peridotite sill (or serpentinite). Chert-rich conglomerate and breccia occur discontinuously along an angular unconformity that separates Balmer volcanic rocks from massive to poorly bedded quartz-crystal tuff of the confederation assemblage. Felsic tuff is stratigraphically overlain by pyrrhotite-rich well-bedded argillite and wacke.

The DMC property occurs in the same structural and stratigraphic setting as the Campbell, Red Lake and Cochenour-Willans mines, and contains widespread and locally high-grade gold mineralization (e.g. 90 g/t Au over 0.15 metre and 15.8 g/t over 1.1 metre in drill core). New ‘blind’ gold occurrences were discovered in 2002 (namely at the B and C zones), which were followed up and expanded on in 2003. Previously unmapped ultramafic bodies, recognized by Rubicon, within Balmer age mafic volcanic strata, occur in a folded, heterogeneously sheared environment, associated with broad zones of Fe-carbonate alteration, potassium addition (fuchsite, biotite and muscovite), silicification and arsenic and antimony enrichment. Gold mineralization at the DMC occurs in: a) mafic to ultramafic hosted structurally controlled vein/stockwork, b) chert-magnetite iron formation and cherty breccia, and c) felsic to intermediate intrusive hosted vein/stockwork. There is potential for DMC to host a Campbell-Red Lake type deposit and is supported by high-grade gold mineralization over mineable widths (e.g. 22.83 g/t over 3.10 metres, including 75.91 g/t over 0.70 metre; true width unknown) identified by Rubicon roughly 50 metres from the DMC Property boundary on the adjacent McCuaig JV property (60% interest owned by Rubicon; see below) in 2002.

Work conducted by the Company includes: geological mapping, rock and soil sampling, 109 line-kilometres detailed ground magnetic survey and 29 line-kilometre IP survey in 1996 and 1997; 11 hole (2476 metres) drill program in 1998; Anglogold funded regional airborne SPECTREM Magnetic/EM survey, mechanical stripping and channel sampling, gradient helimag, lake bottom seismic profiling, 12-line IP survey and 16 holes (5421 M) drill program in 2000 to 2002; and Anglogold funded 14 hole (3873 metres) drill program in 2003.

During the first quarter of 2006, Agnico funded a $635,000 3832 metre drill program on the core of the DMC property. Drilling identified gold mineralization in conjunction with biotite, fuchsite, arsenopyrite, pyrite alteration plus carbonate and quartze veining within host mafic/ultramafic rocks of the Balmer Assemblage indicative of a widespread gold bearing system. Intercepts include 2.41 g/t gold over 9.0 metres (including 5.27 g/t gold over 1 metre and 3.32 g/t gold over 3.5 metres), 3.41 g/t gold over 3.5 metres and 4.60 g/t gold over 1 metre. The dominant control on the mineralization and alteration appear to be associated with the intersection between northeast-trending and west-northwest-trending structures. Currently an ongoing program of data analysis (3D lithogeochemical and structural modeling) is taking place to formulate plans for a follow-up drill program in the winter of 2007.

*McCuaig JV Property*

The Company has earned a 60% interest in the McCuaig Property from Golden Tag Resources Ltd. for which the Company paid $25,000 and incurred total exploration expenditures of $972,000 by May 31, 2003. The property consists of 3 unpatented mining claims (10 claim units) located in Dome Township, Red Lake Mining Division, Ontario. The property is subject to a 2% NSR royalty of which the Company purchased 50% in the ERD (as defined below) acquisition in March 2003. The Company may with its 40% partner purchase 50% of the remaining 1% NSR royalty for $200,000 and also retains a right of first refusal on the remaining NSR royalty.

The property is located West-Northwest of the town of Cochenour. Access to the property is by boat in the summer and ice roads in the winter. The property is underlain by Balmer age mafic/ultramafic rocks which are

unconformably overlain by confederation age sediments. Structurally, the McCuaig property is on the western end of the main Red Lake Mine trend. An intense penetrative cleavage, trending west-northwest and dipping steeply to the south, is pervasive across the property. Gold Mineralization is associated with intensely altered Ultramafic rocks, chert breccia units and rare, dark grey quartz veins.

In 1998, the Company drilled two holes (total of 575 metres) and intersected potentially important altered Ultramafic rocks. Low gold values were returned from assays. The Company carried out a program of extensive soil sampling, mechanized trenching and ground magnetics at the end of 1999 on the McCuaig Property. In the northwest portion of the McCuaig JV Property, the Company has exposed the contact of an altered and deformed ultramafic body. Alteration is associated with the development of intense quartz-carbonate accompanied by strongly elevated arsenic, antimony, mercury and locally gold. Magnetic data are interpreted to suggest that this contact extends southwestwards beneath Red Lake for a minimum additional 800 metres. Soil surveys have detected the areas of known mineralization referred to, above, and have detected new targets that warrant follow-up. In 2000, the Company conducted detailed mapping of Mackenzie Island with the goal of generating drill targets by incorporating details of soil sampling and trenching conducted in October – November 1999. A new gold-bearing structure was intersected at the McCuaig JV Property in March 2001. In January through April 2002, the Company carried out a diamond drill program at the McCuaig JV Property. The Company completed 20,824 feet (6347 metres) in 26 diamond drill holes on the project.

During 2004, the Company carried out a drill program on its McCuaig JV Property with partner Golden Tag Resources Ltd. No significant results were reported. At this point in time, the Company has no immediate plans for exploration on this property. The Company is reviewing exploration plans for this property.

*Red Lake North Property*

The Red Lake North Property is comprised of 329 claim units: 295 contiguous claim units (staked claims and portions of underlying Coli Lake Agreement, Red Lake East Agreement and East Bay Agreement) in the Black Bear Lake, Coli Lake and Sobeski Lake areas and 34 non-contiguous claims units (northeastern portion of the property known as the Sidace Lake area) in Coli Lake, Sobeski Lake areas (consisting of staked claims and parts of the Coli Lake Agreement). The Company has optioned up to a 65% interest is the property to Solitaire Minerals Corp., with a third party controlling a sliding scale NSR of 1.75% to 2.5% depending on the price of gold. Under the terms of the Agreement, signed April 18, 2006, Solitaire Minerals Corporation has the option to acquire a 55% interest in the property by spending $2.5 million in exploration costs over a four year period, including a firm commitment to spend $275,000 in exploration in the first year of the agreement. Solitaire is required to make a $5000 cash payment (completed) and issue 50,000 of its common shares to the company (completed). Exploration programs are planned for late summer / early fall and will be drill focused.

The Red Lake North property is located north northwest of Red Lake and can be accessed year round by well maintained logging roads and ATV trails. The property encompasses the northwestern arm of the Red Lake greenstone belt, where it bifurcates around the Black Bear Intrusive. The property is underlain by variably altered tholeiitic volcanic and metasedimentary rocks of the Balmer Assemblage, thin units of ultramafic rocks and volcaniclastic sediments of intermediate composition and a package of unconformably overlying rocks of the confederation assemblage. Structurally, this property is characterized by an intense penetrative fabric that trends north-south at the southern end of the property and northeast-southwest at the northern end of the property. The overall dip to these units is to the northwest. The northeastern property straddles the ‘Sidace Gold Zone’, both updip and downdip of the currently defined horizon. Intense aluminosilicate alteration is observed on the downdip extension of the Sidace Gold Zone. Mineralization includes pyrite, pyrrhotite, chalcopyrite and rare telurides. The gold observed on the property is typically associated the sericite altered zones. No previous exploration, prior to the Company’s work, has taken place on this property.

Previous, historical exploration drilling on this 12 km long main block of the property is limited to 10 holes. Mineralization observed on this portion of the property is typically disseminated and dominated by pyrite and chalcopyrite. Previous exploration has been focused on VMS style mineralization and has not been a historical gold target.

In the fall of 2004 and winter of 2005, the Company carried out work that included geological mapping, prospecting, mobile metal ion ("**MMI**") sampling and a 1150 metres drill program. The focus of this exploration program was the southwestern extension of sericite schist hosted, ("Sidace Gold Zone"). Although the prospective sericite schist was located on the property, no significant results were returned. Considerable strike length on this property remains to be explored.

In the first half of 2004, the Company completed a regional mapping program, ground IP geophysics, and a 3,000 metre drill program in the Sidace Lake area. The majority of the drilling was directed at confirming the presence of the down-dip extension of the Sidace Gold Zone, a Hemlo-style, gold bearing, sericite schist horizon which has seen extensive drilling on the adjacent property. Broad zones of prospective sericite schist were intersected which contained anomalous gold-bearing intervals.

*Adams Lake Property*

The Adams Lake property is comprised of 235 claim units in Balmer and Bateman townships (consisting of staked claims and a portion of the underlying Red Lake East Agreement). The Company has a 100% interest in the property, with a third party controlling a sliding scale NSR of 1.75% to 2.0% depending on the price of gold.

The Adams Lake property is located east-northeast of the currently operating Campbell and Red Lake Mines, in Balmertown and can be accessed year round by well maintained logging roads and ATV trails. The property is underlain by Balmer age tholeiitic volcanic rocks, ultramafic rocks and volcaniclastic sediments of intermediate composition. Structurally, the southern portion of the property is on the mirror image of the regional fold observed at the Red Lake Mine, but located farther to the northeast. The central and northern portions of the property have a moderate penetrative fabric, arcuate in shape, trending north-northeast. Historical exploration has involved regional grid mapping, sampling, trenching and over 100 drill holes. The majority of the drill holes have been relatively shallow, with the majority less than 250 metres in length. From 2002-2004 the company completed a regional airborne magnetic survey, ground geophysics (TITAN24 and CSAMT), a gold in till sampling survey, detailed ground mapping and a 1983 metre drill program. Although results from this drill program were encouraging, there were no significant gold results reported. In 2005 work on the Adams Lake property included a total of 1960 metres of drilling targeting mafic/ultramafic Balmer stratigraphy. Anomalous gold results were returned. At this point in time, the Company has no immediate plans for exploration on this property.

*Slate Bay Property*

The Company acquired a 100% interest in 146 claim units located in the McDonough, Graves, and Dome townships of the Red Lake Mining Division, Ontario. The property is subject to a sliding scale NSR of 1.75% to 2.0% depending on the price of gold. There is an additional 1% NSR on 4 claims.

The majority of the Slate Bay property can be accessed by boat during the summer months and year round by logging roads and ATV trails. The Slate Bay property is underlain to the southeast by a stratigraphic sequence of Balmer assemblage mafic to ultramafic volcanic flows and intrusive rocks unconformably beneath a veneer of clastically derived conglomerates and sandstones and felsic to intermediate tuffaceous volcaic rocks. The northwest portion of the property is dominated by the Slate Bay Stock, an intrusive quartz diorite porphyry.

Exploration between 2001 and 2003 included initial property scale mapping, prospecting and trenching, regional SPECTREM airborne magnetic/EM survey, 418 line-kilometre airborne 3D gradient magnetic survey, 35 line-kilometre IP ground survey and 2670 metres of drilling. A large mineralizing system measuring several kilometres across has been identified in the Slate Bay area, which includes vein and possible disseminated gold drilled in 2001, and porphyry style copper-gold mineralization discovered in 2003. Highlight assay results include: 3.44 g/t Au over 21.85 metres, including 5.60 g/t Au over 6.1 metres and 0.21% Cu, 1.1 g/t Ag, and 0.14 g/t Au over 72.9 metres, including 9.00 metres of 0.48% Cu, 1.9 g/t Ag and 0.41 g/t Au. In the fall of 2005 a 1500 metre drill program was funded by King's Bay gold with no significant results. The Company has no immediate plans for exploration on this property.

*East Bay Property*

The East Bay property consists of 123 claim units located in the Bateman, Black Bear Lake, Shaver and Bateman Townships, Red Lake Mining Division, Ontario. The Company owns a 100% interest in 79 of the claim units and has an option to earn 100% interest in the remaining 44 claim units through two separate option agreements: The "Herbert" option, comprising 42 claim units and the Seargeant option comprising 2 claim units. Under the Herbert option (signed December 21, 2002) the Company owns a 40% interest in the claims and has the option to acquire the remaining 60% interest by making cash payments of $87,000 ($27,000 paid) and issuing 60,000 common shares (45,000 issued). The Herbert optioned claims are subject to a 1.2% NSR with a 0.6% buydown for $600,000. Under the "Seargeant" option, the Company can earn 100% by making cash payments of $55,000 ($20,000 paid) by October 20, 2006. The property is subject to a 2% NSR of which the Company may purchase 1% of the NSR royalty for $750,000. The entire property is subject to an additional sliding scale NSR royalty of 1.75-2.0%.

The East Bay property is located north northwest of Red Lake and can be accessed year round by well maintained logging roads and ATV trails. The East Bay property is underlain by Balmer assemblage rocks consisting of mafic to Ultramafic flows and intrusions and minor intercalated iron formation. Two major, over 100 metre thick, ultramafic bodies, the East Bay Serpentinite and the Pindar Creek Serpentinite trend northeast across the center of the property for a combined strike length of 6 km. The mafic to Ultramafic sequence dips moderately to steeply to the northwest, and is flanked by large granodiorite bodies to the north and southeast (the Blackbear Pluton and Walsh Lake Pluton respectively).

Structure on the property is dominated by a regional D2 fabric, with only minor evidence of early D1 structures. Rocks are moderately to strongly foliated (subparallel to bedding), and are variable flattened as is well exemplified in pillowed mafic units. In the east half of the property, similarity between the two main ultramafic bodies (East Bay and Pindar Creek serpentinites) suggests possible repetition about a tight to isoclinal, shallowly plunging fold. This interpretation is consistent with larger scale regional magnetic and geologic patterns.

The East Bay Deformation Zone ("**EBDZ**"), which follows the length of the East Bay Serpentinite, cuts through the core of the property. It consists of a several hundred metres wide zone of heterogeneous strain, with discrete narrow ductile shear structures interwoven with lesser deformed rocks. A similar parallel deformation zone, the Post Narrows Deformation Zone, projects through the western edge of the property with cross-cutting west and northwest trending structures interpreted from magnetic data.

Exploration to date by the company includes regional SPECTREM magnetic/EM survey, gradient Helimag survey and 6257 metres of drilling. In 2004, Wolfden Resources Inc. optioned 4 claims and funded 5163 metres of the diamond drilling targeting the downdip potential of GAZ (Green Altered Zone) mineralization intersected on the adjacent property immediately to the south (inferred resource is 1.4M tones grading 8.0 g/t Au for a contained 326,407 ounces Au (Wolfden NR Feb 23, 2005)). Broad intersections of low grade gold anomalies associated with silicified intrusives (0.74 g/t Au over 28.2m and 0.59 g/t Au over 40.5m) and anomalous gold marginal to the intrusives within mafic and ultramafic rocks (4.57 g/t Au over .9m, 3.53 g/t Au over 3.5m, 3.17 g/t Au over 2.5m). Results are indicative of a sizeable gold-bearing system. Elsewhere single gold hits of 7.83g/t Au over 0.4m within the biotite-carbonate altered mafic rocks and 8.75g/t Au over 0.54 metres within an arsenopyrite bearing quartz feldspar porphyry were returned.

*Humlin Property*

The Company has optioned a 55% interest in its 294 claim units known as the Humlin property to Solitaire Minerals Corp. ("Solitaire") located in Fairlie and Baird Township, Red Lake Mining Division, Ontario. The company signed an option agreement on its Humlin Property on April 18, 2006 whereby Solitaire Minerals Corporation has the option to acquire a 55% interest in the property by spending $2.5 million in exploration costs over a four year period, including a firm commitment to spend $250,000 in exploration in the first year of the agreement. Solitaire is required to make a $5000 cash payment (completed) and issue 50,000 of its common shares to the company. Underlying property obligations include a third party NSR of 1.75% to 2.0% depending on the price of gold.

The Company acquired a 100% interest in 294 claim units located in Fairlie and Baird Township, Red Lake Mining Division, Ontario. The property is subject to a sliding scale NSR of 1.75% to 2.0% depending on the price of gold.

The southern and northern portions of the Humlin property can be accessed year round by well maintained logging roads and ATV trails. The central portion of the property is accessed by boat in the summer months and ice roads in the winter. The property covers the central portion of the Red Lake Greenstone Belt, and is transected by a broad over 1 km wide, 'Mine Trend' parallel, regional-scale, northwest-trending structure referred to as the Pipestone Bay – St. Paul Bay deformation zone. The area is underlain by tholeiitic to komatiitic flows and ultramafic intrusions of the 2.98 to 2.96 Ga Balmer assemblage, and lesser felsic tuff and siliciclastic rocks of the 2.74 to 2.73 Ga confederation assemblage, which overlies the Balmer assemblage on a regional unconformity. The western margin of the Dome stock (2.72 Ga) underlies the southeast corner of the claim group, whereas the Killala-Baird batholith (2704 Ma) underlies the southwest corner. Minor gold occurrences (1-5 g/t Au) are found throughout the property.

Rubicon completed approximately $350,000 of work during 2001, 2002 and 2003 including reconnaissance-scale mapping and sampling, 1200 line-kilometres of high-resolution airborne magnetic survey, regional SPECTREM airborne magnetic/EM survey and 1593 metres of drilling. Exploration programs will include summer surface exploration and a winter 2007 drill program.

*Redstar Option Agreement*

During 2002, the Company granted Redstar Resources Corporation ("Redstar") the right to earn up to a 70% interest in several of the Company's properties (a total of 226 claim units) at the western end of the Red Lake gold camp. The optioned properties included the Baird, Pipestone North, Pipestone South and Wolf Bay properties.

Redstar can earn an initial 51% interest in the properties by making cash payments to the Company totalling $135,000, issuing 500,000 post-consolidation shares (250,000 received) to the Company and expending $2.75 million in exploration work over four years, including a firm commitment of $450,000 for the first year (completed). During the comparative year, the Company amended the agreement in which Redstar can increase its interest to 60% by funding total exploration expenditures of $3 million over eight years and can increase its interest to 70% by funding and bankable feasibility study and arranging project financing for a mine. Redstar is also responsible for making all cash payments to the underlying property vendors and the issuance of 150,000 common shares to the Company (paid). Subsequent to December 31, 2004, the Company renegotiated this option agreement with Redstar whereby under the new agreement, Redstar agreed to make an initial cash and share payment of $25,000 and 250,000 common shares. Redstar is then required to make additional cash payments of $175,000, issue an additional $75,000 in Redstar shares and complete an additional $1,100,000 in work expenditures over a four year period to earn a 51% interest in the properties covered under the Redstar option agreement.

Redstar is currently operating the exploration programs on the properties. Ongoing exploration is currently taking place

*English Royalty Division ("**ERD**")*

The Company acquired rights to cash and share option payments and contractual interests (Letter Agreement signed January 23, 2003) in an initial portfolio of 63 mineral interests, mainly in the Red Lake district of Ontario, from prospector Perry English in exchange for $500,000 and 250,000 Rubicon Common Shares. As part of the agreement, the Company engaged Perry English as a consultant for a period of two years at an annual rate of $75,000, renewable for another two years at Perry English's option, to acquire additional mineral properties of merit for optioning to third parties. Subsequent to 2004, Perry English elected to extend the consultancy agreement for one additional year. Mr. English is also entitled to a bonus on cash and share option payments received from the mineral properties in the ERD in excess of $150,000, payable as follows: 10% on receipts between $150,000 and $300,000, 15% on the next, $50,000, 17.5% on the next $100,000 and 20% on the next $400,000.

In addition, the initial portfolio of mineral properties in the ERD included 14 mineral properties optioned to the Company which it now owns through the ERD. As a result, the Company has saved $231,000 in option payments to the end of 2005.

During 2005, the company spent $162,000 on acquisition and maintenance costs and recovered $141,000. As at December 31, 2005, the English Royalty Division properties had a carrying cost of $0.44 million (excluding saved option payments which Rubicon would otherwise have to have made).

Combined with the savings in option and advance royalty payments, the Company expects to recover all its initial and subsequent costs included to date during 2006 at which point it will have acquired rights to cash and share option payments and royalty interests in a substantial number of mineral properties for little or no cost. The Company however expects to continue to acquire additional mineral properties of merit for optioning to third parties.

Future cash and option payments are dependent on third parties maintaining the mineral properties optioned from the ERD and the value of its contractual interests in its ERD properties is dependent on the exploration results carried out by optionees.

*Manitou Property*

The Company has the option to earn a 100% interest in 301 claim units from the Bjorkmans located in the Lower Manitou Lake and Harper Lake Townships in the Kenora Mining Division of Ontario known as the Manitou Property. Under terms of the Due Diligence Letter Agreement signed April 6, 2005 and executed on June 30, 2005, the Company is required to make a total of $210,000 cash payments ($15,000 paid in 2005) and issue $70,000 share payments (10,000 issued in 2005) over 3 years to earn 100% interest. Pursuant to an amendment to the option agreement, dated June 14, 2006, if the Arrangement is completed, the remaining share issue requirements are changed to a total of 120,000 Rubicon Common Shares payable over 2 years to June 30, 2008.

Commencing on the fifth anniversary of the agreement (June 30, 2010) the owners are entitled to an annual advance royalty of $15,000 and the property is subject to a 2% NSR with a 50% buydown for $1,000,000.

The Manitou West Limb Gold property is approximately 80km south of Dryden, Ontario. The property can be accessed year round by well maintained logging roads and ATV trails. The property is located on the western limb of a major, belt-scale, northeast plunging antiform, on the western margin of the Manitou Greenstone Belt. The Manitou greenstone belt is dominated by metavolcanic and metasedimentary rocks of Archean age. The property is underlain by rocks of the Blanchard Lake Basalt group. The metamorphic grade is upper greenschist to amphibolite. A large intrusive, the Atikwa Batholith, occurs approximately 2 km to the northwest of the property. The Carlton Lake Stock and the Scattergood stock occur to the southeast of the property. Outcrop exposure on the property is very good, with upwards of 50-60% exposure. The property was optioned based on 2004 channel sampling performed on the Dryden-Red Lake showing that returned assays of 54 g/t Au over 30cm, 16 g/t Au over 50cm and 17 g/t over 22cm and were followed up by grab samples by Rubicon geologists that returned values of 233 g/t Au, 36 g/t Ag and 0.6% Zn and 120 Au, 14 g/t Ag and 0.25% Zn.

Gold mineralization is observed in shear zone hosted quartz veins and the surrounding wall rock within the shear zones. Associated sulphides include chalcopyrite, pyrite, sphalerite and galena.

During the summer and late fall of 2005 work conducted on the property included initial prospecting, geological mapping, soil sampling and local trenching. At this point in time, the company is planning a 2006 summer field exploration program including regional mapping, sampling and trenching.

## MARKET FOR SECURITIES

An application has been made to continue the listing of the Rubicon Common Shares on the TSX. An application has also been made to continue the listing of the Rubicon Common Shares on AMEX.

## DIRECTORS AND OFFICERS

For details of Rubicon's Directors and Officers, see "Annual Meeting Matters to be Acted Upon – Election of Directors" and "Directors, Senior Management and Employees" at pages 42-50 of the Annual Report.

## PRIOR SALES

During the 12 months preceding the date of this Circular, Rubicon has issued the following Rubicon Common Shares at the following prices:

| Date | Number of Shares | Issue Price per Share | Total Issue Price | Nature of Consideration Received |
|---|---|---|---|---|
| June 29, 2006 | 888,500 | $0.85 | $737,455 | Cash |
| June 23, 2006 | 6,000 | $0.83 | $4,980 | Cash |
| June 20, 2006 | 22,000 | $0.83 | $18,266 | Cash |
| May 26, 2006 | 9,376 | $1.21 | $11,344.96 | Cash |
| May 2, 2006 | 20,000 | $1.48 | $29,600 | Cash |
| May 2, 2006 | 25,650 | $0.85 | $21,802.50 | Cash |
| April 28, 2006 | 175,000 | $0.83 | $145,250 | Cash |
| April 28, 2006 | 50,000 | $1.18 | $59,000 | Cash |
| April 21, 2006 | 18,750 | $1.21 | $96,687.50 | Cash |
| April 21, 2006 | 50,000 | $1.48 | $74,000 | Cash |
| April 20, 2006 | 720 | $1.40 | $1,008 | Cash |
| April 20, 2006 | 95,000 | $1.48 | $140,600 | Cash |
| April 19, 2006 | 20,000 | $1.48 | $29,600 | Cash |
| April 19, 2006 | 18,750 | $1.21 | $22,687.50 | Cash |
| April 13, 2006 | 20,000 | $0.85 | $17,000 | Cash |
| April 13, 2006 | 10,000 | $0.83 | $8,300 | Cash |
| April 12, 2006 | 7,640,560 | $1.48 | $11,308,028.80 | Cash |
| April 10, 2006 | 50,000 | $0.85 | $42,500 | Cash |
| April 7, 2006 | 20,000 | $0.85 | $17,000 | Cash |
| April 3, 2006 | 265,880 | $0.85 | $225,998 | Cash |
| April 3, 2006 | 9,376 | $1.21 | $11,344.96 | Cash |
| April 3, 2006 | 30,000 | $1.48 | $44,400 | Cash |
| March 31, 2006 | 50,750 | $0.85 | $43,137.50 | Cash |
| March 31, 2006 | 8,750 | $0.99 | $8,662.50 | Cash |
| March 31, 2006 | 15,626 | $1.21 | $18,907.46 | Cash |
| March 30, 2006 | 20,000 | $0.83 | $16,600 | Cash |
| March 21, 2006 | 40,000 | $1.19 | $47,600 | Property |
| March 6, 2006 | 15,000 | $0.83 | $12,450 | Cash |
| February 23, 2006 | 186,353 | $0.693 | $129,142.63 | Cash |
| February 21, 2006 | 25,000 | $0.85 | $21,250 | Cash |
| February 15, 2006 | 19,230 | $0.85 | $16,345.50 | Cash |
| February 9, 2006 | 15,000 | $1.45 | $21,750 | Cash |
| February 6, 2006 | 55,000 | $0.83 | $45,650 | Cash |
| February 1, 2006 | 7,500 | $0.693 | $5,197.50 | Cash |
| January 20, 2006 | 69,230 | $0.85 | $58,845.50 | Cash |
| September 29, 2005 | 5,000 | $0.68 | $3,400 | Property |
| September 22, 2005 | 50,000 | $0.90 | $45,000 | Property |
| August 18, 2005 | 10,000 | $0.88 | $8,800 | Property |
| August 16, 2005 | 1,967,300 | $0.65 | $1,278,745 | Cash |
| August 15, 2005 | 7,264,700 | $0.65 | $4,722,055 | Cash |

## STOCK EXCHANGE PRICE

The following table shows the range in the trading price and the volume of the Rubicon Common Shares on the TSX for the current and preceding quarter on a monthly basis and the seven preceding quarters on a quarterly basis:

| | Price Range | Volume |
|---|---|---|
| July 2006 | $1.30-$1.46 | 451,000 |
| June 2006 | $1.11-$1.52 | 3,855,100 |
| May 2006 | $1.30-$1.72 | 5,883,500 |
| April 2006 | $1.42-$1.85 | 7,136,500 |
| 1st Quarter 2006 | $1.00-$1.71 | 21,705,500 |
| 4th Quarter 2005 | $0.68-$1.01 | 9,439,400 |
| 3rd Quarter 2005 | $0.64-$0.94 | 12,701,800 |
| 2nd Quarter 2005 | $0.76-$1.22 | 7,962,400 |
| 1st. Quarter 2005 | $1.07-$1.42 | 5,916,000 |
| 4th Quarter 2004 | $1.15-$1.57 | 4,534,600 |
| 3rd Quarter 2004 | $1.01-$1.71 | 7,219,400 |

**Note:**

(1) The month of July 2006 includes the price range and volume of trade of the Rubicon Common Shares from July 4, 2006 until July 6, 2006.

## OUTSTANDING OPTIONS

As at July 4, 2006, Rubicon has granted persons options to purchase or acquire an aggregate of 4,206,372 Rubicon Common Shares as described below.

| Date of Grant | Number of Options | Exercise Price | Market Price at the Date of Grant(1) | Expiry Date |
|---|---|---|---|---|
| **Executive Officers and former Executive Officers of Rubicon (9 persons)** | | | | |
| August 8, 2002 | 525,000 | $0.83 | $1.04 | August 8, 2007 |
| July 18, 2003 | 225,000 | $0.84 | $0.84 | July 18, 2007 |
| January 6, 2005 | 1,100,000 | $1.18 | $1.18 | January 6, 2010 |
| January 28, 2005 | 350,000 | $1.18 | $1.18 | January 28, 2010 |
| September 12, 2005 | 150,000 | $0.74 | $0.74 | September 12, 2010 |
| December 14, 2005 | 200,000 | $0.86 | $0.86 | December 14, 2010 |

| Date of Grant | Number of Options | Exercise Price | Market Price at the Date of Grant(1) | Expiry Date |
|---|---|---|---|---|
| **Consultants and Former Consultants of Rubicon (4 persons)** | | | | |
| July 9, 2002 | 100,000 | $1.15 | $1.44 | July 9, 2007 |
| January 27, 2004 | 50,000 | $1.48 | $1.48 | January 27, 2009 |
| June 8, 2004 | 200,000 | $1.16 | $1.16 | June 8, 2007 |
| August 22, 2005(2) | 92,000 | $0.83 | $1.52 | November 15, 2006 |
| August 22, 2005(2) | 250,000 | $1.18 | $1.52 | November 15, 2006 |

| Date of Grant | Number of Options | Exercise Price | Market Price at the Date of Grant(1) | Expiry Date |
|---|---|---|---|---|
| **Employees and former Employees of Rubicon (19 persons)** | | | | |
| August 8, 2002 | 80,000 | $0.83 | $1.04 | August 8, 2007 |
| October 20, 2003 | 20,000 | $1.17 | $1.18 | October 20, 2013 |
| January 27, 2004 | 415,000 | $1.48 | $1.48 | January 27, 2009 |
| December 31, 2004 | 298,122 | $1.21 | $1.21 | December 31, 2009 |
| June 23, 2005 | 11,250 | $0.99 | $0.99 | June 23, 2007 |

| | | | | |
|---|---|---|---|---|
| September 1, 2005 | 100,000 | $0.67 | $0.67 | September 1, 2010 |
| April 21, 2006 | 40,000 | $1.70 | $1.70 | April 21, 2011 |

**Notes:**

(1) The market price at the date of grant is the closing price at the TSX at the date of grant.
(2) These options were originally granted to a director who subsequently ceased being a director and was engaged as a consultants after which the expiration date was shortened. The original grant date market price for theses options were $.83 and $1.18, respectively.

## CONSOLIDATED CAPITALIZATION

Except as disclosed in this Circular (including documents incorporated by reference), there has not been any material change in the share capital of Rubicon on a consolidated basis since December 31, 2005.

### Share Capital

#### *Common Shares*

Rubicon is authorized to issue an unlimited number of Rubicon Common Shares. All of the authorized Rubicon Common Shares rank equally as to dividends, voting powers (one vote per common share) and participation in assets upon dissolution or winding-up. No Rubicon Common Shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the Rubicon Common Shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provisions permitting or restricting the issuance of additional securities, or requiring a securityholder to contribute additional capital. Provisions as to the modification, amendment or variation of such rights or provisions are contained in the BCBCA and Rubicon's Articles. Generally, substantive changes to the share capital require the approval of the Shareholders by special resolution (at least two-thirds of the votes cast by Shareholders present in person or by proxy).

Rubicon does not have, and will not have immediately following the Arrangement, any classes of preferred shares authorized or issued.

*Loan Capital*

Rubicon does not have any debt obligations outstanding.

## STOCK OPTION PLAN

For details of Rubicon's stock option plan, see the Circular under the heading "Rubicon Stock Option Plan".

## RISK FACTORS

In evaluating the Arrangement, Rubicon Shareholders should carefully consider, in addition to the other information contained in this Circular, the risk factors which apply to Rubicon. **See Schedule "M" – Risk Factors for certain considerations relevant to Shareholders regarding the Arrangement and their investment in the securities referred to in this Circular.** These risk factors are not a definitive list of all risk factors associated with the business to be carried out by Rubicon.

## AUDITOR, REGISTRAR AND TRANSFER AGENT

Rubicon's Auditor after the Arrangement will continue to be DeVisser Gray, Chartered Accountants, 401-905 West Pender Street, Vancouver, BC V6C 1L6.

The Registrar and Transfer Agent for Rubicon after the Arrangement will continue to be Computershare Investor Services Inc., 3rd Floor - 510 Burrard Street, Vancouver, BC, Canada V6C 3B9.

## MATERIAL CONTRACTS

The following are the material contracts of Rubicon, other than those entered onto in the ordinary courses of business that have been entered into within two years before the date of this Circular.

1. Employment Agreement between Rubicon and Robert G. Lewis dated August 29, 2005 pursuant to which Mr. Lewis agreed to act as chief financial officer of Rubicon in exchange of $100,000 per annum for a term of three years.

2. Amended and Restated Shareholder Rights Plan Agreement between Rubicon and Computershare Investor Services Inc. dated June 14, 2006.

3. Support Agreement between Rubicon and certain significant shareholders dated as of June 30, 2006.

4. Amended and Restated Support Agreement between Hasita S.A., Resource Marketing Services Ltd., John Tognetti, Noelle Tognetti in trust for Nicolle, Danielle and Gabriela Tognetti, Anna Clark and Rubicon dated July 5, 2006.

5. Arrangement Agreement between Rubicon, Africo, Paragon and CopperCo dated July 6, 2006.

## OTHER MATERIAL FACTS

There are no other material facts other than as disclosed herein.

## SCHEDULE "J"

(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

## INFORMATION CONCERNING PARAGON AFTER THE ARRANGEMENT

NOTICE TO READER ..... 1
COMPANY PROFILE ..... 2
CORPORATE STRUCTURE ..... 2
GENERAL DEVELOPMENT OF THE BUSINESS ..... 2
DESCRIPTION OF THE BUSINESS OF PARAGON ..... 3
DESCRIPTION OF MINERAL PROPERTIES ..... 3
PRINCIPAL PROPERTIES ..... 4
OTHER PROPERTIES ..... 21
FUNDS AVAILABLE ..... 41
SELECTED CONSOLIDATED FINANCIAL INFORMATION ..... 44
DESCRIPTION OF SECURITIES ..... 44
CAPITALIZATION ..... 44
CONSOLIDATED CAPITALIZATION ..... 45
OPTIONS TO PURCHASE SECURITIES ..... 45
PRIOR SALES ..... 46
ESCROWED SECURITIES ..... 46
PRINCIPAL SHAREHOLDERS ..... 47
DIRECTORS AND OFFICERS OF PARAGON ..... 47
EXECUTIVE COMPENSATION ..... 50
PROPOSED EXECUTIVE COMPENSATION ..... 51
PROPOSED PARAGON STOCK OPTION PLAN ..... 51
INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS OF PARAGON ..... 54
LISTING APPLICATION ..... 54
RISK FACTORS ..... 54
PROMOTERS ..... 54
LEGAL PROCEEDINGS ..... 54
INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ..... 54
AUDITOR, REGISTRAR AND TRANSFER AGENT ..... 55
MATERIAL CONTRACTS ..... 55
OTHER MATERIAL FACTS ..... 56

## NOTICE TO READER

**The following is a summary of the business of Paragon after the Arrangement and should be read together with the more detailed information and financial data and statements contained elsewhere in this schedule and in the Circular. Except where otherwise indicated herein, all of the disclosure in this schedule is made on the basis that the Arrangement has been completed as described in the Circular.**

## COMPANY PROFILE

Paragon was incorporated in order to take part in the Arrangement. Paragon has applied to be listed on the TSX-V, however, there are no assurances as to if, or when, Paragon will be listed on the TSX-V, if ever. Pursuant to the Arrangement, Paragon will acquire certain assets previously owned by Rubicon which consisted of gold and base metal exploration properties in Newfoundland and Labrador. See "The Arrangement". The focus of Paragon will be the acquisition and advancement of its principal gold exploration properties in Newfoundland and Labrador and other exploration properties in Newfoundland and Labrador.

## CORPORATE STRUCTURE

### Name and Incorporation

Paragon was incorporated as "Paragon Minerals Corporation" under the CBCA on July 4, 2006. Paragon's head office and principal business address is Suite 1540 – 800 West Pender Street, Vancouver, British Columbia, V6C 2V6 and its registered and records office is located at 2800 Park Place, 666 Burrard Street, Vancouver, BC, V6C 2Z7.

### Intercorporate Relationships

Paragon has no subsidiaries.

## GENERAL DEVELOPMENT OF THE BUSINESS

### Three-Year History

On September 30, 2003, Rubicon graduated to the TSX. In September, 2004, the Rubicon Common Shares began trading on AMEX.

On November 21, 2005, Rubicon announced that the Board of Directors of Rubicon had approved a corporate reorganization in order to maximize shareholder value. The reorganization would result in each of the three major asset groups, currently owned by Rubicon, forming the basis of its own clearly focused public company.

As part of the reorganization of Rubicon, Rubicon would transfer to Paragon the exploration properties in the Province of Newfoundland and Labrador and the Territory of Nunavut (the "**Newfoundland Assets**"), in exchange for shares that would be distributed to the Shareholders in accordance with the terms of the Arrangement.

### Trends

Paragon will be a mineral exploration company. Accordingly, Paragon's financial success will be dependent upon the extent to which is can discover mineralization and the economic viability of developing such properties. Such development may take years to complete and the amount of resulting income, if any, is difficult to determine with any certainty. Paragon has no mineral reserves and to date has not produced revenues. The sales value of any mineralization that may be discovered by Paragon is largely dependent on factors beyond Paragon's control, such as the market value of the metals produced. See "Risk Factors" and Schedule "M" – Risk Factors.

Paragon proposes to carry out the Phase I and II exploration programs discussed in this Schedule "J". See Schedule "J", "Information Concerning Paragon After the Arrangement – Description of Mineral Properties – Principal Properties, and Schedule "N" – Risk Factors". The implementation of any Phase II exploration program is independent of the results of the Phase I exploration programs but will depend on the availability of sufficient exploration funds. In addition, Paragon intends to seek and acquire additional properties worthy of exploration and development.

Prior to the completion of the Arrangement and the proposed listing of the Paragon Common Shares on the TSX-V, Paragon proposes to carry out an offering of additional securities by way of a non-brokered private placement of special warrants, to raise gross proceeds of a minimum of $3,000,000 and a maximum of $3,700,000. See Schedule "J", "Information Concerning Paragon After the Arrangement – Funds Available - Private Placement Financing".

Other than disclosed herein, Paragon is not aware of any trends, uncertainties, demands, commitments or events which are reasonably likely to have a material effect on Paragon's business, financial condition, or results of operations as at the date of the Circular.

## DESCRIPTION OF THE BUSINESS OF PARAGON

### Business Objectives

Paragon's primary objective upon completion of the Arrangement is to carry out the exploration programs recommended in the "Technical Report for the JBP Linear property, Gander and Gander River Areas, NTS 2D/15 & 2E/02, Newfoundland and Labrador" dated December 9, 2005 and prepared in accordance with NI 43-101 by Larry Pilgrim, a Registered Professional Geologist and Independent Qualified Person (the "**JBP Linear Report**") and the "Technical Report for the Golden Promise Property, Badger and Grand Falls Map Sheets, NTS 12A16 & 2D/13, Newfoundland and Labrador" dated January 6, 2006 and prepared in accordance with NI 43-101 by Larry Pilgrim (the "**Golden Promise Report**") with respect to the Newfoundland Assets. See Schedule "J", "Information Concerning Paragon after the Arrangements - Principal Properties – JBP Linear Property and Golden Promise Property", respectively. If the results of the initial phases of exploration prove to be encouraging, Paragon will require additional capital prior to embarking on additional exploration work. The additional capital may come from future financings or through joint ventures or option agreements with one or more third parties. There can be no assurance that Paragon will be able to raise such additional capital if and when required. See "Risk Factors", Schedule "J", "Information Concerning Paragon After the Arrangement – Risk Factors and Schedule "N" – Risk Factors.

On May 1, 2006, the Golden Promise Property was optioned to Crosshair Exploration & Mining Corporation ("**Crosshair Exploration**"), whereby Crosshair Exploration can earn a 60% interest in the property. See Schedule "J", "Information Concerning Paragon after the Arrangements - Principal Properties – Golden Promise Property"

### Competitive Conditions

The precious metal minerals exploration industry and mining business is a competitive business. Paragon will be competing with numerous other companies and individuals in the search for and the acquisition of attractive precious metal mining properties. The ability of Paragon to acquire precious metal mineral properties in the future will depend not only on its ability to develop its present properties, but also on its ability to select and acquire suitable producing properties or prospects for precious metal development or mineral exploration.

## DESCRIPTION OF MINERAL PROPERTIES

The principal and other properties of Paragon are defined into five distinct trends (or gold belts) and as base metal properties. The properties are briefly summarized below and further described in the following sections (see Principal Properties and Other properties).

**Glenwood – Botwood Trend Properties, Newfoundland**

1. **JBP Linear property (Principal property)** – 100% interest
2. Glenwood property – 100% interest
3. Jonathans Pond property – 100% interest
4. Wings Point property – 100% interest
5. Golden Bullet property – option to earn 100% interest
6. Appleton property – option to earn 100% interest
7. Bowater property – option to earn 100% interest

8. Linear Property – option to earn 100% interest
9. Mt. Peyton Linear property – 100% interest
10. TCH property – 100% interest
11. Huxter Lane property –100% interest, optioned to Meridian Gold Company ("Meridian") for up to 70% interest

**Golden Promise Trend Properties, Newfoundland**

1. **Golden Promise property (Principal property)** – 100% interest, optioned to Crosshair Exploration to earn 60% interest
2. South Golden Promise property - 100% interest, optioned to Crosshair Exploration for 60% interest
3. Barren Lake property – 100% interest; optioned to Crosshair Exploration for 60% interest
4. Victoria Lake property – 100% interest; optioned to Crosshair Exploration for 60% interest
5. Victoria Lake 10188M property – option to earn 100% interest optioned to Crosshair Exploration for 60% interest

**New World Trend Properties, Newfoundland**

1. New World property –100% interest

**Star Track Trend Properties, Newfoundland**

1. Star Track property –option to earn 100% interest

**Avalon Trend Properties, Newfoundland**

1. Bergs property –100% interest

**Base Metal Properties, Newfoundland**

1. Seal Bay property – Rubicon 51% - Falconbridge Limited 49% joint venture (not formalized)
2. West Cleary property – Rubicon 51% - Falconbridge Limited 49% joint venture (not formalized)
3. Pt. Leamington Mining Lease – NSR interest (TLC Ventures has a 100% earned interest)
4. Harpoon property – option to earn 100% interest
5. Lake Douglas East and West properties –option to earn 100% interest

**Maritec Property, Baie Verte, Newfoundland**

1. Maritec property– 100% interest

**Incognita Property, Baffin Island, Nunavut**

1. Incognita property – 100% interest

## PRINCIPAL PROPERTIES

### JBP Linear Property

***Introduction and Terms of Reference***

The following information concerning the JBP Linear property is summarized from the JBP Linear Report.

***Property Description and Agreements***

The JBP Linear property is located 15 kilometres west of Gander, Newfoundland, and is covered by NTS mapsheet 2D/15 and 2E/02. Access to the property is excellent with the Trans-Canada Highway crossing through the southern portion of the property. Well-maintained logging roads from the highway provide good access to various points on the property.

The JBP Linear property consists of 6 mineral licences (426 claims) covering a total area of 10,850 hectares. In April 2006, Rubicon increased the size of the JBP Linear property by regrouping existing licenses. Regrouped licences 12071M and 12073M include former mineral licences that are subject to the JBP property agreement as outlined below.

| Licence | Claims | Area (ha) | Comments |
|---|---|---|---|
| 6821M | 2 | 50 | Lush Property Agreement |
| 7179M | 8 | 200 | B Property Agreement |
| 9713M | 30 | 750 | Lush Property Agreement (former mineral license 6812) |
| 12071M | 144 | 5,700 | Includes former mineral license 8613M and 10965M |
| 12073M | 147 | 1,775 | |
| 10966M | 95 | 2,375 | Includes former mineral licenses 8344M, 8415M and 8572M |
| | **426** | **10,850** | |

Five of the six mineral licenses are subject to property option agreements from local prospectors and two mineral licenses were map staked by Rubicon. With the exception of the Lush property (1 payment remaining), Rubicon has a 100% interest into the optioned and staked properties. The three property option agreements covering the optioned properties are registered with the Government of Newfoundland and Labrador and summarized below.

JBP Linear Property – B Property Agreement - The B Property Agreement is an option agreement with local prospectors Gary Lewis, Cyril Reid and Paul Chafe and consists of five non-contiguous mineral licenses in the Glenwood-Gander area. One licence (7179M and associated area of influence) is included in the JBP Linear property group. Under the B Property Agreement, the mineral license(s) are subject to cash and share option payments over a 3 year period and a sliding-scale NSR relative to the price of gold payable to the vendors as follows: <US $300/oz = 2.0% NSR; >US $300-400 = 2.5% NSR; and >US$400 = 3.0% NSR. Rubicon has completed its option payments obligations and has earned a 100% interest in the mining and mineral rights to the five mineral licenses under the B Property Agreement. Rubicon must begin making advance royalty payments of $10,000 per year on December 23, 2006.

JBP Linear Property– Lush Property Agreement - The Lush Property Agreement is an option agreement with local prospector Tom Lush and consists of 3 non-contiguous mineral licenses in the Glenwood-Gander area. Two mineral licences (6821M and 9713M) are included in the JBP Linear property group. Rubicon can earn a 100% interest in the Lush property by making cash payments over 3 years ($15,000 remaining). The property is subject to a 2% NSR payable to the vendor of which Rubicon can purchase 1% for $1 million and Rubicon holds a right of first refusal on the remaining 1% NSR.

JBP Linear Property– JBP Property Agreement - The JBP property was optioned from prospectors Allan Keats, Kevin Keats and Peter Dimmell. The four optioned licenses have been regrouped into two mineral licenses 10966M and 12071M. Under the agreement Rubicon has earned a 100% interest in the optioned mineral licenses. The licenses are subject to a 2.5% NSR payable to the vendor of which Rubicon can purchase 1.5% for $5.5 million. Rubicon may purchase 0.5% portions of the remaining NSR for $500,000 each. Rubicon holds a right of first refusal on the remaining 1% NSR.

***Accessibility, Climate, Local Resources, Infrastructure and Physiography***

Access to the property is excellent with the Trans-Canada Highway crossing through the southern portion of the property. A forestry trunk road from the highway provides access to various points on the property. The climate is typical for an Atlantic province, with pleasant summers, cool wet springs and autumns, and snowy, often windy winters. The town of Gander, the main service and transportation centre for central Newfoundland, is a modern community with all the amenities for a population of approximately 9,600 (2001 census). Rubicon maintains a field office and warehouse facility in Gander. Hydroelectricity is available from the provincial grid that cuts through the southern portion of the property.

Topography in the area is dominated by fairly broad, northeast trending ridges with intervening lower ground often occupied by linear bogs, brooks, and some larger ponds (H Pond Brook, Joe Batt's Pond, H Pond). Maximum elevation is close to 125 metres above sea level.

***History***

The Gander area experienced extensive gold exploration activity during the mid 1980's and early 1990's on several properties northeast and immediately west of the JBP Linear property, resulting in the discovery of several gold prospects (Knob, Bullet, Westfield, Linear). Despite this activity, little detailed work was conducted on the area now comprising the current JBP Linear property.

From 1987-1989 Noranda Exploration Company, Limited ("**Noranda**") conducted reconnaissance soil and till sampling at 500 metre intervals along three widely spaced lines (2.2 to 2.8 km) running diagonally across the H Pond-Pocket Pond area. Numerous highly anomalous gold values (up to 975 ppb gold) were obtained in the H Pond area, along the H Pond Brook and east of H Pond. No follow up work is recorded.

In 1990, Gander River Minerals carried out geological reconnaissance on the Joe Batt's Brook property that includes the northern part of former JBP Linear licence 8613M. Geochemical sampling included 12 rock samples, 147 soil samples, 30 stream silt samples and 18 panned stream silt sample. One anomalous soil area and an anomalous stream silt area (up to 1020 ppb gold) were identified. No bedrock source was found.

Between 1999 and 2000, Larry and Roland Quinlan staked two mineral licences that include the area of former JBP Linear licence 8415M and the northern part of former licence 8344M. The Quinlan's report documents prospecting and sampling by Noranda that reported high grade float (54 g/t and 55 g/t gold), plus some quartz veins in outcrop that assayed 6 g/t gold. Noranda apparently carried out geophysical (magnetic/VLF) surveys and soil geochemical work that identified a small number of soil anomalies. Information on this work is currently not available. In 1999, the Quinlan's collected 24 rock samples and 9 soil samples. Twenty-two of the rock samples were angular quartz float of which 8 samples assayed greater 1 g/t gold and one quartz float sample with heavy arsenopyrite mineralization returned 20.5 g/t gold. Two soil samples northeast of the mineralized float returned 487 and 1489 ppb gold.

In 2001, Rubicon began acquiring the JBP Linear property by optioning mineral licenses from local prospectors and map-staking selected ground. Exploration work completed by Rubicon is summarized in this report.

***Regional Geology***

The JBP Linear property is located within the exploits subzone near the Eastern edge of the Dunnage zone. Rocks of the Dunnage zone consist of volcanic, volcaniclastic and sedimentary rocks of island-arc and back-arc affinity interpreted to represent vestiges of the Iapetus Ocean. Evolution of the Dunnage is divided into three phases including a pre-accretionary phase, syn-accretionary phase and post-accretionary phase. The initial Cambrian to Mid-Ordovician pre-accretionary phase is marked by periods of volcanism and sedimentation in island-arc and back-arc basins. The syn-accretionary phase (or initial closure of Iapetus Ocean) resulted in the structural emplacement of Notre Dame subzone rocks over the continent of Laurentia (Taconic Orogeny) and the exploits subzone rocks over the Gondwana continental margin (Penobscot Orogeny). Continued closure of Iapetus Ocean during the Late Ordovician-Early Silurian corresponds to a period of sedimentation in fault bound basins. Post-accretion activation and reactivation of large strike-slip faults led to deposition of Silurian fluvial sedimentary and terrestrial volcanic rocks. Siluro-Devonian deformation (Salinic orogeny) resulted in crustal thickening that caused regional greenschist and amphibolite grade metamorphism and crustal melting that resulted in widespread plutonism. Subsequent faulting (possibly Alleghenian Carboniferous age) produced shallow pull-apart basins in which continental and shallow water sediments were deposited.

Williams et al. coined the term Indian Islands Belt to include four major units between the Dog Bay Line and the Gander River Ultrabasic Belt ("**GRUB**") Line. Ophiolitic volcanic and sedimentary rocks of the Gander River Complex, the Davidsville group, the Hamilton Sound group, and the Indian Islands group represent the major units

of the Indian Island Belt. The JBP Linear property is underlain by the Davidsville group rocks, which are interpreted to conformably overlie the Gander River complex.

***Property Geology – Stratigraphy, Structure and Alteration***

The property area is underlain by sedimentary rocks of the Davidsville group, and consists of a monotonous sequence of north-northeast trending grey to black slate and siltstone with minor red slate and sandstone units. The sedimentary rocks metamorphosed to lower greenschist facies and are variably folded and faulted. The finer grained thinner bedded sediments usually display a strong, penetrative cleavage.

Geological mapping by Rubicon indicates that the strong penetrative cleavage ("**S1**") overprints bedding ("**S0**") within the sedimentary rocks. The S1 cleavage is a consistent axial planar structure on the steep east limb of a large anticline ("**F1**"), whose axis is located farther to the west of the H Pond mineralization. Variably plunging S0/S1 intersection lineations reflect the doubly plunging nature of the regional F1 folding with the average plunge of the F1 folds being 38o towards 028o.

Graded bedding from coarse- to fine-grained siltstone indicates that most of the beds are upright, although, locally bedding is overturned by the steep forelimb of the F1 fold system. The S1 cleavage is often strongly refracted and is also deformed by a weak kinking of the layers ("**F2**"). The scale of F2 kink folds varies from centimetre to metre wavelengths. Typically, the larger scale F2 folds are proximal to significant, late faults that crosscut fabrics of the F1 fold system. F2 folds have near vertical northwest striking axial surfaces with average plunges of 56o towards 349o.

Quartz veins crosscut the S1 foliation and are folded by the F1 fold system. This relationship is interpreted to indicate that development of quartz vein systems is a late syn-tectonic structural feature. Textures in the more deformed veins are heavily modified, but vugs with drusy quartz crystals and remnants of quartz crystals formed perpendicular to the vein margin suggest that these veins formed as extensional veins. The presence of folded extensional veins and lesser deformed veins is interpreted to indicate that the development of tension vein arrays were a common occurrence during the late stages of the F1 fold systems and are possibly points of initiation of the brittle fault systems controlling the distribution of mineralized veins.

Sericite and iron carbonate alteration of the fine-grained sediments is widespread, and most intensely developed within 10's of metres to the main auriferous quartz veined zones. The iron carbonate occurs as pinprick to 3 mm granules peppered throughout the sediments with the coarser carbonate spots associated with well mineralized quartz veining. Associated with this alteration is finely disseminated to coarse granular pyrite and arsenopyrite porphyroblasts (up to 3 cm), which often propagate along bedding planes. Chlorite is developed in late fractures and veinlets with weak pervasive to fracture-controlled calcite found in local chloritic nodules. Minor gypsum or dickite veinlets and fracture coatings are present.

***Deposit Types***

The current exploration model is a turbidite hosted, mesothermal gold type deposit similar to the Bendigo-Ballarat goldfield deposits of central Victoria, Australia. The Bendigo-Ballarat gold deposits are found in a similar aged orogenic belt (Lachlan Fold Belt) made up of predominately quartz-rich turbidites of sandstone, slate, and siltstone. The sedimentary rocks are tightly folded and variably faulted and is interpreted to strongly controlled the location of the mineralization. Key features and exploration guides for these deposit types include:

1) Veins occur in "fields", hosted by short strike-extent faults (<1 km) in areas of 1 kilometre by 8 to 12 kilometres and parallel the structural grain.
2) Veins are hosted by large antiformal culminations.
3) The largest tonnage deposits generally occur within permeable turbidites, immediately beneath or within carbonaceous shale cap rock.
4) Gold occurs chiefly as free, coarse native gold.

5) Gold occurs within laminated fault fill quartz veins (bedding parallel thrusts), and large tonnage saddle quartz stockworks and veins, and extension veins.

6) "Ore" chutes occur along the fold hinges, and parallel to fold hinges within the laminated veins.

7) White mica (sericite), quartz, carbonate, sulphides (pyrite, arsenopyrite, and pyrrhotite) and occasional albite characterize wallrock alteration envelopes.

8) Visible alteration extends 10 metres from the auriferous veins.

According to Dominy et al. these types of coarse gold-bearing veins are characterized by high grades that are localized and erratic. Effective sampling of these veins is difficult and grade distribution can only reliably be obtained from underground development; including close-spaced sampling, bulk sampling, and trial mining. Diamond drilling is still an effective measure of geological continuity, but it is unlikely that anything above an Inferred Mineral Resource category can be estimated from surface drilling alone.

***Mineralization***

Significant gold-bearing quartz veins have been discovered at three main sites on the property, specifically the H Pond prospect, Pocket Ponds prospect, and Lachlan prospect.

H-Pond Prospect

The H Pond prospect is located along the trace of H Pond Brook in close proximity to the H-Pond Brook quartz boulder train. Twenty-three diamond drill holes (4,009 metres) at 50-metres spacing have successfully tested the mineralized quartz veins over a strike length of 450 metres and to a depth of 250 metres. Initial interpretation indicates a "main" sub-vertical multiple quartz veined zone linked to a shallower dipping "western spur", and flanked by a sub-parallel "eastern reef" zone.

The host to the quartz veining is a folded, variably altered, fine- to very fine-grained mudstone/shale with slightly grittier siltstone sections. Cutting these deformed and altered sediments are numerous, up to 16 metres wide quartz veined zones (average 5 metres) consisting of 10 to 90% (average 25%) weakly vuggy, often stylolitic, locally inclusion-rich, quartz-iron carbonate veins from <1 to 190 cm thick. Approximately 50% of the veined zones contain individual veins greater than 20 cm thick, while 7% have veins more than 100 cm thick. The zones with the thicker veins also contain the majority of the higher gold grades. The veins have several orientations though the majority trend northeast (040°) with a wide spectrum of dips from flat to vertical. Many of the veins appear folded.

Much of the quartz veining is enveloped in a 50 to 75 metres wide, steep northwest dipping package of dark grey, strong sericite-iron carbonate speckled alteration, flanked on the western (hangingwall) side by strong to intense creamy-yellow sericite alteration with iron carbonate granules peppered throughout. Locally these granules are rimmed or totally replaced by chlorite.

Accompanying the veining is finely disseminated and coarse granular pyrite and arsenopyrite porphyroblasts (up to 3 cm), which often propagate along bedding planes. The porphyroblasts are locally zoned, with pyrite overgrowths around cores of arsenopyrite, and often have quartz filled pressure fringes. Some of the finer pyrite appears to replace the iron carbonate granules. Sulphide contents reach a maximum of 15 to 20% marginal to the veins though rarely is there >1 to 2% combined in the veins themselves. Accessory minerals in the veins include iron carbonate, chlorite, sericite, dickite, talc, along with honey yellow to purple-grey sphalerite, chalcopyrite, galena, boulangerite, and visible gold. The iron carbonate usually occurs along the vein margins. The visible gold also was found near the vein margins or just in the adjacent wallrock.

Pocket Ponds Prospect

The Pocket Ponds prospect is located under and to the west of East Pocket Pond, approximately 2.5 kilometres southwest of the H Pond prospect. Three diamond drill holes (639 metres) and two trenches have been completed on the Pocket Pond prospect. Two significant quartz veined zones, including one with visible gold, have been traced over approximately 50 metres by coring and trenching. The steep west-dipping (60° to 70°), sub parallel quartz veined zones are approximately 8 to 16 metres wide, are comprised of 10 to 35% vein material, and are about 200 metres apart. The easternmost veined zone was traced 150 metres below surface.

Lachlan Prospect

The Lachlan prospect is exposed in a series of trenches approximately 400 metres south of the Trans Canada Highway. Detailed mapping and channel sampling by Rubicon in 2004 and 2005 has outlined two sub-parallel, steep dipping, northeast striking, 2 to 10 metre wide, 40+ metre long multiple quartz veined zones carrying significant gold values of up to 8.5 g/t gold over 0.5 metres. Individual veins vary in width from 5 to 80 centimetres. Alteration of the folded, fine-grained metasedimentary host rocks consists of iron carbonate spotting and sericite; similar to the other prospects described above.

***Exploration***

Since 2002, Rubicon has completed extensive prospecting, geological mapping, soil sampling, trenching, airborne and ground geophysical surveys and diamond drilling on the JBP Linear property. This has included 4,947.5 metres of diamond drilling in 28 holes, 603 line kilometres of airborne magnetic and electromagnetic surveys, 8.4 kilometres of induced polarization (IP) geophysical survey, 9.3 kilometres of linecutting, excavated 15 trenches, collected 5,346 B-Horizon soil or humus samples, 7 lake sediment samples, 854 grab/float rock samples, 172 channel samples. Property reports by Moore and MacVeigh (2004a, 2004b, and 2005) cover exploration work by Rubicon since 2002. This work is summarized below.

Prospecting and Rock Sampling

In June 2002, Rubicon prospectors Suley and Al Keats discovered visible gold in quartz float along the shore of Gander Lake, as well as panning gold at the Gander Lakeshore showing and near the current Lachlan prospect. During the summer of 2003, Rubicon's prospecting crew of Sandy Stares and Rick Crocker located abundant quartz float over a 3 kilometre trend between H Pond and Pocket Ponds, including a major, 800 metres long, quartz boulder train exposed along H Pond Brook. One sample of quartz vein float from along the brook assayed 159 g/t gold, while 19 of 53 samples averaged better than 3 g/t gold. Visible gold was reported from seven of these samples. The abundance, size, and angularity of the quartz float suggested a very local bedrock source.

Trenching carried out in January 2004 exposed a mineralized quartz vein system at Pocket Ponds. Grab samples returned up to 22.6 g/t gold. Subsequent diamond drilling by Rubicon in August and September 2004 discovered the H Pond prospect along H Pond Brook and the Pocket Ponds prospect near East Pocket Pond. Continued prospecting by Rubicon personnel has encountered several mineralized quartz boulder trains and quartz veins in bedrock, notably at Pocket Ponds prospect, Lachlan prospect, and the "Blondie-Marilyn" area.

Since work began in 2002, approximately 584 float and bedrock samples have been submitted for gold and geochemical analysis. Additionally, another 172 channel samples were obtained from trenches at the Lachlan prospect.

Soil Sampling

A total of 5,346 B-horizon soil and humus samples have been collected on the JBP Linear Property since 2003. The field sampling protocol specified the collection of the B-horizon, and if that was not possible,

then a humus sample was collected. The sampling was initially undertaken in areas of anomalous gold bearing quartz boulders at a sample spacing of 25 metres and line spacing of 100 to 200 metres as part of an orientation survey. Positive results prompted the expansion of the program whereby sample coverage now encompasses a 2 to 2.5 kilometre wide corridor from Gander Lake on the south to 1.5 kilometres north of H Pond on the north; a distance of 14 kilometre at a line spacing of 100 to 400 metres.

Northeast to north-northeast trending gold soil anomalies of up to 541 ppb gold have been outlined on the property. Approximately 7% of the samples analyzed returned anomalous gold. Arsenic values in the soils typically show a poor correlation with individual elevated gold values, but higher arsenic analyses do generally occur within the broader zones of elevated gold. Many of the elevated gold values occur in areas of gold-bearing quartz float which suggests the float is locally derived.

Trenching

Fifteen trenches were excavated during 2004 in three areas of the property where quartz float trains or bedrock quartz veining were located. The three areas are: 1) Pocket Ponds prospect; 2) Lachlan prospect; and 3) “Blondie-Marilyn” Area.

At Pocket Ponds prospect, five trenches in three areas were completed. Rubicon’s first trench on the JBP Linear Property was excavated along the shoulder of a new woods road, approximately 2 kilometres north of the Trans-Canada Highway. Grab samples returned a high of 22.6 g/t gold while very limited channel sampling assayed 1.5 g/t gold across 0.6 metres. Four more trenches examined areas immediately to the west of East Pocket Pond where auriferous quartz float and/or gold-in-soil anomalies were outlined. However, bedrock was only reached in two. A north-northeast striking, 10 to 50 cm wide, arsenopyrite-bearing quartz vein system was intermittently exposed in two trenches with individual grab samples assaying as high as 25.5 g/t gold, including six samples with greater than 5 g/t gold, and eleven greater than 1 g/t gold.

Five trenches were excavated at the Lachlan prospect located approximately 400 metres south of the Trans-Canada Highway. One trench uncovered a quartz-veined zone that was initially discovered by prospecting (up to 15.8 g/t gold in grabs). Subsequent mapping outlined a north-northeast trending, 10 metres wide and 45 metres long zone comprised of several 10 to 80 cm wide quartz and quartz-ankerite veins. The veins are hosted by variably altered, foliated, and folded fine-grained metasediments and generally trend parallel to the foliation. Sulphide content of the veins rarely exceeds 5% and consists primarily of arsenopyrite with lesser amounts of pyrite and chalcopyrite. Alteration of the host sediments consists of iron carbonate spotting, sericite, and porphyroblastic pyrite; which all intensify towards the veining. The best channel sample from this veined zone returned 0.96 g/t gold over 1.0 metre.

A second, sub-parallel quartz veined zone at Lachlan was exposed in another trench located 75 metres to the east-northeast. Here, two narrow, 2 to 10 cm wide, arsenopyrite-bearing quartz veins are traceable for approximately 40 metres along a north-northeasterly strike. Two of the better channel samples across the zone returned 6.8 g/t gold and 8.5 g/t gold, both across 0.5 metres.

The third trenched area (“Blondie-Marilyn” Area) included five individual trenches located approximately 500 metres southeast of the H Pond prospect. The trenching was following up on two quartz float trains discovered by prospecting and several multi-station gold-in-soil anomalies. Minor bedrock was encountered in only two of the trenches and no quartz veining was found.

Airborne Geophysical Survey

Fugro Airborne Surveys of Mississauga Ontario completed a DIGHEMV-DSP airborne geophysical survey over a portion of the JBP Liner Property between June 18 and June 24, 2003. A total of 1,671 line kilometres were flown as part of a helicopter-supported, multi-frequency electromagnetic and horizontal gradient magnetic survey utilizing east-west oriented lines spaced at 75 metres intervals. Of this total, 603 kilometres are on the JBP portion of the block.

Results reveal a series of north-northeast and northeast striking structures/breaks as resistivity lows which segment domains of contrasting magnetic susceptibility and resistivity roughly coincident with what has been mapped as being underlain by Davidsville Group sediments. East of this, an area of higher magnetic relief is defined that appears to correspond with the portion of the area mapped as being underlain by rocks of the GRUB. The magnetic data also detect a series of north-northeast and northwest-striking linear magnetic features extending over distances of 2 to 10 kilometres that may in part correlate with small, fine to medium grained, intrusive gabbroic bodies interpreted to be Siluro-Devonian in age and probably related to the Mount Peyton batholith to the south. Based on crosscutting relationships defined by the magnetic data it appears that the dyke swarms are of two ages: an older northeast striking set and a younger northwest striking set. Neither set of dykes appears to cross cut the Mount Peyton plutonic suite suggesting correlation with the Mount Peyton batholith is possible. Diamond drilling at the H Pond Prospect has intersected a narrow, strongly magnetic ultramafic dyke that correlates directly with one of the northwest trending magnetic highs.

***Diamond Drilling***

A total of 4947.5 metres of diamond drilling in 28 holes have been completed at the JBP Linear Property since August 2004. The drilling has focussed on the H Pond and Pocket Ponds Prospects plus some nearby float and soil anomalies. It was carried out in two campaigns: August to September 2004 and January to March 2005. Petro Drilling of Springdale, NL carried out the work using a Boyles Brothers 37 drill rig equipped to drill NQ sized core. Drill samples from the program were sent to Eastern Analytical Labs in Springdale, Newfoundland for gold analysis while the other half was returned to the core tray and stored in metal racks set up at the logging facility. Gold analyses were carried out using a combination of metallic screening and 30-gram (1 A.T.) fire assay techniques. Quality control was monitored by inserting a blank at regular intervals (every 20th sample) and by analyzing two different known standards with each sample batch. After the gold analyses were complete, the remaining pulps were shipped to ALS Chemex Labs in Vancouver, BC for 27-element multi-acid digestion ICP analysis as well as some check assaying for gold.

2004 Drilling

A diamond drill program comprising 1395.5 metres in 8 holes was completed on the JBP Linear Property between August 7th and September 3rd, 2004. Six of the holes (HP-04-01 to HP-04-06) tested the H Pond Prospect (1045.3 metres) while the remaining two holes (HP-04-07, HP-04-08) were collared at the Pocket Ponds prospect (350.2 metres). The program was successful in identifying gold-bearing quartz vein systems beneath H Pond Brook and under East Pocket Pond.

Significant intersections from the H Pond prospect include 8.08 g/t gold over 1.1 metre and 12.39 g/t gold over 0.5 metre, both within a broader interval of 0.75 g/t gold over 44.45 metres from HP-04-01; 2.25 g/t gold over 4.8 metre from HP-04-02; 11.70 g/t gold over 3.4 metre, including 124.5 g/t gold over 0.3 metre from HP-04-03; and 8.73 g/t gold over 2.1 metre including 15.69 g/t gold and 17.85 g/t gold over 0.5 metre and 0.4 metre respectively from HP-04-04. Drillhole HP-04-07 intersected 6.63 g/t gold over 1.7 metres including 25.25 g/t gold over 0.4 metres at the Pocket Ponds prospect.

2005 Drilling

A diamond drill program comprising 3552 metres in 20 holes was completed on the JBP Linear Property between January 13th and March 19th, 2005. This diamond drill program evaluated the H Pond and Pocket Ponds prospects discovered by diamond drilling in 2004 as well as testing two areas with coincident gold-in-soil ± quartz float + weak IP chargeability anomalies to the east and west of H Pond Brook. Seventeen of the holes tested the H Pond prospect (HP-05-09 to HP-05-23 inclusive, HP-05-25, HP-05-26: 2964.3 metres) while one hole each was collared 350 metres west of H Pond Brook (HP-05-24: 154.2 metres) and 300 metres east of the brook (HP-05-27: 145.1 metres) respectively. The final hole of the winter campaign was collared near East Pocket Pond (HP-05-28: 288.3 metres), 2.6 kilometres along strike to the southwest of the H Pond prospect.

Some of the better intersections from the H Pond prospect are 9.79 g/t gold over 1.15 metres including 14.40 g/t gold over 0.5 metres (HP-05-15), 6.91 g/t gold over 1.85 metres including 31.75 g/t gold over 0.35 metres (HP-05-11), and 9.02 g/t gold over 0.8 metres including 15.02 g/t gold over 0.4 metres (HP-05-09). At East Pocket Pond, the best values returned from HP-05-28 are 5.37 g/t gold over 1.55 metres including 13.99 g/t gold over 0.4 metres.

The H Pond prospect is defined over a 450-metre strike length and vertical depth of almost 250 metres. The prospect is open in all directions, most notably to the northeast. Visible gold has been observed along 400 metres of its length in 12 of 20 holes specifically drilled into the prospect. Preliminary interpretation indicates a steep west dipping, northeasterly striking multiple quartz veined "Main Zone", linked to a shallower dipping "Western Spur", and flanked by a sub-parallel "Eastern Reef" zone. Although data is limited, a shallow southeasterly plunge of higher-grade mineralization is suggested.

At the Pocket Ponds prospect, two 8 to 16 metre wide, pyrite-arsenopyrite bearing quartz veined zones, comprised of 10 to 35% vein material, were cored in HP-05-28. One zone contained the first occurrence of visible gold at this prospect. Both zones can be traced a minimum of 50 metres along strike, while the best mineralized zone from HP-04-07 (25.23 g/t Au across 0.4 metres) was also extended 100 metres down dip to 150 metres below surface.

Although only weakly auriferous (1.04 g/t gold over 0.30 metres), a quartz vein system with similar alteration characteristics as the above prospects was intersected in HP-05-27, 500 metres to the southeast of the H Pond Prospect ("Blondie-Marilyn" area). Because the single drill hole collared into quartz veining, the overall width and gold tenor of the zone have yet to be established.

Drilling to the west of H Pond Brook (HP-05-24) intersected minor quartz veining within weakly altered rocks with sparse sulphide and gold mineralization.

***Recommendations***

Based on the encouraging results of exploration conducted to date, a two-phase program on the JBP Linear Property is envisaged. The Phase 1 program, consisting of 1350 metres of diamond drilling and continued trenching at Pocket Ponds is recommended for 2006. The projected budgeted cost of this program is $200,000. The recommended Phase 2 program comprises diamond drilling (2000 metres) and trenching at the H Pond Prospect, and diamond drilling (up to 1500 metres) of several new prospects discovered through ongoing prospecting and geochemical surveys. Anticipated costs are estimated to be $500,000.

The Phase 1 exploration program is recommended to consist of continued evaluation of the Pocket Ponds prospect by diamond drilling and trenching and some follow-up drilling in the "Blondie-Marilyn" area. The two existing trenches near drill hole HP-05-28 at Pocket Ponds should be expanded to fully expose a robust gold-bearing quartz veined zone, especially on higher ground to the south-southwest. The resulting exposure should be mapped and channel sampled as only grab samples have been collected to date. Continued diamond drilling (9 holes, 850 metres) is recommended to delineate this exposed Pocket Ponds zone at 50 metre step outs over a 200 metre strike length. An additional two holes (350 metres) are warranted to test a coincident quartz float/Au-As soil anomaly roughly 200 metres to the north. One hole totalling 150 metres should be drilled in the "Blondie-Marilyn" area, grid west of HP-05-27 to fully assess the altered, weakly auriferous quartz veined zone into which HP-05-27 collared.

The Phase 2 program is recommended to comprise continued evaluation of the H Pond prospect where both infill and step out drilling along with trenching is required to further assess the continuity and extent of the gold mineralization. A minimum of 14 holes, totalling 2000 metres is necessary to intersect the known zones at 50 metres centres to approximately 100 metres below surface. The proximity of the surface projection of the H Pond prospect to H Pond Brook and its boggy flood plain limits trenching possibilities. However, one area that would be amenable to excavation is located on higher ground between L13500N and L13600N around 9950E. Continued ground exploration work on the JBP Linear Property (prospecting, mapping, soil sampling) will dictate where additional drilling and/or trenching are required. Based on the multiple gold discoveries made to date, at least 1500 metres of drilling, in addition to the 2000 metres already allocated for the H Pond prospect, is envisaged. One target already

defined is a strong Au-As soil anomaly located 500 metres to the southwest of the H Pond Prospect. A budget of $500,000 is necessary to complete all the components of the Phase 2 campaign.

**Phase 1 Budget**

| | |
|---|---|
| Diamond Drilling (1350m) | $108,000 |
| Trenching (10 days) | $ 15,000 |
| Assays | $ 25,000 |
| Wages (incl. drilling/trenching) | $ 24,000 |
| Vehicles (Trucks/ATV/gas etc) | $ 4,000 |
| Field Office/Core Shack & Supplies | $ 2,500 |
| Accommodation/Food etc. | $ 3,000 |
| Contingences (10%) | $ 18,500 |
| **Total** | **$200,000** |

**Phase 2 Budget**

| | |
|---|---|
| Diamond Drilling (3500 metres) | $280,000 |
| Trenching (15 days) | $ 22,500 |
| Assays | $ 60,000 |
| Wages (incl. drilling/trenching/mapping etc) | $ 65,000 |
| Vehicles (Trucks/ATV/gas etc) | $ 12,500 |
| Field Office/Core Shack & Supplies | $ 6,000 |
| Accommodation/Food etc. | $ 9,000 |
| Contingences (10%) | $ 45,000 |
| **Total** | **$500,000** |

***References***

Dominy, S.C., Johansen, G.F., Cuffley, B.W., Platten, I.A., and Annels, A.E. (2000): Estimation and Reporting of Mineral Resources for Coarse Gold-bearing Veins; Exploration and Mining Geology, Volume 9, No. 1, pp.13-42, ("**Doming, et al.**")

MacVeigh, J.G. (2004a): Assessment Report on Soil Sampling on Part of JBP (Joe Batt's Pond Linear) Property, Licence 8572M (2nd Year), NTS 2D/15, Newfoundland and Labrabor, 9p. ("**MacVeigh(2004a)**")

MacVeigh, J.G. (2004b): Assessment Report on Soil Sampling on Part of Glenwood Break Property (Joe Batt's Linear Project Area), Licence 8607M (2nd Year), NTS 2D/15, 2E/02, Newfoundland and Labrador, 9p. ("**MacVeigh(2004b)**")

MacVeigh, J.G. (2005): Report on Prospecting, Rock Sampling, Soil Sampling, Trenching, Linecutting, and IP Survey on part of the Glenwood Break Property, Licences 6821M (6th Year), 8344M (3rd Year), 8415M (3rd Year), 8572M (3rd Year), 8607M, 8613M, 8616M, 8617M, & 9684M (2nd Year), NTS 2E/02 & 2D/15, Newfoundland, 16p. ("**MacVeigh(2005)**")

Moore, P.J. (2003): Report on Work, Airborne Geophysical Surveys, Prospecting and Rock Sampling on the Glenwood Break Property; Licences 6821M, 6823M, 7182M, 8414M, 8473M, 8572M, 8687M, 8607M, 8613M, 8614M, 8615M, 8616M, 8617M, & 9684M, 8 p. ("**Moore**")

Williams, H., Currie, K. L., and Piasecki, M.A.J. (1993): The Dog Bay Line: A major Silurian tectonic boundary in northeastern Newfoundland. Canadian Journal of Earth Sciences, Volume 30, p. 2481-2494, ("**Williams et al**")

**Golden Promise Property**

***Introduction and Terms of Reference***

The following information concerning the Golden Promise property has been summarized from the technical report entitled "NI 43-101F1 Technical Report for the Golden Promise property, Badger and Grand Falls Map Sheets, NTS 12A16 & 2D/13, Newfoundland and Labrador" dated January 6, 2006 and prepared in accordance with National Instrument 43-101 by Larry Pilgrim, a Registered Professional Geologist and Independent Qualified Person.

***Property Description and Agreements***

The property consists of 10 mineral licenses (1,424 claims) covering an area of 35,600 ha. The size of the property has changed since the writing of the NI 43-101 report dated January 6, 2006 with two mineral licences (11016M and 11018M) allowed to lapse and the Goldstream option (8897M) returned to the property vendor. The aggregate land position consists of both optioned and staked property 100% owned by Rubicon. A total of 198 claims are subject to underlying option agreements.

| Licence | Claims | Area (ha) | Comments |
|---|---|---|---|
| 8904M | 6 | 150 | Otter Brook Property Agreement |
| 8947M | 22 | 550 | |
| 11033M | 256 | 6400 | Includes parts of former licenses 8859M, 8864M and 8868M |
| 11034M | 217 | 5425 | Includes parts of former licences 8859M and 8868M |
| 11017M | 112 | 2800 | |
| 11028M | 256 | 6400 | Includes parts of former licences 8864M and 8868M |
| 11029M | 256 | 6400 | Includes parts of former licences 8859M, 8864M and 8868M. |
| 11057M | 42 | 1050 | |
| 11062M | 147 | 3675 | |
| 11347M | 110 | 2750 | |
| 8897M | 0 | 0 | Goldstream Agreement terminated |
| 11016M | 0 | 0 | Licence lapsed (157 claims, 3925 ha) |
| 11018M | 0 | 0 | Licence lapsed (55 claims, 1375 ha) |
| | **1,424** | **35,600** | |

Golden Promise – Mercer Option - A portion of the property immediately surrounding the Jaclyn Zone (192 claims; 4,800 ha) is subject to an option agreement with Mr. Bill Mercer with payments totalling $230,000 of which $155,000 has been paid and 100,000 Rubicon Common Shares which has all been issued. There is an underlying 2% NSR to Mr. Mercer of which Rubicon can purchase 1% NSR for $1 million at any time. Annual advance royalty payments of $20,000 are due to the vendor beginning in June 2007. The property was regrouped in May 2005 and licences of the Golden Promise agreement with Mr. Mercer (8859M, 8864M and 8868M) now form parts of licences 11028M, 11029M, 11033M and 11034M as outlined above.

Otter Brook Option - The Otter Brook (OB) Property is a single mineral license (8904M) of 6 claims covering an area of 150 hectares. The OB property is under option from prospector Stephen Courtney and Newfoundland and Labrador Minerals Ltd. whereby Rubicon can earn a 100% interest by making cash payments totalling $35,000 over 3 years. A 2% NSR is payable to the vendors of which 1% NSR can be purchased by Rubicon for $1 million.

On May 1, 2006, the Golden Promise Property was optioned to Crosshair Exploration. Under the terms of the agreement, Crosshair Exploration must spend $4.0 million over four years, including $750,000 firm in the first year, make share payment payments totalling 80,000 common shares in the Capital of Crosshair Exploration including 20,000 common shares firm in the first year and make underlying property payments, to earn a 60% interest in the project. See Schedule "J", "Information concerning Paragon after the Arrangement - Material Contracts".

***Accessibility, Climate, Local Resources, Infrastructure and Physiography***

The property is located immediately west of the town of Grand Falls-Windsor and encompasses the town of Badger and occurs entirely within NTS sheets 12A/16 and 02D/13. Access to the property is excellent along several logging and skidder roads and by the Trans-Canada and Buchans highways, which transect the property. Northeast trending topographic features, which consist of low, northeast trending ridges and valleys, parallel the many ponds and rivers occurring on the property. Glacial features on the property suggest a dominant episode of north-eastward ice flow as exemplified by striations with an average orientation of 58º, although locally striations vary from 30o/210o to 90o/270o throughout the property, indicative of various ice flow events.

***History***

Few mineral exploration companies targeted the Badger area prior to Rubicon initial work in 2002, and interest in the region has traditionally been focused on base metal volcanogenic massive sulphides (e.g. Buchans, Duck Pond) within volcanic belts located west and south of the property. Although the area of Golden Promise diamond drilling has periodically been staked prior to 2002, there is no record of any prior gold focused ground exploration in the area surrounding the Jaclyn Zone, however limited ground work has been completed over portions of the property including the Tom Joe Option and the Three Angle Pond Area.

In the spring of 2002, local prospector Mr. William Mercer collected samples from quartz float exposed following a major forest fire that swept through the area in 1999. One composite sample from approximately ten boulders assayed 30 g/t Au. Based on this occurrence, Rubicon optioned the property from Mr. Mercer in May 2002.

***Regional Geology***

The property is located within the Exploits subzone near the western edge of the Dunnage Zone. Rocks of the Dunnage Zone consist of volcanic, volcaniclastic and sedimentary rocks of island-arc and back-arc affinity interpreted to represent vestiges of the Iapetus Ocean. Evolution of the Dunnage is divided into pre to syn-accretionary and post-accretionary phases. The initial Cambrian to Mid-Ordovician pre to syn-accretionary phase is marked by periods of volcanism and sedimentation in island-arc and back-arc basins. The syn-accretionary phase (initial closure of Iapetus Ocean) resulted in the structural emplacement of Notre Dame subzone rocks over the continent of Laurentia (Taconic Orogeny) and the Exploits subzone rocks over the Gondwana continental margin (Penobscot Orogeny). Continued closure of Iapetus during the Late Ordovician to Early Silurian corresponds to a period of sedimentation in fault bound basins. Post-accretion activation and reactivation of large strike-slip faults led to deposition of Silurian fluviatile sedimentary and terrestrial volcanic rocks. Siluro-Devonian deformation (Salinic orogeny) resulted in crustal thickening that caused regional greenschist and amphibolite grade metamorphism and crustal melting that resulted in widespread plutonism. Subsequent, possibly Alleghenian, Carboniferous faulting produced shallow pull-apart basins in which continental and shallow water sediments were deposited. The Dunnage Zone is divided into the Notre Dame and Exploits subzones, separated by the Red Indian Line. The line is an extensive fault system interpreted to separate rocks originating from opposing sides of the Iapetus Ocean that were not linked until the late Llanvirn to early Llandeilo.

Kean et al. divide the Badger map area (NTS 12A/16) into numerous lithostratigraphic units, many of which have been further separated on the basis of lithology. These units range in age from Middle Ordovician and older to Devonian, and comprise sedimentary, extrusive and intrusive rock types. Rocks of the Victoria Lake Supergroup are stratigraphically overlain by a regionally extensive sequence of Carodocian black shale which separates rocks of the Victoria Lake Supergroup to the south from overlying Ordovician to Silurian siliciclastic sediments of the Badger Group to the north. The Badger Group sediments are comprised of a flyschoid sequence of argillite, greywacke and conglomerate that ranges in age from Middle Ordovician to Early Silurian age.

***Property Geology – Stratigraphy, Structure and Alteration***

The property is mapped as being underlain by Badger Group sediments located north of, and presumably up sequence of a conformable contact with Carodocian black shales, which in turn overlie Middle Ordovician epiclastic and sedimentary rocks of the Victoria Lake Supergroup. Stratigraphy in the area is mapped as being upright and

moderately to steeply dipping (50º to 90º) with attitudes influenced by open to sub-isoclinal upright folds that plunge moderately towards the northeast. Mafic dykes are observed to intrude the local stratigraphy and occupy the same structure as gold bearing quartz veins of the Jaclyn Zone. The Siluro-Devonian Skull Hill Intrusive Complex and Hodges Hill granite batholith intrude the property to the north and north-northeast, respectively.

The Victoria Lake, Caradoc and Badger stratigraphy has been deformed about tight to isoclinal, upright, northeast plunging folds. F1 folds appear to be cut by the 411±6 Ma Hodges Hill granite stock in the north. This supports a late Taconic to early Salinic age (445-411 Ma) for the earliest deformation ("D1"), related to the juxtaposition of the Exploits Subzone with Laurentian overlap rocks, across the Red Indian Line. Quartz veins and major fault zones throughout the area trend northeast and are related to deformation during formation of F1 folds. The F1 folds are cut by brittle fault zones that strike NE (045o) sub-parallel to the axial trace of the F1 folds (070o and 110o to 120o). The 070o orientation is correlative to that which hosts the Jaclyn Zone vein system. These structures likely developed due to late-stage brittle accommodation following "locking-up" of tightly appressed F1 folds. These structures tend to be multiply reactivated over time and regionally have been shown to act as conduits for mineralized fluids and mafic to felsic intrusives. Narrow (50 to 100 metre) and continuous, magnetic mafic and felsic dykes occupy structures oriented in similar (120o and 070o and 045o) ways as the brittle fault zones discussed above. These are most obvious in the northern part of the property and share a similar distribution to the brittle structures. At the Jaclyn Zone, a mafic dyke pervades the same structure (070o) as the gold bearing vein.

Alteration on the Golden Promise property associated with the veining generally extends to 10 to 15 metres either side of the zone, but varies somewhat from rock type to rock type. The most pronounced alteration is developed in fine-grained mudstone where light green 1 to 10 mm clots, splotches, and bladed textured entities of silica-sericite-carbonate often coalesce into massive alteration sections. Locally, a yellowy green, more pervasive looking, sericite-iron carbonate alteration has developed. Superimposed on both above types of alteration, and most strongly developed immediately adjacent to the main vein, is a granular, black, carbonaceous, fracture-controlled "spider-web" to patchy textured, locally bedding replacement alteration. Scattered grains of mostly arsenopyrite with lesser pyrite and pyrrhotite, occur within the altered zones, but are most abundant immediately adjacent to the main vein. Some hairline pyrite fractures develop within 1 metre of the vein margin. A carbonatized, buff coloured, 0.5 to 1.2 metre thick steeply dipping, though laterally restricted mafic dyke with chilled contacts cuts all rock types including the mineralized quartz vein.

***Deposit Types***

Gold bearing quartz veins at Golden Promise are hosted within Lower Ordovician to Silurian metasedimentary rocks of the Victoria Lake Group and the Caradocian shale. The style of veining, mineralization, alteration, host rock and tectonism most closely resembles other turbidite-hosted (or slate belt) gold deposits throughout the world. Examples are the turbidite-hosted gold deposits of the Lachlan Fold Belt in central Victoria, Australia. These deposit types are characterized by the following geologic elements as described by Johansen (2001):

1) Veins occur in "fields", hosted by short strike-extent faults (<1 km) in areas of 1 km by 8 to 12 km and parallel the structural grain.
2) Veins are hosted by large antiformal culminations.
3) The largest tonnage deposits generally occur within permeable turbidites, immediately beneath or within carbonaceous shale caprock.
4) Gold occurs chiefly as free, coarse native gold.
5) Gold occurs within laminated fault fill quartz veins (bedding parallel thrusts), and large tonnage saddle quartz stockworks and veins, and extension veins.
6) "Ore" chutes occur along the fold hinges, and parallel to fold hinges within the laminated veins.
7) White mica, quartz, carbonate, sulphides (pyrite, arsenopyrite and pyrrhotite) and occasional albite characterize wallrock alteration envelopes.
8) Visible alteration extends approximately 10 metres from the auriferous veins.

According to Dominy et al. these types of coarse gold-bearing veins are characterized by high grades that are localized and erratic. Effective sampling of these veins is difficult and grade distribution can only reliably be obtained from underground development; including close-spaced sampling, bulk sampling, and trial mining. Diamond drilling is still an effective measure of geological continuity, but it is unlikely that anything above an "Inferred Resource" category can be estimated from surface drilling alone.

***Mineralization***

The gold-bearing quartz veins at Golden Promise are milky white to grey in colour, comb-textured to locally vuggy, often stylolitic to banded, and inclusion rich. Visible gold distribution within a vein is generally restricted to 10-20 cm thick zones, often close to vein margins. Gold occurs as: i) specks (0.1 mm) to coarser 3 mm flakes along short fractures oriented perpendicular to the vein margin (comb quartz crystal boundaries); ii) along stylolitic seams with fine-grained arsenopyrite; iii) as scattered specks along rusty fractures parallel to the vein boundary; and, iv) and less commonly as isolated grains in massive quartz.

Accessory minerals include calcite, chlorite, sericite, iron carbonate, arsenopyrite, pyrite, galena, sphalerite, and chalcopyrite. Wall rock inclusions locally contain abundant arsenopyrite with lesser pyrite. Hosting the veins are predominantly very fine grained, weakly to well bedded mudstone/greywacke intercalated with more granular arkosic greywacke, and massive arkoses with mudstone clasts to 2 cm. Very well preserved sedimentary structures such as load casts, flame structures, scours, and graded bedding suggest an upright facing, relatively shallow north northeast dipping sequence. Alteration associated with the veining extends for several metres to 15 metres either side of the zone, but varies somewhat according to rock type. The most pronounced alteration is developed in fine-grained mudstone where light-green 1 to 10 mm spots and fracture alteration consisting of silica-sericite-carbonate locally coalesce into massive alteration sections. A thick (up to 1.2 metres) steeply dipping mafic dyke with chilled contacts cuts all rock types including the mineralized quartz vein.

Known gold zones on the Golden Promise property include the Jaclyn, Jaclyn South and Jaclyn North zones, the Christopher Zone and the Shawn's Shot Occurrence.

<u>Jaclyn, Jaclyn South and Jaclyn North Zones</u>

The Jaclyn Zone is sub-vertical (80 to 85°) dipping mainly steeply to the southeast though to the east it dips steeply to the northwest, while its strike varies from 070° to 090° (true). The Jaclyn Zone vein system attains an estimated true thickness of close to 4 metres, with individual veins up to 2.7 metres thick. The Jaclyn Zone is currently defined, by drilling, over a strike length of 375 metres and to a vertical depth of 192 metres.

The Jaclyn South Zone comprises three quartz vein zones, as follows:

- The first with a thickness of 3.4 metres with no arsenopyrite or visible gold noted within the vein with only minor (1%) pyrite and few (5%) wall rock inclusions;
- The second vein is 30 cm quartz vein is laminated and contains up to 2% arsenopyrite and 1% pyrite and at least 25 specks of visible gold.
- A third, 40 cm wide quartz vein is milky white in colour, brecciated and contains trace arsenopyrite. No visible gold was noted.

The Jaclyn South Zone is indicated at surface by abundant quartz vein float that contains occasional visible gold and arsenopyrite. The lateral extent of the Jaclyn South Zone is uncertain, as it has only been tested with 2 diamond drill holes spaced 100 metres apart. The Jaclyn South Zone is not exposed at surface. Core axis angles of quartz veins in diamond drill core along with the trend of the quartz boulder train that overlies the Jaclyn South Zone, indicate that the vein Zone has a likely strike of 070o and dips south east at ~80o, a similar orientation as the Jaclyn Zone.

The Jaclyn North Zone comprises three sub-parallel (strike 070° with north-westerly dips of 55° to 60°) mineralized quartz vein zones, as follows:

- Zone one is a 35 cm thick (15 cm estimated true thickness) laminated quartz vein containing 1 to 2% arsenopyrite and pyrite, trace chalcopyrite, galena and sphalerite. 20 grains of visible gold were noted within the vein;
- Zone two is a single narrow (2 cm) quartz vein containing 4 specks of visible gold;
- Zone three is a 2.8 metre thick (1 metre estimated true thickness) quartz vein. The vein contains significant arsenopyrite (2 to 3%) and pyrite (1%) with a minimum of 9 specks of visible gold.

The Jaclyn North Zone is indicated at surface by abundant quartz vein float that contains occasional visible gold and arsenopyrite. The lateral extents of the Jaclyn North Zone are uncertain as it has only been tested with one diamond drill hole and is not exposed at surface.

Christopher Zone

The Christopher Zone is a 2-metre wide composite vein zone with a main central quartz vein measuring 0.4 to 1.8 metres wide. The exposed vein zone has a known strike length of 35 metres and has been intersected by diamond drilling at a vertical depth of 28 metres. The central portion of the vein is comprised of massive, milky-white quartz with the margins being characterized by laminated and stylolitic textures. Arsenopyrite (trace to 2%) occurs mainly as disseminated anhedral masses within massive quartz in areas of angular wallrock inclusions, and as disseminated euhedral grains within, and proximal to, stylolitic laminae. Visible gold has been noted at surface in one place at the Christopher Zone and assays up to 3.8 g/t Au have been obtained from grab samples. The quartz veining exposed at the Christopher Zone, and the quartz float train aligned with the Jaclyn Zone both exhibit textures similar to the Jaclyn Zone, and thus, dramatically increases the possible extent of mineralization within the Jaclyn Area.

Shawn's Shot Occurrence

Gold-bearing quartz veins in bedrock also exist at Shawn's Shot (7 km west-southwest of Jaclyn) where a 35 cm quartz vein assayed 100.5 g/t gold. The vein outcrops along the bank of the Exploits River and is exposed over a strike length of 2 metres before proceeding beneath the river. The vein strikes SE (120o) and dips sub-vertically.

***Exploration***

Exploration since June 2002 on the Golden Promise property comprises a total of 5,736.31 metres of diamond drilling in 46 holes, 8,250 line kilometres of airborne magnetic and electromagnetic surveys, ground geophysical surveys on 20 line kilometres of grid, excavation of 16 trenches, collection of 5,624 B-horizon soil samples, 226 MMI (Mobile Metal Ion) soil samples over the Jaclyn West area and the Shawn's Shot and Branden gold occurrences, 2,334 rock float, grab and channel samples and regional (1:50,000 scale) and detailed geological mapping (1:500 scale). The majority of the work, including 30 diamond drill holes has focused on the Jaclyn Zone, however regional exploration work has identified at least 6 areas of significant gold mineralization. Drilling programs during August 2002, Fall 2003 and Spring 2004 along with the airborne survey were completed with financial support (~$412,000) from the Newfoundland and Labrador Government's Junior Company Exploration Assistance Program (JCEAP).

Prospecting

Since June 2002, a total of 2,334 rock samples have been collected from the Golden Promise property. Since that time prospecting has been completed over most of the easily accessible areas, particularly roads and trails that are amenable to truck or ATV travel. At its peak, up to five teams of two prospectors and/or geologists completed geological mapping and ground follow-up prospecting of airborne structures and anomalous lake, soil, and rock samples. An extensive network of logging roads provided access to the majority of the property by truck and ATV, while power lines and rivers were traversed on foot. Key target areas were 045o, 070o, 110o trending structures such as faults and magnetic dykes visible on the airborne geophysical maps, as these orientations are also known gold-bearing structures at the Jaclyn Zone and the Shawn's Shot occurrence. Also a priority was follow-up prospecting of existing anomalous soil and rock

samples. Overall prospecting has defined the highest potential for gold mineralization to exist within and stratigraphically beneath the trace of the Caradocian black shale with very little indication of economic grades of gold mineralization within the Badger Group stratigraphy. This is not exclusive however as well mineralized float has been discovered in areas underlain by Badger Group rocks.

Soil Sampling

Since June 2002, a total of 5,624 B-horizon and humus soil samples have been collected from the Golden Promise property. Soil sampling focused on the Jaclyn Area, Jaclyn West Area and the Justin's Hope gold occurrence (~2,500 samples). A small soil grid (167 samples) is located over the Branden Occurrence. Other soil grids were completed on a reconnaissance basis and were designed to follow up on favourable stratigraphic and structural environments as outlined by the airborne geophysical survey and regional geological mapping; that is areas of folded (generally regional to local scale anticlinal closures) Victoria Lake Group sedimentary rocks with overlying Caradocian shale sequences. In general, areas of known mineralized bedrock or float were covered with soil samples at a line spacing of 100 to 200 metres and a sample spacing of 25 metres. Areas of reconnaissance soil sampling had soil sample lines spaced at 200 to 400 metres with line spacing at 25 metres.

Airborne Geophysical Survey

From October 21 to November 19, 2003 a total of 8,250 line kilometres of high resolution, helicopter-borne electromagnetic/magnetic surveys were completed on the Golden Promise property. The airborne survey covered the entire Golden Promise property following the trace of the Caradocian shale horizon throughout the property. The survey (traverse) flight lines were generally flown in a north-south orientation.

Total field magnetic data along with three frequencies of electromagnetic data (900Hz, 7,200Hz and 56,000Hz) were collected during the survey. All frequencies of resistivity and magnetic data show strong contrast in the underlying lithologies and reveal regional and local-scale folded and faulted stratigraphy, both potentially of critical significance for formation of gold bearing quartz veins. Abrupt transitions from high resistivity to low resistivity units marks the transition from siliciclastic rocks of the Victoria Lake and Badger siliciclastic metasediments to the Carodocian shale marker unit.

Trenching

Since July 2002, a total of 21 trenches have been excavated over targets on the Golden Promise property. The majority of the trenches have targeted exposing mineralized quartz vein systems within the Jaclyn Area, with additional trenches testing mineralized quartz vein float or anomalous B-horizon soils at the Jaclyn West Area (including the Christopher Zone), the Justin's Hope Gold Occurrence, and the Branden Float Occurrence. Trenching overall has proven a cost effective means of testing for underlying mineralized quartz vein systems in an area of extensive, but generally thin, overburden cover. Trenching has been successful in exposing the Jaclyn Vein Zone at surface in one location as well the Christopher Zone.

***Diamond Drilling***

Since August 2002, Rubicon has completed 5,736.31 metres of diamond drilling in 46 holes on the Golden Promise property, with the majority (33) of the drillholes being completed on the Jaclyn (30 holes), Jaclyn North (1 hole) and Jaclyn South (2 holes) Zones. Highlights of the 2002 and 2003 diamond drilling programs at the Jaclyn Zone include intersections of up to 16.57 g/t Au over an estimated true thickness of 1.64 metres (GP02-01); 23.14 g/t Au over an estimated true thickness of 0.67 metres (GP02-14); 68.95 g/t Au over an estimated true thickness of 0.21 metres (GP02-21); 11.16 g/t Au over 1.6 metres (GP03-24); 18.18 g/t Au over 0.6 metres (GP03-25); 44.59 g/t Au over 0.3 metres (GP03-31), and 12.13 g/t over 0.35 metres (GP03-32).

The 2002 and 2003 drilling programs were successful in defining gold bearing mineralization at the Jaclyn zone. Drilling defined the Jaclyn Zone over a 375-metre strike length and a vertical depth of 192 metres. Drill holes GP03-31, 32 and 33 have shown that the north (Jaclyn North Zone) and south (Jaclyn South Zone) boulder trains are underlain by highly altered sedimentary stratigraphy that also hosts visible gold bearing quartz veins, similar in style to that encountered within the Jaclyn zone. These new discoveries emphasize the potential of Jaclyn North and South Zones to host gold bearing quartz veins similar in extent to the Jaclyn Zone.

Other drillholes on the property targeted quartz vein float or B-horizon soil anomalies in the Jaclyn East, Jaclyn West and Justin's Hope occurrence areas. Two drill holes targeted the Christopher Vein Zone in the Jaclyn West area, one drill hole targeted a soil anomaly 600 metres to the west of the Jaclyn North Zone, and two drill holes (GP-4-35 and 36) targeted the Shawn's Shot Occurrence. Drilling in 2004 was successful in intersecting the Christopher vein at a vertical depth of 28 metres and defining two new zones of arsenopyrite-bearing quartz veining in drillhole GP04-41 with assays as high as 3.4 g/t Au over 0.4 metres (western extension of the Jaclyn North Zone). Drillhole GP04-42 was successful at intersecting a zone of mafic dykes and quartz veining that shows similar relationships to the Jaclyn Vein Zone as well as those veins intersected in drillhole GP04-41.

***Recommendations***

Exploration at Golden Promise has been successful in extending the area of known mineralization within the Jaclyn Area and is ready for an aggressive, systematic drilling program in 2006. Approximately 600 metres and 775 metres of strike length at the Jaclyn North Zone and the Jaclyn Zone need to be drill tested, respectively. Based on the encouraging results to date, a two-phase program on the Golden Promise property is recommended.

A Phase 1 drill program consisting of 2000 metres of diamond drilling is recommended for the Jaclyn North Zone. This drill program should focus on extending the area of known gold mineralization along strike from the current drill holes (GP03-32 and GP04-41) and to depths of 75 to 200 metres. The projected cost of this program is $242,000 (including contingency)

A Phase 2 drill program consisting of 5000 metres of diamond drilling is recommended at the Jaclyn Zone or Jaclyn North Zone (depending on results of the Phase 1 drilling). Drilling at the Jaclyn Zone should consist of a series of deeper drill holes on the east portion of the known Jaclyn mineralization and a tier of shallower holes along the east and west extents of the known zone. The projected costs are estimated to be $583,000 (including contingency).

| **Phase 1 Budget** | |
|---|---|
| Diamond Drilling (2000m) | $150,000 |
| Assays | $ 20,000 |
| Wages (drilling) | $ 30,000 |
| Vehicles (Trucks/ATV/gas etc) | $ 7,500 |
| Field Office/Core Shack & Supplies | $ 2,500 |
| Accommodation/Food etc. | $ 10,000 |
| Contingency (10%) | $ 22,000 |
| **Total** | **$242,000** |

| **Phase 2 Budget** | |
|---|---|
| Diamond Drilling (5000 metres) | $375,000 |
| Assays | $ 37,500 |
| Wages (drilling) | $ 75,000 |
| Vehicles (Trucks/ATV/gas etc) | $ 15,000 |
| Field Office/Core Shack & Supplies | $ 6,500 |
| Accommodation/Food etc. | $ 21,000 |
| Contingency (10%) | $ 53,000 |
| **Total** | **$583,000** |

***References***

Johansen, G.F. (2001): An Exploration Strategy for the Redevelopment of the Bendigo Goldfield. Internal Company report prepared for Bendigo Mining N.L. 97p. ("**Johansen**")

Kean, B.F. and Jayasinghe, N.R. (1982): Badger, Grand Falls District, Newfoundland. Map 80-281. Scale: 1:50 000. In Geology of the Badger map area (12A/16), Newfoundland. Government of Newfoundland and Labrador, Department of Mines and Energy, Mineral Development Division, Report 81-02, 42 pages, enclosures (map, cross-section). GS# 012A/16/0283. ("**Kean et al**")

## OTHER PROPERTIES

### Glenwood-Botwood Gold Trend Properties, Newfoundland

The Glenwood-Botwood Trend properties are located in the Gander area of central Newfoundland. The majority of the properties are located in the eastern half of a northwest trending orogenic belt of volcanic, volcaniclastic and sedimentary rocks known as the Exploits Subzone. Exploration on these properties is focused on the turbidite-hosted auriferous quartz veins that show similar elements to the world class Bendigo-Ballarat goldfield deposits currently being mined in Victoria, Australia and intrusive hosted gold mineralization at Huxter Lane (optioned by Meridian) and the Mt. Peyton Linear property.

#### Glenwood Gold Property (Au)

The 100% Rubicon-owned Glenwood property is located approximately 20 kilometres northwest and west-northwest of the town of Gander in central Newfoundland. Numerous logging roads and ATV trails provide access to most points on the property from the north side of the Trans Canada Highway, west of Gander.

Ownership

The Glenwood property is comprised of a group of 4 mineral licences (109 claims) covering a total of 2725 hectares owned 100% by Rubicon. Three mineral licences 7180M, 7181M and 7912M (22 claims) form part the B-Property Option agreement (now 100% Rubicon) that includes advanced royalty payments ($10,000/year) and a sliding scale NSR that varies from 2-3%. Crosshair Exploration optioned the property in February 2003 and then relinquished the option in September 2005 after spending approximately $350,000

Geology and Exploration

The eastern part of the property area on the east side of the Dog Bay Line is underlain by turbiditic sedimentary rocks of the Davidsville Group (similar to the JBP Linear) with similar potential for Bendigo-Ballarat type gold deposits. The western part of the property (west of the Dog Bay Line), underlying licence 12068M, hosts the Clydesdale and T-Rex gold showings within an area mapped as a fault bounded block of mélange.

At the Clydesdale gold showing, a five meter channel sample returned an average grade of 6.34 g/t Au over 5.0 metres and includes a higher grade section assaying 12.22 g/t gold over 2.5 metres. Gold values in grab samples have returned values of up to 50.23 g/t gold, 44.46 g/t gold and 39.69 g/t gold. The mineralization in the trench is open for follow-up and currently the subject of detail mapping and additional channel sampling.

Trenching at the T-Rex gold showing, located 1.5 km west of the Clydesdale prospect, has exposed a zone at least 3 metres wide and at least 50 metres long (limit of trenching). Channel sampling to date (42 samples, each 0.5 metre in length) has returned highly anomalous values of 2.17, 2.26, and 1.04 g/t gold

over 0.5 metre and wider with an average grade of 1.20 g/t gold over 2.0 metres and 6.0 metres of 0.52 g/t gold. The mineralized zone consists of moderate to strongly sericitized, silicified porphyry with 2-5% generally finely disseminated pyrite, arsenopyrite and locally sphalerite.

A drill program (5 drill holes, 642.6 metres) completed by Crosshair Exploration in 2005, tested approximately 75 metres of the Clydesdale linear. All five drill hole intersected multiple zones of brecciated, quartz veined sedimentary and intrusive rock variably mineralized with pyrite and arsenopyrite and carrying weakly to strongly anomalous gold values to a maximum of 5.15 g/t gold over 0.55 metres. Drill holes CD-05-3 and 4, undercuts of the high grade channel sample reported from the 2004 channel sampling (6.34 g/t gold over 5.0 metres), intersected the target zone of which CD-05-3 intersected 1.31 g/t gold over 0.80 metres (including 2 specks of visible gold) while CD-05-4 (undercut of CD-05-3) intersected the Clydesdale horizon and returned 1.92 g/t gold over 1.60 metres including 5.17 g/t gold over 0.55 metres indicating that the Clydesdale horizon remains open to depth.

Rubicon is reviewing the project data and formulating plans for continued exploration at Clydesdale and T-Rex showings and to evaluate the potential for extensions of the Bendigo-Ballarat type gold environment established at the JBP Linear, H-Pond discovery, on trend to the south. Rubicon is seeking partners to advance the Glenwood property.

**Jonathans Pond Gold Property (Au)**

The Jonathans Pond Property is located approximately 15 kilometres north-northeast of Gander, Newfoundland and is easily accessed by paved highway and a network of logging roads, north of Gander.

Ownership

The Jonathans Pond Property group is comprised of 4 mineral licences consisting of 320 claims. Rubicon owns a 100% interest in 314 claims and has an option to earn a 100% interest in an additional 6 claims. Fifty-four (54) claims are subject to a 2.5% NSR payable to vendors of which 1.5% can be purchased for $1.5 million. Advanced royalty payments of $7,500 per year begin in April 2007. One mineral licence (6 claims) is subject to advanced royalty payments of $10,000/year and a sliding scale NSR of 2-3% of which 50% can be purchased for $250,000 per 0.25%. One mineral license (6 claims) is part of a current option agreement with Tom Lush (see Principal Property - JBP Linear - Property Description and Agreements). Rubicon is currently earning in on this agreement with one remaining option payment to earn 100% interest.

Geology and Exploration

The Gander River Complex (informally referred to as the GRUB Line) that consists of ultramafic rocks, gabbros, mafic volcanic rocks, quartz-feldspar porphyrys and shales underlies the property. These rocks are structurally interleaved with and unconformably overlain by Davidsville group rocks that host the high grade H-Pond prospect (JBP Linear property). The main historic gold occurrence is the "Westfield" showing that was originally discovered by Blackwood (1982) and staked by Westfield Minerals. Gold values up to 12.8 g/t gold in grab samples and 8.9 g/t gold in bulk samples were returned from quartz vein zones cutting sheared gabbros with associated pyrite and arsenopyrite mineralization. Follow-up work in the area (mainly by Noranda) outlined several areas of weakly anomalous gold showings, particularly as a result of trenching (i.e. 5.8 g/t Au over 1 metre).

The greater potential of the area is highlighted by a large number of highly anomalous gold in heavy mineral concentrate (HMC) till samples (> 1000 ppb gold) to extremely highly anomalous HMC gold-in-tills (up to 410,000 ppb Au) over an area of about 1.0 by 1.5 kilometres in the area north of the Jonathan's Brook fault. Detailed work of the glacial geology and gold grain morphology indicate at least two ice-flow directions (south to north and west to east) and probably two sources for the gold grains. In 2004, Rubicon prospectors discovered 3 visible gold bearing floats with one very large quartz float that assayed 54 g/t gold, that lie within and on the western edge of the HMC gold in till anomaly, thereby documenting the

veracity of the till anomaly. A follow-up trenching program in the fall of 2004 exposed two large quartz vein systems (200m long by 15m wide) that remain open on strike. The veins were mineralized, mainly along the margins and returned up to 2.8 g/t Au in a grab sample. Extensions to these veins or similar veins may represent the source of the high-grade gold float and gold in till anomaly. Rubicon is seeking a partner to advance this project.

**Wing's Point Property (Au)**

The Wing's Point property is located 40 km north of the community of Gander on NTS sheets 2E/07 and 2E/08. Access to the property is excellent via a series of paved roads and gravel roads from Gander

Ownership

The Wings Point property consists of 5 mineral licences comprising 108 claims (2,700 hectares) and was optioned from local prospectors Roland, Larry and Eddie Quinlan in 2002. Rubicon has earned a 100% interest in the Property by completing all option payments. Under the agreement, the claims are subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%. Rubicon must make annual advance royalty payments of $10,000 beginning May 14, 2007.

In 2003, Rubicon optioned the property to Crosshair Exploration. Crosshair Exploration returned the property to Rubicon in September 2005 with Crosshair Exploration earning no interest.

Geology and Exploration

The Wing's Point property is underlain by Ordovician to Silurian sedimentary rocks that are divided into Indian Islands Group to the northwest separated by a central zone of Main Point formation (Caradoc black shales) and Hamilton Sound Group mélange, with Davidsville Group shales, siltstones and sandstones on the southeast side of the property. Felsic dykes and mafic dykes, sills and plugs have variably intruded the sedimentary rocks. There are 4 significant gold occurrences on the property referred to gold prospect, Tibbey's Point prospect, Bussey's Point showing and the Ledrew-Gold Quarry prospect

Roland and Larry Quinlan discovered the Tibbey Point gold prospect in 1997-98 within rocks mapped as Hamilton Sound Group mélange with associated deformed felsic dykes. Grab samples returned gold values up to 47.4 g/t gold. The property was subsequently optioned to Fort Knox Gold Resources in 1999, who completed prospecting, mapping and diamond drilling (6 holes, 647 metres). Drilling by Fort Knox outlined a steeply dipping quartz-arsenopyrite+/-stibnite gold-bearing zone with significant intercepts of 9.98 g/t gold over 1.15 metres, 6.33 g/t gold over 1.30 metres and 5.45 g/t gold over 1.20 metres.

The Titan Gold prospect discovered by Rubicon in 2003 is hosted by intensely quartz-carbonate veined and altered gabbros that intrude the Indian Islands Group sedimentary rocks. The new prospect is located approximately 9 kilometres inland from the Tibbey Point gold prospect. Widely spaced trenching of the Titan showing area has exposed a large, northeast trending zone of altered gabbros and associated quartz-carbonate veining containing visible gold over approximately a 500 metre strike length. Significant trenching results include 12.6 g/t gold over 1.8 metres (including 47.2 g/t Au over 0.40 metre), 9.41 g/t gold over 4.25 metres and 15.25 g/t Au over 3.00 metres. In 2004-05, Crosshair Exploration completed 20 diamond drillholes for 1559 metres. The drilling outlined a gold mineralized zone hosted in highly altered gabbros and sedimentary rocks. Significant intercepts include 10.22 g/t gold over 3.35 metres, 3.65 g/t gold over 2.32 metres, 4.45 g/t gold over 2.50 metres and 5.22 g/t gold over 1.20 metres. The mineralization is open to depth and along strike.

Bussey's Point showing and the Ledrew-Gold Quarry prospects are located in Davidsville Group shales, siltstones and sandstones and are characterized by similar sericite-carbonate alteration and arsenopyrite mineralization that suggests a minimum 2 kilometre northeast trend. The Bussey's Point showing is exposed on the coast over a strike-length of 225 metres and is up to 15 metres wide and consists of

mineralized and quartz-carbonate veined siltstones, sandstones and shales. Disseminated arsenopyrite is extensively developed in the coarser sandstone units. Results from channel sampling include 573 ppb gold over 13.2 metres including 1.3 g/t gold over 2.0 metres. At the Ledrew-Gold Quarry prospect located 1.9 kilometres inland and on trend with Bussey's Point, gold bearing mineralization has been exposed in an active rock quarry as well as by trenching at the Ledrew showing that yielded 962 ppb gold over 1.6 metres with grab samples up to 11.6 g/t gold.

The Company is currently seeking a partner to advance this project.

The following properties: Golden Bullet, Appleton, Bowater and Linear are contiguous properties located approximately 12-18 kilometres west of Gander, Newfoundland. The properties have recently been acquired by Rubicon to cover a broad mineralized gold trend termed the Appleton Linear. Significant gold showings have been traced over approximately 7 kilometres along the Appleton Linear gold trend.

**Golden Bullet Property (Au)**

The Golden Bullet property is located approximately 16 kilometres west of Gander, Newfoundland, near the village of Appleton. The property is covered by NTS mapsheet 02D/15. The Trans Canada Highway cuts through the northern portion of the property with a local quarry access road providing access to the central portion of the property.

Ownership

The Golden Bullet property consists of 1 mineral licence (46 claims, 1150 hectares) and is under option from local prospectors Roland, Larry and Eddie Quinlan. Under the agreement, the claims are subject to option payments totalling $197,000 ($145,000 paid) and 78,000 Rubicon Common Shares over 4 years, which have been. The property is subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $2.25 million. Rubicon has the right of first refusal on the remaining 1.0%. Rubicon must make annual advance royalty payments of $25,000 beginning May 14, 2007.

Geology and Exploration

Middle Ordovician fine-grained, clastic sedimentary rocks of the Davidsville Group underlie the property. Two significant gold mineral occurrences, the Bullet and Knob gold showings were discovered on the property in 1987 and 1989, respectively. The auriferous quartz vein showings are hosted within a variably deformed northeast-trending greywacke unit in fault contact with an unmineralized and visibly unaltered sequence of shale. The shale is overturned and dips steeply to the northwest and forms the structural footwall to the mineralized package. Faulting appears to have offset the mineralized veins.

*Knob showing* - consists of two types of quartz veins including: 1) pyrite-arsenopyrite rich veins with low gold values; and 2) milky-white massive and smaller sheeted quartz veins that contain coarse free gold and minor amounts of pyrite, chalcopyrite and boulangerite. Both vein types are shear controlled and are hosted by structures that crosscut the greywacke at a high angle.

*Bullet showing* - located approximately 0.75 kilometres north-northeast of the Knob showing and within 25 metres of a 540 ppb Au-in-soil anomaly. This gold occurrence is characterized by narrow fault/shear zone cutting friable shale and contains multiple sub-parallel quartz veins with high amounts of visible gold. Channel samples from the surface trenches have assayed up to 91.60 g/t gold over 1.10 metres and grab samples have assayed up to 702.00 g/t gold.

Gander River Minerals optioned the property in 1992 and completed prospecting, trenching and diamond drilling. Gander River Minerals reported grades of 329.0 g/t gold over 0.5 metres from a trench channel sample and 8.98 g/t gold over 14.33 metres from drill core. Other significant channel sample results from the Knob showing include 6.26 g/t gold over 13.0 metres, 81.53 g/t gold over 0.81 metres, 12.08 g/t gold

over 2.78 metres and 631.34 g/t gold over 0.60 metres. Drilling results include 38.53 g/t gold Au over 6.45 metres, 105.99 g/t gold over 2.30 metres and 411.87 g/t gold over 0.58 metres.

Rubicon began a program of extensive prospecting, geological mapping and trenching in 2002, resulting in the discovery of several new gold occurrences on the property. The Letha and Grouse gold showings are located approximately 350 and 750 metres, south-southwest of the Knob gold showing. Several significant grab samples (106.3 g/t gold, 136.5 g/t gold, and 225.6 g/t gold) were collected from quartz-veins with visible gold at the Letha showing and samples with up to 19.4 g/t gold at the Grouse showing. Geological mapping around the Knob showing has identified three separate mineralized structures, each containing visible gold in quartz veins at surface. Rubicon completed fifteen diamond drill holes (2,162 metres) on the property in 2004. The drilling focused on the Knob gold showing (7 holes) the Letha gold showing (2 holes) and the Grouse gold showing (6 holes). Assay results from the drilling returned up to 2.72 g/t gold over 1.2 metres at the Knob Prospect, up to 3.79 g/t gold over 0.5 metres at the Letha showing and up to 7.49 g/t gold over 0.5 metres at the Grouse.

Results indicate a complex mineralized quartz vein system with highly anomalous gold values over significant widths. Rubicon is currently compiling and evaluating the results of the Appleton Linear land package (Golden Bullet, Appleton, Bowater, Linear properties) and with plans to drill in 2006/2007.

**Appleton Property (Au)**

The Appleton property is located 13 kilometres west of the town of Gander, Newfoundland and approximately 5 kilometres east of the village of Appleton. The property is covered by NTS mapsheet 2D/15 and 02E/02. The Trans Canada cuts through the southern portion of the property, with access to most points on the property by a network of logging roads from the Highway.

Ownership

The Appleton property consists of 1 mineral licence (21 claims, 3150 hectares) that was optioned from local prospectors Tom Gosine and Alec Turpin. Under the agreement, the claims are subject to option payments totalling $59,360 ($23,360 paid) over 3 years. The property is subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%. Rubicon must make annual advance royalty payments of $20,000 beginning March 10, 2009.

Geology and Exploration

Middle Ordovician fine-grained, clastic sedimentary rocks of the Davidsville Group underlie the Appleton property. The property is located between and contiguous with the Linear and Golden Bullet property to the west (Appleton linear gold trend) and the JBP Linear property to the east (H-Pond linear gold trend), covering topographic linear features that may reflect gold bearing structures.

In May 2005, Rubicon completed a program of rock sampling and prospecting on the Appleton property in order to begin assessing the gold potential of the property. Twenty-five rock samples outlined a weakly mineralized quartz vein system assaying up to 80 ppb gold. The prospecting program indicated that abundant quartz veining exists within the moderately carbonate-sericite altered sedimentary rocks. The quartz veins typically contain significant (1-3%) pyrite and arsenopyrite – a key component in the mineralized, high grade gold bearing quartz vein zones found in the adjacent Appleton and H-Pond gold trends.

Exploration work planned for 2006 consists of prospecting and additional soil sampling on the property.

**Bowater Property (Au)**

The Bowater property is located approximately 17 kilometres west of Gander, Newfoundland near the village of Appleton. The property is adjacent to the west boundary of the Golden Bullet and Linear property and covered by NTS mapsheet 02D/15. The Trans Canada Highway cuts through the northern portion of the property and a quarry access road from the highway provides good access to the central portion of the property.

Ownership

The Bowater Property consists of 1 mineral licence (6 claims, 150 hectares) that was optioned from local prospectors Gary Lewis and Paul Chafe. Under the agreement, Rubicon must make option payments totalling $195,000 ($15,000 paid) over 5 years. The property is subject to a sliding scale NSR payable to the vendors (<US $300/oz - 2.0% NSR; >US $300-400 - 2.5% NSR; US$400 - 3.0% NSR). Fifty percent of the NSR is purchasable by Rubicon at anytime for $250,000 for each 0.25% NSR. Rubicon has a right of first refusal on the remaining NSR.

Geology and Exploration

The property is underlain by middle Ordovician fine grained, clastic sedimentary rocks of the Davidsville Group and covers the strike and dip extension of the Knob prospect quartz vein system (Golden Bullet property). The auriferous quartz veins on the property occur within a variably deformed northeast-trending greywacke unit that is in fault contact with an unmineralized and visibly unaltered sequence of shale. The shale dips steeply to the northwest and forms the structural footwall to the mineralized package. Faulting appears to have offset the mineralized veins.

Prior too the company acquiring the property, VVC Exploration Corporation completed 18 diamond drillholes (1,485.8 metres) in 2002 and 2003. The drilling targeted seven discrete gold soil anomalies that VVC had discovered from a soil geochemical survey. Significant results of the drilling program include 1.13 g/t gold over 0.42 metres and 3.79 g/t gold over 1.52 metres from a quartz vein with up to 15% sulphides. Other drill holes reportedly intersected 0.194 g/t gold over 22.86 metres in a sericite, carbonate altered sediments with quartz veinlets hosting pyrite-arsenopyrite, and 0.466 g/t gold over 23.17 metres in a wide zone of carbonaceous shale and siltstone with abundant quartz-calcite veining and variable pyrite, arsenopyrite and chalcopyrite mineralization.

Rubicon is completing additional sampling and compilation of the Bowater data prior to conducting follow-up drilling.

**Linear Property (Au)**

The Linear property is located 18 kilometres west of Gander, Newfoundland and approximately 3 kilometres east of Appleton. The property is covered by map sheets 2D/15 and 2E/02. Access to the property is excellent with the Trans-Canada Highway cutting through the southern portion of the property. A network of forestry roads provides access to most points on the property.

Ownership

The Linear Property consists of 1 mineral licence (50 claims, 1250 hectares) and is subject to an option agreement with ASK Prospecting and Guiding Ltd. and Krinor Resources Ltd. Under the agreement Rubicon can earn a 100% interest in the property by making option payments totalling $160,000 and 150,000 Rubicon Common Shares over 5 years. The property is subject to a 3.0% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon may purchase an additional 0.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0% NSR. The Company must make annual advance royalty payments of $24,000 beginning September 15, 2010.

Geology and Exploration

Middle Ordovician fine-grained, clastic sedimentary rocks of the Davidsville Group underlie the Linear Property. Auriferous quartz veins are developed within variably deformed northeast-trending greywacke units that are in fault contact with a visibly unaltered, unmineralized sequence of shales. Previous owners that include Noranda, United Carina Corporation and Candente Resources Corporation have recognized five significant mineralized gold zones on the property. The showings are located along a north-northeast trending zone measuring roughly 4 kilometres in length. The previous companies have reported the following significant drill results at the various showings:

- **Dome Showing** - 18.46 g/t gold over 8.6 metres and 304.8 g/t gold over 0.6 metres;
- **Keats Zone** – 0.36 g/t gold over 30.1 metres with visible gold occurring in narrow band, 2-3 mm thick;
- **Baseline Showing** - 8.8 g/t gold over 4.3 metres (including 61.3 g/t gold over 0.6 metres) and 9.23 g/t gold over 1.6 metres (including 35.4 g/t gold over 0.3 metres);
- **Road Showing** - 15.36 g/t gold over 2.7 metres; and
- **Lotto Showing** - 2.15 g/t gold over 6.6 metres (including 76.7 g/t gold over 0.3 metres).

Noranda carried out prospecting on the property in 1990. Visible gold in float boulders was located in the southern portion of the claim group with one boulder assaying 54.5 oz/t gold. Noranda completed a reconnaissance soil geochemical survey over the property between the Trans-Canada Highway and the Gander River. Gridlines were paced and flagged at 400 metres intervals over a 4.7 kilometres strike length with samples taken at 50 metres intervals. Values up to 590 ppb gold with many samples in the 50 ppb gold plus range were located with good continuity between the widely spaced grid lines. Noranda completed no follow-up prospecting or drilling.

United Carina Corporation optioned the property in 1999 and completed line cutting, soil geochemistry surveys (gold, arsenic), ground geophysics (VLF-EM, magnetic, and IP), trenching and diamond drilling leading to the discovery of many of the currently known gold occurrences. United Carina completed 38 drillholes (3647.5 metres) on the property in 1999 and 2000. No systematic geological mapping or structural mapping was carried out, except for the mapping of the trenches carried out in conjunction with the sampling.

Candente Resource Corporation optioned the property in 2002 and completed grid reclamation work, prospecting and geological mapping on the property. Candente completed 5 diamond drill holes (665 metres) that focused on follow-up drilling of the Dome, Little, Cokes and Keats South gold showings. Significant results included 3.36 g/t gold over 3.9 metres, 4.45 g/t gold over 1.4 metres and 2.89 g/t gold over 7.4 metres. Results from the Keats South Zone include 2.6 g/t gold over 2.0 metres and 7.2 g/t gold over 0.4 metres.

Prior to formalizing the option agreement, Rubicon completed a due diligence program of limited soil sampling and the relogging of 42 drill holes. Results from the due diligence work support the presence of a significant auriferous quartz vein system on the property and confirmed the results of previous surveys. Exploration plans for 2006 would initially consist of continued soil sampling, trenching and geological mapping with follow-up diamond drilling.

**Mt. Peyton Linear Property (Au)**

The Mt. Peyton property is located 25 kilometres west of Gander, Newfoundland and is covered by NTS mapsheet 02E/03, O2D/14 and 02D/15. The property is located approximately 2 kilometres from Trans-Canada Highway from which several logging roads and ATV trails provide access to most points on the claim block.

Ownership

The property consists of 9 mineral licences (115 claims. 2875 hectares) that Rubicon optioned from local prospectors Gary Lewis, Cyril Reid and Paul Chafe in 2002 Rubicon has earned a 100% interest in the property which remains subject to annual advance royalty payments of $10,000 beginning in December, 2006.

Geology and Exploration

The Mt. Peyton property is underlain by fine to medium grained granitic to gabbroic rocks of the Mount Peyton Intrusive Suite. Granitic, apilitic and tonalitic dykes occur locally and are related to granitic rocks that outcrop further to the south. Noranda originally staked the property based on government reports outlining anomalous arsenic values (up to 1190 ppm As) from government lakes sediment surveys.

Noranda identified five significant gold prospects in the central portion of the property that include the Corsair, Hurricane, Apache, Comanche and Saber gold showings. The Corsair is a 3 to 4 metres wide sericitic zone containing pyrite and arsenopyrite with minor quartz veining that assayed up to 3.2 g/t gold in grab samples and 3.63 g/t gold over 1.0 metres in drill core. The Hurricane zone is an approximately 2 metre thick sericitized zone in diorite with pyrite-arsenopyrite bearing quartz veins assaying up to 166 g/t gold and 11.4 g/t silver in grab samples. The Apache, Saber and Comanche are smaller zones of alteration and mineralization with one sample from the Saber showing assayed up to 2.1 g/t Au and 47.6 oz/t Ag.

Noranda completed prospecting, rock/soil sampling and geophysical surveys (IP and airborne 3-D gradient magnetics), trenching and diamond drilling in 1989. The drilling tested the southern extension of the Hurricane and Peyton trends both intersected zones of similar mineralization that include 8.4 g/t gold over 0.4 metres, 7.9 g/t gold over 1.0 metre and 7.5 g/t gold over 1.0 metre.

Prospecting activities carried out along the shorelines of the lakes to the north-northwest of the Noranda gold showings resulted in the discovery of numerous float occurrences of auriferous sulphide bearing float (grab samples up to 44 g/t gold). The auriferous float samples extend the known gold mineralization over about 12 kilometres to the north-northwest and is referred to as the Mt Peyton Gold Linear. Rubicon recognized the potential of this area to host significant structurally controlled gold mineralization. A systematic program of prospecting, soil sampling and trenching in areas of significant auriferous float occurrences is recommended for 2006. Rubicon is currently seeking a partner to advance this project.

**TCH Property (Au)**

The TCH Property is located 35 kilometres northwest of Gander and covered by NTS mapsheet 02E/03. The property is interpreted to cover the northern extension of the Mt Peyton Gold Linear (see Mt. Peyton Linear Property). The Trans-Canada Highway cuts through the center of the property from which a numerous logging roads and ATV trails provide access to most points on the claim block.

Ownership

The 100% Rubicon owned TCH property consists of 1 mineral licence (6 claims, 150 hectares). Rubicon optioned the property from Roland and Larry Quinlan in May 2002. The property is subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%. Annual advance royalty payments of $10,000 begin on May 14, 2007.

Geology and Exploration

The property is underlain by fine to medium grained granitic to gabbroic rocks of the Mount Peyton Intrusive Suite and locally by sediments of the Botwood and Badger Groups. Gold mineralization is hosted by a strongly carbonate altered granitic dyke which exhibits a strong miarolitic texture (Slip

showing). The intrusive body measures up to 10 metres in width and is well exposed in the rock quarry wall. The gold-bearing intrusion crosscuts the gabbroic-dioritic phase of the Mt Peyton Intrusive. Grab samples from the showing have returned gold values of up to 28.6 g/t gold with associated silver-copper-lead-zinc values.

Prospecting by Rubicon has discovered additional gold showings to the west of the rock quarry that consist of narrow stibnite rich quartz veins in gabbroic rocks. Grab samples from the quartz veins grade up to 12.9 g/t gold. Rubicon is seeking a partner to advance this project in conjunction with the Mt Peyton property

**Huxter Lane Property (Au)**

The Huxter Lane property is located approximately 50 kilometres south of the community of Grand Falls-Windsor, Newfoundland. Access to the property area via paved highway (Hwy 360) from the community of Grand Falls-Windsor. Logging roads that originate from the highway provide good access to most points on the property.

Ownership

The Huxter Lane property consists of 4 mineral licenses (54 claims, 1,350 hectares) optioned from Roland and Larry Quinlan in May 2002. Rubicon has earned a 100% interest in the property by completing all option payments. The property is subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%. Annual advance royalty payments of $10,000 begin on May 14, 2007.

In 2004, Rubicon optioned the property to Meridian Gold Company (“Meridian”). Under the terms of the agreement, Meridian can earn a 55% interest in property by spending $1,000,000 over a period of three years; make underlying cash payments to the vendor, and paying Rubicon approximately $61,400. Meridian may earn an additional 10% by funding the project to a bankable feasibility study and an additional 5% (for a total interest of 70%) by funding all costs to a positive production decision.

Geology and Exploration

The Huxter Lane property is situated in the Dunnage tectonostratigraphic zone of the Newfoundland Appalachians, at the eastern margin of a large elliptical structure informally referred to as the Tim Horton complex. The property straddles the contact between the Coy Pond Complex ultramafic-mafic rocks and the felsic volcanic rocks and marine siliciclastic rocks of the Baie d’Espoir Group. The exploration target is an intrusive-related gold deposit.

Prospectors who staked the Huxter Lane property discovered gold float in 1998. Rubicon acquired the right to earn a 100% interest in the property through an option deal with the prospectors in early 2002. Rubicon completed prospecting and trenching that resulted in bedrock discovery of gold mineralization in altered quartz-feldspar-hornblende porphyry.

In 2005, Meridian funded a systematic program of soil geochemical sampling; prospecting; IP ground geophysical surveys and trenching. The trench and channel sampling programs uncovered widespread mineralization in trenches over an area of about 550 metres in the porphyry and along the contact zones between the porphyry and ultramafic rocks. Highlights of sampling to date include: 6.87 g/t gold over 2.6 metres, 6.08 g/t gold over 2.9 metres and 4.19 g/t gold over 3.2 metres. Two channel samples from the Mosquito Hill Occurrence returned 15.3 g/t gold over 0.8 meters and 12.6 g/t gold over 0.45 meters.

Proposed work for 2006 includes a high-resolution airborne magnetic/electromagnetic survey over the property and a minimum 1000 metre diamond drill program targeting the Mosquito Hill mineralization.

**Golden Promise Trend Properties, Newfoundland**

The Golden Promise Trend properties are located in the Grand Falls-Windsor to Millertown area of central Newfoundland. The majority of the properties are located along the Cambro-Ordovician Victoria Lake Group: a belt of volcanic, volcaniclastic and sedimentary rocks within the Exploits Subzone. Exploration on these properties is focused on the turbidite-hosted auriferous quartz veins (Golden Promise and South Golden Promise properties) that show similar elements to the world class Bendigo-Ballarat goldfield deposits currently being mined in Victoria, Australia. Properties further to the southwest are hosted within volcanic dominated stratigraphy of the Tulks and Tally Pond Volcanic belts and these properties (Barren Lake, Victoria Lake) are the focus of exploration for precious-metal rich base metal mineralization.

In February 2003, Rubicon signed an option agreement with International Lima Resources Corporation, now Crosshair Exploration whereby Crosshair Exploration can earn a 60% interest in the Victoria Lake Option. Under the terms of the agreement, Crosshair Exploration must spend $1.75 million over a four-year period and issue a total of 400,000 shares to Rubicon (100,000 per year). The agreement covers and incorporates the underlying 100% Rubicon owned Southern Golden Promise Property, Victoria Lake Property and Barren Lake Property properties. On June 6 2006, the 100% owned Victoria Lake 10188M Property was incorporated into the Victoria Lake Agreement. See Schedule “J”, “Information Concerning Paragon after the Agreement” - “Material Contracts”.

**Southern Golden Promise Property (Au)**

The South Golden Promise property is centered approximately 40 kilometres southwest of the town of Badger in central Newfoundland The property is covered by NTS mapsheet 12A/09, 10, 15, and 16 and is contiguous with the southern boundary of the Golden Promise property. The Buchans Highway is located along the northern property boundary from which logging roads and ATV trails provide access to most of the claim block.

<u>Ownership</u>

The property consists of 8 mineral licences (1072 claims) that cover an area of 26,800 hectares. The property is 100% Rubicon owned and subject to the Victoria Lake Option agreement with Crosshair Exploration. The licences are currently registered to Crosshair Exploration. In April 2006, Crosshair Exploration returned part of the optioned claim block (208 claims) to Rubicon as permitted under the agreement

<u>Geology and Exploration</u>

The property is underlain by sedimentary rocks (mudstone, greywacke) and lesser volcanic rocks (mafic, rhyolite tuff) of the Victoria Lake Group. These rocks are stratigraphically overlain by the Carodocian black shale sequence, which separates rocks of the Victoria Lake Group to the south from overlying Ordovician to Silurian siliciclastic sediments of the Badger Group to the north. Younger felsic plutonic rocks of the Hodges Hill granite and the Skull Hill intrusion locally intrude all rocks. Several minor gabbroic dykes and sills also cut the stratigraphy.

Rubicon completed prospecting and geological mapping on the property in 2002 and 2003. Highlights of the work include anomalous gold mineralization in bedrock of up to 3.5 g/t gold at Wigwam Brook and heavy metal concentrate gold panned samples of up to 178 g/t gold.

On optioning the property, Crosshair Exploration completed a high-resolution magnetic-EM helicopter airborne survey over approximately 60% of the property. In 2004, Crosshair Exploration completed a soil geochemistry survey collecting a total of 4077 soil samples. Thirty-five anomalous samples were returned from the soil survey with assays as high as 252 ppb gold. Follow-up prospecting led to the discovery of the Snow White prospect, an area of mineralized float with initial grab samples up to 10 g/t gold. Trenching by Crosshair Exploration at the Snow White prospect was successful in exposing a composite quartz vein system over a strike length of approximately 170 metres and up to 5 metres in width.

Highlights of the sampling include up to 29.7 g/t gold over 0.5 metres channel samples and grab samples of up to 232 g/t gold.

Crosshair Exploration plans to begin diamond drilling on the Snow White prospect in the summer of 2006.

**Barren Lake Property (Au and base metals)**

The Barren Lake property is located in central Newfoundland, approximately 90 kilometres southwest of Badger and 35 kilometres south of Buchans. The property is covered by NTS mapsheet 12A/10 and 12A/07 and is accessible by well maintained logging roads south of Millertown and a network of ATV accessible trails on the property.

Ownership

The 100% Rubicon owned Barren Lake property consists of 3 mineral licenses (95 claims) covering 2,375 hectares. Rubicon optioned the property from local prospectors Al Keats, Kevin Keats and Peter Dimmell in 2002 and has earned a 100% interest in the property. The property is subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%. The property was optioned to Crosshair Exploration in 2003 as part of the Victoria Lake Option agreement.

Geology and Exploration

The northeast–southwest trending volcanic and sedimentary rocks of the Cambro-Ordovician Victoria Lake Group underlie the Barren Lake property. The Victoria Lake Group is well known to host significant volcanogenic massive sulphide deposits including the Duck Pond deposit (Aur Resources) and Boomerang deposit (Messina Minerals). The Victoria Lake - Tally Pond volcanic belt extends along the southeast portion of the claim block, consisting of mafic and felsic volcanic rocks that include felsic tuffs/breccias and mafic tuffs, agglomerates and pillow lavas. Sedimentary rocks occur along the northwest portion of the claim block and consist of interbedded volcanic tuffs and epiclastic sediments including sandstones, siltstones, shales and greywackes.

Prospecting by Rubicon in 2003 for gold and base metal targets on the property identified disseminated base metal (lead-zinc) mineralization in outcrop and float. Felsic volcanic rocks including quartz eye rhyolites and interbedded sedimentary units were identified on the property. A total of 74 rocks samples were collected. No significant gold values were located with one sample returning up to 1.1% zinc. Crosshair Exploration has completed reconnaissance-style prospecting on the property.

**Victoria Lake Property (Base metals and Au)**

The Victoria Lake property is located in central Newfoundland, approximately 120 kilometres southwest of the town of Badger and 65 kilometres southwest of Buchans. The property is covered by NTS map sheet 12A/06. The property is accessed via the Buchans Highway to Millertown and then via a network of well maintained logging roads to within 10 kilometres of the claims. Rough, non-maintained logging roads provide 4-wheel drive and ATV access to most parts of the property.

Ownership

The 100% owned Victoria Lake property consists of 1 mineral licence (166 claims) covering an area of 4150 hectares. Rubicon has earned a 100% interest in the property, which was optioned, from prospectors Allan Keats and Kevin Keats in 2002. The property is subject to a 2.5% NSR payable to the vendors of which Rubicon can purchase 1.5% for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%. The property was optioned to Crosshair Exploration in 2003 as part of the Victoria Lake Option agreement.

Geology and Exploration

The northeast–southwest trending volcanic and sedimentary rocks of the Cambro-Ordovician Victoria Lake Group underlie the Victoria Lake property. The Victoria Lake Group is well known to host significant volcanogenic massive sulphide deposits including the Duck Pond deposit (Aur Resources) and Boomerang and Long Lake deposits (Messina Minerals). On the property, the Victoria Lake Tulks Hill volcanic belt underlies a majority of the property and consists of mafic and felsic volcanic rocks that include felsic flows, tuffs and breccias and lesser mafic tuffs, agglomerates and pillow lavas. Sedimentary rocks occur along the southeast margins of the claim block and consist of interbedded volcanic tuffs and epiclastic sediments including sandstones, siltstones, shales and greywackes.

Historical exploration by Noranda (1980's to early 1990's) highlighted the presence of at least three distinct zones of altered (sericite-silica-pyrite) felsic volcanic rocks exhibiting volcanogenic massive sulphide indicators including strongly depleted sodium (0.13% to 0.33% Na2O), enriched potassium (up to 12% K2O) and enriched barium (4,940 ppm Ba) whole rock signatures. There are also unsourced, sulphide rich boulders assaying 6.5% zinc, 4.1% lead, 0.37% copper, 33.9 g/t Ag and 1.02 g/t gold. Boulders of massive barite have also been located immediately northeast of the property boundary.

Soil sampling completed by Noranda and more recently by Rubicon has outlined significant copper, zinc, lead and silver anomalies that locally correspond with alteration zones and geophysical targets, most of which are untested by diamond drilling. After optioning the property, Crosshair Exploration refurbished approximately 62 kilometres of gridlines on three separate grids in addition to cutting one new grid (DPS grid). Crosshair Exploration completed ground gravity surveys on the new and refurbished grids and outlined several significant gravity targets. Crosshair Exploration is proposing follow-up drilling of these targets in 2006.

**Victoria Lake 10188M Property (Base metals and Au)**

The Victoria Lake 10188M property is located central Newfoundland approximately 110 kilometres southwest of the town of Badger and 65 kilometres southwest of Buchans. The property is covered by NTS Mapsheet 12A/06 and is located immediately northeast of the Victoria Lake property (described previously). The property is accessed from the Buchans Highway to Millertown and then via a network of well maintained logging roads to within 10 kilometres of the claims. Rough, non-maintained logging roads provide 4-wheel drive and ATV access to most parts of the property.

Ownership

The Victoria Lake 10188M property consists of 2 licences (90.75 claims, 2268.75 hectares) and is contiguous with the Victory Lake property. The property is under option from prospectors Al Keats and Kevin Keats. Under the agreement the claims are subject to option payments totalling $60,000 ($15,000 paid) and 40,000 Rubicon shares (5,000 paid) over 2 years. A 2.5% NSR is payable to the vendors of which Rubicon can purchase 1.5% can be purchased by Rubicon for $1.5 million. Rubicon has the right of first refusal on the remaining 1.0%.

The property is under option to Crosshair Exploration and is subject to the Victoria Lake Option Agreement. Of the 90.75 claims that make up the property, forty-nine (49) claims occur within the 2 km Area of Influence (AOI) of the Victoria Lake Property as defined in the Victoria Lake agreement. Crosshair Exploration has accepted these claims into the Victoria Lake Option agreement. The remaining 41.75 claims that occur outside of the above mentioned Area of Influence were incorporated into the Victoria Lake Option on June 6, 2006. See Schedule "J", "Information Concerning Paragon After the Agreement" - "Material Contracts".

Geology and Exploration

The property is underlain by Cambro-Ordovician volcanic and sedimentary rocks of the Victoria Lake Group similar to that described for the Victoria Lake property. Rubicon completed a limited program of prospecting and geological mapping on the property. A total of 41 rock samples were collected in 2005 and analyzed for base and precious metals.

Highlights of the prospecting include a small float sample of massive sulphide (pyrite-chalcopyrite) with values of up to 3.62% Copper, 262 ppm zinc, 212 ppm lead, 363 ppb gold, 6.5 ppm silver and 490 ppm arsenic. Other samples include a large angular, rhyolitic tuff sample containing semi-massive to massive bands of pyrite-sphalerite-galena (0.88% Zn, 0.58% lead, 46.8 ppm Ag and 37 ppb Au) and silica altered, quartz porphyry bearing float sample containing massive bands of pyritic sulphide and assaying 916 ppb gold, 650 ppm arsenic and 310 ppm lead. The angular nature of the mineralized float samples is interpreted to be near source.

**New World Trend Properties, Newfoundland**

**New World Property (Au)**

The New World property is located near New World Island in north central Newfoundland approximately 75 kilometres north of the town of Gander and 2 kilometres west of the town of Parkview. The property is covered by NTS mapsheet 2E/07 and 2E/10. Paved highway from Gander to Twillingate provides ready access to the property with coastal parts of the property being reached by boat from Parkview or Boyd's Cove. The majority of the property consists of coastal exposures along small islands, which can only be accessed by boat.

Ownership

The New World property consists of 4 licences (231 claims) for a total area of 5775 hectares. Rubicon has earned a 100% interest in the property since optioning it from local prospectors Roland, Larry and Eddie Quinlan in 2002. The property is subject to a 2.0% NSR payable to the vendors of which Rubicon can purchase 1.0% for $1.0 million. Rubicon has the right of first refusal on the remaining 1.0%. Rubicon must make annual advance royalty payments of $15,000 beginning April 19, 2007.

Geology and Exploration

The New World property is underlain by the Middle Ordovician Dunnage Mélange, which occurs stratigraphically below the black shales of the Caradocian Dark Hole Formation. Coarse-grained siliciclastic rocks of the Milliners Arm Formation conformably overlie the Dark Hole Formation. The Dunnage Mélange is comprised of large heterolithic clasts/blocks and mega-boudins of felsic volcanics, gabbro, pillowed mafic volcanic, siliciclastic and calcareous sedimentary rocks within a shale/siltstone/volcaniclastic matrix. The Dunnage Mélange has been intruded by the Coaker Porphyry, which underlies the southern part of the property.

Exploration by Rubicon and the property vendors has defined two east-west trending gold mineralized zones; the New World Trend in the north property area and the Dunnage-Coaker Trend in the south property area. Eleven gold occurrences have been discovered along the New World Trend (7 with visible gold) and three along the Dunnage-Coaker Trend.

The New World Trend is a 15 kilometre long structural-stratigraphic contact zone between siliciclastic turbidites (Caradocian and Badger Group) and the Dunnage Mélange. Mineralization is exposed along the southern shore of New World Island and on small islands within the waterway of Dildo Run. Pyrite, arsenopyrite, and gold mineralization are typically associated with moderate to strong, crosscutting quartz carbonate veining within the variably altered sedimentary and mafic rocks and felsic intrusive units.

Highlight from channel samples collected from various gold showings along the New World Trend are summarized below.

- Dark Hole showing – 44.3 g/t gold over 0.5 metres and 6.1 g/t gold over 1.2 metres
- Little Island showing – 10.7 g/t gold over 1.4 metres and 13.2 g/t gold over 1.1 metres
- Gina showing – 49.0 g/t gold over 0.3 metres and 18.8 g/t gold over 0.3 metres
- Big Island showing – 18.1 g/t gold over 2.3 metres and 50.2 g/t gold over 1.1 metres
- Big Oz showing – 87.0 g/t gold over 0.8 metres

The Dunnage-Coaker Trend is exposed over a 2-kilometre strike length between Coaker and Dunnage Islands. Gold mineralization occurs in pervasively altered and variably quartz-carbonate veined porphyry and as higher-grade mineralization at the contact of Coaker porphyry and adjacent Dunnage Mélange. Highlight assays from channel samples collected from occurrences along the DCC are outlined in the table below.

- Hi-grade showing – 7.3 g/t gold over 2.05 metres, 4.73 g/t gold over 1.6 metres, 8.3 g/t gold over 1.9 metres, 6.2 g/t gold over 1.2 metres and 7.1 g/t gold over 1.2 metres
- Mispickel showing – 1.03 g/t gold over 25.9 metres
- Quinlan showing – 0.68 g/t gold over 12.8 metres

Planned exploration work for 2006 includes a high-resolution airborne magnetic and electromagnetic survey and follow-up diamond drilling (~1000 metres) targeting the gold mineralization at the Big Oz Zone.

**Star Track Trend Properties, Newfoundland**

**Star Track Property (Au)**

The Star Track property is located approximately 16 kilometres east of Gander, Newfoundland near the town of Benton. The property is covered by NTS mapsheet 02D/16. Access to the property is excellent with the Trans Canada Highway transecting the western-most portion of the property. Existing logging roads and an abandoned railroad bed provide good access to most areas of the property.

Ownership

The Star Track property consists of 1 mineral licence (158 claims) and covers 3950 hectares. Rubicon optioned the property from local prospectors Robert and Alexander Stares in November 2001. Under the terms of the agreement, Rubicon can earn 100% interest in the property by making cash and share payments over a five-year period. The claims are subject to a 2% NSR of which Rubicon can purchase 50% of the NSR for $1,000,000. See Schedule “J”, “Information Concerning Paragon After the Arrangement” - “Material Contracts”.

Geology and Exploration

The property is underlain by rocks of the Gander Group that are further divided into early to middle Ordovician Indian Bay Big Pond Formation, Cambrian to Early Ordovician Jonathan’s Pond Formation, and the Square Pond Gneiss. Black politic rocks characterize the Indian Bay Big Pond Formation and quartz-rich psammitic rocks characterize the Jonathan’s Pond Formation. The Square Pond Gneiss located to the east of the property is a 10 kilometres wide belt of rocks that underlie and are considered to be metamorphosed equivalents of Gander Group rocks. A regional gravity-magnetic high correlates with a discontinuous belt of mafic-ultramafic of rocks that appear to be associated with a zone of west dipping thrusting that underlies the Startrack property at depth. The correlation of arsenic, antimony and gold lake sediment anomalies along this gravity-magnetic boundary points to a potential new gold belt that has had little previous exploration

A government geologist initially discovered gold in the area in 1986. Since that time, various companies including Noranda, Corona Corporation, Celtic Minerals and Terra Nova Exploration have conducted early stage exploration in the region. Exploration by these companies consisted of reconnaissance prospecting, soil sampling, lake sediment sampling, geological mapping and sampling and limited geophysical surveys. Reported results indicate anomalous to locally highly anomalous gold values and associated arsenic and antimony.

Beginning in 2001, Rubicon conducted extensive prospecting, geological mapping, trenching and airborne geophysical programs that have resulted in discovery of numerous new gold occurrences. A total of 2000 rock, soil and trench channel samples have been collected from the Star Track property. High grade gold values from grab samples occur in highly deformed quartz-arsenopyrite vein zones referred to as the "Star Track Trend" and "Stallion Trend". Grab samples from the Jobs Pond Gold showing found within the Star Track Trend contained up to 256.1 g/t gold with trench channel samples retuning up to 20.7 g/t gold over 0.60 metres. In 2004, Rubicon completed seven diamond drill holes (2,162 metres) that were designed to test gold showings along the two mineralized trends. The drilling intersected highly deformed quartz-arsenopyrite vein zones with sample results returning up to 1.34 g/t gold over 0.6 metres over an interval located about 100 metres down dip from the Jobs Pond showing.

Rubicon's exploration work confirms the presence of a prospective vein-hosted gold system characterized by broad zones (trends) of alteration and silicification with associated pyrite, arsenopyrite, stibnite and gold mineralization. The Startrack Trend is thought to represent a structural culmination in the hanging wall to a major crustal shear with possibilities of an "extensive saddle reef system at depth". The mineralization style is interpreted to be analogous to Bendigo-Ballarat gold deposits located in central Victoria, Australia. The Stallion Trend forms a second gold environment, and consists of fault controlled, vuggy quartz-sediment breccias and silicified-sericitic zones with arsenopyrite, stibnite and elevated gold values (up to 9 g/t Au in grabs). The structurally controlled stibnite-rich veins are the subject of Chris Buchanan's Ph.D. thesis at Memorial University.

Drilling is recommended at the Jobs Pond occurrence and additional soil sampling is warranted to outline near surface veins and vein extensions

**Avalon Trend Properties, Newfoundland**

**Bergs Property (Au, Ag)**

The Bergs property is located approximately 12 kilometres west of St. John, Newfoundland and surrounds the community of Conception Bay South. Access to the property is excellent from Route 1 west of St. John and Route 60 to the Conception Bay South area. Routes 10 and 13 provide access to the south end of the property.

Ownership

The property consists of one mineral licence (255 claims) covering a total area of 6375 hectares. Rubicon optioned the property from local prospectors Mark Osmond, Alex Turpin, Tom Gosine and Greg Peddle in November 2002 and has since earned a 100% interest. The property is subject to a 2% NSR payable to the vendors of which Rubicon can purchase 1% for $1.5 million. Rubicon has the first right of refusal on the remaining 1%. Annual advance royalty payments of $15,000 per year begin in November 2007.

Geology and Exploration

The Bergs property lies within the eastern Avalon high-alumina belt ("EAHAB"), an extensive zone of epithermal-style hydrothermal alteration located along the eastern margin of the late Neoproterozoic (590-570 Ma) volcano-plutonic core of the Avalon Peninsula. The host rocks are part of a thick sub-aerial succession of welded and variously flattened, rhyolitic to dacitic, pumice-rich ash-flow tuffs,

stratigraphically associated with dome-facies flows, plugs and breccias of broadly similar composition. These rocks are favourable hosts to low sulphidation, high-grade gold-silver vein systems.

Historically, the area has seen very little exploration for this type of low sulphidation gold target, with the exception of a short period of exploration by Fort Knox Gold Resources in 1998-1999. Fort Knox completed geological mapping and six diamond drill holes – no results available. In April 2002, prospector Greg Peddle completed a single reconnaissance drill hole at the Bergs prospect. The drill hole intersected three significant mineralized veins and/or vein-breccia zones including 0.535 g/t gold over 2.2 metres, 0.327 g/t gold over 2.5 metres, and 0.570 g/t gold over 3.8 metres. Additional veins assaying from 0.10 to 0.40 g/t gold were intersected to depths of 75 metres down the hole. Results from the drill core indicate multiple veins and breccia zones to be present, and may form part of a significantly larger, complex and composite vein-stockwork-breccia system.

Geological mapping and prospecting by Rubicon between 2003 and 2005 outlined multidirectional, crustiform-banded silica-hematite veins and vein-breccias that intrude silica-altered rhyolite and rhyolite breccias in an outcrop on the central portion of the Bergs prospect. Grab samples yielded the high-grade gold assays of 54.30 g/t gold, 26.50 g/t gold, and 23.60 g/t gold. Other veins in the same outcrop assayed 4.9 g/t gold, 1.65 g/t gold, 0.34 g/t gold, 0.27 g/t gold, and 0.14 g/t gold. Four grab samples of banded vein fragments collected from sub-cropping angular breccias located approximately 85 metres to the northwest of the high-grade gold veins contain anomalous gold of up to 7.75 g/t gold.

Bonanza grade gold values coupled with favourable host rocks support a low suphidation epithermal gold environment and the potential for the Bergs property to host economic gold deposits. Rubicon is currently seeking a partner to advance this project.

## Base Metal Properties, Newfoundland

### Point Leamington Property

The Point Leamington massive sulphide deposit is located in north-central Newfoundland, approximately 70 kilometres northwest of Gander and 37 kilometres north of the town of Grand Falls. The property sits in a low-lying swampy area accessible via an 8-kilometre logging road connecting to Highway #1.

The Point Leamington property consists of one mining lease and two mineral licences, covering a total area of approximately 638 hectares. In February 2004, Rubicon entered into a cash and shares purchase agreement with TLC Ventures Corp (“TLC”), whereby TLC can acquire 100% of the Point Leamington property. In May 2006, TLC earned a 100% interest in the property by completing the terms of the purchase agreement. The property is subject to a 2% NSR royalty, of which Rubicon may purchase 0.5% for $500,000.

### Seal Bay Property

The Seal Bay property is located on the western side of Seal Bay, 90 kilometres northwest of the town of Gander and 50 kilometres north of the town of Grand Falls-Windsor, Newfoundland. The property area is accessible by boat from Leading Tickles, a fishing community connected to the Trans-Canada Highway via Highway 350. Food supplies and small hardware items can be obtained from the communities of Leading Tickles or Triton. The closest service and supply centre for advanced exploration projects would be the seaport town of Botwood, located 30 kilometres southeast of Seal Bay.

Ownership

The Seal Bay property is subject to an earn-in option to the Joint Venture agreement with Falconbridge Limited (“Falconbridge”) whereby Rubicon can earn a 51% interest by spending $700,000. Rubicon made additional expenditures of more than $205,000 in 2005 to earn its 51% interest as required by an amended Seal Bay agreement dated July 15, 2002. A joint venture is currently being formalized.

Geology and Exploration

The Seal Bay area is situated within the Dunnage Tectonostratigraphic zone of the Newfoundland Appalachians and is largely underlain by supracrustal sequences of volcanic, sub volcanic and epiclastic rocks of the Ordovician Wild Bight Group. The lithologies, geochemistry, and variety of proximal fragmental rhyolitic rocks underlying the property are analogous to those commonly associated with Paleozoic volcanogenic massive sulphide deposits. The proximal nature of the felsic volcanic rocks, coupled with two phases of folding, faulting and a penetrative N-S foliation has complicated efforts to fully understand the stratigraphy. A re-interpretation by Falconbridge geologists in 1990-91 and Rubicon geologists in 1996 in the area of the Camp and Main Zone sulphides occurrences, suggests that the overall trend of the felsic sequence is about N70o-80oE, as opposed to foliation parallel N10o-15oE.

Texasgulf and Falconbridge drilled a total of 3885 metres in 20 holes between 1974 and 1991, to test several copper-zinc base metal occurrences. The best results to date are 9.1 metres of 1.0% copper, 0.82% zinc, 36 g/t silver; 9.0 metres of 0.75% copper; and 89.1 metres of 0.80% zinc.

Rubicon completed two drill programs in June-July 1998 and November-December 2005 for a total of 3148 metres of drilling. The 1998 program (2034 metres in 5 holes) tested the re-interpretation of the rock trend and intersected significant base metal mineralization in several holes including 9.0 metres of 0.75% copper in SB-98-13 and 89.1 metres of 0.80% zinc and 0.16 g/t gold in SB-98-14. A total of 1,114 metres were drilled in 4 drillholes in 2005. Highlights include 10.5 metres of 111 ppb gold, 101 ppm copper, 363 ppm lead, 2162 ppm zinc and 10.7 g/t silver in drillhole SB05-10ext.

Downhole EM should be completed on the most recent drill holes and a resurvey of some of the old holes is warranted prior to more drilling. The two Rubicon drill programs have limited the plunge of Main Zone mineralization to steep north or northeast and this concept should be tested. Stratigraphy to the south of the Main zone indicates a rapid facies change to altered rhyolite tuffs that are not exposed on surface and are interpreted to have a moderate west-northwest dip. The facies change may represent a more favourable environment for massive sulphide deposition relative to the massive proximal host rhyolites that are exposed on surface. This idea warrants drill testing. The Camp zone was not adequately tested by SB-05-18 because of extreme drill hole deviation and requires more testing. Two additional surface showings, the North Zone and Eagle Head need to be drill tested.

**West Cleary Property**

The West Cleary property is located 2 kilometres east of the town of Robert's Arm in north central Newfoundland. The property consists of a single mineral license (16 claims) covering 400 hectares. Highway 380 to Robert's Arm cuts through the south part of the property. Numerous winter roads/trails provide access to the northern parts of the property.

Ownership

Rubicon optioned the West Cleary property from Falconbridge in March 1996. Rubicon has since earned a 51% interest in the mineral license from Falconbridge. by incurring exploration expenditures of more than $81,387. A joint venture with Falconbridge is currently being formalized.

Geology and Exploration

Lower Ordovician volcanic rocks of the Robert's Arm Group underlie the property. The Roberts Arm Group is a lower Ordovician, spilitized island arc assemblage of mafic and felsic volcanic rocks. The area is regionally referred to as the Buchans-Roberts Arm Belt, and is a prolific host of volcanogenic massive sulfide deposits, including the former producer, Buchans Cu-Pb-Zn deposit. The rocks are separated to the north from tholeiitic basalts of the Lush's Bight Group by the Lobster Cove fault. The Robert's Arm Group is faulted to the west against the Mansfield Cove tonalite, a complex of older formed plutonic rocks,

and to the southeast (Red Indian Line) against the Crescent Lake Formation. Intruding the Roberts Arm volcanics are a series of small, possibly coeval gabbroic to dioritic intrusive bodies

The property saw limited systematic exploration until 1989, when Falconbridge completed soil, stream, and rock sampling programs, detailed trench mapping and VLF/Magnetics geophysics on the property from 1989 to 1990. Significant results include a sample from the shaft vein with 4.56% copper, 2.5% lead, 1.1% zinc over 3.0 metres; and angular float sample of 0.36% copper, 11.2% lead, 21.0% zinc, 19.2 g/t gold, 30.2 g/t silver and up to 8.8% zinc from altered basalt fragmental rocks in trench #5. The work showed indications of a large zoned hydrothermal system.

Since acquiring the property in March 1996, Rubicon has completed soil sampling, prospecting, rock sampling and geophysical surveys on the property. A single drillhole completed in 1998 intersected two stockwork zones with weakly anomalous base and precious metals.

Two diamond drill holes were completed on the property targeting chargeability IP anomalies and surface veining and alteration during January 2006. In the first hole, minor mineralization was encountered throughout the host intrusive with locally up to 5-7% combined pyrite, chalcopyrite, galena and sphalerite. In the second hole, a veined zone with semi-massive to a massive section of sulphides was encountered between 32.68 metres to 32.90 metres. It contained mainly pyrite with up to 5 to 10% sphalerite, chalcopyrite, and galena. Assays up to 3.7 g/t gold, 5.6 ppm silver, 2730 ppm lead, 791 ppm copper and 1.1% zinc over 0.3 metres (52.45 metres to 52.75 metres) were obtained from the first hole. Assays up to 6.21 % zinc, 1.02% copper, 1.42% lead and 12.2 ppm silver over 0.22 metres (32.68 to 32.90 metres) were obtained from the second hole.

**Harpoon Brook Property**

The Harpoon Brook property is located in central Newfoundland approximately 80 kilometres southeast of Grand Falls-Windsor and 17 kilometres south of the community of Millertown. The property is easily accessed via well-maintained logging roads originating from Millertown. A number of secondary logging roads and logging trails provide very good access to various parts of the interior of the property. The new Duck Pond Mine development (located 2.4 kilometres east of the property) provides additional year-round road access to the northeastern part of the claim and construction of a power line.

Ownership

The Harpoon property consists of 5 mineral licences (225 claims) and covers a total area of 5625 hectares. The Harpoon property is under option from prospectors Al and Kevin Keats. Under the agreement the claims are subject to option payments totalling $95,000 ($25,000 paid) and 10,000 Rubicon Common Shares (10,000 paid) over 3 years with the property subject to a 2.0% NSR payable to the vendors of which Rubicon can purchase 1.0% for $1.0 million. Rubicon has the right of first refusal on the remaining 1.0% NSR.

Geology and Exploration

The Harpoon Lake Project covers a significant strike length of the Victoria Lake Group, a very prospective volcanic package hosting significant VMS deposits and prospects (Duck Pond, Burnt Lake, Boomerang deposit, Long Lake and others). These deposits are hosted within two belts of felsic volcanic-sedimentary sequences: the Tulks Hill and Tally Pond belts. The Harpoon Lake property covers approximately 20 kilometres of the Tally Pond that includes a package of chloritized felsic volcanic rocks assumed to be the extension of the Duck Pond Horizon (host to the Duck Pond and Boundary massive sulphide deposits). Numerous EM anomalies are present on the property; many are associated with graphitic sedimentary horizons (“formational”). Coincidentally, the Duck Pond deposit is intimately associated with graphitic sediments as well as the Boomerang Deposit currently being explored by Messina Minerals.

The Duck West area on the Harpoon property is situated approximately 2.8 km west of the Duck Pond Deposit in an area interpreted to contain the western projection of the favourable Duck Pond Horizon. Access is good to the grid area along abandoned logging roads branching from the Duck Pond Mine Road. Deep stratigraphic drilling (hole HP-90-1) intersected the interpreted "Duck Pond Thrust" but the hole was terminated in pyrite-mineralized volcaniclastic sediments just below the fault zone.

Rubicon has completed limited exploration work since acquiring the project in 2005. Recommended work for 2006 includes expanded prospecting, soil and till sampling, trenching of geochemical targets and a high-resolution airborne magnetic and electromagnetic survey.

**Lake Douglas East & West Property**

The Lake Douglas property is located approximately 40 kilometres south-southwest of Millertown with Lake Douglas located in the northeast part of the property. The property is covered by NTS mapsheet sheet 12A/7. Access is excellent via a series of well-maintained logging roads extending south from Millertown. Several outfitters camps are located in the area as well as boarding houses in Millertown and provide suitable accommodations.

Ownership

The Lake Douglas property consists of 13 minerals licenses (298 claims) covering 7,450 hectares. The property was optioned from local prospectors whereby Rubicon can earn a 100% interest in two agreements (Lake Douglas West and Lake Douglas East) by spending an aggregate $500,000 and issuing 175,000 Rubicon Common Shares over a 5-year period (2006 to 2011). The property vendors retain 2.0% NSR, of which Rubicon may purchase 1.0% NSR for $1,000,000, with a right of first refusal on the remaining 1.0%NSR.

Geology and Exploration

The Lake Douglas property covers a 20 kilometre strike length of the prospective Victoria Lake Group, a volcanic-sedimentary rock sequence hosting several significant VMS deposits and prospects (Aur Resources - Duck Pond Deposit, Messina Minerals – Boomerang Deposit and Long Lake prospect, Celtic Minerals - Great Burnt Lake & South Pond deposits). The Victoria Lake Group VMS deposits are historically hosted within two felsic volcanic-sedimentary sequences: the Tulks Hill and Tally Pond belts. The Lake Douglas property is hosted within an adjacent Cambro-Ordovician volcanic-sedimentary belt known as the Lake Douglas-Carter Lake Volcanics; a belt that Rubicon believes has potential to host significant base-metal deposits similar to that in the Tulks Hill and Tally Pond Belts.

The volcanic-sedimentary belt consists of three main lithologies: 1) interbedded siltstones, arkoses and black shale. 2) Crystal-lithic and siliceous felsic tuffs, rhyolitic flows, breccias and/or sub volcanic intrusive rocks, and 3) Mafic volcanic rocks which are generally massive or pillowed and locally vesicular. Both felsic and mafic intrusive rocks of Silurian-Devonian age occur in the southern part of the property. Gander Zone metasedimentary rocks occur to the southeast of the property, and are separated from the volcanic-sedimentary rocks by the Noel Paul's Line.

Angular, massive sulphide float was discovered on the property by the vendors in December 2005. The massive sulphide boulders contain sphalerite, galena, pyrite, chalcopyrite, and jamesonite-boulangerite and graphite. Assay results indicate of up to 20% zinc, 16.6% lead, 1.57 g/t gold and 157.5 g/t silver, and 0.5% copper in one sample (LD-05-01) and 12.5% zinc, 24.5% lead, 0.07 g/t gold and 253.4 g/t silver in a second sample (LD-05-02). A massive pyrite boulder found in the same area assayed 0.43% zinc, 0.04% lead, 1.11 g/t gold and 42.5 g/t silver, 0.25% copper (LD-05-03). The mineralized boulders contain elevated concentrations of indium (to 21.1 ppm) and antimony (to 5.9%), mercury and tellurium.

Compilation of historic Noranda, Falconbridge and Loydex Resources Inc. data include several float and bedrock base metal and precious metal occurrences, anomalous soils, stream sediment and lake sediment

geochemistry, anomalous rock litho-geochemistry and several AEM conductors on the property. Noranda occurrences include a banded sulphides sample (subcrop) containing 7% zinc; an outcrop sample with 1.3% lead, 1% zinc and 60 ppm silver and an anomalous float sample containing 3% zinc, 1.7% lead, 4.3 g/t gold and 627 ppm silver. Collins (1993) commented, "This area represents one of the most geochemically anomalous zones in the entire former Tally Pond joint venture area with multi-element lake sediment, stream silt, and subsequent soil geochemistry anomalies". Collins (1993) also reported whole rock geochemistry results whereby a sample from a mineralized showing plotted within the favourable "Duck Pond Field" on the lithogeochemical discrimination diagram.

The Haven Steady prospect, located 2.5 kilometres northeast of the property's northern boundary, appears to share striking similarities to the Lake Douglas geology and mineralization. The Haven Steady prospect consists of surface and drill intersections consisting of broad stringer-disseminated-stockwork zones and narrower massive sulphides intervals. Up to three significant mineralized horizons have been reported from previous drilling. Typical results include stringer-stockwork mineralization ranging from 2 to 13 metres thick and massive sulphide intersections ranging from 1.5 to 3 metres thick. Values from the massive sulphide intersections include 22.2 % zinc, 6.13% lead, 0.14% copper, 62 ppm silver and 0.93 g/t gold over 1.5 metres. Stringer-stockwork zones are thicker and include 2.94% zinc, 1.01% lead, 0.26% copper, 18.25 ppm silver and 0.51 g/t gold over 15 metres.

Since acquiring the property in January 2006, Rubicon has started a comprehensive digital compilation of previous work and results. A comprehensive exploration program of prospecting, geological mapping, soil and till sampling, lithogeochemical sampling, trenching, high-resolution airborne magnetic and electromagnetic survey is recommended with follow-up drilling where warranted. A key goal of the initial exploration is to locate the bedrock source of the angular, massive sulphide discovery float.

**Maritec Property, Baie Verte**

The Maritec Property is located in north-central Newfoundland approximately 16 kilometres northeast of the town of Baie Verte in the Mings Bight area of the Baie Verte Peninsula. The property is accessed via secondary paved highways and a network of logging roads. Anaconda's Pine Cove Deposit (currently in feasibility) is located 5 kilometres to the southwest of the property and is hosted in the same rocks as those that underlie the Maritec property.

The Maritec Property consists of 3 mineral licences (43 claims) for 1075 hectares and is owned 100% by Rubicon. The exploration target is structurally controlled gold. Highlights from property are 61.8 g/t gold over 1 metre in historic channel sample, and 10.06 oz/t gold in historic grab sample. This property is currently being marketed to third parties.

**Incognita Property, Baffin Island, Nunavut**

The Incognita property is located approximately 160 kilometres west of Iqaluit and 90 kilometres northwest of the town of Kimmirut on south Baffin Island, Nunavut. The claims are covered by NTS maps sheets 025M/03, 04, 05 and 06. Access to the property is by helicopter from Iqaluit from which daily scheduled domestic air service is available from south and western Canada.

Rubicon has a 100% interest in the 5 mineral claims that covers approximately 2,118 hectares. The property is subject to a 1.5% NSR royalty payable to a third party. Rubicon may purchase its portion of the NSR royalty, at the option of the third party, by either issuing 150,000 Rubicon Common Shares or paying $1.0 million, at the election of the royalty holder. There are no current exploration plans for the property.

## FUNDS AVAILABLE

### Private Placement Financing

Prior to the completion of the Arrangement, Paragon intends to carry out a non-brokered private placement of special warrants (the "**Paragon Financing**") to raise gross proceeds of a minimum of $3.0 million and a maximum of $3.7 million by way of the sale of a combination of flow-through special warrants ("**Paragon Flow-Through Special Warrants**") and non flow-through special warrants ("**Paragon Unit Special Warrants**") (collectively, the "**Offered Securities**"), such that the total number of Paragon Flow-Through Special Warrants and Paragon Unit Special Warrants issued will comprise of approximately 62% and 38%, respectively, of the total number of Offered Securities.

Under the Paragon Financing and subject to completion of the Arrangement, Paragon will sell:

1) a minimum of 3,333,333 and a maximum of 4,166,666 Paragon Flow-Through Special Warrants at the price of $0.60 per special warrant. Each Paragon Flow-Through Special Warrant entitles the holder to receive, upon exercise and for no additional consideration, one flow-through Paragon Common Share; and

2) a minimum of 2,000,000 and a maximum of 2,400,000 Paragon Unit Special Warrants at the price of $0.50 per special warrant. Each Paragon Unit Special Warrant entitles the holder to receive, upon exercise and for no additional consideration, one non-flow-through Paragon Common Share and a one whole non-flow-through share purchase warrant (the "**Paragon Series A Warrant**"), with each whole Paragon Series A Warrant entitling the holder to purchase one additional non-flow-through Paragon Common Share at the price of $1.00 per share for a term of two years following the closing of the Paragon Financing.

Pursuant to an agreement (the **"Altius Agreement"**) entered into on June 21, 2006 with Altius Resources Inc. ("**Altius**"), a wholly-owned subsidiary of Altius Minerals Corporation, Altius will subscribe under the Paragon Financing for 2,500,000 Paragon Flow-Through Special Warrants and will subscribe for or place with eligible investors 800,000 Paragon Unit Special Warrants. Under the Altius Agreement, Rubicon and Altius have agreed to work together to place the remaining Offered Securities to eligible investors in British Columbia, Alberta, Ontario and Newfoundland and Labrador and such other jurisdictions as may be agreed to (the "**Offering Jurisdictions**") pursuant to exemptions from the registration and prospectus requirements of the securities legislation of the Offering Jurisdictions. Rubicon has reserved the right to purchase up to 1,000,000 Paragon Unit Special Warrants under the Paragon Financing.

**If market conditions require it, Paragon may, subject to agreement with Rubicon and the Altius, vary or amend the terms and conditions of the Paragon Financing which may result in reducing the purchase price per security, increasing the number of securities to be sold pursuant thereto and/or varying or modifying the number and price of the Offered Securities and, accordingly, in certain circumstances, increasing the gross proceeds from the sale of the Paragon Flow-Through Special Warrants from the currently contemplated 62%, up to a maximum of 70%, of the total gross proceeds raised from the sale of all of the Offered Securities, subject to acceptance by the TSX-V. Any such variation of the terms and conditions of the Paragon Financing may result in further dilution of the Paragon shareholders, in excess of the dilution currently assumed and otherwise disclosed in this Circular.**

**The TSX-V has required, as a condition of granting final approval to the Arrangement and to the listing of the Paragon Common Shares on the TSX-V that Paragon raise at least $3 million from the Paragon Financing.**

Rubicon is a "Principal" of Paragon and any Paragon Common Shares and Paragon Series A Warrants will be subject to a TSX-V-approved form of escrow agreement. See Schedule "J" "Escrowed Securities". In addition, pursuant to the Altius Agreement, Altius will be required to acknowledge that in order for Rubicon to implement its tax plan for the Arrangement, if Altius, together with any associates, holds 10% or more of the of Paragon Common Shares on completion of the Arrangement, Altius will not be able to sell any of the Paragon Common Shares as part

of the same "series of transactions" as the Arrangement and Altius will be required to give a representation to that effect to Rubicon.

Under the Altius Agreement, Altius has agreed that, upon expiry of the hold period on the Offered Securities, it will, on a best efforts basis, maintain orderly market conditions if it proposes to sell any or all of the Paragon Common Shares acquired through the Paragon Financing. Altius has also agreed not to increase its ownership position in Paragon to 20% or greater of the Paragon Common Shares. In addition, Altius was granted the right to participate in future financings equal to or less than the percentage of Paragon Common Shares held at the time of such financing. The Altius Agreement provides that Altius's right to pro rata participation in future financings will lapse if Altius does not to participate in two subsequent financings.

Paragon has agreed under the Altius Agreement to enter into an option agreement with Altius with respect to the South Tally Pond property to acquire a 100% undivided ownership interest in the South Tally Pond property by making the following share payments: (i) 250,000 Paragon Common Shares immediately after the Effective Date of the Arrangement (ii) 250,000 Paragon Common Shares on or before the 1st anniversary of the Effective Date and (iii) 500,000 Paragon Common Shares on or before the 8th anniversary date of the Effective Date or upon completion of a feasibility study on the property.

The closing of the Paragon Financing will occur on to the Effective Date following completion of the Arrangement. An escrow agent ("**Escrow Agent**") will be appointed by Paragon to hold all of the subscription proceeds under the Paragon Financing in escrow until closing of the Paragon Financing.

Under the Arrangement, the Paragon Flow-Through Special Warrants and Paragon Unit Special Warrants will be automatically exercised on the Effective Date without any further action on the part of the subscribers, and the Paragon Common Shares and Paragon Series A Warrants will be issued accordingly. Upon closing of the Paragon Financing, the Escrow Agent will release the subscription proceeds to Paragon. The subscribers will receive certificates representing the Paragon Common Shares and the Paragon Series A Warrants.

**If the Plan of Arrangement does not complete, the subscription proceeds of the Paragon Financing will be returned to the subscribers.**

The price of the Offered Securities was determined by negotiation between Rubicon, Paragon and Altius, and in accordance with the policies of the TSX-V.

**Canadian Exploration Expense**

Subject to certain detailed conditions and restrictions under the *Income Tax Act* (Canada) (the **"ITA"**), the initial holders of Paragon Flow-Through Special Warrants who receive flow-through Paragon Common Shares pursuant to the Arrangement ("**Flow-Through Investors**") will be entitled to claim certain deductions for income tax purposes in respect of any Canadian Exploration Expense ("**CEE**") (as defined in subsection 66.1(6) of the ITA), other than expenses that are prescribed Canadian exploration and development overhead expense for the purpose of subsection 66 (12.6) of the ITA, incurred by Paragon and renounced in favour of such holder. Flow-Through Investors who are individuals will also be entitled to claim an investment tax credit on the CEE renounced to such Flow-Through Investors. Under the terms of the subscription agreements to be entered into with the prospective subscribers under the Paragon Financing, Paragon will agree to incur CEE in an aggregate amount which will enable it to renounce CEE in an amount that is not less than 95% of the gross proceeds from the sale of the Paragon Flow-Through Special Warrants (the "Initial Flow-Through Funds"). Paragon will expend as much of the Initial Flow-Through Funds as is commercially reasonable between the closing date of the Paragon Financing and the last day of the year after the year in which the Initial Flow-Through Funds are received, and to renounce on or before March 31, 2007 the amount of the Initial Flow-Through Funds so incurred to purchasers with an effective date of renunciation of no later than December 31, 2006.

## Funds Available

As at July 7, 2006, Paragon had no working capital. Upon completion of the Paragon Financing and the Arrangement, the available working capital of Paragon will be approximately $3,000,000, assuming completion of the minimum Paragon Financing, and approximately $3,700,000, assuming completion of the maximum Paragon Financing (the "**Available Funds**").

## Principal Purpose of Available Funds

Assuming completion of the Arrangement, Paragon will use the Available Funds as follows:

| **Use of Proceeds** | **Minimum Financing** | **Maximum Financing** |
|---|---|---|
| To pay for the exploration activities on Paragon's Principal properties as follows: | | |
| Joe Batt's Pond Linear Property (1) ........ | $700,000 | $700,000 |
| To pay outstanding property commitments on Paragon's Principal Properties: | | |
| Joe Batt's Pond Linear Property (1) ........ | $50,000 | $50,000 |
| To fund exploration activities and maintenance on Paragon's other properties (2)... | $1,200,000 | $1,200,000 |
| To fund ongoing operations and administration costs........ | $690,000 | $690,000 |
| To provide working capital (unallocated)........ | $360,000 | $1,060,000 |
| TOTAL FUNDS AVAILABLE | $3,000,000 | $3,700,000 |

**Notes:**

(1) See Schedule "J", "Information Concerning Paragon After the Arrangement – Principal properties – JBP Linear property"

(2) Other than the Golden Promise Property, which is solely funded by Crosshair Exploration (see Schedule "J", "Information Concerning Paragon After the Arrangement - Principal Properties - Golden Promise Property"). See Schedule "J", "Information Concerning Paragon after the Arrangement – Other Properties".

The funds available for ongoing operations will be sufficient to meet Paragon's administration costs for the next twelve months. See Schedule "J", "Information Concerning Paragon After the Arrangement – Administration Expenses". Paragon will spend the Available Funds as set out above. There may be circumstances, however, where for sound business reasons, a reallocation of funds may be necessary. Paragon will only redirect funds to other properties on the basis of a recommendation from a professional geologist or engineer.

## Administration Expenses

The following table discloses the estimate aggregate monthly and yearly administration costs that will be incurred by Paragon:

| TYPE OF ADMINISTRATIVE EXPENSE | Estimated Monthly Expenditure | Estimated 12-Month Expenditure |
|---|---|---|
| Salaries and Consulting (1) | $ 27,500 | $ 330,000 |
| Professional Fees (2) | $ 10,000 | $ 120,000 |
| Rent and Office Services (3) | $ 8,000 | $ 96,000 |
| Regulatory Filing Fees | $ 4,000 | $ 48,000 |
| Investor Relations | $ 8,000 | $ 96,000 |
| **TOTAL** | **$ 57,500** | **$ 690,000** |

**Notes:**

(1) This includes expenses related to salaries of officers and employees (not otherwise allocated to exploration projects) and required travel.

(2) This includes expenses related to legal fees, audit fees, and accounting fees.

(3) This includes the expenses related to the Vancouver office, utilities, insurance and supplies

## SELECTED CONSOLIDATED FINANCIAL INFORMATION

The section entitled "Selected Proforma Financial Information" at page 5 of the Circular is a summary of pro-forma financial information for Paragon as at March 31, 2006 derived from the financial statements of Rubicon at such date. As well, at Schedule "A" to the Circular is the unaudited pro-forma consolidated balance sheet for Paragon as at March 31, 2006. The unaudited pro-forma consolidated balance sheet was prepared as if the Arrangement had occurred on March 31, 2006.

## DESCRIPTION OF SECURITIES

## CAPITALIZATION

The following table sets forth Paragon's capitalization as of the dates indicated taking the completion of the Paragon Financing into account:

| Designation | Authorized | Outstanding as at July 7, 2006 | Outstanding Following Completion of the Arrangement Assuming Minimum Financing | Outstanding Following Completion of the Arrangement Assuming Maximum Financing |
|---|---|---|---|---|
| Paragon Common Shares | Unlimited | Nil | 18,275,420(1)(2) | 19,508,753(1)(3) |
| Long Term Debt | N/A | Nil | Nil | Nil |

**Notes:**

(1) This number is based on 76,152,525 Rubicon Common Shares being issued and outstanding at the Effective Date and the exchange of one Paragon Common Share for every 6 Rubicon Common Shares for a total of 12,692.087 Paragon Common Shares.

(2) Based on a minimum Paragon Financing of $3 million through the issuance of 5,333,333 Paragon Common Shares of which 3,333,333 are flow through Paragon Common Shares; and the issuance of 250,000 Paragon Common Shares to Altius on the Effective Date pursuant to the option agreement with Altius with respect to the Tally Pond property. See Schedule "J", "Information Concerning Paragon After the Arrangement - Funds Available - Private Placement Financing".

(3) Based on a maximum Paragon Financing of $3.7 million through the issuance of 6,566,666 Paragon Common Shares of which 4,166,666 are flow through Paragon Common Shares; and the issuance of 250,000 Paragon Common Shares to Altius on the Effective Date pursuant to the option agreement with Altius with respect to the Tally Pond property. See Schedule "J", "Information Concerning Paragon After the Arrangement - Funds Available - Private Placement Financing".

### Share Capital

*Common Shares*

Paragon is authorized to issue an unlimited number of Paragon Common Shares. Once issued, all of the authorized Paragon Common Shares will rank equally as to dividends, voting powers (one vote per Paragon Common Share) and participation in assets upon dissolution or winding-up. No Paragon Common Shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the Paragon Common Shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provision permitting or restricting the issuance of additional securities, or requiring a securityholder to contribute additional capital. Provisions as to the modification, amendment or variation of such rights or provisions are contained in the CBCA and Paragon's Articles. Generally, substantive changes to the share capital require the approval of the shareholders by special resolution (at least two-thirds of the votes cast by shareholders present in person or by proxy).

Paragon does not have and will not have immediately following the Arrangement, any classes of preferred shares authorized or issued.

### Loan Capital

Paragon does not have any debt obligations outstanding.

**Fully Diluted Share Capital**

The following table represents the share capitalization of Paragon on completion of the minimum financing, as at the Effective Date and assuming completion of the Arrangement.

| SHARE CAPITALIZATION | Number of Shares | Percentage Of Total |
|---|---|---|
| Paragon Common Shares issued pursuant to the Arrangement Agreement(1) | 12,692,087 | 59% |
| Paragon Common Shares issued in connection with Paragon Financing(2) | 5,333,333 | 25% |
| Paragon Common Shares issued in connection with the South Tally Pond property acquisition | 250,000 | 1% |
| ***SUB-TOTAL*** | **18,275,420** | **85%** |
| | | |
| **FULLY DILUTED** | | |
| Paragon Common Shares on exercise of existing Rubicon Warrants and Rubicon Options(3) | 1,309,861 | 6% |
| Paragon Common Shares on exercise of Warrants issued in connection with the Paragon Financing(4) | 2,000,000 | 9% |
| ***SUB-TOTAL*** | **3,309,861** | **15%** |
| **TOTAL** | **21,585,281** | **100%** |

**Notes:**

(1) Based on 76,152,525 Rubicon Common Shares being issued and outstanding at the Effective Date and the exchange of one Paragon Common Share for every six Rubicon Common Shares held at the Share Distribution Date.

(2) Based on raising the minimum amount of $3 million under the Paragon Financing.

(3) Based on 3,627,396 Rubicon Warrants; 4,206,372 Rubicon Options and 25,398 additional warrants available on exercise of Compensation Options being outstanding as at Effective Date, which entitles the Holder to purchase 1/6 of a Paragon Common Share per Rubicon Warrant, 1/6 of a Paragon Common Share per Rubicon Option and 1/6 of a Paragon Common Share per Compensation Option.

(4) Based on raising the minimum amount of $3 million under the Paragon Financing, which includes 2,000,000 Paragon Unit Special Warrants, which on the Effective Date converts into 2,000,000 Paragon Common Shares and 2,000,000 Share Purchase Warrants.

## CONSOLIDATED CAPITALIZATION

Paragon has not completed a financial year. Except as disclosed in his Circular, there has not been and it is not proposed there be any material change in the share capital of Paragon on a consolidated basis since the date of incorporation.

## OPTIONS TO PURCHASE SECURITIES

Rubicon's shareholders will be asked at the Meeting to approve the stock option plan of Paragon adopted by the directors of Paragon on July 5, 2006. See Schedule "J", "Information Concerning Paragon After the Agreement – Proposed Stock Option Plan of Paragon" below. The Paragon Common Shares reserved for incentive stock options to be granted under the Paragon Stock Option Plan are not to exceed 20% of the total issued and outstanding Paragon Common Shares at the date of the initial listing of the Paragon Common Shares on a stock exchange.

As of the date of this Circular, Paragon has not granted any incentive stock options under the Paragon Stock Option Plan. As at July 4, 2006, 4,206,372 Rubicon Options are reserved under the Rubicon Stock Option Plan. Upon completion of the Arrangement, the holders of the Rubicon Options will receive 1/6 Paragon Option for each Rubicon Option for a total of 701,062 Paragon Options. Upon completion of the Arrangement, Paragon expects to grant options to directors and officers of Paragon and to former optionholders of Rubicon, as set out below.

| Name and Position of Optionee | Securities under Option | Date of Grant | Exercise Price (1) | Market Value of Securities underlying the Options | Expiration Date |
|---|---|---|---|---|---|
| David W. Adamson<br>Chairman of the Board, Director | 150,000 | Effective Date | Market Price | N/A | 5th Anniversary of Listing Date |

| Name and Position of Optionee | Securities under Option | Date of Grant | Exercise Price (1) | Market Value of Securities underlying the Options | Expiration Date |
|---|---|---|---|---|---|
| Michael J. Vande Guchte<br>President & CEO, Director | 250,000 | Effective Date | Market Price | N/A | 5th Anniversary of Listing Date |
| J. Garfield MacVeigh<br>VP Exploration, Director | 250,000 | Effective Date | Market Price | N/A | 5th Anniversary of Listing Date |
| William Cavalluzzo<br>VP Investor Relations | 150,000 | Effective Date | Market Price | N/A | 5th Anniversary of Listing Date |
| Robert Lewis<br>Secretary & CFO | 150,000 | Effective Date | Market Price | N/A | 5th Anniversary of Listing Date |
| Gordon J. Soneff<br>Director | 150,000 | Effective Date | Market Price | N/A | 5th Anniversary of Listing Date |

**Note:**
(1) The exercise price will be the closing price on the TSX-V on the first day of trading on TSX-V, subject to any discount pursuant to the TSX-V.

All options will be granted as incentive options to directors, officers, employees and consultants of Paragon. The Board of Directors of Paragon may grant additional options in an amount not to exceed the number of options available under the Paragon Stock Option Plan. See Schedule “J”, “Information Concerning Paragon after the Arrangements - Proposed Paragon Stock Option Plan”.

## PRIOR SALES

Prior to the date of this Circular, Paragon has not issued any shares.

## ESCROWED SECURITIES

Other than disclosed herein, upon completion of the Arrangement, it is expected that there will not be any Paragon securities held in Escrow.

Pursuant to the Altius Agreement, Rubicon has reserved the right to purchase up to 1,000,000 Paragon Unit Special Warrants under the Paragon Financing. See Schedule “J”, “Funds Available - Private Placement Financing”.

If Rubicon participates in the Paragon Financing, Rubicon will be considered a “Principal” of Paragon under the policies of the TSX-V and, as a result, Rubicon’s Paragon Common Shares and Paragon Series A Warrants will be subject to a TSX-V-approved form of escrow agreement.

At the time of this Circular, TSX-V has not indicated if Altius’s Paragon Common Shares purchased pursuant to the Paragon Financing would be required to be escrowed by the TSX-V. See Schedule “J”, “Funds Available - Private Placement Financing”.

The term and release provisions of the escrow will depend upon which tier (Tier 1 or Tier 2) the TSX-V classifies Paragon, and whether the securities issued are considered to be “Value” or “Surplus”. “Value” securities are securities that are issued at a price that equals or exceeds their value whereas “Surplus” securities are issued at a price less than their value. Value securities of a Tier 1 company are subject to an 18 month escrow term, with ¼ of the securities being released from escrow upon receipt of the TSX-V Bulletin accepting listing of the company’s shares (the “Bulletin”) and ¼ being released on each of 6, 12 and 18 months from the date of the Bulletin. Value securities of a Tier 2 company are released over three years, with 10% being released on the date of the Bulletin, and 15% being released on each of 6, 12, 18, 24, 30 and 36 months following the date of the Bulletin. Surplus securities issued by a Tier 1 company are released over three years, with 10% being released on the date of the Bulletin, and 15% being released on each of 6, 12, 18, 24, 30 and 36 months following the date of the Bulletin. Surplus securities issued by a Tier 2 company are released over a six year period, with 5% of the securities being

released on each of 6, 12, 18 and 24 months following the date of the Bulletin, and 10% being released on each of 30, 36, 42, 48, 54, 60, 66 and 72 months following the date of the Bulletin.

## PRINCIPAL SHAREHOLDERS

To the knowledge of the directors and senior officers of Paragon, no person upon completion of the Arrangement will beneficially own, directly or indirectly, or exercise control or direction over, shares carrying more than 10% of the voting rights attached to each class of then outstanding voting securities of Paragon; except as follows:

| Name | Paragon Common Shares prior to the Effective Date | Paragon Common Shares Upon Completion of the Arrangement | Percentage of Paragon Common Shares on Completion of the Arrangement assuming Completion of the minimum Paragon Financing | Percentage of Paragon Common Shares on Completion of the Arrangement assuming Completion of the maximum Paragon Financing |
|---|---|---|---|---|
| Altius Resources Inc.[(1)] | Nil | 2,500,000 Paragon Common Shares | 13.68% | 12.81% |

**Note:**

(1) Altius will subscribe for or place with eligible investors an additional 800,000 Paragon Common Shares pursuant to the Paragon Financing. See Schedule "J", "Funds Available - Private Placement Financing". If Altius subscribes for the full 800,000 Paragon Common Shares, Altius will hold 18.06% or 16.92% of the Paragon Common Shares upon completion of the Arrangement assuming completion of the minimum or maximum Paragon Financing, respectively.

## DIRECTORS AND OFFICERS OF PARAGON

The following table provides the names, municipalities of residence, position, principal occupations and the number of voting securities of Paragon that each of the current and proposed directors and executive officers of Paragon are expected to beneficially own, directly or indirectly, or exercise control over, all of whom, except Michael J. Vande Guchte and Gordon Soneff, are existing directors and officers of Rubicon:

| Name, Position and Province & Country of Residence[(1)] | Principal Occupation for the Past Five Years[(1)] | Date First Appointed as a Director[(2)] | No. of Common Shares Beneficially Held or Controlled on Completion of the Arrangement [(1), (3)] |
|---|---|---|---|
| Michael J. Vande Guchte<br>President, CEO & Director<br>Vancouver, British Columbia, Canada | Professional Geoscientist; Manager Corporate Development of Rubicon September 2005 to present; System Consultant with Accenture Business Services from August 2000 to August 2005 | July 5, 2006 | 2,300[(4)] |
| J. Garfield MacVeigh<br>Vice-President, Exploration & Director<br>Delta, British Columbia, Canada | Exploration Geologist; Chairman of the Board and Director of Rubicon; President and Director of Rubicon Management Ltd., over five years | July 5, 2006 | 217,182[(4)] |
| Robert G. Lewis<br>Chief Financial Officer<br>Vancouver, British Columbia, Canada | Certified General Accountant, LLB; Chief Financial Officer, Rubicon September 2005 to present; Controller, International KRL Resources Corp. and Logan Resources Ltd. May 2004 to September 2005. Controller, Northwest Mettech Corp. September 1997 to May 2004. | N/A | Nil |
| David W. Adamson<br>Director<br>White Rock, British Columbia, Canada | Exploration Geologist; President, CEO and Director of Rubicon; Director of Rubicon Management Ltd., over five years | July 5, 2006 | 179,711 [(5)] |
| Gordon J. Soneff<br>Director<br>Edmonton, Alberta, Canada | MBA, Investor, Self-employed, over five years | July 5, 2006 | Nil |

**Notes:**

(1) The information as to municipality, province and country of residence, present principal occupation or employment and the number of Paragon Common Shares beneficially owned or controlled pursuant to the Arrangement, is not within the knowledge of the management of Paragon and has been furnished by the respective nominees.
(2) All directors of Paragon will hold office until the next annual general meeting of Paragon or until their successors are duly elected or appointed, unless their office is earlier vacated.
(3) This number is based on 76,152,525 Rubicon Common Shares being issued and outstanding at the Effective Date and the exchange of one Paragon Common Share for 6 Rubicon Common Shares. This number does not include Paragon Options held by the directors - See Schedule "J", "Information Concerning Paragon after the Arrangement – Options to Purchase Securities".
(4) This number does not include the Paragon Common Shares, which Mr. MacVeigh and Mr. Vande Guchte expects to purchase pursuant to the Paragon Financing.
(5) This number also includes $^{1}/_{3}$ of the Paragon Common Shares to be received under the Arrangement by Rubicon Management Ltd.

David W. Adamson, Gordon J. Soneff and Michael J. Vande Guchte are members of the audit committee.

David W. Adamson and Gordon J. Soneff are members of the compensation committee.

**Management of Paragon**

The following are brief descriptions of the individuals who will be directors and officers of Paragon on completion of the Arrangement.

**David W. Adamson**, Chairman of the Board of Directors of Paragon, Director, age 46. Mr Adamson received his B.Sc. (Hons.) at the University of Southampton, U.K. in 1980, an M.Sc. (1984) at the University of Regina, Saskatchewan and Ph.D. (1988) at the University of Aston in Birmingham, U.K. David has been associated with the mineral exploration industry for 20 years with experience in gold and base metal exploration in Canada, U.S.A. and Europe. Mr. Adamson has been President and CEO, and a Director of Rubicon from January 2001 to present and was the Vice-President Exploration and Director of Rubicon from March 1996 to January 2001. Prior to co-founding Rubicon, Mr. Adamson was Senior Geologist with Lac Minerals Ltd, where he was instrumental in the discovery process on several major projects. Mr. Adamson will provide services to Paragon as required by the Board of Directors of Paragon. Mr. Adamson has not entered into a non-competition or non-disclosure agreement with Paragon.

**Michael J. Vande Guchte**, President and CEO, Director, age 44. Mr Vande Guchte is a graduate of the University of Alberta (BSc. Geology 1986) and received a Diploma of Technology from BCIT in 2000. He is a member of the Association of Professional Engineers and Geoscientists of British Columbia (P.Geo since 1993) and member of the Project Management Institute (PMP since 2002). Mr. Vande Guchte has been Manager Corporate Development for Rubicon from September 2005 to present. Michael has 13 years of base and precious exploration experience in Canada, USA, Central and South America as a project manager and geologist with Rubicon (1996-1999), Catherdral Gold Corporation (1994-1996), MineQuest Consulting (1993-1994), and Falconbridge Ltd (1987-1993). Prior to rejoining Rubicon, Mr. Vande Guchte was a system consultant for Accenture Business Services from 2000 to 2005. Mr Vande Guchte will commit a minimum of 40 hours a week to the affairs of Paragon. Mr. Vande Guchte has not entered into a non-competition or non-disclosure agreement with Paragon.

**J. Garfield MacVeigh**, Vice President Exploration, Director, age 57. Mr. MacVeigh received his B.Sc. from Queen's University at Kingston in 1972. Mr. MacVeigh has 34 years of experience in gold and base metal exploration in Canada, U.S.A. and Central America. He was a participant in the discovery of the Hoyle Pond Gold Deposit in Timmins, Ontario, and contributed to the exploration and discovery of HW Deposit and several new zones at Westmin Resources Ltd. Buttle Lake massive sulphide ore deposits on Vancouver Island, British Columbia. Mr. MacVeigh was the President & CEO and a Director of Rubicon from March 1996 to January 2001 and has been Chairman of the Board and a Director of Rubicon Minerals from January 2001 to present. Prior to co-founding Rubicon, Mr. MacVeigh was District Manager for Lac Minerals Ltd. in western Canada and Alaska from 1991 to 1995, and involved in the exploration of the Red Mountain gold deposit near Stewart, B.C., Canada. Mr. MacVeigh will provide services to Paragon as required by the Board of Directors of Paragon. Mr. MacVeigh has not entered into a non-competition or non-disclosure agreement with Paragon.

**William J. Cavalluzzo**, Vice-President, Investor Relations, age 63. Mr Cavalluzzo received his Bachelor of Arts degree (Geography) from Pennsylvania State University in 1969. He has over 32 years of experience in mineral land management and investor relations in the mineral industry with both major mining companies and junior exploration companies. Mr. Cavalluzzo has been the Vice-President Investor Relations for Rubicon from January 2002 to present. Prior to joining Rubicon, Mr. Cavalluzzo was the Manager-Investor Relations with Pangea Goldfields Limited which was acquired by Barrick Gold Corporation in June 2000. Mr. Cavalluzzo will provide services to Paragon as required by the Board of Directors of Paragon. Mr. Cavalluzzo has not entered into a non-competition or non-disclosure agreement with Paragon.

**Robert G. Lewis**, Secretary and CFO, age 54. Mr. Lewis received his Bachelor of Law degree from the University of British Columbia in 1977 and earned a Certified General Accounting degree designation in 1984. Robert has over 22 years of accounting experience as a Controller for mineral exploration companies and geological consultants as well as several years in the manufacturing industry. Mr. Lewis has been Chief Financial Officer for Rubicon from September 2005 to present. Prior to joining Rubicon, he was Controller for International KRL Resources Corp/Logan Resources Ltd (May 2004 – Sept 2005), Northwest Mettech Corporation (Sept 1997 – May 2004) and OreQuest Consultants Ltd. (May 1984 – Sept 1997). Mr. Lewis will provide services to Paragon as required by the Board of Directors of Paragon. Mr. Lewis has not entered into a non-competition or non-disclosure agreement with Paragon.

**Gordon J. Soneff**, Director, age 45. Mr. Soneff is a graduate of the University of Western Australia, Perth, Western Australia (MBA Finance, 1999) and the University of Calgary, Calgary Alberta (Bachelor of Arts, Economics, 1988). Mr. Soneff also has formal training in the Master of Accounting program at Edith Cowan University, Perth, Western Australia (1999). Gordon has been self-employed as an investor since 1999. Mr. Soneff received extensive training and experience in finance and accounting during his 8 years with Ford Credit Canada Ltd. (1989 to 1997). Mr. Soneff will commit to such number of hours as may be necessary to manage the affairs of Paragon. Mr. Soneff has not entered into a non-competition or non-disclosure agreement with Paragon.

**Corporate Cease Trade Orders or Bankruptcies**

Other than as disclosed herein, to the best of Paragon's knowledge, no existing or proposed director, officer of Paragon, nor any shareholder holding sufficient securities of Paragon to affect materially the control of Paragon is, or within the ten years prior to the date hereof has been, a director or officer of any other corporation that, while that person was acting in the capacity of director or officer of that other corporation:

(a) was the subject of a cease trade order or similar order or an order that denied the corporation access to any statutory exemptions for a period of more than 30 consecutive days, or

(b) became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold the assets of that other corporation.

**Penalties or Sanctions**

Other than as disclosed herein, to the best of the Paragon's knowledge, no proposed director or officer of Paragon, nor any shareholder holding sufficient securities of Paragon to materially affect control of Paragon has:

(a) been subject to any penalties or sanctions imposed by a court relating to Canadian securities legislation or by a Canadian securities regulatory authority or has entered into a settlement agreement with a Canadian securities regulatory authority; or

(b) been subject to any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor making an investment decision.

**Personal Bankruptcies**

To the Paragon's knowledge, no proposed director or officer of Paragon, nor any shareholder holding sufficient securities of Paragon to affect materially the control of Paragon, nor any personal holding company of any such person has, within the ten years before the date of this Circular, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or been subject to or instituted any proceedings, arrangements or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of that person.

**Conflicts of Interest**

Except as disclosed in this Circular, to the best of Paragon's knowledge, there are no known existing or potential conflicts of interest among Paragon and its promoters, directors, officers or other members of management as a result of their outside business interests except that certain of the directors, officers, promoters and other members of management serve as directors, officers, promoters and members of management of other public companies, and therefore it is possible that a conflict may arise between their duties as a director, officer, promoter or member of management of such other companies.

**Directorships, Officers or Promoters**

During the past five years, the current or proposed directors, officers or promoters of Paragon have been directors, officers or promoters of the following reporting issuers:

| Name | Name of Reporting Issuer and Market | Start and Ending Date |
|---|---|---|
| J. Garfield MacVeigh(1) | Rubicon Minerals Corporation (TSX, AMEX) | March 1996 – present |
| | Toquima Minerals Corporation (not listed) | June 17 2003 – present |
| | Constantine Metal Resources Ltd. (not listed) | May 11, 2006 - present |
| David W. Adamson(2) | Rubicon Minerals Corporation (TSX, AMEX) | March 1996 - present |
| | Toquima Minerals Corporation | June 17, 2003 – present |
| William J. Cavalluzzo(3) | Rubicon Minerals Corporation (TSX, AMEX) | January 1, 2002 – present |
| Robert G. Lewis(4) | Rubicon Minerals Corporation (TSX, AMEX) | September 12, 2005 – present |
| | International KRL Resources Corp. (TSX-V) | April 2004 to September 2005 |
| | Logan Resources Ltd. (TSX-V) | September 2004 to September 2005 |

__Notes__:

(1) J. Garfield MacVeigh is currently a director, officer or promoter of a total of five companies (including Paragon).
(2) David W. Adamson is currently a director, officer or promoter of a total of seven companies (including Paragon).
(3) William J. Cavalluzzo is currently an officer of three companies (including Paragon).
(4) Robert G. Lewis is currently a director, officer or promoter of two companies (including Paragon).

No one of the directors, officers or promoters of Paragon was a director, officer or promoter of any issuer during the period he was a director, officer or promoter of Paragon, struck from the applicable corporate registry, or whose securities were the subject of a cease trade or suspension order for a period of more than thirty consecutive days.

## EXECUTIVE COMPENSATION

For the purposes of this Schedule, "**Executive Officer**" of Paragon means an individual who at any time during the year was the Chair or a Vice-Chair of Paragon; the President; the Chief Executive Officer, any Vice President in charge of a principal business unit, division or function including sales, finance or production; and any officer of Paragon or any other individual who performed a policy-making function in respect of Paragon.

**Summary Compensation Table**

Paragon has not paid any compensation to any Executive Officers of Paragon since its incorporation.

**Long Term Incentive Plan (LTIP) Awards**

Paragon does not have LTIP, pursuant to which cash or non-cash compensation intended to serve as an incentive for performance (whereby performance is measured by reference to financial performance or the price of Paragon's securities) was paid or distributed to the Executive Officer of Paragon during the most recently completed financial year.

**Option Grants During the Most Recently Completed Financial Year**

Paragon not granted any options since its date of incorporation to an Executive Officers of Paragon.

**Termination of Employment, Change in Responsibility and Employment Contracts**

Paragon has no compensatory plan, contract or arrangement whereby any Executive Officer of Paragon may be compensated in an amount exceeding $100,000, other than as disclosed herein, in the event of that officer's resignation, retirement or other termination of employment, or in the event of a change of control of Paragon or a subsidiary or a change in the Executive Officers' responsibilities following such a change of control.

**Compensation of Directors**

Paragon has no arrangements, standard or otherwise, pursuant to which directors are compensated by Paragon for their services in their capacity as directors, including any additional amounts payable for committee participation or special assignments.

## PROPOSED EXECUTIVE COMPENSATION

The Executive Officers of Paragon currently are:

| | |
|---|---|
| Michael Vande Guchte: | President & CEO |
| William J. Cavalluzzo | Vice President Investor Relations |
| J. Garfield MacVeigh: | Vice President Exploration |
| Robert G. Lewis: | Secretary & Chief Financial Officer |

Each of the Executive Officers is either an employee of Rubicon or employee of Paragon. Upon completion of the Arrangement, Rubicon will invoice Paragon for time spent by the Rubicon executive officers on Paragon matters at a rate equal to Rubicon's cost. The costs are estimated at $300,000 for the first year from the completion of the Arrangement. See Schedule "J", "Information Concerning Paragon After the Arrangement – Administration Expenses".

## PROPOSED PARAGON STOCK OPTION PLAN

On July 5, 2006, the directors of Paragon established, subject to approval by the Rubicon Shareholders and acceptance by the TSX-V, Paragon's Stock Option Plan (the "**Paragon Plan**"). The maximum number of Paragon Common Shares reserved for issuance under the Paragon Plan is 20% of the issued and outstanding Paragon Common Shares as at the date of the initial listing of the Paragon Common Shares on the TSX-V. Rubicon is seeking shareholder approval of the Paragon Plan from Disinterested Shareholders of Rubicon at the Meeting pursuant to the policies of the TSX-V.

According to the TSX-V policies, shareholders must approve any stock option plan that could result at any time the number of shares reserved for issuance under stock options exceeding 10% of the issued Shares. An issuer must obtain disinterested shareholder approval of stock options if: (i) a stock option plan, together with all of the issuer's previously established and outstanding stock option plans or grants, could result at any time in: (A) the number of shares reserved for issuance under the stock options granted to insiders exceeding 10% of the issued shares; (B) the grant to insiders, within a 12 month period, of a number of options exceeding 10% of the issued shares; or (C) in the case of a Tier 1 issuer only, the issuance to any one optionee, within a 12 month period, of a number of shares exceeding 5% of the issued shares (Tier 2 Issuers may not grant more than 5% of the issued shares to any one optionee in a 12 month period); or (ii) the issuer is decreasing the exercise price of stock options previously granted to insiders. For the purposes of the policies of the TSX-V, an "Insider" is (i) a director or senior officer of Paragon, (ii) a director or senior officer of a company that is an insider or subsidiary of Paragon, (iii) a person that beneficially owns or controls, directly or indirectly, voting shares carrying more than 10% of the voting rights attached to all outstanding voting shares of Paragon, and (iv) Paragon itself, if it holds any of its own voting shares.

**Outstanding Options**

Upon completion of the Arrangement, it is expected that there will be stock options outstanding to purchase an aggregate of 1,801,062 Paragon Common Shares representing approximately 49.28% of the stock options available to be granted under the Paragon Plan and 9.86% of the issued and outstanding Paragon Common Shares based on the minimum Paragon Financing. This number of options includes Paragon Common Shares to be issued upon the exercise of the options granted by Rubicon which will be exchanged for Paragon Options under the Arrangement and rolled into the Paragon Plan and options granted to the directors, and officers of Paragon upon completion of the Arrangement. As of the date of this Circular, there are stock options available for granting which, if granted, would enable the holders to purchase an aggregate of 701,062 Paragon Common Shares, representing approximately 19.18% of the Paragon Common Shares reserved for the granting of stock options and 3.84% of the issued and outstanding Paragon Common Shares based on the minimum Paragon Financing.

**Purpose of Plan**

The purpose of the Paragon Plan is to provide an incentive to Paragon's directors, senior officers, employees and consultants to continue their involvement with Paragon, to increase their efforts on Paragon's behalf and to attract new employees. Paragon has also decided to implement the Paragon Plan at this time to provide additional incentive for any persons who becomes new directors, officers or employees as a result of the Arrangement.

**General Description /Exchange Policies**

The Paragon Plan will be administered by the Board of Directors of Paragon (in this section, the "**Board**") or, if applicable, a committee (in this section, the "**Committee**") appointed for such purpose by the Board. A full copy of the proposed form of Paragon Plan is available to Rubicon Shareholders upon request and will be available at the Meeting.

The following is a brief description of the principal terms of the Paragon Plan, which description is qualified in its entirety by the terms of the Paragon Plan:

1. The maximum number of Paragon Common Shares that may be reserved for issuance of stock options granted under the Paragon Plan shall not exceed 20% of the issued capital of Paragon as at the date of the initial listing of the Paragon Common Shares on the TSX-V, which is to include all Paragon Common Shares which is reserved for issue for Paragon Options granted by Paragon prior to such date and the number of Paragon Common Shares reserved for issue pursuant to the exchange of Rubicon Option for Paragon Options. See "the Arrangement - Effect of Arrangement on Certain Outstanding Securities".

2. The exercise price of the stock options, as determined by the Board or the Committee in its sole discretion, shall not be less than the minimum price permitted by the policies of the TSX-V. The current policies of the TSX-V provide that the exercise price for stock options must not be less than the greater of $0.10 and the last closing price of the Paragon Common Shares before the date of grant, less a maximum discount of

25% where the closing price was up to $0.50, 20% where the closing price was $0.51 to $2.00 and 15% where the closing price was above $2.00, subject to adjustment in the event of a recent share consolidation or announcement of material information.

3. Stock options under the Paragon Plan may be granted by the Board or the Committee to:

(a) a senior officer, director or employee of Paragon or an affiliate of Paragon;

(b) a consultant (other than an employee or director of Paragon) providing consulting, technical, management or other services to Paragon, or a consultant company excluding (unless an exemption from prospectus requirements is available under applicable securities laws) a consultant providing investor relations services; and

(c) an employee of a corporation providing management services to Paragon, which management services are required for the ongoing successful operation of the business enterprise of Paragon but excluding a person engaged in investor relations activities.

4. The aggregate number of Paragon Common Shares that may be reserved for issuance under the Paragon Plan is restricted as follows:

(a) the aggregate number of Paragon Common Shares that may be reserved for issuance for a stock option to any one individual in a 12 month period must not exceed 5% of the issued shares of Paragon at the time of grant of the stock option;

(b) the number of options granted to a consultant in a 12 month period must not exceed 2% of the issued shares of Paragon at the time of grant of the stock option; and

(c) the aggregate number of options granted to employees involved in investor relations activities must not exceed 2% of the issued shares of Paragon in any 12 month period, at the time of grant of the stock option.

5. The term for exercise of stock options for listed companies designated as Tier 2 issuers on the TSX-V is a maximum of five years from the date of grant (or a maximum of ten years from the date of grant if the issuer is a Tier 1 issuer) provided that in the event of the optionee's death and the expiry date of the stock option. In addition, if Paragon is classified as a Tier 2 issuer by the TSX-V, stock options may only be exercised until the earlier of the expiry date and a period of not more than 30 days after the optionee ceases to be a qualified optionee, except in the case of persons providing investor relations activities to Paragon where it is limited to the earlier of the expiry date and a period of not more than 30 days after such optionee ceases to be a qualified optionee.

6. All options shall be non-assignable and non-transferable except as between an optionee and a wholly owned personal corporation, with the consent of the TSX-V.

7. Any decrease in the exercise price of stock options previously granted to insiders requires approval by a "disinterested shareholder vote" prior to exercise of such re-priced stock options.

8. Notwithstanding the date of expiration of the term of an option, the date of expiration of the term of an option will be adjusted, to take into account any black out period imposed on the optionee by Paragon as follows: (i) if the term expiration date falls within a black out period imposed on the optionee by Paragon, then the term expiration date is extended to the close of business on the tenth business day after the end of such black out period by Paragon (in this section, the "**Black Out Expiration Term**"); or (ii) if the term expiration date falls within two business days after the end of a black out period imposed on the optionee by Paragon, then the term expiration date is extended to the date which is the Black Out Expiration Term reduced by the number of business days between the term expiration date and the end of such black out period.

The Disinterested Shareholders of Rubicon will be asked at the Meeting to approve the Paragon Stock Option Plan Resolution in substantially the form set out on Schedule "F" attached to this Circular. In this regard, a total of 3,104,146 Rubicon Common will be withheld from voting at the Meeting, which include Rubicon Common Shares held by Rubicon's Disinterested Shareholders and the Rubicon Common Shares held by the directors, senior officers and their associates of Paragon. If the Plan is not approved by the Disinterested Shareholders of Rubicon, Paragon will not be in a position to offer increased incentives to its current or future directors, officers, employees and independent consultants.

## INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS OF PARAGON

No director or senior officer of Paragon, proposed nominee for election as a director, or associate or affiliate of any such director or senior officer or proposed nominee, is or has been indebted to Paragon during the period from Paragon's incorporation to the date of this Circular.

## LISTING APPLICATION

An application has been made to have the Paragon Common Shares listed for trading on the TSX-V as a Tier 2 issuer as soon as possible after the Effective Date. Listing will be subject Paragon fulfilling all of the original listing requirements of the TSX-V. There are no assurances as to if, or when, the Paragon Common Shares will be listed or traded on the TSX-V indicated above, if ever.

## RISK FACTORS

In evaluating the Arrangement, Paragon Shareholders should carefully consider, in addition to the other information contained in this Circular, the risk factors which apply to Paragon after the Effective Date. **See Schedule "M" – Risk Factors for certain considerations relevant to Shareholders regarding the Arrangement and their investment in the securities referred to in this Circular.** These risk factors are not a definitive list of all risk factors associated with the business to be carried out by Paragon.

## PROMOTERS

Rubicon is a promoter of Paragon within the meaning of applicable securities legislation, by virtue of having taken the initiative in founding Paragon. Rubicon currently owns the single issued and outstanding Paragon Common share. Upon completion of the Arrangement, it is not expected that Rubicon will hold any Paragon Common Shares, other than the Paragon Common Shares and the Paragon Series A Warrant that Rubicon may acquire pursuant to the Paragon Financing. See Schedule "J", "Information Concerning Paragon After the Arrangement - Funds Available - Private Placement".

## LEGAL PROCEEDINGS

Paragon is not a party to any material legal proceedings and is not aware of any such proceedings known to be contemplated.

## INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Except as described elsewhere in this Circular, no current or proposed director, officer, principal shareholder or associate or affiliate of them, has any material interest, direct or indirect, in any transaction since incorporation or in any proposed transaction that has materially affected or will materially affect Paragon.

## AUDITOR, REGISTRAR AND TRANSFER AGENT

Paragon's Auditors are DeVisser Gray, Chartered Accountants of Suite 401, 905 West Pender Street, Vancouver, British Columbia, V6C 1L6.

Paragon's registrar and transfer agent is Computershare Investor Services Inc. of 3rd Floor, 510 Burrard Street, Vancouver, British Columbia, V6C 3B9. The registers of the Paragon Common Shares are located in Vancouver, British Columbia.

## MATERIAL CONTRACTS

The following will be the material contracts of Paragon following the Effective Date, other than those entered into in the ordinary courses of business that have been entered into within two years before the date of this Circular.

1. Golden Promise Property Agreement between Rubicon and Crosshair Exploration dated May 1, 2006 (Golden Promise Property);

2. Letter Agreement between William Mercer and Rubicon on the Golden Promise Property dated May 22, 2002 (Golden Promise Property);

3. Purchase and Royalty Letter Agreement between Al Keats, Kevin Keats & Peter Dimmel and Rubicon on the Tom Joe Property, NL dated August 4, 2003 (Golden Promise Property);

4. Purchase and Royalty Letter Agreement between Stephen Courtenay and Newfoundland & Labrador Minerals Ltd. and Rubicon on the OB Property, NL dated June 14, 2004 (Golden Promise Property);

5. Letter Agreement between Gary E. Lewis, Cyril M. Reid & Paul Chaffe and Rubicon Minerals Corporation and the B Property dated December 24, 2001 (JBP Linear Property);

6. Letter Agreement between Al Keats, Kevin Keats & Peter Dimmel and Rubicon Minerals Corporation on the JBP Property, NL dated April 10, 2002 (JBP Linear Property);

7. Purchase and Royalty Letter Agreement between Tom Lush and Rubicon Minerals Corporation on the Lush Property, NL dated August 11, 2003 (JBP Linear Property);

8. Purchase and Royalty Letter Agreement between A.S.K Prospecting & Guiding Inc. and Rubicon Minerals Corporation on the Lake Douglas East Property, NL dated January 17, 2006;

9. Purchase and Royalty Letter Agreement between A.S.K Prospecting & Guiding Inc. and Rubicon Minerals Corporation on the Lake Douglas West Property, NL dated January 17, 2006;

10. Due Diligence Purchase and Royalty Letter Agreement on the Linear Property dated Sept. 30, 2005 as amended on April 10, 2006 between Rubicon, A.S.K. Prospecting & Guiding Inc. and Krinor Resources Inc.;

11. Purchase and Royalty Letter Agreement on the Appleton Property dated March 10, 2005 between Rubicon, Tom Gosine and Alec Turpin;

12. Amended Due Diligence Purchase and Royalty Letter Agreement on the Bowater Property dated September 26, 2005 between Rubicon, Gary Lewis and Paul Chafe;

13. Victoria Lake Property Agreement dated February 14, 2003 as amended April 29, 2004 and November 16, 2004 between Rubicon and International Lima Resources Corp. (now Crosshair Exploration & Mining Corporation);

14. Letter Agreement on the Victoria Lake 10188M Property dated May 18, 2005 between Rubicon, Al Keats and Kevin Keats;

15. Victoria Lake 10188M Property – Land Offering – License 11060M dated April 24, 2006 between Rubicon and Crosshair Exploration & Mining Corporation.

16. Letter Agreement on the Stares Property dated November 9, 2001 as amended on October 14, 2004, November 11, 2005 and June 15, 2006 between Rubicon, Robert Stares and Alex Stares; and

17. Due Diligence Purchase and Royalty Letter Agreement on the Harpoon Property dated November 23, 2004 between Rubicon, Al Keats and Kevin Keats.

The material contracts described above may be inspected at the head office of Paragon at Suite 1540 – 800 West Pender Street, Vancouver, British Columbia, V6C 2V6, during normal business hours prior to the meeting and for a period of 60 days thereafter.

## OTHER MATERIAL FACTS

There are no other material facts other than as disclosed herein.

**SCHEDULE "K"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006)

INFORMATION CONCERNING COPPERCO AFTER THE ARRANGEMENT


NOTICE TO READER ....... 1
COMPANY PROFILE AND PURPOSE OF THE ARRANGEMENT ....... 1
CORPORATE STRUCTURE ....... 1
DESCRIPTION AND GENERAL DEVELOPMENT OF THE BUSINESS OF COPPERCO ....... 2
DESCRIPTION OF MINERAL PROPERTY ....... 4
FUNDS AVAILABLE ....... 57
SELECTED FINANCIAL INFORMATION ....... 58
DESCRIPTION OF SECURITIES ....... 59
CONSOLIDATED CAPITALIZATION ....... 60
DIVIDEND RECORD AND POLICY ....... 60
OPTIONS TO PURCHASE SECURITIES ....... 60
PRIOR SALES ....... 62
ESCROWED SECURITIES ....... 62
PRINCIPAL SHAREHOLDERS ....... 62
DIRECTORS AND OFFICERS OF COPPERCO ....... 62
EXECUTIVE COMPENSATION ....... 65
PROPOSED COPPERCO STOCK OPTION PLAN ....... 69
INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS OF COPPERCO ....... 71
LISTING APPLICATION ....... 71
RISK FACTORS ....... 72
PROMOTERS ....... 78
LEGAL PROCEEDINGS ....... 78
INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ....... 78
AUDITOR, REGISTRAR AND TRANSFER AGENT ....... 79
MATERIAL CONTRACTS ....... 79
OTHER MATERIAL FACTS ....... 79

## NOTICE TO READER

**The following is a summary of the business of CopperCo, which will be renamed "Africo Resources Ltd." after the Arrangement, and should be read together with the more detailed information and financial data and statements contained elsewhere in this Schedule and in the Circular. Except where otherwise indicated herein, all of the disclosure in this Schedule is made on the basis that the Arrangement has been completed as described in the Circular. All capitalized terms used in this Schedule and not defined herein have the meaning ascribed to them in the Circular.**

**Completion of the Arrangement is conditional upon Africo or CopperCo raising sufficient funds pursuant to the CopperCo/Africo Financing (as defined in the Circular) in order to meet its business objectives.**

## COMPANY PROFILE AND PURPOSE OF THE ARRANGEMENT

CopperCo was incorporated under the CBCA on July 4, 2006, in order to take part in the Arrangement. CopperCo has applied to be listed on the TSX. Listing will be subject to CopperCo fulfilling all the original listing requirements of the TSX and there can be no assurance as to if, or when, CopperCo will be listed on the TSX. Pursuant to the Arrangement, CopperCo will acquire the Rubicon Africo Shares and subsequently enter into a share exchange with the holders of the Remaining Africo Shares (see "The Arrangement"). Upon completion of the Arrangement, Africo will be a wholly-owned subsidiary of CopperCo. The focus of Africo will remain the continued exploration and development of the Kalukundi copper/cobalt deposit, located in the Democratic Republic of the Congo (the "**DRC**"). See "Information Concerning CopperCo After the Arrangement - Description of Mineral Property".

Upon the implementation of the Arrangement, Rubicon will continue to hold its current Red Lake, Alaska and Nevada interests and Paragon will hold Rubicon's current Newfoundland and Labrador and Nunavut gold and base metal assets. CopperCo will be the sole shareholder of Africo and will indirectly hold the assets currently held by Africo. As a result of the Arrangement, but prior to completion of the CopperCo/Africo Financing, the Rubicon Shareholders will directly hold 39.6% of the CopperCo Common Shares and the rest of the Africo Shareholders will own the remaining equity. Except for the distribution pursuant to the CopperCo/Africo Financing, on a share-for-share basis, the Africo Shareholders will own the same number of shares and percentage interest in CopperCo that they currently own in Africo.

## CORPORATE STRUCTURE

### Name and Incorporation

CopperCo was incorporated under the CBCA on July 4, 2006. Upon completion of the Arrangement, CopperCo will change its name to "Africo Resources Ltd." and the current Africo will change its name to "Africo Resources (BC) Ltd.". CopperCo's head office and principal business address is Suite 1540 – 800 West Pender Street, Vancouver, British Columbia V6C 2V6 and the registered and records office is located at 2800 Park Place, 666 Burrard Street, Vancouver, British Columbia V6C 2Z7.

### Intercorporate Relationships

CopperCo currently has no subsidiaries. Upon completion of the Arrangement, Africo will be a wholly-owned subsidiary of CopperCo and CopperCo will indirectly own the assets presently held by Africo.

## DESCRIPTION AND GENERAL DEVELOPMENT OF THE BUSINESS OF COPPERCO

### Three Year History

*Rubicon*

On September 17, 2003, Rubicon graduated to the TSX from the TSX-V. In September 2004, the Rubicon Common Shares began trading on the AMEX. On November 21, 2005, Rubicon announced that its directors approved a corporate reorganization in order to maximize shareholder value. The reorganization would result in each of the three major asset groups currently owned by Rubicon forming the basis of its own public company. Accordingly, CopperCo was incorporated on July 4, 2006. As part of the reorganization, Rubicon will transfer to CopperCo the Rubicon Africo shares, in exchange for shares that will be distributed to the Rubicon Shareholders in accordance with the terms of the Arrangement. CopperCo will also carry out a share exchange with the holders of the Remaining Africo Shares, as a result of which all existing Africo Shareholders will become shareholders of CopperCo immediately upon completion of the Arrangement. **Completion of the Arrangement is conditional upon Africo or CopperCo raising sufficient funds pursuant to the CopperCo/Africo Financing in order to meet its business objectives.**

*Africo*

Africo was incorporated as "684657 B.C. Ltd." under the British Columbia *Company Act* on January 7, 2004 and filed a Transition Application and Notice of Articles under the BCBCA on April 14, 2004. It changed its name to "Africo Resources Ltd." effective April 16, 2004. Africo's head office and principal business address is Suite 1540 – 800 West Pender Street, Vancouver, British Columbia V6C 2V6 and the registered and records office is located at 2800 Park Place, 666 Burrard Street, Vancouver, British Columbia V6C 2Z7.

On March 23, 2004, Africo entered into the H&J Agreement whereby Africo agreed to purchase all of the right, title and interest of the Sellers in all of the issued and outstanding H&J Shares owned by the Sellers (all as defined and more fully described below under "Material Property"), subsequent to which Africo has continued exploration and development work on the Kalukundi Property (see "Information Concerning CopperCo After the Arrangement - General Development" and "Description of Mineral Property").

To date, Africo's operations have been funded by the sale of Africo Shares to the current Africo Shareholders.

### General Development

Upon completion of the Arrangement, CopperCo's only material property will be the Kalukundi Property (hereinafter referred to as the "**Kalukundi Property**" or the "**Kalukundi Project**" **-** see "Information Concerning CopperCo After the Arrangement - Description of Mineral Property"). There is no assurance that the Kalukundi Property will prove to be economic, or that CopperCo's other properties will or will not prove to be economic, in the fullness of time. CopperCo's primary objective upon completion of the Arrangement will be to carry out the exploration and development programs recommended by the Kalukundi Report (as defined below). In order for CopperCo to continue with the exploration and development programs and for Africo to fully exercise its option to acquire 100% of the H&J Shares as described below, CopperCo will be required to raise additional capital. The additional capital may come from future financings or through joint ventures or option agreements with one or more third parties. There can be no assurance that CopperCo will be able to raise such additional capital if and when required. See "Information Concerning CopperCo After the Arrangement - Risk Factors" and Schedule "M" – Risk Factors.

**Material Property**

Upon completion of the Arrangement, the following agreements will govern CopperCo's business and interests in the Kalukundi Property:

***Contract (as amended) for the Establishment of a Company between La Générale des Carrières et des Mines ("GCM") and The Enterprise H&J Swanepoel Famille Trust sprl ("H&J") for the Mining of the Kalukundi Deposits dated February 2001 (the "Swanmines Agreement")***

GCM was the exclusive holder of the rights relating to the Kalukundi Property as more particularly described below. Pursuant to the Swanmines Agreement, GCM and H&J set up a private limited liability company called Société d'exploitation des gisements de Kalukundi (hereinafter referred to as "**Swanmines**"), of which GCM was to own 45% of the outstanding share capital and H&J was to own 55% of such outstanding share capital.

GCM covenanted to transfer to Swanmines all its right, title and interest in the Kalukundi Property and to provide to Swanmines all data, information, registers and reports on the Kalukundi Property in its possession. GCM also committed to obtain all regulatory approvals in connection with the mining operations on the Kalukundi Property.

H&J covenanted to provide all necessary financing to Swanmines in connection with its exploitation and development of the Kalukundi Property, to finance a feasibility study on the Kalukundi Property, to commit all necessary funds to commence commercial production on the Kalukundi Property and to finance the building of a metallurgical processing plant following the recommendations of the feasibility study.

Swanmines covenanted to carry out all mining and exploration activities on the Kalukundi Property, undertake a feasibility study, mine the Kalukundi deposits and process the ore in plants according to the recommendations of the Feasibility Study (as herein defined) on condition that these recommendations are accepted by both parties to the Swanmines Agreement, and comply with technical mining standards. Further, Swanmines also covenanted to provide the parties to the Swanmines Agreement with a feasibility study within 24 months of the date of its establishment. The feasibility study (the "**Feasibility Study**") was completed by Africo and delivered to the parties pursuant to the Swanmines Agreement on May 18, 2006. Africo has had prepared a technical report in accordance with NI 43-101 in respect of the Feasibility Study. See "Information Concerning CopperCo After the Arrangement – Description of Mineral Property" below.

The Swanmines Agreement provides that the net profits from the Kalukundi Project will be allocated as to 60% to repay all loans incurred by Swanmines, and 40% to GCM and H&J according to their proportionate interests in Swanmines. The Swanmines Agreement is in effect until the Kalukundi Property can no longer be mined or is terminated by mutual agreement of the parties.

The Swanmines Agreement was amended by subsequent amendments, the total effect of which was to reduce the interest of GCM in Swanmines to 25% and increase the interest of H&J to 75%. The amendments also extended the time for Swanmines to present the Feasibility Study to the parties to 24 months from the last amendment dated May 18, 2004, and provided that Swanmines would pay a royalty of 2.5% on its gross turnover to GCM (a portion of which GCM could require to be paid in advance).

***Memorandum of Agreement among Lymnokyknos Holdings Ltd. and Hasita s.a. (together, the "Sellers") and Africo dated March 23, 2004 (the "H&J Agreement")***

The H&J Agreement provides that the Sellers will transfer all their right, title and interest in all of the issued and outstanding share capital of H&J (the "**H&J Shares**") owned by the Sellers. The purchase price for the H&J Shares is US$2,275,000, of which US$1,025,000 has been advanced as at the date hereof.

As at the date of the Circular to which this Schedule is annexed, Africo has made the necessary payments under the H&J Agreement to earn a 48% interest in H&J (subject to the resolution of the dispute with Lymnokyknos Holdings Ltd., see "Information Concerning CopperCo after the Arrangement – Risk Factors" and "Legal Proceedings"), which in turn has a 75% interest in the shares of Swanmines, the holder of the exploitation permits for the Kalukundi Property. Africo is in the process of raising funds and intends to make the remaining payments under the H&J Agreement in order to earn a 100% interest in H&J as soon as practicable.

## DESCRIPTION OF MINERAL PROPERTY

Upon completion of the Arrangement, the only material property of CopperCo will be the Kalukundi Property. The following description with respect to the Kalukundi Property is derived from a technical report on the Kalukundi Property dated June 2006 (the "**Kalukundi Report**") written by John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global, who was retained by Africo to prepare a technical report compliant with NI 43-101. Both Mr. Hearne and Dr. Verbeek are a "Qualified Person" and considered "independent" as both those terms are defined in NI 43-101. Mr. Hearne, the primary author of the Kalukundi Report, was responsible for the preparation of sections 1 to 5, 17.8, 18, 19, 20, 21 and 23 of the Kalukundi Report and, in addition to supervising the preparation of the Kalukundi Report, directed the work pertaining to the mineral reserve estimates. Mr. Hearne has not visited the Kalukundi Property. Dr. Verbeek was the Qualified Person responsible for the preparation of sections 6 to 15 and 17 (17.1 to 17.7) of the Kalukundi Report and has visited the Kalukundi Property on a number of separate visits throughout 2004, 2005 and 2006. Preparation of the Kalukundi Report relied on additional Qualified Person support from five other individuals, as identified in Section 2.2 of the Kalukundi Report. The full text of the Kalukundi Report is available for review at Africo's or Rubicon's office at Suite 1540 – 800 West Pender Street, Vancouver, British Columbia, and may also be accessed by the reader of this Circular on the SEDAR website at www.sedar.com under Rubicon's issuer profile.

### Property Description and Location

*Project Location*

The Kalukundi Project is located within the Kolwezi District of Katanga Province in the south-east of the DRC, 60km to the east of Kolwezi and just 4km to the north of the road between Likasi and Kolwezi (see Figures 4.1_1 & 4.1_2 of the Kalukundi Report). The distance by road to the capital of the Katanga Province, Lubumbashi, is 270km. The project is only 15km by road from the Tenke Project and 25km from Fungurume. The mining centre of Likasi is 160km from Kalukundi.

The Kalukundi Project area is located just to the north of the main road between Likasi and Kolwezi. The village of Kisankala is situated close to the Principal and North Fragments of the Kalukundi deposit. Until November 2004, this village housed approximately 3,000 informal or artisan miners and their dependants. Most of these workers left once Swanmines stopped all illegal artisan mining on the property. It appears that although limited artisan mining continues in the surrounding areas, the issue of tenure with regards to these miners has been resolved.

*Tenements*

The Kalukundi Project is secured under an Exploitation or Mining License, PE591, which was issued on 11 October 2001 for a term of 20 years. The tenement is 19.5km$^2$ in extent, consisting of 23 carrés or blocks. The boundaries of the project have been surveyed and are marked with six boundary beacons.

The beacons were surveyed by Robert John McGaw, a qualified surveyor from Zimbabwe, using differential GPS-based survey instrument. The six mining lease corner beacons were correlated to first

order government topographic survey beacons. The corner beacons were concreted in and certified as being correct by the Mining Dept (Kolwezi) and the Topographic Dept (Kinshasa).

*Ownership*

The exploitation permit, Permis d'exploitation, No 591 (Mining License) for Kalukundi is held by the Swanmines Joint Venture (Swanmines) and the ownership of Swanmines is shared between H & J Family trust (75%) and Gécamines (25%). Africo currently holds a 48% interest in H & J Family Trust and has the option to increase this holding to 100%. Rubicon holds a 39.6% interest in Africo. The ownership of the Kalukundi Project is shown in Figure 4.3_1 of the Kalukundi Report.

*Tenement Status*

The Kalukundi permit was originally issued on 11 October 2002 as permit C242 with an approximate area of 15.5km$^2$ inside a five point polygon. With the implementation of the new Mining Code, the boundaries were moved in 2003 to coincide with the co-ordinates of the national topographic cadastral grid. This resulted in the concession area being increased to 19.5km$^2$ within a six pointed polygon. The Certificat d'exploitation for the revised area was signed on January 28 2004. Annual rental fees of $5.00/hectare are payable to the Government of the DRC amounting to $9.769.64/year. The rental payable in terms of the Mining Code has been fully paid to date. The payment for 2006 was due by the end of March 2006 and has been paid.

Thus far, over $9M has been committed to the project. This permit entitles the company to commence mining activities, subject to relevant DRC mining legislation.

*Royalties and Agreements*

Once production begins, the owners will be required to pay royalties to the DRC Government in accordance with current mining legislation which imposes a royalty tax payable on the sale of minerals at the rate of 0.5% for ferrous metals, 2% for non-ferrous metals and 2.5% for precious metals. Thus Africo will be committed to payment of a 2% royalty on gross sales to the government.

In accordance with an agreement with Gécamines, a 2.5% royalty on gross sales is payable by the owners of Swanmines to Gécamines.

*Environmental Liabilities*

The proposed mine will be developed in an area covered largely by natural forest. There are extensive trenches and artisan workings covering the area, but most will likely be removed by mining.

Provisional costs for mine reclamation and post-closure environmental monitoring have been included in the Project financial modeling.

**Accessibility, Climate, Local Resources, Infrastructure and Physiography**

*Project Access*

Access to the project is either by road through Zambia, via Lumbumbashi (270km) and Likasi, or from Kolwezi (60km).

The road between the Zambian/DRC border post at Kasumbula and Lubumbashi is tarred and has recently been rehabilitated but experiences heavy trucking traffic and unless it is appropriately maintained will deteriorate rapidly over the next few years. The road from Lubumbashi to Likasi is good by DRC standards, but potholes are numerous. The road was repaired during the second half of 2005 and this

improved its condition substantially. The contract to reconstruct this road completely has been awarded and work has commenced on the section nearest to Lubumbashi. The road between Likasi and Kolwezi is in extremely poor condition. The trip from the Project to Lubumbashi takes about six hours of hard driving in small four wheel drive vehicles. Transporting heavy equipment can take a number of days.

An electrified railway line passes some 4km south of the project, linking Lubumbashi and Kolwezi. The line is currently poorly maintained and a limited goods and passenger service operates on trains running intermittently in either direction and the Luilu plant at Kolwezi is serviced on a twice weekly basis. There is an international airport at Lumbumbashi, and a local airport at Kolwezi.

*Physiography*

The north-central DRC is a large plateau at about 300m amsl (above mean sea level) and is drained by the Congo River. The country becomes more mountainous in the east in the vicinity of the East African Rift Valley.

The area surrounding the project is relatively flat to undulating, with occasional low ridges of resistant rock. The concession area slopes gently towards the Kisankala Spring situated in the centre of the Kalukundi Property. Outcrops of silicified Katangan stratigraphy form conspicuous low hills, which rise about 20m to 30m above the surrounding plains. These hills are characterised by the lack of large trees, which results from copper toxicity in the soils (copper clearings). The silicified nature of some lithologies further inhibits growth of large trees. These low ridges often represent prospective stratigraphy. Most of the area between the mineralised fragments consists of flat-lying terrain underlain by shales and conglomerates belonging to the Lower Kundelungu Group, covered by a few meters of soil and/or saprolite. Some patchy laterite pavements occur along the banks of the Kisankala River and near the eastern property boundary.

Four ridges in the Kalukundi area are underlain by fragments of mineralised stratigraphy and are the focus of the Kalukundi Report. From southwest to northeast these are:-

- Principal: Largely continuous stratigraphy with a steep north-easterly dip. Offset on steeply dipping north-easterly striking cross faults.
- Anticline: Isoclinally folded zone of generally steeply dipping stratigraphy with a north-westerly verging and steeply plunging closure.
- Kalukundi: Largely continuous south-easterly dipping footwall zone with discontinuous structural repetition in the hangingwall.
- Kii: Largely continuous but structurally overturned south-easterly dipping stratigraphy.

There are other mineralised fragments within the Kalukundi project area. It is likely that these will be evaluated at some stage, and surface portions of some of these fragments have already been exploited by local artisan workers. Only the above mentioned four fragments are incorporated in the Kalukundi Report.

The area is generally forested by natural forest, known as Miombo Woodland with occasional clearings for largely subsistence agriculture. This woodland extends from Angola in the west to Zambia in the south and Tanzania in the east. The ecology is characterised by broadleaf deciduous woodland (10 to 20m in height) and savannas interspersed with grassland over the mineralised fragments.

Deforestation close to the roads and towns is advanced and charcoal burning is common.

Groundwater level has been measured at approximately 40m below the surface at Kalukundi. There are two perennial springs at Kisankala and Kii, fed by fracture-borne water from the dolomitic formations.

*Climate*

Congo has a mild climate throughout the year, with typically heavy summer rains. During the rainy season, water-logging contributes significantly to the rapid degradation of roads. The climate is tropical. It is typically hot and humid in the equatorial river basin, cooler and drier in southern highlands and cooler and wetter in eastern highlands. South of Equator, the wet season is November to March and the dry season is April to October.

There are three main weather stations with reliable historical meteorological data located around the Kalukundi project area. In the southern parts of the DRC the annual average rainfall varies between 1,220 and 1,320mm with double maxima in December and March. Between December and April most field work is restricted to areas served by good roads, effectively limiting exploration. The temperature for summer is between 18ºC and 32ºC and in winter varies between and 4ºC and 25ºC. The prevailing wind direction during most of the year is from the east-southeast. Average wind speeds vary from a low of 1.6m/sec in February to a high of 3.4m/sec in September. Maximum gusts range from about 22m/sec in the dry winter months up to 30m/sec in the wet summer months. Thunderstorms during the summer are generally associated with west-north-westerly winds.

In the immediate vicinity of the Kalukundi project area, Miombo woodland dominates and there are no dambos (small wetlands in shallow depressions), but a few small areas along the Kisankala stream become waterlogged in the wet season. Local subsistence agriculture utilises these limited areas for cultivation. The Kalukundi license is located on gently undulating topography with a mean elevation of 1400m amsl.

Malaria is endemic to the area.

*Local Infrastructure and Services*

Relatively undisturbed Miombo woodland covers the permit with little agricultural activities undertaken. Main crops grown are maize and cassava.

The closest town is Kolwezi, and although there are numerous villages surrounding the project, these have extremely poor or no infrastructure.

Kisankala Village is located at the centre of the permit. Kisanfu is the nearest village to Kisankala and is located 7km to the south with more permanent housing and infrastructure. A census was carried out in January 2005 and the population of Kisankala Village was 1,064 people. The census was updated in January 2006 and there were 2,361 people living in Kisankala Village. Most of the housing in the village comprises temporary wood structures.

There is a clinic in Kisanfu (7km) and hospitals can be found in Kolwezi (50km) and Likasi (100km). There are three primary schools in Kisanfu. The disused railway station is the location of the third school. Secondary and tertiary education facilities can be accessed in Kolwezi, Likasi or Lubumbashi.

The electrified SNCC Kolwezi-Likasi railway passes 2km south of the southern boundary of PE 591. The nearest station is Kisanfu. The railway line is in use and is currently in good condition. Trains for a passenger service run intermittently and the Luilu plant at Kolwezi is serviced on a twice weekly basis.

Telephonic communication to the site was initially via satellite telephone, but recently the cellular telephone network was extended in March 2005 such that intermittent coverage could be obtained on elevated portions of the site. Currently, fair coverage is obtained over much of the site and along the main road as well.

Although there is no current connection, the national power grid carrying hydroelectric power from the Congo River scheme passes close to the south of the project.

Despite having high rainfall, the country experiences water shortages in towns due to poorly maintained infrastructure. The main local water resources within the Kalukundi concession area consist of two small springs, called Kii and Kisankala. Additional water for mining purposes could be obtained from the Lualaba River dam, 24km to the west. It is anticipated that pit de-watering boreholes will contribute to mining and process water requirements.

Because of the state of the access roads, rail and power links and although the mining lease is not far from established towns in terms of distance, it is essentially a remote site in terms of infrastructure.

**History**

*General*

The Zambian and Congolese copper belts host some of the world's most continuous, largest and richest sediment hosted copper and cobalt deposits known. The oxide zones of many of the deposits currently being mined and explored were exploited by indigenous artisan workers long before the first wave of explorers and colonisation reached the southcentral African interior in the 1880's. Early copper mining started in the Belgian Congo soon after the turn of the century. A rail link was constructed from Victoria Falls through Zambia to Lubumbashi in late 1910. A smelter was built at Lubumbashi under the management of Union Miniere and copper production from Kolwezi, Kakanda and Kambove started to increase. Kansanshi, Bwana Mukuba and Nkana are good examples of copper deposits with an ancient history of exploitation in Zambia.

Modern mining has been focused on exploiting these deposits for over the last 100 years. The DRC copper belt saw the steady increase in copper and cobalt production through to the copper boom of the late 1980's. However, a period of political turbulence followed the independence of the Congo from Belgium in 1967 and the destructive reign of Mobutu Sese Seko. The operations of Union Miniere continued through to independence, but then fell under the new para-statal organisation called Gécamines. At this stage, production had reached a peak of 500,000t of copper metal and 30,000t of cobalt metal. For a while, production continued at a steady pace, but soon began to decline and by the early 1990's.

The large pits and tailings facilities bear witness to the fact that this area was once an important force in global copper and cobalt production. Since independence however, a steady decline in mining activities has occurred. Following the rise of African Nationalism in the DRC and Zambia, and subsequent independence from colonial powers, mining operations in Zambia were nationalised in 1970. After nationalisation and leading up to the late 20th century, the mines in the sub-region declined in profitability, and exploration was sidelined. Around the end of this period, privatisation was initiated, and revitalisation of the industry ensued.

In the DRC, informal mining is still largely carried out by artisan workers or semi formal mining operations for cobalt and processing occurs in basic washing plants and other decaying infrastructure.

Most formal mining activities in the DRC have, until recently, been undertaken by Stateowned Gécamines in the copper belt and OKIMO (gold mining operations). Recently however, mining has suffered from a lack of capital investment, particularly after the security situation deteriorated in 1990, and most operations have ceased or are operating at restricted capacity. Currently, metal production is estimated at less than 10% of previous levels. It is estimated that Gécamines produced approximately 500Ktpa of copper during the mid 1980's. Copper production in 1996 was approximately 30Kt, and this level of production has been maintained and only slightly exceeded in recent years.

Gécamines have been actively attempting to improve rapidly declining copper and cobalt production by promoting several ailing mines and associated ore treatment facilities to foreign investors, generally by offering joint venture terms. Political change in January 2001 has led to increasing levels of confidence in the return of political stability to the region. This in turn has led to increased interest from international mining companies that have started to acquire mining interests in the Copperbelt. These include Phelps

Dodge (Tenke Fungurume), First Quantum (Lonshi, Likasi Tailings), Anvil Mining (Dikulushi), the Forrest Group (Kolwezi area), International Panorama Resources (Kambove and Kakanda Tailings) and American Mineral Fields (Kolwezi Tailings). Only the Anvil operations, at Dikulushi have flourished and constitute the first significant new mining and processing operation in the DRC in recent times. Operations at Lonshi are restricted to mining activities only, with the ore being trucked across the border to a processing facility at Bwana Makubwa. Similarly a barge is used to transport Dikulushi ore across Lake Bengwelu.

The President of the DRC, Joseph Kabila, is widely supported by the international community, and financial assistance from the World Bank and the IMF has been recently forthcoming for the first time in over a decade. The DRC is currently more stable than it has been for many years, and it is hoped that stability will bring development and general prosperity to the country. Infrastructure rehabilitation is underway, and large investments have been made in telecommunications development. Renewed interest in mining investments is also evident, especially in the south-eastern portion of Katanga where the province has been relatively unaffected by various armed conflicts that have plagued the north-eastern border region, where mining and exploration for gold is still expanding.

The existence of mineralised fragments of Roan stratigraphy in the Kalukundi area has been known since 1916. The focus during that time, however, was on the huge tonnages available in the larger deposits of the Zambian and DRC copper belts.

*Exploration by Previous Owners*

The southern portion of the DRC was first prospected on a systematic basis by Tanganyika Concessions Limited just prior to the end of the 19th Century. As exploration moved into active production of copper (and minor tin) a new company, Union Miniere du Haut Katanga (UMHK) was formed in July 1906 to oversee the development and operation of the mines. In addition to the early exploration for copper, cobalt and gold, exploration also focussed on iron and pyrite in the Kasonta area, and graphite and pyrite in the Mwashia units that surround the “mega-breccia” zone. As a result of their systematic evaluation work most of the major and many minor copper occurrences had been discovered by 1916.

UMHK also prospected the low lying ground between the topographically obvious, and outcropping Lower Roan rafts. This prospecting was carried out mainly through pitting and some “electrical” ground geophysics.

Exploration work in the vicinity of Kalukundi between 1927 and 1987 consisted largely of detailed surface mapping and excavation, mapping and sampling of pits and trenches and the ‘manual’ drilling of shallow exploratory holes for mapping purposes.

Active exploration has been carried out by three main companies, Gécamines, JCI and Swanmines since about 1986 which has resulted in the definition of stratigraphy and mineralised areas.

Gécamines completed eight diamond drillholes between 1986 and 1987, along with extensive trenching and pitting and geological mapping. These were intermediate to deep holes to 600m, focused on determining the continuity of the copper ore geology at depth.

In late 2001 and early 2002, Geo-Consult, on behalf of JCI drilled twelve boreholes totaling 1,440m, along with further geological mapping and interpretation. Geo-Consult assayed all their drillholes for Cu and Co. In addition they analysed 1/3 of the drillholes for Au, Ag, Ca, Mg, Ni, Fe, Mn, S, Si and P, and determined bulk densities for the mineralised zones. The JCI exploration work is detailed in a report by Geo-Consult in July 2002.

In August 2002, a metallurgical assessment was carried out by Mr. M.J. Boylett to evaluate the possibility of using local plant facilities to process Kalukundi oxide ores and thereby reduce the burden of capital

costs. Numerous options were considered for leaching and flotation of the ores to produce various products.

In September 2002, a preliminary financial analysis was done by JCI investigating alternative production rates and processing routes.

At this stage, Swanmines negotiated the rights to the Kalukundi property thus taking over from JCI. The *permis de research* was converted to a *permis de exploitation*, and funds were secured to commence a resource evaluation and feasibility study in May 2004.

*Historical Resources*

Drillhole sampling by JCI/Geo-Consult and Gécamines correlated well. Average total Co grades of 0.66% Co (JCI) compared well with the 0.6% Co quoted by Gécamines. Gécamines also reported a mean Cu grade of approximately 4% Cu for their Upper and Lower Ore Zones. This corresponded to the JCI average of 3.03% Cu. The JCI figure, however, includes low grade material that was excluded by Gécamines.

Mineral 'reserves' reported by Gécamines in January 1998 are reproduced in Table 6.3_1 of the Kalukundi Report. Gécamines reported the 'reserve' as 'Probables' and 'Possibles' which JCI (2001) correlated to Indicated and Inferred Resources in terms of JORC and SAMREC. The details of the above resource are however uncertain. Tonnage and grade from which the resource was derived were not reported, only total contained metal.

RSG Global believes that these estimates could have been considered inferred if JORC/SAMREC codes had been appropriately applied and grade and tonnage had been tabulated, based on the limited data available and deficiencies in the data quality, particularly the core recovery achieved during drilling. Furthermore, there is no documentation regarding the calculation of the estimate. Although not 43-101 compliant, these historical resource figures have been provided for background information purposes.

In an attempt to obtain a better estimate, JCI (2001) estimated the mineral resource based on width and grade data, strike and a nominal 100m depth, a sectional polygonal type estimate. The estimate was constrained by a basic spreadsheet type optimisation process to produce a 'reserve' as reproduced in Table 6.3_2 of the Kalukundi Report. A 5% geological loss and 5% dilution at zero grade is incorporated in the JCI estimate. This is a mixture of resource and reserve terminology, but JCI (2001) made no attempt to classify their estimate in terms of JORC or SAMREC.

In February 2004, SRK undertook a limited due diligence assessment of the JCI geological and ore resource reports, and recommended an Inferred Resource classification. RSG Global concurs with this classification.

Table 6.3_4 of the Kalukundi Report provides a summary of the Geo-Consult resources in a comparable format to the current resources, reported in Section 17, 0% internal Cu and Co cutoff, but based on a nominal external cutoff of 0.5% total Cu.

*Historical Production*

Historical production from the Kalukundi deposit occurred during two phases:-

- Informal mining by artisan workers.
- Limited surface mining by Swanmines on fragments not included in this review.

Production records from the former can at best be estimated, but largely constitute Heterogenite or cobalt mined manually from relatively narrow excavations to depths of up to about 20m below surface. The

artisan excavations were never surveyed and are not safe to work in. Some of these workings have since been backfilled.

An attempt was made to produce heterogenite from the Kesho Fragment, formerly known as C5 East. A washing plant was established on the site, but washing of a limited amount of material was unsuccessful and the operation was abandoned. No production records for the latter were retained due to the small amount of material used in the plant as testwork. The plant has since been dismantled and removed from the site. The Kesho Fragment does not form part of this ITR.

An estimate of material extracted from these fragments is about 200,000t comprising:-

- Principal 127,500t;
- Anticline 40,000t;
- Kalukundi 9,500t,
- Kii 14,500t; and
- Kesho 9,000t.

Rough wireframes have been built of the depletion zones and these have been depleted from current models for Principal, Kalukundi and Kii. The depletion at Anticline is negligible.

**Geological Setting**

*Regional Setting*

Base metal mineralisation in the Zambian and DRC copper belt provinces is hosted by sedimentary rocks of the Neo-Proterozoic Katangan Sequence, developed within the Lufilian Arc. This copper belt extends over 600km from Luanshya (Zambia) in the southeast and to Kolwezi in the Democratic Republic of the Congo (DRC) in the northwest.

The Katangan Supergroup rocks are up to 7,000m thick and are underlain by basement granite, intermediate metavolcanic and metasedimentary rocks dated at ~1,800Ma to 2,000Ma. The sediments represent a facies continuum of proximal to intermediate and distal dolomitic mudstones, sandstones and algal reef fragments.

The Katangan Supergroup is subdivided into Roan, Lower and Upper Kundelungu Groups, separated respectively by the *Grand* and the *Petit Conglomerat* diamictite marker units. Mineralisation at Kalukundi occurs within the Mines Sequence (or *Series des Mines*) which is correlated to Lower Roan rocks elsewhere in the Lufilian arc.

The Lufilian Arc forms part of a network of supracrustal belts in Africa (Pan-African) and South America that are host to important metallogenic provinces e.g. Katangan (DRC), Zambian copper belt, Kabwe Zn/Pb/Ag terrane (Zambia), Otavi Mountain Land Cu/Zn/Pb (Namibia), Gariep Belt Zn/Pb (Namibia) and the São Francisco craton Zn/Pb deposits (Brazil).

Generalised stratigraphy for the copper belts is shown in Figure 7.1_1 of the Kalukundi Report. The maximum age of the Katangan sedimentation is constrained by U-Pb dates on zircons from the Nchanga granite at 877+/-11Ma. Extensive rifting occurred at around this time. It is generally accepted that the deposition of the supracrustals occurred during the rift phase of the Katangan Sequence in Zambia and DRC.

The development of isolated, structurally bounded basins comprising half grabens/graben structures controlled initial sedimentation in the lowermost portion of the Katangan Sequence, the Roan Group. The configuration of the basin margin is especially important and controlled the development of thick wedges

of clastic sediments in the basal sequences. Growth faults controlled prolonged and variable sedimentation into the basins. This resulted in the development of predominantly arenaceous and argillaceous rocks, with relatively thin interbeds of rudaceous material. Facies change occurs between the Zambian and DRC Roan group rocks, with argillaceous and carbonaceous rocks predominating in the DRC.

The development of the 'ore shale' unit marks the first major marine transgression in the Zambian copper belt, and in the DRC this transgression also resulted in laterally extensive shallow marine sedimentation in the *Series Des Mines*. This provides an important marker that can be traced throughout the copper belts.

The extensive flat-lying plains surrounding the Roan ridges in the DRC are ubiquitously underlain by Lower Kundelungu rocks although these are not exposed on surface at Kalukundi because of deep soils and thick vegetation. Lower Kundelungu sequence rocks were also not intersected by boreholes drilled on the Kalukundi project, but were intersected by condemnation boreholes drilled below potential waste dump and plant areas. These confirm the presence of Kundulungu stratigraphy as shown on maps compiled by Gécamines and other regional studies. The Lower Kundelungu stratigraphy consists of a basal conglomerate overlain by sandstones and shales.

While the Katangan Supergroup sediments in Zambia are deformed by a series of open folds, in the DRC the Katangan Supergroup is preserved both as tightly folded, but relatively intact sequences and as complexly deformed, locally continuous but structurally dismembered 'rafts' of lower Roan strata (*Series Des Mines*) within a 'mega breccia' or melange that contains abundant evaporite minerals. The mega-breccia forms a kiteshaped wedge elongated parallel and adjacent to a major northwest trending lineament. Interpretations based on Landsat and aerial photographs suggest that this structure may represent an original Katanga basin edge fault.

The structure of the Katangan Sequence in Zambia is considered to be the result of compression during basin closure, however in the DRC it is probably the result of decoullement at the northern margin of the basin and northward thrusting of the Katangan Supergroup over basement lithologies (granites and gneisses) and other, higher, Katangan Supergroup stratigraphy. The mega breccia is probably of tectonic origin, but focussed on incompetent chemical sediments.

Metamorphic grade increases southwards but within the Kalukundi area very low-grade chlorite facies metamorphism is evident.

*Local Geology*

The Roan stratigraphy preserved in the Kalukundi area belongs to the *Series Des Mines* (correlated to Lower Roan in Zambia) and occurs as isolated allochthonous outliers (klippe or "ecailles", referred to henceforth simply as fragments) bounded by large shear and fault zones. These outliers are exposed over several hundreds of meters of strike length and also exhibit significant dip extents. The *Series Des Mines*, in particular the RSC, is more resistant than the adjacent stratigraphy and the mega-breccia. As a result, the RSC forms outcrops and low ridges that are prominent in the otherwise flat terrain.

Of the twelve fragments identified in the Kalukundi concession area, only four are the subject of the Kalukundi Report. These are the Principal, Anticline, Kalukundi and Kii Fragments (Figure 7.2_1 of the Kalukundi Report). Limited exploration and evaluation work has been undertaken on the other fragments, but only the Kalukundi East fragment (Kesho) contains known mineralisation, identified in outcrops, trenches and larger excavations. One vertical borehole by Gécamines intersected the ore-bearing stratigraphy and returned some excellent cobalt values, but poor copper results. As copper was the main target at the time, no further work was focussed on this fragment. The Kesho fragment (and possibly other fragments) represent upside to the existing Kalukundi resources.

Stratigraphy for the Series des Mines in the Kalukundi area is summarised below. The term "Ore Zone" is both historical and local terminology. The term Ore is restricted under the JORC and SAMREC codes to

mineralised material proven to be economic. The use of the term Ore Zone here should not be taken to imply that economic studies have been carried out and found to be feasible.

- **CMN** – "*Calcaire a Minerais Noirs"*, comprises dolomite and limestone and is the uppermost sequence of the *Series Des Mines*. The lower portion of this unit is made up of dolomitic shales and chert-rich zones. Mineralisation, when present, may constitute a Third Ore Zone characterised by high gangue acid consumption ("GAC") in fresh rock but with lower GAC in the weathered/oxidised zone.
- **SDS** - "*Shales Dolomitiques Superieurs*" (Upper Dolomitic Shales) composed of bedded and laminated dolomitic siltstone and fine-grained sandstone. Sporadic, poor (sub-economic) copper mineralization occurs throughout this horizon. In some fragments, there are significant intersections of "hangingwall ore" in this material. The hangingwall ore is, however, difficult to correlate between drill sections and has not been modelled or estimated, but it could represent upside potential for the Kalukundi project.
- **SDB** - "*Schistes De Base*" (Basal Schists) silty dolomite to siltstone containing some nodules. This (Upper Orebody) is also one of the main ore bearing horizons with high grade copper and cobalt, which has been extensively mined by artisan workers.
- **RSC** - "*Roches Silicieuses Cellulaires*" (Siliceous Rocks with Cavities, Cellular) comprises massive to stromatolitic, silicified dolomite. It forms conspicuous ridges and is generally poorly mineralised. The hydrothermally altered stromatolites are occasionally enriched with black heterogenite (cobalt) oxides.
- **RSF** - *Roches Siliceuses Feuilletees* or "Foliated" (Laminated) and Silicified (dolomitic) Rocks. It is made up of silicified bedded dolomitic shales. This unit hosts the "Lower Ore Zone" which is developed close to the contact with the overlying RSC.
- **DStrat**. - *Dolomites Stratifiees* or "Stratified Dolomite" is similar to the overlying RSF. It is comprised of well-bedded argillaceous dolomites. Near the top of the unit, a nodular chert-rich horizon is characteristic. This unit may also form part of the Lower Ore Zone.
- **RAT -** *Roches Argilo-Talcqueuse* is the lowest member of the Series des Mines stratigraphy and comprises a sequence of dolomitic and talcose argillaceous units. Both RAT Griese (Grey) and RAT Lilas (purple) occur in the Kalukundi area.
- **Breche Heterogene** - This unit occurs at the base of the sequence and the fragments in the breccia are derived from all rock types of the Roan Mines Series. The fragments are generally angular but occasionally well rounded, ranging from a few millimetres to several centimetres in size. The matrix consists of finer-grained particles with the same composition as the larger fragments. The breccia is generally accepted as having a tectonic origin.

Higher, Lower Roan stratigraphy is absent at Kalukundi. The sequence reflects a facies continuum of proximal to intermediate and distal dolomitic mudstones, sandstones and algal reef fragments.

The whole sequence has been silicified and remobilisation of silica and copper-cobalt mineralisation has played a major role in the present appearance of the rocks, for example the formation of vugs in and silicification of the RSC Unit.

The dimensions of the four fragments evaluated in detail during this programme are as follows (strike length & drilled width):-

- Principal 630m x 36.70m.
- Anticline 150m x 80.25m.
- Kalukundi 430m x 44.18m.
- Kii 330m x 40.84m.

The Principal fragment has a NW-SE strike and north-easterly dips varying from 75º in the SE, flattening to about 55º towards the northern end. The north-western half is displaced by four NE-SW striking faults with displacements up to about 15m. Drilling results suggest that the down-dip extension flattens to almost 45º and deep Gécamines drilling suggests that it may terminate down-dip against a sub horizontal fault.

The Anticline Fragment has a north-westerly trending fold axis with both fold limbs dipping about 045º north-easterly. The axial trace also plunges steeply NNE. Both limbs have a strike length of 150m and a width of about 80m. The tight folding has resulted in numerous cross-cutting faults.

The Kalukundi Fragment has a strike length of 430m heading 053º and dips southeastwards at 78º. Deep exploration holes drilled by Gécamines suggest that the dip reverses, dipping northwards with depth. This suggests a synformal relationship with the Kii Fragment. A NE-SW trending (dextral) fault with an approximate displacement of 45m intersects the orebody near its south-western end. The projected extension of this fault may possibly intersect the north-eastern limit of the Kii Fragment.

The Kii Fragment strikes 045º with a length of 330m and dips at 65º. Deep drilling results from Gécamines (KDI 102) suggest that the down-dip extension may be cutoff against a fault.

A fifth fragment, Kesho, is located close to the proposed plant site. No detailed drilling has been undertaken here, but this fragment is well mineralised and could add significant resources to the Kalukundi Project. One diamond drill (KDI 4) was drilled by Gécamines, which intersected mineralised material below 120m vertical depth. The dimensions of the Kesho fragment are inferred to be 350m (strike) x 41.40m (thickness).

In general, the zone of weathering and oxidisation reaches between 70 and 130m below surface. The depth of the weathered zone appears to be greater in the Principal, Anticline and Kii fragments than in the Kalukundi fragment. Below the weathered oxide zone, a mixed zone containing oxide and sulphide mineralisation occurs. No boreholes have intersected pure sulphide ore the deepest drillhole intersects mineralisation at 490 m below the surface. Weathering is severe and the silty and shaly parts of the succession are completely decomposed down to depths of approximately 40m and are still friable and crumbly to 100 metres below surface. Weathering and oxidation penetrate down selective lithologies such as the D Strat to an inclined depth of 350m (BH KDI2) drilled by Gécamines on the Principal fragment.

*Structural Geology*

The fragments are folded, forming tight, steeply dipping synclinal and anticlinal structures. The vergence of the folds is variable on a regional scale; this is consistent with the interpretation of chaotic fragments within a mega-breccia (*Breche Heterogene*). The dip of the limbs is between 45° and 85°. Similar styles of deformation have been interpreted for the Kolwezi ore bodies.

Individual fragments are terminated by faults on their lateral extents, and crosscutting brittle faults offset stratigraphy, especially in the Principal fragment. Fault displacements vary between 15m (Principal) and 45m (Kalukundi). These shears and faults may have provided passageways for siliceous fluids and fluids responsible for the remobilisation of copper and cobalt.

All the mineralised zones have been faulted and/or folded to varying degrees of intensity, but gross continuity of the lithological units can nevertheless be demonstrated.

In the southern portion of the Kalukundi deposit, both the northern and southern limb of a faulted and folded sequence of Roan rocks is exposed. The northern limb (Anticline fragment) has an antiformal geometry and a north-westerly plunging fold axis and terminates at depth against a brecciated footwall zone, possibly a thrust fault. The southern limb (Principal fragment) dips at between 60° and 85° towards the northeast and is also truncated against the breccia at depth.

In the north-eastern portion of the Kalukundi deposit, the Kalukundi fragment is exposed as two subparallel/*en echelon* outcrops. These represent the limbs of an overturned isoclinal synform, dipping at 45° and 70° to the southeast for the southern (Kalukundi fragment) and northern (Kii) fragments. Two deep boreholes were drilled by Gécamines to depths of 475m and 600m to investigate the continuity of these two fragments in depth. The deeper borehole, KDI 101 intersected the Kalukundi fragment at a vertical depth of 490m, confirming considerable depth continuity. BH KDI 102 intersected the *Breche Heterogene* at the point where the Kii fragment was anticipated, thus some displacement of this zone may be anticipated here.

**Deposit Types**

The Lufilian Arc forms part of a network of supracrustal Pan African belts (Neoproterozoic age) in Africa and South America that are host to important base metal provinces e.g. Katangan (DRC and Zambian copper belts), Kabwe Zn/Pb/Ag terrane, Otavi Mountain Land Cu/Zn/Pb (Namibia), Gariep Belt Zn/Pb (Namibia) and the São Francisco craton Zn/Pb deposits of Brazil.

There are two main deposit types developed in the DRC copper belt where Cu and Co mineralisation occurs:-

- Continuous, stratabound, sediment hosted Cu-Co deposits with significant strike extent (e.g. Tenke-Fungarume). These are similar to the Cu-Co deposits developed in the Zambian Copperbelt but may also be terminated at depth against breccia zones representing thrust faults. This is in contrast to the Zambian copper belt deposits which are generally continuous at depth.
- Discontinuous, raft-style stratabound sediment hosted Cu-Co deposits such as Kalukundi. The raft-style deposits are interpreted to be generally small allochtonous fragments of Lower Roan stratigraphy thrust northwards from the main Lufilian arc. Mineralisation and host lithology is broadly similar to the more continuous deposits.

The relationship between the DRC carbonate-shale hosted deposits and the Zambian shale-arenite deposits is controversial, but there is no reason to propose widely differing origins. The main differences are the characteristics of the Lower Roan Formation facies, and the tectonic disruption of the DRC stratigraphy.

**Mineralisation**

*General*

The Kalukundi deposit represents hypogene remobilisation of primary sulphide mineralisation. The primary mineralisation was probably typical of other Lower Roan mineralisation in copper belt deposits in Zambia and the DRC. Some of the deeper drillholes at Kalukundi have intersected partially weathered sulphide mineralisation as far down as 270m below the surface.

The principal sulphide zone copper bearing minerals are chalcocite, chalcopyrite and bornite. Cobalt is present in carrollite. Within the oxidised zone copper occurs as malachite and cobaltiferous malachite with subordinate kolwezite and chrysocolla, and cobalt occurs as heterogenite. Spherocobaltite occurs within the RSC in small amounts.

Within the Kalukundi fragment significant amounts of chalcocite are developed below the depth of 40 metres below surface, whilst elsewhere, malachite persists well below this depth. Chalcocite is, however, often developed in a supergene zone near surface and does not necessarily reflect true unoxidised sulphide ore. Heterogenite appears to be enriched near surface, especially in the subsurface from 4m down to about 40m depth.

Mineralisation in the Mines Series in the sulphide zone on the Katanga Copperbelt is well developed and shows continuity within the upper and lower ore bodies both along strike and down dip, while the

stromatolitic dolomite unit separating these ore bodies, the RSC, carries some cobalt mineralisation and only minor copper mineralisation. In the oxide zone, remobilisation of copper and cobalt into the RSC results in this central zone being quite well mineralised in places.

Mineralisation at Kalukundi is best developed within the lower 'ore' body (RAT Grise/D Strat/RSF) and to a slightly lesser degree in the upper (SDB/RSC) 'ore' zone. The two mineralised horizons may have been distinct within the sulphide zone with lower grade mineralisation between the two. In the oxide zone mineralisation is largely continuous from the DStrat to the SDB with significant remobilisation of metal into the RSC. Nevertheless, the highest grades usually remain in the lower and upper 'ore' zones.

In certain parts of the fragments, the upper 'ore' body is poorly mineralised to barren and the adjacent RSC is often poorly mineralised adjacent to this zone. This is evident in the SE Principal fragment, both near surface and in depth and in the Kalukundi fragment near surface.

The distribution of mineralisation is variable, reflecting changes in both the original distribution and the subsequent weathering regimes. Within the oxidised zone very high grades of both copper and cobalt may be encountered due to supergene enrichment.

Contrarily, certain zones may be poorly mineralised. Differential leaching in the porous RSC unit near surface results in this unit and closely adjacent lithologies being locally barren.

The relationship between the thrusting and faulting responsible for the present distribution of the Lower Roan at Kalukundi and the primary mineralisation is uncertain, but the lateral bounding faults and breccias in the sole thrusts have contributed to increased permeability for hypogene fluids and the deep weathering at the Kalukundi deposit.

*Oxide and Sulphide Mineralogy*

The main oxide minerals in the Kalukundi fragments are Malachite, Kolwezite and Chrysocolla in the case of copper and heterogenite in the case of cobalt. These and the less common minerals are listed as follows:-

- Malachite — $Cu_2Co_3(OH)_2$
- Chalcanthite — $CuSO_4.5H_2O$
- Kolwezite — $(Cu,Co)_2CO_3(OH)_2$
- Libenthinite — $(Cu_2(PO_4)(OH))$
- Chrysocolla — $Cu_2H_2(Si_2O_5)(OH)_4$
- Cuprite — $Cu_2O$
- Native Copper
- Heterogenite — $Co^{+3}O(OH)$
- Mg-Spherocobaltite — $Mg.CoCO_3$

The main sulphide minerals are chalcocite, bornite and chalcopyrite in the case of copper, and carrollite in the case of cobalt. The chemical compositions are as follows:-

- Chalcocite — $Cu_2S$
- Digenite — $Cu_2S$
- Bornite — $Cu_5FeS_4$
- Covellite — $CuS$

- Chalcopyrite $CuFeS_2$
- Carrolite $Cu(Co)_2S_4$
- Linaeite (Siegenite) $Ni(Co)_2S_4$
- Cobaltite CoAsS

In addition, haematite ($Fe_2O_3$), specular hematite ($Fe_2O_3$), "*sel rose cobalt*" a bright pink cobaltiferous-$CaCO_3$ (above), and siderite ($FeCO_3$) were reported by JCI and Gécamines also described the presence of tenorite (CuO). Pyrite is present in small amounts.

Uranium is present at Kalukundi in very small amounts. Weak radioactivity has been detected in the SDB and the RAT Grise units. The uranium silicate, coffinite U ($SiO_4$) $(OH)_4$ was detected in trace amounts within goethite in a sample from the RAT Grise.

**Exploration**

*Topographical Survey*

The original survey and the topographic maps produced by Gécamines reflected survey points, drillhole collars, trenches and other details. Check surveys conducted during the Geo-Consult exploration program corresponded to the previous data. Geo-Consult also established 4 baselines with red painted corner beacons parallel and adjacent to the strikes of the main outcrop at Kalukundi and Principle fragments.

Subsequent surveys have been carried out over more than 90% of the property by a contract surveyor. Traditional surveying techniques were employed using a (laser) theodolite and prismatic staff and a local Gauss Conform (LO26), Clark 1866 datum coordinate system utilised by Gécamines. This survey data was used to produce a topographic map with 1m contour intervals. All the borehole collars were also accurately surveyed. The local LO26 co-ordinate system was used in all the 3-D resource modelling.

Some data manipulation has been necessary to convert data from the local coordinate system to the "Triangulation Du Katanga, issued by Comité Special Du Katanga (CSK), Service Geographique et Geologique" on which regional topographical survey beacons are based. Conversion from local to standard grid coordinates (Universal Transform Mercator (UTM) World Global System of 1984 (WGS84)) will ultimately be necessary. Any resultant conversion errors are likely to be small and not material.

*Geological Mapping*

Gécamines and its predecessors explored the deposits within the Kalukundi and surrounding areas between 1927 and 1987. The work consisted mainly of extensive pitting (up to 16m), trenching, mapping and sampling. The pitting data was extensively used for creating geological maps in areas with almost no outcrop. Virtually all of these pits are still open and can be located in the field.

Mapping and presentation of geological data by Gécamines was done to a high standard and Geo-Consult and Africo geologists have made only minor changes to the original Gécamines and Geo Consult maps based on new data secured from the drilling and from more detailed surface mapping and trench data, e.g. at Kalukundi where the width of the RSC was overstated as a result of thick scree cover and soil creep.

Most of the maps were hand drawn 1:2000 scale geological and assay plans. Ammonia prints of these maps are still available from Gécamines.

*Trenches*

A number of trenches and pits were excavated by Gécamines (total length >2000m) in order to assist with mapping in areas obscured by overburden and scree, and also to provide sampling of near-surface material.

Trenches on some fragments were excavated aligned to local grid north (30 to 40º to the strike direction), others were excavated perpendicular to strike.

JCI/Geo-Consult cleaned out those trenches positioned on drillhole sections and remapped and re-sampled them. They also extended the trenches and sampled sections (especially within the RSC) that had not been sampled by Gécamines. Samples were taken as continuous lines of rock chips. JCI/Geo-Consult considered the quality of the Gécamines logging and mapping to be good, and commented on the high incidence of black oxides as veins and nodules indicative of high heterogenite in the near-surface zone. They also noted that Cu grades in the trenches were generally lower than for shallow boreholes, concluding that there had been significant surface leaching. For the purposes of orebody modelling, JCI assumed the leaching zone to extend to 10 metres below surface. Subsequent interpretations by Africo geologists confirm that there is considerable or complete leaching of the RSC outcrops in the uppermost 2m to 3m. Below this cobalt is enriched in open spaces and fractures, but copper mineralisation remains depleted down to a depth at least 10m and possibly slightly deeper.

Some of these original Gécamines trenches were again mapped and sampled by Africo geologists. The assay results from these trenches have been included in the geological models prepared jointly by Africo and RSG Global.

*Exploration Data Collection*

Maps have been digitised and incorporated into a GIS System (TNTmips and ArcView). Other geological information (borehole logs, assay and survey data) is maintained in a series of Microsoft Excel spreadsheets for import into GIS and geological modeling software (Gemcom and Datamine). Drafted (Microstation) drillhole cross-sections have also been produced. Original handwritten logs are archived and maintained on site.

*Interpretation and Discussion*

Exploration data is consistent with the interpretation of the Kalukundi deposit as a hypogene, oxide facies, raft-type, carbonate-shale, stratabound, sediment hosted Cu-Co deposit.

RSG Global has reviewed the exploration data available and considers the data quality and interpretations to be good, and the model to be well understood. The data confirms excellent continuity of the mineralised horizons both along strike and down dip.

Trench coverage, however, is poor over some of the fragments. Almost no trenching was done across the RSC horizon due to its poor mineralisation and hard, silicified nature of the RSC unit. The focus of Gécamines geologists was the higher-grade mineralisation along the SDB-RSC contact (Upper Ore Zone) and on the RSC-RSF-D Strat contacts (Lower Ore Zone). In most cases the intervening silicified and vuggy RSC dolomites were not sampled. The artisan trenches have not been mapped as they are dangerous to work in, particularly following heavy seasonal rains.

Consequently there remains considerable uncertainty regarding the surface distribution of remobilised Cu and Co oxides, both along strike and down dip. Africo has attempted to address this uncertainty by drilling shallow diamond drillholes in the near surface region and by carrying out additional trenching. This has been only partially successful due to limitations on access to the surface zones resulting from, amongst other things, artisan workings.

RSG Global has not applied adjustments to their estimates for leaching, enrichment or depletion, but has classified the surface zones as Inferred where sampling density is poor.

**Drilling**

Drilling conditions were difficult, especially in weathered rock and core recoveries were low for all three phases of drilling, especially in friable zones where oxide mineralisation occurs along foliation planes and as open space fillings in veins. Core losses often occurred where rock hardness changed rapidly between soft, weathered shale/dolomite and hard silicified rock. Karstic cavities have been identified in the RSC and where the material is friable, grinding was experienced. RSG Global has experience in drilling similar material in the DRC and Zambian copper belts and accepts that obtaining high core recoveries is problematic. Discussion of the relationship between core recoveries and grades is presented in Section 17, Mineral Resource and Mineral Reserve Estimates of the Kalukundi Report.

*Drilling by Previous Owners*

Although RSG Global has not audited the Gécamines core, Geo-Consult has indicated that the boreholes drilled by Gécamines were well logged and suitable for integration into the database. They also state that sampling and recording of assays on the logs appear to have been diligently done, but that no QA/QC information is available to verify this statement. Gécamines did not sample sections of core outside the ‘conventional’ extent of the ‘ore’ zones even though they were sometimes mineralised.

JCI drilled twelve boreholes (1,440m), largely as a due diligence exercise confirming the geological interpretations initially made by Gécamines. JCI achieved an average drill rate of 24m/day. Water loss in the RSC was common, resulting in the overlying mudstones running dry and clogging onto the rods until it became impossible to turn the drill string. This was overcome by casing off this section and then drilling with water loss and thick muds to hole completion.

The boreholes from both the above campaigns were relogged in detail by Africo geologists. This confirmed the excellent standard of previous work and brought the logs into line with the format used for the Africo evaluation. Limited re-sampling was also undertaken.

*Drilling by Current Owners*

Africo/Swanmines completed a comprehensive core drilling programme which may be summarised as follows:-

| | | |
|---|---|---|
| • Resource boreholes | 50 | 4,561.67m |
| • Infill drilling boreholes | 11 | 595.96m |
| • Geotechnical boreholes | 17 | 2,256.55m |
| • Exploration boreholes | 5 | 261.60m |
| • Condemnation boreholes | 5 | 317.25m |
| • **Total** | **88** | **7,993.03m** |

Of these 88 boreholes drilled by Africo, 58 were used directly in the geological model for resource definition purposes and the remainder for geological and geotechnical purposes.

Drilling for resource evaluation purposes was carried out in three campaigns. Seventy eight boreholes (9,650m) were used in the geological model to define the resource. Of the remainder, selected boreholes were used to define geological extensions and limits to continuity.

| | | | |
|---|---|---|---|
| • Gécamines in 1986/87 | 8 holes | 2,809m | 10% of the drillholes |
| • JCI/Geo-Consult in 2001/02 | 12 holes | 1,440m | 15% of the drillholes |

- Africo/Swanmines 2004/05 58 holes 5,401m 75% of the drillholes
- **Totals** **78 holes** **9,650m**

Similar core recovery problems to those experienced in previous drilling programs were also encountered in the current drilling. However, improved core recoveries were achieved during drilling by Africo with the average overall borehole core recovery for the resource holes being 77.66% (74.24% for the ore zones). This is a significant improvement on the 70.45% (65% for the ore zones) achieved for the JCI programme in 2002.

The contractor was Geosearch International Ltd. All drillholes have been drilled using wireline diamond drilling with a triple tube recovery, typically collared and cased in PQ size (83mm). The majority of the drilling was carried out using HQ size core (61mm) once competent rock was encountered, usually around 15m, but sometimes as deep as 40m.

Reduction to NQ sized core (45mm) only occurred rarely under exceptionally poor ground conditions where severe brecciation was encountered in siliceous lithologies. Drilling was conducted perpendicular to the strike at a dip of 45º. Drilling muds were used throughout the programme to improve core recovery and reduce collapse in the holes.

RSG Global observed core drilling during a site visit to the Kalukundi project, and believes that appropriate techniques were employed to maximise core recovery. Some holes were re-drilled at the contractor's expense when client supervision indicated that unacceptable core losses had been the result of poor drilling practice. Nevertheless, core recovery remained poor through some sections of stratigraphy.

Drillhole collars were set up using handheld GPS, but were subsequently surveyed by a registered surveyor before incorporation into the database.

Downhole surveys were undertaken by Geosearch using a digital single shot REFLEX down-the-hole survey instrument at collar and end of hole and between 45 and 100m down the hole, generally providing at least two survey points between the collar and end of hole.

**Sample Method and Approach**

*Trenches*

Geo-Consult resampled the Gécamines trenches after clearing all loose rubble and soil from the trench by cutting a channel into the sidewall about 15-20cm above the trench floor. The channel was about 5cm wide and deep and the sample was collected directly into a plastic sample bag. The geology of the trench sidewall was mapped and the sample positions indicated thereon.

Care was taken during the resampling of the trenches to ensure that the samples were not contaminated by waste and other material redistributed from the small artisan workings in the vicinity of the trenches.

As Geo-Consult had undertaken an evaluation of the trenches, Africo did not repeat this work. A detailed study was made of the surface exposures. Where artisan workers had created a significant disturbance at surface, systematic sampling across the exposed lithologies was concluded to be impractical and in places, dangerous. The main limitation was thick scree in places (Kalukundi and Kii fragments).

*Diamond Drilling*

Core from the Africo drilling was packed into 1.5m long, galvanised steel trays and the end of drill runs indicated by means of a yellow plastic tag. Accurate depths were determined from stick-up measurements that were regularly checked by the geologist.

The borehole core was sampled by cutting longitudinally along the core axis, perpendicular to the core-bedding angle. Cutting was done mainly by diamond saw but some core was also split using a cold chisel. Where the core was very soft and broken it was split longitudinally with a machete before sampling. Where mineralisation was observed in very soft muddy core, it was halved with a machete while still wet on the drill site.

The samples were taken to honour geology and also to separate high or low grade zones. Minimum size was limited to 30cm and maximum to 2.0m. In zones where recovery was especially poor, samples were taken over the whole drill run to ensure that the depths were accurate.

**Sample Preparation, Analysis and Security**

*Sample Preparation and Analysis*

Gécamines

Analyses carried out by Gécamines were carried out by atomic absorption (AA) at in-house laboratories at Kolwezi. Details of the sample preparation and analysis are not recorded.

JCI/GeoConsult

JCI/GeoConsult samples were sent to Set Point Laboratories in Johannesburg for analyses (copper and cobalt) by pressed pellet XRF (x-ray fluorescence). The "ore" zones of four boreholes (i.e. 1/3 of the current boreholes) were analysed for a variety of other elements (Au, Ag, Ca, Mg, Ni, Fe-total, Mn, S, Si, and P) to aid with metallurgical assessments by the same method. Bulk densities were determined for the major ore zones.

Africo

The drill core samples were placed into plastic bags at the on-site core yard. Eight to ten bags were placed in a durable, woven plastic bag and firmly tied with plastic strapping to restrict movement of the sample bags and limiting breakages in transit. All the sample bags were numbered and weighed on site. These weights were recorded on the dispatch notes.

The samples were then sent to Lubumbashi by road and subsequently to Johannesburg by airfreight. All the bags were weighed again in Lubumbashi by the air freighting company. Here they were collected and delivery to SGS Lakefields Laboratory in southern Johannesburg was personally supervised.

Sample preparation and analysis of the borehole core and trench samples was carried out at SGS Lakefield Laboratories. This involved crushing, drying and milling followed by XRF analysis by pyrosulphate fusion for Cu, Co, Pb, Zn, Ni, Fe and Mn. Reject samples and pulps were retained for repeat analysis and further analysis.

Selected composite samples were also analysed for acid soluble Cu, Co, acid consumption gangue acid consumption. In addition some composite samples were also analysed by ICP-OES using a multi acid Leach for Al, Ba, Be, Bi, Ca, Cd, Co, Cr, Cu, Fe, K, Li, Mg, Mn, Mo, Na, Ni, P, Pb, Sb, Sn, Sr, Ti, V, Zn, Zr.

*Quality Control Procedures*

Gécamines

No QA/QC data is available for the eight Gécamines boreholes or trench samples. Both JCI/Geo-Consult and Africo however have expressed confidence in the quality of the Gécamines sampling and assay work, based on discussions with Gécamines geologists and the generally high level of other geological work done by Gécamines.

RSG Global considers that the results of the Gécamines drilling are broadly consistent with the results of current drilling, consequently all Gécamines data have been incorporated into the estimation database. This data represents about 10% of the boreholes.

JCI/Geo-Consult

Quality control plots for the Geoconsult/JCI program have been presented in their report, and are not reproduced in the Kalukundi Report. Initial analyses were carried out at Set Point Laboratories in Johannesburg, with umpire assays being submitted Lakefields Laboratories, also in Johannesburg. Initial variances between the laboratories were resolved though recalibration and re-reading of the powder pellets.

A selection of duplicate samples was submitted as laboratory controls. Blank samples were also inserted into the sample stream to assess possible contamination. All the blank assays returned extremely low copper and cobalt background values.

Some 10% of the core samples were sent for check analyses to a second laboratory and standard reference samples were also included. Original and repeat samples exhibit correlation coefficients of 0.97 for copper and 0.98 for cobalt. Both the original and repeat analyses were carried out using XRF techniques. AA analyses were also carried out on some repeat samples; correlation between AA and XRF analyses was greater than 0.99 for both Cu and Co. Certified reference standards (Mintek) were also inserted into the sample stream, showing acceptable accuracy.

No discussion of standards and blanks was included in the Geoconsult/JCI report except for the statement: "*In order to ascertain the accuracy of the analyses standards, blanks and duplicates were routinely included in the sample stream. These proved that the results are reliable and not contaminated and accordingly provide confidence in the averages grades defined for the resources"*. No raw QA/QC data are available to validate this statement.

This data represents about 15% of the boreholes.

Africo Resources

All samples analysed in the current program have been analysed at SGS Lakefields Laboratories, Johannesburg. This data represents about 75% of the boreholes.

Blanks were inserted into all sample batches. All returned grades below detection limit indicating that there is no contamination in the sample prep and laboratory procedures.

Internal standards were made up by milling and homogenising a large sample of oxide ore from the surface exposures on the Principal Fragment and inserted into the sample stream. This large sample was initially analysed 9 times by two laboratories, and then inserted into batches after every 10th sample. RSG Global has used the average of all the 'standard' analyses to define the mean of the control sample rather than the average of the initial nine analyses. The use of an uncertified reference standard means that the variability of the expected results is not defined, and RSG Global has used a 10% variance for reference. As a large percentage of the reference samples was analysed by the same laboratory as the actual samples, this

'standard' does not serve to identify possible bias in the results or the accuracy of the results. They do however serve to confirm that no problems have been experienced with sample numbering or switching.

RSG Global recommends that certified reference samples should be obtained and used for any future drilling.

A number of repeat assays have been carried out on quartered portions of the Kalukundi core from the current drilling program. While there are some significant variations between original and repeat assays, especially for higher grade samples, these are to be expected as there is significant heterogeneity in the core, resulting largely from the presence of malachite veins and heterogenite nodules.

Notwithstanding the inadequacies of quality control, RSG Global has integrated data from all three operations in order to estimate the deposit.

Twinning: KM1 and KM1B are drilled close to K2, effectively twinning it. KM1 was collared with the intention of obtaining PQ core for metallurgical studies, but drilling difficulties resulted in this PQ being curtailed although HQ drilling continued. Poor core recoveries in the 'ore' zone resulted in a redrill as KM1B at HQ size. Core recoveries were vastly improved to 85.4%. Comparison of the results of the three holes is inconclusive due to differences in the drilling methods and recoveries.

*RSG Global Statistical Analysis of Africo QA/QC Data*

The data used for the Kalukundi Report was supplied in three Excel files; 'ORIGI~46.XLS', 'CA03123SEP05 + Original values (checked + variances).XLS' and 'QC value comparison Table K13-K55 & % Variations.xls'. The supplied data falls into three QAQC regimes; standards data (internal and laboratory), core-resample (1/4 core) and Umpire Laboratory repeats (pulps).

The precision and accuracy of the copper and cobalt assay data for the Kalukundi drillhole samples has been assessed based on routine quality control samples submitted during the 2005 drilling campaigns, and by samples submitted by internal laboratory quality control procedures. The reliability of the assay data from the primary laboratories has also been assessed by comparison of the original assay results with umpire assays completed by SGS Lakefield Johannesburg and SGS Lakefield Toronto.

The quality control data has been assessed statistically to determine relative precision and accuracy levels between various sets of assay pairs and the quantum of relative error. The results of the statistical analysis are presented as summary plots in Appendixes I and II of the Kalukundi Report, which includes the following:

- Thompson and Howarth Plot showing the mean relative percentage error of grouped assay pairs across the entire grade range, used to visualise precision levels by comparing against given control lines.
- Rank % HARD Plot, which ranks all assay pairs in terms of precision levels measured as half of the absolute relative difference from the mean of the assay pairs (% HARD), used to visualise relative precision levels and to determine the percentage of the assay pairs population occurring at a certain precision level.
- Mean vs. % HARD Plot, used as another way of illustrating relative precision levels by showing the range of % HARD over the grade range. Mean vs. %HRD Plot is similar to the above, but the sign is retained, thus allowing negative or positive differences to be computed. This plot gives an overall impression of precision and also shows whether or not there is significant bias between the assay pairs by illustrating the mean percent half relative difference between the assay pairs (mean % HRD).

- Correlation Plot is a simple plot of the value of assay 1 against assay 2. This plot allows an overall visualisation of precision and bias over selected grade ranges. Correlation coefficients are also used.
- Quantile-Quantile (Q-Q) Plot is a means where the marginal distributions of two datasets can be compared. Similar distributions should be noted if the data is unbiased.
- Standard Control Plot shows the assay results of a particular reference standard over time. The results can be compared to the expected value, and the ±10% precision lines are also plotted, providing a good indication of both precision and accuracy over time.

Assay Accuracy – Standards and Blanks

The accuracy of the copper and cobalt assay data and the potential for cross contamination of samples during sample preparation has been assessed based on the assay results for the laboratory internal blanks and from company standards submitted by Africo.

The values for the Africo standard sample assays were taken from the spreadsheet '*QC value comparison table K13-K55 & % Variations.xls'*. The Africo standard was based upon crushed mineralised material supplied from Kalukundi. The company blank was created using 'internal waste rock'. No expected value (EV) was stated for this blank.

As no expected range was stated for the blanks and standards, consequently a value of +/- 10% was used based on the EV.

Company Standards and Blanks

A total of 100 company standards were identified; the use of this standard commenced from the drilling of drillhole K19 onwards. The standards were analysed using XRF by pyrosulphate fusion. A summary of the standards statistics are shown in Table 13.3.2_1 of the Kalukundi Report. Appendix I of the Kalukundi Report shows summary charts for the standard data.

Two different company blanks were identified:

- Blank 'B' - 23 samples described as a 'Blank' in the excel spreadsheet; and
- Blank 'IW' - 18 samples described as 'Internal waste rock' in the excel spreadsheet.

The result from the company blanks are summarised in Table 13.3.2_2 of the Kalukundi Report. Appendix I of the Kalukundi Report shows summary charts for the blanks data.

The results of the company standards and blanks can be summarised as follows:

- The majority of the standards are within +/- 10% of the stated mean EV of the standard. There is a lower grade spike in both the Cu and Co readings on the 24/1/05 which could be due to analytical instrument calibration;
- Both of the blank samples display low grade variability indicating no cross contamination or mishandling during laboratory preparation; and
- The company standard and blank values exhibit industry acceptable levels of accuracy.

Laboratory Blanks

A total of 14 blank samples from SGS Lakefield Johannesburg were identified. A summary of the data statistics are shown in Table 13.3.3_1 of the Kalukundi Report. The blanks were analysed using XRF by pyrosulphate fusion. Appendix I of the Kalukundi Report shows summary charts for the blanks data.

The results of the SGS blanks can be summarised as follows:

- The blank samples display low grade variability indicating no cross contamination or mishandling during laboratory preparation; and
- The SGS blank values exhibit industry acceptable levels of accuracy.

Assay Precision

The precision of the copper and cobalt assay data has been statistically assessed based upon the following sample and data types:

- Duplicate diamond core (1/4 core) samples – these are termed field duplicates (FD). These results reflect the total combined sampling and analytical errors (field and laboratory);
- Primary versus umpire laboratory analyses of duplicate pulp splits – allows assessment of inter-laboratory precision inclusive of sampling and analytical errors after sample pulverisation.

The order of the comparative data types listed above reflects the successive removal of sampling error thus allowing the precision associated with each stage in the sampling process (field and laboratory), and finally the sample analyses, to be assessed. Details of the available datasets and results of the statistical analyses are summarised below, while a full compilation of statistical plots of the comparative datasets, by laboratory, accompanies the Kalukundi Report in Appendix II of the Kalukundi Report.

Duplicate Core Data

The precision of the copper and cobalt analysis completed by SGS Lakefield Johannesburg has been assessed on 82 field duplicate repeats of ¼ core. Standard control plots are shown in Appendix II of the Kalukundi Report. The result of the statistical analysis of the field duplicates data are displayed in Table 13.3.5_1 of the Kalukundi Report.

The results of the statistical analysis of the duplicate data can be summarised as follows:

- The precision of the duplicate data is moderate to high, with 62% of the Cu data within a 10% mean HARD range, 85% of the data is within a 15% mean HARD range;
- There is a good linear (Pearson C.C.) and rank (Spearman C.C) correlation between the original and duplicate results;
- The original Cu results exhibit a small positive bias (3.9% HRD) with respect to the duplicate results; and
- Industry acceptable levels of precision are met.

Umpire Laboratory

The inter-laboratory precision and relative accuracy between the SGS Lakefield Johannesburg and Toronto laboratories was based upon a comparison of pulp duplicate data which his summarised in Table 13.3.6_1 of the Kalukundi Report. Standard control plots are shown in Appendix II of the Kalukundi Report.

The results of the statistical analysis of the duplicate data can be summarised as follows:

- The inter-laboratory precision is high with 93% of the Cu data and 80% of the Co data with a 10% mean HARD range;
- There is a high linear (Pearson C.C.) and rank (Spearman C.C) correlation between the original and duplicate results;
- There is no apparent bias between the data sets; and
- Industry acceptable levels of inter-laboratory precision and accuracy are met.

Discussion and Conclusion

The QAQC data presented to RSG Global met industry standard levels of precision and accuracy. The internal company standards and blanks showed good levels of accuracy, as did the SGS Lakefield Johannesburg blanks samples. The core duplicate and interlaboratory pulp-duplicate data showed high levels of precision.

- The QAQC results would benefit in the future from the addition of coarse duplicate samples (1:20 first crush of the core before pulverisation) and the submission of lab aware (1:20 pulps at the laboratory) and lab blind (1:2- pulps sent from site) pulp duplicate sampling at the primary laboratory.
- Certified reference standards should be obtained and used.

This data represents 73.7% of the resource boreholes.

**Data Validation**

*Borehole Validation and Logging Procedures*

While on site between 6th and 13th December 2004, RSG Global validated the logging of boreholes K14, K18, K22 and K26, roughly 10% of the boreholes drilled at that time. Particular attention was paid to validation of lithology, sample lengths and core measurements. The following comments apply to logging procedures used over the 3 periods of drilling at Kalukundi and have also been addressed by SRK in their September 2004 report.

- Lithological logging and core measurements are of a high standard for those boreholes audited. In some cases detail in the core logs is limited, but main units are correctly identified and measured.
- Sampling for laboratory analysis has been done in a number of different ways, with early (Gécamines) boreholes being sampled at variable lengths usually about 2m but occasionally as high as 3m. The early borehole samples did not honour core (at end of core run) or lithologic breaks. Later boreholes (Africo) were sampled so as to honour lithological boundaries, but commonly did not honour core breaks. Current sampling practice is to honour both core breaks and lithological breaks.
- Core recoveries can be particularly bad for all phases of drilling and core recovery measurements are absent for the Gécamines drillholes. This is due at least in part to poor drilling control and slow reactions to changes in the hardness of the rock being cored, but also to inherently friable nature of the mineralised material. RSG Global accepts that achieving adequate core recovery is a problem in most areas of the copper belt, but feels that the extent of core losses (up to 60% in places) reflects poor drilling control. It is estimated that in the worst case, variance between sampled and true grades may be up to 50%, mitigated by the fact that these cases are subordinate. Furthermore, as sampling practice has not always honoured lithological boundaries and core breaks (even, in some cases e.g. K18 37-38m, straddling core size breaks, PQ to HQ at 37.88), there is considerable uncertainty regarding the positioning of those samples and consequently the measured core recoveries over the sample length as opposed to the core run. The positioning could be out by up to 2m for areas of particularly poor core recovery. Notwithstanding these

problems, and comments made in Section 17, Mineral Resource and Mineral Reserve Estimates of the Kalukundi Report, RSG Global has largely accepted the poor core recoveries without adjusting grades or classification, because there is limited evidence that the poor recoveries have resulted in significant biases in the sample assays. Where there is evidence of bias (upgrading of samples), this has been dealt with by cutting a limited number of samples with high grades and low recoveries.

- The importance of achieving adequate core recovery was addressed in the Geoconsult report and in the SRK review. The importance of core recovery in ore evaluation was clearly understood by the Africo exploration team at the outset of the drilling programme. This was also followed up with close supervision of the drilling crews. Given the severe drilling conditions, the core recoveries achieved by Africo are, in general, reasonable. The overall average for the 50 resource boreholes is 75%. This is a considerable improvement on the GeoConsult program and presumably on the Gécamines holes. Core recoveries of up to 97.89% were achieved in competent rocks for the entire hole, but in the more leached, porous and friable zones, losses were severe and in an isolated case was as high as 78%.
- Bulk density measurements taken in the current drilling program are numerous (36 samples in K18), but do not adequately represent zones with very friable or vuggy material, e.g. within the RSC. Furthermore, density measurements have been taken as 'point' measurements, and not as intervals. Records of the From and To measurements of the density samples should also be recorded.

*Assessment of Project Database*

Africo provided phased delivery of the drillhole and assay data between January 2005 and November 2005.

The drillhole and trench database was provided to RSG Global in the form of comma separated variable text files (*.csv) by the Kalukundi team. These files contained assay data for Total Copper (Cu), Total Cobalt (Co) and bulk density (BD).

Extensive manual validation of the database was carried out by Africo against original assay certificates. Africo also carried out electronic validation on import into GEMCOM software. In addition, RSG Global validated data electronically to track changes between versions and to check for structural deficiencies (overlapping samples, duplicate entries etc) and checked 10% of the data at random against the assay certificates. Agreement between checked assay certificates and logs was 100%.

A number of codes were inserted into the database for below detection, insufficient sample and no assay returned. Below detection values were replaced with values for half detection limit (0.05% Cu and 0.025% Co). Insufficient sample and no sample values were generally replaced with null values, but in some cases were replaced by half detection limit on an individual basis to prevent the spreading of high grades. Voids were treated as null values throughout.

*Adjacent Properties*

Africo has had in depth communication with Comide, the owners of the ground surrounding the Kalukundi concession (EP's 2606 and 2607). The negotiations with Comide representatives were designed to secure an option to carry out exploration activities on their concessions. To date, these negotiations have been inconclusive.

**Mineral Processing and Metallurgical Testing**

*Metallurgical Testwork*

As part of the Feasibility Study, a number of metallurgical tests have been undertaken at the Mintek labs in Johannesburg, South Africa. These included bench scale acid leach tests, comminution test work and a pilot plant campaign to confirm the recovery process selection and metal recoveries for both copper and cobalt.

During the first phase of test work, samples produced from drill core at Kalukundi were tested to determine the comminution and leaching characteristics of the ore. During the second phase of testwork, the plant design was confirmed during a pilot plant campaign.

*Ore Samples*

Bulk Sample Selection

The testwork samples were taken from surface exposures at the Kalukundi Project. The ability to secure representative material from trenches and from excavations opened up by artisan workings was evaluated in detail and material was taken from three of the five fragments. The Kalukundi fragment was not sampled due to poor exposure of representative ore material for all lithologies.

Excavations within the open workings or trenches were selected and each geological ore horizon was channel sampled on a proportional basis. On the Principal fragment, the sampling was undertaken in two areas, the more cobalt-rich zone in the NW and the more copper-rich area to the SE. On the Anticline fragment, the trenches and to a lesser degree the artisan workings provided good exposures of the ore lithologies. On the Kii fragment, exposures were found on the SW side to sample each of the ore lithologies. Ideal sampling points were chosen where the unit could be channel sampled across its entire width. The surface was then chipped clean before taking a broad channel sample.

The proportions of the bulk sample are representative of the average thickness of the 5 ore horizons within the fragments overall. Every effort was made to take high grade, medium grade and low grade samples representative of the different lithologies in the different locations.

Two composite samples were prepared from borehole core fines to derive an intermediate depth sample and a deeper sample representative of the ore material from the 4 fragments under evaluation. Bench scale hydrometallurgical leach testwork was carried out on both of these samples. The residence time was twelve hours at ambient temperature of 25°C.

The results returned from these leaches proved that the recoveries were very similar to those achieved from the surface samples.

Hydrometallurgical testwork on the Bulk Sample material.

The assay results from the 27 composite samples were studied and 22 of the 27 samples were selected for bench scale metallurgical testwork. Five samples were omitted due to too low grade or suitability. The tests were carried out on 500g samples which were leached for four hours at 25ºC.

The preliminary results of this testwork raised further concerns about the recovery of cobalt using the current leaching conditions. Half of the samples returned cobalt recoveries lower than 68%, with the lowest being only 33.76% Co recovery from a sample grading 1.49% Co. Consequently, using this leaching method, a very high proportion of the cobalt in the Kalukundi ore body would be lost.

Based on these results and following in-depth discussions with MDM and Mintek, three sets of tests were proposed:

- To undertake very fine grinding of a sample with very low cobalt recoveries and then undertake the leaching testwork
- To undertake additional mineralogical testwork.
- To repeat the bench scale leaching testwork on at least two samples from which the worst cobalt recoveries were experienced. For these samples, the leaching was to be extended over 24 hours and to be carried out at ambient temperature of 25°C and at 40°C.

The results returned for the fine grinding testwork were excellent, with 95% of the cobalt being leached. This confirmed that most of the cobalt is susceptible to leaching under standard conditions.

The mineralogical testwork confirmed that the cobalt mineral present in the samples is heterogenite. It also identified the existence of two types of heterogenite, a Co-rich phase, as seen before in the tails and another phase which is Co-poor and also contains varying amounts of other minerals of which the major components are Cu, Mn, Fe, and Al. The latter mineral, which may be referred to as "amorphous" in texture, has a completely different appearance to the former and is more susceptible to leaching, as this material is not detected in the tailings samples.

The repeat bench scale results were very positive with around 86% of the cobalt being leached after twelve hours. It was clearly apparent from this kinetic testwork that the original leach times had been too short, hence the more compact or crystalline heterogenite was not being taken into solution

*Ore Comminution*

Seven samples were tested at Mintek. These samples represented material from different mining areas.

The testwork covered included Bond Ball Work Indices, Bond Rod Work Indices, Bond Crushability Indices, Bond Abrasion Indices and Unconfined Compressive Strength tests. Testwork was conducted on each individual sample as well as a composite sample prepared by taking a proportionate amount of material from each individual sample.

The test programme was successful in identifying the variability of the deposit in terms of identifying ore characteristics and potential processing difficulties based on standard laboratory comminution testwork.

*Pilot Leach Testwork Campaign*

After the preceding bench testwork programmes, the guidelines were provided to Mintek to prepare a bulk sample representative of the overall orebody, encompassing defined percentages of each lithology.

The main objective of the batch leach pilot-scale testwork was as follows:

- Confirm data regarding the leaching efficiency of the bulk sample.
- Establish $H_2SO_4$ and $SO_2$ (g) consumptions at steady state operation, which would include the effect of the recycle of raffinate to the leach.
- Determine steady state levels of impurities (Al, Fe, Mn, Mg, Ni, Zn, Si, Cr, Ca and Pb) in the leach filtrate.
- To generate steady state leach liquor which ultimately would result in a constant raffinate bleed stream with the required cobalt tenor for the second phase of piloting.

The laboratory leach testwork employing SMBS achieved ~80% Co leaching, where as in Leach 1, an efficiency of greater than 94% was achieved using $SO_2$ gas. Co and Cu leaching efficiencies of greater than 94% and 97% respectively were achieved consistently for all the pilot-scale leaches.

Leach kinetics showed that once the $SO_2$ gas was heated, then greater than 94% Co dissolution occurred within six hours of leaching. This however doubled the $SO_2$ consumption.

Steady state Cu and Co tenors of 14g/l and 11g/l were achieved respectively from Leach 7 to 12. Steady state impurities were also achieved after Leach 6 except for a small increase in Fe concentration. This occurred when the $SO_2$ gas was heated resulting in more leaching of Fe.

Acid consumption decreased from Leach 1 to Leach 2 as a result of raffinate being recycled for slurring of the feed solids. The average raffinate contribution to the total acid requirement for Leaches 7 to 12 was 82%. The average total acid (including raffinate) and $SO_2$(g) consumption at steady state (Batches 4 to 9) was 48kg acid/t solid feed and 23.8kg $SO_2$/t solid feed. This equates to an average sulphur consumption of 28kg S/t solid feed.

As a result of the improved recoveries achieved with $SO_2$, it was decided to use it rather than SMBS in the process and the acid plant required for the plant would be sized to have enough capacity to produce $H_2SO_4$ as well as $SO_2$ with the $SO_2$ being kept in storage as a buffer.

Primary Copper Solvent Extraction

Copper solvent extraction (SX) is a well-established technology for the recovery of copper from a sulphate medium. This was employed for the selective removal of Cu from the Cu/Co leach liquor.

The Cu SX was operated in a closed loop with the Cu/Co leaching and Cu electrowinning (EW) steps during a twelve day continuous pilot-plant campaign. The organic phase used comprised of LIX 984N (Cognis reagent), a 50/50 aldoxime/ketoxime mixture, in an aliphatic hydrocarbon diluent, SSX210 (Sasol Schumman reagent).

Copper Electrowinning

EW, used in conjunction with Cu SX, is an established technology and has found application across the world for the production of high-grade copper metal. During the Kalukundi pilot plant campaign, a pilot scale copper cell, holding approximately 300l of solution inventory, was run. The cell was initially filled with a synthetic feed solution. The aim of running the Cu EW was to provide strip liquor for the copper solvent extraction circuit, to determine any build up of impurities in the electrolyte over time, and to establish the deportment of metals between the electrolyte and copper metal.

Iron Removal

The Fe removal circuit is the first of seven purification and refining steps in the production of high purity Co metal from a bleed stream of the primary Cu circuit. The feed for the Fe removal circuit originates from a bleed of the primary Cu SX raffinate.

The pilot plant trail demonstrated that Fe2+ could be effectively oxidised using air/SO2 with an average pH of 2.5. Precipitation of the resultant Fe3+ at this concentration resulted in Fe concentration of <100mg/l. The residual ferric was completely removed during the Al removal stage at a higher pH. Co-precipitated Co losses of less than 0.5% were reported.

Secondary Copper solvent extraction

The secondary copper solvent extraction (Cu SX2) circuit followed the iron removal stage and functioned as a polishing stage to reduce the Cu content in the Co electrolyte.

An average Cu extraction efficiency of 95% was obtained over the duration of the campaign.

Aluminium Removal

The aluminium removal stage follows the Cu SX2. The raffinate from Cu SX2 feeds the Al removal stage where Al and residual Fe is precipitated to produce a barren solution containing less than 2mg/l of Fe and Al.

Results showed that an average of 94% of the Al (< 15mg/l for most batches) was removed from the feed stream in two stages of Al removal (residence time of 1 hour per stage) at ambient temperature.

Zinc/Manganese Solvent Extraction

The Zn/Mn SX circuit followed the aluminium removal stage. This stage functioned to remove Zn, Mn, Fe, Al, Ca and a portion of Cu from the Co electrolyte by solvent extraction using di-2-ethyl hexylphosphoric acid (DEHPA).

Copper Ion Exchange

Ion exchange is often recommended when low concentrations of impurities have to be removed from metal electrolytes to improve its quality. For the Kalukundi Project, Cu was removed from the Co electrolyte to limit the contamination of the Co cathode. Mn was also removed upfront in the circuit by means of solvent extraction to limit MnO2 sludge formation in the electrowinning circuit. The Cu ion exchange (IX) unit operation was situated after Mn SX.

Cobalt Solvent Extraction

The Co SX circuit followed the Cu IX stage. This stage functioned to remove Co from the Co electrolyte by solvent extraction using Cyanex 272.

Co Electrowinning

During the Kalukundi pilot plant campaign, undivided Co EW technology, in a deep cell, was employed in order to recover cobalt metal from the Co SX loaded strip liquor (advance electrolyte). The cell was initially filled with synthetic solution, prepared to represent a typical Co spent electrolyte using this technology.

The aim of Co EW was to produce high purity cobalt cathodes, to determine the build up of impurities in the electrolyte over time, and to establish the deportment of elements between the electrolyte and cobalt metal.

Acid consumption

Leach testwork carried out on selected core samples returned very positive results for acid and gangue acid consumption (GAC). In fact, the average GAC for the deposit, based on data from four boreholes, one from each fragment, was 36.6kg/t. It was on the basis of this information and the improved metal recoveries and consequently the excellent financial returns that could be obtained that the decision was made to select the leach process as being the optimum process to recover both copper and cobalt from the Kalukundi oxide deposit.

As soon as assay results were being returned from the drilling programme, SGS Lakefield was approached to re-establish the acid leach analytical method by which the analyses were undertaken to derive the above GAC value. This method measures leachable copper and cobalt as well as the acid consumption and from this, the GAC can be calculated.

Over a period of 20 months as the drilling programme was undertaken and results received, individual borehole core samples were analysed by this method. By the end of the programme, a comprehensive database of these values had been received and processed. From this database, it was possible to define the

acid consumptions and GAC for a full representative cross section of each of the four fragments evaluated at Kalukundi. This is summarised as follows:

| | |
|---|---|
| Principal Fragment | 29kg/tonne |
| Anticline Fragment | 39kg/tonne |
| Kii Fragment | 33kg/tonne |
| Kalukundi Fragment | 29kg/tonne (between surface and 40 to 60m depth) |
| Average | 32kg/tonne |

The figures above are based on a total of 1,120 samples from 33 boreholes. An additional 410 samples from nine boreholes were used to define GAC (average 354kg/tonne) within the sulphide zone of the Kalukundi fragment below 40-60 metres.

From this data, it may be concluded that the GAC for the majority of the deposit is relatively low. Consequently, the oxide ores from all four fragments are amenable to the leaching and SX/EW process which has been selected for the Kalukundi Report.

*Performance and Recovery Predictions*

The pilot plant testwork returned average leach recovery figures of Cu 98.04% and Co 95.43%.

Leach recoveries from bench scale testwork returned the comparative values as outlined in Table 16.5_1 of the Kalukundi Report.

These results confirmed that similar leach recoveries could be expected in depth as was found at surface. Interrogation of the data led to the following observations:

- The intermediate sample has an amount of about 5% of refractory copper mineralization which has reduced the copper recoveries by about 3% relative to the surface bulk sample. Cobalt recoveries are closely comparable.
- The deep sample is a composite of material from six boreholes. Borehole K22 drilled into the Kalukundi Fragment intersected mainly sulphide ore material. This hole returned leach recoveries of about 15% Cu and it makes up about 13% of the composite sample. Thus if this material were excluded, copper recoveries of up to 93% could be expected in the Deep oxide zone of the other three fragments.

It is interesting to note that the cobalt recoveries in the deep sample are not similarly depressed. This is possibly because in BH K22, a significant proportion of the carrollite has been converted to sphaerocobaltite (Co-carbonate) which leaches readily.

**Mineral Resource and Mineral Reserve Estimates**

*Geological Interpretation and Modelling*

There are several orebody fragments exposed at the surface at Kalukundi. Four of the fragments will be mined, these being the:

- Principal;
- Anticline, located 300m northeast of the Principal fragment;
- Kalukundi, located 2.7km north north-east of the Anticline fragment; and
- Kii, located 400m north of the Kalukundi Fragment.

Geological interpretations were carried out by Africo staff and provided to RSG Global as string files and wireframe files (* dxf) from original work in GEMCOM software. RSG Global imported this data and built Datamine wireframes based on the files provided.

Interpretations are based on surface mapping and projections to drillhole intercepts at depth. Projections of the units below the deepest drillhole intercepts were made based on reasonable geological extrapolation. While the paucity of sampling at shallow depths remains, recent infill drilling has improved confidence in the grade of this zone. Confidence in the continuity of the units however, is considered excellent.

Wireframes reflect geology and continuity of lithology rather than mineralisation above a particular cutoff. Care was taken, however to incorporate natural cutoffs within the sequence, for instance the footwall in the RATG is generally a grade footwall rather than a stratigraphic one, as is the hangingwall in the SDB.

RSG Global believes that the interpretations adequately reflect the continuity of the units. Wireframes have been clipped to borehole intersections. Establishing continuity is complicated in some cases by structural discontinuities. This is particularly true in the Kalukundi fragment where units are repeated in the south-western portion of the fragment. In cases where the extent of the repetition is uncertain, the affected portion of the model has been classified as inferred. Although in other portions of the project area cross cutting faults cause offsets in the lithologies, these are not considered to be material to the confidence in the broader continuity of the units.

Significant opportunity exists to increase measured and indicated tonnages in the repeated portions of the stratigraphy. Furthermore there is hangingwall and footwall mineralization that cannot be estimated due to uncertainty in its continuity. This and other 'out of sequence' intersections represent potential upside for the resource. Preliminary pit optimisation work suggests that these zones will fall within the pit limits and RSG Global considers it likely that they will be defined at a grade control stage and mined.

RSG Global is aware of a Cu-leached, Co-enriched surface profile, but this is still not quantified by sampling. JCI/GeoConsult applied an arbitrary depletion/enrichment to the upper 10m of the mineralised zone. Africo has obtained some samples within the depletion/enrichment zone, and these suggest that the depletions and enrichments are not uniform over the fragments. RSG Global has consequently not applied a depletion zone to their grade model.

*Mining Depletion*

There has been extensive artisan mining in the upper 20m of the Principal fragment in particular. This has been focussed on the highest cobalt grades. The extent of this depletion has been estimated and represented by wireframe solids which have been used to deplete the resource for Principal, Kalukundi and Kii fragments. Depletion in the Anticline fragment is considered to be minor and not material.

*Statistical Analysis*

<u>Compositing</u>

Downhole composites were calculated for all boreholes, within the modelled lithologies, resulting in a nominal composite length of 2m. Composite residuals were retained 'as is' rather than incorporated into previous composites or discarding them. The residuals were not utilised for variogram calculation, but were used for interpolation.

<u>Recovery vs Grade</u>

Recoveries have been measured on core runs and not for individual assay samples although there may be six or more meter samples per core run. Consequently, it is sometimes difficult to discern which assay sample has suffered from bad recovery. In a few cases, however, it is clear that there has been upgrading of samples with poor recovery. These samples usually have recoveries of < 50% and show Cu and Co values

that are amongst the highest for that unit. Other intervals with low recovery and relatively low grade may also have been enriched due to core loss, some intervals may be depleted by core loss. However, unless enrichment or depletion can be clearly demonstrated, no remedial action has been taken. The database for Kalukundi does not include recoveries for the older holes (Gécamines) consequently; no adjustment can be made for recovery and grade for these holes.

Statistical analysis of the main RATG unit for the Kalukundi Fragment indicates that there is generally no correlation between grade and recovery (Figure 17.3.2_1 of the Kalukundi Report). The poorest recovery for this unit was 22%, corresponding to the highest grade of 23.9% Cu. It is likely that this sample was upgraded by the loss of lower grade material, but also possible that the poor recovery was the result of high grade mineralisation causing the core to be especially friable, or a combination of both. In this case, the grade was downgraded to the preceding down-the hole grade of 7.27% Cu prior to compositing. There is also evidence of upgrading of the Co grade for this interval and this has also been cut to the previous interval of 0.08% Co.

Samples considered to be enriched through core loss are listed in Table 17.3.2_1 of the Kalukundi Report. Remedial action is also listed in this table.

Distributions

RSG Global studied distributions for each unit, within each fragment, for Cu, Co and bulk density. Due to the numerous permutations descriptive statistics and histograms for each are not presented here, but the following general comments are considered relevant.

- The distributions of both Cu and Co are generally negatively skewed. Cu grades are in the range between 0 and 30%. Cobalt is between 0 and 12.4% before compositing. After compositing to 2m and adjustment for recovery copper grades range between 0 and 16% and cobalt grades range between 0 and 6.8%. The distributions are not considered to be strongly skewed, and no cutting of samples has been applied.
- The distribution for bulk density approximates a symmetrical distribution, with a very slight negative skew. The low side of the density tail extends to 1.63t/m3 as a result of the reduction in density during weathering and the presence of vugs in silicified material.
- The separation of lithologies within fragments and the use of hard boundaries for hanging and footwalls simplify the estimation process as it reduces the range of Cu and Co values used to estimate each unit, but reduces the number of samples available to estimate each particular unit.

Block Modelling

RSG Global constructed two block models for each fragment, first an orthogonal model with blocks aligned to the Cartesian co-ordinates and second a rotated block model with coordinates aligned to the dip of the deposit. Although RSG Global considered the rotated model to be superior in terms of volumetric interpretation and interpolation, the orthogonal model was very similar in terms of interpolated grade and modelled tonnage, and was more practical to use because the models had a common block prototype and could be added to form a deposit wide model. Furthermore, the orthogonal model was useful for conversion to other software formats (e.g. GEMCOM). Consequently, reporting and mine planning was carried out using the orthogonal block models.

RSG Global used the following parent block sizes:

- Rotated, 25m x 10m x 5m in the rotated X, Y, Z directions, i.e. along strike, down dip, across dip respectively.
- Orthogonal, 20m x 20m x 10m in the X, Y, Z Cartesian directions.

Sub-celling was allowed to provide for good volumetric representation.

Only orthogonal models are tabulated in the resource statement.

*Grade Estimation*

Variograms

RSG Global calculated and modelled variograms for Cu, Co and BD at the end of July 2005. Since then, some additional drillholes have been added to the data set, specifically drillholes in the shallow portions of the mineralisation. The current estimation is based on variography defined before the infill drilling results were available. While the variography may have changed slightly with the new data, RSG Global does not believe that this will materially change the interpolated grades.

RSG Global calculated variograms for each unit, within each fragment, and separately for structural repetitions within the fragments. Due to the numerous permutations, plots of experimental and modelled variograms are not reproduced here.

Due to limited availability of drillholes, directional variograms are generally poorly defined. Consequently, most variograms were modelled based on omnidirectional experimental variograms. Some of the variograms in the Anticline fragment showed sufficient structure to support the use of anisotropy. Notwithstanding the use of omnidirectional variograms, there are still insufficient samples to clearly define structured variography in many cases. RSG Global believes that this is due to paucity of sample pairs rather than the result of inherently unstructured variography, and has interpreted model variograms in spite of variogram noise. In cases where confidence in the structure of the variography is extremely low, a 100% nugget variogram was applied. Variograms used are listed in Table 17.5.1_1 of the Kalukundi Report.

Search Parameters

Stepped search parameters were used with a base search of 90m (rotated X axis, along strike) x 50m (rotated Y axis, down dip) x 30m (rotated Z axis, thickness). For most blocks the use of hard stratigraphic boundaries negates the Z search restriction. This initial search was aligned to the strata dip and designed largely on the sample pattern rather than variography. An octant search was applied with a minimum of two octants and two samples per octant and a maximum of 20 samples per block. This basic search was used for Cu, Co and BD.

A second pass search was designed using a search distance of approximately 90% of the total variance (sill), isotropic searches were doubled for a second search and tripled for a third. Blocks estimated in the second or third pass were generally classified as inferred. Bulk density values that remained unestimated were assigned average density values.

GAC searches were set at 50m x 50m x 50m, increasing to 450m to ensure that all blocks are informed. A minimum of one sample per block was set.

Search and sample selection parameters are listed in Table 17.5.2_1 of the Kalukundi Report.

Estimation Strategy

Grade and bulk density interpolation was carried out using ordinary kriging with variogram parameters as defined in Table 17.5.1_1 of the Kalukundi Report and search parameters as defined in Table 17.5.2_1 of the Kalukundi Report. GAC was estimated using inverse distance squared.

Classification

Classification of the mineral resource at Kalukundi was carried out in a subjective/objective manner, based on RSG Global's experience in estimating and exploiting stratigraphic Cu-Co deposits in the Lufilian Arc. Due consideration was applied to continuity of the units, number of drillholes intersecting units and

especially tectonic fragments of units, and continuity of grades. Where the continuity of tectonic fragments was uncertain, the zones were classified as Inferred Resource.

RSG Global considered confidence in the grade estimates to be good, even though drillhole density was limited down dip. Confidence was supported by low grade variability and low skewness parameters.

Consequently all material falling between adjacent boreholes at a nominal spacing of 50m was initially classified as Measured Resource. A thin rim of Measured Resource was projected beyond the last boreholes on each section, and a further rim of Indicated Resource was interpreted beyond that. Cognisance was taken of the rapid increase in kriging variance beyond the last borehole on each section in defining the limits of Measured and Indicated Resources.

There remains a deficiency of sampling in the near-surface zone, which has consequently been classified as inferred. The extent of the inferred has, however been significantly reduced since infill drilling results became available in November 2005.

Some of the mineralised intercepts exhibit poor core recovery. This factor inherently reduces confidence in the grade estimate. Where appropriate, RSG Global adjusted grades from zones of very poor core recovery, but in most cases did not believe that the poor core recoveries materially affected confidence in the resource estimate. RSG Global further recognises that obtaining good core recovery in oxidised and friable material is not practical in many cases and that most of the samples obtained are probably the best possible. Nevertheless, RSG Global recommends that for future resource delineation drilling, emphasis should remain focussed on employing suitable methods and experienced contractors in order to provide the best practical core recoveries.

Resource Reporting

Resources for the Kalukundi Deposit are tabulated in Tables 17.7_1 to 17.7_4 of the Kalukundi Report. Figures are shown at a 1.5% Cu equivalent cutoff. The Cu equivalent cutoff has been calculated on the basis of a 12:1 Co:Cu revenue basis which in turn is based largely on price ratios. As metallurgical and other economic factors are still under evaluation in the Feasibility Study, factors such as net smelter return have not been incorporated.

For the purpose of this exercise, only resources above 200m below surface have been considered “potentially economically extractable”. Inferred Resource models exist below this, but they would most likely have to be extracted using underground methods. No evaluations of underground parameters have yet been carried out and hence no resources have been quoted below this level. Furthermore these resources are predicated on very limited drilling information. Significant exploration potential is suggested by these models.

*Reserve Estimates*

The Project mineral Reserve estimate as of May 2006 is reported in Table 17.8_2 of the Kalukundi Report. All stated Reserves are completely included within the quoted Resources. The input parameters used in Reserve estimate are described in Section 23 of the Kalukundi Report. For ease of reference, however, a summary of the most pertinent input parameters is provided in Table 17.8_1 of the Kalukundi Report.

The reported reserves have been compiled by Mr John Hearne. John Hearne is a Member of the Australian Institute of Mining and Metallurgy (AusIMM) and an employee of RSG Global. He has sufficient experience, relevant to the style of mineralization and type of deposit under consideration and to the activity he is undertaking, to qualify as a Competent Person as defined by the JORC code.

**Other Relevant Data and Information**

All monetary amounts expressed in the Kalukundi Report are in United States of America dollars (US$) unless otherwise stated.

The term "ore" is used for convenience throughout the Kalukundi Report to denote that portion of the Measured and Indicated mineral resources that have been converted to Proven and Probable mineral reserves.

The reserve estimate has been determined and reported in accordance to the CIM definitions referred to in NI 43-101. Furthermore, the reserve classifications are also consistent with the 'Australasian Code for Reporting of Mineral Resources and Ore Reserves' of December 2004 ("JORC Code"). The reserve classifications for both reporting systems are essentially the same, with only minor semantic differences in the naming conventions. Reserves are called "Ore Reserves" under the JORC Code and "Mineral Reserves" under the CIM standards. "Proved Reserves" under the JORC code are called "Proven Reserves" under the CIM Standards. The reserve naming convention for both systems is summarised in Table 18_1 of the Kalukundi Report for the sake of completeness.

A full listing of abbreviations used in the Kalukundi Report is provided in Table 18_2 of the Kalukundi Report.

**Interpretations and Conclusions**

The Kalukundi project in the DRC represents a high grade Cu-Co deposit developed in the Mines Series of the Lower Roan Sequence preserved in a number of tectonic fragments within a melange or breccia zone. Resource models have been developed which meet international industry standards. Co is dominant in the value of the mineralisation, while copper still makes a very significant contribution to the overall metal value.

The previous inferred resource has been improved through close spaced drilling and converted to 12.2Mt of Measured and Indicated Resources plus 9.3Mt of Inferred Resources to a comparable vertical depth of 150m. Additional Inferred Resources of 5.8Mt have been delineated to a depth of 200m below surface.

The study demonstrates that an economically viable mining operation can be developed at Kalukundi with production possible in late 2008.

The current financial models are based on the scenario of 100% equity financing for the project. This, coupled with a conservatively projected base price of copper and cobalt gives a project IRR of 14.7%. The anticipated project payback time is less than four years.

**Recommendations**

*Geology*

Shallow infill drilling using RC methods for grade control purposes should be commenced prior to start up mining operations. Preliminary surface evaluation work will be commenced well in advance to guide this work.

An evaluation of the hangingwall oxide ore copper mineralisation must be undertaken to establish the continuity of this material along strike.

Surface exploration of the Kesho fragment must be undertaken and drilling planned to define the oxide resources on this fragment. This work should be undertaken prior to commencement of mining operations. The same should be done for the Kinshasa fragment, but will be dependent on the results of preliminary surface evaluation work.

A programme of deeper drilling should be planned for the Principal, Anticline and Kii fragments to establish the depth of the exploitable oxides and the nature of the oxide sulphide transition zone at depth. Timing for this drilling is not urgent, but information gained would allow for mining operations to take account of transition mining from open pit to underground operations. Thus commencement of this programme should not commence later than two years after production commences.

Future analytical programmes should include the use of certified reference standards.

*Mining*

The Kalukundi Report recommends that Africo proceeds with:

- Development of a detailed mine implementation program.
- Compilation of tender documents for mine contracting and subsequent tender process.
- Consideration and evaluation of Africo supplying some major mining consumables (e.g. fuel and explosives) to share some risk and reduce contract mining costs.
- Geotechnical evaluation of the blasting and 'diggability' of the rock.
- Bench height optimisation for mining dilution and recovery control.
- Risk based geotechnical and geohydrological evaluation, which may lead to steepening of wall angles.
- Personnel recruitment, policies and procedures and training.
- More detailed or updates to mine design, scheduling and budgeting.
- Design and implementation of a number of technical and production systems and procedures.
- Source local earthworks and civil contractors and machinery.

Opportunities exist in most areas of the project to be more rigorously investigated during the detailed engineering phase and to firm up certain assumptions, thereby mitigating and or removing some of the risks that have been identified during the FS.

**Additional Requirements for Technical Reports on Development Properties and Production Properties**

*Mining*

Mining Approach

It has been assumed that the Kalukundi Project will involve a conventional open pit, selective mining exploitation method, employing a mining contractor.

Drilling and blasting will be performed on 5m high benches, with blasted material excavated in two discrete flitches, each nominally of 2.5m height.

The mining equipment that is considered to be suitable for Kalukundi would depend on the final mining contractor fleet but include up to 100t back hoe excavators for mining and haul trucks with a payload capacity of between 20t and 35t.

Recommended Slope Design Parameters

Ground conditions influencing open pit wall stability and excavation requirements for the various pits were assessed by Knight Piésold.

It is estimated that the zone of oxidation related to weathering extends down approximately 40 to 60m below surface for the Kalukundi fragment and to between100 to 130m below surface for the other fragments. The deeper pits will have a significant effect on the stability of pit slopes as well as drill and blast requirements for the project.

Recommendations for batter height, batter angle and berm width have been provided for each domain. The shape of the wall has been blended in the different weathering horizons requiring different batter heights.

The recommended slope design parameters are based on an assessment of deeper seated failure. However, the potential occurrence of smaller-scale, near surface instability due to blasting and/or mining induced stress damage behind pit limit faces cannot be discounted. Areas of potential rockfall hazard in terms of recommended slope design parameters have therefore been assessed in terms of potential trajectories of blocks of rock rolling/falling down the recommended pit slope geometries. The importance of mining clean bench faces and removing potentially unstable blocks of rock is emphasised.

Knight Piésold has concluded that the level of naturally induced seismic hazard at the Kalukundi site is sufficiently low, to the extent that the use of slope design methods with seismic loading included is not considered necessary.

The slope stability assessment and design was developed assuming that the pit dewatering system will comprise a pit sump dewatering system with appropriate stormwater control only. Should further study show that slope depressurisation by means of a network of vertical drainage wells is feasible, slope designs presented in the Kalukundi Report can be reassessed with a view of steepening some of the pit slope geometry proposed accordingly.

Contract Mining

It was assumed that contract mining would be employed to carry out all mining related work. An owner mining cost model was developed based on first principles to provide a comparison against this and future contract mining tender submissions.

Requests for Quotations (RFQ) on the project were sent to a number of mining contractors that had been identified as having current work or the ability to work in the DRC.

The RFQ documentation was based on a preliminary mine production schedule that was developed in July 2005 for the project. The schedule was predicated on a preliminary pit optimizations and pit designs.

Two contracting groups informed RSG Global that they intended to form a joint venture company for operations in the DRC and one contractor provided a quotation on behalf of the joint venture.

This contractor quote and the first principals mining cost estimate are within 5% of each other and indicate that the single contractor quote received forms a reasonable cost basis for the mining section of the FS.

The contractor equipment requirements and mining costs that were submitted are budget estimates only, based on a preliminary mining schedule. It will be necessary to obtain final contract estimates in an open mining tender, based on the final mining schedule.

Pit Optimisation

Pit optimization studies have been undertaken for all four deposits. Pit optimizations were carried out using the Whittle Four-X pit optimization software package.

The small size of the proposed primary load and haul equipment lends itself to highly selective mining practices. Mining dilution was set to 3% at zero grade and a mining loss of 2% has been assumed.

The input parameters adopted for the pit optimization cover a wide range of disciplines and as a result, a number of specialists have been involved in determining these parameters. The principal input parameters used in the pit optimization and the specialists responsible for determining these parameters are listed in Table 23.2.4_1 of the Kalukundi Report.

The revenue parameters supplied are as outlined in Table 23.1.4_2 of the Kalukundi Report.

A summary of the principal costs associated with mining are shown in Table 23.1.4_3 of the Kalukundi Report.

The processing costs for the Leach & SX/EW plant have been estimated by MDM. These take into consideration the low GAC figures for the near surface ore and the increasing GAC values with depth.

The processing costs vary by depth as shown in Table 23.1.4_4 of the Kalukundi Report.

The recoveries for each fragment were supplied by MDM and are variable, dependent on grade, depth and material type.

The project general and administration cost was supplied by MDM at $7.2M/year.

Once production begins, the owners will be required to pay royalties to the DRC government in accordance with current mining legislation which imposes a royalty tax payable on the sale of minerals at the rate of 0.5% for ferrous metals, 2% for non-ferrous metals and 2.5% for precious metals. Thus Africo will be committed to payment of a 2% royalty on net sales to the government.

In accordance with an agreement with Gécamines, a 2.5% royalty on gross sales is payable to the JV partners.

The Whittle Four-X financial analysis was carried out using the following base assumptions and parameters:

- Mill throughput: 0.72 Mtpa.
- Mill limiting – i.e. sufficient waste is removed each period to enable the required milling rate to be maintained.
- Discount rate – 10%.

Three cashflows were produced for each analysis:

- Undiscounted Operating Cashflow.
- Best Case Discounted Operating Cashflow – Each incremental pit is removed prior to advancing to the next adjacent incremental pit. The cashflow schedule is the equivalent of multiple pushbacks.
- Worst Case Discounted Operating Cashflow – Each bench is mined out prior to moving to the next bench, using the optimization block height as the default bench height. The cashflow schedule is the equivalent of top down 'flat' mining.

An actual mining schedule will most likely lie between the two extremes of Worst Case and Best Case as described above.

The cashflows, as described above, are exclusive of any capital expenditure or Project start-up costs and should be used for pit optimization comparison purposes only. No Net Present Value (NPV) can be derived from these cashflows.

Pit Optimisation Results

Based on the highest average discounted cash flow, Whittle pit shell 16 gives the optimum result, i.e., the optimal four pits for the four fragments. Pit shell 16 contains some 8.6Mt of mill feed at 2.49% Cu and 0.69% Co. Some 32Mt of waste are contained within the pit with a stripping ratio of 3.7:1. The undiscounted operating cash flow, exclusive of capital and start up costs, is $821M.

The optimum pit shell based on the maximum undiscounted cash flow is pit shell 21. Pit shell 21 contains some 8.8Mt of mill feed at 2.49% Cu and 0.69% Co. Some 34.2Mt of waste are contained within the pit with a stripping ratio of 3.9:1. The undiscounted operating cash flow, exclusive of capital and start up costs, is $823M.

The pit optimisation results are shown in Figure 23.1.5_1 of the Kalukundi Report

Mine Design

Detailed pit design work for both deposits was carried out based on the optimum pit shells as described above.

The pit slope parameters as provided by Knight Piesold were used for the detailed pit design work. A 15 m wide dual access ramp was selected for the detailed mine design work, which allows for a safe operating width of three truck widths plus a windrow in the case of a 35 t dump truck. The ramp gradient is set at 1 in 10. The pit haul road designs have been orientated to exit the pit to minimise the ore haulage profile to the process plant.

Due to the small scale of the individual pits, staged development has not been undertaken.

The main electrical power line into the Democratic Republic of the Congo runs over the southern end of the Principal fragment. MDM have directed that this power line will not be realigned to allow the mining of the entire Principal fragment. The Principal pit has been designed to have a standoff distance of 50m from the pit crest to the power line. This allows for a 30m wide service corridor to be maintained along the power line and an additional 20m accommodating surface drainage, bunding and access along the pit crest.

Table 23.1.6_1 of the Kalukundi Report provides a summary of the material breakdown as contained within the final pit designs

Figure 23.1.6_1 of the Kalukundi Report shows the final design for the Kii and Kalukundi pits, located to the north of

the process plant, and Figure 23.1.6_2 of the Kalukundi Report shows the final design for the Principal and Anticline pits, located to the west of the process plant.

Waste Dumps

The waste dumps have been designed to Western Australian standards and the parameters used are:

- Face slope 20º
- Bench height 20m
- Berm width 10m
- Overall slope 18º

Furthermore, the waste dump capacities have been based on a swell factor of 20%. No allowance for any in-pit or exhausted pit backfilling has been made.

The waste dump positions have been determined by taking into account geologically prospective ground, the existing drainage patterns, waste haulage profiles and the space and infrastructure issues required for the planned operations. A condemnation evaluation programme was undertaken to establish, with as high a degree of confidence as possible, that areas delineated for development of mine infrastructure and waste dumps would be positioned such as to avoid sterilisation of currently hidden or unexplored mineralization that could in the future become exploitable ore resources.

As the pit is developed, temporary haulage ramps will be used to minimise waste haul distances for ROM pad and waste dump development.

<u>Mine Production Schedule</u>

Following a number of plant reviews during the study, the process plant throughput was increased from the 720,000t/year used in the optimisation to the 800,000t/year used as the basis for the final mine schedule.

The mine production schedule was developed using Microsoft Excel.

Scheduling was carried out on a bench by bench basis for all the pit designs.

The schedule was required to achieve the following criteria:

- Maximum Cu grade of 3.03% to achieve 800,000tpa throughput
- Maximum Co grade of 0.66% to achieve 800,000tpa throughput
- Maximise the value of the project
- Copper and Cobalt metal production to remain as constant as possible over the life of mine
- Maximum annual vertical mining advance of 40m

In order to reduce pre-production capital cost, it was assumed that only part of the ROM pad will be built, ready for plant commissioning and that the ROM pad will be extended with suitable waste during ongoing mining after plant commissioning.

After the prestrip period of six months, mining is scheduled at a rate of 7.3Mtpa for the first year then 6.3Mtpa for the second year. After Year 2 and until the end of mining in Year 11, the mining rate steadily decreases in line with the decreasing strip ratio of the pits.

The timing of the pit development is as follows:

- Pre-production commences in Quarter 2, Year 0 from the Principal and Kii pits.
- Kalukundi Pit commences in Quarter 4, Year 2.
- Anticline Pit commences in Quarter 4, Year 2.

The summary schedule is shown in Table 23.1.8_1 of the Kalukundi Report.

Total material movement and the individual pit contribution is shown in Figure 23.1.8_1 of the Kalukundi Report.

*Recoverability*

There are four fragments which contribute to the currently defined ore resources at Kalukundi. The shape of each of the fragments is different and as may be expected the chemical characteristics of each of the fragments are slightly different. There are more similarities than differences. The features common to each of the fragments are as follows:

- Same or similar lithologies
- Similar bulk densities.
- Each has been subjected to deep oxidation processes which have resulted in the conversion of sulphide Cu & Co ores to a suite of oxide minerals.
- Similar ore mineralogy
- The leachable characteristics of the oxide ore mineral suite is the same or very similar for each fragment.

Pervasive oxidation of the original sulphide ores has taken place to different depths in each of the fragments. This is a very important issue to understand and to define. Definition of the changeover to sulphides comes from studying the borehole core and leachable copper assays. The best drill coverage occurs in the zone from near surface down to 100m.

Processing costs have been evaluated in detail by MDM on the basis of the Pilot plant testwork results and associated bench scale leach test data. The main variable factor in these costs is the sulphuric acid and the $SO_2$. consumption.

The amount of acid and $SO_2$ used and hence the processing costs will be influenced by the gangue acid consumption of the ore and the cobalt content. These figures have been closely scrutinized by Mintek and MDM to arrive at acid and $SO_2$ consumptions for the deposit based on the current testwork as shown in Table 23.2_1 of the Kalukundi Report.

From interrogation of the results achieved by Mintek and from discussions with MDM, a table of copper and cobalt recoveries (Table 23.2_2 of the Kalukundi Report) was compiled using the above recovery figures and by applying the following assumptions:

To convert the leach recoveries to metal recoveries, the following process losses derived from the pilot plant testwork have been applied:

- -1.93% for copper.
- -14.29% for cobalt.
- -3% to allow for losses incurred from up-scaling from pilot plant stage to full operating plant status. This would apply to all depths.
- -2% - This is to allow for lower plant recovery efficiency in the first year of start up operations.

For the zone between 10m to 30m, an average of the Bulk and Intermediate recoveries is applied.

For the Deep zone, the same copper and cobalt recoveries are applied as for the intermediate zone.

All of the figures in italics in Table 23.2_2 of the Kalukundi Report are assumed to lie within an oxide sulphide transition zone. Here the leach recoveries to metal are estimated from the SGS leach assay figures.

No estimations of recoveries are warranted for the potential ore below 150m vertical depth at this stage due to the paucity of data at those depths. Also this ore would fall essentially into the category of sulphides, which can only be recovered via a concentrator. Deeper drilling will be needed to define the depth extent of the oxide/sulphide interface.

Sulphides have not been quantified by testwork.

The processing costs have therefore been calculated from a component of fixed costs of US$29.54/tonne to which the costs of sulphur have been added in proportion to the progressively increasing consumption of sulphur projected in depth from the testwork.

Bench and pilot plant scale testwork carried out on the three main composite samples returned differing acid consumption figures for each of these samples. The leach recoveries were found to be similar, but the GAC values increased significantly in depth.

This data is set out in table 23.2_3 of the Kalukundi Report

The fact that the GAC increases in depth has been taken into account by MDM in the estimation of processing costs for the three zones, bulk, intermediate and deep. From the pilot plant testwork it was established that the $SO_2$ consumption is higher near surface and decreases in depth.

From the above figures, it can be seen that the costs of both acid and $SO_2$ make up a very significant component of the process operating costs.

*Process Flowsheet*

The testwork indicated that the Kalukundi ore could be processed using a single stage crushing circuit followed by a conventional SAG / ball milling circuit with the ball mill in closed circuit with a cyclone.

The ore requires leaching for twelve hours at 25oC and 30% solids, using 150g/l sulphuric acid and sulphur dioxide as leaching agents. Co and Cu leaching efficiencies of greater than 94% and 97% respectively were consistently achieved. Overall recovery after losses in processing was between 93% and 89% for Cu and between 78 and 70% for Co.

The leach product is then washed in a 6 stage counter current decantation plant to ensure a clarified liquor is sent to the copper recovery circuit whilst keeping losses due to entrainment below 1%. The copper recovery circuit consists of copper solvent extraction step where the copper is moved to an organic phase before being stripped to produce an advance liquor that is treated in the copper tank house. The copper tank house produces cathode plate that will be sold. A bleed stream from the copper circuit is sent to the cobalt recovery circuit.

The cobalt circuit consists of several purifying steps where impurities like iron, aluminium, manganese, zinc and finally copper are removed before the purified cobalt liquor is sent to solvent extraction circuit where cobalt is loaded onto an organic phase before being stripped to produce the advance solution that is treated in the cobalt tank house. The cobalt tank house produces cobalt cathode that will be binned and sold.

*Plant Design*

The Kalukundi plant is designed to recover Cu and Co from a copper/cobalt ore body consisting of four fragments, namely Principle, Anticline, Kalukundi and Kii, at a total treatment rate of 800,000tpa, at an average feed grade of 2.37% Cu and 0.69% Co over the life of mine. The proposed Kalukundi plant design is based on conventional, well understood, tested and proven technology.

Ore from the pits is delivered to the ROM pad where blending will take place to ensure equalised feed to the plant. Ore from the ROM pad is sent to a single stage crushing circuit to generate a crushed product that passes 160mm. The crushed product is stockpiled before being fed to milling plant. The crushing plant is designed to have 85% operating utilisation out of an eight hour shift basis. The remaining time each day will be available for maintenance, offering up to 16 hours/day for scheduled maintenance purposes.

The stockpiled ore is reclaimed using apron feeders and fed to the milling plant at a steady rate of 95tph. MDM examined a number of alternative milling and leach size scenarios to determine an optimum power

consumption solution for the plant. The optimum power consumption was achieved utilising an open circuit SAG mill followed by a closed circuit ball mill to grind ore down to 75% passing 75µm. Testwork conducted by MINTEK has confirmed the ore to be amenable to SAG milling and the circuit has been designed accordingly. The milling plant is designed to operate at 95tph and have 91% operating utilisation, which includes eight hours per week for scheduled maintenance purposes.

The milled ore feeds the thickener where excess water is removed before thickener underflow is fed to a belt filter. The dewatering steps are used to reduce the water consumption in the plant and also to prepare the leach feed with raffinate used in the leach circuit. The leach circuit consists of four leach tanks per stage for a total residence time of twelve hours. Most of the copper is leached during the time in the first two tanks where Sulphuric Acid ($H_2SO_4$) is added, while the cobalt is leached in the latter tanks. Sulphur Dioxide ($SO_2$) is added to the last two tanks to help the cobalt leach process. The leach product flows to the first of six counter current decantation (CCD) thickeners.

Raffinate from the Cobalt Solvent Extraction area is added to the last CCD thickener as a washing liquor. The overall wash ratio in the CCD area is approximately 1.3. This ratio minimises the entrained losses during washing while still achieving the required pregnant liquor solution (PLS) grades for Copper and Cobalt. In the CCD thickener circuit the slurry is pumped downstream from CCD1 whilst the liquor is pumped upstream from CCD6. The PLS from CCD1 is pumped to the Pinned Bed Clarifier whilst the Underflow is pumped from CCD6 to the tailings treatment tank. The pinned bed clarifier is utilised to ensure no solids enter the solvent extraction (SX) phase of the process.

The pinned bed clarifier overflow is pumped to the primary copper SX where copper is extracted from the PLS and loaded onto an organic LIX984N before being stripped of the organic by a 200g/l H2SO4 strip solution. The stripped organic is re-used whilst the loaded aqueous stream or advance electrolyte is pumped to the copper electrowinning plant. The cobalt rich, copper stripped, raffinate is pumped to the raffinate storage tank from where it is pumped to the filtration and leach areas as make-up solution whilst a bleed stream is sent to the cobalt recovery section of the plant.

In the cobalt recovery section, it is imperative that the electrolyte sent to cobalt electrowinning is cleaned of all metals that could co-deposit and reduce the grade of cobalt metal. The first metal removed is iron, which is oxidised to the ferric form and precipitated out using lime.

The clarified Iron removal thickener overflow PLS flows to the secondary copper SX where the PLS is scavenged to remove any remaining copper using the stripped organic from the primary copper SX area. The clarified PLS is sent to the aluminium removal section whilst the copper loaded organic is returned to the primary copper SX area.

The secondary copper SX PLS is further purified by precipitating out aluminium using lime. The first stage thickener underflow is pumped to the tailings treatment tank whilst the overflow flows to second stage where some more lime is added to purify the PLS further. The second stage product is sent to the second stage thickener from where the purified PLS overflow flows to the manganese and zinc (Mn/Zn) SX plant. The underflow from the second stage thickener is returned to the iron precipitation section.

In the Mn/Zn SX plant, the manganese and zinc is extracted from the PLS using di-2-ethyl hexylphosphoric acid (DEHPA). The manganese and zinc is then stripped from the DEPHA using a 150g/l H2SO4 strip solution. The manganese and zinc rich aqueous phase is then pumped to tailings and effluent treatment. The clarified PLS is pumped to the copper ion exchange (IX) plant.

The PLS is pumped to the IX columns where the remaining copper is loaded onto the resin. The copper barren solution is pumped to the cobalt SX plant. A two molar H2SO4 eluant is used to strip the copper from the resin before returning the eluate solution to the copper leach circuit to recover the eluted copper. The resin is regenerated using sodium hydroxide.

In the cobalt SX plant, cobalt is extracted in five extraction stages using Cyanex 272 as the organic phase. The raffinate from the cobalt SX extraction phase is returned to the CCD area. The loaded organic is pumped to the cobalt SX scrubbing and stripping where the cobalt is stripped from the organic. The stripped organic is returned to the extraction phase whilst the cobalt rich advance solution is pumped to the cobalt electrowinning section.

In both the copper and cobalt electrowinning areas, the advance liquor is heated through heat exchangers. Guar is added to the pregnant electrolyte as a smoothing agent for the cathodes. Copper electrolyte is pumped to the copper tank house which consists of 100 cells each with 43 anodes and 42 cathodes of 1.1m by 1.0m in size. Copper is plated on the cathode and the cathodes are periodically removed for stripping before the cathodes are baled for transport. Cobalt electrolyte is pumped to 36 cells consisting of 43 anodes and 42 cathodes of 0.75m by 1.0m in size. Cobalt is plated on the cathodes and the cathodes are periodically removed for stripping. The cobalt metal plate is brittle and will be shipped in drums.

All the discard streams in the plant are pumped to the tailings and effluent treatment tank where lime is added to neutralise the slurry before it is pumped to the tailings dam some 3.5 km from the metallurgical site. Return water from the tailings dam is pumped back to the plant and is used as part of the plant water requirements. In order to best utilise the limited water available in the area, water is re-circulated and retained in process where possible. The only water leaving the process will be in the tailings stream.

To ensure the quality of the copper cathode and cobalt final product, the final product bin and storage area will be housed in a roofed area. In addition the design provides for all the required offices, warehouses, service buildings etc.

*Tailings Management*

Golder Associates Africa Pty Ltd (Golders) established that the project requires a tailings disposal facility that can accommodate 12Mt of tailings at a deposition rate of 60,000tpm over the life of the project. The life of the current project is currently 10 years. Allowance (in concept only) has been made for future expansion of the facility to 17 years capacity at present rates.

A spigot deposition method has been adopted for optimised water return and creating a safe and stable tailings dam. Storm water diversion trenches, upstream of the facility, will prevent clean storm water from the external catchment flowing onto the tailings disposal facility. Catchment paddocks will contain eroded solids and surface runoff from the side slopes during the operational stage of the facility.

A gravity penstock system will return supernatant to the return water dam. The return water dam pump station will return water to the plant for re-use in the process. The water balance indicates that approximately 40% (average) of the operations water will be returned to the plant.

*Infrastructure*

Knight Piésold provided the geotechnical services for the plant site foundations. Investigations included test pitting, laboratory testing of selected samples and borehole drilling and logging to depths of 30 metres at the plant site.

All buildings are either concrete with brick infill or structural steel framed with brick infill, all with galvanised steel roofing. All buildings are suitably furnished and electrically fitted for purpose. The construction will be done using the main contractors' supervisory personnel and local labour. Raw materials i.e. sand, stone and blocks will be sourced locally with cement and all hardware being imported.

Raw water usage requirements for the project are estimated at 1,387,400m3/year. A water pumping station has been planned to pump the full requirement of water from Lake Nzilo, on the Lualaba River, 22km to the site in a buried steel pipeline into the plant raw water storage dam. Water will be drawn from the storage dam water for plant make-up, fire and potable water. The fire water is pumped to a fire water ring

main by a dedicated electrical and standby diesel pumping system. The raw water will be treated through a chlorination plant for the production of potable water prior to storage in two separate storage tanks. The plant and camp sewerage will be treated in two bio-filter plants with the grey water being discharged to the environment.

The plant access road will be rehabilitated prior to the rainy season to allow delivery of the materials and equipment required for the early start program. The roads will receive ongoing maintenance during the life of mine. All in-plant and camp roads will be HD interlocking blocks laid on a suitably prepared sub base and will be kerbed.

A provisional sum has been allowed for in the capital cost build up for a rail spur from Kisanfu rail siding to site of approximately 4.8km long. This rail spur allows for all incoming raw materials and consumables to be delivered from source directly to site as well as the export of copper and cobalt to a port for export.

Power at 110kV will be supplied to the plant from the existing National Grid overhead power lines which pass 100m from the plant boundary. Two plant power transformers at 15MVA each, will be situated in the plant main switchyard. Power distribution on site will be at 11kV. Plant power will be distributed from the main plant switchgear room. Based on the total installed kW and the relevant power correction factors applied to the absorbed kW ratings the plant will have a 100% redundancy factor based on the above transformers.

The entire concession area will be fenced with a 1.2m high four strand barbed wire fence. The process plant lay down and camp areas will be fenced with a 2.4m high fence with razor wire top resulting in a total height of 2.6m. Double gate access will be provided at all security access points.

All combustible solid waste will be removed off site to a waste disposal site for incineration. All used spares, scrap, used oil and redundant neutralized products will be removed from site by the various contractors for disposal in one of the closest towns where these products would be sold as scrap.

*Markets*

<u>Copper</u>

Copper is a mature commodity from the point of applications. No single new application is likely much to alter the rate of growth in copper consumption. The major use is in wire rod for electric conductor applications. Semi-fabricated mill products - tubes, rods, bars, sections, sheet, strip and plate - are collectively significant although no one product group has a dominant influence on total consumption.

Electrical engineering and construction are directly or indirectly responsible for much of the growth in copper demand. Wire rod is used in electricity transmission cables of all types and overlaps the two sectors. The two main applications for copper tubes are plumbing and air conditioning, both of which are correlated with construction. Sheet, strip and plate are used for ammunition, coinage, building products and coinage.

In the short term, high prices for copper have induced substitution in applications where such substitution is possible. To some extent, aluminium can be used in place of copper in some electrical and electronic applications, such as magnet wire and power cables, both of which use wire rod. Plastic plumbing tubes are an increasingly strong threat to the use of copper in residential construction. In the short term, too, physical shortages of material may sometimes constrain consumption, especially when fabricators find it difficult to obtain their full cathode requirements. In the first half of 2006, cathode availability has become a factor restraining consumption in some markets.

Forecasts for copper demand are largely based on top-down analysis using macroeconomic indicators including industrial production and GDP.

The medium-term outlook for GDP is fairly robust. Global GDP is expected to remain in the 3-4% annual range for the entire 2006-2010 period. China, which is by far the leading consumer of refined copper, is expected to lead the world in GDP growth. Chinese GDP growth is forecast to accelerate from 9.3% in 2006 to 9.9% in 2008, but should slow after the 2008 Olympics and should manage just 6.4% by 2010.

The outlook for industrial production is stronger still. Global industrial production is expected to fall to 3.6% in 2010, but it should exceed 4% per year in 2006-2009 and even 5% in two of the four years. Chinese industrial production is forecast to decline from 14.0% in 2006 to just 9.1% in 2010.

Cobalt

Cobalt has a wide variety of uses, of which chemicals are the most important. In 2005, the chemical industry consumed 52% of total demand. The other large sector of cobalt demand is superalloys, which are non-ferrous alloys used in specific heat- or corrosion-sensitive applications. The remaining cobalt is used in a variety of material-cutting applications and in magnets. The most important of these applications is the category of cemented carbide and diamond tools.

By far the most important single use for Co is in rechargeable batteries. In 2005, Li-ion batteries consumed 11,000t of cobalt in cobalt oxide while Ni-Cd and NiMH batteries consumed a further 2,000t of cobalt in cobalt hydroxide. Batteries are not only the most important application, but have also been the fastest growing. Li-ion cells dominate the market for batteries in mobile phones and portable personal computers.

Both of these applications have enjoyed explosive growth in recent years. The market is expected to mature, and, moreover, battery manufacturers have been working on new formulations of battery cathode materials that use less cobalt per cell.

From 2010 onwards, there may be additional demand for cobalt in Li-ion batteries to come from hybrid electric vehicles (HEVs). These vehicles, which are powered by both batteries and conventional engines, are produced in small volumes at present, around 200,000 units per year. Encouraged by high oil prices, motor vehicle manufacturers are accelerating the development of HEVs. At present, HEV batteries are powered exclusively by NiMH batteries, but carmakers and battery manufacturers are working on solutions that would permit the use of Li-ion batteries.

The other sectors of expected rapid growth from a significant base are cobalt acetate catalysts and superalloys.

The growth of demand for cobalt acetate is linked to substitution in beverage packaging. Various packaging materials - glass, steel, aluminium, laminated cardboard and PET – are used as beverage containers. Of these, PET has been growing the fastest, taking advantage of rising demand for non-alcoholic and non-carbonated beverages. World PET resin consumption for beverage containers increased by around 12% per year between 1999 and 2005, while total consumption of cobalt acetate increased by 8.2% per year.

Aircraft rotating parts and heat-and corrosion-resistant industrial applications are the major uses of cobalt in superalloys. Around 4,000t of cobalt were consumed in each of these sub-sectors in 2005, out of total cobalt demand in superalloys of 11,000t. The production of aircraft rotating parts (for jet engines) is expected to increase in line with the demand for aircraft. Aircraft deliveries started to recover in 2004 following a long period of erratic growth, and aircraft and jet engine manufacturers alike predict that the recovery will be sustainable. The continued expansion in demand for commercial air travel, especially in Asia, is expected to help underpin the growth in aircraft deliveries. Industrial applications for superalloys have shown strong growth historically and this is expected to continue.

The overall outlook for supply and demand is close to balance out to 2010. This balance is extremely dependent upon the continuing trade in crude cobalt units from the DRC and the refining in China. After

2010, the future supply demand balance is going to be very dependent upon the timing of new probable and possible projects. The demand for cobalt in batteries will also be extremely important.

Contracts

Total cost of transporting the metal, insurance, wharfage and other harbour charges up to FOB status as estimated by MDM.

The marketing cost and commissions have been estimated as 2% of the gross revenue. This also covers the administration charges of 1% levied by agencies in the DRC on facilitating exports.

*Environmental*

Objectives

Swanmines is committed to pollution prevention and responsible environmental stewardship in their sphere of operations at all stages of the Kalukundi Project. This commitment will be strictly followed during initial development and design through construction, operation, commissioning, decommissioning and post-closure environmental and safety monitoring.

To achieve these commitments, Swanmines will:

- Ensure compliance with Congolese mining and environmental regulations;
- Integrate environmental protection into all exploration activities;
- Identify, assess and manage environmental performance;
- Work with Government and relevant authorities to develop effective, efficient and equitable measures to minimise the environmental effect of Company activities;
- Require contractors and suppliers to embrace and comply with the Company's Environmental Policy;
- Ensure all employees understand and are given the opportunity to meet their environmental responsibilities; and
- Communicate openly with stakeholders on matters of environmental concern in all areas within which the company is active.

Environmental Assessment

An assessment of baseline environmental conditions was carried out between October 2004 and April 2006. The Kii River and the Kisankala Stream control the topography of the permit. The source of the Kisankala Stream is located in the permit and flows northwesterly into the Kii River. The undulating topography is punctuated by rocky outcrops vegetated with Miombo woodland.

The Kisankala Stream provides the water source for Kisankala Village and sampling of this stream and the Kii River indicated that the water quality was generally good, however small concentrations of bacterial coliform and lead do not comply with World Health Organisation (WHO) Drinking Water Guidelines. Aluminium levels do not comply with DRC final effluent standards of 0.05-0.2mg/l.

Groundwater quality was sampled from the springs feeding the Kii and Kisankala watercourses and the quality is generally good, however aluminium and lead concentrations exceed WHO Drinking Water Quality Standards.

Public consultation has been initiated and carried out throughout the development of the Kalukundi Project. Opinions gained through discussions with the local population and villagers of Kisankala Village are positive towards the project and a Public Consultation Meeting will be carried out by Swanmines/Africo prior to proceeding with the Kalukundi Project. A report will be developed and submitted to the Department for the Protection of the Mining Environment (DPME).

Environmental Impacts and Mitigates

The major potential environmental impacts and mitigates that are anticipated are as follows:

- The mining of four open pits and the consequent waste rock dumps will have a large visual impact on the landscape. The topography and Miombo woodland will mitigate this impact. The open pits will provide new sources of water for irrigation, consumption and sustainable economic developments;
- The locations of the open pits may potentially induce a wide sphere of influence on the groundwater through dewatering. The relatively shallow pits will minimise the depth of drawdown of the water table but pit locations in the northeast and southwest of the permit will mean that water will be lowered over a wider area. The groundwater levels will return to baseline conditions after the stoppage of dewatering activities;
- Impacts on the surface & groundwater from spillages of process water, tailings supernatant, oils, greases and untreated mine effluent. These may occur in the process plant, the TSF, the light and heavy vehicle workshops and from water storage dams. Swanmines will construct perimeter drains and install oil traps to minimise impacts. Surfacing with concrete and impervious layers in the plant and workshop areas will prevent groundwater contamination;
- Contamination of surface water and safety impacts from the TSF. Swanmines has consulted Golder to design a TSF which will be done according to best industrial practices. Regular inspections will be carried out by a specialist to ensure stability and the tailings slurry pumped to the TSF will be neutralized before pumping from the process plant;
- Dust blow may be generated from the TSF during the dry season. The prevalent wind direction is from the east and dust will be deposited on the vegetation downwind. The scale of this impact will be monitored visually and the exposure of the tailings surface will be limited by maintaining a wetted surface on the facility;
- Relocation of Kisankala Village will require clearance of Miombo vegetation in the south of PE 591. Swanmines will carry out a Resettlement Action Plan that will follow World Bank Guidelines on Involuntary Relocation and will document all proceedings with respect to relocation. Villagers will be compensated at 150% of their present assets. Swanmines will provide a school and small clinic to the relocated village;
- The mine will provide a source of development for Kisanfu, Kolwezi, Likasi and the Mutshatsha Territory as a whole, through economic investment from Swanmines into the Project. Swanmines will aim to aid small scale social projects focusing on sustainable development of education, health and agriculture in the area;
- The provision of jobs and the demand for services will create economic expansion. The use of local contractors will develop the skills in the area; and
- General improvement in the health of the local population will be achieved through the provision of health facilities on the mine for mine workers and their families and the clinic in the relocated Kisankala Village. HIV/AIDS awareness programs and malaria rollback campaigns will be developed.

Environmental Plans

A Mitigation and Rehabilitation Plan (MRP) was carried out in 2004, by African Mining Consultants (AMC) and submitted to the DPEM in May 2006. AMC Consultants completed an Environmental Impact Statement (EIS) and an Environmental Management Plan (EMP), which was carried out between October 2004 and April 2006.

The EMP is structured as follows:

- Environmental Management and Monitoring;
- Occupational Health and Safety;
- Social Management;
- Mine Site Decommissioning and Rehabilitation; and
- Mine Reclamation Costs.

Implementation of the EMP will be the responsibility of the Environmental Manager. A Social Liaison Officer will communicate Swanmines' environmental policies to the local community through an ongoing public consultation process.

EMPs for all the identified positive and negative impacts of the Kalukundi Project have been developed. These plans are based on the social/environmental policies of Swanmines/Africo, DRC Environmental Regulations (Mine Code 2003), and other relevant international guidelines.

An Environmental Monitoring Plan will be implemented by Swanmines and will focus on the monitoring of air, surface water, groundwater and soil. The monitoring plan will be initiated during the construction phase and will be used to assess the mine compliance with DRC Environmental Regulations (Mine Code 2003) and other relevant guidelines.

Internationally accepted standards for occupational health and safety will be implemented by Swanmines to ensure a safe working environment and the prevention of illness and accidents.

Swanmines will implement a Sustainable Development Plan (SDP) that will focus on the local employment of employees and contractors and social development of the region through education and health improvement. Swanmines will aim to provide aid for commercial enterprises and increase the skills levels of the surrounding population through provision of training and literacy classes. The SDP will also focus on public safety, through regular consultation of mine activities with the local population, and responsible environmental management. The SDP will be carried out once the Project is generating revenue from metal sales.

The Mine Reclamation Plan will be implemented by Swanmines and aims to return the land affected by mine activities to its former land use or other sustainable use and prevent adverse impacts on the surrounding watercourses (Kisankala Stream). The management actions proposed to mitigate the project impacts are based on industrial best practice and adapted, where appropriate, to the DRC conditions.

The activities that will be carried out during the closure phase will be completion of processing of the ROM stockpiles, decommissioning of the ROM pad, removal of buildings and all foundations (unless otherwise specified to Swanmines by the local population), cleanup of any contaminated soils and leveling and re-vegetation of the site. Provisional costs for mine reclamation and post-closure environmental monitoring have been included. The total mine reclamation cost is $1.0M. The total cost of post-closure environmental monitoring and reporting is $43,700.

*Taxes*

Government

The DRC has a host of different taxes, but mining companies are exempt of many and most are negligible in terms of amount imposed. Only the following taxes have been included in the analysis:

- Additional tax on expatriate salaries — 10% of remuneration
- Import Duties — 2% pre-production and 5% during production
- Income Tax — 30% of taxable income
- Withholding Taxes - repatriation of dividends 10% of dividend paid

The additional tax on expatriate salaries, which may not be deducted from remuneration, has been included in the working cost, whereas the import duties have been included in the capital equipment estimates and consumables portion of working cost.

Taxes that have been ignored as having a negligible effect on working cost are:

- Tax on Land owned outside the concession area – not applicable
- Tax on rental income – not applicable
- Turnover Tax - on imports – mining is exonerated on exports – mining is exonerated on internal transactions – 5% with rate of 3% applicable to local goods, assumed to be included in cost of sales.
- Road Circulation Tax – on road usage, levied per vehicle – deemed negligible.
- Tax on vehicles – not payable for vehicles used exclusively for mining, deemed negligible for other project vehicles.

Royalties and Agreements

Once production begins, the owners will be required to pay royalties to the DRC Government in accordance with current mining legislation which imposes a royalty tax payable on the sale of minerals at the rate of 0.5% for ferrous metals, 2% for non-ferrous metals and 2.5% for precious metals. Thus Africo will be committed to payment of a 2% royalty on gross sales to the DRC Government.

In accordance with an agreement with Gécamines, a 2.5% royalty on gross sales is payable by the owners of Swanmines to Gecamines.

Overall Operating Cost Estimate

The overall operating costs for the plant and mining operation per tonne of ore mined are shown in Table 23.12_1 of the Kalukundi Report.

Mine Operating Costs

Based on an 800,00t/year ore production schedule and a contractor mining scenario, the total mine operating cost, including pre-production, is $159.5M.

Table 23.13_1 of the Kalukundi Report details the annual unit costs for the main activities undertaken in the mining operation and Table 23.13_2 of the Kalukundi Report shows the annual unit cost per tonne of material mined for both the contractor and the owner.

The unit mining costs for contract mining increase over time, which is a function of the increasing depth of mining. Year 4 exhibits a reduction in unit mining costs, which is a function of full scale mining operations commencing in the Anticline pit.

The owners unit mining costs exhibit a marked increase from Year 6, which is a function of the decreased strip ratio resulting in proportionately higher unit fixed costs (such as mine supervision).

Process Plant Operating Costs Estimate

The basis for the operating costs is for a milling rate of 801,000tpa or 2,225 tonnes per day. The average operating costs for the process plant (Life of Mine), as detailed in this section are summarised in Table 23.14_1 of the Kalukundi Report.

The process plant operating costs were estimated by MDM on the following basis:

- Power costs are based on grid power at US$0.03 /kWh.
- Labour rates provided by Africo were applied to a staffing plan based on prevailing industry norms for a plant with an appropriate degree of automation. The labour compliment is based on provision for shift operating 8-hours. The labour costing also includes all employee overheads in the total cost. This includes holidays based on the applicable shift regime, and where applicable; allowances, social security payments, overtime, and travel costs.
- A production-based bonus is also included for all employees to ensure that all are motivated to ensure maximum production.
- Reagent consumptions have been determined on the basis of laboratory test work and industry experience. Requests for quotations were made to local and international vendors for current reagent pricing.
- Media consumption rates were provided by major equipment vendors based on test work data, and on industry experience, where required. Costing was based on current vendor pricing. No reagent contingencies have been included in the operating cost estimates, on the basis that consumptions of these have been determined from test work and costs are quoted costs.
- Import duties of 2% on capital cost items and first fill and 5% for on-going consumables has been allowed for.

Accuracy of the estimates is ±10%.

*Capital Cost*

Summary

The total capital expenditure of $166.6M in June 2006 terms is forecast to be spent as set out in Table 23.15.1_1 below, with outlays on plant and infrastructure as per a schedule provided by MDM Engineering Ltd.:

**Table 23.15.1_1**

**Kalukundi Project**

**Summary Capital Expenditure Schedule**
**US$'000**

| **Capital Item** | **Period** | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Q-6** | **Q-5** | **Q-4** | **Q-3** | **Q-2** | **Q-1** | **Q1** |
| Computers | 60 | 60 | | | 60 | 60 | |

| Table 23.15.1_1<br>Kalukundi Project<br>Summary Capital Expenditure Schedule<br>US$'000 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Capital Item** | **Period** | | | | | | |
| | **Q-6** | **Q-5** | **Q-4** | **Q-3** | **Q-2** | **Q-1** | **Q1** |
| Studies | 250 | 250 | | | | | |
| Mining | 1,405 | 85 | | | | | |
| Plant & Infrastructure | 31,816 | 62,353 | 19,042 | 21,007 | 22,685 | 6,639 | 324 |
| **TOTAL** | **33,531** | **62,748** | **19,042** | **21,007** | **22,685** | **6,639** | **324** |

In addition, an amount of $6.85M is provided for pre-stripping during the 6 months preceding start of metal production.

Process Plant Capital Cost Estimate

The capital cost of the process plant is summarised in Table 23.15.2_1 of the Kalukundi Report. This assumes that a lump sum turnkey contract is signed, and as a result of this includes an allowance for 'contractor's margin' (mark-up).

*Economic Analysis*

Introduction

The economic evaluation of the Kalukundi Project presented in the Kalukundi Report and prepared by RSG Global, assumes the project will be 100% equity financed.

For the purposes of the study, the evaluation is based on 100% of the project cashflows before distribution of profits to the equity owners.

All monetary amounts are in United States of America dollars (US$).

Assumptions

The financial base case has the following capital assumptions as of June 2006:

- Capital costs $166.6M
- Pre-stripping costs $6.85M
- Capitalised working capital $25.4M
- Annual Sustaining capital costs $0.05M
- Life of Mine 10 years

The basis of the revenue assumptions was the long term forecast prices for copper (US$1.25/lb) and cobalt (US$12.50/lb), in lieu of the current high market spot prices. Using the current high metal prices as basis for the valuation would be not representative of the future market conditions at the time of presumed metal sales.

Financial Outcomes

The Base Case 100%-equity financed scenario, using a constant Cu price of $1.25/lb and a constant Co price of $12/lb, indicates a before-tax internal rate of return (IRR) of 14.7%.

No allowance has been made in the model for the effects and levels of debt financing available or required. When using the maximum allowed level of outside funding in terms of the agreement with Gecamines, the return on investment increases to 28.5%.

Cumulative before-tax cashflows are $580.6M over a ten year mine life. RSG Global has prepared the model based on the current best information in terms of the taxation provisions in the DRC.

Direct operating costs, without credits for by-products, average $1.52/lb Cu and $6.51/lb Co produced over the mine life. The DRC Government benefits by $247M (15.1% of gross revenue) in terms of royalties, income taxes and withholding taxes. Not specifically calculated are additional benefits such as taxes on remuneration and import duties which are part of the cost of sales.

A summary of the Base Case cashflow model is provided in Table 23.16.3_1 of the Kalukundi Report.

The present mine life of the Kalukundi Project is ten years. The initial capital investment of $167M is paid back in under four years.

Other key outcomes of the financial analysis include:

| | |
|---|---|
| • Copper (Cu) revenue at $1.25 per pound Gross - $452.8M | At-Mine - $383.2M |
| • Cobalt (Co) revenue at $12 per pound Gross - $1,018.3M | At-Mine - $958.0M |
| • Cash cost per pound Cu based on percentage of total revenue | $0.62/lb |
| • Cash cost per pound of Co based on percentage of total revenue, net of by-product revenue | $0.62/lb |
| • Cash cost per pound of Co based on percentage of total revenue, net of by-product revenue | $6.64/lb |
| • Cash cost per pound Cu net of Co by product credit | -$1.12/lb (1) |
| • Cash cost per pound Co net of Cu by product credit | $1.99/lb |
| • Total copper production | 164,296 tonnes (362.1 million lbs) |
| • Total cobalt production | 38,485 tonnes (84.8 million lbs) |

**Note:**

(1) This amount has been changed to -$1.12/lb, as opposed to $1.12/lb as indicated in the Kalukundi Report, in order to be consistent with the Feasibility Study.

Sensitivity Analysis

Several cashflow projections were calculated whereby certain of the Base Case parameters were varied. In particular, each of the metal prices, capital costs, operating costs, grade and recovery were varied by +10% and -10%.

The results of the sensitivity analyses are summarized in Figures 23.16.4_1, 23.16.4_2 and 23.16.4_3 of the Kalukundi Report in which the sensitivity of the project to each of the varied parameters is quantified in terms of change in the Project cashflow calculated at a 10% discount rate and change in the Project Internal Rate of Return (IRR).

The project is very sensitive to metal prices and is generally insensitive to working cost and capital expenditure.

*Mine Life*

The present life of the Project, based on the current Reserves, is ten years.

There is considerable scope to increase the current Reserve of 7.8Mt by proving up existing Resources, by carrying out follow up studies and through drilling of other mineralized bodies on the property, as follows;

- Approximately 1.4Mt of Resource are currently not included in the mining plan as Reserves due to the proximity of a powerline. Africo will carry out a small scale study to examine the feasibility of including these resources in the mine plan.
- Within the Kalukundi concession area, twelve fragments have been identified, of which four are the subject of the Kalukundi Report. An additional eight mineralized fragments within the concession area have received only preliminary investigation. Limited drilling has been undertaken on selected fragments and the results returned to date indicate that at least two of these fragments, the Kesho fragment, to the east of the Anticline and the Kinshasa fragment in the North West corner area, have significant mineralisation and warrant detailed evaluation.
- Significant resources exist beneath each proposed pit. Additional Resources amounting to 19.3Mt down to a depth of 200m have not been included in the current life of mine plan. Potential further resources are indicated by three boreholes and depths deeper than 200m, providing blue-sky potential for Africo.

*Project Implementation Plan*

The Kalukundi Project implementation schedule is sensitive to the timing of key activities relative to the rainy season from early November to late March each year. In order to bring the Kalukundi project on line in the first quarter of 2008, a fast track approach to the project programming was evaluated. The main consideration in the planning process was to try to minimise the effects of the wet season. It is apparent that the programme is most adversely affected by the wet season at the end of 2007.

To minimise this seasonal impact, all major civil, structural and mechanical activities must be completed by the end of October 2007. This approach means that the only activities to be completed during November would be the finishing of plant piping and electrical activities. The months of December and January would then be used for plant commissioning and the completion of punch list items.

It is imperative that an early start is made on the road rehabilitation, therefore making the section of the road from Likasi to site accessible for mobilisation of construction equipment and materials. It is envisaged that the mobilisation of equipment to site will take approximately thirty days if contractors have to be mobilised from South Africa, which is the most reliable source. Investigations will however be undertaken in the DRC to source the road rehabilitation and bush clearing contractors, thus reducing the mobilisation periods.

If this approach is adopted and properly managed throughout the duration of the project the time delaying wet season effect can be minimised and Africo can expect the production of the first Cu and Co metal in February of 2008.

The following key dates are extracted from the project schedule:

| | |
|---|---|
| 01 to 30 June 2006 | Tender and adjudicate key site contractors |
| 01 to 31 July 2006 | Negotiate key design/supply contracts |

| | |
|---|---|
| 01 to 31 July 2006 | Tender long lead items |
| 01 July 2006 to 28 February 2007 | Detailed design |
| 15 July 2006 to 31 October 2006 | Bulk earthworks, construction camp, road rehabilitation, commence civils |
| 18 November 2007 | Commence dry commissioning |
| 20 December 2007 | Commence wet commissioning |
| 05 January 2008 | Commence ore commissioning |
| 31 January 2008 | First Cu cathode production |
| 28 February 2008 | First Co cathode production |

**There can be no assurance that Africo or CopperCo will raise sufficient funds to meet the capital costs contemplated in the Kalukundi Report or that the economic and mining projections or prices will be achieved. There can also be no assurance that Africo or CopperCo will be able to meet the project implementation or production schedule outlined in the Kalukundi Report.** See "Information Concerning CopperCo After the Arrangement – Risk Factors".

## FUNDS AVAILABLE

As at the date of this Circular, Africo is in the process of arranging a bridge loan (the "**Bridge Loan**") of up to CDN$5 million with certain lenders, some of which are its current shareholders, including Rubicon, (together, the "**Lenders**") by way of convertible promissory notes (the "**Notes**"). It is anticipated that Rubicon will lend to Africo the sum of CDN$1.5 million, but there can be no assurance that this will in fact occur. The Notes are repayable on or before December 31, 2006 (the "**Repayment Date**"). The amounts outstanding under the Notes are convertible, at the Lenders' option within 30 days following completion of a Qualifying Financing (as defined below) and not less than 15 days prior to the Repayment Date into common shares or such other securities of Africo or CopperCo offered pursuant to the Qualifying Financing at a price equal to 85% of the price at which common shares or other securities are offered in a Qualifying Financing.

"**Qualifying Financing**" is defined as the first issuance or issuances of common shares or other securities in Africo or CopperCo after the date of the Notes, on a single day or multiple days in any 90 day period, resulting in gross proceeds of not less than $10,000,000.

In addition, the Notes are convertible at Africo's option, in the event the Qualifying Financing does not complete by the Repayment Date, into Africo Shares at a price of $3.50 per Africo Share. There can be no assurance that the Bridge Loan or the CopperCo/Africo Financing will be completed in part, or at all.

In addition, Africo or CopperCo will endeavour to complete the CopperCo/Africo Financing by issuing the CopperCo/Africo Special Warrants in order to meet its business objectives, have adequate working capital and carry out additional exploration work on the Kalukundi Property contemplated by the Kalukundi Report. As at the date of this Circular, Africo has engaged in discussions with various underwriters as to the offering price of the securities comprising, and the total amount of, the CopperCo/Africo Financing. Africo contemplates that the CopperCo/Africo Financing will be in the amount of CDN$75,000,000, or such lesser amount as may be determined by its Board of Directors. Africo will seek shareholder approval of the CopperCo/Africo Financing by way of a consent resolution or at a special meeting of its shareholders. No current shareholders or insiders of Africo are expected to participate in the

CopperCo/Africo Financing. In addition, Rubicon will issue a news release announcing the terms of the CopperCo/Africo Financing at least five business days prior to the closing of the CopperCo/Africo Financing.

**Completion of the Arrangement is conditional upon Africo or CopperCo raising sufficient funds pursuant to the CopperCo/Africo Financing in order to meet its business objectives.** See "Information Concerning CopperCo After the Arrangement - Risk Factors" and Schedule "M" – Risk Factors.

**Current Funds Available**

As at July 6, 2006, Africo had estimated working capital of approximately US$200,000. Upon completion of the Arrangement, the available consolidated working capital of CopperCo will increase based on the size of the CopperCo/Africo Financing and the Bridge Loan, both as described above.

**Principal Purpose of Available Funds**

Assuming completion of the Arrangement, CopperCo will use its available funds to fund exploration and development activities on the Kalukundi Property, to fund its general and administration costs and for general working capital, as outlined under Capital Cost Summary (see "Information Concerning CopperCo After the Arrangement – Description of Mineral Property – Additional Requirements for Technical Reports on Development Properties and Production Properties – Capital Cost").

CopperCo expects that the funds available from the CopperCo/Africo Financing will be sufficient to meet CopperCo's administration costs for the next twelve months. There may be circumstances, however, where for sound business reasons a reallocation of funds may be necessary. CopperCo will only redirect funds to other properties on the basis of a recommendation from a professional geologist or engineer.

## SELECTED FINANCIAL INFORMATION

CopperCo was only recently incorporated and has not yet completed a financial year. The following selected financial information is based on and derived from the audited consolidated financial statements of Africo and notes thereto.

**Annual Information**

| **Operating Data:** | **3 months ended March 31, 2006 (unaudited)** | **Year ended December 31, 2005 (audited)** | **From incorporation January 7, 2004 to December 31, 2004 (audited)** |
|---|---|---|---|
| Revenue | Nil | Nil | Nil |
| Expenses | $203,034 | $955,241 | $160,057 |
| Loss for the period | $189,599 | $1,535,625 | $71,271 |
| **Balance Sheet Data:** | **As at March 31, 2006 (unaudited)** | **As at December 31, 2005 (audited)** | **As at December 31, 2004 (audited)** |
| Total assets | $14,419,244 | $14,681,376 | $6,540,011 |
| Total current liabilities | $365,277 | $437,810 | $426,683 |
| Future income tax liability | $1,758,949 | $1,758,949 | $1,302,283 |

## DESCRIPTION OF SECURITIES

### Capitalization

The following table sets forth CopperCo's capitalization as of the dates indicated, excluding securities to be issued pursuant to the CopperCo/Africo Financing:

| Designation | Authorized | Outstanding as at July 6, 2006 | Outstanding Following Completion of the Arrangement (excluding securities to be issued pursuant to the CopperCo/Africo Financing) |
|---|---|---|---|
| CopperCo Common Shares | Unlimited | Nil | 19,559,139[1] |
| Long Term Debt | N/A | Nil | Nil |

**Note:**

(1) Prior to the exercise of outstanding stock options. See "Information Concerning CopperCo After the Arrangement - Options to Purchase Securities".

### Share Capital

*Common Shares*

CopperCo is authorized to issue an unlimited number of CopperCo Common Shares. Once issued, all of the authorized CopperCo Common Shares will rank equally as to dividends, voting powers (one vote per CopperCo Common Share) and participation in assets upon dissolution or winding-up. No CopperCo Common Shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the CopperCo Common Shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provision permitting or restricting the issuance of additional securities, or requiring a securityholder to contribute additional capital. Provisions as to the modification, amendment or variation of such rights or provisions are contained in the CBCA and CopperCo's Bylaws. Generally, substantive changes to the share capital require the approval of the CopperCo Shareholders by special resolution (at least two-thirds of the votes cast by shareholders present in person or by proxy).

As of the date of the Circular, CopperCo does not have, and will not have immediately following the Arrangement, any classes of preferred shares authorized or issued.

### Loan Capital

CopperCo does not or will not have any debt obligations outstanding, with the exception of the Bridge Loan described under "Information Concerning CopperCo After the Arrangement - Funds Available".

### Fully Diluted Share Capital

The following table represents the share capitalization of CopperCo, excluding securities to be issued pursuant to the CopperCo/Africo Financing, as at the Effective Date and assuming completion of the Arrangement.

| SHARE CAPITALIZATION | Number of Shares | Percentage Of Total |
|---|---|---|
| CopperCo Common Shares issued pursuant to the Arrangement Agreement | 19,559,139 | 86.4% |
| ***SUB-TOTAL*** | **19,559,139** | **86.4%** |
| | | |
| **FULLY DILUTED[(1)]** | | |
| CopperCo Common Shares on exercise of existing Rubicon Warrants, Rubicon Options and Africo Options[(2)] | 2,320,000[(2)] | 10.3% |
| CopperCo Common Shares on exercise of CopperCo Options to be issued to Dr. Harwood in connection with the CopperCo/Africo Financing[(3)] | 750,000[(3)] | 3.3% |
| ***SUB-TOTAL*** | **3,070,000** | **13.6%** |
| **TOTAL** | **22,629,139** | **100%** |

__Notes__:

(1) See "Information Concerning CopperCo After the Arrangement - Options to Purchase Securities".

(2) Upon completion of the Arrangement, the holders of Rubicon Warrants and Rubicon Options will receive such number of CopperCo Warrants and CopperCo Options as is equal to the number of Rubicon Warrants and Rubicon Options, respectively, multiplied by the Rubicon-CopperCo Exchange Ratio. As at the date of this Circular, Rubicon holds 7,747,101 Africo Shares, and the fully diluted number of Rubicon Common Shares is 84,011,690, which results in a Rubicon-CopperCo Exchange Ratio of approximately 0.0922, or one CopperCo Common Share for approximately every 10.84 Rubicon Common Shares held. Accordingly, no additional CopperCo Common Shares will be issued to Rubicon or the Rubicon Shareholders other than the Africo Shares held by Rubicon on the Share Distribution Record Date. However, if Rubicon were to exercise its conversion rights under the proposed Bridge Loan to Africo prior to the Effective Date, Shareholders would be entitled to receive a greater number of CopperCo Common Shares under the Arrangement, i.e., the aforementioned 0.0922 number would increase slightly and the aforementioned 10.84 number would decrease slightly, as a result of Rubicon holding a greater number of Africo Shares on the Share Distribution Record Date. These numbers cannot be determined at the date of this Circular, because the conversion terms of the Bridge Loan are based on the pricing of the CopperCo/Africo Financing, which pricing has not occurred at the date of this Circular (nor is there any assurance that the Bridge Loan or the CopperCo/Africo Financing will be completed).

(3) If CopperCo completes the CopperCo/Africo Financing in an amount not less than CDN$75,000,000, Dr. Harwood will receive an additional 750,000 CopperCo Options. This grant of options to Dr. Harwood will be effective as of the date of commencement of trading of the CopperCo Common Shares on the TSX, for a term of five years, with an exercise price determined according to the CopperCo Stock Option Plan. See "Information Concerning CopperCo After the Arrangement - Executive Compensation - Termination of Employment, Change in Responsibility and Employment Contracts".

## CONSOLIDATED CAPITALIZATION

CopperCo has not completed a financial year. There has been no change in the share capital of CopperCo since the date of incorporation.

## DIVIDEND RECORD AND POLICY

Neither Africo or CopperCo has paid any dividends since their respective incorporations and neither has plans to pay dividends in the near future. The directors of CopperCo will determine if and when dividends should be declared and paid in the future based on CopperCo's financial position at the relevant time.

## OPTIONS TO PURCHASE SECURITIES

Rubicon's Shareholders will be asked at the Meeting to approve the CopperCo Stock Option Plan adopted by the directors of CopperCo on July 7, 2006. See "Information Concerning CopperCo After the Arrangement - Proposed Stock Option Plan of CopperCo". CopperCo Common Shares reserved for incentive stock options to be granted under the CopperCo Stock Option Plan are not to exceed 20% of the

total issued and outstanding CopperCo Common Shares on the date of the initial listing of the CopperCo Common Shares on a stock exchange.

As of the date of this Circular, CopperCo has not granted any incentive stock options under the CopperCo Stock Option Plan. As at July 4, 2006, 4,206,372 Rubicon Options were granted and outstanding under the Rubicon Plan. Upon completion of the Arrangement, the holders of the Rubicon Options will receive such number of CopperCo Options as is equal to the number of Rubicon Options multiplied by the Rubicon-CopperCo Exchange Ratio. As the Rubicon-CopperCo Exchange Ratio is not yet known, for the purposes of these calculations the Rubicon-CopperCo Exchange Ratio is assumed to be approximately one CopperCo Option for every 10.84 Rubicon Options (or approximately 420,637 CopperCo Options).

Upon completion of the Arrangement, the following option holders of Africo will receive options of CopperCo, as set out below.

| Name and Position of Optionee | Securities[(1)] under Option | Date of Grant | Exercise Price[(2)] | Market Value[(2)] of Securities underlying the Options | Expiration Date |
|---|---|---|---|---|---|
| Options held by all executive officers and past executive officers of Africo as a group (3 individuals in the aggregate) | 200,000<br>200,000<br>400,000 | June 6, 2005<br>June 6, 2005<br>April 1, 2006 | $0.75<br>$1.50<br>$2.50 | N/A – See Note 2 below | June 6, 2010<br>June 6, 2010<br>April 1, 2011 |
| Options held by all directors and past directors of Africo who are not also executive officers (5 individuals in the aggregate) | 500,000[(3)]<br>370,000[(4)] | June 6, 2005<br>April 1, 2006 | $0.75<br>$2.50 | N/A – See Note 2 below | June 6, 2010<br>April 1, 2011 |
| Options held by other employees and past employees of Africo as a group | 75,000<br>325,000 | June 6, 2005<br>Nov 16, 2005 | $0.75<br>$1.75 | N/A – See Note 2 below | June 6, 2010<br>Nov 16, 2010 |
| Options held by consultants to Africo | 250,000 | June 6, 2005 | $0.75 | N/A – See Note 2 below | June 6, 2010 |
| **TOTAL** | **2,320,000**[(5)] | | | | |

**Notes:**

(1) The underlying securities are Africo Shares.
(2) As the Africo Shares are not listed on a stock exchange, the market value of the securities underlying the options on the date of grant is not readily available. The exercise price was determined by the Board of Directors of Africo.
(3) 300,000 of these options were granted to William J. Cavalluzzo (100,000) and John Swanepoel (200,000), past directors of Africo.
(4) 50,000 of these options were granted to William J. Cavalluzzo, a past director of Africo.
(5) If CopperCo completes the CopperCo/Africo Financing in an amount not less than CDN$75,000,000, Dr. Harwood will receive an additional 750,000 CopperCo Options. This grant of options to Dr. Harwood will be effective as of the date of commencement of trading of the CopperCo Common Shares on the TSX, for a term of five years, with an exercise price determined according to the CopperCo Stock Option Plan. See "Information Concerning CopperCo After the Arrangement - Executive Compensation - Termination of Employment, Change in Responsibility and Employment Contracts".

All Options will be granted as incentive options to directors, officers, employees and consultants of CopperCo. The Board of Directors of CopperCo may grant additional Options in an amount not to exceed the number of options available under the CopperCo Stock Option Plan. See "Information Concerning CopperCo After the Arrangement - Proposed Stock Option Plan of CopperCo".

## PRIOR SALES

As at the date of this Circular, CopperCo has issued no CopperCo Common Shares. Africo currently has 19,559,139 Africo Shares issued and outstanding. The following Africo Shares have been issued by Africo during the 12 months preceding the date of this Circular:

| Date of issue | Common shares issued | Price per common share | Purpose of issue |
|---|---|---|---|
| July 21, 2005 | 83,129 | $1.50 | Seed capital subscriptions |
| August 19, 2005 | 3,001,898 | $1.50 | Private placement |
| August 30, 2005 | 235,964 | $1.50 | Private placement |
| December 9, 2005 | 200,000 | $1.75 | Private placement |

## ESCROWED SECURITIES

Upon completion of the Arrangement, it is expected that there will not be any CopperCo securities held in escrow.

## PRINCIPAL SHAREHOLDERS

To the knowledge of the directors and executive officers of CopperCo, upon completion of the Arrangement no person will beneficially own, directly or indirectly, or exercise control or direction over, shares carrying more than 10% of the voting rights attached to each class of the then outstanding voting securities of CopperCo except as following:

| Name | Africo Shares prior to the Effective Date | CopperCo Common Shares Upon Completion of the Arrangement | Percentage of CopperCo Common Shares on Completion of the Arrangement (excluding securities to be issued pursuant to the CopperCo/Africo Financing)(3) |
|---|---|---|---|
| Hasita S.A.(1) | 2,797,654 Africo Shares | 2,797,654 CopperCo Common Shares | 14.3% |
| Rubicon Minerals Corporation | 7,747,101 Africo Shares | Nil(2) | Nil(2) |

**Notes:**

(1) Hasita S.A. is beneficially owned by family members of John Swanepoel, who was a director of Africo from February 14, 2005 to January 8, 2006.

(2) As a result of the Arrangement and not including any securities to be issued pursuant to the CopperCo/Africo Financing, the Rubicon Shareholders will directly hold 39.6% of the CopperCo Common Shares, the Africo Shareholders other than Rubicon will own the remaining CopperCo Common Shares, and Rubicon will hold no CopperCo Common Shares.

(3) As at the date of this Circular, on a fully diluted basis, Hasita S.A. holds 12.8% and Rubicon holds 35.4% of the Africo Shares. Upon completion of the Arrangement, on a fully diluted basis (not including any securities to be issued pursuant to the CopperCo/Africo Financing), Hasita S.A. will hold 12.8% and the Rubicon Shareholders will hold 35.4% of the issued and outstanding CopperCo Common Shares.

## DIRECTORS AND OFFICERS OF COPPERCO

The following table provides the names, municipalities of residence, position, principal occupations and the number of voting securities of CopperCo that each of the current directors and executive officers of CopperCo are expected to beneficially own, directly or indirectly, or exercise control or direction over on

completion of the Arrangement. Mr. Adamson is an existing director and executive officer. Messrs. Adamson, Tomsett, Dixon, Harwood, Maree and Theodoropoulos are existing directors of Africo; and Dr. Harwood is an existing executive officer of Africo. See "Information Concerning CopperCo After the Arrangement - Management of CopperCo".

| Name, Position and Province & Country of Residence(1) | Principal Occupation for the Past Five Years(1) | Date Appointed as a Director(2) | No. of CopperCo Common Shares Beneficially Held or Controlled on Completion of the Arrangement (1)(3) |
|---|---|---|---|
| **DAVID W. ADAMSON**<br>*Director*<br>British Columbia, Canada | Exploration Geologist; President, CEO and Director of Rubicon Minerals Corporation, Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits. | July 4, 2006 | 1,078,266 Rubicon Common Shares and 425,000 Rubicon Options(4) |
| **JOHN DIXON**<br>*Director*<br>Tanzania | Independent Geologist with Bastillion Resources (Pty) Ltd., an independent geological and mining consulting company specialising in Africa. | July 4, 2006 | Nil |
| **ANTONY (TONY) HARWOOD**<br>*President, Chief Executive Officer & Director*<br>England, United Kingdom | President and CEO of Africo (since May 31, 2006); Vice President, Placer Dome Inc., a publicly listed international gold mining company (June 1998 to March 2006). | July 4, 2006 | 15,650 Rubicon Shares(5) |
| **LUKAS MARTHINUS (TINUS) MAREE**<br>*Director*<br>British Columbia, Canada | President, River Capital Partners Ltd., a private investment company, since January 2001; Director, River Group (January 1998 to January 2001). | July 4, 2006 | Nil |
| **CHRIS THEODOROPOULOS**<br>*Director & Chairman of the Board*<br>British Columbia, Canada | Associate Counsel, Getz Prince Wells LLP (law firm) since November 2003; independent legal and business consultant 1996 to November 2003. | July 4, 2006 | 101,529 |
| **PETER W. TOMSETT**<br>*Director*<br>British Columbia, Canada | Consultant (January 2006 to present); an officer in various capacities (President and Chief Executive Officer) from September 2004 to January 2006; Executive Vice-President, Asia Pacific and Africa from March 2004 to September 2004; Executive Vice-President, Asia Pacific from January 2001 to March 2004; and a director (September 2004 to January 2006) of Placer Dome Inc. | July 4, 2006 | Nil |

**Notes:**

(1) The information as to residency, present principal occupation or employment and the number of CopperCo Common Shares to be beneficially owned or controlled pursuant to the Arrangement, is not within the knowledge of the management of CopperCo and has been furnished by the respective directors.

(2) All directors of CopperCo will hold office until the next annual general meeting of CopperCo or until their successors are duly elected or appointed, unless their office is earlier vacated.

(3) Does not include Stock Options held by the directors - See "Information Concerning CopperCo after the Arrangement – Options to Purchase Securities" and does not include any securities to be issued pursuant to the CopperCo/Africo Financing.

(4) The number of CopperCo Common Shares to be held by Mr. Adamson upon completion of the Arrangement will be based on the Rubicon-CopperCo Exchange Ratio. See "The Arrangement – Details of the Arrangement" in the Circular.

(5) Dr. Harwood indirectly owns these Rubicon Shares through Harwood International, which were issued as part of an option/joint venture agreement on the Incognita project, Baffin Island between Rubicon and the Meunier Syndicate, of which Harwood International was a member. The number of CopperCo Common Shares to be held indirectly by Dr. Harwood upon completion of the Arrangement will be based on the Rubicon-CopperCo Exchange Ratio. See "The Arrangement – Details of the Arrangement" in the Circular.

Dr. Harwood (non-independent) and Messrs. Dixon and Tomsett (both independent) are members of CopperCo's Audit Committee, Compensation Committee and Corporate Governance Committee. Mr. Tomsett is the Chair of all three Committees of the Board.

**Corporate Cease Trade Orders or Bankruptcies**

Other than as disclosed herein, to the best of CopperCo's knowledge, no director or officer of CopperCo, nor any shareholder holding sufficient securities of CopperCo to affect materially the control of CopperCo is, or within the ten years prior to the date hereof has been, a director or officer of any other corporation that, while that person was acting in the capacity of director or officer of that other corporation:

(a) was the subject of a cease trade order or similar order or an order that denied the corporation access to any statutory exemptions for a period of more than 30 consecutive days, or

(b) became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold the assets of that other corporation.

Lukas Marthinus (Tinus) Maree was a director of Energem Resources Inc. from July 2005 until May 2006. On March 7, 2006, the BC Securities Commission ordered that all trading by the insiders in the securities of Energem cease until Energem filed comparative financial statements for the fiscal year ended November 30, 2005, related Management Discussion and Analysis, and an Annual Information Form for the fiscal year ended November 30, 2005. This cease trade order was revoked by the BC Securities Commission on May 31, 2006.

**Penalties or Sanctions**

Other than as disclosed herein, to the best of CopperCo's knowledge, no director or officer of CopperCo, nor any shareholder holding sufficient securities of CopperCo to materially affect control of CopperCo has:

(a) been subject to any penalties or sanctions imposed by a court relating to Canadian securities legislation or by a Canadian securities regulatory authority or has entered into a settlement agreement with a Canadian securities regulatory authority; or

(b) been subject to any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor making an investment decision.

**Personal Bankruptcies**

To CopperCo's knowledge, no director or officer of CopperCo, nor any shareholder holding sufficient securities of CopperCo to affect materially the control of CopperCo, nor any personal holding company of any such person has, within the ten years before the date of the Circular, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or been subject to or instituted any proceedings, arrangements or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of that person.

**Conflicts of Interest**

Certain of the directors, officers, promoters and other members of management serve as directors, officers, promoters and members of management of other public companies involved in the resource sector, and therefore it is possible that a conflict may arise between their duties as a director, officer, promoter or

member of management of such other companies. See "Information Concerning CopperCo after the Arrangement - Risk Factors".

**Management of CopperCo**

The following is a brief description of the individual who will be responsible for the management of CopperCo on completion of the Arrangement. By or before the Effective Date of the Arrangement, it is the intention of the Board of Directors of CopperCo to augment its management team with the appointment of a Chief Financial Officer, Corporate Secretary and a Chief Operating Officer.

**ANTONY HARWOOD, BSc. (Hon.), PhD. – President & Chief Executive Officer (Age: 51)**

Dr. Harwood obtained his Bachelor of Science and PhD from Cardiff University in the United Kingdom. He was the managing director of Harwood International, a geological consulting company, from September 1993 to June 1998 and was a Vice-President of Placer Dome Inc., a publicly listed international gold mining company, from June 1998 to March 2006. At Placer Dome Inc., he was responsible for global generative and Africa Eurasia exploration. Dr. Harwood was appointed President and Chief Executive Officer of Africo on May 31, 2006. As President and Chief Executive Officer of CopperCo and Africo, Dr. Harwood will have overall responsibility for the management of CopperCo and its assets, subsidiaries, business and affairs, reporting directly to the Board of Directors and intends to devote 100% of his working time to the affairs of CopperCo and Africo, subject to certain exceptions. Dr. Harwood's employment arrangement with Africo includes a covenant not to compete with Africo and its business and operations, as well as confidentiality and non-disclosure provisions (see "Information Concerning CopperCo After the Arrangement - Executive Compensation - Termination of Employment, Change in Responsibility and Employment Contracts" below for further details).

## EXECUTIVE COMPENSATION

CopperCo was only recently incorporated, has not yet completed a financial year and has not, as of the date of the Circular to which this Schedule is annexed, paid any compensation to any executive officer, or otherwise, nor has it granted any options or other rights to acquire its equity securities. The summary compensation table below discloses compensation paid to the following individuals of Africo during its financial year ended December 31, 2005 and the period from its incorporation on January 7, 2004 to December 31, 2004:

(a) each individual who served as CEO of Africo;

(b) each individual who served as CFO of Africo;

(c) each of Africo's three most highly compensated executive officers, other than the CEO and CFO, who were serving as executive officers at the end of the most recently completed financial year and whose total salary and bonus exceeded $150,000 per year; and

(d) any additional individuals for whom disclosure would have been provided under (c) except that the individual was not serving as an officer of Africo at the end of the most recently completed financial year;

(each, a "**Named Executive Officer**" or "**NEO**"). Mr. Adamson is a current director of Africo and CopperCo.

**Summary Compensation Table**

| | Annual Compensation | | | | Long-Term Compensation |
|---|---|---|---|---|---|
| **Name and principal position** | **Fiscal period/year ended Dec 31** | **Salary** | **Bonus** | **Other annual compensation** | **Securities under options granted** |
| David W. Adamson[(1)]<br>*President & Chief Executive Officer* | 2005<br>2004 | Nil<br>Nil | Nil<br>Nil | US$6,435[(2)]<br>Nil | 200,000<br>Nil |
| Michael Keating[(3)]<br>*Chief Operating Officer* | 2005<br>2004 | CDN$132,000<br>N/A | Nil<br>N/A | Nil<br>N/A | 200,000<br>N/A |
| Victor Song[(4)]<br>*Financial and Commercial Manager (acting in the capacity of Chief Financial Officer)* | 2005<br>2004 | CDN$108,000<br>N/A | Nil<br>N/A | Nil<br>N/A | 100,000<br>N/A |

<u>**Notes**</u>:

(1) Mr. Adamson was the President and Chief Executive Officer of Africo from February 2, 2004 to May 31, 2006.
(2) Consulting fees accrued by Africo and payable to Mr. Adamson for his services as the President and CEO of Africo.
(3) Mr. Keating was appointed Chief Operating Officer and became an employee of Africo on June 30, 2005.
(4) Mr. Song was appointed Financial and Commercial Manager and became an employee of Africo on July 1, 2005.

In addition, the Board of Directors has resolved to pay to Mr. Adamson a cash bonus of CDN$100,000, subject to completion of the CopperCo/Africo Financing.

**Option Grants During the Most Recently Completed Financial Year**

The following table sets out all incentive stock option grants to the Named Executive Officers during Africo's most recently completed financial year ended December 31, 2005.

| Named Executive Officer | Securities[(1)] under options granted (#) | % of total options granted in period | Exercise price[(2)] ($/Security) | Market value[(2)] of securities underlying options on date of grant ($/Security) | Expiration date |
|---|---|---|---|---|---|
| David W. Adamson | 200,000 | 12.9% | $0.75 | N/A – see Note 2 | June 6, 2010 |
| Michael Keating | 200,000 | 12.9% | $1.50 | N/A – see Note 2 | June 6, 2010 |
| Victor Song | 100,000 | 6.5% | $1.75 | N/A – see Note 2 | November 16, 2010 |

<u>**Notes**</u>:

(1) The underlying securities are Africo Shares.
(2) As the Africo Shares are not listed on a stock exchange, the market value of the securities underlying the options on the date of grant is not readily available. The exercise price was determined by the Board of Directors of Africo.

Subsequent to the year ended December 31, 2005, Mr. Adamson was granted 100,000 incentive stock options at an exercise price of $2.50 per share for a period of 5 years from the date of grant.

**Termination of Employment, Change in Responsibility and Employment Contracts**

CopperCo has, as yet, no compensatory plan, contract or arrangement whereby any NEO may be compensated in an amount exceeding $100,000, other than as disclosed herein, in the event of that officer's resignation, retirement or other termination of employment, or in the event of a change of control of CopperCo or a subsidiary or a change in the NEO's responsibilities following such a change of control.

**ANTONY HARWOOD, BSc. (Honours), PhD. – President & Chief Executive Officer**

Pursuant to an offer letter from Africo dated May 25, 2006, which was accepted by Antony (Tony) Harwood on May 31, 2006, Africo entered into an employment contract with Dr. Harwood pursuant to which Dr. Harwood agreed to act as Africo's President and Chief Executive Officer, commencing May 31, 2006, with a 60-day probationary period, at a fixed remuneration of CDN$325,000 per annum, payable in monthly instalments, such annual salary to be reviewed by Africo's Board of Directors annually. Under the agreement, Dr. Harwood is entitled to 21 paid vacation days per 12-month period and reimbursement for reasonable expenses incurred by Dr. Harwood in performance of his duties and responsibilities as President and Chief Executive Officer of Africo. In addition, Dr. Harwood is entitled to receive a benefits package which will reimburse him for medical and dental coverage for himself and his dependents, as well as for life, travel and international insurance.

Dr. Harwood has been granted options to purchase up to 250,000 Africo Shares at an exercise price of CDN$2.50, 125,000 of which vested on commencement of employment (and notwithstanding whether employment continues beyond the probationary period). The remaining 125,000 options vest on May 31, 2007. All options granted to Dr. Harwood terminate on April 1, 2011. In addition, options to purchase a further 750,000 CopperCo Common Shares are to be granted to Dr. Harwood should the CopperCo/Africo Financing complete in an amount of not less than CDN$75,000,000. This grant of options to Dr. Harwood will be effective as of the date of commencement of trading of the CopperCo Common Shares on the TSX, for a term of five years, with an exercise price determined in accordance with the CopperCo Stock Option Plan. 375,000 of such options vest on the date of commencement of trading of the CopperCo Common Shares on the TSX and the remaining 375,000 will vest on the first anniversary thereof. A cash bonus of CDN$200,000 will be paid to Dr. Harwood upon completion of the CopperCo/Africo Financing.

As a condition of his employment arrangement, Dr. Harwood has agreed to a non-compete arrangement that restricts him, for a period of 12 months from the date of termination of his employment, from being involved in any capacity in a competing business, the principal activities of which are conducted and the principal assets of which are located within the geographical area known as the DRC of mineral deposits, the principal value of which consists of copper and/or cobalt (excluding Oryx Mining and Exploration Ltd., a private company of which Mr. Harwood is a director).

Dr. Harwood may terminate the employment arrangement with Africo by giving at least one calendar month's advance notice in writing to Africo. Africo may waive such notice, in whole or in part, and if it does so, Dr. Harwood's employment with Africo will cease on the date such notice is waived by Africo. Africo may terminate the employment arrangement:

1. at its sole discretion without notice or pay in lieu of notice and without cause during the 60-day probationary period from May 31, 2006;

2. without notice, payment in lieu thereof or payment of severance of any kind for just cause; and

3. after the probationary period, at its sole discretion for any reason, without cause, upon providing Dr. Harwood six calendar months' notice or, at Africo's option, pay in lieu of notice equal to six months' base salary as at the date of termination, together with all other payments or entitlements to which Dr. Harwood would be entitled pursuant to applicable employment or employment standards legislation. After the first fully completed year of employment and each fully

completed year thereafter, an additional one month's notice or pay in lieu of such notice will be given by Africo to Dr. Harwood in the event of such termination.

Any pay in lieu of notice on termination will be calculated on the basis of Dr. Harwood's annual base salary as of the date of notice of termination and will be provided in regular monthly instalments, subject to all deductions and withholdings required by law. Pay in lieu of notice will also include a pro-rata portion of any bonus or other form of additional compensation for the year in which employment is terminated. In addition, all options granted but not vested as at the date of termination shall vest immediately. Dr. Harwood's rights and entitlements under any performance bonus (except for rights and entitlements, if any, accrued up to the date of termination of employment and unpaid at the date of such termination) shall otherwise terminate effective as of the date of termination, or as at the date notice of termination is given, pay in lieu of notice is provided.

In the event of a change in control of Africo by way of a successful take-over bid, merger, amalgamation or reorganization pursuant to which ownership of more than 51% of the Africo Shares is acquired, if within six months thereafter Dr. Harwood's employment is terminated, or within such six months Dr. Harwood elects to treat his employment as terminated, pay in lieu of notice equal to two years' annual base salary as at the date of termination, together with pro-rated bonus, if any and all options granted but not vested as at the date of termination will vest immediately. These change of control provisions do not apply to a change of control resulting from an initial public offering of Africo Shares or the implementation of the proposed Plan of Arrangement with Rubicon.

In the event of termination for cause, employment benefits will cease effective as of the date of termination and, in the event of termination without cause, will continue for a period of six months after the date of termination.

The employment agreement is not assignable by Dr. Harwood and the agreement shall not be assigned by Africo except in the event of a merger, consolidation, plan of arrangement, corporate restructuring or sale of substantially all of the assets of Africo, and only if the assignee agrees in writing with Dr. Harwood to perform the obligations of Africo under the agreement.

**Compensation of Directors**

CopperCo has no arrangements, standard or otherwise, pursuant to which directors are compensated by CopperCo for their services in their capacity as directors, including any additional amounts payable for committee participation or special assignments.

Directors who are also officers and receive a salary from Africo do not receive any remuneration from Africo for serving as a director, except for reimbursement of any out-of-pocket expenses incurred in acting as a director and participation in Africo's stock option plan. Directors who are not so employed receive remuneration from Africo in the amount of $2,500 per month. Committee members do not receive any additional compensation per year for acting in their respective capacities as such.

For the year ended December 31, 2005, certain of the directors of Africo received aggregate cash compensation of $22,500 and were granted options to purchase an aggregate of 700,000 Africo Shares, at a price of $0.75 per share, for their services as directors of Africo. The following table sets out details of incentive stock options granted by Africo to the directors during the fiscal year ended December 31, 2005.

| Name | Number of Options Granted | Exercise Price | Expiry Date |
|---|---|---|---|
| David W. Adamson[(3)] | 200,000 | $0.75 | June 6, 2010 |
| William J. Cavalluzzo[(1)] | 100,000 | $0.75 | June 6, 2010 |
| Lukas Marthinus (Tinus) Maree[(3)] | 100,000 | $0.75 | June 6, 2010 |

| Name | Number of Options Granted | Exercise Price | Expiry Date |
|---|---|---|---|
| John Hendrik Swanepoel[(2)] | 200,000[(1)] | $0.75 | June 6, 2010 |
| Chris Theodoropoulos[(3)] | 100,000 | $0.75 | June 6, 2010 |

**Notes:**

(1) Mr. Cavalluzzo ceased to be a director of Africo on June 30, 2006.
(2) Mr. Swanepoel resigned as a director of Africo on January 8, 2006 and continues, as required, to consult to and on behalf of Africo.
(3) Subsequent to year end, a further 100,000 options were granted to each of Messrs. Adamson, Maree and Theodoropoulos exercisable at a price of $2.50 per share for a five year period.

In addition:

1. John Swanepoel, a director of Africo from February 14, 2005 to January 8, 2006, was paid US$37,559 for services as a consultant during Africo's most recently completed financial year ended December 31, 2005;

2. Africo has accrued an amount of US$6,435, payable to William J. Cavalluzzo, a former director of Africo, for services as a consultant to Africo during its 2005 fiscal year;

3. US$92,920 in consulting fees was paid by Africo to River Capital Partners Ltd., a private company of which Mr. Maree, a current director of Africo and CopperCo, is a shareholder and a director, for services rendered by Mr. Maree to Africo; and

4. US$83,571 in consulting fees was paid by Africo to 143 Investments Ltd., a private company controlled by Mr. Theodoropoulos, a current director of Africo and CopperCo, for services rendered by Mr. Theodoropoulos to Africo.

## PROPOSED COPPERCO STOCK OPTION PLAN

### General Description

On July 7, 2006, the Board of Directors of CopperCo and the Board of Directors of Rubicon approved a new "fixed number" stock option plan in a form compatible with the rules of the TSX (the "**CopperCo Plan**"), which is subject to acceptance by the TSX and approval by the Rubicon Disinterested Shareholders at the Meeting. Under the CopperCo Plan, CopperCo is authorized to grant options entitling the holders to acquire such number of CopperCo Common Shares as is equal to 20% of the issued and outstanding capital of CopperCo as at the date of the initial listing of the CopperCo Common shares on a stock exchange. Under the rules of the TSX, "fixed number" stock option plans are required, upon institution and when amended, to be approved by a majority of a listed issuer's directors and, where required, the listed issuer's Disinterested Shareholders. Accordingly, Rubicon is requesting shareholder approval of the CopperCo Plan at the Meeting by its Disinterested Shareholders. A copy of the CopperCo Plan may be requested from Rubicon by any Shareholder.

### Outstanding Options

Upon completion of the Arrangement and assuming completion of the CopperCo/Africo Financing, it is expected that there will be stock options outstanding to purchase an aggregate of approximately 3,070,000 CopperCo Common Shares. This number of options includes CopperCo Common Shares to be issued upon the exercise of the options granted by Africo and Rubicon, which will be exchanged for CopperCo Options under the Arrangement and rolled into the CopperCo Plan, including 750,000 CopperCo Options which CopperCo may grant to Dr. Harwood upon completion of the CopperCo/Africo Financing. See "Information Concerning CopperCo After the Arrangement – Capitalization – Fully Diluted Share Capital" and "Information Concerning CopperCo After the Arrangement – Options to Purchase Securities".

**Purpose of the CopperCo Plan**

The principal purposes of the CopperCo Plan are to provide CopperCo with the advantages of the incentive inherent in share ownership on the part of those persons responsible for the continued success of CopperCo; to create in those persons a proprietary interest in, and a greater concern for, the welfare and success of CopperCo; to encourage such persons to remain with CopperCo; and to attract new talent to CopperCo. CopperCo does not intend to provide financial assistance to facilitate the purchase of common shares under the CopperCo Plan.

**TSX Policies**

The CopperCo Plan will be, administered by the Compensation Committee of the Board (the "**CopperCo Committee**"). The following is a brief description of the principal terms of the CopperCo Plan, which description is qualified in its entirety by the terms of the CopperCo Plan:

1. The aggregate number of CopperCo Common Shares reserved for issuance upon the exercise of options granted under the CopperCo Plan cannot exceed the number which is equal to 20% of the issued and outstanding CopperCo Common Shares at the time the CopperCo Common shares are listed on a stock exchange.

2. The exercise price of stock options, as determined by the CopperCo Committee, may not be less than the last closing price of the CopperCo Common Shares on the TSX immediately prior to the time of the grant of an option.

3. Stock options under the CopperCo Plan may be granted to:

   (a) an executive officer, director or employee of CopperCo or an affiliate of CopperCo;

   (b) a consultant (other than an employee or director of CopperCo) providing consulting, technical, management or other services to CopperCo, or a consultant company; and

   (c) an employee of a corporation providing management services to CopperCo, which management services are required for the ongoing successful operation of the business enterprise of CopperCo but excluding a person engaged in investor relations activities.

4. The term for exercise of the options under the CopperCo Plan is a maximum of ten years from the date of grant. Stock options may only be exercised until the earlier of the expiry date and a period not more than 90 days after the optionee ceases to be an employee, consultant, director, or executive officer of CopperCo or an affiliate, or such later date determined by the Board of Directors of CopperCo which can be no later than the original expiry date of such option.

5. The Board of Directors of CopperCo taking into account the recommendations of the CopperCo Committee, shall have the complete discretion to set the terms of any vesting schedule for each option granted, including the discretion to permit partial vesting in stage or percentage amounts based on the term of such option or to permit full vesting after a state or period of time has passed from the date of grant.

6. All options shall be non assignable and non transferable except as to a Qualified Successor or as otherwise permitted by applicable securities laws. "Qualified Successor" means a person who is entitled to ownership of an option upon the death of an optionee, pursuant to a will or the applicable laws of descent and distribution upon death. In the event of death of an optionee, such optionee's options shall be exercisable by the Qualified Successor until the expiry of the term of the option. If an optionee becomes disabled, such optionee's options may be exercised by a guardian until the expiry of the term of the option.

7. If there is any change in the number of CopperCo Common Shares outstanding through any declaration of a stock dividend or any consolidation, subdivision or reclassification of the CopperCo Common Shares, the number of shares available under the CopperCo Plan, the shares subject to any option and the exercise price will be adjusted proportionately, subject to any approval required by the TSX. If CopperCo amalgamates, merges or enters into a plan of arrangement with or into another corporation, the shares received on exercise of the options thereafter will reflect the shares that would have been received had the options been exercised immediately prior to the record date for the amalgamation, merger or plan of arrangement and the exercise price will be adjusted proportionately. If a Change of Control (as defined in the CopperCo Plan) occurs, other than pursuant to the Arrangement, all options will become immediately exercisable. If a bona fide takeover bid (as defined in the British Columbia Securities Act) is made for the CopperCo Common Shares, optionees will be entitled to exercise any options they hold to permit them to tender the shares received upon exercise of the options to the takeover bid.

8. The CopperCo Plan contains provisions which require shareholder approval or, where required, approval by CopperCo's Disinterested Shareholders, to: (i) increase the aggregate number of CopperCo Common Shares which may be issued under the CopperCo Plan, (ii) materially modify the requirements as to the eligibility for participation in the CopperCo Plan which would have the potential of broadening or increasing insider participation; and (iii) materially increase the benefits accruing to participants under the CopperCo Plan. However, the CopperCo Plan may be amended by the Board of Directors of CopperCo without shareholder approval in order to comply with the requirements of any applicable regulatory authority and to make amendments of a housekeeping nature to the CopperCo Plan.

9. Notwithstanding the date of expiration of the term of an option, the date of expiration of the term of an option will be adjusted, without being subject to the Board of Directors of CopperCo or CopperCo Committee's discretion, to take into account any black out period imposed on the optionee by CopperCo as follows: (i) if the term expiration date falls within a black out period imposed on the optionee by CopperCo, then the term expiration date is extended to the close of business on the 10th business day after the end of such black out period by CopperCo (the "**Black Out Expiration Term**"); or (ii) if the term expiration date falls within two business days after the end of a black out period imposed on the optionee by CopperCo, then the term expiration date is extended to the date which is the Black Out Expiration Term reduced by the number of business days between the term expiration date and the end of such black out period.

The Disinterested Shareholders of Rubicon will be asked at the Meeting to approve the CopperCo Plan Resolution in substantially the form set out on Schedule G attached to this Circular. In this regard, a total of 3,105,996 Rubicon Common Shares will be withheld from voting at the Meeting, which include Rubicon Common Shares held by Rubicon's Disinterested Shareholders and the directors, senior officers and their associates of CopperCo. If the Plan is not approved by the Disinterested Shareholders of Rubicon, CopperCo will not be in a position to offer increased incentives to its current or future directors, officers, employees and independent consultants.

## INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS OF COPPERCO

No director or executive officer of CopperCo or associate or affiliate of any such director or executive officer, is or has been indebted to CopperCo during the period from incorporation to the date of this Circular.

## LISTING APPLICATION

An application has been be made to have the CopperCo Common Shares listed for trading on the TSX as soon as possible after the Effective Date. Listing will be subject CopperCo fulfilling all the original listing

requirements of the TSX. **There are no assurances as to if, or when, the CopperCo Common Shares will be listed or traded on the TSX indicated above**. See "Information Concerning CopperCo After the Arrangement - Risk Factors" below and Schedule "M" – Risk Factors.

## RISK FACTORS

In evaluating the Arrangement, shareholders and investors should carefully consider, in addition to the other information contained in this Circular, the risk factors which apply to CopperCo after the Effective Date. **See Schedule "M" – Risk Factors for certain considerations relevant to Shareholders regarding the Arrangement and their investment in the securities referred to in this Circular.** In addition, the following risk factors associated with the business to be carried out by CopperCo should be reviewed. These risk factors assume the completion of the Arrangement, which is conditional upon completion of the CopperCo/Africo Financing, and that Africo will be a wholly-owned subsidiary of CopperCo.

### Exploration, Development and Operating Risk

The exploration for and development of mineral deposits involves significant risks, which even a combination of careful evaluation, experience and knowledge may not eliminate. While the discovery of an ore body may result in substantial rewards, few properties which are explored are ultimately developed into producing mines. Major expenses may be required to locate and establish mineral reserves, to develop metallurgical processes and to construct mining and processing facilities at a particular site. There is no certainty that the expenditures to be made by CopperCo or Africo towards the search and evaluation of mineral deposits will result in discoveries of commercial quantities of ore. Whether a mineral deposit will be commercially viable depends on a number of factors, some of which are: the particular attributes of the deposit, such as size, grade and proximity to infrastructure; metal prices, which are highly cyclical; currency exchange rates, which are volatile; and government regulations, including regulations relating to prices, taxes, royalties, land tenure, land use, importing and exporting of minerals and environmental protection. The exact effect of these factors cannot be accurately predicted, but the combination of these factors may result in CopperCo not receiving an adequate return on invested capital.

CopperCo's activities will be primarily directed towards the exploration for and development of mineral deposits. Exploration programs entail risks relating to the location of economic ore bodies, the development of appropriate metallurgical processes, the receipt of necessary governmental permits and regulatory approvals, and the timely completion of capital projects, including the construction of mining and processing facilities at mining sites. Major expenses will be required to establish reserves by drilling and to construct mining and processing facilities at a particular site.

Mining operations generally involve a high degree of risk. Although Africo does not yet operate a mine on the Kalukundi Property, it or CopperCo intends to develop a mine as indicated in the Kalukundi Report. Such operations are subject to all the hazards and risks normally encountered in the exploration, development and production of copper, zinc, gold and other base or precious metals, including unusual and unexpected geologic formations, seismic activity, rock bursts, cave-ins, flooding and other conditions involved in the drilling and removal of material, any of which could result in damage to, or destruction of, mines and other producing facilities, damage to life or property, environmental damage and possible legal liability. Processing operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas, which may result in environmental pollution and consequent liability.

### Mining and Development Plan

Although Africo has received the Feasibility Study from its consultants, Africo's Board of Directors has made no positive production decision in regards to this Feasibility Study or with respect to the Kalukundi Project and may elect to modify, expand or otherwise embark on a different course of action regarding the

Kalukundi Project depending, among other things, the amount of capital it raises and the development plan that it ultimately undertakes.

**Capital Requirements and Potential Dilution**

CopperCo will require significant equity capital and debt financing in order to fund its operating costs, to service future indebtedness that may be incurred and to carry out plans to develop its existing and future projects. **There is no assurance that the contemplated CopperCo/Africo Financing will be completed, in part or at all**. CopperCo currently has no revenues and, until production begins on the Kalukundi Property, is wholly reliant upon external financing to fund all of its capital requirements. In addition to the contemplated CopperCo/Africo Financing, CopperCo will require additional equity and debt financing from external sources to meet such requirements. There can be no assurance that such additional financing will be available to CopperCo or, if it is, that it will be offered on acceptable terms. If additional financing is raised through the issuance of equity or convertible debt securities of CopperCo, the interests of shareholders in the net assets of CopperCo may be significantly diluted. Any failure of CopperCo to obtain required financing on acceptable terms could have a material adverse effect on CopperCo's financial condition, results of operations and liquidity and may require CopperCo to cancel or postpone planned capital investments.

**Tax Consequences**

The completion of the Arrangement is subject to, among other things, Rubicon obtaining the Tax Ruling from the Canada Revenue Agency (the "**CRA**") in form and substance satisfactory to Rubicon and Africo, with respect to certain income tax consequences of the Arrangement. There may be disagreements with the CRA with respect to certain tax consequences associated with the Arrangement. There can be no assurance that the Tax Ruling will be obtained or that it will be satisfactory to Africo. **Africo Shareholders should consult their own tax and legal advisors for advice with respect to the income tax and other consequences associated with their acquisition of securities under the Arrangement.**

**Insurance and Uninsured Risks**

CopperCo's business will be subject to a number of risks and hazards generally, including adverse environmental conditions, industrial accidents, labour disputes, unusual or unexpected geological conditions, ground or slope failures, cave-ins, changes in the regulatory environment and natural phenomena such as inclement weather conditions, floods and earthquakes. Such occurrences could result in damage to mineral properties or production facilities, personal injury or death, environmental damage to CopperCo's properties or the properties of others, delays in development or mining, monetary losses and possible legal liability. Although CopperCo will maintain insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance will not cover all the potential risks associated with its operations. In addition, CopperCo may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against political risk, and risks such as environmental pollution or other hazards as a result of exploration and production, is not generally available to CopperCo or to other companies in the mining industry on acceptable terms. Losses from these events may cause CopperCo to incur significant costs that could have a material adverse effect upon its financial performance and results of operations.

**Environmental Risks and Hazards**

All phases of CopperCo's operations will be subject to environmental regulation in the various jurisdictions in which it intends to operate. These regulations will mandate, among other things, the maintenance of air and water quality standards and land reclamation and relocation of people. They will also set forth limitations on the generation, transportation, storage and disposal of solid and hazardous waste. Environmental legislation is evolving in a manner which will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments

of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect CopperCo's operations. There is also no assurance that CopperCo will be able to effect any required relocation of people in order to develop the Kalukundi Property.

Environmental hazards may exist on the properties on which CopperCo holds interests, which are unknown to CopperCo at present and which have been caused by previous or existing owners or operators of the properties. There can be no assurance that these hazards, if any exist, will not be CopperCo's responsibility and, consequently, may adversely affect CopperCo's operations.

**Government Regulation**

CopperCo's mineral exploration and planned development activities will be subject to various laws governing prospecting, mining, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. No assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail production or development. Government approvals and permits are currently, and may in the future be, required in connection with CopperCo's operations. To the extent such approvals are required and not obtained, CopperCo may be curtailed or prohibited from continuing or proceeding with planned exploration or development of mineral properties. Failure to comply with applicable laws, regulations and permitting requirements may result in enforcement actions thereunder, including orders issued by regulatory or judicial authorities causing operations to cease or be curtailed, and may include corrective measures requiring capital expenditures, installation of additional equipment, or remedial actions. Parties engaged in mining operations or in the exploration or development of mineral properties may be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed for violations of applicable laws or regulations. Amendments to current laws and regulations governing operations or more stringent implementation thereof could have a substantial adverse impact on CopperCo and cause increases in exploration expenses, capital expenditures or production costs or reduction in levels of production at producing properties or require abandonment or delays in development of new mining properties.

**Commodity Prices**

The development and success of CopperCo's projects will be primarily dependent on the future price of base and precious metals and for copper and cobalt in particular. Commodity prices are subject to significant fluctuation and are affected by a number of factors that are beyond the control of CopperCo. Such factors include, but are not limited to, the sale or purchase of base or precious metals by various central banks and financial institutions, interest rates, exchange rates, inflation or deflation, fluctuation in the value of the United States dollar (the currency in which resource prices generally are quoted) and other currencies, global and regional supply and demand, speculative trading, the overall level of forward commodity sales, international or regional political and economic events or trends and the political and economic conditions of major producing countries throughout the world. The price of base and precious metals has fluctuated widely in recent years, and future serious price declines could cause the continued development of and commercial production from CopperCo's properties to be impracticable. Depending on the price of base and precious metals, projected cash flows from planned mining operations may not be sufficient and CopperCo could be forced to discontinue development and may lose its interest in, or may be forced to sell, some of its properties. Future production from CopperCo's mining properties is dependent on commodity prices that are adequate to make these properties economic.

In addition to adversely affecting CopperCo's reserve estimates and its financial condition, declining commodity prices can impact operations by requiring a reassessment of the feasibility of a particular project. Such a reassessment may be the result of a management decision or may be required under financing arrangements related to a particular project. Even if the Kalukundi Property is ultimately

determined to be economically viable, the need to conduct such a reassessment may cause substantial delays or may interrupt operations until the reassessment can be completed.

**No Assurance of Titles, Boundaries or Water Rights**

Title to the Kalukundi Property in the name of Swanmines may be challenged or impugned and may be subject to prior unregistered agreements, transfers or claims. In addition, CopperCo may be unable to operate its properties as permitted or to enforce its rights with respect to its properties. CopperCo will take reasonable steps to attempt to ensure that proper title to the Kalukundi Property held by Swanmines has been obtained and that all grants of mineral rights for its properties have been registered in the appropriate deeds offices. There is no guarantee that title to such mineral project and permits held by Swanmines will not be challenged or impugned. Despite the due diligence conducted by CopperCo, the records in the DRC are incomplete and there can be no assurance that Swanmines', and therefore Africo's, interest in such mineral project and permits will not be subject to challenge. There are risks associated with enforceability of various agreements made with entities controlled by the government of the DRC government, such as the Swanmines Agreement.

CopperCo and Africo require licences and permits in order to access each of its mineral projects and anticipate that they will need the ready availability of water if any of its mineral projects become operational. Management believes that Africo's current surface rights and water rights are sufficient to carry on the activities of Africo's current work program. However, the need may arise for CopperCo to purchase or lease additional surface rights or obtain additional water rights in order to further explore and develop a particular mineral property, and its ability to further explore or develop such property may be dependent upon CopperCo's ability to secure such additional surface or water rights that may be required.

**Competition**

The mining industry is competitive in all of its phases. CopperCo will face strong competition from other mining companies in connection with the acquisition of properties producing, or capable of producing, precious and base metals. Many of these companies have greater financial resources, operational experience and technical capabilities than CopperCo. As a result of this competition, CopperCo may be unable to maintain or acquire additional attractive mining properties on terms it considers acceptable or at all. Consequently, CopperCo's revenues, operations and financial condition could be materially adversely affected.

**Foreign Investments and Operations**

Mineral exploration and mining in certain countries may be affected in varying degrees by political stability and government regulations relating to the mining industry and foreign investment. There can be no assurance that the government of the DRC will not institute regulatory policies that adversely affect the exploration and development on the Kalukundi Property. Any changes in regulations or shifts in political conditions in these countries are beyond the control of CopperCo and may adversely affect its business. Investors should assess the political and regulatory risks related to CopperCo's foreign country investments. Operations may be affected in varying degrees by government regulations with respect to restrictions on production, price controls, export controls, foreign exchange controls, income taxes, expropriation of property, environmental legislation and mine safety.

**Currency Risks**

The proceeds from the CopperCo/Africo Financing may be received in Canadian dollars, while a significant portion of its operating expenses will be incurred in Congolese francs, United States dollars and other foreign currencies. From time to time, CopperCo may borrow funds and will incur capital expenditures that are denominated in foreign currency. In addition, any revenue generated from operations may be in United States dollars. Accordingly, foreign currency fluctuations may adversely affect CopperCo's financial position and operating results.

**Dependence on Qualified Personnel**

CopperCo's success will depend to a significant degree upon the contributions of qualified technical personnel and its ability to attract and retain highly skilled personnel in the DRC and elsewhere. Competition for such personnel in the mining industry is intense, and CopperCo may not be successful in attracting and retaining qualified personnel locally or in obtaining the necessary work permits to hire qualified expatriates. Its inability to do so in the future may seriously harm its business and results of operations. Additionally, CopperCo will depend on its key management for the operation of its day-to-day activities and personal connections and relationships of its key management are important to the conduct of its business. If CopperCo were to lose a member of its key management, its business and results of operations might be adversely affected.

**Increased Labour Costs**

Wages and related labour and consulting costs account for a large portion of CopperCo's costs. Accordingly, CopperCo's costs may be materially affected by increases in wages and related labour and consulting costs.

**Conflicts of Interest**

The directors and officers of CopperCo will not be devoting all of their time to the affairs of CopperCo. The directors and officers of CopperCo are directors and officers of other companies, some of which are in the same business as CopperCo. The directors and officers of CopperCo are required by law to act in the best interests of CopperCo. They have the same obligations to the other companies in respect of which they act as directors and officers. Discharge by the directors and officers of their obligations to CopperCo may result in a breach of their obligations to the other companies, and in certain circumstances this could expose CopperCo to liability to those companies. Similarly, discharge by the directors and officers of their obligations to the other companies could result in a breach of their obligation to act in the best interests of CopperCo. Such conflicting legal obligations may expose CopperCo to liability to others and impair its ability to achieve its business objectives.

**Requirement for Permits and Licences**

The operations of CopperCo will require licences, permits and in some cases renewals of existing licences and permits from various governmental authorities. Management believes that Africo currently holds or has applied for certain of the necessary licences and permits to carry on the activities that it is currently conducting under applicable laws and regulations in respect of its properties, and also believes that Africo is complying in all material respects with the terms of such licences and permits. However, CopperCo's ability to obtain, sustain or renew such licences and permits or obtain all other required licences or permits on acceptable terms is subject to changes in regulations and policies and to the discretion of the applicable governmental authorities.

**Risk of Expropriation and Enforceability of Contracts with Government, Parastatal Organizations or Joint Venture Partners**

It is possible that the current system of exploration and mine permitting in the DRC may change, resulting in expropriation of CopperCo's properties without adequate compensation. In addition, there is a possibility that CopperCo's agreements with governments, parastatal organizations or joint venture partners may be unenforceable against these parties. While the risk may appear remote at this time, this risk should not be discounted.

**Future Mining Operations**

There is no assurance that CopperCo will produce revenue, operate profitably or provide a return on investment in the future from mining operations.

**Lack of Infrastructure in the DRC**

Transportation and service infrastructure in the DRC are sub-standard due largely to the recent civil war. The transportation of equipment and supplies into the DRC and the transportation of resources out of the DRC may be subject to delays that adversely affect the ability of CopperCo to proceed with the Kalukundi Project in the country in a timely manner. Failure in electrical power and shortages of the supply of diesel, mechanical parts and other items required for CopperCo's operations occur frequently in the country. Extended periods without electricity or other necessary elements required to support its operations could have an adverse effect on CopperCo's business, operating results and financial condition. Administrative delays with government agencies in the DRC could also further delay the progress of the Kalukundi Property. CopperCo's interests in the DRC will be accessed over lands that may be subject to the interests of third parties. CopperCo's business and operations may be materially adversely affected in the event that it is unable to access its mineral interests, is delayed in accessing these interests or is in any way inhibited in carrying out its operational activities. Favourable prospects for the national economy now depend upon the maintenance of domestic peace and the continued receipt of substantial foreign aid to supplement government revenues.

**Political Stability**

CopperCo's projects in the DRC may be subject to the effects of political changes, war and civil conflict, changes in government policy, illegal mining activities, lack of law enforcement and labour unrest and the creation of new laws. These changes (which may include new or modified taxes or other government levies as well as other legislation) may impact the profitability and viability of its properties. The DRC is an impoverished country with physical and institutional infrastructure that is in a debilitated condition. It is in transition from a largely state-controlled economy to one based on free market principles, and from a non-democratic political system with a centralized ethnic power base to one based on more democratic principles. There can be no assurance that these changes will be effected or that the achievement of these objectives will not have material adverse consequences for CopperCo and its operations. Moreover, the northeast region of the DRC has undergone civil unrest and instability that could have an impact on political, social or economic conditions in the DRC generally. The effect of unrest and instability on political, social or economic conditions in the DRC could result in the impairment of the exploration, development and mining operations at those projects. Any such changes are beyond the control of CopperCo and may adversely affect its business.

**Effects of Inflation on Results of Operations**

The DRC has historically experienced relatively high rates of inflation.

**Health Risks**

HIV/AIDS, malaria and other diseases represent a serious threat to maintaining a skilled workforce in the mining industry throughout Africa. HIV/AIDS, malaria and other diseases are a major healthcare challenge faced by CopperCo's operations in the DRC. There can be no assurance that CopperCo will not lose members of its workforce or workforce man-hours or incur increased medical costs as a result of these high health risks, which may have a material adverse effect on CopperCo's operations.

**Limited Business History**

Africo has only recently commenced operations and CopperCo was only recently incorporated and neither has a history of any operating earnings. The likelihood of success of CopperCo and Africo must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the establishment of any business. As of the date of this Circular, CopperCo and Africo have limited financial resources and there is no assurance that additional funding will be available for further operations or to fulfil obligations under applicable agreements. There is no assurance that

CopperCo and/or Africo can generate revenues, operate profitably, or provide a return on investment, or that they will successfully implement their plans.

**Option to Acquire H&J**

Although Africo has an option to acquire the remaining shares in H&J that it does not presently own, there can be no assurance that Africo will be able to raise the requisite funds to acquire the remaining H&J Shares. In addition, even if Africo pays the remainder of the funds required to the Sellers under the H&J Agreement, there is the possibility that such Sellers may withhold or delay transferring title to the remaining H&J Shares to Africo. See "Information Concerning CopperCo After the Arrangement – Legal Proceedings".

**Fluctuation in Market Value of the CopperCo Common Shares**

There is currently no market for the CopperCo Common Shares and there can be no assurance that an active market will develop or be sustained after the Effective Date of the Arrangement. The lack of an active public market could have a material adverse effect on the price of the CopperCo Common Shares.

The market price of a publicly-traded stock is affected by many variables not directly related to the corporate performance of the company, including the market in which it is traded, the strength of the economy generally, the availability and attractiveness of alternative investments, and the breadth of the public market for the stock. The effect of these and other factors on the future market price of the CopperCo Common Shares on any stock exchange cannot be predicted.

## PROMOTERS

Rubicon is the promoter of CopperCo within the meaning of applicable securities legislation, by virtue of having taken the initiative in founding CopperCo.

## LEGAL PROCEEDINGS

Except as disclosed below, CopperCo and Africo are not parties to any material legal proceedings and are not aware of any such proceedings known to be contemplated.

Pursuant to the H&J Agreement described under "Description and General Development of the Business of CopperCo – Material Property", Africo has made the necessary payments under the H&J Agreement to earn a 48% interest in H&J. Due to an internal dispute between the Sellers under the H&J Agreement, one of the Sellers, Lymnokyknos Holdings Ltd. ("**LHL**"), has refused to transfer to Africo 6% of the H&J Shares registered in its name (the "**LHL Shares**"). Africo obtained a judgement in the High Court of Lubumbashi in the DRC on June 17, 2006, which ordered that Africo is entitled to have the LHL Shares transferred to it pursuant to the H&J Agreement. LHL has provided notice that it disputes the judgement. Africo believes this notice is without merit and will continue its efforts to enforce the judgement. Africo intends to use the proceeds of the Bridge Loan or the CopperCo/Africo Financing to make all further payments under the H&J Agreement to acquire a 100% interest in H&J. See also "Information Concerning CopperCo After the Arrangement - Risk Factors".

## INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Except as described elsewhere in this Circular, no current or proposed director, officer, principal shareholder or associate or affiliate of them, has any material interest, direct or indirect, in any transaction since incorporation or in any proposed transaction that has materially affected or will materially affect CopperCo.

## AUDITOR, REGISTRAR AND TRANSFER AGENT

CopperCo's auditor is De Visser Gray, Chartered Accountants, of Suite 401, 905 West Pender Street, Vancouver, British Columbia, V6C 1L6. Following the Arrangement, CopperCo intends to appoint PriceWaterhouseCoopers LLP, Chartered Accountants, of Suite 700, 250 Howe Street, Vancouver, British Columbia V6C 3S7 as its auditor.

The registrar and transfer agent for CopperCo is Computershare Investor Services Inc. of 4th Floor, 510 Burrard Street, Vancouver, British Columbia V6C 3B9. The register of transfers of the CopperCo Common Shares is located in Vancouver, British Columbia.

## MATERIAL CONTRACTS

The following are the material contracts of CopperCo and Africo other than those entered into in the ordinary course of business, that have been entered into within two years before the date of the Circular, which CopperCo or Africo is a party, directly or indirectly.

1. The Arrangement Agreement. See "The Arrangement" in the Circular.

2. The Swanmines Agreement and the various amendments. See "Description and General Development of the Business of CopperCo – Material Property".

3. The H&J Agreement. See "Description and General Development of the Business of CopperCo – Material Property".

The material contracts described above may be inspected at the head office of CopperCo at Suite 1540 – 800 West Pender Street, Vancouver, British Columbia V6C 2V6, during normal business hours prior to the Meeting and for a period of 60 days thereafter.

## OTHER MATERIAL FACTS

There are no other material facts other than as disclosed herein.

**SCHEDULE "L"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006

**RIGHTS OF DISSENT**

The BCBCA does not contain a provision requiring Rubicon to purchase Rubicon Common Shares from Shareholders who dissent from the Arrangement. However, pursuant to the terms of the Interim Order and the Plan of Arrangement, Rubicon has granted the Shareholders who object to the Special Resolution the right to dissent (the "Dissent Right") in respect of the Arrangement. The Dissent Right is granted in Article 6 of the Plan of Arrangement and is summarized below. The terms of such Dissent Right are similar to the dissenting shareholder provisions of the BCBCA. The following is a summary only and Shareholders are referred to Article 6 of the Plan of Arrangement for the complete Dissent Rights.

A Shareholder who wishes to exercise his or her Dissent Right (a "Dissenting Shareholder") must give written notice of his or her dissent (a "Notice of Dissent") to Rubicon by depositing such Notice of Dissent with Rubicon, or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 West Pender Street, Vancouver, British Columbia V6C 2V6, marked to the attention of the President, not later than 2pm, Thursday August 3, 2006. A Shareholder who wishes to dissent must prepare a separate notice of dissent for (i) the Shareholder, if the Shareholder is dissenting on its own behalf and (ii) each person who beneficially owns shares in the Shareholder's name and on whose behalf the Shareholder is dissenting. To be valid, a Notice of Dissent must:

(a) identify in each Notice of Dissent the person on whose behalf dissent is being exercised;

(b) set out the number of Rubicon Common Shares in respect of which the Shareholder is exercising the Dissent Right (the "Notice Shares"), which number cannot be less than all of the Rubicon Common Shares held by the beneficial holder on whose behalf the Dissent Right is being exercised;

(c) if the Notice Shares constitute all of the shares of which the Dissenting Shareholder is both the registered owner and beneficial owner and the Dissenting Shareholder owns no other Rubicon Common Shares as beneficial owner, a statement to that effect;

(d) if the Notice Shares constitute all of the shares of which the Dissenting Shareholder is both the registered and beneficial owner but the Dissenting Shareholder owns other Rubicon Common Shares as beneficial owner, a statement to that effect, and

  (i) the names of the registered owners of those other shares,

  (ii) the number of those other shares that are held by each of those registered owners, and

  (iii) a statement that Notices of Dissent are being or have been sent in respect of all those other shares;

(e) if dissent is being exercised by the Dissenting Shareholder on behalf of a beneficial owner who is not the Dissenting Shareholder, a statement to that effect, and

  (i) the name and address of the beneficial owner, and

  (ii) a statement that the Dissenting Shareholder is dissenting in relation to all of the shares beneficially owned by the beneficial owner that are registered in the Dissenting Shareholder's name.

The giving of a Notice of Dissent does not deprive a Dissenting Shareholder of his or her right to vote at the Meeting on the Special Resolution. A vote against the Special Resolution or the execution or exercise of a proxy does not constitute a Notice of Dissent. A Shareholder is not entitled to exercise a Dissent Right with respect to any Rubicon Common Shares if the Shareholder votes (or instructs or is deemed, by submission of any incomplete proxy, to have instructed his or her proxyholder to vote) in favour of the Arrangement Resolution. A Dissenting Shareholder, however, may vote as a proxy for a Shareholder whose proxy required an affirmative vote, without affecting his or her right to exercise the Dissent Right.

If Rubicon intends to act on the authority of the Arrangement Resolution, it must send a notice (the "Notice to Proceed") to the Dissenting Shareholder promptly after the later of:

(a) the date on which Rubicon forms the intention to proceed, and

(b) the date on which Rubicon forms the intention to proceed.

If Rubicon has acted on the Arrangement Resolution it must promptly send a Notice to Proceed to the Dissenting Shareholder. The Notice to Proceed must be dated not earlier than the date on which it is sent and state that Rubicon intends to act or has acted on the authority of the Arrangement Resolution and advise the Dissenting Shareholder of the manner in which dissent is to be completed.

On receiving a Notice to Proceed, the Dissenting Shareholder is entitled to require Rubicon to purchase all of the Rubicon Common Shares in respect of which the Notice of Dissent was given.

A Dissenting Shareholder who receives a Notice to Proceed is bound to sell its Rubicon Common Shares to Rubicon and must send to Rubicon within one month after the date of the Notice to Proceed:

(a) a written statement that the Dissenting Shareholder requires Rubicon to purchase all of the Notice Shares;

(b) the certificates representing the Notice Shares; and

(c) if dissent is being exercised by the Shareholder on behalf of a beneficial owner who is not the Dissenting Shareholder, a written statement signed by the beneficial owner setting out whether the beneficial owner is the beneficial owner of other shares of Rubicon and if so, setting out:

    (i) the names of the registered owners of those other shares,

    (ii) the number of those other share that are held by each of those registered owners, and

    (iii) that dissent is being exercised in respect of all of those other shares,

    whereupon Rubicon is bound to purchase them in accordance with the Notice of Dissent.

Rubicon and the Dissenting Shareholder may agree on the amount of the payout value of the Notice Shares and in that event, Rubicon must either promptly pay that amount to the Dissenting Shareholder or send a notice to the Dissenting Shareholder that Rubicon is unable lawfully to pay Dissenting Shareholders for their shares as Rubicon is insolvent or if the payment would render Rubicon insolvent.

If Rubicon and the Dissenting Shareholder do not agree on the amount of the payout value of the Notice Shares, the Dissenting Shareholder or Rubicon may apply to the court and the court may:

(a) determine the payout value of the Notice Shares or order that the payout value of the Notice Shares be established by arbitration or by reference to the registrar or a referee of the court;

(b) join in the application each Dissenting Shareholder who has not agreed with Rubicon on the amount of the payout value of the Notice Shares; and

(c) make consequential orders and give directions it considers appropriate.

Promptly after a determination of the payout value of the Notice Shares has been made, Rubicon must either pay that amount to the Dissenting Shareholder or send a notice to the Dissenting Shareholder that Rubicon is unable lawfully to pay Dissenting Shareholders for their shares as Rubicon is insolvent or if the payment would render Rubicon insolvent. If the Dissenting Shareholder receives a notice that Rubicon is unable to lawfully pay Dissenting Shareholders for their shares the Dissenting Shareholder may within 30 days after receipt, withdraw his or her Notice of Dissent. If the Notice of Dissent is not withdrawn the Dissenting Shareholder remains a claimant against Rubicon to be paid as soon as Rubicon is lawfully able to do so or, in liquidation, to be ranked subordinate to the rights of creditors of Rubicon but in priority to its shareholders.

Any notice required to be given by Rubicon or a Dissenting Shareholder to the other in connection with the exercise of the Dissent Right will be deemed to have been given and received, if delivered, on the day of delivery, or, if mailed, on the earlier of the date of receipt and the second business day after the day of mailing, or, if sent by telecopier or other similar form of transmission, the first business day after the date of transmittal.

A Shareholder who:

(a) properly exercises the Dissent Right by strictly complying with all of the procedures ("Dissent Procedures") required to be complied with by a Dissenting Shareholder, will

  (i) be bound by the Dissent Rights set forth in Article 6 of the Plan of Arrangement,

  (ii) be deemed not to have participated in the Arrangement, and cease to have any rights as a Shareholder other than the right to be paid the fair value of the Rubicon Common Shares by Rubicon in accordance with the Dissent Procedures and deemed to have transferred his shares on the Effective Date, or

(b) seeks to exercise the Dissent Right, but

  (i) who for any reason does not properly comply with each of the Dissent Procedures required to be complied with by a Dissenting Shareholder, or

  (ii) subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent,

will be deemed to have participated in the Arrangement on the same basis as each non-dissenting Shareholder and will receive his or her pro rata portion of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares based upon the number of Rubicon Common Shares of which such Dissenting Shareholder is the registered holder. Rubicon may in its sole discretion, waive any non-compliance by a Shareholder with any of the provisions of Article 6 of the Plan of Arrangement in order to give effect to a Shareholders' Dissent Rights.

Except as described above a Dissenting Shareholder may not withdraw a Notice of Dissent without the consent of Rubicon. A Dissenting Shareholder may, with the written consent of Rubicon, at any time prior to the payment to the Dissenting Shareholder of the full amount of money to which the Dissenting Shareholder is entitled under Article 6 of the Plan of Arrangement, abandon such Dissenting Shareholder's dissent to the Arrangement by giving written notice to Rubicon, withdrawing the Notice of Dissent, by depositing such notice with Rubicon, or mailing it to Rubicon by registered mail, at its head office at Suite 1540, 800 West Pender Street, Vancouver, British Columbia V6C 2V6, marked to the attention of the President, and will then be deemed to have participated in the Arrangement on the same basis as each non-dissenting Rubicon Shareholder and will receive such number of New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares, to which he or she is entitled.

If a Shareholder exercises the Dissent Right, Rubicon shall on the Effective Date set aside and not distribute that portion of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares which is attributable to the Rubicon Common Shares for which Dissent Rights have been exercised. If a Rubicon Shareholder exercises the Dissent Right, but does not properly comply with the Dissent Procedures as set out above, or subsequent to giving his or her Notice of Dissent, acts inconsistently with such dissent, then Rubicon shall distribute to such Shareholder his or her pro rata portion of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares. If a Shareholder duly complies with the Dissent Procedures, then Rubicon shall retain the portion of the New Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares attributable to such Shareholder (the "Non- Distributed New Rubicon, Paragon and CopperCo Common Shares"), and the Non-Distributed New Rubicon, Paragon and CopperCo Common Shares will be dealt with as determined by the Board of Directors of Rubicon in its discretion.

**Shareholders should consult their legal advisors with respect to the legal rights available to them in relation to the Arrangement and the Dissent Rights.**

**SCHEDULE "M"**
(to the Management Information Circular of Rubicon Minerals Corporation dated July 7, 2006

## RISK FACTORS

In evaluating the Arrangement, Shareholders should carefully consider, in addition to the other information contained in this Circular, the risk factors which apply to Rubicon, and will apply to Paragon and CopperCo as appropriate after the Effective Date. These risk factors are not a definitive list of all risk factors associated with the business to be carried out by Rubicon and the new companies Paragon and CopperCo.

### No known Reserve or Resources

Rubicon properties are in the exploration stage and are without a known body of commercial ore.

Rubicon has no mineral producing properties at this time. Only those mineral deposits that Rubicon can economically and legally extract or produce, based on a comprehensive evaluation of cost, grade, recovery and other factors, are considered "resources" or "reserves." Rubicon has not defined or delineated any proven or probable reserves or resources on any of its properties. Although the mineralized material and mineralized deposit estimates included herein have been carefully prepared by Rubicon, or, in some instances have been prepared, reviewed or verified by independent mining experts, these amounts are estimates only and no assurance can be given that any particular level of recovery of gold, silver, copper, cobalt or other minerals from mineralized material will in fact be realized or that an identified mineralized deposit will ever qualify as a commercially mineable (or viable) reserve.

Development of any of Rubicon's properties will only follow upon obtaining satisfactory exploration results, mineral exploration and development involve a high degree of risk and few properties which are explored are ultimately developed into producing mines. There is no assurance that Rubicon's mineral exploration activities will result in the discovery of a body of commercial ore on any of its properties. Several years may pass between the discovery of a deposit and its exploitation. Most exploration projects do not result in the discovery of commercially mineable mineralized deposits

### Operating Hazards and Risks

Mineral exploration involves many risks. The operations in which Rubicon has a direct or indirect interest will be subject to all the hazards and risks normally incidental to exploration, any of which could result in work stoppages and damage to persons or property or the environment and possible legal liability for any and all damage. Fires, power outages, labour disruptions, flooding, land slides and the inability to obtain suitable or adequate machinery, equipment or labour are some of the risks involved in the conduct of exploration programs.

### Environmental Factors

Rubicon currently conducts exploration activities in the Canadian Provinces of Ontario, Newfoundland, British Columbia and in the Nunavut Territory and through its majority owned subsidiary, Toquima Minerals Corporation, the States of Alaska and Nevada. Such activities are subject to various laws, rules and regulations governing the protection of the environment, including, in some cases, posting of reclamation bonds. In Canada, extensive environmental legislation has been enacted by federal and provincial governments. Such legislation imposes rigorous standards on the mining industry to reduce or eliminate the effects of wastes generated by extraction and processing operations and subsequently deposited on the ground or emitted into the air or water. All phases of Rubicon's operations are subject to environmental regulation in the jurisdictions in which it operates. Environmental legislation is evolving in a manner which requires stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed properties and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect the Rubicon's operations.

The cost of compliance with changes in governmental regulations has the potential to preclude entirely the economic development of a property.

Rubicon is able to conduct its exploration within the provisions of the applicable environmental legislation without undue constraint on its ability to carry on efficient operations. The estimated annual cost of environmental compliance for all properties held by Rubicon in the exploration stage is minimal and pertains primarily to carrying out diamond drilling, trenching or stripping.

Environmental hazards may exist on Rubicon's properties, which hazards are unknown to the Company at present, which have been caused by previous or existing owners or operators of the properties.

On the McFinley property, there are a number of mine structures (head frame, bulk sample process plant) and mine features (unused tailings and settling ponds, rock dumps) which were used by the previous owners to gain underground access and stockpile mill feed. The mill was never operational and the stockpiled feed was never processed. Rubicon conducts on-going general rehabilitation activities to ensure the site is safe and secure. There are no immediate and material environmental concerns or liabilities based on consulting reports from URS Corporation and AMEC Engineering. Relatively minor environmental issues exist that can readily be addressed on final closure of the site. Water quality in the receiving environment meets prevailing norms.

**Additional Financing and Agreements with Other Parties**

Rubicon has to-date been able to raise sufficient equity financing to undertake and carry out a certain amount of exploration on its principal and other properties. Rubicon also relies on corporate partners to fund a number of its properties in Ontario and Newfoundland. Additional future exploration of Rubicon's properties depends on Rubicon's ability to obtain additional required equity or partner financing.

As of December 31, 2005, Rubicon had cash and cash equivalents of approximately $2.8 million. Working capital at December 31, 2005 was CDN$3.2 million. In 2006, up to June 6, 2006, the Company had raised an additional $12.2 Million from a private placement and the exercise of options and warrants. Rubicon will continue to incur exploration and assessment costs and intends to fund its operations from working capital. Rubicon anticipates that it will incur approximately CDN$4 million in exploration and assessment costs and administrative and other expenditures during the year ending December 31, 2006. Rubicon's ability to continue its future exploration, assessment, and development activities depends in part on Rubicon's ability to commence operations and generate revenues or to obtain financing through joint ventures, debt financing, equity financing, production sharing arrangements or some combination of these or other means.

There is no assurance that additional funding will be available to allow Rubicon to maintain its mineral properties in good standing. The lack of additional financing could result in delay or indefinite postponement of further exploration and the possible, partial or total loss of Rubicon's interest in its mineral properties.

**Competition**

The resource industry is intensively competitive in all of its phases, and Rubicon competes with many companies possessing greater financial resources and technical facilities than itself. Competition could adversely affect Rubicon's ability to acquire suitable producing properties or prospects for exploration in the future.

**Title**

There is no guarantee that title to properties in which Rubicon has a material interest will not be challenged or impugned. Rubicon's mineral property interests may be subject to prior unregistered agreements or transfers or native land claims and title may be affected by undetected defects. In addition, certain of the mining claims in which Rubicon has an interest are not recorded in the name of the Company and cannot be recorded until certain steps are taken by other parties. Before a number of claims under option can be recorded in Rubicon's name, the underlying title holder has to assign title to Rubicon once Rubicon satisfies its option agreement obligations. There

are no assurances that the underlying title holder will assign title. As at the date of this Circular, approximately 36% of claims have yet to be recorded in the Rubicon's name.

**Governmental Regulation**

Exploration activities on the Rubicon's properties are affected to varying degrees by: (i) government regulations relating to such matters as environmental protection, health, safety and labour; (ii) mining law reform; (iii) restrictions on production, price controls, and tax increases; (iv) maintenance of claims; (v) tenure; and (vi) expropriation of property. There is no assurance that future changes in such regulation, if any, will not adversely affect Rubicon's operations. Changes in such regulation could result in additional expenses and capital expenditures, availability of capital, competition, reserve uncertainty, potential conflicts of interest, title risks, dilution, and restrictions and delays in operations, the extent of which cannot be predicted.

Rubicon is at the exploration stage on all of its properties. Exploration on the Rubicon's properties requires responsible best exploration practices to comply with company policy, government regulations, maintenance of claims and tenure. Rubicon is required to be registered to do business and have a valid prospecting license (required to prospect or explore for minerals on Crown Mineral Land or to stake a claim) in any Canadian province in which it is carrying out work.

Mineral exploration primarily falls under provincial jurisdiction. However, Rubicon is also required to follow the regulations pertaining to the mineral exploration industry that fall under federal jurisdiction, such as the Fish and Wildlife Act.

If any of Rubicon's projects are advanced to the development stage, those operations will also be subject to various laws and regulations concerning development, production, taxes, labour standards, environmental protection, mine safety and other matters.

**Ontario**

Legislation and regulations implemented by the Ministry of Northern Development and Mines and the Ministry of Natural Resources directly affect the mining industry in the Province of Ontario where Rubicon holds some of its mineral claims. Rubicon can carry out exploration work including drilling, trenching, heavy mineral studies, airborne geophysical surveys, extensive use of off road vehicles, establishment of a camp or other activities capable of causing ground disturbance, water quality impairments or disruption to wildlife or wildlife habitat, provided that it complies with applicable provincial and federal acts and regulations in so doing. Rubicon is not required to obtain a work permit for exploration activities on its Ontario properties.

The acts and regulations which guide exploration activity in Ontario are: the Mining Act, the Public Lands Act, the Forest Fire Prevention Act, Lakes and Rivers Improvement Act, Crown Timber Act, Fisheries Act, Occupational Health and Safety Act, Health Protection and Promotion Act, Environmental Protections Act, and Gasoline Handling Act.

**Newfoundland/Paragon**

Legislation and regulations implemented by the Newfoundland Department of Mines and Energy directly affect the mining industry in the Province of Newfoundland and Labrador where Rubicon currently holds some of its mineral claims and where Paragon will hold nearly all of its mineral properties. In particular, Rubicon must currently provide prior notice and a description of the planned exploration work and receive written approval before the commencement of the exploration work.

Exploration work which involves mechanized activities such as drilling, trenching, heavy mineral studies, airborne geophysical surveys, extensive use of off road vehicles, establishment of a camp or other activities capable of causing ground disturbance, water quality impairments or disruption to wildlife or wildlife habitat, cannot commence until the work plan has been reviewed by the Department of Mines and Energy and a written exploration approval notice issued, outlining such terms and conditions deemed necessary and prescribed by the Minister.

A License of Occupation under the Newfoundland Lands Act is required for a camp location where use or occupation of the camp is proposed to involve long term, seasonal or permanent use and occupation of the camp, or involves ground disturbance. Any clearing of areas in order to construct camps must comply with the Newfoundland Forestry Act and Regulations, and Rubicon must currently comply with the reclamation requirements pursuant to the Mineral Act.

Pursuant to the Newfoundland Historic Resources Act, if drilling is planned for an area with known archaeological sites, Rubicon may be required to hire an archaeologist to ensure the work does not disturb any sites. No such sites are known to exist on any of Rubicon's existing claims.

The acts and regulations which guide exploration activity in Newfoundland are: the Mineral Act, the Quarry Materials Act, the Mineral Holding Impost Act, the Crown Lands Act, the Forestry Act, the Forestry and Agricultural Act, the Occupational Health and Safety Act and the First Aid Regulations, the Waste Material (Disposal) Act, the Department of Health Act, the Food and Drug Act, the Wildlife Act, the Provincial Parks Act, the Dangerous Goods Transportation Act and the Municipalities Act.

**International Risks/CopperCo**

See Schedule "K", "Information Concerning CopperCo After the Arrangement - Risk Factors"

**Management**

Rubicon is dependent upon a number of key directors, officers and employees: J. Garfield MacVeigh, Chairman of the Board; David W. Adamson, President and CEO; Robert G. Lewis, CFO, and, William J. Cavalluzzo, Vice-President —Investor Relations. The loss of any one or more of the named directors, officers and employees could have an adverse effect on Rubicon. Rubicon has entered into management contracts with Mssrs. MacVeigh, Adamson, Lewis and Cavalluzzo. Rubicon does not maintain key person insurance on any of its management. It is expected that Paragon and CopperCo will be similarly dependent on a limited number of key directors, officers and employees.

**Conflicts of Interest**

Certain directors of Rubicon are directors of, or may become associated with, other natural resource companies that acquire interests in mineral properties. Such associations may give rise to conflicts of interest from time to time. Such a conflict poses the risk that the Company may enter into a transaction on terms which place Rubicon in a worse position than if no conflict existed. The officers and directors of Rubicon are required by law to act honestly and in good faith with a view to the best interests of Rubicon and its Shareholders and to disclose any interest which they may have in any project or opportunity of Rubicon, but each officer or director has the identical obligation to other companies for which such officer or director serves as an officer or director. The directors and officers of Paragon and CopperCo will face similar conflicts.

**Foreign Incorporation**

Rubicon, Paragon and CopperCo are incorporated under the laws of the Province of British Columbia, Canada and the federal laws of Canada, and all of Rubicon's seven directors and all of its officers and all of Paragon's four directors and all of its officers are residents of Canada, and all of CopperCo's six directors and all of its officers are residents of Canada, United Kingdom or Tanzania. Consequently, it may be difficult for United States investors to effect service of process within the United States upon Rubicon, Paragon or CopperCo or upon those directors or officers who are not residents of the United States, or to realize in the United States upon judgments of United States courts predicated upon civil liabilities under the United States Securities Exchange Act of 1934, as amended. There is substantial doubt whether an original lawsuit could be brought successfully in Canada, United Kingdom or Tanzania against any of such persons or Rubicon, Paragon or CopperCo predicated solely upon such civil liabilities.

*"Penny Stock" Rules*

The Rubicon Common Shares are "penny stock" as defined by the Securities and Exchange Commission, which might affect the trading market for the Rubicon Common Shares. Penny stocks are generally equity securities with a price of less than U.S. $5.00 (other than securities registered on certain national securities exchanges, including AMEX or quoted on the NASDAQ National Market, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system). The Securities and Exchange Commission has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. The penny stock rules require a broker-dealer, prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document prepared by the Securities and Exchange Commission that provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and compensation information must be given to the customer orally or in writing before or with the customer's confirmation. In addition, the penny stock rules require that prior to a transaction in a penny stock not otherwise exempt from such rules, the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. These disclosure requirements may have the effect of reducing the level of trading activity in the secondary market for a stock that is subject to the penny stock rules, such as the Rubicon Common Shares which are considered "penny stock", and therefore make it more difficult to sell those Rubicon Common Shares.

*Limited Operating History: Losses*

Rubicon has limited experience in mining or processing of metals. Rubicon has experienced, on a consolidated basis, losses in all years of its operations, including losses of $3,644,284, $4,082,836 and $2,312,394 in the years ended December 31, 2005, 2004 and 2003, respectively. Rubicon has no mineral properties in development or production and has no revenues from operations. Rubicon does not anticipate it will earn any revenue in 2006 and anticipates it will incur losses for the foreseeable future. There can be no assurance that Rubicon will operate profitably in the future, if at all. As at December 31, 2005, Rubicon's deficit was $15,841,543.

*Price Fluctuations: Share Price Volatility*

In recent years, the securities markets in the United States and Canada have experienced a high level of price and volume volatility, and the market price of securities of many mineral exploration companies have experienced wide fluctuations in price which have not necessarily been related to the operating performance, underlying asset values or prospects of such companies. In particular, the price of the Rubicon Common Shares fluctuated from a high of $1.66 CAD to a low of $0.64 CAD per share within the twelve month period preceding the date of this Circular. There can be no assurance that the continual fluctuations in price will not occur.

**Shares Reserved for Future Issuance: Dilution**

As at December 31, 2005 and March 27, 2006, there were respectively 4,815,000 (weighted average exercise price of $l.10 per share) and 4,475,000 stock options (average exercise price of $1.10 per share) and 4,815,000 (average exercise price of $1.10 per share) and 4,948,896 warrants (average exercise price of $0.88 per share) outstanding pursuant to which shares may be issued in the future, which will result in further dilution to Rubicon's shareholders and pose a dilutive risk to potential investors.

**Risk Associated with the Issuance of Flow-Through Shares**

The Company has financed its past exploration activities and operations primarily through the issuance of equity, including flow-through shares and Paragon is proposing to issue flow-through shares as pert of the Paragon Financing. Under the ITA, exploration companies are permitted to issue flow-through shares pursuant to a written agreement under which the issuer agrees to incur certain eligible Canadian exploration expenses within the time frame specified in the agreement and to flow-through or "renounce" the related tax deduction to the investor. The

proceeds from the issuance of flow-through shares must be expended on "qualifying expenditures," which are related to mineral exploration.

In general, in such circumstances Rubicon agrees to incur certain qualifying expenditures and to renounce the related tax deduction to the investor within the time frame specified in the given agreement. In the event that Rubicon is unable to make the renunciation or fails to expend the funds on qualifying expenditures, the investor may be subject to reassessment for any related tax deduction taken by the investor and Rubicon could be liable to the investor for damages in an action for breach of contract. However, there is no right of rescission of the subscription contract that would result in a reversal of the share issuance. The investor may be entitled to damages (based on a breach of contract claim), which may include amounts related to the increased tax liability that the shareholder experienced resulting from the failure of Rubicon to renounce the contracted qualifying expenditures. In addition, Rubicon could be required to pay a penalty and interest to Canada Revenue Agency for failure to make and renounce such qualifying expenditures.

Although Rubicon and Paragon believe they will make the qualifying expenditures based on its current operating plan and renounce the related tax deduction for the benefit of the purchasers of its flow-through shares, there can be no assurance that Rubicon or Paragon will make the qualifying expenditures or renounce such deductions in a timely manner. The failure to make the qualifying expenditures or to renounce such deductions in a timely manner could have a material adverse effect on the Rubicon's or Paragon's business or its ability to raise additional financing through the issuance of flow-through shares.

**Dividend Record Policy**

Rubicon has not paid any dividends since incorporation and neither it, Paragon nor CopperCo has any present intention of paying dividends on their Shares as they anticipate that all available funds will be invested to finance the growth of their businesses. The directors of Rubicon, Paragon and CopperCo will determine if and when dividends should be declared and paid in the future based on the their respective financial positions at the relevant time. All of the Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares are entitled to an equal share of any dividends declared and paid.

**Tax consequences based on valuations obtained by Rubicon**

The anticipated tax consequences of the proposed transaction to Rubicon and its shareholders are based on estimates of the fair market value of Rubicon's assets which were obtained by Rubicon from and independent third party valuator. The valuation obtained from the valuator are not binding on the Canada Revenue Agency and if the Canada Revenue Agency disagrees with these valuations, the tax consequences to both Rubicon and its Shareholders may differ from those set out herein.

**Potential adverse tax consequences to annuitas of RRSP's and RRIF's and to DPSP's and RESP's which acquire Rubicon Common Shares, Paragon Common Shares and CopperCo Common Shares**

In the event Paragon and/or CopperCo does not obtain a listing on either the TSX or the TSX-V or the Rubicon Common Shares are not listed on the TSX or AMEX, its shares may not be qualified investment of a registered retirement savings plan ("**RRSP**"), a registered retirement income fund ("**RRIF**'), a deferred profit sharing plan ("**DPSP**") or a registered education savings plan ("**RESP**") and adverse tax consequences will arise.

**Failure to obtain Advance Tax Ruling**

The completion of the Arrangement is subject to, among other things, Rubicon obtaining the Tax Ruling from the Canada Revenue Agency (the "**CRA**") in form and substance satisfactory to Rubicon and Africo, with respect to certain income tax consequences of the Arrangement. There may be disagreements with the CRA with respect to certain tax consequences associated with the Arrangement. There can be no assurance that the Tax Ruling will be obtained or that it will be satisfactory to Rubicon or Africo. **Shareholders should consult their own tax and legal advisors for advice with respect to the income tax and other consequences associated with their acquisition of securities under the Arrangement.**

**Dissenting Shareholders**

If Rubicon receives Notice of Dissent from Shareholders holding greater than 1% of the outstanding Rubicon Common Shares management of Rubicon may at their option not implement the Plan of Arrangement.

**Failure to obtain Court, Shareholder, TSX and/or AMEX approval to the Plan of Arrangement**

The Plan of Arrangement is subject to the approval of the Shareholders, TSX, AMEX and the Supreme Court of the Province of British Columbia. There is no assurance that the Shareholders, TSX, AMEX and the Supreme Court of British Columbia will approve the Plan of Arrangement. If Rubicon does not receive approval from all parties Rubicon will not proceed with the Plan of Arrangement.

**The Plan of Arrangement may not produce the anticipated benefits**

Notwithstanding that Rubicon completes the Plan of Arrangement the reasons for the Plan of Arrangement and the anticipated benefits may not materialize.

**SCHEDULE "N"**
(to the Management Information Circular of Rubicon Minerals Corporation, dated July 7, 2006)

**DISCLOSURE OF CORPORATE GOVERNANCE PRACTICES**

Comments

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| **1. Board of Directors** | |
| (a) Disclose the identity of directors who are independent. | (a) Rubicon has four independent directors, namely: Philip S. Martin, John R. Brodie, Kevin D. Sherkin and Chris Bradbrook. These directors are considered independent under AMEX Rule 121(b). |
| (b) Disclose the identity of directors who are not independent, and describe the basis of that determination. | (b) Rubicon has three non-independent directors, namely: J. Garfield MacVeigh, Chairman, David W. Adamson, President & CEO, both employed full time by Rubicon and David R. Reid, legal counsel to Rubicon. |
| (c) Disclose whether or not a majority of directors are independent. If a majority of directors are not independent, describe what the board of directors (the board) does to facilitate its exercise of independent judgement in carrying out its responsibilities. | (c) The board of directors consists of a majority of directors who are independent. |
| (d) If a director is presently a director of any other issuer that is a reporting issuer (or the equivalent) in a jurisdiction or a foreign jurisdiction, identify both the director and the other issuer. | (d) The following directors are presently also directors of other reporting issuers as listed:<br>• J. Garfield MacVeigh: Toquima Minerals Corporation (not listed) and Constantine Metal Resources Ltd. (not listed)<br>• David W. Adamson: Toquima Minerals Corporation (not listed)<br>• David R. Reid: Far West Mining Ltd. (TSX); Western Prospector Group Ltd. (TSX-V); Ross River Minerals Inc. (TSX-V) and Harbour Pacific Minerals Inc. (not listed)<br>• John R. Brodie: Far West Mining Ltd. (TSX); Copper Belt Resources Ltd. (CNQ); Pacific Safety Products Ltd. (TSX-V); Silver Standard Resources Inc. (TSX) and trustee, AgGrowth Income Fund (TSX), Western Canadian Coal Corp. (TSX)<br>• Philip S. Martin: Asia Now Resources Corp. (TSX-V); Aura Gold Inc. (not listed); Beta Minerals Inc. (TSX-V); High Plains Uranium, Inc. (TSX); Maximus Ventures Ltd. (TSX-V); Southern Era Diamonds Inc. (TSX)<br>• Chris Bradbrook: New Gold Inc. (TSX, AMEX) |

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| (e) Disclose whether or not the independent directors hold regularly scheduled meetings at which non-independent directors and members of management are not in attendance. If the independent directors hold such meetings, disclose the number of meetings held since the beginning of Rubicon's most recently completed financial year. If the independent directors do not hold such meetings, describe what the board does to facilitate open and candid discussion among its independent directors. | e) The independent directors of the board hold at least one meeting per year in which non-independent directors and members of management are not in attendance and as many more such meetings as are deemed necessary. The independent directors have held 2 meetings since the beginning of the 2005 fiscal year. Those two meeting were on June 14 and June 28, 2006. |
| (f) Disclose whether or not the chair of the board is an independent director. If the board has a chair or lead director who is an independent director, disclose the identity of the independent chair or lead director, and describe his or her role and responsibilities. If the board has neither a chair that is independent nor a lead director that is independent, describe what the board does to provide leadership for its independent directors. | (f) The Chairman of the Board, J. Garfield MacVeigh, is not an independent director. As Chair, J. Garfield MacVeigh is responsible for chairing all meetings of the board of directors for which he is present. |
| (g) Disclose the attendance record of each director for all board meetings held since the beginning of Rubicon's most recently completed financial year. | (g) The board of directors of Rubicon has held 8 meetings since the beginning of Rubicon's most recently completed financial year. The attendance record for its seven directors is:<br>• J. Garfield MacVeigh: 8<br>• David W. Adamson: 8<br>• David R. Reid: 6<br>• John R. Brodie: 6 (appointed as a director on January 27, 2006 and has attended all meetings since his appointment)<br>• Philip S. Martin: 7<br>• Kevin D. Sherkin: 6 (appointed as a director on January 27, 2006 and has attended all meetings since his appointment)<br>• Chris Bradbrook: 3 (appointed as a director on December 14, 2005 and has attended all meetings since his appointment) |
| **2. Board Mandate**<br>Disclose the text of the board's written mandate. If the board does not have a written mandate, describe how the board delineates its role and responsibilities. | The Board has a written mandate as set out in its Corporate Governance Policy attached hereto as Exhibit A. |
| **3. Position Descriptions**<br>(a) Disclose whether or not the board has developed written position descriptions for the chair and the chair of each board committee. If the board has not developed written positions for the chair and/or the chair of each board committee, briefly describe how the board delineates the role and responsibilities of each such position. | (a) Because of the small size of the board, the board has not developed written position descriptions for the chair and the chair of each board committee. While Rubicon has not created written position descriptions, the role and responsibilities of the chair of the board and the chair or each board committee are delineated in Rubicon's Corporate Governance Guidelines. |

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| (b) Disclose whether or not the board and CEO have developed a written position description for the CEO. If the board and CEO have not developed such a position description, briefly describe how the board delineates the role and responsibilities of the CEO. | (b) The board and CEO have not developed a written position description for the CEO. However, the directors are kept fully informed of management actions that have a material impact on the operation and performance of Rubicon. All material contracts and agreements are put before the directors for approval and/or ratification. The board has charged the CEO with the responsibilities for the day to day running of Rubicon and to propose strategic direction, policies and financial goals for the review, consideration and approval of the board. |
| **4. Orientation and Continuing Education** | |
| (a) Briefly describe what measures the board takes to orient new directors regarding:<br>(i.) the role of the board, committees and its directors; and<br>(ii) the nature and operation of Rubicon's business. | (a) The Chief Financial Officer is responsible for providing an orientation for new directors. Director orientation and on-going training will include presentations by senior management to familiarize directors with Rubicon's strategic plans, its significant financial, accounting and risk management issues, its compliance programs, its principal officers and its internal and independent auditors. Each director is encouraged to visit one of Rubicon's significant properties at least once every two years. |
| (b) Briefly describe what measures, if any, the board takes to provide continuing education for its directors. If the board does not provide continuing education, describe how the board ensures that its directors maintain the skill and knowledge necessary to meet their obligations as directors. | (b) The Chief Financial Officer is responsible for periodically providing materials for all directors on subjects relevant to their duties as directors of Rubicon. |
| **5. Ethical Business Conduct** | |
| (a) Disclose whether or not the board has adopted a written code for the directors, officers and employees. If the board has adopted a written code:<br>(i) disclose how a person or company may obtain a copy of the written code;<br>(ii) describe how the board monitors compliance with its code, or if the board does not monitor compliance, explain whether and how the board ensures compliance with its code; and<br>(iii) provide cross-reference to any material change report filed since the beginning of Rubicon's most recently completed financial year that pertains to any conduct of a director or executive officer that constitutes a departure from the code. | (a) Rubicon has a written code of ethical business conduct for its directors, officers and employees. |

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| (b) Describe any steps the board takes to ensure directors exercise independent judgement in considering transactions and agreement in respect of which a director or executive officer has a material interest. | (b) Under Rubicon's Corporate Governance Guidelines, the directors are required to disclose to the board (and to any applicable committee) any financial interest or personal interest in any contract or transaction that is being considered by the board or committee for approval. The interested director shall abstain from voting on the matter and, in most cases, should leave the meeting while the remaining directors discuss and vote on such matter. Disclosed conflicts of interest will be documented in the minutes of the meeting. |
| (c) Describe any other steps the board takes to encourage and promote a culture of ethical business conduct. | (c) The board of directors has instructed Rubicon to circulate Rubicon's Code of Business Conduct and Ethics, Corporate Disclosure Policy, Insider Trading Policy and Whistleblower Policy to all officers and employees of Rubicon and, where appropriate, to third parties with a connection to Rubicon. |
| **6. Nomination of Directors** | |
| (a) Describe the process by which the board identifies new candidates for board nomination. | (a) The process by which the board identifies new candidates for board nomination is provided in Rubicon's Corporate Governance Guidelines and the Nominating Committee Charter. When a board vacancy occurs or is contemplated, the Nominating Committee will recommend qualified individuals for nomination to the board. |
| (b) Disclose whether or not the board has a nominating committee composed entirely of independent directors. If the board does not have a nominating committee composed entirely of independent directors, describe what steps the board takes to encourage an objective nomination process. | (b) The Board has appointed a Nominating Committee composed of John R. Brodie, Kevin D. Sherkin and Philip S. Martin, each of whom is an independent director. |

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| (c) If the board has a nominating committee, describe the responsibilities, powers and operation of the nominating committee. | (c) The Nominating Committee Charter provides that:<br>• the Nominating Committee's responsibilities are to review on an annual basis the appropriate skills and characteristics required of Board members in the context of the current make-up of the Board and any perceived needs. In addition, on an annual basis, the Committee will assess the Board's compliance with laws and policies relating to the independence of certain Board members.<br>• The Board has delegated to the Nominating Committee the authority set out in the Nominating Committee Charter which includes the Committee forming and delegating authority to sub-committees and the Nominating Committee retaining persons having special competencies to assist the Committee in fulfilling its responsibilities.<br>• The process to be taken by the Nominating Committee for nomination of candidates for election to the Board include the Nominating Committee identifying the need to add new Board members, with careful consideration of the mix of qualifications, skills and experiences represented on the Board; the chair of the Nominating Committee coordinates the search for qualified candidates with input from management and other Board members; the Nominating Committee may engage a search firm to assist in identifying potential nominees; prospective candidates are interviewed; the Nominating Committee will recommend a nominee and seek full Board endorsement of the selected candidate based on its judgment as to which candidate will best serve the interest of the Company's shareholders. |

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| **7. Compensation** | |
| (a) Describe the process by which the board determines the compensation for Rubicon's directors and officers. | (a) Rubicon's Compensation Committee assesses performance and determines the remuneration of senior officers. The Compensation Committee also administers Rubicon's stock option plan. The Compensation Committee may recommend to the board the granting of stock options to directors of Rubicon as well as determine directors fees, if any, from time to time. Directors may also be compensated in cash and/or equity for their expert advice and contribution towards the success of Rubicon. The form and amount of such compensation will be evaluated by the Compensation Committee, which will be guided by the following goals: (i) compensation should be commensurate with the time spent by directors in meeting their obligations and reflective of the compensation paid by companies similar in size and business to Rubicon; and (ii) the structure of the compensation should be simple, transparent and easy for shareholders to understand. Shareholders will be given the opportunity to vote on all new or substantially revised equity compensation plans for directors as required by regulatory policies. |
| (b) Disclose whether or not the board has a compensation committee composed entirely of independent directors. If the board does not have a compensation committee composed entirely of independent directors, describe what steps the board takes to ensure an objective process for determining such compensation. | (b) Rubicon's Compensation Committee is comprised of Chris Bradbrook (Chair), Philip S. Martin and John R. Brodie, each of whom is considered "independent" as that term is defined in MI 52-110 and under AMEX Rule 805. |
| (c) If the board has a compensation committee, describe the responsibilities, powers and operation of the compensation committee. | (c) The role of the Compensation Committee is primarily to administer Rubicon's stock option plan and to determine the remuneration of senior officers of Rubicon. |
| (d) If a compensation consultant or advisor has, at any time since the beginning of Rubicon's most recently completed financial year, been retained to assist in determining compensation for any of Rubicon's director's and officers, disclose the identity of the consultant or advisor and briefly summarize the mandate for which they have been retained. If the consultant or advisor has been retained to perform any other work for the issuer, state that fact and briefly describe the nature of the work. | (d) Roger Gurr & Associates was retained to review executive and outside director compensation and to report to the Compensation Committee to assist in the development of an appropriate compensation strategy for executives and outside directors. The report to the Compensation Committee was dated March 8, 2005. |

| CORPORATE GOVERNANCE DISCLOSURE REQUIREMENT | OUR CORPORATE GOVERNANCE PRACTICES |
|---|---|
| **8. Other Board Committees**<br>If the board has standing committees other than the audit, compensation and nominating committees, identify the committees and describe their function. | The board also has a committee called the Corporate Governance Committee. The primary functions of this committee are to review the Corporate Governance Guidelines on an annual basis and if considered appropriate by the committee, to suggest changes to the Board of Directors; to review whether any director who has a change of employer or primary occupation or whose occupational responsibilities are substantially changed from when the director was elected to the board (excluding retirement) should resign as a director and make the appropriate recommendations to the board considering whether or not the new occupation of the director is consistent with the specific rationale for originally selecting that individual as a director of Rubicon; to review critically each director's continuation on the board every year, to establish a process for the evaluation of the performance of the board and each of its committees and such other tasks as may be assigned to the committee by the board from time to time. |
| **9. Assessments**<br>Disclose whether or not the board, its committees and individual directors are regularly assessed with respect to their effectiveness and contribution. If assessments are regularly assessed with respect to their effectiveness and contribution. If assessments are not regularly conducted, describe how the board satisfies itself that the board, its committees, and its individual directors are performing effectively. | The Corporate Governance Committee Charter provides that the committee shall review critically each director's continuation on the board every year considering among other things, a director's service on other boards and the time involved in such other service, and establish a process for the evaluation of the performance of the board and each of its committees, which should include a solicitation of comments from all directors and a report annually to the board and the results of this evaluation. |

**EXHIBIT A TO SCHEDULE N**

# CORPORATE GOVERNANCE GUIDELINES

The following Corporate Governance Guidelines have been approved by the Board of Directors (the "**Board**") of Rubicon Minerals Corporation (the "**Company**"), and along with the charters and key practices of the committees of the Board, provide the framework for the governance of the Company.

## 1. MISSION AND PRIMARY RESPONSIBILITIES OF THE BOARD

The mission of the Board is to oversee the business affairs of the Company in order to ensure the long-term financial strength of the Company and the creation of enduring shareholder value. The Board must also maintain a sense of responsibility to the Company's customers, employees, suppliers and the communities in which it operates.

The primary responsibilities of the Board are to:

i. develop, monitor and, where appropriate, modify the Company's strategic plan;

ii. review and, where appropriate, approve the financial and business goals and objectives, major corporate actions and internal controls of the Company;

iii. regularly monitor the effectiveness of management policies and decisions;

iv. select, evaluate and compensate the Chief Executive Officer (the "**CEO**") and other senior officers and review management succession planning;

v. assess major risks facing the Company and review options for their mitigation;

vi. ensure that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations;

vii. review, with input from the Audit Committee, the financial performance and financial reporting of the Company and assesses the scope, implementation and integrity of the Company's internal control systems;

viii. appoint the officers of the Company, ensuring that they are of the calibre required for their roles and planning their succession as appropriate from time to time; and

ix. establish and oversee committees of the Board as appropriate, approve their mandates and approve any compensation of their members.

## 2. DIRECTOR QUALIFICATIONS AND SELECTION

### 2.1 Board and Director Requirements

The directors will be elected each year by the shareholders at the annual meeting of shareholders. The Board will propose a slate of nominees to the shareholders for election to the Board at such meeting. Between annual meetings of shareholders, the Board may appoint directors to serve until the next such meeting.

Each director should possess the following minimum qualifications: (a) the highest personal and professional ethics, integrity and values; (b) commitment to representing the long-term interest of the shareholders; (c) relevant business or professional experience; and (d) sufficient time to effectively fulfill duties as a Board member. The Nominating Committee will endeavour to recommend qualified individuals to the Board who, if added to the Board, would provide the mix of director characteristics and diverse experiences, perspectives and skills appropriate for the Company.

The Board will have a majority of directors who meet the criteria for independence as defined in National Instrument 58-201, *Corporate Governance Guidelines* and by the rules of the American Stock Exchange, each as may be amended or replaced from time to time, and any other applicable laws, rules and regulations that may apply to the Company from time to time. The rules of the American Stock Exchange presently require that at least three of the independent directors satisfy its audit committee independence requirements.

## 3. BOARD LEADERSHIP AND TERM

### 3.1 Board Leadership

The Board selects the Chairman of the Board ("Chairman") in the manner and based on the criteria that it deems best for the Company at the time of selection. The role of the Chairman and Chief Executive Officer should be separate, where possible. Unless the Chairman is an independent director, or if there is no Chairman appointed, the Board will have a designated lead director of the Board, who will meet the Company's independence criteria**.** The lead director will (a) preside over all meetings of the Board at which the Chairman, if any, is not present, including non-management directors meetings; (b) serve as liaison with the other independent directors; (c) consult with the CEO regarding meeting agendas and information sent to the Board; and (d) notify other members of the Board regarding any legitimate shareholder concerns of which he or she becomes aware.

### 3.2 Directors' Tenure Policy

The Board believes that it is in the best interests of the Company that any management director whose employment at the Company terminates for any reason (including normal retirement) is expected to promptly resign from the Board, unless expressly agreed otherwise in advance.

### 3.3 Term Limits and Re-election

The Board does not believe it is appropriate or necessary to limit the number of terms a director may serve because of the time and effort necessary for each director to become familiar with the business of the Company. As an alternative to term limits, the Corporate Governance Committee will review critically each director's continuation on the Board every year.

### 3.4 Changes to the Board

Changes to the Board will be announced by press release.

## 4. DUTIES OF BOARD MEMBERS

### 4.1 Director Responsibilities

All directors must exercise their business judgment to act in a manner they reasonably believe to be in the best interest of the Company and its shareholders. Directors must be willing to devote sufficient time and effort to learn the business of the Company, and must ensure that other commitments do not materially interfere with service as a director. In discharging their obligations, directors are entitled to rely on management and the advice of the Company's outside advisors and auditors, but must at all times have a reasonable basis for such reliance. Directors are expected to attend Board meetings and meetings of committees on which they serve, and to spend the time needed and meet as frequently as necessary to properly discharge their responsibilities.

The directors are entitled to have the Company purchase reasonable directors' and officers' liability insurance on their behalf, and to the benefits of indemnification to the fullest extent permitted by law, the Company's charter documents and any indemnification agreements.

### 4.2 Service on Other Boards

The Company recognizes that its directors benefit from service on boards of other companies, so long as such service does not significantly conflict with the interests of the Company. The Nominating Committee will take into account the nature of and time involved in a director's service on other boards in evaluating the suitability of individual directors for election (or re-election).

Directors should advise the Chairman, if any, or the designated lead director, and the chairman of the Corporate Governance Committee in advance of accepting an invitation to serve on the board of another company which is a potential competitor of the Company.

### 4.3 Conflicts of Interest

Directors are required to disclose to the Board (and any applicable committee) any financial interest or personal interest in any contract or transaction that is being considered by the Board or committee for approval. The interested director shall abstain from voting on the matter and, in most cases, should leave the meeting while the remaining directors discuss and vote on such matter. Disclosed conflicts of interest will be documented in the minutes of the meeting.

If a director has any significant conflict of interest with the Company that cannot be resolved, the director will promptly resign.

### 4.4 Company Loans and Corporate Opportunities

The Company will not make any personal loans or extensions of credit to directors or executive officers of the Company.

A director that possesses a business opportunity related to the Company's business shall make such business opportunity available to the Company. The director may pursue the business opportunity for the director's own account or on the account of another if the Company informs the director in writing that the Company will not pursue the opportunity.

### 4.5 Director Orientation and Continuing Education

The Chief Financial Officer will be responsible for providing an orientation for new directors, and for periodically providing materials for all directors on subjects relevant to their duties as directors. Director orientation and on-going training will include presentations by senior management to familiarize directors with the Company's strategic plans, its significant financial, accounting and risk management issues, its compliance programs, its Code of Business Conduct and Ethics, its principal officers and its internal and independent auditors.

Each director is encouraged to visit one of the Company's significant properties at least once every two years.

### 4.6 Share Ownership Guidelines

All directors are encouraged to have a significant long-term financial interest in the Company, but no director is required to be a shareholder of the Company.

## 5. BOARD COMPENSATION

### 5.1 Directors' Fees

Directors are entitled to receive reasonable directors' fees and other compensation for their services as directors and committee members as may be determined from time to time by the Compensation Committee and the Board, as well as reimbursement of expenses incurred on Company business or in attending Board or committee meetings.

### 5.2 Additional Compensation

In addition to directors' fees, directors may be compensated in cash and/or equity for their expert advice and contribution towards the success of the Company. The form and amount of such compensation will be evaluated by the Compensation Committee, which will be guided by the following goals: (i) compensation should be commensurate with the time spent by directors in meeting their obligations and reflective of the compensation paid by companies similar in size and business to the Company; and (ii) the structure of the compensation should be simple, transparent and easy for shareholders to understand.

## 6. BOARD MEETINGS AND COMMUNICATIONS

### 6.1 Attendance at Meetings

The number of scheduled Board meetings will vary with the circumstances, but the Board will meet at least once every financial quarter including following the annual meeting of shareholders held each year. In addition, special Board meetings will be called as necessary. Directors should make reasonable efforts to attend all meetings of the Board and of all Board committees upon which they serve. Any director candidate nominated for election at the annual meeting of shareholders is expected to attend such shareholders' meeting.

### 6.2 Board Agendas

The Chairman, if any, or the designated lead director, will establish the agenda for each Board meeting in advance. Each director is free to suggest the inclusion of items on the agenda and to raise at any Board meeting subjects that are not on the agenda for that meeting. The Board will review the Company's long-term strategic plans and the principal issues that the Company will face in the future during at least one Board meeting each year.

### 6.3 Board Material Distribution

Meeting agendas and other materials for review, discussion and/or action of the Board should, to the extent practicable, be distributed sufficiently in advance of meetings to allow time for review prior to the meeting. Directors are required to review such materials before Board meetings to enable a full discussion at the meetings.

Presentations to the Board may rely on directors having reviewed information set forth in the briefing materials, thus allowing more time for discussion, clarification and feedback.

**6.4 Access to Management and Independent Advisors**

Directors have full and free access to officers and employees of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or the Corporate Secretary or directly by the director. The directors will use their judgment to ensure that any such contact is not disruptive to the business operations of the Company.

The Board has the power to hire independent legal, financial or other advisors as it may deem necessary.

**6.5 Executive Sessions of Non-Management Directors**

Non-management directors will meet in executive session at a scheduled Board meeting at least once per year and special meetings can be called as often as necessary. The Board will designate a lead independent director to lead such sessions. Minutes of each meeting must be prepared.

**6.6 Communications with Interested Parties**

Any interested party that is not an employee, officer or director of the Company, who desires to contact the Company's lead director or the other members of the Board may do so by writing to the Corporate Secretary, Rubicon Minerals Corporation, Suite 1540 – 800 West Pender Street, Vancouver, BC V6C 2V6. Any such communication should state the number of shares of the Company beneficially owned by the party making the communication, if such interested party owns shares. The Corporate Secretary will forward to the lead director any such communication addressed to him or to the Board generally, and will forward such communication to other directors (including all non-management directors), as appropriate, provided that such communication addresses a legitimate business issue. For any communication relating to accounting, auditing or fraud, such communication will be forwarded immediately to the chairman of the Audit Committee.

**7. EVALUATION AND SUCCESSION**

**7.1 Annual Performance Evaluation**

The Board will conduct an annual self-evaluation to determine whether it and its committees are functioning effectively. The Corporate Governance Committee will establish a process for the evaluation of the performance of the Board and each of its committees, which should include a solicitation of comments from all directors and a report annually to the Board on the results of this evaluation.

**7.2 CEO Evaluation**

The Compensation Committee will conduct an annual review of the CEO's performance. The Board will review the Compensation Committee's report in order to ensure that the CEO is providing the best leadership for the Company. The evaluation should be based on criteria including performance of the business, accomplishment of long-term strategic objectives, the handling of extraordinary events and development of management. The criteria should ensure that the CEO's interests are aligned with the long-term interests of the Company's shareholders. The evaluation will be used by the Compensation Committee in the course of its deliberations when considering the compensation of the CEO. In the absence of a Compensation Committee, the Board (excluding the CEO, if he or she is a director), will conduct the review of the CEO's performance.

**7.3 Management Succession**

The Compensation Committee should make an annual report to the Board on succession planning which should include policies and principles for CEO selection and performance review as well as policies regarding succession

in the event of an emergency or the retirement of the CEO. The entire Board will work with the Compensation Committee to evaluate and nominate potential successors to the CEO. In the absence of a Compensation Committee, the Board should perform these functions.

## 8. BOARD COMMITTEES

### 8.1 Committee Structure

The Board will have at all times an Audit Committee, a Corporate Governance Committee and a Compensation Committee unless the Board otherwise determines. The Board may from time to time establish additional committees as necessary or appropriate, such as a Nominating Committee, delegating to such committees all or part of the Board's powers. Such additional committees will have a number of independent members as is required to meet the requirements of any applicable laws, rules and regulations and this Corporate Governance Guidelines. In general, committees of the Board are utilized to focus on issues that may require in-depth scrutiny. All significant findings of a committee are presented to the full Board for discussion and review.

### 8.2 Corporate Governance Committee

The Corporate Governance Committee should be composed of at least a majority of independent directors, and the remaining members may be non-management directors. The Corporate Governance Committee should review these Guidelines on an annual basis or as otherwise needed, and make recommendations to the Board of any suggested changes. The Corporate Governance Committee is responsible for administering the Company's Code of Business Conduct and Ethics, and will perform such other tasks as indicated in this Policy, or as assigned by the Board from time to time. In the event the Board determines to discontinue the Corporate Governance Committee, functions described herein as functions of the Corporate Governance Committee shall be performed by the non-management directors of the Company or a committee composed of such directors, as directed by the Board.

### 8.3 Compensation Committee

The Compensation Committee should be composed entirely of independent directors. In the event the Board determines to discontinue the Compensation Committee, functions described herein as functions of the Compensation Committee shall be performed by the disinterested directors of the Company, unless otherwise stated herein.

### 8.4 Nominating Committee

If the Board appoints a Nominating Committee, such committee should be composed entirely of independent directors. The Nominating Committee should review with the Board, on an annual basis, the appropriate skills and characteristics required by Board members in the context of the current make-up of the Board, and the Nominating Committee will endeavour to recommend qualified individuals who, if added to the Board, would provide the mix of director characteristics and diverse experiences, perspectives and skills appropriate for the Company.

### 8.5 Committee Charters and Responsibilities

Each key committee will have its own charter. The charters will establish the purposes, goals and responsibilities of the committees as well as qualifications for committee membership, procedures for committee member appointment and removal, committee structure and operations and committee reporting to the Board. The charters will also provide that each committee will annually evaluate its performance.

### 8.6 Committee Agendas

The chairman of each committee, in consultation with the committee members will determine the frequency and length of the committee meetings consistent with any requirements set forth in the committee's charter. The chairman of each committee, in consultation with the appropriate members of the committee and management, will develop the committee's agenda.

### 8.7 Compensation of Committee Members

The members of committees are entitled to receive such fees as the Board determines.

### 8.8 Advisors

The Audit Committee, the Corporate Governance Committee and the Compensation Committee each have the power to hire independent legal, financial or other advisors as they may deem necessary upon approval by the Board of a budget for such services. Any other committee has the power to hire independent legal, financial or other advisors as they deem necessary, with approval of the Board.

## 9. CODE OF BUSINESS CONDUCT AND ETHICS

All directors, officers and employees will comply with the Company's Code of Business Conduct and Ethics, which reaffirms with Company's high standards of business conduct. The Code of Business Conduct and Ethics is part of the Company's continuing effort to ensure that it complies with all applicable laws, has an effective program to prevent and detect violations of law, and conducts its business with fairness, honesty and integrity. In the unlikely event of a waiver, any such waivers of this Code for directors or officers will be approved by the Corporate Governance Committee and such waiver will be properly disclosed by shareholders as required by law.

## 10. MISCELLANEOUS

These guidelines are not intended to modify, extinguish or in any other manner limit the indemnification, exculpation and similar rights available to the directors of the Company under applicable law and/or the Company's articles and/or its charter documents. Although these Corporate Governance Guidelines have been approved by the Board, it is expected that these guidelines will evolve over time as customary practice and legal requirements change. In particular, guidelines that encompass legal, regulatory or exchange requirements, as they currently exist will be deemed to be modified as and to the extent such legal, regulatory or exchange requirements are modified. In addition, the guidelines may also be amended by the Board at any time as it deems appropriate.

Nothing in these guidelines should be construed or interpreted as limiting, reducing or eliminating the obligation of any director, officer or employee of the Company to comply with all applicable laws. Conversely, nothing in these guidelines should be construed or interpreted as expanding applicable standards of liability under provincial or federal law for directors or officers of the Company.

***Approved and Adopted by the Board Effective December 30, 2005.***

(This page has been left blank intentionally.)