# Exhibit 33

# Notice of Annual and Special Meeting of Shareholders

# and

# Management Information Circular

**Dated May 14, 2008**

AFRICO RESOURCES LTD

**Meeting to be held:**

**Thursday, June 12, 2008 at 1:30 p.m.**
**Pacific Room, Metropolitan Hotel**
**645 Howe Street, Vancouver, British Columbia**

AFRICO RESOURCES LTD

# NOTICE OF ANNUAL AND SPECIAL MEETING OF SHAREHOLDERS

TO: All holders of common shares of Africo Resources Ltd.

We will hold an annual and special meeting of our shareholders on **Thursday, June 12, 2008** in the **Pacific Room** of the **Metropolitan Hotel** at **645 Howe Street, Vancouver, British Columbia**. The meeting will start at **1:30 p.m.** (Vancouver time). We cordially invite you to attend and encourage you to do so.

At the meeting we will:

(1) present our financial statements for the year ended December 31, 2007, together with the notes thereto and the report of our auditor on those statements;

(2) elect directors;

(3) re-appoint PricewaterhouseCoopers LLP, Chartered Accountants, as our auditor;

(4) authorize the Board of Directors to fix the auditor's remuneration;

(5) ask you to consider and, if you think it appropriate to do so, to pass, with or without amendment, a resolution approving amendment to, and the subsequent termination of, Africo's Shareholder Rights Plan Agreement, all as more particularly described in the Information Circular which accompanies this Notice of Meeting;

(6) ask you to consider and, if you think it appropriate to do so, to pass, with or without amendment, the Camrose Transactions Resolutions approving the proposed transactions with Camrose Resources Limited, all as more particularly defined and described in the Information Circular which accompanies this Notice of Meeting;

(7) ask you to consider and, if you think it appropriate to do so, to approve the adoption by the Board of Directors of the 2008 Stock Option Incentive Plan, all as more particularly described in the Information Circular which accompanies this Notice of Meeting; and

(8) consider any other proper business.

An Information Circular prepared by the management of Africo, together with a form of proxy, accompany this Notice of Meeting and should be read in conjunction with this Notice of Meeting.

May 14, 2008.

AFRICO RESOURCES LTD.

By: *"Chris Theodoropoulos"*

Chris Theodoropoulos
Chairman of the Board

**If you cannot attend, we encourage you to complete and return the enclosed form of proxy indicating your voting instructions. Please complete, date and sign your form of proxy or voting instruction form and return it by mail in the envelope provided for this purpose, or by facsimile to our transfer agent, Computershare Investor Services Inc., 9th Floor, 100 University Avenue, Toronto, Ontario M5J 2Y1 Canada (facsimile numbers: within North America 1-866-249-7775; outside North America 1-416-263-9524); or by following the procedures for telephone or Internet voting provided in the enclosed form of proxy or voting instruction form. To be valid, a completed form of proxy must be received by our transfer agent by no later than 1:30 p.m. (Vancouver time) on Tuesday, June 10, 2008 or, if the meeting is adjourned, by no later than 48 hours prior to the time of the adjourned meeting.**

**If you are not a registered shareholder, please refer to the accompanying Information Circular for information on how to vote your shares.**

## TABLE OF CONTENTS

**PART 1 – VOTING ... 1**
HOW A VOTE IS PASSED ... 1
WHO CAN VOTE? ... 1
VOTING BY PROXY ... 2
NON-REGISTERED SHAREHOLDERS ... 3

**PART 2 - VOTING SHARES AND PRINCIPAL HOLDERS THEREOF ... 4**

**PART 3 - THE BUSINESS OF THE MEETING ... 4**
FINANCIAL STATEMENTS ... 4
ELECTION OF DIRECTORS ... 4
APPOINTMENT OF THE AUDITOR ... 6
AMENDMENT TO, AND SUBSEQUENT TERMINATION OF, THE SHAREHOLDER RIGHTS PLAN AGREEMENT ... 7
TRANSACTIONS WITH CAMROSE RESOURCES LIMITED ... 7
SUBSCRIPTION AGREEMENT WITH CAMROSE RESOURCES LIMITED ... 8
TRANSFER AGREEMENT ... 9
AKAM AGREEMENT ... 10
RISKS TO AFRICO ASSOCIATED WITH COMPLETION OF THE CAMROSE TRANSACTIONS ... 11
SHAREHOLDER APPROVAL OF THE TRANSACTIONS WITH CAMROSE RESOURCES LIMITED ... 11
APPROVAL OF 2008 STOCK OPTION PLAN ... 12

**PART 4 – EXECUTIVE COMPENSATION ... 13**
COMPENSATION OF NAMED EXECUTIVE OFFICERS ... 13
TERMINATION OF EMPLOYMENT, CHANGE IN RESPONSIBILITIES AND EMPLOYMENT CONTRACTS 15
COMPOSITION OF THE COMPENSATION COMMITTEE ... 18
REPORT ON EXECUTIVE COMPENSATION ... 18
COMPENSATION OF DIRECTORS ... 19
PERFORMANCE GRAPH ... 20

**PART 5 – SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS ... 21**

**PART 6 – AUDIT COMMITTEE ... 23**

**PART 7 – CORPORATE GOVERNANCE ... 23**

**PART 8 – OTHER INFORMATION ... 26**
DIRECTORS AND OFFICERS INSURANCE ... 26
INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS ... 26
INTEREST OF CERTAIN PERSONS IN MATTERS TO BE ACTED ON AT THE MEETING ... 27
INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS ... 27
MANAGEMENT CONTRACTS ... 27
CEASE TRADE ORDERS AND CORPORATE BANKRUPTCY ... 27
PENALTIES AND SANCTIONS ... 28
PERSONAL BANKRUPTCY ... 28
OTHER MATTERS ... 28
ADDITIONAL INFORMATION ... 28
DIRECTORS' APPROVAL ... 28

SCHEDULE "A" – Rights Plan Termination Agreement
SCHEDULE "B" – Rights Plan Termination Resolution
SCHEDULE "C" – Camrose Transactions Resolutions

AFRICO RESOURCES LTD

# Management Information Circular

The information contained in this Information Circular, unless otherwise indicated, is as of May 14, 2008. In this Information Circular, unless otherwise specified, all references to "$" or "dollars" are to Canadian dollars.

This Information Circular is being mailed by the management of Africo Resources Ltd. ("Africo" or the "Corporation") to everyone who was a shareholder of record of our company on May 12, 2008, which is the date that has been fixed by the directors of Africo as the record date to determine the shareholders who are entitled to receive notice of the meeting.

We are mailing this Information Circular in connection with the solicitation of proxies by and on behalf of our management for use at the annual and special meeting of the shareholders of Africo that is to be held on Thursday, June 12, 2008, at 1:30 p.m. (Vancouver time) at the Metropolitan Hotel, 645 Howe Street, Vancouver, British Columbia. The solicitation of proxies will be primarily by mail. Certain employees or directors of Africo may also solicit proxies by telephone or in person. The cost of solicitation will be borne by Africo. Africo may after the date hereof choose to retain an information agent, in which case such costs will also be borne by Africo and same will be announced by press release.

Under Africo's By-laws, at least two persons must be present in person or represented by proxy, each being a shareholder entitled to vote at the meeting or a duly appointed proxy for an absent shareholder so entitled, before any action may validly be taken at the meeting. If such a quorum is not present in person or by proxy, we will reschedule the meeting.

## PART 1 – VOTING

### HOW A VOTE IS PASSED

Other than as noted below, all of the matters that are to be voted at the meeting as described in the attached Notice of Meeting are ordinary resolutions and can be passed by a simple majority – that is, if more than half of the votes that are cast in person or by proxy are in favour, then the resolution is approved. In addition, the resolution to approve the amendment to, and subsequent termination of, the Shareholder Rights Plan Agreement, as hereinafter defined and described, must be approved by a simple majority of votes cast by Africo's shareholders who are "independent shareholders" as defined by the Rights Plan. Further, shareholder approval of the 2008 Stock Option Plan requires a simple majority of the votes cast by Africo's shareholders who are not insiders of Africo or associates of such insiders and who are entitled to participate in the 2008 Plan. In this regard, as of May 12, 2008, the date fixed by our directors as the record date for determining who is entitled to receive notice of and to vote at the meeting and based on the information available to Africo, the votes attached to 527,737 common shares are not eligible to vote for approval of the 2008 Stock Option Plan. See Part 3 – The Business of the Meeting for more detail on the proposed resolutions to be put to shareholders at the meeting.

### WHO CAN VOTE?

If you are a registered shareholder of Africo as at May 12, 2008, you are entitled to attend the meeting and cast a vote for each share registered in your name on all resolutions put before the meeting. If the shares are registered in the name of a corporation, a duly authorized officer of the corporation may attend on its behalf but documentation indicating such officer's authority should be presented at the meeting. If you are a registered shareholder but do not wish to, or cannot, attend the meeting in person you can appoint someone who will attend the meeting and act as your proxyholder to vote in accordance with your instructions (see "Voting by Proxy"). If your

shares are registered in the name of a "nominee" (usually a bank, trust company, securities dealer or other financial institution) you should refer to the section entitled "Non-registered Shareholders" set out below.

It is important that your shares be represented at the meeting regardless of the number of shares you hold. If you will not be attending the meeting in person, we invite you to complete, date, sign and return your form of proxy as soon as possible so that your shares will be represented.

**VOTING BY PROXY**

If you do not attend the meeting, you can still make your votes count by appointing someone who will be there to act as your proxyholder. You can either tell that person how you want to vote or you can let him or her decide for you. You can do this by completing a form of proxy.

In order to be valid, you must return the completed form of proxy by no later than 1:30 p.m. (Vancouver time) on Tuesday, June 10, 2008, to our transfer agent, Computershare Investor Services Inc., 9th Floor, 100 University Avenue, Toronto, Ontario M5J 2Y1 Canada (facsimile numbers: within North America 1-866-249-7775; outside North America 1-416-263-9524).

*What is a proxy?*

A form of proxy is a document that authorizes someone to attend the meeting and cast your votes for you. We have enclosed a form of proxy with this Information Circular. You should use it to appoint a proxyholder, although you can also use any other legal form of proxy.

*Appointing a proxyholder*

**You can choose any individual to be your proxyholder.** It is not necessary for the person whom you choose to be a shareholder of Africo. To make such an appointment, simply fill in the person's name in the blank space provided in the enclosed form of proxy. To vote your shares, your proxyholder must attend the meeting. If you do not fill a name in the blank space in the enclosed form of proxy, the persons named in the form of proxy are appointed to act as your proxyholder. Those persons are directors and/or officers of Africo.

*Instructing your proxy*

You may indicate on your form of proxy how you wish your proxyholder to vote your shares. To do this, simply mark the appropriate boxes on the form of proxy. If you do this, your proxyholder must vote your shares in accordance with the instructions you have given.

If you do not give any instructions as to how to vote on a particular issue to be decided at the meeting, your proxyholder can vote your shares as he or she thinks fit. If you have appointed the persons designated in the form of proxy as your proxyholder they will, unless you give contrary instructions, vote your shares at the meeting as follows:

- ✓ **FOR the election of the proposed nominees as directors;**
- ✓ **FOR the re-appointment of PricewaterhouseCoopers LLP, Chartered Accountants, as Africo's auditor;**
- ✓ **FOR the resolution authorizing the Board of Directors to fix the auditor's remuneration;**
- ✓ **FOR the resolution to approve the amendment to, and subsequent termination of, the Shareholder Rights Plan Agreement;**
- ✓ **FOR the resolution to approve the Camrose Transactions Resolutions, as herein defined; and**

✓ **FOR the resolution to approve adoption by the Board of Directors of the 2008 Stock Option Plan.**

For more information about these matters, see Part 3 - The Business of the Meeting. The enclosed form of proxy gives the persons named on it the authority to use their discretion in voting on amendments or variations to matters identified on the Notice of Meeting. At the time of printing this Information Circular, the management of Africo is not aware of any other matter to be presented for action at the meeting. If, however, other matters do properly come before the meeting, the persons named on the enclosed form of proxy will vote on them in accordance with their best judgment, pursuant to the discretionary authority conferred by the form of proxy with respect to such matters.

*Changing your mind*

If you want to revoke your proxy after you have delivered it, you can do so at any time before it is used. You may do this by (a) attending the meeting and voting in person; (b) signing a proxy bearing a later date; (c) signing a written statement which indicates, clearly, that you want to revoke your proxy and delivering this signed written statement to the registered office of Africo at Suite 1810 – 1111 West Georgia Street, Vancouver, British Columbia V6E 4M3 Canada; or (d) in any other manner permitted by law.

Your proxy will only be revoked if a revocation is received by 5:00 in the afternoon (Vancouver time) on the last business day before the day of the meeting, or any adjournment thereof, or delivered to the person presiding at the meeting before it (or any adjournment) commences. If you revoke your proxy and do not replace it with another that is deposited with us before the deadline, you can still vote your shares but to do so you must attend the meeting in person.

**NON-REGISTERED SHAREHOLDERS**

If your shares are not registered in your own name, they will be held in the name of a "nominee," usually a depository, bank, trust company, securities dealer or other financial institution and, as such, your nominee will be the entity legally entitled to vote your common shares and must seek your instructions as to how to vote your shares.

Accordingly, unless you have previously informed your nominee that you do not wish to receive material relating to shareholders' meetings, you will have received this Information Circular from your nominee, together with a form of proxy or a request for voting instruction form. If that is the case, **it is most important that you comply strictly with the instructions that have been given to you by your nominee on the form of proxy or voting instruction form**. If you have voted and wish to change your voting instructions, you should contact your nominee to discuss whether this is possible and what procedures you must follow.

If your shares are not registered in your own name, Africo's transfer agent will not have a record of your name and, as a result, unless your nominee has appointed you as a proxyholder, will have no knowledge of your entitlement to vote. If you wish to vote in person at the meeting, therefore, please insert your own name in the space provided on the form of proxy or voting instruction form that you have received from your nominee. If you do this, you will be instructing your nominee to appoint you as proxyholder. Please adhere strictly to the signature and return instructions provided by your nominee. It is not necessary to complete the form in any other respect, since you will be voting at the meeting in person. Upon arrival at the meeting, please register with the representative from Computershare Investor Services Inc., our transfer agent, who will be present at the meeting to act as scrutineer.

**The Notice of Meeting, this Information Circular and our audited consolidated financial statements for the fiscal year ended December 31, 2007 are being sent to both registered and non-registered owners of common shares in the capital of Africo. If you are a non-registered owner and we have sent these materials to you directly, your name and address and information about your holdings of common shares of Africo have been obtained in accordance with applicable securities regulatory requirements from the nominee holding the securities on your behalf. By choosing to send these materials to you directly, Africo (and not your nominee) has assumed responsibility for (i) delivering these materials to you, and (ii) executing your proper voting instructions. Please return your voting instructions as specified in the form of proxy or request for voting instructions form.**

## PART 2 - VOTING SHARES AND PRINCIPAL HOLDERS THEREOF

Africo has authorized capital of unlimited common shares. Each shareholder is entitled to one vote for each common share registered in his or her name at the close of business on May 12, 2008, the date fixed by our directors as the record date for determining who is entitled to receive notice of and to vote at the meeting.

At the close of business on May 12, 2008, 27,213,092 common shares in the capital of Africo were outstanding. To the knowledge of Africo's directors and officers, the only persons who beneficially owned, directly or indirectly, or exercised control or direction over 10% or more of Africo's common shares on that date were:

| Name[(1)] | Number of common shares[(1)] | Percentage of issued shares |
|---|---|---|
| Geologic Resource Partners LLC | 3,320,700 | 12.2% |
| John Tognetti | 3,255,000 | 12.0% |

(1) Information as to ownership of shares has been extracted from insider reports or Early Warning Reports filed by the individuals pursuant to applicable securities legislation and publicly available through the internet at the Canadian System for Electronic Disclosure by Insiders (SEDI) at www.sedi.ca or at the Canadian System for Document Analysis and Retrieval (SEDAR).

## PART 3 - THE BUSINESS OF THE MEETING

### FINANCIAL STATEMENTS

The consolidated financial statements of Africo for the year ended December 31, 2007 will be placed before you at the meeting. These financial statements have been mailed to shareholders together with the Notice of Meeting and this Information Circular.

### ELECTION OF DIRECTORS

Directors of Africo are elected for a term of one year. The current term of office of each of the nominees proposed for election as a director will expire at the meeting, and each of them, if elected, will serve until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time. Under Africo's Articles and in accordance with the requirements of the *Canada Business Corporations Act*, Africo shall have a minimum of three and a maximum of nine directors, the exact number of directors, within such limits, to be determined from time to time by the Board. Africo currently has five directors and six directors are proposed by management for election as directors at the meeting. Notwithstanding this, **pursuant to the terms of the Subscription Agreement described in Part 3 – The Business of the Meeting – Subscription Agreement with Camrose Resources Limited, Africo has agreed to support the nomination of four individuals designated by Camrose for appointment or election to Africo's Board of Directors and to take all steps necessary to ensure that the Board is comprised of no more than seven directors.** As such, the Board of Directors of Africo has set by resolution, in accordance with Africo's By-laws, the number of directors at seven.

**To fulfill Africo's obligations to Camrose Resources Limited with respect to Board representation, upon closing of the transactions contemplated by the Subscription Agreement, it is expected that David Adamson, John Dixon and Michael O'Brien, each a nominee for election as a director of Africo at the meeting, will resign and the three vacancies on the Board thereby created will be filled by three persons nominated by Camrose Resources Limited and, in addition, the Board will appoint, in accordance with its By-laws, one additional nominee of Camrose as a director to the Board, at which point Africo's Board of Directors will be comprised of seven directors, four of whom will be nominees of Camrose. Shareholders will not be given an opportunity to elect such nominees until the next annual general meeting.**

#### Nominees for Election

The following are the nominees proposed for election as directors of Africo together with the number of common shares and stock options that are beneficially owned, or controlled or directed, directly or indirectly, by each nominee. All of the nominees, with the exception of Michael O'Brien, are currently directors. Each of the nominees has agreed to stand for election and we are not aware of any intention of any of them not to do so. If,

however, one or more of them should become unable to stand for election, it is likely that one or more other persons would be nominated at the meeting for election and, in that event, the persons designated in the form of proxy will vote in their discretion for a substitute nominee.

| Name and place of residence | Principal occupation | Director since | Number of shares | Number of options |
|---|---|---|---|---|
| **DAVID W. ADAMSON**[(1)]<br>British Columbia, Canada<br><br>*Director*<br><br>*Member of the Audit Committee* | Exploration Geologist; President, CEO and a director of Rubicon Minerals Corporation, a Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits (since March 1996). | July 4, 2006 | 100,207 | 439,307 |
| **JOHN DIXON**<br>Tanzania<br><br>*Director*<br><br>*Chair of the Compensation Committee and Member of the Audit Committee and the Corporate Governance Committee* | President of Oryx Mining and Exploration, a Canadian company exploring for viable gold deposits in Africa (since July 2006); Independent Geologist with Bastillion Resources (Pty) Ltd., an independent geological and mining consulting company specialising in Africa (1996 – 2006). | July 4, 2006 | 83,658 | 200,000 |
| **ANTONY (TONY) HARWOOD**<br>England, United Kingdom<br><br>*President, Chief Executive Officer & Director*<br><br>*Member of the Compensation Committee* | President and CEO of Africo Resources (BC) Ltd. (since May 2006); Vice President, Placer Dome Inc., a publicly listed international gold mining company (June 1998 to March 2006). | July 4, 2006 | 110,195 | 670,000 |
| **LUKAS MARTHINUS (TINUS) MAREE**<br>British Columbia, Canada<br><br>*Director & Secretary*<br><br>*Member of the Audit Committee, the Compensation Committee and the Corporate Governance Committee* | President, River Capital Partners Ltd., a private investment company (since January 2001). | July 4, 2006 | 119,648 | 340,000 |

| Name and place of residence | Principal occupation | Director since | Number of shares | Number of options |
|---|---|---|---|---|
| **CHRIS THEODOROPOULOS**<br>British Columbia, Canada<br><br>*Director & Chairman of the Board*<br><br>*Member of the Corporate Governance Committee* | Self-employed businessman; Chairman of the Board of Africo (since July 2006) and its now wholly-owned subsidiary, Africo Resources (BC) Ltd. (since April 2005); Associate Counsel, Getz Prince Wells LLP, a law firm in Vancouver (November 2003 to March 2007); independent legal and business consultant (1996 to November 2003). | July 4, 2006 | 114,029 | 570,000 |
| **MICHAEL O'BRIEN**<br>British Columbia, Canada<br><br>*Director nominee & Chief Financial Officer* | Chief Financial Officer of Africo since March 2007 (acting Chief Financial Officer since December 2006); Consultant (August 2005 to February 2007); Chief Financial Officer and director of Irvin & Johnson Ltd (South Africa) (September 2004 to July 2005); Group Financial Manager of Irvin and Johnson Ltd (South Africa) (January 2003 to August 2004); Manager: Finance of Soekor Exploration and Production (Pty) Ltd (now part of PetroSA, South Africa) (August 1996 to September 2002). | Not applicable; nominee only | Nil | 200,000 |

(1) Although Mr. Adamson is being elected as a director at the meeting, he is expected to resign concurrently with the completion of the transactions contemplated with Camrose Resources Limited in favour of a nominee of Camrose Resources Limited. In the event that the transactions contemplated with Camrose Resources Limited do not complete, Mr. Adamson has advised Africo that he wishes to step down from the Board. In such case, Africo would seek an additional candidate to fill the vacancy created by Mr. Adamson's resignation.

Africo's management recommends that shareholders vote in favour of the nominees for election as directors. **Unless you give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the election of the nominees as directors of Africo for the ensuing year.**

## APPOINTMENT OF THE AUDITOR

During the financial year ended December 31, 2007, PricewaterhouseCoopers LLP, Chartered Accountants, served as Africo's auditor, having served as auditor of Africo since June 30, 2005.

For details of fees paid by Africo to PricewaterhouseCoopers LLP for audit services during the last two completed financial years, see "Item 10 – Audit Committee" in Africo's Annual Information Form dated March 28, 2008 for the financial year ended December 31, 2007, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com.

Africo's management recommends that shareholders vote in favour of the re-appointment of PricewaterhouseCoopers LLP, Chartered Accountants, as Africo's auditor for the ensuing year and in favour of granting the Board of Directors the authority to determine the remuneration to be paid to the auditor. **Unless you**

**give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the appointment of PricewaterhouseCoopers LLP to act as our auditor until the close of our next annual meeting and to vote FOR the proposed resolution to authorize the Board of Directors to fix the remuneration to be paid to the auditor.**

## AMENDMENT TO, AND SUBSEQUENT TERMINATION OF, THE SHAREHOLDER RIGHTS PLAN AGREEMENT

The completion of the transactions contemplated by the Subscription Agreement between Africo and Camrose Resources Limited, as fully described below at Part 3 – The Business of the Meeting – Subscription Agreement with Camrose Resources Limited, is conditional upon, among other things, the amendment to and subsequent termination of the Shareholder Rights Plan Agreement (the "Rights Plan") dated as of May 25, 2007 between Africo and Computershare Trust Company of Canada (the "Rights Agent").

The amendment and termination is set forth in an amendment and termination agreement (the "Termination Agreement") between Africo and the Rights Agent dated as of April 17, 2008. A copy of the form of Termination Agreement is attached as Schedule "A" hereto. A copy of the Rights Plan has been electronically filed with regulators through the System for Electronic Document Analysis and Retrieval (SEDAR) and is available for public viewing via the Internet at www.sedar.com.

The amendment to the Rights Plan is to provide for the waiver and release of any and all rights that may have accrued in favour of the shareholders and holders of Rights immediately prior to the termination of the Rights Plan pursuant to the Termination Agreement. Africo is not aware of any such rights that may have accrued and is seeking the waiver and release merely as a matter of prudence in connection with the termination of the Rights Plan. The amendment and termination of the Rights Plan is subject to shareholder approval at this meeting and will become effective immediately after such approval is obtained.

The Rights Plan may only be amended and terminated pursuant to a resolution passed by a majority of the votes cast by all holders of common shares of Africo who vote in respect of such amendment and termination (other than any holder who does not qualify as an "Independent Shareholder", as such term is defined in the Rights Plan, with respect to all common shares beneficially owned by such person). As of the date of this Circular, management of Africo is not aware of any shareholders that would not qualify as Independent Shareholders.

At the meeting, Independent Shareholders (as that term is defined in the Rights Plan) will be asked to pass a resolution in the form set out in Schedule "B" hereto (the "Rights Plan Termination Resolution") approving the Termination Agreement. The Board of Directors has determined that it is advisable and in the best interests of Africo and its shareholders that the Rights Plan be amended and terminated as set forth in the Termination Agreement.

**The Board of Directors unanimously recommends that shareholders vote IN FAVOUR of the Rights Plan Termination Resolution. In the absence of contrary instructions, the persons designated by management of Africo in the enclosed form of proxy intend to vote FOR the Rights Plan Termination Resolution.**

## TRANSACTIONS WITH CAMROSE RESOURCES LIMITED

The following is a summary of three agreements that Africo has entered into, which is derived from, and should be read in conjunction with, the referenced agreements which are hereinafter referred to as the "Camrose Transactions". This summary is qualified in its entirety by the actual terms of the relevant agreements. The agreements have been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and are available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com.

See also Part 8 – Other Information – Interest of Certain Persons in Matters to be Acted on at the meeting.

***SUBSCRIPTION AGREEMENT WITH CAMROSE RESOURCES LIMITED***

Pursuant to a Subscription Agreement dated as of April 17, 2008, as amended (the "Subscription Agreement"), between Camrose Resources Limited ("Camrose") and Africo, Camrose agreed to subscribe for 40,000,000 common shares of Africo and 20,000,000 common share purchase warrants, each warrant entitling the holder to acquire one common share of Africo at a price of $3.50 for a period of 18 months from closing of the subscription (the "Subscription"). The aggregate purchase price payable by Camrose is $100,000,000, being $2.50 for each common share and ½ of a warrant. Africo will use the proceeds from the Subscription to fund on-going exploration and feasibility study work including such other development expenditures that are necessary or incidental to the development of Africo's Kalukundi cobalt copper project located in the Katanga province of the Democratic Republic of Congo, including general and administrative costs related thereto.

Camrose is a recently-established special purpose vehicle, incorporated and registered in the British Virgin Islands, owned by a trust for the benefit of the family of Dan Gertler. It is the sole shareholder of Kigala International Limited, which has purchased the entire share capital of Akam Mining Sprl (see "Akam Agreement" below). Camrose is currently arms' length, and is not a related party, to Africo.

Completion of the Subscription is subject to, among other things:

(a) the Transfer Agreement (as defined and described below) being executed and delivered by each of the parties thereto and being in full force and effect;

(b) the Akam Agreement (as defined and described below) being executed and delivered by each of the parties thereto and being in full force and effect;

(c) the shareholders of Africo having approved the transactions contemplated by the Subscription Agreement, the issuance of shares under the Transfer Agreement and the Akam Agreement and the issuance of shares contemplated by the Note (all as defined and described below);

(d) acceptance by The Toronto Stock Exchange (the "TSX");

(e) the Board of Directors of Africo and the shareholders of Africo having approved the amendment to the Rights Plan to waive any rights thereunder which may have existed or exist since its inception and the termination and repeal of the Rights Plan; and

(f) the Rights Plan being amended and terminated.

The completion of the Subscription is to take place on or about the 65th day following the meeting to which this Circular relates, or such earlier date after the meeting as Africo may determine.

The Subscription Agreement also provides that Africo will support the nomination of four individuals designated by Camrose for appointment to Africo's Board of Directors upon closing of the transactions contemplated by the Subscription Agreement, and will take all steps necessary to ensure that the Board is comprised of no more than seven directors and that a quorum is not more than a majority of all directors. In addition, Africo has agreed to support Camrose's majority representation on Africo's Board indefinitely, provided that if (i) the percentage of issued and outstanding common shares of Africo beneficially owned by Camrose and its affiliates (the "Camrose Interest") is at least 40% but less than 50%, Africo will support the nomination of three Camrose representatives at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, (ii) the Camrose Interest is at least 30% but less than 40%, Africo will support the nomination of two Camrose representatives at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, (iii) the Camrose Interest is at least 20% but less than 30%, Africo will support the nomination of one Camrose representative at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, and (iv) the Camrose Interest is less than 20%, Africo shall have no further obligations until such time as the Camrose Interest is again 20% or more.

In addition, Africo has agreed to execute an investors' rights agreement in favour of Camrose and any lenders to Camrose pursuant to which Africo will agree, at its cost, to qualify by prospectus the resale in Canada of the shares of Africo held by them on a demand and on a "piggyback" basis on customary terms.

Further, the Subscription Agreement provides that as long as Camrose and its affiliates hold at least 10% of the issued and outstanding shares of Africo, if Africo or any subsidiary proposes to issue any further Africo shares or convertible securities, Camrose shall have the right to purchase the portion thereof equal to the percentage of shares of Africo then beneficially owned by Camrose and its affiliates. However, this right will not apply to shares issued under a stock option plan established from time to time for the benefit of participating employees of Africo or upon the conversion or exchange of, or the exercise of any right attaching to, any convertible securities, or the issuance of securities in connection with a *bona fide* business acquisition by Africo or in connection with *bona fide* strategic partnerships, alliances and similar transactions. Africo has also agreed that, if the Rights Plan were ever determined to have been triggered in connection with the Subscription, Africo will issue to Camrose sufficient additional shares (the "Additional Shares") at the same price as applies under the Rights Plan so that Camrose's percentage ownership position after the exercise of the Rights Plan remains the same as without such exercise.

Camrose has advanced the principal amount of $2,000,000 to Africo (the "Loan"), pursuant to a Demand Promissory Note (the "Note") dated April 17, 2008 from Africo to Camrose. The Note provides that:

(a) the Loan will bear interest at the a rate equal to the London Interbank Offer Rate plus 2% per annum, calculated and payable semi-annually in arrears, with interest on overdue interest at the same rate;

(b) Camrose may only make demand on the earliest to occur of (i) the completion of the Subscription, (ii) the termination of the Subscription Agreement, and (iii) August 31, 2008; and

(c) if and only if demand is made upon completion of the Subscription Agreement, the entire Loan shall be set off against the aggregate subscription price payable under the Subscription Agreement. If the transactions contemplated by the Subscription Agreement are not completed, at the option of Africo, the entire Loan may be repaid by the issuance of common shares of Africo at a deemed price of $2.50 per share (subject to usual anti-dilution provisions).

***TRANSFER AGREEMENT***

Africo entered into an agreement (the "Transfer Agreement") dated April 17, 2008 with La Congolaise des Mines et de Developpement (Comide Sprl) ("Comide"), a joint venture company owned as to 75% by an affiliate of Camrose and as to 25% by La Générale des Carrières et des Mines ("Gécamines"), a mining company owned by the Government of the Democratic Republic of the Congo (the "DRC"). The Transfer Agreement provides that Comide has agreed to transfer to Swanmines sprl (to be owned at least 75% by Africo and the balance by Gécamines) Exploitation Permit No. PE2607 (the "Exploitation Permit"), consisting of 41 squares or blocks (approximately 34.83155 $km^2$) for copper, cobalt, gold and nickel extraction, situated in the Territory of Lubudi, District of Kolwezi, Province of Katanga.

The Exploitation Permit is owned and held by Comide. Comide Concession PE2607 (the "Concession") is located within the Kolwezi District of Katanga Province in the south-east of the DRC, approximately 60km to the east of Kolwezi and 1km to the north of the main road between Likasi and Kolwezi. The Concession is secured under the Exploitation Permit, which was issued to Comide on July 6, 2005, for a term of 20 years. This license area is contiguous with the Swanmines concession area of Kalukundi, further details of which are described in Africo's Annual Information Form dated March 28, 2008 (which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com).

The purchase price for the transfer will be based on the value of the Exploitation Permit (the "Valuation") as determined by Stephan, Robertson & Kirsten (SRK) Consulting Engineering and Scientists. The Valuation will be started on the earlier of completion of an exploratory drilling program currently being carried out by Comide and six months after completion of the Subscription. The purchase price will be 75% of the mid point of the range determined by the Valuation (the "Mid-Point Amount"). The purchase price is 75% of the Mid-Point Amount because Gécamines will retain the 25% interest in the Exploitation Permit. The parameters and scope of the Valuation will be agreed upon by the parties in advance of the commencement of the Valuation. The Valuation will be carried out on a stand-alone basis, which means that the Concession will be valued separately and independently of the Kalukundi property, taking into account its own capital cost requirements. In the event that either party is not satisfied with the results of the Valuation, such party can nominate a second valuator to carry out a valuation with the other party's consent. In that event, the determining valuation will be the average of the two valuations carried

out. In the event of a dispute with respect to the scope and process of the Valuation, the parties have agreed to implement arbitration proceedings to resolve such dispute.

The purchase price will be paid by the issuance of common shares by Africo to affiliates of Comide, at a deemed price of $2.50 per share, subject to usual anti-dilution adjustments. Africo's management has been advised by Camrose that, while the number of common shares to be issued cannot be known at this time, based on the work done to date on the Concession, Camrose currently anticipates that no more than 120,000,000 common shares of Africo, representing a maximum valuation of $300 million, would have to be issued pursuant to the Transfer Agreement, which would represent approximately 62.3% of Africo's issued share capital after giving effect to the Subscription Agreement, the Akam Agreement and the Transfer Agreement, and 441% of Africo's current share capital.

Although the Transfer Agreement requires Africo to pay the purchase price even if it is more than $300 million, Africo's obligation to complete the transactions under the Transfer Agreement is conditional upon the receipt of all required approvals for the issuance of the number of common shares required to satisfy the purchase price, including the approval of the shareholders at the meeting and acceptance of the TSX. As required by the rules of the TSX, shareholder approval of a maximum number of shares to be issued is required. Accordingly, Africo is seeking approval for the potential issuance of up to 120,000,000 common shares in satisfaction of the purchase price payable under the Transfer Agreement or such lesser amount pursuant to the Valuation; and if the purchase price were to be more than $300 million, Africo would be required to again seek shareholder approval to issue such additional number of common shares as would be required to satisfy the purchase price.

Management of Africo believes that, although the actual number of shares to be issued pursuant to the Transfer Agreement is entirely dependent on the Valuation, the Transfer Agreement is in the best interests of Africo. The transactions contemplated by the Transfer Agreement will provide Africo with project synergies and additional land to facilitate completion of Africo's Kalukundi property, as the property covered by the Exploitation Permit is contiguous with the Kalukundi property. In addition to this agreement-specific benefit, completion of the transactions contemplated by the Subscription Agreement are conditional upon the Transfer Agreement and the Akam Agreement being executed and delivered by the parties. Thus, the Transfer Agreement is one part of a three part whole, the other two parts consisting of the Akam Agreement and the Subscription Agreement. Each agreement confers benefits on Africo, and management of Africo believes that the Camrose Transactions as a whole confer substantial benefits to Africo that exceed the sum of their parts.

The transfer is subject to, among other things, approval by the shareholders of Africo of the issuance of Africo common shares as consideration for the transfer, approval of the TSX, the implementation of the transfer of the Exploitation Permit as contemplated by the Transfer Agreement, completion of the Subscription Agreement and Africo being satisfied as to the legal validity of Comide's interest and title in the Exploitation Permit. The transactions contemplated by the Subscription Agreement, Akam Agreement and Transfer Agreement as a whole constitute a backdoor listing pursuant to the TSX Company Manual and Africo will be required to meet original listing requirements of the TSX in order to receive final TSX approval. There is no assurance that Africo will be able to meet these requirements in a timely fashion, or at all.

***AKAM AGREEMENT***

Africo entered into an agreement (the "Akam Agreement") with Camrose dated April 17, 2008. The Akam Agreement acknowledges that Camrose has, through a wholly-owned subsidiary, entered into an agreement to purchase the outstanding shares of Akam Mining Sprl ("Akam"), which purchase has completed as at the date of this Circular. The Akam Agreement is intended to resolve the existing litigation regarding the Kalukundi property described in Africo's Annual Information Form dated March 28, 2008 (which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com); and provides, for greater certainty, that Camrose will cause Akam to assign all of its rights, title and interest in Swanmines sprl (the "Swanmines Shares") to a wholly-owned subsidiary of Africo in consideration of the issuance to Camrose of 5,400,000 shares of Africo at a deemed price of $2.50 per share, subject to usual anti-dilution adjustments. The Akam Agreement also provides for mutual releases from Africo and Akam in connection with the Swanmines Shares on closing of the transaction.

The transaction is to complete upon the closing of the Subscription and is subject to approval by the shareholders of Africo of the issuance of the Africo common shares as the consideration for the transfer, completion of the Subscription and approval by the TSX.

***RISKS TO AFRICO ASSOCIATED WITH COMPLETION OF THE CAMROSE TRANSACTIONS***

Africo currently believes that the aggregate maximum number of shares that could be issuable to Camrose under the Subscription Agreement (and upon exercise of the warrants in connection therewith), the Transfer Agreement (assuming the maximum number of shares issuable thereunder), the Akam Agreement or otherwise in connection therewith would be approximately 185,400,000 common shares in the capital of Africo, representing 87.2% of Africo's then issued share capital and 681% of Africo's current issued capital assuming no other issuances of shares in the interim. Camrose's actual shareholdings will only be known when the Valuation contemplated by the Transfer Agreement is available. If the transactions contemplated by the Subscription Agreement, Transfer Agreement and Akam Agreement do not complete, the number of common shares of Africo issuable pursuant to the Note would be approximately 800,000.

**As such, Camrose will have, subject to applicable law, the ability to determine the outcome of certain matters submitted to shareholders for approval in the future, including the election and removal of directors, amendments to Africo's corporate governing documents and certain business combinations. Africo's interests and those of its controlling shareholder may at times conflict, and this conflict might be resolved against Africo's interests. The concentration of control in the hands of a significant shareholder may impact the potential for the initiation, or the success, of an unsolicited bid for Africo's shares.**

***SHAREHOLDER APPROVAL OF THE TRANSACTIONS WITH CAMROSE RESOURCES LIMITED***

Shareholder approval of the transactions contemplated with Camrose is required pursuant to the TSX Company Manual on the basis that the issuance of Africo's securities pursuant to such transactions will constitute more than 25% of Africo's outstanding share capital and will materially affect control of Africo. The resolutions to approve:

1. the proposed issuance of securities pursuant to the Subscription Agreement, the Additional Shares, and the potential issuance of common shares pursuant to the Note if the transactions contemplated by the Subscription Agreement do not complete;
2. the proposed issuance of common shares in the capital of Africo pursuant to the Transfer Agreement; and
3. the proposed issuance of common shares in the capital of Africo pursuant to the Akam Agreement;

are herein collectively referred to as the "Camrose Transactions Resolutions", the full text of which is set out in Schedule "C" hereto.

**Recommendation of the Board of Directors**

The Board of Directors of Africo has approved the terms of the Camrose Transactions. In reaching its conclusion, the Board of Directors:

- reviewed the risk factors relating to Africo as set out in Africo's Annual Information Form dated March 28, 2008 for the financial year ended December 31, 2007, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR), particularly with respect to the litigation that Africo is currently involved in and Africo's need to acquire further working capital;
- reviewed the management, business, financial condition, operating results and prospects of Africo and the current industry, economic, market and regulatory conditions in the DRC;
- reviewed the potential consequences to Africo in the event that the Camrose Transactions do not complete particularly with respect to the ability of Africo to carry out the immediate development of the Kalukundi Property; and

- considered that the transactions contemplated by the Subscription Agreement, Akam Agreement and the Transfer Agreement are all part of a single transaction.

The Board of Directors did not quantify or otherwise attempt to assign relative weight to the specific factors considered in reaching its determination. The Board of Directors considers that the Camrose Transactions, overall, represent a reasonable business risk for Africo given Africo's current circumstances involving the uncertainty of its legal efforts to re-acquire the Kalukundi Property and its pressing requirement for working capital. The Camrose Transactions eliminate that uncertainty and provide sufficient working capital for the foreseeable future. Given the current circumstances, the Board of Directors has determined that if the Camrose Transactions are not approved, there is a material risk that Africo will be unable to re-acquire and develop the Kalukundi Property and may in that event cease to be a going concern. Shareholders are urged to consider these possible consequences of non-approval when voting their shares.

**Based on the above factors, Africo's management recommends that shareholders vote IN FAVOUR of the Camrose Transactions Resolutions. Unless they are instructed otherwise, the persons named in the enclosed form of proxy intend to vote FOR the Camrose Transactions Resolutions.**

## APPROVAL OF 2008 STOCK OPTION PLAN

At the meeting, shareholders who are not insiders of Africo or associates of such insiders and who are entitled to participate in the 2008 Plan (the "Disinterested Shareholders") will be asked to approve the implementation by the Board of Directors of the 2008 Stock Option Plan (the "2008 Plan").

### Background

On April 22, 2008 (the "Adoption Date"), the Board of Directors of Africo adopted the 2008 Plan. The 2008 Plan is subject to approval by Africo's Disinterested Shareholders and the approval of the regulatory authorities having jurisdiction over Africo's securities. The maximum number of common shares issuable under the 2008 Plan (the "2008 Plan Maximum") is proposed to be 10,000,000 shares, which will represent approximately 13.8% of Africo's issued and outstanding common shares upon completion of the transactions contemplated by the Subscription Agreement and the Akam Agreement, as herein defined, which is an increase of 5,216,762 shares from the current plan maximum. In the event the transactions contemplated by the Subscription Agreement, Transfer Agreement and Akam Agreement do not complete, the 2008 Plan Maximum will be 5,442,618, which represents 20% of Africo's issued and outstanding shares as at the date of this Circular, which is an increase of 659,380 shares from the current plan maximum.

See Part 5 – Securities Authorized for Issuance under Equity Compensation Plans for a summary of Africo's current Stock Option Plan, the terms of which are identical in the proposed 2008 Plan with the exception of the following:

(a) the increase in the number of shares issuable under the 2008 Plan; and

(b) provision that stock options may only be exercised to the extent not earlier exercised or terminated in accordance with the terms of the 2008 Plan, and the earliest of:

  (i) the termination date specified in the Option Certificate issued by Africo specifying the terms of the option being granted to the optionee;

  (ii) where the optionee ceases to be an eligible person pursuant to the 2008 Plan by reason of termination for just cause, the date of such termination, or such later date determined by the Board, which can be no later than the original expiry date of the option; and

  (iii) where an optionee ceases to be an eligible person pursuant to the 2008 Plan for a reason other than disability, death or termination for just cause, 90 days after such date of termination, unless otherwise extended by the Board.

As of the date of this Circular, there are 3,975,000 incentive stock options outstanding under Africo's current stock option plan, which represents 14.6% of Africo's current issued and outstanding common shares.

Upon the implementation of the 2008 Plan, all of Africo's previous option plans will terminate and the current outstanding 3,975,000 incentive stock options will be rolled into and governed pursuant to the 2008 Plan.

The 2008 Plan has been put in place for the benefit of Africo to enable it to appropriately compensate directors, executive officers, employees and consultants of Africo and its affiliates and their permitted assigns as that term is defined in National Instrument 45-106 of the Canadian Securities Administrators (the "Participants"), as well as to attract and retain additional key personnel on a going-forward basis, to enable Africo to better align the interests of its directors, management and employees with those of its shareholders, reduce the cash compensation Africo would otherwise have to pay, and to encourage Participants to promote Africo's business affairs to the best of their abilities. The 2008 Plan provides that the Board of Directors may grant options to the Participants on terms that the Board may determine within the limitations set out in the 2008 Plan. Africo does not intend to provide financial assistance to any Participants under the 2008 Plan. As at the date of this Circular, no new options have been granted under the 2008 Plan.

**Shareholder Approval of the 2008 Plan**

At the meeting, Disinterested Shareholders (as defined above) will be asked to pass a resolution (the "2008 Option Plan Resolution") in the following form:

> "RESOLVED THAT adoption by the Board of Directors of the 2008 Stock Option Plan (the "2008 Plan") as described in the Corporation's Information Circular dated May 14, 2008 (the "Circular"), which allows for a maximum number of common shares in the capital of Africo issuable pursuant to the 2008 Plan of 10,000,000 or, in the event the transactions contemplated by the Subscription Agreement, the Transfer Agreement and Akam Agreement (all as defined and more particularly described in the Circular) do not complete, 5,442,618 common shares, is hereby approved, subject to the approval of, and with any amendments to the 2008 Plan that may be required by, the regulatory authorities having jurisdiction over the securities of the Corporation."

Following approval of the 2008 Plan by Africo's Disinterested Shareholders, further shareholder approval will not be required for option grants made in accordance with the 2008 Plan, except as required by the policies of the Exchange. Shareholder approval of the 2008 Plan requires a simple majority of the votes cast by the Disinterested Shareholders. In this regard, as of May 12, 2008, the record date for the meeting and based on the information available to Africo, the votes attached to 527,737 shares are not eligible to vote on this matter.

The text of the 2008 Plan is available for viewing by any shareholder of Africo at Africo's registered office located at 1810-1111 West Georgia Street, Vancouver, British Columbia V6E 4M3, at any time up to and including the day prior to the meeting or the adjournment thereof. A copy of the 2008 Plan will also be available for viewing by any shareholder at the meeting.

**Africo's management recommends that shareholders vote IN FAVOUR of the resolution to approve adoption by the Board of Directors of the 2008 Stock Option Plan. Unless you give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the 2008 Option Plan Resolution as set out herein.**

## PART 4 – EXECUTIVE COMPENSATION

### COMPENSATION OF NAMED EXECUTIVE OFFICERS

Antony Harwood served as President, Michael O'Brien served as Chief Financial Officer, Chris Theodoropoulos served as Chairman of the Board of Africo, and Grant Pierce served as Country Manager in the Democratic Republic of the Congo during Africo's financial year ended December 31, 2007 (together, the "Named Executive Officers"). The summary compensation table below discloses compensation paid to the Named Executive Officers during the financial years ended December 31, 2007, 2006, and 2005. No other executive officer of Africo was paid more than $150,000 in compensation during the periods reported on in the following table.

*Summary Compensation*

| | | Annual Compensation | | | Long-Term Compensation |
|---|---|---|---|---|---|
| **Name and principal position** | **Fiscal year ended Dec 31** | **Salary** | **Bonus** | **Other annual compensation** | **Securities under options granted** |
| Antony Harwood | 2007 | $325,000 | Nil | Nil | 350,000 |
| *President & Chief Executive* | 2006 | $167,136[(6)] | $130,000[(7)] | Nil | 320,000 |
| *Officer*[(1)] | 2005[(5)] | N/A | N/A | N/A | N/A |
| Michael O'Brien | 2007 | $156,000 | Nil | Nil | 200,000 |
| *Chief Financial Officer*[(2)] | 2006 | $104,850 | Nil | Nil | Nil |
| | 2005[(5)] | N/A | N/A | N/A | N/A |
| Chris Theodoropoulos | 2007 | $75,000[(8)] | $150,000[(9)] | $226,500[(11)] | 250,000 |
| *Chairman of the Board*[(3)] | 2006 | Nil | $200,000 | $130,000[(11)] | 220,000 |
| | 2005[(5)] | Nil | $100,000[(10)] | $100,000[(11)] | 100,000 |
| Grant Pierce | 2007 | $350,114 | Nil[(4)] | Nil | 250,000 |
| *Country Manager*[(4)] | 2006 | $91,668 | Nil | Nil | Nil |
| | 2005[(5)] | N/A | N/A | N/A | N/A |

(1) Dr. Harwood has been the President and Chief Executive Officer of Africo since July 7, 2006 (prior to which he was President and Chief Executive Officer of Africo's operating subsidiary from May 31, 2006).

(2) Michael O'Brien served as Acting Chief Financial Officer of Africo from December 1, 2006 to March 9, 2007, when he was appointed Chief Financial Officer.

(3) Mr. Theodoropoulos has been the Chairman of Africo since July 7, 2006 (and of its operating subsidiary since April 7, 2005).

(4) Grant Pierce served as Africo's Country Manager in the Democratic Republic of the Congo from September 1, 2006 to his resignation on March 31, 2008. See "Termination of Employment, Change in Responsibilities and Employment Contracts".

(5) Disclosure for the year ended December 31, 2005, is for Africo's operating subsidiary, Africo Resources (BC) Ltd., prior to Africo's incorporation on July 4, 2006.

(6) $162,500 of this amount was satisfied by issuance of 40,625 common shares in the capital of Africo at a deemed price per share of $4.00 and warrants entitling the holder to purchase 20,312 common shares in the capital of Africo at a per share price of $5.00 (subject to adjustment in certain circumstances) until May 23, 2008.

(7) Accrued in the first quarter of fiscal 2007 for contributions to Africo achieving several business development milestones during fiscal 2006.

(8) Annual fee for serving in the capacity of Chairman of the Board.

(9) Awarded and paid in the first quarter of 2008.

(10) Awarded and paid subsequent to the end of fiscal 2005 for contributions to Africo achieving several business development milestones during fiscal 2005.

(11) Consulting fees paid to 143 Investments Ltd., a private company controlled by Mr. Theodoropoulos. $50,000 of the $130,000 payable during fiscal 2006 was satisfied by issuance of 12,500 common shares in the capital of Africo at a deemed price per share of $4.00 and warrants entitling 143 Investments Ltd. to purchase 6,250 common shares in the capital of Africo at a per share price of $5.00 (subject to adjustment in certain circumstances) until May 23, 2008.

See "Termination of Employment, Change in Responsibilities and Employment Contracts" below and Part 8 – Other Information – Management Contracts.

*Incentive Stock Options and Stock Appreciation Rights*

The following table sets out all incentive stock options granted to the Named Executive Officers during the most recently completed financial year ended December 31, 2007.

| Named Executive Officer | Securities under options granted (#) | % of total options granted in period | Exercise price ($/Security) | Market value of securities underlying options[(1)] on date of grant ($/Security) | Expiration date |
|---|---|---|---|---|---|
| Antony Harwood | 350,000 | 15.9% | $2.31 | $808,500 | November 18, 2012 |
| Michael O'Brien | 200,000 | 9.1% | $2.31 | $462,000 | November 18, 2012 |
| Chris Theodoropoulos | 250,000 | 11.4% | $2.31 | $577,500 | November 18, 2012 |
| Grant Pierce | 250,000[(2)] | 11.4% | $2.31 | $577,500 | March 31, 2009[(2)] |

(1) The underlying securities are common shares of Africo.

(2) These options will expire on March 31, 2009, as a result of Mr. Pierce's resignation as Country Manager in the Democratic Republic of the Congo.

During the financial year ended December 31, 2007, no options held by the Named Executive Officers were downward re-priced and no incentive stock options held by the Named Executive Officers were exercised. The following table sets out details of the value, if any, of unexercised incentive stock options held by the Named Executive Officers as at December 31, 2007.

| Named Executive Officer | Securities acquired on exercise | Aggregate value realized | Unexercised options as at year end December 31, 2007 | | Value of unexercised in-the-money options at year end December 31, 2007[(1)] | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Antony Harwood | Nil | N/A | 670,000 | Nil | $73,500 | N/A |
| Michael O'Brien | N/A | N/A | 200,000 | Nil | Nil | N/A |
| Chris Theodoropoulos | Nil | N/A | 570,000 | Nil | $210,000 | N/A |
| Grant Pierce | N/A | N/A | 250,000 | Nil | Nil | N/A |

(1) The value of unexercised "in-the-money options" at financial year-end is the difference between the option exercise price and the closing price of the underlying stock on the Toronto Stock Exchange at the end of the fiscal year. The closing price of Africo's common shares on December 31, 2007 was $1.80.

## TERMINATION OF EMPLOYMENT, CHANGE IN RESPONSIBILITIES AND EMPLOYMENT CONTRACTS

See also Part 8 – Other Information – Interest of Certain Persons in Matters to be Acted on at the Meeting.

*Dr. Antony Harwood – President & Chief Executive Officer*

Pursuant to an offer letter from Africo Resources (B.C.) Ltd. dated May 25, 2006, which was accepted by Dr. Antony (Tony) Harwood on May 31, 2006, as amended December 19, 2007, Africo entered into an employment contract with Dr. Harwood pursuant to which Dr. Harwood agreed to act as Africo BC's President and Chief Executive Officer, commencing May 31, 2006, at a fixed remuneration of $325,000 per annum, payable monthly, such annual salary to be reviewed by Africo's Board of Directors annually. Under the agreement, Dr. Harwood is entitled to 21 paid vacation days per 12-month period and reimbursement for reasonable expenses incurred by Dr. Harwood in performance of his duties and responsibilities as President and Chief Executive Officer of Africo. In addition, Dr. Harwood is entitled to receive a benefits package which will reimburse him for medical and dental coverage for himself and his dependents, as well as for life, travel and international insurance, and is eligible to participate in Africo's stock option plan and be granted options to purchase 250,000 common shares of Africo, which options have been granted, in addition to others. The agreement further provides that Dr. Harwood is entitled to receive an additional 750,000 stock options to be exercisable at a per share price equal to the market price of

Africo's common shares on the TSX prior to the date of grant (such entitlement now reduced to 400,000 stock options as a result of the issuance of 350,000 options to Dr. Harwood in November 2007) and a cash bonus of $200,000 in the event that Africo completes a financing in the amount of $75,000,000.

As a condition of his employment arrangement, Dr. Harwood has agreed to a non-compete arrangement that restricts him, for a period of 12 months from the date of termination of his employment, from being involved in any capacity in a competing business, the principal activities of which are conducted and the principal assets of which are located within the geographical area known as the DRC of mineral deposits, the principal value of which consists of copper and/or cobalt (excluding Oryx Mining and Exploration Ltd., a private company of which Mr. Harwood is a director).

Dr. Harwood may terminate the employment arrangement with Africo by giving at least one calendar month's advance notice in writing to Africo. Africo may waive such notice, in whole or in part, and if it does so, Dr. Harwood's employment with Africo will cease on the date such notice is waived by Africo. Africo may terminate the employment arrangement with Dr. Harwood:

1. without notice, payment in lieu thereof or payment of severance of any kind for just cause; and
2. at its sole discretion for any reason, without cause, upon providing Dr. Harwood six months' notice of termination or, at Africo's option, pay in lieu of notice equal to six months' base salary as at the date of termination, together with all other payments or entitlements to which Dr. Harwood would be entitled pursuant to applicable employment or employment standards legislation. After the first fully completed year of employment and each fully completed year thereafter, an additional one month's notice or pay in lieu of such notice will be given by Africo to Dr. Harwood in the event of such termination.

Any pay in lieu of notice on termination will be calculated on the basis of Dr. Harwood's annual base salary as of the date of notice of termination and will be provided in regular monthly instalments, subject to all deductions and withholdings required by law. Pay in lieu of notice will also include a pro-rata portion of any bonus or other form of additional compensation for the year in which employment is terminated. In addition, all options granted but not vested as at the date of termination shall vest immediately. Dr. Harwood's rights and entitlements under any performance bonus (except for rights and entitlements, if any, accrued up to the date of termination of employment and unpaid at the date of such termination) shall otherwise terminate effective as of the date of termination, or as at the date notice of termination is given, if pay in lieu of notice is provided. In the event of termination for cause, employment benefits will cease effective as of the date of termination and, in the event of termination without cause, will continue for a period of six months after the date of termination.

If within six months of a change in control of Africo by way of a successful take-over bid, merger, amalgamation or reorganization pursuant to which ownership of more than 51% of the Africo common shares is acquired, Dr. Harwood's employment is terminated, or within such six months Dr. Harwood elects to treat his employment as terminated, Dr. Harwood shall be entitled to pay in lieu of notice equal to two years' annual base salary as at the date of termination, together with payment of any pro-rated bonus entitlement. In addition, all options granted but not vested as at the date of termination shall vest immediately, and any options which, but for such termination, would have been granted in due course within the six months following termination shall be granted to Dr. Harwood and vest immediately. In the event Dr. Harwood elects to treat his employment as terminated after a change in control as outlined above, and the transaction resulting in the change of control was one that was recommended by the directors of Africo to shareholders for approval, provided all monies due to Dr. Harwood in lieu of notice have been paid to Dr. Harwood, Dr. Harwood has agreed to continue to provide services to Africo pursuant to the terms of his employment agreement for a period of no less than 120 days following the deemed termination date.

The employment agreement is not assignable by Dr. Harwood and the agreement shall not be assigned by Africo except in the event of a merger, consolidation, plan of arrangement, corporate restructuring or sale of substantially all of the assets of Africo, and only if the assignee agrees in writing with Dr. Harwood to perform the obligations of Africo under the agreement.

*Michael O'Brien, Chief Financial Officer*

Africo is party to an agreement dated May 17, 2007, as amended December 19, 2007, with Michael O'Brien, pursuant to which Mr. O'Brien acts in the capacity of Chief Financial Officer of Africo for an annual salary of $156,000, to be reviewed annually, an annual performance based bonus at the discretion of the directors, plus entitlement to participate in Africo's stock option plan.

Mr. O'Brien may terminate the agreement by giving Africo at least one month's advance notice in writing, which Africo may waive in whole or in part, in which case Mr. O'Brien's employment will terminate on the date of such waiver. Africo may terminate the employment arrangement with Mr. O'Brien:

1. without notice, payment in lieu thereof or payment of severance of any kind for just cause; and
2. at its sole discretion for any reason, without cause, upon providing Mr. O'Brien six months' notice of termination or, at Africo's option, pay in lieu of notice equal to six months' base salary as at the date of termination, together with all other payments or entitlements to which Mr. O'Brien would be entitled pursuant to applicable employment or employment standards legislation. After the first fully completed year of employment and each fully completed year thereafter, an additional one month's notice or pay in lieu of such notice will be given by Africo to Mr. O'Brien in the event of such termination.

Any pay in lieu of notice on termination will be calculated on the basis of Mr. O'Brien's annual base salary as of the date of notice of termination and will be provided in regular monthly instalments, subject to all deductions and withholdings required by law. Pay in lieu of notice will also include a pro-rata portion of any bonus or other form of additional compensation for the year in which employment is terminated. In addition, all options granted but not vested as at the date of termination shall vest when due during the notice period, provided that none shall vest more than 90 days after the end of the notice period. Mr. O'Brien's rights and entitlements under any performance bonus (except for rights and entitlements, if any, accrued up to the date of termination of employment and unpaid at the date of such termination) shall otherwise terminate effective as of the date of termination, or as at the date notice of termination is given, if pay in lieu of notice is provided. In the event of termination for cause, employment benefits will cease effective as of the date of termination and, in the event of termination without cause, will continue for a period of six months after the date of termination.

If within six months of a change in control of Africo by way of a successful take-over bid, merger, amalgamation or reorganization pursuant to which ownership of more than 51% of the Africo common shares is acquired Mr. O'Brien's employment is terminated, or within such six months Mr. O'Brien elects to treat his employment as terminated, Mr. O'Brien shall be entitled to pay in lieu of notice equal to two years' annual base salary as at the date of termination, together with payment of any pro-rated bonus entitlement. In addition, all options granted but not vested as at the date of termination shall vest immediately, and any options which, but for such termination, would have been granted in due course within the six months following termination shall be granted to Mr. O'Brien and vest immediately. In the event Mr. O'Brien elects to treat his employment as terminated after a change in control as outlined above, and the transaction resulting in the change of control was one that was recommended by the directors of Africo to shareholders for approval, provided all monies due to Mr. O'Brien in lieu of notice have been paid to Mr. O'Brien, Mr. O'Brien has agreed to continue to provide services to Africo pursuant to the terms of his employment agreement for a period of no less than 120 days following the deemed termination date.

The employment agreement is not assignable by Mr. O'Brien and the agreement shall not be assigned by Africo except in the event of a merger, consolidation, plan of arrangement, corporate restructuring or sale of substantially all of the assets of Africo, and only if the assignee agrees in writing with Mr. O'Brien to perform the obligations of Africo under the agreement.

*Grant Pierce – Country Manager, Democratic Republic of the Congo*

Africo entered into a Contract of Employment with Grant Pierce pursuant to which Mr. Pierce agreed to full-time employment as Africo's Country Manager in the Democratic Republic of the Congo, based in Lubumbashi, commencing September 1, 2006, at a fixed remuneration of $275,000 per annum, payable in monthly instalments. Mr. Pierce resigned as Country Manager effective March 31, 2008. Africo has agreed to pay Mr. Pierce $275,881 in settlement of Mr. Pierce's resignation and bonus entitlement, of which 50% was paid on April

16, 2008 and the remaining 50% will be paid following Africo's next debt or equity raising. Mr. Pierce's 250,000 stock options, exercisable at $2.31, will expire on March 31, 2009. Mr. Pierce will continue to provide support and advice on a consulting basis if and when requested, for as long as practicable, without further compensation from Africo.

See Part 8 – Other Information – Management Contracts.

**COMPOSITION OF THE COMPENSATION COMMITTEE**

The members of the Compensation Committee of the Board of Directors of Africo are John Dixon (Chair), Antony Harwood and Tinus Maree, each of whom is a director of Africo. Antony Harwood has been the President and Chief Executive Officer of Africo since July 7, 2006, and the Chief Executive Officer of Africo's wholly-owned subsidiary, Africo Resources (B.C.) Ltd. since May 31, 2006.

**REPORT ON EXECUTIVE COMPENSATION**

*Role of the Compensation Committee*

The compensation of Africo's executive officers and the recommendations with respect to Africo's Option Plan (as herein defined) are determined by the Compensation Committee. Dr. Harwood does not participate in decisions of the Compensation Committee regarding his remuneration. The Compensation Committee will, as part of its review and evaluation process, engage independent third party executive compensation consultants and be guided in part on reports prepared by such consultants.

In order to attract and retain key personnel, Africo employs a combination of base compensation and equity participation through its Option Plan. In establishing levels of remuneration and in granting stock options and bonuses, the executive's performance, level of expertise, responsibilities, length of service to Africo and comparable levels of remuneration paid to executives of other companies of comparable size and development within the industry are taken into consideration.

Africo's Option Plan is administered by the Compensation Committee. The Option Plan is designed to give each option holder an interest in preserving and maximizing shareholder value in the longer term, to enable Africo to attract and retain individuals with experience and ability, and to reward individuals for current performance and expected future performance. Stock option grants are considered when reviewing executive officer compensation packages as a whole. See Part 5 – Securities Authorized for Issuance Under Equity Compensation Plans for a summary of the principal features of Africo's Option Plan.

*Base Salary*

In the Compensation Committee's view, paying base compensation that is competitive in the markets in which Africo operates is a first step to attracting and retaining talented, qualified and effective executives. The base salary of each particular executive officer is determined by an assessment by the Compensation Committee of such executive officer's responsibilities, performance, a consideration of competitive compensation levels in companies similar to Africo and a review of the performance of Africo as a whole and the role such executive officer played in such company performance.

*Bonus*

Bonuses are performance based short-term financial incentives and will be paid based on certain indicators such as personal performance, team performance and/or Africo's financial performance. Bonus levels will be, in part, determined by level of position with Africo and by contractual arrangements.

*Long-Term Incentive*

Africo provides a long-term incentive by granting stock options to executive officers in accordance with the policies of the TSX. Africo's Board has adopted the Option Plan to provide incentive to directors, officers, employees and consultants. The objective of granting options is to encourage executive officers to acquire an

ownership interest in Africo over a period of time, which acts as a financial incentive for such executive officer to consider the long-term interests of Africo and its shareholders. See Part 5 – Securities Authorized for Issuance under Equity Compensation Plans.

*CEO Compensation*

The components of the Chief Executive Officer's compensation are the same as those that apply to all of Africo's executive officers, namely base compensation, performance bonuses and long-term incentives in the form of stock options. The general compensation philosophy of Africo for executive officers is to provide a level of compensation that is competitive within the international marketplace and that will attract and retain individuals with the experience and qualifications necessary for Africo to be successful, and to provide long-term incentive compensation which aligns the interest of executives with those of the shareholders of Africo and provide long-term incentives to members of senior management whose actions have a direct and identifiable impact on the performance of Africo and who have had a material responsibility for long-range strategy development and implementation.

In establishing the CEO's compensation, the Compensation Committee reviews salaries paid to other executive officers in Africo, salaries paid to other CEOs in the industry, and the Chief Executive Officer's contribution to the affairs of Africo on an annual basis. Based on this criteria, the Committee then makes recommendations to the Board.

See Part 4 - Executive Compensation - Summary Compensation Table above for more information on remuneration of Named Executive Officers.

The foregoing report has been submitted by the Members of the Compensation Committee of the Board of Directors of Africo: John Dixon (Chair)
Antony Harwood
Lukas Marthinus (Tinus) Maree

**COMPENSATION OF DIRECTORS**

Directors who are also officers and receive a salary from Africo do not receive any remuneration from Africo for serving as a director, except for reimbursement of any out-of-pocket expenses incurred in acting as a director and participation in Africo's Option Plan. Directors who are not so employed receive remuneration from Africo in the amount of $2,500 per month. With effect from December 1, 2006, the Chair of the Audit Committee receives an additional $5,000 per annum and the Chair of the Compensation Committee receives $2,000 per annum for their respective services as such, and committee members receive $500 per committee meeting attended. Aggregate directors fees paid by Africo to its directors during the year ended December 31, 2007 were $119,500, excluding the $75,000 annual Chairman's fee paid to Mr. Theodoropoulos and described below.

Chris Theodoropoulos, the Chairman of the Board of Africo, receives $75,000 annually for acting as Chairman, on the basis of devoting five days per month to the affairs of Africo in his capacity as Chairman, and an additional $2,500 per day for each additional day in excess of five days per month that Mr. Theodoropoulos devotes to Africo. In addition, from November 2003 to March 2007, Chris Theodoropoulos was associate counsel with the Vancouver law firm Getz Prince Wells LLP, which firm provides legal services to Africo. During the period January 1 to March 31, 2007, Africo paid Getz Prince Wells LLP an aggregate $53,062 for legal services rendered.

David Adamson, a director of Africo since its incorporation on July 4, 2006, received cash compensation from Africo during the fiscal year ended December 31, 2007 of an aggregate $31,333 for his services as a director.

John Dixon, a director of Africo since its incorporation on July 4, 2006, received cash compensation from Africo during the fiscal year ended December 31, 2007 of an aggregate $42,667 for his services as a director. In addition, during the fiscal year ended December 31, 2007, Africo was party to a written agreement with East African Mineral Resources, an entity controlled by John Dixon, for provision of staff and all support services for Swanmines and the Republic of South Africa office, and travel services for Dr. Harwood in his capacity as President and Chief Executive Officer of Africo, the intention being that this contract was for cost recovery only, with no profit component to East African Mineral Resources. During Africo's fiscal year ended December 31,

2007, Africo paid East African Mineral Resources an aggregate $632,119 in reimbursement of these costs and for this service.

Lukas Marthinus Maree, a director of Africo since its incorporation on July 4, 2006, and a director of Africo Resources (B.C.) Ltd. since February 14, 2005, received cash compensation from Africo during the fiscal year ended December 31, 2007 of $31,000 ($22,500 of which has been paid and the balance accrued) for his services as a director.

During the year ended December 31, 2007, Africo's directors were granted options to purchase an aggregate 900,000 common shares of Africo as set out in the following table.

| Name | Date of grant | Options granted | Exercise price | Expiry date |
|---|---|---|---|---|
| David Adamson | November 19, 2007 | 100,000 | $2.31 | November 18, 2012 |
| John Dixon | November 19, 2007 | 100,000 | $2.31 | November 18, 2012 |
| Antony Harwood | November 19, 2007 | 350,000 | $2.31 | November 18, 2012 |
| Tinus Maree | November 19, 2007 | 100,000 | $2.31 | November 18, 2012 |
| Chris Theodoropoulos | November 19, 2007 | 250,000 | $2.31 | November 18, 2012 |

See Part 8 – Other Information – Management Contracts.

**PERFORMANCE GRAPH**

The following graph compares the quarterly percentage change in the cumulative total shareholder return for $100 invested in common shares of Africo on December 31, 2006 (the end of the quarter in which Africo became listed on the TSX) against the cumulative total shareholder return of the S&P /TSX Composite index, for the first year of trading for Africo, assuming the reinvestment of all dividends. As at the date of this Circular, Africo's current share price was $1.80.




| | 2006 Q4 | 2007 Q1 | 2007 Q2 | 2007 Q3 | 2007 Q4 |
|---|---|---|---|---|---|
| Africo Resources Ltd | 100.00 | 92.50 | 55.00 | 53.75 | 45.00 |
| S&P/TSX Composite | 100.00 | 102.60 | 109.05 | 111.22 | 109.83 |

## PART 5 – SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS

The following information is as of December 31, 2007, Africo's most recently completed financial year.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by securityholders | 3,975,000 | $1.95 | 337,688 |
| Equity compensation plans not approved by securityholders | Not applicable | Not applicable | Not applicable |
| Total | 3,975,000 | $1.95 | 337,688 |

*Summary of the Stock Option Plan*

On July 7, 2006, the Board of Directors of Africo approved a "fixed number" stock option plan (the "Option Plan") in a form compatible with the rules of the TSX. The Option Plan has not been amended since it was adopted. Under the Option Plan, Africo is authorized to grant options entitling the holders to acquire up to an aggregate 4,783,238 Africo common shares, which represented 20% of the issued and outstanding common share capital of Africo as at the date of the initial listing of Africo's common shares on the TSX. As of the date of this Circular, the Option Plan reserve represents approximately 17.6% of Africo's issued and outstanding common share capital.

As at the date of this Circular, stock options have been granted and are outstanding pursuant to the Option Plan entitling the holders thereof to purchase an aggregate 3,975,000 common shares in the capital of Africo representing approximately 83.1% of the Option Plan reserve and 14.6% of Africo's issued and outstanding common share capital, of which options to purchase an aggregate 2,419,307 common shares of Africo (or approximately 8.9% of its current issued and outstanding common share capital) are held by Africo's directors and executive officers.

The principal purposes of the Option Plan are to provide Africo with the advantages of the incentive inherent in share ownership on the part of those persons responsible for the continued success of Africo; to create in those persons a proprietary interest in, and a greater concern for, the welfare and success of Africo; to encourage such persons to remain with Africo; and to attract new talent to Africo. Africo has not to date and does not intend to provide financial assistance to facilitate the purchase of common shares under the Option Plan.

The Option Plan is administered by the Compensation Committee of the Board. The following is a brief description of the principal terms of the Option Plan, which description is qualified in its entirety by the terms of the Option Plan:

1. The maximum number of Africo common shares issuable upon the exercise of options granted under the Option Plan is 4,783,238 common shares in the capital of Africo.

2. The exercise price of stock options, as determined by the Compensation Committee, may not be less than the last closing price of the Africo common shares on the TSX immediately prior to the time of the grant of an option.

3. Stock options under the Option Plan may be granted to:

   (a) an executive officer, director or employee of Africo or any related entity to Africo;

(b) a consultant (other than an employee or director of Africo) providing consulting, technical, management or other services to Africo or any related entity to Africo, or a consultant company; and

(c) an employee of a corporation providing management services to Africo or any related entity to Africo, which management services are required for the ongoing successful operation of the business enterprise of Africo but excluding a person engaged in investor relations activities.

4. The term for exercise of the options under the Option Plan is a maximum of ten years from the date of grant. Stock options may only be exercised to the extent not earlier exercised or terminated in accordance with the terms of the Option Plan, and the earliest of: a) the termination date specified in the Option Certificate issued by Africo specifying the terms of the option being granted to the optionee; b) where the optionee ceases to be an eligible person pursuant to the Option Plan by reason of termination for just cause, the date of such termination, or such later date determined by the Board, which can be no later than the original expiry date of the option; c) where an optionee ceases to be eligible person pursuant to the Option Plan for a reason other than disability, death or termination for just cause, 90 days after such date of termination, or upon the optionee making written application to the Board, such later date determined by the Board, which can be no later than the original expiry of such option; and d) the date of any violation of any term of the Option Plan with respect to transferability.

5. The Board of Directors of Africo, taking into account the recommendations of the Compensation Committee, shall have the complete discretion to set the terms of any vesting schedule for each option granted, including the discretion to permit partial vesting in stages or percentage amounts based on the term of such option or to permit full vesting after a stated or period of time has passed from the date of grant.

6. All options shall be non-assignable and non-transferable except as to a Qualified Successor or as otherwise permitted by applicable securities laws. "Qualified Successor" means a person who is entitled to ownership of an option upon the death of an optionee, pursuant to a will or the applicable laws of descent and distribution upon death. In the event of death of an optionee, such optionee's options shall be exercisable by the Qualified Successor until the expiry of the term of the option. If an optionee becomes disabled, such optionee's options may be exercised by a guardian until 12 months after the expiry of the term of the option.

7. If there is any change in the number of Africo common shares outstanding through any declaration of a stock dividend or any consolidation, subdivision or reclassification of the Africo common shares, the number of shares available under the Option Plan, the shares subject to any option and the exercise price will be adjusted proportionately, subject to any approval required by the TSX. If Africo amalgamates, merges or enters into a plan of arrangement with or into another corporation, the shares received on exercise of the options thereafter will reflect the shares that would have been received had the options been exercised immediately prior to the record date for the amalgamation, merger or plan of arrangement and the exercise price will be adjusted proportionately. If a Change of Control (as defined in the Option Plan) occurs, all options will become immediately exercisable. If a bona fide takeover bid (as defined in the British Columbia *Securities Act*) is made for the Africo common shares, optionees will be entitled to exercise any options they hold to permit them to tender the shares received upon exercise of the options to the takeover bid.

8. The Option Plan contains provisions which require shareholder approval or, where required, approval by Africo's disinterested shareholders, to: (i) increase the aggregate number of Africo common shares which may be issued under the Option Plan, (ii) materially modify the requirements as to the eligibility for participation in the Option Plan which would have the potential of broadening or increasing insider participation; and (iii) materially increase the benefits accruing to participants under the Option Plan. However, the Option Plan may be amended by the Board of Directors of Africo without shareholder approval in order to comply with the requirements of any applicable regulatory authority and to make amendments of an administrative, grammatical or typographical nature to the Option Plan.

9. Notwithstanding the date of expiration of the term of an option, the date of expiration of the term of an option will be adjusted, without being subject to the Board of Directors of Africo or Compensation Committee's discretion, to take into account any black out period imposed on the optionee by Africo as follows: (i) if the term expiration date falls within a black out period imposed on the optionee by Africo, then the term expiration date is extended to the close of business on the tenth business day after the end of

such black out period by Africo (the "Black Out Expiration Term"); or (ii) if the term expiration date falls within two business days after the end of a black out period imposed on the optionee by Africo, then the term expiration date is extended to the date which is the Black Out Expiration Term reduced by the number of business days between the term expiration date and the end of such black out period.

A copy of the Option Plan will be provided to any shareholder upon request for same sent to Africo's Chief Financial Officer. See Part 3 – The Business of the Meeting – Approval of 2008 Stock Option Plan.

## PART 6 – AUDIT COMMITTEE

For disclosure with respect to composition of the Audit Committee of Africo's Board of Directors, the Audit Committee Charter, fees paid to Africo's external auditor during the last two fiscal years and other related information, see "Item 10 – Audit Committee" in Africo's Annual Information Form dated March 28, 2008 for the financial year ended December 31, 2007, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com.

## PART 7 – CORPORATE GOVERNANCE

Follows is a summary of Africo 's current approach to corporate governance.

*Composition of the Board of Directors*

The Board of Directors of Africo, at present, is comprised of five directors, one of whom, John Dixon, is considered to be independent. In determining whether a director is independent, the Board considers, for example, whether the director has a relationship, which could, or could be perceived to, interfere with the director's ability to objectively assess the performance of management. On this basis, Chris Theodoropoulos, as Chairman of the Board receiving remuneration for his services; David Adamson, an executive officer of Africo's principal operating subsidiary within the last three years; Antony Harwood, the current President and Chief Executive Officer of Africo; and Tinus Maree, who receives remuneration from Africo for consulting services, are not considered to be independent directors.

The Board anticipates that as Africo matures as a business enterprise, it will identify additional qualified candidates that have experience relevant to its needs, are independent of Africo's management and its subsidiaries and are considered independent under applicable corporate governance legislation and guidelines.

*Board Mandate*

The Board of Directors of Africo has not, as yet, adopted a written mandate. The Board is, however, responsible for approving long-term strategic plans and annual operating plans and budgets recommended by management. Board consideration and approval is also required for all material contracts, business transactions and all debt and equity financing proposals.

Africo's Board of Directors delegates to management, through the President and Chief Executive Officer, responsibility for meeting defined corporate objectives, implementing approved strategic and operating plans, carrying on Africo's business in the ordinary course, managing Africo's cash flow, evaluating new business opportunities, recruiting staff and complying with applicable regulatory requirements. The Board also looks to management to furnish recommendations respecting corporate objectives, long-term strategic plans and annual operating plans.

The Board has appointed three Committees: an Audit Committee, a Compensation Committee and a Corporate Governance Committee, each responsible for making recommendations to the Board in their respective areas of endeavour (see below for further detail on the mandate of each Committee). The Board and its Committees meet independently of management on a regular basis.

*Position Descriptions*

Africo's Board of Directors has not yet developed written position descriptions for the Chairman of the Board or the Chair of the Board Committees. The role of the Chair of the Audit Committee flows from and is informed and guided by the factors identified in the Audit Committee Charter (see Part 6 – Audit Committee).

The Board of Directors has not developed a written position description for the Chief Executive Officer. As Chief Executive Officer, Dr. Harwood is responsible for management of the business and affairs of Africo and its subsidiaries, subject always to Board approval of business plans and decisions relating to major expenditures, financing arrangements and significant acquisitions or divestitures (see *Board Mandate* above).

*Attendance*

The following table provides a summary of attendance for Board and Committee meetings held from January 1, 2007 to December 31, 2007.

| **Name** | **Board meetings attended** | **Committee meetings attended** |
|---|---|---|
| David Adamson(1) | 9 of 10 | 1(1) of 3 (Audit) |
| John Dixon | 10 of 10 | 3 of 3 (Audit)<br>2 of 2 (Compensation) |
| Antony Harwood(2) | 10 of 10 | 2(2) of 3 (Audit)<br>2 of 2 (Compensation) |
| Lucas Marthinus (Tinus) Maree(3)(4) | 8 of 10 | 0(3) of 3 (Audit)<br>1(4) of 2 (Compensation) |
| Chris Theodoropoulos | 10 of 10 | N/A |

(1) Mr. Adamson was appointed as a member of the Audit Committee on October 31, 2007, therefore, he only attended one meeting of the Audit Committee held subsequent to his date of appointment as a member.

(2) Dr. Harwood was a member of the Audit Committee during the fiscal year to October 31, 2007, therefore, he only attended the two meetings of the Audit Committee, as a member, held during the period he was a member.

(3) Mr. Maree was appointed as a member of the Audit Committee on October 31, 2007, and was unavailable to attend the one meeting of the Audit Committee held subsequent to his date of appointment as a member.

(4) Mr. Maree was appointed as a member of the Compensation Committee on October 31, 2007, therefore, he only attended one of the two meetings of the Committee held subsequent to his date of appointment as a member.

*Directorships*

Certain of the current directors of Africo are also directors of other reporting issuers (or equivalent) in a jurisdiction or a foreign jurisdiction as follows:

| **Name** | **Reporting Issuer (or equivalent in a foreign jurisdiction)** |
|---|---|
| David Adamson | Paragon Minerals Corporation<br>Rubicon Minerals Corporation<br>Constantine Metal Resources |
| Antony (Tony) Harwood | Adamus Resources Limited<br>Lappland Goldminers AB |
| Chris Theodoropoulos | Ethos Capital Corp.<br>Pediment Exploration Ltd.<br>Peer 1 Network Enterprises, Inc. |

*Orientation and Continuing Education*

Given the relatively static composition of the Board of Directors since its incorporation, the Corporation has not yet developed an official orientation or training program for new directors.

New directors will have the opportunity to become familiar with the Corporation by meeting with the other directors and with officers and employees. Orientation activities will be tailored to the particular needs and experience of each director and the overall needs of the Board.

*Ethical Business Conduct*

Africo's Board of Directors has adopted a Code of Ethics, a copy of which is available for review through the internet on SEDAR at www.sedar.com or on Africo's website at www.africoresources.com.

Africo's Board of Directors monitors the ethical conduct of its affairs by its directors, employees and contractors to ensure that it complies with applicable legal and regulatory requirements, such as those of relevant securities commissions and stock exchanges. The Board has found that the fiduciary duties placed on individual directors by applicable corporate law, as well as the restrictions placed by applicable corporate legislation on an individual director's participation in decisions of the Board in which the director has an interest, have been sufficient to ensure that the Board operates independently of management and in the best interests of Africo's business and operations, as well as shareholders' interests.

The Board of Directors promotes a culture of ethical business conduct for officers and employees of Africo through its own high standards of ethical business behavior in fulfilling its mandate.

Africo's Board of Directors has adopted a "Whistleblower Policy" which provides employees, management, officers, directors, contractors, consultants and Committee members with the ability to report, on a confidential and anonymous basis, any complaints and concerns regarding accounting, internal controls or auditing matters, including, but not limited to, unethical and unlawful accounting and auditing policies, practices or procedures, fraudulent or misleading financial information and instances of corporate fraud, in addition to other wrong doing. The Board believes that providing a forum for such individuals to raise concerns about ethical conduct and treating all complaints with the appropriate level of seriousness fosters a culture of ethical conduct within Africo.

The Board of Directors has also adopted a Corporate Disclosure Policy to ensure that communications to the investing public about the business and affairs of Africo and its subsidiaries are made in accordance with all applicable legal and regulatory requirements, covering disclosure in documents filed with regulators and written disclosure documents sent to shareholders, presentations by senior management, information contained on Africo's website and other electronic communications. The Corporate Disclosure Policy extends to oral statements made in meetings and telephone conversations with analysts and investors, interviews with the media, as well as speeches, industry or press conferences and conference calls.

Further, Africo's Board has adopted an Insider Trading Policy to ensure that persons having knowledge of material information not generally disclosed to the public do not take advantage of such information through trading in securities issued by Africo or in securities of other corporations whose price would be affected by such undisclosed material information. This Trading Policy is intended to ensure that Africo's directors, officers, employees and other insiders, or associates of such persons, act, and are perceived to act, in accordance with applicable laws and the highest standards of ethical and professional behaviour.

*Nomination and Assessment of Directors*

The Corporate Governance Committee and the Board as a whole intend to annually examine the size of the Board of Directors to ensure that it is optimum for decision making. The current Board comprising five directors (six nominees being proposed for election at the 2008 annual meeting to which this Circular relates) is small enough for constructive interaction to take place but, at the same time, large enough to encompass a broad representation of relevant skills and competencies.

*Assessments*

As part of its mandate, the Corporate Governance Committee, comprised of John Dixon, Tinus Maree and Chris Theodoropoulos, of which Mr. Dixon is independent, is responsible for assessing, at least annually, the effectiveness of the Board as a whole, the Committees of the Board and the contribution of individual directors (including the competencies and skills that each individual director is expected to bring to the Board), including considering the appropriate size of the Board.

*Compensation*

See Part 4 – Executive Compensation – Report on Executive Compensation.

*Committees of the Board*

*Audit Committee*

See Part 6 – Audit Committee.

*Compensation Committee*

The Compensation Committee of the Board of Directors, comprised of John Dixon (Chair), Tony Harwood and Tinus Maree, is responsible for approving senior executive compensation and retirement plans (see *Compensation* above and Part 4 – Executive Compensation – Report on Executive Compensation).

*Corporate Governance Committee*

John Dixon, Tinus Maree and Chris Theodoropoulos are members of Africo's Corporate Governance Committee. The Committee's responsibilities include:

- identifying qualified candidates and making recommendations to the Board regarding nominees for election or appointment as directors;
- conducting annual reviews of committee memberships and periodically reviewing the powers, mandates and performance of the committees of the Board;
- reviewing the composition, compensation and governance of the Board, assessing the effectiveness of the Board as a whole and contribution of the directors individually, and making recommendations for improving effectiveness; and
- ensuring corporate compliance with applicable legislation.

## PART 8 – OTHER INFORMATION

### DIRECTORS AND OFFICERS INSURANCE

Africo maintains insurance for the benefit of its directors and officers against liability incurred by them as such, subject to certain limitations contained in the *Canada Business Corporations Act* and as outlined in the insurance policy. The policy provides coverage to directors and officers in the aggregate amount in any policy year (April 23, 2008 to April 22, 2009) of $10,000,000, subject to a deductible of $100,000. The total premium charged for this insurance during the current policy year is $61,250 and is paid by Africo.

### INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS

Since the beginning of the most recently completed financial year ended December 31, 2007 and as at the date of this Information Circular, no director, executive officer or employee or former director, executive officer or employee of Africo or its subsidiaries, nor any nominee for election as a director of Africo, nor any associate of any such person, was indebted to Africo or any of its subsidiaries during the most recently completed financial year ended December 31, 2007 for other than "routine indebtedness", as that term is defined by applicable law; nor was

any indebtedness to another entity the subject of a guarantee, support agreement, letter of credit or other similar arrangement or understanding provided by Africo or any of its subsidiaries.

## INTEREST OF CERTAIN PERSONS IN MATTERS TO BE ACTED ON AT THE MEETING

Except as described herein, none of the directors or executive officers of Africo or its subsidiaries, no proposed nominee for election as a director of Africo, none of the persons who have been directors or executive officers of Africo or its subsidiaries since the commencement of Africo's last completed consolidated financial year, and no associate or affiliate of any of the foregoing persons has any substantial interest, direct or indirect, by way of beneficial ownership of securities or otherwise, in any matter to be acted upon at the meeting other than the election of the directors (see Part 3 – The Business of the Meeting). The Board of Directors of Africo resolved to set aside a bonus pool amounting to 1% of the value of the proposed transactions with Camrose Resources Limited as described in this Circular, to a maximum of $1,135,000, to be distributed to employees, officers and directors of Africo at the discretion of Africo's Compensation Committee, and which bonuses are over and above any contractual entitlements, respectively, of employees, officers, and directors. See in this Circular Part 4 – Executive Compensation – Termination of Employment, Change in Responsibility and Employment Contracts.

## INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS

Except as described herein, no proposed nominee for election as a director, and no director or executive officer of Africo or any of its subsidiaries who has served in such capacity since the beginning of the last financial year of Africo, and no shareholder holding of record or beneficially, directly or indirectly, more than 10% of Africo's outstanding common shares, and none of the respective associates or affiliates of any of the foregoing, had any interest in any transaction with Africo since the beginning of the last completed financial year, or in any proposed transaction that has materially affected Africo or any of its subsidiaries, or is likely to do so.

See Part 4 – Executive Compensation - Termination of Employment, Change in Responsibilities and Employment Contracts and Part 8 – Other Information – Management Contracts.

## MANAGEMENT CONTRACTS

The management functions of Africo and its subsidiaries are performed by our directors and executive officers and we have no management agreements or arrangements under which such management functions are performed by persons other than the directors and executive officers of Africo and its subsidiaries, respectively. See Part 4 – Executive Compensation - Termination of Employment, Change in Responsibilities and Employment Contracts and Compensation of Directors.

## CEASE TRADE ORDERS AND CORPORATE BANKRUPTCY

Except as described below, as at the date of this Information Circular, no proposed nominee for election as a director of Africo is, or has been, within 10 years before the date of this Information Circular:

1. a director, chief executive officer or chief financial officer of any company (including Africo and any personal holding company of the proposed director) that, while that person was acting in that capacity:
    (a) was subject to a cease trade order (including any management cease trade order which applied to directors or executive officers of a company, whether or not the person is named in the order) or an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation that was in effect for a period of more than 30 consecutive days (an "Order"); or
    (b) was subject to an Order that was issued after the proposed director ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in the capacity as director, chief executive officer or chief financial officer; or
2. a director or executive officer of any company (including Africo and any personal holding company of the proposed director) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to

bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets.

Lukas Marthinus (Tinus) Maree was a director of Energem Resources Inc. from July 2005 until May 2006. On March 7, 2006, the British Columbia Securities Commission ordered that all trading by the insiders in the securities of Energem cease until Energem filed comparative financial statements for the fiscal year ended November 30, 2005, related Management Discussion and Analysis, and an Annual Information Form for the fiscal year ended November 30, 2005. This cease trade order was revoked by the British Columbia Securities Commission on May 31, 2006.

**PENALTIES AND SANCTIONS**

As at the date of this Information Circular, no proposed nominee for election as a director of Africo (nor any of his or her personal holding companies) has been subject to:

(a) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or

(b) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable shareholder in deciding whether to vote for a proposed director.

**PERSONAL BANKRUPTCY**

As at the date of this Information Circular, no proposed nominee for election as a director of Africo has, within the ten years before the date of this Information Circular, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the proposed director.

**OTHER MATTERS**

Management of Africo is not aware of any other matters to come before the meeting other than as set forth in the Notice of Meeting that accompanies this Information Circular. If any other matter properly comes before the meeting, it is the intention of the persons named in the enclosed form of proxy to vote the shares represented thereby in accordance with their best judgment on such matter.

**ADDITIONAL INFORMATION**

You may obtain additional financial information about Africo in our audited consolidated financial statements and Management's Discussion and Analysis for the year ended December 31, 2007, which are included with this Information Circular. Additional copies may be obtained without charge upon request to us at Suite 1108 – 1030 West Georgia Street, Vancouver, British Columbia V6E 2Y3, telephone (604) 646-3225; fax (604) 646-3226. You may also access our disclosure documents through the internet on the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) at www.sedar.com.

**DIRECTORS' APPROVAL**

The Board of Directors of Africo Resources Ltd. has approved the contents of this Information Circular and the sending of it to each shareholder entitled to receive notice of the meeting.

Vancouver, British Columbia, May 14, 2008.

*"Chris Theodoropoulos"*

Chris Theodoropoulos, Chairman of the Board

**SCHEDULE "A"**

**RIGHTS PLAN TERMINATION AGREEMENT**

# AMENDMENT, WAIVER AND TERMINATION AGREEMENT

**AMENDMENT, WAIVER AND TERMINATION AGREEMENT** dated as of April 17, 2008 with respect to the **SHAREHOLDERS RIGHTS PLAN AGREEMENT** dated as of May 25, 2007 between **Africo Resources Ltd.**, a company incorporated under the laws of Canada (the "Issuer") and **Computershare Investor Services Inc.**, a company incorporated under the laws of Canada (the "Rights Agent")

## BACKGROUND

A. the Issuer and the Rights Agent are parties to the Shareholders Rights Plan Agreement dated as of May 25, 2007 (the "Rights Plan");

B. the Issuer and Camrose Resources Limited ("Camrose") have entered into a Subscription Agreement dated as of April 17, 2008 ("Subscription Agreement") pursuant to which Camrose has agreed to subscribe for common shares of the Issuer representing more than 20% of the outstanding common shares of the Issuer after giving effect to completion of the Subscription Agreement;

C. completion of the Subscription Agreement is conditional upon the rights under the Rights Plan being waived and the Rights Plan being terminated;

D. the Rights Plan is not intended to apply to a subscription agreement, the completion of which is conditional upon the rights under the Rights Plan being waived and the Rights Plan being terminated, and the Rights Plan is therefore not intended to apply to the Subscription Agreement;

E. no "Flip-in Event" (as defined in the Rights Plan) has occurred; and

F. the Issuer and the Rights Agent are entering into this Agreement to amend the Rights Plan to provide for the waiver on behalf of all of the shareholders and Rights holders of any rights that may have accrued in their favour prior to the termination of the Rights Plan pursuant to this Agreement and to provide for the Rights Plan to be rescinded in its entirety and terminated effective as of the date of shareholder approval of this Agreement.

In consideration of the premises, $10 now paid by the Issuer and the Rights Agent to each other and the covenants and agreements hereinafter set forth (the receipt and sufficiency of which is hereby acknowledged), the Issuer and the Rights Agent agree as follows:

1. In this Agreement terms that are defined in the Rights Plan and not otherwise defined herein shall have the meanings defined in the Rights Plan.

2. The Rights Plan is hereby amended, effective as of the date of shareholder approval of this Agreement, to provide that any and all rights that may have accrued under the Rights Plan and the Rights in favour of holders of Common Shares prior to the termination of the Rights Plan pursuant to this Agreement are fully and finally and irrevocably waived and the obligations of the Issuer in connection therewith are fully and finally and irrevocably released.

3. The Rights Plan is hereby rescinded in its entirety and terminated, and of no further force and effect, effective as of the date of shareholder approval of this Agreement.

4. This Agreement is subject to the approval of the holders of Common Shares, by the affirmative vote of a majority of the votes cast by all holders of Common Shares (other than any holder who does not qualify as an Independent Shareholder, with respect to all Common Shares Beneficially owned by such Person), represented in person or by proxy at a Special Meeting called and held in compliance with applicable laws and regulatory requirements and the requirements of the Issuer's bylaws and the Rights Plan.

5. This Agreement shall be deemed to be a contract made under the laws of the Province of British Columbia and for all purposes shall be governed by and construed in accordance with the laws of such Province applicable to contracts to be made and performed entirely within such Province.

6. This Agreement and the Rights Plan are the only agreements between the parties with respect to the subject matter hereof and thereof and there are no other agreements, representations, warranties, covenants or conditions with respect thereto.

7. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.

In witness whereof, the parties hereto have caused this Agreement to be duly executed under seal as of the day and year first above written.

**AFRICO RESOURCES LTD.**

By: c/s

*"Chris Theodoropoulos"*
*(Authorized Signatory)*

Name: Chris Theodoropoulos
Title: Chairman of the Board

**COMPUTERSHARE INVESTOR SERVICES INC.**

By: c/s

*"June Glover"*
*(Authorized Signatory)*

Name: June Glover
Title: Relationship Manager

*"Jenny Karim"*
*(Authorized Signatory)*

Name: Jenny Karim
Title: Relationship Manager

## SCHEDULE "B"

## RIGHTS PLAN TERMINATION RESOLUTION

"RESOLVED THAT:

1. In accordance with the terms of section 5.4 thereof, the Shareholder Rights Plan Agreement (the "Rights Plan") dated as of May 25, 2007, between the Corporation and Computershare Trust Company of Canada, as Rights Agent, be amended to provide that the Rights Agent is irrevocably authorized and directed by each of the holders of certificates for Common Shares and Rights Certificates, to waive on behalf of all of the shareholders and holders of Rights, any right that may have accrued in their favour prior to termination of the Rights Plan pursuant to the Termination Agreement dated April 17, 2008 between the Corporation and the Rights Agent, a copy of which is attached as Schedule "A" of the Corporation's Management Information Circular dated May 14, 2008.

2. The Termination Agreement dated as of April 17, 2008 between the Corporation and the Rights Agent, a copy of which is attached as Schedule "A" of the Corporation's Management Information Circular dated May 14, 2008, is hereby ratified, confirmed and approved.

3. Any director or officer of the Corporation is hereby authorized and empowered, acting for, in the name of, and on behalf of the Corporation, to execute or cause to be executed, under the seal of the Corporation or otherwise, and to deliver or cause to be delivered, all such documents or instruments, and do or cause to be done all such other acts or things, as in the opinion of such director or officer of the Corporation may be necessary or desirable in order to implement and give effect to, and to carry out, the resolutions set forth herein."

**SCHEDULE "C"**

**CAMROSE TRANSACTIONS RESOLUTIONS**

"RESOLVED THAT:

1. The issuance of 40,000,000 common shares and 20,000,000 warrants to acquire common shares to Camrose Resources Limited pursuant to the Subscription Agreement and the Additional Shares, all as more particularly described and defined in the Corporation's Management Information Circular dated May 14, 2008, are hereby approved.

2. The issuance of 5,400,000 common shares to Camrose Resources Limited pursuant to the Akam Agreement as more particularly described in the Corporation's Management Information Circular dated May 14, 2008 is hereby approved.

3. The issuance of a maximum of 120,000,000 common shares to affiliates of La Congolaise des Mines et de Developpement (Comide Sprl) pursuant to the Transfer Agreement as more particularly described in the Corporation's Management Information Circular dated May 14, 2008 is hereby approved.

4. Any director or officer of the Corporation is hereby authorized and empowered, acting for, in the name of, and on behalf of the Corporation, to execute or cause to be executed, under the seal of the Corporation or otherwise, and to deliver or cause to be delivered, all such documents or instruments, and do or cause to be done all such other acts or things, as in the opinion of such director or officer of the Corporation may be necessary or desirable in order to implement and give effect to, and to carry out, the resolutions set forth herein."