# Exhibit 41

**GEORGE MASON UNIVERSITY SCHOOL OF LAW JOURNAL OF INTERNATIONAL COMMERCIAL LAW**

## ARTICLES

INTEGRATING THE RUGGIE GUIDING PRINCIPLES INTO THE INTERNATIONAL ECONOMIC COMMUNITY
*Laurie E. Abbott*

RENEGOTIATING INVESTMENT CONTRACTS: THE CASE OF MINING CONTRACTS IN DEMOCRATIC REPUBLIC OF THE CONGO
*Kapwadi F. Lukanda*

## NOTES

ANYTHING BUT "F**KING BRILLIANT:" THE FCC'S NEW INDECENCY DEFINITION AND ENFORCEMENT POLICY
*Azadeh Malek*

DAVID V. GOLIATH – IN THE FASHION ERA: ANALYZING THE LANHAM ACT TO PROTECT INDIVIDUAL DESIGNERS AND SMALL BUSINESS OWNERS
*Jacqueline M. Nguyen*

VOLUME 5 SUMMER ISSUE NUMBER 3

**JOURNAL OF INTERNATIONAL COMMERCIAL LAW**

VOLUME 5 SUMMER ISSUE NUMBER 3

## CONTENTS

### ARTICLES

INTEGRATING THE RUGGIE GUIDING PRINCIPLES INTO THE INTERNATIONAL ECONOMIC COMMUNITY — *Laurie E. Abbott* — 261

RENEGOTIATING INVESTMENT CONTRACTS: THE CASE OF MINING CONTRACTS IN DEMOCRATIC REPUBLIC OF THE CONGO — *Kapwadi F. Lukanda* — 301

### NOTES

ANYTHING BUT "F**KING BRILLIANT:" THE FCC'S NEW INDECENCY DEFINITION AND ENFORCEMENT POLICY — *Azadeh Malek* — 361

DAVID V. GOLIATH – IN THE FASHION ERA: ANALYZING THE LANHAM ACT TO PROTECT INDIVIDUAL DESIGNERS AND SMALL BUSINESS OWNERS — *Jacqueline M. Nguyen* — 393

JOURNAL OF INTERNATIONAL COMMERCIAL LAW

VOLUME 5 SUMMER ISSUE NUMBER 3

***Editor-in-Chief***
JACQUELINE NGUYEN

***Executive Editor***
CAMERON HAMES

***Managing Editor***
BRYAN MULCAHEY

***Senior Articles Editor***
CHRISTOPHER GARDNER

***Articles Editor***
MARK HAGEDORN

***Senior Research Editor***
ALENA THOMAS

***Articles Editor***
ERIC FRICK

***Notes Editors***
ALYSSA COFFEY
JASON SARFATI

***Associate Editors***
YOOJUN LEE

***Candidate Members***

BRYAN BURACK
TERRICA CARRINGTON
CHRISTINE CONNELL
REBECCA EUBANK
ALEX JENSEN
KATHERINE MCCLASKEY
LUCY MECKLEY
BRIAN MOTTI
TAYLOR HOVERMAN
GABRIEL PETERS
ARUN SHOME

***Faculty Advisor***
JAMES BYRNE

Cite as 5 GEO. MASON J. INT'L COM. L. ___ (2013)

The *George Mason Journal of International Commercial Law* is published three times per year. The *George Mason Journal of International Commercial Law* can be contacted as follows:

George Mason Journal of International Commercial Law
3301 N. Fairfax Drive, Arlington, VA 22201
http://www.georgemasonjicl.org/

The *George Mason Journal of International Commercial Law* is a traditional student-edited legal periodical at the George Mason University School of Law in Arlington, Virginia. Providing international scholars and practitioners a forum to exchange, develop, and publish innovative ideas, the *Journal* is uniquely situated to address the legal issues affecting international commerce. The *Journal* publishes scholarly, concise, and practical material from leading scholars and practitioners to provide a source of authority and analysis for the advancement of uniformity in the law underlying international commerce.

**Subscriptions:** Single issues are available for download online at http://www.georgemasonjicl.org. Print versions are available by request to the Managing Editor at the mail address listed above or by email at: managing@georgemasonjicl.org. Single issues may be purchased for $15 per copy for domestic and $18 for foreign subscribers.

**Submissions:** The Editors welcome submissions of unsolicited manuscripts. The *George Mason Journal of International Commercial Law* seeks to publish articles and essays making a significant, original contribution to the fields concerning international commerce. Footnotes should follow the form prescribed in *The Bluebook: A Uniform System of Citation* (19th ed. 2010). Articles must be both well written and completely argued at the time of submission. Manuscripts and editorial correspondence should be addressed to Senior Articles Editor, *George Mason Journal of International Commercial Law*, at the address listed above or by email at: articles@georgemasonjicl.org.

©2014 by *Journal of International Commercial Law*. All Rights Reserved

Case 1:16-cr-00515-NGG-LB Document 88-41 Filed 03/06/20 Page 6 of 64 PageID #: 4132



# RENEGOTIATING INVESTMENT CONTRACTS: THE CASE OF MINING CONTRACTS IN DEMOCRATIC REPUBLIC OF THE CONGO

*Kapwadi F. Lukanda*[*]

*This article examines the issue of renegotiating an existing mining contract which does not provide for renegotiation clause. A prevailing theory in this respect asserts that a claim for renegotiating an existing agreement which contains no renegotiation clause should be disregarded as it amounts to an undue interference. This article addresses the question whether a contract concluded with unelected government or leaders of military factions in contravention to prevalent laws should escape revision. It assesses the rules and principles pertaining to renegotiation of an existing agreement against the Congolese process of renegotiation which involved over sixty mining contracts.*

Key words: Renegotiation, revision, adaptation, long terms contract, investment, mining project, mining agreement, Congolese mining sector, DRC mining revision, renegotiation clause, contract flexibility.

---

[*] LL.D. candidate, International Development Law Unit, Faculty of Law, University of Pretoria.

Attorney registered at the Bar Association of Kinshasa-Gombe, DRC. The views expressed in this article are personal and should not be attributed to any institution affiliated with the author. Email: francky.lukanda@gmail.com.

## I. INTRODUCTION

The subject of renegotiating an existing agreement has often generated considerable discussion among resource rich countries and investors.[1] While the former seek increased control over natural resource operations, the latter envisage stability of the contract in order to meet lender and shareholder expectations.[2] Countries endowed with natural resources have a tendency to hide behind their sovereign prerogatives to modify or escape from their contractual commitments and those of their subordinate entities. The underlying rationale is the perception that the agreed commitments are imbalanced, exploitative or contrary to nationalistic feelings.[3] In contrast, investors rely on the sanctity of contract principle to recover the upfront payment made at the very start of a project, and draw profit from their investment.

---

[1] The host state-investors discussion over revision of existing contracts goes back to the aftermath of World War II, as a result of the decolonization process that has taken place during that period. Newly independent states have sought to revamp the prevailing international regime by developing new principles and rules that would reflect the on-going change and match their social and economic needs. The one outcome of this motion has been the introduction of permanent sovereignty over natural resources principle in the United Nation (UN) debate and its embodiment in the subsequent resolutions of the General Assembly of the UN (UNGA). Alongside the UN, resource rich countries have benefited from the OPEC support, throughout their attempt to legitimize the renegotiation of existing contracts. *See* OPEC Resolution XVI, 90 (1968). For further development about the permanent sovereignty principle, see G..A. Res. 626 (VII), U.N. GAOR, 7th Sess., Supp. No. 20, U.N. Doc. A/2361, at 18 (Dec. 21, 1952),; G..A. Res. 1515 (XV), U.N. GAOR, 15th Sess., Supp. No. 16, U.N. Doc. A/4648, at 9 (Dec. 15, 1960); G..A. Res. 1803 (XVII), U.N. GAOR, 17th Sess., Supp. No. 17, U.N. Doc. A/5217, at 15 (Dec. 14, 1962); G..A. Res. 3016 (XXVII), U.N. GAOR, 27th Sess., Supp. No. 30, U.N. Doc. A/8963, at 48 (Dec. 18, 1972); G..A. Res. 3281 (XXIX), U.N. GAOR, 29th Sess., Supp. No. 31, U.N. Doc. A/9631, at 50 (Dec. 12, 1974); G.A. Res. 37/7, UN Doc. A/RES/37/51 (Oct. 28, 1982); Nico Schrijver, Sovereignty over Natural Resources – Balancing Rights and Duties 399-401 (Cambridge 2008); Burns H. Weston, *The Charter of Economic Rights and Duties of States and the Deprivation of Foreign-Owned Wealth*, 75 AM. J. INT'L L. 437, 437-38 (1981).

[2] *See* Stephen M. Schwebel, *International Protection of Contractual Arrangements*, Proc, 53rd Meeting of AM. SOC. OF INT'L L. 266, 266 (1959); Thomas W. Waelde & George Ndi, *Stabilizing International Investment Commitments: International Law Versus Contract Interpretation,* 31 TEX. INT'L L.J. 215 (1996); Thomas W. Wälde, *Renegotiating Acquired Rights in the Oil and Gas Industries: Industry and Political Cycles Meet the Rule of Law*, 1 J. WORLD ENERGY L. BUS. 55, 58-59 (2008).

[3] The late rise in commodity prices has inspired many governments to seek to enhance their revenues from natural resource sector. In Sub-Sahara Africa, for instance, countries like South Africa, Zambia, Ghana, Nigeria Guinea, and Zimbabwe have taken measures to ensure either a bigger stake for public entities in the oil and mining agreements or increase in taxes. *See Resource nationalism in Africa: Wish You Were Mine*, The Economist, February 11, 2012, *available at* http://www.economist.com/node/ 21547285.

While host government initiatives to renegotiate state contracts is by no means peculiar to developing and least developed countries,[4] investors have limited their countermeasures against this perceived interventionism to the sole aforesaid group of countries.[5] A survey of industry practices has shown that the devil does not lie in the host government usage of its sovereign prerogatives, but rather in the nature of the contract per se.[6] Implementing a natural resource contract can take a minimum of ten years from the exploration level to that of exploitation or operation. Commitments taken for such a long duration are undoubtedly prone to be affected by events not envisaged by the parties at the start of the contractual relationship. Both the host state and an investor may find themselves in a situation that requires revising the agreed contractual regime. Renegotiating an existing commitment seems to be a middle way solution between the absolute intangibility of the contractual regime sought by an investor and the need for the state to exert its sovereign prerogatives.

However, the main criticism of this approach of contract management is that a claim for renegotiating an existing agreement that contains no renegotiation clause or insistence on a third party intervention for adapting such a contract amount to an undue interference. Notwithstanding, the way contracts negotiated in countries exhibiting poor governance or situation of army conflict challenges this view. The question then is whether an existing contract – specifically those concluded with unelected government or leaders of military factions –in contravention of prevailing laws or subject to corruption, should escape revision.

The case of renegotiated mining contracts in the DRC presents a great opportunity for assessing prevailing rules and principles related to renegotiating an existing agreement which does not provide for renegotiation clause against host state-investor practices. The examined process took place between 2007 and 2010 and involved 63 mining

---

[4] A recent survey commissioned by Ernest & Young suggests that over 25 countries worldwide have changed their fiscal framework applicable to mining and metal companies, and others have invoked 'use it or lose it' clauses − which conditions the maintenance of an investor's rights to the fulfillment of some determined milestones. *See* Ernst & Young, *Resource Nationalism: The rise of Special Mining taxes – What are the Accounting Impacts*? 1-5 (Nov. 2011) Ernst & Young, *Resource Nationalism Update* 1-3 (June 4, 2012).

[5] For instance, investors do not insert stabilisation provisions into contracts concluded with developed countries. Professor Wälde have explained this discrepancy in the contractual risk management: "companies tend to invest [in developed countries] with an expectation that the fiscal and regulatory regime will be adjusted reasonably and without too much surprise or predatory exploitations of tax opportunities." Wälde, *supra* note 2, at 58.

[6]*See* Abba Kolo & Thomas W. Waelde, *Renegotiation and Contract Adaptation in the International Investment Project: Applicable Legal Principles & Industry Practices,* 5-3(a) CPML/Dundee, 14-15 (2000).

contracts. The Congolese government set out very ambitious objectives such as: investor respect of legislation, use of local resources, social responsibility clauses, and revaluation of the equity shareholding to the point that the public entity side should be holding not less than 51%.

This article is aimed at contributing to the on-going debate over factors that ought to be taken into account in renegotiating an existing agreement. It unveils the limits of existing theory which argues that a claim for renegotiating an existing agreement that contains no renegotiation clause should be disregarded as it amounts to an undue interference. In the DRC renegotiation case, renegotiated mining contracts did not provide for such a clause. Instead, some contracts included a general stabilization clause restricting the legislative and administrative power of the Congolese state to amend the established contractual regime. Others provided for provisions guaranteeing either the freezing of economic advantages granted to investors for the duration of the contract or restoration of the economic equilibrium in case the equilibrium was breached by an act emanating from the state. Notwithstanding the absence of a renegotiation clause, almost all investors succeeded in securing their investments, and some have even managed to extend their contractual advantages. The renegotiation process undertaken by the Congolese government has shown that salvaging the contractual relationship is the pragmatic way to mitigate unpredictable investment risks. However, it failed to achieve its objectives and benefit the local population. The reason might be a combination of technical, strategic and political factors.

The first part of this article surveys what major legal systems, arbitral awards and scholars say about renegotiating an existing agreement whose clauses do not provide for such a mechanism and the consequence in case of failure to agree. The second part examines the legal framework of the mining sector in DRC. The third part assesses the Congolese renegotiation process and analyses its effects. Finally, the article ends with some concluding thoughts.

## II. REGULATING THE RENEGOTIATION OF AN EXISTING AGREEMENT

It seems appropriate to begin with a survey of principles surrounding renegotiation of an existing agreement before examining the process of renegotiation that took place in DRC. This part attempts to respond to such questions as: is renegotiation of an existing long-term commitment acceptable in major system of law in general and Congolese law in particular? If so, which conditions should govern a sound renegotiation of such a contract? This part also examines the conceptual, theoretical and practical advantages of a flexible long-term investment contract approach. It discusses the jurisprudential reason underpinning the aforesaid approach. It argues that, subject to the feature of the applicable law, a long-term

investment contract should provide for a renegotiation clause, for any lawful subsequent request of renegotiation. The important argument, it asserts, is that the flexibility of the contractual regime brings more stability in the host state investor relationship.

A. Re-negotiability of Long term Investment Agreements: Stability vs. Flexibility

The concept of renegotiation, as an international contractual management tool, came into being in the second half of the last century as a result of the tension between investors and developing countries endowed with natural resources.[7] While the former always sought a stability guaranty to secure their up-front investment, the latter looked for a bigger control over their non-renewable natural resources. The host state/investor tension extended even to developed world where increasing profits in the natural resource sector have triggered adjustments in the contractual regime, mainly by way of new windfall tax measures or increasing royalties.[8] Renegotiating an existing contract also reveals tension between the compulsory nature of the legal instrument, and the economic difficulties of abiding by contractual commitments when a substantial change of circumstances badly impacts project profitability.[9] Long-term contracts require particular tools to mitigate risks, such as long duration, the necessity of a large amount of up-front capital, stakeholder interest, the commodity's price volatility, and host government intervention.

1. The Sanctity of Contract Principle

The sanctity of contract (or *Pacta Sunt Sevanda*) principle refers to the classical theory that a contract must be honored for it is an expression of parties' free will. It derives from natural justice[10] and economic necessity[11] which convey the idea that nothing can be done without reliable promises. It is a cardinal principle of contract law recognized worldwide. International

---

[7] Thomas W. Walde, *Revision of Transnational Investment Agreements: Contractual Flexibility in Natural Resources Development,* 10 L. AM. 275-78 (1978).

[8] *See* Eduardo Engel & Ronald Fischer, *Optimal Resource Extraction Contracts under Threat of Expropriation* (National Bureau of Economic Research, Working Paper No. 13742, 2008); A.F.M. Maniruzzaman, *The Issue of Resource Nationalism: Risk Engineering and Dispute Management in the Oil and Gas Industry*, 5 TEX. J. OIL GAS & ENERGY L. 79, 86 (2009).

[9] Kolo & Waelde, *supra* note 6, at 3 (2000).

[10] Hans Wehberg, *Pacta Sunt Servanda,* 53 AM. J. INT'L L. 775, 775 (1959).

[11] Peter J. Mazzacano, *Force Majeure, Impossibility, Frustration & the Like: Excuses for Non-Performance: the Historical Origins and Development of an Autonomous Commercial Norm in the CISG*, NORDIC J. COM. L. 1, 6 (2011).

Law embodied it in Articles 26 of the Vienna Convention of Law of Treaties and 1.3 of the UNIDROIT Principles of International Commercial Contracts (UNIDROIT Principles). Congolese law provided the principle applied to contracts and contractual obligations in Article 33 paragraphs 1 to 3 of the Decree of the King-Sovereign dated 30 July 1888.

The principle of sanctity of contract applies to agreements between states, but also to those between host state and investor. In the context of mining contracts between host state and investor, it suggests that the agreed regime should be implemented to the letter no matter how cumbersome it may prove to be. This interpretation seems to be unproved yet. No legal system gives a stiff meaning to the sanctity of contract principle.[12] This is because "there has been an increase in the number of vitiating factors the law of contract recognizes, based on the acceptance of the idea that the law should take into consideration the relative bargaining strengths of the parties".[13] These factors are sourced in the classic contract law[14] whereby parties to a contract could be relieved from their commitments in case of duress or the strong taking advantage of the weak. In International Law, the limits to the said principle stem from the notion of fundamental change of circumstances (or *rebus sic stantibus*) as provided for in Article 62 of the Vienna Convention on Law of Treaties. The UNIDROIT Principles provide the same kind of counter-principle to the *pacta sunt servanda* in the notion of hardship and force majeure as stipulated in its Articles 6.2.1-2 and 7.1.7. The same is to be said with regard to Article 79 of the Convention on Contracts for the International Sale of Goods (CISG) which provides for excuses in case of non-performance. When the common law counter-balances the *pacta sunt servanda* principle with theories such as frustration, hardship, estoppel, or the public interest exception, the civil law jurisdictions limit the principle with theories such as lésion, imprévision, force majeure, etc.[15]

However, investors involved in long term agreements with developing counties[16] are inclined to perceive exceptions to the *pacta sunt servanda* principle as risks that lessen the predictability of the contract; in particular,

---

[12] *See* R. Geiger, *The Unilateral Change of Economic Development Agreements*, 23 ICLQ, at 78 (1974) 78; Waelde & Kolo, *supra* note 6, at 4; Muthucumaraswamy Sornarajah, *The International Law on Foreign Investment,* Second ed. Cambridge, at 421 (2004).

[13] Sornarajah, at 421.

[14] Kolo & Waelde, *supra* note 6, at 4.

[15] For developments in these major systems of law, *see* Geiger, *supra* note 12, 78-101; Julian Hermida, *Convergence of Civil Law and Common Law Contracts in the Space Field,* 34 HONG KONG L.J. 1, 17-21 (2004); Mazzacano, *supra* note 11, 12-54.

[16] For historical evolution of the contractual stability management, *see* Peter D. Cameron, Stabilisation in Investment Contracts and Changes of Rules in Host Countries: Tools for Oil & Gas Investors 15 (Ass'n Int'l Petroleum Negotiators 2006).

its legal certainty.[17] In light of this purported weakening of the contractual commitment, they developed special clauses aimed at freezing the contractual regime over the course of its implementation, called stabilization clauses.[18] These clauses play the role of a risk-mitigation tool that protects investments from what investors perceive as 'sovereign or non-commercial' risks, namely changes in law, nationalization, expropriation, nullification of the contract pursuant to the national law, etc. Lenders consider them as an essential prerequisite to the 'bankability' of the project in certain markets. They shield investment from discriminatory and arbitrary measures that might impact it adversely. Sometimes, they even act as an incentive for attracting investors.

Stabilization clauses seem to conflict with other international principles.[19] For instance, they clash with a state's rights and obligations such as sovereignty over its natural resources, the state's obligation to regulate the protection of human rights and the environment by investors. In addition, the stabilization clauses tend to play a disincentivizing role for investors to meet acceptable business standards.[20] They also raise the issue of compliance with the existing legal framework.[21] On occasion, they are concluded with an unelected government[22] or entity that is not empowered to undertake such a commitment.[23] The stiffest provisions are believed to have been subject to corruption.[24] Last but not the least, this technique of freezing the contractual regime has also proven ineffective.[25]

In practice, stabilization clauses do not invalidate a host state's unilateral action. At best, they make it unlawful so as to impact the amount

---

[17] Abdullah Faruque, *Validity and Efficacy of Stabilisation Clauses: Legal Protection vs. Functional Value*, 23 J. INT'L ARB. 317, 322 (2006).

[18] For further information on the nature, scope, implementation and interpretation of stabilization clauses, *see* Waelde & Ndi, *supra* note 2, at 216; Cameron, *supra* note 16; Faruque, *supra* note 17; Andrea Shemberg, Stabilization Clauses and Human Rights (IFC & U.N. May 2009).

[19] Waelde & Ndi, *supra* note 2, at 230; Shemberg, *supra* note 18, at viii.

[20] Howard Mann, *Stabilization in Investment Contracts: Rethinking the Context, Reformulating the Result*, Investment Treaty News (Oct 7, 2011), http://www.iisd.org/itn/2011/10/07/stabilization-in-investment-contracts-rethinking-the-context-reformulating-the-result/.

[21] Cameron, *supra* note 16, at 13.

[22] Mann, *supra* note 20, at 7.

[23] Piero Bernadini, *Stabilization and Adaptation in Oil and Gas Investments,* 1 J. WORLD ENERGY L. BUS. 98, 99 (2008).

[24] Mann, *supra* note 20, at 7.

[25] *See* Jeswald W. Salacuse, *Renegotiating International Project Agreements*, 24 FORDHAM INT'L L.J. 1319, 1362 (2000); Zeyad A. Al Qurashi, *Renegotiation of International Petroleum Agreements,* 22 J. INT'L ARB. 261, 264 (2005); Bernadini, *supra* note 23, at 101.

of compensation that a tribunal might award.[26] Therefore, the recourse to a flexible contractual management tool seems unavoidable for balancing the aforementioned flaws.

### 2. Flexibility in the Contract or Stability in the Relationship

To focus on the protection of legitimate expectations of an investor who commits significant capital to a project is understandable, although quite fruitless due to the volatility of the extractive industry sector. In the negotiation of a natural resource agreement, no party can capture all the surrounding facts that might impact the viability of the investment. Usually, the agreement is concluded based on speculative assumptions about the geological area, input costs, output, rate of return, cost of compliance with the legal framework, labor, taxation rate and other financial charges.[27] If these projections turn out to exceed what the parties expected at the signing of their contract, the host state may feel it is giving away its non-renewable natural resources and therefore seek the renegotiation of the agreed to regime. This attitude is not exclusive to the host state. An investor may likewise find itself in a position where asking for renegotiation could be the only gateway to escape the devastating effect of a marginal geological discovery or collapse in the commodity price at the international market.[28] An investor might also seek renegotiation when fiscal impositions became onerous. Such a renegotiation is not often publicly reported because investors and the host state prefer not to set a precedent.[29] Renegotiating an existing agreement is inherent to natural resource projects.[30]

It is undoubtedly imperative to ensure stability in the contractual terms, but at the same time a certain degree of flexibility is necessary to allow parties to adjust their relationship when an unforeseen event occurs.[31] Detlev Vagts argued: "it is idle to freeze the position of the parties for long periods to conditions that become so out of date. Either parties will include renegotiation provisions in their contracts or they will act as if they were there."[32] This position depicts the reality on the ground. No party to a long-

---

[26] Cameron, *supra* note 16, at 15. It must be noted that a similar award was issued under an ICSID arbitration on November 30, 1979 in AGIP S.P.A. v. People's Republic of Congo, ICSID Case No. ARB/77/1, Award (Nov. 30, 1979), 1 ICSID Rep. 306 (1993). The same conclusion was reached by the *Aminoil* award of March 24, 1982; Bernadini, *supra* note 23, at 101.

[27] *See* Kolo & Waelde, *supra* note 6, at 15; Al Qurashi, *supra* note 25, at 263.

[28] Kolo & Waelde, *supra* note 6, at 21.

[29] *Id.* at 22.

[30] *See* Walde, *infra* note 54, 273-79; Wälde, *supra* note 2, 66-69.

[31] Salacuse, *supra* note 25, at 1327.

[32] Detlev F. Vagts, *Coercion and Foreign Investment Rearrangements*, 72 AM. J. INT'L L. 17, 22 (1978).

term agreement could keep implementing a commitment he acknowledges having given, but of which he draws no benefit. Certainly, he would seek either its adjustment or its termination. If parties agree to terminate their contract or one of them withdraws, it will also destroy their relationship that would have been mutually profitable otherwise.[33] Such a fiasco will raise criticism about the managerial capacities of both parties and affect the confidence that stakeholders may have on them.[34]

A flexible approach of the contractual relationship can also be useful in a situation where parties, by virtue of their differing cultures, understand and perceive the basis of a business relationship in totally different ways.[35] In Asian countries, for instance, business executives consider the relationship between parties as a pillar of a business transaction. Frequent adjustments of such a relationship reflect their cultural conception of a business contract.[36] African businessmen also tend to give preference to the relationship with their partners. By contrast, western businessmen are inclined to consider "the transaction as set in the concrete of lengthy and detailed contract, without possibility of modification".[37] It is imperative to find a middle ground that can satisfy all parties.

3. Consequence of the Distinction

Saving the contractual relationship is a pragmatic attitude to mitigate investment risks stemming from cultural differences or the occurrence of an unforeseen event. When entering into their contractual relationship, parties should define conditions under which the renegotiation might occur. Not all situations should give a right to adjust an existing agreement; otherwise the choice of a flexible approach in the risk management will fuel unlimited demand of adaptation, and result in the instability of the contractual regime. As the following discussion will show, there should be a renegotiation clause in the contract. However the applicable law should give guidance on whether and to what extent an existing contract can be renegotiated when a renegotiation clause is not included. In the absence of such prudential measures, the unilateral adjustment of an existing agreement may amount to an indirect expropriation entitling the aggrieved party to compensation.[38]

---

[33] Kolo & Waelde, *supra* note 6, at 1.
[34] *Id.* at 22-23.
[35] Salacuse, *supra* note 25, at 1329.
[36] *Id.* at 1329-30.
[37] *Id.* at 1330.
[38] For development on indirect expropriation, *see* August Reinisch, *Expropriation,* in The International Handbook of International Investment 420-51 (Oxford Univ. Press 2008).

### B. Renegotiating an Investment Contract in Major Systems of Law

The legal framework of the renegotiation or adjustment clause depends on the applicable law to a given contract. If parties opt for the national law, it will apply exclusively subject to the issues of expropriation and compensation that might fall in the competence of international law as far as state responsibility[39] for the property rights of aliens is concerned. Alternatively, parties may agree on the exclusive application of international law.[40] Lastly, parties may choose a solution that combines international law, national law and industry practices.[41] In the DRC, by virtue of Article 320 of the new Mining Code, parties willing to operate in the mining sector have a compelling obligation to refer to the Congolese law as the applicable law to their contract. But as developments in part two showed, international law and extraterritorial legislation may also be applied to a certain extent.

When difficulties arise in the identification of the legal rules, such as when the law applicable to the contract is a combination of the national and international law, the solution will normally be found by applying the rules that are common to those different systems of law.[42] What do the main systems of law say about renegotiating an existing commitment?

#### 1. Common Law

Common law systems, especially English law, are known for their prominence in drafting detailed contracts. Its traditional position regarding the change of an existing commitment due to imperfections or the supervening of an unforeseen event is quite rigid. The common law principle regarding contractual commitments is that a positive obligation to do a thing must be performed, or compensation must be paid for not doing so.[43] Over time, this position has evolved to recognize the doctrine of discharge in limited circumstances- through notions such as implied terms, frustration, impossibility, hardship or impracticability.[44] Of the Common

---

[39] Waelde & Kolo, *supra* note 6, at 23.

[40] Different opinions take side on whether public international law alone can govern all aspects of a contractual relationship between a government and a foreign investor. *See* Sornarajah, *supra* note 12, 416-29; Geiger, *supra* note 12, 80-83.

[41] Al Qurashi, *supra* note 25, at 269.

[42] Waelde & Kolo argued that 'arbitrators have a natural tendency to select those principles which are international and are seen as a reflection of an international consensus, while they are likely to disregard principles of national law which are inconsistent with generally recognised principle of international law.' *See* Waelde & Kolo, *supra* note 6, at 24.

[43] Sir D. Hughes Parry, *The Sanctity of Contract in English Law,* Stevens & Sons Limited, at 47 (1959).

[44] Mazzacano, *supra* note 11, at 17.

law worlds, Anglo-American jurisdictions appear to have adopted the most progressive approach with regard to the excuse for non-performance.

a. English Law Jurisdictions

English law is hostile to the notion of change in circumstances or impracticability to perform. It "has placed greater emphasis on certainty and *pacta sunt servanda*, even though the result has occasionally been harsh on one of the parties."[45] For instance, English courts have held "an unanticipated 88 per cent increase in the cost of goods to be supplied, or a rise in the price of raw materials to manufacture paper, or in freight costs of the seller that made the transaction unprofitable, are not grounds to discharge a contract."[46] Similarly, in the *British Movietonenews* case, after the Court of Appeal had upheld the argument based on an uncontemplated turn of events to discharge parties of their contractual commitments, the House of Lord reversed the judgment. Lord Simon observed this:

> [T]he parties to an executor contract are often faced, in the course of carrying it out, with a turn of events which they did not at all anticipate—a wholly abnormal rise or fall in prices, a sudden depreciation of currency, an unexpected obstacle to execution or the like. Yet this does not of itself affect the bargain they have made.[47]

English courts accept discharging parties from their contractual commitments in a very narrow situation.[48] The reason given for this rigidity is that Common law countries did not experience the same degree of wartime destruction, as did civil law countries in continental Europe.[49]

b. Anglo-American Jurisdictions

Anglo-American jurisdictions have taken a more flexible approach to the issue of excuse for non-performance. This approach is called

---

[45] *Id.* at 31.

[46] Mazzacano referred to S. Instone & Co. Ltd. v. Speeding Marshall & Co. Ltd. (1916), 33 T.L.R. 202; E. Hulton & Co. Ltd. v. Chadwick Taylor & Co. Ltd. (1916), 33 T.L.R. 202; Blythe & Co. v. Richards, Turpin & Co. Ltd. (1916), 85 L.J.K.B. 1425; *See* P. J. Mazzacano, *supra* note 11, at 30.

[47] British Movietonenews Ltd. v. London and District Cinemas (1952) A.C. 166 [H.L.].

[48] Contractual parties can escape from their commitments under the notion of Frustration. For further development *see* R. Stone, *The Modern Law of Contract,* Cavendish publishing limited, 5th Ed (2002), H.G. Beale et. al. *Contracts case and materials*, Oxford University Press, 5th Ed (2008), Mazzacano, *supra* note 11, 12-36, Geiger, *supra* note 12, 87-91.

[49] *See* E. Ch. Zaccarria, *The Effects of Changed Circumstances in International Commercial Trade,* 9 INT'L TRADE & BUS. L. REV., at 138 (2005); Mazzacano, *supra* note 11, at 30.

'commercial impracticability' and is provided in section 2-615 of the Uniform Commercial Code (UCC) and section 268(2) of the Restatement (second) of Contracts. According to this theory, a party can withdraw from a contract or seek its adjustment when the cost of performance has increased so dramatically that his original commitment has become economically unviable.[50] A mere increase in the cost cannot discharge a party of his obligations. The performance must become excessively onerous to trigger the excuse of impossibility.[51] The underpinning idea is that when a change was unpredicted at the signing of the contract, coercing a party to operating under the contract would lead him or his investment into bankruptcy.[52] However, the tendency among American Courts is that without a renegotiation or adjustment clause provided for in the contract, parties cannot expect to obtain relief from their obligations because the unforeseen difficulty is believed to have been accepted implicitly.[53] This situation prompted professor Mazzacano's comment that US courts tend to follow the traditional approach of the *pacta sunt servanda* despite the enactment of the UCC and Restatement (second).[54] Nevertheless, the important thing to keep in mind here is that US law recognizes the renegotiability of long term contracts.

2. Civil Law

The excuse for non-performance of contractual commitments was developed differently in civil law jurisdictions. Although civilian lawyers had stated the *pacta sunt servanda* principle as their common law counterpart, they seemed to have given emphasis to the exception of that rule, the *rebus sic stantibus* principle.[55] According to this principle, a contract is valid as long as the underlying circumstances that were essential at its formation have continued to exist.[56] The popularity of *rebus sic stantibus* in civil law jurisdictions is due to efforts to deal with the devastation caused by several wars in Europe.[57] The underlying reasoning of the approach taken by civil law jurisdictions is that parties could not bargain to the impossible even if this was the term of the contract.[58] This does not mean that civil law systems offer parties an easy escape from their

---

[50] *See* Waelde & Kolo, *supra* note 6, at 25; Mazzacano, *supra* note 11, at 32.
[51] Mazzacano, *supra* note 11, at 33.
[52] Al Qurashi, *supra* note 25, at 271.
[53] Waelde & Kolo, *supra* note 6, at 25; Zaccarria, *supra* note 49, at 144.
[54] Mazzacano, *supra* note 11, at 37.
[55] *Id.*
[56] Waelde & Kolo, *supra* note 6, at 26.
[57] Mazzacano, *supra* note 11, at 38.
[58] *Id.* at 38.

contractual commitments. There are conditions that contractual parties must meet to benefit from the excuse for non-performance or contractual adjustment. These conditions are enshrined in theories such as *Wegfall der Geschäftsgrundlag, imprévision,* and to a certain extent *lesion*.

a. German principle of Wegfall der Geschäftsgrundlag

The German principle of *Wegfall der Geschäftsgrundlag* (disappearance of the transaction's basis) suggests that when unforeseen events have radically changed an essential condition of the contract, the foundation thereof has been destroyed; therefore, the parties are no longer bound to their original contractual obligations.[59] This doctrine is sourced in paragraph 242 of the *Bürgerliches Gesetzbuch* (BGB), the German civil code, which requires that agreements be implemented in good faith.[60] To hold a burdened party liable for its commitments of which unforeseen events have severely affected the financial equilibrium amounts to performing an agreement in bad faith. Unlike in Common law systems, German courts have the power to adapt the contract to the changed circumstances. As professor R Geiger stated these courts "are willing not only to supplement, but also to alter express contractual terms to permit an adjustment according to the presumed intent of the parties or to objective standards of fair dealing and good faith."[61] Alternatively, German courts may consider a premature termination of the contract if there is no ground to keep it alive. The 2001 amendment to the German civil code codified the courts' practice of adaptation.[62]

b. French Theory of Imprévision

As with the preceding principle, the theory of *imprévision* is a variation of the *rebus sic stantibus* principle. It refers to an implied condition in contracts with the French Government or administrative entity according to which the continuation of the performance depends on the existence of fundamental circumstances contemplated by the parties.[63] Those external factors shall be independent of the parties' will, and mostly affect the financial balance of the contract.[64] As professor Maniruzzaman argued, "the rationale behind the doctrine of *imprévision* is that the public

---

[59] *See* Geiger, *supra* note 12, at 91; Zaccarria, *supra* note 49, at 149.
[60] *See* Zaccarria, *supra* note 49, at 149; Geiger, *supra* note 12, at 92.
[61] Geiger, *supra* note 12, at 93.
[62] Art. 313 of the BGB; *See* Mazzacano, *supra* note 11, at 48; Geiger, *supra* note 12, at 93; Zaccarria, *supra* note 49, at 149.
[63] Mazzacano, *supra* note 11, at 44.
[64] Sidonia Culda, *The Theory of Imprevision,* Fiat Iustitia, at 52 (2010).

interest requires that State contracts be performed and that private entities should not be discouraged from contracting with the government."[65]

It was for the purpose of ensuring the continuation of the public service that the *Conseil d'Etat* (the French administrative Supreme Court) developed and expounded for the first time this theory in its judgment related to the case '*Gaz de* Bordeau' on March 30, 1916.[66] Afterwards, there were several attempts to extend the theory of *imprévision* to civil contracts, although the French civil code has not provided for such a provision expressly. Consequently, French civil courts have regularly rejected the extension of this theory to civil contracts.[67] The leading decision in this regard was issued by the *Cour de Cassation* (the French Civil Supreme Court) in the case '*Canal de* Craponne'. The Court held:

> *Dans aucun cas, il n'appartient aux tribunaux, quelque équitable que puisse paraître leur décision, de prendre en considération le temps et les circonstances pour modifier les conventions des parties et substituer des clauses nouvelles à celles qui ont été librement acceptées par les contractants.*[68]
>
> The courts cannot - even in the interest of equity - take into consideration the time and circumstances in order to modify these agreements, and to substitute new clauses for those which have been freely accepted by the contracting parties.[69]

The theory of *imprévision* allows the adjustment or termination of a contract when the threat to its economic viability is otherwise irreversible. Despite the reluctance of French civil courts to extend its application to civil contracts, this theory has been embodied in a number of other countries' civil codes.[70]

---

[65] M. Maniruzzaman, *State Contracts with Aliens: The Question of Unilateral Change by the State in Contemporary International Law,* 9 J. INT. ARB., at 153 (1992).

[66] *Id.*

[67] Geiger, *supra* note 12, at 94.

[68] *De Galiffet c. Commune de Pélissane (Canal de Craponne)*, Civ. 6 mars 1876, in Fr. Terré et Y. Lequette (eds) *Les grands arrêts de la jurisprudence civile* (2000) n° 163 Dalloz tome 2.

[69] Translated by the Institute for Transnational Law http://www.utexas.edu/law/academics/centers/transnational/work_new/french/case.php?id=1186 accessed April 12, 2012.

[70] *See* 'Article 269 of the Polish Civil Code of 1932, Arts. 1467–69 of the Italian Civil Code of 1946, Art. 147 of the Egyptian Civil Code of 1948, Art. 107 of the Algerian Civil Code, Art. 388 of the Greek Civil Code, Art. 212 of the Czechoslovak Civil Code, Arts. 3183–85 of the Ethiopian Civil Code.' As quoted by Maniruzzaman, *supra* note 65, at 155.

#### c. Civil Theory of Lesion

Unlike the aforementioned principles, the civil theory of the *lesion* is not a variation of the *rebus sic stantibus* principle, but as with the latter principle, it allows the aggrieved party to seek adjustment of its existing obligations. The civil notion of the *lesion* refers to the situation whereby one of the contractual parties suffers a prejudice as a result of the gross disparity between the value of the performance he is indebted and that he will obtain in return.[71] Without prejudice to the freedom of contract, the rationale of this theory is that parties entering into a bargain without full and fair awareness of what is involved shall have their property protected.[72] The theory of the *lesion* is not to be confused with that of *imprévision*.[73] While the latter focuses on the economic viability of the contract during the performance of the contract, the former emphases on the viability of the contract at its formation. The civil *lesion* theory is similar to the common law notion of unconscionability though it does not operate the same way. In the occurrence of the civil *lesion*, the court can rescind the contract upon request of the aggrieved party.[74] In DRC, this theory is embodied in Article 131 *bis* of the Decree of the King-Sovereign dated 30 July 1888 on contracts or contractual obligations, as amended.

### 3. International Law

The preceding developments indicated that it is questionable that parties choose international law as the only law applicable to their investment agreement. The more realistic hypothesis is that international law may be called upon as an adjunct to the national law. With regard to the issue of renegotiating an existing commitment, it is worth mentioning that international law admits the principle of *rebus sic stantibus* as an excuse for non-performance, irrespective of its inclusion in the contract.[75] The principle or/and its variations are found in Articles 62 of the Vienna contention, 79 of the CISG and 6.2.1-2 and 7.1.7 of the UNIDROIT Principles.

---

[71] W. L. Church & N. Katouzian, *Lesion Contracts: A Comparative Review*, TEHRAN L. REV. No. 12, at 13 (1975).

[72] A.H. Angelo & E.P. Ellinger, *Unconscionable Contracts: A Comparative Study of the Approaches in England, France, Germany, and the United States*' 14 Loy. L.A. INT'L & COMP. L. REV., at 474 (1992).

[73] Church & Katouzian, *supra* note 71, at 14.

[74] For further developments, *see* Angelo & Ellinger, *supra* note 72, 460-501; Church & Katouzian, *supra* note 71, 13-47; Hermida, *supra* note 15, at 18.

[75] *See* Waelde & Kolo, *supra* note 6, at 35, Al Qurashi, *supra* note 25, at 277.

a. Excuse for Non-Performance in the Vienna Convention

Article 62 of the Vienna Convention[76] sets out the conditions under which a party may invoke a fundamental change of circumstances. When these conditions are met, the aggrieved party has a right to request withdrawal or renegotiation of his obligations. However, as some scholars pointed out the carefully wording of the Article suggests that its application is limited to exceptional cases for shielding the stability of international agreements as provided in Article 26.[77] In the *Gabcikovo-Nogymoros* case, the ICJ stated this:

> A fundamental change of circumstances must have been unforeseen; the existence of circumstances at the time of the Treaty's conclusion must have constituted an essential basis of the parties to be bound by the Treaty. The negative and conditional wording of Article 62 of the Vienna convention on low of treaties is a clear indication, moreover, that the ability of treaty relations requires that the plea of fundamental change of circumstances be applied only in exceptional cases[78]

[76] '1. A fundamental change of circumstances which has occurred with regard to those existing at the time of the conclusion of a treaty, and which was not foreseen by the parties, may not be invoked as a ground for terminating or withdrawing from the treaty unless:

(a) the existence of those circumstances constituted an essential basis of the consent of the parties to be bound by the treaty; and

(b) the effect of the change is radically to transform the extent of obligations still to be performed under the treaty.

2. A fundamental change of circumstances may not be invoked as a ground for terminating or withdrawing from a treaty:

(a) if the treaty establishes a boundary; or

(b) if the fundamental change is the result of a breach by the party invoking it either of an obligation under the treaty or of any other international obligation owed to any other party to the treaty.

3. If, under the foregoing paragraphs, a party may invoke a fundamental change of circumstances as a ground for terminating or withdrawing from a treaty it may also invoke the change as a ground for suspending the operation of the treaty.'

[77] Al Qurashi, *supra* note 25, 277-78.

[78] *Gabcikovo-Nogymoros project*, Award, 25 September 1997, 37 I.L.M. 162 (1998).

b. Excuse for Non-Performance in the CISG

Article 79 of the CISG[79] deals with the change of circumstances, even though it does not contain any national concepts, such as frustration, hardship, *imprévision*, *wegfall der geschäftsgrundlag*, etc.[80] It reflects the negotiators' endeavors to find a middle ground position between the civil law and common law effects of the change in circumstances principle.[81] For professor Mazzacano, this Article "is more than just a compromise provision; it is a self-contained, independent, concept that must be read and interpreted without reference to domestic legal principles."[82] In the *Scafom International B.V. vs Lorraine Tubes* case, which was brought before the Belgian Supreme Court, it was decided that:

> [T]his provision (Article 79 of the CISG) expressly covers force majeure cases as events exempting from performance, it does not implicitly exclude the relevance of less than force majeure situations such as hardship. (…) [A]n unforeseen change of circumstances leading to a substantial alteration of the contractual equilibrium might, under specific circumstances, constitute an event exempting from performance according to Article 79[83]

The CISG does not give clear guidance as to what would happen to the contract after an impediment beyond a party's control has been acknowledged.[84] However, the last sub-paragraph of Article 79 stipulates that parties remain free to adopt any other remedy apart from the payment of damages. Therefore, one may deduce that the adjustment mechanism can be called upon as a mitigating tool, even within the CISG framework, when unforeseen impediments beyond the control of contracting parties arise.

---

[79] Article 79 of the CISG (1) A party is not liable for a failure to perform any of his obligations if he proves that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences.(…)

[80] *See* A. Veneziano, *UNIDROIT Principles and CISG: Change of Circumstances and Duty to Renegotiate according to the Belgian Supreme Court*, Rev dr unif, at 139 (2010); Mazzacano, *supra* note 11, at 48; Zaccarria, *supra* note 49, at 163.

[81] Zaccarria, *supra* note 49, at 162.

[82] Mazzacano, *supra* note 11, at 49.

[83] As quoted by Veneziano *supra* note 80, (2010) 139, Cass.,19 June 2009, Scafom International BV v. Lorraine Tubes S.A.S.

[84] Zaccarria, *supra* note 49, at 167.

c. Excuse for Non-Performance in the UNIDROIT Principles

Unlike the preceding convention, the UNIDROIT Principles of International Commercial Contracts (PICC) are not a binding international instrument. Despite that, practitioners have regarded them "as a useful restatement of the *lex mercatoria*."[85] They are also believed to serve as a supplement to the CISG, by virtue of Article 7 (2) of the CISG,[86] insofar as they are part of the general principles applicable to international obligations.[87] The PICC's drafters took a flexible approach in tackling the issue of extraordinary events beyond the control of contracting parties, in contrast to the drafting of the equivalent provision in the CISG. The PICC regulates the issue of impediment beyond the control of contracting parties towards two different notions, namely: hardship and force majeure.

The section of the PICC dealing with the notion of hardship starts with the reaffirmation of the necessity for each of the contractual parties to fulfill its commitments even when these later become more onerous. Then it provides for the definition[88] and effects of the hardship. Among the effects of the hardship concept defined in Article 6.2.2 of the PICC, is the entitlement of the disadvantaged parties to seek adjustment of their commitments.[89]

The second notion in the PICC that deals with the issue of impediment beyond the control of contracting parties is force majeure. As with hardship, the drafters defined and gave the effect of the force majeure within the PICC framework.[90] However, the occurrence of force majeure does not give

---

[85] Frederick Fucci, *Hardship and Changed Circumstances as Grounds for Adjustment or Non-Performance of Contracts: Practical Considerations in International Infrastructure Investment and Finance,* paper presented to the spring meeting of the American Bar Association, at 9 (April 2006).

[86] M.J. Bonell, *The UNIDROIT Principles of International Commercial Contracts and the Harmonisation of International Sales Law* 36 R.J.T., 343-53 (2002).

[87] *See* ICC Award No 7375 of 5 June 1996, ICC Award No 8261 of 27 September 1996 ICC Award No 7365 of 5 May 1997, as quoted by Bonell, *supra* note 86, 344-45.

[88] PICC art. 6.2.2 "There is hardship where the occurrence of events fundamentally alters the equilibrium of the contract either because the cost of a party's performance has increased or because the value of the performance a party receives has diminished, and

(a) the events occur or become known to the disadvantaged party after the conclusion of the contract;

(b) the events could not reasonably have been taken into account by the disadvantaged party at the time of the conclusion of the contract;

(c) the events are beyond the control of the disadvantaged party; and

(d) the risk of the events was not assumed by the disadvantaged party."

[89] PICC art. 6.2.3 (1).

[90] UNIDROIT Principles, art. 7.1.7:

rights to adjust the contract. Rather, it only exempts the party who invokes it from performing its obligations, without prejudice to the right of the other party to terminate the contract or to withhold performance or request interest on money due.[91]

C. Nature, Types and Conditions of Renegotiating an Existing Agreement

The foregoing developments show that major legal systems of law have provided for mechanisms - with different levels of flexibility- to deal with an unforeseen change of circumstances. To the exclusion of the Vienna Convention, which might not be seen as convenient for state-investor relationships, an examination of the CISG and PICC suggests that international investment law has reached a consensual position on this issue. Only the supervening of an exceptional and unpredictable change of circumstances can excuse parties for their contractual commitments. However, as professor Russi pointed out, "in long term contracts, complete relief from the duty to perform may turn out as an inappropriate solution in light of the complexity of the relationship - which makes it hardly replaceable - and of the costs and financial obligations already incurred by the parties."[92] Thus, the reliance on the adjustment mechanism to mitigate the impact of a fundamental change of circumstances shall be clearly defined to prevent any of the contracting parties from acting arbitrarily when invoking the aforesaid impediment.

---

(1) Non-performance by a party is excused if that party proves that the non-performance was due to an impediment be yond its control and that it could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences.

(2) When the impediment is only temporary, the excuse shall have effect for such period as is reasonable having regard to the effect of the impediment on the performance of the contract.

(3) The party who fails to perform must give notice to the other party of the impediment and its effect on its ability to perform. If the notice is not received by the other party within a reasonable time after the party who fails to perform knew or ought to have known of the impediment, it is liable for damages resulting from such non-receipt.

(4) Nothing in this Article prevents a party from exercising a right to terminate the contract or to withhold performance or request interest on money due.

[91] PICC art.7.1.7 (1), (4).

[92] Luigi Russi, *Chronicles of a Failure: From a Renegotiation Clause to Arbitration of Transnational Contracts' Italian Legal Scholarship Unbound* Working Paper No 2008-11/EN, at 6 (2008) *available at* http://works.bepress.com/cgi/viewcontent.cgi?article=1009&context=ilsu_working_paper_series.

1. Nature and Scope of the Renegotiation

In long-term contracts the concept of renegotiation refers to a mechanism enshrined either in a contractual clause or the applicable law, according to which the supervening of an unpredictable event rendering performance impracticable for one side requires both parties to seek a solution to preserve their relationship. It also covers the case when in the absence of such an enshrinement, parties seek a common solution to an unpredictable fundamental change of circumstances grounded on the notion of hardship or force majeure.[93] Nonetheless, this approach seems to be quite limited since international arbitrators are reticent to adjust an existing agreement without a specific contractual basis.[94] It has been stated that:

> It is not for the Arbitral Tribunal to question the motives or judgment of the Parties, but to assess their rights and obligations in light of their legally significant acts or omissions. That is all; that is enough. To go beyond this role would be to betray the legitimate expectations reflected in the Parties' agreement to arbitrate, and indeed to impair the international usefulness of the arbitral mechanism.(...) The arbitrators cannot usurp the role of government officials or business leaders. They have no political authority, and no right to presume to impose their personal view of what might be an appropriate negotiated solution. Whatever the purity of their intent, arbitrators who acted in such a fashion would be derelict in their duties, and would create more mischief than good. The focus of the Arbitral Tribunal's inquiry has been to ascertain the rights and obligations of the parties to the particular contractual arrangements from which its authority is derived.[95]

Parties to a long-term contract are, in principle, responsible for their own interests. They should take precautions against adverse changes in circumstances by agreeing to renegotiation clauses at the outset of their relationship. If they fail to do so, force majeure or hardship concepts may

---

[93] Waelde & Kolo, *supra* note 6, at 34; For the distinction between hardship and force majeure, *see* Russi, *supra* note 92, at 6; Al Qurashi, *supra* note 25, at 279-85; Waelde & Kolo, *supra* note 6, at 34-35.

[94] Klaus Berger, *Renegotiation and Adaptation of International Investment Contracts: The Role of Contract Drafters and Arbitrators,* 36 VAND. J. TRANSNAT'L L. 1347, 1353 (2003).

[95] Berger, *supra* note 94, at 1353 citing UNCITRAL Award of 4 May 1999, 25 Y.B. COM. ARB. 13, 61 (2000).

not serve as a substitute for their negligence and will not serve as a pretext for diluting the *pacta sunt servanda* principle.[96] The stability in the contractual regime remains the fundamental of international business transactions.

The endeavors to bring flexibility in the host state-investors' long-term relationships necessitate the control of the mechanism of adaptation that is to be relied on. In principle, there is no inherent limitation of the scope of the renegotiation clauses aside from those expressly agreed to by the parties.[97] Nevertheless, practice in international business transactions does not provide for a large array of general renegotiation provisions to be inserted into a contract. Investors fear that such an insertion might undermine their legitimate expectation of stability.[98] To circumvent this obstacle, parties should not only agree upon specific events that trigger the renegotiation, but also determine the level above which the negative impact of the said events will be considered exceeding the reasonable limit.[99] In any event they should keep in mind:

> [T]he function of [the renegotiation] clauses is limited to adapting the contract to the changed circumstances. They do not justify a restructuring of the entire contract (…) Renegotiation clauses should not result in a commercial advantage to one of the parties, but instead, function either to maintain or to restore the commercial balance of the contract to adjust to changed circumstances.[100]

2. Types of Renegotiations

Professor Salacuse identified three types of renegotiations that may take place in the context of long-term contracts, namely: the post-deal renegotiations, intra-deal renegotiations, and extra-deal renegotiations.[101]

a. The Post-Deal Renegotiations

The post-deal renegotiations cover situations when both parties meet to negotiate the conditions of the extension or renewal of their relationship at the expiration of their contract, though legally free from their preceding commitments to go their own ways. At first glance, these renegotiations

---

[96] Jarvin & Yves Derains, Collection of ICC Arbitral Awards 1974-85 (1990) citing ICC AWARD No. 1512.
[97] *See* Russi, *supra* note 92, at 5; Qurashi, *supra* note 25, at 288.
[98] Waelde & Kolo, *supra* note 6, at 35.
[99] Russi, *supra* note 92, at 7.
[100] Berger, *supra* note 94, at 1365.
[101] Salacuse, *supra* note 25, at 1320.

may look like negotiations the parties undertook at the signing of their original contract, but in practice they differ in approaches and results.[102] Unlike the context in the first negotiation, the expired contract may contain a provision that compels parties to renegotiate in good faith the renewal of their contract or preclude them from entering into negotiations with a third party until the post-deal renegotiations have failed. The willingness of the parties to reach an agreement with each other will be influenced by what they had learned in their preceding relationship[103]

b. The Intra-Deal Renegotiations

The second type of renegotiations refers to the intra-deal renegotiations. As its name suggests, this model of renegotiations covers the situation where parties, at the outset of their relationship, acknowledge the necessity of inserting into their contract a mechanism of adjustment for mitigating the contractual risk stemming from the supervening of unpredictable events beyond their control or imperfections in the contract. [104] It also designates the situation where both parties, acknowledging the existence of implicit minor renegotiation clauses in their contract, agree to mitigate practical issues that arise towards their on-going relationship.[105] Moreover, intra-deal renegotiations cover instances where parties agree to meet periodically with a view to considering in good faith whether their contract is still operating fairly to each of them and with the aim at further discussing in good faith any problems arising from the practical operation of their project.[106] In addition, intra-deal renegotiations may also include an automatic adjustment mechanism such as price indexation clauses for adapting the contract price.[107] Lastly, they may designate an open term-provision in the contract that enables parties to delay the discussion of certain matters to a later time after the signing of the contract. As professor Salacuse indicated, the negotiations that may occur thanks to the open-term clause are not in *stricto sensu* renegotiations for "the parties have not yet agreed to anything (…)".[108] Parties may however use this opportunity to review certain aspects of their contractual regime.[109]

---

[102] *Id.* at 1321.
[103] *Id.* 1323-24.
[104] *Id*. 1327-30.
[105] *Id*. at 1327-31.
[106] Peter, *Arbitration and Renegotiation of International Investment Agreements*, Kluwer Law International, at 79 (1995).
[107] Russi, *supra* note 92, at 3.
[108] Salacuse, *supra* note 25, at 1333.
[109] *Id.*

c. The Extra-Deal Renegotiations

The last type of renegotiations refers to the extra-deal renegotiations. Unlike the preceding category where the adjustment of an existing contract is sought by both sides, extra-deal renegotiations encompass situations where one party insists on adapting the terms of a presumed valid contract that does not provide for an express provision authorizing renegotiation.[110] Earlier developments showed that the party that fails to take advantage of the agreed regime tends to rely on the notion of force majeure or hardship in order to trigger the renegotiation. Additionally, the party may find room to adjust his commitments in the provisions of the applicable law.[111] The only problem is that such an approach is likely not enforceable. Indeed, when confronted by a demand for adaptation, which is not expressly envisaged in the contract, English law jurisdictions are reluctant to interfere in what contractual parties agreed upon. By contrast, civil law jurisdictions tend to be more flexible with regard to the issue of fundamental change of circumstances that renders the performance impracticable for one side. In some cases, civil judges can not only supplement, but also alter the contractual parties' desires by enabling the balance of performances burdened by either side to meet the standard of good faith.[112] Moreover, the upset party can invoke provisions of international instruments, namely the PICC and to a certain extent the CISG, to justify the extra-deal renegotiations, subject to specific conditions.[113] In case of conflict, the willingness to reach an agreement or to pursue a legal remedy will ultimately depend on the parties' evaluation of the profitability of either option.[114]

3. Conditions of Renegotiating an Existing Agreement

It is of great importance that parties willing to be bound to a long-term relationship define the conditions that should give the right to renegotiate at the signing of their agreement. Preceding developments stressed the necessity of adopting a flexible contractual approach in long-term relationship. They also reaffirmed one of the primary goals of contracting,

---

[110] *Id.* at 1335.
[111] Berger, *supra* note 94, at 1355.
[112] Geiger, *supra* note 12, at 93.
[113] Al Qurashi, *supra* note 25, at 279-85; Waelde & Kolo, *supra* note 6, at 34-35; Zaccarria, *supra* note 49, at 167; Veneziano, *supra* note 80, at 145.
[114] Salacuse, *supra* note 25, at 1336.

namely providing "predictability and certainty for the parties."[115] To avoid conflict between these two objectives– stability and flexibility in their contract, parties should control the mechanism that leads to renegotiation. Professor Berger suggested some key points parties should look to when drafting their agreement, namely:

- The definition of events triggering the duty to renegotiate (trigger events);
- The exact content of the contractual obligations, in particular
    - The question of an obligation to negotiate as well as
    - The question of an obligation to reach a (particular?) result;
- The legal consequences of failure to fulfill the contractual obligation to negotiate;
- The enforceability of the obligation to negotiate before an international arbitral tribunal, in particular the authority of the tribunal to adapt the contract to the changed circumstances in lieu of the parties.[116]

The below comments will develop these issues in three prongs. The first point will be discussed under the heading of the triggering events. The second issue will be examined under the heading of parties' obligations, and the last issues will be partially covered under the heading of the duty to negotiate as well as in the paragraph that will follow.

a. The Triggering Events

There is no one size fits all formula for defining the events that give the right of renegotiation.[117] Nonetheless, the effectiveness of the process depends on preconditions parties clearly set out in order to start a consensual adjustment.[118] Studies in natural resources contracts[119] revealed the existence of two main approaches with regard to the drafting of triggering events.[120]

---

[115] John Gotanda, *Renegotiation and Adaptation Clauses in Investment Contracts, Revisited*, 36 VANDERBILT J. TRANSNAT'L L. 1461, 1464 (2003) citing Interim Award in Case No. 1694 of 1996, reprinted in 23 Y.B. COM. ARB. 97, 110 (1998).
[116] Berger, *supra* note 94, at 1361.
[117] Al Qurashi, *supra* note 25, at 289.
[118] Berger, *supra* note 94, at 1362.
[119] For model of renegotiation clauses see Berger, *supra* note 94, 1358-60; Al Qurashi, *supra* note 25, at 286-87.
[120] Berger, *supra* note 94, at 1362.

The first approach refers to the case where parties avoid detailing events but prefer relying on a general review clause that will bring about renegotiation. This approach stems from the complexity of trying to capture all unforeseen events that might affect the commercial balance of the parties' future agreement.[121] The other reason is the difficulty in determining the extent to which the aforesaid impact will have to be considered crossing the level of triviality to trigger the renegotiation. Therefore, if the drafting of a general renegotiation clause seems to meet the need of flexibility advocated above, it addresses the issue of stability imperfectly. Indeed, it gives way to spurious demands for renegotiation[122] and fuels seeds of conflict amongst parties in determining whether the triggering event has occurred. In addition, a general review clause may "cast doubt on the efficacy and enforceability of such a clause."[123] For these reasons, a lot of modern investment contracts rely on the notions of hardship and force majeure rather than providing a general renegotiation clause.[124]

The second method of drafting a triggering event encompasses the case where parties agree to begin the adaptation procedure at the occurrence of isolated or conjunctional events identified more precisely in the clause.[125] Unlike the preceding approach, this method has the advantage of identifying the starting point of the renegotiation process more precisely. However, it envisages the renegotiation of an existing agreement in very limited circumstances.

b. The Parties' Obligations in the Renegotiation process

The mere desire of one side to renegotiate is not sufficient to operate a contract's renegotiation clause. Parties should attach a certain number of obligations- good faith, in particular the notion of fairness and reasonableness that derive from the principle,[126] that are to be fulfilled towards the process of adaptation to such a clause. Renegotiation clauses "are not empty shells. Rather, by agreeing to the clause, both parties are legally obliged to cooperate in the renegotiation procedure in an efficient manner, i.e. in a manner aimed at successfully negotiating a solution."[127] The arbitral tribunal in the *AMINOIL* case summarized the content of the parties' obligations as follows:

---

[121] *Id*. at 1362.
[122] Waelde & Kolo, *supra* note 6, at 35.
[123] Al Qurashi, *supra* note 25, at 290.
[124] *See* Waelde & Kolo, *supra* note 6, at 35; Berger, *supra* note 94, at 1363.
[125] Berger, *supra* note 94, at 1362.
[126] *See* Peter, *supra* note 106, at 244; Berger, *supra* note 94, 1363-65.
[127] Berger, *supra* note 94, at 1364.

> [Neither side has neglected] the general principles that ought to be observed in carrying out an obligation to negotiate, - that is to say, good faith as properly to be understood; sustained upkeep of the negotiations over a period appropriate to the circumstances; awareness of the interests of the other party; and a preserving quest for an acceptable compromise.[128]

Taking into account scholarly works pertaining to the issue, Professor Berger listed conduct that should be a feature of the parties' renegotiation process:

1. Keeping to the negotiation framework set out by the clause;
2. Respecting the remaining provisions of the contract,
3. Having regard to the prior contractual practice between the parties,
4. Making a serious effort to reach agreement,
5. Paying attention to the interests of the other side,
6. Producing information relevant to the adaptation,
7. Showing a sincere willingness to reach a compromise,
8. Maintaining flexibility in the conduct of negotiations,
9. Searching for reasonable and appropriate adjustment solutions,
10. Making concrete and reason able suggestions for adjustment instead of mere general declarations of willingness,
11. Avoiding rushed adjustment suggestions,
12. Giving appropriate reasons for one's own adjustment suggestions,
13. Obtaining expert advice in difficult and complex consensus proceedings,
14. Responding promptly to adjustment offers from the other side,
15. Making an effort to maintain the price-performance relationship taking into consideration the parameters regarded as relevant by the parties,
16. Avoiding an unfair advantage or detriment to the other side ("no profit – no loss" principle),

[128] *See* Kuwait v. Am. Indep. Oil Co., Final Award, Mar. 24, 1982, 21 I.L.M. 976, (1982) 1014, as quoted by K. P. Berger, *supra* note 94, 1364-65.

17. Prohibition on creating established facts during negotiations except in emergency situations (ban on 'escalation' strategies),
18. Maintaining efforts to reach agreement over an appropriate length of time, and
19. Avoiding unnecessary delays in the consensus proceedings.[129]

Parties can utilize these guiding principles as a starting point to build a regime convenient for them, subject to the principle of good faith and especially the concept of fairness and reasonableness that derive from the principle.[130]

c. The Duty to Negotiate and its Enforceability

The question that arises throughout the process of renegotiation is whether parties are compelled to reach an agreement. At the domestic level, there is not a clear-cut answer. English law jurisdictions appear reluctant to admit the existence of such an obligation, whereas civil law jurisdictions - especially German law, do acknowledge it as long as the renegotiation criteria and aim have been spelled out.[131] Internationally, there seems to be a unanimous opinion on the matter. "Renegotiation clauses only contain an obligation on the parties to make the best possible effort to reach an agreement…They do not, however, require the parties to actually reach an agreement."[132]

The duty to renegotiate becomes a justiciable obligation when it brings into play the notions of good faith and its derivatives. However, not reaching an agreement does not constitute *per se* a breach of the duty. It may turn out to be a breach however if it is proved that the other side acted in bad faith. That very case may entitle the aggrieved party to claim compensation.[133] For instance, a party does not breach the duty to renegotiate when he rejects the other side's proposals because of normal

---

[129] Berger, *supra* note 94, at 1365-66.
[130] *Id.* at 1366.
[131] *See* Salacuse, *supra* note 25, at 1322-23; Berger, *supra* note 94, at 1367.
[132] Berger, *supra* note 94, at 1367; *see also* Kuwait v. Am. Indep. Oil Co., 21 I.L.M. 976, 1004 (1982) (stating that an obligation to negotiate is not an obligation to agree); Wintershall A.G. v. Gov't of Qatar, 28 I.L.M. 798, 814 (1989); Permanent Court of International Justice In re Ry. Traffic between Lithuania and Poland, P.C.I.J., Series A/B, 116, North Sea Continental Shelf (F.R.G. v. Den.), 1969 I.C.J. 4, 47 (Feb. 16).
[133] International Institute for the Unification of Private Law (UNIDROIT), Principles of International Commercial Contracts, art. 6.2.3. (2004) [hereinafter UNIDROIT Principles]; *see also* Salacuse, *supra* note 25, at 1323 (claiming that the details of good faith negotiations will vary from country to country and that failure by a party may result in liability in damages).

commercial judgment.[134] By contrast, failing to agree because of a refusal to enter negotiations, despite the existence of the triggering event is to be considered a breach of obligation to renegotiate.[135] The same applies to the case where a party takes "insufficient cooperative steps vis-à-vis the standard set by good faith"[136]; such as "where proceedings are unjustifiably delayed…negotiations are intentionally obstructed or…proposals by one side are obviously rejected for reasons other than normal business judgment."[137]

### D. The Practice in International Arbitration

The logical consequence of failing to agree when the renegotiation was conducted in good faith is that the contract will remain in force. The principle of *pacta sunt servanda* will apply to the contract as initially agreed.[138] However, when the source of the disagreement is in the conditions of the renegotiation clause, parties may call upon an arbitrator to determine whether the alleged triggering events have met the requirement(s) set forth in the contract. The arbitrator may also be requested to determine the extent to which the adjustment will restore the contractual equilibrium. The possible outcomes[139] will depend on the substance of the request filed by the parties. Indeed, a request based on a mere conflict of interpretation does not raise the same issues as those that involve a demand to supply an alternative contractual regime.[140]

International arbitrators are reluctant to adapt a contract in the absence of a specific provision in the contract empowering the *ad hoc* arbitral tribunal to do so.[141] Therefore, alongside with a renegotiation clause a long-term contract should contain an arbitration clause that expressly confers "the power to adapt the agreement and determine the manner for its exercise as well as the limits of the arbitrator's authority in that regard."[142] This position has been recalled in the AMINOIL case: "an arbitral tribunal ...could not, by way of modifying or completing the contract, prescribe how a provision such as the Abu Dhabi Formula must be applied. For that, the consent of both parties would be necessary.''[143] A mere reference to

---

[134] Berger, *supra* note 94, at 1368.
[135] Russi, *supra* note 92, at 14.
[136] *Id.*
[137] Berger, *supra* note 94, at 1369.
[138] Al Qurashi, *supra* note 25, at 292; *see also* UNIDROIT Principles, art. 6.2.3(2).
[139] *See* Bernadini, *supra* note 23, at 106-10; Berger, *supra* note 94, at 1370-77.
[140] Russi, *supra* note 92, at 16.
[141] Berger, *supra* note 94, at 1353.
[142] Bernadini, *supra* note 70, at 107.
[143] *Kuwait*, 21 I.L.M. at ¶ 76.

arbitration in case of disagreement is not sufficient to imply the empowerment of the arbitral tribunal to adapt the contract, unless it is expressly granted.[144] Nevertheless, the reference to certain texts,[145] especially those that provide for the third's party power either to terminate the contract or to adapt it with the aim of restoring its equilibrium may be sufficient to confer such a power to an arbitrator.[146] This is to recall that the choice of the applicable law to the contractual obligations should be made carefully.

However, even when parties empower the arbitral tribunal to adjust their agreement, doubts may rise regarding the jurisdictional power of the said tribunal.[147] Some procedural rules, such as the ICSID convention, do not expressly authorize an arbitral tribunal to undertake a contractual adjustment on behalf of the parties. It is crucial, when choosing an arbitral forum, to make sure that the *lex arbitri* does not prohibit the adaptation of contracts by an arbitrator.[148] In addition, it is worth noting the distinction between the function of settling a dispute in an adjudicatory context and that of filling a gap in the contract.[149] The former is of an adjudicatory nature- therefore, enforceable under the New York convention of 1958, whereas the latter is deemed of a contractual nature.[150]

Scholars hold divergent opinions regarding the existence of a 'dispute' or 'legal dispute' when examining the issue of adapting a contract throughout arbitral proceedings.[151] For Professor Berger, a dispute exists when an arbitral tribunal "is not called upon to make a creative legal decision but rather to decide the rights and obligations of the parties."[152] Parties should "make it clear that they wish to transfer to the tribunal this 'creative competence' that goes beyond normal dispute adjudication".[153] For this end, they should allocate an express competence to the arbitral tribunal to adapt the contract.[154] This is the position the arbitral tribunal adopted in the Aminoil case:

---

[144] Bernadini, *supra* note 23, at 107.
[145] *See e.g.*, UNIDROIT Principles at art. 6.2.3 (4).
[146] Bernadini, *supra* note 23, at 107.
[147] Berger, *supra* note 94, at 1371.
[148] Bernadini, *supra* note 23, at 107.
[149] *See also* Berger, *supra* note 94, at 1370-78; Bernadini, *supra* note 23, at 108; Russi, *supra* note 92, at 25-27.
[150] Bernadini, *supra* note 23, at 108.
[151] Gotanda, *supra* note 115, at 1465; Georges R. Delaume, *ICSID Arbitration Proceedings: Practical Aspects*, 5 PACE L. REV. 563, 567 (1985).
[152] Berger, *supra* note 94, at 1372.
[153] *Id.*
[154] Bernadini, *supra* note 23, at 107.

> [T]here can be no doubt that, speaking generally, a tribunal cannot substitute itself for the parties in order to …modify a contract unless that right is conferred upon it by law, or by the express consent of the parties …arbitral tribunals cannot allow themselves to forget that their powers are restricted. It is not open to doubt that an arbitral tribunal—constituted on the basis of a 'compromissory' clause contained in relevant agreements between the parties to the case…could not, by way of modifying or completing a contract, prescribe how a provision [for the determination of the economic equilibrium] must be applied. For that, the consent of both parties would be necessary.[155]

## III. THE LEGAL FRAMEWORK OF THE MINING SECTOR IN DRC

The one motive that prompted the unilateral decision of the Congolese government to renegotiate some of the existing mining agreements is that the allocation and exploitation of mining rights were contravening existing regulations. This part examines the relevant regulations an investor should abide by when he intends to operate in the Congolese mining sector lawfully. It essentially covers the pertinent national, international and extraterritorial regulations applicable to the mining operation. It also discusses the issue of supervision of the said regulations as well as that of their enforcement.

### A. The Applicable Regulations to the Mining Sector in DRC

The framework of the applicable regulations for the mining sector in DRC lies mostly in a set of multidisciplinary rules drawn from national and international laws, the contractual will of the parties expressed in accordance with the national law, and to a certain extent, extra-territorial laws related to some segment of the mining operations and voluntary principles applicable to the industry.

#### 1. The National Law

At the national level, the mining code and its subsidiary mining regulations constitute the main source of the mining regulations. These texts were both drafted and respectively passed in 2002 and 2003, under the

---

[155] *See* Kuwait, 21 I.L.M. at 1016.

auspices of the World Bank. They are believed to be self-contained[156] rules in the sense that they cover almost every aspect pertaining to the mining.[157] In addition to these two texts, mining regulations are found in Article 34 of the Constitution of the Democratic Republic of Congo dated February 18, 2006, as amended on January 20, 2011,which sets the principles protecting the private property.

Nonetheless, there are a number of other regulations that cover issues outside the scope of the aforementioned texts but, still remain important to lawfully operating in the Congolese mining sector. This is the case of the laws on commercial companies, the law on public enterprises, the contract law, the land law, the labor code, the law of social security and the law combating money laundering.

a. The 2002 Mining Code

The rules provided for in the 2002 Mining Code superseded those laid down by the 1981 Mining Law. Their purported aims were to address, amongst other things, issues related to the lack of clarity and attractiveness in the issuing of mining rights seen with the former mining law. The law also intended to end tax exonerations that were disadvantageous to the Public Treasury.[158] In addition, the new Mining Code was designed to bring more transparency in the management of the mining sector.[159] The 2008 assessment report commissioned by the World Bank considers the novel code consistent with the international standard and a foundation for a sustainable development of the DRC's mineral resources.[160]

One of the big innovations of the new mining code is to suppress the contentious mining concession scheme provided for in the Mining Law of 1981[161]. This scheme subjected the ownership of mineral rights by private corporations to a partnership agreement with a state-owned enterprise or a specific agreement with the Congolese state. In the new code such ownership is opened up without restriction to the private corporations,

---

[156] H. André-Dumont, *Mining in the Democratic Republic of Congo*, Rocky Mountain Mineral Law Foundation, June 2011, at 37.

[157] *Id*.

[158] *Id.* at 37.

[159] Conference Presentation, Colloquium on Exploitation of Natural Ressources in Conflict situations: International Liability and Prospect of Solution in DRC, *Réforme de la législation minière et rôle des institutions multilatérales de financement dans le développement du secteur minier en RDC*, (April 2, 2004), http://www.ieim.uqam.ca/IMG/pdf/MMazalto-presentation.pdf.

[160] World Bank, Democratic Republic of Congo: Growth with Governance in the Mining Sector, Report No. 43402-ZR, at 17 (May 2008).

[161] *Id.* at 43.

inasmuch as land for exploration and/or exploitation is vacant.[162] The 2002 Mining Code has made it possible for investors whose partnerships with the state-owned enterprises were fully compliant with the 1981 Mining Law to remain in force until their expiration, unless both sides take the option to subject the partnership to the new code.[163]

The Article 3 of the new mining code lays down the principle of State ownership of the mining resources. Eligible individuals and corporations can acquire mining or quarrying rights on a first come, first serve basis, subject to compliance with the law.[164] However, the new Mining Code establishes a strict distinction between the ownership of the land and ownership of the mining rights.[165] The mining titleholder is not necessarily entitled to the land above the mine, unless he applied for the ownership of the land.

Any investor in possession of a valid mining right can take part in exploitation of mineral substances specified in its permit. Nonetheless, non-Congolese nationals cannot engage into artisanal mining. The 2002 Mining Code establishes a clear distinction between mining rights and quarrying rights. While mining rights can be requested either for industrial purpose (industrial mining) or small-scale mining, such an option is not available for quarrying rights. Articles 50 to 96 of the 2002 Mining Code lay down principles for industrial mining, whereas Articles 97 to 108 provide rules for small-scale mining. Moreover, the new Mining Code set rules for artisanal mining[166].

Three types of industrial mining rights exist, namely research (exploration), exploitation (operation) and tailing exploitation permits. The small-scale mining category includes a sole mining right: the small-scale mining exploitation permit. Although they produce nearly 90 per cent of the mineral exported by the DRC, the 2002 Mining Code does not provide for mining rights to artisans[167]. Provincial authorities deliver a mere 'digger's card', for the equivalent of U.S. $25 per year, to authorize the diggers to mine in a special area called artisanal exploitation zone.[168] Finally,

---

[162] *See* 2002 MINING CODE, art. 23. (DEM. REP. CONGO).

[163] *See* 2002 MINING CODE art. 340. (DEM. REP. CONGO).

[164] *See* 2002 MINING CODE, arts., 23-27. (DEM. REP. CONGO).

[165] *See* 2003 Mining Regulation, art. 3,¶ 3; G Bakandeja, *Droit Minier et des Hydrocarbures en Afrique Centrale,* Larcier, at 97 (2009); Vale Columbia Center on Sustainable International Investment (VCC), Extractive Industries and Sustainable Development: The Challenges of Implementation Background Notes of the Fifth Columbia International Investment Conference jointly organized by the Columbia Law School and The Earth Institute at University of Columbia on 27- 28 October 2010, at 3 (2010).

[166] *See* 2002 MINING CODE, arts. 109-26 (DEM. REP. CONGO).

[167] *See* World Bank, *supra* note 160, at 10.

[168] *See* Bakandeja, *supra* note 165, at 116-18; World Bank, *supra* note 160, at 60.

quarrying rights are rules by Articles 229 to 167 of the new Mining Code. Two types of quarrying rights are present, namely the exploration license of quarry products and the exploitation (operation) license. An exploitation license can be issued on temporary or permanent basis.

A number of requirements, of which non-compliance may result in the cancelation of mining rights, affect the granting or maintenance of each and every one of the mining rights cited above. For instance, the new Mining Code limits the issuing of an exploration permit to only those who can prove a minimum financial capacity.[169] By contrast, it allows an investor to acquire an exploitation permit if he submits an application including a feasibility study along with a technical work plan and a rehabilitation plan among other documents. In addition, the new Mining Code requires an investor to demonstrate the existence of financial resources for carrying out its project from the building of facilities to the closure of mine. The state must also be granted 5 % of the shares of the company applying for a mining license free of charge and on a non-dilutable basis.[170]

Moreover, the new Mining Code provides for environmental and safety provisions. The issuing of a temporary quarrying exploitation license and the operation of an exploration permit are subject to the prior approval of a mitigation and rehabilitation plan (MRP). However, the granting of any other exploitation permits or license is conditional on the prior approval of an environmental impact study (EIS) and an environmental management plan (EMP).[171]

Furthermore, any holder of a mining or quarrying right shall, subject to the nature of his mining or quarrying rights, commence the work within a specific time period-either six months, one or three years, of the date the title evidencing his right is issued.[172] A mining titleholder shall also pay the annual surface area fees per quadrangle relating to his title, before the deadline set by the law.[173]

Lastly, the 2002 Mining Code provides for a strict liability[174] scheme, in the sense that the victim does not need to demonstrate the fault of the mining operator. The mere fact of proving a connection between the damage suffered by the victim and the mining operation is enough to trigger the compensation.[175] Moreover, without prejudice to the transferee's right

[169] Some commentators have seen the amount required negligible and therefore worthy to be revised. *See* World Bank, *supra* note 160, at 17.

[170] *See* 2002 MINING CODE, art. 71 (DEM. REP. CONGO).

[171] *See* 2003 Mining Regulation, art. 407 (DEM. REP. CONGO).

[172] *See* 2002 MINING CODE, art. 197. (DEM. REP. CONGO).

[173] See MINING CODE art. 280 (DEM. REP. CONGO).

[174] MINING CODE art. 198 (DEM. REP. CONGO).

[175] André-Dumont, *supra* note 156, at 41.

of recourse against the transferor, both the transferor and the transferee bear the liability for damage caused before the transfer.[176]

### b. The Laws on Commercial Companies

The laws applicable to commercial companies operating in DRC encompass regulations mostly borrowed from Belgian or French law. The main regulations are: (a) the Decree of the King-Sovereign dated 27 February 1887 on commercial companies, as amended to date and its related regulations; (b) the Royal Decree of June 22, 1926 on companies limited by shares, as amended to date and its related regulations; (c) the Decree on the commercial registry enacted on March 06, 1951, as amended to date; (d) the Decree passed on August 13 1973 related to the national identification number; and to a certain extent, (e) the Decree enacted on June 09, 1966 pertaining to the notarized acts.

In accordance with the mining law, the laws on commercial companies do not stop a foreign investor from operating in DRC. The relevant features to point out, with regard to the mining operation, relate to the requirements an investor could be subject to when operating as a foreign company or incorporated subsidiary. According to Articles 8 and 9 of the Decree of the King-Sovereign dated 27 February 1887 on commercial companies, as amended to date, a lawfully incorporated foreign company can operate in DRC, subject to the registration of its articles of association with the commercial registry and the publication thereof in the official gazette. When operating as a subsidiary, an investor shall abide by the same conditions. In this latter instance, the registration is conditional upon the notarization of the Articles of association.[177]

As H. André-Dumont wisely argued, investors mainly use two types of domestically incorporated companies to carry out mining activities.[178] The first is a private limited liability company (*société privée à responsabilité limitée "SPRL"*). This company has a minimum of two shareholders. But, it is not eligible to benefit from tax deductions for interest on shareholders' advances.[179] The second is a company limited by shares (*société par actions à responsabilité limitée "SARL"*).[180] This type of company has a minimum of seven shareholders as well as a presidential decree approving its incorporation and substantial changes to its bylaws, in

---

[176] MINING CODE art. 192. (DEM. REP. CONGO).

[177] *See* Decree of the King-Sovereign On Commercial Companies, Feb. 27,1887, art. 2 as amended to date (DEM. REP. CONGO).

[178] André-Dumont, *supra* note 156, at 36.

[179] *Id.*

[180] *Id.*

addition to the general conditions imposed to other categories of company.[181]

c. The Contract law

As already mentioned, the new Mining Code overrules the conventional scheme laid down by the 1981 Mining Law.[182] There is no requirement to enter into a partnership with a state-owned enterprise to operate in the sector given that the granting of mining and quarrying rights is done on a first come first served basis. Nonetheless, the 2002 Mining Code has made it possible for any exploitation license holder to lease and/or transfer its rights.[183] However, it does not give any model of contract to be used especially when the lessor or transferor is a state-owned enterprise.[184]

The only existing guidance refers to a compulsory insertion in the contract of an accelerated termination clause in case the lessee fails to comply with the existing laws.[185] In addition, the new Mining Code requires a clause compelling joint and several liability of the lessor and the lessee vis-à-vis the State to be included in the contract as well as the clauses setting out the conditions for the maintenance and the reinvestment necessary for the appropriate exploration and development of the deposit.[186] Furthermore, the exploration permit holder is entitled to enter freely into an option contract with a third party.[187] Once again, the 2002 Mining Code gives no guidance when one of the contracting parties is a state-owned enterprise.

Furthermore, the new Mining Code is silent on whether a state-owned enterprise can enter into a public private partnership with an investor to operate the mining or quarrying rights belonging to the former.[188] No apparent ground exists to hold such a convention unlawful, inasmuch as it derives from an agreement of the contractual parties. However, prospective contractual parties should keep in mind that without prejudice to the provisions provided for in the new Mining Code and in the Public Enterprises Law, their contract will be subject to the Contract Law.

---

[181] *Id.*
[182] MINING CODE, art. 2 (DEM. REP. CONGO).
[183] MINING CODE, art. 65, 89, 100, 137, 148, 177-95 (DEM. REP. CONGO).
[184] *See* MINING CODE, (DEM. REP. CONGO).
[185] MINING CODE, (DEM. REP. CONGO).
[186] MINING CODE, art. 177 (DEM. REP. CONGO).
[187] Which is mainly that conferring on the beneficiary the right to obtain a participation in the exercise of the mining exploitation right deriving from an exploration license. *See* MINING CODE art. 193 (DEM. REP. CONGO).
[188] *See Id.*

In DRC, the Contract Law refers to Decree of the King-Sovereign dated 30 July 1888 on contracts or contractual obligations, as amended.[189] This text contains provisions mostly inspired by the Napoleonic Code as is the case in the majority of civil law countries. The Congolese contract law does not enumerate many specific rights and duties to be protected and enforced.[190] Rather, it has a number of limiting principles, under which the contracting parties may create their own rights and duties.[191] Then, the law will uphold only those rights and duties created in accordance with the principles thereof.[192]

One of the prominent principles enshrined by the contract law is that lawfully concluded agreements (conventions) become the law for those who make them.[193] However, for a convention to be legally enforceable, it cannot contravene any existing public law. According to Article 8 of the same law, a contract is valid when: (a) There is a consent between contracting parties; (b) the parties agree within their contractual capacity; (c) the agreement is based on a certain object and; (d) the cause of the obligation is lawful. Additional requirements may also apply to enforcing a convention legally. These include compliance with the rules governing the conditions and termination of contractual obligations. Therefore, it is safe to say that a mining agreement is governed by the contractual will of the parties provided that it was expressed in accordance with the principles set out in the contract law.

2. International Law

At the international level, the applicable law for mining operations in the DRC covers both hard law and soft law. The former encompasses specific legally binding obligations that delegate authority for interpreting and implementing the law,[194] whereas the latter refers to situations where "legal arrangements are weakened along one or more of the dimensions of obligation, precision, and delegation."[195] The soft law facilitates compromise and, therefore, collaboration between actors with different interests, value, and degree of power.

---

[189] DECREE OF THE KING-SOVEREIGN ON CONTRACTS OR CONTRACTUAL OBLIGATIONS, JULY 30, 1888 (DEM. REP. CONGO).
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.* at art. 33.
[194] Kenneth W. Abbott & Duncan Snidal, *Hard and Soft Law in International Governance* 54 INT'L ORG., no. 3, 2003, at 421.
[195] *Id.* at 422.

a. The Hard Law

The binding international principles applicable to mines operating in the DRC cover, without prejudice to the international treaties related to human rights, labor and environmental issues, multilateral and regional economic or investment treaties to which the State is party or has adhered to namely, WTO, WIPO, ISCID, OHADA, SADC, etc. It specifically refers to the bilateral investment treaties (BITs) signed by the Congolese state. These include BITs between DRC and Switzerland, USA, UK, France, Germany, Rep of Korea, Italy, Guinea, Egypt and Belgium.[196] Only four of these BITs have entered into force (those with France, Germany, Switzerland and the US).[197]

Some salient features can be raised in connection with investment treaties. The first is the principle of non-discrimination, the second is fair and equitable treatment, and the third is the regulation of expropriation or takings and related compensation. Additionally, investment treaties may provide for the strengthening of the legal value of investment contracts by requiring the host state to respect its commitments vis-à-vis investors originating in the other state party to the investment treaty.[198] This kind of provision is known as an "umbrella clause".[199] It should be noted, however, that the above list shows only a few examples and should not in any event be considered as being exhaustive of the salient features of investment treaties.

The non-discrimination principle underpins most treaties and agreements governing investments. It provides a two-pronged obligation: (a) a government shall not treat companies controlled by nationals or residents of another country less favorably than domestic companies in like situations (national treatment); (b) or give companies of most-favored nations special treatment. [200] It must be borne in mind that the principle of

---

[196] U.N. Conference On Trade and Dev., Full List of Bilateral Investment Agreements Concluded June 1, 2013, http://unctad.org/Sections/dite_pcbb/docs/bits_congo_dr.pdf.

[197] André-Dumont, *supra* note 156, at 50.

[198] Lorenzo Cotula, *Investment Contracts and Sustainable Development: How to Make Contracts for Fairer and More Sustainable Natural Resource Investments* 14 (IIED, 2010).

[199] For more information on the umbrella clause, *see* Thomas Walde, *The "Umbrella" (Or Sanctity of Contract/Pacta Sunt Servanda) Clause in Investment Arbitration: A Comment on original Intentions and Recent Caes, Transn'l. Dispute Mgmt.* Oct. 2004; Stephan W. Schill, *Enabling Private Ordering: Function, Scope and Effect of Umbrella Clauses in International Investment Treaties*, 18 MINN. J. INT'L L. 1 (September 2008).

[200] For further information about the evolving, scope and implementation of the principle of non-discrimination *see* Santiago Montt, *State Liability in Investment Treaty Arbitration*, (2009); Dr. Nicolas F. Diebold, *Non-Discrimination and the Pillars of International Economic Law*, IILJ Emerging Scholars Paper 18 (2010).

non-discrimination does not suggest the host state provide advantages to foreign investors.[201]

The fair and equitable treatment of investors is a concept that has fuelled many controversies between host states and capital importing states because it was perceived as a likely catch all provision that could be invoked with respect to almost any adverse treatment of an investor.[202] The 2007 UNCTAD report on bilateral treaties treats this principle as providing a basic standard, detached from the host country's domestic law, against which the behavior of the host country vis-à-vis foreign investments can be assessed.[203] It covers, amongst other, issues: (a) the stability, predictability and consistency of the host state's legal framework; (b) the protection of confidence and legitimate expectation of the investor; (c) administrative and judicial due process; (d) transparency and; (e) reasonableness and proportionality.[204]

The regulation of expropriation or takings is another salient feature of the international investment treaty that is worth mentioning. The concept of expropriation refers to "an outright taking of private property by the state, usually involving a transfer of ownership rights to the state or to a third person."[205] It may even occur indirectly, from a decisive act that does not imply a taking but deprives foreign investors of their property rights. Regardless the manner of its occurrence, a lawful expropriation shall meet following requirements: (a) it must be enacted for a public purpose; (b) it must not be discriminatory; (c) it shall imply a prompt, full and adequate compensation of the dispossessed parties.

b. The Soft Law

Mining operations are subject to another broad type of international rule called soft law. As its name suggests, it consists of non-judiciable

---

[201] *Id.*

[202] Fiona Marshall, *Fair and Equitable Treatment in International Investment Agreements, Issues in International Investment Law*, *Background Papers for the Developing Country Investment Negotiator's Forum* (Sing. Oct. 1 – 2, 2007).

[203] U.N. Conference on Trade And Dev., *Bilateral Investment Treaties 1995 – 2006: Trends in Investment Rulemaking*, UNCTAD/ITE/IIT/2006/5 (2007), *available at* http://www.unctad.org/en/docs/iteiia20065_en.pdf.

[204] *See* ILA German Branch/Working Group, General Public International Law and International Investment Law A Research Sketch on Selected Issues, at 14-22 (December 2009). For further information on the definition, evolving, scope, interpretation and implementation of the fair and equitable principle *see* OECD, *Fair and Equitable Treatment Standard in International Investment Law* (September 2004), *available at* http://www.oecd.org/dataoecd/22/53/33776498.pdf, accessed on February 17, 2012, R. Dolzer & Chr. Schreuer, *Principles of International Investment Law,* Oxford University Press, at Chapter 7 (2008); UNCTAD, *supra* note 57; Marshall, *supra* note 191.

[205] Reinisch, *supra* note 38, at 408.

international standards mostly developed by subjects of international relations on a single or collaborative basis. It aims to enhance the responsibility of corporations in almost every aspect of their business operation, from the outset of the mining project to the closure of the mine. It covers various topics such as human rights, indigenous people and woman, labor, health and security, land use and displacement, transparency, reporting, etc.

Although there is no hierarchy between existing international standards, an investor will pay much more attention to the standards of instruments both the Congolese state and its home state have assented to, as well as the standards specified by the lenders and customary international law. In particular, mining projects must comply with the standards set out by the OECD Guidelines for Multinational Enterprises, the Extractive Industry Transparency Initiative (EITI), the Kimberly Process, the IFC Corporation's Policy on Environment and Sustainability, the World Bank Pollution Prevent Abatement Handbook and, the Equator Principle. As in former instances, this is only a partial list and should not in any event be considered as providing a comprehensive survey of the existing standards.

The OECD Guidelines comprise a set of voluntary principles in all the major areas of any business operation, including employment and industrial relations, environment protection, information disclosure, combating bribery, consumer interests, science and technology, completion, and taxation. Its latest update completed in 2011 encompasses, among other thing, new recommendations on human rights consistent with the Guiding Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework.[206]

EITI is a multi-stakeholder initiative to monitor the flow of resource revenues to insure a sound natural resource management. [207] It came into being in 2003, following the momentum of the U.K. government, several large extractive industry companies and other stakeholders.[208] It commits participants to disclose payments to governments (or payments received by companies) consequent to the extractive industry operations in countries that have joined that initiative.[209] The framework encompasses twelve principles pertaining to resource management, transparency, accountability, sustainable economic growth, and sovereignty, and contains six criteria designed to ensure that signatories implementing the initiative comply with

---

[206]For further information *see*: OECD, OECD Guidelines for Multinational Enterprises, (2011) OECD Publishing *available at* http://dx.doi.org/10.1787/9789264115415-en, accessed on January 12, 2012.

[207] EITI International Secretariat, *FAQ,* EITI (July 2, 2014), http://eiti.org/faqs.

[208] *Id.*

[209] *Id.*

the defining standards.[210] The DRC has been an EITI candidate since February 2008.[211]

The Kimberley Process Certification Scheme (KPCS) is another multi-stakeholder instrument for extractive industry designed to stem the trade of conflict diamonds.[212] It entered into force in 2003 pursuant to UN General Assembly Resolution 55/56 of 1 December 2000, and concerns 75 countries.[213] The DRC implemented the KPCS since May 31, 2003.[214]

The IFC Corporation's Policy on Environment and Sustainability, World Bank Pollution Prevent Abatement Handbook and the Equator Principle are performance standards developed by lenders.[215] The first two standards provide benchmarks used in a project financed by the IFC or World Bank.[216] The Equateur principle is applicable to projects funded by commercial lenders that have agreed to the principles.[217]

3. Extraterritorial Legislation

The last group of principles applicable to mining operation in the DRC finds its origin in extraterritorial legislation. It consists of foreign legislation that may impact mining operations conducted by companies linked to foreign states where the legislation was enacted. Succinctly, one can mention the United States Foreign Corrupt Practices Act (FCPA) which makes it unlawful for certain classes of persons and entities to make payments to foreign government officials for the purpose of obtaining or retaining business.[218] The UK Bribery Act also contains provisions that have an extraterritorial coverage.[219] Lastly, the mining operations in the DRC might be subject to the Cardin-Lugar provision in the US Dodd-Frank Wall Street Reform and Consumer Protection Act (known as Dodd-Frank Act).[220] The Cardin-Lugar provision is named after an amendment to the Dodd-Frank Act submitted by Senators Cardin and Lugar- based on the

---

[210] EITI International Secretariat, *FAQ,* EITI (July 2, 2014), http://eiti.org/eiti/principles.
[211] For more information consult http://eiti.org.
[212] *The Kimberly Process*, http://www.kimberleyprocess.com (last visited July 3, 2014).
[213] *The Kimberly Process*, http://www.kimberleyprocess.com (last visited July 3, 2014); G.A. Res 55/56, 55th Sess., (Jan. 29, 2001).
[214] Democratic Republic Congo, *Kimberly Process* (July 3, 2014) http://www.kimberleyprocess.com/en/democratic-republic-congo.
[215] IFC, *Policy on Environmental and Social Sustainability* (Jan. 1, 2012); *The World Bank Group*, U.N. Environment Programme & U.N. Indus. Dev. Org., Pollution Prevention and Abatement Handbook (1998); *About the Equator Principles,* Equator Principles (July 2, 2014), http://www.equator-principles.com/index.php/about-ep/about-ep.
[216] IFC *supra* note 215; World Bank Group *supra* note 215.
[217] Equator Principles *supra* note 215.
[218] The Foreign Corrupt Practices Act, 15 U.S.C. §§ 78(dd)(1)- et seq.
[219] Bribery Act, 2010, c.23 (U.K.).
[220] PUB. L. No. 111-203.

Energy Security through Transparency Act (S. 1700) of 2009.[221] Following this amendment, all listed extractive companies must disclose their payments in all the countries they operate.[222] Another key provision of the Dodd-Frank Act that is worth mentioning is section 1502, which, in accordance with the EITI, requires companies that utilize certain conflict minerals to conduct and report due diligence on their supply chains in order to ascertain whether the source of these minerals is supporting the on-going conflict in the Democratic Republic of Congo.

B. The Supervision of the Mining Regulation

The preceding part discussed the normative framework applicable to the mining operations in DRC. It has shown that the normative framework includes, without prejudice to the contractual will of the parties, a large number of national, international, and even extraterritorial laws. To make these regulations effective, there should be a body empowered to oversee the implementation of existing regulations, especially with regard to the issuing or withdrawal of the mining or quarrying license. This body would also look at the public-private partnerships state-owned enterprises holding a mining title enter into. The same analysis should be undertaken with regard to the contracts signed with the lenders or insures.

It must be kept in mind that the Congolese mining legal framework does not empower a single regulatory body to supervise every segment of the mining operation. Instead, several institutions within and outside the Mining Ministry supervise the implementation of mining regulations.[223] As a result, some issues, such as compliance with company law and aligning existing trading companies' by-laws with regional business regulations (OHADA, COMESA and SADC), do not enjoy the supervision of any regulatory body. There is not a well-established nexus of information sharing between existing supervisory bodies even between institutions attached to the Mining Ministry. Consequently, the lack of compliance with the law as well as the fraud is wildly disseminated in the Congolese mining sector.[224]

---

[221] Energy Security through Transparency Act.
[222] *Id.*
[223] *See* World Bank, *supra* note 160, at 37.
[224] There is a wealth of literature discussing how Government officials collude with extractive companies to circumvent procedures related to the grant of mining license and the payment of taxes. Existing literature has also mentioned that significant portion of Congolese minerals is mined informally and exported illegally. *See* Bakandeja, *supra* note 165, at 135 and 146-149; World Bank, *supra* note 160, at 41, Global Witness Report, Digging in corruption: fraud, abuse and exploitation in Katanga's copper and cobalt mines, at 4 (July 2006).

The main supervisory bodies involved in mining operations in DRC are: [225]

- The President of the Republic, who is solely entitled to (i) classify, declassify or reclassify mineral substances as mine or quarry products; (ii) declare, classify or declassify an area as a prohibited area for mining activities or quarry work; (iii) declare, classify or declassify a mineral substance as a 'reserved substance'; and (iv) confirm the reservation of a deposit which is subject to tender pursuant to a Ministerial Decree. He exercises his powers by ordinances passed on his own initiative or on the proposal of the minister, after having obtained the opinion of the Geological Department or the Mining Registry.

- The Minister of Mines, who has jurisdiction over (i) the granting, refusal and cancellation of mining rights; (ii) the creation of artisanal exploitation zones as well as the granting and withdrawal of approval for the purchasing of artisanal exploitation products; (iii) the supervision of the institutions, essentially public or semi-public entities, that carry out mining activities and quarry works. He exercises his powers by way of decrees.[226]

- The Governor of the Province is responsible for: (i) Issuing traders' cards for artisanal exploitation products; and (ii) the decision to open quarries to carry out public utility works on public land.

- The Head of the Provincial Mining Division has jurisdiction over (i) the issuing of artisanal miners' cards; and (ii) the granting of exploration rights for quarry products, and of permanent or temporary quarry exploitation rights for standard construction material.

- The Mining Registry or *CAMI*, a semi-autonomous agency within the Ministry of Mines. It is in charge of administrative proceedings concerning the application for, and registration of mining rights, as well as the withdrawal, cancellation and expiration of those rights.

---

[225] *See* Arts. 9-16 of the 2002 MINING CODE; World Bank, *supra* note 160, at 37-39; G. Bakandeja, *supra* note 165, at 52-60; H. André-Dumont, *supra* note 156, at 47-49.

[226] For more information about the Minister of mine, *see* http://mines-rdc.cd.

Case 1:16-cr-00515-NGG-LB Document 88-41 Filed 03/06/20 Page 48 of 64 PageID #: 4174


- The Directorate of Mines is in charge of the monitoring and assessing of mining activities with regard to safety, health, work practices, production, transport, sale and social matters, as well as establishing statistics, inspecting mining operations.

- The Small-scale and Artisanal Mining Extension Service or *SAESSCAM,* an office within the Mining Ministry that aims to facilitate small-scale mining and artisanal mining.

- The Diamond Expertise and Evaluation Office or *CEEC,* the official state agency responsible for the evaluation and certification of diamonds. It is involved in the implementation of the Kimberley Process, and the valuation of exported gold and diamonds to ensuring the government receives their fair market value. In any case, the affectivity of its operation remains questionable.

- The Central Bank of Congo, the *BCC,* which has jurisdiction over foreign exchange control and exports.

- The National Comity of The EITI or *CN-ITIE/RDC* which is in charge of the monitoring of the implementation of the principles and criteria of the Extractive Industries Transparency Initiative.

- The institutions supervised by the Finance ministry (namely *DGI*, *DGRAD* and *DGDA* previously called *OFIDA*) that are in charge of the collection of taxes, duties and royalties.[227]

- The President of the Republic and the Commercial Registry's Clerk who are respectively empowered with regard to the acquisition of legal personality of companies shaped into *SRPL* and *SARL*.

C. The Enforcement of the Mining Regulation

The normative framework applicable to the mining operations is enforced first and foremost by the supervisory bodies mentioned in the preceding part. These bodies are empowered to implement the law related to their specialty. Unfortunately, this is not the case on the ground. Supervisory bodies are very often remiss in aligning mining operation with

---

[227] *See* World Bank, *supra* note 160, at 24-28.

the applicable law. The 2008 World Bank report on the mining sector in DRC clearly stated:

> [T]he monitoring and evaluation of work performed by [exploration] permit holders is non-existent. The Directorate of Mines, which is nominally responsible for inspections, does not have the personnel, equipment, or presence in the mining areas to conduct the inspections. As a result, the Government is largely ignorant of a company's compliance with its work program obligations, stipulated in the Mine Law ….The situation is particularly acute with respect to compliance with environmental, health, and safety standards. In addition, … permits may change hands or be leased to other companies without the knowledge of the Government and in violation of the Mine Law.[228]

In addition to the supervisory bodies, national courts and tribunals enforce laws applicable to the mining operations. According to Article 46 of the 2002 Mining Code, if the Mining Registry does not proceed to the registration of the mining or quarrying right within the conditions and time frame set forth therein, the applicant can seek the granting of the rights by submitting a request to the Tribunal of the High Court that has territorial jurisdiction. Article 315 of the 2002 Mining Code lists supervisory body decisions, which can be challenged before an administrative court, grounding on the new Mining Code provisions. It must be noted that any aggrieved party affected by the mining operation, can seek relief by filing a case with the competent Tribunal.

Lastly, a domestic or international arbitral tribunal can enforce mining regulations, subject to the provisions pertaining to breaches, penalties and sanctions set forth by the new Mining Code.[229] According to the Explanatory Memorandum, these issues cannot be directly submitted to arbitration. They must first be brought through administrative and judicial procedures; otherwise the arbitration recourse will be deprived of its effectiveness.[230]

---

[228] *Id.* at 23.

[229] According to the Article 319 of the 2002 MINING CODE, the recourse to international arbitration shall be done under the ICSID forum.

[230] *See* Articles 46, 57 and 317 of the 2002 MINING CODE. For further information *see* H. André-Dumont, *Dispute and their Resolution under the Mining Code 2002 in the Republic Democratic of Congo*, 4 J. OF ENERGY & NAT. RESOURCES L., 362-71 (November 2007).

## IV. THE STATUS OF MINING CONTRACTS RENEGOTIATED

The preceding part surveyed the legal framework applicable to the Congolese mining sector. While Part II advocated the pre-existence of a renegotiation clause in the contract defining the triggering events, rights and obligations of the parties throughout the process of renegotiation as well as the enforceability thereof. This part shows that mining contracts renegotiated in the DRC did not provide for the mechanisms suggested in Part II. An overall glance at litigious contracts reveals that some included a general stabilization clause restricting the legislative and administrative power of the Congolese state to amend the established contractual regime.[231] Others provided for a provision guaranteeing the freezing of economic advantages granted to investors for the duration of the contract or restoration of the economic equilibrium, in case this latter was breached by an act emanating from the Congolese state.[232]

It is difficult to come to the conclusion that the renegotiation of mining agreements undertaken by the Congolese government was arbitrary, though they were unilaterally decided. The general premise, according to which there should be a renegotiation clause inserted into the contract for any subsequent demand of adaptation to be lawful, falls short of proving valid in the very case vitiating factors affect the contract. The one advantage of the renegotiation process undertaken by the Congolese government is that it strengthens the idea that saving the contractual relationship is the pragmatic attitude to mitigate investment risks. However, it failed to achieve its objectives and benefit the local population. The reason may be a combination of technical, strategic and political factors.

### A. Recalling the Context which Prevailed before the Mining Review

From independence to the first half of 1990s the state-owned enterprises[233] dominated the Congolese mining sector. They enjoyed a

---

[231] Convention between the state-owned enterprise Miba and BHP Billiton World Exploration Inc., convention between the state-owned enterprise Gecamine and the group of corporates Luding Holdings, Chui Ltd., Paru Ltd., Mboko Ltd., Mofia Ltd. and Tembo Ltd., the agreement between the OBM B.V & Groupe Goeorge Forrest and the state-owned enterprise Gecamine *available at* http://minesrdc.cd/fr/index.php?option=com_content&view=Article&id=92, accessed November 11, 2011.

[232] Convention between the Congolese State and Anvil Mining NL, convention between the state-owned enterprise Gecamine and Kin-Forrest Ltd., convention between the state-owned enterprise Miba and De Beers Centenary AG, convention between the state-owned enterprise Okimo and Mwana Africa Holdings (PTY), *available at* http://mines-rdc.cd/fr/index.php?option=com_content&view=article&id=92, accessed November 11, 2011.

[233] Including: Gécamines (Générale des Carrières des Mines), MIBA (Minière de Bakanga), Sominki (Société Minière et Industrielle du Kivu), Okimo (Office des Mines d'Or

monopoly over large surfaces of exploration and exploitation ground including the most valuable mining deposits known.[234] Far from taking advantage of this position, these enterprises were mismanaged and finally became moribund. Then, in an attempt to redress them, the Congolese government decided to privatize half of their assets, with the encouragement of the international financial institutions.

In 1995, the Congolese state started negotiations with a number of mining firms, including: Swipco, Lundin Group, Cluff Mining, Banro, Mindev, Barrick Gold, South Atlantic Resources, Union Minière, Anvil Mining, Gencor, Iscor and Broken Hill, to sell them the mining rights the state-owned enterprises failed to exploit. As a result of the process, Gécamines entered into a joint venture with the Lundin Group for the exploitation of the Tenke-Fungurme project, and Anvil Mining was granted a cobalt and silver deposit of almost 13,000 square kilometers. Mindev and the Barrick Gold Corporation were granted 2,000 and 82,000 square kilometers of gold exploitation surfaces. Sominki (a state-owned enterprise) was acquired by a consortium including Banro Resources Corporation and Mines d'Or du Zaïre (MDDZ), a Belgian corporation.[235]

However, as commentators have pointed out, the majority of mining contracts concluded that time was with junior companies, without any capacity to develop a large scale project but only interested in speculating in mining titles on the international market.[236] The rebellion that started in September 1996 and ended a year later with the overthrow of President Mobutu worsened the situation. Mining contracts were granted that rewarded the multinationals that logistically had supported the rebellion, rather than granting those that would benefit the Congolese state and its population.[237] In 1998, just two years after the leader of the rebellion became President, a second rebellion started with almost the same involvement of multinationals in the supply of military equipment and service to rebel groups.[238] When this second rebellion officially ended, in

de Kilomoto), EMK-Mn (Entreprise Minière de Kisenge-Manganèse, SODIMICO (Société de Développement Industriel et Minier du Congo).

[234] *See* The World Bank, *supra* note 160, at 40.

[235] Assemblée Nationale, Rapport de la Commission Spécial Chargée de l'Examen de la Validité des Conventions à caractère économique et financier conclues pendant les guerres de 1996-2003, (also known as Lutundula Commission Report), 6 (2005).

[236] The World Bank, *supra* note 160, at 46, 50.

[237] Assemblée Nationale, *supra* note 213, 6-7.

[238] The UN Secretary-General, Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo, U.N. Doc. S/2002/1146 (16 Oct. 2002) 12.

2002 with the signature of the Global and Inclusive Agreement, also known as the Sun City Agreement, several concerns arose about the legality of the agreements signed with leaders of different rebel factions.[239]

The Congolese National Assembly commissioned a special committee in 2004 to survey the validity of economic and financial contracts signed during the two wars (1996-1997 and 1998-2002) known as the Lutundula Commission. The report submitted in June 2005 found that the majority of contracts signed during the war period were illegal or contributed little or nothing to the development of the country.[240] For instance, it highlighted contracts in which the state had agreed to tax exemptions of joint ventures for periods of 15 to 30 years. The report also denounced the failure of conducting feasibility studies as well as interference of high-level politicians in the negotiation process. Moreover, it found that joint ventures with state-owned enterprises have failed to resolve the social problems of the population in an adequate manner. In fact, the companies that were born out of the partnerships were incapable of absorbing the staff of the public enterprises that work on the sites and their installations. Finally, the report recommended that some of these contracts be rescinded and others be renegotiated. In addition, it suggested that no new mining concessions be granted during the remaining transitional period until a new government is in power after elections.[241]

Disappointingly, the report was never discussed by the parliament. The allocation of mining concession even increased afterwards according to some observers. Indeed, the transitional government officials who acted had an interest to line their pockets in order to influence the outcome of the elections, whether by increased advertising, by buying votes outright or by bribing electoral officials to favor their party.[242] The contracts that were signed during the transition period were considered extremely unfavorable to the DRC and are suspected to be tainted by corruption. Some of the joint ventures the state-owned enterprises entered into were signed thanks to a blatant conflict of interest.[243] Others were concluded with a total lack of

---

[239] *See* Rights & Accountability in Development (RAID), Unanswered Questions: Companies, Conflicts and the Democratic Republic of Congo, at 18 (May 2004); Global Witness Report, Under-Mining Peace The explosive Trade in Cassiterite in Eastern DRC, at 8 (June 2005); International Crisis Group Africa Report No 114, Escaping the Conflict Trap: Promoting Good Governance in the Congo, 6-7 (July 2006); Human Right Watch Report, Democratic Republic of Congo: Election in Sight, Don't Rock the Boat, at 14 (December 2005).

[240] Assemblée Nationale, *supra* note 213, at 6.

[241] *Id.* at 270.

[242] Human Right Watch Report, *supra* note 217, at 14.

[243] Global Witness Report, *supra* note 202, at 37.

transparency, on the basis of flawed or non-existent international tendering procedure.[244]

A survey commissioned by the World Bank found that many of these contracts diverged from international practice.[245] It also pointed out the failures of supervisory bodies to enforce the law with respect to labor, environment, health and safety issues.[246] This survey noted, however, that other contracts conformed to international standards but required certain additions or supplements such as operating agreements, accounting practices, and internal governance procedures.[247] These developments corroborate the idea that it was widely recognized, at both the national and international level, that the Congolese mining sector has been and continues to be characterized by high levels of fraud, corruption and obfuscation as well as a disregard for the right of the Congolese population to benefit from the country's natural wealth.[248]

Against this backdrop, the Congolese government enacted a decree calling for the review of mining agreements and set up a commission to this end in April 2007, just after the nation wide elections. Article 2 of the ministerial decree stipulates that the Commission's mission was to examine the partnership contracts concluded by the state and/or public companies with private investors in the mining sector and assess their impact on the DRC's public companies and national development. In addition, it requires the Commission recommend the terms and conditions to review the audited contracts with the aim of correcting the related imbalances and flaws.[249] The Congolese government did not question the renegotiability of existing mining agreements, nor did it voice concerns over the willingness of investors to adjust the existing regime. It merely made a unilateral decision, using its sovereign prerogatives, to attempt to restructure the agreements almost completely as a result of societal and international NGOs pressure.

### B. The Process Followed by the Congolese Government

The use of a renegotiation mechanism in the Congolese context aimed at aligning mining agreements, especially those signed during the transitional period, to what the Congolese government perceived as an

---

[244] Rights & Accountability in Development (RAID), Key Mining Contracts in Katanga: The Economic Argument for Renegotiation, at 4 (April 2007).

[245] The World Bank, *supra* note 160, at 47.

[246] *Id.* 23, 63.

[247] *Id.* at 47.

[248] Global Witness Report, The Congolese mining sector in the balance: lack of transparency risks undermining review of mining contracts, at 4 (October 2007).

[249] Arrêté ministérielle No 2745/Cab.Min/Mines/01/du 20/04/2007 portant mise sur pied de la commission ministérielle chargée de la revisitation des contrats miniers (2007).

acceptable standard. To achieve this the Congolese government followed a two-step approach. First, it commissioned a taskforce to assess existing agreements and audit the mining agreements. Secondly, it appointed another taskforce to renegotiate or cancel those contracts that were non-compliant to what the Congolese government perceived as an acceptable standard.

1. The Audit of Mining Agreements

Few official documents have been disclosed with regard to the setting up of the ad hoc Commission to review mining contracts. The ministerial Decree that announced this audit outlined the objectives of the Commission; it would;

- examine the partnership contracts concluded by the state and/or public companies with private investors in the mining sector and assess their impact on the DRC's public companies and national development;

- propose, if necessary, terms and conditions of their review with the aim of correcting any imbalances and related flaws.

This ministerial Decree does not include the Commission's terms of reference, nor does it set the scope and conditions of the review process. Nonetheless, the Commission adopted its terms of reference that, unfortunately, have not been made public.[250] The Commission was entirely composed of members of the government and civil servants including, amongst others, representatives of the Presidency, the Prime Minister's office, the Ministry of Mines, the Ministry of Finance and several others ministries.

Article 3 of the ministerial Decree setting up the Commission stipulates that the Commission can resort to external expertise, without giving additional details. In accordance with this Article, the report submitted by the Commission acknowledged the assistance of national and

---

[250] A Global Witness report suggest that these terms of reference was drawn from 'Guidelines for the Revision of Mining Contracts in DRC: the Quest for Justice, Fairness, Transparency and Accountability' published by the Southern Africa Resource watch. The draft terms of reference that has been disclosed to the aforesaid organisation listed five main aspects, namely: (1) the distribution of share capital within joint venture, (2) the breakdown of the allocation of revenues from joint venture companies, (3) the respect of social clause, (4) the disempowerment of statutory management bodies of the joint venture company in favour of operating company, the subsidiary of the majority partner, (5) the confidentiality clause with respect to the principles of the Extractive Industries Transparency Initiative. Global Witness report, *supra* note 226, 5-6.

international non-governmental organizations.[251] The national organizations that participated in the process were appointed by the Congolese government as mere observers. Commentators have noted that the opportunity for Congolese NGOs to provide meaningful input toward the process was limited in practice.[252] Of the five organizations selected by the Congolese government, only one, *Avocats Verts*, could be considered to be an 'activist' NGO working for the protection of rights. The other committed Congolese NGOs as well as networks of NGOs that have been working on mining issues in DRC for many years, were not chosen.[253] The local population living in mining areas was not involved in the process of assessing mining agreements.

At the time mining agreements were audited the CAMI, the governmental body empowered to issue mining permits and keep appropriate records, had already issued over 3,000 mining rights, of which no less than 416 were issued to the state-owned enterprises.[254] The review commission assessed only 63 mining agreements, including 57 partnerships with state-owned enterprises and 6 contracts involving the Congolese state. As of the writing of this article there had been no disclosure on how the Commission chose these agreements and if the process of auditing them included any prioritization. The Commission report divides the reviewed agreements into three categories: category A was for agreements that were to be unchanged; category B dealt with agreements that needed to be renegotiated; and category C was for those that were to be cancelled.[255] Of the all agreements subjected to the review, not a single agreement was classified in category A. 23 agreements were assigned in category C, 40 agreements were put in category B.[256]

---

[251] Commission de Revisitation des Contrats Miniers, Raport des Travaux' tome 1 (Novembre 2007) 5, available in French only http://www.miningcongo.cd/pdf/TOME%201%20RAPPORT%20CRCM%20VERSION%20FINALE-%20270208%20&_h%C3%A9%C3%A8.pdf, accessed September 14, 2011. The outside expertise came from three organisations, namely: Carte Centre, Open Society Initiative for Southern Africa (OSISA), both not-for-profit organisations, and Companies Benjamin de Rothschild.

[252] Global Witness report, *supra* note 226, at 17.

[253] Apart from Avocat Vert, following organisations were selected by the Congolese government: the *Centre d'études pour l'action sociale* (*CEPAS*, a Jesuit research, and study centre focusing on social issues), the *Conférence Episcopale nationale du Congo* (*CENCO*, National Bishops' Conference), the *Fédération des Entreprises Congolaises* (*FEC*, Federation of Congolese Businesses), the *Association Nationale des Entreprises du Portefeuille* (*ANEP*, National Associatio n of Public Companies).

[254] The World Bank, *supra* note 160, at 41.

[255] *Id.*

[256] Commission de Revisitation des Contrats Miniers, *supra* note 229, at 4.

Case 1:16-cr-00515-NGG-LB Document 88-41 Filed 03/06/20 Page 56 of 64 PageID #: 4182


Listed per public partner, the picture is as follows:

| **Public Partner** | **Category B** | **Category C** |
|---|---|---|
| **State** | 3 | 3 |
| **EMK-Mn** | 1 | 1 |
| **Miba** | 6 | / |
| **Okimo** | 6 | 3 |
| **Sakima** | 1 | 5 |
| **Sodimico** | 1 | 5 |
| **Gécamines** | 22 | 6 |
| **Total** | 40 | 23 |

The Commission's report did not provide clear recommendations about how renegotiations should be carried out, nor did it provide for guidelines with regard to the obligations of the parties whose contracts have to be cancelled. In addition, it did not refer acts of illegality that it disclosed to the relevant judicial authorities. The Commission's report also did not identify new problems in the mining contracts concluded in DRC, The Commission's mandate ended with the notification of its findings to respective companies. The Congolese government appointed a new task force for proceeding with renegotiation.

2. The Renegotiation of Mining Agreements

Unlike the preceding stage, the Congolese government has disclosed the terms of reference applicable to the task force that proceeded with the renegotiation and cancellation of mining agreements.[257] These terms of reference encompass 15 headings, of which 14 deal with renegotiation.[258]

---

[257] Ministry of Mines, Terms of Reference for the Renegotiation and/or the Termination of Mining Contracts, 1-6 (August 2008). An English translation is *available at* http://www.atol.be/docs/ebib/TDR%20RENEGOCIATION%20ENGLISH.pdf, accessed March 22, 2012.

[258] Here are the headings of the terms of reference applicable to the task force that proceeded with the renegotiation and cancellation of mining agreements, namely: (a) preliminaries to the renegotiation, (b) evaluation of the inputs of the partners, (c) financial repercussions in the short, medium and long term, (d) financing of projects, (e) rate of remuneration of the projects, (f) respect of legislation, (g) control of the movements of shares

The developments underneath these headings reveal that the Congolese government attached a lot of importance to the financial and management aspects of the mining projects. The expected standard in this respect included the increase of the state-owned enterprises' shares in the targeted joint ventures up to 51% of the capital stock, involvement of representatives of the Congolese side in the operational and management bodies, adjustment of the profit redistribution, and supplement of the transfer bonus (also called key money or *pas de porte*) paid for access to reserves.[259]

The presumed intent of the Congolese government, to get fair bargains and align the contentious agreements with the Congolese laws, contrasts with certain suggestions in the terms of reference. A blatant example of this ambiguity is the moratorium declared before the start of the renegotiation process on feasibility studies' submission and payments of duties related to surface rent and royalties.[260] Article 69 of the 2002 Mining Code provides that the granting of an exploitation permit is subject to the submission of a feasibility study. Articles 196 and 197 of the same code stipulate that the validity of mining rights depends on the commencement of the operations within six months time following the issuance of the title evidencing the mining and the payment of the surface area fees relating to the mining title, each year before the deadline specified in Article 199 of this code. The mining Code provides for sanctions in case of failing to meet these requirements.[261] In light of these provisions, the legality of the moratorium is deeply questionable.

The terms of reference give no guidance in connection with the human rights and environmental aspects of the mining operation. The developments under the headings referring to the termination of the contract are silent with regard to the rights and obligations of the Congolese side after the cancellation of a mining agreement. The contracts involved in the Congolese renegotiation process did not provide for a clause enabling the use of the adaptation mechanism in the way described in the preceding

---

or parts, (h) effective participation in the daily management of the partnership, (i) taking into account the blocking minority, (j) respect of the obligations of the partners, (k) Use of local resources, (l) Contracts or partnerships concluded on the basis of calls for tender, (m) Social responsibility clauses, (n) Applicable law in case of dispute, (o) Termination of contracts.

[259] Ministry of Mine, *supra* note 229, 1-4.

[260] *Id.* at 1, 6.

[261] According to Article 289 of the 2002 Mining Code, the failure to pay surface rights fees and to start work within the deadline set forth under the law constitutes a cause of forfeiture of mining rights.

Case 1:16-cr-00515-NGG-LB Document 88-41 Filed 03/06/20 Page 58 of 64 PageID #: 4184


part.[262] Nonetheless, some of them did provide for a general review clause subjecting the adjustment of the contractual provisions to a common agreement of the parties:

> *La présente convention ne peut être amandée ou modifiée que par un écrit signé par toutes les parties ou par leurs successeurs et cessionnaires autorisées respectifs*.[263]
>
> The present agreement shall not be amended or modified but trough a written agreement between all the parties or their respective authorized successors and the transferees..

Others did provide for a stabilization clause freezing wholly or part of the contractual regime, or seeking the economic balancing of the contractual benefits:

> *L'Etat garantit pendant toute la durée de la présente convention, à Anvil Mining Zaïre (congo), à ses actionnaires étrangers et, à son ou ses gestionnaires et à leurs sociétés affiliées, à ses mandataires sociaux et à ses agents salaries expatriées et ses bailleurs de fonds et assureurs, la stabilité de la législation et règlementation zaïroise (congolaise) en vigueur à la date de la signature de la convention et notamment dans les domaines judicaire, foncier, fiscal, des conditions de séjour, de mouvement et de travail des étrangers, de la sante, de la protection et de la réglementation minière.*
>
> *Aucune disposition législative ou règlementaire prenant effet à une date postérieure à la date de la signature de la convention ne peut avoir pour conséquence de restreindre et de diminuer les avantages particuliers ou entraver l'exercice des droits résultant de la présente convention*[264]
>
> The State guarantees Anvil Mining Zaire (Congo), his foreign shareholders, administrators and their affiliated companies, his social representatives, foreign

[262] A clause which defines the conditions of carrying out the renegotiation including, among others, the triggering events, rights and obligations of the parties throughout the process as well as the effect of the failure to agree.

[263] Art. 20.1 of the convention between the state-owned enterprise Gecamine and the group of corporates Luding Holdings, Chui Ltd., Paru Ltd., Mboko Ltd., Mofia Ltd. and Tembo Ltd. for the development of the Tenke Fungurume Mining project.

[264] Art. 34 of the convention between the Sate and Anvil Mining NL for the development of the Dikulushi-Kapulo mining project.

> workers, financiers and insurers, the stability of the current Zairian (Congolese) rules and legislations, during the term of this agreement, in particular fields such as judiciary, land law, fiscal law, conditions of stay, movement and work of foreigners, health and safety, and mining regulations.
>
> Any legislative or regulatory measure coming into effect after the signature of this agreement Shall not amount to an impairment of specific advantages or a hindrance to the exercise of rights specified hereunder.
>
> *L'exactitude de chaque stipulation, déclaration et garantie, ainsi que l'engagement de les respecter, constituent pour chacune des parties une condition déterminante de la signature du présent contrat.*
>
> *Il ne peut être renoncé, en tout ou en partie, à une de ces stipulations, déclarations et garanties que par la partie en faveur de la quelle la stipulation, la déclaration ou la garantie est faite comme stipule au présent article, pour autant que CMSK continue d'exister. Chaque partie s'engage à tenir indemne et à indemniser l'une ou l'autre partie de tout dommage résultant de toute violation d'une stipulation, déclaration ou garantie quelconque contenue dans le présent contrat.*[265]
>
> The accuracy of every condition, statement and guarantee, as well as the commitment to respect them, constitute for each of the parties a substantive requirement of entering into this agreement.
>
> None of these conditions, statements and guarantees shall be waived but by the party in favor of which they were made, throughout the existence of CMSK, in accordance with the present article. Each of the parties commits not to change any condition, statement or guarantee specified hereunder, and to indemnify the other party(ies) for any damage resulting from any violation thereof.

Similarly, Article 22.6 of the convention between the State, state-owned enterprise Gécamines and Congo Mineral Development (a First Quantum's subsidiary) for the development of the Kingamyambo Musinoi tailing project:

---

[265] Art. 24 of the convention between the state-owned enterprise Gécamines and Enterprise General Malta Forrest for the development of the Luiswishi mining project.

*Si conformément à l'article 18 du présent contrat une décision définitive de la cour d'arbitrage de la chambre de commerce internationale constate que l'Etat a imposé à KMT ou aux parties contribuant au financement un prélèvement fiscal ou parafiscal anormal ou excédant ce qui existait a la date de la signature du présent contrat et si, dans les trente jours de cette décision arbitrale, l'Etat n'a pas remboursée le prélèvement trop perçu à celui qui l'a payé, et si aucune autre solution n'est trouvée, l'Etat et Gécamines s'engagent à prendre en charge le montant des prélèvements trop perçus en autorisant KMT et les parties contribuant au financement à faire jouer la compensation avec toutes avances, paiements, primes et/ou distributions quelconques payables par KTM ou par CMD à l' Etat et/ou Gécamines en vertu du présent contrat, étant entendu que tout remboursement ultérieur par L'Etat sera, dans ce cas, immédiatement remboursé à Gécamines .*

If, pursuant to Article 18 of this contract the Court of Arbitration of the International Chamber of Commerce issues a final award which find that the State imposed on KMT or parties contributing to finance the project an abnormal tax or administrative levy exceeding the threshold set out at the signature of this contract and if, within thirty days of this arbitral award, the State has not paid back the excessive tax collected to the one who paid it, and if no other solution is found, the State and Gécamines make a commitment to bear the excessive burden of such a tax by authorizing KMT and the parties contributing to finance the project to compensate for whatever advances, payments, or any bonus payable and distributed by KTM or CMD to the State and/or Gécamines by virtue of the present contract, provided that.

The above listed contractual provisions are far from exhaustive. They may suffice, however, to reveal some of the legal issues that arise from the approach taken by the Congolese government. The shared characteristic between these clauses is that the decision to renegotiate any provision of the existing mining agreements should have been a consensual one. In any event, it should have not consisted of attempting to restructure the mining

Case 1:16-cr-00515-NGG-LB Document 88-41 Filed 03/06/20 Page 61 of 64 PageID #: 4187



agreements on the whole, as the terms of reference issued by the Congolese government suggested.[266]

In September 2008, the taskforce appointed by the Congolese government entered negotiations with the companies that were notified of the Review Commission's findings. This taskforce also renegotiated some of the partnerships that should have been cancelled.[267] The conditions surrounding this choice remain unknown. A large number of companies agreed to adjust their mining agreement, though to a lesser degree than that suggested in the terms of reference. Others initially rejected the Congolese government's demand however they later agreed to tiny adjustments. The most difficult negotiations were with six firms, including AngloGold Ashanti, Banro, First Quantum, Freeport-McMoRan, Gold Fields and Mwana Africa.[268] These firms, with the exception of First Quantum, reached an agreement with the Congolese side in August 2009. Fist Quantum's contract was cancelled.[269]

The salient futures that can be drawn from the renegotiation include[270] the increase of the State-owned enterprises' share in the partnership from less than 20 percent to approximately 30 percent, with some exceptions,[271] the involvement of representatives of the state-owned companies in the management bodies of the partnership,[272] and the increase in the amount of the transfer bonus and royalties.[273]

---

[266] *See* Ministry of Mine *supra* note 257 for further development in connection with this issue, *see* 3.4.3 Conditions of Renegotiating an Existing Agreement in Section two above.

[267] SARW/CENCO, Rapport de l'Atelier sur l'Evaluation du Processus de Revisitation et de Renégociation des Contrats Miniers, 6 (14 décembre 2009).

[268] Mining Journal, The Democratic Republic of the Congo, A supplement to Mining Journal, at 5 (March 2010), *available at* http://www.mining-journal.com/__data/assets/supplement_file_attachment/0004/209074/DRC_2010scr.pdf, accessed July 7, 2014.

[269] This unfortunate decision was based in political considerations. Other investors whose mining agreement contemplated the same criticisms succeeded to secure their investment.

[270] Including the few contracts published in the website of the Congolese Ministry of Mine http://mines-rdc.cd/fr/index.php?option=com_content&view=article&id=166&Itemid=126, public speeches of government representatives, information disclosed by private companies and NGOs involved in the mining sectors in DRC.

[271] Gécamines' shares in the Tenke Fungurume project increased from 17.5 % to 20. By contrast, the initial OKIMO's stake in the Moto gold project, 30 % of the stock share, decreased to 13.78%, as a result of the sale of half thereof to the private partner.

[272] Art. 5 of the amended Tenke Fungurume project.

[273] Statement made by the Minister of mine representative in a workshop organized by SAWR and CENCO the 14 December 2009, SAWR/CENCO, *supra* note 257, 6-7.

C. Appraisal of the Renegotiation Process

From the above examination of the processes followed by the Congolese government, it became quite clear that the outcome of the renegotiation does not correspond to what one may call a success, with regard to the objectives set forth in the terms of reference. Rather, this attempt to bring fairness and compliance with the Congolese laws into existing mining agreements has opened up the Congolese mining sector to a new era where traditional taboos are little by little given up. For the first time, mining agreements have been made public by the Congolese government. Some of the mining agreements the State and/or state-owned enterprises entered into before and after the renegotiation process can be consulted on the website of the Mining Ministry.[274]

The Congolese renegotiation process also showed that the absence of a renegotiation clause does not dilute the worthiness of the adjustment demand. Although the existing agreements did not provide for a specific renegotiation clause, not a single investor among those requested to adjust their existing agreements did reject the Congolese state's demand. Far from using this legitimate exception, they all entered negotiations and adjusted some provisions of their contracts. Both the Congolese government and investors used the renegotiation mechanism to attempt to validate the agreements they entered into. It is not surprising that the benefits drawn from these contractual adjustments were not limited to the Congolese side.[275] These facts truly prove that salvaging the contractual relationship is the pragmatic way to mitigate investment risks. However, as previously shown, the legal issues that arise when parties fail to agree cannot be overcome to the satisfaction of the side that seeks the adjustment, if the original contractual regime does not provide for an adjustment mechanism, and regulate the intervention of third parties.

The renegotiation of mining contracts in the DRC showed that the mining sector is extremely politicized. The investor and Congolese sides have benefited from this condition with different fortunes. The negotiators that acted on behalf of the Congolese side were politicians, without the appropriate skills to handle the renegotiation process successfully; the Congolese government forwent external expertise at this critical stage of the process.[276] Of the data gathered for this study, it seems that the Congolese

---

[274] *See* http://minesrdc.cd.

[275] The Carter Center, The Mining Review in the Democratic Republic of the Congo: Missed Opportunities, Failed Expectations, Hopes for the Future, (3 April 2009) *available at* http://www.cartercenter.org/news/pr/drc_040309.html accessed July 7, 2014.

[276] The Carter Center, The Mining Review in the Democratic Republic of the Congo: Missed Opportunities, Failed Expectations, Hopes for the Future, (3 April 2009) *available at*

negotiators did not take advantage of their best alternative (Batna) to either reach a mutually satisfactory agreement or walk away to a better alternative. A report submitted by one of the NGOs involved in the renegotiation process corroborates this conclusion: "the government sought short-term benefits at the expense of long term improvements".[277] Finally, the overall process of renegotiation does not appear to meet a reasonable standard of transparency.[278] The final report of the renegotiation process has not been published thus far. Except for the few amended agreements available on the Mining Ministry's website, it seems that contractual parties did not attempt to regulate future demand of adaptation.

D. Remaining issues

The renegotiation process left a lot of unresolved issues, with regard to the reasons that prompted it. These issues cover, among others, the non-renegotiated agreements kept secretly,[279] as well as the appraisal and valuation of mineral assets granted to private companies.[280] Similarly, amended agreements cannot be deemed fully compliant with the Congolese laws with respect to the tender procedures, the granting of tax exemption, submission of feasibility studies and the deadline for the payment of the surface area rent, royalties and others duties. In addition, there is a lot of public concern over new agreements that the Congolese government has concluded since the enactment of the ministerial Decree calling for the review of mining agreements.[281]

---

http://www.cartercenter.org/news/pr/drc_040309.html?printerFriendly=true, accessed March 22, 2012.

[277] *Id.*

[278] *See* the development beneath subsection B 'The process followed by the Congolese government'.

[279] It is worth recalling that the renegotiation of mining contracts involved only 63 agreements. At the time this process started, the CAMI has already issued over 3 000 mining rights, of which no less than 416 were issued to the state-owned enterprises, *see* The World Bank, *supra* note 160, at 41.

[280] Recently, the Great Britain announced that an investigation will be carried out regarding the involvement of British-connected shell companies and London-listed mining groups in opaque deals to acquire prime mining assets in the Democratic Republic of the Congo. *See* S. Goodley & J. Borger, *Mining firms face scrutiny over Congo deals*, The Guardian, (8 May 2012) *available at* http://www.guardian.co.uk/business/2012/may/08/mining-firms-congo-deals, accessed May 20, 2012.

[281] For instance, the infrastructure for minerals deal with Chinese companies – strongly criticized by the IMF for it implied new massive debt.

## V. CONCLUSION

Long-term agreements are concluded on speculative assumptions, which may turn out to be untrue. This justifies a renegotiation clause that allows parties to adjust the original contractual regime when imperfections, cultural differences or unforeseen events occur. Renegotiating an existing agreement is a common future of international business transactions and does not necessarily conflict with the contract's stability. Major systems of law have confronted the issue of non-performance of a contractual obligation. The stability of the contractual terms is important, but a certain degree of flexibility is necessary to allow parties to adjust their relationship in case of imperfections, cultural differences or supervening of unforeseen events.

However, to be effective, the renegotiation mechanism must be regulated so as to not fuel unlimited demand for adaptation resulting in contracts that might ultimately have counterproductive effects on host state attractiveness. If an existing contract does not provide for a renegotiation clause, its adaptation is still possible so long as the applicable law regulates that issue. Nonetheless, the absence of a specific clause regulating third party intervention might hinder the third party in adjusting a contentious agreement on behalf of the parties.

This article revealed that constant suspicions of illegal mining exploitation have prevailed on the Congolese mining sector as a result of ill-enforcement of the applicable regulations, corruption and mismanagement. These suspicions prompted national and international calls for renegotiating mining agreements concluded in DRC. The dominant position is there should be a renegotiation clause inserted into the contract, or applicable law should regulate the issue for any subsequent demand or adaptation to be lawful, falls short of proving valid in this case study where vitiating factors affecting the existing contracts. Both Congolese and investors sides used the renegotiation mechanism for attempting to legitimate the agreements they entered into, although the latter did not provide for renegotiation clause. An examination of the amended agreements that have been disclosed so far reveals many unresolved issues, particularly with regard to the reasons that prompted the renegotiation and regulation of future demands of adaptation.

It is crucial that forthcoming conclusions of the mining agreement include a renegotiation clause and regulate the intervention of third parties. The Congolese government should endeavor to lessen political interference throughout mining contract negotiations. It should also build negotiation skills among its representatives involved in that process. Investors should increase among them awareness of corporate social responsibility standards for preventing illegal exploitation of mining resources which, ultimately, results in triggering unilateral contract adjustment. The remaining issues in connection with the amended agreements should be resolved amicably for this approach is more likely to bring mutual satisfaction to either side.