

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES:DCP/JPM/JPL/GMM
F. #2012R01716

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 30, 2020

**TO BE PARTIALLY FILED UNDER SEAL**

<u>By ECF</u>

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. OZ Africa Management GP, LLC
   Criminal Docket No. 16-515 (NGG)

Dear Judge Garaufis:

   The government respectfully submits this letter in reply to the defendant OZ Africa Management GP, LLC's (together with Och-Ziff Capital Management Group LLC referred to as "Och-Ziff") submission concerning the appropriate calculation of restitution (ECF Dkt. No. 87, "Defendant's Brief" or "Def. Br.") to Claimants in the above-referenced matter. The defendant's argument that "share price loss method is the only fair, straightforward, objective way to calculate" restitution ignores the more reliable frameworks for valuing the Kalukundi mining rights that the government put forth in its opening submission. (Def. Br. at 38). The defendant has not meaningfully disputed that its own prior valuation of the mining rights—$150 million—which the Claimants' expert also recognizes as a low-end valuation for the mining rights at the time of the offense (see ECF Dkt. No. 69-1 at 3 (2019 SRK Addendum or "SRK Add.")), is a reliable estimate of the value of these rights. Having previously used its own $150 million valuation to in furtherance of the very bribery scheme that harmed the Claimants, the defendant cannot now disclaim that valuation simply because it is in the defendant's current financial interest to do so. Alternatively, the use of a discounted cash flow method ("DCF"), based on the present potential for development of the mine, yields a fair valuation of $259 million, of which Africo Resources Ltd. ("Africo") would have had approximately a $151 million stake. The Court should hold the defendant responsible for the payment of restitution based on these fair valuations of the Kalukundi mining rights.

I.        The Defendant's Prior Valuation of $150 Million is Both Reliable and Fair

          The defendant's submission fails to meaningfully challenge the central premise of the government's opening submission: that the defendant's own prior valuation of $150 million is both the best, and fairest, approximation of the value of the mining rights at the time of the offense conduct.

          As further detailed below, the parties' calculations of value today, which have fluctuated over the course of this litigation, provide less certainty than pre-litigation valuations made between 2006 and 2008, which were identified in the government's opening submission. There, the government identified six reports and one investment memorandum that valued the Kalukundi mining rights at between $102 million and $162.9 million. The defendant's own $150 million valuation from its July 2008 Investment Memorandum is squarely within this range of valuations prepared at the time of the offense conduct.[1] (See Government Opening Submission dated November 22, 2019 (ECF Dkt. No. 68 ("November Submission" or "Nov. Submission"), at Ex. 7).

          Although the defendant now seeks to distance itself from its own prior valuation, the defendant's reasoning is particularly unpersuasive in light of the fact that using its own figures would result in a larger restitution award. As an initial matter, the defendant claims the government somehow "misread" a section of its investment memorandum entitled "Valuation" that plainly provides valuations for multiple mining projects in the Democratic Republic of Congo ("DRC"). The "Valuation" section of the memorandum described both the model used by Och-Ziff—RSG Global's 2006 Feasibility Study—and what adjustments Och-Ziff made to that Feasibility Study, including "increasing the US$ denominated capital and cash cost by 20% and 10% respectively, in order to reflect industry wide cost pressures." (Id., Ex. 7, at 8).[2] The defendant nonetheless points to irrelevant language concerning rates of return on investments and the memorandum's statement that a $150 million valuation would not justify a stand-alone investment in Africo. But the question before the Court is not whether an investment in Africo was an attractive, stand-alone investment to Och-Ziff in

---

          [1] Indeed, Dr. Neal Rigby, the Claimants' expert, notes in his recent addendum: "[I]t remains our view that the value of Africo's 75% stake in the Kalukundi mining rights as of 2008 was between **US$150** - US$258 million." (SRK Add. at 3 (emphasis added)).

          [2] The claim that the government "misread" the memorandum is further belied by a complete review of the "Valuation" section. In that section, Kalukundi was the first of several mining projects that the defendant valued. After Kalukundi, the investment memorandum addressed an adjacent property called "PE 2607." The memorandum states that Och-Ziff evaluated "PE 2607 . . . for all intents and purposes" as "identical to Africo's stake in Kalukundi from a geology, capex, opex, and production point of view." Consistent with that conclusion, the memorandum gave an equal $150 million valuation to PE 2607.

2008 at a value of $150 million. The question is the value of those mining rights, to which the July 2008 Investment Memorandum provides a crystal-clear answer: $150 million.

The defendant fails to show why using its own prior valuation is imprudent or unfair. Three Och-Ziff employees who specialized in private investments prepared the July 2008 Investment Memorandum. They prepared the valuation understanding the consequences of their work—that their determination would affect the terms of Och Ziff's partnership with DRC Partner, the future economic division of sales of Kalukundi and the reporting of Och-Ziff's asset valuations to auditors. This valuation was done before the present litigation and during the time period of the offense conduct.

The defendant offers a further distraction by claiming that Africo had internally valued its interest in the Kalukundi mine at $1 million. In support, the defendant produced a blank email that an Och-Ziff employee apparently sent after the operative events in April 2009, which appended various attachments, only one of which the defendant provided to the Court, the government and the Claimants. (See Def. Br. at Curtin Decl. Ex. 48). This undated spreadsheet, which was provided without any context of its authorship, purpose, or inputs, does not undermine the seven valuations prepared during the relevant time period by various mining consultants and investment companies, most of whom have nothing to do with this litigation.

It is also important to consider that Och-Ziff's July 2008 Investment Memorandum – which valued Africo's purported share of the Kalukundi mining rights at $150 million – enabled Och-Ziff to accomplish some of its goals in this bribery scheme, which harmed the Claimants. The government submits it is fair that Och-Ziff be held to that valuation today.

II.    The DCF Model Provides a Fair, Present-Day Valuation

Notwithstanding the clarity and propriety of using the defendant's own 2008 valuation to determine restitution, the government respectfully submits that the DCF valuation is a reasonable alternate method to approximate the potential value of the Kalukundi mining rights at the time of sentencing. In its November submission, the government noted that, although the DCF valuation is inherently limited, the DCF value reached by the government was consistent with the value of the Kalukundi mining rights. (Nov. Submission at 8, 11). Since filing that submission, the government, along with its own independent consultant, Stout Risius Ross, LLC ("Stout"), has further refined its DCF analysis based on information it obtained from both the defendant and the Claimants. The revised DCF analysis reveals that the total value of the Kalukundi mining rights is $259 million, while Africo's apparent share of those mining rights is approximately $151 million.

A.    DCF is a Reasonable and Proper Way to Value Africo's Mining Rights

The defendant's outcome-driven argument that a DCF valuation, which Stout confirms is both reasonable and widely utilized in both the investment and acquisition community, is not a sound methodology pursuant to the MVRA, should be rejected. Courts

have repeatedly recognized that "the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method." Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004) (citing Frymire–Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir. 1993) (referring to the DCF method as "the methodology that experts in valuation find essential").

The defendant's case law citations demonstrate that there is no legal basis for its argument. In United States v. 400 Acres of Land, No. 15-CV-01743, 2019 WL 4120802, at *1 (D. Nev. Aug. 29, 2019), an inapposite eminent domain case from Nevada, (see Def. Br. at 24), a district court declined to use an income approach as too speculative where the proposed income was potential tourism from visitors to Area 51. Id. at *9. The district court's rejection was premised on the fact that the land at issue had never been used for the purpose being posited as a source of future income. See id. at *6-7. In the context of a mining project, there is but one feasible use to extract value—to dig into the ground and extract minerals. The existence of numerous prior valuations using a DCF approach that appraise the value of doing such extractions, including the Kalongwe mine (see supra Section I), makes plain that the DCF approach is routinely viewed as reliable in this context.

Furthermore, contrary to the defendant's assertion, in instances like this one, international tribunals have applied the same analysis. For example, in Gold Reserve Inc. v. Bolivarian Republic of Venezuela, ICSID Case No. ARB(AF)/09/1, Award (Sept. 24, 2014), the tribunal applied a DCF analysis to determine the fair market value of a mine in Venezuela that had not been developed, but for which feasibility studies had been completed. (Id. at ¶¶ 13-28). The Tribunal noted that although the relevant project "was never a functioning mine and therefore did not have a history of cashflow which would lend itself to the DCF model," it accepted the experts' representation "that a DCF method can be reliably used in the instant case because of the commodity nature of the product [gold] and detailed mining cash flow analysis previously performed." (Id. at ¶ 830). The Tribunal applied a DCF analysis to determine the value of the mine even though competing experts differed greatly on virtually every input, including both mining and financial inputs. (Id. at ¶¶ 691-92).

B.     Revised DCF Demonstrates a Reasonable Valuation of $259 million with Africo's Share Valued at $151.5 million

In the November Submission, the government, with the assistance of Stout, calculated a total value of the mining rights of $188.7 million.[3] See Nov. Submission at 11. Since that time, the government and Stout have obtained and reviewed new information from

---

[3] Upon refining its analysis for this submission, the government noticed that the valuation in the November Submission included an extra discount period, which resulted in an understatement of the value. The removal of the extra discount period resulted in an increase of the value to $207.4 million. Nevertheless, for the reasons discussed below, the valuation in the current submission is based upon updated data and replaces the November 2019 valuation.

both the Claimants and the defendant that has facilitated the calculation of an updated DCF valuation of the Kalukundi mining rights. That valuation is **$259.0 million** for the Kalukundi mining rights. Notably, however, as discussed below, the actual value of the Kalukundi mining rights owned by Africo is lower in order to account for the allocation of cash flows from the mine to Africo. The value of Africo's share of the mining rights is **$151.5 million**.

Set forth below is a summary of the changes to the inputs underlying the government's DCF analysis that accounts for the revised valuation.

1.     <u>Revised Mining Data and Commodity Prices</u>

In the November Submission, the government utilized a model created by Dr. Rigby and his team at SRK in 2017. (<u>See</u> Nov. Submission at 2). Dr. Rigby and SRK created an updated model, as of November 2019, which contained updated commodity pricing, cost assumptions, pit optimization and mining schedules. Because of that, certain inputs and assumptions have changed in the model. These changes have impacted both the cost of production and projected revenues, including the amount of mined copper and cobalt and the commodity prices in the 2017 model previously relied on by the government. Claimants have provided SRK's revised model to the government, and the government is relying on Dr. Rigby and SRK's expertise in the technical mining aspects of the mine, including pit optimization, mining schedules, processing volume and operating costs.[4]

The government is also relying on SRK's November 2019 model utilizing the long-term real consensus pricing as of September 2019 and the corresponding pit optimization and mining schedule as the basis for its analysis.

Regarding the commodity pricing, the November Submission utilized CapitalIQ consensus pricing for copper and cobalt, which was "nominal" pricing (<u>i.e.</u>, it was adjusted for inflation). In its current model, the government and Stout utilized SRK's consensus pricing from Consensus Economics, to maintain consistency with other factors utilized by SRK, and because such pricing is more conservative than, and a reasonable alternative to, the pricing used by the government in November 2019, resulting in a slight decrease to the valuation.

2.     <u>Discount Rate</u>

As set forth in the November Submission, the government used a discount rate of 20.5% provided by Stout based on its build-up method. (<u>See</u> Nov. Submission at 8-9). In its current valuation, Stout has refined its inputs and arrived at a revised applicable discount rate of **19.6%**. The difference, of less than 1%, is due to three factors: (i) the adoption of an international index for market risk; (ii) the adoption of a risk premium for Micro Cap

---

[4] Stout are valuation experts and do not have independent expertise in the operation or technical aspects of mines. Accordingly, the government does not address the technical dispute between Dr. Rigby and the defendant's retained expert.

companies, and; (iii) adjustment to a "real" discount rate to account for application of SRK's "real" commodity and pricing inputs.

The government submits that the discount rate advanced by the Claimants is too low and inconsistent with sound valuation of an asset in the present-day DRC. The government's build-up methodology accounts for several essential factors, such as interest rate risk, market equity risk premiums, small stock premiums, country-specific risk, company-specific risk, the capital structure of the entity, and tax effects, among others. And while comparing and evaluating discount rates applied to other similar mining projects may have some illustrative appeal, it is not the proper or optimal method to calculate a discount rate.

Claimants' reliance on the discount rates at other mines, particularly the Kalongwe mine, further supports the discount rate advanced by Stout and the government. For the Kalongwe mine, which is a copper and cobalt mine located near Kalukundi, the 12% discount rate used for the project differs in several ways. First, Kalongwe had a recent feasibility study conducted and the valuation was predicated on the proven and probable reserves, which have the highest geologic certainty and highest economic viability, contained in that feasibility study. To the contrary, SRK's 2019 valuation model is predicated on a 2013 AMEC Report that solely estimates the indicated and inferred resources, which have lower geologic certainty and lower economic viability, and specifically excludes any estimate of the mineral reserves. (See 2013 AMEC Report at 1-22 and 15-1). Thus, SRK has increased the potential available economically viable mineral ore without a supporting feasibility study, which weighs in favor of a higher discount rate. Second, the valuation of the Kalongwe project considered a Stage Two expansion plan, which did not have an estimate of reserves. As a result, the independent expert conducting the valuation of the Kalongwe mine concluded that the expansion plan did not increase the total net present value of the cash flows at all. In other words, the valuation of Kalongwe did not place any value on resources a potential Stage Two expansion, which did not have a supportable estimate of reserves. Although the government adopts SRK's mining statistics and relies on Dr. Rigby's expertise in that regard, the government's higher discount rate appropriately accounts for the understandable uncertainty in translating the basis of SRK's valuation model, inferred resources identified in the 2013 AMEC Report, into proven and probable reserves, as well as considers that the value of a comparable mine was unaffected by resources that were only subject to a preliminary economic analysis.[5]

---

[5] Notably, the value ascribed to the Kalongwe mine, which is of similar size (based on proven and probable reserves) to the Kalukundi mine, is $91 million. Claimants will likely argue that Kalukundi is a larger mine, but the difference in size is primarily related to unproven resources, which are highly uncertain and assumed to be valueless.

3.    Government Royalties and Taxes

The government's DCF analysis was refined following the November Submission with regard to both the method in which government royalties were calculated and how taxes were applied.

a.    Government Royalties

In the November Submission, the government applied a 3.5% and 10% royalty rate to revenues earned from recovered copper and cobalt ore, respectively. In calculating the base to which the royalty percentage was applied, the government utilized a methodology in which the base for the royalty was determined using revenues, minus all direct costs and the royalty due to Gécamines, the DRC state-owned mining company. This methodology was ultimately utilized by the defendant in its DCF. In its current DCF model, the government has calculated the royalty slightly differently. The model still applies a 3.5% and 10% royalty rate to copper and cobalt, respectively. However, in calculating the base to which the royalty rate was applied, the government adopted the methodology used by SRK, which was revenues, minus transport and marketing costs. This resulted in an increased government royalty cost and lower value.

b.    Taxes

One important change between the November Submission and the government's current valuation is the application of the "Super Profit Tax," which is a provision in the DRC mining code creating a special tax on excess profits, as determined when the prices of materials or commodities increases exceptionally, above 25% compared to those included in the bankable feasibility study of the project. (Nov. Submission at 8). In the November Submission, the government incorporated the "Super Profit Tax" by calculating a 50% tax rate, with the Super Profit Tax as an additional 20% tax above and beyond the corporate tax rate of 30% on profits generated from revenues resulting from commodity prices greater than 25% of the commodity prices in the 2006 feasibility study.

In the current model, the government does not incorporate the Super Profit Tax into its valuation. Based upon a translation of the DRC mining code provided by the parties, reasonable valuation principles do not merit in favor of applying the Super Profit Tax for the following reasons. In 2021, the owner of the Kalukundi mine will be required to renew the mining license for the property, a fact the parties do not appear to dispute. That license renewal will require a new feasibility study, both by the terms of the license renewal and in order to obtain debt financing if the owner was to move forward with the development of the mine. The new feasibility study would reset the baseline for the commodity pricing from which the Super Profit Tax is assessed and effectively eliminate the application of the Super Profit Tax. The nearness of the updated feasibility study to the launch of the development of the mine greatly reduces the likelihood of a 25% increase in commodity prices, which would eliminate the application of the Super Profit Tax. As a result, the

government believes that a reasonable valuation must account for the new feasibility study and its effect on the Super Profit Tax.[6]

### 4. Amount of Initial Capital

An additional input in the government's model that has changed is the amount of initial capital required to develop the mine, and the effect it will have on the project's cash flows going forward. In the November Submission, the government determined that the initial capital required would be $387.1 million. In the current model, the government uses a slightly smaller initial capital cost of $350.6 million, which it believes is more accurate since it is based on an actual cost estimate of a 1.25 million tonne per year production facility. The net effect of this change is minimal on the overall valuation of the mine.

### C. Africo's Portion of the Revised DCF Valuation Demonstrates a Value of $151 Million

As discussed above, the revised inputs lead to a valuation of $259 million for the Kalukundi mining rights. However, that value is not equivalent to Africo's share of the Kalukundi mining rights, which is the most relevant for restitution.[7] That figure, as set forth below, is approximately $151.5 million.

It is important to note that, despite that the fact that there is a 75% / 25% ownership split between Africo and Gécamines, the cash flows are not simply divided on that basis. Pursuant to the agreement between Africo and Gécamines, Africo is responsible for raising all funds for the development of the mine. (ECF Dkt. No. 88-1 at 53 n.194: (Expert Report of Quadrant Economics prepared by Dr. Daniel Flores). The government has assumed that the funding would take place at the present time at an interest rate of 5%, which likely reflects a blended rate of non-interest-bearing partner advances and market rates for commercial debt from third-party lender(s). The interest on that financing would be borne by Swanmines and reduce the operating cash flow of the mine by approximately $43 million of interest expense. The government's model assumes 60% of the after-tax cash flow of the mine would be allocated to pay Africo for outstanding principal on the financing until it is fully repaid, which the government anticipates will occur in 2026. The remaining after-tax cash flow would be split between Africo (70%) and Gécamines (30%). The 70/30 ratio would replace the current 75/25 ratio based on Africo's required divestiture of 5% of its

---

[6] The risk of any minimal uncertainty in the possible application of a Super Profit Tax in the future is captured in the government's discount rate, which generally accounts for the higher risk associated with developing a commodity-based product in a high-risk jurisdiction.

[7] The government's analysis does not yet attempt to ascribe the restitution amount for individual claimants. No one, not the Claimants nor the government, has taken the position that an individualized loss calculation is unnecessary. Rather, that individualized loss number can be calculated if and when the Court decides the appropriate loss methodology and loss amount.

ownership interest as a condition of the license renewal in 2021.  Application of this cash flow allocation means that the value of Africo's share of the Kalukundi mine is $151.5 million.

### D. DCF Conclusion

As it did in the November Submission, the government has undertaken a sensitivity analysis to provide the Court with the resulting value based on different inputs. The sensitivity analysis demonstrates how the valuation changes based on potential adjustments to the inputs.  The below sensitivity analysis is based on two inputs: the discount rate and the commodity pricing.  The sensitivity analysis includes three different discount rates: (i) the rate the government anticipates the Claimants will assert is appropriate (12%); (ii) the rate the government calculated (19.6%); and (iii) the rate advanced by the defendant (24.0%).  Moreover, the different commodity prices are the spot prices utilized by Dr. Rigby and the consensus pricing in real terms, also used by Dr. Rigby.  As shown in the table below, the value of the mine and Africo's share of the mine changes significantly based on these two inputs alone.  Notably, applying the 12% discount rate the Claimants argue is appropriate leads to a value of Africo's shares of the mining rights of $358 million.

| Value of Kalukundi Mine and Africo's Share | | | | |
|---|---|---|---|---|
| *(US $000s)* | | | | |
| | | Spot Price | | Long-Term Real Consensus Price |
| Copper | | $2.63 | | $2.93 |
| Cobalt | | $16.10 | | $20.56 |
| | Total Mine Value | Africo's Share | Total Mine Value | Africo's Share |
| **Discount Rate** | | | | |
| 12.0% | $ 361,079 | $ 229,086 | $ 543,504 | $ 358,472 |
| 19.6% | $ 156,112 | $ 77,391 | $ 259,040 | $ 151,450 |
| 24.0% | $ 84,103 | $ 23,674 | $ 162,128 | $ 80,360 |

## III. The Defendant's Reliance on Share Price to Value Mining Rights is Misplaced

The defendant appears to assert that the Court is <u>required</u> to perform a share price analysis to calculate restitution in this case and, therefore, is foreclosed from even considering a DCF analysis to value the stolen Kalukundi mining rights.  In support of this argument, the defendant cites four cases as purported "well-settled and controlling authority."  (Def. Br. at 18).  However, none of the cases cited by the defendant restrict the Court's broad discretion in "determining the measure of value appropriate to restitution calculation in a given case."  <u>United States v. Boccagna</u>, 450 F.3d 107, 117 (2d Cir. 2006).  Moreover, each of the cases cited by the defendant for the bold proposition that the Court is

required to perform share price analysis involved dramatically different sets of facts than the facts of this case.[8]

Indeed, this case presents a complex and unique set of facts and circumstances, not likely to be repeated elsewhere: where damage was indirectly caused to shareholders of a public company that had no operating revenue and owned a single material asset, by virtue of the theft of that asset.[9] While the government has acknowledged that applying a share price analysis in this case is within the Court's discretion, the government respectfully submits that the Court is not bound to do so. See United States v. Gushlak, 728 F.3d 184, 196 (2d Cir. 2013) (the calculation of restitution under the MVRA need not be perfect, rather, "the MVRA requires only a reasonable approximation of losses supported by a sound methodology"). Where the defendant itself, a highly sophisticated multi-national hedge fund, had already ascribed a value to the stolen Kalukundi mining rights at the time of the offense through "sound methodology," and that value is consistent with two separate DCF valuations, such valuation must not be ignored.

IV.    The Court Should Order the Defendant to Pay the Full Restitution Amount

The defendant does not dispute that the Court must award restitution for the entirety of the Claimants' losses under 18 U.S.C. § 3664(f)(1) of the MVRA. The government respectfully submits that the Court should not apportion any liability to the individual who pleaded guilty because, as noted in the government's opening submission,

---

[8] United States v. Gushlak, 2012 WL 1379627, at *1 (E.D.N.Y. Apr. 20, 2012), was a securities fraud case that involved a "pump and dump" scheme where the defendant bribed brokers to aggressively promote a stock allowing the defendant to sell his stake in the company at an artificially inflated price, which, in turn, caused the company's stock to fall; United States v. Hatfield, 2014 WL 7271616, at *1 (E.D.N.Y. Dec. 18, 2014), involved three corporate executives who engaged in numerous schemes within their own company including insider trading, undisclosed self-dealing, overstating the value of the company's inventory and profit margins, and misappropriating company assets for unauthorized personal use and compensation; United States v. Schwamborn, 2012 WL 6050561, at *3 (E.D.N.Y. Dec. 3, 2012), another securities fraud case, involved the fraudulent inflation of the stock of a company that was inherently worthless because it "produced nothing, earned nothing, and had no assets"; United States v. Stein, 846 F.3d 1135, 1140-42 (11th Cir. 2017), involved a number of fraudulent schemes by a corporate lawyer who, among other things, fabricated press releases and bogus purchase orders to inflate the stock price of his client, which misinformation was incorporated into the corporate client's public filings and an internal audit.

[9] Due to the highly unique nature of the harm caused and the victims in this case, the defendant's attempt to analogize the shareholders of Goldman Sachs to the victim shareholders of Africo is misplaced. (ECF Dkt. No. 87, at 13).

based on the government's current information, that individual is unlikely to meaningfully contribute to the restitution award.







VII.    Conclusion

For the reasons detailed above, the Court should use the defendant's own valuation of $150 million for Africo's Kalukundi mining rights, which was determined at the time of the offense conduct and prior to this litigation, as it is the best and fairest method for valuing those rights. Alternatively, the Court can utilize a discounted cash flow method as a fair, but less definite, method of valuation. Doing so would yield approximately the same value for the rights, as the total DCF valuation for the mine would be $259 million, of which Africo would have had approximately a $151 million stake.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    _____/s/_____
David C. Pitluck
Jonathan P. Lax
James P. McDonald
Assistant U.S. Attorneys
(718) 254-7000


ROBERT ZINK
Chief, Fraud Section
U.S. Dept. of Justice, Criminal Division

By:    _____/s/_____
Gerald M. Moody
Trial Attorney
(202) 616-4988

cc:    Clerk of the Court (NGG) (by ECF)
       All Counsel of Record (by ECF)