

1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022

PHONE 212.999.5800
FAX 212.999.5899
**www.wsgr.com**

April 30, 2020

**PARTIALLY FILED UNDER SEAL**

<u>**VIA CM/ECF**</u>

The Honorable Nicholas G. Garaufis
Senior United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

 Re:  <u>*United States v. OZ Africa Management GP, LLC*</u>, No. 1:16-cr-00515-NGG

Dear Judge Garaufis:

 Pursuant to the Court's August 29, 2019 Memorandum and Order (ECF No. 51 at 20), the Victims respectfully submit this letter reply regarding the appropriate calculation of restitution.

**<u>INTRODUCTION</u>**

 This reply submission is respectfully submitted on behalf of victims ("Victims") of the crime committed by defendant OZ Africa Management GP, LLC ("Defendant"), along with its parent company, Och Ziff Capital Management Group LLC ("Och Ziff").

 As set forth below, three litigants in this matter – the Victims, the Government and Defendant – have presented the Court with two dramatically different accounts of the value of the Victims' Kalukundi mining rights stolen over a decade ago by Defendant, Och Ziff, and their co-conspirators.  On the one hand, the Government and the Victims are in complete agreement that the valuation conducted by Och Ziff itself in 2008, which used, by its own admission, "conservative" mineral pricing and a "high" discount rate, sets forth a minimum value of the Victims' mining rights at or around the time of the loss of those rights of at least $150 million. As the Government described in its opening submission of November 22, 2019, "[t]he defendant should not be entitled to disown or explain away its prior valuation – which it conducted <u>outside</u> the litigation context and around the time of its criminal activity – simply because it is in defendant's financial interest to do so today."  Government Letter Brief, dated November 22, 2019, Dkt. No. 68 ("Govt Submission") at 2 (emphasis in original).  The Victims agree.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 2

Similarly, the Government and the Victims agree that the proper methodology to determine the value of those mining rights as of today is to conduct a discounted cash flow analysis ("DCF") and not a share price analysis. That DCF analysis yields a "time of sentence" value for the mining rights well in excess of the "time of loss" value for the simple reasons that the consensus prices of copper and cobalt have nearly doubled from the conservative pricing used in Och Ziff's 2008 valuation, and the volume of the minerals present at the Kalukundi mine is now known to be more than twice the volume known in 2008.

While the Government's DCF analysis presented to the Court on November 22, 2019 contained certain errors – which we understand are now acknowledged by the Government – and while the Government and the Victims disagree over the proper discount rate to use in the DCF, the DCF approach presented by the Victims and the Government is otherwise comparable. Using a discount rate of 12% and correcting the errors in the Government's analysis results in very similar values determined by both the Government and the Victims for Africo's interest in the Kalukundi mining rights:

Government corrected valuation:     $415.4 million.

Victim valuation:                   $421.8 million.

Finally, the Government and the Victims agree that there is not the sort of "complexity" in this matter that would prevent an order of restitution from being entered, and that Defendant should be held responsible for the entire loss to the Victims without apportionment.

Then there is the account presented by Defendant. According to Defendant, it should not be held to the DCF valuation Och Ziff performed itself in 2008 because that valuation was performed simply to assess whether Och Ziff would make a loan in connection with the Kalukundi mining rights at that time. But Defendant's account is false. As detailed in both the facts stipulated to by Defendant, and as set forth in the Settlement Agreement with the SEC, Och Ziff structured its investment as a convertible loan precisely to conceal its criminal nature. Moreover, whether the 2008 Och Ziff valuation was performed in furtherance of its crime or in furtherance of a legitimate financial transaction, the fact remains that Och Ziff performed its own valuation of the Kalukundi mining rights in 2008, "outside the litigation context," and in exactly the same way that the Government and the Victims are now advocating – a DCF analysis – and Och Ziff "should not be entitled to disown or explain away" that valuation. Govt Submission at 2.

As for the value of those mining rights today, Defendant presents a completely disingenuous DCF analysis of its own. According to Defendant's analysis, the Kalukundi

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 3

mining rights are worth nothing; actually, they are worth less than nothing. Echoing the insulting contention advanced by counsel to Defendant at a prior appearance before this Court, Defendant essentially argues that the Kalukundi mining rights are so worthless that Defendant did a favor to the Victims by stealing their mining rights and that the Victims should be thanking the Defendant for having done so. Defendant also presents the Court with an alternative and equally insincere valuation approach – a share price analysis – pursuant to which it concludes that the value of the Victims' mining rights is but a fraction of the amount Och Ziff invested and paid in bribes when it undertook to commit a felony and steal mining rights located on the other side of the planet. Needless to say, neither of the valuation presentations submitted by Defendant are remotely reasonable, and neither should be credited by the Court.

Defendant also argues that it should not be responsible for the full amount of the Victims' losses because some unidentified individual has pleaded guilty to being part of Defendant's conspiracy and part of the restitution should be allocated to him. But the Government has made clear that this unidentified individual cannot make any meaningful contribution to restitution, and the law makes clear that Defendant should be held accountable for the full amount of restitution.

Lastly, in obvious recognition that its so-called "valuations" and its apportionment arguments are not remotely credible, Defendant advances arguments why it should be relieved of restitution altogether: ██████████████████ that determining a reasonable restitution amount is too complex, that those individuals responsible for its crimes have been fired, and that it has suffered enough by having to change its corporate name. Each of these arguments is devoid of any legal support whatsoever – indeed, Defendant does not cite even a single case supporting most of these arguments – and they should be rejected.

In the end, this multi-billion-dollar hedge fund, led by individuals making tens and sometimes hundreds of millions of dollars a year, decided, in its arrogance, that it could steal a copper/cobalt mine in the Democratic Republic of the Congo by bribing judges and other public officials, and that no one would ever catch it. But Defendant was caught, and it is well beyond time that it be required to pay full restitution to its Victims.

In this reply submission, Victims first address the opening submission made by the Government, with the assistance of its financial advisor Stout Risius Ross, LLC ("Stout"). In that section of this reply, the Victims address the few ways in which their submission differs from the Government/Stout submission – identifying certain admitted errors by Stout, and a disagreement over the applicable discount rate to be used. In the second part of this reply, the Victims address the absurd valuations advanced by Defendant as well as the myriad excuses Defendant advances by which it seeks to avoid its restitution obligations.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 4

## I.   THE GOVERNMENT AND THE VICTIMS HAVE ARRIVED AT REASONABLY SIMILAR VALUES FOR RESTITUTION BOTH AS OF THE TIME OF LOSS AND THE TIME OF SENTENCING

### A.   The Value of Africo's Mining Rights in 2008 – The Time of Loss

As the Court is aware, the relevant time periods for valuation under the MVRA are the time of "loss" and time of "sentencing[.]"  18 U.S.C. § 3663A(b).

The Victims' expert, Dr. Neal Rigby of SRK Consulting (U.S.), Inc. (hereinafter "SRK"), has opined that Africo's interest in the Kalukundi mining rights as of 2008, the time of loss, was worth between $150 million and $258 million.  *See* Dkt. No. 69-1 (under seal), SRK November 22, 2019 Addendum ("SRK Addendum") at 2-3.  The Government reached a similar conclusion:

> Och-Ziff's 2008 valuation of **at least $150 million** is the best approximation of the value of the mining rights affected by the offense conduct.  Not only did Och-Ziff have many of the prior valuations available at the time when it conducted its own analysis, but it had also assumed control of Kalukundi, which gave Och-Ziff and its partners direct access to the resource.  No party was better positioned to value the project than the defendant.  Moreover, it is only fair that the defendant, whose conduct harmed the victims in this case, should be held to their own prior valuation of the very property they stole from the victims.

> Principles of fairness and common sense dictate that the defendant – which harmed the victims in this case – should be held to its own valuation of the stolen mining rights, especially as that valuation was, as detailed herein, in line with other estimates prepared at the time and outside of the present litigation context.

Govt Submission at 2, 3 (emphasis added).

The Victims adhere to the "time of loss" calculation submitted by SRK.  But as discussed below, as the "time of sentence" amount is greater, the Victims respectfully submit that SRK's "time of sentence" valuation should control.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 5

**B.     The Value of Africa's Mining Rights at Present – The Time of Sentencing**

Both the Government's and Victims' experts have determined that the use of a DCF analysis is the appropriate methodology for valuing the Victims' mining rights today.  Govt Submission at 5; SRK Addendum at 3.[1]  Both the Government's and Victims' experts use the 2006 feasibility study and the 2013 AMEC Resource Update as the basis of their models.  SRK Addendum at 5; Govt Submission at 7 ("[T]he government adopted the DCF model as created by Dr. Rigby and verified the accuracy of the formulas and financial modeling contained therein while assessing and adjusting the five relevant inputs described previously.").  Both the Government's and Victims' experts replicate the Defendant's 2008 DCF model by applying a 30% discount rate to the model's first year and a lower discount rate for the following years.  SRK Addendum at 4; Govt Submission at 5.  In short, the Government's and Victims' experts agree on the methodology and approach for conducting a current valuation of the Kalukundi mining rights.

In reviewing Stout's work, SRK did discover certain errors in the inputs to Stout's valuation that improperly and significantly reduced the Stout valuation:

- *First*, Stout inadvertently applied an extra year to its discounting model.  This error improperly reduced the Stout valuation by $19.2 million.  SKR Consulting Reply Report, dated April 20, 2020 ("SRK Reply") at ¶ 19 attached as Exhibit 1.  The Government and Stout have acknowledged this error and we understand that it is being corrected in the Government's reply submission.

- *Second*, Stout improperly applied the DRC Super Profit Tax ("SPT").  As discussed by SRK in its reply report, there is no basis to reduce the value of the Kalukundi mining rights based on the application of the SPT.  SRK shared its views on the SPT with the Government and Stout, and we understand that the Government and Stout now agree that the SPT should not be factored into a valuation of the Kalukundi mining rights, and that this is being corrected in the Government's reply submission.  By having incorrectly assumed that the SPT would apply, Stout, in its original submission, improperly reduced the value of the Kalukundi mining rights by an additional $97.3 million.  *Id*. at ¶ 23.

---

[1] As discussed below, in the response to Defendant's submissions, DCF valuation is the preferred methodology for properties like Kalukundi in the mining industry.  *See infra* at pp. 37-39.

WILSON
SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 6

- *Third*, Stout's selection of a 20.5% discount rate, as purportedly "consistent with discount rates applied to other mines in similar locations," Govt Submission at 9, is completely unfounded. As described by SRK in its report, a 12% discount rate should be used as such a discount rate: (i) is conservative (SRK Addendum at 4 n.5), (ii) is the very discount rate Och Ziff itself selected for its own valuation, which Och Ziff recognized as being "high" (Govt Submission, Ex. 7 at 9), and (iii) is consistent with the discount rates applied to comparable mines in the DRC.

Once these three corrections are made to Stout's analysis, as discussed more fully below, the valuation of Africo's interest in the Kalukundi mining rights at the "time of sentence" by the experts for the Victims and the Government are not materially different:

Government corrected valuation:     $415.4 million.

Victim valuation:                   $421.8 million.[2]

    1.    *Stout's Inadvertent Error in its Discount Rate*

As noted in SRK's opening submission, SRK mirrored the approach employed in Och Ziff's 2008 DCF Valuation and applied a 30% discount rate for the first year of the mine life to account for various contingencies. Govt Submission, Ex. 7 (the "2008 Och Ziff Valuation Memo") at 9. Stout attempted to undertake the same approach. SRK's review of Stout's model, however, indicated that Stout had inadvertently added an extra year to its model, which had the impact of artificially reducing the DCF calculation. Counsel to the Victims, at the request of SRK, raised this error with the Government, and Stout confirmed the error and indicated that it would be corrected in the Government's reply submission. Stout's error in this regard improperly reduces Stout's net present value for Africo's interest by $19.2 million, from $207.9 million to $188.7 million. SRK Reply at ¶¶ 17-20.[3]

---

[2] SRK Reply at ¶ 70.

[3] This improper reduction was actually $34.4 million for Africo's interest, but SRK also noted that the Stout model did not discount the Terminal Value in accordance with its own discount factor. Once this additional correction is made, the net impact of the Stout model error is $19.2 million. SRK Reply at ¶ 19 n.10.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 7

>  2. *Stout's Incorrect Application of the SPT*

Stout further reduced its valuation of the Kalukundi mining rights based upon the erroneous application of the DRC's Super Profit Tax, enacted in 2018.[4]  On March 9, 2018, the DRC enacted legislation imposing a 50% "Super Profit Tax" (the "SPT"), which is applied to that portion of a mine's income which exceeds 125% of the EBITDA stated in the mine's feasibility study, in circumstances where commodity prices are also 25% above the levels included in the project's feasibility study.  As noted by SRK, the intention of the SPT was to increase the mining sector's contribution to state revenue during periods of high commodity prices.  SRK Reply at ¶ 22 n.12.  As a result, super profits taxes are typically applied for relatively short periods to excess profits during periods of extreme price movements, but rarely are applied for prolonged periods due to risks in deterring expansion of the local mining sector.  *Id*.

Stout's original position was that the SPT would apply because the existing feasibility study for Kalukundi is from 2006 and thus uses 2006 metal prices, which are substantially lower than current consensus metals prices.  But Stout's view failed to account for certain express provisions of the DRC mining code, which require Kalukundi to update its feasibility study, and which would exempt Kalukundi from the SPT.  *See* SRK Reply at ¶¶ 24-30.

*First*, Stout overlooked that the Kalukundi mining rights have two fifteen-year renewal periods, and that the first renewal is in 2021.  Article 80(b) of the DRC Mining Code requires that in connection with license renewal, the licensee must "present[] a new feasibility study that demonstrates the existence of exploitable reserves."  *See* SRK Reply at ¶ 25 & Exhibit SRK-01.  Additionally, Article 530 of the DRC Mining Code provides that it is the updated feasibility study that would then be used for purposes of determining if any the SPT is owed, not the prior feasibility study.  Specifically, Article 530 states, "in the event that the feasibility study is submitted . . . as part of the renewal of a mining license . . . the data relating to the price of raw or other materials and the EBITDA ***must*** be updated.  This modified feasibility study ***must include*** forecasts for the project's EBITDA for each accounting year for each project.  A copy of this feasibility study must be provided to the Tax Authority within sixty (60) days of the approval of this feasibility study, and it ***will be used*** to calculate the base of the special tax on excess profits."  SRK Reply at ¶ 26 & Exhibit SRK-02 (emphasis added).  Accordingly, as an updated feasibility study would include current pricing, unless there was then a dramatic increase in copper and cobalt pricing beyond those prices – which no expert has assumed for purposes of valuing the Kalukundi mining rights – the SPT would have no application.

---

[4] Given its recent enactment, SRK and Stout agree that the SPT is only relevant to the value of the Kalukundi mining rights at the time of sentencing, not the value at the time of loss.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 8

*Second*, even if an updated feasibility study was not required in connection with license renewal, the SPT still would not apply.  Article 530 of the DRC Mining Code further requires that a licensee submit a feasibility study to the DRC Tax Authority prior to the start of production.  SRK Reply at ¶ 28.  This section does not require that a licensee submit its first feasibility study.  *Id*.  As the Kalukundi property is not yet in operation, the license holder has the ability to submit an updated feasibility study, and thereby avoid any impact of the SPT based on the mineral pricing contained in the 2006 feasibility study.  *Id*.  SRK has confirmed this application of Article 530 through the analysis of other DRC mining properties.[5]  *Id*. at ¶ 29.  Thus, it was clear to SRK that there should be no impact on the valuation of the Kalukundi mining rights due to the SPT, and that Stout's reduction in value based on the SPT was in error.

As it was clear that Stout's inclusion of the SPT as an input in its DCF model was erroneous, we contacted the Government and offered to have SRK meet with the Government and Stout to explain the reasons the SPT would not apply here.  That meeting was convened, and the materials collected by SRK were presented to the Government and Stout by SRK.  As a result of that meeting and the DRC mining code sections discussed above, the Government and Stout concluded that their original submission to the Court was in error and that the SPT should not apply to any valuation of the Kalukundi mining rights.

The impact of the incorrect application of the SPT on Stout's "time of sentence" valuation was to improperly reduce the value of Africo's interest in the Kalukundi mining rights by $97.3 million.  SRK Reply at ¶¶ 23, 33.  The Government/Stout "time of sentence" valuation should thus be increased from $207.9 million to $305.2 million.  *Id*. at ¶ 34.  We understand that the Government and Stout will be making this correction to their reply submission.

### 3.    *Stout's Improper Selection of a 20.5% Discount Rate*

The final, and as we now understand, *only* remaining area of material disagreement between Stout and SRK relates to the applicable discount rate for the Kalukundi DCF analysis.  In the Victims' November 22, 2019 submission, SRK noted that discount rates for mining projects similar to Kalukundi were generally between 10% and 12%, and that in order to be both conservative and to embrace the discount rate selected by Defendant in its 2008 valuation, SRK employed a 12% discount rate.  *See* SRK Addendum at 4 n.5 ("Discount rates for mining projects of this sort generally run between 10% and 12%.  In order to be conservative, and to match the discount rate selected by Och Ziff, we adopted a 12% discount rate.").  To SRK's

---

[5] *See* SRK Reply at ¶ 29.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 9

surprise, Stout came forward with a discount rate more than 70% higher, at 20.5%. As set forth below, Stout's position in this regard is unsupportable.

> **a)** Stout Failed to Abide by the Government's Position that Och Ziff Should Be Held to its Prior Valuation

The Government's expert inexplicably failed to heed the Government's fundamental argument: specifically, that "defendant should not be entitled to disown or explain away its prior valuation[.]" Govt Submission at 2. Specifically, Stout ignored that Och Ziff itself had selected a 12% discount rate for its own DCF valuation; a discount rate that even Och Ziff recognized was "high." *See* 2008 Och Ziff Valuation Memo at 15 ("Lastly, team has used a high real discount rate of 12% to reflect uncertainty of future cash flows.").

If the Government's position that Defendant should not be entitled to disown or explain away its prior valuation is to be sustained, Och Ziff must be held to the discount rate it selected as the basis of that valuation. As the Government forcefully noted, "[p]rinciples of fairness and common sense dictate that the defendant – which harmed the victims in this case – should be held to its own valuation of the stolen mining rights, especially as that valuation was, as detailed herein, in line with other estimates prepared at the time and outside of the present litigation context." Govt Submission at 2. For this reason alone, because it is fair and appropriate to hold Defendant to its application of a "high" 12% discount rate, the Court should adopt a 12% discount rate and reject Stout's discount rate that is more than 70% higher.

> **b)** Stout's Discount Rate Defies Common Sense

Stout's selection of a 20.5% discount rate should also be rejected because it defies common sense. As noted above, Defendant, by its own admission, using "conservative" consensus pricing, valued Africo's 75% portion of the Kalukundi mining rights at between $150 million and $194 million. 2008 Och Ziff Valuation Memo at 9. Since 2008, only two material changes have occurred: (1) consensus prices for copper and cobalt have risen substantially above those used by the Defendant[6] and (2) the volume of copper and cobalt known to exist at the Kalukundi property has more than doubled, from 27.1 MT to 55.7 MT.[7] SRK Reply at ¶ 39. Despite the substantial increases in both metal prices and volume, Stout – due to its selection of a 20.5% discount rate – calculated that the value of the same 75% of the Kalukundi mining rights

---

[6] Copper consensus prices are over 100% higher and cobalt consensus prices are more than 50% higher than those prices used by the Defendant in 2008. SRK Reply at ¶ 39.

[7] Stout confirmed to counsel for the Victims that it is unaware of any additional material changes in the market or mining industry since the time of the Defendant's DCF valuation in 2008.

# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 10

somehow decreased from 2008 to the present.  Specifically, Stout concluded that the current value of the entire Kalukundi mining rights are worth $188.7 million, of which Africo's 75% portion would be $141.5 million.  Govt Submission at 11.  Thus, notwithstanding the fact that consensus prices have nearly doubled, and the volume of minerals have more than doubled, Stout, by applying its inflated discount rate, has calculated a lower valuation for the Victims' portion of the mining rights at the "time of sentence" ($141.5 million), than that reached by Defendant in 2008 at the "time of loss" (at least $150 million).  2008 Och Ziff Valuation Memo at 9.  This cannot be correct and defies common sense.  As consensus prices have doubled and volume has doubled, the mine cannot be worth less today, unless there has been some material change to the industry or market, which there has not been.  *See supra* n.6.  Accordingly, because Stout's selection of a discount rate of 20.5% defies common sense, that discount rate should be rejected.

> c)  The Discount Rate Selected by Stout is Not Consistent with any Comparable Mining Projects

Finally, Stout's purported justification for its selection of a 20.5% discount rate was that it "is consistent with discount rates applied to other mines in similar locations." Govt Submission at 9.  However, as discussed below, ***a discount rate of 20.5% is not consistent with the rate applied at even a single comparable mine in the DRC – not one.***[8]

> (1)  Stout's Purportedly Comparable Valuation Properties

While the Government's submission did not list the purportedly comparable properties Stout considered, SRK requested that it be provided with these comparables so that it could evaluate them.  There were three such properties: Prospect Resources (a lithium mine in Zimbabwe), Semhkat (a copper mine in the DRC), and Kinsenda (a copper mine in the DRC).  As described in SRK's reply submission, not one of these projects supports Stout's selection of a 20.5% discount rate.  SRK Reply at ¶¶ 45-60.

---

[8] It is important to note that SRK has identified that Stout's 20.5% discount rate is actually a "nominal" rate.  Both SRK and Defendant's expert, Quadrant, agree that cashflows in a DCF model should be expressed as "real" cashflows, and thus should use real discount rates, not nominal rates.  *See* Dkt. No. 88-1, Expert Report of Quadrant Economics ("Quadrant Report") at ¶¶ 115-16; SRK Reply at ¶ 38.  Quadrant and SRK have both confirmed that Stout's 20.5% nominal discount rate equates to a real discount rate of 18.1%.  Quadrant Report at ¶ 118; SRK Reply at ¶ 38.  This adjustment increases the Stout valuation of Africo's interest, after correcting for the model error already acknowledged by Stout and removing the SPT reduction from $305.2 million to $386.8 million. SRK Reply at ¶ 38.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 11

**Prospect Resources:** Prospect Resources is a lithium project located in Zimbabwe.  As SRK explains in it reply submission, given the mineral at issue, it is not in any way a valid comparable for a copper/cobalt mine in the DRC. SRK Reply at ¶ 48.  As SRK describes:

> lithium projects impose a broad range of issues and challenges that do not exist in copper/cobalt projects. SRK notes that while both Kalukundi and the lithium project are mining projects, the discount rates applied to each should differ significantly from one another with lithium receiving a much higher discount rate. Kalukundi is a copper project. Copper, a base metal, is widely used, and copper markets benefit from large volumes, a diverse global customer base and transparent pricing mechanisms for copper mine products. This is not the case with lithium, as the market is much more limited and does not benefit from a broad customer base and transparent pricing similar to other industrial minerals or specialty metals. Moreover, lithium mines produce a product which requires significant additional refining, and without access to an expensive refinery, the product is of limited value. This contrasts with a copper/cobalt mine, such as Kalukundi, where the product leaving the mine is able to be sold into broad international markets with minimal additional refining. Typically, these factors are reflected in the discount rate applied to industrial minerals and specialty metals through the application of a significantly higher discount rate than would be applied to base or precious metals. The higher discount rate allows valuers to capture the impact of opaque downstream markets and marketing risk for the products of mining projects. Due to the differences between the copper and lithium space, the discount rates are not comparable across the commodities. SRK notes that a lithium project does not present an acceptable discount rate comparison for the Kalukundi project.

*Id*. at ¶ 48.

**Semhkat:** Semhkat is a copper project located in the DRC.  As SRK explains in its reply submission, however, Semhkat is not a proper comparable to Kalukundi.  Semhkat possesses an extremely low grade of copper (0.8% as compared to Kalukundi's 2.8%).  More importantly, Semhkat has never achieved a feasibility study.  SRK Reply at ¶¶ 51-53.  As SRK's report notes, the lack of a bankable feasibility study alone "completely disqualifies Semhkat as a potential comparable to Kalukundi."  *Id*. at ¶ 52.  As described in further detail in SRK's reply report, the use of a DCF analysis is embraced in the mining industry primarily for those properties which

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 12

have achieved a bankable feasibility study (or equivalent pre-feasibility study).  That is because the feasibility study is a process through which the primary inputs to the DCF analysis are rigorously investigated and verified.  *Id*. at ¶¶ 72-74.  There can be no relevant comparison between a property that has undergone this intensive process with one that has not, SRK offers an apt analogy:

> [I]f there was a parcel of land in Texas that had performed testing and had identified oil in the ground that could economically be extracted from the earth, that parcel of land could then be valued, based on the economics of extracting and selling the oil (i.e., by a DCF).  But if there was another parcel miles away, that had had no such testing and no financial plan, there would be no principled or valid basis for comparing the value of that second parcel to the first.  This is precisely the situation here, where Stout seeks to rely on Semhkat as a comparable to Kalukundi.

SRK Reply at ¶ 52.  Finally, the discount rate for Semhkat was lifted by Stout from an accounting impairment analysis, rather than from a willing buyer/willing seller transaction.  *Id*. at ¶ 54.  This is inconsistent with the Government's position that fair market value is "the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts."  Govt Submission at 9.  While SRK does not foreclose the use of impairment analyses for comparative purposes, given Semhkat's other significantly distinguishing features, it cannot in any meaningful or reliable way support Stout's selection of a 20.5% discount rate for Kalukundi.  SRK Reply at ¶ 55.

**Kinsenda**: Kinsenda is a copper project located in the DRC.  Stout relied on a 2009 CEO's Report, which noted that the company had performed a "risk-based" valuation using a 20% real discount rate.  While Kinsenda may appear to support Stout's selected 20.5% discount rate, had Stout probed even minimally deeper, it would have discovered that Kinsenda actually supports a discount rate ***below*** the 12% rate selected by both SRK and Och Ziff itself in its 2008 valuation.

*First*, at the time of the 2009 valuation of Kinsenda, the property lacked a feasibility study.  As SRK explains, this disqualifies a project from being a comparable to Kalukundi, which obtained a feasibility study in 2006.  Indeed, the CEO Report relied on by Stout specifically states that as the project moves toward a feasibility study, the discount rate "is expected to reduce."  *Id*. at ¶ 57.  The views of Kinsenda's CEO in 2009 are hardly surprising: as the project moves toward the point where economic feasibility is more certain, the lower the risk, and the lower the applicable discount rate.  *Id*.

# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 13

*Second*, Stout failed to consider what transpired at Kinsenda *after* 2009.  Kinsenda subsequently did obtain a feasibility study, and in 2013, Kinsenda was purchased by a third party, Jinchuan Group International Resources Co. Ltd., for $1.29 billion.  The valuation report prepared in connection with that transaction was filed with the Hong Kong Stock Exchange on or around August 30, 2013.  SRK Reply at ¶ 58.  As that filing makes clear, the discount rate used for valuing Kinsenda, after it had obtained a feasibility study, was ***10.43%.  See id***. (citing Hong Kong Stock Exchange Circular, dated August 30, 2013, Appendix V at 246 (attached hereto as Exhibit 7).

As SRK notes in its reply submission, Kinsenda is a valid comparable to Kalukundi.  It is a copper project located in the DRC, and it achieved a feasibility study.  Its fair market value was determined in an arm's length transaction between an unaffiliated willing buyer and willing seller.  And the applicable discount rate for that valuation was 10.43%.  Accordingly, in SRK's opinion, Kinsenda supports SRK's view that a 12% discount rate is a proper yet conservative discount rate for Kalukundi and does not support Stout's selection of a 20.5% discount rate. SRK Reply at ¶ 59.

Accordingly, of the three purported comparables selected by Stout, two have no relevance to Kalukundi at all, and the third undermines Stout's selection of a 20.5% discount rate while supporting SRK's selection of 12% as a proper yet conservative discount rate for the valuation of the Kalukundi mining rights.

(2)    SRK's List of Comparable Valuation Events

As noted in SRK's reply submission, in addition to evaluating the purported comparable discount rates selected by Stout, SRK also undertook an analysis of comparable transactions to assess the discount rates for properties comparable to Kalukundi.  It began by reviewing DRC copper/cobalt transactions and events from 2008 to the present.  Using the list of traits for selecting comparables, SRK narrowed that group to 11 properties SRK believes are relevant to the question of assessing the appropriate discount rate for a valuation of the Kalukundi mining rights.  SRK Reply at ¶ 61. That list of comparable valuation properties is set forth in the chart attached to the SRK reply submission as Exhibit SRK-04.

# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 14

The relevance of these properties is clear: they are all copper or copper/cobalt projects located in the DRC; some are even in the Katanga province where Kalukundi is located; all had achieved a feasibility study; and the majority are "willing buyer/willing seller" transactions.  All of these valuations used real discount rates of between 8 and 12%.  SRK Reply at ¶¶ 61-69; Exhibit SRK-04.  Taken together, the median discount rate of these valuations is 10%, and not a single comparable valuation was identified with a discount rate anywhere close to the 20.5% selected by Stout.  *Id*. at ¶ 64.

One of the comparables on the list is Kinsenda, as discussed above.  This is a noteworthy comparable as it was selected by Stout and then misinterpreted by Stout.  SRK identified another particularly illustrative comparable.  According to SRK, the Kalongwe copper and cobalt property in the DRC's Katanga province, owned by a small, publicly-listed Australian company called Nzuri Copper Limited ("Nzuri"), "offers an excellent, contemporaneous comparable that supports the use of a DCF methodology…[and] also fully supports the 12% real discount rate used by SRK."  SRK Reply at ¶¶ 66-67.  SRK explained that, in addition to the mineral and location similarities between Kalongwe and Kalukundi, Kalongwe has a bankable feasibility study but has not yet started development (like Kalukundi), and 85% of the Kalongwe mining rights were the sole material asset held by a small, publicly-listed company (like Africo).  As a part of Chengtun Mining Group's acquisition of Nzuri earlier this year, global accounting firm BDO performed a DCF analysis using a post-tax real discount rate of 12% and consensus market prices for copper and cobalt.  *Id*.  Notably, the transaction closed last quarter with at least a 30% *premium* to the DCF valuation.  *Id*.  Thus, at a mine less than 50 miles from Kalukundi, at a similar stage of development, owned by a similar company, the mining rights were valued using a 12% real discount rate and consensus market pricing, just as SRK undertook here.  And, consistent with SRK's opinion that a 12% discount rate will result in a *conservative* value of the Kalukundi mining rights, ***the price at which Nzuri changed hands from a willing seller to a willing buyer was at least a 30% premium above the value derived by a DCF analysis using a 12% discount rate.***  SRK Reply at ¶ 66.[9] [10]

---

[9] We note that Stout did not address Kalongwe as a comparable in its submission to the Court.  Indeed, the only copper mine located in the DRC with a feasibility study that Stout did identify was Kinsenda, which as noted, used a discount rate of 10.43% in 2013.  We also note that Defendant's squadron of experts curiously also failed to identify a single copper or cobalt mine in the DRC with a feasibility study as a comparable – the only projects they identified in the DRC were Semhkat and a gold mine.

[10] We alerted Stout to the existence of Kalongwe and the recent arm's length transaction in which a real discount rate of 12% was used.  Stout thereafter noted that Kalongwe and Kalukundi, as far as it could see, were of comparable sizes.  But Stout was incorrect in that regard.  As explained in the SRK reply submission, despite similarities in terms of stage of development, Kalukundi is a significantly larger, and more valuable deposit than Kalongwe.  The resource at Kalukundi contains 55.7 million tonnes of mineral bearing ore, and is approximately 4 times the resource at Kalongwe which contains 13.5 million tonnes of mineral bearing ore. More importantly for the

WILSON
SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 15

Based on the above, SRK has concluded that Stout's selection of a 20.5% discount rate is unreasonable and cannot be justified. The 12% discount rate selected by SRK, in contrast, is conservative, as it is at the high end of the discount rates used for comparable projects and is consistent with the "high" discount rate used by Och Ziff itself in 2008. *See* 2008 Och Ziff Valuation Memo at 9.

Despite Stout's stated opinion that a 20.5% discount rate was a proper discount rate to use to value the mining rights at Kalukundi, Stout actually calculated the value of the Kalukundi mining rates using a variety of discount rates. *See* Exhibit 10 to the Government submission of November 22, 2019. And one of those calculations was run with a discount rate of 12%. *See* Dkt. No. 68-10. The value determined by Stout at 12% was $477.5 million for the entire Kalukundi mining rights, which translates to a value of $358.1 million for the 75% attributable to Africo. SRK Reply at ¶ 13. After adjusting this amount to correct for Stout's admitted model error, and after removing the improper SPT reduction, Stout's DCF analysis at 12% produces a value for the entire Kalukundi mining rights of $553.9 million[11], which translates to a value of $415.4 million for Africo's interest. *Id*. at ¶ 69.

The comparison of Stout's corrected valuation at 12% to SRK's valuation at 12% for Africo's interest in the Kalukundi mining rights is set forth below:

Stout Corrected Valuation at 12%:        $415.4 million

SRK Valuation at 12%:                          $421.8 million

On behalf of the Victims, we respectfully submit that either of these amounts would represent a reasonable estimate of Africo's interest in the Kalukundi mining rights that were lost as a result of Defendant's crime.

---

purpose of determining the value of the mine through a DCF, the recoverable metal (Copper & cobalt, expressed in Copper equivalent terms), which is available for sale from the SRK 2019 mine plan for Kalukundi is approximately 1.2 million tonnes, which is approximately 5 times the saleable metal from Kalongwe of .25 million tonnes under its mine plan. SRK Reply at ¶ 66 n.31.

[11] SRK noted that Stout appears to have selected nominal consensus pricing for its model. As a result, SRK has adjusted this figure downward to assure that the prices are real consensus prices.

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 16

## II.     THE DEFENDANT'S POSITIONS ARE NOT REASONABLE AND SHOULD BE REJECTED

### A.     OZ's Primary Arguments Have Already Been Litigated (Repeatedly) and They Have Been Rejected

As an initial matter much of Defendant's opposition seeks to relitigate issues that have already been resolved by this Court against Defendant.  Throughout its brief, Defendant reargues three issues: (1) whether the Victims' interest in the Kalukundi mining rights were "property" covered by the MVRA, (2) whether Defendant should be held responsible for its co-conspirators' actions prior to its joining the conspiracy, and (3) whether the forced Camrose Takeover returned the Victims' Kalukundi mining rights and merely put the Victims in the same diluted position they would have been in regardless of Defendant's crime.  Each of these arguments has already been raised, repeatedly, by Defendant and each has been considered and rightly rejected by this Court.  Defendant's recycled arguments have no more merit today than when made in 2018 and provide the Court with no reasonable basis to change its prior rulings.

*First*, Defendant attempts to reargue its position that the former shareholders of Africo do not qualify as victims under the MVRA because they did not *directly* own the Kalukundi mining rights.  Remarkably, Defendant argues that the Court has not yet been "presented with" and has not yet considered the nature of the property at issue and the manner of harm caused by the Defendant's crimes.  Dkt. No. 87 ("Def. Br.") at 14-15.  In so doing, Defendant brazenly repeats, almost word for word, the same arguments and precedent it has unsuccessfully proffered to the Court over the past two years.  Defendant attempts to distract from the fact that these very arguments have already been rejected by disingenuously assuring the Court that, this is not an argument about the form of or harm to the Victims' interests in the Kalukundi mining rights, but rather a new argument about how the value of those interests should be calculated.  *See id.* at 15. This ploy is belied, however, by the almost identical language used by the Defendant in its current and prior briefs.  For example, Defendant's most recent brief argues, "Claimants owned common shares in Africo.  They did not own any interest, direct or indirect, in a mine, mining rights, any other assets of Africo, or anything other than their shares."  *Id.* at 14.  This is nearly identical to the argument Defendant made to the Court on March 2, 2018, "WSGR's clients did not in fact own *any* property or mining rights in the DRC.  They owned stock in Africo[.]"  Dkt. No. 37 at 6 (emphasis in original).  *See also id.* at 18 ("Nor can the supposed injury be the loss of mining rights relating to [the Kalukundi mining rights] because WSGR's clients never owned any mining rights in the Kalukundi property.  They were shareholders in Africo[.]").  Defendant made the same argument again on June 29, 2018: "Claimants had no property interest in any mine or any mining rights in the Congo," Dkt. No. 47 at 3, and "the actual property the Claimants did own – shares in Africo Resources Ltd. – was never taken from them, as a result of

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 17

the offense or otherwise. . . . Each Claimant owned exactly the same number of shares after the Camrose Transactions[.]" *Id*. at 5. And in now remaking these arguments, Defendant cites the same cases it has previously provided to the Court. *See, e.g.*, *United States v. Marino*, 654 F.3d 310 (2d Cir. 2011) (cited in Def. Br. at 6, 13); Dkt. No. 37 at 18, 20 n.17, 23 n.21; Dkt. No. 47 at 6, 7; Dkt. No. 63 at 3 n.3; *Robers v. United States*, 572 U.S. 639 (2014) (cited in Def. Br. at 15); Dkt. No. 47 at 5 n.3; Dkt. No. 55 at 2 n.4.[12][13]

Following over a year of briefing on this precise issue from the Government, the Victims,[14] and Defendant, the Court considered, *inter alia*, "whether Claimants' interest in the mining rights constitutes 'property'". Order, Dkt. No. 51 at 11. The Court ruled that the Victims held intangible property rights, cognizable under the MVRA, specifically an indirect "interest in Africo's mining rights[.]" *Id*. at 12 ("[I]ndividuals can be victims under the MVRA even where they lack a private right of action against a defendant[.]") (citing *United States v. Gushlak*, 728 F.3d 184, 187 (2d Cir. 2013); *United States v. Marino*, 654 F. 3d 310, 321 (2d Cir. 2011)). The Victims' property interests were harmed by Defendant and its co-conspirators, who stole the Kalukundi mining rights by way of a default judgment secured and maintained through the

---

[12] *See also, e.g.*, *United States v. Kinney*, 684 F. App'x 73 (2d Cir. 2017) (cited in Def. Br. at 13); Dkt. No. 37 at 23; *United States v. Maynard*, 743 F.3d 374 (2d Cir. 2014) (cited in Def. Br. at 14); Dkt. No. 37 at 23; Dkt. No. 47 at 5 n.3.

[13] In an attempt to present the Court with some new case law on this issue, Defendant cites to case law that does not exist. This poor attempt at an analogy to non-existent case law is no more persuasive than Defendant's previous attempts to avoid making its Victims whole. Specifically, Defendant uses an example from 2010, when a Goldman Sachs programmer was prosecuted for stealing Goldman Sachs's source code. Defendant argues that using the rationale advanced by Victims, that would entitle every Goldman Sachs shareholder to a pro-rata share of the source code. Def. Br. at 13. *First*, to be clear, Defendant cites no case. We assume Defendant is referring to *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012), but there, the programmer was ordered only to pay a fine, not restitution, and the programmer's conviction was subsequently overturned. *Second*, in making this argument, Defendant completely misconstrues the facts of this case. Goldman Sachs is a multi-national trillion-dollar investment bank and financial services company with diverse assets whereas Africo was a special purpose vehicle with a single asset at the time of Defendant's theft. Here, Defendant and its conspirators stole the single asset underlying Africo and leveraged this theft into a corrupt takeover of Africo, eliminating any opportunity the shareholders may have otherwise had to recoup their losses through the company. In contrast, the theft of a single computer program would have been easily rectifiable by Goldman Sachs. Furthermore, Defendant's analogy equates theft of Goldman Sachs's intellectual property – which would not impair Goldman Sachs's operation but simply create unfair market competition – to theft of Africo's mining rights – which effectively gutted all value from the company's shareholders.

[14] The Victims have, of course, consistently argued that each Victim had property interests in the Kalukundi mining rights as equity holders in a tightly held, single-asset special purpose vehicle formed for the purposes of developing the mining rights. Order, Dkt. No. 51. Defendant and its co-conspirators stole the Kalukundi mining rights (through the bribery of DRC judges) and leveraged the theft in order to seize control of the special purpose vehicle, ensuring that the Kalukundi mining rights were never returned to its rightful owners. *Id*. at 13.

# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 18

bribery of DRC judges and then leveraged that theft into a corrupt takeover of the entity through which the shareholders held their interests, ensuring that the Kalukundi mining rights never returned to the Victims. Order, Dkt. No. 51 at 10-14; *id.* at n.8 ("A pecuniary loss includes the loss of tangible or intangible property." (citing *United States v. Bengis*, 631 F.3d 33, 39-40 & n.3 (2d Cir. 2011) (holding that the MVRA covers those who have lost tangible property and finding South Africa was a victim as it had lost its property interest in illegally harvested lobsters)). *See also* Statement of Facts, Dkt. No. 11-3 ("SOF") at ¶¶ 24-58.[15]

In so ruling, the Court made clear that it understood (and rejected) the arguments Defendant makes again here, "[i]n Defendant's view, Claimants' interests in the Kalukundi mining rights were too attenuated to constitute property because Claimants owned stock in Africo . . . none of [the] Claimants exercised control over Africo. . . .The Court disagrees with Defendant." Order, Dkt. No. 51 at 11-12. The Court held that the harm to those rights caused by the Defendant's conspiracy was, not mere dilution, but the loss of a "promising opportunity." *Id.* at 13. *See also id.* at 20 n.12 ("The property in question here is the misappropriated Kalukundi mining rights themselves, not a working mine on the site (although the two are linked). The restitution award would need to be based solely on the value of those mining rights[.]"). That is why the Court asked the parties to provide further briefing on, *inter alia*, "the value of the mining rights themselves (as opposed to the value of a working mining on the site)[.]" *Id.* at 20.

**Second**, Defendant again argues that the Court should not hold it responsible for the Victims' losses because of its "late" entrance in to the conspiracy in 2007 and its purportedly

---

[15] None of Defendant's recycled cases or arguments support Defendant's claim that the "actual loss caused by the scheme" is not the loss of the Kalukundi mining rights. Def. Br. at 13 (citation omitted). *First*, the general principle that "the corporation and its shareholders are distinct entities" is irrelevant. *Id.* at 12 n.18. The Victims do not seek restitution on behalf of the corporation. *Second*, the proposition that shareholders do not own a corporation's assets is entirely unrelated to the facts here – where Defendant not only stole the corporation's sole asset but used that theft to corruptly take control of the corporation from the Victims, leaving the Victims with no means to meaningfully recoup their loss. *Third*, the cases cited by Defendant are entirely inapposite. Many of the cited cases are not even about restitution. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 471 (2003) (evaluating whether a corporate subsidiary can claim it is an instrumentality of a foreign state to invoke the Foreign Sovereign Immunities Act and remove to Federal Court); *United States v. Dupree*, 781 F. Supp. 2d 115, 121-22, 139-40 (E.D.N.Y. 2011) (holding that the defendant-officers, who engaged in a fraud scheme through the corporation, could not claim a property interest to prevent the government from seizing the corporation's illegally obtained funds); *Collins v. Mnuchin*, 938 F.3d 553, 624 (5th Cir. 2019) (Defendant cites parade of horrible language from the **dissent** on shareholder standing). The cases Defendant cites that are about restitution hold that the claimants are not victims because the defendants' crimes in those cases did not cause the loss suffered by the claimants. *See United States v. Calderon*, 944 F.3d 72, 96 (2d Cir. 2019); *United States v. Ruzicka*, 331 F. Supp. 3d 888, 900 (D. Minn. 2018). But this Court has already held that the Africo shareholders are victims under the MVRA and Defendant caused the Victims' harm. Order, Dkt. No. 51 at 14-17. The Court should ignore Defendant's repeated attempts to relitigate this issue.

# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 19

limited, purely financial, role in the offense.  Specifically, in its most recent submission Defendant argues, "it would be unjust to hold OZ Africa accountable for the entirety of the Claimants' losses."  Def. Br. at 37.  It notes that, "OZ Africa had no involvement in the conspiracy prior to December 2007 . . . OZ Africa's direct involvement in any loss was limited to financing the Camrose Transactions, which largely positioned the Claimants as they would have been positioned in the absence of the offense . . . much of the wrongdoing here was directly caused not by OZ Africa[.]"  *Id.*  Here again, these arguments are directly lifted from its prior, unsuccessful briefs on these issues.  Dkt. No. 37 at 10-11.

The Court has considered and rejected Defendant's arguments regarding its culpability for harms caused by the conspiracy both prior to and after it joined.  The Court, relying on clear precedent, found Defendant was not only liable for the final corrupt takeover in 2008, but also for the initial theft of the mining rights even if that occurred before Defendant joined the conspiracy because the corrupt actions of the co-conspirators that occurred prior to Defendant's entrance were plainly foreseeable.  Order, Dkt. No. 51 at 16-18 (citing *Bengis*, 783 F.3d at 413 (rejecting argument from late-entering co-conspirator that he should not be held responsible for harms caused by conspiracy before he joined because "if [Defendant's] understanding of the scope of the conspiracy he joined…was such that he knew or reasonably should have known about some or all of the conspiracy's past imports," his restitution order should encompass those amounts); *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir 2000) (affirming a district court restitution order holding the defendant "liable for the reasonably foreseeable acts of all co-conspirators"); *United States v. Fiumano*, 721 F. App'x 45, 52-53 (2d Cir. 2018) (rejecting argument that defendant should not be held responsible for losses occurring before he joined the charged conspiracy)).  The Court properly noted that because the Defendant admitted that DRC Official 2 had worked to steal the Kalukundi mining rights on behalf of Defendant's conspirator, Gertler, and Defendant "entered into business with Gertler knowing that he paid substantial bribes to obtain mining rights in the DRC," the Defendant "knew or should have known that Gertler had been involved in corruptly acquiring control of the Kalukundi mining rights in the first place."  Order, Dkt. No. 51 at 16-17 (citing SOF at ¶¶ 17, 24).

***Third***, Defendant attempts to relitigate its arguments regarding the "return" of the Kalukundi mining rights and the resulting dilution caused by the Camrose Transactions, which it asserts would have occurred absent Defendant's crimes.  Specifically, Defendant argues in its most recent submission that *all* of Africo's Kalukundi mining rights were returned to the Africo shareholders in the Camrose Transactions, and thus the restitution order should be reduced by the 24% of the mining rights held by the Victims following the corrupt takeover.  *See, e.g.*, Def. Br. at 32 (arguing that "after the Camrose Transactions" the Victims owned, an albeit smaller portion of, precisely "the same company, with its mining rights again intact").  Defendant additionally argues that, "OZ Africa's direct involvement in any loss was limited to financing the

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 20

Camrose Transactions, which largely positioned the Claimants as they would have been positioned in the absence of the offense, since their ownership percentage of Africo shares would have been similarly reduced [by a previously abandoned transaction]," *Id.* at 37.

These arguments from Defendant have been previously raised, considered and rejected by the Court. *See, e.g.*, Order, Dkt. No. 51 at 11-12 ("In Defendant's view . . . while Claimants lost their interests in the mining rights by the 2006 Default Judgment, Claimants regained them via the 2008 Camrose transactions . . . The Court disagrees with Defendant.") (citing Dkt. No. 37 at 18-19); *id.* at 13 ("Defendant also maintains that Claimants cannot demonstrate that they were actually harmed by the Camrose takeover . . . [n]one of these arguments is persuasive."). The Court found the forced Camrose Takeover, financed by Och Ziff, did harm the Victims: it deprived them of the opportunity to negotiate fairly absent the leverage of the stolen asset and allowed the co-conspirators to retain control over the asset they had stolen. *See id.* at 14 ("Having conspired to deceive Claimants into accepting the Camrose Takeover, Defendant cannot now rely on Claimants' assent to avoid paying restitution."); *Id.* ("There is no way to know that Africo would have needed to dilute its shareholders, and, in any event, it lost the opportunity to do so fairly, which is a harm recompensable under the MVRA.") (citing *United States v. Kline*, 199 F. Supp. 2d 922, 924-26 (D. Minn. 2002) (providing restitution for a shareholder who was deprived of the ability to fairly sell her stock even where there was no proof she would have achieved more money through a legitimate sale); *United States v. Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) (affirming restitution order that included an award for an amount investors' accounts would have increased "but for" the defendant's embezzlement years earlier); *United States v. Bartleson*, 74 F. Supp. 3d 947, 984-85 (N.D. Iowa 2015) (ordering restitution for "lost investment earnings" based on "assumptions" about how money would have been invested); *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) ("[T]here is no reason to exclude losses that result from the deprivation of the victim's ability to put its money to productive use.")).[16]

---

[16] Defendant's citation to *Robers v. United States*, 572 U.S. 639 (2014) is inapposite. In that case, Robers fraudulently obtained bank loans, and when he defaulted on those loans the banks seized several houses that had collateralized the loans, which were then sold for less than the total value of the loans to Robers. The Court in *Robers* considered when "part of the property" was returned to crime victims, for valuation purposes – whether the property was returned and should have been valued when the victims received houses that served as collateral for the fraudulent loans, or when the victims liquidated that property. *Id.* at 640. The Court found that the property harmed by the crime was not "returned" to the victims until the houses were liquidated because, "the statutory provision refers to the money lost, not to the collateral received," and thus the relevant time of valuation was the time of sale. *Id.* at 646. Here, of course, the issue is not the "timing" of the valuation of the part of the property returned, because the property stolen from the Victims (the mining rights and accompanying opportunity to develop the Kalukundi property) *was never returned to the Victims* as a part of the corrupt Camrose takeover. The Victims were instead, deprived of their right to negotiate any acquisition fairly and forced to accept a takeover of that property by the very people who had stolen it in the first place. Order Dkt. No. 51 at 14. The relevance of the Court's decision in

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 21

As described above, the Court, following almost two years of extensive argument from Defendant, the Government, and Victims, found that (1) Victims' property interests in the Kalukundi mining rights were covered by the MVRA,  (2) Defendant was liable for both the initial theft of those mining rights and the subsequent forced takeover by Camrose, and (3) the Camrose transaction itself harmed, not helped, the Victims.  We respectfully request that Defendant's attempts to relitigate these issues should be rejected by the Court.

**B.      Both Defendant's Share Price and DCF Valuations are Unreasonable**

When Defendant finally does get around to addressing the issues the Court asked it to address, it presents two alternative valuations.  The first, its "share price" methodology, argues that all the Court needs to do is look at the impact on Africo's shares to determine the value of Africo's interest in Kalukundi's mining rights.  Defendant's presentation in this regard is baseless and insincere.  It argues that Africo was worth only a fraction of what Och Ziff itself paid (in bribes and other investments) to steal Africo; a proposition that is nonsensical. Defendant's second valuation methodology is equally preposterous.  Defendant had its expert perform a DCF analysis in a manner to conclude that Africo's interest in Kalukundi today would be worth less than nothing.  Defendant essentially argues that it did a favor to the Victims by stealing their mining rights.  Both of Defendant's proffered valuations should be rejected.[17]

*1.      Defendant's Proposed Share Price Methodology Fails to Reasonably Capture the Harm Caused to the Victims*

Defendant has offered the Court an illogical methodology selected to achieve an absurdly low result.  Defendant argues that the market value of the Victims' property interests harmed by the conspiracy can be divined at the "time of loss" by comparing the share price from the day before Africo publicly announced the dispute over the Kalukundi mining rights, with the average share price from the period surrounding the announcement of Africo's first unsuccessful appeal

---

*Robers* to this case is its recognition of the statutory purpose of the MVRA - that when there is a difference in value between the victim's position after the offense and before, the MVRA requires courts to ensure that victims are neither undercompensated or receive a windfall.  Thus, where the property given to victims by the defendant is not of the same character as the property lost, the Defendant must compensate the victims for that difference. *Robers*, 572 U.S. at 644.

[17] The goal of restitution, in the criminal context, is "to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury."  *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006).  It is obvious the opportunity to develop the Kalukundi project cannot be returned to the Victims, and it should be equally obvious that were the Kalukundi mining rights available to be purchased, and the Victims wished to repurchase the rights, the cost for doing so would be by considering a DCF valuation, not based on an artificial extrapolation of where the Africo share price was in 2007.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 22

(secretly secured by the co-conspirators' bribes). Defendant argues that this is the relevant comparison to capture the portion of the value of the Kalukundi mining rights "retained" by the Victims, even after they had been stolen by the co-conspirators. Def. Br. at 21-22. This argument is (1) illogical, (2) internally inconsistent, and (3) based on the false premise that the market for Africo shares was efficient.

Defendant's arguments regarding the value of the Victims' property interests at the "time of sentence" are equally nonsensical. Defendant argues that the value of the Victims' property interests at the "time of sentence" can be easily ascertained by taking the share price from the day before Africo publicly announced the dispute over the Kalukundi mining rights and applying a 50% deduction reflecting the performance of mining companies purportedly "similar to Africo" from 2007 to the present. Def. Br. at 23. This argument suffers from the same fundamental issues as the Defendant's "time of loss" calculation.[18]

a)      Defendant's Insincere Share-Price Valuations Defy Logic

The lack of credibility and reasonableness of Defendant's valuations is made obvious by the absurd conclusions Defendant asks the Court to draw.

*First*, Defendant asks the Court to accept that the co-conspirators went halfway around the world, invested over $100 million in Africo, paid millions in bribes to DRC judges and other public officials, and risked severe criminal penalties to steal mining rights that the market purportedly valued at only $37 million.[19]  Considering that Och Ziff (now Sculptor) is a multi-billion dollar hedge fund that promoted itself in 2008 as "a leading, global institutional alternative asset management firm", "one of the largest alternative asset managers in the world" and as being at "the forefront of international expansion" with "the knowledge, access and ability to identify and source attractive investment opportunities across the globe",[20] the argument advanced by Defendant – that Och Ziff would spend well in excess of $100 million to secure an asset worth a mere fraction of that amount – is absurd. Indeed, Och Ziff's decision to invest well over $100 million to steal these mining rights, compounded with its decision to risk hundreds of

---

[18] The Government, notably, agrees that the DCF method is preferable to a share price analysis, "[t]he government is unaware of any case in which the value of a stolen corporate asset has been measured by a decrease in share price, and the government respectfully submits that it is not necessary to do so here, particularly where there are other reliable valuation methodologies."  Govt Submission at 3.

[19] *See* Def. Br. at 22 ("this share price decline reflects the market's valuation of Africo's loss of its interests in the mining rights, and any lost opportunity to develop and profit from the Kalukundi property.");Quadrant Report at ¶ 20 (25M shares outstanding at $1.47 loss/share); SOF ¶¶ 27, 30, 38.

[20] *See* https://web.archive.org/web/20081206093021/http://www.ochziff.com/aboutOchZiff/index.html.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 23

millions of dollars more should its corrupt efforts be discovered, conclusively disqualifies the unreasonable share price calculations advanced by Defendant.  Defendant offers no explanation for why, with all its investment savvy, it did not merely pay a small premium to the Africo shareholders to acquire the mine.[21]

   *Second*, Defendant asks the Court to ignore the fact that Defendant *itself* did not believe the market for Africo shares was efficient or reflected the true value of the Kalukundi mining rights.  Despite the stock price analysis Defendant now champions in this case, the fact remains that in 2008, Och Ziff performed its own valuation of Africo's Kalukundi mining rights using the DCF method and determined that those rights were worth between $150 million and $194 million.  *See* 2008 Och Ziff Valuation Memo at 9.  Yet it asks this Court to accept the outlandish view of its proffered expert, Dr. Daniel Flores, that on July 15, 2008, the day Och Ziff's investment memo was circulated, the Kalukundi mining rights were in fact worth less than $50 million.[22]  Needless to say, when Och Ziff wanted to know the value of Africo's interest in Kalukundi, it did not simply multiply outstanding shares by the stock trading price.  Rather, it engaged experts in valuing such assets, and those experts performed a DCF analysis (using a 12% discount rate) and concluded that the value of those rights was between $150 million and $194 million.  Govt Submission at 4-5 & n.4; 2008 Och Ziff Valuation Memo at 9.

   *Third*, Defendant asks the Court to rely on the transparency of market activity when Defendant and its co-conspirators ensured that the market, including Africo and its shareholders,

---

[21] The reality is that Defendant could not have secured the mining rights through purchasing shares, which alone demonstrates that its share price methodology is unsound.  The Shareholder Rights Plan Agreement would have prevented such an effort (to forcibly obtain control of the mining rights through a hostile takeover) as there was a poison pill provision in place.  *See* Management Information Circular at 1 (attached as Exhibit 3) ("To ensure, to the extent possible, that all shareholders of the Issuer are treated fairly in connection with any takeover bid for Common Shares of the Issuer, the Issuer's board of directors has determined that it is in the best interests of the Issuer to adopt a shareholder rights plan.").  Defendant's obvious awareness of this is made clear from the Camrose Agreement in which the coconspirators required the shareholders to void the Shareholder Rights Agreement.  Dkt. No. 88-33 at 7 ("The completion of the transactions contemplated by the Subscription Agreement between Africo and Camrose Resources Limited . . . is conditional upon, among other things, the amendment to and subsequent termination of the Shareholder Rights Plan Agreement (the 'Rights Plan') dated as of May 25, 2007[.]").

[22] According to Dr. Flores, the value of the Victims' interests can be reasonably calculated by multiplying the share price by the number of outstanding shares.  Quadrant Report at ¶ 16 ("To calculate the value of each Claimant's shares in Africo but for the offense, I use the share price of Africo before the market reacted to the Akam judgment, which reflects the value of Africo's only material asset: the opportunity to develop the Kalukundi mine, or Africo's 75% interest in the Kalukundi mining rights . . . Africo's share price was US$ 3.39 on 26 April 2007, the last trading day prior to the announcement of the Akam judgment.  This represents the market value of one Africo share but for the offense.").  On July 15, 2008, Africo's 27,213,000 outstanding shares traded at $1.78, and thus, according to Dr. Flores' theory, the value of Africo's mining rights was less than $50 million.  *Id.*, Exhibit QE-2 at 10.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 24

was unaware of the scope of their criminal activities related to the Kalukundi mining rights. Defendant's share price analysis looked at a "relevant period" from December 15, 2006 to July 24, 2008. *See* Dkt. No. 88-2, Expert Report of Ronnie Barnes, Ph.D. ("Barnes Report") at ¶ 8. As noted by Defendant, however, press releases in this period only informed the market about the "dispute over its interest in the mining rights," not their loss. Def. Br. at 21.[23]   The share price for Africo throughout 2007 and 2008 can at best thus only reflect uncertainty regarding the ownership of the mining rights, not their value.

*And finally*, Defendant asks the Court to accept the nonsensical proposition that the Victims' interests in the Kalukundi mining rights somehow lost significant value between 2007 and the present, based on the application of a 50% deduction reflecting the performance of mining companies purportedly "similar to Africo" to the share price from the day before Africo publicly announced the dispute over the Kalukundi mining rights. Def. Br. at 23. This result further confirms the unreasonableness of Defendant's share price method, as consensus prices for copper and cobalt have nearly doubled from the prices Och Ziff used in its own 2008 valuation, and the amount of minerals known to exist at Kalukundi more than doubled since the time of the theft. SRK Reply at ¶ 39. It is thus certainly unreasonable to conclude that the value of the Victims' interest in the Kalukundi mining rights could have decreased by 50% over the same period.

b)     Defendant's Valuations Are Internally Inconsistent

Defendant's desperate attempts to undervalue the harm caused to its Victims also results in inconsistencies inherent in its own arguments. In fact, Defendant's arguments make clear that the market ***could not*** have accurately reflected the Victims' property interests including the lost

---

[23] *See* April 27, 2007 Africo Press Release, Dkt. No. 38-9 at 1 ("Africo has been advised by DRC counsel that the purported sale is illegal and not only subject to rescission in conjunction with the Berardone Judgment, but is also null and void . . . Africo has been advised by DRC counsel that an appeal has been lodged in the proceedings between Akam and Gecamines to have the Decision set aside . . . Africo believes that these actions taken by third parties in the DRC are wholly without merit. Africo will vigorously pursue its interests in the courts and is optimistic that it will prevail, although there can be no assurance of this."). *See also* August 13, 2007 Africo Press Release, Dkt. No. 88-32 at 1 ("A preliminary analysis by our DRC legal counsel indicates that the Supreme Court of Justice determined that the actions of the judges in certain of the matters could not be examined by the Supreme Court as they took the form of orders and not judgements . . . The judgement left intact all the other appropriate recourses against the instruments ordering and carrying out the public sale of the shares of Swanmines, which can thus be initiated before the Lubumbashi courts. In this regard, Africo had initiated a number of actions in addition to the judicial misconduct application and will continue to vigorously pursue these. Africo will proceed forthwith to have the hearing in the original action appealing the judgement that awarded the $3 million to Mr [Berardone], which had been postponed pending the outcome in the judicial misconduct application, as well as the application by H&J for a court order declaring the sale of the Swanmines shares to Akam Mining, declared null and void.").

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 25

opportunity to develop the Kalukundi mining rights. *See* Order, Dkt. No. 51 at 13. Specifically, Defendant argues that the Victims' lost opportunity to develop the Kalukundi mine was the *only value* reflected in Africo's share price because the company had not yet developed the mine. Def. Br. at 16 ("[T]he fact that Africo's stock had *any value at all* proves that the market was valuing Africo's future prospects of developing the property. It could not have been valuing anything else.") (emphasis in original). However, as a part of its "time of loss" calculus, Defendant argues that the value of the Victims' shares prior to the announcement of the dispute over the mining interests must be reduced by, "the value of the property *retained* by the Claimants…after the market fully factored in the judicial sale of the mining rights." *Id*. at 21. Defendant cannot have it both ways. If the share price reflected only a future opportunity, then the price should have been $0 when the "market fully factored in" the total loss of that opportunity. *Id*. There would be no "opportunity" left and thus no "property retained" by the Victims.[24] *Id*. Defendant's grasping, inconsistent arguments serve only to make the Victims' point: the market did not reflect the value of the Victims' property interests in the Kalukundi mining rights, but only a vacillating uncertainty over the ownership of those rights.

> ### c) Defendant's Valuations are Based on the False Premise that the Market for Africo Shares Was Efficient

Even Defendant concedes that a share price analysis can only be relevant where the market is efficient.[25][26] Here, however, Defendant offers the Court no valid basis to conclude

---

[24] Defendant argues that on August 13, 2007, Africo "announced that it had lost its appeal of the sale", so the average share price in the 90-day period following this event "reflects the market's valuation of Africo's loss of its interest in the mining rights, and any lost opportunity to develop and profit from the Kalukundi property." Def. Br. at 22. But Defendant concedes that Africo's average share price over this period was $1.92 per share, and that there were over 25,000,000 outstanding shares. Thus, according to Defendant, Africo, a single-asset company, lost its only asset and was still valued by the market at over $48,000,000. The market thus could not have "fully factored in the judicial sale of the mining rights." *Id.* at 21. Instead the share price for Africo throughout 2007 and 2008 at best reflected shifting uncertainty regarding the ownership of the mining rights, not their value.

[25] "The Supreme Court has made clear that *when a company's shares are traded in an efficient market*, all publicly available information about the company and its assets is reflected in its share price." (Def. Letter at 16) (emphasis added). *See also* Def. Letter at 18 ("Due to the *efficiency of the market* and the reliability of its valuation of Africo and its sole material asset, Dr. Barnes has confirmed that *the most accurate and reliable method* for valuing the Claimants' loss is the loss in the value of their Africo shares caused by the offense.") (emphasis added.); Barnes Report at ¶ 23 (Defendant's expert notes that the "superiority" of Defendants' "market price approach" is a "function of the facts and circumstances of this matter, including the *degree of efficiency of the market* for Africo shares"). (emphasis added.)

[26] The cases cited by Defendant demonstrate that share price often does not reflect the genuine value of a company or its assets, even when a company is traded on a large public exchange. *See Rusoro*, ICSID Case No. ARB(AF)/12/5, Award, ¶¶ 11, 710, 790 (valuing a company traded on the Canadian TSX-Venture stock exchange at $966.5 million, over $200 million more than the highest market valuation before expropriation measures, which was

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 26

that the market for Africo, a "Canadian start-up company" that on some days had a trading volume of less than 1,000 shares,[27] was anywhere near efficient. *First*, Defendant relies solely on its expert Dr. Barnes' flawed and manipulated event study. *Second*, even taking Dr. Barnes's analysis at face value, Defendant has not provided the Court with a basis to conclude that the market for Africo's shares was efficient. [28] [29]

---

$750 million); *Khan Resources v. Mongolia*, PCA Case No. 2011-09, Award, Mar. 2, 2015 ¶¶ 58, 400, 421 (finding "the fair value of the Claimants' investment" as of July 2009 was $80 million, roughly $60 million more than the company's market capitalization on the Toronto Stock Exchange during that time period, which was between $14.8 and $20.4 million.); *Huff Fund Inv. P'ship v. CKx, Inc.*, C.A. No. 6844-VCG, 2013 WL 5878807, at *13 n.124 (Del. Ch. Nov. 1, 2013) (finding the merger price a "better indicator of fair value" than the NASDAQ stock price when "stock price may have undervalued the company"), *aff'd*, No. 348, 2014, 2015 WL 631586 (Del. Feb. 12, 2015). It is not only courts and tribunals that value companies higher than their share prices. Companies often receive acquisition offers that exceed stock price as demonstrated by Defendant's own cases. *See Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 828 (7th Cir. 1985) (explaining that the parties settled on an acquisition price equivalent to $25 per share. Prior to the acquisition, the stock traded at $7 per share); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 35 n.179 (Del. 2017) (noting the deal price of $13.75 per share "reflected an 'approximately 37% premium over the ninety-day-average unaffected trading price of $9.97'" on the NASDAQ) (citation omitted); *Khan*, PCA Case No. 2011-09, Award, ¶¶ 407-08 (finding "the market price of Khan did not reflect the intrinsic value of the [company's] Dornod Project" because "a willing buyer in or around the relevant time was willing to pay much more for Khan's investment than" the market price). And these market offers likely undervalue companies since acquirers intend to make a profit from their acquisitions. *See Metlyn*, 763 F.2d at 837 ("It is always the case that an acquiring firm thinks the stock or other assets to be acquired worth more than the current price," "[w]hy else would they have gone ahead with the merger?").

[27] *See* Quadrant Report, Exhibit QE-2 at page 4 (showing 867 shares traded on June 7, 2007 when Africo's outstanding shares were approximately 25 million, page 7 (788 shares on January 3, 2008 when Africo's outstanding shares were approximately 27 million), page 9 (292 shares on May 12, 2008 when Africo's outstanding shares were approximately 28 million) all during Defendant's purported relevant period).

[28] Defendant's invocation of the "modified rescissory method" to suggest that the restitution award should be calculated to match the Guidelines loss determination. This argument is meritless. The Second Circuit "has repeatedly noted that loss calculations under the Guidelines and the MVRA will often differ" and has stated that it is "wrong" to argue a "Guidelines loss determination is a necessary prerequisite to a restitution award." *United States v. Peyton*, 186 F. App'x 81, 83 (2d Cir. 2006) (holding the court could use information from cooperation when calculating restitution even though it was shielded from using the information in calculating the defendant's guidelines range); *see also United States v. Goodrich*, No. 14-CR-399 (ENV), 2019 WL 112612, at *1 (E.D.N.Y. Jan. 4, 2019) (explaining the MVRA requires "restitution to each victim [of a covered crime] in the *full amount* of each victim's losses. … Given this individualized remedial purpose, the computation of restitution will often differ from the economic gain or loss computation used in the calculation of a defendant's sentencing guidelines.").

[29] The efficient market cases cited by Defendant are securities class actions where shareholders sued over misrepresentations that caused them to buy or sell shares at artificially inflated or deflated prices. *See e.g.*, *Basic* 485 U.S. at 243-44; *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017); *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). These cases rely on the *Basic* presumption – that in an efficient market, a public, material misrepresentation will distort the price of stock, and, as a result, courts may presume shareholders purchased or sold stock in reliance on the misrepresentation. *Id*. The *Basic* Court **never held** that because a stock price reflects

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 27

(1)     *Dr. Barnes' Event Study is Unreliable and Incredible*

As the Court is aware, Dr. Barnes' event study was designed to test whether the market for Africo's shares reacted to Africo-specific news in a statistically significant manner. Here, Dr. Barnes selected days in which company-specific news would be expected to impact Africo's market, and analyzed trading data, using a regression model, to determine whether trading on those days reflected a statistically-significant movement in Africo's shares. If the market did not have such statistically significant reactions, then the market was not efficient. As Defendant concedes, share prices in an inefficient market do not properly value a company or its assets. *See* Def. Br. at 16.

Dr. Barnes presented the Court with an event study with a regression analysis that led to his conclusion that the market for Africo shares was efficient. Barnes Report at ¶ 8. But as set forth below, and as described more fully in the expert report of Michael P. Salve, Ph.D., of FTI Consulting ("FTI Report") (attached hereto as Exhibit 2), the design of Dr. Barnes's regression analysis is fatally flawed in at least three material areas, each of which renders Dr. Barnes's conclusions unreliable. *First*, Dr. Barnes chose an irrelevant index to analyze whether movements in Africo's share price could be separated from general market and industry movement. FTI Report at ¶ 13. *Second*, Dr. Barnes improperly added an unnecessary element, the USD-CAD exchange rate, to his analysis, and having improperly added an unnecessary element, Dr. Barnes compounded his error by failing to account for its confounding impact on his statistical analysis of ARL's returns. *Id. Third*, Dr. Barnes failed to define his event window, a fundamental step in the design of event studies, and contrary to standard methods. *Id.* While each one of these errors is enough to disqualify Dr. Barnes' findings, in combination they render Dr. Barnes' report useless for the Court's analysis.

---

publicly available information, it does so fully or accurately, or that a stock price mirrors the fair market value of the company and its assets. The Supreme Court clarified the scope of the *Basic* presumption in *Halliburton v. Erica P. John Fund*, 573 U.S. 258, 280 (2014), which is cited by Defendant. *See* Def. Br. at 17 n.20. In *Halliburton*, the Court explained that the *Basic* presumption relies on the "modest premise" that most publicly announced material affects stock market prices – *Basic* did not "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Id.* at 272. The Court stated that the fact the "price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss," which is "**all that Basic requires**." *Id.* (emphasis added). *Halliburton* therefore makes clear that even in an efficient market that satisfies the *Basic* presumption, stock prices do not necessarily equal fair market value of the corporation and its assets. As discussed, Africo did not trade in an efficient market. But even if it did, that does not mean the share price was an accurate valuation of Africo and its attendant mining rights.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 28

*First*, Dr. Barnes' model attempts to compare movements in Africo's share price to movements in the share price of large, multinational mining conglomerates, many with revenues exceeding $1 billion dollars, as reflected on the Solactive Global Copper Mines Total Return Index. FTI Report at ¶ 18.  Since the point of Dr. Barnes' event study and regression analysis is to determine when Africo's stock moved in a way separate and apart from the movements in the market as a whole or other firms just like Africo due to "company-specific, value-relevant, and unexpected news", Dr. Barnes' fatal choice of an index of firms *unlike* Africo means that Dr. Barnes' model cannot reliably identify movements in Africo returns that were related to general movements in like companies (and thus unrelated to Africo-specific news).  *Id.*  Defendant and its expert appear to concede, in their haste to reduce their "time of loss" valuation by 50%, that the Solactive Index would not have accurately predicted the quantity and direction of movements in Africo's share price, making it useless in a regression analysis – "as Dr. Flores notes, this estimate [of the predicted decline in Africo's share price] may be overly generous to Africo and the Claimants, since a company with no track record and a single asset in the DRC *likely would have underperformed in comparison* to other more established mining companies."  Def. Br. at 23 (emphasis added) (citing Quadrant Report at ¶ 25 n.31 (listing features distinguishing Africo from the companies included in Defendant's chosen industry index)).  *See also* FTI Report at ¶¶ 21-25.  To put it bluntly, because Dr. Barnes' model cannot accurately predict the way Africo share prices *should* have moved based on generic market and industry forces, it cannot accurately recognize instances when Africo share prices moved in ways *not related* to those forces.  This acknowledged error renders the results of Dr. Barnes' regression analysis irrelevant because he cannot reach any conclusions regarding the statistical significance of movements in Africo's share price.  *Id.* at ¶ 25.

*Second*, in comparing Africo's actual share price movements to those predicted by the Solactive Index, Dr. Barnes incorporates daily fluctuations in the currency exchange rates – effectively adding an additional and unnecessary element into his model.  By introducing the exchange rate as a variable, this means that changes in that rate will affect the rate of movement in Africo's share price predicted by Dr. Barnes' model less accurate, and thus the potential relationship between movements in Africo's share price and Africo-specific news and events is further obscured.  FTI Report at ¶ 19.  This fundamental error makes it impossible to know whether Africo's returns on even one of the "news days" identified by Dr. Barnes were statistically significant or correlated instead, to fluctuations between the exchange rate between Canadian and U.S. dollars on a given day.  Having added this unnecessary variable into his analysis, Dr. Barnes makes no attempt to isolate its effects on the predictions generated by his model, further compounding his error. Here again, this lack of analysis makes it impossible to decipher whether Dr. Barnes' study shows relevant and statistically significant movements in Africo's share price, or instead merely reflects fluctuations between the exchange rate between Canadian and U.S. dollars on a given day.  FTI Report at ¶¶ 26-32.  These errors related to the

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 29

USD/CAD exchange rate make Dr. Barnes' analysis of the statistical significance of Africo's returns entirely unreliable.  *Id.* at ¶ 32.

*Third*, Dr. Barnes failed to abide by standard practices by choosing not to define "event windows," and instead considered only single-day share price movement.  FTI Report at ¶ 20. An "event window" is the length of time following the stimulus (*e.g.*, the Africo-specific news) that passes before the reaction or effect (*e.g.*, the movement in Africo's share price) is measured. *Id.* at ¶ 33.  Because Dr. Barnes failed to define the confines of his event windows, he cannot assess the speed at which Africo's share price reacted to news and events, an important factor in an analysis of market efficiency.  *Id.* at ¶¶ 33-34.  Reaction speed needs to be assessed, "because if stock prices do not respond quickly *and* fully to news (for example, if it takes several days for the full impact of news to be reflected in a stock price), investors could trade on such information earning superior returns, thus establishing market inefficiency."  *Id.* at ¶ 33.  That is why defining event windows is a standard and necessary practice in event studies.  Because Dr. Barnes failed to define event windows, his non-standard analysis should not be relied on by the Court.

> (2)  *Defendant's Expert Report Supports the Conclusion that the Market for Africo's Shares was Inefficient*

Should the Court choose to ignore each of the above fundamental errors in the design of Dr. Barnes' regression model and event study – and respectfully, it should not – Dr. Barnes' model still fails to support the conclusions he draws and instead indicates that the market for Africo's shares was **inefficient** during the relevant period.  There are two reasons for this, each addressed below.

*First*, of the 23 non-random days Dr. Barnes hand-picked with "company-specific, value-relevant, and unexpected news" ("news days") on **only eight** did returns in Africo shares exhibit movements that could not be attributed to general movements in the market and purportedly similar mining companies.  Barnes Report at ¶ 37.  **Second**, Dr. Barnes fails to properly address the other factors considered by Courts to determine market efficiency under *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and the three factors identified in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).[30]

---

[30] In addition to the issues identified with Dr. Barnes' methodology, his finding of only eight days of statistically significant movement, and his failure to address the *Cammer* and *Krogman* factors, Dr. Salve and FTI identified numerous other significant issues with the results of Dr. Barnes's model, each of which is discussed in detail in the FTI Report ¶¶ 49-53 (very poor model fit), ¶¶ 54-58 (coefficient not statistically significant), ¶¶ 59-67 (factors could indicate market *inefficiency*).

# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 30

First, Dr. Barnes identified 23 news dates, and he found only *eight* (or 35%) "had statistically significant residual returns on the market impact date." Barnes Report at ¶ 39. Putting aside that many if not all of these eight days should not be properly counted,[31] even accepting all eight, Dr. Barnes's conclusions are infirm as a matter of law. Specifically, statistical significance percentages in the mid 40% range have *failed* to establish the efficiency of a market under *Cammer* and *Krogman*, yet here, the percentage calculated by Dr. Barnes was only 35%.[32]

For example, *Menaldi v. Och-Ziff Capital Management Group LLC*, 328 F.R.D. 86 (2018), is particularly instructive. In that case, **Och Ziff** opposed a motion for class certification based on the claimed *inefficiency* of its *own stock*. Even though it is a multi-billion-dollar hedge fund (many times larger than the "start-up" Africo) that trades on the NYSE (the world's largest stock exchange), Och Ziff argued that because plaintiffs' expert showed that only 8 of his 17 selected news dates had statistically significant results (47%), plaintiff had failed to show market efficiency. *Id.* at 22-23. In advancing its argument, Och Ziff relied on Judge Forrest's decision in *George v. China Automotive Systems, Inc.*, where 7 out of 16 days of market reaction (44%) was deemed insufficient. No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013). As Judge Forrest explained, "[e]ven assuming that the methodology was proper, showing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency." *Id.*[33]

---

[31] Not only does Dr. Salve identify issues regarding the individual statistical significance of the movement in Africo shares on each of the eight days relied on by Dr. Barnes, but he also illuminates the statistical fallacies of Dr. Barnes' conclusion that relevant returns on eight out of 23 days with Africo-specific news or events where movement *would be expected* is a statistically robust finding. FTI Report at ¶¶ 42-48.

[32] As explained in the FTI Report, if Africo's stock were truly "efficient" one would expect *every* news-date to have a statistically significant market reaction. FTI Report at ¶ 26 n.13. Defendant provides no reason why an efficient market would *not* react to important company-specific news. For example, in *Menaldi*, Och Ziff argued that "[a]n efficient market *always*—not sometimes—incorporates new information rapidly and fully" and thus "[Plaintiffs' expert's] conclusion that OZM's stock price sometimes reacted to the events he selected thus falls far short of showing the cause-and-effect relationship needed to establish market efficiency." No. 1:14-cv-03251-JPO, Dkt. No. 143 at 15 (S.D.N.Y. Nov. 10, 2017) (emphasis in original).

[33] The *Menaldi* court found against Och Ziff and in favor of class certification notwithstanding its acknowledgment that a 47% reaction rate was Och Ziff's "strongest argument" (*Menaldi*, 328 F.R.D. at 97), because *every other factor* that Courts are instructed to consider in evaluating the efficiency of a market counseled in favor of market efficiency. *Menaldi*, 328 F.R.D. at 97 ("In the end, this would be a much closer call if Plaintiffs' case rested solely on *Cammer* 5. But Plaintiffs are aided by the fact that the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency.").

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 31

Here, Dr. Barnes identified a market reaction percentage of only 35% – far below the 47% Och Ziff itself argued was insufficient in *Menaldi*, and far below the 44% market reaction found to be inadequate by Judge Forrest in *George*. Thus, both the case law and, in fact, Defendant's own previously advanced position[34] reveal that Dr. Barnes' conclusion that a 35% market reaction is somehow sufficient is baseless. *See also* FTI Report at ¶¶ 42-48. Based on the market reaction percentage alone, it is clear, as FTI has confirmed, that Africo shares did not trade in an efficient market. That is yet one more independent reason why Defendant's share price analysis must fail.

Second, we note that the event study performed by Dr. Barnes – irrespective of its conclusions – is only one of the many factors courts consider in determining whether an efficient market has been established. Courts look to the five factors identified in *Cammer* and the three factors identified in *Krogman*, when considering market efficiency. *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 89 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 200 (2d Cir. 2008). Dr. Barnes ignored most of these factors altogether, and the few others he failed to properly consider. FTI Report at ¶¶ 68-73.[35] We submit that the reasons Dr. Barnes ignored most of these factors is clear: he recognized they all pointed definitively toward the conclusion that Africo shares did not trade in an efficient market.

As described above, Defendant has provided the Court with no basis to conclude that a share price analysis provides a reasonable valuation of the Victims' property interests at either the time of "loss" or the time of "sentencing[.]" *See* 18 U.S.C. § 3663A(b). Its share price

---

[34] Defendant takes other positions here that are inconsistent with those Och Ziff advanced in *Menaldi*. As noted above, Dr. Barnes failed to define his "event windows", which is a bedrock step in a proper event study. Och Ziff's expert in *Menaldi* noted the importance of properly defined event windows, and in fact criticized plaintiffs' expert there for the lack of event windows and his single-day analysis: "[A] proper test of market efficiency must specify the time period within which the price will react before observing the actual price change…Once the event window is defined, a researcher can then examine whether the stock price changed quickly within the event window, or whether there was prolonged price reaction outside the event window. This is important because…if stock prices do not respond quickly and fully to new public information (say, for example, if it takes several days for the information to be impounded into the stock price), investors would be able to trade on such information and earn superior returns, which is a violation of market efficiency." No. 1:14-cv-03251-JPO, Dkt. No. 144 at ¶ 86 (S.D.N.Y. Nov. 10, 2017).

[35] The five *Cammer* factors are: (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *Menaldi*, 328 F.R.D. at 94-95. The three *Krogman* factors are: (1) the capitalization of the company, (2) the bid-ask spread of the stock, and (3) the percentage of stock not held by insiders. *Id.*

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 32

approach provides the Court with artificially stunted valuations far below its own contemporaneous valuation, and far below what common sense dictates the Victims interests must be worth given that Defendant and its coconspirators invested over $100 million and paid millions more in bribes to steal those rights. Defendant's insincere arguments that its share-price valuation is reliable ignores that *Defendant* did not believe that Africo's market reflected the true value of the mining rights. And for good reason, any analysis of Africo's market, including Defendant's, shows only that it was an inefficient market that did not reflect the value of the mining rights. For all the foregoing reasons, Defendant's proposed, self-serving share-price methodology should be rejected by the Court.

> 2.  *DCF Analysis is the Appropriate Method to Value the Kalukundi Mining Rights, But Defendant's DCF Analysis is Unreasonable on its Face*

Notwithstanding that outside of a litigation context, Och Ziff itself elected to use a DCF analysis when it wanted to know the value of these very same mining rights, Defendant argues now that a DCF analysis is some kind of strange, unused process that cannot be reliable because it produces divergent results. Defendant also specifically attacks certain of the inputs in SRK's analysis. All of these arguments are unavailing.

> a)  Defendant's Use of a DCF Analysis to Value Africo's Kalukundi Mining Rights in 2008 Demonstrates That Even Defendant Believes DCF is the Proper Methodology

Defendant begins its discussion of the DCF method's purported inadequacies by seeking to disavow its own 2008 DCF valuation. Seeking to achieve precisely what the Government has said Defendant should not be allowed to do: "disown or explain away its prior valuation," Govt Submission at 2, Defendant shamelessly mischaracterizes virtually every aspect of its 2008 valuation.

*First*, Defendant's characterization of its 2008 valuation as relating solely to approval from its investment committee to make a *loan* is false. The financial transaction contemplated by Och Ziff was structured as a short-term *convertible loan.* The convertible loan provided Och Ziff with the right to convert the loan into an equity stake in Camrose at Och Ziff's sole option in a mere six months. *See* Convertible Loan Facility Agreement for Camrose Resources Limited with Vipar Investments Limited (the "Vipar Convertible Loan Agreement"), at § 5, clause 8 (attached as Exhibit 4). Indeed, both the stipulated Statement of Facts and the Settlement Agreement between Och Ziff and the SEC make clear that a key reason why this investment was structured as a convertible loan was an attempt to conceal the use of Och Ziff's funds to bribe public officials in the DRC.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 33

For example, pursuant to the SOF:

21. *Och-Ziff Employee 6 also forwarded the due diligence report on DRC Partner to an outside attorney representing Och-Ziff on anti-corruption issues. The outside attorney advised that providing a convertible loan to DRC Partner would be high-risk, but that there would be "no [anti-money laundering] or anti-corruption issue" as long as DRC Partner "has no discretion with regard to how to spend the proceeds of the loan." As described below, the subsequent agreements provided DRC Partner with a significant amount of discretion over the use of the loan proceeds.*

27. *Och-Ziff and DRC Partner agreed on a multi-step plan to obtain the disputed mining interest by acquiring Akam using Och-Ziff funds, and then settling the legal dispute over the DRC Mine. As part of its agreement, Och-Ziff, through AGC, provided Company B with significant financing to carry out the resolution of the DRC legal dispute and to gain control of Africo. This financing was provided through the Convertible Loan Agreement, which was originally intended to be approximately $115 million, funded in two tranches of $15 million and $100 million.*

28. *On or about April 3, 2008, Och-Ziff Employee 5 sent an e-mail to Och-Ziff Employee 3 and others seeking approval to fund the first tranche under the Convertible Loan Agreement, in the amount of $15 million, to acquire Akam.*

29. *On or about April 7, 2008, DRC Partner caused $2.2 million to be delivered to DRC Official 2, and on or about April 10, 2008, DRC Partner caused $2.8 million to be delivered to DRC Official 2.*

30. *On or about April 17, 2008, Och-Ziff, through AGC, funded the first tranche of the Convertible Loan Agreement through wire transfers from New York. This first tranche of $15.750 million was funded purportedly to acquire Akam, make a shareholder loan to Africo, and pay legal expenses. A few days later, on or about April 21, 2008, Africo announced that it reached an agreement with Company B for a private placement of CAD $100 million that would result in Company B (i.e., DRC Partner's company) owning approximately 60 percent of Africo.*

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 34

Och Ziff's Settlement Agreement with SEC made the same points[36]:

> 3.  *Och-Ziff categorized these transactions as investments or convertible loans despite the fact that two Och-Ziff employees, Och-Ziff Employee A and Och-Ziff Employee B, knew that investor funds would be used to pay bribes.*

> 53.  *Also in April 2008, Och-Ziff caused AGC I to enter into an approximately $124 million convertible loan with a holding company affiliated with DRC Partner. The stated uses of these funds were threefold: first, to provide DRC Partner with approximately $15 million to purchase a Congolese entity that had acquired the rights to a valuable mining asset in the DRC (the longstanding asset of a Canadian mining company) through an ex parte default judgment in the DRC that resulted in judicial misconduct proceedings; second, to provide DRC Partner with approximately $100 million to purchase a majority stake in that Canadian mining company in exchange for resolving its legal issues; and third, to advance an additional $9 million to be used for future mining operations in the DRC. Och-Ziff Employee A and Och-Ziff Employee B knew that the true purpose of the transaction, however, was to provide DRC Partner with funds to pay bribes to facilitate the takeover of the Canadian mining company for the benefit of Och-Ziff and DRC Partner.*

> 54. *Och-Ziff Employee A structured the transaction as a convertible loan. The company had received legal advice from outside counsel indicating that less due diligence on the use of proceeds and counterparties was required in a standard commercial convertible loan versus an equity investment.*

> 55. *Och-Ziff then proceeded with the convertible loan.*

In short, this was an equity investment into the Kalukundi mining rights that Och Ziff and its co-conspirators went to criminal lengths to acquire, not a loan, which is why the investment memo analyzes the value of the mining rights in such detail, both at the time of the investment and then two years after. *See* 2008 Och Ziff Valuation Memo.

That Defendant now seeks to advance before this Court the very veil it fabricated in 2008 to conceal its own crimes flies in the face of its recent arguments to this Court that Och Ziff – now named "Sculptor" – has terminated all the wrongdoers at Och Ziff and has changed its corporate name to demonstrate its commitment to now being a law-abiding corporate citizen.

---

[36] *See* https://www.sec.gov/litigation/admin/2016/34-78989.pdf.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 35

But Och Ziff's metamorphosis is plainly far from complete, for Defendant's argument that its valuation was done solely in contemplation of a "loan" reveals that "Sculptor" appears to be just as committed today to misrepresenting the conduct at issue as "Och Ziff" was when it created this sham convertible loan in 2008.

*Second*, Defendant argues that it should be relieved from its valuation because "it was Africo, not OZ Africa, that was best 'positioned to value the project,'" and it was Africo, not OZ Africa that had "'direct access to the resource[.]'" Def. Br. at 33 (quoting Govt Submission at 3). Both statements are false. In April 2007, more than a year before this valuation was created, the DRC courts recognized Akam as Gecamines' partner in Swanmines, giving Akam direct access to Kalukundi and to all pertinent records. *See* Curtin Dec. Ex. 30 (Dkt. No. 88-30), Africo News Release, dated April 27, 2007. By the time Och Ziff's valuation was compiled, the co-conspirators had owned Akam for months. Moreover, the agreement between Camrose and Och Ziff gave Och Ziff the right to all the information Camrose possessed regarding Kalukundi. *See* Exhibit 4 at § 20.8. Indeed, the Och Ziff's valuation memo itself confirms that Och Ziff used the financial model from Africo's 2006 Feasibility Study to prepare its valuation, and "adjusted [it] where appropriate." 2008 Och Ziff Valuation Memo at 8. Thus, it is clear that Defendant and its co-conspirators not only had the Kalukundi feasibility study, they also possessed the additional information used to "adjust" it.[37]

*Third*, Defendant seeks to obfuscate the value it calculated with its parent company in 2008 for Africo's 75% interest in Kalukundi. This effort should not be countenanced. Based on what Och Ziff itself described as "conservative long term commodity prices," (2008 Och Ziff Valuation Memo at 9), which were approximately 15% below consensus market prices at the time, SRK Reply at ¶ 39, and using a DCF analysis with a discount rate of 12%, which Och Ziff itself described as "high," (2008 Och Ziff Valuation Memo at 15), Och Ziff calculated a value of $194 million **for Africo's interest alone** in Kalukundi. *Id*. at 9. Rather than use this $194 million value, however, Och Ziff then decided to discount that by a further $44 million, resulting in the even more conservative valuation of $150 million. *Id*. In other words, even in Defendant's view, the $150 million valuation was a highly conservative value *for Africo's share of the Kalukundi mining rights* at the time of the crime.

---

[37] *See also* Govt Submission at 3 ("Och-Ziff's 2008 valuation of at least **$150 million** is the best approximation of the value of the mining rights affected by the offense conduct. Not only did Och-Ziff have many of the prior valuations available at the time when it conducted its own analysis, but it had also assumed control of Kalukundi, which gave Och-Ziff and its partners direct access to the resource. No party was better positioned to value the project than the defendant. Moreover, it is only fair that the defendant, whose conduct harmed the victims in this case, should be held to their own prior valuation of the very property they stole from the victims.") (emphasis in original).

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 36

Should Defendant and Och Ziff continue to suggest that its own valuation was other than highly conservative, the Court need only look to the other calculations Och Ziff performed in 2008:

- *Och Ziff contemplated a scenario where it would publicly list Camrose* – Och Ziff calculated that within two years of its investment, the value of Camrose's 52.5% ownership of Africo, based on the attributable value of Kalukundi, could be $180 million, which translates into Africo's share of the Kalukundi mining rights being worth $243 million.[38]

- *Och Ziff also contemplated selling Camrose* – Och Ziff calculated Camrose's share of Africo, based on the attributable value of Kalukundi, would be worth $235 million, ascribing a value of $348 million for Africo's share of the mining rights alone.[39]

These calculations, performed in 2008, in a non-litigation context, reveal what Och Ziff truly believed the value of these mining rights were. *See* 2008 Och Ziff Valuation Memo.

*Fourth*, Och Ziff's 2008 valuation makes clear that Och Ziff understood that a DCF analysis with a 12% discount rate was the proper way to value Africo's interest in Kalukundi. Defendant again seeks to muddy the waters by arguing that the potential investment return calculated for Och Ziff's investment in Africo, 34 %, would not justify an investment in Africo alone. Def. Br. at 34. This investment determination does not change the fact that Och Ziff relied upon a DCF analysis using a 12% discount rate to arrive at that determination.

SRK has noted in each of its submissions to the Court that a 12% discount rate is a relatively high discount rate for the valuation of the Kalukundi mining rights. SRK Report at ¶¶ 26, 62; SRK Addendum at 4 n.5; SRK Reply at ¶ 60. Defendant, of course, now claims that 12% is far too low. Def. Br. at 27. But lest there be any doubt about what the co-conspirators believed at the time, in a non-litigation context, we would point the Court to the first paragraph under "Key risks & mitigants" in the Och Ziff valuation which says: ***"Lastly, team has used a high real discount rate of 12% to reflect uncertainty of future cash flows."*** 2008 Och Ziff Valuation

---

[38] Och Ziff's calculations indicate that Africo itself would be worth $343 million, and after deducting the $100 million that Camrose intended to inject into the company in July 2008 through the Camrose Transaction, Africo's share of the Kalukundi mining rights would thus be worth $243 million. *See* 2008 OZ Valuation Memo at 9.

[39] Och Ziff calculates a value of $448 million for 100% of Africo, and once the $100 million Camrose investment is accounted for, resulting in a $348 million value for Africo's share of the Kalukundi mining rights. *See* 2008 OZ Valuation Memo at 9.

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 37

Memo at 15 (emphasis added).  Och Ziff's own words reveal unequivocally that it believed that a 12% discount rate was "high."

*Fifth*, it is worth noting that the authors of the valuation memo were all seasoned investment professionals employed by Och Ziff from leading investment banks: Vanja Baros (Deutsche Bank – Natural Resources),[40] Taj Sidhu (Merrill Lynch),[41] and Pim Kalisvaart (J.P. Morgan – Natural Resources).[42]  Och Ziff engaged these professionals to reach an accurate assessment of the value of Africo's interest in the Kalukundi mining rights.

In sum, Defendant's efforts to disavow and explain away Och Ziff's own valuation should not be permitted by the Court.

> b)    DCF Analyses are the Industry Standard Approach to the Valuation of Mining Rights

Undoubtedly, Defendant used a DCF valuation model in 2008 because this type of analysis is the cornerstone of mining valuation.  SRK Reply at ¶¶ 74-75.  DCF models are used broadly across various stages of mine development and for investment decisions associated with mining projects like Kalukundi.  *See id.* at ¶¶ 73-77.  As explained by SRK in its November 21, 2017 report, because the Kalukundi project is classified as a "Development Property," the ***industry standard*** valuation approach is a DCF analysis (SRK Report at ¶ 23), an approach recognized by the Canadian Institute of Mining, Metallurgy and Petroleum's Special Committee on Valuations ("CIMVal") (*Id.* at ¶ 22).

Additionally, public mining companies with assets in the DRC routinely value their assets through the use of a DCF analysis.  The acquisition of Nzuri's mining assets in Kalongwe by Xuxchen International, a subsidiary of Chengtun Mining Group, discussed above, serves as a useful and recent example.  *See supra* at p. 14.  Much like Kalukundi in 2008, Kalongwe had obtained a feasibility study, but had not yet dug a shovel into the dirt.  Much like Africo, Nzuri was publicly traded on a non-U.S. market.  In BDO's role performing a "sum of arts" valuation of Nzuri, it used a DCF analysis of the Kalongwe project, much like the one conducted here.

Moreover, arbitration panels around the world that regularly handle mining disputes regularly use DCF analyses to determine the value of mining rights.  *See, e.g.*, *Tethyan Copper*

---

[40] Bio:  http://serinusenergy.com/wp-content/uploads/2017/06/RB-19_2015-ENG-Combined.pdf

[41] Bio:  https://www.carlyle.com/about-carlyle/team/taj-sidhu.

[42] Bio:  https://www.tetragoninv.com/people/details/pim-kalisvaart?category=tfg-am/hawkes-point.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 38

*Co. Pty Ltd. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1, Award, ¶ 301 (July 12, 2019), https://www.italaw.com/sites/default/files/case-documents/italaw10737.pdf ("[T]he Tribunal considers that, in principle, the information and evidence presented by Claimant provide a reasonable and sufficient basis to determine the value of Claimant's investment using an income-based valuation method.").[43]

Even the cases cited by Defendant do not support its position that it is improper to use a DCF analysis to value a mine.  For example, in *DFC Global Corporation v. Muirfield Value Partners, L.P.*, the Delaware Supreme Court disagreed only with the Chancery Court's DCF inputs, not with the use of a DCF.[44]  172 A.3d 346, 386 (Del. 2017).  Defendant's citations to these cases, most of which are not even valuing mining rights and none of which are in the

---

[43]  Indeed, in that arbitration over the value of lost mining rights, the respondent attempted to discredit the use of the DCF method in the mining industry thorough its mining expert of over 40 years.  The expert's cross examination then went as follows

> Q.  Well, no.  I want to be precise about this, that you have never seen any major investment decision made on the basis of a comparable; right?
>
> A.  Except as a confirmation.
>
> Q.  And every single instance will be based on discounted Present Value; right?
>
> A.  Usually, yes.
>
> Q.  No.  Every single instance that you've seen; right?
>
> A.  Yes. Yes.

*See Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1, Award, ¶ 1738 (July 12, 2019), https://www.italaw.com/sites/default/files/case-documents/italaw10737.pdf.  Not surprisingly, the arbitration panel concluded that DCF was the proper methodology for valuing the lost mining rights in that case.

[44]  *See also In re Iridium Operating LLC*, 373 B.R. 283, 351 (Bankr. S.D.N.Y. 2007) (explaining that "the discounted cash flow method is a valid and standard approach, and may even be the preferred method for valuing a business such as Iridium" but noting that the DCF conclusion needed to be validated by comparing the approach to other valuations) (citation omitted); *Huff Fund*, 2013 WL 5878807, at *10, *15 (describing DCF analysis as a "relevant factor" typically used to assess "fair value" that simply was not appropriate due to the unique facts of the case, where ongoing contract negotiations were "a single superseding event beyond the company's control involving idiosyncratic actors making decisions that would have a large effect on the company's future value"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, ¶¶ 896-99 (Apr. 4, 2016) (noting that "conceptually it would have no difficulties in accepting [net asset valuation] as a method per se," but the claimant admitted to flaws in the valuation and finding it was unnecessary to consider "the more customary DCF approach" where the claimant "did not supply a DCF calculation at all"), https://www.italaw.com/sites/default/files/case-documents/italaw7194.pdf.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 39

restitution context, do not take away from the fact that Defendant believed a DCF analysis was the most meaningful approach when valuing the mining rights for its own financial purposes.[45]

Finally, Defendant's argument that the DCF methodology should not be trusted because the Victims' and Government's results differ, is similarly baseless. Under this nonsensical argument, if a methodology is sound, it should always produce identical or similar results. The Court should be relieved to know that expert witnesses will never disagree again! But even confronting this silly argument, here, the DCF models used by both Stout and SRK produce very similar results. While there remains disagreement on one material input – the applicable discount rate – that does nothing to undermine the conclusion of the Government, of Stout and of SRK, who all agree that the DCF methodology is the appropriate methodology for valuing the Kalukundi mining rights. That, of course, was also the conclusion of Och Ziff itself when it chose how to determine the value of those mining rights in 2008 as part of its effort to steal those rights. And as noted above, once the discount rate error made by Stout is corrected, the valuations of both Stout and SRK for Africo's Kalukundi mining rights are extremely similar[46]:

---

[45] In fact, several of these cases hold that Defendant's chosen methodology, a share price analysis, is reliable **only** when there is an efficient market, which Defendant has not shown exists for Africo's stock. *See Metlyn*, 763 F.2d at 835 (the price of an "actively" traded stock is "reliable" when the "essential conditions", including a "liquid market" and "following by professional investors" are met); *DFC Glob.*, 172 A.3d at 372, 373 n.144 ("In an efficient market you can trust prices" and explaining that at-issue company's stock "was listed on a major U.S. exchange, traded actively . . . [and] was also actively examined by the debt markets, which rated and analyzed its creditworthiness."); *Dell, Inc.*, 177 A.3d at 7 (Dell's market capitalization was more than $20 billion, it had a "deep public float", was "actively traded" and was "widely covered by equity analysts"). Defendant also ignores entirely that in many of the cases it cites, which, involve fair market valuation of companies and actual offers to purchase companies, the offers or valuations were at premiums well above the publicly traded value of the stocks being purchased, further demonstrating that the stock value on any given day was not a valid proxy for value. *See supra* n.26; *Dell, Inc.*, 177 A.3d at 5 (deal price was "already" a 37% premium to the company's 90-day-average unaffected stock price); *Rusoro Mining*, ICSID Case No. ARB(AF)/12/5, Award, ¶ 710-11, 768-790 (final valuation awarded was more than $200M higher than the sum of the company's "peak" market capitalization subtracting debt).

[46] Defendant's attempt to rely on other supposed valuations of the Kalukundi mining rights is unavailing. There are only two relevant times of value under the MVRA, the time of loss and the time of sentence. 18 U.S.C. § 3663A(b). None of the other purported valuations of the Kalukundi mining rights are from the relevant times designated by the MVRA. Defendant cites to the May 2004 transaction between Africo and H&J as well as a May 2006 Rubicon Press Release. Def. Br. at 7-8 & Exs. 19, 22. These events were well before the initial theft of the mining rights, Kalukundi's Bankable Feasibility Study establishing the economic viability of the resources, and the forced Camrose Takeover. Additionally, these events, for what they were worth, were two of the many data points available to Defendant when it diligenced and valued the mining rights at least US$150 million in 2008. *See* 2008 Och Ziff Valuation Memo; Govt Submission at 3 ("Not only did Och-Ziff have many of the prior valuations available at the time when it conducted its own analysis, but it had also assumed control of Kalukundi, which gave Och-Ziff and its partners direct access to the resource. No party was better positioned to value the project than the defendant."). Similarly, the 2007 Paradigm capital raise cited by Defendant, is prior to the forced Camrose takeover and the information regarding this capital raise was available for Defendant's consideration in arriving at its at least

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 40

Government Corrected Valuation at 12%:          $415.4 MILLION

SRK Valuation at 12%:                          $421.8 MILLION[47]

      c)      Defendant's DCF Analysis is Incredible and its Criticisms of SRK's Analysis are Incorrect or Immaterial

Defendant does eventually perform its own DCF analysis, but it selects inputs that are so unreasonable that it results in the self-serving conclusion that the Kalukundi mining rights are worth **less than $0**.  *See* Def. Br. at 32.  In other words, Och Ziff now argues that it is such an incompetent criminal, that it spent well north of $100 million dollars, committed numerous felonies, and put its investors at risk of losing their investments, to steal something that had a negative value.  Just stating the premise of Defendant's position demonstrates how specious it is.

To arrive at its negative DCF valuation Defendant lobs a series of "critiques" at the inputs used in SRK's model including: (1) the discount rate, (2) the rate at which the minerals were recovered from the mine (the "mineral recovery rate"), (3) the slope of the pit walls in SRK's mine plan (the "pit slope"), (4) the value ascribed to the minerals present at Kalukundi but not mined in the mine plan (the "terminal value"), (5) the percent of the Kalukundi mining rights attributable to Africo (the "75%"), (6) the operating and capital costs, and (7) the volume of "economically viable" mineral material available at Kalukundi (the "mineral volume").[48]  *See* Def. Br. at 25-30.

Not only is each of Defendant's so-called "critiques" baseless, but Defendant manipulates the impact of each on SRK's DCF model by choosing to ignore that the model would adjust

---

US$150 million valuation a little over a year later.  Def. Br. at 37.  Additionally, the Paradigm Transaction, involved no change in control or any takeover by those investors and thus cannot be used to extrapolate a value for the entire Kalukundi rights held by Africo and its shareholders.  *See* List of Investors in Paradigm Transaction, attached as Exhibit 5 (showing the new investors consisted of forty-one unrelated parties, the largest of which held less than eight and a half percent.).  Defendant's reliance on an internal Africo spread sheet from 2009 is similarly irrelevant. Not only were these spreadsheets created after the time of loss and well before the time of sentence, other than metal prices from mid-2008 used in one of attached worksheets, both of these spreadsheets use extreme inputs and assumptions from 2009 (so neither is a "2008 valuation" as suggested by Defendant) in order to assist Africo in determining whether it needed to take an impairment under GAAP during the depths of the last global economic crisis.  *See* Def. Br. at 30-33 & Ex. 48.

[47] SRK Reply at ¶ 70.

[48] While these critiques are addressed in detail in the SRK Reply attached as Exhibit 1, they are summarized here for the Court's convenience.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 41

these inputs if any of these changes were to be made.  As explained by SRK, this is software that optimizes the model based on the determined inputs.  If you change one, the others adjust in order to achieve the minimum economic disruption.  Defendant's experts ignore this critical fact, and they seek to conceal it by not creating their own model.  The result is that each of the proposed adjustments from Defendant's experts results in an artificially inflated impact on SRK's calculations.  This undermines Defendant's DCF calculation altogether and explains how Defendant comes to the patently unreasonable ***negative valuation*** of the Kalukundi mining rights. SRK Reply at ¶¶ 131-32.  This DCF valuation is thus a baseless and incredible attempt by the Defendant to avoid its restitution obligations and should be rejected by the Court.[49]

   *Discount Rate*: Defendant's primary critique of SRK's DCF valuation is its use of a 12% rate.  Defendant's hand-picked experts argue that the 12% discount rate selected by SRK (which is based on the 2008 Kalukundi DCF valuation performed by Och Ziff itself) does not properly account for the risks to the project based on its location in the DRC and because development has not yet begun.  *See* Quadrant Report at ¶¶ 117-20.  Defendant's expert instead suggests the use of a 24% discount rate to account for these risks.  *See id.* at ¶ 119.

   As detailed above, *supra* at pp. 11-12, _, the 12% discount rate selected by Defendant in 2008, and replicated by SRK, is a conservative rate based on other comparable valuations from the DRC.  SRK Reply at ¶¶ 61-68.  All of the purported comparables cited by Defendant and its experts except one, are either not in the DRC or are not copper mines.  *Id*. at ¶¶ 84-85.  The one DRC copper mine cited by Defendant is Semhkat.  *Id.* at ¶ 85.  As discussed in detail above, Semhkat is not a proper comparable to Kalukundi because it lacks a bankable feasibility study and has a substantially lower grade ore body than Kalukundi.  *Id.*

   Defendant's expert's selection of irrelevant comparables is particularly telling given the number of actually similar properties SRK was able to identify.  In each of the comparable DRC copper mine valuation events identified by SRK, not one included a "country-specific risk premium," even though the industry professionals who completed these valuations were undoubtedly aware of the location of the property being valued.  SRK Reply at ¶ 86.  Defendant has thus provided the Court with no rational basis to ignore the "high" discount rate of 12% used by Defendant in 2008, replicated by SRK, and confirmed by numerous comparable valuations in the DRC.

---

[49] Defendant also fails to address the steps SRK took to confirm the reasonableness of its DCF valuation. Specifically, and as described in both SRK's initial and November 2019 reports, SRK analyzed comparable transactions as an alternative method of valuing the Kalukundi mining rights.  *See* SRK Report at ¶¶ 66-76; SRK Addendum at 7.

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 42

*Mineral Recovery Rate*: Defendant argues that SRK's model overstates the mineral recovery rate, or the percentage of valuable minerals recovered after mining and processing the ore. *See* Dkt. No. 88-3, RPA Expert Report ("RPA Report") at ¶ 164. SRK used the recovery rates provided by the experts who completed the 2006 Bankable Feasibility Study and the 2013 Resource Update. SRK Reply at ¶ 88. Flat rates like the one used by the feasibility study and SRK are used to "provide a reasonable approximation of expected metallurgical recoveries." *Id*. RPA, in contrast, rejected those rates and derived its own based on a separate table in the 2006 feasibility study, applying distinct rates each year of the mine life. SRK chose to use the flat rate provided by the feasibility study primarily because a flat rate is more conservative in the first few years of a mine's life when the discount rate is more relevant. *Id*. at ¶ 89. While RPA's method is not entirely irrational, it was misapplied in a manner designed to overstate the impact of this critique on SRK's DCF valuation. *First*, RPA calculated a straight average, rather than the proper weighted average needed to accurately reflect the plant recovery performance. *Id*. *Second*, RPA's application improperly assumed irrational mining behavior. Specifically, the application of RPA's straight average assumed that Africo would have continued to mine unprofitable portions of property and then mix in the less valuable material with the more profitable ore (bringing down the average recovery in that year). *Id*. at ¶ 90. While SRK believes there is no reason to depart from the flat recovery rate provided in the 2006 Bankable Feasibility Study and the 2013 Resource Update, SRK calculated the impact of the proper application of RPA's chosen method on SRK's DCF model, and showed the impact was vastly overstated by RPA. *Id*. at ¶¶ 91-92.[50]

*Pit Slope*: The pit slope is the angle of the pit wall from the maximum depth of the pit to the lip of pit at surface. Pit slope is an important factor in determining the amount of waste material that needs to be removed from the mine so that mineral bearing ore can be accessed (the "strip ratio"). RPA argued that the pit slope used by SRK was 45-degrees for every pit, that 45-degrees was too steep and caused SRK to underestimate the strip ratio (and thus under estimate the cost of removing waste material from the mine pit). RPA, however, misread the SRK model. While SRK's model included a 45-degree pit slope as a *maximum parameter* for the mining software program, the actual pits mined in the model had pit slopes between 33 and 40 degrees, consistent with the 2006 Bankable Feasibility Study and 2013 AMEC Resource Update. Additionally, the strip ratio applied by RPA, almost twice as high as the ratio in the 2006 Bankable Feasibility Study and 2013 AMEC Resource Update (and replicated in the SRK model), is used by RPA without citation or explanation in a manner baldly designed to bring down the DCF valuation. *Id*. at ¶¶ 93-102.

---

[50] *See also* SRK Reply at ¶ 91, n.63 explaining that the true impact of using a weighted average recovery rate and the accompanying weighted average processing cost in SRK's model is an approximately US$4 million *increase* in the NPV.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 43

*Terminal Value*: Defendant argues that both the Government's expert and SRK incorrectly ascribe any value to the over 40 million tons of mineral material left unmined in the DCF mine plan. *See* RPA Report at ¶ 197. This argument belies common sense and market reality. As explained by SRK, "failing to give any value to the over 40 million tonnes left unmined at the end of a mine life is not appropriate in cases like Kalukundi, where significant quantities of valuable metals are known to exist beyond the scope of the initial mining plan." SRK Reply at ¶ 104. Here, SRK applied a conservative value to the remaining material in line with market valuations in comparable transactions. That conservative value was further discounted by the model's conservative 12% rate. Here, all of that means that the value given to this 40 million tons of valuable mineral material, known to exist based on the 2006 Bankable Feasibility Study and 2013 AMEC Resource Update, is only US$20 million (or 5% of the value of the Kalukundi mining rights presented to the Court). *Id*. at ¶ 106. Defendant's experts have provided no valid basis to depart from industry standard practice and ignore this material. *Id*. at ¶ 107.

*75% Attributable to Africo*: Defendant and its expert argue that SRK failed to account for the SPT, the costs of development borne by Africo as a part of its joint-venture with Gecamines, and the additional 5% of the mining rights that could be ceded to the DRC government as a part of the mining-license renewal process. *See, e.g.*, Def. Br. at 31-32; Quadrant Report at ¶ 84. Again, Defendant completely misses the mark. As noted in section above, *supra* at pp. 7-8, there is no basis to apply the SPT to Kalukundi's "time of sentence" valuation. Regarding Africo's joint venture with Gecamines and the potential additional 5%, it should be noted that even if both of these arguments were correct, which they are not, SRK's extremely conservative additional year 30% discount factor, which reduces the value of the mining rights by US$150 million, is more than sufficient to absorb any variation from the 75% ownership stake. SRK Reply at ¶ 109. Regarding funding, Defendant misinterprets SRK's DCF, which purposely calculated the valuation for Kalukundi on an *unleveraged* basis.[51] Because the project would, in reality, be developed on a leveraged basis (as was explored by Africo before Defendant's crimes), the inclusion of debt would increase the NPV of the project because the interest rate payable on the debt will be less than the discount rate of 12% used in the DCF. *Id*. at ¶ 110. Regarding the transfer of the additional 5% of equity, this is a new provision in the March 2018 DRC mining code, and SRK is unaware of any license renewals which have occurred under it. *Id*. at ¶ 111. However, there is a parallel provision in the 2003 mining code, which required companies to transfer 5% (updated to 10% in the 2018 code) of the ownership to the DRC government at the time the mining license was first issued. This provision has been imposed only on mining companies that have *not* entered into a joint venture with Gecamines (unlike Africo). Therefore,

---

[51] Unleveraged means financing the mine without incurring debt, as opposed to leveraged, which means financing the mine with debt. Och Ziff calculated the DCF valuation of Kalukundi on an unleveraged basis in 2008.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 44

it is unlikely that joint ventures with Gecamines will be required to transfer an additional 5% to the DRC government, especially considering that the DRC government, through Gecamines, already has a 25% interest in Kalukundi.  *Id*. at ¶¶ 112-13.

*Costs*: Defendant's expert argues that SRK understates the costs necessary to develop and operate the Kalukundi property by as much as $350 million.  *See* RPA Report, Ex. RPA-002. The capital and operating expenditure figures propounded by RPA have no citation and bear no relation to the figures quoted for other similar DRC mining properties.  Regarding capital costs, *first*, RPA ignores that the costs used in SRK's mine plan are based on quotes provided by MDM, which was the engineering firm involved in the 2006 feasibility study that was to be responsible for building the plant.  SRK Reply at ¶ 116. In contrast, RPA relied on the 2008 SRK (Johannesburg) Report to estimate costs, which was not commissioned nor authorized by Africo, and Africo's management and technical team did not participate in the preparation of it (nor did MDM).  *Id*. at ¶ 117. *Second*, the reasonableness of SRK's costs (and the unreasonableness of RPA's) is demonstrated by comparing those costs to nearby projects in the DRC.  *Id*. at ¶ 118. Thus, RPA has provided no valid basis to change the capital costs used by SRK.  Regarding operating expenses, RPA's arguments are similarly without basis.  RPA assumes operating costs that fall within the top 5% of mines in the world and provides no basis for its increases over the already very conservative prices used by SRK.  *Id*. at ¶¶ 120-22. [52]

*Mineral Volume*: Defendant argues that SRK's model overestimates the volume of mineral that can be economically extracted from the Kalukundi property because it does not distinguish between measured and inferred resources.  *See* Dkt. No. 88-3, RPA Report at ¶¶ 17, 20.  This strawman argument should be dismissed by the Court.  Although SRK could not "classify" the resource it calculated into measured, indicated and inferred reserve categories, this was not because of a lack of confidence in the resources, but rather due to technicalities inherent in mining regulations.  SRK Reply at ¶ 124.  At bottom, the 2013 AMEC Resource Update identified that volume of mineral was *twice* what was originally expected in 2006.  However, through no fault of the Victims, the steps to technically "classify" those additional minerals did not happen while Defendant and its coconspirators controlled Kalukundi.  Thus, to ignore those minerals would be irresponsible and unreasonable, and would artificially reduce the value of Kalukundi based on semantics.  Moreover, regardless of Defendant's semantics-based argument, SRK is completely comfortable with its volume estimate, as it closely mirrors the 2013 AMEC

---

[52] RPA's operating expenses numbers are generally in line with SRK's operating expenses numbers (RPA US$80.00 and US$14.00 per tonne of ore processed, SRK's US$78.32 and US$12.84 per tonne of ore processed).  SRK Reply at ¶ 120.  Still, RPA fails to justify its calculation – RPA provides no evidence to support the increases in its report. RPA's mining operating expenses number is not supported or specific to this project, and no backup information has been provided to support it.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 45

Resource Update and is very conservative for several reasons, including that under SRK's mine plan, less than **30%** of the resource identified at Kalukundi is being exploited, leaving approximately 40 million tonnes of the resource identified in the 2006 Bankable Feasibility Study unmined.  There is no reason that a willing buyer and willing seller would ascribe no value to these resources that are known to exist.  *Id*. at ¶¶ 124-28.

> **D.**     **Defendant's Other Attempts to Avoid Restitution are Unsupported by the Law and the Facts**



# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 46



# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 47



# WILSON
# SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 48

2. *The Need for Restitution Outweighs Any Complexity*

The Victims and the Government agree that there is no complexity sufficient to outweigh the need to provide restitution. *See* Govt Submission at 16-17; Dkt. No. 69 ("Victim Br.") at 4-8. Defendant makes only a half-hearted attempt to argue otherwise. But Defendant does not attempt to argue that it meets the high burden for the complexity exception to the MVRA. *See* 18 U.S.C. § 3663A(c)(3)(B) ("[D]etermining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."). Instead, the Defendant uses the complexity exception as yet ***another*** opportunity to argue that its valuation methodology should be adopted by the Court: "Here, OZ Africa respectfully submits that the share price loss method is the only fair, straightforward, and objective way to calculate restitution, whereas the DCF method, as demonstrated above, is overly complex, subject to manipulation, and will unduly delay the sentencing process." Def. Br. at 38. Defendant does not point to a single case holding that a DCF analysis is "too complex" to determine restitution for crime victims. The argument is unsupported, illogical, and should be rejected, especially given that the Government already agreed to delay sentencing for at least 18 months at the request of and for the exclusive benefit of *Defendant*. For these reasons, and those stated in Victims' opening brief, Dkt. No. 69, we respectfully request the Court hold the Defendant to its restitution obligations.[56]

3. *There is No Basis to Apportion Restitution Liability Under 18 U.S.C. § 3664(h)*

The Court has already determined that the conspiracy to which the Defendant pled guilty was the direct and proximate cause of the Victims' harm and that the Defendant is liable for the entire conspiracy. Order, Dkt. No. 51 at 17 ("[I]n calculating Claimants' restitution, the court will consider Defendant liable for the initial theft of Claimants' Kalukundi mining rights, as

---

[56] In a footnote at the tail end of its brief, Defendant argues that Victims' "failure to identify individual Claimants and their specific losses severely complicates and would improperly prolong the sentencing process". Def. Br. at 38 n.51. Putting aside that the class of victims has been identified and the information that the Victims have provided the Government, as already explained by Victims, courts have regularly allowed the government to hold funds in trust for identified but not yet located victims. *See United States v. Ageloff*, 809 F. Supp. 2d 89, 104 (E.D.N.Y. 2011) ("I also accept and incorporate as part of this order the government's representation that it shall hold the collected restitution funds in trust, to exist for no longer than twenty years, at which time the restitution judgment will expire by operation of New York law and any undistributed funds shall be returned to Ageloff."), *aff'd sub nom. United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012); *see also United States v. Berardini*, 112 F.3d 606, 607 (2d Cir. 1997) (affirming district court's decision to order defendant to make restitution payment to government as trustee for the identified but not yet located victims).

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 49

Defendant knew or should have known about it."). The Court then ordered the parties to submit briefing regarding whether it "should either apportion liability among the coconspirators or make Defendant jointly and severally liable for all of [Victims'] losses under 18 U.S.C. § 3664(h)[.]" *Id.* at 20.

In their opening submission, the Victims explained why there existed no valid basis for the Court to apportion liability here, and that Defendant should be held jointly and severally liable for all of the Victims' losses. Victim Br. at 2-3 ("Here, of course, there is only a single defendant that has been charged by the Government, and only a single defendant who will be sentenced by the Court for this conspiracy. Section 3664(h) is thus inapplicable. Under the MVRA, the Court must therefore enter an order for restitution for the entire amount of the victims' losses.") (citing *United States v. Walker*, 353 F.3d 130, 131 (2d Cir. 2003); *United States v. Channita*, 9 F. App'x 274, 274-75 (4th Cir. 2001); *United States v. McGlown*, 380 F. App'x 487, 491 (6th Cir. 2010)). *See also Bengis*, 783 F.3d at 414; *Fiumano*, 721 F. App'x at 52 (affirming "the district court's decision to order [the defendant] to make restitution for the entire length of the charged conspiracy" including "losses occurring before he joined the charged conspiracy" because the defendant "knew or reasonably should have known that fraudulent activity had transpired there prior to his arrival").

The Government's opening submission, relying on the same controlling authority, reached the identical result. *See* Govt Submission at 14-15 ("[T]he Court should order the defendant to pay restitution for the full amount of the [Victims'] losses" because "there is also no basis to apportion the defendant's liability").

Defendant responded with three arguments as to why it should not be held responsible for all of the Victims' losses. Each of these arguments is utterly baseless.

*First*, according to both the Government and Defendant, an individual who has never been identified to the Victims or their counsel has pled guilty – apparently under seal – to participating in some unidentified part of the large conspiracy to which Defendant pled guilty.[57] According to Defendant, some of the responsibility for making restitution should therefore fall to this other individual. But as the Government informed the Court, this individual will be unable to "meaningfully contribute to the restitution award." Govt Submission at 15. Defendant does

---

[57] As the Court is aware, Defendant OZ Africa and its parent, Och Ziff Capital Management, pleaded guilty to participating in a conspiracy that extended beyond stealing the Kalukundi mining rights in the DRC. That conspiracy covered similar conduct in Libya. SOF at ¶¶ 64-92. Accordingly, given that this individual's case docket remains entirely under seal, it is not clear to the Victims what role, if any, this unidentified individual played in the theft of the Kalukundi mining rights.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 50

not contest this.  As a result, Defendant's "ask" here is clear: it prefers that the Court pare down the Defendant's own financial liability by seizing upon the empty pocket of the unidentified individual and thereby enter a restitution order that does not make the Victims whole.  *Id.* at 36-37.  Defendant's position is contrary to the law.

Importantly, even if the unknown individual was before this Court, it would still be appropriate for the Court to order the co-conspirators jointly and severally liable.  18 U.S.C. § 3664(h); *see also Fiumano*, 721 F. App'x at 52 (affirming joint and several liability for a late entering co-conspirator).[58]  And as the Government has made clear that the "individual [is] unable to 'meaningfully contribute to the restitution award,'" in the face of a joint and several award, Defendant would still be on the hook for the full amount of restitution.  Def. Br. at 36 (citation omitted).  Moreover, even if the Court could apportion the restitution between Defendant and the unknown individual, the Defendant has not provided any reason why it should not be allocated the entire payment given the Defendant's significant "level of contribution" and wealth.  18 U.S.C. § 3664(h).[59]  *United States v. Goodrich*, No. 14-CR-399 (ENV), 2019 WL 112612, at *3 (E.D.N.Y. Jan. 4, 2019) (denying apportionment when "most of [the] co-defendants liable for the … losses are cash-strapped" and "any recovery by victims will be 'severely diminish[ed]' if the Court apportions liability among the co-conspirators"); *United States v. Washington*, 408 F. App'x 458, 459-60 (2d Cir. 2011) (affirming the district court's decision to hold a co-conspirator liable for the entire restitution because of her culpability even when the "mastermind" of the conspiracy was not convicted and owed no restitution).

*Second*, Defendant argues that it would be "unjust" to hold it accountable for the losses to the Victims, because certain of the wrongdoing here was undertaken by others – Defendants'

---

[58] The Defendant's own cases demonstrate that if its coconspirators were charged in this case, the Defendant could still be held jointly and severally liable for the entire restitution award.  *See United States v. Smith*, 513 F. App'x 43, 45 (2d Cir. 2013) (finding "the district court did not err in holding [the defendant jointly and severally liable] for losses resulting from the actions of her coconspirators in furtherance of the conspiracy" because it was "reasonably foreseeable that the conspiracy would cause [those] substantial losses"); *United States v. Donaghy*, 570 F. Supp. 2d 411, 433 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (finding co-conspirators "jointly and severally liable" for the victim's direct harm from the conspiracy and apportioning only investigation costs and attorneys' fees that were not attributable to all defendants).

[59] Defendant provides no reason why its economic circumstances would warrant discretionary apportionment to a judgment-proof co-conspirator likely because Defendant is the subsidiary of a multi-billion dollar hedge fund that routinely pays its executives tens of millions of dollars in annual compensation.  18 U.S.C. § 3664(h).  In fact, as we noted in prior submissions, Och Ziff continues to award incentive packages valued at as much as $250 million for a single executive.  *See, e.g.*, https://www.forbes.com/sites/nathanvardi/2017/02/15/33-year-old-hedge-fund-star-james-levin-awarded-250-million-pay-package-amid-och-ziff-stock-debacle/?utm_source=TWITTER&utm_medium=social&utm_content=811834274&utm_campaign=sprinklrForbes MainTwitter#4aaf8bff49e3.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 51

own co-conspirators.  Def. Br. at 37.  But as the Defendant is aware, none of these "others" – "Gertler" and the "corrupt DRC officials" – have been charged in this case.  In such circumstances, it is appropriate for the Court to hold Defendant solely responsible for the total restitution payment.  *See United States v. Peyton*, 186 F. App'x 81, 84 (2d Cir. 2006) (affirming the district court's order that the defendant "pay the full amount of restitution rather than making the obligation joint and several with confederates in the same scheme" when "[a]t the time [the defendant] was sentenced, other confederates in the fraud scheme had been charged but not yet convicted"); *United States v. Lucien*, 347 F.3d 45, 54 (2d Cir. 2003) (holding that district court was not required to make defendant's restitution obligation joint and several with entities upon whom the court then lacked 'authority' to impose a restitution order).  Moreover, as stated above, the Court already has held that the Defendant is "liable for the initial theft of Claimants' Kalukundi mining rights, as Defendant knew or should have known about it."  Order, Dkt. No. 51 at 17.  Again, the Defendant complains about the apparent unfairness of the Government's charging decisions here.  Def. Br. at 37.  Moreover, the Court has already held that the Victims' losses were foreseeable to the Defendant at the time it participated in the conspiracy, a point Defendant no longer appears to contest.  As a result, Defendant's complaints of some kind of unfairness here ring hollow.  Defendant elected to harm the Victims.  The Victims are entitled to full restitution.  If that means Defendant must shoulder that burden alone, that is the result of the choice Defendant made when it decided to commit its crime with the attendant foreseeable circumstances.

*Third*, citing no authority, Defendant pleads that it should be spared having to make full restitution to the Victims because it has imposed on itself what it describes as enormous hardship – having to fire certain employees and then changing its corporate name.  As an initial matter, Defendant did not endure any of these purported hardships; these were remedial steps unilaterally undertaken by Defendant's co-conspirator parent company, multi-billion dollar hedge fund Och Ziff Management.  Moreover, even if these "hardships" had befallen Defendant, they obviously have not in any way compensated the Victims of Defendant's crime, and as a result, do nothing at all to reduce Defendant's restitution obligations.

# WILSON SONSINI

The Honorable Nicholas G. Garaufis
April 30, 2020
Page 52

## <u>CONCLUSION</u>

Based on the above, and for the reasons set forth in the other submissions on behalf of the Victims, including the reports of SRK and FTI, we respectfully submit that the Court should conclude that the value of Africo's mining rights as of the time of sentencing is US$421.8 million, and that an Order of restitution be entered in that amount.

Dated:  April 30, 2020

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

<u>s/ Morris J. Fodeman</u>
Morris J. Fodeman
Michael S. Sommer
Kate T. McCarthy
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899
mfodeman@wsgr.com
msommer@wsgr.com
kmccarthy@wsgr.com

*Counsel for Claimants*

cc:  All Counsel of Record (via CM/ECF)