# Exhibit 1

# Reply Report to the

# Valuation of the Kalukundi Copper/Cobalt Project

**Report Prepared by**

srk consulting

SRK Consulting (U.S.), Inc.

April 30, 2020

srk consulting

# Table of Contents

**I. SRK HAS PROVIDED THE COURT WITH REASONABLE VALUES OF THE KALUKUNDI MINING RIGHTS BOTH AT THE TIME OF LOSS AND PRESENT............1**

A. Purpose of this Supplemental Report ....1

B. SRK's Conclusions ....1

**II. RESPONSE TO THE GOVERNMENT/STOUT SUBMISSION ....3**

A. Introduction ....3

B. Value of the Kalukundi Mining Rights in 2008 ....4

C. Value of the Kalukundi Mining Rights at Present ....5

D. The Extra Year of Discounting in the Stout Model ....7

E. The Application of the DRC "Super Profit Tax" ....9

F. The Applicable Discount Rate ....14

G. Stout's Comparables ....19

H. Conclusions Regarding Stout's Comparables ....26

I. SRK's Survey of Comparable Discount Rates ....26

J. Conclusions as to the Government/Stout Submission ....33

**III. OCH ZIFF'S DCF ANALYSIS IS UNREASONABLE ....33**

A. DCF is the Proper Methodology to Value Kalukundi ....34

B. 12% is an Appropriate, Though Conservative Discount Rate ....37

C. The Metallurgical Recovery Rates used by SRK are Justified ....42

D. Pit Slopes and Stripping Ratios used by SRK are Correct ....46

E. Addition of a Terminal Value is Justified ....49

F. 75% of the Kalukundi Property is the Appropriate Percent Attributable to Africo ....52

G. Och Ziff Overstates Costs in its Analysis ....55

H. The Resource Volume Used by SRK is Reasonable ....60

I. Comparable Transaction Analysis ....63

J. Och Ziff Exaggerates the Potential Impacts of the Critiques it Raises, Resulting in an Entirely Unreasonable and Negative Valuation ....64

# Appendices

Appendix A: Comparison Between Kalukundi and Kalongwe

Appendix B: SRK Kalukundi Pit Depth

srk consulting

## Exhibits

SRK-01: DRC 2018 Mining Code

SRK-02: DRC Article 530

SRK-03: Metorex Annual Report

SRK-04: DRC Consummated Transactions

srk consulting

# I. SRK HAS PROVIDED THE COURT WITH REASONABLE VALUES OF THE KALUKUNDI MINING RIGHTS BOTH AT THE TIME OF LOSS AND PRESENT

## A. Purpose of this Supplemental Report

1. SRK Consulting, Inc. ("SRK") was asked by Wilson Sonsini Goodrich & Rosati ("WSGR" or "counsel") to review and respond to the submissions generated by the United States Government / Stout, Risius, Ross, LLC ("Stout") and the Defendant's experts; Quadrant Economics ("Quadrant"), Roscoe Postle Associates ("RPA"), and Dr. Ronnie Barnes of Cornerstone Research ("Barnes").

## B. SRK's Conclusions

2. Having reviewed the submissions made by the Government and the Defendant, SRK remains confident in the reasonableness of the valuations it has set before this Court.

### i. Kalukundi is a World Class Deposit

3. Currently the world is mining open-pit copper deposits with grades below 1%.[1] Many of these operate at depths in excess of 500m, which is over 3 times the maximum depth that the Kalukundi mine will reach at the end-of-life mine plan. Kalukundi by comparison has an effective, copper equivalent grade of 8.1% (when including the equivalent grade of the cobalt by-product). At just over 8%, Kalukundi is some ten times the average copper grade being mined globally at present.[2]

---

[1] Anyone extracting a mineral resource goes for the richest, most easily mined deposits first, so ore grades ran from 10% to 20% copper until late in the 19th century and then plummeted to 2% to 3% in the early 20th century. Since the mid-1990s, the world copper grade has been just below 1% and in slow decline, according to data compiled by resource geologist Gavin Mudd of Monash University, Clayton, in Australia, in a 2013 paper in the *International Journal of Sustainable Development.*

[2] 2019 Consensus Market Price TEM

4. In our opinion, and described further below, Kalukundi is thus one of the best "shovel ready" undeveloped copper/cobalt deposits in the world today.

**ii. SRK's 2017 and 2019 Models are Conservative**

5. The economic models of Kalukundi that SRK prepared in 2017 and 2019 intentionally represent a conservative assessment of the value of Kalukundi as it is based on very conservative inputs. For example, as described herein, the models assume that only 17Mt of mineable material will be extracted, out of a total established resource of 55Mt. That is, the mine plan (and thus the DCF analysis) leaves 70% of the established resource of the mine unexploited in our models.[3] Additionally, in order to conform with what Och Ziff ("Och Ziff") itself did in 2008, we added an additional year before mining begins to our standard modeling approach, with a punitive discount rate of 30% for that year. This additional year, with this very high discount rate, individually reduces the net present value ("NPV") of Kalukundi by approximately US$150 million. Similar to the approach taken by Och Ziff in 2008, SRK has adopted this additional discount approach in order to compensate for any differences that might arise between even the very conservative assumptions used in our model and what might actually arise when Kalukundi is mined. This US$150 million deduction is a very significant "cushion" that likely overcompensates for any deviations between the results our model generates and the actual experience of mining the property. As described herein, we have also ascribed a conservative value to the residual unmined resource and a conservative approach to pit optimization and estimation of operating costs. These factors, when taken together, result in

[3] Table 1-1 AMEC 2013 Ex 4, SRK November Addendum at Figure 18

what we consider to be a very conservative valuation result, with a substantial margin to compensate for any unexpected deviations from the mine plan as presented.

## II. RESPONSE TO THE GOVERNMENT/STOUT SUBMISSION

### A. Introduction

6. On November 22, 2019, the Government made its letter submission to the Court, attaching the report of its financial consultant, Stout, Risius, Ross, LLC ("Stout"). The Government letter and the Stout analysis are referred to collectively as the "Government/Stout" submission.

7. In connection with the value of the mining rights in 2008, the Government/Stout submission concluded that the value of the mining rights owned by the former Africo shareholders in 2008 was "at least US$150 million," a valuation drawn directly from the valuation performed by Och Ziff itself in 2008 (the "Och Ziff 2008 Valuation").

8. As for the current value of the mining rights, Stout agreed with SRK that a discounted cash flow ("DCF") analysis should be performed (just as Och Ziff had elected to do itself in 2008) and it adopted the model that SRK had presented in its opening submission to the Court. Stout incorporated certain different assumptions into that DCF model and concluded that the value of the entire Kalukundi mining rights as of late-2019 was US$188.7 million, which would amount to US$141.5 million attributable to the former Africo shareholders.

9. This section of our reply submission addresses the Government/Stout submission. Specifically, SRK addresses: (i) the Government/Stout valuation of Africo's interest in the

mining rights at the time of loss in 2008 of "at least US$150 million;" and (ii) the Government/Stout valuation of Africo's interest in the mining rights as of late-2019 of US$141.5 million. As set forth below, while SRK agrees with the vast majority of the Government/Stout submission, there are certain errors in the Government/Stout model that cause it to significantly under-value the Kalukundi mining rights. Once these errors are corrected, the result is that the SRK valuations and the Government/Stout valuations are very similar.

### B. Value of the Kalukundi Mining Rights in 2008

10. Both the SRK submission and the Government/Stout submission focused on the fact that Och Ziff performed its own valuation of the Kalukundi mining rights, and that it did so in 2008, at or around the "time of loss". In fact, both SRK and the Government/Stout reports agreed on the following:

- In 2008, Och Ziff performed its own valuation of Africo's 75% interest in the Kalukundi mining rights and determined that the value at that time was at least US$150 million, and as much as US$194 million.
- The Och Ziff 2008 Valuation employed a discounted cash-flow ("DCF") methodology, the methodology the Government/Stout submission identified as the appropriate methodology, and the methodology SRK maintains is the appropriate methodology as it is the analysis the mining industry uses to determining the value of development stage mineral properties, such as Kalukundi.
- The Och Ziff 2008 Valuation DCF calculation employed a 30% discount rate in the first year, and 12% for each subsequent year.
- The Och Ziff 2008 Valuation used conservative copper and cobalt prices that are a little over half of current consensus prices for these minerals.

- The Och Ziff 2008 Valuation was performed before it was confirmed that there were vastly more copper and cobalt resources at the Kalukundi site, and as a result, these additional resources were not included in the Och Ziff 2008 Valuation.

- The Och Ziff 2008 Valuation was performed in a non-litigation context.

11. As noted above, SRK is in agreement with the Government/Stout submission in almost all respects relating to the value of the mining rights as of the time of loss in 2008. The Government/Stout submission places that value at "at least US$150 million," drawing from the Och Ziff 2008 Valuation itself which determined that, based on "conservative long term commodity prices," the value was between US$150 - US$194 million, and by looking to other valuations of Kalukundi performed at or around that time to confirm that the 2008 Och Ziff Valuation was reasonable. SRK undertook the same approach: it considered the Och Ziff 2008 Valuation, and it considered other valuations of Kalukundi at the time. SRK factored those other valuations into its analysis and determined that the value of the stolen mining rights as of 2008 was between US$150 - US$258 million.[4][5]

## C. Value of the Kalukundi Mining Rights at Present

12. As for the value of the mining rights at the present, SRK and the Government/Stout submission were again largely in agreement. SRK again endeavored to apply as closely as possible Och Ziff's own valuation model but updating it to account for any material changes

---

[4] SRK Consulting, November 2019 Addendum to the Valuation of the Kalukundi Copper/Cobalt Project ("2019 SRK Addendum") at 3.

[5] We would note, however, that Stout appears to have misread the 2006 MDM and RSG Reports, which reflect a value of 75% of the Kalukundi mining rights at US$228.4 million. *See* Government/Stout Submission at 4; MDM Report at 19-14. The Government/Stout submission failed to include the US$65.5. million, which representative MDM/RSG's heavily discounted valuation for non-reserve resources (within and below existing reserves). Government/Stout Submission – Ex 1 page 2 ¶ 2.

that have occurred since 2008. These material changes included: (i) the increase in the price of copper and cobalt; (ii) the more than doubling of the amount of copper and cobalt confirmed on site at Kalukundi; (iii) new DRC taxes; and (iv) increases in costs from those that existed in 2008.[6] Based on this approach, SRK's DCF analysis, using the identical discount rate of 30% for an additional year and 12% for the remaining life of mine plan, a rate that Och Ziff itself had determined was appropriate (in fact Och Ziff considered 12% "high" even without the 30% additional year), as well as consensus pricing, resulted in a valuation of the Kalukundi mining rights as of late-2019 of US$562.4 million, with Africo's 75% interest being US$421.8 million.[7]

13. Stout undertook the same approach. It determined that a DCF analysis was the correct approach; it updated the prices of copper and cobalt by using consensus pricing; it evaluated the additional confirmed copper and cobalt at Kalukundi identified in the 2013 AMEC Resource Update; and it sought to account for changed market circumstances, including modifications to the DRC tax structure. Stout concluded that based on a discount rate of 12%, the current value of the Kalukundi mining rights was US$477.5 million, of which Africo's 75% interest would be US$358.12 million. While Stout calculated a

[6] As noted in our November 22, 2019 submission, and as discussed herein as well, SRK was of the view that certain inputs in the Och Ziff valuation model, such as a 30% discount rate for year one and then a 12% discount rate for each subsequent year, were highly conservative and thereby had the effect of depressing the value of the Kalukundi mining rights. SRK, however, was asked by counsel to the victims to endeavor to replicate the Och Ziff model as closely as possible for the current valuation as that model was selected by Och Ziff on its own, for its own purposes, and in a non-litigation context. As a result, SRK incorporated some highly conservative inputs, such as the 30% and 12% discount rates, when other inputs would have been justified and would have resulted in a significantly higher valuation. By way of example, Exhibit 10 to the Stout report shows that reducing the discount rate from 12% to 10% results in an increase in the Stout valuation of the Kalukundi mining rights from $477.5 million to $590.8 million.

[7] In its opening submission, SRK presented valuations using both consensus pricing and spot pricing, the two recognized pricing methodologies.

valuation at a 12% discount rate (as well as at a 10% and 15% discount rate), it ultimately opined that it believed the correct discount rate was actually 20.5%, which resulted in a DCF valuation of the Kalukundi mining rights of US$188.7 million, with Africo's 75% interest being worth US$141.5 million.[8]

14. Despite the general agreement between SRK and the Government/Stout, there were three material areas in which SRK disagreed with the Government/Stout submission: (i) the method by which Stout applied the number of years to its model; (ii) the application of the DRC's 2018-enacted "Super Profit Tax"; and (iii) the selection of a discount rate of 20.5% as the applicable discount rate for a copper/cobalt mine in the DRC. Each of these three areas of disagreement are discussed below.[9]

## D. The Extra Year of Discounting in the Stout Model

15. The first issue identified by SRK in connection with its assessment of the work performed by Stout is that the DCF model built by Stout appeared to contain an error.

16. The Och Ziff 2008 Valuation used a 30% discount rate for the first year, and then applied a 12% discount rate for each subsequent year. Despite SRK's view that the 30% year-one discount rate and the 12% discount rate applied for each subsequent year were unnecessarily conservative, and resulted in an undervaluation of the Kalukundi mining rights, counsel for the Victims requested that to the extent reasonably possible, SRK

---

[8] Government/Stout Submission (Exhibit 10).

[9] The Government/Stout Submission also appears to have misunderstood the capital cost in SRK's model, and as a result increased it by 16% in their model. SRK understands counsel for the Victims has clarified the capital cost in SRK's model with Government/Stout.

endeavor to mimic the Och Ziff 2008 Valuation methodology in an effort to minimize the disputes with the Defendant over the valuation methodology. As a result, SRK faithfully followed the Defendant's application of a discount rate of 30% for year-one and then a 12% discount rate for each subsequent year from the Och Ziff 2008 Valuation.

17. Stout endeavored to undertake the same approach – adopting the Och Ziff 2008 Valuation approach of using a 30% discount rate for year-one, and then reverting to a lower discount rate for each subsequent year. SRK's review of the Stout model revealed that in addition to applying the 30% discount rate to the first year, Stout had apparently (inadvertently) added an additional year of discounting in its model, beyond what Och Ziff itself had done.

18. SRK asked counsel for the Victims to raise this issue with the Government. We were subsequently informed that Stout had confirmed its inadvertent error. We understand that Stout is correcting this error in its reply submission.

19. To be clear, the Stout model error has no impact on the Government/Stout position on the value of the mining rights at the time of the loss, in 2008. But the impact of Stout's model error on Stout's "time of sentencing" DCF valuation is material. The exact amount of the increase varies depending on the discount rate selected from Stout's Exhibit 10. By way of example, at the 20.5% discount rate calculated by Stout, the correction to the Stout model error yields a valuation increase from US$188.7 million to US$207.9 million. The impact of the Stout model error is reflected in the following chart.

| | STOUT: Original Model @ 20.5 discount rate | STOUT: Correction of extra year discount rate* |
|---|---|---|
| Total value of Kalukundi (100%) | US$188.7M | US$207.9M |
| Change from prior column | | US$19.2M |
| Cumulative change | | US$19.2M |

*And correction of discount rate application to residual values.[10]

20. SRK understands that the Government/Stout will be making this correction in its reply submission.

## E. The Application of the DRC "Super Profit Tax"

21. The second area of disagreement between SRK and Stout in the November 2019 submissions to the Court related to the impact of the 2018 enactment of DRC's Super Profit Tax on the "time of sentencing" valuation of the Kalukundi mining rights.[11]

22. On March 9, 2018, the DRC enacted legislation imposing a 50% "Super Profit Tax" (the "SPT"), which is applied to that portion of a mine's income which exceeds 125% of the EBITDA stated in the mine's feasibility study, in circumstances where commodity prices are also 25% above the levels included in the project's feasibility study. [12]

[10] The Stout model did not discount the Terminal Value in its model in accordance with its chosen discount factor. Thus, while the impact of the extra year was actually US$34.4 million for Africo's interest, once SRK correctly applied Stout's discount rate to its Terminal Value, the net impact of the Stout model error reduced to US$19.2 million.

[11] SRK and Stout agree that the SPT would have no impact on the 2008 time of loss calculations.

[12] The intention of the SPT was to increase the mining sector's contribution to state revenue during periods of high commodity prices. Other countries have also implemented super profits tax for similar reasons. However, mining is a global business, and countries increasing taxes need to balance the potential for increased revenue against adversely impacting their competitiveness in attracting future investment in their mining sector. As a result, super profits taxes are typically applied for relatively short periods to excess profits during periods of extreme price movements, but rarely are applied for prolonged periods due to risks in deterring expansion of the local mining sector. A prolonged application not only discourages further investment in the local mining sector, but encourages mining companies to structure their activities in a manner that reduces the profit earned locally, also resulting in harm to the local mining sector.

23. In its DCF valuation, Stout imposed the SPT, which decreased the value of the Kalukundi mining rights in the Stout DCF valuation by approximately US$97.3 million. SRK did not include such a reduction in its valuation because it believes that a reduction in the valuation of the Kalukundi mining rights based on the SPT is plainly incorrect.

24. Stout's assumption that the SPT would apply to Kalukundi appeared to be based on its mistaken understanding that the 2006 bankable feasibility study for Kalukundi would be used for SPT purposes. But this cannot be the case. The current mining license for Kalukundi expires on October 10, 2021.[13] There exist two 15-year renewal options[14]. As a result, a valuation designed to determine the current value of the Kalukundi mining rights must account for the fact that the first license renewal will occur in 2021.

25. Pursuant to Article 80(b) of the DRC Mining Code, attached hereto as Exhibit SRK-01, a mining license may be renewed provided that the licensee "presents a new feasibility study that demonstrates the existence of exploitable reserves." As such, the owners of the Kalukundi mining rights would need to submit a ***new*** feasibility study no later than 2021 in connection with license renewal applying 2019 copper and cobalt consensus pricing. Again, Stout's submission, which did not consider Article 80(b) of the DRC Mining Code, assumed that it would be the 2006 Kalukundi feasibility study that would be the operative feasibility study for SPT purposes. This is incorrect.

26. Article 530 of DRC Mining Code provides in relevant part:

---

[13] AMEC, Africo Resources Ltd. Kalukundi Copper – Cobalt Project, NI 43-101, at 4.4. (AMEC 2013 Update)
[14] AMEC, Africo Resources Ltd. Kalukundi Copper – Cobalt Project, NI 43-101, at 4.4. (AMEC 2013 Update)

- In the event that the feasibility study is submitted . . . as part of the renewal of a mining license under Article 80 letter b of the Mining Code, the data relating to the price of raw or other materials and the EBITDA must be updated. This modified feasibility study must include forecasts for the project's EBITDA for each accounting year for each project. A copy of this feasibility study must be provided to the Tax Authority within sixty (60) days of the approval of this feasibility study, and it will be used to calculate the base of the special tax on excess profits. Excess profits or super profits are calculated on the basis of the analytical EBITDA per product."

Article 530 is attached hereto as Exhibit SRK-02.

27. Under Article 530, therefore, in the event of license renewal, an updated feasibility study must be submitted to the Tax Authority, and it will be that updated feasibility study that is the basis for determining if any SPT is owed. Therefore, Stout's assumption that Kalukundi's 2006 feasibility study would be used for purposes of calculating any SPT liability was simply wrong.

28. Even absent the need for license renewal, under the DRC Mining Code, Kalukundi would not be required to use its 2006 feasibility study for SPT purposes in any event. Specifically, Article 530 further provides that the holder of the mining rights is required to submit to the DRC Tax Authority a feasibility study before the actual start of production. Due to the increased resource which has been confirmed at Kalukundi, Kalukundi would need to update the 2006 feasibility prior to commencing mining. There is no requirement that the holder submit a specific feasibility study for the purposes of SPT. As Kalukundi is

not yet in operation, it would therefore have the ability to submit an updated feasibility study, and thereby avoid any impact of the SPT based on its 2006 feasibility study.[15]

29. The application of Article 530 in this regard has been confirmed by the actions taken related to another copper/cobalt mine located virtually next door to Kalukundi in the DRC called Kalongwe. Kalongwe, which is discussed in more depth below at paragraph 26, is, like Kalukundi, an undeveloped mine in the DRC. It obtained a feasibility study in 2017 before the SPT was enacted and was thus at risk of having the SPT apply once the mine went into production. To avoid the risk of the SPT, and in apparent response to significant increases in mineral consensus prices, in April 2018, shortly after the SPT was enacted, Kalongwe obtained an updated feasibility study using consensus pricing.[16] In 2020, the entity owning the majority of Kalongwe, a company called Nzuri Copper Limited, was purchased by a Chinese company with operations in the DRC called Chengtun Mining Group. BDO was engaged to perform the valuation of the mining rights owned by Nzuri, and it employed a DCF valuation; just as SRK did for Kalukundi, just as Stout did for Kalukundi, and just as the Defendant itself did for Kalukundi. And because Nzuri had obtained an updated feasibility study implementing consensus mineral pricing, BDO

---

[15] For the purpose of the Kalukundi Mining License renewal in 2021 an updated feasibility would need to be submitted with the renewal application. The preparation of an updated feasibility study would not be an onerous nor costly undertaking. The Kalukundi project scope is essentially fixed in all its components and an updated study would essentially update and bring current capital and operating costs and metals prices, all inputs to an updated cashflow model and DCF analysis. The cost for such an update would be tens to hundreds of thousands rather than millions of dollars.

[16] A mine only becomes liable for SPT, under the 2018 DRC Mining Code, when metals prices exceed the forecast metal price in the mine's feasibility, and the mine's EBITDA exceeds 125% of the EBITDA in the feasibility. If the assumed metal prices in the feasibility are low, the mine may be required to pay SPT. If metal prices in the feasibility reflect current market prices, then the mine will not pay SPT until the price moves 25% higher.

included no exposure for Kalongwe to the SPT, and thus, the transaction valuation included no liability in the DCF for SPT purposes.

30. Thus, whether Kalukundi is looked at through the lens of being required to submit an updated feasibility study in connection with license renewal, or of having the right to submit an updated feasibility study in advance of commencement of operation, there is no scenario under which the SPT should be included to reduce the valuation of the Kalukundi mining rights.

31. As noted, in its submission to the Court, Stout assumed that the SPT would apply to the operation of the Kalukundi mine—and as explained, this is simply incorrect.

32. In light of this rather clear error by Stout, SRK offered to meet with the Government and Stout, and then did meet with the Government and Stout, and explained to them the DRC Mining Code provisions discussed above, and why the SPT should not be factored into a valuation of the Kalukundi mining rights. As a result of this meeting and the code provisions provided to the Government and Stout by SRK, we understand that Stout has now concluded that the SPT should not have any impact on a valuation of the Kalukundi mining rights, and as a result, Stout will be removing any impact of the SPT from the corrected valuation it will be submitting to the Court in its reply.

33. As noted above, Stout's improper reduction of the value of the Kalukundi mining rights based on the SPT was approximately US$97.3 million. This value must be added back into Stout's valuation, which we understand Stout will be doing in its corrected valuation.

34. The impact on the Stout analysis from correcting the SPT error is set forth in the chart below:

| | STOUT: Original Model @20.5 discount rate | STOUT: Correction of extra year discount rate | STOUT: Elimination of Super Profit Tax |
|---|---|---|---|
| **Total value of Kalukundi (100%)** | US$188.7M | US$207.9M | US$305.2M |
| **Change from prior column** | | US$19.2M | US$97.3M |
| **Cumulative change** | | US$19.2M | US$116.5M |

## F. The Applicable Discount Rate

35. The third area where SRK disagreed with Stout ‘s original submission was in connection with the applicable discount rate to use in the DCF analysis. In its opening submission, SRK noted that discount rates for mining projects like Kalukundi run between 10% and 12%, and that in order to be both conservative and to embrace the discount rate selected by Defendant, SRK adopted a 12% discount rate, with an additional year at 30%.

36. SRK was surprised that the Government/Stout submission applied a discount rate of 30% for the first year and then 20.5% for each subsequent year. The 20.5% discount rate represents a rate more than 70% higher than the discount rate selected by Och Ziff itself in a non-litigation context. SRK noted that the Government/Stout submission justified this extraordinarily high rate by noting that “[t]his rate is consistent with discount rates applied to other mines in similar locations.”[17]

[17] Government/Stout submission at 9.

37. As discussed below, SRK believes that the discount rate selected by Stout is another error on Stout's part. First, the selection of that discount rate generates a result that simply defies common sense and reasonableness. Second, there have been no material changes to the industry or the market that would justify selecting a discount rate more than 70% higher than the discount rate selected by Och Ziff itself. And third, the 20.5% discount rate is not in any way "consistent with discount rates applied to other mines in similar locations." To the contrary, a review of comparable mines and the discount rates used in valuing those mines demonstrates unequivocally that a 20.5% discount rate is unjustified, and that the 12% discount rate selected by both SRK and Och Ziff (in 2008) is an appropriate and reasonable discount rate.

38. Before addressing Stout's choice of a 20.5% discount rate, it is important to note that Stout's discount rate is a nominal rate. SRK has expressed the cashflows in its model as real cashflows. Consequently, the applicable discount needs to be expressed as a real discount rate. Och Ziff expert Quadrant identified this issue[18] and calculates that Stout's applicable real rate is 18.1%. A "real" discount rate is already adjusted to remove the effects of inflation, in order to reflect the "real" costs of funds. A "nominal" discount rate is not adjusted for inflation. Thus, in order to compare a real discount rate to a nominal one, the nominal one must be adjusted down to account for the effects of inflation. Because the cashflows in the DCF used by Stout and SRK are "real" cashflows (which are presented in constant dollar or uninflated terms), the discount rate applied needs to be real as well. Put simply, if Stout maintains its 20.5% nominal discount rate, then it needs to discount the

[18] Quadrant Expert Report at ¶116

cashflows in its model (obtained from the SRK model as adjusted), using a 18.1% real discount rate, not the 20.5% nominal discount rate. This adjustment will increase Stout's valuation by US$81.6 million The resulting adjustment is outlined in the table below.

| | STOUT: Original Model | STOUT: Correction of extra year discount rate | STOUT: Elimination of Super Profit Tax | STOUT: Correcting nominal to real discount rate |
|---|---|---|---|---|
| **Total value of Kalukundi (100%)** | US$188.7 M | US$207.9M | US$305.2M | US$386.8M |
| **Change from prior column** | | US$19.2M | US$97.3M | US$81.6M |
| **Cumulative change** | | US$19.2M | US$116.5M | US$198.1M |

**<u>The Stout Calculation Defies Common Sense</u>**

39. In assessing the extremely high discount rate selected by Stout, we note at the outset that it defies common sense. In 2008, as discussed above, Defendant, using admittedly conservative pricing, valued Africo's 75% interest in the Kalukundi mining rights as being worth between US$150 million to US$194 million. Since that time, the only two material changes that have occurred relating to Kalukundi are that the consensus prices for copper and cobalt have risen substantially above the conservative pricing used by the Defendant in its own valuation – copper consensus prices are over 100% higher and cobalt consensus prices are more than 50% higher – and the quantity or volume of the copper and cobalt known to exist at Kalukundi has more than doubled – from 27.1 Mt to 55.7 Mt.[19]

40. Yet despite the vast increases in both prices and volume, Stout actually calculated that the value of Africo's interest in the Kalukundi mining rights has actually ***decreased***

[19] 27.1 Mt 2006 RSG Feasibility Table 1.7_1 Ex 1 SRK 2017 & 55.7 Mt – Table 1-1 AMEC 2013 Ex 4 SRK 2017.

from 2008 to today.[20] Specifically, the Government/Stout submission concludes that the Defendant should be held to its own 2008 valuation, which places the value of Africo's interest at "at least" US$150 million, and yet the Stout DCF calculation for the current value comes out to US$188.7 million for the entire Kalukundi mining rights, of which Africo's 75% share would be US$141.5 million. In other words, notwithstanding that prices have doubled, and that volume has doubled; Stout, by applying an excessive discount rate of 20.5%, has actually come out with a lower valuation than the value the Defendant itself calculated in 2008. This makes no sense at all. If prices have doubled and volume has doubled, it cannot be the case that the mine is worth less today, unless there has been some material change to the industry or market, which as discussed in our next point, there has not been.

**<u>There Have Been No Market or Industry Changes to Support A Sharply Higher Discount Rate</u>**

41. As noted above, the only explanation for how the doubling of price and volume can result in mining rights that are worth less is if the discount rate should be increased due to changes in the industry or market since 2008. SRK has undertaken a review of the industry as a whole and in the DRC in particular and has not identified any material market or industry changes since 2008 that would justify any increase in the applicable discount rate, much less one that is more than 70% higher.

[20] SRK notes that the errors contained within the Stout model, namely the extra year discount rate, the application of the super profit tax and the use of a nominal discount rate also contribute to this decrease in value.

42. To assure that SRK was not overlooking anything in its analysis, SRK asked counsel to the Victims to inquire of the Government and Stout if they were aware of any market or industry change from 2008 to the present that would counsel in favor of selecting such a sharply higher discount rate from that which Och Ziff itself believed was appropriate and which SRK has confirmed is reasonable, albeit conservative. We understand that neither the Government nor Stout have identified any such market or industry change.

43. Accordingly, this provides further support for SRK's conclusion that a 20.5% (18.1 % real)[21] discount rate is excessive, unwarranted and unreasonable.

**<u>The Selection of a 20.5% Discount Rate is Not Consistent with Discount Rates Applied to Other Mines in Similar Locations</u>**

44. The Government/Stout submission informed the Court that its 20.5% (18.1% real) discount rate should be credited as "[t]his rate is consistent with discount rates applied to other mines in similar locations."[22] SRK, however, is not aware of a discount rate anywhere near the range of 20.5% applied in valuing a copper or cobalt mine in the DRC that possesses a Bankable Feasibility Study. In order to understand what the Government/Stout was referring to, and to be able to evaluate these purported comparable mines, SRK asked counsel to the Victims to request from the Government the list of comparables identified and relied upon by Stout. At the same time, SRK conducted its own review of discount rates used in valuations of copper and cobalt mines in the region. The results of SRK's work in

[21] Nominal discount rates include allowances for the impacts of inflation upon the underlying assumptions and should therefore only apply to models which contain nominal underlying assumptions (e.g., prices and operating and capital costs). Real discount rates are applied to cashflows that do not incorporated the impacts of inflation (constant dollar models). The Kalukundi model is a real model and should receive a real discount rate rather than a nominal one.
[22] Government/Stout at 9.

these two regards has confirmed that Stout's 20.5% (18.1% real) discount rate is inflated and cannot be justified.

### G. Stout's Comparables

45. As noted, the first step in our review of the reasonableness of Stout's 20.5% (18.1 % real) discount rate was to request and review the comparables that Stout identified and relied upon. In anticipation of that review, we shared with counsel to the Victims our view of what makes one mine a useful comparable to another. We understand that this list of attributes was shared with the Government and Stout and that there was no disagreement regarding the relevant attributes:

- The closer you come to matching the attributes of the property at issue, the better the comparison.
- As Kalukundi is a copper/cobalt project, it would be best to identify other copper/cobalt projects.
- As Kalukundi is in the DRC, it would be best to identify projects in the DRC.
- As we are talking about the Katanga Province in the DRC, it would be best to identify other projects in Katanga.
- As Kalukundi achieved a bankable feasibility study, it would be appropriate to identify other projects that have also achieved a feasibility study.[23]
- Since the principle underlying valuation is to find a price at which a willing buyer and willing seller would enter into a transaction, it would be best to find comparable transactions where there has been an actual offer to acquire from an unaffiliated third party or a consummated transaction.

[23] According to Enders and Leveille, respected geologists in the mining industry, there is only a 20% chance that a project at the scoping study stage will get to the feasibility study stage due to technical and economic risks.

- And as we are talking about a timeframe from roughly 2008 to the present, we should look at the time frame from 2008-2020, but with a special focus on finding comparables as recent as possible.

46. Next, we obtained through counsel to the Victims the list of the comparables identified and relied upon by Stout, as well as the supporting documentation Stout considered in reaching its conclusion that these were appropriate comparables.

47. Stout had identified three such mining projects: (i) Prospect Resources; (ii) Semkhat; and (iii) Kinsenda. We address each in turn.

**i. Prospect Resources**

48. Given the number of copper/cobalt deals that are reported in the industry, and in the DRC in particular, SRK was quite surprised that Stout selected as its first comparable a lithium development project in Zimbabwe. First, lithium projects impose a broad range of issues and challenges that do not exist in copper/cobalt projects. SRK notes that while both Kalukundi and the lithium project are mining projects, the discount rates applied to each should differ significantly from one another with lithium receiving a much higher discount rate. Kalukundi is a copper project. Copper, a base metal, is widely used, and copper markets benefit from large volumes, a diverse global customer base and transparent pricing mechanisms for copper mine products. This is not the case with lithium, as the market is much more limited and does not benefit from a broad customer base and transparent pricing similar to other industrial minerals or specialty metals. Moreover, lithium mines produce a product which requires significant additional refining, and without access to an expensive refinery, the product is of limited value. This contrasts with a copper/cobalt mine, such as Kalukundi, where the product leaving the mine is able to be sold into broad international

markets with minimal additional refining. Typically, these factors are reflected in the discount rate applied to industrial minerals and specialty metals through the application of a significantly higher discount rate than would be applied to base or precious metals. The higher discount rate allows valuers to capture the impact of opaque downstream markets and marketing risk for the products of mining projects. Due to the differences between the copper and lithium space, the discount rates are not comparable across the commodities. SRK notes that a lithium project does not present an acceptable discount rate comparison for the Kalukundi project.

49. Second, the proposed deal in which the discount rate was used was a related party transaction.[24] But the bottom line is that Stout has not identified any justification whatsoever for the use of a lithium project in Zimbabwe as a comparable for a copper/cobalt project in the DRC. Indeed, Prospect Resources does not meet any of the characteristics for a comparable that SRK and Stout agree are controlling. It is the view of SRK, therefore, that Prospect Resources is not a valid comparable to Kalukundi and does not in any reasonable or fair way support Stout's selection of a 20.5% discount rate.

**ii. Semkhat (Societe d'Exploration Miniere du Haut Katanga)**

50. The Semkhat joint venture was a copper exploration project, which was located in Katanga in the DRC, managed by the ASA Resources Group, which consisted of a series of

[24] The Prospect Resources acquisition is a related party transaction – the shareholders of the Zimbabwean based seller are also senior executives and on the Board of the listed Australian parent company, which is purchasing the additional stake in the project. The discount rate applied in the transaction by the acquirors is significantly higher than the discount rate they have previously used to value the mining property. It is not possible in the context of this related party transaction to know how the sellers quantified the benefit of owning shares in a listed Australian company, as opposed to a Zimbabwean company. Zimbabwe is a country that presented unique challenges to these specific shareholders, including exchange control restrictions.

potential targets, and some 27 exploration licences, only one of which was upgraded to an Exploration and Evaluation project, the Kibolwe project. It could therefore be argued that Semkhat has some attributes which are comparable to Kalukundi. SRK notes the following, however:

51. *First*, the Semkhat joint venture did not have any projects that reached the bankable feasibility study stage of project development, and neither did it appear to have developed a project cashflow model associated with the earlier exploration stage studies. A calculation to discount cashflows cannot be conducted if there are no forecast cashflows, so in the case of Semkhat, and the Kibolwe project the determination and application of a discount rate is a meaningless factor.

52. In SRK's opinion, this fact alone completely disqualifies Semkhat as a potential comparable to Kalukundi. By way of analogy, if there was a parcel of land in Texas that had performed testing and had identified oil in the ground that could economically be extracted from the earth, that parcel of land could then be valued, based on the economics of extracting and selling the oil (i.e., by a DCF). But if there was another parcel miles away, that had had no such testing and no financial plan, there would be no principled or valid basis for comparing the value of that second parcel to the first. This is precisely the situation here, where Stout seeks to rely on Semkhat as a comparable to Kalukundi. Kalukundi had completed a bankable feasibility study by 2006. Semkhat has never achieved the bankable feasibility study stage which explains why a discount rate for an undefined economic resource cannot be used. As a result, in SRK's opinion, Semkhat cannot be used as a comparable to Kalukundi.

53. *Second*, Semkhat reported a JORC compliant resource with an average copper at a grade of only 0.8%.[25] For comparison, Tenke Fungurume, an operating copper mine in the DRC, nearby to Kalukundi, has an average ore grade of 2.6% Cu,[26] and Kalukundi is forecasted to be 2.8% Cu (even without the cobalt credits) which suggests that further exploration work will be required to advance the Kibolwe project through the required engineering and economic studies to the feasibility stage.

54. *Third*, the discount rate identified by Stout for Semkhat related to an accounting impairment analysis and not a market valuation. As the Government noted in its submission to the Court, the most reliable basis to assess value is to determine "fair market value" – "the price at which property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts."[27] An impairment analysis performed for accounting purposes plainly does not meet this definition and in addition International Accounting Standards recognize that Exploration and Evaluation projects do not have future cashflows and that the impairment analysis should be conducted on a different basis, using market comparables based on an estimation of the resources. A market comparable is not impacted by the choice of discount rate.

55. To be clear, SRK believes that discount rates used in impairment analyses can be a valid benchmark to "evaluate" comparable projects, but they are not to be confused with

[25] Asa Resource Group Annual Report 2016 - Copper Strategy at 46.
[26] China Moly HK SX Circular - Statement of Ore Reserves as at 31 March 2016; Grand Total copper grade Letter from Board at 8.
[27] Government/Stout Submission at 9.

valuations, and of course need to have associated forecast cashflows to conduct the analysis. There were no estimated cashflows associated with Semkhat's Kibolwe project when the 27% discount rate was reported in Asa Resource Group's annual accounts in 2016. The 27% discount rate is meaningless in relation to the calculation it is purported to support, and also meaningless as a comparative.

**iii. Kinsenda**

56. Kinsenda is a copper project and it is located in Katanga in the DRC. Stout, in seeking to support its 20.5% (18.1% real) discount rate, specifically relied on a CEO's report from 2009, which noted that the company did a risk-based valuation using a real discount rate of 20%. But Stout's reliance on this statement from the CEO of Kinsenda's parent company does not justify the selection of a 20.5% (18.1 % real) discount rate.[28]

57. *First*, in 2009, when the statement of the CEO was made, Kinsenda had not yet obtained a bankable feasibility study. As discussed above in connection with Semkhat, this eliminates Kinsenda from being a comparable to Kalukundi as of 2009. This is confirmed by the very same CEO report, which noted that as the project advanced toward a feasibility study, the discount rate "is expected to reduce." *See* CEO Report attached hereto as Exhibit SRK-03. Kinsenda's CEO recognized that the closer a project gets to a feasibility study, the greater the confidence there is in the economic viability of the project, and the lower the discount rate becomes. Stout failed to consider this, and its selection of the discount rate from a timeframe well in advance of Kinsenda completing a feasibility study was incorrect.

[28] Metorex Limited Annual report for the year ended 30 June 2009 - CEO Report at 14.

Also, like Semkhat, the 20% discount rate was used by Kinsenda not for the purpose of a valuation, but for the purpose of an impairment calculation, in the midst of the global financial crisis when commodity prices had collapsed.

58. *Second, and most significantly*, while Stout seized upon Kinsenda's parent company's CEO statement in 2009, Stout failed to recognize that by 2013 Kinsenda had actually completed a feasibility study. A valuation of Kinsenda was then completed in connection with the purchase of Metorex Limited, the parent company of Kinsenda by an unaffiliated third-party willing buyer. In August 2013, Kinsenda was acquired by JinChuan Group, when Metorex was purchased for US$1.29 billion. The acquisition included a valuation report, filed with the Hong Kong stock exchange, and the discount rate used to value the Kinsenda property was 10.43%.[29] In other words, the statement of Kinsenda's parent company's CEO in 2009 was certainly correct: well before obtaining a feasibility study, Kinsenda was using a 20% discount rate but recognized that the discount rate would decline as it neared a feasibility study. By 2013, Kinsenda had completed a feasibility study, and its parent had then entered into a "willing buyer/willing seller" transaction in which it was sold to a Chinese acquiror. The discount rate used in that fair market context was 10.43%.

59. It is SRK's opinion that as of 2013, Kinsenda was a valid comparable to Kalukundi. It was a copper project located in Katanga in the DRC and it had a feasibility study. Its fair market value was determined in an arm's length transaction between an unaffiliated willing

[29] See Hong Kong Stock Exchange Circular dated August 30, 2013, at 246.

buyer and willing seller. And the applicable discount rate for that valuation was 10.43%. Accordingly, in SRK's opinion, Kinsenda does not in any way support Stout's selection of a 20.5% discount rate, and rather supports SRK's view that a 12% discount rate is a conservative discount rate for Kalukundi.

## H. Conclusions Regarding Stout's Comparables

60. As set forth above, two of Stout's purported comparables are irrelevant: one is a lithium mine in Zimbabwe, and another is an exploration and evaluation property without a feasibility study. The third property identified by Stout is a proper comparable – the Kinsenda property. That property confirms what SRK has propounded in each of its submissions to the Court: the 12% discount rate selected by SRK (as well as by Och Ziff itself) was a conservative discount rate that could have been lower, but certainly should not be higher.

## I. SRK's Survey of Comparable Discount Rates

61. As noted above, in addition to evaluating the comparables selected by Stout, SRK also undertook an analysis of comparable transactions in the DRC to assess the discount rates for properties comparable to Kalukundi. SRK notes that the London financial advisory RFC Ambrian has compiled a database of over 300 copper M&A deals completed since 2008. These deals spanned some 21 countries, and each had a value in excess of US$10 million, demonstrating the wealth of available real-world information for "willing buyer/willing seller" DCF valuations to be verified against. Based on a broad search of publicly available information, SRK identified 11 deals/events from 2011 to 2020 that it

believes are comparable and relevant to the question of assessing the appropriate discount rate to be used for the valuation of Kalukundi. This list of DRC comparables is set forth in a chart attached hereto as Exhibit SRK-04.

62. Three of the examples listed on the comparables chart are impairment analyses conducted for accounting purposes and not as part of an actual "willing buyer/willing seller" transaction. As noted above, Stout selected as two of its comparables an asset impairment analyses done of Semkhat, and one of Kinsenda in 2009, and we noted that while an impairment analysis can provide insight into comparable discount rates, Semkhat and the 2009 Kinsenda were nevertheless not valid comparables due to the fact that they had not yet obtained a feasibility study. The three impairment analyses, listed as items 1, 2, and 4 in the comparables chart, used discount rates ranging from 10.7% to 13.5%. SRK notes, however, that discount rates applied in impairment analyses typically are pre-tax discount rates. SRK's discount rate of 12% (and the 12% discount rate selected by the Defendant) are post-tax discount rates. The Court should also be aware that as well as the distinction between pre and post-tax discount rates, the mining sector also interchangeably refers to both real and nominal rates. Accordingly, in order to compare "apples to apples", SRK has attempted to estimate the "equivalent" rates most usually used, which is a post-tax real rate. In the recent past, such post-tax real rates have typically been at least 2-4% lower than pre-tax discount rates,[30] and using this estimation, the impairment analyses have comparable equivalent post-

[30] Determining an equivalent post-tax discount rate from a pre-tax rate requires an iterative calculation using the underlying company cashflows, because of the actual timings associate with the tax payments. SRK have simply assumed that each company is paying tax and have applied the DRC corporate tax rate of 30% to generate an estimated equivalent post-tax rate. If there was no tax due the equivalent post tax real rate would not exceed 12%.

tax real discount rates of approximately 7.5% to 9.5%, but even allowing for variances caused by the estimation of tax payments, all would certainly be below 12%.

63. The other eight examples are arm's length consummated transactions involving a willing buyer and a willing seller. One of these eight transactions, item 8, is the 2013 acquisition of Kinsenda, the mine selected by Stout as a comparable as discussed above, which used a discount rate of 10.43%. The other seven transactions are all copper or copper/cobalt mines located in the DRC; all are projects that have achieved feasibility studies; and all were involved in arm's length transactions allowing for "fair market value" to be determined. The post-tax real discount rates in all seven of these additional comparables ranged from 8% to 12%; not a single buyer in the comparables chart used a discount rate anywhere near the 20.5% selected by Stout to determine a market value of a purchased mining property

64. Taking the eleven comparables together, the median post-tax discount rate of all eleven comparables is 10%, and the median post-tax discount rate of the consummated transactions is 10.4%. Not a single transaction or contemplated transaction had a discount rate anywhere near 20.5%, and there was no comparable that used a discount rate anywhere near that range.

65. Based on SRK's review of the comparables selected by Stout, and the far broader review undertaken by SRK, SRK has identified no support at all for the assertion by the Government and Stout that a 20.5% discount rate was "consistent with discount rates applied to other mines in similar locations."

66. One of the mines on the comparables chart merits particular discussion here. Item 11 is the Kalongwe project, which was discussed above in connection with the SPT. Kalongwe was involved in an arm's length sale just last quarter. The comparisons to Kalukundi are noteworthy:

- Kalongwe is a copper and cobalt mine, just like Kalukundi.
- The majority of the mining rights were owned by a small listed Australian company named Nzuri, just as the majority of Kalukundi's mining rights were owned by a small listed Canadian company named Africo. Similar to Kalukundi the project was joint ventured, but in Kalongwe case with La Generale Industrielle et Comerciale au Congo (GICC) (10%) and the DRC Government (5%), rather than Gecamines.
- Kalongwe, like Kalukundi, is located in the DRC.
- Kalongwe, like Kalukundi, is located in the Katanga Province of the DRC.
- In fact, Kalongwe is practically next door to Kalukundi, located less than 50 miles away.
- As of 2017, Kalongwe had financed and completed a bankable feasibility study, but had not commenced production, or begun developing the mine, just like Kalukundi.
- Nzuri had not raised the debt and equity capital it would need to build the Kalongwe mine, just as Africo had not closed on the funding required to build Kalukundi in April 2007.
- On February 27, 2019, Chinese mining company, Chengtun Mining Group, announced it had entered into a deal to acquire 100% of Nzuri Copper Limited, whose principal asset, as noted, was 85% of the Kalongwe mining rights.
- As such, Chengtun's acquisition of Nzuri offers a direct comparable to Africo, with a current transaction.

- In connection with Chentgun's acquisition of Nzuri, BDO was engaged to perform a valuation on behalf of Nzuri shareholders.

- SRK in Australia was retained by BDO and Nzuri as a technical specialist to review and opine on the technical assumptions and model inputs. In other words, BDO prepared the fairness opinion for shareholders, supported by a technical review by SRK.

- As part of the fairness opinion, BDO calculated the value of Nzuri's interest in the Kalongwe copper/cobalt project.

- To value Nzuri, BDO completed a DCF analysis of the Kalongwe project. The report quotes the appropriate Valmin standards for using this approach – the Australian equivalent of the Canadian CIMVAL standard used and quoted by Dr. Rigby and SRK here.

- BDO used consensus market prices sourced from Consensus Economics – the same group SRK used.

- And as noted above, BDO did not include any provision for the Super Profit Tax as it references the fact that Nzuri had completed a feasibility study in 2017 and then commissioned an updated feasibility study.

- BDO used a post-tax nominal discount factor of 14% in the Kalongwe DCF, which equates approximately to a post-tax real discount rate of 12% which SRK applied to the Kalukundi DCF.

- BDO's "sum of parts" valuation of Nzuri valued the unmined resources at the end of the expected life of mine, which had been defined in the Kalongwe plan, as SRK has done at Kalukundi.

- One other significant data point here: after performing its valuation using a DCF methodology with a real post-tax discount rate of approximately 12%, and including the terminal value of the unmined resources, the offer that was made by Chengtun to acquire the listed company, Nzuri, was at a 30-40% premium to that valuation. In other words, this transaction, for a project nearly identical to Kalukundi in every respect, except of smaller scale with less recoverable copper and cobalt, **was consummated at a 30-40% premium to a DCF valuation using**

**a real discount rate of approximately 12%, and consensus market prices.**[31] *See*, Appendix A.

67. In summary, Nzuri offers an excellent, contemporaneous comparable that supports the use of a DCF methodology – the methodology selected by SRK, by Stout, and by Och Ziff in 2008. The analysis of Nzuri also fully supports the 12% real discount rate used by SRK as it shows that transactions are currently being concluded, and have been concluded over the past 5-7 years by participants in the copper mining industry at discount rates around 12% or lower for both large and small projects, while it also demonstrates that the 20.5% (18.1% real) selected by Stout is not "consistent with discount rates applied to other mines in similar locations."[32][33]

---

[31] SRK alerted Victims' Counsel that Nzuri, owner of the Kalongwe project, was acquired in an arm's length transaction in February 2020, and that Nzuri had substantial similarities to Kalukundi. We understand Victims' Counsel then alerted the Government and Stout. SRK also alerted Victims' Counsel that despite similarities in terms of stage of development, Kalukundi is a significantly larger and more valuable deposit than Kalongwe. The resource at Kalukundi contains 55.7 million tonnes of mineral bearing ore and is approximately 4 times the resource at Kalongwe, which contains 13.5 million tonnes of mineral bearing ore. More importantly for the purpose of determining the value of the mine through a DCF, the recoverable metal (copper & cobalt, expressed in copper equivalent terms), which is available for sale from the SRK 2019 mine plan for Kalukundi, is approximately 1.2 million tonnes which is approximately 5 times the saleable metal from Kalongwe of .25 million tonnes under its mine plan. Appendix A.

[32] Exhibit 43 of Och-Ziff submission states on Page 15 *"For example, in a security valuation report for First Quantum Minerals Ltd. issued by RBC Capital Markets, discount rates of 12-15% were used for African copper properties in contrast to a normal 8% rate used for North American copper equities.* (12. Hale-Sanders, C., 2002, First Quantum Minerals Ltd., RBC Capital Markets, September). At the time of the RBC Capital Markets report in 2002 First Quantum owned copper projects in the Central African copper-belt, in both Zambia and in Katanga in the DRC. FQM assets in the DRC were expropriated and were acquired by ENRC).

[33] There is no reason to conclude that a higher discount rate would be necessary for Kalukundi because it was anticipated to be financed through equity raises only. Government/Stout Submission at 9, fn. 9. There is, in fact, no reason to conclude that Kalukundi would have been financed purely by equity, because throughout 2007, Africo had made a convincing business case to debt providers. For example, Africo received an expression of interest from South African bank RMB, in April 2007. April 20, 2007 Expression of Interest, Fortis, RMB. Additionally, Africo worked with Standard Chartered and other entities in September 2007 on financing that anticipated a 55/45 debt to equity ratio. September 2007, Indicative Term Sheet, Africo. These efforts were obviously complicated by the theft and resulting legal battle over the Kalukundi mining rights, but there is no reason to conclude that the Kalukundi project would not have been financed by a mix of debt and equity, thus obviating any need to adjust the discount rate.

68. Based on the above, SRK is of the view that Stout's selection of a discount of 20.5% is unreasonable and unsupported by any of the comparables that Stout examined. In contrast, the one valid comparable Stout did find, and the eleven comparables that SRK identified, all support SRK's opinion that a 12% discount rate is both reasonable and conservative and is an appropriate discount rate to use.

69. As a result, when a discount rate of 12% is applied to Stout's model, it generates a value of US$522.2 million for the mining rights at Kalukundi, leading to a value for Africo's 75% interest of US$391.65 million.[34] But when the errors discussed above are corrected, and the metal pricing profile applied in the model is modified to reflect the lower pricing profile applied by SRK in its model, the Stout DCF model at 12% yields a value for all of Kalukundi of US$553.9 million, which equates to US$415.4 million for Africo's 75% interest. This is a reasonable valuation, is consistent with the undisputed increases in both price and volume, and is quite comparable to the value calculated by SRK:

| | **STOUT: Original Model** | **STOUT: Correction of extra year discount rate** | **STOUT: Elimination of Super Profit Tax** | **STOUT: Correct nominal to real discount rate** | **STOUT: 12% discount rate** | **STOUT: Consensus Economics Market Pricing (2019)** |
|---|---|---|---|---|---|---|
| **Total value of Kalukundi (100%)** | US$188.7M | US$207.9M | US$305.2M | US$386.8M | US$693.2M | US$553.9M |
| **Change from prior column** | | US$19.2M | US$97.3M | US$81.6M | US$306.4M | (US$139.3M) |
| **Cumulative change** | | US$19.2M | US$116.5M | US$198.1M | US$504.5M | US$365.2M |

[34] See Government/Stout Submission (Exhibit 10).

srk consulting

### J. Conclusions as to the Government/Stout Submission

70. As noted at the outset of this section, SRK is in agreement on the majority of issues addressed in the Government/Stout submission. SRK did, however, identify three principle areas in which it disagreed with the Government/Stout original submission. As to two of those disagreements — the extra discount year in the Stout model and the application of the SPT – SRK understands that Stout has acknowledged that its original presentation to the Court was in error, and those two errors will be corrected. On the one remaining issue of material disagreement – Stout's selection of a 20.5% (18.1% real) discount rate — SRK is of the opinion that Stout's discount rate cannot be justified or supported, and that it should not be adopted by the Court. In its place, the Court should accept the 12% discount rate selected by SRK; the same discount rate selected by Och Ziff itself when it wanted to know the value of Africo's interest in the Kalukundi mining rights. Once Stout's errors are corrected, the results generated by SRK and Stout are quite similar:

| | |
|---|---|
| **SRK DCF calculation at 12% for Africo's 75% interest** | **$421.8 million** |
| **Stout Corrected DCF calculation at 12% for Africo's 75% interest[35]** | **$415.4 million** |

## III. OCH ZIFF'S DCF ANALYSIS IS UNREASONABLE

71. Och Ziff and its experts, Quadrant Economics ("Quadrant"), Roscoe Postle Associates ("RPA"), and Dr. Ronnie Barnes of Cornerstone Research ("Barnes"), criticize SRK's use of a Discounted Cash Flow ("DCF") analysis to value the Kalukundi mining rights. Additionally, Och Ziff's experts critique certain inputs in SRK's DCF model,

[35] Adjusted to account for the model error Stout has acknowledged and the improper inclusion of the SPT.

specifically: (1) the volume of "economically viable" mineral material available at Kalukundi, (2) percentage of the metals contained in the ore, which can be recovered for sale through processing (the "mineral recovery rate"), (3) the value ascribed to the minerals present at Kalukundi but not mined in the mine plan (the "terminal value"), (4) the use of a 12% discount rate, (5) the operating and capital costs, and (6) whether 75% of the Kalukundi mining rights were attributable to Africo. Not only are Och Ziff and its experts' critiques unjustified, but the impact of each critique is artificially inflated, thus leading to an entirely unreasonable, and in fact, negative valuation. Each of these issues is addressed below.

### A. DCF is the Proper Methodology to Value Kalukundi

72. Och Ziff's experts criticize the use of a DCF analysis for Kalukundi because the property is pre-production and thus has no history of revenue or existing infrastructure.[36] In SRK's view, this argument is not persuasive. *First*, the use of Bankable Feasibility Studies in the mining industry generally (and for Kalukundi specifically) means that each of the "speculative" inputs that Och Ziff's experts have focused on have, in fact, been rigorously investigated and considered by industry professionals to ensure the project's economic feasibility to the standards required by international finance institutions; and *second*, a DCF analysis is the preferred methodology in the mining industry for Development Stage properties such as Kalukundi that have a Bankable Feasibility Study, and have the appropriate Government permits.[37]

---

[36] - Expert Report of Ronnie Barnes, PhD, March 6, 2020 ("Barnes Report") at ¶¶53-55, Expert Report of Quadrant Economics, March 6, 2020 ("Quadrant Report") at ¶¶27-28.
[37] *See* SRK November 2019 Addendum ("SRK Addendum") at 3.

73. *First*, Och Ziff's experts fail to acknowledge and address the differences between the use of DCFs in the context of pre-production mining companies that have achieved a Bankable Feasibility Study and early stage companies in other industries where no such study has been completed. A DCF analysis provides a rigorous framework for the financial evaluation of a mining project and allows for the incorporation of all relevant underlying fundamental technical, and economic aspects of a project that impact its value. The inputs in the DCF analysis include, among others, the volume and quality of the ore, mining rate, commodity price, metallurgical recovery, capital / operating costs, and tax structures. In the mining industry, an initial Bankable Feasibility Study is an exacting process undertaken by professionals with applicable technical qualifications; it typically involves dozens of technical experts and can take years and cost millions of dollars to complete. As a part of this process, many of the inputs into a DCF are investigated and verified to a set of rigorous standards. The standards for completing the Bankable Feasibility Study are in place to ensure that once the study is complete, the mine will have established the following, with the confidence necessary for banks and other potential lenders:

- the quantity of mineral bearing ore,
- the cost of mining and processing that ore,
- the recovery of saleable metal from the ore, and
- the cost of building the mine, processing plant and associated infrastructure.

74. Thus, unlike early stage companies in other industries and pre-feasibility study mining companies, pre-production mining companies that have achieved a Bankable Feasibility Study have acquired, through rigorous investigation and verification, much more

confidence in each of the necessary DCF inputs. That is why the mining industry supports the use of the DCF methodology once a Bankable Feasibility Study or other equivalently detailed study has been completed.

75. *Second*, the mining industry has recognized the DCF analysis as the preferred method to value Development Stage properties with a Bankable Feasibility Study. The primary example is that of the Canadian Institute of Mining, Metallurgy, and Petroleum's Special Committee on the Valuation of Mineral Properties ("CIMVAL"), which has recommended the DCF methodology for both producing and non-producing properties where there has been a preliminary economic assessment, prefeasibility study, or feasibility study.[38]

76. While Defendant's expert RPA suggests in this case that DCF valuations are not the standard valuation methodology in the mining industry, it is noteworthy that in a presentation the same RPA individuals prepared and presented, they acknowledged that valuations of mining properties should include income approach (DCF) valuations.[39]

77. Additionally, in SRK's experience, DCF analyses are used extensively by mining consulting and engineering firms, like SRK, in the context of feasibility studies, mine development, mergers & acquisitions, litigation and arbitration. DCF analyses are also used by equity analysts and investment bankers as the standard method for comparing and

---

[38] CIMVAL at 8 & 22.
[39] RPA 2019 London Mines and Money Conference Presentation ("RPA Presentation") at slide 121.

srk consulting

valuing mineral properties for recommendations to investors, as well as in potential transactions.

78. As none of Och Ziff's experts have cited to any mining industry publication, regulation, or recommendation to support a deviation from the standard method recognized by CIMVAL and other mining regulators, SRK remains confident that the DCF methodology is the appropriate and proper mechanism to value Kalukundi. As described in its initial report and November 2019 addendum, SRK has also completed a market comparable valuation analysis of Kalukundi to confirm the reasonableness of its DCF valuation, consistent with industry practice.[40]

## B. 12% is an Appropriate, Though Conservative Discount Rate

79. One of the Defendant's other experts, Quadrant identified 24% as the appropriate discount rate for its DCF analysis based on an unleveraged weighted adjusted cost of capital ("WACC").[41] Quadrant argues that this rate is necessary to account for, among other things, a "country-specific risk premium for the DRC."[42] Quadrant argues that it has confirmed the reasonableness of its discount rate by comparing it to the rates outlined in an article by a mining industry analyst related to that company's newly proposed mechanism to calculate discount rates for iron ore projects.[43] Quadrant additionally cites to the State of Arizona

---

[40] SRK 2017 Valuation of Kalukundi Copper-Cobalt Project ("2017 SRK Valuation Report") at 30 and SRK November 2019 Addendum ("SRK Addendum") at 3.
[41] As noted above, there is no reason to believe that Kalukundi would not have further explored the debt options it was considering before the theft of the mining rights by Och Ziff.
[42] Quadrant Report at QE-53 pg. 40.
[43] Quadrant Report at ¶88 states "It follows that the discount rate for a project necessarily has to be the hurdle rate or minimum required rate of return". Dr. Flores fails to consider that the return earned by an investor in a mining project

Department of Revenue to argue that 12% is more akin to the discount rate used in more developed countries like the United States, as well as two purportedly comparable properties in the DRC to support the applicability of its chosen discount rate.[44]

80. It is SRK's opinion that the 24% discount rate identified by Quadrant has no reasonable basis, as demonstrated by the inapplicable comparisons cited by Quadrant as well as the failure to reconcile its artificially inflated discount rate with those actually used in the DRC for similar mining projects. SRK will not repeat all of its explanations as to why Stout's selection of a 20.5% discount rate for its DCF analysis is inflated and inappropriate but will simply refer the Court back to that discussion contained above. Needless to say, just as SRK views a 20.5% discount rate as substantially and improperly inflated without a reasonable basis, so too does SRK view Quadrant's even higher proposed discount rate of 24%.

81. *First*, the majority of the "comparisons" cited by Och Ziff's expert are not copper mines at all, let alone copper projects in the DRC. This issue has already been addressed by SRK in Section G above. As noted, the best comparables are those that share as many of the traits as the property under consideration. Here, Defendant's discussion of its hand-selected non-copper mines renders such comparables irrelevant and disingenuous.

---

consists of two components a) the return implicit in the DCF on the forecast cash flows, and b) the return on any additional, known or unknown resource which is not included in the DCF calculation. Investors purchase mines, particularly early stage mines, for the potential of future expansion. The investor considers earning the discount rate as satisfactory, based on the cash flows in the feasibility study, but also has the potential for a significantly greater return from the resources which are not part of the initial mine plan. In 1996 Antofagasta purchased Los Pelambres for $1.4bn based on an NPV of $800m - $1.5bn. During the first 16 years the mine paid out more than $14bn in dividends and has a remaining life of over 30 years. Reko Diq Arbitration—Tethyan Copper Company Pty Limited Award at559, ¶1686.

[44] Defendant OZ Africa Management GP, LLC Brief ("OZ Brief") at 27-28 (citing Exhibit 43).

82. Importantly, and in SRK's lengthy experience, the discount rates for mining projects are primarily assigned by metal type. That is the first and foremost consideration. While other considerations, such as location and the confirmation of positive economics (a successful feasibility study), are certainly important considerations in looking at comparable properties, one only gets to these other considerations after satisfying the primary consideration that you are considering the same mineral. In this regard, the expression "comparing apples to apples" is quite appropriate. If one wants to make a valid comparison, it must begin with the most fundamental characteristic—are the two things that you are comparing actually comparable…are you comparing "copper to copper?" If you are not, the foundation for your comparison does not exist.[45] It is for this reason that SRK does not find the large majority of the examples advanced by Defendant to be meaningful for they relate to minerals other than copper.[46] In this regard, SRK refers the Court back to its chart submitted as Exhibit SRK-04. This chart, as noted, identifies 11 comparable mining projects, all of which are copper projects, and all of which are located in the DRC. It is quite telling, in the view of SRK, that Defendant's experts elected not to identify a single one of these comparable projects, when the listed projects represent obvious comparables to Kalukundi.

83. *Second*, Quadrant's arguments regarding discount rates used in developed countries as opposed to less developed countries evidences a fundamental misunderstanding of the

[45] That is why SRK dismissed one of the purported comparables advanced by Stout – a lithium mine in Zimbabwe. As explained above, lithium production encompasses a host of challenges that do not exist for copper mining, and therefore the use of a lithium mine as a comparable to a copper mine fails before one even considers the location.
[46] This is why Och Ziff's discussion of Zani Kodo, a gold property located in the DRC is also beside the point.

mining industry. Arizona is a particularly inapt comparison because mining projects in developed countries are often met with community resistance and a need to comply with strict regulations in terms of environmental standards and permitting more generally. By contrast, developing countries often embrace mining as a means of developing their local economy, earning tax revenues, and uplifting local communities through infrastructure and services supported by the mine.[47]

84. *Third,* Quadrant makes an irrelevant comparison to the rates suggested in the CRU Group's paper analyzing the value of iron ore projects, which assigns a discount rate of between 26-31% for "high-risk countries including the DRC."[48] Not only does CRU admit that its paper does not reflect industry standard methodology for determining discount rates, but also it is limited to iron ore projects which are typically heavily dependent upon large, long lead time and expensive infrastructure (railroads and port facilities) to deliver products to market. This is somewhat similar to the fallacy discussed by SRK previously in this report of attempting to attribute discount rates associated with lithium projects to copper projects in that commodity specific externalities are being ignored when they are actually an integral component of the downstream structure required to recognize value from mining projects.

---

[47] World Bank and International Finance Corporation, Treasure of Trouble? Mining in Developing Countries, *2002.*
[48] OZ Brief Exh 45 at 3.

85. *Fourth*, while Quadrant does ultimately identify a copper mine located in the DRC for discussion, it points to the exploration projects owned by the Semkhat Joint Venture..[49] Semkhat, which is discussed at length above, is not a valid comparable with Kalukundi because it lacks a feasibility study and had reported a substantially lower grade ore body.[50]

86. SRK finds it significant that despite the numerous available examples of mining properties actually comparable to Kalukundi, Quadrant elected not to address any of them. This at least suggests the possibility that Quadrant turned a blind eye to actual comparables in order to reach a pre-selected result of an inflated discount rate.[51] As detailed above in Section G, SRK undertook a review of comparable DRC copper transactions between 2007 and 2020 and did not identify a single such project where a real discount rate in excess of 12% was used. When skilled professionals applied discount rates in those comparable projects, those professionals obviously knew that the projects were located in the DRC. But in no instance did a single one of those professionals include a "country-specific risk" for the DRC that inflated the discount rate selected to the inflated level that Quadrant advances. As noted by SRK in its review of comparable transactions, the median discount rate selected was approximately 10%. Accordingly, SRK believes there is no basis to credit Quadrant's selection of a 24% discount rate and adheres to its view that a 12% discount rate is sound,

[49] Quadrant appears to have taken Semkhat from Stout's opening submission but then failed to engage in any analysis to evaluate whether Semkhat actually constitutes a valid comparable.
[50] SRK notes its view that any genuine effort to identify comparables to Kalukundi would have necessarily included all 11 of the examples on Exhibit SRK-04 to this reply submission. But at a minimum, such a genuine effort would have included some discussion of Kalongwe, which, as noted, is a copper/cobalt project virtually next door to Kalukundi with remarkably comparable characteristics.
[51] The other possible explanation is that Quadrant failed to identify every one of the eleven comparables on Exhibit SRK-04 hereto.

srk consulting

reasonable, and indeed conservative. It was, after all, the same discount rate Och Ziff selected to use itself when it wanted to know the value of Africo's interest in the Kalukundi mining rights in 2008.[52]

## C. The Metallurgical Recovery Rates used by SRK are Justified

87. As described in our opening report, the metallurgical recovery rate is the percentage of metal recovered after mining and processing the ore. Relying on Table 23.2_2 from the 2006 feasibility study, RPA argues that SRK has made a "fundamental error" by assuming metallurgical recoveries for copper and cobalt will be constant at 90% and 70% respectively from surface to 150 meters depth.[53] In so doing, RPA rejects the conclusion of both the 2006 Feasibility Study [54] and the 2013 AMEC report,[55] which determined an overall recovery rate for copper of 89%-93% and 70%-78% for cobalt. [56] Instead, RPA attempts to adjust the recovery rates in its DCF to reflect Table 23.2_2, but its mistaken application of its chosen method causes it to vastly overstate the impact of its chosen recovery rate on SRK's DCF analysis.

88. *First*, SRK's decision to assume metallurgical recoveries for copper and cobalt will be fixed at an average rate of 90% and 70% respectively from surface to 150 meters depth was reasonable. Fixed average recovery rates are used to simplify the analysis and provide a

---

[52] SRK notes that the 30% discount rate in the first year can also be considered conservative. OZ Investment Memo, July 2008 at 9 and comparables chart (SRK-04).
[53] RPA Expert Report at ¶¶ 67, 132, 143-44, 163.
[54] MDM 2006 Kalukundi FS at 1-14, §1.5.
[55] AMEC 2013 NI 43-101 TR at 25-5, §25.9.
[56] SRK Valuation of Kalukundi at Appendix E.

reasonable approximation of expected metallurgical recoveries. As described in our prior reports, the fixed rate used by SRK was provided by the 2006 Feasibility Study[57] and the 2013 AMEC report.[58] While those studies do indicate that the recovery rate is expected to decline with depth generally, as near surface oxide ore transitions to sulfide ore at depth,[59] the 2006 Bankable Feasibility Study makes clear the lower recovery in the one fragment is based solely on the results of a single drill core, which intersected primarily sulfide ore (and thus reflected lower recovery rates possible for the oxide processing planned for Kalukundi in the first instance). SRK, however, was comfortable with the fixed average provided because, without additional sample drilling and testing, SRK does not believe it is necessary or proper to adjust the fixed recovery rates in the 2006 Feasibility Study based on a single drill core result. A 2011 technical study for the development of the Mutanda Mine, 15 miles south of Kalukundi applied a fixed recovery rate of 90% for copper and 80% for cobalt in the optimization study.[60]

89. *Second*, SRK identified several errors made by RPA in attempting to adjust its DCF to reflect the recoveries in Table 23.2_2, [61] which resulted in a vastly overstated impact on the NPV calculated by SRK. One such error was the method by which RPA calculated a recovery rate for each year of the mine's operation. To calculate recovery rate accurately for each year of the mine, RPA would need to calculate the volume of ore processed from each

[57] MDM 2006 Kalukundi FS at 1-14, §1.5.
[58] AMEC 2013 NI 43-101 TR at 25-5, §25.9.
[59] While both the oxide ore and sulfide ore at Kalukundi contain recoverable copper and cobalt, the planned processing method at Kalukundi can only treat the oxide ore. As noted in Section III (E) this does not mean that the metals contained in the sulfide ore have no value.
[60] Other examples would include; Mineral Expert's Report: Mutanda, *Golder Associates May 2011*, Pit Optimization at 65.
[61] RSG 2006 Global TR at 90.

fragment, and the depth from which the ore was extracted. Then, RPA would need to calculate a *weighted* average recovery rate for that year to accurately represent the resulting plant recovery performance. Instead of doing this, RPA seems to have done a simple average calculation. This understates total metallurgical recovery rates. It is important to note that the ultimate mined pits will resemble the shape of an inverted cone. As the depth of the open pit increases, less material is mined from each successive level in the pit. Simply put, the deeper material expected to be subject to decreased recovery rates is much less in volume than the shallower, higher recovery material. SRK notes that some of the shallow material is expected to experience recovery rates well in excess of SRK's average rate. The main reason SRK used the flat rates is because SRK wanted to be conservative in the first years, where the discount is more relevant. By applying higher recoveries as proven in the study, the NPV would have been much higher. To prove that SRK was correct in assuming a conservative flat curve, SRK generated a weighted average by bench, as stated in all the feasibility studies, and the answer was within 3.5% which would not be enough to change the result calculated by SRK using the flat recoveries. When SRK calculated the weighted average recovery for each year, resulting life of mine averages were similar to the flat recovery profile used by SRK.

90. RPA's model also incorrectly assumed uneconomic, loss-making ore would be mined. This illogical assumption results in a considerable reduction in NPV. But this would never occur in any mine. If the recovery rates in Table 23.2_2 were accepted, at some point in the life of the mine, it would become uneconomic to process ore from the one fragment the table identified with a low recovery rate. Rather than rational economic behavior,

RPA's valuation assumes the irrational – that the uneconomic ore from the one fragment, which has little to no recoverable metal, will continue to be mined and then blended with the ore from the other fragments, making the overall mine less profitable. Instead, mining at the one fragment would cease, while mining at the other fragments would continue.

91. *Third*, even assuming the recovery rates proposed by RPA – which, as noted above, SRK does not believe is necessary – the impact of this adjustment on SRK's model is not substantial when the errors in RPA's methodology are corrected. SRK modelled this scenario to determine the real impact of assuming the recoveries from Table 23.2_2. When SRK incorporated recoveries as per Table23.2_2 into the mine plan, the overall impact of the recoveries was a decrease in NPV @ 12% of only US$24 million.[62] [63] Appendix B shows the final pit depth for the low recovery fragment compared to the original pit design.

92. Thus, as described above, SRK's decision to assume metallurgical recoveries for copper and cobalt will be fixed at an average rate of 90% and 70% respectively from surface

[62] It should be noted that SRK's mine plan mines all fragments simultaneously. Thus, because higher recovery rates are reached earlier in a mine's life, and, lower recoveries are reached later in the mine's life, due to the impact of discounting, the overall impact of the lower recoveries on NPV is less.

[63] Just as SRK used a flat recovery percentage over the life of the mine to be conservative, SRK used a flat processing cost. In reality, processing costs are lower at first and increase with depth, which would have a positive impact on NPV This is consistent with SRK's conservative approach to modelling of Kalukundi. If the recovery profile is to be varied over the life of the operation, the processing cost should be as well. Both of these parameters represent material underlying aspects that should drive the mining plan and must be accounted for when running pit optimization software which can optimize the resulting mining schedule based on the updated parameters. When the parameters outlined above, recovery and cost by depth, are accounted for in the creation of the mining schedule and the TEM, the resulting difference in NPV is negligible. The difference was accounted for stepwise in the economic model. When only the recovery modification is accounted for in the economic model, the result is a US$24 million decrease in the NPV @12%. When both the recovery profile and the cost profile are accounted in the economic model, the result is a US$4 million increase from the NPV presented by SRK in its updated report *See*, Appendix B. Note: This is for the Kalukundi pit and all others are the same.

to 150 meters depth was reasonable. And even assuming the recovery rates methodology proposed by RPA, RPA drastically overstates the impact on NPV.

## D. Pit Slopes and Stripping Ratios used by SRK are Correct

93. RPA also challenges the pit slopes and stripping ratios selected by SRK for its mine plan. Those challenges are mistaken.

### i. RPA Misrepresents SRK's Pit Slopes

94. RPA takes issue with the pit slope in SRK's mine plan. The pit slope is a geotechnical structure which goes beyond its simplified definition of an angle of the pit wall from the maximum depth of the pit, which in this case is limited to 150m, to the lip of pit at surface. A pit slope design and implementation must be conducted with all consideration including technical, economic, environmental and safety issues. It is therefore important to implement a well-defined methodology which should be conducted according to the following phases: 1) rock mass characterization derived from the acquisition and analysis of geological and geomechanical data; 2) determination of the potential mechanisms of deformation and failure, and their numerical modelling; 3) slope design and definition of reinforcement and monitoring methods.

95. According to RPA, SRK's mine plan is flawed because SRK assumed pit slopes of "45 degrees for all pits, a percentage that is too high."[64] RPA's position in this regard is

---

[64] RPA Report at ¶¶ 132, 159(2)

based either on an intentional or accidental misreading of SRK's reports and model.[65] SRK's optimized pit design has ***no*** pits with 45 degree pit slopes; rather, SRK's design criteria stated a maximum pit slope of 45 degrees and the resulting pits slopes are consistent with the 2013 AMEC report indicating the use of slopes between 33 and 40 degrees (as was also the case with the 2006 BFS) and a mine stripping ratio of 4.02.[66] The 45 degree pit slope angle referenced in the 2017 SRK report is merely a constraint on the maximum allowable slope for the optimization software. SRK's optimized pit design slope angles, in fact, range between 33-40 degrees, with an average at approximately 37 degrees.

96. As a result, RPA's critique of SRK's pit slopes is completely baseless and provides no reason for the pits designed by SRK to be adjusted. The downward adjustments RPA makes to the Kalukundi NPV based on its mistake should thus also be disregarded.

**ii. RPA's Criticisms of SRK's Stripping Ratios Are Unfounded**

97. RPA next challenges SRK's stripping ratios. "Stripping ratio" is the ratio of waste material to mineral-bearing ore mined. The slope of the pit wall, discussed above, is an important factor in determining the amount of waste material that needs to be removed from the mine so that mineral bearing ore can be accessed. Designing pits with shallow sloping pit walls results in a higher stripping ratio. Removing non ore bearing waste can be a substantial cost for a mine, so achieving a low stripping ratio is important. RPA argues that

---

[65] RPA also incorrectly states that all of the pit walls in the 2006 Bankable Feasibility Study 30 degrees. RPA Report at ¶ 159. In fact, the pit slopes from the 2006 Bankable Feasibility Study were between 29 and 56 degrees, with a majority of slopes in the 33 to 40-degree range. 2006 Kalukundi BFS at 6-13 to 6-15.

[66] 2006 Kalukundi BFS at 1-13, Table 1.4-2.

SRK's purported use of 45-degree pit slopes (which as noted above, SRK does not use), has a "significant effect on the economics of the pits . . . ."[67]

98. *First*, RPA, as discussed immediately above, wrongly states that SRK used 45-degree pit slopes. This effectively ends the discussion about the stripping ratio. Because RPA misrepresents SRK's pit slopes, RPA's suppositions about stripping ratios are entirely flawed.

99. *Second*, RPA goes on to argue that that the life of mine stripping ratio should be in excess of 7 to 1 (waste to ore ratio).[68] But RPA offers no explanation regarding how it derived this stripping ratio. In fact, it is SRK's opinion that RPA's +7 stripping ratio is not based on any rational mine design – and no mine design is offered by RPA. In contrast, SRK's stripping ratio is based on the same angles used in the 2006 Bankable Feasibility Study and the 2013 AMEC Resource Update. Unsurprisingly, with similar pit slopes, the stripping ratio in the SRK model closely aligns with the stripping ratio in the 2006 Feasibility model.

100. The 2006 Bankable Feasibility Study showed the following ore and waste tonnes[69]:

- Ore Tonnes: 7.8 Mt
- Waste Tonnes: 31.5 Mt
- Stripping Ratio = 4.02

---

[67] RPA Expert Report at ¶ 132.
[68] Exhibit RPA-002 (It's important to note that RPA's consensus and spot pricing are in excess of 7:1 stripping ratio).
[69] 2006 Kalukundi BFS at 6-71, Table 11.3.2_1.

101. The 2019 SRK model, which is based on the AMEC 2013 resource update, resulted in ore, waste and stripping as follows:[70]

- Ore Tonnes: 13.94 Mt (higher ore tonnes due to new area and additional drilling)
- Waste Tonnes: 59.26 Mt (higher waste tonnes due to larger pits – only 150m in depth)
- Stripping Ratio = 4.29

102. The feasibility study and the SRK model based on the 2013 AMEC Resource Update determined stripping ratios of 4.02 and 4.29 respectively. As a result, SRK maintains that its stripping ratio of 4.29 is appropriate and conservative, and that RPA's stripping ratio in excess of 7 is unsupportable.

## E. Addition of a Terminal Value is Justified

103. RPA's next argument is that SRK should not have assigned any economic value to the over 40 million tonnes of material known to exist at Kalukundi that were not included in SRK's mine plan.[71] According to RPA, these 40 million tonnes would have recoveries of only "0-5%" because of the increasing content of sulfide ore making them "uneconomic".[72] There is no reasonable basis for RPA's position.

104. RPA's position is inconsistent with industry practice and market transactions in failing to account for the valuable metals that can be extracted from sulfide ore. More

---

[70] *See*, SRK November 2019 Addendum at Appendix F.
[71] RPA Expert Report at ¶ 197; Quadrant Report at ¶ 43; AMEC 2013 at Table 1-1, shows resources at 55.6Mt, less the amount mined by SRK's mine plan is approximately 40 Mt.
[72] RPA Expert Report at ¶¶ 162, 197.

specifically, failing to give any value to the over 40 million tonnes left unmined at the end of a mine life is not appropriate in cases like Kalukundi, where significant quantities of valuable metals are known to exist beyond the scope of the initial mining plan. In this case, the mine plan includes only the exploitation of the oxide mineralization cap (meaning, near the surface). As described in further detail in our initial report and above, at Kalukundi, the oxide ore transitions to sulfide ore as the depths increase. Copper and cobalt can be extracted from both oxide and sulfide ore; they merely require a different type of processing. At Kalukundi, the initial mine plan (in the 2006 Bankable Feasibility Study and the SRK model based on the AMEC 2013 Resource Update) only mines a portion of the oxide ore, leaving the valuable metals contained within the sulfide ore untouched.[73] Those metals would remain in the ground, waiting to be exploited even after the initial oxide mine was completed. The reason that this 40 million tonnes of material was not included in the previous studies and in SRK's current mine plan was because logic dictates that the oxide must be mined before the deeper sulfide.

105. A representative example is the nearby Tenke Fungurume property, in which a majority 56% stake was acquired by China Molybdenum for US$2.65bn in 2016. Like the majority of copper mines in the Katanga province, the Tenke Fungurume deposit has similar attributes and transitions from oxides near surface to sulfide at depth similar to Kalukundi.[74] As a part of the 2016 acquisition, the sulfide ore (unmined under the then current plan) was

---

[73] The 2006 Bankable Feasibility Study included a US$65.5 million terminal value for the unmined materials.
[74] China Moly HKSX Circular - Appendix V, Competent Persons Report at V-128, §13.5 Sulphide Development Options

ascribed a value of US$166 million[75] (equivalent to a present value of $0.01/lb of copper equivalent). This low value per pound of copper is a mechanism to account for the capital investment that would be needed to build out sulfide treatment processing facilities.

106. It would be irresponsible and illogical not to apportion some residual value to the remaining resources at Kalukundi. They are large (at least 40 million tonnes), high grade, and verified.[76] SRK examined various market comparables as part of the original expert report. SRK then applied a conservative present valued metric of US$0.0056/lb of copper equivalent, which is in line with market valuations in comparable transactions. This number is applied in a conservative manner as the value of the material is discounted from the end of the mine life to the evaluation date. In other words, only a fraction of the calculated residual value is applied to the value of the project (US$20 million of US$387 million).[77] SRK would expect a subsequent sulfide operation (mining the materials left untouched in SRK's mine plan) on the Kalukundi property to be much larger in scale and total tonnage and recovered metal than the present pit under SRK's very conservative mine plan. It is necessary and reasonable to apply a conservative value to these resources. This is what parties would do in a market transaction, where a reasonable expectation of mining that material in the future exists.

---

[75] China Moly Circular, Censere Valuation Report at V1-37.
[76] AMEC 2013 at Table 1-1. Note that not all of the resources are mined.
[77] November 2019 Addendum at Figure 15

107. In the opinion of SRK, RPA's position that no value should be given to these valuable residual resources is designed to allow RPA to artificially depress the value of the Kalukundi mining rights and should be rejected.

**F. 75% of the Kalukundi Property is the Appropriate Percent Attributable to Africo**

108. As set forth in SRK's opening submissions, Africo in 2008 was the 75% owner of the Kalukundi mining rights. SRK understands that ownership is not disputed. Quadrant, however, argues that this percentage overstates Africo's interest in the mining rights for two reasons. *First*, even though the Organization Agreement of May 18, 2004 states that equity ownership is allocated Africo (75%) and Gécamines (25%), because Africo was "solely responsible for funding the development of the Project", Africo's overall economic interest would be worth less than 75%.[78] *Second*, Quadrant argues that "[e]ffective March 2018, a renewal of a mining license requires the transfer of an additional 5% equity stake to the DRC. As Kalukundi's mining rights are renewable in October 2021, a DCF valuation as of today . . . ought to reduce the ownership share of Africo from 75% to 70%." Taken together, Quadrant argues that Africo's ownership interest in the mining rights is effectively only 67%.[79] SRK does not agree with Quadrant.

109. *First*, even if both of these arguments advanced by Quadrant were correct, which they are not, SRK's extremely conservative additional year 30% discount factor, which reduces the value of the mining rights by US$150 million, is more than sufficient to absorb any variation from the 75% ownership stake. As the goal here is to determine a reasonable

[78] Quadrant Expert Report at ¶¶134-146.
[79] *Id* at ¶¶147-148.

value for the mining rights, Defendant's approach of adopting the "worst-case" scenario for every possible variable does not amount to a reasonable approach. Reasoned assessments must be brought to bear across all such variables, with attention paid to determinations that drive the assessment of reasonableness. Here, as noted, SRK did not agree with an added year of discount in Och Ziff's 2008 valuation of 30%. In the view of SRK, this was punitive, and both artificially and improperly reduced the value of Africo's interest in the Kalukundi mining rights by US$150 million. As further noted, counsel for the Victims asked SRK to track the Och Ziff 2008 valuation method as closely as possible in order to minimize disputes with Defendant's own modelling approach. But the application of the 30% discount rate cannot be viewed in a vacuum and disregarded. Reducing Africo's interest in the Kalukundi mine by US$150 million, provides an enormous cushion that easily absorbs many of the lesser issues raised by Defendant, even if they were to be credited.

110. Turning to the first of the two issues identified by Quadrant, Africo's funding of the project, Quadrant misinterprets SRK's DCF valuation. SRK calculated the DCF valuation of Kalukundi on an *unleveraged*[80] basis, in the same manner calculated by Och Ziff in 2008. This results in a generally conservative DCF of the Kalukundi mining rights because, in reality, the Kalukundi project would be developed, with part of the funding provided by a project finance facility from a syndicate of third-party lenders, similar to the options being explored by Africo before Och Ziff's crime. The inclusion of the project financing structure would increase the NPV of the project, as the interest rate payable on the debt will be less than the discount rate of 12% used in the DCF. As a result, the share of the NPV attributable

[80] Unleveraged means financing the mine *without* incurring debt. Leveraged means financing the mine *with* debt.

to Africo, when expressed as a percentage of the original unleveraged NPV, increases with the inclusion of the debt structure, and reduces as a result of the financing arrangements between Africo and Gécamines. The NPV attributable to Africo would be marginally more or marginally less than 75% of the unleveraged value of Kalukundi. SRK therefore believes that 75% is a fair estimate of the portion of the NPV attributable to Africo and its shareholders.

111. Regarding the transfer of the additional 5% of equity, this is a new provision in the March 2018 DRC Mining Code, as an initial matter, SRK assumes that even Defendant's experts would agree that this new provision would have no impact on a "time of loss" calculation. Accordingly, the issue here is what impact, if any, this provision has on the "time of sentencing" valuation.

112. SRK is unaware of any license renewals which have occurred under this new provision. As a result, SRK cannot assess from actual examples how this provision will be implemented. SRK notes, however, that there is a parallel provision in the 2002 Mining Code, which required companies to transfer 5% (updated to 10% in the 2018 code) of the ownership to the DRC government at the time a mining license was first issued. SRK reviewed how this provision has been applied historically, and SRK's review revealed that this provision has been imposed only on mining companies that have *not entered* into a joint venture with Gécamines.[81] We are unaware of any company that entered into a joint venture with Gécamines, like Africo, that has been required on establishment of their joint venture to

---

[81] An example would be; The Kamoa-Kakula Copper Project which is a joint venture between Ivanhoe Mines (39.6%), Zijin Mining Group (39.6%), Crystal River Global Limited (0.8%) and the DRC government (20%), NOT Gécamines.

transfer 5% to the DRC government. Thus, it is our understanding that this type of provision has not applied to the type of joint venture that Africo already had in place. SRK is thus skeptical that joint ventures with Gécamines will be required to transfer an additional 5% to the DRC government upon license renewal because the DRC government, through Gécamines, already has a 25% interest in Kalukundi.[82]

113. Based on the above, SRK maintains that 75% of the value of Kalukundi property is the appropriate percentage to attribute to Africo.

## G. Och Ziff Overstates Costs in its Analysis

### i. Capital Costs

114. RPA next argues that SRK "significantly underestimates" operating and capital costs because (i) SRK's costs are "based on a lower plant capacity than used in the life of mine plan", (ii) SRK "omitted material cost components required for production, and (iii) the costs are inconsistent with estimates contained in the SRK (Johnnesburg) 2008 Report.[83] Due to these supposed errors, RPA then calculates a different and higher capital cost.

[82] Mining ventures in the DRC are authorised either as joint ventures with Government owned mining enterprises, like La Générale des Carrières et des Mines (Gécamines) or Société Minière de Kilo-Moto SA (Sokimo). Alternatively, joint venture can be negotiated directly with the DRC Government itself, with or without other local DRC partners. Where joint ventures have been concluded with the DRC Government and other private DRC companies, the 5% Government interest (negotiated under the terms of 2003 code) is evident and the required 5% increase on licence renewal under the 2018 code is likely to apply. A few examples include; Nzuri Copper Company, Kalownge project – comprising a joint venture between Nzuri (85%), La Generale Industrielle et Comerciale au Congo (GICC) (10%) and the DRC Government (5%) - total DRC ownership 15%. Where the terms of the joint venture have been finalised with the Government under the 2018 Code, the DRC ownership is reflected at the higher rate. In the case of the Kamoa-Kakula copper project the DRC Government owns 20%. Joint venture arrangements with Gécamines have typically be negotiated at 20 -25%, although there are outliers at either end. https://www.cartercenter.org/resources/pdfs/news/peace_publications/democracy/congo-report-carter-center-nov-2017.pdf

[83] RPA Report, ¶¶ 20, 146, 148.

115. RPA's arguments fail on two grounds, as discussed below. First, RPA misunderstands or misstates the capital costs used by SRK, which are consistent with the quotes provided by MDM, the engineering firm hired to build the processing plant. *Second*, SRK has confirmed the reasonableness of the prices used in its model by comparing them with capital costs incurred by nearby projects.

116. *First*, RPA ignores that the costs used in SRK's mine plan are based on quotes provided by MDM, which was the engineering firm involved in the 2006 feasibility study that was to be responsible for building the plant. MDM provided several updated quotes on a lumpsum turnkey basis,[84] ensuring Africo had no risk for cost overruns. SRK calculated the 2006 Capital Cost (including contingencies and 2% export duty) to be US$249 million. This is also the amount Stout used in its model. SRK calculated this to be equivalent to US$287.5 million in 2010. The 2010 value was then escalated to 2017 and 2019 values respectively.[85] SRK used these prices as the best estimate of capital cost of the project, as they are based on the quotes from the engineering firm designated to build the plant on a lumpsum, turnkey basis. SRK compared the updated MDM FEED costs from 2008 and when escalated to 2010, SRK announced that they were broadly similar to the numbers SRK used in its model.

---

[84] Lump Sum Turnkey (LSTK) is A Lump Sum Contract is a contract under which an owner agrees to pay a specified contracted amount for completing work to a contractor, and the contractor is responsible for completing the project under the contractor's financial risk. Turnkey (TK) specifies that the scope of work includes start-up of the facility and achievement of the normal operation status under the contractor's responsibility.

[85] Because the 2006 Bankable Feasibility only contained MDM's estimated costs for a 800 ktpa processing plant, rather than the 1.25 Mtpa plant envisioned in the AMEC 2013 Resource Update, SRK confirmed that the costs estimate it used was consistent with the updated capital cost estimates made by MDM in November 2007 and October 2008, in which MDM included cost estimates for both a 800 ktpa and 1.25 Mtpa plant. The costs used by SRK and Stout are within US$3M (of TOTAL) of the estimates made by MDM in 2008 for a 1.25 Mtpa plant escalated to 2019 dollars. Thus, further confirming the adjusted prices used by SRK and Stout.

| Source | Capital (US$M) | Escalation Factor | Resulting Capital (US$M) (2010) |
|---|---|---|---|
| 2006 Cost | 249 | 1.155[1] | 287.6 |
| 2008 MDM Update | 275.7 | 1.056[2] | 291.3 |

[1]Escalation Factor referenced in first report in 2017

[2]Calculated from surface mine capex index

SRK does not believe there is a better estimate of capital costs.

117. In contrast, SRK understands that the 2008 SRK (Johannesburg) Report relied on by RPA (i)was not commissioned or authorized by Africo, and (ii) Africo's management and technical team did not participate in the preparation of it, nor did MDM. SRK understands that the 2008 SRK (Johannesburg) Report was intended to focus solely on the neighboring property, Mashitu, as part of the planned sale of Mashitu to Africo, which was part of the Camrose transaction, and ultimately, the Africo board directed SRK (Johannesburg) to remove all references to Kalukundi in the report, and the report was never published. As a result of the lack of engagement with Africo and MDM, and without access to critical information, professional standards required that SRK (Johannesburg) take an excessively and artificially conservative approach to valuing Kalukundi in 2008. While a conservative valuation may have suited Camrose and Comide in the context of the merger discussions with Africo, the report is unreliable for current purposes.

118. *Second*, the reasonableness of SRK's capital costs and unreasonableness of those used by RPA is demonstrated by comparison to other nearby projects in the DRC. For example, the Deziwa project is in the same central region of the DRC copper belt as

Kalukundi and was commissioned on January 15, 2020. The Deziwa project was financed by China Nonferrous Mining Corporation, with a total reported capital investment of US$880 million for the Solvent Extraction Electo-Wining processing plant and open-pit development. The 4.5 Mtpa processing plant at Deziwa is approximately 3.6 times the size of the 1.25 Mtpa plant planned for Kalukundi. Comparing SRK's and RPA's capital cost for Kalukundi with Deziwa on a dollars per tonne of annual throughput highlights just how inflated RPA's capital cost is. Deziwa's capital cost is US$195 per tonne of annual throughput while SRK's capital cost for Kalukundi is US$277 per tonne of annual throughput. By comparison, RPA's capital cost for Kalukundi is US$506 per tonne of annual throughput.[86] RPA has thus provided no valid basis to change the capital costs used by SRK.

**ii. Operating Expenses**

119. RPA next argues that SRK's operating expenses are too low. However, RPA does not offer support for its operating costs beyond generalization of benchmarking for mining costs. SRK also notes that RPA agrees with the escalation methodology used by SRK and the results for processing and G&A costs appear to be rounded versions of the SRK results. SRK's operating expense number is reasonable and correct because it is based on feasibility study level work that has been conducted for this project.[87] A large component of processing costs for mines like Kalukundi is the acid consumption to remove the metal from the crushed ore. Because acid consumption increases with depth, overall costs also increased

[86] RPA Report ¶166 at 41, RPA's initial cost estimate of US$633 million. This estimate was used to generate the cost per tonne of annual throughput by dividing by 1.25 million tonne plant capacity for Kalukundi.
[87] The 2006 Bankable Feasibility

with depth. The cost of acid that will be consumed is a significant driver of processing costs at Kalukundi. In the early years, processing costs would be much lower (US$40/t) and would increase over time. As mentioned above, SRK chose a conservative number representative of average life of mine costs to apply to a simple cashflow model, which drives drown the NPV in the SRK cashflow model. If SRK had applied a variable cost profile tied to acid consumption by depth, the significantly lower operating costs early in the mine life would drive a material ***increase*** in project NPV due to the impact of discounting cashflows.

120. Moreover, RPA's operating expenses numbers are generally in line with SRK's operating expenses numbers (RPA US$80.00 and US$14.00 per tonne of ore processed, SRK's US$78.32 and US$12.84 per tonne of ore processed).[88]

121. Notwithstanding that RPA's operating expenses numbers are generally in line with SRK's operating expenses numbers, RPA fails to justify its calculation—RPA provides no evidence to support the increases in its report. RPA's mining operating expenses number is not supported or specific to this project, and no backup information has been provided to support it. Moreover, compared to SNL's global database[89], RPA's proposed mining cost is in the top 5% of all projects worldwide. Typically, the top 5% consists of mines in very cold climates and/or high altitude, neither of which applies to Kalukundi. Typical mining costs are between US$1.75 to US$2.75 per tonne moved, and SRK used US$2.91 costs, which is higher than the average range, and which results in a more conservative valuation.

---

[88] RPA Expert Report at 42
[89] SNL Metals & Mining is a database offering owned by S&P Global Market Intelligence.

122. As explained above, the operating costs estimated were already very conservative. RPA provided no basis for the increases it applied to those costs, and thus they should be disregarded.

## H. The Resource Volume Used by SRK is Reasonable

123. RPA argues that the volume SRK includes in its mine plan overstates the volume of economically viable material at Kalukundi because SRK did not recognize the difference between measured, indicated and inferred resources.[90] RPA is playing a semantic shell game. As described in greater detail in our first report:

- Measured Mineral Resources: is that part of a Mineral Resource for which quantity, grade or quality, densities, shape, and physical characteristics are so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters, to support production planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity.

- Indicated Mineral Resources: is that part of a Mineral Resource for which quantity, grade or quality, densities, shape and physical characteristics can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters, to support mine planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed.

[90] RPA Expert Report at ¶¶17, 136.

- Inferred Mineral Resources: is that part of a Mineral Resource for which quantity and grade or quality can be estimated on the basis of geological evidence and limited sampling and reasonably assumed, but not verified, geological and grade continuity. The estimate is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes.

124. While SRK could not "classify" the resources it calculated into measured, indicated and inferred resource categories, this was not because of a lack of confidence in the resources, but rather due to the fact that it did not have access to the complete drillhole database and geological block model; moreover, nor was a site visit by a QP possible.[91] As a reminder to the Court, in 2013, the mineral volumes at the Kalukundi mine were discovered to be more than twice the volume previously believed.[92] At that time, of course, the Victims had no ability to arrange a QP visit to the site to have these additional resources classified. But under no scenario does that justify ignoring their existence. To ignore those minerals would therefore be irresponsible and unreasonable and would artificially reduce the value of Kalukundi based on nothing but semantics. Indeed, if SRK geologists and mining engineers could go to the site in the near future, SRK is of the strong opinion that the expanded resources would be made official, thereby doubling the resources and dramatically increasing the cash flows of the project.

125. SRK is confident in its volume estimate for four additional reasons. *First*, the volume of economic resources identified by SRK's model was within 5% of the total

---

[91] These requirements can be found in SEC S-K 1300, NI 43-101 and JORC Reporting Code Standards.
[92] Table 1-1 AMEC 2013 Ex 4 SRK 2017

resources identified in the 2013 AMEC Resource Update.[93] This means that SRK agrees with AMEC's calculation and the "Double of Mineral Resources" are real and should be added to the value of the project. If four independent world recognized geologist came up with the answer that they have double the resources, it means that it is for real.

126. *Second*, SRK's mine plan involves mining all pits concurrently and thus for the first half of the mine life (eight years), the mining occurs predominantly at a depth less than 75m, which is very shallow. Approximately 65% of the NPV is from the first 8 years of mining. The drilling density at this level is such that the resource being mined is all in the indicated category identified in AMEC's 2013 resource estimate. Based on all available drilling information, the areas where the drilling confidence is the highest, it is near the first 75 to 0 meters in depth. SRK's mine plan mines the "top of the ore body, which is drilled well enough to have high confidence. It is very important to note that the reason that companies drilled more shallow holes is due to cost, but the main reason is to improve the confidence of mining in the first 5 to 10 years of operation. SRK focused on developing a mine plan in these well drilled areas first.

127. *Third*, under SRK's mine plan, less than 30% of the resource identified at Kalukundi is being exploited. The plan leaves approximately 40 million tonnes of the resource identified in the 2013 AMEC Resource Update unmined. There are many companies mining the 70% material left behind with grades and stripping ratio less than

---

[93] 2017 SRK Report, Appendix D

Kalukundi. RPA cannot state that it is not economical if many companies with less grades are mining economically.

128. *Finally*, there is no reason that a willing buyer and willing seller would ascribe no value to these resources that are known to exist based on thorough exploration and validation merely because they cannot technically be classified as measured and indicated reserves.[94] SRK thus believes that the volume of material included in its DCF analysis reasonably and conservatively represents the volume of economic material present at the Kalukundi site.

## I. Comparable Transaction Analysis

129. RPA and Quadrant fail to adequately address the secondary measure valuation that SRK used to confirm the reasonableness of its DCF analysis: the Market Approach that SRK performed for the Kalukundi property.[95] As outlined in SRK's prior reports, the Market Approach entails comparing the mineral property being valued to the transaction value of similar mineral properties transacted in an open market. As explained in our prior report, the Market Approach is more typically used to value less developed properties that lack a Bankable Feasibility Study. It was performed here as a confirmatory measure for SRK's DCF valuation. Using that approach, SRK's analysis resulted in a valuation of the Kalukundi property of between US$543 million and US$749 million (with US$407 million

---

[94] RPA's 2019 Mines and Money Presentation states "In 1996, Barrick paid US$1.0 billion for Arequipa Resources and developed the Pierina Mine on the basis of nine diamond drill holes – no Mineral Resources" at 62.

[95] 2017 SRK Valuation Report at 29.

to US$562 million attributable to Africo's 75% share).[96] This range confirms the reasonableness of SRK's DCF valuation of US$562 million on a 100% basis and US$421.8 for Africo's interest.[97]

130. RPA, in conclusory fashion, notes in its report that it finds SRK's analysis 'unreliable'. However, RPA makes no effort to conduct its own market comparable analysis even though RPA's own presentations on international valuation codes note the importance of multiple measures of value in a valuation process.[98] Interestingly, RPA's own presentation on the subject of valuation notes the difficulty of construction of a comparable dataset. Given that market comparables are a critical component of mining project valuation, SRK is surprised at the lack of an alternative comparable presented by RPA.

## J. Och Ziff Exaggerates the Potential Impacts of the Critiques it Raises, Resulting in an Entirely Unreasonable and Negative Valuation

131. As described in detail above, each criticism raised by RPA misreads the SRK report, misunderstands its model, or lacks support in the 2006 Feasibility Study and 2013 AMEC Resource Update. Not only is each criticism levied by Och Ziff and its experts unfounded, Och Ziff exaggerates the impact of each of the criticisms it raises, resulting in an absurd, negative valuation of the Kalukundi property.

---

[96] SRK Addendum at 6
[97] *Id* at 6.
[98] RPA state "In mining we can compare with properties of the same commodity in the same geological environment or similar jurisdiction. We value based on the amount of the contained commodity, the stage of the project, and try to find similar types of deposits.", RPA Presentation at slide 119.

132. Och Ziff and its experts attempt to artificially inflate the impact of each of their criticisms regarding the inputs used by SRK. However, because RPA (and Och Ziff's other experts) fail to design their own mine plan, they are falsely inflating the impact of each altered variable on SRK's model. As described in detail in our prior report, the mine plan was optimized using sophisticated modeling software.[99] Thus, were SRK to change an input (for example, pit slope) as suggested by RPA, that software would then optimize the mine plan to take into account the economic impact of changing the pit design to mitigate the impact on the value of the project. By failing to design, let alone optimize, a mine plan based on its desired inputs, RPA's hypothetical "valuation" based on a Frankenstein version of SRK's mine plan cannot be compared to SRK's valuation based on an optimized mine plan keyed to the inputs it selected and intended to replicate a plan that would actually be used to mine the property. By persisting with SRK's mine plan, RPA is not determining its own DCF valuation under its own assumptions. Rather, RPA is merely demonstrating that under its flawed assumptions, it is not economic to follow the mine plan that SRK prepared. This should not come as a surprise. The failure of RPA and the other Och Ziff Experts to follow standard industry practice and common sense is how Defendant, through its experts, determines that the value of Africo's interest in the Kalukundi mining rights at the time of sentencing is less than $0. As noted at the outset of this report, Kalukundi is one of the most profitable undeveloped copper/cobalt properties in the world. Defendant's suggestion that it cannot even be given away, as it has a purported negative value, is not even remotely credible.

[99] Leapfrog™ Software (used for geologic modeling), Datamine™ Mining Software (used for resource estimation), Whittle™ Pit Analysis Software (used for pit optimization).

## IV. CONCLUSION

133. Based on the above, and for the reasons outlined in our initial report and November 2019 addendum, it remains our view that the value of Africo's 75% stake in the Kalukundi mining rights as of 2008 was between US$150 - US$258 million.[100]

134. Moreover, for the reasons outlined in our initial report and November 2019 addendum, it remains our view that the value of Africo's stake in the Kalukundi mining rights as of 2019 was US$421.8 million, based on consensus pricing and a 12% discount rate.

[100] *See*, SRK Addendum at 3.

# Appendices / Exhibits

# Appendix A: Comparison Between Kalukundi and Kalongwe

| Key Project Metrics | | Nuzri 2018 Kalongwe | Africo 2008 Kalukundi | | Africo 2019 Kalukundi | |
|---|---|---|---|---|---|---|
| **Indicated & Inferred Resource** | Mtonnes | 13.46 | 27.18 | 2.0 | 55.66 | 4.1 |
| **Contained Metal** | | | | | | |
| Copper | Cu Tonnes | 234,906 | 692,827 | | 1,161,362 | |
| Cobalt | Co Tonnes | 27,166 | 161,262 | | 253,881 | |
| **Mining Schedule** | | | | | | |
| Ore Processed/Annum | Mtpa | 1.00 | 1.25 | | 1.25 | |
| Aggregate Total Ore Processed | Mtonnes | 7.97 | 10.50 | | 16.86 | |
| % of Resource Mined | | 59.21 | 38.64 | | 30.28 | |
| **Recovered Metal** | | | | | | |
| Copper | Cu Tonnes | 149,258 | 238,880 | | 427,259 | |
| Cobalt | Co Tonnes | 10,964 | 51,280 | | 86,365 | |
| % Insitu Copper Recovered | | 64 | 34 | | 37 | |
| % Insitu Cobalt Recoverd | | 40 | 32 | | 34 | |
| **Copper/Cobalt Price Ratio** | | 9 | 6 | | 9 | |
| **Copper Equivalent Recovered** | tonnes | 247,934 | 546,560 | 2.2 | 1,204,542 | 4.9 |

# Appendix B: SRK Kalukundi Pit Depth


1450 L
Variable Recovery Pit
1400 L
Flat Recovery Pit
1350 L

# Exhibits

**Exhibit SRK - 1. DRC 2018 Mining Code**

*If the cadastral and technical opinions following the investigation of the application for the Mining License are favorable but the environmental certificate is unfavorable, the Minister makes his/her decision to refuse within 30 working days of the date of receipt of the application file sent to him/her by the Mining Registry.*

*If the cadastral and technical opinions following the application for the Mining License are favorable but the environmental certificate has not yet been issued, the Minister makes a preliminary and conditional approval decision within 20 working days from the date of receipt of the application file submitted to him/her by the Mining Registry and defers his/her final decision to grant or reject the Mining License until the environmental certificate is received.*

*The Minister's preliminary and conditional approval decision has the effect of definitively approving the cadastral and technical opinion. It determines his/her final decision to grant the receipt of a favorable environmental certificate.*

*The Minister makes and transmits the reasoned decision to grant or reject the Mining Permit to the Mining Registry for execution within 30 days of the date of receipt of the environmental certificate sent to him/her by the Mining Registry.*

## Article 77: The extension to associated mineral substances

*Prior to conducting research or exploitation activities for mineral substances other than those for which its Mining License has been established, the licensee is required to obtain the extension of its license to these other associated substances.*

*In the event that the licensee of the Mining License does not apply for such an extension, the Mining Directorate requires the licensee to apply for it within 60 days.*

*On expiry of this period, the provisions of Article 299 of this Code apply to the licensee if it continues to exploit these substances.*

*Any associated mineral substance discovered and waived by the licensee of the Mining License as part of the extension, automatically becomes the property of the State.*



## Article 80: Conditions for the renewal of the Mining License

*The Mining License is renewable provided that the licensee:*

**a.** *did not fail to meet its obligations to maintain the validity of the license under Articles 196 to 199 of this Code;*

**b.** *presents a new feasibility study that demonstrates the existence of exploitable reserves;*

**c.** *demonstrates the financial resources required to continue to complete its project in accordance with the financing and operating plan for the mine and the site rehabilitation plan when it closes. This plan specifies each type of financing targeted and the justifications for their likely availability;*

**d.** *obtains approval for the updating of the ESIA and the ESMP;*

**e.** *signs a commitment to actively continue its exploitation;*

**f.** *demonstrates the entry of the project into the profitability phase;*

**g.** *demonstrates the steady and uninterrupted development of the deposit;*

**h.** *transfers to the State on each renewal 5% of the shares or units in the company's share capital in addition to those previously transferred;*

**i.** *did not fail in its fiscal, parafiscal and customs obligations;*

**j.** *files a deed of commitment to comply with the specifications defining social responsibility to local communities affected by the project's activities.*

*The application for renewal of the Mining License is made by the licensee with the Mining Land Registry at least one year and no more than five years before the expiry date of the Mining License. This request includes the following information:*

**a.** *the statements provided for in letters a, b and c of Article 35 of this Code;*

**b.** *the identity of affiliated companies;*

**c.** *the nature, number and size of the perimeter held by the licensee and its affiliated companies.*

*The Mining Regulations set out the terms of the establishment, filing, admissibility or inadmissibility, the cadastral, technical, environmental and social investigation of the application for renewal of the Mining License and the renewal decision, registration, notification and display.*

### *Article 85: The marketing of mining products*

*The marketing of mining products from the Mining Perimeters is free. The holder of a Mining License may sell its products to customers of their choice at freely negotiated prices.*

## *CHAPTER III: THE EXPLOITATION OF MINING WASTE*

### *Article 88: The scope of the Mining Waste Permit*

*The Mining Waste Permit covers the mineral substances for which it is specifically established. The Mining Waste Permit may extend to other mineral substances in accordance with the provisions of Article 77 of this Code.*

### *Article 91 section 2*

*Without prejudice to the provisions of the previous section, the applicant partial transferor of a Mining License presents the deed of partial transfer to the Mining Registry for registration to which its application for the Permit to exploit the waste is attached.*

### *Article 95: Renewal of the Mining Waste Permit*

*The provisions of Article 80 of this Code apply to the filing, processing and investigation of the application and to the granting or refusal of the renewal of the Mining Waste Permit.*

## *CHAPTER IV: SMALL-SCALE MINING*

### *Article 97: Access to small-scale mining*

*Without prejudice to the provisions of Article 23, a of this Code, corporations who propose to operate a mine on a small scale can apply for and obtain a Small Mine License.*

### *Article 99: The scope of the Small Mine License*

*The provisions of Article 64 of this Code apply to the Small Mine License.*

### *Article 101: The duration of the Small Mine License*

*The duration of the Small Mine License is five years, renewable once for the same duration.*

*However, at the request of the licensee and after favorable opinion from the Mining Directorate, the Minister may extend the duration of a Small Mine License beyond 10 years, depending on the case and for substances with more than 10 years of exploitation.*

### *Article 104, section 1*

*In addition to the conditions provided for in the terms of Article 71, b to g of this Code, no one can obtain a Small Mine License if they do not demonstrate the existence of a deposit, the technical factors of which do not permit profitable industrial exploitation by presenting a feasibility study with a technical management plan for the development, construction and exploitation of the mine.*

### *Article 107: Conditions for the renewal of the Small Mine License.*

*The application for renewal of the Small Mine License sent to the Minister is filed with the Mining Registry no earlier than one year and no later than six months prior to the expiry date of the License. This application includes the information listed in Article 80 section 2 in fine of this Code.*

**Exhibit SRK - 2. DRC Article 530**

JOURNAL OFFICIEL

de la
République Démocratique du Congo

CABINET DU PRESIDENT DE LA REPUBLIQUE

# DECRET N° 038/2003 DU 26 MARS 2003 PORTANT

# REGLEMENT MINIER

**TEL QUE MODIFIE ET COMPLETE PAR LE DECRET N° 18/024 DU 08 JUIN 2018**

***(Textes coordonnés)***

59e Année | Numéro spécial | 12 juin 2018

**Article 177 : De la notification et de l'affichage de la décision prenant acte de la déclaration de renonciation du Permis d'Exploitation**

Dès réception de l'arrêté prenant acte de la déclaration de renonciation du Permis d'Exploitation et au cas où la déclaration de renonciation est réputée acceptée faute d'arrêté pris dans le délai prescrit, le Cadastre Minier central ou provincial notifie au titulaire cette décision sans frais par le moyen le plus rapide et le plus fiable, et procède à son affichage dans la salle de consultation publique.

**Article 178 : De la modification des inscriptions et du Certificat d'Exploitation**

En cas de renonciation partielle, le Cadastre Minier central ou provincial modifie l'inscription du Permis d'Exploitation au registre des droits octroyés ainsi que le report du périmètre d'Exploitation sur la carte de retombes minières. Il procède à la modification du Certificat d'Exploitation en y inscrivant la renonciation partielle et le retourne dans un délai de cinq jours à compter de l'inscription.

**Article 179 : Des effets de la renonciation du Permis d'Exploitation**

Les effets de la renonciation sont ceux prévus à l'article 79 alinéas 5 et 6 du Code minier.

***Chapitre IV :***
***DU RENOUVELLEMENT DU PERMIS D'EXPLOITATION***

**Article 180 : De l'établissement de la demande de Permis d'Exploitation**

Pour obtenir le renouvellement de son Permis d'Exploitation, le titulaire dépose au plus tôt dans les cinq ans et au plus tard un an avant la date de l'expiration du Permis d'Exploitation, sa demande auprès du Cadastre Minier central ou provincial, suivant le formulaire de Renouvellement à retirer auprès du Bureau du Cadastre Minier.

Le formulaire de Renouvellement du Permis d'Exploitation est rempli et signé par le titulaire du Permis d'Exploitation ou son mandataire.

Au formulaire de Renouvellement sont joints les documents suivants :

- une copie de la décision d'octroi du Permis d'Exploitation ;
- le Certificat d'Exploitation;
- une carte à l'échelle 1/200.000 sur laquelle est indiquée la situation géographique du périmètre dont le renouvellement est demandé ;

- les coordonnées géographiques des sommets du périmètre dont le renouvellement est demandé ainsi que le nombre des carrés y compris;
- le rapport et le programme des travaux d'exploitation ;
- une étude de faisabilité mise à jour ;
- l'EIES et le PGES mis à jour ;
- un acte d'engagement de poursuivre activement l'exploitation et la preuve de mise en valeur régulière du gisement ;
- le plan de financement des travaux d'exploitation ;
- la preuve de l'existence des ressources financières nécessaires à la poursuite d'exploitation du projet ;
- la déclaration notariée de cession des 5% des parts ou actions à l'Etat, conformément à l'article 144 alinéas 2 à 4 du présent Décret ;
- un acte d'engagement de se conformer au cahier de charge prévu dans le présent Décret ;
- une attestation fiscale ;
- une copie de la quittance ou du récépissé du paiement des frais de dépôt ;
- la preuve de l'entrée en phase de rentabilité du projet.

**Article 181 : Du dépôt de la demande de renouvellement du Permis d'Exploitation**

Le formulaire contient :

- la dénomination sociale, l'adresse et les autres coordonnées du titulaire du Permis d'Exploitation et, le cas échéant, de son mandataire en mines et carrières;
- le numéro du Permis d'Exploitation et le nombre de carrés y compris ;
- le numéro de la décision d'octroi ;
- la date d'octroi ;
- la localisation administrative : territoire, district, province ;
- la superficie du Permis d'Exploitation ;
- dénomination des sociétés affiliées du titulaire ;
- le nombre de Permis d'Exploitation détenus par le titulaire et ses sociétés affiliées ;

Avant le dépôt de la demande de renouvellement du Permis d'Exploitation, le titulaire paie les frais de dépôt afférant à l'instruction cadastrale au Cadastre Minier central ou provincial qui lui délivre un récépissé.

**Article 182 : De la recevabilité ou de l'irrecevabilité de la demande de renouvellement du Permis d'Exploitation**

Dès la réception de la demande de renouvellement, le Cadastre Minier central ou provincial vérifie si elle est recevable. La demande est recevable si :

- elle contient tous les éléments repris à l'article 181 ci-dessus ;
- elle a été déposée au Cadastre Minier central ou provincial qui a délivré le Certificat d'Exploitation au plus tôt dans les cinq ans et au plus tard un an avant la date d'expiration du Permis d'Exploitation comme prévu à l'article 80 alinéa 2 du Code minier ;
- elle contient tous les renseignements requis dans le formulaire de renouvellement du Permis d'Exploitation conformément à l'article 181 ci-dessus et dans le rapport des résultats des travaux d'exploitation.

En cas de recevabilité de la demande, le Cadastre Minier central ou provincial inscrit la demande de renouvellement au cahier d'enregistrement général et délivre au titulaire un récépissé du dépôt de la demande conformément aux dispositions de l'article 70 du présent Décret.

En cas d'irrecevabilité, le Cadastre Minier central ou provincial restitue ou renvoie le dossier de demande au titulaire en lui indiquant le motif.

**Article 183 : De l'instruction de la demande de renouvellement du Permis d'Exploitation**

Les instructions cadastrale, technique et environnementale de la demande de renouvellement du Permis d'Exploitation s'opèrent conformément aux dispositions des articles 149 à 153 du présent Décret.

Lors de l'instruction cadastrale le Cadastre Minier central ou provincial vérifie :

- l'éligibilité du titulaire du Permis d'Exploitation aux droits miniers ou de carrières conformément à l'article 23 du Code minier ;
- la validité du Permis d'Exploitation ;
- la déclaration notariée de la cession de 5% à l'Etat conformément à l'article 144 alinéas 2 à 4 du présent Décret;

- le respect par le titulaire du Permis d'Exploitation de ses obligations du maintien de la validité du permis ;
- l'existence de tous les carrés renouvelés ou retenus dans le périmètre du Permis d'Exploitation ;
- le respect des limitations du Permis d'Exploitation défini à l'article 142 du présent Décret ;
- le paiement par le titulaire du montant des droits superficiaires annuels par carré pour son Périmètre d'Exploitation pendant la période de validité de son Permis d'Exploitation ;
- le commencement des travaux d'exploitation dans les trois ans à compter de l'octroi de son Permis d'Exploitation sauf cas de force majeure prévu à l'article 297 du Code minier.

Si le Cadastre Minier constate au cours de l'instruction cadastrale un défaut dans la demande qui est susceptible d'être corrigée par le titulaire, il notifie à ce dernier par le moyen le plus rapide et le plus fiable et l'invite à corriger sa demande.

Aux éléments de l'instruction technique effectuée par la Direction des Mines précisés à l'article 152 du présent Décret, s'ajoute la vérification de l'engagement souscrit par le titulaire de bonne foi de continuer activement l'exploitation et la mise en œuvre des normes nationales, régionales et internationales de transparence dans les industries extractives ainsi que de celles souscrites pour un approvisionnement responsable en minerais.

L'instruction environnementale et sociale effectuée par l'Agence Congolaise de l'Environnement, le Fonds National de Promotion et de Service Social en collaboration avec la Direction chargée de la Protection de l'Environnement Minier est réalisée selon les modalités précisées à l'article 153 du présent Décret et doit être achevée dans un délai de nonante jours ouvrables à compter de la date de son déclenchement.

Le Cadastre Minier central, la Direction des Mines, l'Agence Congolaise de l'Environnement, le Fonds National de Promotion et de Service Social en collaboration avec la Direction chargée de la Protection de l'Environnement Minier émettent, chacun en ce qui le concerne, un avis favorable ou défavorable.

Une fois les avis cadastral, technique et le certificat environnemental reçus, le Cadastre Minier central notifie au titulaire du Permis d'Exploitation les avis cadastral, technique et environnemental favorables ou défavorables émis sans frais par le

moyen le plus rapide et le plus fiable et procède à son affichage dans la salle de consultation publique.

Dans un délai de cinq jours ouvrables à compter de la date de demande de renouvellement recevable, le Cadastre Minier central transmet au Ministre le projet d'arrêté portant renouvellement ou refus de renouvellement du Permis d'Exploitation, selon le cas, les avis cadastral, technique ou environnemental favorables ou défavorables et les motifs du refus.

**Article 184 : De la décision de renouvellement ou de refus de renouvellement du Permis d'Exploitation**

Dans un délai de trente jours ouvrables à partir de la réception du dossier de demande de renouvellement du Permis d'Exploitation transmis par le Cadastre Minier central avec les avis cadastral, technique, environnemental favorables ou défavorables et sauf cas d'erreur manifeste dans ces avis ou entre ceux-ci et le projet d'arrêté, le Ministre prend et transmet audit Cadastre l'arrêté portant renouvellement ou refus de renouvellement du Permis d'Exploitation.

Tout refus de renouvellement doit être motivé et donne droit aux recours selon les prescrits des articles 313 à 314 et 317 à 320 du Code minier.

Le délai de trente jours ouvrables de la décision du Ministre visée à l'alinéa 1er du présent article court conformément aux dispositions de l'article 45 alinéa 1erdu Code minier.

A défaut de décision du Ministre dans le délai de trente jours ouvrables requis, le renouvellement du Permis d'Exploitation est, selon que les avis cadastral, technique et environnemental sont favorables ou défavorables, réputée accordé ou refusé.

**Article 185 : De l'inscription de la décision de renouvellement ou de refus de renouvellement du Permis d'Exploitation**

Dans les cinq jours ouvrables à compter soit de la date de décision du Ministre, soit de la date à laquelle la décision est réputée prise conformément aux avis cadastral, technique et au certificat environnemental favorables ou défavorables, le Cadastre Minier l'inscrit selon le cas :

- sur la fiche technique de la demande de renouvellement du Permis d'Exploitation;
- dans le cahier d'enregistrement général en cas de décision de refus ;
- dans le registre des droits octroyés en cas de décision de renouvellement du Permis d'Exploitation.

A défaut d'inscription d'office du renouvellement du Permis d'Exploitation réputé accordé par le Cadastre Minier dans le délai requis, le titulaire du Permis d'Exploitation ou son mandataire adresse à ce dernier une demande d'inscription de son droit conformément à l'article 43 alinéa 4 du Code minier. Dans les cinq jours ouvrables à compter de la réception de la demande d'inscription, le Cadastre Minier est tenu de procéder à l'inscription du Permis d'Exploitation renouvelé.

A défaut d'inscription par le Cadastre Minier, du Permis d'Exploitation renouvelé dans le délai visé à l'alinéa précédent, le titulaire du Permis d'Exploitation ou son mandataire peut recourir à la procédure d'inscription par voie judiciaire conformément à l'article 46 du Code minier.

**Article 186 : De la notification et de l'affichage de la décision de renouvellement ou de refus de renouvellement du Permis d'Exploitation**

Dans les cinq jours à compter de la date de la décision du Ministre ou de la date à laquelle la décision est réputée prise, le Cadastre Minier central la notifie au titulaire du Permis d'Exploitation sans frais par le moyen le plus rapide et le plus fiable et procède à son affichage dans la salle de consultation publique et dans celle du Cadastre Minier provincial.

Si le titulaire obtient le renouvellement de son Permis d'Exploitation dans la dernière année de sa validité, la notification de la décision de renouvellement indique que le montant à payer au titre des droits superficiaires *prorata temporis* par carré pour la première année de la période du renouvellement du Permis d'Exploitation dont le mode de calcul est précisé à l'article 394 du présent Décret. La notification précise également la date limite pour le paiement de cette somme qui sera le trentième jour ouvrable suivant la date de la décision de renouvellement.

**Article 187 : De la modification et de la délivrance du Certificat d'Exploitation renouvelé**

Endéans les cinq jours ouvrables suivant l'inscription de la décision de renouvellement du Permis d'Exploitation et sous réserve des dispositions de l'alinéa 2 du présent article, le Cadastre Minier procède à la modification du Certificat d'Exploitation initial en y inscrivant le renouvellement du Certificat d'Exploitation accordé et restitue au titulaire son Certificat d'Exploitation modifié conformément aux termes du renouvellement.

Le titulaire qui obtient le renouvellement de son Permis d'Exploitation dans la dernière année de validité de son Permis d'Exploitation paie les droits superficiaires *prorata temporis* par carré pour la première année de la période de renouvellement,

conformément aux dispositions de l'article 385 du présent Décret comme condition de la délivrance de son Certificat d'Exploitation modifié.

Lors du paiement des droits superficiaires, le Cadastre Minier délivre un récépissé ou une quittance au titulaire, indiquant son nom, le montant et la date du paiement ainsi que les références du Permis d'Exploitation y afférent.

La mention du paiement par le titulaire des droits superficiaires par carré pour la première année du renouvellement est inscrite par le Cadastre Minier dans le registre des droits superficiaires annuels par carré.

Si, à l'expiration de la date limite indiquée sur la notification, le titulaire du Permis d'Exploitation n'a pas payé les droits superficiaires *prorata temporis* par carré pour la première année de la période du renouvellement du Permis d'Exploitation, le renouvellement du Permis d'Exploitation est caduc conformément à l'article 47 alinéa 3 du Code minier. Dans ce cas, les dispositions de l'article 188 ci-dessous lui sont applicables.

**Article 188 : De la radiation du Permis d'Exploitation non-renouvelé ou du Permis d'Exploitation renouvelé non suivi du paiement des droits superficiaires dus pour la première année de renouvellement**

En cas de décision de refus de renouvellement du Permis d'Exploitation ou de non-paiement dans le délai imparti, des droits superficiaires par carré pour la première année de renouvellement de Permis d'Exploitation, le Cadastre Minier central radie l'inscription du périmètre sur le registre des droits octroyés et le report du périmètre sur la carte de retombes minières, lorsque le Permis d'Exploitation arrive à son terme. Dans ce cas, la superficie en cause est immédiatement libérée et devient disponible, sous réserve du maintien de la priorité en faveur du titulaire qui obtient gain de cause à la suite d'une procédure de recours administratif ou arbitral dûment initiée par lui dans les trente jours suivant la date de la décision de refus.

# TITRE VI :
# DU PERMIS D'EXPLOITATION DES REJETS

## *Chapitre Ier :*
## *DE L'OCTROI DU PERMIS D'EXPLOITATION DES REJETS*

**Article 189 : Des limitations**

Les limitations suivantes quant à la superficie s'appliquent au Permis d'Exploitation des Rejets :

commencement des travaux de recherches. L'attestation de commencement des travaux est dûment certifiée par le Cadastre Minier central ou provincial.

En cas d'objection écrite de la part de l'un ou l'autre de ces services dans le délai imparti, le service concerné demande les informations complémentaires au titulaire par lettre envoyée au Cadastre Minier provincial qui la notifie au titulaire par le moyen le plus rapide et le plus fiable. Dans ce cas, le titulaire est tenu, dans les douze jours ouvrables à compter de la date de la réception de cette lettre, de fournir le complément d'information demandé.

Dans les douze jours ouvrables à dater du dépôt de la réponse du titulaire, le service concerné doit indiquer et communiquer au Cadastre Minier central ou provincial par écrit soit l'établissement de la preuve requise soit l'insuffisance de celle-ci.

En cas d'insuffisance de preuve attestant le commencement des travaux pour l'une ou l'autre opération prévue à l'article 386 du présent Décret, le chef du service concerné prépare et transmet un avis écrit au Cadastre Minier central avec copie à chaque Cadastre Minier provincial concerné. Le Cadastre Minier central ne certifie pas le commencement des travaux. Il notifie cet avis au titulaire sans frais par le moyen le plus rapide et le plus fiable et procède à son affichage dans la salle de consultation publique et dans celle du Cadastre Minier provincial concerné.

En cas de refus de certification ou d'absence de preuve du commencement des travaux de recherches conformément à l'article 387 du présent Décret, le Cadastre Minier informe la Direction des Mines aux fins de l'établissement du constat prévu à l'article 288 du Code minier dans un délai de cinq jours.

### Section II : Du commencement des travaux de développement et de construction

#### Article 390 : Des opérations attestant le commencement des travaux de développement et de construction en vertu d'un Droit Minier d'Exploitation ou d'une Autorisation d'Exploitation de Carrières Permanente

En application des dispositions de l'article 197 du Code minier, le titulaire d'un Droit Minier d'Exploitation ou d'une Autorisation d'Exploitation de Carrières Permanente doit, selon le cas, dans un délai d'un an ou trois ans à partir de la délivrance de son titre minier ou de carrières, réaliser les opérations suivantes :

- le dépôt de deux copies de son Plan de Gestion Environnementale et Sociale du Projet approuvé dont une au Cadastre Minier provincial et l'autre à la Division provinciale des mines où le périmètre d'exploitation est situé ;

- la transmission d'un sommaire du Plan de Gestion Environnementale et Sociale du Projet aux autorités locales et l'explication des mesures d'atténuation et de réhabilitation prévues ;
- la constitution d'une sûreté financière pour la réhabilitation du périmètre ;
- l'engagement des travaux de développement et de construction pour un montant supérieur à cinq fois le montant des droits superficiaires exigibles pour la première année entière de la durée du Permis d'Exploitation, du Permis d'Exploitation de Petite Mine ou du Permis d'Exploitation des Rejets, selon le cas.

Un Arrêté du Ministre précise les travaux qui sont considérés comme des travaux de développement et de construction.

**Article 391 : De la preuve du commencement des travaux de développement et de construction**

Dans le délai prévu à l'article 390 ci-dessus, le titulaire d'un Droit Minier d'Exploitation ou d'une Autorisation d'Exploitation Permanente est tenu de fournir au Cadastre Minier la preuve du commencement des travaux de développement et de construction suivant une attestation contenant la déclaration écrite sur l'honneur par le titulaire sur l'exactitude des renseignements portant sur la réalisation des opérations susmentionnées.

L'attestation de commencement des travaux de développement et construction comporte notamment les mentions suivantes :

- la dénomination sociale, l'adresse et tous autres éléments d'identification du titulaire ;
- les références de l'acte d'octroi du Droit Minier d'Exploitation ou de l'Autorisation d'Exploitation de Carrières Permanente et des certificats y afférents ;
- l'indication du Cadastre Minier provincial et de la Division provinciale des Mines où le Plan de Gestion Environnementale du Projet a été déposé et la date du dépôt ;
- les noms et adresses des autorités locales auxquelles un sommaire du plan de gestion environnementale du projet a été transmis et expliqué, ainsi que les dates des entretiens au sujet du Plan de Gestion Environnementale du Projet ;
- la forme, le montant et la date du dépôt ou d'ouverture de la sûreté de réhabilitation ;

# TITRE XVIII : DES OBLIGATIONS ENVIRONNEMENTALES ET SOCIETALES

## *Chapitre I : DES OBLIGATIONS ENVIRONNEMENTALES ET SOCIETALES DES TITULAIRES DE DROITS MINIERS ET DE CARRIERES*

### Section I : Des exigences environnementales et sociales

**Article 404 : Des opérations subordonnées à la présentation et à l'approbation préalables d'un Plan Environnemental et Social**

Hormis l'exploitation artisanale, toutes les opérations de recherches et d'exploitation minières et de carrières doivent faire l'objet d'un Plan Environnemental et social préalablement établi et approuvé conformément aux dispositions prévues par le présent titre.

**Article 404 bis : Des mesures préventives d'exposition et de contamination**

L'opérateur minier est responsable de la radioprotection pour toutes ses activités conformément à la loi portant dispositions relatives à la protection contre les dangers des rayonnements ionisants et à la protection physique des matières et des installations nucléaires et le Décret portant réglementation de la protection contre les dangers des rayonnements ionisants.

Il doit assurer la protection radiologique de ses travailleurs et prendre toutes les dispositions nécessaires pour éviter que ses activités minières ne soient sources de contamination radiologique de l'environnement afin de prévenir l'exposition et la contamination du public aux rayonnements ionisants.

Un contrôle réglementaire de la radioactivité est effectué pendant la recherche, l'exploitation, le traitement et le transport des minerais par l'autorité de régulation des rayonnements ionisants. En cas d'obstruction à ce contrôle, l'autorité de régulation des rayonnements ionisants saisit la Direction de Protection de l'Environnement Minier pour mettre en demeure le titulaire défaillant de s'y soumettre.

Si la mise en demeure n'est pas suivie d'effets le titulaire concerné est sanctionné conformément à la loi.

L'opérateur minier s'assure de la surveillance radiologique de l'environnement, de la gestion du radon dans les locaux, dans les mines à ciel ouvert, les mines

souterraines ainsi que dans les sites sur l'ensemble du périmètre minier et ses environs.

Cette surveillance est effectuée par les sociétés congolaises habilitées par l'Autorité de régulation des rayonnements ionisants, conformément à la législation et à la réglementation spécifique en la matière.

La surveillance radiologique de l'environnement comprend entre autres :

a) le prélèvement et l'analyse des échantillons;

b) le contrôle des eaux naturelles ou industrielles;

c) le contrôle de la radioactivité dans l'air, dans la poussière;

d) le contrôle de la radioactivité dans le sol, les végétaux, les sédiments, la faune et la chaine alimentaire.

La gestion du radon dans les locaux comprend notamment :

a) une campagne de dépistage ;

b) la fourniture et analyse des dosimètres passifs ;

c) des analyses complémentaires ;

d) l'Etude des sites avant les opérations minières.

L'étude radiologique des postes dans les sites miniers comprend entre autres :

a) l'étude dosimétrique de la radioactivité naturelle;

b) le suivi dosimétrique des travailleurs ;

c) la gestion des déchets (rejets radioactifs);

d) le calibrage des sources radioactives;

e) la formation en radioprotection.

En cas de non-respect des prescrits du présent article, la Direction de Protection de l'Environnement Minier recourt à l'Autorité de régulation des rayonnements ionisants pour constater les manquements aux obligations reprises ci-dessus et sanctionne conformément à l'article 290 du Code minier.

**Article 405 : De la responsabilité environnementale du titulaire**

Le titulaire n'est responsable des dommages causés sur l'environnement par ses activités que dans la mesure où il n'a pas respecté les termes de son Plan

Environnemental approuvé, y compris les modifications au cours du projet, ou a violé l'une des obligations environnementales prévues au présent Titre.

En cas de cession, le Cessionnaire et le Cédant d'un droit minier font procéder, conformément aux dispositions de l'article 186 du Code minier, à un audit environnemental du site d'exploitation concerné par la cession. Cet audit détermine les responsabilités et obligations environnementales du cédant pendant la période où il était titulaire du droit minier en cause. Les frais et charges y afférents incombent au cédant.

Sans préjudice des dispositions de l'alinéa précédent et conformément à l'article 182 du Code minier, le titulaire qui acquiert son droit minier ou de carrières par cession assume, pour compte et à charge du cédant, les obligations environnementales vis-à-vis de l'Etat, à moins que le cédant ait obtenu l'attestation de libération de ses obligations environnementales prévue au Chapitre VII du présent Titre.

Le titulaire qui acquiert son droit minier ou de carrières par octroi n'est pas responsable des dommages et dégâts causés par les personnes qui ont occupé son périmètre avant lui ou travaillé à l'intérieur de celui-ci. Toutefois, il est obligé de tenir compte de ces dommages et dégâts dans son Plan Environnemental et de démontrer que les mesures d'atténuation et de réhabilitation qu'il propose de mettre en œuvre seront conformes aux dispositions du présent titre et efficaces pour éviter que ses propres opérations aient l'effet d'aggraver les dommages et dégâts existants qui pourraient porter atteinte à la santé et à la sécurité des travailleurs ou des populations ou encore aux milieux sensibles.

**Article 405 bis : De la responsabilité industrielle du titulaire**

Le titulaire est responsable des dommages causés aux personnes, aux biens et à l'environnement du fait de ses activités minières, même en l'absence de toute faute ou négligence.

Cette responsabilité objective vise à protéger l'être humain, les biens et l'environnement du fait du caractère potentiellement dangereux des activités minières industrielles.

**Article 405 ter : De la réparation des dommages causés aux personnes, aux biens et à l'environnement par les activités minières.**

Le titulaire d'un droit minier et/ou de carrières est responsable de dommages causés aux personnes, aux biens et à l'environnement par ses activités minières.

Si l'enquête conclut à la confirmation du dommage allégué, la Direction de Protection de l'Environnement Minier détermine l'étendue dudit dommage et les mesures de réparation appropriées qu'elle soumet au titulaire du droit minier ainsi qu'aux victimes.

En cas de refus de réparer ou de désaccord entre le titulaire et les victimes, le Tribunal compétent sera saisi par la partie diligente suivant la procédure de droit commun.

**Article 405 quater : Des maladies imputables à l'activité minière.**

La liste des maladies causées par l'activité minière est déterminée par un arrêté interministériel des Ministres ayant les Mines et la Santé dans leurs attributions.

**Article 405 quinquies : De l'emploi**

Le titulaire des droits miniers ou de carrières, l'amodiataire et les détenteurs d'agrément au titre d'entité de traitement ou de transformation doivent se conformer à la législation du travail en matière d'emploi, plus particulièrement la réglementation du travail des étrangers en ce qui concerne les pourcentages autorisés, celle fixant la liste des emplois interdits aux étrangers ainsi que la réglementation déterminant les conditions d'engagement des étrangers.

A compétences égales, le titulaire des droits miniers ou de carrières, l'amodiataire et les détenteurs d'agrément au titre d'entité de traitement ou de transformation recrutent en priorité des nationaux.

Le tableau ci-après reprend le quota minimal d'employés congolais par catégorie aux différentes phases d'un projet minier :

| CATEGORIE D'EMPLOIS | PHASES DU PROJET | | | | |
|---|---|---|---|---|---|
| | Recherche Minière | Développement et construction | Production commerciale | | |
| | | | 1è-5è | 6è-10è | 11è et au-delà |
| Cadres de direction | 20% | 25% | 60% | 65% | 70% |
| Cadres de maitrise | 30% | 35% | 70% | 75% | 80% |
| Ouvriers qualifiés | 60% | 40% | 80% | 85% | 90% |
| Manœuvres | 80% | 85% | 90% | 95% | 100% |

**Article 405 sexies : De la formation**

Le titulaire des droits miniers ou de carrières, l'amodiataire et les détenteurs d'agrément au titre d'entité de traitement ou de transformation établissent et mettent en œuvre un programme de formation du personnel congolais identifié pour ses besoins, couvrant toutes les qualifications, pour permettre à celui-ci d'acquérir des compétences exigées par le management de l'entreprise en vue d'occuper des postes de direction et de maitrise dans les dix années qui suivent la date du démarrage de la production commerciale, conformément au quota repris à l'article 405 quinquies ci-dessus.

Les personnes susvisées établissent et transmettent à la CTCPM, pour information et suivi, leur plan de formation et de perfectionnement du personnel.

Ce plan comporte un volet de stages de formation en faveur des élèves et étudiants des Universités, d'Etablissements d'enseignement Supérieur technique dont le cursus scolaire et académique selon le cas, porte sur les sciences et techniques minières ainsi que sur les corps des métiers des mines.

**Article 406 : Des opérations subordonnées à la présentation et à l'approbation préalable d'un Plan d'Atténuation et de Réhabilitation**

Les opérations de recherches des mines ou des carrières ainsi que les opérations d'exploitation en vertu d'une Autorisation d'Exploitation de Carrières Temporaire doivent faire l'objet d'un Plan d'Atténuation et de Réhabilitation préalablement établi et approuvé conformément aux dispositions du Chapitre IV du présent Titre.

Pour les opérations de recherches minières ou de carrières, le Plan d'Atténuation et de Réhabilitation est déposé après l'octroi du Permis de Recherches ou de l'Autorisation de Recherches des Produits de Carrières. Son approbation par l'Agence Congolaise de l'Environnement en collaboration avec la Direction chargée de la Protection de l'Environnement Minier est une condition préalable du commencement des opérations de recherches.

Pour les opérations d'exploitation de carrières temporaire, le Plan d'Atténuation et de Réhabilitation est déposé en même temps que la demande de l'Autorisation d'Exploitation de Carrières Temporaire et son approbation par l'autorité compétente est une condition d'octroi de l'autorisation.

**Article 407 : Des opérations subordonnées à la présentation et à l'approbation préalables de l'Etude d'Impact Environnemental et Social, en sigle EIES et du Plan de Gestion Environnementale et Sociale, en sigle PGES.**

A l'exception de l'exploitation de carrières temporaire, toute opération d'exploitation doit faire l'objet d'une Étude d'Impact Environnemental et Social du Projet et d'un Plan de Gestion Environnementale et Sociale préalablement établis et approuvés, conformément aux dispositions du Chapitre V du présent titre.

L'Etude d'Impact Environnemental et Social ainsi que le Plan de Gestion Environnementale et Sociale doivent être déposés en même temps que la demande du droit d'exploitation. Leur approbation par l'autorité compétente est une condition d'octroi du droit d'exploitation.

Pour ce qui concerne l'Etude d'Impact Environnemental et Social, l'autorité compétente est l'Agence Congolaise de l'Environnement, le Fonds National de Promotion et de Service Social en collaboration avec la Direction chargée de la Protection de l'Environnement Minier, conformément aux dispositions de l'article 42 du Code minier.

**Article 408 : abrogé**

**Article 409 : abrogé**

**Section II : De l'obligation de sûreté financière**

**Article 410 : De la sûreté financière de réhabilitation de l'environnement**

En application de l'article 204, alinéa 4 du Code minier, toute personne effectuant des opérations de recherches ou d'exploitation minière ou de carrières est tenue de constituer une sûreté financière de réhabilitation de l'environnement en vue d'assurer ou de couvrir le coût des mesures de réhabilitation de l'environnement.

La sûreté financière de réhabilitation de l'environnement est constituée conformément à la Directive sur la Sûreté Financière de Réhabilitation de l'Environnement reprise à l'annexe II du présent Décret après l'approbation du Plan Environnemental et Social du titulaire.

Les fonds de la sûreté financière de réhabilitation de l'environnement sont mis à la disposition de l'Etat et gérés aux fins de la réhabilitation du site des opérations minières ou de carrières dans les conditions précisées ci-dessous.

Au sens de l'article 294 du Code minier, on entend par « la provision correspondante constituée par le titulaire pour la réhabilitation du site, » la sûreté financière de réhabilitation de l'environnement.

**Article 411 : De la confiscation de la sûreté financière de réhabilitation de l'environnement**

En cas d'inexécution ou d'exécution fautive par le titulaire de ses obligations d'atténuation et de réhabilitation prévues au Plan Environnemental et Social en cours ou à la cessation de ses activités de recherches ou d'exploitation, le tribunal territorialement compétent peut prononcer, à la requête du Ministre ou de son délégué accompagnée de la preuve de la réalisation des procédures préalables exposées aux articles 412 et 413 ci-dessous, la confiscation de la sûreté financière de réhabilitation de l'environnement en faveur de l'Etat, représenté par le Ministre.

Outre la confiscation des fonds de sûreté financière de réhabilitation de l'environnement, le titulaire défaillant peut être astreint à d'autres mesures financières ou restrictives conformément aux dispositions de l'article 294 alinéas 2 et 3 du Code minier.

Dans l'intérêt public, le jugement prononcé par le tribunal saisi en cas de la confiscation de la sûreté financière de réhabilitation de l'environnement est soumis au recours judiciaire prévu aux articles 315 et 316 du Code minier.

En cas de confiscation, les fonds de la sûreté financière de réhabilitation sont gérés conformément aux dispositions de l'article 414 ci-dessous.

Si le coût d'exécution des travaux d'atténuation et de réhabilitation est inférieur à la sûreté financière, le titulaire a droit à la restitution du trop-perçu.

Si la sûreté financière de réhabilitation de l'environnement confisquée ne couvre pas les coûts réels du site endommagé, le Ministre ou son délégué peut confier l'exécution des travaux correspondants à un tiers. Le surplus des frais est à la charge du titulaire défaillant.

**Article 412 : De la procédure préalable à la confiscation de la sûreté financière de réhabilitation de l'environnement en cas de défaillance du titulaire au cours des activités minières ou de carrières**

Si, au terme de la deuxième prolongation de la période de suspension temporaire prononcée conformément à l'article 570 du présent Décret, le titulaire n'a pas réalisé les travaux d'atténuation et de réhabilitation de l'environnement et envoyé une Attestation de libération d'obligations environnementales et sociales au Ministre, ce

**Article 456 : De la notification et de la transmission du certificat Environnemental**

Conformément à l'article 42 du Code minier, dans un délai de cinq jours ouvrables à compter de la réception du certificat Environnemental, le Cadastre Minier central :

- notifie le Certificat Environnemental au requérant par le moyen le plus rapide et le plus fiable ;
- procède à l'affichage du Certificat Environnemental dans sa salle de consultation publique et le cas échéant dans celle du Cadastre Minier provincial où la demande a été déposée ;
- inscrit le Certificat Environnemental sur la fiche technique de la demande.

Dans le même délai, le Cadastre Minier transmet le dossier de l'Etude d'Impact Environnemental et Social et le Certificat Environnemental au Ministre ou au Chef de Division provinciale des Mines, lorsqu'il s'agit d'une demande d'Autorisation d'Exploitation de Carrières Permanente des matériaux de construction à usage courant, pour décision d'octroi ou de refus d'octroi du droit d'exploitation, y compris l'approbation ou le refus d'approbation de l'Etude d'Impact Environnemental et Social et du Plan de Gestion Environnementale et Sociale.

**Article 457 : Du recours du requérant**

Dans les quinze jours de la notification du certificat environnemental défavorable, le requérant peut exercer un recours administratif contre ce certificat. Cette procédure suspend la décision définitive du Ministre ou du Chef de Division provinciale jusqu'au jugement définitif.

**Section II : De la mise en œuvre du Plan de Gestion Environnementale et Social**

**Article 458 : Du rapport annuel de réalisation des travaux d'exploitation, d'atténuation et de réhabilitation**

Dans les cent jours qui suivent la date anniversaire de l'approbation de l'Étude d'Impact Environnemental et Social et du Plan de Gestion Environnementale et Sociale, le titulaire est tenu de déposer chaque année, un rapport auprès de l'Agence Congolaise de l'Environnement, du Fonds National de Promotion et de Service Social et de la Direction chargée de la Protection de l'Environnement Minier.

Ce rapport doit décrire sommairement :

- les travaux d'exploitation réalisés et leur impact sur l'environnement ;

- les travaux d'atténuation et de réhabilitation qui ont été réalisés ;
- l'état d'avancement des mesures d'atténuation et de réhabilitation par rapport à celles prévues dans le Plan de Gestion Environnementale et Sociale approuvé ;
- les frais engagés en relation avec la mise en œuvre de ces travaux d'atténuation et de réhabilitation ;
- l'état d'avancement et les résultats de la mise en œuvre du plan de développement durable et du cahier des charges.

**Article 459 : De l'audit environnemental et social**

Tous les deux ans à partir de la date d'approbation de l'Etude d'Impact Environnemental et Social initiale, le titulaire d'un droit minier ou de carrières est tenu de faire réaliser, à ses propres frais, un audit par un Bureau d'études environnementales agréé autre que celui qui a élaboré l'Etude d'Impact Environnemental et Social ou le Plan de Gestion Environnementale et Sociale.

L'audit constatera l'avancement des travaux d'atténuation et de réhabilitation par rapport au calendrier prévu, la conformité des impacts sur l'environnement avec les normes techniques de la directive sur l'Etude d'Impact Environnemental et Social et toutes autres observations sur les impacts des activités minières ou de carrières sur l'environnement ainsi que le niveau d'exécution du cahier des charges.

**Article 460 : Du rapport de l'audit environnemental et social**

Le Bureau d'études environnementales agréé chargé de l'audit environnemental et social rédige un rapport et en transmet les copies à l'Agence Congolaise de l'Environnement, au Fonds National de Promotion et de Service Social et à la Direction chargée de la Protection de l'Environnement Minier et une autre au titulaire dans un délai de nonante jours ouvrables à compter de la date du commencement des travaux d'audit.

**Article 461 : Du contrôle des travaux d'atténuation et de réhabilitation**

Les travaux d'atténuation et de réhabilitation réalisés par le titulaire sont soumis aux inspections effectuées par l'Agence Congolaise de l'Environnement en collaboration avec la Direction chargée de la Protection de l'Environnement Minier et le Fonds National de Promotion et de Service Social, pour vérifier leur état d'avancement par rapport au calendrier prévu et leur conformité par rapport aux mesures prévues dans le Plan de Gestion Environnementale et Sociale ainsi que le cahier des charges approuvés.

A l'issue de chaque contrôle, un rapport est dressé en deux copies, dont une est transmise au titulaire et une autre à la Direction des Mines, dans un délai de trente jours ouvrables à compter de la clôture de l'opération du contrôle.

L'Etat se réserve le droit de diligenter un audit chaque fois que les circonstances l'exigent.

**Article 462 : Du suivi de l'efficacité des mesures d'atténuation et de réhabilitation**

L'Agence Congolaise de l'Environnement en collaboration avec la Direction chargée de la Protection de l'Environnement Minier, les autorités provinciales ou tout autre organisme autorisé par la Direction susvisée sont chargés d'étudier l'état de l'environnement et l'évolution des caractéristiques du milieu ambiant de la situation du périmètre et sont autorisés à effectuer des études, des prélèvements et des analyses ponctuels ou réguliers sur l'environnement.

Nonobstant les rapports, l'Agence Congolaise de l'Environnement en collaboration avec la Direction chargée de la Protection de l'Environnement Minier, l'autorité ou l'Organisme chargé des opérations de suivi de l'environnement affecté par les opérations de recherches minières ou de carrières et d'exploitation rédige son rapport de suivi et en transmet les copies à l'Agence Congolaise de l'Environnement, à la Direction chargée de la Protection de l'Environnement Minier, à la Direction de Géologie et au titulaire dans les vingt jours à compter de la fin des opérations de suivi.

**Article 463 : De la révision de l'Etude d'Impact Environnemental et Social et du Plan de Gestion Environnementale et Sociale**

Le titulaire d'un droit minier ou de carrières soumis à l'Etude d'Impact Environnemental et Social est tenu de réviser son Etude d'Impact Environnemental et Social et Plan de Gestion Environnementale et Sociale initialement approuvés et de les signer :

- tous les cinq ans ;
- lors du renouvellement de son droit ;
- lorsque des changements dans les activités minières ou de carrières justifient une modification de l'Etude d'Impact Environnemental et Social ;
- lorsqu'un rapport de contrôle et/ou de suivi démontre que les mesures d'atténuation et de réhabilitation prévues dans son Plan de Gestion

Environnementale et Sociale ne sont plus adaptées et qu'il y a un risque important d'impact négatif sur l'environnement.

Les procédures de dépôt, de l'instruction et d'approbation de l'Etude d'Impact Environnemental et Social révisée suivent celles relatives à l'Etude d'Impact Environnemental et Social initiale.

**Article 464 : De la révision de la sûreté financière de réhabilitation**

La Direction chargée de la Protection de l'Environnement Minier est habilitée à décider, après avis du Comité Permanent d'Evaluation, de réviser le montant de la sûreté financière de réhabilitation afférant à l'Etude d'Impact Environnemental et le Plan de Gestion Environnementale du Projet si elle n'est plus suffisante ou si elle doit être réduite en raison des coûts prévisibles de la réalisation des mesures d'atténuation et de réhabilitation. La révision est décidée à l'initiative de la Direction chargée de la Protection de l'Environnement Minier ou sur proposition du titulaire, après avoir entendu l'autre partie intéressée.

**Article 465 : Du rapport d'évaluation des mesures d'atténuation et de réhabilitation**

Dans les six mois à compter de la fermeture du site et ensuite dans les douze mois et dans les trois ans de celle-ci, le titulaire envoie un rapport sur l'évaluation des mesures d'atténuation et de réhabilitation de son Plan de Gestion Environnementale et Sociale à l'Agence Congolaise de l'Environnement et à la Direction de Protection de l'Environnement Minier.

## *Chapitre VI :*
## *DE LA MISE EN CONFORMITE ENVIRONNEMENTALE DES OPERATIONS EN VERTU DES DROITS EXISTANTS VALIDES ET TRANSFORMES*

**Article 466 : abrogé**

**Article 467 : abrogé**

**Article 468 : abrogé**

**Article 469 : abrogé**

**Article 470 : abrogé**

**Article 471 : abrogé**

## Section II : Des Impôts sur les revenus

### Paragraphe 1 : Des impôts sur les revenus mobiliers

#### Article 528 : Des revenus exonérés de l'impôt mobilier

En application des dispositions de l'article 246 du Code minier, les intérêts payés par le titulaire au titre des emprunts contractés en devise à l'étranger sont exonérés de l'impôt mobilier, sous réserve du respect des conditions requises ci-après :

- les emprunts concernés doivent être exclusivement affectés à la réalisation du projet minier ;
- les taux d'intérêt et les autres conditions d'emprunts contractés par le titulaire auprès des entreprises situées à l'étranger et sous la dépendance, directe ou indirecte, desquelles il se trouve, sont fixés selon le principe de pleine concurrence.

### Paragraphe 2 : De l'Impôt Professionnel sur les Bénéfices et Profits

#### Article 529 : Des plus-values et moins-values sur cession des titres miniers

Pour l'application de l'article 253 du Code minier, les dépenses de développement comprennent toutes dépenses pour la construction des immeubles par incorporation situés dans le périmètre minier ainsi que pour l'achat des immeubles par destination affectés à l'exploitation minière, réalisées avant ou après la mise en exploitation de la mine.

#### Article 529 bis : De l'impôt spécial sur les plus-values de cession d'actions ou de parts sociales

Toute cession d'actions ou de parts sociales par des personnes morales établies en République Démocratique du Congo et celles domiciliées à l'étranger, ayant abouti à la constatation d'une plus-value, est soumise au régime de plus-value prévu à l'article 253 bis du Code minier.

Les plus-values réalisées par les personnes morales étrangères lors de la cession d'actions ou de parts sociales détenues, directement ou indirectement, sur une entreprise titulaire des droits miniers ou de carrières située en République Démocratique du Congo est réputée être de source congolaise dans la mesure où la cession desdites actions ou parts sociales équivaut à la cession d'une fraction ou de la totalité des actifs corporels et incorporels et des réserves minières relevant du patrimoine de la personne morale établie en République Démocratique du Congo.

Le montant de la plus-value visée par le paragraphe premier ci-dessus est constitué par la différence entre le prix de cession de l'action ou de la part sociale et de la valeur nette comptable de cette action ou part sociale.

Lorsque les actifs sont situés dans plusieurs juridictions, l'impôt spécial sur les plus-values de cession d'actions ou de parts sociales est calculé sur une quotité de la plus-value constatée déterminée suivant une fraction ayant au numérateur la valeur des actifs de la filiale de droit congolais et au dénominateur la valeur totale des actifs de la société étrangère dont les actions ou parts sociales ont été cédées.

Le prix de cession à retenir ne peut être inférieur à celui correspondant à la valeur réelle des actifs cédés représentatifs desdites actions ou parts sociales au moment de l'opération. En cas moins-values prouvées celles-ci ne sont déductibles ni de l'assiette de l'impôt spécial sur les plus-values des autres actions ou parts sociales ni de celle de l'impôt sur les bénéfices et profits.

**Article 530 : Du report déficitaire**

Pour l'application de l'article 251 du Code minier, le déficit doit obligatoirement être reporté sur les résultats du premier exercice bénéficiaire, puis sur les résultats du ou des exercices suivants dans la mesure où le bénéfice du premier exercice non déficitaire n'a pas atteint un montant suffisant. Les échelonnements ne sont pas autorisés.

Le principe de la limitation de la déduction des résultats déficitaires des cinq exercices antérieurs n'est pas applicable aux amortissements comptabilisés en période déficitaire.

Pour l'application des dispositions de l'alinéa précèdent, les déductions s'opèrent dans l'ordre suivant :

- amortissement de l'exercice ;
- déficit ordinaires des exercices antérieurs en commençant par le plus ancien dans la limite de cinq exercices ;
- déficits d'exercices antérieurs provenant d'amortissements réputés différés sans limitation de durée.

Le report illimité des amortissements réputés différés en période déficitaire cesse de s'appliquer si l'entreprise reprend tout ou partie des activités d'une autre entreprise ou lui transfère tout ou partie de ses propres activités.

Les autres modalités d'imputation de report déficitaire sont celles de droit commun.

Toutefois, le titulaire est autorisé à appliquer intégralement les dispositions du droit commun en vigueur.

**Article 530 bis : De l'Impôt spécial sur les profits excédentaires**

Pour l'application de l'article 251 bis du Code minier, l'excédent brut d'exploitation qui sert d'assiette de l'impôt spécial sur les profits excédentaires est constitué par la différence entre le montant de l'excédent brut d'exploitation de l'exercice comptable considéré diminué du montant de l'excédent brut d'exploitation dégagé par l'étude de faisabilité bancable du projet minier pour cette même année, ce dernier montant augmenté de 25%.

Dans ces conditions, le titulaire est tenu de déposer une copie de l'étude de faisabilité du projet minier auprès de l'Administration des impôts avant l'entrée effective en production dudit projet.

Pour les projets déjà en phase d'exploitation, cette obligation doit être accomplie dans les nonante (90) jours de la publication du présent Règlement.

Pour le cas où l'étude de faisabilité est mise à jour lors de l'extension des travaux d'exploitation au titre de l'Article 77 ter du Code minier ou transmise dans le cadre du renouvellement d'un permis d'exploitation au titre de l'Article 80 littera b du Code minier, les données relatives au prix des matières premières ou des matériaux et à l'excédent brut d'exploitation devront être mises à jour. Cette étude de faisabilité modifiée devra inclure les prévisions d'excédent brut d'exploitation du projet pour chaque exercice comptable pour chaque produit. Une copie de cette étude de faisabilité devra être fournie à l'Administration Fiscale dans les soixante (60) jours de l'approbation de cette étude de faisabilité et sera utilisée pour calculer l'assiette de l'impôt spécial sur les profits excédentaires.

Les profits excédentaires ou super profits sont calculés sur la base de l'excédent brut d'exploitation analytique par produit.

L'article 251 bis ne s'appliquera que si le prix de vente moyen effectif du produit pour l'exercice comptable excède de plus de 25% le prix de vente moyen du produit pour cette année tel que prévu dans l'étude de faisabilité.

Pour la détermination des profits excédentaires, les dépenses de recherche et de développement ne sont pas déductibles. De même, l'imputation des déficits antérieurs est interdite.

Le titulaire est tenu de souscrire une déclaration de l'impôt spécial sur les profits excédentaires, selon le modèle fourni par l'Administration des Impôts, au plus tard à

la date de l'échéance prévue pour le dépôt de la déclaration de l'Impôt sur les bénéfices et profits.

**Article 531 : De la justification de paiement des biens et services en faveur des sociétés affiliées**

Les sommes versées par le titulaire à ses sociétés affiliées pour des biens ou prestations de services ne sont admises comme charges professionnelles déductibles que dans les conditions du droit commun.

**Article 532 : abrogé**

**Article 532 bis : De la déduction des intérêts payés à l'étranger**

Pour l'application de l'article 254 du Code minier, les intérêts visés sont ceux payés à l'étranger aux associés ou à toute autre personne qui se trouve directement ou indirectement dans des liens quelconques d'interdépendance avec le titulaire.

La période de calcul de la moyenne annuelle des taux effectifs pratiqués par les établissements de crédit du pays où est établie l'entreprise prêteuse est celle correspondant à l'année de conclusion du contrat de prêt.

Dans tous les cas, les conditions afférentes audit contrat doivent être au moins égales à celles de pleine concurrence pratiquées dans ce pays sans considération des circonstances qui prévalent sur le lieu où le projet minier est réalisé.

Seule la quotité des intérêts excédant le taux moyen défini à l'article 254 du Code minier est exclue du droit à déduction.

**Article 533 : Des charges professionnelles déductibles**

Outre les dépenses prévues aux articles 532 ci-dessus, sont également considérées comme dépenses professionnelles déductibles des revenus imposables, les charges professionnelles prévues à l'article 256 du Code minier.

**Article 533 bis : Du taux de l'impôt minimum**

En application de l'article 247 bis, le taux de l'impôt minimum applicable au titulaire est celui du droit commun en vigueur à la date de la promulgation du présent Code minier.

**Section III : De la contribution sur le chiffre d'affaires à l'intérieur**

**Article 534 : abrogé**

A la demande du titulaire, le montant de la sûreté financière de réhabilitation de l'environnement est révisé par la Direction chargée de la Protection de l'Environnement Minier :

a) soit en fonction de l'état d'avancement des travaux d'atténuation et de réhabilitation progressifs ;

b) soit quand le titulaire démontre qu'il va utiliser notamment des méthodes de réhabilitation plus économiques sans perte d'efficacité.

**Article 4 : De la durée de la sûreté financière de réhabilitation de l'environnement**

Sous réserve des dispositions de l'article 412 du Règlement minier, la sûreté financière de réhabilitation de l'environnement reste maintenue jusqu'à la délivrance de l'attestation de libération des obligations environnementales au titulaire du droit minier ou de carrières pour le projet en cause.

**Article 5 : De l'insaisissabilité de la sûreté financière de réhabilitation de l'environnement**

La sûreté financière de réhabilitation de l'environnement est insaisissable par les tiers, sauf le cas de confiscation par le Ministre ou son délégué conformément aux dispositions du Code minier et du Règlement minier lorsque le titulaire n'a pas accompli les travaux d'atténuation et de réhabilitation prévus dans son Plan Environnemental approuvé.

## *Chapitre II :*
## *DES MODALITES DE LA SURETÉ FINANCIÈRE DE RÉHABILITATION DE L'ENVIRONNEMENT*

**Article 6 : De l'option des modalités de la sûreté financière de réhabilitation de l'environnement**

En fonction de ses objectifs de réhabilitation à court ou à long terme et de sa capacité financière, le titulaire d'un droit minier ou de carrières a le choix entre plusieurs modalités de sûreté financière de réhabilitation de l'environnement.

Le titulaire peut associer plusieurs modalités de sûretés financières énumérées à l'article 7 ci-dessous pour couvrir le coût des mesures d'atténuation et de réhabilitation, à condition d'utiliser une seule modalité pour chaque versement.

Le titulaire notifie la Direction chargée de la Protection de l'Environnement Minier de son choix de modalité pour le premier versement de la sûreté financière au moins dix

jours ouvrables avant la date prévue pour la réalisation du versement. Il notifie le même service de son choix de modalité pour chaque versement subséquent de la sûreté financière au moins dix jours ouvrables avant la date de la réalisation du versement.

**Article 7 : Des modalités de la sûreté financière de réhabilitation de l'environnement acceptées**

Les modalités de la sûreté financière de réhabilitation de l'environnement acceptées sont les suivantes :

a) des espèces versées au compte de sûreté financière de réhabilitation de l'environnement du titulaire ouvert auprès d'une banque commerciale, d'une Caisse d'Epargne et de Crédit ou toutes autres institutions financières dûment agréées par la Banque Centrale du Congo ;

b) un chèque tiré à l'ordre d'une des institutions financières visées au littera a ci-dessus pour le compte de sûreté financière de réhabilitation de l'environnement du titulaire ;

c) un certificat de dépôt garanti ou à terme, en francs congolais ou en devises, émis en faveur du titulaire par une banque commerciale, une institution financière ou une Caisse d'Epargne et de Crédit ou toutes autres institutions financières agréées par la Banque Centrale du Congo. Ce certificat de dépôt doit avoir une durée d'au moins 12 mois et être automatiquement renouvelable jusqu'à la délivrance de l'attestation de libération des obligations environnementales au titulaire et ne pas comporter de restrictions quant à l'encaissement en cours de terme, sous réserve du prononcé de la confiscation par le tribunal compétent ;

d) une lettre irrévocable et inconditionnelle du crédit payable en francs congolais ou en devises émise en faveur du titulaire, par une banque commerciale, une institution financière, ou une caisse d'épargne et de crédit agréée par la Banque Centrale du Congo ;

e) une caution ou une police de sûreté financière de réhabilitation de l'environnement payable en francs congolais ou en devises émis en faveur du titulaire, par une compagnie ou une institution financière légalement habilitée pour agir en cette qualité ;

f) une caution fournie par un tiers payable en francs congolais ou en devises, en faveur du titulaire, sous réserve du prononcé de la confiscation par le tribunal compétent, conformément aux dispositions de la loi n° 73-021 du 20 juillet 1973

portant régime général des biens, régime foncier et immobilier et régime des sûretés telle que modifiée et complétée par la loi n° 80-008 du 18 juillet 1980.

Lorsque le titulaire utilise l'une des modalités de sûreté financière précisées aux litteras c, d, e ou f du présent article pour plusieurs versements, le montant du dernier versement cumulé avec la valeur actuelle des versements antérieurs doit être égal au montant de l'obligation cumulative du titulaire en matière de versements de la sûreté financière de réhabilitation de l'environnement conformément à la présente directive.

**Article 8 : Des banques, institutions financières et caisses d'épargne et de crédit agréées par la Banque Centrale du Congo**

Les banques commerciales, les institutions financières multilatérales ou bilatérales, et les caisses d'épargne et de crédit sont agréées par la Banque Centrale du Congo si, au moment du versement de la sûreté financière de réhabilitation de l'environnement, leur réputation de solvabilité est très bonne et s'il n'y a aucun obstacle juridique ou diplomatique à leur paiement éventuel en vertu du certificat de dépôt, de la lettre de crédit ou de la caution en question.

Les banques commerciales et les caisses d'épargne et de crédit peuvent être des banques établies légalement en République Démocratique du Congo ou des banques étrangères légalement établies dans un pays avec lequel la République Démocratique du Congo maintient des relations diplomatiques et commerciales cordiales.

**Article 9 : Du compte de sûreté financière de réhabilitation de l'environnement ouvert par la Banque Centrale du Congo**

Si le titulaire notifie au Service chargé de la Protection de l'Environnement Minier son choix de verser la sûreté financière de réhabilitation de l'environnement en espèces ou en chèque conformément aux dispositions des articles 6 et 7 ci-dessus, dans un délai de trois jours ouvrables à compter de la date de la réception de la notification du titulaire, le service demande à la Banque Centrale du Congo d'ouvrir dans son propre nom un compte intitulé « le compte de sûreté financière de réhabilitation de l'environnement afférent au titre minier ou de carrières».

Les fonds versés au compte de sûreté financière de réhabilitation de l'environnement ainsi ouvert ne peuvent être retirés que selon les modalités suivantes :

a) par le titulaire sur présentation de l'attestation de libération des obligations environnementales, en réservant 5% du montant total de la sûreté financière ainsi constituée auprès de la Banque Centrale du Congo au profit du Trésor Public ;

b) par le Ministre ou son délégué sur présentation du prononcé de la confiscation de la sûreté financière afférente au titre minier ou de carrières en cause.

Dans un délai de cinq jours ouvrables à compter de la date de la réception de la notification de la Direction chargé de la Protection de l'Environnement Minier, la Banque Centrale du Congo ouvre un compte produisant un intérêt pour le dépôt du versement de la sûreté financière par le itulaire.

La Banque Centrale du Congo communique le nom et le numéro du compte au Service sus-visé immédiatement. Ce dernier, à son tour, notifie cette information au titulaire dans un délai de deux jours ouvrables.

Le titulaire effectue le versement de la sûreté financière de réhabilitation de l'environnement au compte indiqué dans un délai de trente jours à compter du dernier à survenir entre la date de l'approbation de son Plan Environnemental et la date de la délivrance de son titre minier ou de carrières. La Banque Centrale du Congo fournit un récépissé au titulaire promptement.

A compter du premier versement de la sûreté financière de réhabilitation de l'environnement à ce compte, la Banque Centrale du Congo envoie des relevés du compte trimestriels au Service chargé de la Protection de l'Environnement Minier et au titulaire.

Les intérêts produits par le compte bancaire appartiennent au titulaire et sont rétrocédés à un compte bancaire dont le titulaire aura indiqué le numéro et l'adresse bancaire à la Banque Centrale du Congo.

Le bureau du contrôle de la Division de l'inspection, de l'évaluation et du suivi, et celui du contrôle de la Direction chargé de la Protection de l'Environnement Minier vérifie la ponctualité des versements de la sûreté financière de réhabilitation de l'environnement ainsi que l'exactitude de chaque montant à verser.

## *Chapitre III :*
## *DES MODALITES DES VERSEMENTS DE LA SURETE FINANCIERE DE REHABILITATION DE L'ENVIRONNEMENT*

### Article 10 : Des modalités du versement de la sûreté financière de réhabilitation de l'environnement pour les projets de recherches d'un an au maximum et pour l'exploitation de carrières temporaire

Pour les travaux de réhabilitation soit des projets de recherches minières ou des produits de carrières d'un an au maximum, soit des activités d'exploitation de carrières temporaire, le montant total de la sûreté financière de réhabilitation de

l'environnement est versé dans les 15 jours de la réception de l'approbation du Plan d'Atténuation et de Réhabilitation de l'environnement par le titulaire.

**Article 11 : Des modalités du versement de la sûreté financière de réhabilitation de l'environnement pour les travaux de recherches de plus d'un an**

Pour les projets de recherches de plus d'un an, le montant du premier versement de la sûreté financière de réhabilitation de l'environnement correspond aux coûts évalués pour les travaux de réhabilitation du milieu ambiant affecté par les activités de recherches planifiées pour la première année. Chaque année suivante et ce jusqu'à l'expiration du Permis de recherches, lors de la date d'anniversaire de l'approbation du Plan Environnemental, le titulaire du Permis de recherches verse une nouvelle somme qui correspond aux coûts évalués des travaux de réhabilitation du milieu ambiant affecté par les activités de recherches planifiées pour l'année considérée.

**Article 12 : Des modalités du versement de la sûreté financière de réhabilitation de l'environnement pour les travaux d'exploitation**

Pour les travaux d'exploitation, le montant total de la sûreté financière de réhabilitation de l'environnement est versé conformément à un échéancier établi en fonction de la durée de vie des activités d'exploitation prévue dans l'étude de faisabilité du titulaire, jusqu'à un maximum de quinze ans, comme il est présenté au Tableau IIA de la présente directive. La Direction chargée de la Protection de l'Environnement Minier notifie le titulaire du calendrier et du montant des versements sur demande après l'approbation de son Plan Environnemental.

Le cas échéant, le premier versement est effectué dans les 30 jours qui suivent la délivrance du titre d'exploitation.

Chaque versement annuel subséquent a lieu au plus tard à la date d'anniversaire de l'approbation du Plan Environnemental.

Lorsque la durée de vie de l'activité d'exploitation est inférieure à cinq ans, un seul versement peut être exceptionnellement reporté et celui-ci s'ajoute alors au versement suivant. Cette modalité ne peut s'appliquer dans les deux dernières années de versements exigibles.

Pour les activités d'exploitation de plus de dix ans, deux versements consécutifs peuvent être exceptionnellement reportés. Aucun report n'est possible pour les trois dernières années exigibles.

**Article 13 : Du dépôt de la preuve du versement de la sûreté financière de réhabilitation de l'environnement**

Dans un délai de trente jours à compter de la date de l'approbation de son Plan Environnemental, le titulaire dépose auprès de la Direction chargée de la Protection de l'Environnement Minier la preuve de versement de la sûreté financière de réhabilitation de l'environnement par l'un des moyens suivants :

a) la copie du récépissé du versement délivré par la Banque Centrale du Congo ;
b) la copie du certificat de dépôt établi conformément aux dispositions de l'article 7 de la présente directive ;
c) la copie de la lettre de crédit établie conformément aux dispositions de l'article 7 de la présente directive ;
d) la preuve de la caution établie conformément aux dispositions de l'article 7 de la présente directive.

## *Chapitre IV :*
## *DE LA CONSTITUTION D'UN FONDS DE RÉHABILITATION POUR LES ZONES D'EXPLOITATION ARTISANALE*

**Article 14 : Des modalités de constitution des fonds de réhabilitation des zones d'exploitation artisanale**

Un fonds de réhabilitation destiné à financer les mesures d'atténuation et de réhabilitation est constitué dans chaque zone d'exploitation artisanale selon des modalités qui sont déterminées par arrêté du Ministre des Mines après consultation de l'association des exploitants artisanaux.

L'arrêté du Ministre portant constitution du fonds de réhabilitation de la zone d'exploitation artisanale détermine les modalités de constitution de ce fonds, l'autorité locale compétente pour gérer ce fonds et les procédures de comptabilité et de déboursement des sommes nécessaires pour la réalisation des mesures d'atténuation et de réhabilitation.

**Article 15 : De la gestion des fonds de recherche d'une exploitation artisanale**

Le fonds de réhabilitation pour une zone d'exploitation artisanale est géré de façon autonome. Il est indépendant de la comptabilité des finances publiques et ne transite pas par le compte du Trésor.

# Exhibit SRK - 3. Metorex Annual Report

METOREX LIMITED ANNUAL REPORT 2009

2009

a new focus for the future



# ANNUAL REPORT 2009





**METOREX**
LIMITED

# Contents

2009







Metorex is an established mid-tier mining group that occupies a unique position in the southern African mining industry.

Our vision is to expand our mining and exploration activities within and from sub-Saharan Africa through acquiring, developing and managing a portfolio of quality base-metal assets.

**Overview**

1 Salient features

**Management review**

2 Directorate
4 Chairman's review
10 Chief Executive Officer's report
16 Executive committee
17 Statistical information

**Operational review**

18 Ruashi
22 Chibuluma
26 Sable Zinc
30 Vergenoeg
34 Consolidated Murchison
38 Pan African

42 **Sustainable development**
48 **Corporate governance**

**Annual financial statements**

56 Group secretary's certification
56 Directors' approval
57 Independent auditors' report
58 Directors' report
60 Income statements
61 Balance sheets
62 Cash flow statements
63 Notes to the cash flow statements
64 Statements of changes in equity
65 Notes to the annual financial statements

97 **Supplementary information**
116 **Notice of annual general meeting**
119 **Proxy**
IBC **Corporate information**

## Geographic locations




www.metorexgroup.com

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 115 of 237 PageID #: 4900



# Salient features



**Copper production**
(tons)




*Copper production history for the four years ended 30 June 2009*

**Focus on restoring the reputation of Metorex**

**Advancements made to restore the Group balance sheet**

**Pan African shareholding sold for R386 million with effect from 1 July 2009**

**Vergenoeg BEE transaction announced for R109 million**

**Resource and Reserve review at Ruashi completed**

| Performance for the years ended 30 June | | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Gross revenue | (R000) | 1 013 328 | 1 703 757 | 1 614 789* | **1 241 721** |
| Mining profit before depreciation | (R000) | 272 135 | 598 026 | 799 245* | **263 190** |
| Cash mining profit margin | (%) | 25 | 35 | 50 | **21** |
| EPS | (cents) | 54,3 | 183,5 | 159,4 | **(272,4)** |
| HEPS | (cents) | 47,7 | 110,5 | 131,7 | **23,9** |
| Market capitalisation | (R000) | 3 237 093 | 8 048 840 | 8 856 460 | **2 227 614** |
| Shares in issue | (000) | 289 026 | 324 550 | 369 173 | **742 538** |
| Weighted average number of shares | (000) | 286 147 | 302 810 | 347 797 | **553 349** |
| Share price | (cents) | 1 120 | 2 480 | 2 399 | **300** |
| ZAR/US$ rate – Average | (R/US$) | 6,4 | 7,2 | 7,30 | **9,03** |
| ZAR/US$ rate – Closing | (R/US$) | 7,2 | 7,0 | 7,83 | **7,72** |

**Restated for assets held-for-sale*

# Directorate














## Directors

**1. Robert George Still –** (54)
Non-Executive Director
*BCom (Hons), CA(SA), IMM*
Rob started his career as a chartered accountant, becoming a partner of Ernst & Whinney before leaving in 1986 to co-found the JSE listed exploration and mining company Rhoex Limited. Since that time Rob has been involved in both the senior and junior sectors of the mining industry worldwide and has held both executive and non-executive director positions in mining and exploration companies listed in South Africa, Australia, Canada and the UK. Rob has participated in the development of several new mining projects including Rhovan, Ticor Titanium, Pangea Goldfields, Southern Mining (Corridor Sands), Great Basin Gold (Burnstone) and Zimbabwe Platinum Mines Limited.

Rob was appointed to the Metorex Board in February 2005 and as Chairman in January 2009.

Chairman of the Nomination Committee, and member of the Remuneration and Audit Committee.

**2. Terence Philip Goodlace –** (50)
Chief Executive Officer: Executive Director
*MBA, BCom, NHD (Metalliferous mining)*
Terence was appointed Chief Executive and Director on the Board with effect from 2 March 2009. He has more than 27 years' operating experience and was previously the Chief Operating Officer at Gold Fields Limited.

Member of the SHEC committee.

**3. Alberto Barrenechea Guimón –** (66)
Non-Executive Director
Alberto is CEO of Minersa, a multi-commodity mineral and chemical group. He has been a Board member of several industrial and financial companies. He provides a life-long experience in the mining and chemical industry.

Member of the Remuneration Committee.

**4. Pierre Chevalier –** (57)
Non-Executive Director
*Degree in law and criminology*
Pierre has been a member of Parliament for the district of Brugge since 1985, he is currently a member of the VLD party bureau. Since October 2000, he has been Town Councillor of Brugge. He is also a personal representative for the Prime Minister and the Minister of Foreign Affairs at the Inter-governmental Conference. Since 2007 he has been a special envoy for the Belgian Foreign Ministry in charge of UN Security Council Affairs.

**5. John G Hopwood –** (57)
Independent Non-Executive Director
*BCom, CA(SA)*
John is a non-executive director of Gold Fields Limited and Pan African Resources plc and is presently chairman of the audit committees of both companies. He is also a member of the board of trustees of the New Africa Mining Fund and chairman of the fund's investment committee. Previous experience includes being an executive director of Gold Fields of South Africa Limited from January 1992 to September 1998 and director and Head of Mergers and Acquisitions at Ernst & Young Corporate Finance.

Appointed on 1 November 2009 as Chairman of the Audit Committee, to succeed Alistair Laughland.

**6. Nonkululeko ("Nkuli") Kgositsile –** (35)
Independent Non-Executive Director
Nkuli has a background in journalism and was a founder of the Voice of Soweto Community radio station. She is an entrepreneur with her own entertainment company. She brings experience in social and political affairs in Africa, having lived and been educated in a number of southern African countries.

Member of the SHEC committee. Appointed 11 August 2009.













**7. Alistair John Laughland –** (62)
Independent Non-Executive Director
*LLB (London), MBL (Unisa)*
Alistair has extensive experience in banking, specifically in corporate and mining finance. He was on the board of the previous Maranda Mines Limited. He has served as an Independent Non-Executive Director of Metorex since 1999.

Chairman of the Audit Committee. Resigned 31 October 2009.

**8. Victor Mabuza –** (39)
Independent Non-Executive Director
*BCom (Acc)*
Victor runs EsopShop (Pty) Limited, which advises on employee and community ownership trust structures. He has advised many mining companies on employee stock ownership schemes, including African Rainbow Minerals Limited, Anglo Platinum Limited, Gold Fields Limited and Northam Platinum and black economic empowerment transactions including Sasol Inzalo and Vodacom YeboYethu. He has held various directorships in retail, corporate and investment banking and has worked for major financial institutions including Standard Bank, ABSA and Stanlib. He was also previously an Executive Head for Asset Management and sat on the Board of the National Empowerment Fund, where he was at the forefront of the highly successful Asonge MTN retail share offer.

Appointed as Chairman of the Remuneration Committee on 11 August 2009.

**9. Leslie John Paton –** (57)
Independent Non-Executive Director
*BSc (Hons) Geology, BCom*
Les is an executive director of several Implats companies and has been with the group for 34 years. His career incorporates spells in base metal exploration throughout southern Africa, as well as gold and platinum mining and exploration experience. Les rose to the position of Chief Consulting Geologist within the Gencor Group, and was subsequently transferred to Implats where, in 2003, he was appointed to the Board of both Implats and Zimplats. Les is experienced in the evaluation and technical overview of projects and in project management.

Chairman of the SHEC committee and member of the Nomination and Remuneration Committees. Appointed 20 January 2009.

**10. Maritz Smith –** (33)
Chief Financial Officer: Executive Director
*BCom (Hons), CA(SA)*
Maritz, who is a Chartered Accountant (SA), joined Metorex in 2002 from Deloitte & Touche. He was appointed Chief Financial Officer in 2005, and in this capacity has overall responsibility for the Group's financial affairs and reporting. Maritz was appointed to the Metorex Board as Financial Director in December 2008.

# Chairman's review

## Dear Fellow Shareholder

This is my first annual report to Metorex shareholders, since my appointment as Chairman in January 2009.

It has been an extremely difficult year, so much so that the very survival of your Company was at times threatened. It is thus pleasing to report that, although much still remains to be accomplished, the worst is probably behind us. Indeed, your Company is steadily emerging from its ordeal with more determination and a new focus for the future, improved executive and operational skills, a strengthened balance sheet and renewed confidence.

Metorex's past year was dominated by a liquidity crisis which became apparent in September 2008 and the raising of emergency funds as a consequence thereof in December 2008. Since then a range of measures have been taken to restore the Company's reputation and capacity, repair its balance sheet and prevent the recurrence of similar situations in future.

## Safety, health, environment and communities ("SHEC")

Whilst pleasing to report that the Metorex Group incurred no fatal accidents during the financial year, independent SHEC audits carried out across Group operations, highlighted deficiencies compared with international standards and inconsistencies in the application of Group SHEC policies and procedures.

The development of an holistic Group SHEC strategy incorporating leading industry practice is a priority at Metorex. A range of initiatives adopted have already begun to show results. Your Board and management is committed to a no compromise top-down culture of safety and health excellence. We are fortunate in having Mr Les Paton, an experienced industry expert in this field, serve as Chairman of the Board's SHEC sub-committee.



"Your company is steadily emerging from its ordeal with more determination and a new focus for the future, improved executive and operational skills, a strengthened balance sheet and renewed confidence."

**Robert G Still**
Chairman

Notwithstanding funding constraints Group companies have progressed a range of social and community initiatives as outlined on pages 45 to 47.

## Operating and financial results

The Group's established operations at Chibuluma, Barberton and Vergenoeg delivered excellent operational performances for the year, whilst that of Consolidated Murchison was unacceptable. The operations at Ruashi I were discontinued in December 2008 and the resulting cessation of concentrate feed to the Sable business unit spoilt an otherwise solid performance, by Sable.

Group copper and cobalt production increased by 23 per cent to 31,207 tons and by 54 per cent to 871 tons respectively (including Ruashi II). Fluorspar production reduced by 15 per cent, driven largely by weaker product demand during the latter part of the financial year.

Primarily as a result of dramatic reductions in commodity prices and the impact of the Rand, mining profit before depreciation decreased by 67 per cent to R263 million.

It is Group policy to annually assess assets for impairment. Following this review, the Group impairment charge before taxation and minorities amounted to R2.3 billion mainly related to the holding in Copper Resources Corporation (R1.7 billion), the closure of the Ruashi phase I project (R216 million) and a write-off of the Consolidated Murchison assets (R125 million).

Group debt at financial year-end amounted to R2.1 billion. With the disposal of Pan African subsequent to the financial year-end and the proposed disposal of Vergenoeg for US$60 million, the Group debt level should reduce to R1.5 billion.

## The development of the Ruashi Copper/Cobalt Mine operation

The construction of the Ruashi solvent extraction electro winning ("SX/EW") plant in the DRC has been a considerable achievement by Meterox. Ruashi II is in the final stages of being constructed and the operating results were thus capitalised for the period under review. Capital spent on Ruashi II to 30 June 2009 amounts to US$320 million and is estimated at US$333 million at final completion. The slow production build-up at Ruashi II was disappointing and was caused by a number of factors including delays in completing the plant, design and process modifications, de-bottlenecking, an untrained/inexperienced workforce and inadequate resource data and mine planning.

However, your executive team has addressed the commissioning challenges at Ruashi and production has been increasing steadily to date.

Great mines are built on superior ore bodies and a full understanding with supporting analysis, is required for optimal exploitation. It was thus deeply concerning that early mining at Ruashi revealed that prior interpretations of the Ruashi mineral resource required revision. Your executive team has implemented a mineral resource management programme at Ruashi commencing with a drilling campaign and a re-interpretation and analysis of the extensive legacy database. It focuses on revised geological, structural and lithological interpretations. It is pleasing to report that results have confirmed the quality of the Ruashi orebody and that the evolving process will result in an optimised mine plan. The new mine plan and production profile will be communicated to the market during the December 2009 quarter.

Your Board is confident that Ruashi will soon become one of the most efficient and successful mines on the copper belt.

## The Metorex liquidity crisis

In common with many capital projects developed during the late stage of the previous bull market, the Group's main capital development programme, the Ruashi copper/cobalt mine in the Democratic Republic of the Congo ("DRC"), experienced a capital cost over-run and ramp-up delays. The estimated capital cost of completing Ruashi now stands at US$333 million, over US$120 million more than estimated in 1H 2008 financial year.

Whilst a large portion of this capital cost over-run was the result of massive input cost increases, particularly steel and cement, poor project management and weak engineering design and estimating also played a significant role. More importantly, weak costing, planning and reporting disciplines failed to alert your Board to the resultant funding shortfall. This exacerbated a situation which could otherwise have been addressed in a pre-emptive fashion in a more stable financial environment.

# Chairman's review continued

Consequently the Company required emergency funds which were raised during December 2008 under highly adverse market conditions. The result was the issue of 372 million new shares at R2 per share raising R704 million, net of costs, and securing a one-year bridge loan facility of R178 million repayable on 30 November 2009. Details of these transactions were provided in the circular issued to shareholders dated 1 December 2008. Metorex would like to re-iterate for the record, its appreciation for the support given to the Company by its bankers, Standard Bank, and by the subscribers to this new equity issue.

The Ruashi capital cost over-run and ramp-up delays further resulted in Ruashi being in default of several covenants contained in its Ruashi project finance agreements.

Consequently, this project finance debt reverted to Metorex and was secured against remaining Group assets.

Furthermore, in December 2008 the Group's lenders insisted that a new four-year copper hedging facility be implemented. As at 30 September 2009 this hedge has a negative value to the Company of US$40 million. Details of this "hedge" are set out in this annual report in note 25.

Consequent to the crisis and emergency funding outlined above, Metorex vigorously implemented a series of initiatives to restore the Company to health as set out below:

## Action taken # 1: Board oversight and corporate governance

The Metorex Board appointed me in a temporary executive capacity to urgently address a range of initiatives and this assignment ended in May 2009. During the year the Board was substantially reconstituted and improved corporate governance procedures implemented. The composition, experience, skills base and enhanced profile of your new Board, is compliant with the King reports and governance guidelines.

## Action taken # 2: Strengthening executive and operational management

Several changes were made to strengthen the Company's executive management team and operational staff. The process of improving Group talent and enhancing management capacity, whilst addressing transformation imperatives, is ongoing.

From 2 March 2009 Terence Goodlace, an experienced mining industry professional, was appointed Chief Executive Officer and immediately made a positive impact by introducing rigorous technical standards and modern management. Your business is now effectively managed in a collaborative manner by the Group Executive Committee.

## Action taken # 3: Disposal of non-core assets

The Group embarked upon a process of disposing of some of its assets, which has to date resulted in:

- the disposal of Phoenix Platinum for R71 million; and
- subsequent to year-end, the sale of the Pan African shareholding for R386 million and the conclusion of a Vergenoeg black economic empowerment deal for R109 million.

These proceeds provided much needed liquidity and secured the completion of Ruashi's capital requirements, repayment of the Group's bridge loans, ongoing funding of CRC and absorption of losses at Consolidated Murchison, including the closure of its negative gold hedge book for R41 million.

## Action taken # 4: Strategic financing initiative

Early in 2009 the Company commenced with a process to secure risk capital at the DRC asset level to reduce existing levels of debt and fund the project pipeline which includes Kinsenda, Musonoi and Lubembe.

This process is ongoing and well advanced. During most of the financial year the Company has traded at a market value significantly below the value of its underlying assets making funding at the asset level imperative.

## Action taken # 5: Refocus of the Company strategy and sale of Vergenoeg

The Company's former multi-commodity strategy has served it well throughout past business cycles. Unfortunately a side-effect of this has been the ongoing structural disadvantage of the Company being valued at less than the "sum of its parts" as analysts were unwilling to focus attention on diverse commodities within the Company's portfolio.

Additionally, changing circumstances across local, national and international levels necessitated a review of this strategy.

Firstly, asset disposals and the planned disposal or closure of Consolidated Murchison have reduced the breadth of the remaining commodity range to base minerals in the form of copper/cobalt and industrial minerals in the form of fluorspar.

Secondly, whilst developing relatively small mines in a developed environment was within the capability of the Company, the successful development of medium/large complex mining operations in challenging environments is clearly a different proposition as the travails of developing Ruashi have demonstrated.

We believe that success requires clear focus and that the Company needs to develop a depth of industry expertise and skill in its focused area. We have reviewed the skills needed to succeed in taking the fluorspar business platform to the next value level for shareholders (industrial minerals marketing and chemical engineering and manufacturing), and concluded that the Company currently lacks both these skills as well as the financial resources to simultaneously develop two diverse non-synergistic focused platforms.

Metorex has thus decided to focus on base minerals, initially in the DRC/Zambian copper belt, and to develop its exciting project pipeline as an initial base. Metorex believes that it is fast developing the required depth of industry expertise and skills in this area to generate a sustained competitive advantage.

Accordingly on 23 September 2009 Metorex announced its intent to dispose of Vergenoeg Mining Limited ("VML") to its strategic partners, Minersa Minerales Y Productos Derivados S.A., for US$60 million subject to the completion of various conditions. VML has been a stellar asset for Metorex for the last decade and this decision was not easily taken.

This disposal and the post year-end disposals referred to above will enable the Company to further reduce Group debt and enable the strategic finance initiative to progress without artificial pressure from its lenders.

## Action taken #6: Consolidated Murchison ("Cons Murch")

Operations at Cons Murch were negatively impacted by a number of factors during the year under review. Revenue was adversely affected by a sharp reduction in the antimony price exacerbated by an interruption in offtake when the contractual buyer, Chemtura, filed for Chapter 11 protection in the mined stakes. The toxic gold hedge at R111 per gram also affected revenue and was closed out in April 2009. A lack of investment into the mine has led to a situation of low plant availability and limited ore reserve flexibility.

Initial assessments revealed that the costs of an immediate unplanned closure of Cons Murch were prohibitive, owing to significantly under-estimated and under-funded closure and retrenchment costs. This situation is being rectified.

Metorex's new management accordingly focused aggressively on implementing a turnaround plan including a reduction of staff levels and a focus on improving all aspects of the operation. In the last quarter of the year head grades improved by 63 per cent and 25 per cent for antimony and gold respectively, the plant recoveries improved by 25 per cent and 30 per cent for antimony and gold respectively, and therefore production of antimony and gold increased by 102 per cent and 27 per cent respectively enabling losses to be significantly reduced.

# Chairman's review continued

Furthermore feasibility studies and evaluations carried out as part of the turnaround plan indicate that Cons Murch may become a viable and sustainable operation following substantial recapitalisation and investment. As Cons Murch is not a core asset for Metorex, discussions are taking place with interested parties to dispose of the operation in an effort to save the mine, associated jobs and the affected community.

## Action taken #7 – Copper Resources Corporation ("CRC")

The acquisition initially of 46 per cent and subsequently of 50,1 per cent of CRC was made during 2007 primarily via the issue of 87 million new Metorex shares and R90 million cash with the purpose of:

a) targeting the future development of the high grade Kinsenda mine, located 85km south east of Lubumbashi on the Zambian border; and
b) progressing the evaluation of the Lubembe prospect situated 25km away.

Metorex has proceeded with the evaluation and planning needed to develop Kinsenda and has carried out initial drilling at Lubembe with positive results. Regrettably costs relating to standing overheads at Kinsenda (mainly the pumping of underground water and costs of staff to maintain the operation), and additional costs imposed on the Company's assets as a result of the DRC government's mineral review process were far higher than anticipated. It has thus been a challenge to justify retaining this investment, despite its attractive prospects.

Management has successfully lowered the ongoing costs at Kinsenda and increased the Metorex shareholding in CRC to 87 per cent via capitalising its loan accounts after offering other shareholders an opportunity to exercise their pre-emptive rights.

Kinsenda and Lubembe represent quality long-term projects for early development in line with the Company's new strategy.

## The Metorex Board

Since the last annual report, Messrs S Malone, E Legg, K Spencer, C Needham, G Forrest, (P Chevalier – alternate) and A Laughland have retired or resigned from the Board and T Goodlace, M Smith, J Hopwood, L Paton, V Mabuza, P Chevalier and N Kgositsile have been appointed to your Board in what represents a complete recomposition and rebalancing of the Board.

We believe that your new Board is now well balanced in terms of skills, including mining, finance, technical and social skills, experience and background and is in accordance with the Company's evolving transformation objectives. An optimal balance of non-executive, and indeed independent non-executive and executive members has also been achieved and this Board and its various sub-committees is now King compliant. Details of this Board's functions and the background of the new members are set out in this Annual Report.

Metorex wishes to record its appreciation to all the directors who have retired or resigned for their services to the Company over, in some instances, many years. Simon Malone retired on 21 January 2009 after 34 years' service to this Company which he co-founded. Metorex would simply not exist today without his inspired past leadership. Keith Spencer, Ed Legg and Charles Needham have retired or resigned after years of service to this Group, although Charles remains a Group executive and Alistair Laughland retires after 10 years of diligent and wise counsel as a non-executive director.

## The Company's operating environment

The near demise of the systemically connected global financial system commencing with the collapse of Lehman Brothers in September 2008 and proceeding at bewildering pace to the virtual closure of international credit markets, propelled the global economy into the most severe recession in 75 years. Fortunately, unprecedented, co-ordinated and massive intervention by monetary authorities globally appears to have largely achieved its objectives and world financial

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 123 of 237 PageID #: 4908



systems have stabilised the global economy for a long, hard and slow road to recovery.

This unprecedented collapse in world markets impacted severely on raw material demand which was exacerbated by a period of sustained de-stocking from November 2008 to March 2009. This impacted on commodity prices with copper having declined some 60 per cent over a three-month period. The resource industry reacted by postponing new projects, reducing output, closing marginal operations and severely cutting capital expenditure which will impact supply in the future.

Some indications of a nascent recovery in emerging markets, particularly China, have led to a robust rebound in energy and infrastructure raw material demand with copper now trading at over US$6,000/ton.

The Company operating environment in Zambia and the DRC was negatively impacted by the proposed tax system changes in Zambia and the mineral review process or 'revisitation' in the DRC. Fortunately, the authorities in Zambia have suspended the proposed new tax system changes regarding windfall taxes and your Company completed the mineral review process with confirmation of the legal tenure of its projects. Unfortunately this process was not without a direct cost to Metorex. However, we believe in the long-term value of our DRC projects and we understand the government's desire to create a level playing field for investors.

Your Company's evolving operational scale in the DRC is facilitating a gradual improvement in its ability to operate effectively but the environment remains difficult. However, it is pleasing to note that the development and evolution of effective political and government structures in the DRC continues.

## Prospects

During the last few months Metorex has focused on strengthening its executive and operational structures and capacity and restoring the Company's reputation and technical excellence. The achievement of full nameplate capacity and operational stability at Ruashi will remain the Company's primary target. In addition your Company will focus on creating shareholder value by progressing the Kinsenda, Musonoi and Lubembe projects.

The strategic financing initiative will be progressed to further strengthen the balance sheet and to provide the Company with the funds needed to proceed with the development of Kinsenda and later Musonoi and further advance its stated policy of targeting base minerals in the African copper belt.

## Appreciation

Your Company's Board, the executive team led by Terence Goodlace and all staff have put in an enormous effort under extreme conditions to commence restoring your Company to health and to lay a platform for future growth. My appreciation to you all.

The counsel and support of my fellow directors, past and new, during this difficult year is appreciated.



**Rob Still**
4 November 2009

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 124 of 237 PageID #: 4909



# Chief Executive Officer's report



"We are confident that with a strong balance sheet, technical excellence and a broader geographic spread, our reputation for safe, reliable and profitable work, will hold us in good stead as we move to focus on the future."

**T P Goodlace**
Chief Executive

## Dear Shareholder

The 2009 financial year was somewhat of a roller coaster ride for the Metorex Group. Performance was marred by financial market turmoil which led to a steep fall in most commodity prices other than gold. The effect on Metorex and its share price was severe and resulted in a complete change in strategy during the second half of the financial year. The Group debt position, the capital over-runs, delayed ramp-up at Ruashi, and reduced off-take in antimony and fluorspar exacerbated the situation. The previous 'growth strategy' for Metorex developed in 2008 changed to become more of a fight for survival. At the time of this report the roller coaster ride appears to have calmed and there has been a pleasing increase in commodity prices. Amongst all the turmoil, I'm pleased to report that all operations have held their heads high and stuck diligently to the tasks at hand.

Since joining the Company in March 2009 there have been two key areas of focus at Metorex. The first focus area is on the restoration of the balance sheet. The second revolves around the restoration of the Company's reputation. There have been various changes at Board and management levels and a number of decisive corporate and operational actions were initiated and successfully executed during the year under review.

## Restoring the balance sheet

- A R282 million (US$36 million) loan facility was raised at the Chibuluma mine. The repayment schedule was successfully renegotiated to create some headroom;
- A R744 million capital raising was successfully carried out during December 2008 in turbulent economic conditions;
- A R178 million bridging loan facility with Standard Bank was secured during December 2008;
- R457 million was raised from the sales of Phoenix Platinum (R71 million) and Pan African Resources (R386 million);
- A 15 per cent stake in Vergenoeg was sold to a BEE partner for R109 million;

- The remaining 55 per cent stake in Vergenoeg is to be sold to Minersa for US$60 million (R462 million), subject to certain conditions precedent, the proceeds of which will be used towards further reducing Ruashi debt; and
- The Company initiated and advanced the process of seeking strategic investors specifically intended to further reduce debt levels at Ruashi.

## Restoring the reputation of the Company

- Continuously improving our safety, health, environment and community ("SHEC") performance and elevating risk management processes to higher levels across the Group;
- Increasing technical inputs and diligence across all operations and new projects;
- Increasing productivity through integrated, all inclusive productivity plans which focus on mine and plant design and set up, simulations and benchmarking, continuous improvement in volume, value, quality, costs and capital ("VVQ2C"). This includes motivating our people to achieve higher levels of output through appropriate remuneration, recognition and rewards ("RRR") within their own unique cultural settings;
- Increasing real profits for today and tomorrow by focusing on revenues and real costs with the cash margin being the ultimate measure. The cash margin is defined as revenue less actual costs less actual capital; and
- Delivering on organic and other growth initiatives such that we maximise on current installed infrastructure and resource bases.

## Disposals

Post an assessment of the Metorex portfolio and commodity prices, the Company embarked on a process of seeking alternatives to unlock value through disposals of the Phoenix Platinum Project and Pan African Resources plc ("PAR") shares. The primary aim was to advance a process that would accelerate receipt of any disposal consideration and thus reduce Metorex's debt exposure and provide for other funding.

The sale of Phoenix Platinum (Pty) Limited to PAR was completed on 21 May 2009 for a cash consideration of R71 million. PAR had accelerated their four-month option on the asset after detailed sampling indicated that grades were consistent with the pre-feasibility work carried out by Metorex.

On the 18 June 2009 PAR announced that Shanduka Gold (Pty) Limited ("Shanduka Gold") was disposing of its 26 per cent shareholding in Barberton Mines to Pan African and the Shanduka rights and the Metorex flip-up right would cease to be exercisable. Pan African then allotted and issued 296 million new ordinary shares to Shanduka Gold giving it a 21 per cent shareholding in PAR.

Metorex owned 594 million PAR ordinary shares that constituted approximately 53,4 per cent of the issued share capital of PAR. On 25 June 2009 we were pleased to announce that, via a bookbuild process, we had conditionally sold these shares at a price of 65 cents per PAR share, resulting in the disposal of all the Metorex owned PAR shares. The gross proceeds amounted to R386 million and the transaction became unconditional in July 2009.

At the same time we announced that we had agreed to allow Shanduka Gold to participate in the bookbuild and that Shanduka Gold had agreed to acquire a further five per cent of PAR's enlarged issued share capital from Metorex through this process. In terms of this agreement, Shanduka Gold acquired 70 million PAR shares from Metorex. The overall effect of the transactions mentioned above was a fully empowered PAR with Shanduka owning 26 per cent of the issued share capital of the Company. As noted at the time, Metorex had proudly been associated with Barberton Mines over a period of six years and we wished the new Pan African Resources shareholders every success in the future.

Shareholders of Metorex were advised on 23 September 2009 that Metorex, Minerales Y Productos Derivados S.A. ("Minersa") and Vergenoeg entered into a sale of shares agreement whereby Metorex will dispose of its entire shareholding in Vergenoeg comprising 137 500 ordinary shares constituting 55 per cent of the issued ordinary share capital of Vergenoeg, to Minersa, currently a 30 per cent shareholder in Vergenoeg, for a cash consideration of US$60 million. This is in line with our stated intention to restructure and reduce debt at the Ruashi project. Minersa has the necessary expertise to continue operating Vergenoeg successfully, thereby retaining the integrity of the recently concluded black economic empowerment ("BEE") transaction involving Medu Capital ("Medu"), a consortium of BEE controlled entities, as announced on 29 July 2009. Through the disposal of its remaining interest in Vergenoeg,

# Chief Executive Officer's report continued

the Company continues to further define itself as a base metals producer, through the increased focus of its resources towards that objective and management is of the view that a deliberate and resolute approach towards the development of the Ruashi project will generate value for shareholders. The Vergenoeg consideration will assist with the execution of the ongoing strategy and will furthermore reduce debt levels on the Ruashi project.

## SHEC

It is pleasing to report that the Metorex Group had no fatal accidents during the last financial year. However, the development of a holistic Group SHEC strategy is a priority at Metorex. This was highlighted after an independent SHEC audit was undertaken at four of the Group operations during the June 2009 quarter. Key benefits of such a strategy are the alignment of all Metorex operations and an acceleration towards industry leading practice.

Another priority identified during the audit was the need to address the occupational health and safety competence of Metorex line managers as well as related specialist functions. To meet this shortcoming the Group is set to focus on specific training interventions including hazard identification, risk assessment and consequential thinking thereby ensuring that internal competencies are developed beyond current levels. The development and use of external and internal expertise during the design and implementation of the SHEC strategy and resultant systems facilitates the process of ownership by our teams at Metorex.

Risk management is a critical element in the "toolkit" of the operating companies and all baseline risk assessments are being reviewed at all mines in the Group. In the absence of proper baseline risk assessments, mines are not able to manage risks nor develop systems that will assist in doing so.

A set of Metorex Safe Production Rules has been compiled and developed for the Group. All staff employed in the Group are being made familiar with these rules that are aimed at providing guidance on health and safety for critical activities on the mines. In addition a new set of safety definitions has been introduced with effect from 1 July 2009. This will ensure consistency of reporting.

The progress of the South African operations to achieve the 2013 Mine Health and Safety Council milestones targets for occupational safety and hygiene will be well monitored and encouraged at operational level. To this end the focus will remain on reducing accidents to achieve safety performance levels that are comparable to international benchmarks. The approach to occupational hygiene will focus on managing a healthy work environment, the control of airborne pollutants and the management of noise and vibration in order to eliminate the incidence of silicosis and noise-induced hearing loss by 2013.

## Licence to operate

During February 2009 the Company announced that it had successfully completed negotiations with the Democratic Republic of the Congo authorities with respect to the licence review process instituted during April 2007. The final agreement with Ruashi Mining entailed a US$4 million mineral content fee (pas-de-porte) to be paid to La Generale des Carrieres et des Mines ("Gécamines"), an equity participation adjustment whereby the Gécamines shareholding increased from 20 per cent to 25 per cent of Ruashi Holdings and a royalty of 2,5 per cent on gross revenue to be paid to Gécamines. Since the agreement we have paid US$1 million to Gécamines. The final agreement with CRC/MMK entailed a mineral content fee of US$3 million to be paid to Societe des Developmente Industrial et Miniere du Congo ("Sodimico"), an equity participation adjustment whereby Sodimico's shareholding increased from 20 per cent to 23 per cent, the return to Sodimico of the Musoshi Mine and a royalty of 2,5 per cent on gross revenue to be paid to Sodimico. To date the Musoshi mine has been returned to Sodimico and US$1 million paid as part of the mineral content fee.

Our South African operations submitted their licence conversions to the Department of Mineral Resources during the year. Post-year-end it was announced that Metorex had entered into a sale of shares agreement whereby Metorex disposed of 37 500 ordinary shares in Vergenoeg, representing 15 per cent of the issued ordinary share capital of Vergenoeg, to Medu Capital, a consortium of BEE controlled entities, for a cash consideration of R109 million. An empowerment partner continues to be sought for the loss-making Consolidated Murchison mine.

## Ruashi

There are a number of factors affecting the reputation of Metorex but the primary issue was one of a lack of delivery at Ruashi. Firstly, the capital project overspent in relation to the

feasibility study and secondly, the production ramp-up did not meet plan and this in turn impacted negatively on cash flows for the mine and the Group. The capital spend for the year amounted to R752 million (US$98 million) and the SX/EW plant is now substantially complete. There were and continue to be bottlenecks and commissioning issues but these are being systematically addressed and solved through constraint management. Key capital items outstanding include the acid plant, the cobalt drying section and the crusher front-end with its associated coarse ore stockpile. The plant reached 50 per cent of capacity by the end of the financial year and the build up should continue during F2010. However, a key shortcoming in planning at Ruashi was a lack of focus on mineral resource management ("MRM"). This was subsequently rectified and a proper constrained resource model for the three open pits at the mine was completed. This resource model is currently being used to determine a production profile for the mine and it is anticipated that the results of this work will be presented to the market during the December 2009 quarter. A Group Mineral Resource Management Consultant (Tim Williams) was appointed during April 2009 to oversee Mineral Resource and Ore Reserve reporting for the Group and to date he has made great strides in advancing the changes needed at Metorex.

## Production and revenue

Copper production for the year increased by 23 per cent to 31,207 tons primarily as a result of 10,378 tons having been produced at the developing Ruashi (phase II) mine in the Democratic Republic of the Congo ("DRC"). Ruashi Phase I, which was supplying concentrate to the Sable plant in Zambia was discontinued during December 2008, and this resulted in a loss of copper production of 5,131 tons as compared to F2008. The Chibuluma mine in Zambia had an exceptional year and increased its annual production by nine per cent for the year to 15,940 tons of copper.

Unfortunately, the decline of some 40 per cent in copper prices achieved to an average of US$4.464 per ton (2008: US$7.277 per ton) resulted in a significant reduction in revenue for the Group. The copper price has since rebounded and at the time of writing is in excess of US$6.000 per ton.

Cobalt production for the F2009 increased by 54 per cent to 871 tons as a direct result of the commissioning of the cobalt plant at Ruashi (phase II). The average price achieved was US$14 per pound and was based on 64 per cent of the London Metals Bulletin ("LMB") in terms of the Ruashi off-take agreement with Jinchuan. Cobalt sales for the year lagged behind that which was produced and this was caused by distribution bottlenecks, which continue to be addressed. The Kasumbalesa border post between the DRC and Zambia is a key logistical bottleneck and needs resolution at the highest levels.

Fluorspar production from the Vergenoeg mine in South Africa was reduced by 15 per cent. This was driven largely by weaker product demand during the second part of the financial year. Fluorspar prices achieved increased by 62 per cent, which together with a weaker Rand/US$ exchange rate, resulted in an overall 20 per cent increase in fluorspar revenue at the Vergenoeg mine.

## Operating costs

Group operating costs increased by 41 per cent to R774 million for the year, mainly as a result of a 24 per cent weakening in the Rand/US$ exchange rate and its effect on translation of the foreign operations costs. Furthermore, the Group experienced strong inflationary increases across its operations driven largely by the exponential price increases in consumables, utilities and services during 2007/2008.

## Mining profit before depreciation

Following the effect of the changes in Group revenues and operating costs, mining profit before depreciation decreased by 67 per cent to R263 million.

## Depreciation and impairments

Depreciation increased by 28 per cent to R122 million in line with the weaker Rand/US$ exchange rate on translation of the Group's foreign operations.

It is Group policy to annually assess assets for impairment. Following this review, the Group impairment charge before taxation and minorities amounted to R2.3 billion mainly related to Copper Resources Corporation ("CRC") (R1.7 billion), the discontinuance of the Ruashi phase I project (R216 million) and a write-off of the Consolidated Murchison operation (R125 million). The primary CRC asset, being the Kinsenda mine, was impaired to R230 million (US$30 million) based upon a risk-based valuation using a real discount rate of some 20 per cent. This was to take account of specific risks as they relate to future project funding, project development and the DRC operating environment in general. A copper price of US$5.000 per ton

# Chief Executive Officer's report continued

was applied in these valuations. The Kinsenda project however, has an estimated internal rate of return of 30 per cent and is considered core to the Group's future development strategy. As the Group advances toward securing funding for a comprehensive bankable feasibility study and ultimately the development of the Kinsenda project, the risk-based discount rate is expected to reduce.

## Borrowing costs

Cash flows from Group debt introduced during the year were mainly applied to the development of the Ruashi project in the DRC. The associated borrowing costs were accordingly capitalised.

## Headline earnings

Group headline earnings per share reduced to 24 cents for the year ended 30 June 2009 and exclude the effect of the impairment charges. The weighted average number of Metorex shares in issue increased by 59 per cent to 553 million shares following the equity issue concluded during December 2008.

## Group cash flow

Cash generated by operations reduced by 49 per cent to R466 million. After dividends paid to minorities of R108 million and taxation payments totalling R236 million, the Group generated net cash from operating activities of R122 million. Cash applied to investing activities of R1.4 billion principally related to capital expenditure at Ruashi and Chibuluma together with ongoing funding of CRC. The Group secured net cash inflows of R1.2 billion from financing activities, which primarily resulted from new debt of R282 million (US$36 million) introduced at Chibuluma, further project loans at Ruashi of R125 million, bridge loan draw-downs of R132 million and new equity of R704 million at the Metorex corporate level.

## Group balance sheet

The Group net asset value reduced by 65 per cent to 323 cents per share following the impairment of CRC, Ruashi phase I and Consolidated Murchison. Interest-bearing debt increased to R2.1 billion of which R696 million is due during the forthcoming 12 months. The subsequent disposal of Pan African and the Vergenoeg deal secured repayment of the Group's short-term loans of R190 million and furthermore the funding of Ruashi to completion as well as the ongoing funding of CRC and Consolidated Murchison. Chibuluma is in a position to service its debt instalments during the next financial year. The first Ruashi instalment of R193 million (US$25 million) is due 31 December 2009. The Group is still trading under cautionary as it is involved in negotiations with the objective of injecting further liquidity and simultaneously restructuring the Ruashi debt profile.

The Ruashi hedge book was restructured during December 2008 which resulted in forward prices of US$3.900 per ton until September 2010 for approximately 50 per cent to 60 per cent of production. Thereafter, fully paid put options apply to June 2012 protecting a minimum price of US$3.900 per ton and full price exposure to the upside.

A limited hedge book was introduced at Chibuluma securing copper prices ranging between US$4.415 per ton and US$5.308 per ton for 50 per cent of production to June 2010. The objective was to introduce some price certainty at Chibuluma taking cognisance of its debt commitments for the financial year ending 30 June 2010.

## Business development

There are a number of potential growth projects in the Group and all of these are concentrated in the central African copper belt. The key projects in our portfolio are the Kinsenda, Lubembe and Musonoi deposits all in the DRC. The Musoshi project has been returned to Sodimico, a state mining company, as a result of the licence review process concluded during the year.

During the year under review, cash constraints delayed the exploration work needed at the CRC assets namely the Kinsenda and Lubembe projects. These two projects are situated near Kasumbalesa on the DRC/Zambian border. The Kinsenda mine forms a part of the Zambian copper belt and has the potential of being a high grade underground copper mine with proved and probable reserves of 11,3 million tons of sulphide ore at 4,92 per cent copper. Pre-feasibility studies for this mine continue to be advanced and should the cash position of the Group change, then an exploration programme would be initiated to upgrade additional resources to reserves. The mine is being dewatered at a rate of 2,000 cubic metres per hour and contingency pump columns have been installed to provide for additional pumping flexibility. Holding costs were reduced from

US$2 million to US$1 million per month during the year as part of the Group's cash preservation strategy. The Lubumbashi office was closed during the June 2009 quarter to reduce holding costs and to establish a base closer to the mine. The development of the underground mine, a copper concentrator and mine general infrastructure will need some US$180 million in capital funding.

Exploration drilling at the Lubembe deposit continued during the first half of the year but these activities were curtailed due to cash constraints in January 2009. The current resource indicates sulphide and oxide mineralisation with good copper grades, amenable to efficient open-pit mining and low stripping ratio oxide open-pit operation. The strike length of the deposit is 1,000 metres and dips at some 25 degrees. Ore body width is around 30 metres and the sub-outcrop is 35 metres below surface. The Lubembe deposit has an historical, non-SAMREC compliant, inferred resource of 47,5 million tons at grades of 2,2 per cent copper. A total of US$1.8 million has been invested in exploration and further exploration drilling is required to advance the resource model. Metorex has completed 115 holes (13,010 metres) in addition to historical drilling. Assay results have been received and a revised SAMREC compliant resource model will be completed in the coming year.

Conceptual order of magnitude studies continue to be advanced for the Musonoi project in Kolwezi. This virgin deposit is of a similar style to the nearby Kamoto underground mine and the project falls under Ruashi Holdings. It is located approximately two kilometres north of the town of Kolwezi and is adjacent to the Katanga Mining Limited operations. The deposit has the potential of being a high grade deposit with copper grades of 3,6 per cent and cobalt grades of one per cent. The deposit is made up of oxide and sulphide mineralisation and US$3.3 million has been invested in 44 boreholes (9,221 metres) drilled by Ruashi/Metorex. Exploration drilling, at a rate of US$30.000 per month, recommenced post 30 June 2009 with the aim of producing a resource model by June 2010.

## Outlook

The team at Metorex will continue to drive at the restoration of the balance sheet and rebuild the reputation of the Company. The balance sheet continues to improve and once settled the Company will be better positioned to participate and grow as a more focused base metals producer. The Company is now operating in the resource rich, infrastructure poor DRC and has a pipeline of projects and an established base to work from. On the operational front we will continue to design and implement a comprehensive SHEC strategy and drive for high levels of performance that can match Australian or Canadian benchmarks.

Operations will focus on increased volumes, values and quality as well as cost leadership and capital optimisation. Key to the operations is the application of constraint theory and operational improvement principles and performance. Human resource development is being advanced through new formal performance management processes that include balanced scorecards and a new incentive system aligned to the operational strategy. Initially this will focus on the management levels but will be rolled out into the organisations over the coming year.

A new Group strategic planning and operational planning process has been implemented to ensure high levels of technical inputs and diligence into plans. As part of this process we will complete the current Ruashi mineral resource and ore reserve programme by the end of October 2009. This work will dictate the ramp-up at the mine. In addition we will continue to improve throughput at the process plant and complete the outstanding capital works.

Metorex as a Company has fundamentally changed over the last year and along with the disposals highlighted in this report, we are now a more focused base metals Company. We will complete the restoration of the Group balance sheet in this financial year and once complete we will be positioned for growth and the advancement of our pipeline of projects.



**Terence Goodlace**
4 November 2009

# Executive committee



*From left: Maritz Smith, Lloyd Bradford, Darryll Castle, Trevor Faber, Terence Goodlace, Charles Needham and Tim Williams.*

**Lloyd Bradford –** (47)
Group Metallurgical Manager
*BSc (Hons) Chemical Engineering*
Before joining Metorex about four-and-a-half years ago, Lloyd spent 19 years working for Anglovaal Mining in various operational and technical roles. He has gained experience across a wide range of metallurgy, from precious metals, base metals, and industrial minerals to other products such as uranium, and acid. He spent 10 years in various capacities working on the mines and also 14 years in a head office environment where he has led feasibility studies, carried out design work and provided technical consulting to the mines. Current responsibilities include providing technical input into metallurgical related projects and operations.

**Darryll Castle –** (40)
Chief Operating Officer
*BSc (Eng) Civil Engineering, BCom, MBA (UCT), CFA*
Before joining Metorex Darryll was Executive Director of Zungu Investments Company, a diversified BEE company with interests in mining, finance, media and other industrial interests. His responsibilities extended through all aspects of the business, including finance and administration, human resources, and strategy and acquisitions. Darryll was responsible for Africa Vanguard Resources, a mining company with joint ventures with Uranium One, Harmony, Rockwell Diamonds and Gold One.

Prior to this Darryll was a fund manager and analyst with STANLIB Asset Management, one of South Africa's largest asset managers. Darryll managed several high profile funds, and held positions on the STANLIB Executive Committee, was Head of Mining and Resources and Head of Mutual Funds.

Darryll previously worked for Billiton in the mining environment, and started his career at Transnet as a civil engineer.

**Trevor John Faber –** (38)
Group Mining Engineer
*BSc Engineering (Mining)*
Trevor joined Metorex in June 2006 as Project Manager for Ruashi phase II. His early career incorporated operational and construction management experience obtained mainly in the South African platinum sector. More recently Trevor was appointed as Technical Director at Ridge Mining and was responsible for the development of its Blue Ridge Platinum Mine in Groblersdal.

Trevor's role on EXCO is two fold. First he is responsible for implementing the Group SHEC framework and second for general overview of all technical issues related to mine design, layout, scheduling and implementation.

**Charles Denby Stockton Needham –** (55)
Corporate Affairs
Charles joined Metorex in 1983. His specific expertise lies in the field of financing, financial reporting, management reporting, hedging and company affairs, as well as in-depth knowledge of and experience in the Metorex Group operations. As our Managing Director, Charles is active in the interface between corporate and operational management.

**Tim Williams –** (42)
Group Mineral Resources Manager
*BSc (Hons) Geology (Wits); GDE (Wits); Pr.Sci.Nat; Fellow (SAIMM)*
Tim is a geologist with 19 years experience in exploration, resource development and mining geology in gold and base metals through West, Central and East Africa. Previously he worked for a major South African mining company with interests throughout Africa. Most recently spent seven years on the Copperbelt in Zambia as Mineral Resources Manager for a large copper mining company.

Joined Metorex in January 2007. Assumed responsibility for Group Mineral Resources Management from May 2009.

# Statistical information

## Commodity production statistics

| Commodity | Unit | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Copper | (t) | 8 002 | 17 131 | 25 350 | **31 207*** |
| Cobalt | (t) | – | 132 | 565 | **871*** |
| Antimony | (mtu) | 576 317 | 377 998 | 361 455 | **257 983** |
| Fluorspar (all grades) | (dmt) | 156 692 | 183 199 | 180 854 | **152 934** |
| Gold | (kg) | 3 763 | 3 348 | 3 517 | **3 498** |

*Includes Ruashi II production.*

## Commodity sales statistics

| Commodity | Unit | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Copper | (t) | 8 369 | 17 107 | 23 291 | **31 846*** |
| Cobalt | (t) | – | 129 | 386 | **578*** |
| Antimony | (mtu) | 585 600 | 371 061 | 337 403 | **271 286** |
| Fluorspar (all grades) | (dmt) | 158 285 | 181 286 | 184 299 | **135 962** |
| Gold | (kg) | 3 777 | 3 332 | 3 603 | **3 451** |

*Includes Ruashi II sales, not part of income statement.*

## Average commodity prices achieved

| Commodity | Unit | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Copper | (US$/t) | 5 514 | 7 066 | 7 277 | **4 464** |
| Cobalt (64% of LMB quoted price) | (US$/lb) | – | 11 | 18 | **14** |
| Gold | US$/oz | 508 | 581 | 804 | **818** |
| Antimony | (USmtu) | 44 | 54 | 58 | **39** |
| Fluorspar (all grades) | (R/t) | 992 | 1 253 | 1 387 | **2 241** |
| Exchange rate (average) | R/US$ | 6,4 | 7,2 | 7,3 | **9,03** |
| Exchange rate (year-end) | R/US$ | 7,2 | 7,0 | 7,8 | **7,72** |

## Capital expenditure

| Company | Description | 2008 R000 | 2009 R000 |
|---|---|---|---|
| Pan African Resources plc | – Plant, equipment and development (Barberton) | 49 817 | **58 305** |
| | – Losses and exploration expenditure | 4 356 | **77 864** |
| Vergenoeg Mining Company (Pty) Limited | – Mineral rights | 5 049 | **3 213** |
| | – Plant, equipment and development | 9 088 | **24 040** |
| | – Land/building and infrastructure | 2 191 | **2 471** |
| | – Other | 2 530 | **10 923** |
| Consolidated Murchison | – Plant, equipment and development | 67 828 | **27 985** |
| | – Other | 558 | **1 683** |
| Chibuluma Mines plc | – Plant, equipment and development | 119 569 | **121 065** |
| Ruashi Mining and Sable Zinc Kabwe Limited | – Capital work in progress | 1 294 910 | **669 504** |
| | – Plant and equipment | 17 569 | **16 166** |
| | – Other | 128 333 | **66 961** |
| | – Borrowing costs and losses | 120 192 | **136 408** |
| Copper Resources Corporation | – Plant, equipment, development and holding costs | 74 239 | **383 068** |
| Metorex Limited | – Furniture and office equipment | 202 | **282** |
| Total capital expenditure for the year (excluding mineral rights from acquisitions) | | 1 896 431 | **1 599 938** |

# Operational review

## Ruashi Mining sprl – Copper and Cobalt



*CCD tanks (Ruashi view over PLS pond)*

Ruashi is a developing copper and cobalt operation located a few kilometres from Lubumbashi in the south eastern province of Katanga in the Democratic Republic of the Congo ("DRC"). Ruashi Holdings (Pty) Limited owns 75 per cent (F2008: 80 per cent) of the operating company (Ruashi Mining sprl), while the remaining 25 per cent (F2008: 20 per cent) is held by the state-owned Gécamines. The decrease in the interest held by Ruashi Holdings (Pty) Limited is as a result of the finalisation of the contract revisitation process and the subsequent amendment to the contract of creation of Ruashi Mining sprl.

During F2009, the process plant took major strides to enhance its engineering and development capacity. During plant commissioning many bottlenecks were identified and solved and a comprehensive mineral resource modelling programme was undertaken to achieve greater certainty and resolution of mineral resources and ore reserves. All costs were capitalised for the Ruashi phase II during the entire financial year.

**Copper price:** July 2008 – June 2009









*Management*
**G Dempsey,** Managing Director
**J Mukinkwe,** Deputy Managing Director
**R Proulx,** Financial Director
**E Mounsey,** Chief Operations Officer
**J Lubbe,** Finance Executive

*Directors*
**C Needham,** Chairman
**G Dempsey**
**R Proulx**
**D Castle**
**Dr M Mutamba**
**C Umba**
**K Kasakoto**

| Ruashi | | | Year | |
|---|---|---|---|---|
| | | | June 2008 | **June 2009** |
| Tons milled | | (t) | n/a | **485 360** |
| Headgrade | – Copper | (%) | n/a | **2,8** |
| | – Cobalt | (%) | n/a | **0,5** |
| Recovery | – Copper | (%) | n/a | **76** |
| | – Cobalt | (%) | n/a | **27** |
| Copper produced | | (t) | n/a | **10 378** |
| Copper sold | | (t) | n/a | **10 351** |
| Cobalt produced | | (t) | n/a | **720** |
| Cobalt sold | | (t) | n/a | **326** |
| Total cash cost/ton of copper produced, net of cobalt credits* | | (US$/t) | n/a | **4 518** |
| Capital expenditure, excluding losses and borrowing costs | | (R'000) | 1 365 773 | **752 632** |

**Cobalt credit calculated basis cobalt production and a gross cobalt price of US$15/pound (US$9.60/pound payable) for illustrative purposes*

## SHEC report

*Safety performance frequency rates*

| Frequency rates | F2008 | **F2009** |
|---|---|---|
| Non-lost time frequency rate | 42,7 | **6,9** |
| Lost time injury frequency rate | – | **0,5** |
| Total recordable injury frequency rate | 42,7 | **7,4** |
| Reportable injury frequency rate | – | **0,5** |
| Serious injury frequency rate | – | **0,5** |
| Lost day severity rate | – | **9,5** |
| Fatality frequency rate | – | **–** |

## Safety and health

Data from the last two financial years are not fully comparable given that reporting methodology of the mine's safety statistics changed to match the new Metorex standard definitions. However, the non-lost time injury frequency rate showed a favourable downward trend. The number of non-lost time injuries increased marginally to the increase in the number of employees. The operation has not had a fatal accident since inception in May 2005 and has achieved 1,27 million fatality-free shifts.

A new Safety, Health, Environment and Communities ("SHEC") policy was introduced in February 2009 in alignment with Metorex's Group policy. Safety training progressed well in the period under review, and safety awareness was heightened through a number of initiatives and an increase in training.

## Environment

Ruashi introduced Metorex's reporting levels in April 2009 to capture its environmental incidents. Only four incidents were reported in the latter half of the year, one of which was an incident that occurred when return water from the tailings dam overflowed and discharged mine water into a nearby stream. Prompt corrective action was taken and measures were put in place to prevent further occurrences.

Improved systems have been installed to clean and prevent further hydrocarbon spills from large earthmoving equipment on the mine. Once a fully operational sulphuric acid plant has been established at Ruashi, it will further reduce the operational risk and costs associated with importing sulphuric acid from the Zambian copper belt.

In terms of occupational health Ruashi has sampling devices around the plant for dust collection. Subsequent chemical analysis is undertaken to ensure compliance with environmental standards for workplaces. Water quality is

# Operational review continued

## Ruashi Mining sprl – Copper and Cobalt continued

monitored in and around the mine and plant, as well as in the community and other general water courses. Equipment to enable a comprehensive range of workplace health monitoring programmes for workers is on order, but a formal system is not yet in place. This will be implemented in F2010. Ruashi undertakes limited malaria spraying and provides impregnated mosquito nets. This specifically structured preventative programme will be enhanced in F2010.

### Serving the community

Ruashi provided both power and water to various sections of the Ruashi village during the year under review. A water storage tank and reticulation system at the main village was upgraded and transformers have been installed at three of the subsections of the village. The company also sponsors sports days and annually hosts the "Ruashi Water Fun Run" to celebrate the commissioning of the water system in F2008. A total of US$1.0 million was spent on social initiatives during F2009. The proximity of the mine to Lubumbashi and more specifically the Ruashi village requires a high level of engagement with local communities. This is a key risk and management focus area.

In addition, a number of additional projects were supported and these are listed in the Corporate Social Investment section.

### Operational review

Commencing in April 2009 the mine embarked on a 5,000 metre infill diamond drilling programme to improve its knowledge of the orebody in areas where there is a lower concentration of information, and also to confirm the different ore types within the overall orebody. The drilling and assay interpretation is complete and a revised South African Mineral Resource Committee ("SAMREC") mineral resource and ore reserve has been defined for publication. A full technical team has been set-up at the mine to ensure compliance with best practice.

Mining commenced in Ruashi Pit 1 at the start of the financial year. Benches and access to the pit were established and dewatering efforts accelerated. Additional curtain dewatering boreholes were drilled on the south sides of Pit 1 and Pit 2. At the close of the 2009 financial year, Pits 1 and 2 were fully established.

The mine delivered 738,236 tons of ore to plant, 252,876 tons of which were initially processed through the phase I concentrator and commencing December 2008, 485,360 tons at the new phase II base metal refinery. The grades recorded were 3,05 per cent copper and 0,47 per cent cobalt to the Phase I concentrator and 2,8 per cent copper and 0,5 per cent cobalt to the Phase II refinery. Waste tonnage stripped for the period amounted to 6,3 million tons.

During the latter half of the year considerable progress was made in developing the Phase II plant into a steady state of operation. Both the milling and the leach sections were stress tested to 200 tons/hour and 180 tons/hour of solids respectively. The pre-leach thickener operated to its design specifications, and transfer to the leaching section was satisfactory. The counter-current decantation circuit operated effectively, as did the solvent extraction ("SX") and electro-winning ("EW") sections.

Annual production comparisons are difficult for F2009 as the Phase I concentrator was placed on care and maintenance while the Phase II plant was being commissioned. In addition the mine blended ores from stockpiles to maintain plant stability until sufficient ore was available from the open pits for full grade and "gangue acid consumption" flexibility.

The Phase II processing facility commenced production of London Metal Exchange "A" grade copper in early January 2009, after commissioning the solvent extraction facility in the last quarter of the 2008 calendar year. This was followed by the commissioning of the cobalt plant in February 2009.

Total Phase II production totalled 10,378 tons of copper and 720 tons of cobalt since the start up of the new facility in January 2009.

Copper sales tonnages have largely been aligned with their anticipated production profile. Conversely cobalt sales lagged considerably behind production due to various logistical problems experienced in the last quarter of the financial year.

Considerable time and effort has been and will continue to be spent on improving logistics flows to and from the DRC.

The company was materially impacted by the decline in commodity prices but benefited from a copper hedge at US$7.071 per ton to 30 June 2009. The company currently maintains a hedge book which is briefly summarised as:

- 24,750 tons to September 2010 at US$3.900 per ton.
- 34,425 tons from October 2010 to 30 June 2012 at a put level of US$3.900 per ton with full exposure to the upside.

The average cobalt price achieved reduced from US$18 per pound to US$14 per pound.

Unit costs for the Phase II processing facility were distorted due to commissioning and ramp-up activities in the year. Although commissioning did not satisfactorily meet the originally expected profile, ongoing elimination of technical bottlenecks, improved maintenance and availability of critical spares ensured encouraging month-on-month improvements. Staff training is augmenting the current ramp-up profile and ensuring its sustainability.

A large proportion of the capital expenditure, totalling US$60.1 million, was spent on finalising the Phase II processing facility and bringing the plant into production. Investment was focused on mainly electrics and instrumentation, commissioning and the front-end crushing section. Overburden stripping in Pit 2 was capitalised and the first dewatering infrastructure was established.

Exploration projects included resource drilling of the Musonoi Project, at a cost of US$1 million and US$1.8 million was spent on infill drilling at Ruashi during the latter half of the financial year.

## Looking forward

The mining and processing ramp-up of Phase II will continue in the year ahead. By the second half of F2010 Ruashi will be producing in excess of 2,000 tons of copper per month and 200 tons of cobalt per month. To achieve this Ruashi will complete a comprehensive mine design and scheduling programme and will complete several projects by the end of the December 2009 quarter as displayed below:

| Area | Activity |
|---|---|
| Front-end crusher and coarse ore stockpile | Completion of civil, mechanical and electrical works. |
| Lime Plant upgrade | Scope defined and equipment orders placed. Construction has commenced |
| Cobalt Plant dryer | All civil, structural, mechanical and instrumentation equipment is on site. Construction is ongoing. |
| Flottweg Tricanter | An additional centrifuge has been ordered for the SX section. |
| Pit Dewatering Project | • Re-positioning of electrical and mechanical equipment for in-pit water pumping<br>• Commissioning of the coffer dam water flow to plant<br>• Constructing and equipping of a number of permanent sumps in both pits<br>• Constructing and equipping seven additional pit dewatering boreholes |

A number of additional capital and developmental projects are planned for the coming year, namely:

- A design review and scope clarification for the mine's acid plant will be completed at the end of October 2009. During this period all engineering work is expected to be completed and the site will be prepared for construction access;
- Exploration work has commenced on identifying sites with the best potential for further exploration to extend mineral resources and resultant ore reserves; and
- The mine design and an evaluation of the development and processing options for the Musonoi (Dilala East) feasibility study are under way for completion in December 2009.

# Operational review continued

## Chibuluma Mines plc – Copper



*Crushing plant*

Chibuluma is situated in the heart of Northern Zambia's copper belt, west of Kitwe, near the town of Kalulushi. Metorex acquired 85 per cent of the company in 1997, while the remaining 15 per cent is held by the Zambian Government and Zambia Consolidated Copper Mines Limited. It is an efficient operation with a high grade orebody and an estimated mine life of seven years. The mine produces approximately 16,000 tons of copper per annum.

Overview
Management review
Operational review
Sustainable development
Financial statements
Supplementary information





*Management*
**J Trouw,** General Manager
**M Bullock,** Financial Manager
**P Jordaan,** Mining Manager
**D Olivier,** Engineering Manager
**R von Bardeleben,** Metallurgical Manager
**G van Heerden,** Finance Executive

*Directors*
**C Needham**
**D Castle**
**J Makumba**
**D Littleford**
**M Lumamba**

| Chibuluma Mines plc | | Year June 2008 | June 2009 |
|---|---|---|---|
| Tons milled | (t) | 555 575 | **568 187** |
| Headgrade | (%) | 2,9 | **3,1** |
| Overall recovery | (%) | 89,6 | **90,0** |
| Copper produced | (t) | 14 583 | **15 940** |
| Copper sold | (t) | 14 491 | **15 905** |
| Total cash cost/ton sold | (US$/t) | 2 663 | **2 793** |
| Mining profit before depreciation | (R'000) | 539 380 | **155 786** |
| Depreciation | (R'000) | 49 070 | **72 781** |

## SHEC report

*Safety performance frequency rates*

| Frequency rates | F2008 | F2009 |
|---|---|---|
| Non-lost time frequency rate | 5,5 | **21,3** |
| Lost time injury frequency rate | 6,0 | **4,0** |
| Total recordable injury frequency rate | 11,5 | **25,3** |
| Reportable injury frequency rate | 6,6 | **0,9** |
| Serious injury frequency rate | 3,3 | **0,9** |
| Lost day severity rate | 618* | **18,7** |
| Fatality frequency rate | 0,6 | **–** |

**Includes 1000 shifts for the fatality in 2008*

## Safety and health

A substantial improvement in safety performance was achieved in the fatality, reportable and serious injury frequency rates in F2009. Improved safety awareness resulted in employees being more aware of and willing to report minor injuries.

During the year, the safety team at Chibuluma was restructured to incorporate a training department and the mine's induction programme was entirely revised. Additionally, an integrated computer database auditing system was commissioned to monitor and report safety and training information.

A number of additional developments took place at Chibuluma in F2009 which included:

- A geotechnical audit to model the mining sequence and method was conducted. The mine plan was modified to minimise ground failure risk;
- A "Mining Skills Improvement Programme" was delivered to employees, many of whom participated on a voluntary basis. (Altogether 134 of the 230 mining employees have enrolled, and 32 modules were completed in F2009);
- Three female truck operators successfully commenced work underground; and
- All mining, concentrator and engineering staff attended a one day safety teamwork presentation.

## Environment

No environmental incidents occurred during the year. The mine's environmental reporting system is under development and several steps were also taken to improve the mine's environmental impact during the year. These included:

- Weekly sampling of effluent discharges to ensure containment within regulated limits;
- Successful sealing of number seven shaft at Chibuluma West;

# Operational review continued

## Chibuluma Mines plc – Copper continued

- Trail dust suppression sprays were installed on the secondary crusher and the system will be extended to other areas in future; and
- The rehabilitation of the Chibuluma South tailings dam, including lawn planting, is well under way.

### Serving the community

Despite community expenditure being adversely affected by liquidity constraints, approximately US$50.000 was spent on supporting ongoing community initiatives, including continued sponsorship of both the local soccer and rugby clubs. The mine continued to drive the 'malaria roll-back campaign' through financing a large portion of a malaria spraying initiative in Kalulushi.

Local police were assisted with fuel, while repairs were carried out on district roads and local schools received building materials.

Chibuluma has played a significant role at the Kalulushi Mine Hospital. In F2009 the hospital continued to provide basic diagnosis and treatment for the wider community. The hospital was also instrumental in assisting with an anti-malaria campaign.

Progress was made in setting up an HIV/Aids centre at the Kalalushi Mine Hospital with the help of the Zambia National Aids Network. The HIV/Aids initiative leverages the hospital infrastructure, but further investigations are under way to rightsize the hospital appropriately for the number of in-patients that it services. Audiometric testing for employees, to be conducted on an annual basis is planned to be introduced at the hospital in the coming year.

In addition a number of additional projects were supported and these are listed in the Corporate Social Investment section.

### Operational review

Chibuluma milled 568,187 tons in the period under review, representing an increase of 2,3 per cent on last year, while the tonnage mined improved by one per cent.

Mining the higher grade lower sections of the orebody delivered a significantly improved average copper grade of 3,1 per cent compared with the prior year's 2,9 per cent. This positively affected sales performance, with a 9,8 per cent increase in copper tons sold of 15,905 tons.

The total capital metres developed of 2,225 metres was 410 metres lower than F2008 and was a deliberate reduction in response to the copper price decline in the second quarter of the year. This decision was subsequently revisited and the main ramp has been restarted.

A contract to sell all copper concentrate to Konkola Copper Mines terminated in December 2008, and F2009 production was allocated to three customers: Republic House Limited (4,697 tons) for exportation; Konkola (6,250 tons), and the Chambishi Copper Smelter (4,960 tons). A new agreement has been finalised to supply all concentrates to the Chambishi Copper Smelter from June 2009 to December 2009. During the year the mine was granted an export tax exemption as a consequence of the Zambian smelters' inability to provide capacity during commissioning of the industry's two new smelters (Konkola and Chambishi). Smelter recoveries increased following a new offtake agreement with the Chambishi Copper Smelter.

The deterioration of the copper price achieved from an average of US$7.811 per ton in F2008 to US$3.887 per ton in F2009 resulted in management implementing a cash flow improvement programme to mitigate its adverse effects on the operation's liquidity. These measures contained the cash cost of copper at US$2.793 per ton for the financial year.

Although the overall tonnage of copper sold increased by 1,416 tons, the deterioration of the copper price substantially impacted the net on-mine revenue which fell from US$106 million to US$52 million for the year.

Smelting, transport and refining costs were marginally higher at US$917 per ton compared to the US$903 per ton achieved in F2008. This was due to the higher realisation costs incurred with the Chambishi smelter.

On-mine costs increased by 17 per cent from US$30 million to US$35 million. This equated to US$2.164 per ton, representing a seven per cent increase year on year from US$2.030 per ton. Production throughput was higher with 568,187 tons milled.

Consumable costs were affected primarily by the fluctuation in the oil price from around US$50 per barrel to over US$140 per barrel. This also substantially impacted on the domestic cost of many of the mine's oil price related costs, in particular diesel, oils and explosives which all increased by over 50 per cent. The steel used for machine maintenance also escalated by more than 20 per cent. Payroll costs increased due to an annual pay award of 16 per cent, which was largely offset by the depreciation of the Zambian Kwacha.

Lower copper prices influenced Chibuluma's expenditure on capital of US$16 million for F2009. This represented a seven per cent reduction and was 17 per cent below the approved budget. During the year under review, capital expenditure was focused on production items with the acquisition of two new underground hauling vehicles for US$3 million. Several machine rebuilds took place to extend the life of the existing fleet, at a cost of US$2 million in F2009. Expenditure at the metallurgical plant totalled US$0.2 million in F2009, a reduction from the US$2 million spent in F2008 when several large investments in crushing equipment were made.

## Looking forward

Chibuluma has overcome significant challenges during the financial year, precipitated by the sharp fall in copper prices at the beginning of the second quarter.

Safety performance continued to improve, and this should continue into the next year as a result of current SHEC initiatives.

Copper production has shown an increase year on year since production commenced at Chibuluma South in F2006. The mine achieved record copper production of 1,600 tons of copper in June 2009 and based on current volumes and forecast grades in the deeper parts of the mine, this improvement trend should continue.

Sites with the potential for further exploration are being identified in the vicinity of the mine with the aim of extending Chibuluma's life of mine.

# Operational review continued

## Sable Zinc Kabwe Limited – Copper and Cobalt



*Raw material receiving and pulverising pad*

Sable is located near the town of Kabwe in the central province of Zambia, approximately 150 kilometres north of Lusaka – the country's capital. The operation comprises a copper and cobalt processing facility that treats concentrate purchased from various suppliers in Zambia and the Democratic Republic of the Congo ("DRC"). The plant is accessed by either the main railway line or the tarred road between the copperbelt and Lusaka.







*Management*
**D Littleford,** General Manager
**R Shannon,** Financial Manager
**B Kaacha,** Electrical Engineer
**A McInnes,** Mechanical Engineer
**P Sharma,** Financial Controller
**S Sayed,** Technical Services Manager
**H Chilumbwa,** General Foreman
**R Baxter,** Logistics Manager
**J Lubbe,** Finance Executive

*Directors*
**C Needham**
**D Littleford**
**D Phiri**

| Ruashi I/Sable | | Year June 2008 | June 2009 |
|---|---|---|---|
| Copper produced | (t) | 10 767 | **4 889** |
| Copper sold | (t) | 8 800 | **5 588** |
| Cobalt produced | (t) | 565 | **151** |
| Cobalt sold | (t) | 386 | **252** |
| Mining profit before depreciation | (R'000) | 176 915 | **11 470** |
| Depreciation | (R'000) | 35 244 | **35 826** |

## SHEC report

*Safety performance frequency rates*

| Frequency rates | F2008 | F2009 |
|---|---|---|
| Non-lost time frequency rate | 14,9 | **108,0** |
| Lost time injury frequency rate | 11,0 | **22,0** |
| Total recordable injury frequency rate | 25,9 | **130,0** |
| Reportable injury frequency rate | 14,9 | **30,0** |
| Serious injury frequency rate | – | **15,0** |
| Lost day severity rate | 14,9 | **97,0** |
| Fatality frequency rate | – | **–** |

## Safety and health

Revised methods of collecting, defining and collating safety performance frequency rates in order to comply with the new Metorex safety standards came into effect at the operation in F2009. As a small surface operation with a limited workforce Sable has historically had a good safety track record. The inflated safety figures for F2009 are a reflection of the new reporting definitions. The most serious injury for the year was a hand injury which resulted in the injured being away for 21 days and this increased the severity rate statistics.

## Environment

A new system for measuring and recording environmental incidents was implemented at Sable in April 2009. Environmental incidents at Sable were limited to minor occurrences of higher than normal emissions at the acid plant as a result of stopping and starting the operation. These were of short duration and were reported accordingly.

## Serving the community

The labour force for Sable resides in the Kabwe Municipal Council housing area and Sable therefore supports the local community and assists the Kabwe Municipal Council in various projects. Over the past year this support ranged from waste removal to the installation of a clock tower at the Kabwe Municipal offices. Sable assists local community churches and recently refurbished the St Margaret's Anglican Church built in 1926.

A number of additional projects were supported and these are listed in the Corporate Social Investment section.

# Operational review continued

## Sable Zinc Kabwe Limited – Copper and Cobalt continued

### Operational review

The F2009 copper cathode production of 4,889 tons was based on Ruashi's oxide concentrate feed, coupled with some locally sourced ore. Oxide concentrate deliveries from Ruashi Phase I ceased in December 2008.

In the second quarter, Sable secured 4,500 tons of third party heavy medium separation ("HMS") concentrate at a grade of 26 per cent acid soluble copper. This supply was suspended in December 2008 when the London Metal Exchange copper price collapsed and the supplier operations in the Congo were placed on care and maintenance. In the latter half of the year, Sable received only 2,389 tons of locally sourced ore and copper production was low at an average of 183 tons per month.

In March 2009, Sable secured an off-take agreement to supply the operation with 21,000 tons of oxide ore at an average grade of 22 per cent scheduled for the period to December 2009. Deliveries commenced in May 2009 and Sable had received 3,582 dry metric tons of oxide ore by year-end.

The copper cathode tonnage improved to 678 tons in June 2009, while sales for the year totalled 5,588 tons of copper.

In the year under review, profits were materially affected by the collapse of both the cobalt and copper prices in the latter months of calendar 2008. In addition, revenue was materially impacted by a lack of ore supply following the collapse in global demand. The total operating costs of the company reduced in line with the lower production levels.

Capital expenditure for F2009 was limited to US$0.4 million. Capital works were carried out on Zinc electro mining plant, additions to plant and machinery, a compressor and a crushing plant for pulverising oxide ore. An acid storage tank with greater capacity was erected and a new forklift was purchased.

### Looking forward

Sable is confident of being able to source suitable ore tonnages and grades from both the DRC and the local market well into F2010. The terms under which these ores are sourced are such that Sable should operate profitably for the year provided copper prices remain robust. Capital spending will be limited in F2010.


*Consolidated Murchison: Flotation plant*


*Long hole open stope driller at Chibuluma Mine*


*Ruashi LME Grade A copper ready for export*


*Mining on bench 1245m in western portion of Ruashi Pit 1*

# Operational review continued

## Vergenoeg Mining Co (Pty) Limited – Fluorspar



*Primary stockpile and crushing facilities*

Situated 150 kilometres north of Johannesburg, Vergenoeg Mining Company ("Vergenoeg") is one of the world's largest known fluorspar resources. Vergenoeg is an open-pit operation with a modern concentrator and magnetic separator which enables it to meet market demand.

Metorex owns 55 per cent of Vergenoeg after the disposal of 15 per cent of the share capital of Vergenoeg to Medu Capital in July 2009, a consortium of black economic empowerment ("BEE") entities. Minerales Y Productos Derivados S.A. ("Minersa") provides Vergenoeg with advice on both metallurgical processes and international marketing. Minersa is a 30 per cent shareholder.





*Management*
**D Cook,** General Manager
**F Opperman,** Financial Manager
**H Pretorius,** Engineering Manager
**H Terblanche,** Mining Manager
**G Brooker,** Metallurgical Manager
**G Thomson,** Financial Executive

*Directors*
**T Goodlace,** Chairman
**J Alonso**
**A Barrenechea**
**D Castle**
**G Thomson**
**E January**
**S Nhlumayo**

| Vergenoeg | | Year | |
|---|---|---|---|
| | | June 2008 | **June 2009** |
| Tons milled | (t) | 570 826 | **537 589** |
| $CaF_2$ grade | (%) | 39,9 | **38,9** |
| $CaF_2$ recovery | (%) | 74,2 | **69,8** |
| Fluorspar produced (all grades) | (dmt) | 180 854 | **152 934** |
| Fluorspar sold (all grades) | (dmt) | 184 299 | **135 962** |
| Price (all grades) | (R/dmt) | 1 387 | **2 241** |
| Total cash cost/ton sold | (R/t) | 841 | **1 123** |
| Mining profit before depreciation | (R'000) | 93 846 | **151 934** |
| Depreciation | (R'000) | 11 218 | **13 437** |

## SHEC report

*Safety performance frequency rates*

| Frequency rates | F2008 | **F2009** |
|---|---|---|
| Non-lost time frequency rate | 18,3 | **47,0** |
| Lost time injury frequency rate | 2,0 | **2,1** |
| Total recordable injury frequency rate | 20,4 | **49,1** |
| Reportable injury frequency rate | 2,0 | **2,1** |
| Serious injury frequency rate | 2,0 | **2,1** |
| Lost day severity rate | 10,0 | **17,0** |
| Fatality frequency rate | – | **–** |

## Safety and health

The non-lost time frequency rate for F2009 has increased from F2008 with the largest category of dressing case injuries being a result of employee carelessness and mainly associated with minor hand injuries. There does not appear to be an obvious reason for this increase in dressing cases but high levels of communication were initiated in an attempt to reduce these injuries. There was one lost time injury in the year which resulted in 17 lost days. This lost time injury led to an increase in the lost day severity rate.

The mine commissioned an external Safety, Health, Environment and Community ("SHEC") audit in the year under review, the results of which form the basis of a system improvement plan to strengthen conformance levels in the coming year. Standard occupational hygiene measurements were performed and no noise-induced hearing loss or silicosis (an occupational lung disease) issues were evident among the mine's employees.

## Environment

A new system for measuring and recording environmental incidents was implemented at Vergenoeg in April 2009. Minor incidents were caused by hydrocarbon spillage from heavy vehicle breakdowns. The mine is in the process of installing systems to minimise environmental exposure, particularly in the area of waste handling.

## Serving the community

Several local economic development projects were progressed in F2009 in accordance with the mine's social and labour plan. Although the appropriate involvement of local municipalities delayed implementation in some areas in the year, heightened activity is expected in the coming year.

# Operational review continued

## Vergenoeg Mining Co (Pty) Limited – Fluorspar continued

Vergenoeg spent in excess of R1.5 million on several of its existing social commitments. Notably during the year Vergenoeg sponsored a training programme for eight local youths in NQF Level 1 Field Guiding and Basic Hospitality. The course is registered by the Field Guide Association of South Africa, and is accredited by the Tourism, Hospitality, Sport, Education and Training Authority.

A number of additional projects were supported and these are listed in the Corporate Social Investment section.

### Operational review

The tons mined and milled for the year are lower than F2008 due to decisions made to reduce the output of the mine to match lower market demand.

Production of fluorspar for the year was 27,917 tons lower in line with the reduced mill throughput, but also due to a lower acidspar recovery. The recovery reduced by four per cent to 70 per cent as a result of the commissioning of new magnetic separators which improve the quality of the final product at the expense of the recovery. There was an increased focus on producing and delivering higher quality acidspar to match customer requirements in F2009.

During the 2008 resource boom there was a perception of a shortage of fluorspar and this created significant demand. This resulted in an increase in fluorspar prices from around US$220 per ton to in excess of US$400 per ton. During this period Vergenoeg was constrained at previously negotiated prices of around US$215 per ton. At calendar year-end, contracts for 2009 were negotiated at prices well over US$300 per ton but some customers were already being affected by the global slowdown and thus did not conclude contracts. In 2009 some consumers who had negotiated contracts for the year called for re-negotiation of the terms and timing of shipments. Prices have regressed by about US$100 per ton. A number of fluorspar mines around the world have been mothballed as they are not viable at current prices.

The reduction in demand for fluorspar provided Vergenoeg the opportunity to stop the mine for a month to perform critical maintenance. A significant amount of fluorspar has been warehoused in an off-site stockpile for sale when the market improves. The fluorspar (all grades) sales were significantly affected by the poor state of the market and reduced from 184,299 tons in F2008 to 135,962 tons in F2009, a 26 per cent reduction.

Fluorspar (all grades) pricing improved from R1.387 per ton to R2.241 per ton year on year. Rand pricing was improved through the depreciation of the Rand which weakened from R7.30 per US$ to R9.03 per US$ year on year. Revenue was negatively affected by the lower sales but positively affected by the higher selling price and the weaker Rand. The net result was that revenue improved from R256 million in F2008 to R305 million in F2009.

On-mine operating costs were negatively affected by the resource boom which resulted in increased input costs and the significant increase in the price of electricity in South Africa. This resulted in costs increasing from R91 million in F2008 to R112 million in F2009.

Vergenoeg's mining profit before depreciation increased by 62 per cent to R152 million for F2009.

During F2009 Vergenoeg increased its capital spending to R41 million, up from R19 million in F2008. A large part of this was the cost of the magnetic separators which improve product quality. The remainder of the capital was spent primarily on increasing plant capacity and on mining operations.

## Looking forward

Fluorspar prices are expected to bottom in the first half of F2010 with volumes becoming more robust in the latter half of the year. Several capital projects are also planned for the coming year, most notable being the construction of a new tailings facility.

Shareholders of Metorex were advised on 23 September 2009 that Metorex and Minerales Y Productos Derivados S.A. ("Minersa") entered into a conditional sale of shares agreement whereby Metorex will dispose of its entire shareholding of 55 per cent in Vergenoeg for US$60 million.

# Operational review continued

## Consolidated Murchison – Antimony



*Ore being transported from Monarch decline*

Consolidated Murchison, a division of Metorex, is currently one of the largest known antimony orebodies in the world. The operation is situated at Gravelotte, in the Limpopo Province and produces both antimony and gold. Antimony is used mostly for flame retardants but has a variety of commercial applications in plastic, fabric and electronic printed circuit boards.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 149 of 237 PageID #: 4934







*Management*
**Z Barnard,** General Manager
**W Bodenstein,** Financial Manager
**C Wilson,** Technical Service Manager
**K Venter,** Metallurgical Manager
**L Swart,** HR Manager
**G van Heerden,** Finance Executive

Consolidated Murchison
(Asset held-for-sale)

| | | Year June 2008 | Year June 2009 |
|---|---|---|---|
| Tons milled | (t) | 355 076 | **345 349** |
| Produced – antimony | (mtu) | 361 455 | **257 983** |
| – gold | (kg) | 533 | **423** |
| Sold – antimony | (mtu) | 337 403 | **271 286** |
| – gold | (kg) | 521 | **423** |
| Total cash cost/mtu sold~ | (R/mtu) | 343 | **592** |
| Mining profit/(loss) before depreciation | (R/t) | 24 925 | **(79 223)** |
| Depreciation | (R'000) | 10 196 | **13 590** |

*~Net of gold revenue*

## SHEC report

*Safety performance frequency rates*

| Frequency rates | F2008 | F2009 |
|---|---|---|
| Non-lost time injury frequency rate | 2,8 | **2,1** |
| Lost time injury frequency rate | 7,8 | **8,9** |
| Total recordable injury frequency rate | 10,5 | **11,0** |
| Reportable injury frequency rate | 1,4 | **2,1** |
| Serious injury frequency rate | 1,4 | **2,1** |
| Lost day severity rate | 12,2 | **11,3** |
| Fatality frequency rate | – | **–** |

## Safety and health

Consolidated Murchison's safety performance during the year under review included the achievement of 1,295 million fatality-free production shifts. Conversely, an increase in injuries continued to hamper the operation's overall safety performance.

At mid-year management implemented several measures to curb an increase in the lost time injury frequency rate. Although the situation improved, three reportable injuries were recorded in the last two months of F2009, which led to a noticeable increase in the reportable injury rate. Accidents and injuries were attributed to engineering activities and operations at the Monarch shaft.

Unfortunately the year under review was not without issues, with the mine having to comply with an instruction by the Department of Mineral Resources ("DMR") to halt production for 10 days in light of safety concerns. It was found that the practice of mid-shift secondary blasting was resulting in limited exposure of some employees to gasses. As a result, this secondary blasting was stopped. During the stoppage the mine re-examined its ventilation regime, analysed the chemical composition of its explosives and embarked on a re-training exercise.

Occupational hygiene is given a high priority at the operation. A full-time medical practitioner conducts all of the medical examinations and compiles information in relation to all illnesses and sicknesses, including noise-induced hearing loss and dust-related diseases.

# Operational review continued

## Consolidated Murchison – Antimony continued

### Environment

In F2009 several audits were undertaken at Consolidated Murchison by the Department of Mine's Environmental Auditors and the Department of Environmental Affairs. No outstanding issues remained following the audits, and a new method of reporting on incidents will be a focus in the coming year.

In an effort to continue sound environmental management practices, an internal review of the mine's environmental rehabilitation liability was undertaken, with an independent consultant appointed to conduct a detailed assessment.

### Serving the community

The community service contributions by the operation's Occupational Medical Practitioner, in conjunction with the Limpopo Department of Health, continues to function well. The surrounding community was impacted by the completion of a retrenchment process ending in March 2009. Of the 304 employees retrenched, 35 were due to medical incapacity while the remaining 269 employees were retrenched as a result of new operational requirements. Management has engaged with the Ba-Phalaborwa Municipality regarding post-retrenchment support, which could potentially extend to the clinic, water and other services.

Social investments undertaken during the year include an Occupational Health Management Programme (R2.9 million), adult education and computer training (R240.000), spending on schools (R120.000), transport for employees (R1.6 million) and hostel feeding (R2.2 million). The mine also supplies the local Gravelotte community with potable water.

### Operational review

The overall tonnage mined at Consolidated Murchison declined by five per cent compared with the prior year. Production was adversely affected by lightning damage to the Beta shaft and a planned reduction in mining in response to the global economic crisis, reduced prices and the bankruptcy of the company's sole antimony client. The previously mentioned closure of the mine for 10 days on the instruction of the DMR further impinged on production.

During the latter part of F2009 the mine ramped up its efforts to target high grade areas, which resulted in improved recovery grades. However, the tons milled declined by three per cent due to the lower mined tonnage.

The mine's overall antimony production declined by 29 per cent, while gold production was 21 per cent lower than the previous year. The primary causes were lower headgrades and lower plant recoveries. Both antimony and gold headgrades recovered during the latter part of F2009 by focusing on high grade areas. It is anticipated that plant repairs and upgrades under consideration will improve plant recoveries to their previous levels in the coming year.

Antimony and gold sales fell 20 per cent and 19 per cent respectively compared with F2008. The mine's only antimony customer, US-based GLCC Laurel, experienced severe financial difficulties and was consequently unable to purchase antimony from the mine after October 2008. Alternative clients were sourced, albeit at substantially lower prices.

The price of antimony reached a high of US$54.68 per metric ton unit ("MTU") at the end of September 2008 but declined to US$16.81 per MTU in January 2009. The subsequent increase in price of antimony was insufficient to close the gap and unit prices were 33 per cent lower on average than the previous year. More positively, the price of gold showed a healthy improvement of 23 per cent in Rand terms.

Overall operating costs increased by 29 per cent year on year, while labour costs increased by 37 per cent (including R5 million retrenchment costs). This was incurred primarily after plans were implemented at the end of F2008 to boost production, which required a larger staff complement. The cost of staff retrenchments, coupled with increased capacity building in the first half of the year, also contributed to increased costs. The continuing international rise of key raw materials (such as steel and reagents) substantially impacted on the domestic cost of many of these indispensable materials.

Reduced production and lower unit prices resulted in an overall revenue decline of 15 per cent against the prior year. Combined with increased costs, Consolidated Murchison recorded a mining loss before depreciation of R79 million. The closing out of a negative gold hedging position realised a loss of R41 million.

All capital projects ceased in October 2008 in response to cash flow constraints, with total capital expenditure for the year amounting to R30 million, well below the R68 million spent in F2008. In the first few months of F2009, capital was spent on new declines, trackless machinery purchasing and the purchase of wet screens for the plant.

## Looking forward

The antimony price began to show some strength towards the end of F2009 and this should continue into F2010, relieving some of the financial pressure on the operation. However, Rand strength continues to offset some of the benefits of the higher Dollar antimony and gold prices. Capital has also been spent on critical maintenance at the plant which should return recoveries to normal levels. The mining plans demonstrate sufficient available tonnages for F2010, but constraints are apparent thereafter. The mine continues to make losses and all alternatives are being investigated to save jobs and return the operation to profitability.

# Operational review continued

## Pan African Resources plc


*Concentrate flotation froth*

**Barberton Mines (Pty) Ltd – Gold (Au)**
Barberton Mines is situated 25 kilometres southeast of the town of Nelspruit, the main business hub of the Mpumalanga Province in South Africa and 10 kilometres outside the town of Barberton.

Gold is produced from the Fairview, Sheba and Consort sections. Concentrate is produced at each mine section and trucked for final processing to the Fairview section (BIOX®, Carbon-in-Leach (CIL) and elution). Barberton was sold with effect from 1 July 2009.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 153 of 237 PageID #: 4938





*Management*
**J Nelson,** Chief Executive Officer
**K Spencer,** Chairman
**K Loots,** Finance Director
**M Gericke,** Mining Executive
**N Reynolds,** Financial Manager
**P Wiese,** New Business Executive
**R Holding,** Platinum Mining Executive
**M Bevelander,** Consulting Geologist

Barberton
(Asset held-for-sale)

| | | Year June 2008 | June 2009 |
|---|---|---|---|
| Tons milled | (t) | 315 305 | **313 952** |
| Headgrade | (g/t) | 8,91 | **10,32** |
| Overall recovery | (%) | 91 | **91** |
| Produced: Gold including Calcine dump | (kg) | 2 984 | **3 075** |
| Sold: Gold including Calcine dump | (kg) | 3 082 | **3 028** |
| Total cash cost/kg sold | (R/kg) | 111 272 | **136 251** |
| Mining profit before depreciation | (R'000) | 226 990 | **347 604** |
| Depreciation | (R'000) | 33 688 | **33 837** |
| Capital expenditure | (R'000) | 54 173 | **58 302** |

## SHEC report

*Safety performance frequency rates*

| Frequency rates | F2008 | F2009 |
|---|---|---|
| Total injury frequency rate | 50,8 | **37,8** |
| Lost time injury frequency rate | 4,8 | **6,4** |
| Reportable injury frequency rate | 3,1 | **1,7** |
| Serious injury frequency rate | 3,1 | **1,7** |
| Lost day severity rate | 11,0 | **6,2** |
| Fatality frequency rate | 0,4 | **0,0** |

## Safety

The number of lost time injuries increased compared to the previous year (2008) mainly due to a higher incidence of minor accidents. The number of serious injuries decreased significantly together with a reduction in the lost day severity rate for the year, which is an indication of the lower severity of injuries experienced.

The mine introduced a new Safety, Health, Environment and Community Development policy in February 2009 and with this initiative is striving to achieve:

- An improvement of health and safety performance through the setting and achievement of goals taking into account stakeholder expectations and industry leading practices;
- The implementation of systems to provide a working environment that is conducive to good health and safety; and
- The management of risks in the workplace and ensuring that employees have the relevant skills to perform work-related tasks in a safe manner.

## Environment

All mining and exploration activities are run with the highest level of environmental awareness realistically possible. The environmental monitoring programme has been approved by the Department of Minerals Resources. The water and air monitoring programmes are compliant with the regulations and requirements of the Department of Water Affairs and Forestry as well as the Department of Environmental Affairs and Tourism.

During the year under review, a water retreatment programme was initialised. Although this type of programme is normally associated with mine closure, the company has decided to begin this process in advance in order to responsibly manage the use of water.

# Operational review continued

## Pan African Resources plc continued

A water use licence application has been submitted to the Department of Water Affairs. The annual environmental performance audit is in progress and was completed by the end of July 2009. The auditor is conducting a gap analysis from the environmental management programme ("EMP") and prepare an amendment to address undefined issues and changes from the current EMP. The mine experienced a serious incident during the year, which involved the spillage of hydrocarbons at the Fairview workshops. The spillage was cleaned and additional controls were implemented to prevent any future recurrence.

Progress made during the year on the environmental programme:

- 58 tons of $AsO_3$ has been removed to ZINCOR.
- The waste rock dump at Fairview has been removed and re-vegetation of the area has commenced.

### Community development

Barberton Mines (Pty) Ltd is involved in a number of community development projects in the areas surrounding the mine. The Verulam lifeskills centre is situated in the Verulam township alongside the Fairview mine and focuses on the development of skills such as brickmaking, welding and boilermaking, bread making and other lifeskills in the community.

The Sinqobile vegetable project is also situated in the Verulam community and is run by the community. This project supplies fresh vegetable produce to the soup kitchen at Royal Sechaba and also sells directly to the community. The Verulam soup kitchen also benefits from the supply of vegetables and provides food to approximately 50 Aids orphans from the surrounding communities on a daily basis.

The Umjindi jewellery project is a jewellery training facility in Barberton, which runs learnership programmes with the support of the Mines Qualifications Authority (MQA). Jewellery-making apprentices from the Umjindi area benefit from the MQA programmes and the jewellery made here is sold commercially.

### Operational review

Barberton Mines milled 313,952 tons at a run-of-mine ("ROM") grade of 10,32 g/t for the financial year. This resulted in gold sales of 3,028 kg for the year, which is marginally down on 3,082 kg achieved for the F2008 year. The focus during the year was on quality reef tons rather than volumes, which resulted in gold production increasing on the previous year at 3,075 kg (2008: 2,984 kg).

At Fairview, 139,301 tons at a ROM grade of 10,10 g/t were produced. These good grades were boosted by the earlier than expected exposure of the 62/11 high-grade block. At Sheba, 103,819 tons at a ROM grade of 11,72 g/t were produced. At Consort, 70,832 tons at a ROM grade of 8,72 g/t were produced.

Gold was sold at spot prices during the past year with no production hedged. The average spot price achieved during the year in review was R251.820 per kg which was 27,4 per cent above that achieved during the previous year. The average R/US$ exchange rate achieved for the year was 16 per cent above the previous year at R9.23 to the Dollar. Mining profit before depreciation improved significantly and was R347.6 million for the year compared to R226.9 million for F2008.

Capital expenditure for the year amounted to R58.3 million, which was 7,5 per cent up on the R54.2 million spent in the previous financial year. The primary focus was on ore reserve replacement and the generation of new ore reserves and approximately 50 per cent of the capital expenditure was spent on this initiative. At Fairview, capital development to replace ore reserves progressed well and a total of 817 metres was completed on the 60/62 platform and 128 metres on the 58 level platform. Work to open up the three shaft bottom to enable the deepening of the shaft is progressing satisfactorily. Exploration drilling continues to confirm and determine the down dip extent of these ore bodies.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 155 of 237 PageID #: 4940



At Sheba, the available ore reserves at the MRC orebody are decreasing and there is a focus on capital development to replace these ore reserves in the Edwin Bray tunnel and the 35 ZK decline areas. At Edwin Bray 740 metres were developed towards the Thomas and Joe's Luck ore bodies. The 35 ZK decline was sunk for 69 metres. Exploration drilling at the Thomas and Joe's Luck ore bodies has been completed.

At Consort, ore reserve flexibility remains tight and capital development to replace ore reserves continues. At 50W 1,224 metres were sunk in the two declines which is on target to open up known pay shoots. On 45 level, 227 metres of exploration development was completed and exploration drilling confirmed the up dip extension of the Bullion orebody currently being mined on 50 level.

Capital expenditure on maintenance of the processing plants included the construction of a cyanide storage facility at the Consort plant and the replacement of three cone crushers at the Sheba and Fairview sections. The plant maintenance programme also included the replacement of a triple deck vibrating screen at Sheba and a conveyor vibrating feeder at Fairview.

The capital spend in the BIOX plant situated at Fairview included the procurement of a new set of regrind rollers for the concentrate regrind circuit and the purchase of a spare BIOX reactor gearbox for the secondary reactor tanks.

Capital expenditure on the maintenance of engineering equipment and infrastructure focused on the re-building and upgrading of the mining equipment fleet. The rehabilitation of shafts and headgears at the mine was also a critical area. This included the replacement of skips, cages and bridles together with the replacement of slack/tight rope safety devices. At Consort and Sheba sections some of the obsolete reciprocating compressors were replaced by modern and efficient screw compressors.

Capital expenditure for the general environmental and administration activities and equipment included the silencing of rock drills and work done to rehabilitate various areas on the mine together with the installation of environmental monitoring equipment at selected points on the mine. In addition the procurement and installation of an electronic clocking system was done to improve time management.

# Sustainable development

## INTRODUCTION

Metorex has a new focus on sustainability through having established the Safety, Health, Environmental and Communities ("SHEC") Board sub-committee in May 2009. This committee has the following role:

- To develop the framework, policies and guidelines for SHEC management;
- To review the policies and performance of the Group, and the ongoing implementation of such policies;
- To encourage independently managed subsidiaries, associates and significant investments to develop guidelines and practices congruent with the Company's SHEC policies;
- To receive reports covering matters relating to SHEC risks and liabilities at:
  - the head office and divisions of the Company
  - managed subsidiaries, and
  - independently managed subsidiaries and significant investments where appropriate.
- To monitor key indicators on accidents and incidents and ensure such information is communicated to other companies managed by or associated with the Company;
- To approve the SHEC content of the Company's annual report;
- To consider substantive national and international regulatory and technical developments in the SHEC fields; and
- To facilitate participation, co-operation and consultation on SHEC matters with relevant stakeholders, including but not limited to, governments, national and international organisations, other companies and other SHEC bodies.

In light of the committee's role and based upon a review of all policies in place at the various Metorex operations it was necessary to completely revamp SHEC related policies and commence with a repositioning in this regard. To this end the new policies have been ratified for implementation at the various operations throughout the Group.

### Metorex occupational health and safety policy

Metorex Limited is a diversified mining company that strives towards world-class health and safety performance. The Company aims to prevent all incidents and accidents at its operations in a reasonably practicable manner and strives to minimise hazards inherent in the working environment.

Metorex is committed to:

- Continually improving occupational health and safety performance through the setting and achievement of goals and taking into account evolving stakeholder expectations, best practices, scientific knowledge and new technology;
- Providing a working environment that is conducive to good health and safety;
- Managing risks in the workplace and ensuring that there is adequate surveillance of workplaces and employees;
- Complying with applicable legal requirements and with other requirements to which the organisation subscribes. In the absence of relevant occupational health and safety laws the Company will apply best practice standards and procedures;
- Ensuring that appropriate resources, training and personal protective equipment are provided to improve occupational health and safety;
- Ensuring that employees and contractors have the relevant skills to perform work-related tasks in a safe manner and that they are aware of their individual health and safety obligations and rights; and
- Following a consultative, transparent and constructive approach in interactions with stakeholders.

Employees and contractors working on Metorex operations play a fundamental role in achieving occupational health and safety objectives through:

- Taking ownership of, and participating in, occupational health and safety management programmes and initiatives and complying with standards and procedures; and
- Exercising their right to work in a healthy and safe environment and their duty to withdraw from an unhealthy or dangerous situation.

## Metorex environmental policy

Metorex Limited is a diversified mining company that undertakes its activities in a manner that strives to minimise or eliminate negative impacts and maximise positive impacts of an environmental or socio-economic nature. The Company is committed to responsible stewardship of natural resources and the ecological environment.

Metorex is committed to:

- Continually improving the assessment and improvement of environmental performance and the prevention of pollution through the implementation of processes, practices and techniques to avoid, reduce or control the creation, emission or discharge of any type of pollutant or waste and to reduce adverse environmental impacts;
- The integration of environmental management into management practices throughout the Company;
- Minimising the use of consumptive resources and promoting the reduction and recycling of waste products where possible;
- Rehabilitating disturbed land and protecting environmental biodiversity;
- Exercising prudence with critical ecological resources, in particular where impacts are unknown or uncertain;
- Managing environmental risk in the workplace and surrounding areas;
- Complying with applicable legal requirements and with other requirements to which the organisation subscribes and which relate to its environmental aspects;
- Training and educating employees in environmental responsibilities; and
- Being transparent and constructive in interactions with stakeholders.

Employees and contractors working on Metorex operations play a fundamental role in achieving environmental objectives through:

- Taking ownership of, and participating in, environmental management programmes and initiatives; and
- Integrating environmental concerns into everyday practice.

## Metorex communities policy

Metorex Limited is a diversified mining company that operates in different countries each with their own unique cultures. The Company strives to minimise potential negative social impacts while promoting opportunities and benefits for host communities. The Company engages in a range of sustainable development and community relations activities.

Metorex is committed to:

- Continually improving community development and community investment programmes through monitoring, measuring and managing our social and economic impacts;
- Developing programmes that ensure the sustainable welfare of communities;
- Upholding and promoting the human rights of our employees and contractors, our suppliers, and the communities in which we operate;
- Recognising and respecting indigenous people's culture, heritage and traditional rights and supporting the identification, recording, management and protection of indigenous cultural heritage;
- Building and maintaining stakeholder relationships with people who are directly affected or interested in our operations; and
- Managing the risk of public health threats amongst employees, contractors and local communities.

## SHEC AUDIT

To assess the SHEC state of play at Metorex an assessment was conducted over a three-week period during the last quarter of F2009 covering four Metorex operations, i.e. Vergenoeg Mining Company, Barberton Mines, Ruashi Mining (DRC), and Chibuluma Mines (Zambia). The focus was placed on safety, health, environmental management as well as community development. In addition, an organisational culture and leadership assessment was also conducted at the said operations.

# Sustainable development continued

## Recommendations of the audit

Based upon the recommendations of the audit Metorex is now advancing an all inclusive process with the most critical activity being the review of, or creation of, baseline risk assessments for all operations covering all SHEC related aspects. The outcome is considered critical for the development of SHEC management systems and related actions. To advance the base line risk assessments a risk management framework for Metorex is being instituted and all personnel are being trained to understand hazard identification and risk management. The whole process is being facilitated and progress will be monitored to ensure quality and the meeting of timelines.

The audit further identified that there was a need to develop and implement a Metorex SHEC management system at the operating units as no systems were found that could fully stand the test of reasonability. In the development of subsequent policies, structures, systems and operating procedures leading practice is being considered. The most cost-effective approach is to develop the Metorex SHEC management system on a centralised basis as similar systems and policies will be enforced. The teams at an operational level will be developed to resume full responsibility and accountability once the SHEC management system has been designed and implemented. The implementation includes training and overseeing of compliance with the systems. Crucial leadership training that will assist in building more effective organisational cultures and accelerate consequential thinking is also being introduced.

## SAFETY

It is pleasing to report that the Group had no fatal accidents during the year. The Metorex Safe Production Rules were introduced in March 2009 and have been developed to provide a basis for eliminating fatal and serious accidents. These rules were formulated through undertaking an historical review of the fatal and serious incidents in other mining groups. In addition new consistent safety definitions were implemented in the Group and are reflected in the various operational reports. The Group is committed to meeting South Africa's Mine Health and Safety Council ("MHSC") 2013 milestones as they relate to occupational safety and hygiene.

## OCCUPATIONAL HYGIENE

Metorex is committed to providing a healthy workplace for our employees. The major challenge is the mitigation, reduction or elimination of occupational health exposures. Where Metorex operations are unable to eliminate such exposures, the strict use of personal protective equipment is enforced to avoid adverse health effects. Occupational medical examinations are in place at all operations. Malaria and HIV/Aids remain a significant health issue for operations on the central African copper belt and Metorex continues to find the most effective ways to help address them. HIV/Aids voluntary counselling and testing and various malaria mitigation measures are in place.

## ENVIRONMENT

The operations at Metorex are in need of environmental management systems that are, at the very least, aligned with international best practice. To this end a decision was made to employ a Group Environmental Consultant and this post will be filled in November 2009. The operations comply with legislative requirements and environmental management programmes are in place at the various sites. In addition to the new environmental policy an environmental incident classification system has been introduced to highlight incidents and remedial measures as well as ensure consistency of reporting.

## COMMUNITIES

Metorex operations are intent on meeting their social licence to operate and all operations contribute to the community via their corporate social responsibility programmes. In South Africa, the operations have completed their social and labour plans and submitted these to the authorities for approval. These plans are comprehensive and cover the South African Mining Charter requirements. Statutory employment equity reports are submitted to the South African Department of Labour.

## Corporate social responsibility

| Project focus area | Locality of the project | Target groups (beneficiaries) |
|---|---|---|
| **Ruashi Mining, DRC** | | |
| Education | | |
| The complete rehabilitation of the Katuba School, this is a secondary school for 10,000 students | The school is in the suburb of Katuba, one of the largest in Lubumbashi | Children of Lubumbashi, and eventually the economy of the DRC. |
| Regular planting of trees together with environmental awareness for the children continues | Mostly in the Ruashi town, although all areas in Lubumbashi are affected | The population of Lubumbashi<br>The population of Ruashi residents, with particular emphasis on the youth |
| Social upliftment | | |
| Water and power supply, a transformer for the local power distribution has been installed in the Ruashi suburb of Kalukuluku | The Ruashi town, which is a suburb of Lubumbashi | The population of Lubumbashi |
| The repairing of roads | The Ruashi town | The population of Ruashi, and the surrounding areas |
| Participating in and sponsoring numerous clean-up campaigns | The Ruashi town | The population of Lubumbashi |
| Promoting of sport, by arranging an annual marathon and an annual soccer schools tournament | Primarily in Ruashi town, but does extend on occasions across the entire Lubumbashi | The population of Ruashi, although the marathon is open to all residents of Lubumbashi |
| Enterprise development | | |
| Utilising local entrepreneurs and artists, for various construction activities on the mine, such as wall construction, small buildings, etc | The Ruashi town | The population of Lubumbashi |
| We have a policy of utilising and purchasing from local business | The whole of Katanga | The population of Katanga |
| **Chibuluma Mines plc, Zambia** | | |
| Roads | | |
| Chief Nkana Road – pothole mending/levelling | Ex-mine through Chief Nkana village | Concentrate haulers and community |
| Airport access road – re-surfacing | Ex-mine to airport road junction | Employees and the community |
| Empowerment | | |
| Job opportunities – recruitment of locals full-time/casual posts | Chief Nkana's surrounding villages | Local community |
| Local contractors and suppliers | Mine | Local business people |
| Gender equality – female recruitment | Mine | Females with requisite qualifications |
| Sports and recreation | | |
| Soccer and rugby clubs – financial/monetary assistance | Kalulushi | Community |
| School sports sponsorship | Kalulushi | Kalulushi Trust School |
| Security | | |
| State police assistance | Kalulushi/Lufwanyama | Local community |
| Donations – material and monetary | | |
| Schools, churches, chiefs | Kalulushi/Lufwanyama | Pupils, congregants and chiefdoms |
| National events<br>– Independence Day<br>– Youth Day<br>– Women's Day<br>– Labour Day | Kalulushi/Lufwanyama | Community |

# Sustainable development continued

| Project focus area | Locality of the project | Target groups (beneficiaries) |
|---|---|---|
| **Sable Zinc, Kabwe** | | |
| Schools | | |
| Entrepreneur of the Year Award – donation | Kabwe Schools | Students |
| Social | | |
| Donation to Catholic Women's League – Fund-raising luncheon | Kabwe | The local community |
| Health | | |
| Donation of diesel for Cholera clean-up campaign | Kabwe | The local community |
| Kabwe Municipal Council | | |
| Installation of new clock in Municipal Council Clock Tower | Kabwe | The local community |
| Culture | | |
| Complete renovation and painting of St Margaret's Anglican Church | Kabwe | The local community |
| Women | | |
| Donation towards the commemoration of International Women's Day celebrations | Kabwe | The local community |
| **Vergenoeg Mining Company (VMC)** | | |
| Education and training | VMC | Two females and one male from the community on electrical and millwright learnerships |
| | Bethesda Outreach Ministries | Aids orphans |
| Social, health and arts and culture | | |
| Donations and support HIV/Aids awareness | Witlaagte | Community |
| Donations for celebrating Heritage Day | Pankop | Community |
| Erection of community hall | Witlaagte | Community |
| Job creation | | |
| Metspar production project | VMC | Community – Steve Bikoville |
| Enterprise development | | |
| Scrap removals and sales | VMC | Various local entrepreneurs |
| Transportation of staff – Moloto | VMC | Various local entrepreneurs |
| Transportation of staff – Hammanskraal | VMC | Various local entrepreneurs |
| VMC canteen | VMC | Various local entrepreneurs |
| **Consolidated Murchison Mine division** | | |
| Khomelelani community project: (hostel kitchen) | | |
| Job creation – five women operate their own business providing food to our employees. | Consolidated Murchison Mine village | Mine employees (770) |
| Lifeskills training | | |
| Education<br>Brick-laying<br>Welding<br>Cooking classes and bread-making | Training centre | Employees as well as the greater community |
| Busy-bodies Pre-school | | |
| Maintenance of the building and supply of water and electricity<br>Set monthly donation | Consolidated Murchison Mine village | Mine employee children and surrounding community<br>• 52 children in total<br>• 46 from the mine; and<br>• 6 from Gravelotte |

| Project focus area | Locality of the project | Target groups (beneficiaries) |
|---|---|---|
| **Consolidated Murchison Mine division continued** | | |
| Leseding Primary School<br>Maintenance of the building, supply cleaning material, water and electricity | Consolidated Murchison Mine village | Mine employee children and surrounding community<br>• 126 children in total<br>• 50 from Gravelotte<br>• 6 from the farms<br>• 70 from the mine |
| Gravelotte Primary School<br>Maintenance of the buildings<br>Supply water to the school<br>Pay 50 per cent of the bus transport cost to and from the mine to Gravelotte | Gravelotte | Mine employee children and surrounding community |
| Mine school bus to schools in Phalaborwa<br>Transport cost and driver's salary cost | Gravelotte/Consolidated Murch Mine Village/Phalaborwa | Mine employees |
| Water supply to Ba-Phalaborwa Municipality | Supply approximately 12,660kℓ water to Gravelotte reservoir @ R2.96 (VAT inclusive)<br>Maintenance of pump, pipes and meters | Farmers along the pipeline from Letaba pump station<br>Gravelotte residents<br>All Consolidated Murchison residents |
| Mathoma Stores (sell clothes and electrical appliances)<br>Service and job creation<br>Maintain buildings and equipment<br>Provide deduction facilities for employees at payroll department | Consolidated Murchison Mine village | Mine employee children |
| Formal training<br>Seven teachers tutor N2<br>adult basic education training ("ABET") | Training Centre Consolidated Murchison Mine | Mine employees and surrounding community<br>– N6 engineering fields<br>– 37 students<br>Tutor N2 – N6 mining fields<br>– 39 students<br>Computer training (Word, Excel and PowerPoint)<br>– 12 students<br>Grade 12 classes<br>– 33 learners |
| Churches<br>Progress Victory Centre, Old Apostle, Anglican, Apostolic Faith Mission, Dutch Reformed<br>Supply and maintain buildings (including electricity and water supply) | Consolidated Murchison Mine village and Gravelotte | Mine employees and surrounding communities |
| BBR Nyati health care<br>24-hour clinic, medical surveillance and primary health care | Consolidated Murchison Mine village | Mine employees and the greater community |
| Meisie se winkel<br>Mariaan se winkel<br>Wisani Café J C I Hostel bar<br>Job creation and service | | Mine employees and surrounding communities |

# Corporate governance

## INTRODUCTION

Our vision at Metorex is to grow our mining activities in southern Africa by acquiring, developing and managing a portfolio of quality long-life mineral resource projects.

Our management philosophy is that of centralised strategic logic, combined with a strong decentralised profit centre concept at operational level, which gives management at our mines the confidence and flexibility to conduct their operations efficiently. The elements that contribute to the success of Metorex include a natural caution, operational leanness, controlled overheads, rigid cost control, strong accountability, efficient capital expenditure, utilisation of specialist consultants, and the quality of the orebody.
Best business practice in respect of corporate governance and internal controls throughout the Group were adhered to and specifically with regard to:

## COMPLIANCE WITH THE KING II REPORT ON CORPORATE GOVERNANCE

The Metorex Group endorses the code of corporate governance as set out in the King II Report as well as in the Listings Requirements of the JSE. In the opinion of the directors, the Group has complied in all material aspects with the code of King II and the JSE throughout the current financial year.

In supporting the code, the Board reviews and enhances the Group's systems of internal control and governance on a continual basis to ensure that its business is managed ethically and in conformity with accepted standards of best practice. The directors of Metorex are committed to the principles of fairness, accountability, responsibility and transparency in all their dealings with our stakeholders.

## CODE OF ETHICS

The Group's code of ethics requires all employees within the Group to act with the utmost good faith and integrity in all transactions and with all stakeholders with whom they interact. It commits Metorex and its employees to sound business practices and compliance with legislation.

Metorex is committed to operating in accordance with the highest standards of professional and business ethics by maintaining a Board of directors and management as well as the development of a community of employees with the highest ethical levels.

The Company has developed a code of ethics which complies with sound corporate governance principles, and has the full support of the Board of directors and senior management. The Company has also established a method for reporting fraud which is well communicated to all staff and management. Further insight regarding the Company's code of ethics can be obtained via our website: www.metorexgroup.com.

Amongst the principles to which the directors, management and employees dedicate themselves are:

- compliance with legislative and regulatory provisions;
- the protection of human life by following sound safety, health and environmental practices;
- treating all employees and stakeholders with respect;
- not discriminating against any person;
- providing employees with equality of opportunity, based on merit;
- ensuring that the quality of life of stakeholders is maintained by seeking to improve, rather than adversely affect, the environment;
- upholding the integrity of all stakeholders;
- respecting the cultural background of stakeholders;
- avoiding all potential conflicts of interest by being transparent in the declaration of all interests;
- only using Company resources for the benefit of the Company and its shareholders; and
- providing all employees with the opportunity to grow and advance.

## THE BOARD

The Board of directors sets overall Group policy, which provides input and makes decisions on matters of strategic importance.
The roles of the Chairman and Chief Executive Officer are separated to ensure that no one person has unfettered powers.

The main responsibilities of the Board are to:

- determine the Company's purpose and values;
- determine the strategy to achieve its purpose;
- exercise leadership, enterprise, integrity and judgement in directing the Company so as to achieve continuing prosperity for its shareholders;
- ensure that procedures and practices are in place that protect the Company's assets and reputation;
- monitor and evaluate the implementation of strategies, policies, management performance criteria and business plans;
- ensure that the Company complies with all the relevant laws, regulations and codes of best business practice;
- ensure that technology and systems used in the Company are adequate to run the business properly and for it to compete through the efficient use of its assets, processes and human resources;
- identify key risk areas and key performance indicators of the business in order for the Company to generate economic profit, so as to enhance shareholders' value in the long term;
- regularly assess its performance and effectiveness as a whole; and that of individual directors, including the CEO; and
- ensure that the Company has developed a succession plan for its executive directors and senior management.

The Board of directors meets quarterly and is responsible for preparing financial statements, monitoring executive management and exercising control over Group activities.

## ANNUAL FINANCIAL STATEMENTS

In accordance with the requirements of the Companies Act, 1973, the directors are responsible for the preparation of annual financial statements, which fairly present the state of affairs of the Company and the Group and that the accounting policies, supported by reasonable and prudent judgements and estimates, have been applied consistently. The directors are further responsible for ensuring that applicable accounting standards have been adhered to. The external auditors are responsible for carrying out an independent examination of the financial statements and reporting their findings thereon in accordance with statements of International Standards on Auditing.

## ACCOUNTABILITY AND CONTROL

The Board of directors recognises its responsibilities to retain full and effective control over the Group, review strategy, plan operational and financial performance, consider acquisitions, disposals and major capital expenditures, manage stakeholder communications and other material matters reserved for its decisions. There is also a provision in the Group's articles of association for decisions to be taken between meetings by way of directors' written resolutions.

The directors set standards and management implements systems of internal control to meet their responsibilities aimed at reducing the risk of error, fraud or loss in a cost-effective manner. This includes the proper delegation of responsibilities within a defined framework, accounting procedures and adequate segregation of duties. These controls are monitored throughout the Group, and all employees are required to maintain the highest ethical standards to ensure that business practices are conducted in a beyond-reproach manner under reasonable circumstances.

The directors are of the opinion, based on information obtained from management as well as internal and external auditors, that the internal accounting controls are adequate, and the financial records may be relied on for the preparation of the financial statements as presented.

**Board composition**

| | | |
|---|---|---|
| Mr Robert Still | – Non-Executive Chairman | |
| Mr Terence Goodlace | – Chief Executive Officer | |
| Mr Alberto Barrenechea | – Non-Executive Director | |
| Mr Pierre Chevalier | – Non-Executive Director | |
| Mr John Hopwood | – Independent Non-Executive Director | – Appointed November 2009 |
| Mr Nkuli Kgositsile | – Independent Non-Executive Director | |
| Mr Victor Mabuza | – Independent Non-Executive Director | |
| Mr Les Paton | – Independent Non-Executive Director | |
| Mr Maritz Smith | – Chief Financial Officer | |

# Corporate governance continued

## ROTATION AND SELECTION PROCESS OF DIRECTORS

The retirement of directors follows a staggered process, with one-third of the directors retiring at each annual general meeting, and no director serving for more than three years without being re-elected by the members in general meeting. Retiring directors are free to make themselves available for re-election and may, as such, be re-elected at the annual general meeting at which they retire. All new directors appointed during the year are also subject to the approval of the shareholders. A summarised curriculum vitae of each retiring director is circulated to shareholders with the notice of annual general meeting, in terms of the Company's articles of association.

The Company in general meeting may also from time to time increase or reduce the number of directors and may also determine in what rotation such increased or reduced number is to go out of office.

Non-Executive directors are individuals of calibre and credibility, and have the necessary skill and experience to bring judgement to bear, independent of management, on issues of strategy, performance, resources, transformation and diversity and they also maintain the balance of power between shareholders and management. Non-Executive directors do not receive any remuneration from the Company for their services as directors other than the fees as reflected in the annual financial statements (refer to note 29 of the financial statements).

All Non-Executive directors receive remuneration in the form of share options in line with the Company's previous remuneration policies (refer to note 29 of the annual financial statements).

### Executive directors

Executive directors are directors that are involved in the day-to-day management and running of the business and are in full-time salaried employment of the Company.

### Non-Executive directors

Non-Executive directors are directors that are not involved in the day-to-day management of the business and are not full-time salaried employees of the Company and/or any of its subsidiaries.

### Board committees

In order to aid and assist the Board and its directors in discharging their duties and responsibilities, specific responsibilities have been allocated to four committees, namely: the Audit Committee, the Remuneration Committee, Nomination Committee and the SHEC Committee.

All the Board committees are chaired by a Non-Executive director and these committees are free to seek independent, professional advice at the Company's expense if so required. Mr R G Still was appointed as a temporary Executive Chairman as announced 20 January 2009. This term ended in May 2009.

### Audit Committee

Messrs A J Laughland (Chairman) and R G Still serve as members of the Audit Committee, which meets semi-annually. Three meetings were held in the current financial year. Subsequently, Mr J G Hopwood was appointed Chairman and Mr A J Laughland retired.

The Audit Committee has satisfied itself that Mr M Smith has the appropriate expertise and knowledge to fulfil the role of Financial Director.

The external and internal auditors have unrestricted access to the committee and representatives of the external auditors attend the committee meetings by invitation.

The principal functions of the committee, as set out in the formal terms of reference, are to review the financial statements and accounting policies, the effectiveness of internal controls and to review and discuss the risks facing the Group and the findings and recommendations of the internal and external auditors, as well as the appointment of the auditors, the remuneration, scope of the audit and the control of the internal audits. The use of auditors for non-audit services is controlled by the committee. Deloitte & Touche was involved in the capital raising initiative and provided the accountant's report.

### SHEC Committee

Messrs L J Paton (Chairman), T P Goodlace, D Castle and T J Faber serve as members of the SHEC Committee, which meets at least quarterly. Metorex has engaged an external consultant, Mr H Moorcroft, to advise the Group and SHEC Committee on safety and health matters. In addition a new Group Environmental Consultant will be appointed to the Group with effect 15 November 2009. Subsequent to year-end N Kgotsitsile joined the SHEC Committee.

One meeting was held in the current financial year as this committee was established on 14 May 2009.

The principal role of the committee is highlighted on page 42 – 44.

### Remuneration Committee and Nomination Committee

The Remuneration Committee, which comprises Messrs V Mabuza (Chairman), A Barrenechea, L J Paton and R G Still, meets quarterly and reviews directors' and senior management's salaries. This is done by reviewing salaries in the marketplace to ensure that the Company is competitive and offers reward for individual contributions which enhance the performance and achievements of the Group. The directors' remuneration and emoluments are disclosed in the annual financial statements (refer to note 29).

The committee also puts recommendations forward with regard to new share option grants in terms of the Group Share Incentive Plan. This is done by reviewing similar trends in the marketplace, assessment of management performance as well as Group and subsidiary performance.

The Nomination Committee comprises Messrs R G Still (Chairman) and L J Paton.

### Board and committee meeting attendance

Year ended 30 June 2009

| | Board | | Audit | | Remuneration Committee | | SHEC | |
|---|---|---|---|---|---|---|---|---|
| | Held while member | Attended | Held while member | Attended | Held while member | Attended | Held while member | Attended |
| R G Still (Chairman) | 6 | 6 | 3 | 2 | 3 | 3 | | |
| T P Goodlace (CEO) | 2 | 2 | | | 1# | 1# | 1 | 1 |
| A Barrenechea | 6 | 6 | | | 3 | 3 | | |
| P Chevalier | 3 | 2 | | | | | | |
| A J Laughland | 6 | 5 | 3 | 3 | | | | |
| L J Paton | 3 | 3 | | | 3 | 3 | 1 | 1 |
| M Smith (CFO) | 6 | 6 | 3 | 3# | 1# | 1# | | |
| A S Malone | 4 | 4 | | | | | | |
| C D S Needham | 6 | 6 | 1 | 1 | | | | |
| E W Legg | 5 | 5 | | | | | | |
| K C Spencer | 4 | 4 | | | | | | |

# *By invitation*

## DIRECTORS' INTERESTS

The declaration of directors' interests is a standard item on the Board agenda. A register of interests is maintained and retained by the Company Secretary. When a director declares an interest in a specific matter, such director is recused from voting on such matter.

# Corporate governance continued

## INTERNAL CONTROL

The directors set policies and management implements systems of internal control to meet their responsibilities aimed at reducing the risk of error, fraud or loss in a cost-effective manner. This includes the proper delegation of responsibilities within a defined framework, accounting procedures and adequate segregation of duties. These controls are monitored throughout the Group, and all employees are required to maintain the highest ethical standards to ensure that business practices are conducted in a beyond-reproach manner under reasonable circumstances.

The directors are of the opinion, based on information obtained from management as well as internal and external auditors, that the internal accounting controls are adequate, and the financial records may be relied on for the preparation of the financial statements as presented.

## INTERNAL AUDIT

The internal audit function is currently performed by Moore Stephens MWM. This function provides management with an independent objective consulting and assurance service that reviews matters relating to control, risk management and corporate governance.

The function's responsibility is to independently assess and appraise the systems of internal control and the policies and procedures of the Group, in order to monitor how adequate and effective they are in ensuring the achievement of organisational objectives, the relevance, reliability and integrity of management and financial information, the safeguarding of assets and compliance with relevant policies, procedures, laws and regulations.

The internal audit function reports directly to the Audit Committee. Bi-annual operational visits are undertaken to each of our operations and the results of these audits are tabled at Audit Committee meetings. A corporate governance review was also conducted by the internal audit function during the financial year.

## RISK MANAGEMENT

The Board of directors accepts its accountability and responsibility for risk management and has delegated to the Audit Committee responsibility for monitoring strategic risks. A consolidated Group risk register is presented to the Metorex Board every six months.

The Board of directors meets quarterly and is responsible for the Group's system of internal financial and operational control. The Group's internal controls are designed to provide reasonable, but not absolute, assurance with regard to the integrity and reliability of the financial statements and to safeguard, verify and maintain accurate records of the Group's assets and efficient management of the Group's resources, and facilitate the early detection of potential fraud, liability, loss and material misstatement, whilst complying with applicable laws and regulations.

During the year under review, nothing has come to the attention of the directors to indicate that any material breakdown in the functioning of these controls, procedures and systems has occurred. A material breakdown is defined as a critical weakness in process or financial systems which could result in a material loss, contingency or uncertainty requiring disclosure in the published annual financial statements.

The Board of directors is responsible for the maintenance of proper disaster management policies at an operational and Group level, to ensure prompt effective action in case of any emergencies during the course of general business operations.

Effective risk management is about identifying the potential risks which can impact the enterprise's objectives, improving understanding of the causes and consequences of those risks, and working to reduce uncertainty and/or increase the ability to control events or outcomes.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 167 of 237 PageID #: 4952



Some of the risks associated with our entities and to which they, to the best of their abilities, attempted to mitigate directly, are:

### Financial

- volatility in commodity prices, which are subject to normal supply and demand pressures as well as, increasingly, speculative activity;
- foreign exchange rate volatility, as a result of product sales and costs being Dollar denominated;
- interest-rate risk;
- inflation;
- credit and liquidity risks;
- rising labour, commodity input costs, sourcing bottlenecks and financing costs; and
- risk financing.

### Political

- changes in the regulatory environment and associated costs;
- potential political instability in countries in which the Group operates; and
- security of tenure of operations.

### Operational

- unexpected events which may impact on production targets being met;
- logistical risks to and from the DRC;
- ore reserves – forecasting and delivery; and
- exploration and project development risks, due to long-lead times and uncertainty inherent in these activities.

### Environmental and social

- the cost impact of increasingly stringent environmental and social requirements and potential unexpected changes to these requirements;
- local community demands and expectations;
- infrastructure development and reliability can significantly impact on costs; and
- climate/weather can have an important bearing on the consistency of operating results.

### Health and safety

- HIV, malaria, TB and other diseases;
- occupational health and safety risks; and
- risk of changes to health and safety legislation and the potential costs of these.

### Human resources

- the cost of training and retaining employees due to a lack of skills and experience in the industry.

Within Metorex Limited it is the Board's responsibility to ensure that the Company maintains a system of internal financial controls to provide reasonable assurance regarding the reliability of the financial information used within the business for publication and that assets are safeguarded. The Board has delegated this duty to the Audit Committee which regularly reviews risk identification and mitigation procedures and reports back to the Board.

Economic risk is the danger that the economy as a whole will perform poorly. When the whole economy experiences a downturn, it affects stock prices, the job market, and the prices of consumer products.

Market risk is the chance that the entire market will decline, thus affecting the prices and values of securities. Market risk in turn, is influenced by outside factors such as interest rate changes.

Inflation risk is the danger that the currency invested in will buy less in the future because prices of consumer goods rise. When the rate of inflation rises, investments have less purchasing power. This is especially the case with investments that earn fixed rates of return. For as long as investments are held at constant rates, they are threatened by inflation. Inflation risk is tied to interest-rate risk, because interest rates often rise to compensate for inflation.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 168 of 237 PageID #: 4953


# Corporate governance continued

Industry risk is the chance that a specific industry will perform poorly. When problems plague one industry, they affect the individual business involved, as well as the securities issued by those businesses. They may also cross over into other industries.
The Group's financial risk management activities are also discussed in note 25 to the financial statements.

## COMPANY SECRETARY AND PROFESSIONAL ADVICE

The Company Secretary is appointed by the Board. The Company Secretary's statement of compliance is set out on page 56 of the financial statements.

All directors have access to the advice and services of the Company Secretary, who is responsible to the Board for ensuring compliance with procedures and regulations of a statutory nature. Furthermore, all directors are entitled to seek independent professional advice concerning the affairs of the Group at the Group's expense, should they believe that course of action would be in the best interests of the Group.

The Company Secretary is also responsible for alerting directors to any relevant changes to the Companies Act, the Insider Trading Act and the JSE Listings Requirements, as well as any other statutory regulations or laws affecting them in their capacity as directors.

## EMPLOYMENT EQUITY

The Group is committed to providing fair and equitable treatment for all employees and creating a workplace in which individuals of ability and application can develop rewarding careers at all levels, regardless of ethnicity or gender, and is in the process of executing an employment equity programme that focuses strongly on providing training and development opportunities for historically disadvantaged groups.

In compliance with the Employment Equity Act (1998), the Group submitted a report and future action plan to government and has been working towards achieving those targets set out in the report and action plan.

## GOING CONCERN

Subject to a successful implementation of the Group's strategy aimed at reducing and restructuring the Ruashi project debt, the directors are satisfied that the Group will be a going concern for the foreseeable future, and have adopted the going-concern basis in preparing these financial statements.

## STAKEHOLDER COMMUNICATION

The Group is committed to transparency and to ensuring regular and open communication with its various stakeholders. The members of the Group's Executive Committee, and more specifically the executive directors, are available at all times to address shareholder queries and concerns. All communication takes full cognisance of the obligations placed on the Group by its listing and the regulatory environment in which it operates.

The Group's communication with its shareholders is premised on a clear understanding of shareholders' desire to maximise returns on investment and that, in order to do so, they and/or their advisers require equitable, timeous access to operating, financial and other information relevant to the health of the Group.

Information defined or deemed to be influential on the Group's share price is first released to the market via the JSE Limited's Stock Exchange News Service ("SENS") and, as soon as possible thereafter, to local and international media and to the addressees on the Group's electronic shareholder database. These addressees include shareholders, fund managers, and analysts. All information is also available on the Group's website.

Information relating to the Group's operating and financial performance is released proactively to the market at least bi-annually in the same way, and sometimes more frequently, as determined by circumstances. The Group disseminates its results by means of a leaflet which is distributed to all shareholders on the database.

The Group hosted frequent analysts' briefings during the year under review and will be hosting such briefings on a regular basis in the future.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 169 of 237 PageID #: 4954



# Annual financial statements

2009







## Contents

**Annual financial statements**
**56** Group secretary's certification
**56** Directors' approval
**57** Independent auditors' report
**58** Directors' report
**60** Income statements
**61** Balance sheets
**62** Cash flow statements
**63** Notes to the cash flow statements
**64** Statements of changes in equity
**65** Notes to the annual financial statements

# Group secretary's certification

I hereby certify that Metorex Limited has lodged with the Registrar of Companies all such returns as are required of a public company in terms of section 268G(d) of the Companies Act, 1973. All such returns are true, correct and up to date.

per O Barbeau

**MOORE STEPHENS MWM INC.**
Group Secretary

4 November 2009

# Directors' approval

**TO THE MEMBERS OF METOREX LIMITED**

The directors of the Company and Group are responsible for the preparation and integrity of the annual financial statements and related financial information included in this report. The financial statements have been prepared in accordance with International Financial Reporting Standards and the Companies Act of South Africa and incorporate full and responsible disclosure in line with the accounting philosophy of the Group and Company.

The directors are responsible for the maintenance of adequate accounting records, the preparation and integrity of the Group and Company annual financial statements and all related information. The directors are also responsible for the systems of internal control which are designed to provide reasonable, but not absolute, assurance as to the reliability of the financial statements and to adequately safeguard, verify and maintain accountability of assets and to prevent and detect material misstatement and loss.

Subject to the successful implementation of the Group's strategy aimed at reducing and restructuring the Ruashi project debt, the directors are satisfied that the Group will be a going concern for the foreseeable future, and have adopted the going-concern basis in preparing these financial statements.

It is the responsibility of the external auditors to express an opinion on the financial statements and their opinion is included on page 57.

The annual financial statements, set out on pages 58 to 96, were approved by the Board of directors on 4 November 2009 and are signed on its behalf by:

**R G Still**
Chairman

**T P Goodlace**
Chief Executive Officer

# Independent auditors' report

**TO THE MEMBERS OF METOREX LIMITED**

We have audited the Group annual financial statements and annual financial statements of Metorex Limited which comprise the consolidated and separate balance sheets as at 30 June 2009, and the consolidated and separate income statements, the consolidated and separate statement of changes in equity and consolidated and separate cash flow statement for the year then ended, and a summary of significant accounting policies and other explanatory notes, and the directors' report as set out on pages 58 to 96.

**Directors' responsibility for the financial statements**

The Company's directors are responsible for the preparation and fair presentation of these financial statements in accordance with International Financial Reporting Standards, and in the manner required by the Companies Act of South Africa. This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

**Auditors' responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgement, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements present fairly, in all material respects, the financial position of Metorex Limited as at 30 June 2009, and its consolidated and separate financial performance and consolidated and separate cash flows for the year then ended in accordance with International Financial Reporting Standards, and in the manner required by the Companies Act of South Africa.

**Emphasis of matter**

Without qualifying our opinion, we draw attention to the directors' statement that subject to the successful implementation of the Group's strategy aimed at reducing and restructuring the Ruashi project debt, they are satisfied that the Group will be a going concern for the foreseeable future, and have adopted the going-concern basis in preparing these financial statements.

**Deloitte & Touche**
Per IT Marshall
Partner

4 November 2009

National Executive: G G Gelink Chief Executive, A E Swiegers Chief Operating Officer, G M Pinnock Audit, D L Kennedy Tax and Legal and Financial Advisory, L Geeringh Consulting, L Bam Corporate Finance, C R Beukman Finance, T J Brown Clients and Markets, N T Mtoba Chairman of the Board, C R Qually Deputy Chairman of the Board.
A full list of partners and directors is available on request.
BBBEE rating: Level 3 contributor/AA (certified by Empowerdex)
Member of Deloitte Touche Tohmatsu

# Directors' report

## NATURE OF BUSINESS

Metorex is an established mid-tier mining company, listed on the JSE Limited (JSE). Metorex was delisted from the London Stock Exchange Plc (LSE) effective 9 March 2009. In addition, Metorex has a level 1 ADR programme sponsored by the Bank of New York. The Company owns and manages quality mining projects on a decentralised profit-centre basis, and provides technical, administrative and financial support to operational management.

## FINANCIAL RESULTS

The results for the year are set out in the audited annual financial statements which appear on pages 58 to 96.

## ASSETS HELD-FOR-SALE

The financial statements for the year ended 30 June 2009 were prepared on the basis of the Pan African and Consolidated Murchison assets being held-for-sale. This follows the disposal of Pan African subsequent to year-end and the Group's intention to exit the Consolidated Murchison operation. The Group's continuing operating assets at year-end are Vergenoeg, Chibuluma Mines plc ("Chibuluma"), Ruashi and Sable Zinc Kabwe Limited. The operational results from these assets other than the Ruashi project comprise mining profit as reported in the consolidated income statement with comparatives having been reclassified as assets held-for-sale in terms of IFRS 5: *Non-current Assets Held-for-Sale and Discontinued Operations*. Refer note 31.

## SPECIAL RESOLUTIONS ADOPTED

A special resolution to increase the authorised share capital of the Company from 500 000 000 shares to 1 500 000 000 shares was adopted during the current year.

## SHARE CAPITAL

The authorised and issued share capital of the Company is detailed in note 17 to the annual financial statements.
The shares issued during the year are as follows:

***Shares issued:***
- 8 July 2008: 18 250 shares at R24 per share to acquire a further interest in CRC; and
- 2 September 2008: 1,2 million shares at R16 per share as payment towards mineral rights.

The values were determined in accordance with the respective agreements.

***Capital raising:***
- 24 December 2008: private placement of 242,5 million shares for cash at R2 per share; and
- 19 January 2009: 129,5 million shares issued for cash followed by a clawback offer at R2 per share.

A cumulative amount of 33,9 million (2008: 14,1 million) share options are available for implementation or exercise in terms of the Metorex Limited Share Incentive Scheme. Share options are offered at the ruling market price and vest between one and five years after their grant. Options on 26,5 million shares at a weighted average price of R1.78 per share were offered to Group employees during the year, significantly out of the money options were amended, and 0,4 million share options were exercised at an average price of R2.45 per share.

### Directors

| | | | |
|---|---|---|---|
| R G Still (Chairman)* | | T V Mabuza*^^ | appointed 11/08/2009 |
| T P Goodlace (Chief Executive Officer) | appointed 02/03/2009 | L J Paton*^^ | appointed 01/12/2008 |
| A Barrenechea*# | | A S Malone | resigned 20/01/2009 |
| A J Laughland*~^^ | resigned 31/10/2009 | C D S Needham | resigned 11/08/2009 |
| M Smith (Chief Financial Officer) | appointed 01/12/2008 | E W Legg | resigned 01/07/2009 |
| P Chevalier*^ | appointed 20/01/2009 | K C Spencer | resigned 31/03/2009 |
| N N Kgositsile*^^ | appointed 11/08/2009 | J G Hopwood*^^ | appointed 01/11/2009 |

**Non-Executive; ~British; #Spanish; ^Belgian; ^^Independent*

## GROUP COMPANY SECRETARY

Moore Stephens MWM Inc
7 West Street, Houghton 2198, South Africa
(PO Box 1574, Houghton 2041)

## DIRECTORS' INTERESTS IN THE COMPANY

The interests of the directors in the issued share capital of the Company at the end of the financial year were:

| | Beneficial 2008 | | **Beneficial 2009** | |
|---|---|---|---|---|
| | Direct | Indirect | **Direct** | **Indirect** |
| T P Goodlace | – | – | **–** | **–** |
| C D S Needham | 2 092 346 | – | **2 092 346** | **–** |
| A Barrenechea | – | 51 587 253* | **–** | **99 359 211** |
| A J Laughland | – | – | **–** | **–** |
| E W Legg | 222 000 | 300 000 | **299 567** | **404 820** |
| R G Still | – | 478 403 | **–** | **9 491 545** |
| M Smith | – | – | **–** | **–** |
| | 2 314 346 | 52 365 656 | **2 391 913** | **109 255 576** |

**Pro rata shares adjusted in order to reflect gross shares held by companies related to Mr A Barrenechea.*

## DIVIDENDS

In view of the funding requirements and the strategy to reduce and restructure the Ruashi debt, the Board considers it inappropriate to declare a dividend for the year ended 30 June 2009 (2008: Rnil).

## SUBSIDIARIES

Refer to note 14 of the annual financial statements for details of subsidiary companies.

The aggregated after-tax earnings attributable to the Group from its subsidiaries were R370 million (2008: R609 million). The aggregated after-tax losses attributable to the Group from its subsidiaries were R299 million (2008: Rnil).

## SUBSEQUENT EVENTS

On 25 June 2009, the Group announced the disposal of its entire shareholding in Pan African Resources plc for R386 million, subject to certain conditions precedent. These conditions have subsequently been fulfilled and accordingly this two-tiered transaction became unconditional on 1 July 2009 and 20 August 2009 respectively. Through this sale Pan African is now an empowered company with 26 per cent of its shareholding being held by Shanduka.

On 29 July 2009, the Group announced the disposal of 15 per cent of the issued ordinary share capital of Vergenoeg to Medu Capital, a consortium of black economic empowerment (BEE) controlled entities, for a cash consideration of R108.8 million.

On 23 September 2009, the Group announced the proposed disposal of its entire remaining shareholding in Vergenoeg comprising 137 500 ordinary shares constituting 55 per cent of the issued ordinary share capital of Vergenoeg to Minersa, currently a 30 per cent shareholder in Vergenoeg, for a cash consideration of US$60 million. This transaction is still subject to a number of conditions precedent, including shareholder approval.

## GOING CONCERN

Subject to the successful implementation of the Group's strategy aimed at reducing and restructuring the Ruashi project debt, the directors are satisfied that the Group will be a going concern for the foreseeable future, and have adopted the going-concern basis in preparing these financial statements.

## MAJOR SHAREHOLDERS (UNAUDITED)

At 30 June 2009 the following shareholders held more than five per cent of the 742 538 403 ordinary shares in issue:

| Shareholder | Number of shares | % of shares |
|---|---|---|
| Industrial Development Corporation (IDC) | 112 756 899 | 15,18 |
| Minerales Y Productos Derivados S.A. | 66 982 297 | 9,02 |
| CIB Strategic No 2 Standard Bank of South Africa Limited | 61 000 000 | 8,21 |
| Usat Nominees (Pty) Limited | 55 598 523 | 7,49 |

As far as can be ascertained from the register of members, and to the best of the directors' knowledge, there were no other holders of five per cent or more in the capital of the Company at that date.

### Analysis of shareholders (unaudited)

| Range of shareholding | Number of shareholders | % of shareholders | Number of shares | % of shares |
|---|---|---|---|---|
| 0 – 1 000 | 1 751 | 26,58 | 893 668 | 0,12 |
| 1 001 – 5 000 | 2 427 | 36,84 | 6 406 652 | 0,86 |
| 5 001 – 10 000 | 910 | 13,81 | 6 851 558 | 0,92 |
| 10 001 – 50 000 | 1 021 | 15,50 | 23 365 934 | 3,15 |
| 50 001 – 100 000 | 158 | 2,40 | 11 440 576 | 1,54 |
| 100 001 – 1 000 000 | 243 | 3,69 | 74 232 021 | 10,00 |
| 1 000 001 and above | 78 | 1,18 | 619 347 994 | 83,41 |
| | **6 588** | **100,00** | **742 538 403** | **100,00** |
| Individuals | 5 226 | 79,33 | 77 011 882 | 10,37 |
| Banks and trust funds | 499 | 7,57 | 41 244 779 | 5,55 |
| Companies | 825 | 12,52 | 599 111 845 | 80,69 |
| Corporate bodies | 38 | 0,58 | 25 169 897 | 3,39 |
| | **6 588** | **100,00** | **742 538 403** | **100,00** |
| Non-public shareholders | 4 | 0,06 | 111 647 489 | 15,04 |
| Directors | 2 | 0,03 | 2 796 733 | 0,38 |
| Associates | 2 | 0,03 | 108 850 756 | 14,66 |
| Public shareholders | 6 584 | 99,94 | 630 890 914 | 84,96 |
| | **6 588** | **100,00** | **742 538 403** | **100,00** |

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 174 of 237 PageID #: 4959



# Income statements

| | | Group | | Company | |
|---|---|---|---|---|---|
| | Notes | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| Revenue | | | | | |
| Mineral sales | | | | | |
| Copper | | 1 247 710 | **866 407** | – | **–** |
| Cobalt | | 111 436 | **70 677** | – | **–** |
| Fluorspar | | 255 643 | **304 637** | – | **–** |
| Gross revenue | | 1 614 789 | **1 241 721** | – | **–** |
| Realisation costs | | 268 715 | **204 894** | – | **–** |
| On-mine revenue | | 1 346 074 | **1 036 827** | – | **–** |
| Cost of production | 2 | 642 477 | **895 871** | 38 085 | **62 186** |
| Mining profit/(loss) | | 703 597 | **140 956** | (38 085) | **(62 186)** |
| Other (expenses)/income | 4 | (22 425) | **147 623** | 116 129 | **100 355** |
| Impairments | 5 | – | **(2 273 429)** | – | **(1 648 110)** |
| Held-for-sale assets, net of tax | 31 | 245 090 | **63 809** | 19 763 | **(142 415)** |
| Discontinued operations | 31 | (8 859) | **(438)** | – | **–** |
| Reverse acquisition of PAR | | | | 376 967 | **–** |
| Finance income | 6 | 7 764 | **7 871** | 55 570 | **17 877** |
| Finance costs | 6 | (9 287) | **(7 621)** | (2 358) | **(18 453)** |
| Profit/(loss) before taxation | 7 | 915 880 | **(1 921 229)** | 527 986 | **(1 752 932)** |
| Income tax expense/(credit) | 8 | 219 786 | **(380 785)** | 82 974 | **(84 639)** |
| Profit/(loss) for the year from continuing operations | | 696 094 | **(1 540 444)** | 445 012 | **(1 668 293)** |
| Attributable to: | | | | | |
| Equity holders of the parent | | 554 552 | **(1 507 218)** | 445 012 | **(1 668 293)** |
| Minority interests | | 141 542 | **(33 226)** | | |
| | | 696 094 | **(1 540 444)** | 445 012 | **(1 668 293)** |
| From continuing and discontinued operations: | | | | | |
| Basic earnings (loss) per share (cents) | 9 | 159,4 | **(272,4)** | | |
| Diluted earnings (loss) per share (cents) | 9 | 156,5 | **(272,4)** | | |
| From continuing operations: | | | | | |
| Basic earnings (loss) per share (cents) | 9 | 161,9 | **(272,3)** | | |
| Diluted earnings (loss) per share (cents) | 9 | 159,0 | **(272,3)** | | |

**Restated for assets held-for-sale.*

# Balance sheets

| | | Group | | Company | |
|---|---|---|---|---|---|
| | Notes | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **ASSETS** | | | | | |
| **Non-current assets** | | | | | |
| Property, plant and equipment | 11 | 2 823 685 | **3 467 738** | 482 | **574** |
| Mineral rights | 11 | 2 701 699 | **1 367 689** | 13 943 | **–** |
| Goodwill | 12 | 11 514 | **11 514** | 11 514 | **11 514** |
| Investments | 13 | 3 443 | **79 718** | 3 443 | **16 487** |
| Derivative financial instrument | 25 | – | **94 942** | – | **–** |
| Deferred tax asset | 22 | 1 354 | **–** | – | **–** |
| Subsidiaries | 14 | | | 2 732 493 | **2 296 762** |
| Rehabilitation trust fund | 21 | 6 450 | **779** | – | **–** |
| | | 5 548 145 | **5 022 380** | 2 761 875 | **2 325 337** |
| **Current assets** | | | | | |
| Inventories | 15 | 300 143 | **264 051** | – | **–** |
| Trade and other receivables | 16 | 572 101 | **447 628** | 79 215 | **13 381** |
| Derivative financial instruments | 25 | 189 | **–** | – | **–** |
| Group companies | | | | 68 609 | **–** |
| Current tax assets | | 13 900 | **6 194** | – | **–** |
| Bank balances and cash | 24 | 119 066 | **73 553** | 11 204 | **6 800** |
| | | 1 005 399 | **791 426** | 159 028 | **20 181** |
| Assets held-for-sale | 31 | 1 414 185 | **1 078 229** | 671 364 | **406 309** |
| **Total assets** | | 7 967 729 | **6 892 035** | 3 592 267 | **2 751 827** |
| **EQUITY AND LIABILITIES** | | | | | |
| **Capital and reserves** | | | | | |
| Share capital | 17 | 36 917 | **74 255** | 36 917 | **74 255** |
| Share premium | 17 | 2 292 746 | **2 979 136** | 2 292 746 | **2 979 136** |
| Hedging and translation reserve | 18 | (167 546) | **(319 870)** | 16 480 | **(11 846)** |
| Retained earnings | | 1 389 089 | **(118 129)** | 1 038 285 | **(630 008)** |
| Share option reserve | | 21 797 | **47 586** | 6 813 | **21 375** |
| Equity reserve | | (117 300) | **(117 300)** | (108 378) | **(108 378)** |
| Assets held-for-sale | | (5 599) | **(146 219)** | (30 026) | **264** |
| Equity attributable to equity holders of parent | | 3 450 104 | **2 399 459** | 3 252 837 | **2 324 798** |
| **Minority interest** | 19 | 683 570 | **457 208** | | |
| Total equity | | 4 133 674 | **2 856 667** | 3 252 837 | **2 324 798** |
| **Non-current liabilities** | | | | | |
| Long-term liabilities | 20 | 1 342 935 | **1 415 563** | 57 934 | **–** |
| Long-term provisions | 21 | 171 038 | **179 486** | – | **–** |
| Deferred tax liabilities | 22 | 799 236 | **469 292** | 108 195 | **33 970** |
| Post-retirement medical aid | 23 | 1 599 | **1 824** | – | **–** |
| | | 2 314 808 | **2 066 165** | 166 129 | **33 970** |
| **Current liabilities** | | | | | |
| Trade and other payables | | 512 638 | **557 831** | 2 719 | **8 099** |
| Short-term borrowings | 20 | 175 296 | **695 604** | – | **189 482** |
| Short-term provisions | 21 | 25 059 | **35 065** | 845 | **1 232** |
| Bank overdraft | 24 | 17 735 | **54 323** | 15 006 | **29 717** |
| Derivative financial instruments | 25 | 273 888 | **230 240** | – | **28 326** |
| Group companies | | | | – | **9 922** |
| Taxation | | 109 189 | **29 999** | 36 560 | **21 019** |
| | | 1 113 805 | **1 603 062** | 55 130 | **287 797** |
| Liabilities held-for-sale | 31 | 405 442 | **366 141** | 118 171 | **105 262** |
| Total equity and liabilities | | 7 967 729 | **6 892 035** | 3 592 267 | **2 751 827** |
| Net asset value per share (cents) | | 935 | **323** | | |
| Net tangible asset value per share (cents) | | 931 | **322** | | |

**Restated for assets held-for-sale.*

# Cash flow statements

| | Notes | Group 2008 R000 | Group 2009 R000 | Company 2008 R000 | Company 2009 R000 |
|---|---|---|---|---|---|
| CASH INFLOWS/(OUTFLOW) FROM OPERATING ACTIVITIES | | 783 956 | **121 602** | 102 777 | **(32 276)** |
| Cash generated by/(utilised in) operations | A | 915 442 | **465 997** | (606) | **(183 957)** |
| Dividends received | | | | 51 142 | **158 049** |
| Dividends paid | | (16 284) | **(108 224)** | – | **–** |
| Taxation paid | | (115 070) | **(236 421)** | – | **(5 792)** |
| Finance income | | 10 556 | **7 871** | 55 750 | **17 877** |
| Finance costs | | (10 688) | **(7 621)** | (3 509) | **(18 453)** |
| CASH (OUTFLOWS)/INFLOW FROM INVESTING ACTIVITIES | | (1 848 615) | **(1 393 693)** | 146 758 | **(822 914)** |
| Additions to property, plant and equipment and mineral rights | | (2 015 085) | **(1 381 650)** | (82 529) | **(282)** |
| Acquisition of subsidiaries | 33 | (169 710) | **–** | – | **–** |
| Proceeds on disposal of property, plant and equipment | | 119 | **1 162** | – | **–** |
| Proceeds on disposal of shares in subsidiary | 33 | 338 575 | **–** | 338 575 | **57 403** |
| Increase in investments | | (2 514) | **(13 205)** | (2 514) | **(13 044)** |
| Loans to subsidiaries | | | | (63 725) | **(885 143)** |
| Movement in Group companies | | | | (43 049) | **18 152** |
| CASH INFLOWS/(OUTFLOW) FROM FINANCING ACTIVITIES | | 1 137 289 | **1 191 426** | (259 105) | **836 075** |
| Borrowings raised | | 1 364 993 | **513 475** | 79 730 | **189 482** |
| Borrowings repaid | | (232 328) | **(26 576)** | (343 459) | **(57 934)** |
| Shares issued | | 4 624 | **704 527** | 4 624 | **704 527** |
| NET INCREASE/(DECREASE) IN CASH AND CASH EQUIVALENTS | | 72 630 | **(80 665)** | (9 570) | **(19 115)** |
| Cash and cash equivalents at the beginning of the year | 24 | 54 558 | **101 331** | 3 677 | **(3 802)** |
| Effect of foreign exchange rate changes | | 2 516 | **(1 436)** | – | **–** |
| Acquisition of CRC | 33 | 53 867 | **–** | – | **–** |
| CASH AND CASH EQUIVALENTS AT THE END OF THE YEAR | B | 183 571 | **19 230** | (5 893) | **(22 917)** |
| CASH AND CASH EQUIVALENTS AT THE END OF THE YEAR – DISCONTINUING OPERATIONS | | | **23 191** | | **(7 064)** |
| CASH AND CASH EQUIVALENTS AT THE END OF THE YEAR – CONTINUING AND DISCONTINUING OPERATIONS | | | **42 421** | | **(29 981)** |

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 177 of 237 PageID #: 4962



# Notes to the cash flow statements

| | Group | | Company | |
|---|---|---|---|---|
| | 2008 R000 | **2009 R000** | 2008 R000 | **2009 R000** |
| **A RECONCILIATION OF PROFIT/(LOSS) BEFORE TAXATION TO CASH GENERATED BY/(UTILISED IN) OPERATIONS** | | | | |
| Profit/(loss) before taxation | 1 031 355 | **(1 921 229)** | 527 986 | **(1 752 932)** |
| Adjusted for: | (2 338) | **2 321 365** | (467 369) | **1 588 011** |
| Dividends received | | | (51 142) | **(158 049)** |
| (Profit)/loss for the year from subsidiary sold/discontinued operations/assets held-for-sale | (157 995) | **76 409** | (376 967) | **79 353** |
| Net profit on hedgebook close-outs | – | **(169 598)** | – | **–** |
| Profit on disposal of mining assets | (119) | **(914)** | – | **–** |
| Share option costs | 16 112 | **20 055** | 2 669 | **17 831** |
| Net finance costs/(income) | 132 | **(250)** | (52 241) | **576** |
| Impairments | – | **2 273 429** | – | **1 648 110** |
| Depreciation | 139 532 | **122 234** | 10 312 | **190** |
| Operating profit before working capital changes | 1 029 017 | **400 136** | 60 617 | **(164 921)** |
| Working capital changes | (113 575) | **65 861** | (61 223) | **(19 036)** |
| (Increase)/decrease in inventories | (180 202) | **13 348** | (12 098) | **–** |
| (Increase)/decrease in trade and other receivables | (109 694) | **43 067** | (4 361) | **(25 468)** |
| Increase/(decrease) in trade and other payables and provisions | 176 321 | **9 446** | (44 764) | **6 432** |
| Cash generated by/(utilised in) operations | 915 442 | **465 997** | (606) | **(183 957)** |
| **B CASH AND CASH EQUIVALENTS** | | | | |
| Bank balances and cash | 203 435 | **73 553** | 11 242 | **6 800** |
| Bank overdraft | (19 864) | **(54 323)** | (17 135) | **(29 717)** |
| | 183 571 | **19 230** | (5 893) | **(22 917)** |

# Statements of changes in equity

| | Notes | Group 2008 R000 | Group 2009 R000 | Company 2008 R000 | Company 2009 R000 |
|---|---|---|---|---|---|
| Share capital | | 36 917 | **74 255** | 36 917 | **74 255** |
| – Balance at beginning of year | | 32 454 | **36 917** | 32 454 | **36 917** |
| – Issue of shares | | 4 463 | **37 338** | 4 463 | **37 338** |
| Share premium | | 2 292 746 | **2 979 136** | 2 292 746 | **2 979 136** |
| – Balance at beginning of year | | 1 293 733 | **2 292 746** | 1 293 733 | **2 292 746** |
| – Issue of shares, net of costs | | 999 013 | **686 390** | 999 013 | **686 390** |
| Foreign exchange translation reserve | | 75 999 | **(237 085)** | 16 480 | **16 480** |
| – Balance at beginning of year | | (41 312) | **75 999** | 16 480 | **16 480** |
| – Foreign exchange reserve | | 161 434 | **(270 539)** | | |
| – Translation profit on foreign monetary item | | (56 726) | **(45 150)** | | |
| – Transfer to AHFS | | (1 578) | **–** | | |
| – Tax effect of translation profit on foreign monetary item | | 14 181 | **2 605** | | |
| Hedging reserve | | (243 545) | **(82 785)** | – | **(28 326)** |
| – Balance at beginning of year | | (73 818) | **(243 545)** | (11 345) | **–** |
| – Fair value (losses)/profits for the year | | (126 202) | **122 266** | (20 140) | **(28 326)** |
| – Transfer to AHFS | | 7 210 | **–** | 31 485 | **–** |
| – Minority interest | | (50 735) | **38 494** | | |
| Equity reserve | | (117 300) | **(117 300)** | (108 378) | **(108 378)** |
| – Balance at beginning of year | | (121 922) | **(117 300)** | (108 378) | **(108 378)** |
| – Transfer to AHFS | | 4 622 | **–** | – | **–** |
| Share option reserve | | 21 797 | **47 586** | 6 813 | **21 375** |
| – Balance at beginning of year | | 10 340 | **21 797** | 5 603 | **6 813** |
| – Transfer to AHFS | | (4 655) | **–** | (1 459) | **–** |
| – Expense for the year | | 16 112 | **25 789** | 2 669 | **14 562** |
| Retained income | | 1 389 089 | **(118 129)** | 1 038 285 | **(630 008)** |
| – Balance at beginning of year | | 834 537 | **1 389 089** | 593 273 | **1 038 285** |
| – Profit/(loss) for the year attributable to equity holders of parent | | 554 552 | **(1 507 218)** | 445 012 | **(1 668 293)** |
| Equity attributable to equity holders of parent | | 3 455 703 | **2 545 678** | 3 282 863 | **2 324 534** |
| Equity attributable to assets held-for-sale | | (5 599) | **(146 219)** | (30 026) | **264** |
| Minority interest | 19 | 683 570 | **457 208** | | |
| Total equity | | 4 133 674 | **2 856 667** | 3 252 837 | **2 324 798** |

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 179 of 237 PageID #: 4964



# Notes to annual financial statements

## 1. ACCOUNTING POLICIES

### Basis of preparation

The annual financial statements have been prepared under the historical-cost basis, except for certain financial instruments which are stated at fair value, and in accordance with International Financial Reporting Standards ("IFRS"). The principal accounting policies are set out below and are consistent in all material respects with those applied in the previous year; except for the classification of Pan African Resources and Consolidated Murchison as assets held-for-sale in terms of IFRS 5: *Non-current Assets Held-for-Sale and Discontinued Operations.*

### New and revised International Financial Reporting Standards not yet adopted

At the date of authorisation of these financial statements, the following standards and interpretations applicable to the Group were in issue but not yet effective:

| | |
|---|---|
| IFRS 1 | First-time Adoption of International Financial Reporting Standards |
| IFRS 2 | Share-based Payments |
| IFRS 3 | Business Combinations |
| IFRS 5 | Non-current Assets Held-for-Sale and Discontinued Operations |
| IFRS 8 | Operating Segments (new) |
| IAS 1 | Presentation of Financial Statements |
| IAS 16 | Property, Plant and Equipment |
| IAS 18 | Revenue |
| IAS 19 | Employee Benefits |
| IAS 20 | Accounting for Government Grants and Disclosure of Government Assistance |
| IAS 23 | Borrowing Costs |
| IAS 27 | Consolidated and Separate Financial Statements |
| IAS 28 | Investments in Associates |
| IAS 29 | Financial Reporting in Hyperinflationary Economies |
| IAS 31 | Interest in Joint Ventures |
| IAS 32 | Financial Instruments: Presentation |
| IAS 36 | Impairment of Assets |
| IAS 38 | Intangible Assets |
| IAS 39 | Financial Instruments: Recognition and Measurement |
| IFRIC 16 | Hedges of a net investment in a foreign operation (new) |
| IFRIC 17 | Distributions of Non-cash Assets to Owners (new) |
| IFRIC 18 | Transfers of Assets from Customer (new) |

The directors anticipate that the adoption of these standards and interpretations in future periods except for IFRS 3, will not have a material impact on the financial statements of the Group other than additional disclosure.

### Critical accounting estimates and judgements

In preparing the annual financial statements in terms of IFRS, the Group's management is required to make certain judgements, estimates and assumptions that may materially affect reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenue and expense during the reported year and the related disclosures. The estimates and judgements are based on historical experience, current and expected future economic conditions and other factors. Actual results may differ from these estimates.

### Judgements made by management

The following judgements, apart from those involving estimates (as mentioned below) have been made by management in the process of applying the Group's accounting policies that have the most significant effect on the amounts recognised in the financial statements:

- In applying IFRS 5, Non-current Assets Held-for-Sale and Discontinued Operations, management had to make judgements as to which non-current assets and discontinued operations fall within the scope of the standard and had to be reclassified and measured in terms of IFRS 5 (refer note 31).
- In applying IFRS 2, Share-based Payments, management had to make certain judgements in respect of the fair value option-pricing models to be used in determining the various share-based arrangements in respect of employees, as well as the variable elements used in these models (refer note 30).
- In applying IFRIC 4, Determining whether an Arrangement contains a Lease, and IAS 17, Leases, contractual agreements were assessed to determine whether they convey the right to use an asset and their classification as either an operating or finance lease.
- Estimates made in determining the present obligation of environmental provisions including decommissioning and rehabilitation.
- Estimates made in determining the recoverable amount of assets where there is an indication that an asset may be impaired, this includes the estimation of cash flows and the discount rates used.
- Estimates made in determining the probability of future taxable income thereby justifying the recognition of a deferred tax asset.
- Estimates made in determining changes in the estimated useful lives of assets and their residual values.
- Estimates made in determining the life of the mines.
- Estimates made in the valuation of mineral rights.

# Notes to annual financial statements continued

1. ACCOUNTING POLICIES (continued)

Judgements made by management (continued)

- Estimates made of legal or constructive obligations resulting in the raising of provisions, and the expected date of probable outflow of economic benefits to assess whether the provision should be discounted.
- Estimates made of contingent liabilities disclosed.
- Estimates of mineral resources and ore reserves in accordance with the SAMREC code (2000) for South African properties. Such estimates relate to the category for the resource (measured, indicated or inferred), the quantum and the grade.

1.1 Basis of consolidation

The consolidated financial statements incorporate the financial statements of the Company and entities controlled by the Company (its subsidiaries) to 30 June each year. Control is achieved where the Company has the power to govern the financial and operating policies of an investee enterprise so as to obtain benefits from its activities.

On acquisition, the assets and liabilities of a subsidiary are measured at their fair values at the date of exchange of assets given, liabilities incurred or assumed and equity instruments issued by the Group in exchange for control of the acquiree plus any costs directly attributable to the business combination. The interest of minority shareholders is stated at the minority's proportion of the fair values of the assets and liabilities recognised.

The results of the subsidiaries acquired or disposed of during the year are included in the consolidated income statement from the effective date of acquisition or up to the effective date of disposal, as appropriate.

Inter-company transactions and balances between Group entities are eliminated on consolidation.

1.2 Business combinations

Acquisitions of subsidiaries and businesses are accounted for using the purchase method. The cost of the business combinations is measured as the aggregate of the fair values (at the date of exchange) of assets given, liabilities incurred or assumed, and equity instruments issued by the Group in exchange for control of the acquiree, plus any costs directly attributable to the business combination. The acquiree's identifiable assets, liabilities and contingent liabilities that meet the conditions for recognition under IFRS 3 Business Combinations are recognised at their fair values at the acquisition date, except for non-current assets (or disposal groups) that are classified as held-for-sale in accordance with IFRS 5 Non-current Assets Held-for-Sale and Discontinued Operations, which are recognised and measured at fair value less costs to sell.

Mineral rights and goodwill arising on acquisition are recognised as an asset, and initially measured at cost, being the excess of the cost of the business combination over the Group's interest in the net fair value of the identifiable assets, liabilities and contingent liabilities recognised. If, after reassessment, the Group's interest in the net fair value of the acquiree's identifiable assets, liabilities and contingent liabilities exceeds the cost of the business combination, the excess is recognised immediately in profit or loss.

The interest of minority shareholders in the acquiree is initially measured at the minority's proportion of net fair value of the assets, liabilities and contingent liabilities recognised.

1.3 Property, plant and equipment

1.3.1 Mining assets

Mining assets, including mine development costs and mine plant facilities, are recorded at cost of acquisition.

Expenditure incurred to develop new ore bodies, to define mineralisation in existing ore bodies, to establish or expand productive capacity and expenditure designed to maintain productive capacities, are capitalised until commercial levels of production are achieved.

1.3.2 Mineral and surface rights

Mineral and surface rights are recorded at cost of acquisition.

1.3.3 Land

Land is shown at cost and is not depreciated.

1.3.4 Gain or loss on disposal or retirement of assets

The gain or loss arising on the disposal or retirement of an item of property, plant and equipment is determined as the difference between the sales proceeds and the carrying amount of the asset and is recognised in profit or loss.

1.4 Depreciation

1.4.1 Depreciation of mining assets and mineral and surface rights

Mining assets, mine development costs, mineral and surface rights and plant mine facilities are depreciated over the lives of the mines to their residual values using the units-of-production method based on estimated proved and probable ore reserves or where impractical, directors' estimates subject to a maximum life of mine of 20 years.

1. ACCOUNTING POLICIES (continued)

1.4 Depreciation (continued)

1.4.1 Depreciation of mining assets and mineral and surface rights (continued)

The assets of the underlying mines are depreciated over the following periods:

| | |
|---|---|
| Consolidated Murchison Mine | Impaired |
| Vergenoeg Mine | 20 years |
| Chibuluma South | ±8 years |
| Barberton Mines | ±15 years |
| Ruashi | ±15 years |
| Sable | ±10 years |

Other mining plant and equipment is depreciated on the straight-line basis over the shorter of the life of the mine or their estimated useful lives.

1.4.2 Depreciation of non-mining assets

Buildings and other non-mining assets are recorded at cost and depreciated on the straight-line basis over their expected useful lives, which vary between 4 to 10 years.

1.4.3 Mining exploration

Expenditure on exploration activities is capitalised until the viability of the mining venture has been proven. If the mining venture is subsequently considered non-viable the expenditure is charged against income as and when that fact becomes known.

1.5 Impairment (except for goodwill)

At each balance sheet date, the Group reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs.

Impairment losses are immediately recognised as an expense. A reversal of an impairment loss is recognised immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

1.6 Goodwill

Goodwill arising on consolidation represents the excess of the cost of acquisition over the Group's interest in the fair value of the identifiable assets and liabilities of a subsidiary, associate or jointly controlled entity at the date of acquisition. Goodwill is initially recognised as an asset at cost and is subsequently measured at cost less accumulated impairment losses.

For the purpose of impairment testing, goodwill is allocated to each of the Group's cash-generating units expected to benefit from the synergies of the combination. Cash-generating units to which goodwill has been allocated are tested for impairment annually, or more frequently when there is an indication that the unit may be impaired. If the recoverable amount of the cash-generating unit is less than the carrying amount of the unit, the impairment loss is allocated first to reduce the carrying amount of any goodwill allocated to the unit and then to the other assets of the unit pro rata on the basis of the carrying amount of each asset in the unit. An impairment loss recognised for goodwill is not reversed in a subsequent period.

On disposal of a subsidiary, associate or jointly controlled entity, the attributable amount of goodwill is included in the determination of the profit or loss on disposal.

The Group's policy for goodwill arising on the acquisition of a subsidiary is described in 1.2 above.

1.7 Taxation

The charge for current tax is based on the results for the year as adjusted for items which are non-assessable or disallowed. It is calculated using tax rates that have been enacted or substantively enacted by the balance sheet date.

Deferred tax is accounted for using the balance sheet liability method in respect of temporary differences arising from differences between the carrying amount of assets and liabilities in the financial statements and the corresponding tax basis used in the computation of taxable profit. In principle, deferred tax liabilities are recognised for all taxable temporary differences, and deferred tax assets are recognised to the extent that it is probable that taxable profit will be available against which deductible temporary differences can be utilised. Such assets and liabilities are not recognised if the temporary difference arises from goodwill or from the initial recognition (other than a business combination) of other assets and liabilities in a transaction, which affects neither tax nor accounting profit.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 182 of 237 PageID #: 4967


# Notes to annual financial statements continued

1. ACCOUNTING POLICIES (continued)

1.7 Taxation (continued)

Deferred tax is calculated at the tax rates that are expected to apply to the period when the asset is realised or the liability is settled, based on tax rates (and laws) that have been enacted or substantively enacted by the balance sheet date. The measurement of deferred tax liabilities and assets reflects the tax consequences that would follow from the manner in which the Group expects, at the reporting date, to recover or settle the carrying amount of its assets and liabilities. Deferred tax is charged or credited to the income statement, except when it relates to items credited or charged directly to equity, in which case the deferred tax is also dealt within equity, or where they arise from the initial accounting of a business combination. In a business combination, the tax effect is taken into account in calculating goodwill or in determining the excess of the acquirer's interest in the net fair value of the acquiree's identifiable assets, liabilities and contingent liabilities over the cost of the business combination.

The carrying amount of deferred tax assets is reviewed at each balance sheet date and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or parts of the asset to be recovered.

1.8 Provisions

Provisions are recognised when the Group has a legal or constructive obligation resulting from past events and it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

The amount recognised as a provision is the best estimate of the consideration required to settle the present obligation at the balance sheet date, taking into account the risks and uncertainties surrounding the obligation. Where a provision is measured using cash flows estimated to settle a present obligation, its carrying amount is the present value of those cash flows.

When some or all of the economic benefits required to settle a provision are expected to be received from a third party, the receivable is recognised as an asset if it is virtually certain that reimbursement will be received and the amount of the receivable can be measured reliably.

1.9 Foreign currencies

Transactions in currencies other than Rand are initially recorded at the rates of exchange ruling on the dates of the transactions. Monetary assets and liabilities denominated in such currencies are retranslated at the rates ruling at the balance sheet date. Profits and losses arising on exchange are dealt with in the income statement.

In order to hedge its exposure to foreign exchange risks, the Group may enter into forward contracts (see note 1.18 for details of the Group's accounting policies in respect of such derivative financial instruments).

On consolidation, the assets and liabilities of the Group's foreign operations are translated at exchange rates ruling at the balance sheet date. Income and expense items are translated at the average exchange rates for the period. Exchange differences arising from the translation of foreign operations are classified as equity and are recognised as income or expenses in the period in which the operation is disposed of. Translation differences on foreign loans to subsidiaries which are classified as equity loans are accounted for as non-distributable reserves.

Goodwill and fair value adjustments arising on the acquisition of a foreign operation are treated as assets and liabilities of the reporting entity and are recorded using the exchange rate at the date of the transaction.

1.10 Borrowing costs

Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets, which are assets that necessarily take a substantial period of time to get ready for their intended use or sale, are added to the cost of those assets, until commercial levels of production are achieved. To the extent that variable rate borrowings are used to finance a qualifying asset and are hedged in an effective cash flow hedge of interest rate risk, the capitalised borrowing costs reflect the hedged interest rate.

Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the cost of those assets.

All other borrowing costs are recognised in net profit or loss in the period in which they are incurred.

1.11 Consumable stores and product inventories

Consumable stores are valued at the lower of cost, determined on a weighted average basis, and estimated net realisable value. Net realisable value represents the estimated selling price less all estimated costs of completion and costs to be incurred in marketing, selling and distribution. Obsolete and slow-moving consumable stores are identified and are written down to their economic or realisable values. Product inventories are valued at the lower of cost, determined on a weighted average basis, and net realisable value. Costs include direct mining costs and mine overheads.

1.12 Retirement benefits

Payments to defined contribution retirement benefit plans are charged as an expense as they fall due. Payments made to state-managed schemes are dealt with as defined contribution plans where the Group's obligations under the schemes are equivalent to those arising in a defined contribution retirement benefit plan.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 183 of 237 PageID #: 4968



1. ACCOUNTING POLICIES (continued)

1.13 Post-retirement benefits other than pension

Certain companies within the Group provide retirement benefits by way of medical aid schemes for employees. Charges to the income statement are based on the accrual basis. The estimated cost for retiree health care is accrued during the participants' actual service periods, up to the date they become eligible for full benefits.

1.14 Equity participation plan

Equity settled share-based payments to employees and others providing similar services are measured at the fair value of the equity instruments at the grant date. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 30.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on the straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each balance sheet date, the Group revises its estimate of the number of equity instruments expected to vest. The impact of the revision of the original estimates, if any, is recognised in profit or loss over the remaining vesting period, with a corresponding adjustment to the equity settled employee benefits reserve.

1.15 Provision for environmental rehabilitation costs

Long-term environmental obligations are based on the Company's environmental plans, in compliance with current environmental and regulatory requirements.

Full provision is made based on the net present value of the estimated cost of restoring the environmental disturbance that has occurred up to the balance sheet date. Increases due to additional environmental disturbances are capitalised and amortised over the remaining lives of the mines. Annual increases in the provisions relating to the change in the net present value of the provision and inflationary increases are shown separately in the income statement.

The estimated cost of rehabilitation is reviewed annually and adjusted as appropriate for changes in legislation or technology. Cost estimates are not reduced by the potential proceeds from the sale of assets or from plant clean-up at closure, in view of the uncertainty of estimating the potential future proceeds.

1.16 Provision for closure costs

The Group provides for closure costs other than rehabilitation costs when the directors have prepared a detailed plan for closure of the particular operation, the remaining life of which is such that significant changes to the plan are unlikely; and the directors have raised a valid expectation in those affected that it will carry out the closure by starting to implement that plan or announcing its main features to those affected by it.

1.17 Revenue recognition

Revenue represents the value of minerals sold, excluding value added tax and is recognised when goods are delivered and risk and reward has passed, and is measured at the fair value of the consideration received or receivable.

Interest income is accrued on a time basis, by reference to the principal outstanding and at the interest rates applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount.

Dividend income from investments is recognised when the shareholders' rights to receive payment have been established.

1.18 Financial assets

Investments are recognised and derecognised on trade date where the purchase or sale of an investment is under a contract whose terms require delivery of the investment within the timeframe established by the market concerned, and are initially measured at fair value, plus transaction costs, except for those financial assets classified as at fair value through profit or loss, which are initially measured at fair value.

Financial assets are classified into the following specified categories: financial assets "at fair value through profit or loss" (FVTPL), "available-for-sale" (AFS) financial assets and "loans and receivables". The classification depends on the nature and purpose of the financial assets and is determined at the time of initial recognition.

Effective interest method

The effective interest method is a method of calculating the amortised cost of a financial asset and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees on points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the financial asset, or, where appropriate, a shorter period.

Income is recognised on an effective interest basis for debt instruments other than those financial assets designated as at FVTPL.

# Notes to annual financial statements continued

## 1. ACCOUNTING POLICIES (continued)

### 1.18 Financial assets (continued)

**Financial assets at FVTPL**

Financial assets are classified as at FVTPL where the financial asset is either held for trading or it is designated as at FVTPL.

A financial asset is classified as held for trading if:
- it has been acquired principally for the purpose of selling in the near future; or
- it is a part of an identified portfolio of financial instruments that the Group manages together and has a recent actual pattern of short-term profit-taking; or
- it is a derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as at FVTPL upon initial recognition if:
- such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or
- the financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Group's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or
- it forms a part of a contract containing one or more embedded derivatives, and IAS 39 Financial Instruments: Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial assets at FVTPL are stated at fair value, with any resultant gain or loss recognised in profit or loss. The net gain or loss recognised in profit or loss incorporates any dividend or interest earned on the financial asset. Fair value is determined in the manner described in note 25.

**Loans and receivables**

Trade receivables, loans and other receivables that have fixed or determinable payments that are not quoted in an active market are classed as loans and receivables. Loans and receivables are measured at amortised cost using the effective interest method, less any impairment. Interest income is recognised by applying the effective interest rate, except for short-term receivables when the recognition of interest would be immaterial.

**Impairment of financial assets**

Financial assets, other than those at FVTPL, are assessed for indicators of impairment at each balance sheet date. Financial assets are impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been impacted.

For unlisted shares classified as AFS, a significant or prolonged decline in the fair value of the security below its cost is considered to be objective evidence of impairment.

For all other financial assets, including redeemable notes classified as AFS and finance lease receivables, objective evidence of impairment could include:
- significant financial difficulty of the issuer or counterparty; or
- default or delinquency in interest or principal payments; or
- it becoming probable that the borrower will enter bankruptcy or financial reorganisation.

For certain categories of financial assets, such as trade receivables, assets that are assessed not to be impaired individually are subsequently assessed for impairment on a collective basis. Objective evidence of impairment for a portfolio of receivables could include the Group's past experience of collecting payments, an increase in the number of delayed payments in the portfolio past the average credit period, as well as observable changes in national or local economic conditions that correlate with default on receivables.

For financial assets carried at amortised cost, the amount of the impairment is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables, where the carrying amount is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognised in profit or loss.

If, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognised, the previously recognised impairment loss is reversed through profit or loss to the extent that the carrying amount of the investment at the date the impairment is reversed does not exceed what the amortised cost would have been had the impairment not been recognised.

**Derecognition of financial assets**

The Group derecognises a financial asset only when the contractual rights to the cash flows from the asset expire; or it transfers the financial asset and substantially all the risks and rewards of ownership of the asset to another entity. If the Group neither transfers nor retains substantially all the risks and rewards of ownerships and continues to control the transferred asset, the Group recognises its retained interest in the asset and an associated liability for amounts it may have to pay. If the Group retains substantially all the risks and rewards of ownership of a transferred financial asset, the Group continues to recognise the financial asset and also recognises a collateralised borrowing for the proceeds received.

1. ACCOUNTING POLICIES (continued)

1.18 Financial assets (continued)

Financial liabilities and equity instruments issued by the Group

Classification as debt or equity

Debt and equity instruments are classified as either financial liabilities or as equity in accordance with the substance of the contractual arrangement.

Equity instruments

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. Equity instruments issued by the Group are recorded at the proceeds received, net of direct issue costs.

Financial liabilities

Financial liabilities are classified as either financial liabilities "at FVTPL" or "other financial liabilities".

Financial liabilities at FVTPL

Financial liabilities are classified as at FVTPL where the financial liability is either held for trading or it is designated as at FVTPL.

A financial liability is classified as held for trading if:

- it has been incurred principally for the purpose of repurchasing in the near future; or
- it is part of an identified portfolio of financial instruments that the Group manages together and has a recent actual pattern of short-term profit-taking; or
- it is a derivative that is not designated and effective as a hedging instrument.

A financial liability other than a financial liability held for trading may be designated as at FVTPL upon initial recognition if:

- such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or
- the financial liability forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Group's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or
- it forms part of a contract containing one or more embedded derivatives, and IAS 39 Financial Instruments: Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial liabilities at FVTPL are stated at fair value, with any resultant gain or loss recognised in profit or loss. The net gain or loss recognised in profit or loss incorporates any interest paid on the financial liability. Fair value is determined in the manner described in note 25.

Other financial liabilities

Other financial liabilities are subsequently measured at amortised cost using the effective interest rate method, with interest recognised on an effective yield basis.

The effective interest rate method is a method of calculating the amortised cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that discounts the estimated future cash payments through the expected life of the financial liability, or, where appropriate, a shorter period.

Derecognition of financial liabilities

The Group derecognises financial liabilities when, and only when, the Group's obligations are discharged, cancelled or they expire.

1.19 Derivative financial instruments

In the ordinary course of its operations, the Group may enter into a variety of derivative financial instruments to manage its exposure to commodity prices and foreign exchange rate risk.

Derivatives are initially recognised at cost at the date a derivative contract is entered into and are subsequently remeasured to their fair value at each balance sheet date. The resulting gain or loss is recognised in profit or loss immediately unless the derivative is designated and effective as a hedging instrument, in which event the timing of the recognition in profit or loss depends on the nature of the hedge relationship.

A derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the instrument is more than 12 months and it is not expected to be realised or settled within 12 months. Other derivatives are presented as current assets or current liabilities.

Hedge accounting

The Group designates certain hedging instruments, which include derivatives, embedded derivatives and non-derivatives in respect of commodity price risk or foreign currency risk, as either fair value hedges or cash flow hedges. Hedges of commodity price risk or foreign exchange risk or firm commitments are accounted for as cash flow hedges.

At the inception of the hedge relationship, the entity documents the relationship between the hedging instrument and the hedged item, along with its risk management objectives and its strategy for undertaking various hedge transactions. Furthermore, at the inception of the hedge and on an ongoing basis, the Group documents whether the hedging instrument that is used in a hedging relationship is effective in offsetting changes in fair values or cash flows of the hedged item.

Note 25 sets out details of the fair values of the derivative instruments used for hedging purposes. Movements in the hedging reserve in equity are also detailed in the statement of changes in equity.

# Notes to annual financial statements continued

1. ACCOUNTING POLICIES (continued)

1.19 Derivative financial instruments (continued)

Fair value hedge

Changes in the fair value of derivatives that are designated and qualify as fair value hedges are recorded in profit or loss immediately, together with any changes in the fair value of the hedged item that are attributable to the hedged risk. The change in the fair value of the hedging instrument and the change in the hedged item attributable to the hedged risk are recognised in the line of the income statement relating to the hedged item.

Hedge accounting is discontinued when the Group revokes the hedging relationship, the hedging instrument expires or is sold, terminated, or exercised, or no longer qualifies for hedge accounting. The adjustment to the carrying amount of the hedged item arising from the hedged risk is amortised to profit or loss from that date.

Cash flow hedge

The effective portion of changes in the fair value of derivatives that are designated and qualify as cash flow hedges are deferred in equity. The gain or loss relating to the ineffective portion is recognised immediately in profit or loss, and is included in the "other gains and losses" line of the income statement.

Amounts deferred in equity are recycled in profit or loss in the periods when the hedged item is recognised in profit or loss, in the same line of the income statement as the recognised hedged item. However, when the forecast transaction that is hedged results in the recognition of a non-financial asset or a non-financial liability, the gains and losses previously deferred in equity are transferred from equity and included in the initial measurement of the cost of the asset or liability.

Hedge accounting is discontinued when the Group revokes the hedging relationships, the hedging instrument expires or is sold, terminated, or exercised, or no longer qualifies for hedge accounting. Any cumulative gain or loss deferred in equity at that time remains in equity and is recognised when the forecast transaction is ultimately recognised in profit or loss. When a forecast transaction is no longer expected to occur, the cumulative gain or loss that was deferred in equity is recognised immediately in profit or loss.

1.20 Leases

Assets held under finance leases are recognised as assets of the Group at their fair value at the date of acquisition. The corresponding liability to the lessor is included in the balance sheet as a finance lease obligation. Finance costs, which represent the difference between the total lease commitments and the fair value of the assets acquired, are charged to the income statement over the term of the relevant lease. Operating leases are accounted for on a systematic basis over the period of the lease.

1.21 Non-current assets held-for-sale

Non-current assets and disposal groups are classified as held-for-sale if their carrying amount will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when the sale is highly probable and the asset (or disposal group) is available for immediate sale in its present condition. Management must be committed to the sale, which should be expected to qualify for recognition as a completed sale within one year from the date of classification.

Non-current assets (and disposal groups) classified as held-for-sale are measured at the lower of their previous carrying amount and fair value less costs to sell.

1.22 Cash and cash equivalents

Cash and cash equivalents comprise cash on hand and demand deposits, and other short-term highly liquid investments that are readily convertible to a known amount of cash and are subject to an insignificant risk of changes in value.

| | | Group | | Company | |
|---|---|---|---|---|---|
| | | 2008* R000 | 2009 R000 | 2008* R000 | 2009 R000 |
| 2. | **COST OF PRODUCTION** | | | | |
| | Mining | 78 924 | **97 820** | – | **–** |
| | Salaries and wages | 144 389 | **176 254** | 20 188 | **27 953** |
| | Processing | 172 531 | **232 012** | – | **–** |
| | Engineering and technical | 113 575 | **152 302** | – | **–** |
| | Administration | 87 716 | **90 425** | 17 781 | **34 043** |
| | Inventory movement | (50 306) | **24 824** | – | **–** |
| | Depreciation | 95 648 | **122 234** | 116 | **190** |
| | | 642 477 | **895 871** | 38 085 | **62 186** |
| 3. | **OPERATING LEASES** | | | | |
| | At the balance sheet date, the Group had outstanding commitments under non-cancellable operating leases mainly in respect of office equipment, security cameras, building rentals and compressors, which fall due as follows: | | | | |
| | Within one year | 3 613 | **3 459** | 1 666 | **1 839** |
| | Years 2 to 5 | 5 131 | **3 362** | 4 782 | **3 154** |
| | | 8 744 | **6 821** | 6 448 | **4 993** |
| 4. | **OTHER (EXPENSES)/INCOME** | | | | |
| | Management and technical fees income | 1 056 | **–** | 47 152 | **19 406** |
| | Profit on Ruashi hedgebook close-outs | – | **210 954** | – | **–** |
| | Prior year copper price finalisation charges | – | **(28 168)** | – | **–** |
| | Dividends received – subsidiaries | | | 51 142 | **158 049** |
| | Foreign exchange gains | 7 558 | **25 418** | 4 750 | **20 118** |
| | (Loss)/profit on disposal of assets | (43) | **914** | – | **–** |
| | Loss on disposal of Phoenix | – | **–** | – | **(79 353)** |
| | Share option expense | (18 099) | **(20 055)** | 15 584 | **(17 831)** |
| | Rehabilitation expense | (6 577) | **(9 040)** | – | **–** |
| | Royalties | (10 626) | **(20 410)** | – | **–** |
| | Sundry other | 4 306 | **(11 990)** | (2 499) | **(34)** |
| | | (22 425) | **147 623** | 116 129 | **100 355** |

5. **IMPAIRMENTS**

It is Group policy to annually assess assets for impairment. Following this review, the Group impairment charge before taxation and minorities amounted to R2.3 billion (Company: R1.6 billion).

This charge is made up as follows:

| | 2009 R000 |
|---|---|
| **Group** | |
| CRC | **1 720 247** |
| Ruashi phase I project | **216 025** |
| Consolidated Murchison Division | **124 477** |
| PAR | **57 575** |
| Other | **155 105** |
| | **2 273 429** |

*The primary CRC asset being the Kinsenda mine, was impaired to R230 million (US$30 million) based on a risk based valuation at a real after tax discount rate of 20 per cent. This discount rate accounts for risks related to project funding, project development and operating in the DRC. A copper price of US$5 000/ton was applied in these valuations. The net CRC impairment, after tax and minorities, of R1.2 billion principally relates to the original investment cost. This cost constituted the issue of 37 million new Metorex shares at R24 per share (R888 million) and R85 million in cash.*

| | 2009 R000 |
|---|---|
| **Company** | |
| CRC | **1 134 284** |
| Property, plant, equipment and mineral rights | **116 928** |
| PAR | **141 931** |
| Other | **254 967** |
| | **1 648 110** |

**Restated for assets held-for-sale.*

# Notes to annual financial statements continued

| | Group 2008* R000 | Group 2009 R000 | Company 2008* R000 | Company 2009 R000 |
|---|---|---|---|---|
| **6. FINANCE (COSTS)/INCOME** | | | | |
| Interest received | 7 764 | **7 871** | 55 570 | **17 877** |
| Interest paid | (129 479) | **(116 010)** | (2 358) | **(18 453)** |
| ***Less:*** Borrowing costs capitalised | 120 192 | **108 389** | – | **–** |
| Net finance (costs)/income | (1 523) | **250** | 53 212 | **(576)** |
| **7. PROFIT/(LOSS) BEFORE TAXATION** | | | | |
| Is stated after charging: | | | | |
| Audit fee | | | | |
| – current year | 1 316 | **1 967** | 657 | **916** |
| – prior year | 585 | **–** | – | **–** |
| Retirement benefit costs | 9 664 | **5 896** | – | **–** |
| Operating leases and rentals | | | | |
| – equipment and buildings | 5 238 | **2 989** | 1 198 | **1 370** |
| Exploration expenditure | 805 | **1 488** | – | **–** |
| **8. INCOME TAX EXPENSE** | | | | |
| SA normal taxation | | | | |
| – current year | 25 313 | **23 806** | 4 086 | **–** |
| – prior year | 2 | **(413)** | – | **(413)** |
| Foreign normal taxation | | | | |
| – current year | 104 197 | **3 570** | – | |
| Deferred taxation | | | | |
| – current year | 89 074 | **(408 766)** | 78 888 | **(84 194)** |
| – prior year | – | **(32)** | – | **(32)** |
| Secondary taxation on companies | | | | |
| – current year | 1 200 | **1 050** | – | **–** |
| Total taxation charge – continuing operations | 219 786 | **(380 785)** | 82 974 | **(84 639)** |
| Profit/(loss) before taxation | 915 880 | **(1 921 229)** | 527 986 | **(1 752 932)** |
| ***Less:*** Held-for-sale assets, net of tax | – | **(210 704)** | – | **–** |
| Total profit/(loss) before taxation – continuing operations | 915 880 | **(2 131 933)** | 527 986 | **(1 752 932)** |
| Taxation at the domestic taxation rate of 28% | 256 446 | **(596 941)** | 147 836 | **(490 821)** |
| Secondary taxation on companies | 1 200 | **1 050** | – | **–** |
| Under/(over) provision – prior year | 2 | **(445)** | – | **(445)** |
| Non-deductible/(exempt income) expenses | 2 968 | **7 902** | (22 300) | **186 826** |
| Tax rate change | (923) | **–** | (485) | **–** |
| Deferred tax asset not recognised | – | **203 813** | – | **219 801** |
| Taxation rate differentials | (39 907) | **3 836** | (42 077) | **–** |
| Taxation expense/(credit) for the year – continuing operations | 219 786 | **(380 785)** | 82 974 | **(84 639)** |
| Effective taxation rate for the year – continuing operations (%) | 24,0 | **17,9** | 15,7 | **4,8** |
| Unredeemed capital expenditure available | 39 256 | **1 316 749** | 39 256 | **67 583** |
| Unredeemed capital expenditure recognised | 30 459 | **1 249 166** | 30 459 | **–** |
| Losses available for future taxable income set off | 19 849 | **1 997 688** | – | **135 132** |
| Taxation losses recognised | – | **1 862 556** | – | **–** |

**Restated for assets held-for-sale.*

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 189 of 237 PageID #: 4974



9. EARNINGS/(LOSS) PER SHARE AND HEADLINE EARNINGS PER SHARE

Earnings/(loss) per share (EPS)

EPS is based on the Group's net profit for the year attributable to equity holders of the parent, divided by the weighted average number of shares in issue during the year.

| | 2008 | | | 2009 | | |
|---|---|---|---|---|---|---|
| | Net profit (R000) | Shares (000) | Per share (cents) | **Net profit/ (loss) R000** | **Shares (000)** | **Per share (cents)** |
| From continuing and discontinued operations | | | | | | |
| Basic EPS | 554 552 | 347 797 | 159,4 | **(1 507 218)** | **553 349** | **(272,4)** |
| Share options | – | 6 650 | (2,9) | **–** | **–** | **–** |
| Diluted EPS | 554 552 | 354 447 | 156,5 | **(1 507 218)** | **553 349** | **(272,4)** |
| From continuing operations | | | | | | |
| Basic EPS | 563 411 | 347 797 | 161,9 | **(1 506 780)** | **553 349** | **(272,3)** |
| Share options | – | 6 650 | (2,9) | **–** | **–** | **–** |
| Diluted EPS | 563 411 | 354 447 | 159,0 | **(1 506 780)** | **553 349** | **(272,3)** |
| Headline earnings per share | | | | | | |
| Headline earnings per share is based on the Group's headline earnings divided by the weighted average number of shares in issue during the year. | | | | | | |
| Reconciliation between earnings and headline earnings from continuing and discontinued operations | | | | | | |
| Earnings/(loss) as reported | 554 552 | 347 797 | 159,4 | **(1 507 218)** | **553 349** | **(272,4)** |
| Adjustments | | | | | | |
| – Discontinued operations | 8 859 | | 2,5 | **438** | | **–** |
| – (Profit)/loss on sale of mining assets, net of tax | 31 | | – | **(431)** | | **–** |
| – Impairments | – | | – | **2 273 429** | **–** | **410,8** |
| – Tax on impairments | – | | – | **(474 642)** | **–** | **(85,8)** |
| – Minorities on impairments | – | | – | **(159 230)** | **–** | **(28,7)** |
| – Profit after tax on reverse acquisition of PAR | (105 220) | | (30,2) | | | |
| Headline earnings per share | 458 222 | 347 797 | 131,7 | **132 346** | **553 349** | **23,9** |
| Share options | – | 6 650 | (2,4) | **–** | **–** | **–** |
| Diluted headline earnings per share | 458 222 | 354 447 | 129,3 | **132 346** | **553 349** | **23,9** |

10. DIVIDENDS

In view of the funding requirements and the strategy to reduce and restructure the Ruashi debt, the Board considers it inappropriate to declare a dividend for the 12 months ended 30 June 2009 (2008: nil).

# Notes to annual financial statements continued

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **11. PROPERTY, PLANT, EQUIPMENT AND MINERAL RIGHTS** | | | | |
| **Land** | | | | |
| Cost and net book value | 5 895 | **6 292** | – | **–** |
| **Buildings and infrastructure** | | | | |
| Cost | 69 562 | **84 631** | – | **–** |
| Accumulated depreciation and impairments | 47 698 | **52 249** | – | **–** |
| Net book value | 21 864 | **32 382** | – | **–** |
| **Plant, machinery and shafts** | | | | |
| Cost | 1 129 783 | **1 228 867** | – | **–** |
| Accumulated depreciation and impairments | 524 271 | **794 248** | – | **–** |
| Net book value | 605 512 | **434 619** | – | **–** |
| **Other** | | | | |
| Cost | 207 425 | **275 974** | 1 212 | **1 494** |
| Accumulated depreciation and impairments | 34 719 | **47 531** | 730 | **920** |
| Net book value | 172 706 | **228 443** | 482 | **574** |
| **Capital work in progress** | | | | |
| Cost | 2 017 843 | **2 766 002** | – | **–** |
| Accumulated depreciation and impairments | 135 | **–** | – | **–** |
| Net book value | 2 017 708 | **2 766 002** | – | **–** |
| **Property, plant and equipment** | | | | |
| Aggregate cost | 3 430 508 | **4 361 766** | 1 212 | **1 494** |
| Aggregate accumulated depreciation and impairments | 606 823 | **894 028** | 730 | **920** |
| **Aggregate net book value** | 2 823 685 | **3 467 738** | 482 | **574** |
| **Mineral rights** | | | | |
| Cost | 2 722 417 | **3 247 877** | 13 943 | **13 943** |
| Accumulated depreciation and impairments | 20 718 | **1 880 188** | – | **(13 943)** |
| Net book value | 2 701 699 | **1 367 689** | 13 943 | **–** |
| **Property, plant, equipment and mineral rights** | 5 525 384 | **4 835 427** | 14 425 | **574** |

The Group reviews the residual values used for purposes of depreciation calculations annually.

**Restated for assets held-for-sale.*

| 2009 | Balance 30 June 2008 R000 | Transfers R000 | Additions R000 | Disposals R000 | Foreign currency translation R000 | Impairment R000 | Depreciation R000 | Balance 30 June 2009 R000 |
|---|---|---|---|---|---|---|---|---|
| **11. PROPERTY, PLANT, EQUIPMENT AND MINERAL RIGHTS (continued)** | | | | | | | | |
| ***Group*** | | | | | | | | |
| Land* | 5 895 | (1 854) | 2 251 | – | – | – | – | **6 292** |
| Buildings and infrastructure | 21 864 | – | 15 399 | (9) | 1 247 | – | (6 119) | **32 382** |
| Plant, machinery and shafts | 605 512 | – | 110 771 | – | 55 080 | (248 613) | (88 131) | **434 619** |
| Other | 172 706 | 1 854 | 69 493 | (239) | (1 235) | – | (14 136) | **228 443** |
| Capital work in progress | 2 017 708 | – | 778 577 | – | (30 283) | – | – | **2 766 002** |
| Mineral rights | 2 701 699 | – | 457 610 | – | (37 481) | (1 740 291) | (13 848) | **1 367 689** |
| Total | 5 525 384 | – | 1 434 101 | (248) | (12 672) | (1 988 904) | (122 234) | **4 835 427** |
| ***Company*** | | | | | | | | |
| Land* | – | – | – | – | – | – | – | **–** |
| Buildings and infrastructure | – | – | – | – | – | – | – | **–** |
| Plant, machinery and shafts | – | – | – | – | – | – | – | **–** |
| Other | 482 | – | 282 | – | – | – | (190) | **574** |
| Capital work in progress | – | – | – | – | – | – | – | **–** |
| Mineral rights | 13 943 | – | – | – | – | (13 943) | – | **–** |
| Total | 14 425 | – | 282 | – | – | (13 943) | (190) | **574** |

| **2008**** | Balance 30 June 2007 R000 | Transfers R000 | Additions R000 | Foreign currency translation R000 | Transfer to AHFS | Depreciation R000 | Balance 30 June 2008 R000 |
|---|---|---|---|---|---|---|---|
| ***Group*** | | | | | | | |
| Land* | 3 913 | – | 2 127 | – | (145) | – | 5 895 |
| Buildings and infrastructure | 16 316 | – | 6 985 | 1 313 | (1 602) | (1 148) | 21 864 |
| Plant, machinery and shafts | 780 857 | (65 085) | 197 597 | 51 373 | (290 978) | (68 252) | 605 512 |
| Other | 17 120 | – | 165 912 | 227 | (3 416) | (7 137) | 172 706 |
| Capital work in progress | 571 462 | (32 983) | 1 415 102 | 64 127 | – | – | 2 017 708 |
| Mineral rights | 1 160 751 | 98 068 | 1 531 710 | 40 299 | (110 018) | (19 111) | 2 701 699 |
| Total | 2 550 419 | – | 3 319 433 | 157 339 | (406 159) | (95 648) | 5 525 384 |
| ***Company*** | | | | | | | |
| Land* | 82 | – | – | – | (82) | – | – |
| Buildings and infrastructure | 4 126 | – | 1 094 | – | (5 220) | – | – |
| Plant, machinery and shafts | 40 386 | – | 64 515 | – | (104 901) | – | – |
| Other | 2 409 | – | 760 | – | (2 571) | (116) | 482 |
| Capital work in progress | – | – | 2 217 | – | (2 217) | – | – |
| Mineral rights | – | – | 13 943 | – | – | – | 13 943 |
| Total | 47 003 | – | 82 529 | – | (114 991) | (116) | 14 425 |

**Details of land are maintained in a register at the Company's registered office, which may be inspected by a member or their duly authorised agents.*

Certain property, plant and equipment is encumbered (refer to note 20).

***Restated for assets held-for-sale.*

# Notes to annual financial statements continued

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **12. GOODWILL** | | | | |
| Goodwill acquired in a business combination is allocated at acquisition to the cash-generating units (CGUs) that are expected to benefit from that business combination. Goodwill is allocated as follows: | | | | |
| Cost | | | | |
| Balance at the beginning and end of the year | 11 514 | **11 514** | 11 514 | **11 514** |

The Group tests goodwill annually for impairment, or more frequently if there are indications that goodwill might be impaired.

The goodwill of R11.5 million (2008: R11.5 million) relates to the Metorex Group and has been assessed for impairment. Management deems no impairment necessary.

The recoverable amounts of the CGUs are determined from value-in-use calculations. The key assumptions for the value-in-use calculations are those regarding the discount rates, production and expected changes to selling prices and direct costs during the period. Management estimates discount rates using pre-tax rates that reflect current market assessments of the time value of money and the risks specific to the CGUs. Changes in selling prices and direct costs are based on past practices and expectations of future changes in the market.

The Group prepares life of mine cash flow forecasts derived from the most recent financial budgets approved by management for the next five years and extrapolates cash flows for the following five years based on certain production, price and cost estimates.

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **13. INVESTMENTS** | | | | |
| Unlisted sundry investments at cost | 3 443 | **16 648** | 3 443 | **16 487** |
| Long-term prepayment – DRC power utility (note 1) | – | **63 070** | – | **–** |
| Directors' valuation | 3 443 | **79 718** | 3 443 | **16 487** |

***Note 1:*** A loan provided to Snel (a DRC state-owned power company) for the construction and commissioning of a high voltage powerline and substation in the DRC. The loan generates interest at US 1 month LIBOR plus two per cent and is recoverable from the monthly tariff over a period of five years commencing from six months after the commissioning of this infrastructure.

*Restated for assets held-for-sale.*

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 193 of 237 PageID #: 4978



## 14. SUBSIDIARIES

Details of the Company's subsidiaries and investments therein at 30 June 2009 are as tabled below.

| | Place of incorporation | Proportion of ownership % | Principal commodity |
|---|---|---|---|
| Abbey Commodities SA Niue | Switzerland | 100 | Dormant |
| Chibuluma Mines plc | Zambia | 85 | Copper |
| Copper Resources Corporation plc | British Virgin Islands | 87 | Copper |
| Maranda Mines (Pty) Limited | South Africa | 100 | Dormant |
| Sable Zinc Kabwe Limited | Zambia | 100 | Copper/Cobalt |
| O'Okiep Copper Company (Pty) Limited | South Africa | 100 | Dormant |
| Vergenoeg Mining Company (Pty) Limited | South Africa | 70 | Fluorspar |
| Pan African Resources plc | United Kingdom | 53 | Gold |
| Ruashi Holdings (Pty) Limited | South Africa | 100 | Copper/Cobalt |

| Investments and loans in subsidiaries | Loans | | Cost (net of impairment) | |
|---|---|---|---|---|
| | 2008 R000 | **2009 R000** | 2008 R000 | **2009 R000** |
| Abbey Commodities SA Niue | (3 928) | **(3 890)** | 37 | **37** |
| Chibuluma Mines plc | 98 438 | **–** | 121 | **121** |
| Maranda Mines (Pty) Limited | (3 164) | **(49 071)** | 53 498 | **53 498** |
| Sable Zinc Kabwe Limited* | 103 414 | **64 118** | 692 | **692** |
| O'Okiep Copper Company (Pty) Limited | (2 789) | **(2 789)** | – | **–** |
| Vergenoeg Mining Company (Pty) Limited* | – | **(7 791)** | 52 500 | **52 693** |
| Ruashi Holdings (Pty) Limited/Ruashi Mining sprl* | 870 390 | **1 557 143** | 381 351 | **400 551** |
| Copper Resources Corporation* | 59 547 | **110 250** | 974 517 | **121 200** |
| Phoenix Platinum (Pty) Limited | 10 576 | **–** | 137 293 | **–** |
| | 1 132 484 | **1 667 970** | 1 600 009 | **628 792** |
| Loans to subsidiaries | | | 1 132 484 | **1 667 970** |
| | | | 2 732 493 | **2 296 762** |

**Interest-bearing loans at market-related rates.*

Loans to/(from) subsidiaries carry no fixed terms of repayment and are interest-free, except where noted otherwise.

# Notes to annual financial statements continued

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **15. INVENTORIES** | | | | |
| Consumable stores | 106 587 | **169 072** | – | **–** |
| Product inventories | 193 556 | **94 979** | – | **–** |
| | 300 143 | **264 051** | – | **–** |
| Inventory amounting to R35.2 million (2008: Rnil) is carried at net realisable value, and inventory to the value of R160 million (2008: R107 million) is pledged as security. | | | | |
| **16. TRADE AND OTHER RECEIVABLES** | | | | |
| Trade receivables | 374 968 | **326 761** | 2 002 | **2 641** |
| Other receivables | 102 362 | **72 361** | 76 998 | **9 814** |
| VAT receivable | 49 303 | **5 912** | 215 | **926** |
| Prepayments | 45 468 | **42 594** | – | **–** |
| | 572 101 | **447 628** | 79 215 | **13 381** |
| *Ageing of amounts past due but not impaired* | | | | |
| The following provides an analysis of the amounts and number of days that trade debtors are past due | | | | |
| Less than 30 days | 51 371 | **76 637** | – | **–** |
| Between 31 – 60 days | 4 580 | **7 901** | – | **–** |

The average credit period is 55 days (2008: 56 days). No interest is charged on the trade receivables.

There are no additional provisions for doubtful debt raised for any amounts past due at balance sheet date as there has not been a significant change in credit quality and the amounts are still considered recoverable.

Before accepting any new customers, the Group and the Company uses a credit bureau or performs a credit assessment to assess the potential customers credit limit and credit quality.

The fair value of trade receivables is not materially different from the carrying values presented. Certain Group companies have ceded their trade receivables as security for banking and overdraft facilities. As at year-end amounts totalling R144.1 million (2008: R190.9 million) included in receivables were pledged. Included in Group trade and other receivables are uncovered Dollar-denominated receivables of US$33.3 million (2008: US$7.7 million).

The directors consider that the trade and other receivables approximate their fair value.

**Restated for assets held-for-sale.*

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | 2009 R000 | 2008* R000 | 2009 R000 |
| **17. SHARE CAPITAL** | | | | |
| ***Authorised*** | | | | |
| 1 500 000 000 (2008: 500 000 000) ordinary shares of 10 cents each | 50 000 | **150 000** | 50 000 | **150 000** |
| ***Issued and fully paid*** | | | | |
| 742 538 403 (2008: 369 172 653) ordinary shares of 10 cents each | 36 917 | **74 255** | 36 917 | **74 255** |
| **SHARE PREMIUM** | | | | |
| Balance at the beginning of the year | 1 293 733 | **2 292 746** | 1 293 733 | **2 292 746** |
| Ordinary shares issued | 1 014 176 | **727 381** | 1 014 176 | **727 381** |
| Expenses written off against share premium | (15 163) | **(40 991)** | (15 163) | **(40 991)** |
| Balance at the end of the year | 2 292 746 | **2 979 136** | 2 292 746 | **2 979 136** |
| **18. HEDGING AND TRANSLATION RESERVE** | | | | |
| Hedging reserve | (243 545) | **(82 785)** | – | **(28 326)** |
| Foreign exchange translation reserve | 75 999 | **(237 085)** | 16 480 | **16 480** |
| | (167 546) | **(319 870)** | 16 480 | **(11 846)** |
| **19. MINORITY INTEREST** | | | | |
| Attributable to minorities at the beginning of the year | 105 147 | **683 570** | | |
| – current year | 141 542 | **(33 226)** | | |
| – acquisitions/equity conversion | 503 900 | **(123 406)** | | |
| Share in hedging reserve | (50 735) | **38 494** | | |
| Dividends | (16 284) | **(108 224)** | | |
| | 683 570 | **457 208** | | |

Notes to share capital (note 17):

***Shares issued:***

- 8 July 2008: 18 250 shares at R24 per share to acquire a further interest in CRC;
- 2 September 2008: 1,2 million shares at R16 per share as payment towards mineral rights.

The values were determined in accordance with the respective agreements.

***Capital raising:***

- 24 December 2008: private placement of 242,5 million shares at R2 per share for cash;
- 19 January 2009: 129,5 million shares issued at R2 per share followed by a clawback offer.

***Share options***

During the year 147 500 shares were issued at an average price of R2.60 per share in terms of the Metorex Share Incentive Scheme.

*Restated for assets held-for-sale.

# Notes to annual financial statements continued

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | 2009 R000 | 2008* R000 | 2009 R000 |
| **20. LONG-TERM LIABILITIES** | | | | |
| Term loans | 1 476 294 | **2 056 795** | 57 934 | **189 482** |
| ***See note 1*** | | | | |
| Instalment finance, lease agreements and trade facility | 41 937 | **54 372** | – | **–** |
| ***See note 2*** | | | | |
| | 1 518 231 | **2 111 167** | 57 934 | **189 482** |
| ***Less***: Repayable within the next 12 months from operating activities: | | | | |
| – term loans | 155 854 | **653 544** | – | **189 482** |
| – instalment finance and lease agreements | 19 442 | **42 060** | – | **–** |
| Total current portion | 175 296 | **695 604** | – | **189 482** |
| Net long-term liabilities | 1 342 935 | **1 415 563** | 57 934 | **–** |
| The Company's articles of association do not restrict the level of borrowings. | | | | |
| ***Note 1*** | | | | |
| RUASHI | | | | |
| Standard Bank | | | | |
| Ecic facility | 1 017 272 | **1 040 217** | – | **–** |
| US Dollar denominated<br>Facility value – US$125 000 000 plus capitalised interest during moratorium period.<br>Interest: US six-month LIBOR plus 1,25%<br>Repayable in nine semi-annual instalments – commencing 31 December 2009 | | | | |
| Commercial facility | 241 048 | **252 723** | – | **–** |
| US Dollar denominated<br>Facility value – US$30 000 000 plus capitalised interest during moratorium period.<br>Interest: Pre-project completion – US six-month LIBOR plus 3,5%<br>Post-project completion – US six-month LIBOR plus 2,75%<br>Repayable in seven semi-annual instalments – commencing 31 December 2009 | | | | |
| Cost overrun facility<br>US Dollar denominated<br>Facility value – US$15 000 000 plus capitalised interest during moratorium period.<br>Interest: US Dollar six-month LIBOR plus 5%. Repayable in seven semi-annual instalments – commencing 31 December 2009 | – | **124 884** | – | **–** |
| Security for Standard Bank facilities<br>– A pledge over all subsoil use rights, land use rights and assets and undertakings of Ruashi under DRC law, including project assets, assignment of rights under all material contracts including, supply contracts, hedging agreement, offtake contracts and project contracts.<br>– First ranking pledge over ordinary shares held by Metorex Limited in Ruashi, Pan African, Chibuluma, Sable and Vergenoeg.<br>– Assignment of insurance proceeds | | | | |
| Guarantees<br>The Standard Bank facilities are guaranteed by Metorex Limited | | | | |
| Pre-offtake finance | 158 436 | **162 315** | – | **–** |
| US Dollar denominated<br>Facility value – US$20 000 000 plus capitalised interest<br>Interest fixed at 4,68% per annum<br>Repayable in 36 monthly instalments – first repayment being 31 January 2010. | | | | |
| Chibuluma Loan | – | **281 649** | – | **–** |
| US Dollar dominated<br>Facility value – US$36 000 000<br>Interest: US Dollar six-month LIBOR plus 4,85% secured by the underlying assets of Chibuluma. Repayable in nine semi-annual instalments – commencing 30 September 2009. | | | | |

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 197 of 237 PageID #: 4982



| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | 2009 R000 | 2008* R000 | 2009 R000 |
| **20. LONG-TERM LIABILITIES (continued)** | | | | |
| Security for pre-offtake finance | | | | |
| Secured by Metorex guarantee which is subordinated to Standard Bank | | | | |
| Term loan facility | | | | |
| Standard Bank | | | | |
| South African Rand denominated | | | | |
| Interest at JIBAR +7,5% | 57 934 | **132 477** | 57 934 | **132 477** |
| Facility repayable on or before 30 November 2009 | | | | |
| ABSA Bank | | | | |
| South African Rand denominated | – | **57 005** | – | **57 005** |
| Interest at the prime lending rate | | | | |
| Facility repayable on or before 30 November 2009 | | | | |
| Other | 1 604 | **5 525** | – | **–** |
| ***Note 2*** | | | | |
| INSTALMENT FINANCE, LEASE AGREEMENTS AND TRADE FACILITY | | | | |
| Secured by the underlying assets. | | | | |
| Bears interest at an average rate of between 10,5% to prime less 2% (2008: 7,5% to prime less 2%). | | | | |
| Repayable either monthly or quarterly within 36 or 48 months (2008: 36 or 48 months). | 41 937 | **54 372** | – | **–** |
| **21. PROVISIONS** | | | | |
| Long-term provisions | | | | |
| Terminal benefits | 25 500 | **14 106** | – | **–** |
| Rehabilitation provision | 145 538 | **149 950** | – | **–** |
| Other | – | **15 430** | – | **–** |
| | 171 038 | **179 486** | – | **–** |
| Current provisions | | | | |
| Terminal benefits | 1 138 | **4 144** | – | **–** |
| Pension fund shortfall | 754 | **–** | – | **–** |
| Rehabilitation provision | 5 854 | **5 768** | – | **–** |
| Leave pay and bonuses | 10 259 | **8 844** | 845 | **1 232** |
| Other | 7 054 | **16 309** | – | **–** |
| | 25 059 | **35 065** | 845 | **1 232** |
| Total provisions | 196 097 | **214 551** | 845 | **1 232** |
| Balance at beginning of year | 113 586 | **196 097** | 10 017 | **845** |
| Transfer to assets held-for-sale | (49 447) | **–** | (8 517) | **–** |
| Utilised during the year | (25 276) | **(9 866)** | (7 897) | **(213)** |
| Released during the year | (63) | **(12 176)** | – | **–** |
| Foreign currency translation | 5 096 | **(12 434)** | – | **–** |
| Provided during the year | 152 201 | **52 930** | 7 242 | **600** |
| Balance at end of year | 196 097 | **214 551** | 845 | **1 232** |

**Restated for assets held-for-sale.*

### Terminal benefits

The terminal benefits provision represents the directors estimate of the portion of the terminal benefits liability outstanding relating to the period of employment of certain employees of Chibuluma Mines plc.

# Notes to annual financial statements continued

## 21. PROVISIONS (continued)

### Rehabilitation trust fund

The Group is exposed to environmental liabilities relating to its mining operations. Estimates of the cost of environmental and other remedial work such as reclamation costs, close down and restoration and pollution control are made on an annual basis, based on the estimated life of the mine, following which payments are made to a rehabilitation trust set up as required by the Minerals Act and Regulations.

The individual companies in the Group contribute, for their own account, to the Metorex Rehabilitation Trust Fund. A guarantee amounting to R25 million has been entered into with Lombard Insurance Company in favour of the DMR relating to the Consolidated Murchison Division.

### Leave pay

The provision for leave pay is provided for, based on the total cost of employment of employees and the amount of leave days owing to them.

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **Rehabilitation trust fund** | | | | |
| The balance of the environmental rehabilitation trust fund, which is represented by cash, was as follows: | | | | |
| Balance at beginning of the year | 35 340 | **6 450** | | |
| Transfer to assets held-for-sale | (34 512) | **–** | | |
| Receipts/(withdrawals), net | 1 718 | **(6 073)** | | |
| Interest earned during the year | 3 904 | **402** | | |
| Balance at end of the year | 6 450 | **779** | | |
| **22. DEFERRED TAX** | | | | |
| **22.1 Deferred tax liabilities** | | | | |
| Property, plant and equipment | 917 654 | **878 015** | 17 360 | **16 269** |
| Leave pay provision | (4 022) | **(802)** | (2 621) | **(2 662)** |
| Other provisions | (14 276) | **(6 589)** | (724) | **(758)** |
| Foreign exchange | (18 538) | **(3 904)** | – | **–** |
| Assessable tax losses | (37 580) | **(547 496)** | – | **–** |
| Transfer to assets held-for-sale | (144 216) | **–** | – | **–** |
| Other | 100 214 | **150 068** | 94 180 | **13 572** |
| Net deferred tax liabilities | 799 236 | **469 292** | 108 195 | **26 421** |
| **Reconciliation of deferred tax liabilities** | | | | |
| Net deferred tax liabilities at the beginning of the year | 416 050 | **799 236** | 29 307 | **108 195** |
| Transfer from deferred tax asset opening balance | (1 887) | **–** | – | **–** |
| Deferred tax charge for the year | 90 083 | **(410 360)** | 79 373 | **(84 226)** |
| Deferred tax credit – rate adjustment | (923) | **–** | (485) | **–** |
| Deferred tax on equity loan included in non-distributable reserve | 606 | **11 545** | – | **–** |
| Translation difference | 22 443 | **4 172** | – | **–** |
| Transfer to assets held-for-sale | (90 285) | **–** | – | **–** |
| Deferred tax raised on additional mineral rights and other | 363 149 | **64 669** | – | **10 001** |
| Net deferred tax liabilities at end of the year | 799 236 | **469 262** | 108 195 | **33 970** |
| **22.2 Deferred tax asset** | | | | |
| Leave pay provision | (178) | **–** | – | **–** |
| Other provisions | (1 176) | **–** | – | **–** |
| Net deferred tax asset | (1 354) | **–** | – | **–** |

**Restated for assets held-for-sale.*

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 199 of 237 PageID #: 4984



| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | 2009 R000 | 2008* R000 | 2009 R000 |
| **22. DEFERRED TAX (continued)** | | | | |
| **22.2 Deferred tax asset (continued)** | | | | |
| **Reconciliation of deferred tax asset** | | | | |
| Net deferred tax asset at the beginning of the year | (1 887) | **(1 354)** | – | **–** |
| Transfer to deferred tax liability opening balance | 1 887 | **–** | – | **–** |
| Acquisition of subsidiary | (1 104) | **–** | – | **–** |
| Deferred tax charge for the year | (86) | **1 562** | – | **–** |
| Translation difference | (164) | **(208)** | – | **–** |
| Net deferred tax asset at the end of the year | (1 354) | **–** | – | **–** |
| **Deferred tax asset not recognised** | | | | |
| Property, plant and equipment, impairments and other | 8 181 | **165 976** | – | **181 964** |
| Assessable losses | – | **37 837** | – | **37 837** |
| | 8 181 | **203 818** | – | **219 801** |
| The following table shows the movement in the unrecognised deferred tax asset for the year: | | | | |
| Opening balance | 5 322 | **8 181** | – | **–** |
| Net unrecognised deferred tax asset during the current year | 2 859 | **195 632** | – | **219 801** |
| Closing balance | 8 181 | **203 813** | – | **219 801** |
| **23. POST-RETIREMENT MEDICAL AID** | | | | |
| The Group sponsors defined benefit post-retirement plans that provide certain health care benefits to eligible employees. Full provision is made for the liability and is based on internal assessments. The following table provides the changes in the obligation: | | | | |
| Benefit obligation at beginning of year | 8 997 | **1 599** | 2 565 | **–** |
| Transferred to assets held-for-sale | (7 295) | **–** | (2 587) | **–** |
| Transferred in | 290 | **–** | – | **–** |
| Interest cost | 482 | **666** | 22 | **–** |
| Benefits paid | (875) | **(441)** | – | **–** |
| Benefit obligation at end of year | 1 599 | **1 824** | – | **–** |
| Discount rate to estimate accumulated benefit (%) | 12 | **12** | – | **–** |
| Health care cost inflation (%) | 12 | **12** | – | **–** |
| **24. GENERAL BANKING FACILITIES** | | | | |
| Cash and bank balances | 119 066 | **73 553** | 11 204 | **6 800** |
| Bank overdraft | (17 735) | **(54 323)** | (15 006) | **(29 717)** |
| | 101 331 | **19 230** | (3 802) | **(22 917)** |
| The Group has the following overdraft facilities at 30 June 2009: | | | | |
| Metorex Limited | | **30 000** | | |
| Barberton Mines (Pty) Limited | | **20 000** | | |
| Consolidated Murchison Division | | **9 000** | | |
| Chibuluma Mines plc** | | **30 840** | | |
| Copper Resources Corporation | | **10 685** | | |
| Vergenoeg Mining Company (Pty) Limited** | | **20 000** | | |
| Ruashi Mining sprl | | **3 858** | | |
| | | **124 383** | | |

The banking facilities are reviewed on an annual basis

***Secured by trade receivables.*

**Restated for assets held-for-sale.*

# Notes to annual financial statements continued

## 25. FINANCIAL INSTRUMENTS

### 25.1 Capital risk management

The Group and Company manages its capital to ensure that the Group and Company will be able to continue as a going concern with the ultimate objective of maximising the return to stakeholders through the optimisation of the debt and equity balance. The Group's overall strategy is focused on the restoration of the balance sheet with specific reference to the reduction of debt to a sustainable level.

The capital structure of the Group and Company consists of debt, which includes borrowings, cash and cash equivalents and equity, comprising share capital, share premium, reserves and retained earnings as disclosed in the statement of changes in equity.

Management regularly reviews the capital structure of the Group.

The gearing ratio at year-end was as follows:

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| Interest-bearing debt | 1 518 231 | **2 111 167** | 57 934 | **189 482** |
| Cash and cash equivalents | (101 331) | **(19 230)** | 3 802 | **22 917** |
| Net interest-bearing debt | 1 416 900 | **2 091 937** | 61 736 | **212 399** |
| Equity | 4 133 674 | **2 856 667** | 3 252 837 | **2 324 798** |
| Net debt to equity ratio (%) | 34 | **73** | 2 | **9** |

### 25.2 Categories of financial instruments

| | Group 2008* R000 | **Group 2009 R000** | Company 2008* R000 | **Company 2009 R000** |
|---|---|---|---|---|
| **Financial assets** | | | | |
| Loans and receivables | 648 314 | **516 058** | 90 204 | **19 255** |
| Derivative instruments | 189 | **94 942** | – | **–** |
| **Financial liabilities** | | | | |
| Amortised cost | 2 157 793 | **2 753 320** | 112 219 | **248 317** |
| Derivative instruments | 273 888 | **230 240** | – | **28 326** |

#### Credit risk

Credit risk refers to the risk that a counterparty will default on its contractual obligations resulting in financial loss to the Group and Company. The Group and Company has adopted a policy of only dealing with creditworthy counterparties and obtaining sufficient collateral, where appropriate, as means of mitigating the risk.

The Group's and Company's credit risk is primarily attributable to its trade receivables. The amounts presented in the balance sheet are net of allowances for doubtful receivables, estimated by the Group's management based on the current economic environment. The Group has no concentration of credit risk in any specific country, but is mainly exposed to copper.

The credit risk on liquid funds is limited because the counterparties are banks with high credit ratings.

**Restated for assets held-for-sale.*

| | Less than R50 million R000 | Greater than R50 million but less than R150 million R000 | Total R000 |
|---|---|---|---|
| 25. FINANCIAL INSTRUMENTS (continued) | | | |
| 25.2 Categories of financial instruments (continued) | | | |
| The Group has the following amounts due from major customers. These customers represent more than 5% of the trade receivable balance for the individual companies. | | | |
| ***Group*** | | | |
| **2009** | | | |
| Copper/Cobalt | **139 591** | **81 400** | **220 991** |
| Fluorspar | **39 346** | **–** | **39 346** |
| Total | **178 937** | **81 400** | **260 337** |
| **2008*** | | | |
| Copper/Cobalt | 37 993 | 136 578 | 174 571 |
| Fluorspar | 30 178 | – | 30 178 |
| Total | 68 171 | 136 578 | 204 749 |

The Group does not have any significant credit risk exposure to any single counterparty or any group of counterparties having similar characteristics. The Group defines counterparties as having similar characteristics if they are related entities.

### Foreign currency commodity price risk

The Group and Company may enter into forward contracts in order to hedge their exposure to fluctuations in mineral prices and exchange rates on specific transactions. The contracts are matched with anticipated future cash flows from mineral sales.

In the normal course of business, the Group primarily enters into transactions for the sale of its commodities, denominated in US Dollars. In addition, the Group has some investments and liabilities in US Dollars and Euros. As a result, the Group is subject to transactions and translation exposure from fluctuations in foreign currency exchange rates.

### Currency risk

The carrying amount of the Group's foreign currency denominated monetary assets and liabilities at balance sheet date is as follows:

| | South African Rand R000 | US Dollar R000 | Total R000 |
|---|---|---|---|
| **2009** | | | |
| Assets | **1 863 454** | **742 039** | **2 605 493** |
| Liabilities | **790 485** | **2 678 326** | **3 468 811** |
| **2008** | | | |
| Assets | 567 827 | 666 780 | 1 234 607 |
| Liabilities | 475 715 | 1 900 074 | 2 375 789 |

### Foreign currency sensitivity analysis

The US Dollar is the primary currency to which the Group is exposed. The following table indicates the Group's sensitivity at year-end to the indicated movements in the US Dollar on financial instruments. The rates of sensitivity are the rates used when reporting to key management.

| | 2008 US Dollar | | **2009 US Dollar** | |
|---|---|---|---|---|
| | R000 10% increase | R000 10% decrease | **R000 10% increase** | **R000 10% decrease** |
| Financial assets | 61 721 | (61 721) | **74 204** | **(74 204)** |
| Financial liabilities | 217 334 | (217 334) | **286 713** | **(286 713)** |

In management's opinion, the sensitivity analysis is unrepresentative of the inherent foreign exchange risk as the year-end exposure does not reflect the exposure during the year.

**Restated for assets held-for-sale.*

# Notes to annual financial statements continued

25. FINANCIAL INSTRUMENTS (continued)

25.2 Categories of financial instruments (continued)

Fair value of financial instruments

**Foreign currency hedges – On balance sheet**

| Currency | Maturity | Amount 000 | Average forward rate | Fair value profit/(loss) R000 |
|---|---|---|---|---|
| **2009** | | | | |
| US Dollar | **1 month** | **US$10 000** | **R8,14/US$** | **(3 773)** |
| US Dollar* | **1 month** | **US$8 054** | **R10,87/US$** | **(24 553)** |
| Total assets | | | | **(28 326)** |
| **2008** | | | | |
| US Dollar | 1 month | US$750 000 | R7,6 – R9,13/US$ | 189 |
| Total assets | | | | 189 |

*Represents the Company.

Foreign currency sensitivity analysis

The US Dollar is the primary currency in which the Group has entered into forward foreign exchange contracts. At year-end the risk of change on the forward exchange contracts are minimal.

Commodity price risk

The carrying amount of the Group's financial assets and liabilities at balance sheet date that are subject to commodity price risk is as follows:

**Commodity hedges – On balance sheet**

| Commodity | Maturity | Volume | Average forward rate | Fair value profit/(loss) R000 |
|---|---|---|---|---|
| **2009** | | | | |
| Copper – Chibuluma South (ATM forwards) | **July 09** | **650t** | **US$3 368/t** | **(15 925)** |
| Copper – Chibuluma South (ATM forwards) | **Aug 09 – Dec 09** | **3 075t** | **US$4 415/t** | **(10 796)** |
| Copper – Chibuluma South (ATM forwards) | **Jan 10 – Jun 10** | **4 200t** | **US$5 308/t** | ** |
| Copper – Ruashi (ATM forwards) | **July 09 – Sep 10** | **24 750t** | **US$3 900/t** | **(219 060)** |
| Copper – Ruashi (put options) | **Oct 10 – Jun 12** | **34 425t** | **Put US$3 900/t** | **138 809** |
| Total liabilities, net | | | | **(106 972)** |

**Transaction executed subsequent to year-end.

| Commodity | Maturity | Volume | Average forward rate | Fair value profit/(loss) R000 |
|---|---|---|---|---|
| **2008** | | | | |
| Copper – Chibuluma South | 2 months | 2 775t | US$8 015 | (14 729) |
| | | | US$6 500/t | |
| Copper – Ruashi (zero cost collar) | 1 month | 100t | US$8 040/t | (467) |
| Copper – Ruashi (forwards) | 1 month | 200t | US$4 952,50/t | (5 740) |
| Copper – Ruashi (participating forwards) | 1 – 12 months | 24 000t | US$7 055/t | (224 845) |
| | | | US$4 420 – | |
| Copper – Ruashi (put options) | 13 – 24 months | 15 000t | US$4 765/t | (28 107) |
| Total liabilities | | | | (273 888) |

*Represents the Company.

## 25. FINANCIAL INSTRUMENTS (continued)

### 25.2 Categories of financial instruments (continued)

#### Commodity price sensitivity analysis

The Group is exposed primarily to movements in the copper price. A sensitivity analysis is not performed for Fluorspar as it is an annually contracted price. The following table indicates the sensitivity of the Group's derivative instruments to the indicated movement in the copper price. The rates of sensitivity are the rates used when reporting to key management.

| | Copper | |
|---|---|---|
| | **R000 10% increase** | **R000 10% decrease** |
| **2009** | | |
| Profit/(loss) | **137 223** | **(144 089)** |
| Derivative financial instrument asset | **(46 596)** | **53 459** |
| Derivative financial instrument liability | **(90 627)** | **90 630** |
| **2008** | | |
| (Loss)/profit | (137 641) | 153 798 |
| Derivative financial instrument liability | 137 641 | (153 798) |

### 25.3 Interest rate and liquidity risk

Fluctuations in interest rates impact on the value of short-term investment and financing activities, giving rise to interest rate risk.

In the ordinary course of business, the Group and Company receive cash proceeds from its operations and are required to fund working capital and capital expenditure requirements. The cash is managed to ensure that surplus funds are invested to maximise returns whilst ensuring that capital is safeguarded to the maximum extent by only investing with reputable financial institutions.

Contractual arrangements for committed borrowing facilities are maintained with several banking counterparties to meet the Group's normal and contingency funding.

#### Interest rate risk

The Group and Company is exposed to interest rate risk as entities within the Group borrow funds at both fixed and floating interest rates.

#### Interest rate sensitivity

The sensitivity analysis has been determined based on the exposure to interest rates as at balance sheet date. The effect of the interest rate exposure of the Group and Company on the income statement is minimal in the current and prior year as the interest on the major long-term borrowings are capitalised to the development project.

#### Liquidity risk

Ultimate responsibility for liquidity risk management rests with the Board of directors, which has built an appropriate 12-month rolling monthly cash flow forecast model for the management of the Group's short-term funding and liquidity requirements. The Group manages liquidity risk by seeking to generate adequate reserves, banking facilities and reserve borrowings facilities, by continually monitoring forecast and actual cash flows and matching maturity profiles of financial assets and liabilities.

The Group has access to limited financing facilities (refer to note 24). The Group expects to meet its financial obligations from operating cash flows, proceeds of maturing financial assets and the disposal of certain mining investments.

# Notes to annual financial statements continued

## 25. FINANCIAL INSTRUMENTS (continued)

### 25.3 Interest rate and liquidity risk (continued)

Liquidity risk analysis

The following table indicates the Group's remaining contractual maturity from its non-derivative financial liabilities.

| | Weighted average interest rate % | Less than 12 months R000 | 1 – 5 years R000 | 5+ years R000 | Total R000 |
|---|---|---|---|---|---|
| ***Group*** | | | | | |
| **2009** | | | | | |
| Trade payables* | **–** | **423 249** | **–** | **–** | **423 249** |
| Long-term liabilities | **4,6** | **–** | **1 415 563** | **–** | **1 415 563** |
| Short-term liabilities | **6,2** | **695 604** | **–** | **–** | **695 604** |
| **2008** | | | | | |
| Trade payables* | – | 449 682 | – | – | 449 682 |
| Long-term liabilities | 7,6 | – | 1 342 935 | – | 1 342 935 |
| Short-term liabilities | 7,6 | 175 296 | – | – | 175 296 |
| ***Company*** | | | | | |
| **2009** | | | | | |
| Trade payables* | – | **5 005** | **–** | **–** | **5 005** |
| Long-term liabilities | 14 | **–** | **–** | **–** | **–** |
| Short-term liabilities | 7,6 | **189 482** | **–** | **–** | **189 482** |
| **2008** | | | | | |
| Trade payables* | – | 1 734 | – | – | 1 734 |
| Long-term liabilities | 7,6 | – | 57 934 | – | 57 934 |
| Short-term liabilities | 7,6 | – | – | – | – |

*Excludes value added taxation.*

Fair value of financial instruments

The directors consider that the carrying amounts of financial assets and liabilities recorded approximate their fair values at 30 June 2009. The fair values have been determined with reference to quoted market prices where available or with the standard terms and conditions per the agreements.

| | Group | | Company | |
|---|---|---|---|---|
| | 2008* R000 | **2009 R000** | 2008* R000 | **2009 R000** |
| **26. CAPITAL COMMITMENTS** | | | | |
| Authorised by directors but not contracted | 151 081 | **1 970** | – | **–** |
| Authorised by directors and contracted | 330 493 | **40 734** | – | **–** |
| | 481 574 | **42 704** | – | **–** |

Capital commitments mainly relate to the Ruashi phase II project.

*Restated for assets held-for-sale.*

## 27. RETIREMENT BENEFIT INFORMATION

Contributions are made by the Group to independent pension and provident funds which are defined contribution retirement benefit plans governed by the Pension Fund Act 1956. All eligible employees are required to become members of these schemes. The assets of the schemes are held separately from those of the Group in funds under the control of the trustees.

Costs charged to income of R11.5 million (2008: R28.9 million) represent contributions payable to these defined contribution schemes by the Group at rates specified in the rules of the schemes.

## 28. STAFF COMPLEMENT

At 30 June 2009: 4 593 (2008: 5 150) people were employed by the Group.

| | 2008 R000 | 2009 R000 |
|---|---|---|
| **29. DIRECTORS' EMOLUMENTS** | | |
| Executive directors | | |
| Emoluments | 8 706 | 11 537 |
| Company contributions | 976 | 1 029 |
| Share options | – | 383 |
| Total | 9 682 | 12 949 |
| Non-executive directors | | |
| Fees | 566 | 1 465 |
| Total | 566 | 1 465 |
| Total | 10 248 | 14 414 |

| Individual directors' emoluments | 2008 Total R000 | Share options exercised and sold R000 | Basic salary R000 | Bonuses R000 | Vehicle allowances R000 | Company contri-butions †R000 | 2009 Total R000 |
|---|---|---|---|---|---|---|---|
| Executive | | | | | | | |
| Mr A S Malone[1] | 1 374 | – | 1 003 | 200 | 94 | 129 | 1 426 |
| Mr T P Goodlace[2] | | – | 951 | – | – | 92 | 1 043 |
| Mr C D S Needham | 3 135 | – | 2 082 | 910 | 182 | 220 | 3 394 |
| Mr E W Legg | 2 025 | – | 1 506 | 510 | 123 | 230 | 2 369 |
| Mr K C Spencer[3] | 2 360 | – | 1 208 | 610 | 105 | 228 | 2 151 |
| Mr M Smith[6] | 788 | 383 | 1 431 | 500 | 122 | 130 | 2 566 |
| Total | 9 682 | 383 | 8 181 | 2 730** | 626 | 1 029 | 12 949 |

| | 2008 R000 | Fees for director services R000 | Fees for other services R000 | 2009 R000 |
|---|---|---|---|---|
| Non-executive | | | | |
| Mr A Barrenechea | 143 | 155 | – | 155 |
| Mr A J Laughland | 145 | 200 | – | 200 |
| Mr R G Still | 173 | 350 | 600 | 950 |
| Mr P Chevalier[4] | – | 75 | – | 75 |
| Mr L J Paton[5] | 105 | 85 | – | 85 |
| Total | 566 | 865 | 600 | 1 465 |

The directors have no fixed term service contracts.

*†Pension, medical aid and leave pay.*

***Bonuses relate to the previous financial year ended 30 June 2008 but only determined in August 2008.*

*[1]Resigned 20/1/2009.*

*[2]Appointed 2/03/2009 – Emoluments for four months.*

*[3]Resigned 31/3/2009 – Emoluments for nine months.*

*[4]Appointed 20/01/2009 – Emoluments for five months.*

*[5]Appointed 1/12/2008 – Emoluments for seven months.*

*[6]Emoluments for 2008 for seven months.*

# Notes to annual financial statements continued

29. DIRECTORS' EMOLUMENTS (continued)

| **2009** Share options | **Total options 1 July 2008** | **Options granted** | **Options exercised** | **Average option price cents** | **Total options 30 June 2009** |
|---|---|---|---|---|---|
| Mr A S Malone | **1 200 000** | **–** | **–** | **550** | **1 200 000** |
| Mr T P Goodlace | **–** | **5 000 000** | **–** | **128** | **5 000 000** |
| Mr C D S Needham | **846 250** | **–** | **–** | **980** | **846 250** |
| Mr K C Spencer | **776 000** | **–** | **(225 000)** | **927** | **551 000** |
| Mr E W Legg | **434 500** | **–** | **–** | **910** | **434 500** |
| Mr M Smith | **442 000** | **–** | **(40 000)** | **1 471** | **402 000** |
| Mr A Barrenechea | **325 000** | **–** | **–** | **1 166** | **325 000** |
| Mr A J Laughland | **325 000** | **–** | **–** | **1 166** | **325 000** |
| Mr R G Still | **325 000** | **–** | **–** | **1 166** | **325 000** |
| Total | **4 673 750** | **5 000 000** | **(265 000)** | | **9 408 750** |

| **2008** Share options | Total options 1 July 2007 | Options granted | Options exercised | Average option price cents | Total options 30 June 2008 |
|---|---|---|---|---|---|
| Mr A S Malone | 1 000 000 | 200 000 | – | 550 | 1 200 000 |
| Mr C D S Needham | 681 250 | 350 000 | (185 000) | 980 | 846 250 |
| Mr K C Spencer | 550 000 | 226 000 | – | 725 | 776 000 |
| Mr E W Legg | 725 000 | 172 000 | (462 500) | 910 | 434 500 |
| Mr M Smith | 170 000 | 272 000 | – | 1 345 | 442 000 |
| Mr A Barrenechea | 200 000 | 125 000 | – | 1 166 | 325 000 |
| Mr A J Laughland | 200 000 | 125 000 | – | 1 166 | 325 000 |
| Mr R G Still | 200 000 | 125 000 | – | 1 166 | 325 000 |
| Total | 3 726 250 | 1 595 000 | (647 500) | | 4 673 750 |

30. SHARE-BASED PAYMENTS

Equity settled share option scheme

The Company has a share incentive scheme for eligible employees of the Group. Options are offered at a price equal to the average quoted market price of the Company's shares on the trading day preceding the offer date. The vesting period is between one and five years and exercise is subject to Board approval. Options lapse if not exercised within 10 years of the option date. Options are forfeited if the employee leaves the Group on account of resignation or dismissal.

Details of the share options outstanding during the year are:

| | 30 June 2008 | | **30 June 2009** | |
|---|---|---|---|---|
| | Number of share options | Weighted average exercise price R | **Number of share options** | **Weighted average exercise price R** |
| Outstanding at the beginning of the year | 10 601 375 | 6,54 | **14 110 750** | **12,24** |
| Granted during the year | 6 314 000 | 19,31 | **26 472 000** | **1,78** |
| Amendment | (725 500) | 12,20 | **(6 301 000)** | **17,99** |
| Exercised during the year | (2 079 125) | 2,70 | **(372 000)** | **2,45** |
| Outstanding at the end of the year | 14 110 750 | 12,24 | **33 909 750** | **3,22** |
| Exercisable at the end of the year | 2 390 750 | | **3 232 250** | |

Options exercisable between one and nine years.

The weighted average share price at the date of exercise for share options exercised during the year was R8.39. During 2009, the following options were granted:

| | **Shares** | **Option price R** |
|---|---|---|
| 23 January 2009 | **18 222 000** | **2,00** |
| 18 March 2009 | **8 250 000** | **1,28** |
| | **26 472 000** | **1,78** |

30. SHARE-BASED PAYMENTS (continued)

Equity-settled share option scheme (continued)

The fair values were calculated using the American-Binomial option-pricing model. The inputs into the model were as follows:

| | **30 June 2009** |
|---|---|
| Weighted average share price (R) | **2,33** |
| Weighted average exercise price (R) | **2,34** |
| Expected volatility (%) | **41 – 58** |
| Expected life (years) | **2 – 5** |
| Risk-free rate (%) | **7,0 – 9,3** |
| Expected dividend yield (%) | **0 – 4,6** |

Expected volatility was determined by calculating the historical volatility of the Company's share price over the previous eight years. The expected life used in the model has been adjusted, based on management's best estimate, for the effects of non-transferability, exercise restrictions and behavioural considerations.

The Group recognised total expenses of R25.2 million (2008: R23.1 million) related to equity-settled share-based payment transactions during the year.

31. NON-CURRENT ASSETS HELD-FOR-SALE AND DISCONTINUED OPERATIONS

Pan African Resources, Consolidated Murchison and the Antimony/Gold segment, have been classified as assets held-for-sale and O'Okiep is classified as a discontinued operation.

The operating results are detailed below:

| | Group | | Company | |
|---|---|---|---|---|
| | 2008 R000 | **2009 R000** | 2008 R000 | **2009 R000** |
| Revenue – mineral sales | 823 730 | **901 196** | 247 473 | **224 025** |
| Realisation costs | (35 866) | **(44 743)** | (34 306) | **(42 721)** |
| Cost of production | (570 590) | **(635 499)** | (195 071) | **(266 404)** |
| Other income/(expenditure) | 141 900 | **(43 554)** | 2 638 | **(51 988)** |
| Discontinued operations | (8 859) | **(438)** | – | **–** |
| Finance income, net | 1 391 | **4 662** | (971) | **(5 327)** |
| Profit before taxation | 351 706 | **181 624** | 19 763 | **(142 415)** |
| Income tax expense | (115 475) | **(118 253)** | – | **–** |
| Profit after taxation | 236 231 | **63 371** | 19 763 | **(142 415)** |
| The major classes of assets and liabilities comprising the operations classified as held-for-sale at the balance sheet date are as follows: | | | | |
| Goodwill | 221 590 | **221 590** | – | **–** |
| Property, plant, equipment and mineral rights | 997 138 | **754 537** | 101 150 | **–** |
| Subsidiaries | | | 514 826 | **372 897** |
| Inventories | 27 953 | **22 012** | 22 072 | **17 474** |
| Trade and other receivables | 83 135 | **49 648** | 33 118 | **15 911** |
| Derivative financial instrument | – | **–** | 160 | **–** |
| Cash and cash equivalents | 84 369 | **30 442** | 38 | **27** |
| Assets classified as held-for-sale | 1 414 185 | **1 078 229** | 671 364 | **406 309** |
| Borrowings | 34 744 | **27 160** | 33 093 | **26 898** |
| Provisions | 56 459 | **82 973** | 11 104 | **26 128** |
| Trade payables | 88 868 | **94 209** | 40 361 | **45 145** |
| Current tax liabilities | 47 542 | **3 212** | – | **–** |
| Deferred tax liabilities | 144 216 | **151 496** | – | **–** |
| Derivative financial instrument | 31 484 | **–** | 31 484 | **–** |
| Bank overdraft | 2 129 | **7 091** | 2 129 | **7 091** |
| Liabilities classified as held-for-sale | 405 442 | **366 141** | 118 171 | **105 262** |
| Net assets classified as held-for-sale | 1 008 743 | **712 088** | 553 193 | **301 047** |
| Cash inflows/(outflows) from operating activities | – | **342 765** | – | **(62 248)** |
| Cash outflows from investing activities | – | **(7 585)** | – | **(6 196)** |
| Cash outflows from financing activities | – | **(156 085)** | – | **(23 616)** |

# Notes to annual financial statements continued

## 32. RELATED PARTIES

The immediate parent and ultimate controlling party of the Group is Metorex Limited (incorporated in the Republic of South Africa).

Furthermore, the Group did not enter into any significant transactions during the year with related parties that are not members of the Group.

Fees paid for services by the Group to Sam Aviation (Pty) Limited into which Mr R G Still and A S Malone have a vested interest amounted to R2.2 million (2008: R2.6 million).

Marketing fees paid by the Group to Minerales Y Productos Derivados S.A. amounted to R3.5 million (2008: R2.8 million).

Management and technical fees amounted to R19.4 million (2008: R47.2 million).

Consulting fees paid by the Group to Pangea Group amounted to R0.6 million (2008: Rnil) for the semi-executive assignment of Mr R G Still during December 2008 to June 2009.

The remuneration of directors, and other members of key management of the Group, is determined by the Remuneration Committee having regard to their performance and market trends. The remuneration of directors is disclosed under note 29.

## 33. ACQUISITIONS AND DISPOSALS

During the 2009 financial year, the Group made no new acquisitions (2008: CRC, PAR and Phoenix was acquired). During the year the Company disposed of Phoenix Platinum Mining (Pty) Limited to Pan African Resources. Details are as follows:

| **2009** | **30 June 2009 R000** |
|---|---|
| Book value of net assets sold | |
| ***Non-current assets*** | |
| Investment | **137 124** |
| Loan | **11 722** |
| ***Current liabilities*** | |
| Payables | **1 757** |
| Net assets disposed of | **150 603** |
| Loss on disposal | **(79 353)** |
| | **71 250** |
| Proceeds | |
| Proceeds paid in cash and cash equivalents | **57 403** |
| Deferred sales proceeds | **12 090** |
| Payables settled | **1 757** |
| | **71 250** |

During the 2008 financial year, the Group made the following acquisitions:

| **2008** | Principal commodity | Date of acquisition | Proportion of share acquired % | Cost of acquisition R000 |
|---|---|---|---|---|
| Copper Resources Corporation plc | Copper | 1 January 2008 | 50,3 | 974 517 |
| Pan African Resources plc (PAR)** | Gold | 31 July 2007 | 55 | – |
| Phoenix Platinum (Pty) Limited* | Platinum | 31 December 2007 | 100 | 137 293 |
| | | | | 1 111 810 |

* *Phoenix Platinum is carried as an investment in the Company and classified as a mineral right asset from a Group perspective. Phoenix has not contributed to the results of the Group in the current year.*

** *The reverse acquisition followed the disposal of Barberton Mines for a share in PAR.*

## 33. ACQUISITIONS AND DISPOSALS (continued)

The major classes of assets and liabilities at acquisition are as follows:

| | PAR R000 | CRC R000 | Year ended 30 June 2008 R000 |
|---|---|---|---|
| Total assets excluding cash and cash equivalents | 674 891 | 481 605 | 1 156 496 |
| Cash and cash equivalents | – | 53 867 | 53 867 |
| Total assets | 674 891 | 535 472 | 1 210 363 |
| Total liabilities | 6 280 | 62 037 | 68 317 |
| Net assets | 668 611 | 473 435 | 1 142 046 |
| Goodwill on acquisition | | | 221 590 |
| Mineral rights on acquisition | | | 601 465 |

The abovementioned assets and liabilities represent the fair value at acquisition and no further adjustments were made.

### Goodwill arising on acquisition

Goodwill amounting to R222 million arose on the reverse acquisition of Pan African Resources plc, which is now disclosed as assets held-for-sale.

A profit of R158 million is included in the 2008 year earnings, which relates to this reverse acquisition and is now disclosed as assets held-for-sale.

### Cost of acquisitions

| | Phoenix R000 | CRC R000 | Year ended 30 June 2008 R000 |
|---|---|---|---|
| Total purchase consideration | 137 293 | 974 517 | 1 111 810 |
| ***Less***: Non-cash consideration | (53 503) | (888 597) | (942 100) |
| Consideration paid in cash | 83 790 | 85 920 | 169 710 |
| ***Less***: Cash and cash equivalents acquired | – | (53 867) | (53 867) |
| | 83 790 | 32 053 | 115 843 |

### Impact of the acquisitions on the results of the Group

PAR's exploration expenditure and related holdings costs since acquisition have been capitalised and therefore not included in the Group's results for the prior and current year.

CRC's loss since acquisition has been capitalised and therefore not included in the Group's results for the prior and current year as CRC is in a development phase.

Had these business combinations been effective 1 July 2007, the 2008 results of the Group would not be materially different.

## 34. SUBSEQUENT EVENTS

On 25 June 2009, the Group announced the disposal of its entire shareholding in Pan African Resources plc for R386 million, subject to certain conditions precedent. These conditions have subsequently been fulfilled and accordingly this two-tiered transaction became unconditional on 1 July 2009 and 20 August 2009 respectively. Through this sale Pan African is now an empowered company with 26 per cent of its shareholding being held by Shanduka.

On 29 July 2009, the Group announced the disposal of 15 per cent of the issued ordinary share capital of Vergenoeg to Medu Capital, a consortium of black economic empowerment (BEE) controlled entities, for a cash consideration of R108.8 million.

On 23 September 2009, the Group announced the proposed disposal of its entire remaining shareholding in Vergenoeg comprising 137 500 ordinary shares constituting 55 per cent of the issued ordinary share capital of Vergenoeg to Minersa, currently a 30 per cent shareholder in Vergenoeg for a cash consideration of US$60 million. This transaction is still subject to a number of conditions precedent, including shareholder approval.

Case 1:16-cr-00515-NGG-LB Document 93-1 Filed 05/01/20 Page 210 of 237 PageID #: 4995



# Notes to annual financial statements continued

## 35. SEGMENTAL ANALYSIS

### Primary segmental information

| | External sales | | Mining profit before depreciation | | Depreciation | | Capital expenditure* | | Assets† | | Liabilities# | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | R000 | % | R000 | % | R000 | % | R000 | % | R000 | % | R000 | % |
| **2009** | | | | | | | | | | | | |
| Fluorspar | **304 637** | **25** | **151 934** | **58** | **13 437** | **11** | **40 647** | **3** | **191 674** | **3** | **37 521** | **4** |
| Copper/ Cobalt | **937 084** | **75** | **167 256** | **64** | **108 607** | **89** | **1 393 454** | **97** | **5 615 938** | **97** | **1 021 248** | **96** |
| Other | **–** | **–** | **(56 000)** | **(22)** | **190** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |
| Group | **1 241 721** | **100** | **263 190** | **100** | **122 234** | **100** | **1 434 101** | **100** | **5 807 612** | **100** | **1 058 769** | **100** |
| **2008** | | | | | | | | | | | | |
| Fluorspar | 255 643 | 16 | 93 846 | 12 | 11 218 | 12 | 18 858 | 1 | 153 408 | 2 | 31 587 | 3 |
| Copper/ Cobalt | 1 359 146 | 84 | 716 295 | 90 | 84 314 | 88 | 3 293 743 | 99 | 6 386 236 | 98 | 970 370 | 97 |
| Other | – | – | (10 896) | (2) | 116 | – | – | – | – | – | – | – |
| Group | 1 614 789 | 100 | 799 245 | 100 | 95 648 | 100 | 3 312 601 | 100 | 6 539 644 | 100 | 1 001 957 | 100 |

### Secondary segmental information

| | Total sales by customer location | | Assets† | | Liabilities# | | Capital expenditure* | |
|---|---|---|---|---|---|---|---|---|
| | R000 | % | R000 | % | R000 | % | R000 | % |
| **2009** | | | | | | | | |
| Africa | **616 931** | **50** | **5 807 612** | **100** | **1 058 769** | **100** | **1 434 101** | **100** |
| Switzerland | **284 996** | **23** | **–** | **–** | **–** | **–** | **–** | **–** |
| USA | **96 119** | **8** | **–** | **–** | **–** | **–** | **–** | **–** |
| Other | **243 675** | **19** | **–** | **–** | **–** | **–** | **–** | **–** |
| Group | **1 241 721** | **100** | **5 807 612** | **100** | **1 058 769** | **100** | **1 434 101** | **100** |
| **2008** | | | | | | | | |
| Africa | 881 403 | 55 | 6 539 644 | 100 | 1 001 957 | 100 | 3 312 601 | 100 |
| Switzerland | 491 631 | 30 | – | – | – | – | – | – |
| USA | 81 716 | 5 | – | – | – | – | – | – |
| Other | 160 039 | 10 | – | – | – | – | – | – |
| Group | 1 614 789 | 100 | 6 539 644 | 100 | 1 001 957 | 100 | 3 312 601 | 100 |

† *Excludes taxation (current and deferred).*
\# *Excludes interest-bearing debt, taxation (current and deferred).*
* *Includes increases in mineral rights.*

# Supplementary information

## SALIENT TERMS OF THE METOREX SHARE INCENTIVE SCHEME, AS AMENDED ("THE SCHEME")

The object and purpose of the scheme is to attract and retain employees and to provide offerees with a performance-based incentive.
The aggregate number of shares which may be utilised for the scheme is limited to 55 782 255 (fifty-five million, seven hundred and eighty-two thousand, two hundred and fifty-five) ordinary shares of Metorex Limited ("the Company"), equivalent to 7,5 per cent of the current issued shares of the Company. Shares which are the subject of an expired or terminated instrument are not taken into account in determining the aggregate number of shares.

The aggregate number of shares which any one offeree may acquire in terms of the scheme shall not exceed in the aggregate 7 437 634 (seven million, four hundred and thirty-seven thousand, six hundred and thirty-four) ordinary shares of the Company, equivalent to one per cent of the current issued shares of the Company.

Options or share appreciation rights ("SARs") may be offered to employees of the Company (which includes anyone employed on a full-time basis by the Company or any of its subsidiaries). The criteria for awards shall be aligned with the strategic requirements of the Company and shall incorporate the objective of incentivising offerees for good performance and promoting the continued growth of the Company.

The option price of an option and the grant price of a SAR is the volume weighted average price of a share of the Company on the JSE on the last trading day preceding the grant date of the option or SAR. The exercise price of a SAR is the volume weighted average price of a share of the Company on the JSE on the last trading day preceding the exercise date of the SAR.

The options are pure vanilla options. Upon the exercise of SARs, an offeree shall be entitled to subscribe for a number of shares of the Company calculated as follows:

SAR exercise price – SAR grant price x number of SARs exercised = TV
TV/SAR exercise price = N
Where:
TV is the total value attributable to the exercise by the offeree of SARs and;
N is the number of shares to be issued by the Company to the offeree, rounded down to the nearest share.

Options and SARs granted are irrevocable and their exercise requires the written approval of the Board of directors ("the Board") in its absolute discretion. Options and SARs shall lapse if not exercised within seven years of their grant, provided that such date may be extended to take account of closed periods.

Options and SARs may be exercised as follows:

- up to 50% (fifty per cent) of the instruments after the third anniversary of the grant date;
- up to 100% (one hundred per cent) of the instruments after the fourth anniversary of the grant date.

If any employee ceases to be employed by reason of death, retrenchment, illness, serious incapacity, serious disability, or by reason of him/her ceasing to be an employee as a result of his employer ceasing to be a member of the Metorex Group, such employee shall be entitled to exercise in full any option or SAR (whether vested or unvested), provided that such exercise must take place within 365 days after the termination of employment.

If any employee ceases to be employed by reason of his retirement, including early retirement, such employee shall be entitled to exercise in full any option or SAR which has vested as at the date of his retirement provided that such exercise must take place within 365 days after the termination of employment.

If any employee ceases to be employed by reason of resignation or dismissal or any other reason not specified above then, and in such event, any unexercised option or SAR (whether vested or unvested) at the date of termination of employment, shall lapse with effect from the date of such termination.

The scheme may be amended from time to time by resolution of the Board, provided that no such amendment shall operate adversely to alter the terms and conditions under which any scheme shares are held prior thereto and provided further that no amendment to the scheme may be made without prior approval of the JSE if so required in terms of the listings requirements of the JSE.

No amendment in respect of the following matters shall operate unless such amendment has been approved by 75 per cent of the Company's shareholders, present in person or represented by proxy in general meeting:

- the determination of the offerees;
- the aggregate number of shares which may be utilised for the scheme;
- the aggregate number of shares which any one offeree may acquire in terms of the scheme;
- the determination of the option price or SAR grant price;
- the determination of the period in which payment of the option price, or SAR grant price has to be made by the offeree;
- the voting, dividend, transfer and other rights (including those arising on liquidation of the Company) attaching the scheme shares;
- the basis upon which an award of options or SARs has to be made;
- the treatment of options or SARs in the instance of mergers, takeovers or corporate actions; and
- the rights of offerees who leave the employment of the Company.

# Supplementary information continued

## INTERESTS IN SUBSIDIARIES, JOINT VENTURES, ASSOCIATES AND INVESTMENTS

Metorex Limited ("the Company") acts as a holding company for the Group. All mining operations are conducted by companies which are members of the Group. The Company holds beneficial interests in its subsidiaries at 30 June 2009 are as follows:

| Subsidiaries | Place of incorporation | Percentage of ownership and voting power held | Principal commodity |
|---|---|---|---|
| Ruashi Holdings (Pty) Limited[1] | South Africa | 100% | Copper, cobalt |
| Chibuluma Mines plc | Zambia | 85% | Copper |
| Copper Resources Corporation[2] | British Virgin Islands | 87% | Copper |
| Sable Zinc Kabwe Limited | Zambia | 100% | Copper, cobalt |
| Vergenoeg Mining Company (Pty) Limited[4] | South Africa | 70% | Fluorspar |
| Consolidated Murchison Division | South Africa | 100% | Gold, antimony |
| Pan African Resources plc [3] | UK | 53% | Gold |
| O'Okiep Copper Company (Pty) Limited | South Africa | 100% | Dormant |
| Maranda Mines (Pty) Limited | South Africa | 100% | Dormant |

1. *Ruashi Holdings has a 75 per cent (2008: 80 per cent) interest in Ruashi Mining sprl which is incorporated in the DRC.*
2. *Copper Resources Corporation (CRC) owns a 77 per cent interest in Minière de Musoshi et Kinsenda sarl (MMK) which holds the Kinsenda and Lubembe copper deposits in the Democratic Republic of the Congo (DRC).*
3. *With effect 1 July 2009, Metorex disposed of its entire shareholding in Pan African Resources plc. Consequently, this asset no longer form part of the Metorex Group.*
4. *Vergenoeg became empowered on 27 July 2009 through the sale of 15 per cent to Medu Capital. Consequently, the Company's interest in this asset reduced to 55 per cent.*

## LEGAL ENTITLEMENT TO MINERALS

The Company conducts its mining operations and exploration activities in terms of approved permits and licences that have been issued and registered according to the regulatory requirements of the various countries in which these are conducted. The details of the permits and licences are set out below:

| Mine or prospect | Farm name | Type of title | Hectares |
|---|---|---|---|
| *Ruashi Mining sprl* | | | |
| | Ruashi PE 578 | Permis de Exploitation | 900 |
| | Musonoi Est PE 4958 | Permis de Exploitation | 2 000 |
| | Sokoroshe I PE 523 | Permis de Exploitation | |
| | Sokoroshe II PE 528 | Permis de Exploitation | |
| *Chibuluma Mines plc* | | | |
| | LML23 | Large-scale mining licence | 4 440 |
| | LML24 | Large-scale mining licence | 960 |
| *Minière de Musoshi et Kinsenda sarl [1]* | | | |
| | Kinsenda PE 101 | Permis de Exploitation | 5 012 |
| | Lubembe PE 330 | Permis de Exploitation | 2 378 |
| Prospecting | Kinsenda PR 4724 | Permis de Reserche | 13 168 |
| *Sable Zinc Kabwe Limited* | | | |
| | SML1 | Large-scale mining licence | 80 |
| *Consolidated Murchison Division* | | | |
| | Farrell 781LT | Old order mining rights [2] | 663 |
| | Josephine 777LT | Old order mining rights [2] | 792 |
| | Claimland 780LT | Old order mining rights [2] | 502 |
| | Begin 765LT | Old order mining rights [2] | 840 |
| Prospecting | | Converted prospecting rights 29/06/2007 – 2010 | 9 454 |
| *Vergenoeg Mining Company (Pty) Limited* | | | |
| | Kromdraai 209JR | Old order mining rights [2] | 393 |
| *O'Okiep Copper Company (Pty) Limited* | | | |
| | Melkboschkuil 132 | Old order mining rights | |
| | Nigramoep 136 | Old order mining rights | |
| | Nababeep 134 | Old order mining rights | |
| | Brakkefontein 133 | Old order mining rights | |
| | Plaatjiesfontein 135 | Old order mining rights | |
| | Steinkopf Rural Area | Old order mining rights | |

1. *Following the review of mining titles by the DRC Ministry of Mines in 2008, it was agreed that all mining and prospecting licences associated with the Musoshi deposit would be returned to Sodimico (the state mining company holding 23 per cent of the MMK assets).*
2. *In terms of the Minerals and Petroleum Resources Development Act (MPRDA), Consolidated Murchison and Vergenoeg are required to submit applications to convert these old order mining rights to new order mining rights. Vergenoeg submitted a conversion application on 24 April 2009. Consolidated Murchison has yet to attain an acceptable level of empowerment.*

## MINING OPERATIONS, MINERAL RESOURCES AND ORE RESERVES

### RUASHI HOLDINGS (PTY) LIMITED

The Ruashi mine is an opencast oxide copper and cobalt mine situated in the Democratic Republic of the Congo (DRC) on the outskirts of Lubumbashi which is the capital of Katanga Province.

The Ruashi mine consists of three open pitable deposits. These deposits occur along strike of each other over a combined strike length of 2,000m, and are separated by cross-cutting faults and breccias zones.

**Historical and Recent Exploration Activities**

The Ruashi deposits were discovered by Union Miniére in 1919 and have been intensively evaluated by drilling over the years. Drilling has been conducted on sections spaced at 50m intervals along strike and drill hole intervals along section of between 25m and 50m. Historical drilling activities at Ruashi prior to Metorex's involvement amounted to 1,047 holes over a total of 76,548m of which a total of 914 holes were captured into the Ruashi geological database from Gécamines geological logs at the time of the 2003 Phase I feasibility study.

Metorex completed a drilling campaign at Ruashi shortly after being granted a Permis d'Exploitation (PE578) in 2003. The Company carried out a verification drilling programme during F2006 consisting of 6 665m of drilling across the three orebodies, of which 5,088m (69 holes) were by reverse circulation (RC) and 1,577m (15 holes) diamond drilling. This programme was carried out to verify and infill the existing Gécamines' drilling where possible and to provide core for assays, lithological identification, Quality Assurance and Quality Control (QAQC) and density determinations for the Phase II feasibility study.

During the course of F2009, Ruashi Mining completed two drilling campaigns between January and June 2009. 1,651m (48 holes) of RC drilling was completed in the Ruashi 1 open pit with a further 5,229m (52 holes) of diamond drilling completed across all three orebodies. Since discovery in 1919, 1,269 drill holes have been completed on the Ruashi property for a total of 94,589m.

In addition to activities at Ruashi, the Company has been involved in exploration activities on the Sokoroshi I (PE523) and Sokoroshe II (PE538) deposits as well as the Dilala East Project, located on the Musonoi Est Permis d'Explotation (a portion of PE 4958) close to Kolwezi. These permits form part of the licences granted to Ruashi Mining sprl in 2003.

Exploration commenced on the Dilala East Project in 2006, and to date, 44 diamond drillholes have been drilled for a total drilled length of 9,221m. Steeply dipping mineralisation has been identified over a strike length of 600m and to a maximum depth of 400m below surface. Drilling activities were stopped in December 2008 but will recommence in F2010 to extend the orebody at depth.

**Geological setting and geological model**

The copper and cobalt deposits of Ruashi occur in the Proterozoic Katangan Supergroup rocks of the Congolese Copperbelt and are hosted in a succession of siltstones, sandy dolomites and shales associated with dislocated thrust sheets and 'rafts' within the northwest trending Lufilian Thrust Belt.

The Ruashi deposits form part of a recumbent synclinal fold trending northwest with flanks compromising Kundulungu Group (Upper Katangan) sediments and a core of Mines Group sediments, which is the Lower Roan Formation equivalent in Zambia. Three orebodies have been recognised, namely Ruashi 1, 2 and 3 with respective strike lengths of 800m, 200m and 450m.

The primary copper and cobalt sulphide mineralisation is stratiform. The orientation of these horizons has been affected by folding and their orientation in the orebody varies from horizontal through vertical to overturned. Supergene enrichment of copper and cobalt resulted in an irregular blanket of oxide ore to a depth of 50m to 70m overlying the steeply dipping sulphide ore and extending laterally beyond the sulphide bodies from 20m to 100m. The main oxide minerals are malachite, chrysocolla and heterogenite.

The supergene cap, which was previously mined by Union Miniere and Gécamines consists of malachite and heterogenite in massive saprolite or in fracture controlled mineralisation along joint planes, fracture cleavages and shear fractures. Mixed oxide-sulphide mineralisation occurs at the transition zone extending into the sulphides at depth over a thickness of 10m to 20m. The sulphide mineralisation comprises chalcopyrite, bornite, carrolite and pyrite.

The Dilala East orebody in Kolwezi occurs along strike from, and is similar to, the Kamoto underground orebody. The orebody occurs on the eastern end of the Dilala Syncline and is a blind deposit with mineralisation starting at between 50 and 100m below surface. It consists of a lower and an upper copper rich zone separated by a copper poor, cobalt rich zone. The full mineralised package is approximately 60m in width and is open ended at depth. A feasibility study is in progress to complete the geological resource model, mining and metallurgical treatment options and capital forecasts for the Dilala East Project.

# Supplementary information continued

**Type of mining, mining activities**
The Ruashi mine comprised an old open pit originally mined by Union Minière starting in the early 1920s and later by Gécamines up to the early 1980s. Approximately 5,5 Mt was mined at a grade of 7,9 per cent Cu.

Metorex has been involved since 2003 with a first phase of copper and cobalt production being derived from old stockpiles previously not treated by Gécamines. The old stockpiles and tailings were reclaimed in Phase I using a load and haul contractor, and treatment through an oxide flotation circuit to recover a low grade copper/cobalt concentrate.

The Phase II solvent extraction, electro winning (SX-EW) plant is now substantially complete. The Ruashi 1 and 2 orebodies have been opened up and oxide copper and cobalt ore production is being ramped up to feed the new SX-EW plant at a rate of 120 ktpm. Pre-stripping on the Ruashi 3 orebody is targeted to commence in F2010. Mining is by a conventional drill, blast, load and haul operation.

**Production figures**
Production figures for Ruashi for 2009 in comparison to 2008 are as follows:

| Description | Units | 2008 | 2009 |
|---|---|---|---|
| *Phase 1 (Concentrator)* | | | |
| Tons milled | (t) | 601 505 | **238 447** |
| Head grade | | | |
| Copper | (%) | 3,2 | **3,05** |
| Cobalt | (%) | 0,4 | **0,47** |
| Metal recovery | | | |
| Copper | (%) | 57 | **43** |
| Cobalt | (%) | 23 | **24** |
| Concentrate produced | (t) | 65 481 | **24 640** |
| Concentrate grade | | | |
| Copper | (%) | 17,10 | **13,59** |
| Cobalt | (%) | 1,95 | **1,27** |
| *Phase 2 (SX/EW Plant)* | | | |
| Tons milled | (t) | – | **485 360** |
| Head grade | | | |
| Copper | (%) | – | **2,8** |
| Cobalt | (%) | – | **0,54** |
| Metal recovery | | | |
| Copper | (%) | – | **76** |
| Cobalt | (%) | – | **27** |
| Cu Cathode produced – Standard grade | (t) | – | **1 448** |
| Cu Cathode produced – LME grade | (t) | – | **8 931** |
| Co Metal produced in Carbonate | (t) | | **720** |

**Methods and key assumptions in estimation and classification of Mineral Resources and Ore Reserves**
Reconciliation of open pit mining actuals to the 2007 resource model during F2009 highlighted limitations in the model. Recent re-interpretation based on the 2009 drilling campaign results and in-pit mapping has resulted in a dramatically improved structural and lithological interpretation with the orebody being further sub-divided into oxide and sulphide zones based on the observed degree of weathering in the drillholes. A hard boundary approach has been applied to oxide and sulphide zones of the same lithological unit to more accurately reflect the statistical difference in grades between the weathered and unweathered units.

The 2009 model geostatistical estimation was carried out by IGS (Pty) Limited using ordinary kriging and has interpolated grades into discrete geological (lithological and structural) domains based on geostatistical estimation parameters matched to each domain.

The 2009 Ruashi orebody model has been classified into SAMREC compliant resource categories on a subjective basis by the Competent Person, with the majority of the drill hole data spaced close enough to categorise the resource as either indicated or measured. A high geological confidence exists in the location and continuity of the lower orebody strataform units. These units have been categorised as measured in the Ruashi 1 and 2 pits where current mining activity has confirmed the continuity and grade of the units. Further drillings will be required to upgrade these units to measured in the Ruashi 3 orebody.

With the exception of the Calcaire a Minerais Noirs zone (CMN), all other lithological units have been classified as Indicated. The CMN zone occurs in the stratigraphic hangingwall of the orebody and is dominated by wad mineralisation (weathered and altered dolomite). It has proved to be more lenticular in nature with a vertical structural and surface weathering control. In the opinion of the Competent Person, this zone has a low geological confidence based on the current drilling grid and has consequently been downgraded to an Inferred category. Additional drilling will be required to upgrade the CMN zone into the indicated or measured during the next year.

A revised Ruashi LOM reserve pit shell for the 2009 model has being completed by VBKOM Consulting Engineers (Pty) Limited using the Whittle 4X pit optimisation software. A mining cost of US$4.1/t mined and a processing cost of US$72.7/t processed has been used based on F2010 steady state budget prices and the completion of the acid plant. A final pit design and schedule is being generated using an optimal NPV Whittle shell based on a long-term copper and cobalt price of US$5.000/t copper and US$15/lb co-respectively.

**Inclusion of Inferred Resources**

Inferred Resources are not included in the life of mine (LOM) plan and production schedule for Ruashi. Consequently, there has been a 22 per cent reduction in LOM reserves from that reported in June 2008.

**Material risk factors that could impact on the Mineral Resource and Ore Reserve Statement**

The possibility of an amendment to the Ruashi resource model was flagged in the 2008 annual report as a risk based on new information from mining activities, ore reconciliations and further enhancements to the geological interpretation.

Remodelling of the orebody in F2009 based on hard lithological, structural and ore type boundaries has significantly de-risked the resource estimate and has highlighted areas that need additional drilling. Open pit Whittle optimisation using revised F2010 budget costs derived from steady state on-mine and off-mine costs will further de-risk the LOM plan and reserve.

Changes in the copper price could impact on the cut-off grade used to define the Mineral Resources and Mineral Reserves which in turn would affect the LOM.

**Legal proceedings or other material conditions that may impact on mining or exploration activities**

The DRC mining licence review process with regard to Ruashi Mining sprl is now complete. Metorex has been informed by Gécamines that the review process with regards to Ruashi has been concluded and no further amendments are likely.

Ruashi Holdings (previously an 80 per cent shareholder in Ruashi Mining sprl) conceded a five per cent interest in Ruashi Mining sprl to Gécamines resulting in a revised shareholding of 75 per cent held by Ruashi Holdings (Pty) Limited and 25 per cent held by Gécamines.

In addition to the change in shareholding, a Pas de Porte of US$4 million is payable to Gécamines on deferred terms and the royalty calculation payable to Gécamines was increased from 0,5 per cent to 2,5 per cent on gross revenue from sales of product.

**Ruashi – Mineral Resources**

| **Oxides** | Tons (Mt) | | Cu Grade (%) | | Copper ('000t) | | Co Grade (%) | | Cobalt ('000t) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Oxides | | | | | | | | | | |
| Measured | – | **1,0** | – | **6,7** | – | **70** | – | **0,29** | – | **3** |
| Indicated | 44,8 | **19,6** | 2,8 | **2,8** | 1 254 | **553** | 0,24 | **0,35** | 107 | **68** |
| Inferred | – | **8,6** | – | **2,2** | – | **186** | – | **0,13** | – | **11** |
| Total oxides | 44,8 | **29,2** | 2,8 | **2,8** | 1 254 | **809** | 0,24 | **0,28** | 107 | **83** |
| Surface oxide stockpiles | | | | | | | | | | |
| Measured | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Indicated | – | **0,3** | – | **2,5** | – | **7** | – | **–** | – | **–** |
| Inferred | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Total surface stockpiles | – | **0,3** | – | **2,5** | – | **7** | – | **–** | – | **–** |
| Oxide total | 44,8 | **29,5** | 2,8 | **2,8** | 1 254 | **817** | 0,24 | **0,28** | 107 | **83** |

# Supplementary information continued

| **Sulphides** | Tons (Mt) | | Cu Grade (%) | | Copper ('000t) | | Co Grade (%) | | Cobalt ('000t) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Sulphides | | | | | | | | | | |
| Inferred | – | **7,9** | – | **3,1** | – | **248** | – | **0,26** | – | **21** |
| Total sulphides | – | **7,9** | – | **3,1** | – | **248** | – | **0,26** | – | **21** |
| Surface sulphide stockpiles | | | | | | | | | | |
| Measured | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Indicated | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Inferred | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Total surface stockpiles | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Sulphide total | – | **7,9** | – | **3,1** | – | **248** | – | **0,26** | – | **21** |

| **Oxides + Sulphides** | Tons (Mt) | | Cu Grade (%) | | Copper ('000t) | | Co Grade (%) | | Cobalt ('000t) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Oxides + sulphides | | | | | | | | | | |
| Measured | – | **1,0** | | **6,7** | – | **70** | – | **0,29** | – | **3** |
| Indicated | 44,8 | **19,6** | 2,8 | **2,8** | 1 254 | **553** | 0,24 | **0,35** | 107 | **68** |
| Inferred | – | **16,6** | | **2,6** | – | **434** | – | **0,19** | – | **32** |
| Total oxides + sulphides | 44,8 | **37,2** | 2,8 | **2,8** | 1 254 | **1 057** | 0,24 | **0,28** | 107 | **103** |
| Surface stockpiles | | | | | | | | | | |
| Measured | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Indicated | – | **0,3** | – | **2,5** | | **7** | – | **–** | – | **–** |
| Inferred | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Total surface stockpiles | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Grand total | 44,8 | **37,5** | 2,8 | **2,8** | 1 254 | **1 065** | 0,24 | **0,28** | 107 | **103** |

## Ruashi – Ore Reserves

| **Oxides** | Tons (Mt) | | Cu Grade (%) | | Copper ('000t) | | Co Grade (%) | | Cobalt ('000t) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Oxides | | | | | | | | | | |
| Proved | | | | | | | | | | |
| Probable | 18,5 | **15,1** | 3,7 | **3,2** | 686 | **483** | 0,36 | **0,39** | 67 | **59** |
| Total oxides | 18,5 | **15,1** | 3,7 | **3,2** | 686 | **483** | 0,36 | **0,39** | 67 | **59** |
| Surface stockpiles | | | | | | | | | | |
| Proved | | | | | | | | | | |
| Probable | – | **0,3** | – | **2,5** | – | **7** | – | **–** | – | **–** |
| Total surface stockpiles | – | **0,3** | – | **2,5** | – | **7** | – | **–** | – | **–** |
| Oxide total | 18,5 | **15,4** | 3,7 | **3,2** | 686 | **491** | 0,36 | **0,39** | 67 | **59** |

## CHIBULUMA MINES PLC

**Location**

The Chibuluma South mine is part of the Chibuluma mines complex situated near the Zambian town of Kalulushi, approximately 12km west of Kitwe. Kitwe is the second largest town on the Zambian Copperbelt and is approximately 300km north of the capital city, Lusaka.

**Historical and Recent Exploration Activities**

The Chibuluma South orebody was discovered in 1969 by Roan Selection Trust (RST). A total of 113 diamond drill holes were drilled in the area, of which 77 drill holes intersected the Chibuluma South orebody. Orebody intersections were spaced between 75 and 150m apart. Metorex drilled three twin holes in 1999 and verified the thickness and grade of the orebody as defined by the historical drilling.

A feasibility study for Chibuluma was completed by Metorex in May 2000. The oxide zone down to 60m below surface was mined in an open pit and treated through a differential flotation and oxide leach plant. The open pit was stopped in 2001 due to poor leach recoveries and operations focused on opening up the underground reserve.

**Geological setting and geological model**

Mineralisation in the copper mines of the Zambian Copperbelt is predominantly stratabound and confined to the Lower Roan Group of the Katanga stratigraphic succession. The Katangan Supergroup consists of Proterozoic age siliclastic, greywacke and carbonate sediments deposited in an extensional rift basin environment that has subsequently been subjected to Pan African age tectonism and deformation.

Mineralisation in the Chibuluma orebody is limited to copper only and is hosted in detrital conglomerates, sandstones and argillaceous siltstones of the Lower Roan Group. The orebody occurs over a strike length of 300m, dipping at about 38° towards the north-west and varies in thickness from a few metres to over 20m in places.

**Type of mining, mining activities**

Post pillar cut and fill (PPCF) mining with trackless mining equipment is used to extract the bulk of the orebody and longhole stoping is often used where the orebody is narrow. The longhole stopes are post filled along with the adjacent cut. The sulphide ore is hauled to surface via a decline ramp at a rate of 45 to 50ktpm.

Mining takes place from the bottom up, while development is from the top down. The orebody is mined in 40m vertical sections as they become available. This necessitates the leaving of sill pillars between these sections, which locks up ore. The sill pillars are partially recoverable at the end of the life of mine.

Underground development waste and classified tailings are used as backfill in the mining process to support exhausted stopes and minimise dilution from the hangingwall through adequate support of the weak hangingwall sediments.

The underground sulphide ore is treated by conventional flotation, which produces a concentrate grade of between 45 and 50 per cent copper and recoveries of 95 per cent. The concentrates are currently transported approximately 40km by road to the Chambishi Copper Smelter (CCS).

**Production figures**

Total production for Chibuluma for 2009 in comparison to 2008 is as follows:

| Description | Units | 2008 | 2009 |
|---|---|---|---|
| Tons milled | (t) | 555 575 | **568 187** |
| Head grade | (% Cu) | 2,9 | **3,1** |
| Overall recovery | (%) | 89,6 | **90** |
| Copper produced | (t) | 14 583 | **15 940** |

**Methods and key assumptions in estimation and classification of Mineral Resources and Mineral Reserves**

Geological block modelling of the Chibuluma orebody is carried out using Surpac. Grade envelopes are delineated on a one per cent copper assay grade and wireframed to produce a 3-dimensional solid model. Lithological contacts are modelled as surfaces. Grade is interpolated into the blocks using ordinary kriging. A Surpac model was completed by IGS (Pty) Limited (IGS) in 2007 utilising updated surface and underground drill hole data. This model was further updated in F2009 using all new data and depleted on a cut by cut basis using a 3-dimensional mining excavation volume model.

The resource is classified as a measured or indicated Resource based on drillhole spacing. A block is considered measured if there are three or more drill holes within a 50m radius of the block and indicated if there are more than three drill holes between 50 and 150m. In general, infill drilling is carried out from the ramp decline and currently all levels above the 411mℓ are considered measured.

# Supplementary information continued

The modifying factors applied to convert the Mineral Resources to Ore Reserves in the upper levels takes into account a waste parting, which is identified in the boreholes and modelled accordingly. Current mining has largely mined the waste parting zone, and little or no internal waste is anticipated in the lower levels. The modifying factors for the conversion of the Resources to Reserves have consequently been modified to reflect the lower dilution expected in the lower levels of the mine.

**Inclusion of Inferred Resources**

Inferred Resources are not included in the LOM plan and production schedule.

**Material risk factors that could impact on the Mineral Resource and Reserve Statement**

The method of stope support was considered adequate at shallow mining depths, and was substantially revamped in December 2008 following a number of hangingwall failures on the 298 and 309m levels. On advice from African Mining Consultants in Kitwe, the mining echelon and timing of backfill support has been scheduled such that the risk of stope failure due to geotechnical reasons will be contained and kept to a minimum.

Changes in the copper price could impact on the cut-off grade used to define the Mineral Resources and Mineral Reserves which in turn would affect the LOM.

**Legal proceedings or other material conditions that may impact on mining or exploration activities**

The Company is not aware of any material conditions that may affect the mining activities at Chibuluma.

## Chibuluma South – Mineral Resources

| | Tons (Mt) | | Cu Grade (%) | | Copper (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Chibuluma South – Underground | | | | | | |
| Measured | 0,9 | **2,4** | 3,5 | **3,3** | 32 | **80** |
| Indicated | 4,3 | **2,1** | 4,0 | **4,8** | 172 | **99** |
| Total underground | 5,2 | **4,5** | 3,9 | **4,0** | 204 | **180** |
| Resources in buttress pillars | | | | | | |
| Indicated | 0,7 | **0,7** | 4,0 | **4,0** | 30 | **30** |
| Total pillars | 0,7 | **0,7** | 4,0 | **4,0** | 30 | **30** |
| Chifupu prospect | | | | | | |
| Inferred | 1,9 | **1,9** | 3,1 | **3,1** | 59 | **59** |
| Total prospects | 1,9 | **1,9** | 3,1 | **3,1** | 59 | **59** |
| Total underground and prospects | 7,9 | **7,2** | 3,7 | **3,7** | 293 | **268** |

## Chibuluma South – Ore Reserves

| | Tons (Mt) | | Cu Grade (%) | | Copper (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Chibuluma South – Underground | | | | | | |
| Proved | 0,8 | **2,1** | 3,0 | **2,9** | 24 | **61** |
| Probable | 3,7 | **1,8** | 3,4 | **4,1** | 127 | **73** |
| Total underground | 4,5 | **3,9** | 3,4 | **3,4** | 150 | **135** |
| Reserves in buttress pillars | | | | | | |
| Probable | 0,3 | **0,3** | 2,7 | **3,0** | 7 | **8** |
| Total pillars | 0,3 | **0,3** | 2,7 | **3,0** | 7 | **8** |
| Total underground | 4,7 | **4,2** | 3,3 | **3,4** | 158 | **143** |

## COPPER RESOURCES CORPORATION PLC

### Miniere de Musoshi et Kinsenda sarl (MMK)

The Kinsenda mine together with the Lubembe prospect is owned by Copper Resources Corporation through Miniére de Musoshi et Kinsenda sarl (MMK). Both are located within a 50km radius of Kasumbalesa, a main border town into the DRC from Zambia. The border is located approximately 75km northwest of Kitwe in Zambia, and 130km southeast of Lubumbashi in the DRC.

The Kinsenda mine is located approximately 24km east of Kasumbalesa and is the focus of a re-equipping programme to bring the mine into production during 2010. Lubembe is located a further 25km south-east of Kinsenda. The Musoshi mine was returned to Sodimico during F2009 as part of the mining title revisitation process, and no longer forms part of the MMK assets.

**Historical and Recent Exploration Activities**

Two hundred and three surface diamond drill holes totalling 51,000m were drilled by Sodimico and Nippon Mining on the Kinsenda orebody from the mid 1960s to early 1970s. Very little core remains from these drilling programmes. Metorex plans to complete a limited surface drilling programme to verify reserves below the 285m level and improve the confidence in the geological interpretation of the lower levels of the mine.

The Lubembe deposit is an advanced exploration prospect, with 22 holes previously drilled by Sodimico in the early 1970s. An infill drilling programme on the Lubembe deposit was funded by Metorex and commenced in June 2008 to verify old data and improve the resource confidence. In total, 7,506m of shallow reverse circulation drilling and 5,272m of diamond core drilling were completed during F2009. A SAMREC compliant resource model will be completed in F2010 before progressing to a full feasibility study.

**Geological setting and geological model**

The Kinsenda and Lubembe orebodies are Zambian Copperbelt style orebodies and are geologically similar to the Chibuluma South and Mufulira mines in Zambia. Mineralisation occurs in the footwall of the Ore Shale Member.

Mineralisation in the Kinsenda orebody is limited to copper only and is hosted in detrital conglomerates, sandstones and argillaceous siltstones of the lower Roan Group and varies from 2 to 20m with an average width of 6m. The orebody occurs in three zones, namely the lower, middle and upper orezones over a strike of approximately 2,000m dipping moderately at 25 – 30°. These zones pinch and swell and in places merge to form a single zone. Kinsenda is a sulphide orebody consisting of predominantly chalcocite, bornite and chalcopyrite mineralisation. The orebody has not been subjected to significant folding and is reasonably uniform along strike and down dip. A normal fault with a throw of 50 to 100m truncates the orebody on the southern, down dip extent of the resource. The downthrown block (starting at 600m below surface) has not been extensively delineated, and presents upside potential for the Kinsenda resource.

The Lubembe deposit is analogous to Kinsenda with a strike length of 1km and an average width of 40m dipping 25 – 30°. A second zone of mineralisation has been identified approximately 1km north of the Lubembe deposit by recent drilling. This zone requires additional exploration drilling to delineate before a resource can be established. Lubembe is distinguished from Kinsenda by lower grades (1,8 to 2,2 per cent copper) and a mixed oxide/sulphide ore type consisting of predominantly chalcocite and chalcopyrite with minor malachite.

**Type of mining, mining activities**

The Kinsenda mine is an old underground operation commissioned in 1977 as a joint venture between Sodimico and Nippon Mining. Ore was mined from Kinsenda and hauled 40km by truck to Musoshi where it was treated through the Musoshi concentrator. In total, 4,5 million tons was mined at Kinsenda from 1977 to 2002 with a maximum tonnage of 410,000 tons in 1984.

The operation was taken over by a Canadian company in the early 1980s, but was curtailed by 1987 due to low copper prices and limited developed reserves. Operations stopped completely with the flooding of the mine in 2002.

The infrastructure at Kinsenda comprises three inclined shafts and one vertical shaft to a depth of 285m below surface. Mine dewatering has lowered the water level to 285m below surface. Metorex has been involved in re-establishing the operation since the beginning of 2008.

The Kinsenda mine programme was curtailed in F2009 to conserve cash outflows with the project being placed on care and maintenance in January 2009. A revised feasibility study is in progress with sulphide ore production planned at a rate of between 60 and 80ktpm using the cut and fill mining method.

Lubembe is a greenfields site, and has not been previously mined.

# Supplementary information continued

**Production figures**
There are no production figures for 2009 and 2008.

**Methods and key assumptions in estimation and classification of Mineral Resources and Ore Reserves**
Resources reported for the Kinsenda mine are based on a model compiled by FinOre in 2006 using Datamine software as part of the feasibility study completed by Mineral Engineering Technical Services (METS) of Perth, Australia on behalf of Copper Resources Corporation. The digital database used by FinOre was generated by EGMF in 2005. The FinOre model used a two per cent Cu assay grade to delineate the orebody with assay data being composited to one metre intervals within individual orezones. No top cuts were applied.

The resource estimation used ordinary kriging to estimate both Total and Acid Soluble Copper with separate geostatistical parameters for each zone and variable. FinOre classified the resources into Measured, Indicated and Inferred using the JORC system of resource reporting.

Reserves were derived by MMK using a spreadsheet scheduling methodology. Individual mining cuts were scheduled using a top down mining philosophy and were modified using generic cut and fill mining extraction and dilution factors. The risk associated with generic nature of the reserve calculation is reflected in the mineral reserve classification.

**Inclusion of Inferred Resources**
No inferred resources were included in the production plan.

**Material risk factors that could impact on the Mineral Resource and Ore Reserve Statement**
The classification of resources into Measured, Indicated or Inferred by FinOre was subjective and was not elaborated on in any detail in the FinOre report. In the conversion of resources to reserves, Metorex has downgraded Measured resources to Probable rather than Proved reserves to reflect uncertainty and risk in the mining plan.

**Legal proceedings or other material conditions that may impact on mining or exploration activities**
Following the 2006 general elections for the National Assembly in the DRC, the application of the regulations of the DRC relating to foreign investment and mining licensing was under review. The DRC Government initiated a review process by the Licence Review Commission in relation to all joint venture agreements entered into by private investors with state-owned companies including the contract between CRC and Sodimico, a DRC state-owned company.

The final outcome of the review process resulted in Sodimico increasing its shareholding in MMK from 20 per cent to 23 per cent. A Pas de Porte payment of US$3 million has been agreed to on deferred terms with a royalty payment calculated at 2,5 per cent on gross proceeds from sales of product. The Musoshi mine (currently flooded to a depth of 200m below surface) and related Prospecting permits have been returned to Sodimico as part of the settlement. The CRC shareholding in MMK has now been amended to an effective 77 per cent.

It has been confirmed that the review process relating to MMK has been finalised, and no further payments or relinquishing of licences will be required.

**Miniere de Musoshi et Kinsenda sarl (MMK) – Mineral Resources**

| | Tons (Mt) | | Cu Grade (%) | | Copper (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Kinsenda Mine – Underground | | | | | | |
| Measured | 13,1 | **13,1** | 4,8 | **4,8** | 628 | **628** |
| Indicated | 4,1 | **4,1** | 5,8 | **5,8** | 235 | **235** |
| Total underground | 17,1 | **17,1** | 5,0 | **5,0** | 863 | **863** |
| Lubembe prospect | | | | | | |
| Inferred | 47,5 | **47,5** | 2,2 | **2,2** | 1 045 | **1 045** |
| Total prospects | 47,5 | **47,5** | 2,2 | **2,2** | 1 045 | **1 045** |
| Total underground and prospects | 64,6 | **64,6** | 3,0 | **3,0** | 1 908 | **1 908** |

### Miniere de Musoshi et Kinsenda Sarl (MMK) – Mineral Resources

| | Tons (Mt) | | Cu Grade (%) | | Copper (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Kinsenda Mine – Underground | | | | | | |
| Proved | 0,6 | **0,6** | 5,7 | **5,7** | 32 | **32** |
| Probable | 10,7 | **10,7** | 4,9 | **4,9** | 522 | **522** |
| Total underground | 11,3 | **11,3** | 4,9 | **4,9** | 554 | **554** |

## SABLE ZINC KABWE LIMITED

The Sable Zinc facility is located approximately 2km south of the centre of Kabwe in central Zambia, some 150km north of the capital Lusaka.

Sable Zinc is a copper and cobalt toll processing facility produced a combination of standard and A-grade copper cathode and was commissioned during May 2006.

### Exploration activities

There is an old dump of oxidised zinc material which contains some 400kt at an average grade of 9,78 per cent zinc. In addition, there is a dump which contains 4,9Mt grading 4,47 per cent zinc. Testwork is underway to evaluate the dumps, but no results were available at the time of preparing this report.

### Geological setting and geological model

Not applicable.

### Type of mining, mining activities

No mining activities were carried out at Sable Zinc during F2009.

The leach, solvent extraction and electro-winning circuits previously enabled Sable to process the copper and cobalt concentrates from Ruashi Phase I.

Sable Zinc plant no longer receives oxide concentrate from Ruashi and is reliant on sourcing high-grade oxide copper feed in the open market and via traders.

### Production figures

Production figures for Sable Zinc for 2009 in comparison to 2008 are as follows:

| Description | Units | 2008 | **2009** |
|---|---|---|---|
| Tons concentrate treated | (t) | 65 481 | **32 638** |
| Concentrate grade | | | |
| Copper | (% Cu) | 17,10 | **16,81** |
| Cobalt | (% Co) | 1,95 | **0,50** |
| Metal Recovery | | | |
| Copper | (%) | 96 | **40** |
| Cobalt | (%) | 44 | **75** |
| Metal Production | | | |
| Copper | (t) | 10 767 | **4 889** |
| Cobalt | (t) | 565 | **151** |

*Includes concentrate from Ruashi phase I and oxide concentrates purchased from third parties.*

### Methods and key assumptions in estimation and classification of Mineral Resources and Ore Reserves

Metorex has classified the two dumps as Inferred Mineral resources due to the inherent problems associated with representative sampling and tonnage determination of dumps and the restricted sampling data.

# Supplementary information continued

**Inclusion of inferred resources**
Inferred resources are not included in the current LOM plan and production schedule for Sable Zinc.

**Material risk factors that could impact on the Mineral Resource and Ore Reserve Statement**
The classification of the dumps into the Inferred Resource category adequately reflects the unknowns and risks associated with the dumps.

**Legal proceedings or other material conditions that may impact on mining or exploration activities**
The Company is not aware of any material conditions that may affect the mining activities at Sable Zinc.

### Sable Zinc – Mineral Resources

| | Tons (Mt) | | ZN Grade (%) | | Zinc (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Washing plant stockpile | | | | | | |
| Inferred | 0,4 | **0,4** | 9,8 | **9,8** | 39 | **39** |
| Total washing plant stockpile | 0,4 | **0,4** | 9,8 | **9,8** | 39 | **39** |
| Residue tailings | | | | | | |
| Inferred | 4,9 | **4,9** | 4,5 | **4,5** | 219 | **219** |
| Total tailings | 4,9 | **4,9** | 4,5 | **4,5** | 219 | **219** |
| Total stockpiles and tailings | 5,3 | **5,3** | 4,9 | **4,9** | 258 | **258** |

## VERGENOEG MINING COMPANY (PTY) LIMITED

The Vergenoeg mine is situated on the farm Kromdraai, approximately 70km north-east of Pretoria and 32km east of the village and rail siding of Pienaars River. The oxidised (upper) zone of the Vergenoeg deposit is exploited for fluorite (fluorspar) and the fluorspar concentrate (acid grade) is exported through Durban to clients mainly in Europe and the America's.

The Vergenoeg deposit is one of the largest fluorite resources in the world. Estimates are that it contains approximately 10 per cent of the world's resources. The mine life is estimated to be in excess of 100 years and the fluorite ($CaF_2$) grade of the mine is in the upper quartile of world deposits.

**Exploration Activities**
The orebody was evaluated in 2000 using 254 percussion drill holes spaced approximately 50m x 50m, and 58 diamond drill holes with a spacing of approximately 100m x 100m. A total of 1 160 blast holes were also used.

Drilling of 23 diamond drill holes during 2003 resulted in the delineation of a good quality orebody termed the A-orebody on the eastern contact of the volcanic pipe with the surrounding wall rock. Two holes in this programme also intersected high-grade fluorspar (metspar). Further drilling allowed for the delineation of a discrete small high-grade fluorspar plug within the main volcanic pipe. This was subsequently mined for metallurgical grade fluorspar (gravel) until the end of 2008 when the overburden: ore ratio became excessive.

From the results of 34 boreholes drilled in F2007, an extension of the A-orebody was traced southwards into the valley and eastwards under the hill and the deposit footprint was more accurately defined.

RC exploration drilling was conducted in F2008 as well as F2009. 181 boreholes totalling 9,836m targeting the upper portion of the Vergenoeg deposit. Samples were taken at 1m intervals and submitted for multiple element analyses. This new data, combined with some of the previous data is currently being used for Surpac modelling and resource estimations of the deposit.

**Geological Setting and Geological Model**
Fluorite (fluorspar) mineralisation is contained within the 1,950Ma Vergenoeg volcanic pipe. Felsic rocks of the Rooiberg Group constituting the roof of the Bushveld Igneous Complex (BIC), host the discordant volcanic pipe and associated surrounding pyroclastic and sedimentary rocks of the Vergenoeg suite. The volcanic pipe and surrounding pyroclastic rocks are related to the Lebowa Granite Suite of the Bushveld Complex, which is regarded as the source of the mineralisation. The volcanic pipe is situated at the intersection of regional lineaments and is centrally located between the four lobes of the BIC.

The Vergenoeg volcanic pipe is about 900m in diameter at surface tapering down at depth where it is still open ended at a depth of approximately 600m. Fluorite is found in massive and disseminated forms throughout the pipe, but its concentration decreases with depth. To the east of the pipe is a spill area (referred to as the A-orebody) where mining currently takes place. The mineralogy of the upper portion of the pipe is dominated by iron oxides and fluorite, with increasing siderite and fayalite occurring with depth.

Recent exploration (2007 – 2009) has resulted in a significant improvement in the understanding of the internal geology of the Vergenoeg orebody. The mineable resource at Vergenoeg is highly dependent on the type and quality of material that is required by the end users.

The ore being mined can now be classified into a number of different ore types. Blending of ores from the pit and crushed ore stockpiles occur commonly. Ores that cannot be processed under current conditions are stockpiled. It is expected that metallurgical extraction methods will improve and ore types that are presently not economical to treat will be processed in the future. The installation of a high-powered magnetic separator at the end of 2008 has resulted in more than 50 per cent of the high aluminium stockpile being successfully submitted to the processing plant. This has also resulted in an increase in the reserves of the best-quality ores.

**Type of Mining, Mining Activities**
Mine planning and production scheduling is spreadsheet based with the three dimensional modelling restricted to the original block modelling and grade estimation. Vergenoeg considers it adequate to plan in a spreadsheet format, as the critical parameters are the fluorspar grade and the contaminants. Currently production planning is determined by marketing factors and no long-term pit planning is viable.

**Production Figures**
Production figures for Vergenoeg for 2009 in comparison to 2008 are as follows:

| Description | Units | 2008 | **2009** |
|---|---|---|---|
| Ore milled | (t) | 570 826 | **537 589** |
| $CaF_2$ feed grade | (%) | 39,9 | **39,2** |
| Fluorspar concentrate produced (all grades) | (dmt) | 180 854 | **152 934** |
| $CaF_2$ Recovery | (%) | 74,2 | **69,8** |

**Methods and key assumptions in estimation and classification of Mineral Resources and Ore Reserves**
A SURPAC block model was constructed in 2000 using diamond drill, percussion drill, blast hole and other available geological and survey data. Grade values were estimated into this model using the inverse distance squared method. Since then the resources have not been re-estimated, but adjusted by depleting this resource model for mining. The Reserves were, however, re-assessed in 2008 following exploration work. Reserve criteria, particularly the cut-off levels of the contaminants, were significantly changed in view of improved plant efficiency as well as the changed market contaminant specifications. Re-assessment of the resources by consultants (IGS) is underway and will be completed before the end of September 2009. Reserves will be categorised into four ore types corresponding to the salient specification requirements of the clients.

The Resources, as determined in 2000, are estimated to a depth of 360m, although mineralisation has been shown to exist to a depth of 600m. Survey data representing the surface topography of the pit, exploration drill hole collar positions and blast hole collar positions are routinely measured.

A specific gravity of 3,28 is applied to the B-orebody and a value of 3,7 has been applied to orebody A. Indicated and Inferred Resources have been estimated using a cut-off of 10 per cent $CaF_2$. Measured Resources consists of ore on stockpiles outside the pit at a cut-off off of 20 per cent $CaF_2$. Inferred Resources consists of low grade material located at significant depths within the geological block model.

The Reserves are based on the following criteria and assumptions:
- Fluorspar concentrate (acid spar) specifications acceptable to existing customers.
- Acid spar concentrate specifications acceptable to customers not currently serviced by VMC.

This assessment also considers the installation of a recently installed SLON magnetic separator that would allow for higher flotation primary-feed aluminium levels and would reduce the iron and arsenic levels of the final concentrates.

# Supplementary information continued

In order to achieve acceptable acidspar concentrate grades, the insitu reserves need to meet the following criteria:

| | Parameter | Criteria |
|---|---|---|
| 1 | $CaF_2$ | >12% |
| 2 | $P_2O_5$ | <2,5% |
| 3 | As | <11000ppm |
| 4 | $Al_2O_3$ | ≤1,5% |
| 5 | S | Less than 0,3% |
| 6 | Hydrated iron oxides | Low levels |
| 7 | Regolith or soils | Low levels |
| 8 | K and Mg | Low levels |
| 9 | Overburden | Less than 33m |
| 10 | Thickness of mineralisation | Not specified |

Proven Reserve is distinguished from Probable Reserve based primarily on the following criteria:
- Degree of certainty of geometry/distribution/occurrence/grade (main criteria).
- Level of metallurgical knowledge regarding the treatment of the particular ore (has material been submitted to the processing plant/pilot plant/lab bench test).
- Overburden thickness (accessibility).
- Geological complexity (faulting, intrusions, weathering, secondary mineralogy).

**Inclusion of inferred resources**
Inferred resources are not included in mine planning and production scheduling.

**Material risk factors that could impact on the Mineral Resource and Ore Reserve statement**
Certain contaminants and minerals have been identified in the ore that negatively affect the final concentrate and recovery. Metallurgical test work is in progress to find processes and methods for eliminating or managing the negative effects.

**Legal proceedings or other material conditions that may impact on mining or exploration activities**
The application for conversion of old order mining rights to New Order Mining Rights in terms of the MPRDA was submitted before 30 April 2009. Feedback regarding this submission was received from the DME and minor modifications to the SLP and MWP as requested by the DME were attended to.

**Vergenoeg – Mineral Resources**

| | Tons (Mt) | | $CuF_2$ Grade (%) | | $CuF_2$ (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Open pit | | | | | | |
| Measured | 12,4 | **11,4** | 37,0 | **40,4** | 4 570 | **4 606** |
| Indicated | 145,1 | **144,7** | 27,9 | **28,0** | 40 483 | **40 516** |
| Inferred | 69,6 | **69,6** | 12,7 | **12,7** | 8 839 | **8 839** |
| Total open pit | 227,1 | **225,7** | 23,7 | **23,9** | 53 892 | **53 961** |
| Surface stockpiles | | | | | | |
| Measured | – | **0,4** | – | **40,4** | – | **162** |
| Total stockpiles | – | **0,4** | – | **40,4** | – | **162** |
| Total open pit and surface stockpiles | 227,1 | **226,1** | 23,7 | **23,9** | 53 892 | **54 122** |

**Vergenoeg – Ore Reserves**

| | Tons (Mt) | | $CuF_2$ Grade (%) | | $CuF_2$ (000t) | |
|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Open pit | | | | | | |
| Proved | 12,0 | **11,4** | 37,0 | **40,4** | 4 440 | **4 606** |
| Probable | 5,7 | **5,7** | 40,0 | **40,0** | 2 280 | **2 280** |
| Total open pit | 17,7 | **17,1** | 38,0 | **40,3** | 6 720 | **6 886** |
| Surface stockpiles | | | | | | |
| Proved | – | **–** | – | **–** | – | **–** |
| Total surface stockpiles | – | **–** | – | **–** | – | **–** |
| Total open pit and surface stockpiles | 17,7 | **17,1** | 38,0 | **40,3** | 6 720 | **6 886** |

## CONSOLIDATED MURCHISON MINES (A DIVISION OF METOREX LIMITED)

The Consolidated Murchison Mine is situated in the Murchison Greenstone belt near Gravelotte in Limpopo. Gold was discovered in the Murchison range towards the end of the 19th century and was mined on a small-scale for many years. Prior to 1937, the high stibnite (antimony sulphide) of the gold ores rendered all but the oxidised ore too refractory to process. Metorex acquired the mine in July 1997. It is the only producer of antimony concentrate in South Africa, and contributes three to five per cent of world production.

**Exploration activities**

No current exploration programme is underway.

**Geological setting and geological model**

The Murchison Greenstone belt is an assemblage of lavas and sediments. The belt strikes WSW-ENE and dips steeply to the north. The rocks are extremely sheared and have been intruded by granites and iron rich gabbros on a number of separate occasions. The greenstone belt is approximately 6 000m thick near Gravelotte and thins to the east. Gold mineralisation occurs erratically throughout the greenstones. Areas of particular economic interest are the Copper-Zinc line, the Antimony line and the various emerald deposits.

The Antimony line is a discontinuous zone of mineralisation approximately 55km long. Stibnite is associated with quartz veining and occurs sporadically along the entire strike length, but has only been worked significantly between the Alpha-Gravelotte area and the Free State-Monarch area. It is generally accepted that the Antimony line represents a major shear zone along which stibnite and gold have been concentrated. The stibnite and gold occur in remobilised quartz veins hosted in quartz-carbonate rocks which have been formed by the hydrothermal alteration of the country rocks. Later tectonic deformation has concentrated the minerals and all major orebodies have strong structural controls. Approximately two-thirds of the known and exploited gold deposits are from quartz veins, while the remainder is associated with banded iron-formations.

**Type of mining, mining activities**

Ore is mined by sub-level open stoping and is hoisted from three working shafts Athens, Monarch and Beta.

During mining, the strike and dip of orezones and extensions to the orezones are followed.

# Supplementary information continued

**Production figures**

Production figures for Consolidated Murchison for 2009 in comparison to 2008 are as follows:

| Description | Units | 2008 | 2009 |
|---|---|---|---|
| Tons milled | (t) | 355 076 | **345 349** |
| Head grade | | | |
| Antimony | (% Sb) | 1,2 | **1,0** |
| Gold | (g/t Au) | 1,8 | **1,7** |
| Metal recovery | | | |
| Antimony | (%) | 84,8 | **72,5** |
| Gold | (%) | 82,0 | **70,4** |
| Metal production | | | |
| Antimony | (mtu) | 361 061 | **257 983** |
| Gold | (kg) | 533 | **423** |

**Methods and key assumptions in estimation and classification of Mineral Resources and Ore Reserves**

Mining blocks are categorised as inferred resources and probable and proved reserves, as follows:

- *Inferred resources are defined as an ore block which has been defined wholly by boreholes.*
  A haulage is developed in the footwall of the orezone. A diamond drill cubby is developed every 30m. Three holes are drilled from each cubby – a horizontal hole at 45° to the orebody, a hole trending upwards perpendicular to the orebody aimed to intersect the orebody approximately 20m above the haulage elevation and a hole aimed downwards to intersect the orebody 20m below the haulage elevation. This results in a grid of approximately 20m x 30m. Boreholes are carefully logged and surveyed. The quartz carbonate orezone and any other mineralised zones are completely sampled. This information is plotted on plans and cross sections to ensure the mineralised zones are continuous. If there is any doubt as to the continuity, additional holes are drilled.

  All values are plotted on longitudinal sections and areas of 30m x 60m are blocked off and a tonnage and grade is assigned to each block. A minimum stoping width of 1,5m is assumed and an area of 30m x 45m in a block is used to allow for the foot and crown pillars. The tonnage of possible ore from the block is estimated using the mean orebody width or measuring the cross-sectional area using a planimeter and applying the frustrum formula. A SG of 2,94 is used. Drill cores are sampled every 50cm and a weighted arithmetic mean is used to estimate both the grade of the borehole intersections and the block value.

  This initial evaluation determines which blocks of ground require secondary development and more detailed evaluation.

- *Probable Reserves are defined as ore blocks that are partly defined by diamond saw sampling and partly by boreholes, but are not fully developed.*
  After a block of ground has been identified, secondary development is planned in order to fully evaluate the orezone and to enable stoping to take place. A cross cut is developed from the haulage to the orezone and two raises are developed at the most suitable position. At each interlevel elevation drives are developed along the orezone for 30m and additional twin raises are developed and sampled. At a 15m interval along the reef drive the orezone is evaluated by boreholes or by developing cross cuts.

- *Proved Reserves are defined as blocks that are fully developed, evaluated and ready for stoping.*
  Cross sections are interpreted and drawn every 10m. The orebody outline is interpreted from sample results. Often the orezone consists of more than a single band and there are areas where the orezone has been severely folded. For each 10m cross section, an area and grade is estimated and hence, an undiluted tonnage and grade is assigned to a proven 30m block.

This information is plotted on interlevel plans and sections. Block values are converted to Reserve estimates by adding a 15 per cent dilution at grades of 0,2 per cent antimony and 0,5g/t gold. Paylimit calculations are performed on each block in order to convert it to a mineral reserve. Paylimit values are plotted on a graph with the antimony grade on the Y axis and the gold grade on the X axis. A line is drawn connecting the two paylimit values. The present paylimit values from which the paylimit line is constructed on X and Y axes are presently 4,53g/t gold and 1,98 per cent antimony. Individual block grades are plotted on the graph and those plotting to the left of the line are considered as uneconomic and remain in the mineral resource category and those to the right of the line are classed as a mineral reserve. Resources five levels or 300m below the present working are classified as Inferred Resources. An 85 per cent mine call factor is applied to the Resource values estimated for both gold and stibnite.

Consolidated Murchison adjusts the grade and tonnage values by regression curves that have been constructed from historical data. The different areas have unique regression curves.

**Inclusion of inferred resources**

To be able to achieve the LOM production plan for Consolidated Murchison, some 60 per cent of the scheduled production will have to come from Inferred Resources. The confidence in Inferred Resources is low. The Inferred Resources enable the LOM to be extended by eight to ten years.

**Material risk factors that could impact on the Mineral Resource and Reserve Statement**

The SAMREC Code states that a Mineral Reserve is inclusive of diluting materials and allows for losses that may occur when the mineral is mined. Some economic criteria have been taken into consideration when estimating the Proved Reserves in the form of grade cutoff values. However, the fact that Consolidated Murchison has found it necessary to apply regression curves to its Reserve estimates indicates that not all the factors reflecting losses that may occur during mining have been taken into consideration in its Reserve estimates.

**Legal proceedings or other material conditions that may impact on mining or exploration activities**

The application for conversion of old order mining rights to New Order Mining Rights in terms of the MPRDA was submitted before 30 April 2009. The Company is in negotiations to identify suitable BEE partners, once these negotiations are finalised, the Company will progress the conversion application.

**Consolidated Murchison – Mineral Resources**

| | Tons (Mt) | | Sb Grade (%) | | Antimony (000t) | | Gold Grade (g/t) | | Gold (000 oz) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Underground | | | | | | | | | | |
| Measured | 0,2 | **0,3** | 2,0 | **2,0** | 5 | **5** | 1,4 | **1,2** | 11 | **10** |
| Indicated | 3,5 | **3,4** | 2,0 | **2,0** | 70 | **68** | 3,3 | **3,2** | 371 | **352** |
| Inferred | 6,0 | **6,0** | 2,3 | **2,3** | 141 | **141** | 2,1 | **2,1** | 403 | **400** |
| Total underground | 9,8 | **9,7** | 2,2 | **2,2** | 216 | **214** | 2,5 | **2,4** | 785 | **762** |
| Surface stockpiles | | | | | | | | | | |
| Measured | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Indicated | 15,3 | **15,3** | 0,5 | **0,5** | 70 | **70** | 0,6 | **0,6** | 280 | **280** |
| Total surface stockpiles | 15,3 | **15,3** | 0,5 | **0,5** | 70 | **70** | 0,6 | **0,6** | 280 | **280** |
| Total underground and surface | 25,1 | **25,0** | 0,5 | **1,1** | 286 | **284** | 1,3 | **1,3** | 1 065 | **1 042** |

# Supplementary information continued

## Consolidated Murchison – Ore Reserves

| | Tons (MT) | | Cu Grade (%) | | Copper (000t) | | Co Grade (%) | | Cobalt (000t) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Classification** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** | F2008 | **F2009** |
| Underground | | | | | | | | | | |
| Proved | 0,1 | **0,1** | 1,4 | **1,5** | 1 | **1** | 2,4 | **2,1** | 5 | **4** |
| Probable | 1,3 | **1,2** | 1,6 | **1,5** | 20 | **19** | 2,4 | **2,5** | 99 | **98** |
| Total underground | 1,3 | **1,3** | 1,6 | **1,5** | 21 | **20** | 2,4 | **2,4** | 104 | **103** |
| Surface stockpiles | | | | | | | | | | |
| Proved | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Probable | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Total surface stockpiles | – | **–** | – | **–** | – | **–** | – | **–** | – | **–** |
| Total underground and surface | 1,3 | **1,3** | 1,6 | **1,5** | 21 | **20** | 2,4 | **2,4** | 104 | **103** |

**Review of exploration activities**

No greenfields exploration activities were conducted by Metorex during F2009.

Drilling at the Dilala East Project (Ruashi Mining) and the Lubembe Project (MMK) are covered under the relevant sections above.

## FACTORS APPLIED TO ORE RESERVE ESTIMATES

| **2009** | **Ruashi** | **Chibuluma South** | **Kinsenda** | **Vergenoeg** | **Consolidated Murchison** |
|---|---|---|---|---|---|
| Cut-off grade | 1,04% Cu<br>0,41% Co | 2,73% Cu | 1% Cu | 12% $CaF_2$ | 2,32% Sb<br>3,74 g/t Au |
| Mining extraction factor (%) | 95% | 82% | 70% | 100% | 100% |
| Block factor (%) | – | 90% | 90% | – | 85% |
| Dilution factor (%) | 5% | 5% | 7,5% | – | – |
| Mine call (%) | – | – | – | – | – |
| Metallurgical recovery factor (%) | 83% Cu<br>59% Co | 94% | 90% | 75% | 85% |

| **2008** | **Ruashi** | **Chibuluma South** | **Kinsenda** | **Vergenoeg** | **Consolidated Murchison** |
|---|---|---|---|---|---|
| Cut-off grade | 3,5% Cu Eqv | 1% Cu | 1% Cu | 12% $CaF_2$ | 2,02% Sb<br>4,27 g/t Au |
| Mining extraction factor (%) | 95% | 80% | 70% | 100% | – |
| Block factor (%) | – | 90% | 90% | – | 85% |
| Dilution factor (%) | 5% | 5% | 7.5% | – | – |
| Mine call (%) | – | – | – | – | – |
| Metallurgical recovery factor (%) | 80% Cu<br>70% Co | 94% | 90% | 75% | 87% |

**Notes**

1. All resources are stated inclusive of reserves.
2. Reserves are a subset of resources and have been modified by mining extraction, dilution and block/mine call factors. All reserves are stated as run-of-mine feed delivered to mill.
3. With the exception of Kinsenda and Ruashi, all mining factors are based on historical results.
4. Mineral Resources for Ruashi have been restated, based on a revised geological block model completed in 2007. The new model has addressed geostatistical and geological issues for both copper and cobalt mineralisation. Whilst the copper metal content has not changed significantly, the contained cobalt has been adjusted downwards by 17 per cent. This downward adjustment is as a result of incomplete capture of cobalt assays from historical boreholes dating between 1920 and 1964.

## COMPETENT PERSONS DECLARATION

Mineral Resources and Ore Reserves for the various operations and projects have been compiled under the direction of the following people:

| Mine | Mineral Resource estimation | Ore Reserve estimation |
|---|---|---|
| Ruashi | Mr S Savage PrSciNat BSc (Hons) (independent consultant) | Mr F van Dalen, PrEng, BSc (Eng) (independent consultant) |
| Chibuluma | Mr S Savage PrSciNat BSc (Hons) (independent consultant) | Mr C Sihole, BSc (Hons) |
| Copper Resources Corporation | Mr G Fahey, MAusIMM, MAIG (independent consultant) | Mr E Patris |
| Vergenoeg | Mr H Terblanche, BSc (Hons) | Mr H Terblanche, BSc (Hons) |
| Consolidated Murchison | Mr C Willson, MGSSA, BSc (Hons) | Mr C Willson, MGSSA, BSc (Hons) |

The competent person who has checked and authorises publication of the Mineral Resources, is Mr T P Williams, PrSciNat (SA Council of Natural and Scientific Professionals Registration No 400387/04), Fellow of the Southern African Institute of Mining and Metallurgy, BSc (Hons). Mr Williams is Group Mineral Resource Manager and is a full-time employee of the Company. He is a mining geologist with 19 years' experience in exploration, resource development and estimation and mining geology in gold and base metals through west, central and east Africa. Mr Williams is based at the Company's Head Office at 2nd Floor, Cradock Heights, 21 Cradock Avenue, Rosebank 2146, Johannesburg.

Messrs Williams, Legg and Faber have confirmed in writing that the information disclosed in terms of 8,63(m) is compliant with the SAMREC Code and where applicable, the relevant Section 12 and Table 1 requirements, and that it may be published in the form and context in which it is intended.

## GROUP ENVIRONMENTAL MANAGEMENT AND FUNDING

The Company is exposed to environmental liabilities relating to its mining operations. Estimates of the cost of environmental and other remedial work such as rehabilitation costs, closure and pollution control are made on an annual basis. Based on the estimated remaining life of mine and any shortfall between total closure liability and accrued funds in a rehabilitation trust fund, additional payments are made to the fund once a year. Estimates of closure liability and the balance in the rehabilitation trust fund for each operation at 30 June 2009 are shown in the table below, together with the annual contribution required to ensure each operation has sufficient funds at the end of operations for rehabilitation:

| | | Environmental costing (R million) | | |
|---|---|---|---|---|
| Mining operation | Date of environmental approval | Closure liability | Accumulated fund | Annual contribution |
| Chibuluma Mines plc | 19/09/2006 | 15,4 | 2,0 | 1,0 |
| Consolidated Murchison | 12/06/1995 | 25,0 | 9,9 | 2,7 |
| Pan African (Barberton) | 27/10/2003 | 35,4 | 30,0 | 0,5 |
| Ruashi Mining sprl | 02/03/2005 | 115,1 | 2,2 | 6,0 |
| Sable Zinc Kabwe Limited | 04/06/2008 | 5,0 | – | 2,0 |
| Vergenoeg | 01/2009 | 6,2 | 3,6 | 0,1 |
| O'Okiep | Dormant | 4,7 | 5,1 | – |
| Rooiberg | Dormant | 0,3 | 0,8 | – |

Environmental factors that could have a material impact of economic extraction have been identified and appropriate measures implemented to mitigate the impact.

All necessary permits have been approved.

# Notice of annual general meeting

Notice is hereby given that the seventy-fifth annual general meeting of members of Metorex Limited ("the Company") will be held in Acacia Room, The Grace Hotel, 54 Bath Avenue, Rosebank, Johannesburg, South Africa on 7 December 2009 at 10:00 for the following purposes:

## Ordinary business

1. To receive, consider and adopt the annual financial statements of the Company and of the Group for the year ended 30 June 2009.

2. To re-elect and appoint directors in accordance with the provisions of the company's articles of association. In terms of the articles of association of the Company, Messrs A Barrenechea, and P A Chevalier retire by rotation but being eligible, offer themselves for re-election. Messrs T P Goodlace, T V Mabuza, and J G Hopwood and Ms N N Kgositsile being directors appointed by the Board since the previous annual general meeting retire, but being eligible, offer themselves for re-election. Brief CVs of these directors are set out on page 2 of this annual report.

3. To approve the directors' remuneration. The remuneration paid to executive directors is detailed in note 29. With effect from 1 April 2009, the fees payable to the non-executive directors for the ensuing 12-month period be set as follows:

| | Proposed annual fee | Proposed attendance fee/meeting |
|---|---|---|
| Chairman | R600 000 | R15 000 |
| Board member | R100 000 | R15 000 |
| Sub-committee members | | R5 000 |

1 *The same fee is payable to those Board members who attend special Board meetings.*
2 *The nomination committee has historically only met once per annum.*

4. To reappoint Deloitte & Touche, as nominated by the Company's Audit Committee, as independent auditors of the Company, to hold office until the conclusion of the next annual general meeting of the Company. It is noted that the individual registered auditor who will undertake the audit during the financial year ending 30 June 2010 is Mr I Marshall.

## Special business

5. To consider and, if deemed fit, to pass, with or without modification, the following ordinary resolutions:

### 5.1 Ordinary resolution number 1 – Control of authorised but unissued shares

"Resolved that, subject to the provisions of the Companies Act, 1973 (Act 61 of 1973), as amended, the authority given to the directors to allot and issue, at their discretion, the unissued share capital of the Company for such purposes as they may determine, be extended until the Company's next annual general meeting."

### 5.2 Ordinary resolution number 2 – General authority

"Resolved that, subject to the passing of ordinary resolution number 1, in terms of the Listing Requirements of the JSE Limited ("JSE"), the mandate given to the directors of the Company in terms of a general authority to issue securities for cash, as and when suitable opportunities arise, be renewed subject to the following conditions:

- That this general authority be valid until the Company's next annual general meeting provided that it shall not extend beyond fifteen months from the date of the passing of this ordinary resolution (whichever period is shorter);
- That the securities be of a class already in issue;
- That securities be issued to public shareholders and not to related parties as defined in the Listings Requirements of the JSE;
- That a paid press announcement giving full details, including the impact on net asset value and earnings per share, be published at the time of any issue representing, on a cumulative basis within a financial year, 5 per cent or more of the number of securities in issue prior to the issue/s;
- That issues in the aggregate in any one financial year shall not exceed 15 per cent of the Company's issued share capital of that class; and
- That, in determining the price at which an issue of securities will be made in terms of this authority, the maximum discount permitted shall be 10 per cent of the weighted average traded price of those securities over the 30-business days prior to the date that the price of the issue is determined or agreed by the directors."

**5.3 Ordinary resolution number 3 – Approval of Share Incentive Scheme**

"Resolved as an ordinary resolution that subject to the approval of a 75 per cent majority of the votes cast by the shareholders of the Company present in person or represented by proxy at the annual general meeting at which this resolution is proposed and the Listings Requirements of the JSE, the replacement and amendment of the provisions of the current Metorex Share Incentive Scheme signed on 17 November 2005 by the provisions of the amended Metorex Share Incentive Scheme dated 7 December 2009 ("Scheme") (a summary of the principal terms of the Scheme is in the supplementary information on page 97 of the annual report), be and is hereby approved and that the directors of the Company be and they are hereby authorised to take all such steps as may be necessary for the amendment and carrying into effect of the Scheme, including the allotment and issue of ordinary shares in the capital of the Company on the terms and conditions set out in the Scheme, to participants of the Scheme, including executive directors of the Company.

**5.4 Ordinary resolution number 4 – Specific authority**

Resolved as an ordinary resolution that all the ordinary shares of the Company required for the purpose of carrying out the terms of the Metorex Share Incentive Scheme dated 7 December 2009 ("the Scheme"), be and are hereby specifically placed under the control of the directors of the Company, who be and are hereby authorised to allot and issue those shares in terms of the Scheme.

**5.5 Ordinary resolution number 5 – Signature of documents**

Resolved as an ordinary resolution that any one director or the secretaries of the Company be and they are hereby authorised to do all such things and sign all documents and take all such action as they consider necessary to implement the resolutions set out in the notice convening this annual general meeting at which this ordinary resolution will be considered.

6. To conduct such other business as may be conducted at an annual general meeting.

## Note

In terms of the Listings Requirements of the JSE, the approval of a 75 per cent majority of the votes of all shareholders, present or represented by proxy, is required to approve ordinary resolution number 5.2. and 5.3.

Shares held in terms of the Metorex Share Incentive Scheme and by subsidiaries of the Company are restricted from voting on the resolutions above.

Directors – refer pages 2 and 3;
Major shareholders of the Company – refer page 59;
Directors' interests in the Company's securities – refer page 58;
Share capital – refer page 58.

## Litigation statement

The directors of the Company, whose names are given on pages 2 and 3 of this annual report, are not aware of any legal or arbitration proceedings, pending or threatened against the Group, which may have or have had, in the 12 months preceding the date of this notice, a material effect on the Group's financial position.

## Directors' responsibility statement

The directors, whose names are given on pages 2 and 3 of this annual report, collectively and individually, accept full responsibility for the accuracy of the information given and certify that to the best of their knowledge and belief there are no facts that have been omitted which would make any statement false or misleading, and that all reasonable enquiries to ascertain such facts have been made and that the annual report contains all the information required by law and the Listings Requirements of the JSE.

# Notice of annual general meeting continued

### Material change

Other than the facts and developments reported on in this annual report, there have been no material changes in the affairs, financial or trading position of the Group since the signature date of this annual report and the posting date hereof.

### Voting and proxies

On a show of hands every shareholder present in person or by proxy and if a member is a body corporate, its representative, shall have one vote and on a poll every shareholder present in person or by proxy and if the person is a body corporate, its representative, shall have one vote for every share held or represented by him/her.

A form of proxy is attached for completion by registered certificated shareholders and dematerialised shareholders with own name registration who are unable to attend the annual general meeting in person but wish to be represented thereat. Forms of proxy must be completed and received by the transfer secretaries at least 48 hours excluding Saturday, Sunday and public holidays, before the time appointed for the meeting. Registered certificated shareholders and dematerialised shareholders with own name registration who complete and lodge forms of proxy will nevertheless be entitled to attend and vote in person at the annual general meeting to the exclusion of their appointed proxy/(ies) should such member wish to do so. Dematerialised shareholders, other than with own name registrations, must inform their CSDP or broker of their intention to attend the annual general meeting and obtain the necessary authorisation from their CSDP or broker with their voting instructions should they not be able to attend the annual general meeting in person but wish to be represented thereat. This must be done in terms of the agreement entered into between the shareholder and the CSDP or broker concerned by the cut-off time stipulated therein.

Each shareholder is entitled to appoint one or more proxies (who need not be a shareholder of the Company) to attend, speak and to vote in his/her stead.

By order of the Board



MOORE STEPHENS MWM INC
Secretaries

# Proxy form

## METOREX LIMITED

(Incorporated in the Republic of South Africa) • (Registration number 1934/005478/06)
Share code: MTX • ISIN: ZAE000022745 • Issuer code: MEMTX

**To be completed by certificated shareholders and dematerialised shareholders with own name registration only.**

For use in respect of the annual general meeting to be held in Acacia Room, The Grace Hotel, 54 Bath Avenue, Rosebank, Johannesburg, South Africa at 10:00 on 7 December 2009. Shareholders who have dematerialised their shares with a CSDP or broker, other than with own name registrations, must arrange with the CSDP or broker concerned to provide them with the necessary authorisation to attend the annual general meeting or the shareholders concerned must instruct their CSDP or broker as to how they wish to vote in this regard. This must be done in terms of the agreement entered into between the shareholder and the CSDP or broker concerned.

I/We ______________________________
(full name and surname in block letters)

of ______________________________
(full address)

as a member of ______________________________

being the registered holder of ______________________________ shares in the Company hereby appoint:

1. ______________________________ or

2. ______________________________ or

3. the Chairman of the meeting
as my/our proxy to attend and vote on my/our behalf, as indicated below, at the annual general meeting of the shareholders of the Company, to be held in Acacia Room, The Grace Hotel, 54 Bath Avenue, Rosebank, Johannesburg, South Africa at 10:00 on 7 December 2009 and any adjournment thereof.

| Resolutions | For | Against | Abstain |
|---|---|---|---|
| Ordinary resolution – adoption of annual financial statements | | | |
| Ordinary resolution – re-election of A Barrenechea as a director | | | |
| Ordinary resolution – re-election of P Chevalier as a director | | | |
| Ordinary resolution – appointment of T P Goodlace as a director | | | |
| Ordinary resolution – appointment of J G Hopwood as a director | | | |
| Ordinary resolution – appointment of V Mabuza as a director | | | |
| Ordinary resolution – appointment of N Kgositsile as a director | | | |
| Ordinary resolution – to approve the directors' remuneration | | | |
| Ordinary resolution – to reappoint the auditors and I T Marshall as designated auditor | | | |
| Ordinary resolution – to place the unissued shares under the control of the directors | | | |
| Ordinary resolution – to provide the directors with a general authority to issue shares for cash | | | |
| Ordinary resolution – to approve the amendment of the Metorex Share Incentive Scheme | | | |
| Ordinary resolution – to specifically place all the ordinary shares of the Company required for the purpose of carrying out the terms of the Metorex Share Incentive Scheme under the control of the directors of the Company | | | |
| Ordinary resolution – to provide any one of the directors or secretaries of the Company with the authority to do all such things, sign all documents and take all action necessary to implement the above resolutions | | | |

Signed this ______________ day of ______________ 2009

Signed ______________ (normal signature)

Capacity and authorisation (see note 6) ______________

(Please indicate instructions to proxy in the space provided above by the insertion therein of the relevant number of votes exercisable). Indicate with an X in the appropriate block.

# Corporate information

**Postal:** PO Box 2814, Saxonwold, 2132, South Africa
**Telephone:** +27 (0)11 880 3155
**Facsimile:** +27 (0)11 880 3322
**Website:** www.metorexgroup.com **Email:** ir@metorexgroup.com
**Registration number:** 1934/005478/06

### Investor relations

College Hill, PO Box 413187, Craighall, 2024, South Africa
**Telephone:** +27 (0)11 447 3030

St James Corporate Services Limited, 6 St James's Place,
London, SW1A INP, England
**Telephone:** +44 207 499 3916

### Registrars

Link Market Services South Africa (Pty) Limited, PO Box 4844, Johannesburg, 2001, South Africa
**Telephone:** +27 (0)11 834 2266

### Company secretaries

Moore Stephens MWM, PO Box 1574, Houghton, 2041, South Africa
**Telephone:** +27 (0)11 728 7240

### Sponsor

Barnard Jacobs Mellet Corporate Finance (Pty) Limited, PO Box 62200, Marshalltown, 2107, South Africa
**Telephone:** +27 (0)11 750 0000

### Auditors

Deloitte & Touche, Private Bag X6, Gallo Manor, 2052, South Africa
**Telephone:** +27 (0)11 806 5000

### Legal representatives

Bowman Gilfillan attorneys, PO Box 785812, Sandton, 2196
**Telephone:** +27 (0)11 669 9000

### ADR Programme – North America and Canada

The Bank of New York, 101 Barclay Street, New York, NY 10286, USA
**Telephone:** +1 212 815 3326

### Directors

R G Still* (Chairman), T P Goodlace (CEO), A Barrenechea* (Spanish), P Chevalier* (Belgian), J G Hopwood*
N N Kgositsile*, A J Laughland* (British), T V Mabuza*, L J Paton*, M Smith (CFO) *Non-Executive

BASTION GRAPHICS



METOREX LIMITED ANNUAL REPORT 2009

## CONTACT US

**Physical and registered address**

Cradock Heights: 2nd Floor
21 Cradock Avenue, Rosebank
Johannesburg, South Africa

**Postal address**

PO Box 2814, Saxonwold, 2132
South Africa

**Telephone:** +27 (0)11 880 3155
**Fax:** +27 (0)11 880 3322 (Management)
+27 (0)11 447 5449 (Development Division)

**www.metorexgroup.com**
**ir@metorexgroup.com**

METOREX
LIMITED

**Exhibit SRK - 4. DRC Consummated Transactions**

| | Mineral Properties | Product | Mine Type | Mining Ore Type | Discount Rate Reported | Discount Rate Type Reported | Equalised Discount Rate to Post-Tax Real | Type of Report | Consultants | Reason | Date | Owner/Developer | Acquirer | Financial Advisors to Acquirer | Type of Valuation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Assumed Inflation Rate | | | | | | | 2% | | | | | | | | |
| DRC Corporate Tax Rate | | | | | | | 30% | | | | | | | | |
| **DRC Copper Projects - recent discount rates reported** | | | | | | | | | | | | | | | |
| 1 | Kamoto Copper Compa | Cu & Co | Open-pit | Oxide & Sulphide | 10.7% | Unspecified ( typically Pre-Tax discount rates apply in impairment calcs) | 7.49% | Financial Report - Impairment & Rehabilition | | 2016 & 2015 Audited Annual Financial Statement | 8-Feb-17 | Katanga Mining Limited | n/a | n/a | |
| 2 | Kamoto Copper Compa | Cu & Co | Open-pit | Oxide & Sulphide | 11.8% | Unspecified ( typically Pre-Tax discount rates apply in impairment calcs) | 8.26% | Resstated Financial Report - Impairment & Rehabilition | Deloitte & Touche | Restated 2017 & 2016 Audit Annual Financial Statements Investigation by Ontario Securities Commission | 31-Mar-18 | Katanga Mining Limited | n/a | n/a | |
| 3 | Mutanda Mining Sprl | Cu & Co | Open-pit | Oxide | 10.0% | Post-Tax Real | 10.0% | Mineral Experts Report | Golder Associates | Glencore plc IPO Prospectus | 4-May-11 | Glencore owned 40% at time of IPO, but increased stake in Feb | n/a | Morgan Stanley & Citigroup | Assets Valuation Report |
| 4 | Mutanda Mining Sprl | Cu & Co | Open-pit | Oxide | 13.5% | Unspecified ( typically Pre-Tax discount rates apply in impairment calcs) | 9.45% | Financial Report - Impairment & Rehabilition | | 2019 Annual Report | 17-Feb-20 | Glencore - decision to place Mutanda on temporary care and maintenance | n/a | n/a | |
| **Consummated DRC Copper Mine/Project Acquisitions** | | | | | | | | | | | | | | | |
| 5 | Kinsevere Mine | Cu | Open-pit | Oxide | 9.3% | Post-Tax Real WACC | 9.3% | HK Stock Exchange Circular | SRK- Competent Persons Report & Valuation Report | Acquistion of parent company | 24-Feb-12 | Anvil Mining Limited | Minmetals Resources Limited | BNP Paribas Corporate & Investment Ba | Assets Valuation Report |
| 6 | Tenke-Fungurume Mine | Cu & Co | Open-pit | Oxide | 12.5% | Nominal WACC | 10.5% | HK Stock Exchange Circular | RPM - Compentent Persons Report Censere (Far East) Limited- Valuation Report | Acquistion of 56% of the operating mine | 8-Sep-16 | Freeport-McMoron | China Molybdenum Co Limited | n/a | Assets Valuation Report |
| 7 | Tenke-Fungurume Mine | Cu & Co | Open-pit | Oxide | 12.5% | Nominal WACC | 10.5% | n/a | n/a | Acquistion of 24% of operating mine by Private Equity company | 15-Nov-16 | Lundin Mining Limited | BHR Partners | unknown | |
| 8 | Kinsenda Copper Comp | Cu | Underground | Oxide & Sulphide | 10.4% | Post-Tax Real WACC | 10.4% | HK Stock Exhange Circular | SRK- Competent Persons Report & Valuation Report | Transfer of Metorex assets from a guaranteed subsiduary to the parent company after the acquisition of Meterox on Aug 2, 2011 for US$1.3bn in a | 30-Aug-13 | Kinsenda Sarl | JinChaun Group International Resources | BOCI Asia Limited & BofA Merrill Lynch, Goldman Sach advised Jinchuan in 2011 | Assets Valuation Report |
| 9 | Ruashi Mine | Cu & Co | Open-pit | Oxide & Sulphide | 10.4% | Post-Tax Real WACC | 10.4% | HK Stock Exchange Circular | SRK- Competent Persons Report & Valuation Report | Transfer of Metorex assets from a guaranteed subsiduary to the parent company after the acquisition of Meterox on Aug 2, 2011 for US$1.3bn in a | 30-Aug-13 | Ruashi Mining | JinChaun Group International Resources | BOCI Asia Limited & BofA Merrill Lynch, Goldman Sach advised Jinchuan in 2011 | Assets Valuation Report |
| 10 | Kamoa-Kakula Project | Cu | Underground | Sulphide | 8.0% | Unspecified but assumed to be Real Post-Tax | 8.0% | HK Stock Exchange Circular | China United Assets Appraisal Group & Orewin Independent | Acquisition of 39.6% of development proje | 2-Jul-15 | Ivanhoe Mines | Zijin Mining Group Co | | Assets Valuation Report |
| **In Progress DRC Copper Mine/Project Acquisitions** | | | | | | | | | | | | | | | |
| 11 | Kalongwe Project | Cu & Co | Open-pit | Oxide | 14.0% | Post-Tax Nominal | 12.0% | ASX Scheme of Arrangement Circular | BDO/SRK | Acquisition of parent company owning a single asset | 28-Feb-20 | Nzuri Copper | Xuchen International Limited subsiduary of Chengtun Mining Company | | Fairness Opinion & Assets Valuation Report |
| Median Post Tax Real - All (A+B+C+D) | | | | | 10.7% | | 10.0% | | | | | | | | |
| Median Post Tax Real - Consummated (B) | | | | | 10.4% | | 10.4% | | | | | | | | |
| **In Matter OZ v Former Shareholders of Africo Resources** | | | | | | | | | | | | | | | |
| 12 | Kalukundi Project | Cu & Co | Open-pit | Oxide | 12.0% | Post-Tax Real | 12.0% | Submission to EDNY Court | SRK | Valuation of Project for Restitution Claim | Sep-19 | Africo Resources Limit | n/a | n/a | |