# Exhibit 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- against -<br><br>OZ AFRICA MANAGEMENT GP, LLC,<br><br>Defendant. | ECF Case<br><br>Case No.: 1:16-cr-00515-NGG-LB |

# Rebuttal Expert Report of Michael P. Salve, Ph.D.

Michael P. Salve, Ph.D.
Senior Managing Director
FTI Consulting
4/29/2020

TABLE OF CONTENTS

I. INTRODUCTION....3

A. Qualifications....3

B. Assignment....4

II. INFORMATION REVIEWED....4

III. SUMMARY OF OPINIONS....4

IV. REVIEW AND ASSESSMENT OF THE BARNES REPORT....6

A. Introduction....6

B. Errors in the Design of Dr. Barnes's Event Study....6

*1. Dr. Barnes's Chosen Industry Index is Inappropriate as a Benchmark for Africo Because it is Composed of Companies Substantially Different from Africo*.... 7

*2. Dr. Barnes Inadvertently Introduced a Confounding Factor Into His Analysis*.... 10

*3. Dr. Barnes Failed to Define his "Event Windows" Contrary to Standard Practice*.... 13

C. Errors Undermining the Conclusions Reached by Dr. Barnes Based on His Flawed Event Study....14

*1. Dr. Barnes's Finding that 8 of 23 Days Reflect Statistically-Significant Movement is Itself Not Statistically Significant*.... 15

*2. The Statistical Significance of the Africo Returns on Each of Dr. Barnes's 8 Days is Also Questionable Because Dr. Barnes's Regression Model Has a Poor Model Fit*.... 17

*3. Neither Index Selected By Dr. Barnes Could be Successfully Used to Isolate Statistically Significant Market Movements in Africo Returns*.... 19

*4. The Impact of the "Day of the Week" Variable on Dr. Barnes's Regression Model Indicates the Market for Africo Shares Could Be Inefficient*.... 21

*5. ARL Daily Returns Are Correlated Over Time, Which Could Indicate Market Inefficiency*.... 22

D. Dr. Barnes Does Not Address the Other *Cammer* and *Krogman* Factors, Which Could Support the Conclusion that Africo did not Trade on an Efficient Market....25

V. CONCLUSIONS ........................................................................................................26

APPENDIX A: Curriculum Vitae of Michael Salve

APPENDIX B: Information Considered

APPENDIX C: 2007/2008 Fiscal Year Annual Revenues and Country(ies) of Operation of Solactive Global Copper Miners Total Returns Index Firms

# I. INTRODUCTION

## A. Qualifications

1. I am a Senior Managing Director at FTI Consulting ("FTI"). My professional responsibilities include providing economics, statistics, econometrics, and financial modeling services. I have over 20 years of experience in designing statistical samples, working with complex financial datasets, developing complex extrapolation and benchmarking models, and evaluating achieved precision levels. I also have extensive experience in using econometric and statistical models for estimating exposure and potential damages. I have served as an expert witness in securities class action litigation, foreign investment disputes, and financial services litigation.

2. I have also worked closely with forensic accountants, auditors, and industry experts on many forensic investigations relating to fraudulent transactions, purchase price disputes, securities litigations, Foreign Corrupt Practices Act, and revenue recognition issues. I have taken the lead role on the quantitative damages component of these engagements related to the market analyses, business forecasts, stock price analyses, earnings reports, accounting disclosures, sampling techniques, technical database analyses, and extrapolation methodologies.

3. I received my Ph.D. in economics from Boston College in 1995, specializing in industrial organization and applied econometrics. While I was in the doctoral program at Boston College, I taught undergraduate courses in statistics, macroeconomic theory, and graduate-level applied mathematics at Boston College, and I taught microeconomic theory at Suffolk University. I have also taught two courses in the graduate economics program at Hunter College in New York City called Econometrics, and Law and Economics.

4. I have testified in court or arbitration six times and have been deposed eleven times as an expert witness in the last five years. I have authored two publications in the last 10 years. These matters and publications are listed in my Curriculum Vitae attached as Appendix A.

5. FTI is compensated at the rate of $730 per hour for my services in this matter. The hourly rates of my supporting staff, working under my supervision, range from $390-600. FTI's compensation for this engagement is not dependent on the results of my report, my testimony, or the outcome in this matter.

### B. Assignment

6. I have been retained by Wilson Sonsini Goodrich & Rosati ("Counsel"), counsel to certain former equity holders of Africo Resources Limited ("Africo" or "ARL"), who I understand have been found to be victims of defendant OZ Africa Management GP's (the "Defendant") crime by the Honorable Judge Nicholas G. Garaufis (the "Victims").

7. I have been asked to review and provide my assessment of the opinions set forth in the expert report of Ronnie Barnes, Ph.D. (the "Barnes Report"), which I understand has been offered by the Defendant in support of its position that Africo's shares were traded in an efficient market during the relevant time period.[1]

## II. INFORMATION REVIEWED

8. My analysis, opinions, and conclusions are based on my personal knowledge, education, training and experience, information produced in this litigation, and the review and analysis of information considered in this report and referenced in Appendix B.

9. My analyses, opinions, and conclusions are based solely on the work performed by me and those under my supervision through the date of this report. I reserve the right to supplement my opinions should additional relevant information become available that bears on the analyses, opinions, or conclusions contained herein.

## III. SUMMARY OF OPINIONS

10. I evaluated the claim that ARL stock was traded in an efficient market set forth in the Barnes Report. ***It is my opinion that the analyses presented in the Barnes Report are deficient; that the conclusions expressed therein are unreliable; and that there exists no credible basis to conclude that Africo's shares traded in an efficient market during the relevant time period***.

11. Dr. Barnes's opinion that ARL common shares traded in an efficient market is based entirely on his "event study." If ARL shares traded in an efficient market, movements in share price would be expected to reflect the market's reaction to ARL-specific news. When used properly, an event study can test whether the trading market for a company's shares reacted to company-specific news in a statistically significant manner. For dates which Dr. Barnes identified that

[1] Expert Report of Ronnie Barnes, Ph.D. dated March 6, 2020.

company-specific news could have affected Africo's stock price, Dr. Barnes analyzed the trading data for the company's shares to determine whether Africo's share price reaction to the company-specific news, rather than to other more general market news, was statistically significant. Although a properly conducted event study may be a relevant consideration in determining whether a security traded in an efficient market, Dr. Barnes's event study and resulting conclusions are flawed in a number of significant respects, rendering it entirely unreliable.

12. ***My analysis reveals that there were material issues with both the design of Dr. Barnes's event study and the conclusions he attempted to draw from it.***

13. Regarding the design of the model, *first*, Dr. Barnes chose an irrelevant index to analyze whether movements in Africo's share price could be separated from general market and industry movement. *Second*, Dr. Barnes improperly added an unnecessary element, the USD-CAD exchange rate, to his analysis. Having improperly added an unnecessary element, Dr. Barnes compounds this error by failing to account for its confounding impact on his statistical analysis of ARL's returns. *Third*, Dr. Barnes failed to define his event window, contrary to standard methods. Each of these errors in design independently renders Dr. Barnes's analysis unreliable.

14. However, even accepting the failures in the model's design, the conclusions drawn by Dr. Barnes from that regression model are themselves unreasonable and statistically unsound. In fact, my analysis instead indicates that Dr. Barnes's model shows inefficiencies in the market for Africo shares. Most importantly, Dr. Barnes does not provide a methodologically sound basis for his conclusion that statistically significant movement on only 8 of the 23 non-random "news days" he identified shows market efficiency. Additionally, Dr. Barnes's poor model fit renders his conclusion regarding the statistical significance of the movement of Africo returns on those 8 days unreliable. Next, the predictions made by Dr. Barnes's model, which form the basis for his conclusions regarding the statistical significance of the movement in Africo returns, are not reliable because my analysis shows that the *Market* index he selected adds no value to his regression model. Dr. Barnes's model also reflects, and fails to account for, both the "day of the week effect" and a negative correlation on subsequent trading days, both of which are indicative of an inefficient rather than an efficient market.

15. Finally, Dr. Barnes failed to consider any of the other critical factors (typically referred to as *Cammer* and *Krogman* factors) routinely relied on by Courts to determine market efficiency. Dr. Barnes's failure to consider these factors is yet another failure of Dr. Barnes's analysis, which cannot support his finding of market efficiency.

## IV. REVIEW AND ASSESSMENT OF THE BARNES REPORT

### A. Introduction

16. Dr. Barnes sought to use an event study to "assess whether the public share price [of Africo] reacted swiftly to new and value-relevant company-specific information."[2] To conduct his event study, Dr. Barnes applied a "regression" model to determine how Africo's stock price reacted to the release of new and value-relevant company-specific information that was not due to generic industry or market effects. An event study is an analysis of trading data used to determine whether the trading market for a company's shares reacted to company-specific news or events in a statistically significant manner.[3] Dr. Barnes identified days on which Africo-specific news or events would be expected to impact the market for Africo shares ("news days"), and then analyzed trading data using his regression model to determine whether trading on those days reflected a statistically-significant market reaction to the Africo-specific news or was driven by general market and industry factors.

17. ***Not only is the design of Dr. Barnes's event study fundamentally flawed, the conclusions he reaches based on that study are unreasonable in addition to being unreliable. Instead, the results of Dr. Barnes's flawed study would tend to support the conclusion that the market for Africo shares was inefficient***.

### B. Errors in the Design of Dr. Barnes's Event Study

18. *First*, Dr. Barnes inexplicably elected to compare Africo's share price movements to those in an index of entirely unlike firms – large, multinational conglomerates, many with revenues exceeding $1 billion dollars. Because Dr. Barnes sets out to utilize a regression analysis to distill when Africo's stock moved in a "statistically significant" manner—meaning, in

---

[2] *See* Barnes Report, ¶ 36.
[3] *See* MacKinlay, A. Craig. "Event Studies in Economics and Finance." *Journal of Economic Literature* 35, no. 1 (1997): 13-39.

layman's terms, in a way separate and apart from the movements in the market as a whole or other firms just like Africo—due to "company-specific, value-relevant, and unexpected news",[4] his choice of an index of firms *unlike* Africo, means that Dr. Barnes's model cannot identify movements in Africo returns that are related to general movements in *like* firms. This renders Dr. Barnes's regression analysis results useless because it does not credibly differentiate movements in Africo's share price due to Africo-specific news from like-company market movements.

19. *Second*, in comparing Africo's returns to the *Industry* index he selected, Dr. Barnes incorporates daily fluctuations in the currency exchange rates. This fundamental error makes it impossible to know whether Africo's returns on one of the "news days" identified by Dr. Barnes moved with the *Industry* index or moved due to fluctuations in the exchange rate between Canadian and U.S. dollars on a given day. This means it is not possible to determine whether Dr. Barnes's analysis shows relevant and statistically-significant movements in Africo returns, or instead merely reflects fluctuations between the exchange rate between Canadian and U.S. dollars on a given day. This error makes Dr. Barnes's analysis of the statistical significance of Africo's returns entirely unreliable.

20. *Third*, Dr. Barnes failed to abide by standard practices by choosing not to define "event windows." Failure to define the confines of event windows makes it impossible to determine the speed at which Africo's share price reacted to news and events, an important factor in an analysis of market efficiency. That is why defining event windows is a standard and necessary practice in event studies. Because Dr. Barnes did not define "event windows", and instead considered only single-day movements, his non-standard analysis cannot be relied upon.[5]

### 1. *Dr. Barnes's Chosen Industry Index is Inappropriate as a Benchmark for Africo Because it is Composed of Companies Substantially Different from Africo*

21. Dr. Barnes attempts to use a regression model to test if the ARL stock was trading in an efficient market. Regression analysis is a statistical method designed to examine the relationship between two or more variables. Here, Dr. Barnes sought to use a regression

---

[4] *See* Barnes Report, ¶ 37.
[5] Expert Report of Allan W. Kleidon, Ph.D. in *Menaldi v. Och-Ziff Capital Management Group LLC* (No. 1:14-cv-03251), ¶ 22.

analysis to identify the movements in Africo returns on the "news days" he selected. He attempted to attribute movements in Africo returns to (i) the movement of the market generally and (ii) the movement of large mining companies generally, in order to isolate the movements related to Africo-specific news. There are thus only two inputs to Dr. Barnes's regression model: the daily returns of a *Market* index and the daily returns of an *Industry* index. According to Dr. Barnes, the *Market* index returns, the *Industry* index returns, and the ARL returns should generally move in the same direction (and in the same magnitude) in response to the same generic market events. When there is an Africo-specific event that necessarily affects only Africo, there should be an effect ***only*** on the ARL returns and not on the two benchmark returns. This would be indicative of Africo trading on an efficient market.

22. The results of Dr. Barnes's regression model are completely dependent on the two benchmark indexes that he has chosen as inputs to his model. If there is a mistake in the selection of either the *Industry* or the *Market* index, then the regression model will not accurately identify changes in ARL returns associated with events that should uniquely affect Africo. Consequently, this will lead to inaccurate regression results and unreliable conclusions regarding market efficiency—the results from such a model would be meaningless.[6] It is therefore critically important for Dr. Barnes to select these two inputs correctly.

23. For the *Industry* index to be a helpful benchmark in Dr. Barnes's analysis, it must contain firms similar to Africo. Dr. Barnes is obviously aware of this fundamental precept. For example, Dr. Barnes cites to a paper that discusses the importance of limiting the firms in an industry index to peer firms of comparable size.[7]

24. The Barnes Report does not discuss whether the *Industry* index he used is comprised of firms that are comparable to Africo, the steps that were taken in the selection of Barnes's *Industry* index, or any actions taken to verify the reliability of the index used. Instead, Dr. Barnes ignores the issue. By failing to undertake this essential analysis, Dr. Barnes's analysis uses an

---

[6] *See* Barnes Report, ¶¶ 38-39.
[7] *See* Barnes Report, footnote. 61 (citing Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review* Vol. 96:553, 2018, pp. 554–621). *See* Fisch, p. 583, footnote 167 ("This index is composed 'of the companies cited by analysts as Halliburton's peers at least three times during the Class Period and with a market cap of at least $1 billion at the end of the Class Period.'").

inappropriate and incompatible *Industry* index, the Solactive Global Copper Miners Total Returns Index,[8] which is composed of firms that are at different stages of firm maturity, perform different functions, operate in different markets, and have different risks than Africo. Further, many of these firms are multinational firms, many of which exceed $1 billion in annual revenue, whereas Africo had zero annual revenue in 2007.[9] One of Defendant's other experts in this matter, Dr. Daniel Flores of Quadrant Economics, concedes this. In Defendant's Expert Report of Quadrant Economics, Dr. Daniel Flores explicitly lists the substantial differences between Africo and the firms that make up Dr. Barnes's *Industry* index to further his argument that Africo's share price would not closely follow the firms on Dr. Barnes's *Industry* index.[10] The table in Appendix C shows that the firms in Dr. Barnes's *Industry* index were much larger in size than Africo (as measured by revenue) in 2007/2008, which suggests that the firms included in this index do not create an appropriate industry benchmark for Africo. For example, Dr. Barnes's *Industry* index includes Xstrata (later acquired by Glencore) and Freeport-McMoRan Inc., which had annual revenues of $28.5 CAD billion and $16.9 CAD billion in 2007. Furthermore, 12 of the 21 firms that have a reported annual revenue in 2007 have annual revenues that exceed $2 CAD billion.[11] Moreover, these firms operated in many different countries, whereas Africo principally operated in the Democratic Republic of the Congo in 2007.[12]

25. Because Dr. Barnes selected an inappropriate and incompatible *Industry* index, he cannot successfully isolate movements related to Africo-specific news from market movements of mining companies similar to Africo and of the market generally. Thus, Dr. Barnes's conclusion that 8 of his 23 "news days" reflect statistically significant movement caused by

---

[8] *See* Barnes Report, ¶ 38.
[9] Africo Resources LTD. Consolidated Financial Statements (Stated in US Dollars) - December 31, 2007.
[10] *See* Expert Report of Quadrant Economics, ¶ 25, footnote 31 (explaining that substantial differences between Africo and the companies on Dr. Barnes's *Industry* index include that Africo was a "junior mining company" while Dr. Barnes's *Industry* index includes "companies that operate producing mines", that Kalukundi is a copper and cobalt property while Dr. Barnes's *Industry* index includes "some exposure to companies in the cobalt sector", and that Africo operated in the DRC while Dr. Barnes's *Industry* index includes companies that operate in developing and developed countries.)
[11] *See* Appendix C.
[12] "Africo Resources Ltd. ('the Company' or 'Africo') is a mineral resource company engaged in exploring, acquiring and developing precious metal and base metal properties. These activities are conducted principally in the Democratic Republic of the Congo ('DRC')." *See* Africo Resources LTD. Consolidated Financial Statements (Stated in US Dollars) - December 31, 2007, p. 7.

Africo-specific news is based on an inappropriate comparison, which renders his conclusion unreliable.

### *2. Dr. Barnes Inadvertently Introduced a Confounding Factor Into His Analysis*

26. As noted above, Dr. Barnes's regression analysis is performed by comparing the daily rates of returns predicted by his *Industry* and *Market* indexes to the actual daily return of Africo shares in an attempt to identify those days where market movement is related to Africo-specific news rather than general market movements. "News dates" where Africo's actual daily returns are not statistically different from the index-predicted returns of his regression model indicate that there is no statistically significant relationship between the Africo returns and company-specific news.[13] However, Dr. Barnes converted the U.S. Dollar-denominated *Industry* index to Canadian dollars, which confounds the relationship between the *Industry* index and Africo's daily returns.

27. More specifically, Dr. Barnes's regression analysis is performed using daily rates of return. Dr. Barnes uses the daily rates of returns of the *Industry* and *Market* indexes to model the *predicted* daily return for ARL shares for comparison with Africo's *actual* daily returns. Africo's *actual* daily return for a specific day is determined by calculating the percent difference between that day's closing price and the closing price of the previous day.

28. By way of example, for December 19, 2006, the *actual* daily ARL return is the percent difference between the ARL closing price on December 19, 2006 and December 18, 2006. According to the dataset provided by Dr. Barnes, the ARL closing price on December 19, 2006 was $4.28 CAD and the ARL closing price on December 18, 2006 was $4.35 CAD, resulting in a daily return of -1.6% on December 19, 2006.[14] The daily returns for the *Industry* and *Market* indexes are calculated in a similar manner.

29. As shown in the example above, daily returns are percent changes. Percent changes, and hence daily returns, do not have a currency denomination. Daily returns measure the day-to-day

[13] Here, Dr. Barnes found that 65% (15 of 23) of his hand-picked "news days" lacked a statistically-significant relationship between Africo-specific news and Africo's daily returns. In a perfectly efficient market, one could expect every hand-picked news day to have a statistically-significant relationship between Africo-specific news and Africo's daily returns.

[14] $-1.6\% \approx (4.28 - 4.35) \div 4.35$.

performance of a particular stock or index. Expressing the variables in terms of daily returns enables a researcher to compare daily performances between different stocks or indexes, regardless of the original currency denomination of the stocks or indexes.

30. However, when Dr. Barnes created his *Industry* index returns, he embedded *both* the index returns *and* the foreign currency returns of the USD/CAD, confounding his daily *Industry* index returns with the daily USD/CAD currency rate returns. This mixing or confounding of the daily returns between the *actual* Industry returns and foreign currency returns renders Dr. Barnes's regression analysis incapable of determining whether the driver of the Africo stock returns on a given day is (1) Dr. Barnes's flawed *Industry* index, (2) the USD/CAD exchange rate, or (3) both.

31. For example, on November 12, 2007 (one of the dates from Dr. Barnes' regression) the actual daily return on the *Industry* index was -7.3%. However, Dr. Barnes did not use this value in his regression. Instead, Dr. Barnes first converted the *Industry* index on November 12, 2007 and November 9, 2007 (the previous trading day) to CAD. After making this conversion, he then calculated a final *Industry* index return of -4.7% on November 12, 2007. This value of -4.7% that Dr. Barnes used in his regression captures only 64%[15] of the *actual* return of the *Industry* index, and thus obscures the relationship between the returns predicted by Dr. Barnes's model and the actual ARL daily returns.

32. Dr. Barnes's flawed conversion of the *Industry* index returns using the added element of the USD/CAD exchange is systemic throughout his data construction. Consequently, his regression analysis, which relies upon these data sets, reports out incorrect and misleading results for each and every day. To continue the illustrative example in the previous paragraph, for November 12, 2007, Dr. Barnes imbedded the USD/CAD exchange rate daily return of approximately +3%[16] into his *Industry* index return. The US dollar's appreciation over the Canadian dollar between the two trading days greatly reduces the actual loss on the ***Industry*** index and masks the actual -7.3% industry index loss on the day. Dr. Barnes's inclusion of this unnecessary element distorts his *Industry* index return on every day that

[15] 64% $\approx 4.7 \div 7.3$.

[16] The USD to CAD exchange rate on 11/9/2007 was 0.94 and 0.97 on 11/12/2007, an approximately 3% gain in the U.S. dollar. 3% $\approx 0.97 \div 0.94$.

there are USD/CAD foreign currency fluctuations. This methodological error renders his regression analysis unable to reliably assess whether Africo's stock price movements on Dr. Barnes's news dates are statistically significant. Thus, Dr. Barnes's analysis is unable to assess market efficiency for Africo's stock. The CAD to USD foreign exchange rates were highly volatile during the time period used in Dr. Barnes's regression (December 15, 2006 – July 24, 2008), which overlaps with the 2007-2008 financial crisis,[17] another factor completely ignored by Dr. Barnes. The chart below plots the CAD to USD exchange rate during this time period.




The movement in CAD/USD exchange rate daily return shown in the above chart affected Dr. Barnes's calculation of the daily return of the *Industry* index, thus negatively impacting the results and interpretation of Dr. Barnes's regression model and rendering his results unreliable.

---

[17] Example events of the 2007-2008 financial crisis falling within Dr. Barnes's time period are: the failure of New Century in April 2007, the U.S. Federal Reserve instituted the Term Auction Facility in December 2007, Bear Stearns failed and was acquired by JP Morgan Chase in March 2008, IndyMac failed in July 2008, the U.S. enacts The Housing and Economic Recovery Act of 2008 in July 2008.

### 3. *Dr. Barnes Failed to Define his "Event Windows" Contrary to Standard Practice*

33. Dr. Barnes failed to define his "event windows," a bedrock step in proper event studies. An "event window" is the time period within which the share price reacts before the level of change is measured.[18] In layman's' terms, an event window is the length of time following an event (here, the Africo-specific news) that is allowed to pass before a reaction or effect (here, the movement of Africo returns) is measured. The definition of an event window is generally the first step to a successful event study, because only once the event window is defined can a researcher investigate whether the stock price changed quickly within the event window or whether there was prolonged price reaction outside the event window.[19] This is essential to the analysis of market efficiency because if stock prices do not respond quickly *and* fully to news (for example, if it takes several days for the full impact of news to be reflected in a stock price), investors could trade on such information earning higher returns, thus establishing market inefficiency.[20]

34. Experts retained by Defendant in other cases have opined on the central importance of event windows. FTI has reviewed the report of Och Ziff's expert Allan W. Kleidon, Ph.D. in *Menaldi v. Och-Ziff Capital Management Group LLC* (No. 1:14-cv-03251). There, Och Ziff's expert took issue with the opposing expert's lack of event windows and the single-day analysis he conducted.[21] Dr. Kleidon opined:[22]

> *"[A] proper test of market efficiency must specify the time period within which the price will react before observing the actual price change. The article by Mitchell and Netter that [Plaintiff's expert] cites … makes precisely the same point by stating that the first step in conducting an event study is to 'define the event window.' Once the event window is defined, a researcher can then examine whether the stock price changed quickly within the event window, or whether there was prolonged price reaction outside the event*

---

[18] *See* MacKinlay, pp. 14-15.
[19] *See* MacKinlay, pp. 14-15.
[20] "An informationally efficient market (an efficient market) is a market in which asset prices reflect new information quickly and rationally. An efficient market is thus a market in which asset prices reflect all past and present information." *See* 2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 2 "The Concept of Market Efficiency," p. 319.
[21] Kleidon Report, ¶ 87 ("[Plaintiff's expert, Zachary Nye, Ph.D.] indicates that his event study analysis uses a one-day event window. Specifically, Nye's Exhibit 13 only lists and discusses residual returns during the one-day event window for each of his selected events.").
[22] *See* Kleidon Report, ¶ 86.

> *window. This is important because, as Ross, Westerfield, and Jaffe (2005) and the District Court in PolyMedica point out, if stock prices do not respond quickly and fully to new public information (say, for example, if it takes several days for the information to be impounded into the stock price), investors would be able to trade on such information and earn superior returns, which is a violation of market efficiency."*

Here, rather than defining an event window, Dr. Barnes, like the expert Och Ziff took issue with in *Menaldi*, only considered single-day returns, thus failing to analyze the speed at which Africo's share price fully reacted to events. Dr. Barnes's failure in this regard is a fatal flaw to his event study, and he thus cannot credibly opine on the efficiency of the market for Africo shares.

### C. Errors Undermining the Conclusions Reached by Dr. Barnes Based on His Flawed Event Study

35. The fundamental errors identified above each independently render Dr. Barnes's conclusions unreliable. Taken together, they make clear that no reasonable or reliable conclusions relating to market efficiency may be drawn from his work. Yet even accepting the multiple failures in the model's design as detailed above, the conclusions drawn by Dr. Barnes from that flawed regression model are themselves unreasonable and methodologically unsound.

36. Dr. Barnes unreasonably argues that statistically significant market movement on ***more than one*** of his hand-picked "news days" is all that is needed to conclude that the market is efficient. In a perfectly efficient market, *all* "news days" could be expected to reflect statistically significant market movement. Dr. Barnes has created an artificially (and methodologically unsound) low bar for efficiency because his analysis indicated that there was ***statistically significant movement on only 35%*** **(*8 of 23*) *of his selected "news days."***

37. However, even Dr. Barnes's conclusions regarding the statistical significance of the movement on each of those 8 "news days" are unreliable. FTI's testing of Dr. Barnes's regression using $R^2$, a diagnostic tool generated by regression software, shows that Dr. Barnes's regression has a very poor "model fit," meaning that the predictions from his model are very far from actual data values. This means that Dr. Barnes's finding that 8 days had statistically significant movements is unreliable.

38. Additionally, self-diagnostic measures, as shown in the output of Dr. Barnes's statistical program,[23] show conclusively that the "market" index coefficient used by Dr. Barnes is not statistically significant, evidence that this variable did not add any value to Dr. Barnes's model. As the mining company index (*Industry* index) Dr. Barnes selected is also inappropriate, for the reasons identified above, this means that *neither* index selected by Dr. Barnes could be successfully used to isolate market movements related to Africo-specific news as opposed to market and industry movements generally.

39. Dr. Barnes's event study also displays a classic market anomaly, routinely taught to Chartered Financial Analysts and indicative of an inefficient market, called the "day-of-the-week effect", which refers to the tendency of inefficiently-traded stocks to exhibit relatively large returns on one particular day of the week compared to the rest of the days in the week. As is universally understood by financial analysts, because the day-of-the-week effect improved Dr. Barnes's model, as shown by statistical testing, there is strong evidence that Africo's stock was in fact traded in an inefficient market. Dr. Barnes failed to identify or address this anomaly, further undermining his findings.

40. Dr. Barnes's model reflects a negative correlation between Africo returns on subsequent days, meaning that days with positive ARL returns can be expected to be followed by days with negative ARL returns. This negative correlation is indicative of an inefficient market because, were the market truly efficient, traders could identify this attribute and compete away any advantage from the correlation until it no longer existed. Dr. Barnes failed to identify or address this correlation, further undermining his findings.

41. Each of these analytical errors by Dr. Barnes, discussed in detail below, render his findings regarding the efficiency of the market for Africo shares methodologically unsound and unreliable.

#### 1. *Dr. Barnes's Finding that 8 of 23 Days Reflect Statistically-Significant Movement is Itself Not Statistically Significant*

42. In the end, Dr. Barnes claims that the 8 out of 23 news days with statistically significant results (i.e., movement in the Africo returns in a meaningful way not predicted by returns in

[23] 01.event_study.do.

the *Industry* and *Market* indexes) establishes that the market for Africo shares was efficient.[24] As discussed above, Dr. Barnes's conclusion that there were statistically significant results on 8 out of 23 news days is unreliable, thereby undermining any of his conclusions. But, even if we accept his "8 out of 23," as discussed below, that percentage is not sufficiently significant, and I understand that an even higher percentage has been determined by a Court in the Second Circuit as being insufficient to establish market efficiency.[25] In other words, Dr. Barnes completely fails to consider or appreciate that ***on 15 of the 23*** days with purportedly important Africo-specific news and events, the market for Africo shares ***did not react*** in a statistically significant manner.

43. Dr. Barnes's finding, that 8 of the 23 dates have statistically significant returns, does not lend support to a conclusion that there is a consistent cause-and-effect relationship between Africo-specific news events and Africo's stock price.

44. Dr. Barnes compares the 8 out of 23 in his sample of events only to his self-created expected percentage of statistically significant days in a hypothetical random sample (5% of 23 days, or 1.15 days): "a given day chosen at random has, by definition, a 5% chance of being significant. Consequently, ***if 23 days were chosen at random***, the expected number of days with a statistically significant residual return is 5% × 23 = 1.15[.]".[26]

45. This is an inappropriate comparison for at least two reasons.

46. *First*, his sample of 23 "news days" was not a random sample and would be expected to have a higher percentage of statistically significant returns, since it was designed to include *only* days with important, Africo-specific events. This bias in the 23-day sample renders a comparison to an unbiased, random sample inappropriate.

47. *Second*, the comparison to the results expected in a hypothetical random sample of days test is the wrong comparison to make. Instead, Dr. Barnes should have compared his results to a scenario where the market for Africo's stock is perfectly efficient and the price movement is expected to be statistically significant on all 23 news days. The fact that Dr. Barnes's sample shows more than 1.15 of 23 days had statistically-significant returns proves only that Africo

---

[24] *See* Barnes Report, ¶ 39.

[25] *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) ("[S]howing that only seven out of sixteen days [43.8%] resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency.").

[26] *See* Barnes Report, ¶ 39.

stock reacted *some of the time* to his selected events. That conclusion falls far short of establishing that Africo stock reacted consistently and appropriately to new information.

48. Moreover, Dr. Barnes's regression model indicates that there are statistically-significant movements in Africo's stock (i.e., movements that are not explained by the *Industry* and *Market* indexes) on days where there was ***no Africo-specific event*** identified. For example, when applying Dr. Barnes's methodology of establishing statistically significant returns to non-news days, the results show that the movement of Africo's share price returns were statistically significant on June 6, 2007 and November 22, 2007, but neither of these dates appear in the list of news dates as shown in the Barnes Report.[27] These counterintuitive results call the reliability of Dr. Barnes's conclusions regarding the statistical significance of his 8 of 23 days finding into further doubt.

### *2. The Statistical Significance of the Africo Returns on Each of Dr. Barnes's 8 Days is Also Questionable Because Dr. Barnes's Regression Model Has a Poor Model Fit*

49. Dr. Barnes's underlying findings regarding the statistical significance of the market movement on each of the 8 "news days" he identified is also questionable because Dr. Barnes's regression model has an $R^2$ of only 6%, indicating a very poor relationship between the predictions made by the model and the actual market returns (or very poor "model fit"). As the statistical significance of Africo returns on a given day is determined by comparing the *actual* Africo returns with the returns predicted by the model (based on the *Industry* and *Market* indexes), the inaccuracy of the predictions made by Dr. Barnes's model renders this comparison unreliable.

50. In statistics, the term $R^2$ (or R-square) is a commonly used measure of model performance generated by the software used to perform a regression analysis. $R^2$ is a measure of how well a regression model fits the underlying data. $R^2$ is expressed either as a percentage or a value between zero and one. A larger $R^2$ is indicative of better model performance than a smaller $R^2$ when comparing two models with the same number of inputs. When comparing two models

[27] *See* Barnes Report, Exhibit 1.

that have different numbers of inputs, a larger adjusted-$R^2$ is, generally, indicative of better model performance.[28]

51. In simple terms, when the $R^2$ is high (i.e., when the regression model fits the data well) the regression model's predictions of what the data values should be are "close to" the actual data values. Conversely, when the $R^2$ is low (i.e., when the regression model does not fit the data well), as is the case in Dr. Barnes's regression model, the regression model's predictions of what the data values should be are "far from" the actual data values.

52. Dr. Barnes's regression model has an $R^2$ of only 6%. This is a very low $R^2$. The table below shows the results of Barnes's regression model.

**Dr. Barnes's Regression Model Results[29]**

| | |
|---|---|
| **Dependent Variable:** | Daily Africo Returns |
| **# of observations:** | 365 |
| **$R^2$:** | 0.0607 |
| **Adjusted $R^2$:** | 0.0556 |

| Independent Variable | Coefficient Estimate | Statistically Significant at the 5% Significance Level? |
|---|---|---|
| Industry | 0.729 | Yes |
| Market | 0.292 | No |

53. This poor model fit as demonstrated by a low $R^2$ shows that the predictions from Dr. Barnes's regression model are far from the actual data values for the daily Africo returns.

[28] For the same dependent variable (in this case the daily Africo share price returns) the $R^2$ value increases with the number of variables in the model. The adjusted-$R^2$ accounts for the different number of variables used in different models and provides a metric that can be used to compare the model fit between two different models that use a different number of variables. *See* Gujarati, Damodar N. "Basic Econometrics," 4th Edition, McGraw Hill (2003), pp. 217-218, for an in-depth discussion of this topic.

[29] In this report, I present only the regression coefficients associated with quantitative variables. For simplicity, I do not present the intercept term.

This poor model fit calls into question whether the regression can be used for any type of predictions at all, let alone for testing for statistical significance on Dr. Barnes's news days.

### *3. Neither Index Selected By Dr. Barnes Could be Successfully Used to Isolate Statistically Significant Market Movements in Africo Returns*

54. Additionally, self-diagnostic measures as shown in the output from Barnes' statistical program show conclusively that the *Market* index coefficient used by Dr. Barnes is not statistically significant, strong evidence that this variable did not add any value to Dr. Barnes's model. As the mining company index Dr. Barnes selected is irrelevant, *see* ¶¶ 23 – 24 above, this means that *neither* index selected by Dr. Barnes could be used to predict the movements in Africo returns in a reliable way. Because the indexes could not reliably *predict* movements in the Africo returns, they could not be successfully used to *isolate* market movements caused by Africo-specific news as opposed to market and industry movements generally. Thus, for this independent reason, the statistically significant returns found by Dr. Barnes are unreliable and cannot form the basis to conclude that the market for Africo shares was efficient.

55. A regression coefficient is a number calculated through regression analysis. The coefficient indicates how much one variable influences, or affects, another variable. In the context of Dr. Barnes's regression, there are two regression coefficients – one for the daily *Industry* index return and one for the daily *Market* index return. These two regression coefficients indicate how much the *Industry* index return and *Market* index return, individually, affect the daily ARL return. In general, if the regression coefficient on the *Industry* index return has a positive value, then the daily ARL return tends to increase when the *Industry* index return goes up. For example, the table above shows that the coefficient on the daily *Industry* index return in Dr. Barnes's regression is 0.729, which is a positive value. This means that the regression has found that the daily ARL return tends to go up when the daily *Industry* index return increases.

56. While every regression will produce either positive or negative coefficients for the regression variables, there is a separate issue of whether the regression variables that are used by a researcher even belong in the model in the first place. While the regression model may mechanically calculate regression coefficients that are different from zero, the regression

model also reports self-diagnostic measures that indicate if the variable should be omitted from the regression because it does not add any value to the model.

57. Specifically, if the estimated positive or negative coefficient is statistically different from zero, then we can say that the regression variable adds value to the model. If the estimated positive or negative coefficient is *not* statistically different from zero, then the regression variable does not add value to the model and therefore does not belong in the regression model.

58. In Dr. Barnes's regression model, only the coefficient for the daily *Industry* return is different from zero in a statistically significant way.[30] The coefficient for the daily *Market* return is not statistically significant. This means that there is no statistically significant relationship between the *Market* returns and the Africo returns. Therefore, the daily *Market* return variable does not add any value to Dr. Barnes's regression model, and it should be excluded. Since the *Industry* index selected by Dr. Barnes was inappropriate for the reasons discussed above,[31] Dr. Barnes is left with no basis to reliably predict Africo returns and thus no way to reasonably conclude that the movement in the Africo returns differed from the returns predicted by general market and industry movements in a statistically significant manner.

---

[30] The output from Dr. Barnes's Stata program, 01.event_study.do, which is used to run his regression model, shows the p-value of the coefficient of the *Market* index is 0.492. This value indicates that the *Market* index is not statistically significant at the 5% significance level. A p-value smaller than 0.05 is needed for the *Market* index to be statistically significant.

[31] *See* sections IV.B.1 and IV.B.2, above. The coefficient for a variable can be statistically significant even though it was constructed improperly. In this case, the results from a regression are not reliable regardless of whether or not the variable in question is statistically significant.

### 4. *The Impact of the "Day of the Week" Variable on Dr. Barnes's Regression Model Indicates the Market for Africo Shares Could Be Inefficient*

59. Dr. Barnes failed to consider the impact of the "Day of the Week" anomaly on his model, let alone isolate its effects. Rather, Dr. Barnes's data and regression model display a classic market anomaly that is indicative of an inefficient market, the "Day-of-the-week effect." Chapter 4 of the Chartered Financial Analysis ("CFA"), Curriculum Level 1, identifies the "Day-of-the-Week" (e.g., Monday, Tuesday, etc.) effect as an example of "market anomalies, [which] if persistent, are exceptions to the notion of market efficiency."[32] As an example, the text describes the "Day-of-the-Week" effect occurring when the "average Monday return is negative and lower than the average returns for the other four days, which are all positive."[33]

60. Academic articles explain that this can occur in equity markets because of the number of days elapsed before a trade is settled is larger on Fridays than on Mondays,[34] and that the presence of these calendar anomalies suggest that the market in which a stock is traded is not efficient.[35] If "Day-of-the-Week" variables improve the fit of the model or the coefficients of these variables are statistically significant, then traders would be able to anticipate these irregularities in ARL returns and capture abnormal returns, an indicator of an *inefficient market.* [36]

61. I included "Day-of-the-Week" variables (e.g., Monday, Tuesday, etc.) in Dr. Barnes's regression model.[37] The Monday, Tuesday, and Friday variables are statistically significant, which is indicative of market inefficiency, as explained above. Further, the adjusted-$R^2$ of the model with the "day-of-the-week" variables is 3.93%, which is larger than the corresponding adjusted-$R^2$ in the model with only the *Industry* and *Market* indexes, which is only 2.46%.[38] These results are shown below.

---

[32] 2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 4 "Market Pricing Anomalies," p. 332.
[33] 2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 4 "Market Pricing Anomalies," p. 334.
[34] Gayaker, Savas, Yeliz Yalcin, and M. Hakan Berument. "The Day of the Week Effect and Interest Rates." *Borsa Istanbul Review* 20, no. 1 (2020): 55-63.
[35] Kumar, Harish, and Rachna Jawa. "Efficient Market Hypothesis and Calendar Effects: Empirical Evidences from the Indian Stock Markets." *Business Analyst* 37, no. 2 (2017): 145-160.
[36] "A finding that investors can consistently earn abnormal returns by trading on the basis of information is evidence contrary to market efficiency." *See* 2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 3 "Forms of Market Efficiency," p. 326.
[37] This includes the days included in Dr. Barnes's regression as well as Dr. Barnes's 23 news-days.
[38] This includes the days included in Dr. Barnes's regression as well as Dr. Barnes's 23 news-days.

**Dr. Barnes's Regression Model With "Day-of-the-Week" Variables**

**Dependent Variable:** Daily Africo Returns

**# of observations:** 388

**$R^2$:** 0.0542

**Adjusted $R^2$:** 0.0393

| Independent Variable | Coefficient Estimate | Statistically Significant at the 5% Significance Level? |
|---|---|---|
| Industry | 0.518 | No |
| Market | 0.401 | No |
| Monday | -0.023 | Yes |
| Tuesday | 0.033 | Yes |
| Wednesday | 0.022 | No |
| Thursday | 0.023 | No |
| Friday | 0.038 | Yes |

62. As stated above, improvement of the fit of the model or statistical significance of the "Day-of-the-Week" regression model coefficients could be indicators of an *inefficient market*. These results indicate that there is evidence that the ARL shares were not traded in an efficient market during the period of interest. Dr. Barnes's failure to examine, let alone isolate, the impact of the Day of the Week variable undermines his conclusions.

### 5. *ARL Daily Returns Are Correlated Over Time, Which Could Indicate Market Inefficiency*

63. The trading data used by Dr. Barnes shows a negative correlation between Africo's returns on subsequent days from December 15, 2006 to July 24, 2008. This negative correlation could be indicative of an inefficient market because traders would identify this attribute and compete away any advantage until it no longer existed were the market truly efficient. Dr. Barnes's failure to identify and address this correlation calls his conclusions into further question.

64. This negative correlation finding means that days with positive ARL returns are generally followed by days with negative ARL returns. For example, Africo's share price return on January 5, 2007 is positive whereas Africo's share price return on the previous day, January 4, 2007, is negative. If the stock were traded in an "efficient" market, ARL returns would not be correlated over time.[39] This is because, in an efficient market, traders could identify the fact that days with negative returns are followed by days with positive returns (and vice versa) and then compete away this type of advantage. This type of arbitrage opportunity would be unavailable if the market were efficient.

65. I regressed the ARL returns against the ARL return from the previous day (the "Lagged Return") during the period of interest.[40] The coefficient on the Lagged Return is negative and is statistically significant (see the regression results below).

**Regression Results of ARL Return Against Lagged Return**

**Dependent Variable:** Daily Africo Returns

**# of observations:** 386

**$R^2$:** 0.0130

**Adjusted $R^2$:** 0.0104

| Independent Variable | Coefficient Estimate | Statistically Significant at the 5% Significance Level? |
|---|---|---|
| Lagged Return | -0.103 | Yes |

66. The negative coefficient on the Lagged Return indicates that days with positive returns can be expected to be followed by days with negative returns (and vice-versa). The following

[39] "A capital market is said to be weakly efficient (1) whenever the time series of past information (usually past returns) *do not contain* any information that enables an investor to obtain higher-than-normal yields." De Groof, C. "Weak Form Efficiency of the Capital Market: A Spectral Analytic Approach." *Recherches Économiques De Louvain / Louvain Economic Review* 44, no. 2 (1978): 193-215, see abstract.
"In an efficient market, existence of zero autocorrelation forms the null hypothesis." *See* Malafeyev, O., Awasthi, A., S.Kambekar, K., & Kupinskaya, A. (2019). Random Walks and Market Efficiency in Chinese and Indian Equity Markets. Statistics, *Optimization & Information Computing*, 7(1), 1-25, p. 7.
[40] This includes the days included in Dr. Barnes's regression as well as Dr. Barnes's 23 news-days.

graphic illustrates this point. The graph shows a negative relationship between the ARL return on a particular day and the ARL return from the previous day. If there was no correlation, the fitted line would be flat.




67. Were Africo trading in an efficient market, traders could have identified this obvious negative correlation and then competed away this trading advantage. The persistence of this negative correlation over time could indicate that Africo shares traded in an inefficient market.[41] Dr. Barnes's failure to identify and address this issue is another failure of his analysis.

---

[41] "A finding that investors can consistently earn abnormal returns by trading on the basis of information is evidence contrary to market efficiency." *See* 2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 3 "Forms of Market Efficiency," p. 326.

**D. Dr. Barnes Does Not Address the Other *Cammer* and *Krogman* Factors, Which Could Support the Conclusion that Africo did not Trade on an Efficient Market**

68. Finally, Dr. Barnes fails to consider any of the other factors (typically referred to as *Cammer* and *Krogman* factors) routinely relied on by Courts to determine market efficiency. These factors should have been analyzed by Dr. Barnes for a more comprehensive assessment of market efficiency or inefficiency. Dr. Barnes's failure to consider these factors is yet another failure of Dr. Barnes's analysis, which thus cannot support his finding of market efficiency.

69. I understand that courts routinely examine the *Cammer* factors: (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price, as well as the *Krogman* factors, (6) the capitalization of the company, (7) the bid-ask spread of the stock, and (8) the percentage of stock not held by insiders.

70. While Dr. Barnes purports to examine the average weekly trading volume of Africo's stock and concludes that the average weekly trading volume during the period of interest to be 1.50% of ARL's outstanding shares,[42] that approach is misleading.

71. My review revealed that approximately 48% of the weeks had a weekly trading volume below 1%, which could be indicative of market inefficiency.[43]

72. Beyond Dr. Barnes's inadequate assessment of average weekly trading volume and his fatally flawed and unreliable event study, he makes no effort to examine the other *Cammer* and *Krogman* factors at all.

---

[42] *See* Barnes Report, ¶ 40.

[43] Furthermore, Dr. Barnes did not provide sufficient details regarding his calculation of the average weekly trading volume. For example, reliable calculations of weekly trading volumes require a detailed timeline of the ownership of the firm, share issuances, insider trades, and information on minority and controlling interests. Regarding the volume of shares outstanding, Dr. Barnes did not provide details related to the authorized shares, the float of shares, restricted shares, or shares held by institutional investors, stock splits, or consolidations. Without this detailed information, Dr. Barnes is unable to make a thorough and robust analysis of market efficiency with respect to the percent of weekly shares that were traded.

73. Although I did not undertake my own investigation, regarding "the number of securities analysts following and reporting" on Africo's stock, counsel for the Victims has informed me that according to their research, they were able to identify only a single analyst report that mentioned Africo during Dr. Barnes's relevant period. Counsel for the Victims has informed me that (1) Africo would not have had the ability to file an S-3, (2) they were unable to uncover the existence of large institutional holdings of Africo's stock, or the existence of arbitrageurs in Africo's stock, and (3) Defendant argues that Africo's market capitalization was only $85,000,000. Dr. Barnes's failure to consider these attributes of Africo is yet another failure of Dr. Barnes's analysis, which thus cannot support his finding of market efficiency.

## V. CONCLUSIONS

74. The analysis above identifies at least three material issues with the design of Dr. Barnes's attempted event study. *First*, Dr. Barnes used an irrelevant index to analyze whether movements in Africo's share price can be separated from general market movement. *Second*, Dr. Barnes improperly added an unnecessary element, the USD-CAD exchange rate, to his analysis, and having improperly added an unnecessary element, Dr. Barnes compounds this error by failing to account for its confounding impact on his statistical analysis of ARL's returns. *Third*, Dr. Barnes failed to define his event window, contrary to standard methods. Each of these errors in design independently renders Dr. Barnes's analysis unreliable.

75. Yet even accepting the failures in the model's design, the conclusions drawn by Dr. Barnes from his regression model are themselves unreasonable and methodologically unsound, and do not rise to the level of analyses of market efficiency in peer-reviewed economic literature. My analysis, in contrast, indicates that the trading data and analyses used by Dr. Barnes could indicate that the market for Africo shares was inefficient.

***It is thus my opinion that the analyses presented in the Barnes Report are deficient; that the conclusions expressed therein are unreliable; and that there exists no credible basis to conclude that Africo's shares traded in an efficient market during the relevant time period.***

I, Michael P. Salve, Ph.D., declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 29, 2020

M Salve

MICHAEL P. SALVE, PH.D.

# APPENDIX A

# Michael P. Salve, Ph.D.

## Senior Managing Director — Economic Consulting

michael.salve@fticonsulting.com



**Three Times Square**

**9th Floor**

**New York, NY 10036**

Tel: +1 646 453 1239

**EDUCATION**

BA, Economics, Boston College
PhD, Economics, Boston College

**PROFESSIONAL**

Adjunct Faculty in the Graduate Economics Program, Hunter College (CUNY)

American Statistical Association (ASA)

Michael Salve is a Senior Managing Director in FTI Consulting's Economic Consulting Services practice based in New York City. Dr. Salve is an applied econometrician with experience in advanced quantitative methods, financial damages cases, statistical studies, survey design, econometric modeling, microeconomics, industrial organization, False Claims Act matters and commercial disputes. He holds a doctorate in economics, with concentrations in both applied econometric and statistical techniques and industrial organization. He currently serves as an adjunct faculty member at Hunter College in New York City where he teaches Econometrics, and Law and Economics in the graduate economics program.

Dr. Salve has extensive econometric modeling experience in performing complex regression analyses, designing statistical samples, developing complex extrapolation and benchmarking models, and evaluating achieved precision levels. He also uses econometric and statistical models for estimating exposure and potential damages. Dr. Salve employs state-of-the-art statistical software and data visualization tools to reveal hidden data patterns for large companies in many different industries including insurance, healthcare, finance and banking. He also uses sophisticated network analysis to find linkages between entities suspected of engaging in potentially illicit behavior or transactions that are being investigated for further review.

Dr. Salve has taken the lead role in several large insurance claim disputes and healthcare claims audits that required: large-scale data capture, database construction and sophisticated computer programming for the purpose of damage calculation and analysis through econometric regression techniques, and rigorous and thorough quality control procedures to ensure reliability of results.

He has also provided expert advice and testimony on topics relating to the extrapolation of statistical results for use in forensic accounting investigations, regression analysis in damage calculations and database architecture. Results of his statistical work have been presented to the SEC and DOJ. He has also been deposed by the US Department of Justice and has been cross examined by the New York State Office of the Medicaid Inspector General.

Prior to joining FTI Consulting, Dr. Salve was a Principal with the Forensic and Dispute Services Group of a Big Four Accounting Firm, where he led the Economic Consulting Services practice in New York and was a Managing Director at a private consulting firm where he led the statistical sampling work in the US. He has been a teaching fellow and graduate mathematics instructor at Boston College and was an adjunct faculty member at Suffolk University.

# Professional Experience

### Representative Complex Analytics & Applied Econometrics Experience

Financial Risk Management, Rogue Trader- designed a financial model of economic damages to shareholders resulting from the fraudulent activity of a rogue trader at an off-shore hedge fund. The model took into account the number of investors who may have relied upon financial statements at different points in time.

Market Manipulation- quantified the financial exposure to shareholders from a well-known short-seller who announced that a life sciences company was performing worse than the share price indicated. The financial model was driven by the movement in the stock price both before and after the announcement and by benchmarking it to composite stock prices

Securities Litigation- Submitted affidavit on behalf of plaintiff that estimated the earnings per share of a large public company and the resulting effect on its quarter-end stock price that would have occurred due to a change in quarterly recognized revenue.

Securities Litigation- Assisted counsel, as a non-testifying consultant, with preparing a claim adverse to a large investment bank. Financial analysis focused on the trend of various ratios and net asset values to demonstrate that various red flags should have been known to the investment bank

White House Email Archive- Submitted declaration on behalf of plaintiff seeking transparency into the data restoration process of e-mails from the Executive Office of the President. Work centered on an ARIMA model and other time series techniques

Qui Tam / False Claims Act Litigation- Retained multiple times as the statistical sampling expert. Responsible for working with independent coding experts to provide a rebuttal damages claim regarding alleged overpayments from Medicare/Medicaid. Statistical work is closely aligned with the guidelines of the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services Medicare Program Integrity Manual to ensure all sampling procedures and extrapolation methodologies are appropriate.

Medicare/Medicaid Reimbursement Litigation- Served as the statistical sampling expert in a large healthcare litigation matter. Specifically, a healthcare provider had taken a supposedly random sample of claims and had estimated the total underpayments in the sample. These “underpayments” were then extrapolated to the entire population of claims for a total “underpayment” amount.

Insurance Coverage Dispute- Retained as the statistical expert witness on sampling methodology of insured mortgages representing billions of dollars in insurance losses. Plaintiff insurance company relied on statistical analysis to perform mass rescission of policies that should not have been underwritten. Tens of thousands of loans were statistically analyzed to determine stratification options.

Mass Appraisal Model- rebutted a residential real estate mass appraisal model that estimated damages due to property value diminution from an industrial accident. The damage area covered thousands of homes within a 10-20 mile radius of the accident. The analysis controlled for many standard home characteristics affecting home prices, such as square footage, but also used advanced statistical technique such as spatial autocorrelation and geotagging. The opposing expert’s opinion and mass appraisal model was excluded through a successful Daubert motion.

Subprime Mortgages- quantified overall diminution in value of residential properties due to delays in the foreclosure process by the bankrupt loan originator. Client was an investment bank with a fiduciary duty to its shareholders to seek potential damages in bankruptcy court. Advanced sampling procedures were utilized to collect loan files.

# Publications in the Last Ten Years

1. “Intellectual Property Disputes – Assessment of Dispute Damages”, Electronics Intellectual Property, Beijing, April 2015.
2. “Intellectual Property Disputes – The Application/Role of Quantum Experts and Assessment of Dispute Damages”, Electronics Intellectual Property, Beijing, June 2014.

# Expert Witness Testimony in the Last Five Years

1. Trial testimony in the litigation between Lendingtools.com Inc. vs. The Banker’s Bank, N.A., Case No. 11CV1879. Eighteenth Judicial Sedgwick District Court, Kansas (2020).
2. Hearing testimony in the matter between Medi-Cal Department of Health Care Services (DCHS) v. Twin Pharmacy, Inc. dba: Dabney Pharmacy, Case Number: 16/02704/19/P. Medi-Cal Department of Health Care Services (2020).

3. Hearing testimony in the matter between Oklahoma State University Medical Center v. Novitas Solutions, Inc., Case No. 16-2092. Provider Reimbursement Review Board of the Department of Health and Human Services (2019).
4. Deposition testimony in the litigation between MAO-MSO RECOVERY II, LLC, a Delaware entity; MSPA Claims 1, LLC, MSP Recovery Claims, Series LLC v. Mercury General; Case No.: 2:17-cv-2525-AB-AJW. United States District Court Central District of California (2019).
5. Deposition testimony in the litigation between United States of America, *ex rel*. J. Scott v. Arizona Center for Hematology and Oncology PLC; Christopher Biggs; Devinder Singh; Daniel Reed; and Terry Lee, Case No. 2:16-cv-03703-DGC. United States District Court District of Arizona (2019).
6. Deposition testimony in the litigation between Laurie Freeman, *et al*., v. Grain Processing Corporation, Case No. KACV921232. Iowa District Court for Muscatine County (2018).
7. Hearing testimony in the litigation between Mark D. Kleinsasser v. Progressive Direct Insurance Company and Progressive Max Insurance Company, Case No. 17-cv-05499. United States District Court Western District of Washington at Tacoma (2018).
8. Deposition testimony in the litigation between Lorena Armijo, *et al*., v. ILWU-PMA Welfare Plan, *et al*, Case No. 2:15-cv-1403-MWF-VBK. United States District Court Central District of California (2017).
9. Deposition testimony in the litigation between Christopher Corcoran, et al v. CVS Pharmacy, Inc., Case No.: No. 15–CV–03504–YGR. United States District Court Northern District of California Oakland Division (2017).
10. Hearing testimony in the litigation between Buffalo Emergency Associates, LLP v. HealthNow New York, Inc. (d/b/a Blue Cross Blue Shield of Western New York), Case No.: 3393. American Health Lawyers Association, ADR Service, New York State (2017).
11. Deposition testimony in the litigation between Naturalock Solutions, LLC v. Baxter Healthcare Corporation, *et al*, Case No.: 1-14-cv-10113. United States District Court for the Northern District of Illinois (2017).
12. Deposition testimony in the litigation between Buffalo Emergency Associates, LLP v. HealthNow New York, Inc. (d/b/a Blue Cross Blue Shield of Western New York), Case No.: 2812. American Health Lawyers Association, ADR Service, New York State (2017).
13. Deposition testimony in the litigation between the State of West Virginia v. AmerisourceBergen Drug Corporation, *et al*, Case No.: 12-C-141. Circuit Court of Boone County, West Virginia (2016).
14. Deposition testimony in the litigation between Portfolio Recovery Associates, LLC v. Caroline L. Houston and Caroline L. Houston (and others similarly situated) v. Portfolio Recovery Associates, LLC, Case No.: 12-CVS-642. General Court of Justice, Superior Court Division, North Carolina, Iredell County (2016).
15. Deposition testimony in the litigation between Musashi, L.L.C. and Huff Asset Management Co., L.L.C. vs. Virgin Media, Inc., Civil Action Docket No.: MRS-L-734-13. Superior Court of New Jersey, Morris County: Law Division (2016).
16. Trial testimony in the litigation between Lendingtools.com Inc. vs. Bankers Bank of Kansas, N.A. and The Banker's Bank, N.A., Case No. 11CV1879. Eighteenth Judicial Sedgwick District Court, Kansas (2016).
17. Deposition testimony in the litigation between United States of America, *ex rel*. Misty Wall vs. Vista Hospice Care, Inc. d/b/a VistaCare; VistaCare, Inc., and Odyssey Healthcare, Inc., Civil Action No. 3-07-CV-0604-M. United States District Court for the Northern District of Texas (2016).

## Teaching Experience

- Adjunct Faculty, Hunter College, 2011 to Present (Law and Economics, Econometrics)
- Teaching Fellow, Boston College, 1994 to 1995 (Statistics, Macroeconomic Theory)
- Adjunct Faculty, Suffolk University, 1993 to 1994 (Microeconomic Theory)
- Graduate Mathematics Instructor, Boston College, 1993 to 1995 (Calculus, Linear Algebra)

## Recognition

- H. Michael Mann Teaching Award, Boston College, 1994

## Employment History

- FTI Consulting, Senior Managing Director (February 2015 to present)
- Alvarez & Marsal, Managing Director, (December 2008 to February 2015)
- Deloitte Financial Advisory Services, Principal (May 2000 to November 2008)
- KPMG, Manager (January 1997 to May 2000)

# APPENDIX B

# List of Information Considered

## Expert Reports

03/06/2020 Expert Report of Quadrant Economics Prepared by Dr. Daniel Flores
03/06/2020 Expert Report of Ronnie Barnes, Ph.D.
11/10/2017 Expert Report of Allan W. Kleidon, Ph.D. in *Menaldi v. Och-Ziff Capital Management Group LLC* (No. 1:14-cv-03251)

## Data

01.Input.xlsx
Event Study Exhibit.xlsx
QE-2 - Share Price Analysis.xlsx

## Stata Programs

01.event_study.do
header.do

## Publicly Available Sources

2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 2 "The Concept of Market Efficiency."

2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 3 "Forms of Market Efficiency."

2020 CFA© Program Curriculum Level I Volumes 1-6, Reading 38, Chapter 4 "Market Pricing Anomalies."

De Groof, C. "Weak Form Efficiency of the Capital Market: A Spectral Analytic Approach." *Recherches Économiques De Louvain / Louvain Economic Review* 44, no. 2 (1978): 193-215.

Finnerty, Joseph E. "Insiders and Market Efficiency." *The Journal of Finance* 31, no. 4 (1976): 1141-1148.

Gayaker, Savas, Yeliz Yalcin, and M. Hakan Berument. "The Day of the Week Effect and Interest Rates." *Borsa Istanbul Review* 20, no. 1 (2020): 55-63.

Gujarati, Damodar N. "Basic Econometrics," 4th Edition, McGraw Hill (2003).

Jill E. Fisch, Jonah B. Gelbach and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review* Vol. 96:553, 2018, pp. 554–621.

Kumar, Harish, and Rachna Jawa. "Efficient Market Hypothesis and Calendar Effects: Empirical Evidences from the Indian Stock Markets." *Business Analyst* 37, no. 2 (2017): 145-160.

MacKinlay, A. Craig. "Event Studies in Economics and Finance." *Journal of Economic Literature* 35, no. 1 (1997): 13-39.

Malafeyev, O., Awasthi, A., S.Kambekar, K., & Kupinskaya, A. (2019). Random Walks and Market Efficiency in Chinese and Indian Equity Markets. *Statistics, Optimization & Information Computing*, 7(1), 1-25.

http://altiusminerals.com/uploads/Factsheet-January-2020.pdf

https://www.antofagasta.co.uk/media/3665/ar-2008.pdf

https://vp217.alertir.com/afw/files/press/boliden/BolidenAR08En.pdf

https://www.centralasiametals.com/wp-content/uploads/2016/05/CAML-2008-Financial-Reports.pdf

https://www.erocopper.com/corporate/overview/

https://www.first-quantum.com/English/our-operations/default.aspx

http://d1lge852tjjqow.cloudfront.net/CIK-0000831259/473b5bd8-5d21-4d2e-a40e-52c1d7e77298.pdf

http://www.annualreports.com/HostedData/AnnualReportArchive/x/LSE_XTA_2008.pdf

https://gmexico.com/images/documentos/en/financial/2008/GMexico-Annual-Report-2008.pdf

https://www.ivanhoemines.com/site/assets/files/1836/2008q4.pdf

https://www1.hkexnews.hk/listedco/listconews/sehk/2009/0429/ltn20090429363.pdf

http://www.jinchuan-intl.com/uploaded_files/investor/433/2008%20annual%20report_eng.pdf

https://www.kazminerals.com/media/2953/2008-trading-update-final-05032009-screen-version.pdf

https://kghm.com/en/investors/reports-and-presentations/financial-reports

https://kghm.com/en/our-business/mining-and-enrichment

https://www.lundinmining.com/

https://www.mmg.com/wp-content/uploads/2019/11/MMR-2008-Annual-Report.pdf

https://www.mmg.com/our-business/

https://www.nittetsukou.co.jp/eng/ir/pdf/20100723_162947Ka3w.pdf

https://www.ozminerals.com/uploads/media/ASX_20090427_OZ_MineralsAnnualReport2008-6ed069b6-0f9c-42f5-bf19-81985a30bf44-0.pdf

https://www.ozminerals.com/exploration/

https://www.sandfire.com.au/site/PDF/f33e1952-1169-4814-80ac-4df8729bd626/AnnualReporttoshareholdAustralia

http://www.solgold.com.au/about-us/#history

http://www.solgold.com.au/investors-center/

http://www.southernperu.com/ENG/invrel/2008/AnnualReport/m2008i.pdf

https://www.teck.com/media/Investors-Teck_2008_Annual_Report_T5.1.1.pdf

https://www.turquoisehill.com/company/overview/

https://www.miningweekly.com/article/ivanhoe-morphs-into-turquoise-hill-resources-2012-08-03

http://www.indiaenvironmentportal.org.in/files/Vedanta%20Resources%20PLC%20AR2008.pdf

http://www.zijinmining.com/Portals/1/Annual2008%20Summary%20Review.pdf

SEDAR - Northern Dynasty Minerals Ltd. CONSOLIDATED FINANCIAL STATEMENTS YEARS ENDED DECEMBER 31, 2008, 2007, AND 2006 (Expressed in thousands of Canadian Dollars)

SEDAR - LUNDIN MINING CORPORATION Notes to consolidated financial statements For the years ended December 31, 2008 and 2007 (Tabular amounts in thousands of US dollars, except for share and per share amounts)

SEDAR - Consolidated Financial Statements (In Canadian dollars) HUDBAY MINERALS INC. Years ended December 31, 2008 and 2007

SEDAR - First Quantum Minerals Ltd. Consolidated Financial Statements December 31, 2008 and 2007 (expressed in millions of U.S. dollars, except where indicated)

SEDAR - Altius Minerals Corporation Consolidated Financial Statements For the years ended April 30, 2008 and 2007

https://www.xe.com/currencytables/

**Africo Financial Statement**

Africo Resources LTD. Consolidated Financial Statements (Stated in US Dollars) - December 31, 2007

**Court Rulings**

George v. China Auto. Sys., Inc., No. 11 Civ. 7533, 2013 U.S. Dist. LEXIS 93698, 2013 WL 3357170 (S.D.N.Y. July 3, 2013)

# APPENDIX C

**Appendix C - 2007/2008 Fiscal Year Annual Revenues and Country(ies) of Operation of Solactive Global Copper Miners Total Returns Index Firms**

| MINING FIRM | 2007 REVENUE | 2008 REVENUE | Source | COUNTRY(IES) of OPERATION | Source |
|---|---|---|---|---|---|
| ALTIUS MINERALS CORPORATION | $7,199,280 | $9,924,192 | Altius Minerals Corporation Consolidated Financial Statements For the years ended April 30, 2008 and 2007 | Canada and Brazil | http://altiusminerals.com/uploads/Factsheet-January-2020.pdf |
| ANTOFAGASTA PLC | $2,553,200,000 | $2,654,800,000 | https://www.antofagasta.co.uk/media/3665/ar-2008.pdf | Chile, Zambia, Pakistan, UK | https://www.antofagasta.co.uk/media/3665/ar-2008.pdf |
| BOLIDEN AB | $5,146,620,000 | $3,935,349,000 | https://vp217.alertir.com/afw/files/press/boliden/BolidenAR08En.pdf | Sweden | https://vp217.alertir.com/afw/files/press/boliden/BolidenAR08En.pdf |
| CENTRAL ASIA METALS PLC | - | $2,722,032 | https://www.centralasiametals.com/wp-content/uploads/2016/05/CAML-2008-Financial-Reports.pdf | Kazakhstan and Mongolia | https://www.centralasiametals.com/wp-content/uploads/2016/05/CAML-2008-Financial-Reports.pdf |
| ERO COPPER CORP | N/A | N/A | Did not exist | Brazil | https://www.erocopper.com/corporate/overview/ |
| FIRST QUANTUM MINERALS LTD | $1,539,200,000 | $1,740,400,000 | First Quantum Minerals Ltd. Consolidated Financial Statements December 31, 2008 and 2007 (expressed in millions of U.S. dollars, except where indicated) | Panama, Spain, Zambia, Australia, Finalnd, Turkey, Mauritania | https://www.first-quantum.com/English/our-operations/default.aspx |
| FREEPORT-MCMORAN INC | $16,939,000,000 | $17,796,000,000 | http://d1lge852tjjqow.cloudfront.net/CIK-0000831259/473b5bd8-5d21-4d2e-a40e-52c1d7e77298.pdf | US, Peru, Chile, Indonesia, **DRC** | http://d1lge852tjjqow.cloudfront.net/CIK-0000831259/473b5bd8-5d21-4d2e-a40e-52c1d7e77298.pdf |
| GLENCORE PLC (then called Xstrata) | $28,542,000,000 | $27,952,000,000 | http://www.annualreports.com/HostedData/AnnualReportArchive/x/LSE_XTA_2008.pdf | Numerous countries, including South Africa and Tanzania | http://www.annualreports.com/HostedData/AnnualReportArchive/x/LSE_XTA_2008.pdf |
| GRUPO MEXICO SAB DE CV | $7,078,247,000 | $5,946,005,000 | https://gmexico.com/images/documentos/en/financial/2008/GMexico-Annual-Report-2008.pdf | Mexico, Peru, Chile | https://gmexico.com/images/documentos/en/financial/2008/GMexico-Annual-Report-2008.pdf |
| HUDBAY MINERALS INC | $991,712,940 | $1,036,190,256 | Consolidated Financial Statements (In Canadian dollars) HUDBAY MINERALS INC. Years ended December 31, 2008 and 2007 | US, Canada, Peru, Chile | Consolidated Financial Statements (In Canadian dollars) HUDBAY MINERALS INC. Years ended December 31, 2008 and 2007 |
| IVANHOE MINES LTD | $3,493,230 | $3,399,248 | https://www.ivanhoemines.com/site/assets/files/1836/2008q4.pdf | South Africa, **DRC**, Australia | https://www.ivanhoemines.com/site/assets/files/1836/2008q4.pdf |
| JIANGXI COPPER CO LTD-H | $5,937,180,645 | $7,933,947,651 | https://www1.hkexnews.hk/listedco/listconews/sehk/2009/0429/ltn20090429363.pdf | China | https://www1.hkexnews.hk/listedco/listconews/sehk/2009/0429/ltn20090429363.pdf |
| JINCHUAN GROUP INTERNATIONAL RESOURCES CO LTD (then called Macau Investment Holdings Ltd) | $11,673,600 | $17,814,900 | http://www.jinchuan-intl.com/uploaded_files/investor/433/2008%20annual%20report_eng.pdf | Not engaged in mining at the relevant time, owned real estate/businesses | http://www.jinchuan-intl.com/uploaded_files/investor/433/2008%20annual%20report_eng.pdf |
| KAZ MINERALS PLC (then called Kazakhmys Copper) | $3,227,000,000 | $3,588,000,000 | https://www.kazminerals.com/media/2953/2008-trading-update-final-05032009-screen-version.pdf | Kazakhstan | https://www.kazminerals.com/media/2953/2008-trading-update-final-05032009-screen-version.pdf |
| KGHM POLSKA MIEDZ SA | $5,465,121,840 | $4,252,041,360 | https://kghm.com/en/investors/reports-and-presentations/financial-reports | Poland | https://kghm.com/en/our-business/mining-and-enrichment |
| LUNDIN MINING CORP | $835,294,000 | $1,059,722,000 | LUNDIN MINING CORPORATION Notes to consolidated financial statements For the years ended December 31, 2008 and 2007 (Tabular amounts in thousands of US dollars, except for share and per share amounts) | Brazil, Chile, Portugal, Sweden and US | https://www.lundinmining.com/ |
| MINMETALS RESOURCES LTD | $939,136,000 | $1,090,050,000 | https://www.mmg.com/wp-content/uploads/2019/11/MMR-2008-Annual-Report.pdf | Peru, **DRC**, Australia | https://www.mmg.com/our-business/ |
| NITTETSU MINING CO LTD | $1,068,039,000 | $1,391,995,000 | https://www.nittetsukou.co.jp/eng/ir/pdf/20100723_162947Ka3w.pdf | Japan | https://www.nittetsukou.co.jp/eng/ir/pdf/20100723_162947Ka3w.pdf |
| NORTHERN DYNASTY MINERALS LTD | LOSSES ONLY | LOSSES ONLY | Northern Dynasty Minerals Ltd. CONSOLIDATED FINANCIAL STATEMENTS YEARS ENDED DECEMBER 31, 2008, 2007, AND 2006 (Expressed in thousands of Canadian Dollars) | US (Alaska) | Northern Dynasty Minerals Ltd. CONSOLIDATED FINANCIAL STATEMENTS YEARS ENDED DECEMBER 31, 2008, 2007, AND 2006 (Expressed in thousands of Canadian Dollars) |
| OZ MINERALS LTD | $990,105,600 | $850,443,200 | https://www.ozminerals.com/uploads/media/ASX_20090427_OZ_MineralsAnnualReport2008-6ed069b6-0f9c-42f5-bf19-81985a30bf44-0.pdf | Australia, Brazil, Peru, Sweden | https://www.ozminerals.com/exploration/ |
| SANDFIRE RESOURCES LTD | LOSSES ONLY (not yet mining) | LOSSES ONLY (not yet mining) | https://www.sandfire.com.au/site/PDF/f33e1952-1169-4814-80ac-4df8729bd626/AnnualReporttosharehold | Australia | https://www.sandfire.com.au/site/PDF/f33e1952-1169-4814-80ac-4df8729bd626/AnnualReporttoshareholders |
| SOLGOLD PLC | Did not exist in similar form | Did not exist in similar form | http://www.solgold.com.au/about-us/#history | Ecuador, Australia, Solomon Islands | http://www.solgold.com.au/investors-center/ |
| SOUTHERN COPPER CORP (now majority owned by Grupo Mexico) | $2,216,400,000 | $1,406,600,000 | http://www.southernperu.com/ENG/invrel/2008/AnnualReport/m2008i.pdf | Mexico, Peru | http://www.southernperu.com/ENG/invrel/2008/AnnualReport/m2008i.pdf |
| TECK RESOURCES LIMITED CLASS B | $6,434,710,000 | $5,633,664,000 | https://www.teck.com/media/Investors-Teck_2008_Annual_Report_T5.1.1.pdf | US, Canada, Peru, Chile | https://www.teck.com/media/Investors-Teck_2008_Annual_Report_T5.1.1.pdf |
| TURQUOISE HILL RESOURCES LTD (then owned by Ivanhoe--see above) | N/A | N/A | N/A | Mongolia | https://www.turquoisehill.com/company/overview/ https://www.miningweekly.com/article/ivanhoe-morphs-into-turquoise-hill-resources-2012-08-03 |
| VEDANTA LTD | $6,502,200,000 | $8,203,700,000 | http://www.indiaenvironmentportal.org.in/files/Vedanta%20Resources%20PLC%20AR2008.pdf | India, Zambia, Australia | http://www.indiaenvironmentportal.org.in/files/Vedanta%20Resources%20PLC%20AR2008.pdf |
| ZIJIN MINING GROUP CO LTD | $2,037,363,716 | $2,399,374,425 | http://www.zijinmining.com/Portals/1/Annual2008%20Summary%20Review.pdf | China | http://www.zijinmining.com/Portals/1/Annual2008%20Summary%20Review.pdf |