# Exhibit 3

AFRICO RESOURCES LTD

# MANAGEMENT INFORMATION CIRCULAR

The information contained in this Information Circular, unless otherwise indicated, is as of May 25, 2007. In this Circular, unless otherwise specified, all references to "$" or "dollars" are to Canadian dollars.

This Information Circular is being mailed by the management of Africo Resources Ltd. to everyone who was a shareholder of record of our company on May 18, 2007, which is the date that has been fixed by the directors of Africo as the record date to determine the shareholders who are entitled to receive notice of the meeting.

We are mailing this Information Circular in connection with the solicitation of proxies by and on behalf of our management for use at the annual and special meeting of the shareholders of Africo that is to be held on Monday, June 25, 2007, at 1:30 p.m. (Vancouver time) at the Metropolitan Hotel, 645 Howe Street, Vancouver, British Columbia. The solicitation of proxies will be primarily by mail. Certain employees or directors of Africo may also solicit proxies by telephone or in person. The cost of solicitation will be borne by Africo.

Under our by-laws, at least two persons must be present in person or represented by proxy, each being a shareholder entitled to vote at the meeting or a duly appointed proxy for an absent shareholder so entitled, before any action may validly be taken at the meeting. If such a quorum is not present in person or by proxy, we will reschedule the meeting.

## PART 1 – VOTING

### HOW A VOTE IS PASSED

All of the matters that will come to a vote at the meeting as described in the attached Notice of Meeting are ordinary resolutions and can be passed by a simple majority – that is, if more than half of the votes that are cast are in favour, then the resolution is approved.

### WHO CAN VOTE?

If you are a registered shareholder of Africo as at May 18, 2007, you are entitled to attend the meeting and cast a vote for each share registered in your name on all resolutions put before the meeting. If the shares are registered in the name of a corporation, a duly authorized officer of the corporation may attend on its behalf but documentation indicating such officer's authority should be presented at the meeting. If you are a registered shareholder but do not wish to, or cannot, attend the meeting in person you can appoint someone who will attend the meeting and act as your proxyholder to vote in accordance with your instructions (see "Voting by Proxy"). If your shares are registered in the name of a "nominee" (usually a bank, trust company, securities dealer or other financial institution) you should refer to the section entitled "Non-registered Shareholders" set out below.

It is important that your shares be represented at the meeting regardless of the number of shares you hold. If you will not be attending the meeting in person, we invite you to complete, date, sign and return your form of proxy as soon as possible so that your shares will be represented.

**VOTING BY PROXY**

If you do not come to the meeting, you can still make your votes count by appointing someone who will be there to act as your proxyholder. You can either tell that person how you want to vote or you can let him or her decide for you. You can do this by completing a form of proxy.

In order to be valid, you must return the completed form of proxy by 1:30 p.m. (Vancouver time) on Thursday, June 21, 2007, to our transfer agent, Computershare Investor Services Inc., 9th Floor, 100 University Avenue, Toronto, Ontario M5J 2Y1 Canada (facsimile numbers: within North America 1-866-249-7775; outside North America 1-416-263-9524).

*What is a proxy?*

A form of proxy is a document that authorizes someone to attend the meeting and cast your votes for you. We have enclosed a form of proxy with this Information Circular. You should use it to appoint a proxyholder, although you can also use any other legal form of proxy.

*Appointing a proxyholder*

You can choose any individual to be your proxyholder. It is not necessary for the person whom you choose to be a shareholder. To make such an appointment, simply fill in the person's name in the blank space provided in the enclosed form of proxy. To vote your shares, your proxyholder must attend the meeting. If you do not fill a name in the blank space in the enclosed form of proxy, the persons named in the form of proxy are appointed to act as your proxyholder. Those persons are directors and/or officers of Africo.

*Instructing your proxy*

You may indicate on your form of proxy how you wish your proxyholder to vote your shares. To do this, simply mark the appropriate boxes on the form of proxy. If you do this, your proxyholder must vote your shares in accordance with the instructions you have given.

If you do not give any instructions as to how to vote on a particular issue to be decided at the meeting, your proxyholder can vote your shares as he or she thinks fit. If you have appointed the persons designated in the form of proxy as your proxyholder they will, unless you give contrary instructions, vote your shares at the meeting as follows:

- ✓ **FOR the election of the proposed nominees as directors;**
- ✓ **FOR the re-appointment of PricewaterhouseCoopers LLP, Chartered Accountants, as Africo's auditor;**
- ✓ **FOR the resolution authorizing the Board of Directors to fix the auditor's remuneration;**
- ✓ **FOR the resolution to ratify and confirm Africo's by-laws, as adopted by the Board of Directors; and**
- ✓ **FOR the resolution ratifying and confirming adoption of a shareholders' rights plan.**

For more information about these matters, see Part 3 - The Business of the Meeting. The enclosed form of proxy gives the persons named on it the authority to use their discretion in voting on amendments or variations to matters identified on the Notice of Meeting. At the time of printing this Information Circular, the management of Africo is not aware of any other matter to be presented for action at the meeting. If, however, other matters do properly come before the meeting, the persons named on the enclosed form of proxy will vote on them in accordance with their best judgment, pursuant to the discretionary authority conferred by the form of proxy with respect to such matters.

*Changing your mind*

If you want to revoke your proxy after you have delivered it, you can do so at any time before it is used. You may do this by (a) attending the meeting and voting in person; (b) signing a proxy bearing a later date; (c) signing a written statement which indicates, clearly, that you want to revoke your proxy and delivering this signed written statement to the Registered Office of Africo at Suite 1810 – 1111 West Georgia Street, Vancouver, British Columbia V6E 4M3 Canada; or (d) in any other manner permitted by law.

Your proxy will only be revoked if a revocation is received by 5:00 in the afternoon (Vancouver time) on the last business day before the day of the meeting, or any adjournment thereof, or delivered to the person presiding at the meeting before it (or any adjournment) commences. If you revoke your proxy and do not replace it with another that is deposited with us before the deadline, you can still vote your shares but to do so you must attend the meeting in person.

**NON-REGISTERED SHAREHOLDERS**

If your shares are not registered in your own name, they will be held in the name of a "nominee," usually a bank, trust company, securities dealer or other financial institution and, as such, your nominee will be the entity legally entitled to vote your common shares and must seek your instructions as to how to vote your shares.

Accordingly, unless you have previously informed your nominee that you do not wish to receive material relating to shareholders' meetings, you will have received this Information Circular from your nominee, together with a form of proxy or a request for voting instruction form. If that is the case, **it is most important that you comply strictly with the instructions that have been given to you by your nominee on the voting instruction form**. If you have voted and wish to change your voting instructions, you should contact your nominee to discuss whether this is possible and what procedures you must follow.

If your shares are not registered in your own name, Africo's transfer agent will not have a record of your name and, as a result, unless your nominee has appointed you as a proxyholder, will have no knowledge of your entitlement to vote. If you wish to vote in person at the meeting, therefore, please insert your own name in the space provided on the form of proxy or voting instruction form that you have received from your nominee. If you do this, you will be instructing your nominee to appoint you as proxyholder. Please adhere strictly to the signature and return instructions provided by your nominee. It is not necessary to complete the form in any other respect, since you will be voting at the meeting in person. Upon arrival at the meeting, please register with the representative from Computershare Investor Services Inc., our transfer agent, who will be present at the meeting to act as scrutineer.

**The Notice of Meeting, this Information Circular and our audited consolidated financial statements for the fiscal year ended December 31, 2006 are being sent to both registered and non-registered owners of common shares in the capital of Africo. If you are a non-registered owner and we have sent these materials to you directly, your name and address and information about your holdings of common shares of Africo have been obtained in accordance with applicable securities regulatory requirements from the nominee holding the securities on your behalf. By choosing to send these materials to you directly, Africo (and not your nominee) has assumed responsibility for (i) delivering these materials to you, and (ii) executing your proper voting instructions. Please return your voting instructions as specified in the request for voting instructions form.**

## PART 2 - VOTING SHARES AND PRINCIPAL HOLDERS THEREOF

Africo has authorized capital of unlimited common shares. Each shareholder is entitled to one vote for each common share registered in his or her name at the close of business on May 18, 2007, the date fixed by our directors as the record date for determining who is entitled to receive notice of and to vote at the meeting.

At the close of business on May 18, 2007, 24,995,690 common shares in the capital of Africo were outstanding. To the knowledge of Africo's directors and officers, there are no persons or companies who or which beneficially owned, directly or indirectly, or exercised control or direction over 10% or more of our common shares on that date.

## PART 3 - THE BUSINESS OF THE MEETING

### FINANCIAL STATEMENTS

The consolidated financial statements of Africo for the year ended December 31, 2006 will be placed before you at the meeting. These financial statements have been mailed to shareholders together with the Notice of Meeting and this Information Circular.

### ELECTION OF DIRECTORS

Directors of Africo are elected for a term of one year. The term of office of each of the nominees proposed for election as a director will expire at the meeting, and each of them, if elected, will serve until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time. Under Africo's Articles and in accordance with the requirements of the *Canada Business Corporations Act*, Africo shall have a minimum of three and a maximum of nine directors, the exact number of directors, within such limits, to be determined from time to time by the Board. Africo currently has six directors and, pursuant to Africo's By-laws, the number of directors to be elected at the meeting has been set by resolution of the Board at five.

#### Nominees for Election

The following are the nominees proposed for election as directors of Africo together with the number of common shares and stock options that are beneficially owned, directly or indirectly, or over which control or direction is exercised, by each nominee. All of the nominees are currently directors. Each of the nominees has agreed to stand for re-election and we are not aware of any intention of any of them not to do so. If, however, one or more of them should become unable to stand for re-election, it is likely that one or more other persons would be nominated at the meeting for election and, in that event, the persons designated in the form of proxy will vote in their discretion for a substitute nominee.

| Name and place of residence | Principal occupation | Director since | Number of shares | Number of options |
|---|---|---|---|---|
| **DAVID W. ADAMSON**<br>*Director*<br>British Columbia, Canada | Exploration Geologist; President, CEO and a director of Rubicon Minerals Corporation, a Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits (since March 1996). | July 4, 2006 | 100,207 | 339,307 |
| **JOHN DIXON**(1)<br>*Director*<br>Tanzania | President of Oryx Mining and Exploration, a Canadian company exploring for viable gold deposits in Africa (since July 2006); Independent Geologist with Bastillion Resources (Pty) Ltd., an independent geological and mining consulting company specialising in Africa (1996 – 2006). | July 4, 2006 | Nil | 100,000 |

| Name and place of residence | Principal occupation | Director since | Number of shares | Number of options |
|---|---|---|---|---|
| **ANTONY (TONY) HARWOOD**[(1)]<br>*President, Chief Executive Officer & Director*<br>England, United Kingdom | President and CEO of Africo Resources (BC) Ltd. (since May 31, 2006); Vice President, Placer Dome Inc., a publicly listed international gold mining company (June 1998 to March 2006). | July 4, 2006 | 66,905 | 320,000 |
| **LUKAS MARTHINUS (TINUS) MAREE**<br>*Director & Secretary*<br>British Columbia, Canada | President, River Capital Partners Ltd., a private investment company (since January 2001); Director, River Group (since January 1998). | July 4, 2006 | 119,648 | 240,000 |
| **CHRIS THEODOROPOULOS**<br>*Director & Chairman of the Board*<br>British Columbia, Canada | Self-employed businessman; Chairman of the Board of Africo (since April 2005) and its now wholly-owned subsidiary, Africo Resources (BC) Ltd. (since July 2006); Associate Counsel, Getz Prince Wells LLP, a law firm in Vancouver (November 2003 to March 2007); independent legal and business consultant (1996 to November 2003). | July 4, 2006 | 114,029 | 320,000 |

(1) Member of the Audit Committee. Peter Tomsett, a current director not standing for re-election at the meeting, is the current Chair of the Audit Committee.

Africo's management recommends that shareholders vote in favour of the nominees for election as directors. **Unless you give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the election of the nominees as directors of Africo for the ensuing year.**

## APPOINTMENT OF THE AUDITOR

During the financial year ended December 31, 2006, PricewaterhouseCoopers LLP, Chartered Accountants, served as Africo's auditor. PricewaterhouseCoopers LLP was appointed as auditor of Africo BC on June 30, 2005, and became auditor of Africo effective December 8, 2006, upon completion of the Plan of Arrangement among Africo, Africo BC, Rubicon Minerals Corporation, among others. Prior to June 30, 2005, Africo BC, then a privately held company, did not have, and pursuant to applicable corporate law was not required to have, an auditor.

Africo's management recommends that shareholders vote in favour of the re-appointment of PricewaterhouseCoopers LLP, Chartered Accountants, as Africo's auditor for the ensuing year and in favour of granting the Board of Directors the authority to determine the remuneration to be paid to the auditor. **Unless you give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the appointment of PricewaterhouseCoopers LLP to act as our auditor until the close of our next annual meeting and to vote FOR the proposed resolution to authorize the Board of Directors to fix the remuneration to be paid to the auditor.**

**RATIFICATION AND CONFIRMATION OF BY-LAWS**

On November 14, 2006, Africo's Board of Directors adopted By-law No. One, being a by-law relating generally to the transaction of the business and affairs of Africo. Pursuant to the *Canada Business Corporations Act*, the directors are to submit a by-law made pursuant thereto to the shareholders at the next meeting of shareholders and the shareholders may, by ordinary resolution, confirm reject or amend the by-law. Shareholders will, accordingly, be asked at the meeting to approve an ordinary resolution confirming By-law No. One.

The complete text of By-law No. One has been filed with securities regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com. A copy of By-law No. One will be provided to any shareholder upon request for same sent to Africo's Chief Financial Officer.

**Unless they are instructed otherwise, the persons named in the enclosed form of proxy intend to vote FOR the resolution to confirm By-law No. One.**

**ADOPTION OF SHAREHOLDERS' RIGHTS PLAN**

The shareholders of Africo will be asked at the meeting to consider and, if thought fit, to pass an ordinary resolution (the "Rights Plan Resolution") to ratify and confirm the adoption of a shareholders' rights plan (the "Rights Plan"), with such changes as may be required by the Toronto Stock Exchange (the "TSX") and any other regulatory authority having jurisdiction over Africo's shares and as may be acceptable to Africo. The Rights Plan, adopted by the board of the directors of Africo, is contained in an agreement (the "Rights Plan Agreement") dated May 25, 2007 between Africo and Computershare Investor Services Inc. (the "Rights Agent"). The full text of the agreement containing the Rights Plan is attached to this Information Circular as Appendix "A". The Rights Plan became effective on May 25, 2007 and will continue in effect unless the shareholders of Africo do not pass the Rights Plan Resolution. The Rights Plan is subject to the approval of the TSX and any other regulatory authority having jurisdiction over Africo's shares.

**Background**

In considering whether to adopt the Rights Plan, the Board of Directors of Africo considered the current legislative framework in Canada governing takeover bids. Under provincial securities legislation, a takeover bid generally means an offer to acquire voting or equity shares of a person or persons, where the shares subject to the offer to acquire, together with shares already owned by the bidder and certain related parties thereto, aggregate 20% or more of the outstanding shares.

The Rights Plan is designed to address the concern that existing Canadian securities legislation (which requires that a takeover bid remain open for only 35 days) does not provide sufficient time for the shareholders to properly consider and respond to an offer and for the Board of Directors to determine whether there may be alternatives available to maximize shareholder value or whether other bidders may be prepared to pay more for Africo's shares than the offeror. The Rights Plan will provide the Board of Directors and the shareholders with more time to fully consider any unsolicited takeover bid without undue pressure; will allow the directors to pursue, if appropriate, other alternatives to maximize shareholder value; and allow additional time for competing bids to emerge. It also addresses the possibility that control or effective control of Africo may be acquired pursuant to a private agreement in which a small number of shareholders sell their shares at a premium to market price which is not shared with other shareholders; and that a person may slowly accumulate shares through market purchases which may result, over time, in an acquisition of control by way of a "creeping" take over without payment of fair value for control or fair sharing of any control premium among all shareholders. The Rights Plan addresses these concerns by applying to all acquisitions of common shares over the 20% level.

The Rights Plan uses the mechanism of a "Permitted Bid" (described below) to try to ensure that someone seeking control of Africo gives its shareholders and directors enough time to evaluate the bid, negotiate with the initial bidder and encourage competing bids to emerge. The Rights Plan seeks to protect shareholders by requiring all potential bidders to comply with certain minimum conditions. A bidder who does not satisfy these minimum conditions becomes subject to the dilutive features of the Rights Plan.

Generally, to qualify as a Permitted Bid, a takeover bid must (a) be made to all shareholders and (b) be open for acceptance for at least 60 days after the bid is made. In addition, the bid must contain a condition that, if more than 50% of the common shares held by Independent Shareholders (which means, in large part, the holders of any shares of Africo other than any Acquiring Person, as described below, any offeror for shares of Africo and any persons who are deemed to beneficially own any of these shares) are tendered and not withdrawn, the bidder may take up and pay for those shares but must then extend the bid for a further period of 10 business days on the same terms so as to allow those shareholders who did not initially tender to do so if they choose. As a result, there should be no coercion to tender during the initial 60-day period.

Neither at the time of adoption of the Rights Plan nor as at the date of this Circular was the Board of Directors aware of any specific proposal to acquire control of Africo nor any such effort to do so. It was not the intention of the Board of Directors in adopting the Rights Plan to secure the continuance in office of the existing members of the board or to avoid an acquisition of control of Africo in a transaction that is fair and in the best interest of the shareholders. Adoption of the Rights Plan will not affect the rights of shareholders under existing law to seek a change in Africo’s management, nor will its adoption affect the duty of the directors to act honestly and in good faith with a view to the best interests of Africo and its shareholders.

**Summary of the Rights Plan**

The following is a summary of the principal terms of the Rights Plan which is qualified in its entirety by reference to the text of the Rights Plan accompanying this Circular.

*Effective Date*

The effective date of the Rights Plan is May 25, 2007 (the “Effective Date”).

*Term*

The term of the Rights Plan is ten years from the Effective Date (the “Expiry Time”), subject to reconfirmation by shareholders at the third and sixth annual meeting of the shareholders after the Effective Date. If the Rights Plan is not reconfirmed by the shareholders, it will automatically lapse.

*Issue of Rights*

On the Effective Date, one right (a “Right”) was issued and attached to each outstanding common share. One Right will also be attached to each subsequently issued common share. The exercise price of the Rights (the “Exercise Price”) will be, until the Separation Time (as described herein), five times the market price of Africo’s common shares, from time to time, and from and after the Separation Time, five times the market price of Africo’s common shares as at the Separation Time. The Exercise Price will be subject to anti-dilution adjustments that are described in the Rights Plan.

*Exercise of Rights*

The Rights are not initially exercisable. They only become exercisable on the tenth trading day after the earlier of (i) the date of the first public announcement by Africo or an Acquiring Person (as described below) that someone has become an Acquiring Person (the “Stock Acquisition Date”), and (ii) the commencement or announcement date of a takeover bid for the common shares other than (a) under a Permitted Bid or (b) certain other limited circumstances described in the Rights Plan. On that date (the “Separation Time”), the Rights will separate from the common shares to which they are attached and become exercisable.

Under the Rights Plan if a person (an “Acquiring Person”), including others acting jointly or in concert with that person, acquires 20% or more of Africo’s common shares otherwise than by way of a Permitted Bid or in certain other limited circumstances, a “Flip-in Event” occurs. Any Rights held by an Acquiring Person on or after the earlier of (a) the Separation Time and (b) the date of the first public announcement by Africo or an Acquiring Person that a person has become an Acquiring Person, will become void upon the occurrence of the Flip-in Event (subject to certain provisions of the Rights Plan relating to waivers).

Ten trading days after the public announcement that a Flip-in Event has occurred, each Right (other than those held by the Acquiring Person) will permit the holder to purchase common shares at a discount of 75% from the market price.

*Exemptions for Portfolio Managers and Institutional Investors*

The Rights Plan contains provisions that are designed to prevent a Flip-in Event from occurring solely as a result of the customary activities of portfolio managers and institutional investors including trust companies and certain others, a substantial portion of whose ordinary business is the management of funds for unaffiliated investors. The "exemption" thus created only applies, however, so long as the portfolio manager does not propose to make a takeover bid either alone or jointly with others.

*Certificates and Transferability*

Until the Separation Time, the Rights will be evidenced only by the register maintained by the Rights Agent and by outstanding common share certificates. Under the Rights Plan, until the Separation Time the Rights will only be transferred with the associated common shares. Until the Separation Time, or earlier termination or expiry of the Rights, each new share certificate issued upon transfer of existing common shares or the issuance of additional common shares, will bear a legend incorporating the terms of the Rights Plan by reference. Promptly after the Separation Time, separate certificates evidencing the Rights will be mailed to the holders of record of common shares as of the Separation Time and thereafter these certificates will be the only evidence of the Rights.

*Waiver and Redemption*

The Board of Directors may, before a Flip-in Event occurs, waive the dilutive effects of the Rights Plan in respect of a particular Flip-in Event. If it does so, it is deemed to have waived the application of the Rights Plan to any future Flip-in Event prior to the expiry of the takeover bid in respect of which the waiver was granted or deemed to have been granted. The Board of Directors may also waive the Rights Plan in respect of a particular Flip-in Event that has occurred inadvertently, provided that the Acquiring Person that inadvertently triggered the Flip-in Event reduces its beneficial ownership of Africo shares to below 20% within such period as the Board of Directors determines.

If, before the occurrence of a Flip-in Event, a person acquires outstanding common shares of Africo pursuant to a Permitted Bid, a Competing Permitted Bid or an Exempt Acquisition under the Rights Plan, then the Board of Directors shall be deemed to have elected to redeem the Rights at a redemption price of $0.0001 per Right appropriately adjusted in accordance with the Rights Plan.

*Amendment to the Rights Plan*

The Board of Directors may amend the Rights Plan to correct clerical errors or to make any changes that may be needed to ensure its continuing validity. The Board of Directors, may also, at any time before the Separation Time, amend, vary or rescind any of the provisions of the Rights Plan or the Rights with the prior consent of Africo's Independent Shareholders. At any time after the Separation Time and before the Expiry Time, the Board of Directors may amend, vary or rescind any of the provisions of the Rights Plan with the prior consent of the holders of Rights.

*Recommendation of the Board*

The Board of Directors has determined that the Rights Plan is in the best interests of Africo and its shareholders. The Board recommends that shareholders vote in favour of the resolution to ratify and confirm the adoption of the Rights Plan, with such changes as may be required by the TSX and any other regulatory authority having jurisdiction over Africo's shares.

**Unless they are instructed otherwise, the persons named in the enclosed form of proxy intend to vote FOR ratification and confirmation of adoption of the Rights Plan as described above.**

## PART 4 – EXECUTIVE COMPENSATION

### COMPENSATION OF NAMED EXECUTIVE OFFICERS

David Adamson served as President of Africo Resources (BC) Ltd. ("Africo BC", now Africo's wholly-owned subsidiary) from its incorporation on January 7, 2004 until May 31, 2006; Chris Theodoropoulos has served as Chairman of the Board of Africo BC since April 7, 2005 and as Chairman of the Board of Africo since July 7, 2006; Antony Harwood was appointed Chief Executive Officer of Africo BC on May 31, 2006 and has served as Chief Executive Officer of Africo since July 7, 2006; Michael Keating served as Chief Operating Officer of Africo BC from June 30, 2005 to October 31, 2006; Victor Song served as Financial and Commercial Manager acting in the capacity of the Chief Financial Officer of Africo BC from July 1, 2005 to October 31, 2006; Grant Pierce has been employed as Africo's Country Manager in the Democratic Republic of the Congo since September 1, 2007; Michael O'Brien served as Acting Chief Financial Officer of Africo from December 1, 2006 to March 9, 2007, when he was appointed Chief Financial Officer (together, the "Named Executive Officers").

The summary compensation table below discloses compensation paid to the Named Executive Officers during the financial years ended December 31, 2006 and 2005 of Africo and Africo BC on a consolidated basis, and for the period from Africo BC's incorporation on January 7, 2004 to December 31, 2004. No other executive officer of Africo or Africo BC was paid more than $150,000 in compensation during the periods reported on in the following table.

*Summary Compensation*

| | | **Annual Compensation** | | | **Long-Term Compensation** |
|---|---|---|---|---|---|
| **Name and principal position** | **Fiscal year (period) ended** | **Salary** | **Bonus** | **Other annual compensation** | **Securities under options granted** |
| Chris Theodoropoulos<br>*Chairman of the Board*[(1)] | 2006<br>2005<br>2004[(8)] | Nil<br>Nil<br>N/A | $200,000<br>$100,000[(9)]<br>Nil | $130,000[(13)]<br>$100,000[(13)]<br>N/A | 220,000<br>100,000<br>N/A |
| David Adamson<br>*President*[(2)] | 2006<br>2005<br>2004[(8)] | Nil<br>Nil<br>Nil | $125,000[(10)]<br>$100,000[(9)]<br>Nil | $30,000[(14)]<br>$7,500[(14)]<br>Nil | 165,000<br>200,000<br>Nil |
| Antony Harwood<br>*President & Chief Executive Officer*[(3)] | 2006<br>2005<br>2004[(8)] | $167,136[(11)]<br>N/A<br>N/A | $130,000[(12)]<br>N/A<br>N/A | Nil<br>N/A<br>N/A | 320,000<br>N/A<br>N/A |
| Michael O'Brien<br>*Chief Financial Officer*[(4)] | 2006<br>2005<br>2004[(8)] | $104,850<br>N/A<br>N/A | Nil<br>N/A<br>N/A | Nil<br>N/A<br>N/A | Nil<br>N/A<br>N/A |
| Grant Pierce<br>*Country Manager*[(5)] | 2006<br>2005<br>2004[(8)] | $91,668<br>N/A<br>N/A | Nil<br>N/A<br>N/A | Nil<br>N/A<br>N/A | Nil<br>N/A<br>N/A |
| Michael Keating<br>*Chief Operating Officer*[(6)] | 2006<br>2005<br>2004[(8)] | $264,000<br>$132,000<br>N/A | Nil<br>Nil<br>N/A | Nil<br>Nil<br>N/A | 50,000<br>200,000<br>N/A |
| Victor Song<br>*Financial & Commercial Manager (acting in the capacity of CFO)*[(7)] | 2006<br>2005<br>2004[(8)] | $162,000<br>$108,000<br>N/A | Nil<br>Nil<br>N/A | Nil<br>Nil<br>N/A | Nil<br>100,000<br>N/A |

(1) Mr. Theodoropoulos has been the Chairman of Africo BC since April 7, 2005 and he has been the Chairman of Africo since July 7, 2006.

(2) Mr. Adamson was the President of Africo BC from February 2, 2004 to May 31, 2006.

(3) Dr. Harwood was appointed President and Chief Executive Officer of Africo BC on May 31, 2006 and has served as President and Chief Executive Officer of Africo since July 7, 2006.

(4) Michael O'Brien served as Acting Chief Financial Officer of Africo from December 1, 2006 to March 9, 2007, when he was appointed Chief Financial Officer.

(5) Grant Pierce has been employed as Africo's Country Manager in the Democratic Republic of the Congo since September 1, 2006.

(6) Michael Keating served as Chief Operating Officer of Africo BC from June 30, 2005 to October 31, 2006.

(7) Victor Song served as Financial and Commercial Manager acting in the capacity of the Chief Financial Officer of Africo BC from July 1, 2005 to October 31, 2006.

(8) Period from incorporation of Africo BC on January 7, 2004 to December 31, 2004.

(9) Awarded and paid subsequent to the end of fiscal 2005 for contributions to Africo achieving several business development milestones during fiscal 2005.

(10) Awarded and paid subsequent to the end of fiscal 2006 for contributions to Africo achieving several business development milestones during fiscal 2006.

(11) $162,500 of this amount was satisfied by issuance of 40,625 common shares in the capital of Africo at a deemed price per share of $4.00 and warrants entitling the holder to purchase 20,312 common shares in the capital of Africo at a per share price of $5.00 (subject to adjustment in certain circumstances) until May 23, 2008.

(12) Accrued in the first quarter of fiscal 2007 for contributions to Africo achieving several business development milestones during fiscal 2006.

(13) Consulting fees paid to 143 Investments Ltd., a private company controlled by Mr. Theodoropoulos. $50,000 of the $130,000 payable during fiscal 2006 was satisfied by issuance of 12,500 common shares in the capital of Africo at a deemed price per share of $4.00 and warrants entitling 143 Investments Ltd. to purchase 6,250 common shares in the capital of Africo at a per share price of $5.00 (subject to adjustment in certain circumstances) until May 23, 2008.

(14) Director's fees.

See "Termination of Employment, Change in Responsibilities and Employment Contracts" below and Part 8 – Other Information – Management Contracts.

*Options and Stock Appreciation Rights*

The following table sets out all incentive stock options granted to the Named Executive Officers during the most recently completed financial year ended December 31, 2006.

| Named Executive Officer | Securities under options granted (#) | % of total options granted to employees in period | Exercise price ($/Security) | Market value of securities underlying options[1] on date of grant ($/Security) | Expiration date |
|---|---|---|---|---|---|
| Chris Theodoropoulos | 120,000<br>100,000 | 9.3%<br>10.3% | $2.50<br>$0.75 | $300,000<br>$375,000 | April 1, 2011<br>June 6, 2010 |
| David Adamson | 100,000<br>65,000 | 7.7%<br>6.7% | $2.50<br>$0.75 | $250,000<br>$243,750 | April 1, 2011<br>June 6, 2010 |
| Antony Harwood | 250,000<br>70,000 | 19.3%<br>7.2% | $2.50<br>$0.75 | $625,000<br>$262,500 | April 1, 2011<br>June 6, 2010 |
| Michael O'Brien | Nil | N/A | N/A | N/A | N/A |
| Grant Pierce | Nil | N/A | N/A | N/A | N/A |
| Michael Keating | 50,000 | 3.9% | $2.50 | $125,000 | April 1, 2011 |
| Victor Song | Nil | N/A | N/A | N/A | N/A |

(1) The underlying securities are common shares of Africo.

No options held by the Named Executive Officers were downward re-priced or exercised during the financial year ended December 31, 2006. The following table sets out details of the value of unexercised incentive stock options held by the Named Executive Officers, if any, as at December 31, 2006.

| Named Executive Officer | Securities acquired on exercise | Aggregate value realized | Unexercised options as at year end December 31, 2006 | | Value of unexercised in-the-money options at year end December 31, 2006[1] | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Chris Theodoropoulos | Nil | N/A | 320,000 | Nil | $830,000 | N/A |
| David Adamson | Nil | N/A | 365,000 | Nil | $1,011,250 | N/A |
| Antony Harwood | Nil | N/A | 195,000 | 125,000 | $415,000 | $187,500 |
| Michael O'Brien | N/A | N/A | N/A | N/A | N/A | N/A |
| Grant Pierce | N/A | N/A | N/A | N/A | N/A | N/A |
| Michael Keating | Nil | N/A | 250,000[2] | Nil | $575,000 | N/A |
| Victor Song | Nil | N/A | 100,000[2] | Nil | $225,000 | N/A |

(1) The value of unexercised "in-the-money options" at financial year-end is the difference between the option exercise price and the closing price of the underlying stock on the Toronto Stock Exchange at the end of the fiscal year. The closing price of Africo's common shares on December 29, 2006, the last day of trading in the stock during the fiscal year was $4.00.

(2) These options were exercised in January 2007.

## Termination of Employment, Change in Responsibility and Employment Contracts

*Dr. Antony Harwood – President & Chief Executive Officer*

Pursuant to an offer letter from Africo BC dated May 25, 2006, which was accepted by Dr. Antony (Tony) Harwood on May 31, 2006, Africo entered into an employment contract with Dr. Harwood pursuant to which Dr. Harwood agreed to act as Africo BC's President and Chief Executive Officer, commencing May 31, 2006, at a fixed remuneration of CDN$325,000 per annum, payable monthly, such annual salary to be reviewed by Africo's Board of Directors annually. Under the agreement, Dr. Harwood is entitled to 21 paid vacation days per 12-month period and reimbursement for reasonable expenses incurred by Dr. Harwood in performance of his duties and responsibilities as President and Chief Executive Officer of Africo. In addition, Dr. Harwood is entitled to receive a benefits package which will reimburse him for medical and dental coverage for himself and his dependents, as well as for life, travel and international insurance.

Dr. Harwood has been granted options to purchase up to 250,000 Africo common shares at an exercise price of CDN$2.50 for a term of five years, expiring April 1, 2011, 125,000 of which vested on commencement of employment. The remaining 125,000 options vest on May 31, 2007. An additional 70,000 options exercisable at $0.75 per share were allocated to Dr. Harwood and expire on June 6, 2010.

As a condition of his employment arrangement, Dr. Harwood has agreed to a non-compete arrangement that restricts him, for a period of 12 months from the date of termination of his employment, from being involved in any capacity in a competing business, the principal activities of which are conducted and the principal assets of which are located within the geographical area known as the DRC of mineral deposits, the principal value of which consists of copper and/or cobalt (excluding Oryx Mining and Exploration Ltd., a private company of which Mr. Harwood is a director).

Dr. Harwood may terminate the employment arrangement with Africo by giving at least one calendar month's advance notice in writing to Africo. Africo may waive such notice, in whole or in part, and if it does so, Dr. Harwood's employment with Africo will cease on the date such notice is waived by Africo. Africo may terminate the employment arrangement:

1. without notice, payment in lieu thereof or payment of severance of any kind for just cause; and

2. at its sole discretion for any reason, without cause, upon providing Dr. Harwood six calendar months' notice or, at Africo's option, pay in lieu of notice equal to six months' base salary as at the date of termination, together with all other payments or entitlements to which Dr. Harwood would be entitled

pursuant to applicable employment or employment standards legislation. After the first fully completed year of employment and each fully completed year thereafter, an additional one month's notice or pay in lieu of such notice will be given by Africo to Dr. Harwood in the event of such termination.

Any pay in lieu of notice on termination will be calculated on the basis of Dr. Harwood's annual base salary as of the date of notice of termination and will be provided in regular monthly instalments, subject to all deductions and withholdings required by law. Pay in lieu of notice will also include a pro-rata portion of any bonus or other form of additional compensation for the year in which employment is terminated. In addition, all options granted but not vested as at the date of termination shall vest immediately. Dr. Harwood's rights and entitlements under any performance bonus (except for rights and entitlements, if any, accrued up to the date of termination of employment and unpaid at the date of such termination) shall otherwise terminate effective as of the date of termination, or as at the date notice of termination is given, pay in lieu of notice is provided.

In the event of a change in control of Africo by way of a successful take-over bid, merger, amalgamation or reorganization pursuant to which ownership of more than 51% of the Africo common shares is acquired, if within six months thereafter Dr. Harwood's employment is terminated, or within such six months Dr. Harwood elects to treat his employment as terminated, pay in lieu of notice equal to two years' annual base salary as at the date of termination, together with pro-rated bonus, if any and all options granted but not vested as at the date of termination will vest immediately.

In the event of termination for cause, employment benefits will cease effective as of the date of termination and, in the event of termination without cause, will continue for a period of six months after the date of termination.

The employment agreement is not assignable by Dr. Harwood and the agreement shall not be assigned by Africo except in the event of a merger, consolidation, plan of arrangement, corporate restructuring or sale of substantially all of the assets of Africo, and only if the assignee agrees in writing with Dr. Harwood to perform the obligations of Africo under the agreement.

*Grant Pierce – Country Manager, Democratic Republic of the Congo*

Africo entered into a Contract of Employment with Grant Pierce pursuant to which Mr. Pierce agreed to full-time employment as Africo's Country Manager in the Democratic Republic of the Congo ("DRC"), based in Lubumbashi, commencing September 1, 2006, at a fixed remuneration of CDN$275,000 per annum, payable in monthly instalments. Mr. Pierce is also entitled to a performance based bonus of 50% to 100% of the annual salary payable under the Contract, based on performance targets to be agreed to by both parties. In addition, Mr. Pierce will be provided by Africo with a suitable, furnished house in Lubumbashi, free of charges including rates, electricity, water and security, reasonable telephone services free of charge and a vehicle for the purpose of carrying out his employment responsibilities in the DRC. Africo is responsible for all costs associated with fuel, maintenance, repairs and insurance for the vehicle. Africo also reimburses Mr. Pierce for reasonable expenses to relocate his personal belongings to and from the DRC. Congolese taxation related to Mr. Pierce's employment is required to be paid by Africo and taxation in the Mr. Pierce's country of origin is required to be paid by Mr. Pierce. The Contract also includes a rest and relaxation component for travel out of the DRC, with various costs related thereto required to be paid for by Africo.

In his capacity as Country Manager, Mr. Pierce is accountable to Africo's Chief Executive Officer for the efficient and safe operation and management of the Kalukundi Project, to achieve budgeted performance objectives and to ensure planning is undertaken to determine future construction and operating strategies. In addition he is accountable for the activities of the Lubumbashi office.

Mr. Pierce is entitled to participate in Africo's Stock Option Plan and, pursuant to the terms of the Contract, Africo has agreed to grant Mr. Pierce options to purchase 200,000 common shares in the capital of Africo, which options have, as of the date of this Circular, not yet been granted. The Contract expires on August 31, 2008, and may be extended for an additional period on agreement by the parties.

In the event of a change of control of Africo by way of a successful takeover, merger, amalgamation or reorganisation pursuant to which ownership of more than 51% of Africo's shares are acquired, if within six months'

thereafter Mr. Pierce's employment is terminated, Africo will pay Mr. Pierce payment in lieu of notice equal to one year's annual salary as at the date of termination together with a prorated bonus.

Mr. Pierce may terminate his employment pursuant to the Contract by giving at least three months' advance notice in writing to Africo or by resignation of his employment for good cause. Africo may waive such notice, in whole or in part, and if it does so, Mr. Pierce's employment with Africo pursuant to the Contract will cease on the date so determined by Africo. Africo may terminate Mr. Pierce's employment pursuant to the Contract without notice, payment in lieu thereof or payment of severance of any kind, for cause by providing Mr. Pierce with written notice of such termination of employment. In addition, Africo may terminate Mr. Pierce's employment pursuant to the Contract at its sole discretion for any reason, without cause, upon providing Mr. Pierce at least three months' advance notice or, at Africo's option, pay in lieu of notice together with all other payments or entitlements to which Mr. Pierce is entitled under applicable employment or employment standards legislation. Any pay in lieu of notice will be calculated on the basis of the annual base salary (not including bonuses and other forms of additional compensation) as of the date Mr. Pierce receives notice of termination and will be provided in regular monthly installments and shall be subject to all deductions and withholdings required by law. Mr. Pierce's rights and entitlements under any performance bonus (except for rights and entitlements, if any, accrued under the Contract up to the date of termination of employment and unpaid at the date of such termination) shall terminate effective as of the date of termination of employment, or as at the date Mr. Pierce receive notice of termination or pay in lieu of notice.

See Part 8 – Other Information – Management Contracts.

**COMPOSITION OF THE COMPENSATION COMMITTEE**

On July 7, 2006, the Board of Directors of Africo appointed John Dixon, Antony Harwood and Peter Tomsett, each of whom is a director of Africo, as members of its Compensation Committee. Antony Harwood has been the President and Chief Executive Officer of Africo since July 7, 2006, and the Chief Executive Officer of Africo's wholly-owned subsidiary, Africo BC, since May 31, 2006.

**REPORT ON EXECUTIVE COMPENSATION**

*Role of the Compensation Committee*

The compensation of Africo's executive officers and the recommendations with respect to Africo's Option Plan (as herein defined) are determined by the Compensation Committee. Interested executives do not participate in decisions of the Compensation Committee regarding their remuneration. The Compensation Committee will, as part of its review and evaluation process, engage independent third party executive compensation consultants and be guided in part on reports prepared by such consultants.

In order to attract and retain key personnel, Africo employs a combination of base compensation and equity participation through its Option Plan. In establishing levels of remuneration and in granting stock options and bonuses, the executive's performance, level of expertise, responsibilities, length of service to Africo and comparable levels of remuneration paid to executives of other companies of comparable size and development within the industry are taken into consideration.

The Option Plan is administered by the Compensation Committee. The Option Plan is designed to give each option holder an interest in preserving and maximizing shareholder value in the longer term, to enable Africo to attract and retain individuals with experience and ability, and to reward individuals for current performance and expected future performance. Stock option grants are considered when reviewing executive officer compensation packages as a whole. See Part 5 – Securities Authorized for Issuance Under Equity Compensation Plans for a summary of the principal features of Africo's Option Plan.

*Base Salary*

In the Compensation Committee's view, paying base compensation that is competitive in the markets in which Africo operates is a first step to attracting and retaining talented, qualified and effective executives.

The base salary of each particular executive officer is determined by an assessment by the Compensation Committee of such executive officer's responsibilities, performance, a consideration of competitive compensation levels in companies similar to Africo and a review of the performance of Africo as a whole and the role such executive officer played in such company performance.

*Bonus*

Bonuses are performance based short-term financial incentives and will be paid based on certain indicators such as personal performance, team performance and/or Africo's financial performance. Bonus levels will be, in part, determined by level of position with Africo and by contractual arrangements.

*Long-Term Incentive*

Africo provides a long-term incentive by granting stock options to executive officers in accordance with the policies of the TSX. Africo's Board has adopted the Option Plan to provide incentive to directors, officers, employees and consultants. The Option Plan replaced the previous option plan of Africo BC, which was implemented by the Board of Africo BC prior to the arrangement which resulted in Africo BC becoming a wholly-owned subsidiary of Africo.

The objective of granting options is to encourage executive officers to acquire an ownership interest in Africo over a period of time, which acts as a financial incentive for such executive officer to consider the long-term interests of Africo and its shareholders. See Part 5 – Securities Authorized for Issuance under Equity Compensation Plans.

*CEO Compensation*

The components of the CEO's compensation are the same as those that apply to all of Africo's executive officers, namely base compensation, performance bonuses and long-term incentives in the form of stock options. The general compensation philosophy of Africo for executive officers is to provide a level of compensation that is competitive within the international marketplace and that will attract and retain individuals with the experience and qualifications necessary for Africo to be successful, and to provide long-term incentive compensation which aligns the interest of executives with those of the shareholders of Africo and provide long-term incentives to members of senior management whose actions have a direct and identifiable impact on the performance of Africo and who have had a material responsibility for long-range strategy development and implementation.

In establishing the CEO's compensation, the Compensation Committee reviews salaries paid to other executive officers in Africo, salaries paid to other CEOs in the industry and the CEO's contribution to the affairs of Africo and makes recommendations to the Board.

See Part 4 - Executive Compensation - Summary Compensation Table above for more information on remuneration of Named Executive Officers.

The foregoing report has been submitted by:

Peter Tomsett (Chair)
Tony Harwood
John Dixon
Members of the Compensation Committee

**PERFORMANCE GRAPH**

No performance graph is presented in this Circular as Africo's common shares were only publicly listed for a period of 15 days prior to the fiscal year ended December 31, 2006, and any performance trends indicated between the start of trading and the year end are of limited value given the initial volatility of the stock price.

**COMPENSATION OF DIRECTORS**

Directors who are also officers and receive a salary from Africo do not receive any remuneration from Africo for serving as a director, except for reimbursement of any out-of-pocket expenses incurred in acting as a director and participation in Africo's Option Plan. Directors who are not so employed receive remuneration from Africo in the amount of $2,500 per month. With effect from December 1, 2006, the Chair of the Audit Committee receives an additional $5,000 per annum and the Chair of the Compensation Committee receives $2,000 per annum for their respective services as such and committee members receive $500 per committee meeting attended.

Lukas Marthinus Maree, a director of Africo since its incorporation on July 4, 2006, and a director of Africo BC since February 14, 2005, through River Capital Partners Ltd., a private company that Mr. Maree is a director of, received cash compensation from Africo during the fiscal year ended December 31, 2006, of an aggregate $110,000 (2005 - $100,000) for consulting services and a bonus of $125,000 for his contributions to Africo achieving several business development milestones during fiscal 2006.

During the fiscal year ended December 31, 2006, Chris Theodoropoulos, a director and the Chairman of the Board of both Africo and Africo BC, was associate counsel with the Vancouver law firm Getz Prince Wells LLP, which firm provides legal services to Africo. During the fiscal year ended December 31, 2006, Africo received invoices for an aggregate $308,087 in legal fees for services rendered by Getz Prince Wells LLP.

During the year ended December 31, 2006, Africo's directors were granted options to purchase an aggregate 870,000 common shares of Africo as set out in the following table.

| Name | Date of grant | Options granted | Exercise price | Expiry date |
|---|---|---|---|---|
| David Adamson | April 1, 2006 | 100,000 | $2.50 | April 1, 2011 |
| | See Note (1) below | 65,000[(1)] | $0.75 | June 6, 2010 |
| John Dixon | April 1, 2006 | 100,000 | $2.50 | April 1, 2011 |
| Antony Harwood | April 1, 2006 | 250,000 | $2.50 | April 1, 2011 |
| | See Note (1) below | 70,000[(1)] | $0.75 | June 6, 2010 |
| Tinus Maree | April 1, 2006 | 100,000 | $2.50 | April 1, 2011 |
| | See Note (1) below | 40,000[(1)] | $0.75 | June 6, 2010 |
| Chris Theodoropoulos | April 1, 2006 | 120,000 | $2.50 | April 1, 2011 |
| | See Note (1) below | 100,000[(1)] | $0.75 | June 6, 2010 |
| Peter Tomsett | November 7, 2006 | 200,000 | $4.00 | November 7, 2011 |

(1) These options were initially granted on June 6, 2005 and were reallocated during 2006.

See Part 8 – Other Information – Management Contracts.

**PART 5 – SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS**

The following information is as of December 31, 2006, Africo's most recently completed financial year.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by securityholders | 2,470,000 | $1.75 | 2,313,238 |
| Equity compensation plans not approved by securityholders | Not applicable | Not applicable | Not applicable |
| Total | 2,470,000 | $1.75 | 2,313,238 |

*Summary of the Stock Option Plan*

On July 7, 2006, the Board of Directors of Africo approved a "fixed number" stock option plan in a form compatible with the rules of the TSX (the "Option Plan"). Under the Option Plan, Africo is authorized to grant options entitling the holders to acquire up to an aggregate 4,783,238 Africo common shares, which represented 20% of the issued and outstanding common share capital of Africo as at the date of the initial listing of Africo's common shares on the TSX.

The principal purposes of the Option Plan are to provide Africo with the advantages of the incentive inherent in share ownership on the part of those persons responsible for the continued success of Africo; to create in those persons a proprietary interest in, and a greater concern for, the welfare and success of Africo; to encourage such persons to remain with Africo; and to attract new talent to Africo. Africo does not intend to provide financial assistance to facilitate the purchase of common shares under the Option Plan.

The Option Plan is administered by the Compensation Committee of the Board. The following is a brief description of the principal terms of the Option Plan, which description is qualified in its entirety by the terms of the Option Plan:

1. The aggregate number of Africo common shares reserved for issuance upon the exercise of options granted under the Option Plan cannot exceed 4,783,238 common shares in the capital of Africo.

2. The exercise price of stock options, as determined by the Compensation Committee, may not be less than the last closing price of the Africo common shares on the TSX immediately prior to the time of the grant of an option.

3. Stock options under the Option Plan may be granted to:

   (a) an executive officer, director or employee of Africo or an affiliate of Africo;

   (b) a consultant (other than an employee or director of Africo) providing consulting, technical, management or other services to Africo, or a consultant company; and

   (c) an employee of a corporation providing management services to Africo, which management services are required for the ongoing successful operation of the business enterprise of Africo but excluding a person engaged in investor relations activities.

4. The term for exercise of the options under the Option Plan is a maximum of ten years from the date of grant. Stock options may only be exercised until the earlier of the expiry date and a period not more than 90 days after the optionee ceases to be an employee, consultant, director, or executive officer of Africo or an affiliate, or such later date determined by the Board of Directors of Africo which can be no later than the original expiry date of such option.

5. The Board of Directors of Africo, taking into account the recommendations of the Compensation Committee, shall have the complete discretion to set the terms of any vesting schedule for each option granted, including the discretion to permit partial vesting in stage or percentage amounts based on the term of such option or to permit full vesting after a state or period of time has passed from the date of grant.

6. All options shall be non-assignable and non-transferable except as to a Qualified Successor or as otherwise permitted by applicable securities laws. "Qualified Successor" means a person who is entitled to ownership of an option upon the death of an optionee, pursuant to a will or the applicable laws of descent and distribution upon death. In the event of death of an optionee, such optionee's options shall be exercisable by the Qualified Successor until the expiry of the term of the option. If an optionee becomes disabled, such optionee's options may be exercised by a guardian until the expiry of the term of the option.

7. If there is any change in the number of Africo common shares outstanding through any declaration of a stock dividend or any consolidation, subdivision or reclassification of the Africo common shares, the number of shares available under the Option Plan, the shares subject to any option and the exercise price will be adjusted proportionately, subject to any approval required by the TSX. If Africo amalgamates, merges or enters into a plan of arrangement with or into another corporation, the shares received on exercise of the options thereafter will reflect the shares that would have been received had the options been exercised immediately prior to the record date for the amalgamation, merger or plan of arrangement and the exercise price will be adjusted proportionately. If a Change of Control (as defined in the Option Plan) occurs, all options will become immediately exercisable. If a bona fide takeover bid (as defined in the British Columbia *Securities Act*) is made for the Africo common shares, optionees will be entitled to exercise any options they hold to permit them to tender the shares received upon exercise of the options to the takeover bid.

8. The Option Plan contains provisions which require shareholder approval or, where required, approval by Africo's disinterested shareholders, to: (i) increase the aggregate number of Africo common shares which may be issued under the Option Plan, (ii) materially modify the requirements as to the eligibility for participation in the Option Plan which would have the potential of broadening or increasing insider participation; and (iii) materially increase the benefits accruing to participants under the Option Plan. However, the Option Plan may be amended by the Board of Directors of Africo without shareholder approval in order to comply with the requirements of any applicable regulatory authority and to make amendments of a housekeeping nature to the Option Plan.

9. Notwithstanding the date of expiration of the term of an option, the date of expiration of the term of an option will be adjusted, without being subject to the Board of Directors of Africo or Compensation Committee's discretion, to take into account any black out period imposed on the optionee by Africo as follows: (i) if the term expiration date falls within a black out period imposed on the optionee by Africo, then the term expiration date is extended to the close of business on the 10th business day after the end of such black out period by Africo (the "Black Out Expiration Term"); or (ii) if the term expiration date falls within two business days after the end of a black out period imposed on the optionee by Africo, then the term expiration date is extended to the date which is the Black Out Expiration Term reduced by the number of business days between the term expiration date and the end of such black out period.

A copy of the Option Plan will be provided to any shareholder upon request for same sent to Africo's Chief Financial Officer.

As at the date of this Circular, stock options have been granted and are outstanding pursuant to the Option Plan entitling the holders thereof to purchase an aggregate 2,230,000 common shares in the capital of Africo, of which options to purchase an aggregate 1,745,000 common shares of Africo are held by Africo's directors and executive officers.

## PART 6 – AUDIT COMMITTEE

See "Item 10 – Audit Committee" in Africo's Annual Information Form dated March 30, 2007 for the financial year ended December 31, 2006, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the internet at www.sedar.com.

## PART 7 – CORPORATE GOVERNANCE

Follows is a summary of Africo 's current approach to corporate governance.

*Composition of the Board of Directors*

The Board of Directors of Africo, at present, is comprised of six directors, two of whom, Messrs. Dixon and Tomsett, are considered to be independent. In determining whether a director is independent, the Board considers, for example, whether the director has a relationship, which could, or could be perceived to, interfere with the director's ability to objectively assess the performance of management. On this basis, Chris Theodoropoulos, as Chairman of the Board receiving remuneration for his services; David Adamson, an executive officer of Africo's principal operating subsidiary within the last three years; Antony Harwood, the current President and Chief Executive Officer of Africo; and Tinus Maree, who receives remuneration from Africo for consulting services, are not considered to be independent directors.

The Board anticipates that as Africo matures as a business enterprise, it will identify additional qualified candidates that have experience relevant to its needs, are independent of Africo's management and its subsidiaries and are considered independent under applicable corporate governance legislation and guidelines.

*Board Mandate*

The Board of Directors of Africo has not, as yet, adopted a written mandate. The Board is, however, responsible for approving long-term strategic plans and annual operating plans and budgets recommended by management. Board consideration and approval is also required for all material contracts, business transactions and all debt and equity financing proposals.

The Board delegates to management, through the President and Chief Executive Officer, responsibility for meeting defined corporate objectives, implementing approved strategic and operating plans, carrying on Africo's business in the ordinary course, managing Africo's cash flow, evaluating new business opportunities, recruiting staff and complying with applicable regulatory requirements. The Board also looks to management to furnish recommendations respecting corporate objectives, long-term strategic plans and annual operating plans.

The Compensation Committee of the Board of Directors, which is comprised of a majority of independent directors (currently Messrs. Dixon, Harwood and Tomsett), is responsible for approving senior executive compensation and retirement plans (see *Compensation* below and Part 4 – Executive Compensation – Report on Executive Compensation). The Board has also appointed a Corporate Governance Committee, which is also currently comprised of a majority of unrelated, non-management directors and is responsible for making recommendations to the Board as to potential nominees and assessing the performance and contribution of directors. Peter Tomsett, considered to be a director independent of Africo's management, is the chair of each of the three Committees of Africo's Board of Directors (Audit, Compensation and Corporate Governance) and serves in a leadership role for the independent directors. In addition, the Board and its Committees meet independently of management on a regular basis.

*Position Descriptions*

Africo's Board of Directors has not yet developed written position descriptions for the Chairman of the Board or the Chair of the Board Committees. The role of the Chair of the Audit Committee flows from and is informed and guided by the factors identified in the Audit Committee Charter (see Part 6 – Audit Committee).

The Board has not developed a written position description for the Chief Executive Officer. As Chief Executive Officer, Dr. Harwood is responsible for management of the business and affairs of Africo and its subsidiaries, subject always to Board approval of business plans and decisions relating to major expenditures, financing arrangements and significant acquisitions or divestitures (see *Board Mandate* above).

*Attendance*

The following table provides a summary of attendance for Board and Committee meetings held from Africo's date of incorporation on July 4, 2006 to December 31, 2006. The Corporate Governance Committee did not hold any meetings during the period from its inception on Africo's incorporation in July 2006 to the end of fiscal 2006.

| **Name** | **Board meetings attended** | **Committee meetings attended** |
|---|---|---|
| David Adamson | 2 of 2 | Not a Committee member |
| John Dixon | 2 of 2 | 2 of 2 (Audit)<br>2 of 2 (Compensation) |
| Antony Harwood | 2 of 2 | 2 of 2 (Audit)<br>2 of 2 (Compensation) |
| Lucas Marthinus (Tinus) Maree | 2 of 2 | Not a Committee member |
| Chris Theodoropoulos | 2 of 2 | Not a Committee member |
| Peter Tomsett | 1 of 2 | 2 of 2 (Audit)<br>1 of 2 (Compensation) |

*Directorships*

Certain of the current directors of Africo are also directors of other reporting issuers (or equivalent) in a jurisdiction or a foreign jurisdiction as follows:

| **Name** | **Reporting Issuer (or equivalent in a foreign jurisdiction)** |
|---|---|
| David Adamson | Paragon Minerals Corporation<br>Rubicon Minerals Corporation |
| Chris Theodoropoulos | Canarc Resource Corp.<br>GoldQuest Mining Corp.<br>Novra Technologies Inc.<br>Pediment Exploration Ltd.<br>Peer 1 Network Enterprises, Inc. |
| Peter Tomsett | North American Energy Partners Inc.<br>Silver Standard Resources Inc. |

*Orientation and Continuing Education*

Given the relatively static composition of the Board of Directors since its incorporation, the Corporation has not yet developed an official orientation or training program for new directors.

New directors will have the opportunity to become familiar with the Corporation by meeting with the other directors and with officers and employees. Orientation activities will be tailored to the particular needs and experience of each director and the overall needs of the Board.

*Ethical Business Conduct*

The Board of Africo has adopted a Code of Ethics, a copy of which is available for review through the internet on SEDAR at www.sedar.com or on Africo's website at www.africoresources.com.

Africo's Board monitors the ethical conduct of its affairs by its directors, employees and contractors to ensures that it complies with applicable legal and regulatory requirements, such as those of relevant securities commissions and stock exchanges. The Board has found that the fiduciary duties placed on individual directors by applicable corporate law, as well as the restrictions placed by applicable corporate legislation on an individual director's participation in decisions of the Board in which the director has an interest, have been sufficient to ensure that the Board operates independently of management and in the best interests of Africo's business and operations, as well as shareholders' interests.

The Board of Directors promotes a culture of ethical business conduct for officers and employees of Africo through its own high standards of ethical business behavior in fulfilling its mandate.

Africo's Board of Directors has adopted a "Whistleblower Policy" which provides employees, management, officers, directors, contractors, consultants and Committee members with the ability to report, on a confidential and anonymous basis, any complaints and concerns regarding accounting, internal controls or auditing matters, including, but not limited to, unethical and unlawful accounting and auditing policies, practices or procedures, fraudulent or misleading financial information and instances of corporate fraud, in addition to other wrong doing. The Board believes that providing a forum for such individuals to raise concerns about ethical conduct and treating all complaints with the appropriate level of seriousness fosters a culture of ethical conduct within Africo.

The Board has also adopted a Corporate Disclosure Policy to ensure that communications to the investing public about the business and affairs of Africo and its subsidiaries are made in accordance with all applicable legal and regulatory requirements, covering disclosure in documents filed with regulators and written disclosure documents sent to shareholders, presentations by senior management, information contained on Africo's website and other electronic communications. It extends to oral statements made in meetings and telephone conversations with analysts and investors, interviews with the media, as well as speeches, industry or press conferences and conference calls.

Further, Africo's Board has adopted an Insider Trading Policy to ensure that persons having knowledge of material information not generally disclosed to the public do not take advantage of such information through trading in securities issued by Africo or in securities of other corporations whose price would be affected by such undisclosed material information. The Policy is intended to ensure that Africo's directors, officers, employees and other insiders, or associates of such persons, act, and are perceived to act, in accordance with applicable laws and the highest standards of ethical and professional behaviour.

*Nomination and Assessment of Directors*

The Corporate Governance Committee and the Board as a whole intend to annually examine the size of the Board of Directors to ensure that it is optimum for decision making. The current Board comprised of six directors (five nominees being proposed for election at the 2007 annual meeting to which this Circular relates) is small enough for constructive interaction to take place but, at the same time, large enough to encompass a broad representation of relevant skills and competencies. Peter Tomsett, an independent director, is not standing for re-election at the meeting and it is the intention of the Board to appoint a further independent director, once a suitable candidate is identified.

*Assessments*

As part of its mandate the Corporate Governance Committee, which is comprised of a majority of independent directors (currently Messrs. Dixon, Harwood and Tomsett), is responsible for assessing, at least annually, the effectiveness of the Board as a whole, the Committees of the Board and the contribution of individual directors (including the competencies and skills that each individual director is expected to bring to the Board), including considering the appropriate size of the Board.

*Compensation*

See Part 4 – Executive Compensation – Report on Executive Compensation.

*Audit Committee*

See Part 6 – Audit Committee.

*Corporate Governance Committee*

Peter Tomsett (Chair), John Dixon and Antony Harwood are members of Africo's Corporate Governance Committee.

The Committee's responsibilities include:

- identifying qualified candidates and making recommendations to the Board regarding nominees for election or appointment as directors;
- conducting annual reviews of committee memberships and periodically reviewing the powers, mandates and performance of the committees of the Board;
- reviewing the composition, compensation and governance of the Board, assessing the effectiveness of the Board as a whole and contribution of the directors individually, and making recommendations for improving effectiveness; and
- ensuring corporate compliance with applicable legislation.

## PART 8 – OTHER INFORMATION

### DIRECTORS' AND OFFICERS' INSURANCE

Africo recently purchased insurance for the benefit of its directors and officers against liability incurred by them as such, subject to certain limitations contained in the *Canada Business Corporations Act* and as outlined in the insurance policy. The policy provides coverage to directors and officers in the aggregate amount in any policy year (April 23, 2007 to April 22, 2008) of $10.0MM, subject to a deductible of $100,000. The total premium charged for this insurance during the current policy year is $61,275 and is paid by Africo.

### INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS

Since the beginning of the most recently completed financial year ended December 31, 2006 and as at the date of this Circular, no director, executive officer or employee or former director, executive officer or employee of Africo, nor any nominee for election as a director of Africo, nor any associate of any such person, was indebted to Africo or any of its subsidiaries during the most recently completed financial year ended December 31, 2006 for other than "routine indebtedness", as that term is defined by applicable securities law; nor was any indebtedness to another entity the subject of a guarantee, support agreement, letter of credit or other similar arrangement or understanding provided by Africo or any of its subsidiaries.

### INTEREST OF CERTAIN PERSONS IN MATTERS TO BE ACTED ON AT THE MEETING

David Adamson, Lukas Marthinus Maree and Chris Theodoropoulos have served as directors of Africo and/or its subsidiaries since the beginning of the consolidated financial year ended December 31, 2006. John Dixon became a director of Africo BC (Africo's wholly-owned subsidiary) on February 17, 2006; Antony Harwood became a director of Africo BC on May 31, 2006; and Peter Tomsett became a director of Africo BC on June 30, 2006. Messrs. Dixon, Harwood and Tomsett all became directors of Africo at the time of its incorporation on July 4, 2006. Michael O'Brien served as Acting Chief Financial Officer of Africo from December 1, 2006 to March 9, 2007, when he was appointed Chief Financial Officer. Bill Cavaluzzo served as a director of Africo BC from February 14, 2005 to June 30, 2006; John Swanepoel served as a director of Africo BC from February 14, 2005 to January 8, 2006; Michael Keating served as Chief Operating Officer of Africo BC from June 30, 2005 to October 31, 2006; and Victor Song served as Financial and Commercial Manager of Africo BC from July 1, 2005 to October 31, 2006.

None of the directors or executive officers of Africo or its subsidiaries, no proposed nominee for election as a director of Africo, none of the persons who have been directors or executive officers of Africo or its

subsidiaries since the commencement of Africo's last completed consolidated financial year, and no associate or affiliate of any of the foregoing persons has any substantial interest, direct or indirect, by way of beneficial ownership of securities or otherwise, in any matter to be acted upon at the meeting other than the election of the directors and approval of the shareholders' rights plan (see Part 3 – The Business of the Meeting).

## INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS

No proposed nominee for election as a director, and no director or executive officer of Africo or any of its subsidiaries who has served in such capacity since the beginning of the last financial year of Africo (as described above), and no shareholder holding of record or beneficially, directly or indirectly, more than 10% of Africo's outstanding common shares, and none of the respective associates or affiliates of any of the foregoing, had any interest in any transaction with Africo or in any proposed transaction since the beginning of the last completed financial year that has materially affected Africo or any of its subsidiaries, or is likely to do so.

See Part 4 – Executive Compensation - Termination of Employment, Change in Responsibilities and Employment Contracts and Part 8 – Other Information – Management Contracts.

## MANAGEMENT CONTRACTS

The management functions of Africo and its subsidiaries are performed by our directors and executive officers and we have no management agreements or arrangements under which such management functions are performed by persons other than the directors and executive officers of Africo and its subsidiaries, respectively. See Part 4 – Executive Compensation - Termination of Employment, Change in Responsibilities and Employment Contracts and Compensation of Directors.

## CEASE TRADE ORDERS AND BANKRUPTCY

Except as described below, as at the date of this Circular, no proposed nominee for election as a director of Africo is, or has been, within ten years before the date of this Circular, a director or executive officer of any company (including Africo) that, while that person was acting in that capacity:

(a) was the subject of a cease trade or similar order or an order that denied the relevant company access to any exemption under securities legislation, for a period of more than 30 consecutive days;

(b) was subject to an event that resulted, after the director or executive officer ceased to be director or executive officer, in the company being the subject of a cease trade or similar order or an order that denied the relevant company access to any exemption under securities legislation, for a period or more than 30 consecutive days; or

(c) within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets.

Lukas Marthinus (Tinus) Maree was a director of Energem Resources Inc. from July 2005 until May 2006. On March 7, 2006, the British Columbia Securities Commission ordered that all trading by the insiders in the securities of Energem cease until Energem filed comparative financial statements for the fiscal year ended November 30, 2005, related Management Discussion and Analysis, and an Annual Information Form for the fiscal year ended November 30, 2005. This cease trade order was revoked by the British Columbia Securities Commission on May 31, 2006.

## PERSONAL BANKRUPTCY

As at the date of this Circular, no proposed nominee for election as a director of Africo has, within the ten years before the date of this Circular, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the proposed director.

**OTHER MATTERS**

Management of Africo is not aware of any other matters to come before the meeting other than as set forth in the Notice of Meeting that accompanies this Information Circular. If any other matter properly comes before the meeting, it is the intention of the persons named in the enclosed form of proxy to vote the shares represented thereby in accordance with their best judgment on such matter.

**ADDITIONAL INFORMATION**

You may obtain additional financial information about Africo in our audited consolidated financial statements and Management's Discussion and Analysis for the year ended December 31, 2006, which are included with this Information Circular. Additional copies may be obtained without charge upon request to us at Suite 1108 – 1030 West Georgia Street, Vancouver, B.C. V6E 2Y3, telephone (604) 646-3225; fax (604) 646-3226. You may also access our disclosure documents through the Internet on the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) at www.sedar.com.

**DIRECTORS' APPROVAL**

The Board of Directors of Africo Resources Ltd. has approved the contents of this Information Circular and its distribution to each shareholder entitled to receive notice of the meeting.

Vancouver, British Columbia, May 25, 2007.

*"Chris Theodoropoulos"*
Chris Theodoropoulos, Chairman of the Board

**APPENDIX "A"**

---

**SHAREHOLDERS' RIGHTS PLAN**

---

**Africo Resources Ltd.**

# SHAREHOLDER RIGHTS PLAN AGREEMENT

**MAY 25, 2007**

# TABLE OF CONTENTS

ARTICLE 1 - INTERPRETATION ....1
Certain Definitions. ....1
Beneficial Ownership. ....7
Control. ....8
Subsidiary. ....9
Currency. ....9
Headings. ....9
Calculation of Number and Percentage of Beneficial Ownership of Outstanding Common Shares. ....9
Acting Jointly or in Concert. ....9
ARTICLE 2 - THE RIGHTS ....9
Legend on Common Share Certificates. ....9
Initial Exercise Price; Exercise of Rights; Detachment of Rights. ....10
Adjustments to Exercise Price; Number of Rights. ....12
Date on Which Exercise Is Effective. ....15
Execution, Authentication, Delivery and Dating of Rights Certificates. ....15
Registration, Transfer and Exchange. ....15
Mutilated, Destroyed, Lost and Stolen Rights Certificates. ....16
Persons Deemed Owners of Rights. ....16
Delivery and Cancellation of Certificates. ....16
Agreement of Rights Holders. ....17
Rights Certificate Holder Not Deemed a Shareholder. ....17
ARTICLE 3 - ADJUSTMENTS TO THE RIGHTS IN THE EVENT OF CERTAIN TRANSACTIONS ....18
Flip-in Event. ....18
ARTICLE 4 - THE RIGHTS AGENT ....19
General. ....19
Merger, Amalgamation or Consolidation or Change of Name of Rights Agent. ....19
Duties of Rights Agent. ....20
Change of Rights Agent. ....21
ARTICLE 5 - MISCELLANEOUS ....21
Redemption and Waiver. ....21
Expiration. ....22
Issuance of New Rights Certificates. ....22
Supplements and Amendments. ....22
Fractional Rights and Fractional Shares. ....24
Rights of Action. ....24
Regulatory Approvals. ....24
Declaration as to Non-Canadian Holders. ....24
Notices. ....24
Costs of Enforcement. ....25
Successors. ....25
Benefits of this Agreement. ....25
Governing Law. ....25
Severability. ....25
Effective Date. ....25
Determinations and Actions by the Board of Directors. ....26
Time of the Essence. ....26
Execution in Counterparts. ....26
EXHIBIT 1 – FORM OF RIGHTS CERTIFICATE
FORM OF ASSIGNMENT
CERTIFICATE
FORM OF ELECTION TO EXERCISE

# SHAREHOLDER RIGHTS PLAN AGREEMENT

**SHAREHOLDER RIGHTS PLAN AGREEMENT** dated as of May 25, 2007 between **Africo Resources Ltd.** a company incorporated under the laws of Canada (the "Issuer") and **Computershare Investor Services Inc.**, a company incorporated under the laws of Canada (the "Rights Agent")

## BACKGROUND

To ensure, to the extent possible, that all shareholders of the Issuer are treated fairly in connection with any take-over bid for Common Shares of the Issuer, the Issuer's board of directors has determined that it is in the best interests of the Issuer to adopt a shareholder rights plan.

To implement this determination the Issuer's board of directors has authorized the issuance (i) effective one minute after the Effective Date, of one right (a "Right") in respect of each Common Share outstanding one minute after the Effective Date; and (ii) of one Right in respect of each Common Share issued after the Record Time and prior to the earlier of the Separation Time and the Expiry Time.

Each Right entitles the holder thereof, after the Separation Time, to purchase Common Shares on the terms and conditions set out in this Agreement.

The Issuer wishes to appoint the Rights Agent to act on its behalf and on behalf of the holders of Rights, and the Rights Agent is willing to so act, in connection with the issuance, transfer, exchange and replacement of Rights Certificates, the exercise of Rights and other matters referred to in this Agreement.

The Issuer's board of directors proposes that this Agreement be in place for a period of ten years, subject to the Agreement being reconfirmed by the Issuer's shareholders every three years.

## AGREEMENT

THEREFORE, in consideration of the foregoing and the respective covenants and agreements set forth herein, and subject to such covenants and agreements, the parties hereby agree as follows:

## ARTICLE 1 - INTERPRETATION

**1.1 Certain Definitions**. For purposes of this Agreement, the following terms have the meanings indicated:

(a) **"Acquiring Person"** means any Person who is the Beneficial owner of more than 20 per cent of the outstanding Common Shares; provided, however, that the term "Acquiring Person" shall not include:

(i) the Issuer or any Subsidiary of the Issuer;

(ii) any Person who becomes the Beneficial owner of more than 20 per cent of the outstanding Common Shares as a result of one or any combination of (A) an acquisition or redemption by the Issuer of Common Shares which, by reducing the number of Common Shares outstanding, increases the proportionate number of Common Shares Beneficially owned by such Person to more than 20 per cent of the Common Shares then outstanding, (B) Permitted Bid Acquisitions, (C) Pro Rata Acquisitions, or (D) Exempt Acquisitions; provided, however, that if a Person becomes the Beneficial owner of more than 20 per cent of the outstanding Common Shares by reason of (A), (B), (C) or (D) and such Person thereafter becomes the Beneficial owner of more than an additional 1% of the number of outstanding Common Shares (other than pursuant to (A), (B), (C) or (D)), as the case may be, such person becomes an Acquiring Person as of the date such Person becomes the Beneficial owner of such additional Common Shares;

(iii) for a period of 10 calendar days after the Disqualification Date (as defined below), any Person who becomes the Beneficial owner of more than 20 per cent of the outstanding Common Shares as a result of such Person becoming disqualified from relying on Subparagraph 1.2 (ii) solely because such Person is

making or has announced a current intention to make a Take-over Bid, either alone or by acting jointly or in concert with any other Person. For the purposes of this definition, "Disqualification Date" means the first date of a public announcement of facts indicating that any Person is making or has a current intention to make a Take-over Bid; or

(iv) an underwriter or member of a banking or selling group that becomes the Beneficial owner of more than 20 per cent of the Common Shares in connection with a distribution of securities of the Issuer; or

(v) a Person (a "Grandfathered Person") who is the Beneficial owner of more than 20 per cent of the outstanding Common Shares determined as at the Record Time, provided, however, that this exception shall not, and shall cease to, apply if, after the Record Time, the Grandfathered Person: (1) ceases to own more than 20 per cent of the outstanding Common Shares, or (2) becomes the Beneficial owner of any additional Common Shares that increases its Beneficial ownership of Common Shares by more than 1% of the number of outstanding Common Shares, other than pursuant to the operation of one or more of paragraph (ii) (A), (B), (C) or (D);

(b) **"Affiliate"**, when used to indicate a relationship with a Person, means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, that Person;

(c) **"Agreement"** means this shareholder rights plan agreement dated as of May 25, 2007 between the Issuer and the Rights Agent, as it may be amended and/or supplemented from time to time; "hereof, "herein", "hereto" and similar expressions mean and refer to this Agreement as a whole and not to any particular part of this Agreement;

(d) **"annual cash dividend"** means cash dividends paid in any fiscal year of the Issuer, to the extent that such cash dividends do not exceed in the aggregate, the greatest of (i) 200 per cent of the aggregate amount of cash dividends declared payable by the Issuer on its Common Shares in its immediately preceding fiscal year; (ii) 300 per cent of the arithmetic mean of the aggregate amounts of the annual cash dividends declared payable by the Issuer on its Common Shares in its three immediately preceding fiscal years; and (iii) 100 per cent of the aggregate consolidated net income of the Issuer, before extraordinary items, for its immediately preceding fiscal year;

(e) **"Associate"**, when used to indicate a relationship with a Person, means a spouse or child of that Person, any Person of the same or opposite sex with whom that Person is living in a conjugal relationship outside marriage, or a relative of that Person who has the same residence as that Person;

(f) **"CBCA"** means the *Canada Business Corporations Act*, R.S.C. 1985, c.C-44, as amended, and the regulations made thereunder and any comparable or successor laws or regulations thereto;

(g) **"Board of Directors"** means the board of directors of the Issuer or any duly constituted and empowered committee thereof;

(h) **"Business Day"** means any day other than a Saturday, Sunday or a day on which banking institutions in British Columbia are authorized or obligated by law to close;

(j) **"Canadian Dollar Equivalent"** of any amount which is expressed in United States Dollars means, on any date, the product of such amount and the U.S. - Canadian Exchange Rate in effect on that date;

(k) **"Canadian-U.S. Exchange Rate"** means, on any date, the inverse of the U.S.-Canadian Exchange Rate in effect on such date;

(l) **"close of business"** on any date means the time on such date (or, if such date is not a Business Day, the time on the next succeeding Business Day) at which the principal office in Vancouver of the transfer agent for the Shares of the Issuer (or, after the Separation Time, the principal transfer office in Vancouver of the Rights Agent) is closed to the public;

(m) **"Common Shares"** means the common shares in the capital of the Issuer;

(n) **"Competing Permitted Bid"** means a Take-over Bid that:

(i) is made after another Permitted Bid has been made and prior to the expiry of that other Permitted Bid;

(ii) satisfies each element of the definition of a Permitted Bid other than paragraph (ii)A thereof; and

(iii) contains, and the take-up and payment for securities tendered or deposited is subject to, an irrevocable and unqualified provision that no Common Shares will be taken up or paid for pursuant to the Take-over Bid prior to the close of business on a date that is no earlier than the later of: (a) 35 days after the date of the Take-over Bid; and (b) the 60th day after the earliest date on which any other Permitted Bid then in existence was made;

(o) **"Co-Rights Agents"** has the meaning ascribed thereto in Subsection 4.1(a);

(p) **"Disposition Date"** has the meaning ascribed thereto in Subsection 5.1(a);

(q) **"Effective Date"** means May 25, 2007.

(r) **"Election to Exercise"** has the meaning ascribed thereto in Subsection 2.2(d);

(s) **"Exempt Acquisition"** means a share acquisition in respect of which the Board of Directors has waived the application of Section 3.1 pursuant to the provisions of Subsections 5.1(a), (b) or (e);

(t) **"Exercise Price"** means, as of any date, the price at which a holder may purchase the securities issuable upon exercise of one whole Right which, until adjustment in accordance with Section 2.3 shall be:

(i) until the Separation Time, an amount, expressed in lawful money of Canada, equal to five times the Market Price per Common Share, from time to time; and

(ii) from and after the Separation Time, an amount, expressed in lawful money of Canada, equal to five times the Market Price per Common Share as at the Separation Time;

(u) **"Expansion Factor"** has the meaning ascribed thereto in Section 2.3(a);

(v) **"Expiry Time"** means the close of business on that date which is the earliest date of termination of this Agreement as provided for in Section 5.15 or, if this Agreement is confirmed and subsequently reconfirmed pursuant to Section 5.15 at the third and sixth annual meetings following the Issuer's annual meeting of shareholders in 2007, the close of business on the tenth anniversary of the Effective Date;

(w) **"Flip-in Event"** means a transaction in or pursuant to which any Person becomes an Acquiring Person;

(x) **"holder"** has the meaning ascribed thereto in Section 2.8;

(y) **"Independent Shareholders"** means holders of any Shares, other than (a) any Acquiring Person, (b) any Offeror (other than any Person who pursuant to Section 1.2 is not deemed to Beneficially own the Common Shares held by such Person), (c) any Affiliate or Associate of any Acquiring Person or Offeror, (d) any Person acting jointly or in concert with any Acquiring Person or Offeror, and (e) any employee benefit plan, stock purchase plan, deferred profit sharing plan and any similar plan or trust for the benefit of employees of the Issuer or a Subsidiary of the Issuer, unless the beneficiaries of the plan or trust direct the manner in which the Common Shares are to be voted or withheld from voting or direct whether the Common Shares are to be tendered to a Take-over Bid;

(z) **"Lock-up Agreement"** means an agreement between an Offeror, any of its Affiliates or Associates or any other Person acting jointly or in concert with the Offeror and a Person (the "Locked-up Person") who is not an Affiliate or Associate of the Offeror or a Person acting jointly or in concert with the Offeror whereby the Locked-up Person agrees to deposit or tender the Common Shares held by the Locked-up Person to the Offeror's Take-over Bid or to any Take-over Bid made by any of the Offeror's Affiliates or Associates or made by any other Person acting jointly or in concert with the Offeror (the "Lock-up Bid"), provided that:

(i) the agreement:

(A) permits the Locked-up Person to withdraw the Common Shares from the agreement in order to tender or deposit the Common Shares to another Take-over Bid or to support another transaction that contains an offering price for each Common Share that is higher than the offering price contained in or proposed to be contained in the Lock-up Bid; or

(B) (a) permits the Locked-up Person to withdraw the Common Shares from the agreement in order to tender or deposit the Common Shares to another Take-over Bid or to support another transaction that contains an offering price for each Common Share that exceeds by as much as or more than a specified amount (the "Specified Amount") the offering price for each Common Share contained in or proposed to be contained in the Lock-up Bid; and (b) does not by its terms provide for a Specified Amount that is greater than 7% of the offering price contained in or proposed to be contained in the Lock-up Bid; and, for greater clarity, an agreement may contain a right of first refusal or require a period of delay to give an Offeror an opportunity to match a higher price in another take- over bid or other similar limitation on a Locked-up Person as long as the Locked-up Person can accept another bid or tender to another transaction; and

(ii) no "break-up" fees, "top-up" fees, penalties or other amounts that exceed in the aggregate one half of the cash equivalent of any amount in excess of the amount offered under the Lock-up Bid and that the Locked-up Person receives pursuant to another Take-over Bid or transaction shall be payable pursuant to the agreement if the Locked-up Person fails to tender Common Shares pursuant thereto in order to accept the other Take-over Bid or support another transaction.

(aa) **"Market Price"** per share of any securities on any date means the average of the daily closing sale prices per share of such class of securities (determined as described below) on each of the 20 consecutive Trading Days through and including the Trading Day immediately preceding such date; provided, however, that if an event of a type analogous to any of the events described in Section 2.3 hereof shall have caused the closing sale prices used to determine the Market Price on any Trading Days not to be fully comparable with the closing sale price on such date or, if the date is not a Trading Day, on the immediately preceding Trading Day, each such closing sale price so used shall be appropriately adjusted in a manner analogous to the applicable adjustment provided for in Section 2.3 hereof in order to make it fully comparable with the closing sale price on such date or, if the date is not a Trading Day, on the immediately preceding Trading Day. The closing sale price per share of any securities on any date shall be:

(i) the closing board lot sale price per share or, if such price is not available, the average of the closing bid and asked prices, for each of such securities as reported by the principal Canadian securities exchange (as determined by volume of trading) on which such securities are listed or admitted to trading, or if for any reason neither of such prices is available on such day or the securities are not listed or admitted to trading on a Canadian securities exchange, the closing board lot sale price per share or, if such price is not available, the average of the closing bid and asked prices, for each security as reported by the principal United States securities exchange (as determined by volume of trading) on which such securities are listed or admitted for trading;

(ii) if for any reason none of such prices is available on such date or the securities are not listed or admitted to trading on a Canadian stock exchange or a United States securities exchange, the last sale price, or in case no sale takes place on such date, the average of the high bid and low asked prices for each of such securities in the over-the-counter market, as quoted by any reporting system then in use; or

(iii) if for any reason none of such prices is available on such day or the securities are not listed or admitted to trading on a Canadian stock exchange or a United States securities exchange or quoted by any such reporting system, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the securities;

provided, however, that if on any such date none of such prices is available, the closing sale price per share of such securities on such date shall mean the fair value per share of the securities on such date as determined by a nationally or internationally recognized investment dealer or investment banker and provided further that if an event of a type analogous to any of the events described in Section 2.3 hereof shall have caused any price used to determine the Market Place on any Trading Day not to be fully comparable with the price as so determined on the Trading Day immediately preceding such date of determination, each such price so used shall be appropriately

adjusted in a manner analogous to the applicable adjustment provided for in Section 2.3 hereof in order to make it fully comparable with the price on the Trading Day immediately preceding such date of determination. The Market Price shall be expressed in Canadian dollars and, if initially determined in respect of any day forming part of the 20 consecutive Trading Day period in question in United States dollars, such amount shall be translated into Canadian dollars on such date at the Canadian Dollar Equivalent thereof.

(bb) **"Nominee"** has the meaning ascribed thereto in Subsection 2.2(c);

(cc) **"Offer to Acquire"** includes:

(i) an offer to purchase or a solicitation of an offer to sell Common Shares of any class or classes, and

(ii) an acceptance of an offer to sell Common Shares of any class or classes, whether or not such offer to sell has been solicited, or any combination thereof, and the Person accepting an offer to sell shall be deemed to be making an Offer to Acquire to the Person that made the offer to sell;

(dd) **"Offeror"** means a Person who has announced, and has not withdrawn, an intention to make or who has made, and has not withdrawn, a Take-over Bid, other than a Person who has completed a Permitted Bid, a Competing Permitted Bid or an Exempt Acquisition;

(ee) **"Offeror's Securities"** means Common Shares Beneficially owned by an Offeror on the date of the Offer to Acquire;

(ff) **"Permitted Bid"** means a Take-over Bid made by an Offeror that is made by means of a Take-over Bid circular and which:

(i) is made to all holders of Common Shares other than the Offeror;

(ii) contains, and the take-up and payment for securities tendered or deposited is subject to, an irrevocable and unqualified provision that no Common Shares will be taken up and paid for pursuant thereto (A) prior to the close of business on a date which is not less than 60 days following the date of the Take-over Bid and (B) unless at such date more than 50% of the Common Shares held by Independent Shareholders shall have been deposited or tendered pursuant to the Take-over Bid and not withdrawn;

(iii) contains an irrevocable and unqualified provision that unless the Take-over Bid is withdrawn, Common Shares may be deposited pursuant thereto at any time during the period described in paragraph (ii) (A) and that any Common Shares deposited pursuant to the Take-over Bid may be withdrawn until taken up and paid for;

(iv) contains an irrevocable and unqualified provision that if the condition set forth in paragraph (ii) (B) is satisfied the Offeror will make a public announcement of that fact and unless the Take-over Bid is withdrawn it will remain open for deposits and tenders of Common Shares for not less than 10 Business Days from the date of such public announcement; and

(v) if any holders of Common Shares are registered on the records of the Issuer as residing in the United States or as a U.S. Person, then the Take Over Bid complies with all applicable requirements of the U.S. Securities Act and the U.S. Exchange Act;

(gg) **"Permitted Bid Acquisition"** means an acquisition of Common Shares of any class made pursuant to a Permitted Bid or a Competing Permitted Bid;

(hh) **"Person"** includes an individual, firm, association, trustee, executor, administrator, legal personal representative, body corporate, company, trust, partnership, joint venture syndicate or other form of unincorporated association, a government and its agencies or instrumentalities, any entity or group whether or not having legal personality, any successor (by merger, statutory amalgamation or otherwise) and any of the foregoing acting in any derivative, representative or fiduciary capacity;

(ii) **"Pro Rata Acquisition"** means an acquisition of Common Shares pursuant to (i) the receipt and/or exercise of rights issued by the Issuer to all the holders of a class of Common Shares to subscribe for or purchase Common Shares, provided that such rights are acquired directly from the Issuer as part of a rights offering and not from any other Person, or (ii) a distribution by the Issuer of Common Shares, or securities convertible into or exchangeable for Common Shares (and the conversion or exchange of such convertible or exchangeable securities) made pursuant to a prospectus or a distribution by way of private placement by the Issuer, provided that the Person does not thereby acquire a greater percentage of such Common Shares, or securities convertible or exchangeable for Common Shares of that class, than the Person's percentage of Common Shares Beneficially owned immediately prior to such acquisition;

(jj) **"Record Time"** means one minute after the Effective Date;

(kk) **"Redemption Price"** has the meaning set forth in Subsection 5.1(c) of this Agreement;

(ll) **"Right"** means a right to purchase a Common Share of the Issuer, upon the terms and subject to the conditions set forth in this Agreement;

(mm) **"Rights Agent"** means Computershare Investor Services Inc., a trust company incorporated under the laws of Canada or any successor Rights Agent appointed pursuant to Section 4.4;

(nn) **"Rights Certificate"** means a Rights Certificate which represents the Rights after the Separation Time, which shall be substantially in the form attached hereto as Exhibit 1;

(oo) **"Rights Holders' Special Meeting"** means a meeting of the holders of Rights called by the Board of Directors for the purpose of approving a supplement or amendment to this Agreement pursuant to Subsection 5.4(c);

(pp) **"Rights Register"** and **"Rights Registrar"** have the meanings ascribed thereto in Subsection 2.7(a);

(qq) **"Securities Acts"** means the securities legislation in all the jurisdictions of Canada where the Issuer is a reporting issuer and any comparable or successor laws or regulations or rules thereto;

(rr) **"Separation Time"** means the close of business on the tenth Trading Day after the earlier of:

(i) the Stock Acquisition Date;

(ii) the date of the commencement of or first public announcement of the intent of any Person (other than the Issuer or any Subsidiary of the Issuer) to commence a Take-over Bid (other than a Permitted Bid or a Competing Permitted Bid, as the case may be); and

(iii) the date upon which a Take-over Bid ceases to be a Permitted Bid or Competing Permitted Bid,

or such later date as may be determined by the Board of Directors, if the Board of Directors acting in good faith determines that a longer period of time is required to satisfy the requirements of the applicable securities laws or comparable legislation in each of the provinces and territories of Canada and of the United States and each of the States thereof in respect of the issue of Common Shares upon the exercise of Rights in accordance with this Agreement, provided that, if any such Take-over Bid expires, is cancelled, terminated or otherwise withdrawn prior to the Separation Time, such Take-over Bid shall be deemed, for the purposes of this definition, never to have been made;

(ss) **"Special Meeting"** means a special meeting of the holders of Common Shares called by the Board of Directors for the purpose of approving a supplement, amendment or variation to this Agreement pursuant to Section 5.4 (b);

(tt) **"Stock Acquisition Date"** means the first date of public announcement (which, for purposes of this definition, shall include, without limitation, a report filed pursuant to early warning provisions contained in the Securities Acts or Section 13 (d) or Section 14 of the U.S. Exchange Act) by the Issuer or an Acquiring Person that an Acquiring Person has become such;

(uu) **"Take-over Bid"** means an Offer to Acquire Common Shares, or securities convertible into Common Shares if, assuming that the Common Shares or convertible securities subject to the Offer to Acquire are acquired and are Beneficially Owned at the date of such Offer to Acquire by the Person making such Offer to Acquire, such Common Shares (including Common Shares that may be acquired upon conversion of securities convertible into Common Shares) together with the Offeror's Securities constitute in the aggregate 20 per cent or more of either the outstanding Common Shares at the date of the offer to Acquire;

(vv) **"Trading Day"**, when used with respect to any securities, means a day on which the principal Canadian securities exchange on which such securities are listed or admitted to trading is open for the transaction of business or, if the securities are not listed or admitted to trading on any Canadian securities exchange, a day on which the principal United States securities exchange on which such securities are listed or admitted to trading is open for the transaction of business or, if the securities are not listed or admitted to trading on any Canadian or United States securities exchange, a Business Day;

(ww) **"U.S.-Canadian Exchange Rate"** means, on any date:

(i) the average noon spot rate of exchange set on that date by the Bank of Canada for the conversion of one United States dollar into Canadian dollars; and

(ii) in any other case, the rate for such date for the conversion of one United States dollar into Canadian dollars calculated in such manner as may be determined by the Board of Directors from time to time acting in good faith;

(xx) **"U.S. Dollar Equivalent"** of any amount which is expressed in Canadian dollars means, on any date, the product of that amount and the Canadian-U.S. Exchange Rate in effect on that date;

(yy) **"U.S. Exchange Act"** means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder as now in effect or as the same may from time to time be amended, re-enacted or replaced; and

(zz) **"U.S. Securities Act"** means the United States Securities Act of 1933, as amended, and the rules and regulations thereunder as now in effect or as the same may from time to time be amended, re-enacted or replaced.

**1.2 Beneficial Ownership**. For the purposes of this Agreement a Person shall be deemed the "Beneficial owner", have "Beneficial ownership" of, and to "Beneficially own", on any date,

(a) any securities of which such Person or any of such Person's Affiliates or Associates is the owner at law or in equity on that date;

(b) any securities of which such Person or any of such Person's Affiliates or Associates has the right, exercisable within a period of 60 days of that date, to become the owner at law or in equity, whether or not on condition or the happening of any contingency or the making of any payment, pursuant to any agreement, arrangement, pledge or understanding, whether or not in writing (other than customary agreements with and between underwriters and/or banking group members and/or selling group members with respect to a distribution of securities and other than pledges of securities in the ordinary course of business), other than the Rights; and

(c) any securities which are Beneficially owned within the meaning of paragraph (a) or (b) by any other Person with whom such Person is acting jointly or in concert;

provided, however, that a Person shall not be deemed the "Beneficial owner" of, or to have "Beneficial ownership" of, or to "Beneficially own", any security:

(i) because such security has been deposited or tendered pursuant to any Take-over Bid made by such Person, any of such Person's Affiliates or Associates or any other Person referred to in paragraph (c), until the earlier of such deposited or tendered security being taken up or paid for;

(ii) because such Person, any of such Person's Affiliates or Associates or any other Person referred to in paragraph (c) holds such security provided that,

A. the ordinary business of any such Person (the "Investment Manager") includes the management of investment funds for others (which others, for greater certainty, may include or be limited to one or more employee benefit plans or pension plans) and such security is held by the Investment Manager in the ordinary course of such business in the performance of such Investment Manager's duties for the account of any other Person (a "Client"), including a non-discretionary account held on behalf of a Client by a broker or dealer registered under applicable law;

B. such Person (the "Trust Company") is licensed to carry on the business of a trust company under applicable laws and, as such, acts as trustee or administrator or in a similar capacity in relation to the estates of deceased or incompetent Persons (each an "Estate Account") or in relation to other accounts (each an "Other Account") and holds such security in the ordinary course of such duties for such Estate Accounts or for such Other Accounts;

C. such Person is established by statute for purposes that include, and the ordinary business or activity of such Person (the "Statutory Body") includes, the management of investment funds for employee benefit plans, pension plans, insurance plans or various public bodies;

D. such Person (the "Administrator") is the administrator or trustee of one or more pension funds, plans or related trusts (a "Plan") registered or qualified under the laws of Canada or any Province thereof or the laws of the United States of America or any state thereof or is a Plan; or

E. such Person is a Crown agent or agency;

provided, in any of the above cases, that the Investment Manager, the Trust Company, the Statutory Body, the Administrator, the Plan, or the Crown agent or agency, as the case may be, is not then making a Take-over Bid or has not then announced an intention to make a Take-over Bid other than an Offer to Acquire Common Shares or other securities by means of a distribution by the Issuer or by means of ordinary market transactions (including pre-arranged trades entered into in the ordinary course of business of such Person) executed through the facilities of a stock exchange or organized over-the-counter market, alone or by acting jointly or in concert with any other Person;

(d) because such security has been agreed to be deposited or tendered pursuant to a Lock-up Agreement, or is otherwise deposited or tendered, to any Take-over Bid made by such Person, any of such Person's Affiliates or Associates or any other Person acting jointly or in concert with such Person until such deposited or tendered security has been taken up or paid for, whichever shall first occur;

(e) because such Person is (i) a Client of the same Investment Manager as another Person on whose account the Investment Manager holds such security, (ii) an Estate Account or an Other Account of the same Trust Company as another Person on whose account the Trust Company holds such security or (iii) a Plan with the same Administrator as another Plan on whose account the Administrator holds such security;

(f) where such Person is (i) a Client of an Investment Manager and such security is owned at law or in equity by the Investment Manager, or (ii) an Estate Account or an Other Account of a Trust Company and such security is owned at law or in equity by the Trust Company or (iii) a Plan and such security is owned at law or in equity by the Administrator of the Plan; or

(g) where such Person is a registered holder of such security as a result of carrying on the business of, or acting as a nominee of, a securities depository;

**1.3 Control**. For the purposes of this Agreement a company is "controlled" by a Person or two or more Persons acting jointly or in concert if:

(a) securities entitled to vote in the election of directors carrying more than 50 per cent of the votes for the election of directors are held, directly or indirectly, by or on behalf of that Person or two or more Persons acting jointly or in concert; and

(b) the votes carried by such securities are entitled, if exercised, to elect a majority of the board of directors of such company;

and "controls", "controlling" and "under common control with" shall be interpreted accordingly;

**1.4 Subsidiary**. For the purposes of this Agreement a company is a Subsidiary of another company if:

(a) it is controlled by:

(i) that other, or

(ii) that other and one or more companies each of which is controlled by that other, or

(iii) two or more companies each of which is controlled by that other, or

(b) it is a Subsidiary of a company that is that other's Subsidiary;

**1.5 Currency**. All sums of money which are referred to in this Agreement are expressed in lawful money of Canada, unless otherwise specified.

**1.6 Headings**. The division of this Agreement into Articles, Sections, Subsections, Clauses, Paragraphs, Subparagraphs or other portions hereof and the insertion of headings, subheadings and a table of contents are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**1.7 Calculation of Number and Percentage of Beneficial Ownership of Outstanding Common Shares**. For purposes of this Agreement, the percentage of Common Shares Beneficially owned by any Person shall be determined by the formula:

$$100 \times A/B$$

where:

A = the number of votes for the election of all directors on the Board of Directors generally attaching to the Common Shares Beneficially owned by such Person; and

B = the number of votes for the election of all directors on the Board of Directors generally attaching to all outstanding Common Shares.

**Where any Person is deemed to Beneficially own unissued Common Shares, such Common Shares shall be deemed to be outstanding for the purpose of calculating the percentage of Common Shares owned by such Person.**

**1.8 Acting Jointly or in Concert**. For purposes of this Agreement, a Person is acting jointly or in concert with every Person who, as a result of any agreement, commitment or understanding whether formal or informal, with the first Person, acquires or offers to acquire Common Shares (other than customary agreements with and between underwriters and/or banking group members and/or selling group members with respect to a public offering or private placement of securities or pledges of securities in the ordinary course of business).

## ARTICLE 2 - THE RIGHTS

**2.1 Legend on Common Share Certificates**. Certificates for Common Shares issued after the Record Time but prior to the earlier of the Separation Time and the Expiry Time, shall evidence, in addition to such Common Shares, one Right for each Common Share represented thereby and shall bear the following legend:

> Until the Separation Time (as defined in the Shareholder Rights Plan Agreement referred to below), this certificate also evidences rights of the holder described in a Shareholder Rights Plan Agreement, dated as of May 25, 2007 (the "Shareholder Rights Plan Agreement"), between Africo Resources Ltd. (the "Company") and Computershare Investor Services Inc., the terms of which are incorporated

herein by reference and a copy of which is on file at the principal executive offices of the Issuer. Under certain circumstances set out in the Shareholder Rights Plan Agreement, the rights may expire, may become null and void or may be evidenced by separate certificates and no longer evidenced by this certificate. The Issuer will mail or arrange for the mailing of a copy of the Shareholder Rights Plan Agreement to the holder of this certificate without charge as soon as practicable after the receipt of a written request therefor.

Share certificates that are issued and outstanding at the Record Time, which as at the Effective Date represent Common Shares, shall also evidence one Right for each Common Share evidenced thereby, notwithstanding the absence of the foregoing legend, until the close of business on the earlier of the Separation Time and the Expiry Time.

**2.2 Initial Exercise Price; Exercise of Rights; Detachment of Rights**.

(a) Subject to adjustment in accordance with this Agreement, each Right will entitle the holder thereof from and after the Separation Time and prior to the Expiry Time, to purchase one Common Share for the Exercise Price. Notwithstanding any other provision of this Agreement, any Rights held by the Issuer or any of its Subsidiaries shall be void.

(b) Until the Separation Time,

(i) the Rights shall not be exercisable and no Right may be exercised; and

(ii) each Right will be evidenced by the certificate for the associated Common Share registered in the name of the holder thereof (which certificate shall also be deemed to represent a Rights Certificate) and will be transferable only together with, and will be transferred by a transfer of, such associated Common Share.

(c) From and after the Separation Time and prior to the Expiry Time:

(i) the Rights shall be exercisable; and

(ii) the registration and transfer of Rights shall be separate from and independent of Common Shares.

Promptly following the Separation Time, the Issuer will prepare and the Rights Agent will mail to each holder of record of Shares as of the Separation Time (other than an Acquiring Person, any other Person whose Rights are or become void pursuant to the provisions of Section 3.1 (b) and, in respect of any Rights Beneficially owned by such Acquiring Person which are not held of record by such Acquiring Person, the holder of record of such Rights (a "Nominee")), at such holder's address as shown by the records of the Issuer (the Issuer hereby agreeing to furnish copies of such records to the Rights Agent for this purpose):

A. a Rights Certificate in substantially the form set out in Exhibit 1 hereof appropriately completed, representing the number of Rights held by such holder at the Separation Time and having such marks of identification or designation and such legends, summaries or endorsements printed thereon as the Issuer may deem appropriate and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law, rule or regulation or judicial or administrative order or with any rule or regulation of any self-regulatory organization, stock exchange or quotation system on which the Rights may from time to time be listed or traded, or to conform to usage; and

B. a description of the Rights,

provided that a Nominee shall be sent the foregoing materials in respect of all Common Shares held of record by it which are not Beneficially owned by an Acquiring Person. The Issuer may require any Person to provide such information as it may require to enable it to determine whether that Person holds Shares Beneficially owned by another Person.

(d) Rights may be exercised, in whole or in part, on any Business Day after the Separation Time and before the Expiry Time by submitting to the Rights Agent in the manner specified in the Rights Certificate:

(i) the Rights Certificate evidencing such Rights;

(ii) an election to exercise such Rights (an "Election to Exercise") substantially in the form attached to the Rights Certificate appropriately completed and executed by the holder or his executors or administrators or other personal representatives or his or their legal attorney duly appointed by an instrument in writing in form and executed in a manner satisfactory to the Rights Agent; and

(iii) payment by certified cheque, banker's draft or money order payable to the order of the Issuer, of a sum equal to the Exercise Price multiplied by the number of Rights being exercised and a sum sufficient to cover any transfer tax or charge which may be payable in respect of any transfer involved in the transfer or delivery of Rights Certificates or the issuance or delivery of certificates for Common Shares or in a name other than that of the holder of the Rights being exercised.

(e) Upon receipt of a Rights Certificate, together with a completed Election to Exercise executed in accordance with Subparagraph 2.2(d)(ii), which does not indicate that such Right is null and void as provided by Subsection 3.1(b), and payment as set forth in Subparagraph 2.2(d)(iii), the Rights Agent (unless otherwise instructed by the Issuer if the Issuer is of the opinion that the Rights cannot be exercised in accordance with this Agreement) will thereupon promptly:

(i) requisition from the transfer agent share certificates representing the number of such Common Shares to be purchased (the Issuer hereby irrevocably authorizing its transfer agents to comply with all such requisitions);

(ii) when appropriate, requisition from the Issuer the amount of cash to be paid in lieu of issuing fractional Common Shares;

(iii) after receipt of the share certificates referred to in Subparagraph 2.2(e)(i), deliver them to or upon the order of the registered holder of such Rights Certificates, registered in such name or names as may be designated by such holder;

(iv) when appropriate, after receipt, deliver the cash referred to in Subparagraph 2.2(e)(ii) to or to the order of the registered holder of such Rights Certificate; and

(v) tender to the Issuer all payments received on the exercise of the Rights.

(f) If the holder of any Rights does not exercise all the Rights evidenced by such holder's Rights Certificate, a new Rights Certificate evidencing the Rights not exercised (subject to the provisions of Subsection 5.5(a)) will be issued by the Rights Agent to such holder or to such holder's duly authorized assigns.

(g) The Issuer covenants and agrees that it will:

(i) take all such action as may be necessary and within its power to ensure that all Common Shares delivered upon exercise of Rights shall, at the time of delivery of the certificates therefor (subject to payment of the Exercise Price), be duly authorized, validly issued and fully paid and non-assessable;

(ii) take all such action as may be necessary and within its power to comply with the requirements of the CBCA, the Securities Acts, the U.S. Securities Act, the U.S. Exchange Act and other applicable laws, rules or regulations, in connection with the issuance and delivery of the Rights Certificates and the issuance of any Shares upon exercise of Rights;

(iii) use reasonable efforts to cause all Common Shares issued upon exercise of Rights to be listed on the principal stock exchanges on which such Common Shares were traded immediately prior to the Stock Acquisition Date;

(iv) pay when due and payable, if applicable, any and all Canadian and United States federal, provincial, state and municipal transfer taxes and charges (not including any income or capital taxes of the holder or exercising holder or any liability of the Issuer to withhold tax) which may be payable in respect of the

original issuance or delivery of the Rights Certificates, or certificates for Shares to be issued upon exercise of any Rights, provided that the Issuer shall not be required to pay any transfer tax or charge which may be payable in respect of any transfer involved in the transfer or delivery of Rights Certificates or the issuance or delivery of certificates for Shares in a name other than that of the holder of the Rights being transferred or exercised; and

(v) after the Separation Time, except as permitted by Section 5.1, not take (or permit any Subsidiary to take) any action if at the time such action is taken it is reasonably foreseeable that such action will diminish substantially or otherwise eliminate the benefits intended to be afforded by the Rights.

**2.3 Adjustments to Exercise Price; Number of Rights**. The Exercise Price, the number and kind of securities subject to purchase upon exercise of each Right and the number of Rights outstanding are subject to adjustment from time to time as provided in this Section 2.3.

(a) If at any time after the Record Time and prior to the Expiry Time the Issuer:

(i) declares or pays a dividend on the Common Shares payable in Common Shares (or other securities exchangeable for or convertible into or giving a right to acquire Common Shares);

(ii) subdivides or changes the number of outstanding Common Shares into a greater number of Common Shares;

(iii) consolidates or changes the outstanding Common Shares into a smaller number of Common Shares; or

(iv) issues any Common Shares (or other securities exchangeable for or convertible into or giving a right to acquire Common Shares) in respect of, in lieu of or in exchange for existing Common Shares except as otherwise provided in this Section 2.3,

the Exercise Price and the number of Rights outstanding, or, if the payment or effective date therefor occurs after the Separation Time, the securities purchasable upon exercise of Rights, shall be adjusted as of the payment or effective date in the manner set forth below. If an event occurs that would require an adjustment under both this Section 2.3 and under Subsection 3.1(a), the adjustment provided for in this Section 2.3 shall be in addition to, and shall be made prior to, any adjustment required under Subsection 3.1(a).

If the Exercise Price and number of Rights outstanding are to be adjusted:

A. the Exercise Price in effect during the 20 consecutive Trading Days following such adjustment will be equal to the Exercise Price in effect immediately prior to such adjustment divided by the number of Common Shares (the "Expansion Factor") that a holder of one Common Share immediately prior to such dividend, subdivision, change, consolidation or issuance would hold thereafter as a result thereof; and

B. each Right held prior to such adjustment will become that number of Rights equal to the Expansion Factor, and the adjusted number of Rights will be deemed to be distributed among the Common Shares with which the original Rights were associated (if they remain outstanding) and the shares issued in respect of such dividend, subdivision, change, consolidation or issuance, so that each such Share (or other capital stock) will have exactly one Right associated with it.

For greater certainty, if the securities purchasable upon exercise of Rights are to be adjusted, the securities purchasable upon exercise of each Right after such adjustment will be the securities that a holder of the securities purchasable upon exercise of one Right immediately prior to such dividend, subdivision, change, consolidation or issuance would hold thereafter as a result of such dividend, subdivision, change, consolidation or issuance.

If, after the Record Time and prior to the Expiry Time, the Issuer issues any shares other than Common Shares in a transaction of a type described in Subparagraph 2.3(a)(i) or (iv), such shares shall be treated herein as nearly equivalent to Common Shares as may be practicable and appropriate under the circumstances and the Issuer and the Rights Agent agree to amend this Agreement in order to effect such treatment.

If at any time after the Record Time and before the Separation Time the Issuer issues any Common Shares otherwise than in a transaction referred to in this Subsection 2.3(a), each such Common Share shall automatically have one new Right associated with it, which Right shall be evidenced by the certificate representing such associated Common Share.

(b) If at any time after the Record Time and before the Separation Time the Issuer fixes a record date for the issuance of rights, options or warrants to all holders of Common Shares entitling them (for a period expiring within 45 calendar days after such record date) to subscribe for or purchase Common Shares (or securities convertible into or exchangeable for or carrying a right to purchase Common Shares) at a price per Common Share (or, if a security convertible into or exchangeable for or carrying a right to purchase or subscribe for Common Shares, having a conversion, exchange or exercise price, including the price required to be paid to purchase such convertible or exchangeable security or right per share) less than the Market Price per Common Share on such record date, the Exercise Price to be in effect after such record date shall be determined by multiplying the Exercise Price in effect immediately prior to such record date by a fraction:

(i) the numerator of which shall be the number of Common Shares outstanding on such record date, plus the number of Common Shares that the aggregate offering price of the total number of Common Shares so to be offered (and/or the aggregate initial conversion, exchange or exercise price of the convertible or exchangeable securities or rights so to be offered, including the price required to be paid to purchase such convertible or exchangeable securities or rights) would purchase at such Market Price per Common Share; and

(ii) the denominator of which shall be the number of Common Shares outstanding on such record date, plus the number of additional Common Shares to be offered for subscription or purchase (or into which the convertible or exchangeable securities or rights so to be offered are initially convertible, exchangeable or exercisable).

In case such subscription price may be paid by delivery of consideration, part or all of which may be in a form other than cash, the value of such consideration shall be as determined in good faith by the Board of Directors, whose determination shall be described in a statement filed with the Rights Agent and shall be binding on the Rights Agent and the holders of Rights. Such adjustment shall be made successively whenever such a record date is fixed, and if such rights, options or warrants are not so issued, or if issued, are not exercised prior to the expiration thereof, the Exercise Price shall be readjusted to the Exercise Price which would then be in effect if such record date had not been fixed, or to the Exercise Price which would be in effect based upon the number of Common Shares (or securities convertible into, or exchangeable or exercisable for Common Shares) actually issued upon the exercise of such rights, options or warrants, as the case may be.

For purposes of this Agreement, the granting of the right to purchase Common Shares (whether from treasury or otherwise) pursuant to an employee benefit, stock option or similar plan shall be deemed not to constitute an issue of rights, options or warrants by the Issuer; provided, however, that, in all such cases, the right to purchase Common Shares is at a price per share of not less than 95% of the current market price per share (determined as provided in such plans) of the Common Shares.

(c) If at any time after the Record Time and before the Separation Time the Issuer fixes a record date for making a distribution to all holders of Common Shares (including any such distribution made in connection with a merger or amalgamation) of evidences of indebtedness, cash (other than an annual cash dividend or a dividend referred to in Subparagraph 2.3(a)(i), but including any dividend payable in securities other than Common Shares), assets or rights, options or warrants (excluding those referred to in Subsection 2.3(b) hereof), the Exercise Price to be in effect after such record date shall be equal to the product of the Exercise Price in effect immediately prior to such record date and a fraction:

(i) the numerator of which is the Market Price per Common Share on such record date, less the fair market value (as determined in good faith by the Board of Directors, whose determination shall be described in a statement filed with the Rights Agent and shall be binding on the Rights Agent and the holders of Rights), on a per share basis, of the portion of the cash, assets, evidences of indebtedness, rights, options or warrants so to be distributed; and

(ii) the denominator of which shall be such Market Price per Common Share.

Such adjustments shall be made successively whenever such a record date is fixed, and if such a distribution is not so made, the Exercise Price shall be adjusted to be the Exercise Price which would have been in effect if such record date had not been fixed.

(d) Notwithstanding any other provision of this Agreement, no adjustment in the Exercise Price is required unless it would increase or decrease the Exercise Price by at least 1%; provided, however, that any adjustments which by reason of this Subsection 2.3(d) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under Section 2.3 shall be made to the nearest cent or to the nearest ten-thousandth of a share. Notwithstanding the first sentence of this Subsection 2.3(d), any adjustment required by Section 2.3 shall be made no later than (i) three years from the date of the transaction which gives rise to such adjustment; or (ii) the Expiration Date, whichever occurs first.

(e) If at any time after the Record Time and before the Separation Time the Issuer issues any securities other than Common Shares in a transaction referred to in Subparagraph 2.3(a)(i) or (iv) above, and the Board of Directors acting in good faith determines that the adjustments contemplated by Subsections 2.3(a), (b) and (c) above in connection with such transaction will not appropriately protect the interests of the holders of Rights, the Board of Directors may determine what other adjustments to the Exercise Price, number of Rights and/or securities purchasable upon exercise of Rights would be appropriate and, notwithstanding Subsections 2.3(a), (b) and (c) above, such adjustments, rather than those contemplated by Subsections 2.3(a), (b) and (c) above, shall be made, subject to the prior consent of the holders of the Common Shares or the Rights as set forth in Subsection 5.4(b) or (c), and the Issuer and the Rights Agent shall have authority upon receiving such consent to amend this Agreement as appropriate to provide for such adjustments.

(f) Each Right originally issued by the Issuer subsequent to any adjustment made to the Exercise Price hereunder shall evidence the right to purchase, at the adjusted Exercise Price, the number of Shares purchasable from time to time hereunder upon exercise of a Right immediately prior to such issue, all subject to further adjustment as provided for herein.

(g) Irrespective of any adjustment or change in the Exercise Price or the number of Shares issuable upon the exercise of the Rights, the Rights Certificates theretofore and thereafter issued may continue to express the Exercise Price per Share and the number of Shares which were expressed in the initial Rights Certificates issued hereunder.

(h) In any case in which this Section 2.3 requires that an adjustment in the Exercise Price be made effective as of a record date for a specified event, the Issuer may elect to defer until the occurrence of that event the issuance to the holder of any Right exercised after such record date the number of Shares and other securities of the Issuer, if any, issuable upon such exercise over and above the number of Shares and other securities of the Issuer, if any, issuable upon such exercise on the basis of the Exercise Price in effect prior to such adjustment; provided, however, that the Issuer shall deliver to such holder an appropriate instrument evidencing such holder's right to receive such additional shares (fractional or otherwise) or other securities upon the occurrence of the event requiring such adjustment.

(i) Notwithstanding anything contained in this Section 2.3 to the contrary, the Issuer shall be entitled to make such reductions in the Exercise Price, in addition to those adjustments expressly required by this Section 2.3, as and to the extent that in their good faith judgment the Board of Directors shall determine to be advisable, in order that any:

(i) consolidation or subdivision of Shares;

(ii) issuance (wholly or in part for cash) of Common Shares or securities that by their terms are convertible into or exchangeable for Common Shares;

(iii) stock dividends; or

(iv) issuance of rights, options or warrants referred to in this Section 2.3, hereafter made by the Issuer to holders of its Common Shares,

shall not be taxable to such shareholders.

(j) If, as a result of an adjustment made pursuant to Section 3.1, the holder of any Right thereafter exercised becomes entitled to receive any securities other than Common Shares, thereafter the number of such other securities so receivable upon exercise of any Right and the applicable Exercise Price thereof shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as may be practicable to the provisions with respect to the Common Shares contained in the foregoing subsections of this Section 2.3 and the provisions of this Agreement with respect to the Common Shares shall apply on like terms to any such other securities.

(k) Whenever an adjustment to the Exercise Price or a change in the securities purchasable upon the exercise of Rights is made pursuant to this Section 2.3, the Issuer shall promptly:

(i) prepare a certificate setting forth such adjustment and a brief statement of the facts accounting for such adjustment;

(ii) file with the Rights Agent and with each transfer agent for the Common Shares, a copy of such certificate; and

(iii) cause notice of the particulars of such adjustment or change to be given to the holders of the Rights.

Failure to file such certificate or to cause such notice to be given as aforesaid, or any defect therein, shall not affect the validity of any such adjustment or change.

**2.4 Date on Which Exercise Is Effective**. Each Person in whose name any certificate for Common Shares or other securities, if applicable, is issued upon the exercise of Rights shall for all purposes be deemed to have become the holder of record of the Common Shares or other securities, if applicable, represented thereon, and such certificate shall be dated the date upon which the Rights Certificate evidencing such Rights was duly surrendered in accordance with Subsection 2.2(d) (together with a duly completed Election to Exercise) and payment of the Exercise Price for such Rights (and any applicable transfer taxes and other governmental charges payable by the exercising holder hereunder) was made; provided, however, that if the date of such surrender and payment is a date upon which the Common Share transfer books of the Issuer are closed, such Person shall be deemed to have become the record holder of such shares on, and such certificate shall be dated, the next succeeding Business Day on which the Common Share transfer books of the Issuer are open.

**2.5 Execution, Authentication, Delivery and Dating of Rights Certificates**.

(a) The Rights Certificates shall be executed on behalf of the Issuer by any two directors or officers of the Issuer. The signature of any of these officers or directors on the Rights Certificates may be manual or facsimile Rights Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers or directors of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices either before or after the countersignature and delivery of such Rights Certificates.

(b) Promptly after it learns of the Separation Time, the Issuer will notify the Rights Agent thereof and deliver Rights Certificates executed by the Issuer to the Rights Agent for countersignature, and the Rights Agent shall countersign (in a manner satisfactory to the Issuer) and send such Rights Certificates to the holders of the Rights pursuant to Subsection 2.2(c) hereof. No Rights Certificate shall be valid for any purpose until countersigned by the Rights Agent as aforesaid.

(c) Each Rights Certificate shall be dated the date of countersignature thereof.

**2.6 Registration, Transfer and Exchange**.

(a) The Issuer will cause to be kept a register (the “Rights Register”) in which, subject to such reasonable regulations as it may prescribe, the Issuer will provide for the registration and transfer of Rights. The Rights Agent is hereby appointed registrar for the Rights (the “Rights Registrar”) for the purpose of maintaining the Rights Register for the Issuer and registering Rights and transfers of Rights as herein provided and the Rights Agent hereby accepts such appointment. If the Rights Agent ceases to be the Rights Registrar, the Rights Agent will have the right to examine the Rights Register at all reasonable times.

After the Separation Time and before the Expiry Time, upon surrender for registration of transfer or exchange of any Rights Certificate, and subject to the provisions of Subsection 2.6(c), the Issuer will execute, and the Rights Agent will countersign and deliver, in the name of the holder or the designated transferee or transferees, as required pursuant to the holder's instructions, one or more new Rights Certificates evidencing the same aggregate number of Rights as did the Rights Certificates so surrendered.

(b) All Rights issued upon any registration of transfer or exchange of Rights Certificates shall be the valid obligations of the Issuer, and such Rights shall be entitled to the same benefits under this Agreement as the Rights surrendered upon such registration of transfer or exchange.

(c) Every Rights Certificate surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer or the Rights Agent, as the case may be, duly executed by the holder thereof or such holder's attorney duly authorized in writing. As a condition to the issuance of any new Rights Certificate under this Section 2.6, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Rights Agent) connected therewith.

(d) the Issuer is not required to register the transfer or exchange of any Rights after the Rights have been terminated pursuant to the provisions of this Agreement.

**2.7 Mutilated, Destroyed, Lost and Stolen Rights Certificates**.

(a) If any mutilated Rights Certificate is surrendered to the Rights Agent prior to the Expiry Time, the Issuer shall execute and the Rights Agent shall countersign and deliver in exchange therefor a new Rights Certificate evidencing the same number of Rights as did the Rights Certificate so surrendered.

(b) If there shall be delivered to the Issuer and the Rights Agent prior to the Expiry Time:

(i) evidence to their reasonable satisfaction of the destruction, loss or theft of any Rights Certificate; and

(ii) such surety bond as may be reasonably required by them to save each of them and any of their agents harmless, then, in the absence of notice to the Issuer or the Rights Agent that such Rights Certificate has been acquired by a bona fide purchaser, the Issuer shall execute and upon the Issuer's request the Rights Agent shall countersign and deliver, in lieu of any such destroyed, lost or stolen Rights Certificate, a new Rights Certificate evidencing the same number of Rights as did the Rights Certificate so destroyed, lost or stolen.

(c) As a condition to the issuance of any new Rights Certificate under this Section 2.7, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Rights Agent) connected therewith.

(d) Every new Rights Certificate issued pursuant to this Section 2.7 in lieu of any destroyed, lost or stolen Rights Certificate shall evidence the contractual obligation of the Issuer, whether or not the destroyed, lost or stolen Rights Certificate shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Agreement equally and proportionately with any and all other Rights duly issued hereunder.

**2.8 Persons Deemed Owners of Rights**. The Issuer, the Rights Agent and any agent of the Issuer or the Rights Agent may deem and treat the Person in whose name a Rights Certificate (or, prior to the Separation Time, the associated Common Share certificate) is registered as the absolute owner thereof and of the Rights evidenced thereby for all purposes whatsoever. As used in this Agreement, unless the context otherwise requires, the term "holder" of any Rights shall mean the registered holder of such Rights (or, prior to the Separation Time, of the associated Share).

**2.9 Delivery and Cancellation of Certificates**. All Rights Certificates surrendered upon exercise or for redemption, registration of transfer or exchange shall, if surrendered to any Person other than the Rights Agent, be delivered to the Rights Agent and, in any case, shall be promptly cancelled by the Rights Agent. The Issuer may at any time deliver to the Rights Agent for cancellation any Rights Certificates previously countersigned and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Rights Certificates so delivered shall be promptly cancelled by the

Rights Agent. No Rights Certificate shall be countersigned in lieu of or in exchange for any Rights Certificates cancelled as provided in this Section 2.10, except as expressly permitted by this Agreement. The Rights Agent shall, subject to applicable laws, destroy all cancelled Rights Certificates and deliver a certificate of destruction to the Issuer.

**2.10 Agreement of Rights Holders**. Every holder of Rights, by accepting the same, consents and agrees with the Issuer and the Rights Agent and with every other holder of Rights:

(a) to be bound by and subject to the provisions of this Agreement, as amended from time to time in accordance with the terms hereof, in respect of all Rights held;

(b) that before the Separation Time, each Right will be transferable only together with, and will be transferred by a transfer of, the associated Common Share certificate representing such Right;

(c) that after the Separation Time, the Rights Certificates will be transferable only on the Rights Register as provided herein;

(d) that prior to due presentment of a Rights Certificate (or, prior to the Separation Time, the associated Common Share certificate) for registration of transfer, the Issuer, the Rights Agent and any agent of the Issuer or the Rights Agent may deem and treat the Person in whose name the Rights Certificate (or, prior to the Separation Time, the associated Common Share certificate) is registered as the absolute owner thereof and of the Rights evidenced thereby (notwithstanding any notations of ownership or writing on such Rights Certificate or the associated Common Share certificate made by anyone other than the Issuer or the Rights Agent) for all purposes whatsoever, and neither the Issuer nor the Rights Agent shall be affected by any notice to the contrary;

(e) that such holder of Rights has waived his right to receive any fractional Rights or any fractional shares or other securities upon exercise of a Right (except as provided herein);

(f) that without the approval of any holder of Rights or Common Shares and upon the sole authority of the Board of Directors, this Agreement may be supplemented or amended from time to time pursuant to Subsection 5.4(a) and the last sentence of the penultimate paragraph of Subsection 2.3(a); and

(g) that notwithstanding anything in this Agreement to the contrary, neither the Issuer nor the Rights Agent shall have any liability to any holder of a Right or to any other Person as a result of its inability to perform any of its obligations under this Agreement by reason of any preliminary or permanent injunction or other order, decree or ruling issued by a court of competent jurisdiction or by a government, regulatory or administrative agency or commission, or any statute, rule, regulation or executive order promulgated or enacted by any governmental authority, prohibiting or otherwise restraining performance of such obligation.

**2.11 Rights Certificate Holder Not Deemed a Shareholder**. No holder, as such, of any Rights or Rights Certificate shall be entitled to vote, receive dividends or be deemed for any purpose whatsoever the holder of any Common Share or any other share or security of the Issuer which may at any time be issuable on the exercise of the Rights represented thereby, nor shall anything contained herein or in any Rights Certificate be construed or deemed or confer upon the holder of any Right or Rights Certificate, as such, any right, title, benefit or privilege of a holder of Common Shares or any other shares or securities of the Issuer or any right to vote at any meeting of shareholders of the Issuer whether for the election of directors or otherwise or upon any matter submitted to holders of Common Shares or any other shares of the Issuer at any meeting thereof, or to give or withhold consent to any action of the Issuer, or to receive notice of any meeting or other action affecting any holder of Common Shares or any other shares of the Issuer except as expressly provided herein, or to receive dividends, distributions or subscription rights, or otherwise, until the Right or Rights evidenced by Rights Certificates shall have been duly exercised in accordance with the terms and provisions hereof

## ARTICLE 3 - ADJUSTMENTS TO THE RIGHTS IN THE EVENT OF CERTAIN TRANSACTIONS

### 3.1 Flip-in Event.

(a) Subject to Section 5.1, if a Flip-in Event occurs before the Expiry Time, then effective at the close of business on the tenth Trading Day after the Stock Acquisition Date, or such later time as the Board of Directors (or a committee of the Board of Directors so designated by the Board of Directors) may determine if the Board acting in good faith determines that a longer period of time is required to satisfy the requirements of the applicable securities laws or comparable legislation in each of the provinces and territories of Canada and of the United States and each of the States thereof in respect of the issue of Common Shares upon the exercise of Rights in accordance with this Agreement, each Right shall entitle the holder to purchase from the Issuer, upon exercise thereof in accordance with the terms hereof, that number of Common Shares having an aggregate Market Price on the date of consummation or occurrence of such Flip-in Event equal to four times the Exercise Price for an amount in cash equal to the Exercise Price (such right to be appropriately adjusted in a manner analogous to the applicable adjustment provided for in Section 2.3 if after the consummation or occurrence or event, an event of a type analogous to any of the events described in Section 2.3 occurs);

(b) Notwithstanding anything in this Agreement to the contrary, when any Flip-in Event occurs, any Rights that are or were Beneficially owned on or after the earlier of the Separation Time or the Stock Acquisition Date by:

(i) an Acquiring Person (or any Affiliate or Associate of an Acquiring Person or any Person acting jointly or in concert with an Acquiring Person or any Affiliate or Associate of an Acquiring Person); or

(ii) a transferee of Rights, directly or indirectly, from an Acquiring Person (or any Affiliate or Associate of an Acquiring Person or any Person acting jointly or in concert with an Acquiring Person or any Affiliate or Associate of an Acquiring Person), where such transferee becomes a transferee concurrently with or subsequent to the Acquiring Person becoming such in a transfer that the Board of Directors has determined is part of a plan, arrangement or scheme of an Acquiring Person (or any Affiliate or Associate of an Acquiring Person or any Person acting jointly or in concert with an Acquiring Person or any Associate or Affiliate of an Acquiring Person), that has the purpose or effect of avoiding clause (i) of this paragraph (b),

shall become null and void without any further action, and any holder of such Rights (including transferees) shall thereafter have no right to exercise such Rights under any provision of this Agreement and further shall thereafter not have any other rights whatsoever with respect to such Rights, whether under any provision of this Agreement or otherwise.

(c) From and after the Separation Time, the Issuer shall do all such acts and things as shall be necessary and within its power to ensure compliance with the provisions of Section 3.1, including without limitation, all such acts and things as may be required to satisfy the requirements of the CBCA, the Securities Acts, the U.S. Securities Act, the U.S. Exchange Act and other applicable securities or other laws in respect of the issue of Common Shares upon the exercise of Rights in accordance with this Agreement.

(d) Any Rights Certificate that would represent Rights Beneficially owned by a Person described in Subparagraph 3.1(b)(i) or (ii) or transferred to any nominee of any such Person, and any Rights Certificate that would be issued upon transfer, exchange, replacement or adjustment of any other Rights Certificate referred to in this sentence, shall either not be issued upon the instruction of the Issuer in writing to the Rights Agent or contain the following legend:

> The Rights represented by this Rights Certificate were issued to a Person who was an Acquiring Person or an Affiliate or an Associate of an Acquiring Person (as such terms are defined in the Shareholder Rights Plan Agreement) or a Person who was acting jointly or in concert with an Acquiring Person or an Affiliate or Associate of an Acquiring Person. This Rights Certificate and the Rights represented hereby are void or shall become void in the circumstances specified in Subsection 3.1(b) of the Shareholder Rights Plan Agreement.

Provided, however, that the Rights Agent shall not be under any responsibility to ascertain the existence of facts that would require the imposition of such legend but shall impose such legend only if instructed to do so by the Issuer in writing or if a holder fails to certify upon transfer or exchange in the space provided on the Rights Certificate that such holder is not a Person described in such legend. The issuance of a Rights Certificate without the legend referred to in this Subsection 3.1(d) shall be of no effect on the provisions of Subsection 3.1(b).

## ARTICLE 4 - THE RIGHTS AGENT

### 4.1 General.

(a) The Issuer hereby appoints the Rights Agent to act as agent for the Issuer and the holders of the Rights in accordance with the terms and conditions of this Agreement, and the Rights Agent hereby accepts such appointment. The Issuer may from time to time appoint one or more co-Rights Agents ("Co-Rights Agents") as it may deem necessary or desirable, subject to the approval of the Rights Agent. If the Issuer appoints one or more Co-Rights Agents, the respective duties of the Rights Agent and Co-Rights Agents shall be as the Issuer may determine with the approval of the Rights Agent and the Co-Rights Agents. The Issuer agrees to pay to the Rights Agent reasonable compensation for all services rendered by it hereunder and, from time to time, on demand of the Rights Agent, its reasonable expenses and counsel fees and other disbursements reasonably incurred in the execution and administration of this Agreement and the exercise and performance of its duties hereunder (including the reasonable fees and other disbursements of any expert retained by the Rights Agent with the approval of the Issuer, such approval not to be unreasonably withheld). The Issuer also agrees to indemnify the Rights Agent, its officers, directors and employees for, and to hold it harmless against, any loss, liability, or expense, incurred without negligence, bad faith or wilful misconduct on the part of the Rights Agent, for anything done or omitted by the Rights Agent in connection with the acceptance and administration of this Agreement, including legal costs and expenses, which right to indemnification will survive the termination of this Agreement or the resignation or removal of the Rights Agent.

(b) The Rights Agent shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted by it in connection with its administration of this Agreement in reliance upon any certificate for Common Shares, Rights Certificate, certificate for other securities of the Issuer, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, notice, direction, consent, certificate, opinion, statement, or other paper or document believed by it to be genuine and to be signed, executed and, where necessary, verified or acknowledged, by the proper Person or Persons. The Issuer shall inform the Rights Agent in a reasonably timely manner of events which may materially affect the administration of this Agreement by the Rights Agent and, at any time upon request, shall provide to the Rights Agent an incumbency certificate certifying the then current officers of the Issuer.

### 4.2 Merger, Amalgamation or Consolidation or Change of Name of Rights Agent.

(a) Any company into which the Rights Agent may be merged or amalgamated or with which it may be consolidated, or any company resulting from any merger, amalgamation, statutory arrangement or consolidation to which the Rights Agent is a party, or any company succeeding to the securityholder services business of the Rights Agent, will be the successor to the Rights Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, provided that such company would be eligible for appointment as a successor Rights Agent under the provisions of Section 4.4 hereof. In case at the time such successor Rights Agent succeeds to the agency created by this Agreement any of the Rights Certificates have been countersigned but not delivered, any successor Rights Agent may adopt the countersignature of the predecessor Rights Agent and deliver such Rights Certificates so countersigned; and in case at that time any of the Rights have not been countersigned, any successor Rights Agent may countersign such Rights Certificates in the name of the predecessor Rights Agent or in the name of the successor Rights Agent; and in all such cases such Rights Certificates will have the full force provided in the Rights Certificates and in this Agreement.

(b) In case at any time the name of the Rights Agent is changed and at such time any of the Rights Certificates shall have been countersigned but not delivered, the Rights Agent may adopt the countersignature under its prior name and deliver Rights Certificates so countersigned; and in case at that time any of the Right Certificates shall not have been countersigned, the Rights Agent may countersign such Rights Certificates either in its prior name or in its changed name; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Agreement.

**4.3 Duties of Rights Agent**. The Rights Agent undertakes the duties and obligations imposed by this Agreement upon the following terms and conditions, all of which the Issuer and the holders of certificates for Shares and Rights Certificates, by their acceptance thereof, shall be bound:

(a) the Rights Agent may retain and consult with legal counsel (who may be legal counsel for the Issuer) and the opinion of such counsel will be full and complete authorization and protection to the Rights Agent as to any action taken or omitted by it in good faith and in accordance with such opinion and the Rights Agent may also consult with such other experts as the Rights Agent shall consider necessary or appropriate to properly carry out the duties and obligations imposed under this Agreement (at the Issuer's expense) and the Rights Agent shall be entitled to act and rely in good faith on the advice of any such expert;

(b) whenever in the performance of its duties under this Agreement, the Rights Agent deems it necessary or desirable that any fact or matter be proved or established by the Issuer prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by Persons believed by the Rights Agent to be any two directors or officers of the Issuer and delivered to the Rights Agent; and such certificate will be full authorization to the Rights Agent for any action taken or suffered in good faith by it under the provisions of this Agreement in reliance upon such certificate;

(c) the Rights Agent will be liable hereunder for its own negligence, bad faith or wilful misconduct;

(d) the Rights Agent will not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the certificates for Common Shares or the Rights Certificates (except its countersignature thereof) or be required to verify the same, but all such statements and recitals are and will be deemed to have been made by the Issuer only;

(e) the Rights Agent will not be under any responsibility in respect of the validity of this Agreement or the execution and delivery hereof (except the due authorization, execution and delivery hereof by the Rights Agent) or in respect of the validity or execution of any certificate for a Common Share or Rights Certificate (except its countersignature thereof); nor will it be responsible for any breach by the Issuer of any covenant or condition contained in this Agreement or in any Rights Certificate; nor will it be responsible for any change in the exerciseability of the Rights (including the Rights becoming void pursuant to Section 3.1 (b) hereof) or any adjustment required under the provisions of Section 2.3 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment (except with respect to the exercise of Rights after receipt of the certificate contemplated by Section 2.3 describing any such adjustment); nor will it by any act hereunder be deemed to make any representation or warranty as to the authorization of any Common Shares to be issued pursuant to this Agreement or any Rights or as to whether any Shares will, when issued, be duly and validly authorized, executed, issued and delivered and fully paid and non-assessable;

(f) the Issuer agrees that it will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Rights Agent for the carrying out or performing by the Rights Agent of the provisions of this Agreement;

(g) the Rights Agent is hereby authorized and directed to accept instructions in writing with respect to the performance of its duties hereunder from any individuals believed by the Rights Agent to be any two officers or directors of the Issuer (it is understood that instructions to the Rights Agent shall, except where circumstances make it impractical or the Rights Agent otherwise agrees, be given in writing and, where not in writing, such instructions shall be confirmed in writing as soon as reasonably practicable after the giving of such instructions), and to apply to such individuals for advice or instructions in connection with its duties, and it shall not be liable for any action taken or suffered by it in good faith in accordance with instructions of any such individual;

(h) the Rights Agent and any shareholder or stockholder, director, officer or employee of the Rights Agent may buy, sell or deal in Common Shares, Rights or other securities of the Issuer or become pecuniarily interested in any transaction in which the Issuer may be interested, or contract with or lend money to the Issuer or otherwise act as

fully and freely as though it were not the Rights Agent under this Agreement. Nothing herein shall preclude the Rights Agent from acting in any other capacity for the Issuer or for any other legal entity; and

(i) the Rights Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents, and the Rights Agent will not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys or agents or for any loss to the Issuer resulting from any such act, default, neglect or misconduct, provided reasonable care was exercised in the selection and continued employment thereof.

**4.4 Change of Rights Agent**. The Rights Agent may resign and be discharged from its duties under this Agreement upon 60 days' notice (or such lesser notice as is acceptable to the Issuer) in writing mailed to the Issuer and to each transfer agent of Common Shares by registered or certified mail. The Issuer may remove the Rights Agent upon 60 days' notice in writing, mailed to the Rights Agent and to each transfer agent of the Common Shares by registered or certified mail. If the Rights Agent should resign or be removed or otherwise become incapable of acting, the Issuer will appoint a successor to the Rights Agent. If the Issuer fails to make such appointment within a period of 60 days after such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Rights Agent, then by prior written notice to the Issuer the resigning Rights Agent (at the Issuer's expense) or the holder of any Rights (which holder shall, with such notice, submit such holder's Rights Certificate, if any, for inspection by the Issuer), may apply to any court of competent jurisdiction for the appointment of a new Rights Agent. Any successor Rights Agent, whether appointed by the Issuer or by such a court, shall be a company incorporated under the laws of Canada or a province thereof authorized to carry on the business of a trust company in the Province of British Columbia. After appointment, the successor Rights Agent will be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Rights Agent without further act or deed; but the predecessor Rights Agent shall deliver and transfer to the successor Rights Agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose. Not later than the effective date of any such appointment, the Issuer will file notice thereof in writing with the predecessor Rights Agent and each transfer agent of the Common Shares, and mail a notice thereof in writing to the holders of the Rights in accordance with Section 5.9. Failure to give any notice provided for in this Section 4.4, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Rights Agent or the appointment of any successor Rights Agent, as the case may be.

## ARTICLE 5 - MISCELLANEOUS

**5.1 Redemption and Waiver**.

(a) If, after a Stock Acquisition Date and before the Separation Time, the Board of Directors determines that a Person became an Acquiring Person by inadvertence and without any intention to become, or knowledge that it would become, an Acquiring Person, the Board of Directors may waive the application of Section 3.1 in respect of the occurrence of a Flip-in Event and if it does so the Stock Acquisition Date will be deemed not to have occurred. Any such waiver must be on the condition that such Person reduces its Beneficial ownership of Common Shares so that the Person is no longer an Acquiring Person, by such date (the "Disposition Date") as the Board of Directors specifies. If the Person remains an Acquiring Person at the close of business on the Disposition Date, the Disposition Date shall be deemed to be the date of occurrence of a further Stock Acquisition Date and Section 3.1 shall apply thereto.

(b) The Board of Directors acting in good faith may, before a Flip-in Event occurs, upon prior written notice delivered to the Rights Agent, determine to waive the application of Section 3.1 to a Flip-in Event that may occur by reason of a Take-over Bid made by means of take-over bid circular to all holders of record of Common Shares (which for greater certainty shall not include the circumstances described in Subsection 5.1(a)), provided that if the Board of Directors waives the application of Section 3.1 to a particular Flip-in Event, the Board of Directors shall be deemed to have waived the application of Section 3.1 to any other Flip-in Event occurring by reason of any Take-Over Bid which is made by means of a Take-Over Bid circular to all holders of Common Shares prior to the expiry of any Take-Over Bid (as the same may be extended from time to time) in respect of which a waiver is, or is deemed to have been granted under this Subsection 5.1(b).

(c) If, before the occurrence of a Flip-in Event, a Person acquires outstanding Common Shares pursuant to a Permitted Bid, a Competing Permitted Bid or an Exempt Acquisition under Subsection 5.1(b), then the Board of Directors shall, immediately upon the consummation of such acquisition without further formality be deemed to have elected to redeem the Rights at a redemption price of $0.0001 per Right appropriately adjusted in a manner

analogous to the applicable adjustment provided for in Section 2.3 if an event of the type analogous to any of the events described in Section 2.3 shall have occurred (such redemption price being herein referred to as the "Redemption Price").

(d) The Board of Directors may, with the prior approval of the holders of Common Shares or Rights given in accordance with the terms of Section 5.4, at any time prior to the occurrence of a Flip-in Event elect to redeem all but not less than all of the then outstanding Rights at the Redemption Price appropriately adjusted in a manner analogous to the applicable adjustments provided for in Section 2.3, which adjustments shall only be made if an event of the type analogous to any of the events described in Section 2.3 shall have occurred.

(e) The Board of Directors may, prior to the close of business on the tenth Trading Day following a Stock Acquisition Date or such later Business Day as they may from time to time determine, upon prior written notice delivered to the Rights Agent, waive the application of Section 3.1 to the related Flip-in Event, provided that the Acquiring Person has reduced its beneficial ownership of Common Shares (or has entered into a contractual arrangement with the Issuer, acceptable to the Board of Directors, to do so within 10 calendar days of the date on which such contractual arrangement is entered into or such other date as the Board of Directors may have determined) so that at the time the waiver becomes effective pursuant to this Subsection 5.1(e) such Person is no longer an Acquiring Person. If such a waiver becomes effective prior to the Separation Time, for the purposes of this Agreement, such Flip-in Event shall be deemed not to have occurred.

(f) Where a Take-over Bid that is not a Permitted Bid Acquisition is withdrawn or otherwise terminated after the Separation Time and before the occurrence of a Flip-in Event, the Board of Directors may elect to redeem all the outstanding Rights at the Redemption Price. Upon the Rights being so redeemed all the provisions of this Agreement shall continue to apply as if the Separation time had not occurred and Rights Certificates representing the number of Rights held by each holder of record of Common Shares as of the Separation Time had not been mailed to each such holder and for all purposes of this agreement the Separation Time shall be deemed not to have occurred and the Issuer shall be deemed to have issued replacement Rights to the holders of its then outstanding Common Shares.

(g) If the Board of Directors is deemed under Subsection 5.1(c) to have elected or elects under Subsections 5.1(d) or (f) to redeem the Rights, the right to exercise the Rights will thereupon, without further action and without notice, terminate and the only right thereafter of the holders of Rights shall be to receive the Redemption Price.

(h) Within 10 calendar days after the Board of Directors is deemed under Subsection 5.1(c) to have elected or elects under Subsection 5.1(d) or (f) to redeem the Rights, the Issuer shall give notice of redemption to the holders of the then outstanding Rights by mailing such notice to each such holder at his last address as it appears upon the registry books of the Rights Agent or, prior to the Separation Time, on the registry books of the transfer agent for the Common Shares. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each such notice of redemption will state the method by which the payment of the Redemption Price will be made.

(i) The Issuer shall give prompt written notice to the Rights Agent of any waiver of the application of Section 3.1 pursuant to this Section 5.1.

**5.2 Expiration**. No Person shall have any rights whatsoever pursuant to this Agreement or in respect of any Right after the Expiry Time, except the Rights Agent as specified in Section 4.1(a) of this Agreement.

**5.3 Issuance of New Rights Certificates**. Notwithstanding any of the provisions of this Agreement or of the Rights to the contrary, the Issuer may, at its option, issue new Rights Certificates evidencing Rights in such form as may be approved by the Board of Directors to reflect any adjustment or change in the number or kind or class of securities purchasable upon exercise of Rights made in accordance with the provisions of this Agreement.

**5.4 Supplements and Amendments**.

(a) The Issuer may make any amendments to this Agreement to correct any clerical or typographical error or which are required to maintain the validity of the Agreement as a result of any change in any applicable legislation, regulations or rules thereunder. The Issuer may, prior to the date of the first Special Meeting referred to in Section

5.15, supplement or amend this Agreement without the approval of any holders of Rights or Shares in order to make any changes which the Board of Directors acting in good faith may deem necessary or desirable. Notwithstanding anything in this Section 5.4 to the contrary, no amendment shall be made to the provisions of Article 4 except with the written concurrence of the Rights Agent to such supplement or amendment.

(b) Subject to Subsection 5.4(a), the Issuer may, with the prior consent of the holders of Common Shares obtained as set forth below, at any time before the Separation Time, amend, vary or rescind any of the provisions of this Agreement and the Rights (whether or not such action would materially adversely affect the interests of the holders of Rights generally). Such consent shall be deemed to have been given if provided by the holders of Common Shares at a Special Meeting called and held in compliance with applicable laws and regulatory requirements and the requirements of the Issuer's bylaws. Consent shall be given if the proposed amendment, variation or rescission is approved by the affirmative vote of a majority of the votes cast by all holders of Common Shares (other than any holder who does not qualify as an Independent Shareholder, with respect to all Common Shares Beneficially owned by such Person), represented in person or by proxy at the Special Meeting.

(c) The Issuer may, with the prior consent of the holders of Rights obtained as set forth below, at any time after the Separation Time and before the Expiry Time, amend, vary or rescind any of the provisions of this Agreement and the Rights (whether or not such action would materially adversely affect the interests of the holders of Rights generally), provided that no such amendment, variation or deletion shall be made to the provisions of Article 4 except with the written concurrence of the Rights Agent thereto. Such consent shall be deemed to have been given if provided by the holders of Rights at a Rights Holder's Special Meeting called and held in compliance with applicable laws and regulatory requirements and, to the extent possible and with the necessary changes, with the requirements in the bylaws of the Issuer applicable to meetings of holders of Common Shares. Consent shall be given if the proposed amendment, variation or rescission is approved by the affirmative vote of a majority of the votes cast by holders of Rights (other than holders of Rights whose Rights have become null and void pursuant to Subsection 3.1(b)), represented in person or by proxy at the Rights Holders' Special Meeting.

(d) Any approval of the holders of Rights shall be deemed to have been given if the action requiring such approval is authorized by the affirmative votes of the holders of Rights present or represented at and entitled to be voted at a meeting of the holders of Rights and representing a majority of the votes cast in respect thereof. For the purposes hereof, each outstanding Right (other than Rights which are null and void pursuant to the provisions hereof) shall be entitled to one vote, and the procedures for the calling, holding and conduct of the meeting shall be those, as nearly as may be, which are provided in the Issuer's articles and the CBCA with respect to the meetings of holders of Common Shares.

(e) Any amendments made by the Issuer to this Agreement pursuant to Subsection 5.4(a) which are required to maintain the validity of this Agreement as a result of any change in any applicable legislation, regulation or rule thereunder shall:

(i) if made before the Separation Time, be submitted to the holders of Common Shares at the next meeting of shareholders and the holders of Common Shares may, by the majority referred to in Subsection 5.4(b) confirm or reject such amendment;

(ii) if made after the Separation Time, be submitted to the holders of Rights at a meeting to be called for on a date not later than immediately following the next meeting of shareholders of the Issuer and the holders of Rights may, by resolution passed by the majority referred to in Subsection 5.4(d) confirm or reject such amendment.

Any such amendment shall be effective from the date of the resolution of the Board of Directors adopting such amendment, until it is confirmed or rejected or until it ceases to be effective (as described in the next sentence) and, where such amendment is confirmed, it continues in effect in the form so confirmed. If such amendment is rejected by the shareholders or the holders of Rights or is not submitted to the shareholders or holders of Rights as required, then such amendment shall cease to be effective from and after the termination of the meeting at which it was rejected or to which it should have been but was not submitted or from and after the date of the meeting of holders of Rights that should have been but was not held, and no subsequent resolution of the Board of Directors to amend this Agreement to substantially the same effect shall be effective until confirmed by the shareholders or holders of Rights as the case may be.

**5.5 Fractional Rights and Fractional Shares**.

(a) The Issuer shall not be required to issue fractions of Rights or to distribute Rights Certificates which evidence fractional Rights and the Issuer shall not be required to pay any amount to a holder of record of Rights Certificates in lieu of such fractional Rights.

(b) The Issuer shall not be required to issue fractions of Shares upon exercise of Rights or to distribute certificates which evidence fractional Shares. In lieu of issuing fractional Shares, the Issuer shall be entitled to pay to the registered holders of Rights Certificates, at the time such Rights are exercised as herein provided, an amount in cash equal to the fraction of the Market Price of one Share that the fraction of a Share that would otherwise be issuable upon the exercise of such Right is of one whole Share at the date of such exercise.

**5.6 Rights of Action**. Subject to the terms of this Agreement, all fights of action in respect of this Agreement, other than fights of action vested solely in the Rights Agent, are vested in the respective holders of the Rights. Any holder of Rights, without the consent of the Rights Agent or of the holder of any other Rights, may, on such holder's own behalf and for such holder's own benefit and the benefit of other holders of Rights, enforce, and may institute and maintain any suit, action or proceeding against the Issuer to enforce such holder's right to exercise such holder's Rights, or Rights to which such holder is entitled, in the manner provided in such holder's Rights Certificate and in this Agreement. Without limiting the foregoing or any remedies available to the holders of Rights, it is specifically acknowledged that the holder of Rights would not have an adequate remedy at law for any breach of this Agreement and will be entitled to specific performance of the obligations under, and injunctive relief against actual or threatened violations of the obligations of any Person subject to, this Agreement.

**5.7 Regulatory Approvals**. Any obligation of the Issuer or action or event contemplated by this Agreement shall be subject to the receipt of any requisite approval or consent from any governmental or regulatory authority, and without limiting the generality of the foregoing, necessary approvals of any stock exchange shall be obtained, such as approvals relating to the issuance of Shares upon the exercise of Rights under Subsection 2.2(d).

**5.8 Declaration as to Non-Canadian and non-U.S. Holders**. If in the opinion of the Board of Directors (who may rely upon the advice of counsel) any action or event contemplated by this Agreement would require compliance by the Issuer with the securities laws or comparable legislation of a jurisdiction outside Canada or the United States, the Board of Directors acting in good faith shall take such actions as it may deem appropriate to ensure such compliance. In no event shall the Issuer or the Rights Agent be required to issue or deliver Rights or securities issuable on exercise of Rights to persons who are citizens, residents or nationals of any jurisdiction other than Canada or the United States, in which such issue or delivery would be unlawful without registration of the relevant Persons or securities for such purposes.

**5.9 Notices**.

(a) Notices or demands authorized or required by this Agreement to be given or made by the Rights Agent or by the holder of any Rights to or on the Issuer shall be sufficiently given or made if delivered, sent by registered or certified mail, postage prepaid (until another address is filed in writing with the Rights Agent), or sent by facsimile or other form of recorded electronic communication, charges prepaid and confirmed in writing, as follows:

Africo Resources Ltd.
Suite 1540 - 800 West Pender Street
Vancouver, British Columbia V6C 2V6

**Attention: Chief Executive Officer**
Facsimile #: (604) 646-3226

(b) Notices or demands authorized or required by this Agreement to be given or made by the Issuer or by the holder of any Rights to or on the Rights Agent shall be sufficiently given or made if delivered, sent by registered or certified mail, postage prepaid (until another address is filed in writing with the Issuer), or sent by facsimile or other form of recorded electronic communication, charges prepaid, and confirmed in writing, as follows:

Computershare Investor Services Inc.
3rd Floor, 510 Burrard Street
Vancouver, British Columbia V6C 3B9

**Attention: General Manager, Client Services**
Facsimile #: 604-661-9401

(c) Notices or demands authorized or required by this Agreement to be given or made by the Issuer or the Rights Agent to or on the holder of any Rights shall be sufficiently given or made if delivered or sent by certified mail, postage prepaid, addressed to such holder at the address of such holder as it appears upon the register of the Rights Agent or, prior to the Separation Time, on the register of the Issuer for its Shares. Any notice which is mailed or sent in the manner herein provided shall be deemed given, whether or not the holder receives the notice.

(d) Any notice given or made in accordance with this Section 5.9 shall be deemed to have been given and to have been received on the day of delivery, if delivered, on the third Business Day (excluding each day during which there exists any general interruption of postal service due to strike, lockout or other cause) following the mailing thereof, if mailed, and on the day of telegraphing, telecopying or sending of the same by other means of recorded electronic communication (provided such sending is during the normal business hours of the addressee on a Business Day and if not, on the first Business Day thereafter).

Each of the Issuer and the Rights Agent may from time to time change its address for notice by notice to the other given in the manner aforesaid.

**5.10 Costs of Enforcement**. The Issuer agrees that if it fails to fulfil any of its obligations pursuant to this Agreement, it will reimburse the holder of any Rights for the costs and expenses (including legal fees) incurred by such holder to enforce his rights pursuant to any Rights or this Agreement.

**5.11 Successors**. All the covenants and provisions of this Agreement by or for the benefit of the Issuer or the Rights Agent shall bind and enure to the benefit of their respective successors and assigns hereunder.

**5.12 Benefits of this Agreement**. Nothing in this Agreement shall be construed to give to any Person other than the Issuer, the Rights Agent and the holders of the Rights any legal or equitable right, remedy or claim under this Agreement and this Agreement shall be for the sole and exclusive benefit of the Issuer, the Rights Agent and the holders of the Rights.

**5.13 Governing Law**. This Agreement and each Right issued hereunder shall be deemed to be a contract made under the laws of the Province of British Columbia and for all purposes shall be governed by and construed in accordance with the laws of such Province applicable to contracts to be made and performed entirely within such Province.

**5.14 Severability**. If any term or provision hereof or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or provision shall be ineffective only as to such jurisdiction and to the extent of such invalidity or unenforceability in such jurisdiction without invalidating or rendering unenforceable or ineffective the remaining terms and provisions hereof in such jurisdiction or the application of such term or provision in any other jurisdiction or to circumstances other than those as to which it is specifically held invalid or unenforceable.

**5.15 Effective Date**. This Agreement is effective and in full force and effect in accordance with its terms from and after the Effective Date. In the event that this Agreement is not confirmed by a majority of the votes cast by holders of Common Shares who vote in respect of confirmation of this agreement (other than any holder who does not qualify as an Independent Shareholder, with respect to all Common Shares Beneficially owned by such Person) at the Issuer's annual meeting of shareholders in 2007, then this Agreement and all outstanding Rights shall terminate and shall be void and of no further force and effect from the date that such event occurs. This Agreement must be reconfirmed by a resolution passed by a majority of the votes cast by all holders of Common Shares who vote in respect of such reconfirmation (other than any holder who does not qualify as an Independent Shareholder, with respect to all Common Shares Beneficially owned by such Person) at the third and sixth annual meeting following the Issuer's annual meeting of shareholders in 2007. If this agreement is not so reconfirmed or is not presented for reconfirmation at such annual meeting, this Agreement and all outstanding Rights shall terminate and be void and of no further force and effect on and from the date of termination of the annual meeting; provided that termination shall not occur if a Flip-in Event has occurred (other than a Flip-in Event which

has been waived pursuant to Subsection 5.1(a) or (b) hereof), prior to the date upon which this Agreement would otherwise terminate pursuant to this Section 5.15.

**5.16 Determinations and Actions by the Board of Directors**. Neither the Board of Directors nor any director of the Issuer shall incur any liability to the holders of the Rights in connection with any action, calculation or determination (including any omission with respect to the foregoing) done or made in good faith by the Board for the purposes of this Agreement.

**5.17 Time of the Essence**. Time shall be of the essence in this Agreement.

**5.18 Execution in Counterparts**. This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**AFRICO RESOURCES LTD.**
By:

______________________________
*(Authorized Signatory)*

Name: Dr. Antony Harwood
Title: President and CEO

______________________________
*(Authorized Signatory)*

Name: Chris Theodoropoulos
Title: Chairman of the Board

**COMPUTERSHARE INVESTOR SERVICES INC.**
By:

______________________________
*(Authorized Signatory)*

Name: ______________________________
Title: ______________________________

______________________________
*(Authorized Signatory)*

Name: ______________________________
Title: ______________________________

# EXHIBIT 1 – FORM OF RIGHTS CERTIFICATE

## AFRICO RESOURCES LTD. SHAREHOLDER RIGHTS PLAN AGREEMENT

Certificate No. Rights

**THE RIGHTS ARE SUBJECT TO TERMINATION ON THE TERMS SET FORTH IN THE SHAREHOLDER RIGHTS PLAN AGREEMENT. IN CERTAIN CIRCUMSTANCES (SPECIFIED IN SUBSECTION 3.1(b) OF THE SHAREHOLDER RIGHTS PLAN AGREEMENT), RIGHTS BENEFICIALLY OWNED BY AN ACQUIRING PERSON OR CERTAIN RELATED PARTIES, OR TRANSFEREES OF AN ACQUIRING PERSON OR CERTAIN RELATED PARTIES, MAY BECOME VOID.**

**Rights Certificate**

This certifies that ____________________________________________, or registered assigns, is the registered holder of the number of Rights set forth above, each of which entitles the registered holder thereof, subject to the terms, provisions and conditions of the Shareholder Rights Plan Agreement, dated as of May 25, 2007, as the same may be further amended or supplemented from time to time, (the "Shareholder Rights Plan Agreement"), between Africo Resources Ltd., a company duly incorporated under the laws of Canada, and Computershare Investor Services Inc., a trust company incorporated under the laws of Canada (the "Rights Agent") (which term shall include any successor Rights Agent under the Shareholder Rights Plan Agreement), to purchase from Africo Resources Ltd. at any time after the Separation Time (as such term is defined in the Shareholder Rights Plan Agreement) and prior to the Expiry Time (as such term is defined in the Shareholder Rights Plan Agreement), one fully paid Common Share of Africo Resources Ltd. (a "Common Share") at the Exercise Price referred to below, upon presentation and surrender of this Rights Certificate with the Form of Election to Exercise (in the form provided hereinafter) duly executed and submitted to the Rights Agent at its principal office in the city of Vancouver, British Columbia or any other cities as may be designated by the Issuer from time to time. The Exercise Price shall initially be ten times the Market Price from time to time per Right and shall be subject to adjustment in certain events as provided in the Shareholder Rights Plan Agreement. The Rights evidenced by this Rights Certificate may not be exercised unless the Common Shares issuable upon such exercise have been registered or are exempt from registration under all applicable securities laws in Canada and the United States.

This Rights Certificate is subject to all of the terms and provisions of the Shareholder Rights Plan Agreement, which are incorporated herein by reference and made a part hereof. Reference is made to the Shareholder Rights Plan Agreement for a full description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Rights Agent, Africo Resources Ltd. and the holders of the Rights Certificates. Copies of the Shareholder Rights Plan Agreement are on file at the principal office of Africo Resources Ltd.

Upon surrender at any of the offices of the Rights Agent designated for such purpose, this Rights Certificate may be exchanged for another Rights Certificate or Certificates of like tenor evidencing an aggregate number of Rights equal to the aggregate number of Rights evidenced by the Rights Certificate or Certificates surrendered. If the Rights represented by this Certificate are exercised in part, the registered holder shall be entitled to receive, upon surrender hereof, another Rights Certificate or Certificates for the number of whole Rights not exercised.

No holder of this Rights Certificate, as such, shall be entitled to vote or receive dividends or be deemed for any purpose the holder of Common Shares or of any other securities which may at any time be issuable upon the exercise hereof, nor shall anything contained in the Shareholder Rights Plan Agreement or herein be construed to confer upon the holder hereof, as such, any of the Rights of a shareholder of Africo Resources Ltd. or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or

to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting shareholders (except as provided in the Shareholder Rights Plan Agreement), or to receive dividends or subscription rights, or otherwise, until the Rights evidenced by this Rights Certificate shall have been exercised as provided in the Shareholder Rights Plan Agreement.

This Rights Certificate is not valid or obligatory for any purpose unless it has been countersigned by the Rights Agent.

WITNESS the facsimile signature of the proper officers of Africo Resources Ltd.

Date: ______________________

**AFRICO RESOURCES LTD.**
By:

____________________________________________
*(Authorized Signatory)*

____________________________________________
*(Authorized Signatory)*

**Countersigned:**

**COMPUTERSHARE INVESTOR SERVICES INC..**
By:

____________________________________________
*(Authorized Signatory)*

Name: ______________________________________
Title: ______________________________________

**FORM OF ASSIGMENT**

(To be executed by the registered holder if such holder desires to transfer the Rights Certificate.)

FOR VALUE RECEIVED ________________________________________________________________

hereby sells, assigns and transfers unto ______________________________________________________

______________________________________________________________________________

(*Please print name and address of transferee*)

the Rights represented by this Rights Certificate, together with all right, title and interest therein, and irrevocably constitute and appoint ________________________________ as attorney, to transfer the within Rights on the books of Africo Resources Ltd., with full power of substitution.

Dated: ____________________

Signature: _____________________________________

Signature Guaranteed: __________________________

(*Signature must correspond to name as written upon the face of this Rights Certificate in every particular, without alteration or enlargement or any change whatsoever*)

*Signature must be guaranteed by a Canadian Chartered Bank, a Canadian trust company, a member firm of a recognized Stock Exchange in Canada, a registered national securities exchange in the United States, a member of the National Association of Securities Dealers, Inc. or a commercial bank or trust company having an office or correspondent in Canada or the United States.*

**CERTIFICATE**

(To be completed if true.)

The undersigned party transferring Rights hereunder, hereby represents, for the benefit of all holders of Rights and Shares, that the Rights evidenced by this Rights Certificate are not, and, to the knowledge of the undersigned, have never been, Beneficially owned by an Acquiring Person or an Affiliate or Associate thereof or a Person acting jointly or in concert with an Acquiring Person or an Affiliate or Associate thereof. Capitalized terms shall have the meaning ascribed thereto in the Shareholder Rights Plan Agreement.

Signature: ______________________________________

(To be attached to each Rights Certificate.)

# FORM OF ELECTION TO EXERCISE

(To be exercised by the registered holder if such holder desires to exercise the Rights Certificate.)

TO: **Africo Resources Ltd.** and Computershare Investor Services Inc.

The undersigned hereby irrevocably elects to exercise ________________________________________ ______________________________________ whole Rights represented by the attached Rights Certificate to purchase the Common Shares or other securities, if applicable, issuable upon the exercise of such Rights and requests that certificates for such securities be issued in the name of:

Name: ______________________________________________

Address: ____________________________________________

City and Province: ____________________________________

Social Insurance, Social Security or other taxpayer identification number: ___________________________________

If fewer than all the Rights evidenced by this Rights Certificate are exercised hereby, a new Rights Certificate for the balance of such Rights shall be registered in the name of and delivered to:

Name: ______________________________________________

Address: ____________________________________________

City and Province: ____________________________________

Social Insurance, Social Security or other taxpayer identification number: ___________________________________

Dated: _____________________

Signature: __________________________________________

Signature Guaranteed: _____________________________

(*Signature must correspond to name as written upon the face of this Rights Certificate in every particular, without alteration or enlargement or any change whatsoever*)

*Signature must be guaranteed by a Canadian Chartered Bank, a Canadian trust company, a member of a recognized stock exchange or a member of the Securities Transfer Association Medallion (STAMP) Program.*