# Exhibit 4

US$115,000,000

# CONVERTIBLE LOAN FACILITY AGREEMENT

dated April 2008

for

CAMROSE RESOURCES LIMITED

with

VIPAR INVESTMENTS LIMITED
acting as Lender

and

VIPAR INVESTMENTS LIMITED
acting as Security Trustee

Linklaters

Ref: NLM

Linklaters LLP

CONTENTS


CLAUSE PAGE

SECTION 1
INTERPRETATION

1. Definitions and interpretation ... 1

SECTION 2
THE FACILITIES

2. The Facilities ... 23
3. Purpose ... 24
4. Conditions of Utilisation ... 24

SECTION 3
UTILISATION

5. Loans ... 26

SECTION 4
REPAYMENT, PREPAYMENT AND CANCELLATION

6. Repayment of Loans ... 27
7. Prepayment and cancellation ... 28

SECTION 5
CONVERSION

8. Conversion ... 30

SECTION 6
COSTS OF UTILISATION

9. Interest ... 32
10. Interest Periods ... 33
11. Changes to the calculation of interest ... 33

SECTION 7
ADDITIONAL PAYMENT OBLIGATIONS

12. Tax gross up and indemnities ... 35
13. Increased costs ... 37
14. Other indemnities ... 38
15. Mitigation by the Lenders ... 39
16. Costs and expenses ... 39

SECTION 8
COMIDE ASSET TRANSFERS

17. Comide Asset Transfers ... 42

SECTION 9
GUARANTEE AND SECURITY

18. Guarantee and indemnity ... 46

SECTION 10
REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT

19. Representations ... 49
20. Information undertakings ... 57
21. General undertakings ... 63
22. Camrose Holdco Group and Cerida Holdco Group Undertakings ... 67
23. Comide Group undertakings ... 69

24. Events of Default ....71

**SECTION 11**

**CHANGES TO PARTIES**

25. Changes to the Lenders ....76
26. Changes to the Obligors ....76

**SECTION 12**

**THE FINANCE PARTIES**

27. Role of the Security Trustee ....78
28. Conduct of business by the Finance Parties ....82

**SECTION 13**

**ADMINISTRATION**

29. Payment mechanics ....83
30. Set-off ....84
31. Notices ....84
32. Calculations and certificates ....85
33. Partial invalidity ....85
34. Remedies and waivers ....86
35. Amendments and waivers ....86
36. Counterparts ....86

**SECTION 14**

**GOVERNING LAW AND ENFORCEMENT**

37. Governing law ....87
38. Enforcement ....87

**EXECUTION PAGES**

**THE SCHEDULES**

**SCHEDULE** **PAGE**

SCHEDULE 1 Conditions precedent ....88
SCHEDULE 2 Utilisation Requests ....95
SCHEDULE 3 Form of Accession Letter ....96
SCHEDULE 4 Security trust provisions ....97
SCHEDULE 5 Form of Compliance Certificate ....100
SCHEDULE 6 Timetables ....101
SCHEDULE 7 Conversion Notice ....102
SCHEDULE 8 Africo Share Warranties ....103

THIS AGREEMENT is dated April 2008 and made between:

(1) CAMROSE RESOURCES LIMITED, a company incorporated under the laws of the British Virgin Islands with registered number 1055983 and whose registered office is at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands (the "**Company**");

(2) LINE TRUST CORPORATION LIMITED, a company registered in Gibraltar under company registration no 25791, whose registered office is at 57/63 Line Wall Road, Gibraltar, in its capacity as trustee of The Ashdale Settlement (the "**Parent**");

(3) CERIDA GLOBAL LIMITED, a company incorporated under the laws of the British Virgin Islands with registered number 1018804 and whose registered office is at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands ("**Cerida**", and together with the Parent, the "**Original Guarantors**");

(4) VIPAR INVESTMENTS LIMITED as lender (the "**Lender**"); and

(5) VIPAR INVESTMENTS LIMITED as security trustee for the Finance Parties (the "**Security Trustee**").

IT IS AGREED as follows:

## SECTION 1

## INTERPRETATION

### 1. DEFINITIONS AND INTERPRETATION

#### 1.1 Definitions

In this Agreement:

"**Acceleration Date**" means the date (if any) on which the Lender gives a notice under Clause 24.19 (*Acceleration*).

"**Accession Letter**" means a document substantially in the form set out in Schedule 3 (*Form of Accession Letter*) and in the form and substance satisfactory to the Lender.

"**Accounting Month**" means each period of approximately 30 days adopted by the Company for the purpose of its financial reporting in any financial year of the Company.

"**Accounting Quarter**" means each period of 3 Accounting Months ending on or about 31 March, 30 June, 30 September and 31 December in any financial year of the Company.

"**Acquisitions**" means the Initial Acquisition and the Africo Placing.

"**Additional Guarantor**" means a company which becomes an Additional Guarantor in accordance with Clause 26 (*Changes to the Obligors*).

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Africo**" means Africo Resources Limited a company existing under the laws of Canada, the registered office of which is at 1030 West George Street, Suite 1108, Vancouver, BCV6E 2Y3 with federal corporate number 4358678.

"**Africo Loan**" means the loan to be made to Africo by the Borrower pursuant to the Africo Loan Document.

"**Africo Loan Document**" means the loan agreement dated on or about the date of the Africo Placing Documents pursuant to which the Borrower makes available to Africo a loan in the amount of $2million.

"**Africo Loan Security**" means the security assignment by the Borrower in favour of the Lender in respect of the Africo Loan Document.

"**Africo Loan Security Document**" means the document pursuant to which the Africo Loan Security is created and to be delivered to the Lender pursuant to Clause 22.3(d) of this Agreement.

"**Africo Loan Closing Date**" means the date on which the Borrower complies with its obligations under the Africo Loan Document to advance funds to Africo.

"**Africo Group**" means Africo and its Subsidiaries from time to time.

"**Africo Placing**" means the private placing made or proposed to be made by Africo in relation to Africo Shares substantially on the terms and conditions set out in the Africo Placing Documents, as that agreement may from time to time be amended, extended, revised or waived in accordance with this Agreement.

"**Africo Placing Closing Date**" means date on which the Africo Placing is completed;

"**Africo Placing Costs**" means all costs, fees and expenses (and Taxes on them) and all stamp duty, stamp duty land tax, registration and other similar Taxes incurred by or on behalf of the Company in connection with the Africo Placing, the Africo Placing Documents or the financing of the Company's subscription to the Africo Placing Shares.

"**Africo Placing Documents**" means the subscription agreement in the Agreed Form to be entered into between Africo and the Company in respect of the Africo Placing and any other document (in the Agreed Form) issued by or on behalf of Africo in respect of the Africo Placing Shares.

"**Africo Placing Lender Costs**" means all costs and expenses (including legal and other fees) incurred by the Lender in connection with the negotiation, preparation, printing and execution of the Transaction Documents on or prior to the Africo Placing Closing Date.

"**Africo Placing Shares**" means all Africo Shares subscribed for by the Company pursuant to the Africo Placing.

**"Africo Purchaser"** means the Company.

"**Africo Share Security**" means the Security to be granted by the Company over the Africo Shares pursuant to Clause 22.3(c) of this Agreement immediately following the Africo Placing Closing Date.

"**Africo Share Security Document**" means the document pursuant to which the Africo Share Security is created.

"**Africo Shares**" means any ordinary shares in the capital of Africo (provided they rank pari passu with and have in all other respects the same economic, voting and other rights as the Africo Placing Shares) and any warrants attached to or associated with such shares.

"**Africo Share Termination Value**" means the lesser of (i) an amount equal to 85 per cent. of the volume weighted average of the closing market price per Africo Share quoted by the Toronto Stock Exchange over the five Dealing Days immediately preceding the date on which repayment of the Facilities occurs and (ii) an amount equal to 115% of the "market price" of the Africo Shares at the time of notice or repayment (or other appropriate time), determined in accordance with the Securities Act (Ontario), less any brokerage fees or commissions.

"**Africo Share Value Amount**" means the aggregate subscription price paid by the Borrower in cash for the Africo Placing Shares and (if any) the other Investments in Africo Shares it acquired on the Africo Placing Closing Date pursuant to the Africo Placing;

"**Agreed Form**" means, in relation to a document, that:

(a) it is in a form initialled by or on behalf of the Company and the Lender on or before the signing of this Agreement for the purposes of identification; or

(b) if not falling within sub-paragraph (a) above, it is in form and substance satisfactory to the Lender (acting reasonably) and initialled by or on behalf of the Lender for the purposes of identification.

"**Akam Claim**" means the claim that the Initial Target had acquired by way of a sale and is the owner of, a 75% interest in Swanmines s.p.r.l, the owner of the Kalukundi Property.

"**Akam Security**" means the security referred to in Clause 22.3(b) of this Agreement:

"**Akam Value Amount**" means the aggregate of:

(a) the amount of all cash payments; and

(b) the value of all Africo Shares (calculated by reference to the subscription price paid by the Borrower in cash for the Africo Placing Shares pursuant to the Africo Placing),

that have been received by a member of the Camrose Holdco Group in consideration for either (i) any transfer of an Interest in the Initial Purchaser, the Initial Target or any Subsidiary of the Initial Target to a member of the Africo Group or (ii) any waiving or settling of the dispute with Africo in respect of the Akam Claim, and net of any payments made by any member of the Camrose Holdco Group to any member of the Africo Group in connection with such transfer.

"**Amount Owing**" means the aggregate of all amounts which the Borrower is or will become actually liable to pay to or for the account of the Lender under or in connection with this Agreement, including principal, interest (including capitalised interest and interest accrued but not yet due and payable), fees, costs, indemnity, charges, duties and expenses payable under or in connection with this Agreement.

"**Anti-Terrorism and Money Laundering Laws**" means any laws, regulations, rules and interpretive guidance designed to combat the financing of terrorism or money laundering, including but not limited to, the United States Executive Order, the United States statutes authorizing the establishment of trade and economic sanctions programs enforced by the Office of Foreign Assets Control of the United States Treasury Department, the United States Bank Secrecy Act of 1970, the USA PATRIOT Act of 2001 (to the extent applicable), the British Virgin Islands Proceeds of Criminal Conduct Act 1997, the British Virgin Islands Anti-Money Laundering Code of Practice 1999, the BVI Anti-Money Laundering Guidance Notes 2000, the United Kingdom Money Laundering Regulations 2003, the United Kingdom Proceeds of Crime Act 2002, the United Kingdom Serious Organised Crime and Police Act 2005 and the United Kingdom Anti-Terrorism, Crime and Security Act 2001

"**Applicable Accounting Principles**" means generally accepted accounting principles, standards and practices and financial reference periods.

"**Articles**" means the Articles of Association of the Company

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means:

(a) in relation to Facility A, the period from and including the date of this Agreement to and including the date which is 7 days after the date of this Agreement; and

(b) in relation to Facility B, the period from and including the date of this Agreement to and including the date which is 120 days after the date of this Agreement.

"**Available Commitment**" means, in relation to a Facility, the Lender's Commitment under that Facility minus:

(a) the amount of its participation in any outstanding Utilisations under that Facility; and

(b) in relation to any proposed Utilisation, the amount of its participation in any Utilisations that are due to be made under that Facility on or before the proposed Utilisation Date.

"**Available Facility**" means, in relation to a Facility, the aggregate for the time being of the Lender's Available Commitment in respect of that Facility.

"**Base Currency**" or "**$**" means United States dollars.

"**Borrower**" means the Company.

"**Borrower Group**" means the Company and its Subsidiaries as enlarged following the Initial Acquisition Closing Date by the Initial Acquisition and following the Africo Placing Closing Date by the Africo Placing.

"**Break Costs**" means the amount (if any) by which:

(a) the interest which the Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b) the amount which the Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London, New York and Gibraltar.

"**Camrose Holdco Group**" means the Company and its Subsidiaries from time to time, excluding any member of the Comide Group or the Africo Group.

"**Camrose Value Amount**" means the aggregate of:

(a) the Africo Share Value Amount as at the Africo Placing Closing Date;

(b) the Comide Asset Value Amount as at the Conversion Notice Date; and

(c) the Akam Value Amount (but without double-counting any part of the Africo Share Value Amount),

in each case as converted (to the extent necessary) into the Base Currency by reference to the Spot Rate of Exchange as at the Business Day immediately preceding the Conversion Notice Date.

"**Capital Expenditure**" means any expenditure which should in accordance with the Applicable Accounting Principles be treated as capital expenditure in the audited consolidated financial statements of the Group.

"**Cash Equivalent Investments**" means:

(a) securities with a maturity of less than 12 months from the date of acquisition issued or fully guaranteed or fully insured by the Government of the United States or any member state of the European Union which is rated at least AA by Standard & Poor's Rating Group or Aa by Moody's Investors Service, Inc.;

(b) commercial paper or other debt securities issued by an issuer rated at least A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc. and with a maturity of less than 12 months; and

(c) certificates of deposit or time deposits of any commercial bank (which has outstanding debt securities rated as referred to in paragraph (b) above) and with a maturity of less than 3 months,

in each case not subject to any Security (other than pursuant to any Security Document), denominated and payable in freely transferable and freely convertible currency and the proceeds of which are capable of being remitted to an Obligor in the United Kingdom.

"**Cerida Holdco Group**" means Cerida, Rokesly International Limited and each of their Subsidiaries, but excluding members of the Comide Group.

"**Charged Assets**" means the assets over which Security is expressed to be created pursuant to any Security Document.

"**Chargor**" means any person expressed to create Security pursuant to any Security Document.

"**Collateral Account**" means the custodian account set up by the Security Trustee to hold the Africo Shares plus any other Comide Assets capable of being so held, pursuant to the Security Documents.

"**Collateral Security"** the (i) the Africo Share Security, (ii) the Comide Security, (iii) the Africo Loan Security and the (iv) Akam Security.

"**Collateral Security Documents**" means the documents pursuant to which the Collateral Security is created.

"**Collateral Value**" means, on any given date, the aggregate of:

(a) the number of Africo Shares held in the Collateral Account or otherwise subject to the Africo Share Security on that date multiplied by the lesser of the closing market price per Africo Share quoted by the Toronto Stock Exchange on the Dealing Day immediately prior to that date and the market price as determined pursuant to the regulations under the Securities Act (Ontario) at that date;

(b) the value of the Comide Security, the Africo Loan Security and the Akam Security, which shall, in respect of the Comide Security, be determined by the Lender (acting reasonably in consultation with the Company) by reference to the Comide Asset Value Amount on that date; and

(c) the value on that date of any Eligible Collateral provided to the Security Trustee in accordance with to Clause 22.2(b) (*Collateral maintenance*), as determined by the Lender (acting reasonably in consultation with the Company),

in each case as converted (to the extent necessary) into the Base Currency by reference to the Spot Rate of Exchange as at that date.

"**Comide**" means Comide s.p.r.l, a company registered in the Democratic Republic of Congo under registration number 52817;

"**Comide Assets**" means any Investment in Comide, any Share Interest or Interest held by Comide in respect of or connected to the Comide Mining Concessions or any other Share Interest or other Interest in respect of or connected to the Comide Mining Concessions held by any other member of the Parent Group, in each case held on the date of this Agreement, but specifically excluding (i) that Share Interest or Interest in Daletona Properties Limited amounting to 15% of the ordinary issued share capital of Daletona Properties Limited held by Silvertide Global Limited pursuant to a declaration of trust in favour of JHM Levy and H Levy (as the Trustees of the Herne Hill Trust)as at the date of this Agreement (the "**Trust Interest**") and (ii) that Share Interest or Interest held by Fervent Limited in Daletona Properties Limited amounting to 35% of the ordinary issued share capital of Daletona Properties Limited as at the date of this Agreement and any further shares acquired by Fervent Limited as a result of a transfer by Silvertide Global Limited of the Trust Interest as permitted pursuant to the Comide Shareholder Document (the "**Fervant Interest**"); (iii) the Gecamines Interest; and (iv) the proportionate share of any Interest in Comide, attributable to the Trust Interest, the Fervent Interest and the Gecamines Interest.

"**Comide Asset Transfer**" means any of the First Comide Asset Transfer, the Second Comide Asset Transfer and the Third Comide Asset Transfer

"**Comide Asset Value Amount**" means:

(a) if the Second Comide Asset Transfer Date has not occurred, the First Comide Asset Value Amount;

(b) if the Second Comide Asset Transfer Date has occurred but the Third Comide Asset Transfer Date has not occurred, the aggregate of the First Comide Asset Value Amount and the Second Comide Asset Transfer Amount; or

(c) if the Third Comide Asset Transfer Date has occurred, the aggregate of the First Comide Asset Value Amount, the Second Comide Asset Transfer Amount and the Third Comide Asset Value Amount.

"**Comide Group**" means Comide and its Subsidiaries from time to time.

"**Comide Security**" means a first ranking charge over all of the shares held by Cerida in Rokesly International Limited.

"**Comide Security Documents**" means the documents pursuant to which the Comide Security is created.

"**Comide Shareholder Document**" means the shareholder letter dated on or about the same date as this Agreement between Cerida, Daletona Properties Limited, Silvertide Global Limited and Fervent Limited in respect of their shareholdings in Rokesly International Limited and Daletona Properties Limited.

"**Comide Mining Concessions**" means each of:

(a) the permis d'exploitation titre 2606 granted in favour of Comide by the Cadastre Minier of the Democratic Republic of Congo on 6 July 2005;

(b) the permis d'exploitation titre 2607 granted in favour of Comide by the Cadastre Minier of the Democratic Republic of Congo on 6 July 2005;

(c) the permis d'exploitation titre 2608 granted in favour of Comide by the Cadastre Minier of the Democratic Republic of Congo on 6 July 2005; and

(d) the Kansuki Mining Concession.

"**Commitment**" means a Facility A Commitment or Facility B Commitment.

"**Compliance Certificate**" means a certificate substantially in the form set out in Schedule 5 (*Form of Compliance Certificate*).

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in the form agreed between the Company and the Lender on or prior to the date of this Agreement or in any other form agreed between the Company and the Lender.

"**Conversion**" means the exercise of the option to subscribe for Shares in the Company in respect of any Conversion Amount pursuant to Clause 8 (*Conversion Mechanics*).

"**Conversion Amount**" means the Amount Owing as at the Conversion Notice Date, as adjusted (if required) pursuant to Clause 8.3 (*Adjustment to the Conversion Amount*).

"**Conversion Notice**" means the notice substantially in the form set out at Schedule 7 to this Agreement (*Form of Conversion Notice*);

"**Conversion Notice Date**" means the date on which the Conversion Notice is delivered to the Borrower;

"**Conversion Number**" means, in relation to a Conversion Notice and subject to Clause 8.3 (*Adjustment to the Conversion Amount*)(which provides that the Conversion Number shall never exceed 50 per cent. of the issued ordinary share capital of the Borrower), the number of Shares (rounded up to the nearest whole number) equal to:

(a) the Conversion Amount specified in that Conversion Notice (subject to any adjustments to be made pursuant to the provisions of Clause 8.3 below);

divided by

(b) the Conversion Price as at the Conversion Notice Date.

"**Conversion Period**" means the period commencing on the Utilisation Date for Facility B and ending at 5.30pm (London time) on the Second Comide Asset Transfer Date;

"**Conversion Price**" means the (i) Camrose Value Amount less (ii) the aggregate of the Amount Owing as at the Conversion Notice Date, any other liabilities of any description and any share capital other than the Shares, then divided by the total number of Shares in issue immediately prior to the Conversion Notice Date.

"**Conversion Shares**" means any Shares issued or to be issued to the Lender pursuant to a Conversion;

"**Dealing Day**" means a day on which the Toronto Stock Exchange is open for business, other than a day on which the Toronto Stock Exchange is scheduled to, or does, close prior to its regular weekday closing time.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 24 (*Events of Default*) which would (with the lapse of time, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Designated Person**" means a person or entity:

(a) listed in the annex to, or otherwise subject to the provisions of, the Executive Order;

(b) named as a "Specially Designated National and Blocked Person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list;

(c) determined by the US Secretary of the Treasury to be owned or controlled by, or to act for or on behalf of, any person referred to in paragraph (a) above or otherwise determined by the US Secretary of State to be subject to the terms of Section 1 of the Executive Order;

(d) a person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; or

(e) a person or entity determined by the US Secretary of State to have committed, or to pose a significant risk of committing, acts of "terrorism" as defined in the Executive Order that threaten the security of US nationals or the national security, foreign policy, or economy of the United States.

"**Due Diligence Information**" means all information reasonably requested by the Lender in respect of the Comide Mining Concessions including (but not limited to):

(a) Copies of all licences and other legal documentation relating to the Comide Mining Concessions;

(b) Geological maps of all areas relating to the Comide Mining Concessions;

(c) Drilling and essay results for all areas relating to the Comide Mining Concessions;

(d) Technical reports, laboratory results and drilling programs prepared by third party consultants relating to the Comide Mining Concessions

(e) Latest geological ore body models relating to the Comide Mining Concessions

(f) Comide budget and business plan (including target drill areas, timetable, cost of drilling and other relevant information);

(g) Latest Management Presentation (presented to the Lender on 13/14 March)

(h) Comide accounts and financial statements for the last two financial years;

(i) Details of any arrangements with any third party service providers or contractors (including, but not limited to, any such arrangements in respect of drilling, earth moving and logistics);

(j) the constitutional documents of all direct and indirect shareholders of Comide

(k) evidence of the shareholding structure of Comide and all its Affiliates;

(l) evidence that the Gertler Family are the ultimate beneficial owners of the Parent

(m) details of the assets and liabilities of Comide, including details of all exploration and exploitation licences held by Comide and any related documentation;

(n) details of the Africo Placing, including draft legal documentation, timeline to completion and details of any Canadian regulatory issues and applicable stock exchange rules that might need to be addressed;

(o) constitutional documents of Initial Target;

(p) details of all assets and liabilities of the Initial Target and confirmation as to why it is to be acquired by the Initial Purchaser; and

(q) CVs of Comide's senior executives,

(to the extent available).

"**Eligible Collateral**" means any of:

(a) cash;

(b) Cash Equivalent Investments;

(c) Africo Shares; and

(d) with the prior written consent of the Lender, any other security, instrument or asset.

"**Environment**" means living organisms including the ecological systems of which they form part and the following media:

(a) air (including air within natural or man-made structures, whether above or below ground);

(b) water (including territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c) land (including land under water).

"**Environmental Claim**" means any litigation, arbitration or administrative proceedings of or before any court, arbitral body or regulatory authority relating to Environmental Law or the environmental, health or safety related obligations of any agreement, laws and regulations of any jurisdiction.

"**Environmental Law**" means all laws and regulations of any relevant jurisdiction concerning or applicable with regard to: (i) the pollution or protection of, or compensation of damage or harm to, the Environment; (ii) occupational or public health and safety; or (iii) emissions, discharges or releases into, or the presence in, the Environment or of the use, treatment, storage, disposal, transportation or handling of Hazardous Substances (including without limitation taxation or any obligation to purchase credits or allowances or to provide financial security with regard to any such activities).

"**Environmental Licence**" means any Authorisation, notification, assessment, certificate, allowance or credit required at any time under Environmental Law.

"**Event of Default**" means any event or circumstance specified as such in Clause 24 (*Events of Default*).

"**Executive Order**" means the United States Executive Order No. 13224 on Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, which came into effect on 23 September 2001.

"**Extension Date**" means the date falling 180 days after the Africo Placing Closing Date.

"**Facility**" means Facility A or Facility B and "**Facilities**" shall mean both of them.

"**Facility A**" means the term loan facility made available under this Agreement as described in paragraph (a) of Clause 2.1 (*The Facilities*).

"**Facility A Commitment**" means:

(a) in relation to the Lender, US$16,250,000; and

(b) in relation to any other Lender, the amount in the Base Currency of any Facility A Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Facility A Lender**" means:

(a) the Lender; and

(b) any Affiliate of the Lender which has become a Facility A Lender in accordance with Clause 25 (*Changes to the Lenders*),

which in each case has not ceased to be a Facility A Lender in accordance with this Agreement.

"**Facility A Loan**" means a loan made or to be made under Facility A or the principal amount outstanding for the time being of that loan.

"**Facility B**" means the term loan facility made available under this Agreement as described in paragraph (b) of Clause 2.1 (*The Facilities*).

"**Facility B Commitment**" means:

(a) in relation to the Lender, US$98,750,000; and

(b) in relation to any other Lender, the amount in the Base Currency of any Facility B Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Facility B Lender**" means:

(a) the Lender; and

(b) any Affiliate of the Lender which has become a Facility B Lender in accordance with Clause 25 (*Changes to the Lenders*),

which in each case has not ceased to be a Facility B Lender in accordance with the terms of this Agreement.

"**Facility B Loan**" means a loan made or to be made under Facility B or the principal amount outstanding for the time being of that loan.

"**Finance Document**" means this Agreement, each Accession Letter, each Security Document and any other document designated as such by the Lender and the Company.

"**Finance Party**" means the Lender or the Security Trustee.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a) moneys borrowed;

(b) any amount raised by acceptance under any acceptance credit facility;

(c) any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d) the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with the Applicable Accounting Principles, be treated as a finance or capital lease;

(e) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f) any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g) any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h) shares which are expressed to be redeemable;

(i) any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(j) the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (j) above.

"**First Comide Asset Value Amount**" shall be one third of the value of the Comide Assets, provided that for the purpose of this definition the total value of the Comide Mining Concessions shall be assumed to be:

(a) $400,000,000;

(b) less the amount equal to $1,000,000 times the number of per cent. of the value of Kansuki Mining S.p.r.l. (whether arising by way of ordinary shareholdings, options, warrants or other equity instrument, security or any equity derivative of any description) that is not directly held by Comide on the Conversion Notice Date; and

(c) adjusted to take into account the value of any Comide Assets sold, leased, transferred or otherwise disposed of pursuant to Clause 17.4 of this Agreement to the extent that the consideration received from the sale is not received and retained by Comide.

"**First Comide Asset Transfer**" means the transfer by the Parent (or to the extent necessary the procurement by the Parent of the transfer from an Affiliate of the Parent) to the Company of full legal and beneficial title to one third of the Comide Assets in consideration for Shares in the Company;

"**First Comide Asset Transfer Date**" means the date on which the First Comide Asset Transfer occurs;

**"Gecamines Interest"** means any Interest in Comide held by Gecamines.

"**Group Structure Chart**" means any of the Initial Group Structure Chart and the Second Group Structure Chart.

"**Guarantor**" means an Original Guarantor or an Additional Guarantor.

"**Hazardous Substance**" means any waste, pollutant, emission, contaminant or other substance (including any liquid, solid, gas, ion, living organism or noise) that may be harmful to human health or other life or the Environment or a nuisance to any person or that may make the use or ownership of any affected land or property more costly.

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary.

"**IFRS**" means the International Financial Reporting Standards adopted by the International Accounting Standards Board.

"**Initial Acquisition**" means the purchase of the entire issued share capital of the Initial Target to be acquired by the Initial Purchaser pursuant to the Initial Acquisition Documents.

"**Initial Acquisition Agreement**" means the sale and purchase agreement dated on or about the date of this Agreement and in the Agreed Form between the Initial Vendor and the Initial Purchaser relating to the sale and purchase of the Initial Target.

"**Initial Acquisition Closing Date**" means the date of completion of the Initial Acquisition.

"**Initial Costs**" means all costs, fees and expenses (and Taxes on them) and all stamp duty, registration and other similar Taxes incurred by or on behalf of the Initial Purchaser in connection with the Initial Acquisition and/or its financing and the Africo Loan.

"**Initial Acquisition Documents**" means the Initial Acquisition Agreement and any other document designated as such by the Lender and the Company.

"**Initial Group Structure Chart**" means the group structure chart in the Agreed Form to be delivered by the Company to the Lender pursuant to Part I of Schedule 1 (*Conditions precedent to initial utilisation*).

"**Initial Lender Costs**" means all reasonable costs and expenses (including legal and other fees) incurred by the Lender in connection with the negotiation, preparation, printing and execution of the Transaction Documents on or prior to the later of the Initial Acquisition Closing Date or the Africo Loan Closing Date.

"**Initial Purchaser**" means Kigala Multinational Limited, a company registered in the British Virgin Islands under company registration number 1462013.

"**Initial Target**" means Akam Mining s.p.r.l, a company registered in the Democratic Republic of Congo under DRC Registration No 10171 with its principal place of business at 21/24, Avenue Mwepu, Commune Lubumbashi, a Lubumbashi, Province of Katanga, Republic Democratique du Congo

"**Initial Vendor**" means Antoine Mununga Kasongo Kamamba and Marie-Therese Mwankwe Kabina, both of 1035 B, avenue Citoyenne MOBUTU, commune de Lubumbashi a Lumbumbashi.

"**Intercompany Loan Assignment**" means the assignment in favour of the Lender in respect of the intercompany loan between Comide and Fleurette Properties Limited.

"**Interest**" means any legal or beneficial interest, holding or right of any description, any asset (whether held legally, beneficially, by way of trust or any other means), and any right, economic interest, option or derivative of any description.

"**Interest Period**" means, in relation to a Loan, each period determined in accordance with Clause 10 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 9.3 (*Default interest*).

"**Internal Revenue Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Investor**" means the Lender or an Affiliate of the Lender.

"**Investor Documents**" means the Shareholders' Agreement, the Articles and any other document designated as such by the Lender and the Company.

"**Investments**" means:

(a) securities and investments of any kind (including shares, stock, debentures, units, depositary receipts, bonds, notes, commercial paper and certificates of deposit);

(b) warrants, options or other rights to subscribe for, purchase or otherwise acquire securities and investments;

(c) all rights relating to securities and investments which are deposited with, or registered in the name of, any depositary, custodian, nominee, clearing house or system, investment manager, chargee or other similar person or their nominee, in each case whether or not on a fungible basis (including rights against any such person); and

(d) all other rights attaching or relating to securities or investments and all cash or other securities or investments in the future deriving from Investments or such rights.

"**IRS**" means the United States Internal Revenue Service.

"**Issue Date**" means the date on which the Borrower allots, issues and delivers to the Lender the Conversion Shares in accordance with Clause 8 of this Agreement;

"**Kalukundi Property**" means the 19.5 square-kilometre tenement in the Kolwezi District of Katanga Province in the Democratic Republic of the Congo, consisting of 23 blocks, that is subject to Exploitation or Mining License PE591 issued on October 11, 2001.

"**Kansuki Mining Concession**" means the permis d'exploitation titre 643 granted in favour of Kansuki Mining s.p.r.l by the Cadastre Minier of the Democratic Republic of Congo on 22 July 2005.

"**Lender**" means a Facility A Lender or a Facility B Lender.

"**Liabilities**" of a Chargor means all present and future moneys, debts and liabilities due, owing or incurred by it to any Finance Party on any current or other account or otherwise in any manner whatsoever (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently and whether as principal, surety or otherwise).

"**LIBOR**" means, in relation to the Loan:

(a) the applicable Screen Rate for loans with a maturity of 6 months, for comparable amounts and denominated in US Dollars; or

(b) (if no Screen Rate is available for the Base Currency for the Interest Period of that Loan) the rates quoted by the Lender to leading banks in the London interbank market,

as at 11.00am on the Quotation Day for the offering of deposits in the currency of that Loan for a period comparable to the Interest Period for that Loan.

"**Loan**" means a Facility A Loan or a Facility B Loan.

"**Margin**" means:

(a) up to and including the Extension Date, 8 per cent. per annum; and

(b) following the Extension Date, 10 per cent. per annum.

"**Material Adverse Effect**" means a material adverse effect on or material adverse change in:

(a) the financial condition, assets (including mining or other licences) prospects or business of any Obligor or the consolidated financial condition, assets, prospects or business of the Borrower Group, the Comide Group, the Targets or the Obligors taken as a whole;

(b) the ability of any Obligor to perform and comply with its obligations under any Finance Document;

(c) the validity, legality or enforceability of any Finance Document or Investor Document; or

(d) the validity, legality or enforceability of any Security expressed to be created pursuant to any Security Document or on the priority and ranking of any of that Security.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day; and

(b) if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

The above rules will only apply to the last Month of any period.

"**Obligor**" means the Company or a Guarantor.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Original Obligor**" means the Company or an Original Guarantor.

"**Parent Group**" means the Parent and its Affiliates from time to time.

"**Parent NAV Certificate**" means the certificate to be delivered by the Parent to the Lender pursuant to paragraph 5(e) of Schedule 1 (*Conditions Precedent*) in form and substance satisfactory to the Lender.

"**Participating Member State**" means any member state of the European Communities that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

**"P.E. 2607 Sale Agreement"** means the sale agreement in the Agreed Form between Comide and Africo in respect of exploitation permit No.PE2607 consisting of 41 blocks for copper, cobalt, gold and nickel, situated in the territory of Lubudi, District of Kolwezi, Province of Katanga, Democratic Republic of Congo.

"**Perfection Requirements**" means the making of the appropriate registrations of the Security Documents as specifically contemplated by any legal opinion delivered pursuant to Clause 4 (*Conditions of Utilisation*) or Clause 26 (*Changes to the Obligors*).

"**Permitted Comide Disposal**" means the sale, lease, transfer or other disposal:

(a) of trading stock by a member of the Comide Group in the ordinary course of trading of the disposing entity;

(b) arising as a result of any Permitted Security; or

(c) of obsolete or redundant vehicles, plant and equipment for cash and which, in the reasonable opinion of the member of the Comide Group making the sale, transfer or disposal, are not required for the efficient operation of its business.

"**Permitted Comide Financial Indebtedness**" means:

(a) any Financial Indebtedness arising under any Finance Document;

(b) any Financial Indebtedness arising under finance leases or contracts for hire purchase entered into in the ordinary course of business up to a maximum aggregate liability over the term of the relevant leases or contracts of $100,000 (or its equivalent in another currency or currencies);

(c) any Financial Indebtedness arising under unsecured general banking facilities including without limitation overdraft facilities, foreign exchange facilities, BACS facilities, credit card facilities and trade finance facilities entered into in ordinary course of business, the aggregate liability of which does not exceed $100,000 (or its equivalent in another currency or currencies);

(d) any Financial Indebtedness owed by Comide to any member of the Parent Group, as disclosed to the Lender in writing prior to the date of this Agreement; and

(e) any Financial Indebtedness approved by the Lender in writing.

"**Permitted Comide Guarantee**" means:

(a) any guarantee arising under the Finance Documents;

(b) any guarantee issued by a member of the Comide Group on arm's length terms and in the ordinary course of its trading, where the aggregate liability (whether actual or contingent) of Comide under all such guarantees does not at any time exceed $100,000 (or its equivalent in another currency or currencies); and

(c) any customary indemnity in relation to a Permitted Disposal.

"**Permitted Comide Loan**" means any trade credit extended by Comide to its customers on normal arms' length commercial terms and in the ordinary course of its trading activities.

"**Permitted Comide Security**" means:

(a) any lien arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by a member of the Comide Group;

(b) any Security arising under retention of title, hire purchase, finance lease or conditional sale arrangements provided that the Financial Indebtedness thereby secured is permitted under paragraph (b) of Permitted Financial Indebtedness and rights of set-off arising in the ordinary course of trading with suppliers of goods to Comide and not as a result of any default or omission by a member of the Comide Group;

(c) any Security or Quasi Security created pursuant to any Finance Document;

(d) any Quasi Security arising as a result of a sale, transfer or other disposal which is a Permitted Disposal.

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined the first day of that period unless market practice differs in the Relevant Interbank Market, in which case the Quotation Day will be determined by the Lender in accordance with market practice in the Relevant Interbank Market (and if quotations for that currency for that period would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

"**Relevant Group**" means:

(a) the Parent,

(b) each Subsidiary of the Parent that has a direct or indirect Share Interest in the Company and/or Comide; and

(c) the Company and Comide and each of their Subsidiaries.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a) its jurisdiction of incorporation;

(b) any jurisdiction where any asset subject to or intended to be subject to a Security Document is situated; and

(c) any jurisdiction where it conducts its business.

"**Relevant Interbank Market**" means the London interbank market.

"**Reservations**" means any general principles of law limiting the obligations of any Obligor which are specifically referred to in any legal opinion delivered pursuant to Clause 4 (*Conditions of Utilisation*) or Clause 26 (*Changes to the Obligors*).

"**Screen Rate**" means:

(a) the British Bankers Association Interest Settlement Rate for the relevant currency and period; and

(b) displayed on the appropriate page of the Reuters screen. If the agreed page is replaced or service ceases to be available, the Lender may specify another page or service displaying the appropriate rate after consultation with the Company.

"**Second Comide Asset Transfer**" means the transfer by the Parent (or to the extent necessary the procurement by the Parent of the transfer from an Affiliate of the Parent) to the Company of one third of the Comide Assets, resulting in the Company holding full legal and beneficial title to two-thirds of the total value of the Comide Assets.

"**Second Comide Asset Transfer Date**" means the date on which the Second Comide Asset Transfer is completed.

"**Second Comide Asset Value Amount**" shall be the aggregate value allocated to the assets subject to the Second Comide Asset Transfer, as agreed between the Company and the Parent on or prior to the Second Comide Asset Transfer Date.

"**Second Group Structure Chart**" means the group structure chart in the Agreed Form to be delivered by the Company to the Lender pursuant to Part II of Schedule 1 (*Conditions precedent to initial utilisation of Facility B*).

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Security Documents**" means the documents listed in paragraph 2(a) of Part I of Schedule 1 (*Conditions precedent*) and any other security document that may at any time be given as security for any of the Liabilities pursuant to or in connection with any Finance Document.

"**Security Property**" has the meaning given to it in Schedule 4 (*Security trust provisions*).

"**Shareholders' Agreement**" means the agreement agreed or to be agreed between the Investor, the Company and the Parent relating to the subscription by the Investor for, or allotment to the Investor of, shares in the Company (whether pursuant to the Conversion or otherwise) which will include provisions satisfactory to the Lender governing the control of Rokesly International Limited by Cerida and the Company and the co-operation by Daletona Properties Limited where necessary.

"**Share Interest**" means (i) any right to exercise or direct the exercise of the voting rights attaching to shares or have general control of shares; (ii) any right, option or obligation which is based on, linked to, derived in whole or part from, or which refers to, shares or the value of shares whether the right, option or obligation is conditional or absolute; or (iii) any derivative whose value is determined by reference to the shares or the value of the shares or grant any interest in shares.

"**Shares**" means ordinary voting shares in the Borrower.

"**Specified Time**" means a time determined in accordance with Schedule 6 (*Timetables*).

"**Spot Rate of Exchange**" means the spot rate of exchange offered by the Lender's prime broker for the purchase of US dollars with the relevant currency at or about 11:00am on a particular day.

"**Subsidiary**" means in relation to any company, corporation or other legal entity (a "**holding company**"), a company, corporation or legal entity:

(a) which is controlled, directly or indirectly, by the holding company; or

(b) more than half the issued share capital of which is beneficially owned, directly or indirectly, by the holding company; or

(c) which is a Subsidiary of another Subsidiary of the holding company,

and, for this purpose, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to determine the composition of the majority of its board of directors or equivalent body.

"**Targets**" means each of:

(a) the Initial Target; and

(b) Africo.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Taxes Act**" means the Income and Corporation Taxes Act 1988.

"**Termination Date**" means the earlier of:

(a) the Issue Date (including for the avoidance of doubt in relation to any part of the Loans and/or interest accrued thereon that remains outstanding following Conversion); and

(b) the date falling 270 days after the Africo Placing Date,

provided always that if the Africo Placing Closing Date has not occurred within 120 days after the date of this Agreement, the Termination Date shall be the date falling 125 days after the date of this Agreement.

"**The Ashdale Settlement**" means the trust constituted pursuant to a deed of settlement dated 3 May 2006 between Joseph Shuldiner (as settlor) and Line Trust Corporation Limited (as trustee), as amended by a deed of exclusion dated 13 March 2008.

"**Third Comide Asset Transfer**" means the transfer by the Parent (or to the extent necessary the procurement by the Parent of the transfer from an Affiliate of the Parent) to the Company of one third of the Comide Assets, resulting in the Company holding full legal and beneficial title to all of the Comide Assets.

"**Third Comide Asset Transfer Date**" means the date on which the Third Comide Asset Transfer is completed, being a date on or before the date falling 12 calendar months after the Africo Placing Closing Date.

"**Third Comide Asset Value Amount**" shall be the aggregate value allocated to the assets subject to the Third Comide Asset Transfer, as agreed between the Company and the Parent on or prior to the Third Comide Asset Transfer Date.

"**Toronto Stock Exchange**" means the Toronto Stock Exchange, a market operated by TSX Group.

"**Total Commitments**" means the aggregate of the Total Facility A Commitments and the Total Facility B Commitments, being US$115,000,000 at the date of this Agreement.

"**Total Facility A Commitments**" means the aggregate of the Facility A Commitments, being US$16,250,000 at the date of this Agreement.

"**Total Facility B Commitments**" means the aggregate of the Facility B Commitments, being US$98,750,000 at the date of this Agreement.

"**Transaction Documents**" means the Finance Documents, the Initial Acquisition Documents, the Africo Loan Document and the Africo Placing Documents.

"**Transfer Date**" means, in relation to a transfer, the later of:

(a) the proposed Transfer Date specified in the Transfer Certificate; and

(b) the date on which the Lender executes the Transfer Certificate.

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the Finance Documents.

"**US**" and "**United States**" means the United States of America, its territories, possessions and other areas subject to the jurisdiction of the United States of America.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 of the United States, as amended.

"**Utilisation**" means a Loan.

"**Utilisation Date**" means the date on which a Utilisation is, or is to be, made.

"**Utilisation Request**" means (in relation to a Loan) a notice substantially in the form set out in Schedule 2 (*Utilisation Requests*).

"**VAT**" means value added tax as provided for in the Value Added Tax Act 1994 and any other tax of a similar nature.

1.2 **Construction**

(a) Unless a contrary indication appears, any reference in this Agreement to:

(i) any "**Finance Party**", any "**Lender**", any "**Obligor**", any "**Party**" or the "**Security Trustee**" shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(ii) "**assets**" includes present and future properties, revenues and rights of every description;

(iii) a "**Finance Document**" or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended, restated (however fundamentally and whether or not more onerously) or replaced and includes any change in the purpose of, any extension of or

any increase in any facility or the addition of any new facility under that Finance Document or other agreement or instrument;

(iv) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(v) a "**person**" includes any person, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) or two or more of the foregoing;

(vi) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(vii) "**shares**" or "**share capital**" includes equivalent ownership interests (and "**shareholder**" and similar expressions shall be construed accordingly);

(viii) "**sterling**" and "**£**" shall mean the lawful currency for the time being of the United Kingdom; and

(ix) "**US dollars**" and "**$**" shall mean the lawful currency for the time being of the United States of America.

(x) a provision of law is a reference to that provision as amended or re-enacted; and

(xi) a time of day is a reference to London time.

(b) Section, Clause and Schedule headings are for ease of reference only.

(c) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d) A Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

(e) The parties agree that this loan is made in the ordinary course, in good faith and on reasonable terms with a view to repayment in full by the Borrower, and not with a view to avoid the application of any statute, including for greater certainty the Competition Act (Canada), the Investment Canada Act, or any Canadian or foreign securities laws or other laws. In the event of any required compliance by the Lender with the Competition Act (Canada) and/or the Investment Canada Act, the Company shall cooperate and shall use reasonable commercial efforts to cause Africo to cooperate therein.

### 1.3 Third Party Rights

A person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

1.4 **Survival**

Unless an express contrary indication appears in this Agreement, no provision of this Agreement shall cease to become effective solely because all amounts outstanding under the Finance Documents have been repaid or converted and all Commitments cancelled.

## SECTION 2

## THE FACILITIES

2. **THE FACILITIES**

2.1 **The Facilities**

Subject to the terms of this Agreement:

(a) the Lender makes available to the Borrower a term loan facility in the Base Currency in an aggregate amount equal to the Total Facility A Commitments; and

(b) the Lender makes available to the Borrower a term loan facility in the Base Currency in an aggregate amount equal to the Total Facility B Commitments.

2.2 **Company as Obligors' agent**

Each Obligor (other than the Company):

(a) irrevocably appoints the Company to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

(i) to give and receive as agent on its behalf all notices, consents and instructions (including Utilisation Requests);

(ii) to sign on its behalf all documents in connection with the Finance Documents (including amendments and variations of and consents under any Finance Documents, and to execute any new Finance Documents); and

(iii) to take such other action as may be necessary or desirable under or in connection with the Finance Documents;

(iv) the Lender to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company; and

(b) confirms that it will be bound by any action taken by the Company under or in connection with the Finance Documents and the Lender may rely on any action purported to be taken by the Company on behalf of that Obligor.

2.3 **Acts of Company**

(a) The respective liabilities of each of the Obligors under the Finance Documents shall not be in any way affected by:

(i) any actual or purported irregularity in any act done, or failure to act, by the Company;

(ii) the Company acting (or purporting to act) in any respect outside any authority conferred upon it by any Obligor; or

(iii) any actual or purported failure by or inability of the Company to inform any Obligor of receipt by it of any notification under the Finance Documents.

(b) In the event of any conflict between any notices or other communications of the Company and any other Obligor, those of the Company shall prevail.

3. **PURPOSE**

3.1 **Purpose**

(a) The Borrower shall apply all amounts borrowed by it under Facility A towards financing or refinancing (but, in each case, only on or after the date on which the purchase consideration for the Initial Acquisition is required to be placed in an account with the lawyers acting for the Initial Purchaser in accordance with the terms of the Initial Acquisition Documents):

(i) the consideration payable by the Initial Purchaser for the Initial Acquisition pursuant to the Initial Acquisition Documents;

(ii) to fund the loan to be made by the Borrower pursuant to the Africo Loan Document;

(iii) the Initial Lender Costs and the Initial Costs up to a maximum aggregate amount of $750,000.

and Facility A shall be used for no other purpose.

(b) The Borrower shall apply all amounts borrowed by it under Facility B towards financing or refinancing (but, in each case, only on or after the Africo Placing Closing Date):

(i) the consideration payable by the Company in respect of the Africo Placing Shares;

(ii) the Africo Placing Lender Costs and the Africo Placing Costs up to a maximum aggregate amount of $750,000.

and Facility B shall be used for no other purpose.

(c) No amount borrowed under the Facilities shall be applied in any manner that may be illegal or contravene any applicable law or regulation in any relevant jurisdiction.

3.2 **Monitoring**

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

4. **CONDITIONS OF UTILISATION**

4.1 **Initial conditions precedent**

The Borrower may not make a Loan of Facility A unless the Lender has received all of the documents and other evidence listed in Part I of Schedule 1 (*Conditions precedent*) in form and substance satisfactory to the Lender. The Lender shall notify the Company promptly upon being so satisfied.

4.2 **Africo conditions precedent**

The Borrower may not make a Loan of Facility B unless the Lender has received all of the documents and other evidence listed in Parts I and 2 of Schedule 1 (*Conditions precedent*) in form and substance satisfactory to the Lender. The Lender shall notify the Company promptly upon being so satisfied.

4.3 **Further conditions precedent**

The Lender will only be obliged to comply with Clause 5.4 (*Lenders Participations*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a) no Event of Default is continuing or would result from the proposed Loan and, in the case of any other Loan, no Default is continuing or would result from the proposed Loan; and

(b) the representations and warranties set out in clause 19 (*Representations*) are true in all material respects; and

(c) in the opinion of the Lender, there not having occurred, prior to the date the Lender provides the notification referred to in Clause 4.1 (*Initial conditions precedent*), any event(s) or circumstance(s) (including any material adverse change or the continuation of any circumstance(s)) which, in the Lender's opinion, has adversely affected or could adversely affect:

(i) the business, condition (financial or otherwise), operations, performance, assets, licences or prospects of any of the Company, the Targets, or their assets; or

(ii) the ability of the Obligors or any of the Targets to perform and comply with its actual or contemplated obligations under the Finance Documents; or

(iii) the international or any relevant domestic loan, debt, bank, capital or equity markets.

**4.4 Maximum number of Loans**

(a) No more than one Loan may be drawn under each of Facility A and Facility B.

(b) The Borrower may not request that a Facility A Loan or a Facility B Loan be divided.

**4.5 Drawing of Facilities**

(a) No Facility B Loan shall be made unless the Initial Acquisition Closing Date has occurred.

## SECTION 3

## UTILISATION

5. **LOANS**

5.1 **Delivery of a Utilisation Request**

A Borrower may utilise any Facility by way of a Loan by delivery to the Lender of a duly completed Utilisation Request in the form of Schedule 2 (*Utilisation Requests*) not later than the Specified Time.

5.2 **Completion of a Utilisation Request**

(a) Each Utilisation Request for a Loan is irrevocable and will not be regarded as having been duly completed unless:

(i) it specifies that it is for a Loan;

(ii) it identifies the Facility to be utilised;

(iii) the proposed Utilisation Date is a Business Day within the Availability Period applicable to that Facility;

(iv) the currency of the Loan comply with Clause 5.3 (*Currency*);

(v) it contains a confirmation that none of the proceeds of the proposed Loan will be applied in any manner that may be illegal or contravene any applicable law or regulation in any relevant jurisdiction; and

(vi) it specifies the account and bank (which must be in London or Gibraltar, in which banks are open for general business on that day) to which the proceeds of the Loan are to be credited.

(b) Only one Loan may be requested in each Utilisation Request.

5.3 **Currency**

(a) The currency specified in a Utilisation Request must be the Base Currency.

5.4 **Lenders' participation**

(a) If the conditions set out in this Agreement have been met, the Lender shall make each Loan under that Facility available by the Utilisation Date.

## SECTION 4

## REPAYMENT, PREPAYMENT AND CANCELLATION

### 6. REPAYMENT OF LOANS

#### 6.1 Repayment of the Loans

(a) Save to the extent the Loans have been previously subject to Conversion in accordance with Clause 8 (*Conversion*), the Borrower shall repay the Loans on the Termination Date.

(b) The Borrower may not reborrow any part of the Facilities which is repaid.

#### 6.2 Method of repayment/prepayment

(a) Subject to paragraph (b) below, if any part or all of the Amount Owing becomes repayable or prepayable under this Agreement on or after the Africo Placing Closing Date, the Lender may, by notifying the Borrower in writing, require the Borrower to repay or prepay (as the case may be) that Amount Owing, at the Lender's option:

(i) in cash; or

(ii) by transferring to the Lender, or to the order of the Lender, full legal and beneficial title to such number of the Africo Shares that is equal to the amount of the Amount Owing to be repaid or prepaid under this paragraph (b), divided by the Africo Share Termination Value; or

(iii) with any combination of the above,

provided that in the absence of a notification from the Lender or if the Amount Owing becomes repayable or prepayable prior to the Africo Placing Closing Date, the Borrower shall make such repayment or prepayment of the Amount Owing in cash.

(b) The number of Africo Shares that may be used to repay the Amount Owing is limited to 40 per cent. of the number of Africo Shares owned by the Borrower and its Affiliates on the relevant date of repayment or prepayment, provided that it has been demonstrated to the satisfaction of the Lender (in its sole discretion) that the number of Africo Shares being used to repay the Loan is equal to such 40 per cent and any Amount Owing that remains outstanding following the transfer of such Africo Shares (in accordance with Clause 6.2(a)(ii) and this Clause) shall be repaid in cash on the same date as the Africo Shares are required to be transferred.

(c) The Borrower hereby irrevocably authorises the Lender and the Security Trustee to transfer from the Collateral Account to any custodial account(s) designated by the Lender, the number of Africo Shares that are to be applied in repayment or prepayment of a Loan in accordance with paragraph (a) above.

(d) The Borrower shall be deemed to make to the Lender (and any other person nominated by the Lender to receive the Africo Shares) the representations and warranties set out in paragraphs 1, 3, 4, 5 (to the extent it relates to the Borrower) and 6 of Schedule 8 (*Africo Share Warranties*) in relation to each Africo Share transferred pursuant to this Clause 6.2 on the date of such transfer.

7. **PREPAYMENT AND CANCELLATION**

7.1 **Illegality**

If it becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain any Loan:

(a) the Lender shall promptly notify the Borrower upon becoming aware of that event;

(b) upon the Lender notifying the Borrower, the Commitment will be immediately cancelled; and

(c) the Borrower shall repay the Loan made to it on the last day of the Interest Period for the Loan occurring after the Lender has notified the Borrower or, if earlier, the date specified by the Lender in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law).

7.2 **Change of Control**

(a) In this Clause 7.2:

a "**Change of Control**" will occur if:

(i) the Parent ceases to control the Company; or

(ii) any person (or group of persons acting in concert) other than the Lender or the Parent acquires control of the Company,

where "**control**" means (i) the power to direct the management and policies of an entity, whether through the ownership of voting capital, by contract or otherwise or (ii) an economic interest of any description (whether by contract, ownership of share capital or any other means) equal to 50% or more of the economic value of the Company.

(b) If a Change of Control occurs:

(i) the Borrower shall promptly notify the Lender upon becoming aware of that event;

(ii) the Lender shall not be obliged to fund the Loan; and

(iii) if the Lender notifies the Borrower in writing, the Facilities shall at the option of the Lender immediately be cancelled and all outstanding Loans, together with accrued interest, and all other amounts accrued under the Finance Documents shall at the option of the Lender become immediately due and payable.

7.3 **Mandatory prepayment from Net Sale Proceeds**

(a) In this Clause 7.3:

"**Net Sale Proceeds**" means the cash or Cash Equivalent Investments (including, when received, the cash or Cash Equivalent Investments of any deferred consideration, whether by way of adjustment to the purchase price or otherwise) received by a member of the Borrower Group in connection with the sale, transfer or other disposal by any member of the Borrower Group of an asset (including any Comide Asset disposed of pursuant to Clause 17.4 (*Permitted Sale of Comide Assets*) but excluding any Permitted Comide Disposal) after deducting:

(i) fees and transaction costs properly incurred in connection with that sale, transfer or disposal; and

(ii) Taxes paid or reasonably estimated by the Company to be payable (as certified by the Company to the Lender) as a result of that sale, transfer or disposal.

(b) If any sale, transfer or disposal of any Interest directly or indirectly held by the Company is completed, the Company shall ensure that an amount equal to any Net Sale Proceeds realised in respect of such Interests and received by the Parent or any of its Affiliates are applied in prepayment of the Facilities pro-rata.

7.4 **Mandatory prepayment from Net Recovery Proceeds**

(a) In this Clause 7.4:

"**Net Recovery Proceeds**" means any amount received or recovered by a member of the Borrower Group pursuant to or in respect of:

(i) any Initial Acquisition Document or any Africo Placing Document related breach of contract, warranty claim, reliance letter or legal action or proceedings (whether by way of judgment on or settlement of any such claim) (in each case net of related fees and transaction costs properly incurred in achieving any such recoveries); or

(ii) an adjustment downwards in the purchase or subscription price for the Initial Acquisition or the Africo Placing.

(b) The Company shall ensure that any Net Recovery Proceeds are applied in prepayment of the Facilities pro-rata.

7.5 **Restrictions**

(a) Any notice of cancellation or prepayment given by any Party under this Clause 7 shall be irrevocable and, unless a contrary indication appears in this Agreement, specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b) Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

(c) The Borrower may not reborrow any part of a Facility which is prepaid.

(d) The Borrower shall not repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

## SECTION 5

## CONVERSION

8. **CONVERSION**

8.1 **Conversion**

(a) The Lender shall have the option to subscribe for the Conversion Number of Conversion Shares at the Conversion Price in accordance with this Clause 8.1 by giving to the Company a Conversion Notice during the Conversion Period.

(b) By giving a Conversion Notice to the Borrower and subject to paragraph 8.3 below, the Lender irrevocably and unconditionally directs the Borrower to apply the Conversion Amount in subscribing for the applicable Conversion Number of Conversion Shares.

8.2 **Issue of Conversion Shares**

(a) No later than five Business Days after the date of the relevant Conversion Notice (the "**Conversion Date**"), the Company shall allot, issue and deliver to the Lender (or its nominee or trustee, as appropriate) the applicable Conversion Number of Conversion Shares in accordance with Clause 8.6 (*Formalities*).

(b) Subject to paragraph 8.3 below, the Lender agrees that the issue of the Conversion Number of Conversion Shares to it in accordance with this Clause fully repays any relevant Conversion Amount and completely discharges the obligations of the Borrower with respect to the relevant Conversion Amount upon that application.

8.3 **Adjustment to the Conversion Amount**

(a) The Lender is not entitled, pursuant to this Clause 8.3, to receive a Conversion Number of Conversion Shares such that the Lender holds, immediately post Conversion, more than 50 per cent. of the Shares of the Borrower.

(b) Taking into account the restriction set out at Clause 8.3.(a) above, to the extent that the calculation to determine the Conversion Number in accordance with paragraphs 1 to 6 of Schedule 7 would result in a Conversion Number that exceeds 50 per cent. of the number of Shares in issue immediately following Conversion, then the Conversion Amount shall be reduced to the extent required to ensure that the Conversion Number does not exceed 50 per cent. of the number of Shares in issue immediately following Conversion.

(c) Where, pursuant to the operation of this Clause 8.3(c) the Conversion Amount is less than the Amount Owing (a "**Shortfall**"), then the amount of the Shortfall shall not be discharged or repaid pursuant to the Conversion, but shall remain outstanding pursuant to the terms of this Agreement as a Loan allocated pro-rata between Facility A and Facility B and shall be repaid on the Conversion Date in accordance with the terms of this Agreement.

8.4 **Conversion Shares**

The Company must ensure that all Conversion Shares will be fully paid and non-assessable and will have the same economic rights (including entitlement to dividends and other distributions) as, and rank *pari passu* in all respects with (including as regards voting rights), the fully paid Shares in issue on the Issue Date.

8.5 **Formalities**

(a) All Conversion Shares shall be allotted and issues in certificated form and the Borrower will dispatch certificates for the relevant Conversion Shares by courier free of charge on the relevant Issue Date; and

(b) On the Issue Date the Borrower shall enter the Lender's name (or it's nominee's or trustee's name, as appropriate) in the register of members of the Borrower as the holder of the Conversion Shares.

8.6 **Costs**

The Borrower shall be responsible for all costs and expenses arising in relation to Conversion, and shall promptly pay (if applicable) all stamp, capital, issue and registration duties payable in relation to the Conversion Shares as a result of Conversion.

8.7 **Post-Conversion dilution**

The Parties acknowledge that the Shareholders Agreement will contain provisions, on terms to be mutually agreed, that provide for further Shares to be issued to members of the Parent or its Affiliates in consideration for each Comide Asset Transfer that occurs following Conversion, resulting in a reduction of the percentage of the total Shares in issue that are represented by the Conversion Shares.

8.8 **Further Adjustments in respect of the Conversion Price**

The Parties acknowledge and agree that, as the right to convert is an option that would only generally be exercised if it is "in the money", the effective price per Africo Share that may be seen to be indirectly acquired by the Lender as a result of conversion of the Amount Owing into Conversion Shares, plus any brokerage commissions or fees, shall in no event exceed 115% of the "market price" of the Africo Shares at the time determined in accordance with the regulations under the Securities Act (Ontario), and that any recalculation of such "market price" would be inappropriate in the circumstances. For greater certainty, the parties agree that if any regulatory authority or court of competent jurisdiction decides at any time to recalculate the "market price" or otherwise determines that the effective price per Africo Share exceeds such 115% of "market price" limit, then the Parties agree to reduce the effective price per Africo Share to that price which is either (a) determined by such court or regulatory authority to be 115% of the "market price" at the time, less any brokerage commissions or fees, or (b) the price which the parties, acting in good faith, believe to be 115% of the "market price" at the time, less any brokerage commissions or fees. If necessary, the Company agrees to pay such amount to the Lender as is required to comply with the foregoing, in a form mutually agreed by the Parties (acting reasonably), which may be in cash or in additional Africo Shares or in assets.

**SECTION 6**

**COSTS OF UTILISATION**

## 9. INTEREST

### 9.1 Calculation of interest

Without prejudice to Clause 9.3 (*Default interest*), the Loans will bear interest on a daily basis at the percentage rate per annum which is the aggregate of the applicable:

(a) Margin; and

(b) LIBOR.

### 9.2 Compounding and payment of interest

(a) On the last day of each Interest Period, the interest which has accrued on a Loan during that Interest Period shall be capitalised so as to form part of that Loan.

(b) The Company shall pay all accrued interest on the date that the relevant Loan is to be repaid or prepaid in accordance with Clause 6 (*Repayment of Loans*), Clause 7 (*Prepayment and cancellation*) and Clause 24.19 (*Acceleration*).

### 9.3 Default interest

(a) If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate per annum which, subject to paragraph (b) below, is the sum of 8 per cent and the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Lender (acting reasonably). Any interest accruing under this Clause 9.3 shall be immediately payable by the Obligor on demand by the Lender.

(b) If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i) the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii) the rate of interest applying to the overdue amount during that first Interest Period shall be the sum of 1 per cent and the rate which would have applied if the overdue amount had not become due.

(c) Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

(d) For the avoidance of doubt and without limitation, this Clause 9.3 applies to all overdue principal, interest, fees, costs and expenses.

## 10. INTEREST PERIODS

### 10.1 Selection of Interest Periods

(a) Subject to Clause 9.3 (*Default interest*) in respect of default interest and paragraph (b) below in respect of the final Interest Period of the Loan prior to the Termination Date each Interest Period shall be of six months' duration.

(b) Subject to Clause 9.3(a) (*Default interest*), an Interest Period for a Loan shall not extend beyond the Termination Date.

(c) Each Interest Period for the Loan shall start on the Utilisation Date or (if already made) on the last day of its preceding Interest Period.

### 10.2 Non-Business Days

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

## 11. CHANGES TO THE CALCULATION OF INTEREST

### 11.1 Market disruption

(a) If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on that Loan for the Interest Period shall be the rate per annum which is the sum of:

(i) the Margin; and

(ii) the rate notified to the Company by the Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to the Lender of funding that Loan from whatever source it may reasonably select.

(b) In this Agreement "**Market Disruption Event**" means:

(i) at or about noon on the Quotation Day for the relevant Interest Period the Screen Rate is not available and the Lender is unable to provide a quotation to determine LIBOR for the relevant currency and for the relevant Interest Period; or

(ii) before close of business in London on the Quotation Day for the relevant Interest Period, the Company receives notifications from the Lender that the cost to it of obtaining matching deposits in the Relevant Interbank Market would be in excess of LIBOR.

### 11.2 Alternative basis of interest or funding

(a) If a Market Disruption Event occurs and the Lender or the Company so requires, the Lender and the Company shall enter into negotiations (for a period of not more than thirty days) with a view to agreeing a substitute basis for determining the rate of interest.

(b) Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of the Lender and the Company, be binding on all Parties.

### 11.3 Break Costs

(a) The Borrower shall, within ten Business Days of demand by the Lender, pay to the Lender its Break Costs attributable to all or any part of the Loan or Unpaid Sum being paid by that

Borrower on a day other than the last day of an Interest Period for that Loan or Unpaid Sum, except to the extent an Amount Owing is repaid pursuant to and in accordance with Clause 8 (*Conversion*).

(b) The Lender shall, as soon as reasonably practicable after a demand by the Borrower, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

## SECTION 7

## ADDITIONAL PAYMENT OBLIGATIONS

### 12. TAX GROSS UP AND INDEMNITIES

(a) In this Agreement:

"**Protected Party**" means a Finance Party which is or will be subject to any liability, or required to make any payment, for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 12.2 (*Tax gross-up*) or a payment under Clause 12.3 (*Tax indemnity*).

(b) Unless a contrary indication appears, in this Clause 12 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

### 12.2 Tax gross-up

(a) Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b) The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Lender accordingly. Similarly, the Lender shall notify the Lender on becoming so aware in respect of a payment payable to that Lender. If the Lender receives such notification from a Lender it shall notify the Company and that Obligor.

(c) If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d) If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e) Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Lender evidence reasonably satisfactory to the Lender that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

### 12.3 Tax indemnity

(a) The Company shall (within three Business Days of demand by the Lender) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be

or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b) Paragraph (a) above shall not apply:

(i) with respect to any Tax assessed on a Finance Party:

(A) under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

(B) under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(ii) to the extent a loss, liability or cost is compensated for by an increased payment under Clause 12.2 (*Tax gross-up*)

(c) A Protected Party making, or intending to make, a claim under paragraph (a) above shall promptly notify the Company of the event which will give, or has given, rise to the claim.

12.4 **Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

(a) a Tax Credit is attributable either to an increased payment of which that Tax Payment forms part, or to that Tax Payment; and

(b) that Finance Party has obtained, utilised and retained that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

12.5 **Stamp taxes**

The Company shall pay and, within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

12.6 **Value added tax**

(a) All amounts set out, or expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for VAT purposes shall be deemed to be exclusive of any VAT which is chargeable on such supply, and accordingly, subject to paragraph (c) below, if VAT is chargeable on any supply made by any Finance Party to any Party under a Finance Document, that Party shall pay to the Finance Party (in addition to and at the same time as paying the consideration) an amount equal to the amount of the VAT (and such Finance Party shall promptly provide an appropriate VAT invoice to such Party).

(b) If VAT is chargeable on any supply made by any Finance Party (the "**Supplier**") to any other Finance Party (the "**Recipient**") under a Finance Document, and any Party (the "**Relevant**

**Party**") is required by the terms of any Finance Document to pay an amount equal to the consideration for such supply to the Supplier (rather than being required to reimburse the Recipient in respect of that consideration), such Party shall also pay to the Supplier (in addition to and at the same time as paying such amount) an amount equal to the amount of such VAT. The Recipient will promptly pay to the Relevant Party an amount equal to any credit or repayment from the relevant tax authority which it reasonably determines relates to the VAT chargeable on that supply.

(c) Where a Finance Document requires any Party to reimburse a Finance Party for any costs or expenses, that Party shall also at the same time pay and indemnify the Finance Party against all VAT incurred by the Finance Party in respect of the costs or expenses to the extent that the Finance Party reasonably determines that neither it nor any other member of any group of which it is a member for VAT purposes is entitled to credit or repayment from the relevant tax authority in respect of the VAT.

## 13. INCREASED COSTS

### 13.1 Increased costs

(a) Subject to Clause 13.3 (*Exceptions*) the Company shall, within three Business Days of a demand by the Lender, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement.

(b) In this Agreement "**Increased Costs**" means:

(i) a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(ii) an additional or increased cost; or

(iii) a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document.

### 13.2 Increased cost claims

(a) A Finance Party intending to make a claim pursuant to Clause 13.1 (*Increased costs*) shall notify the Lender of the event giving rise to the claim, following which the Lender shall promptly notify the Company.

(b) Each Finance Party shall, as soon as practicable after a demand by the Lender, provide a certificate confirming the amount of its Increased Costs.

### 13.3 Exceptions

Clause 13.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(i) attributable to a Tax Deduction required by law to be made by an Obligor;

(ii) compensated for by Clause 12.3 (*Tax indemnity*) (or would have been compensated for under Clause 12.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 12.3 (*Tax indemnity*) applied);

(iii) compensated for by the payment of the Mandatory Cost; or

(iv) attributable to the failure by the relevant Finance Party or its Affiliates to comply with any law or regulation.

## 14. OTHER INDEMNITIES

### 14.1 Currency indemnity

(a) If any sum due from an Obligor under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(i) making or filing a claim or proof against that Obligor;

(ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within three Business Days of demand, indemnify each Finance Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 14.2 Other indemnities

The Company shall (or shall procure that an Obligor will), within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability incurred by that Finance Party as a result of:

(a) the occurrence of any Event of Default;

(b) a failure by an Obligor to pay any amount due under a Finance Document on its due date;

(c) funding, or making arrangements to fund, a Loan requested by the Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

(d) a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company or as required by this Agreement.

14.3 **Indemnity to the Finance Parties**

The Company shall promptly indemnify the Finance Parties against any cost, loss or liability incurred by the Finance Parties (in each case acting reasonably) as a result of:

(a) investigating any event which it reasonably believes is a Default;

(b) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(c) taking, holding, protecting or enforcing any Security created pursuant to any Finance Document; or

(d) exercising any of the rights, powers, discretions or remedies vested in it under any Finance Document or by law

15. **MITIGATION BY THE LENDERS**

15.1 **Mitigation**

(a) Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 12 (*Tax gross-up and indemnities*) or Clause 13.1 (*Increased costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate.

(b) Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

15.2 **Limitation of liability**

(a) The Company shall indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 15.1 (*Mitigation*).

(b) A Finance Party is not obliged to take any steps under Clause 15.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

16. **COSTS AND EXPENSES**

16.1 **Transaction expenses**

The Company shall on each of the Utilisation Date for Facility A and the Utilisation Date for Facility B, as well as promptly on demand at any time after the Utilisation Date for Facility A, pay the Finance Parties the amount (without double-counting) of all costs and expenses (including legal fees) incurred by any of them in connection with the negotiation, preparation, printing and execution of:

(a) this Agreement and any other documents referred to in this Agreement; and

(b) any other Finance Documents executed after the date of this Agreement.

16.2 **Amendment costs**

If (a) an Obligor requests an amendment, waiver or consent or (b) an amendment is required pursuant to Clause 29.4 (*Change of currency*), the Company shall, within three Business Days of demand, reimburse the Finance Parties for the amount of all costs and expenses (including

legal fees) incurred by the Finance Parties in responding to, evaluating, negotiating or complying with that request or in connection with that required amendment.

16.3 **Enforcement costs**

The Company shall, within three Business Days of demand, pay to each Finance Party the amount of all costs and expenses (including legal fees) incurred by that Finance Party in connection with the enforcement of, or the preservation of any rights under, any Finance Document.

16.4 **Security Trustee expenses**

The Company shall promptly on demand pay the Security Trustee the amount of all costs and expenses (including legal fees) incurred by it in connection with the administration or release of any Security created pursuant to any Security Document.

16.5 **Transaction undertaking to pay**

(a) The Company undertakes to pay each Finance Party within three Business Days of demand an amount equal to any liability, damages, cost, loss or expense (including legal fees, costs and expenses) reasonably incurred by that Finance Party or any of its Affiliates or any of its (or its Affiliates') directors, officers, employees or agents (each a "**Relevant Party**") arising out of, in connection with or based on any actual or potential action, claim, suit, investigation or proceeding arising out of, in connection with or based on:

(i) the Initial Acquisition or the Africo Placing (whether or not made or completed);

(ii) any Relevant Party financing or refinancing, or agreeing to finance or refinance, any acquisition of any of the Targets by any member of the Borrower Group or any person acting in concert with any member of the Borrower Group;

(iii) the use of proceeds of any Loan,

except to the extent finally judicially determined to have resulted primarily from the gross negligence or wilful misconduct of that Relevant Party.

(b) The Company undertakes to pay each Finance Party within three Business Days of demand an amount equal to any cost or expense (including legal fees, costs and expenses) incurred by any Relevant Party in connection with investigating, preparing, pursuing or defending any action, claim, suit, investigation or proceeding arising out of, in connection with or based on any of the above, whether or not pending or threatened and whether or not any Relevant Party is a party.

(c) The Lender shall have no duty or obligation, whether as fiduciary for any Relevant Party or otherwise, to recover any payment made or required to be made under paragraph (a).

(d) The Company agrees that no Relevant Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or any of its Affiliates for or in connection with anything referred to in paragraph (a) above except for any such liability, damages, loss, cost or expense incurred by the Company that results directly from any breach by that Relevant Party of any Finance Document which is in each case finally judicially determined to have resulted directly from the gross negligence or wilful misconduct of that Relevant Party.

(e) Notwithstanding paragraph (d) above, no Relevant Party shall be responsible or have any liability to the Company or any of its Affiliates or anyone else for consequential losses or damages.

16.6 **The Company's Undertaking to Pay**

(a) Without limiting the rights of the Lender to claim damages on any basis, each Obligor agrees and undertakes with the Lender in the case of any Obligor failing to comply with any of its obligations under Clause 17 of this Agreement (each a "**Breach**"), to pay in cash to the Lender, a sum equal to the amount necessary to put the Lender into the position which would have existed had the Breach not occurred, together with all costs and expenses (including, without limitation, legal fees, experts' fees and consultants' fees on an indemnity basis and all costs and expenses incurred in the recovery of the amounts payable under the claim for Breach) incurred directly or indirectly as a result of or in connection with the Breach.

(b) Without prejudice to Clause 16.6(a), where the nature or effect of the Breach is that:

(i) the value of an asset (including one warranted to exist but not existing) is or becomes less than its value would have been had there been no Breach; or

(ii) the Lender has or incurs any liability or increase in liability which would not have been incurred if there had been no Breach,

each Obligor shall be liable to pay, in accordance with paragraph (a) above, the full amount of such deficiency or diminution in value of the relevant asset or of the relevant liability or increase in liability.

## SECTION 8

## COMIDE ASSET TRANSFERS

17. **COMIDE ASSET TRANSFERS**

17.1 **First Comide Asset Transfer**

On the Africo Placing Closing Date, the Parent shall make the First Comide Asset Transfer.

17.2 **Second Comide Asset Transfer**

(a) On or before the date falling 6 calendar months after the Africo Placing Closing Date, the Parent shall make the Second Comide Asset Transfer, provided always that the Second Comide Asset Value Amount shall have been agreed between the Parent and the Lender.

(b) The Parent and the Lender shall use reasonable endeavours and shall act in good faith to agree the Second Comide Asset Value Amount.

(c) For the avoidance of doubt, to the extent that no Second Comide Asset Value Amount is agreed between the Parent and the Lender, then the Parent shall not be required to make the Second Comide Asset Transfer.

17.3 **Third Comide Asset Transfer**

(a) On or before the date falling 12 calendar months after the Africo Placing Closing Date, the Parent shall make the Third Comide Asset Transfer, provided always that the Third Comide Asset Value Amount shall have been agreed between the Parent and the Lender.

(b) The Parent and the Lender shall use reasonable endeavours and shall act in good faith to agree the Third Comide Asset Value Amount.

(c) For the avoidance of doubt, to the extent that no Third Comide Asset Value Amount is agreed between the Parent and the Lender, then the Parent shall not be required to make the Third Comide Asset Transfer.

17.4 **Permitted sale of Comide Assets**

The Lender acknowledges that the Relevant Group intends to sell, lease, transfer or otherwise dispose of the Comide Assets in whole or part to Africo or to other independent third parties from time to time and each member of the Relevant Group shall be entitled to sell, lease, transfer or otherwise dispose of the Comide Assets in whole or part, provided that the sale is pursuant to the PE 2607 Sale Agreement or in respect of any other Comide Assets:

(i) each such transaction is concluded on an arms' length basis and the consideration for such sale, lease, transfer or disposal is:

(A) greater than or equal to the then current market value of the Comide Assets that are subject to such disposal;

(B) payable only in cash or shares in a limited liability company (provided that to the extent the consideration for a disposal to a member of the Africo Group is not payable in cash, it shall be payable only in Africo Shares); and

(C) payable only to members of the Relevant Group;

(ii) the Parent gives the Lender no less than 15 Business Days' written notice of the completion of each such transaction;

(iii) the Lender receives the payments and/or shares described in Clause 17.5 below (as appropriate); and

(iv) (to the extent applicable) the Borrower makes the prepayments required under Clause 7.3 (*Mandatory prepayment from Net Sale Proceeds*).

17.5 **Participation in sale of Comide Assets prior to Conversion**

(a) If, prior to the Shareholders' Agreement becoming effective in accordance with its terms, any sale, lease, transfer or other disposal of any Comide Assets is made to any person other than the Company, the Lender shall be entitled (at its election) to participate in such sale, lease, transfer or other disposal in accordance with the provisions this Clause 17.5 as if it were the owner of a 50 per cent. interest in such Comide Assets.

(b) Immediately upon receipt of any consideration for any sale, lease, transfer or other disposal of any Comide Assets by any member of the Relevant Group to any person (other than the Company) prior to the Shareholder' Agreement becoming effective in accordance with its terms:

(i) to the extent the consideration is received in cash, the Parent shall pay (or shall procure the payment) to the Lender an amount equal to 10 per cent of the consideration it or any other member of the Relevant Group has received;

(ii) to the extent the consideration is received in shares ("**Consideration Shares**"), the Lender shall have the option, by notifying the Parent in writing no more than 15 Business Days after being notified of the disposal in accordance with Clause 17.4(a)(ii) above, to acquire for cash 50 per cent. of the Consideration Shares (or each class thereof) received by members of the Relevant Group in connection with the relevant disposal, at the Relevant Strike Price; and

(iii) for the avoidance of doubt, to extent that the consideration is received in a combination of cash and shares, sub-paragraph (i) above shall apply in respect of that part of the consideration received in cash and sub-paragraph (ii) above shall apply in respect of that part of the consideration received in shares,

where "**Relevant Strike Price**" means:

(A) in the case of a disposal to Africo, a price for each Consideration Share equal to the valuation attributed to that Consideration Share in connection with the relevant disposal; and

(B) in the case of a disposal to any person other than Africo, a price for each Consideration Share equal to 80 per cent. of the valuation attributed to that Consideration Share in connection with the relevant disposal.

(c) If the Lender elects to exercise the option described in paragraph (b)(ii) above:

(i) the Parent shall promptly procure that full legal and beneficial title to the relevant Consideration Shares is transferred to the Lender or to the Lender's order (such transfer to be effected in a manner reasonable satisfactory to the Lender);

(ii) if the Consideration Shares are Africo Shares, the Parent shall be deemed to make to the Lender (and any transferee nominated by the Lender to receive the relevant Africo Shares) all the representations and warranties set out in Schedule 8 (*Africo Share Warranties*) in relation to the relevant Africo Shares;

(iii) if the Consideration Shares are not Africo Shares, the Parent shall be deemed to make to the Lender (and any transferee nominated by the Lender to receive the relevant Africo Shares) all of the representations and warranties set out in Schedule 8 (*Africo Share Warranties*) in relation to the relevant Consideration Shares, but as if each reference to "Africo Share" in Schedule 8 was replaced by a reference to the relevant Consideration Share; and

(iv) the Lender shall pay to the Parent the Relevant Strike Price for each Consideration Share transferred under paragraph (i) above on the date of transfer (provided that the Lender has received at least 3 Business Days' notice of such transfer being effected).

(v) The Parties acknowledge and agree that the effective price per Africo Share that may be seen to be directly or indirectly acquired by the Lender as a result of any payment under Clause 17.5(c)(iv) above, plus any brokerage commissions or fees, shall in no event exceed 115% of the "market price" of the Africo Shares at the time determined in accordance with the regulations under the Securities Act (Ontario), and that any recalculation of such "market price" would be inappropriate in the circumstances. For greater certainty, the parties agree that if any regulatory authority or court of competent jurisdiction decides at any time to recalculate the "market price" or otherwise determines that the effective price per Africo Share exceeds such 115% of "market price" limit, then the Parties agree to reduce the effective price per Africo Share to that price which is either (a) determined by such court or regulatory authority to be 115% of the "market price" at the time, less any brokerage commissions or fees, or (b) the price which the parties, acting in good faith, believe to be 115% of the "market price" at the time, less any brokerage commissions or fees. If necessary, the Parent agrees to pay such amount to the Lender as is required to comply with the foregoing, in a form mutually agreed by the Parties (acting reasonably), which may be in cash or in additional Africo Shares or in assets.

(d) In the case of a disposal of a Comide Assets to a person other than Africo, if the Lender has not exercised the option described in paragraph (b)(ii) above within 15 Business Days of being notified of the disposal in accordance with Clause 17.4(a)(ii) above, the Parent shall ensure that 10 per cent. of the Consideration Shares (or each class thereof) received each member of the Relevant Group are immediately transferred to (or as directed by) the Lender in accordance with paragraphs (c)(i) and (c)(iii) above.

17.6 **Participation in sale of Comide Assets following Conversion**

The Parties acknowledge that the Shareholders' Agreement shall contain provisions, on terms to be mutually agreed, replicating this Clause 17 for the benefit of the Investor, save that the Investor's entitlement to receive payments or acquire shares pursuant to Clause 17.5 shall be reduced by the extent to which the Investor has an interest (by virtue of the Investor's shareholding in the Company, or otherwise, at the time) in the Comide Assets that are subject to the disposal.

17.7 **Characterisation of payments received**

For the avoidance of doubt, any amount received by the Lender pursuant to this Clause 17 shall not constitute discharge of any amount owing under any other provision of the Finance Document, but instead constitutes further consideration for providing the Facilities in accordance with the terms of the Finance Documents.

## SECTION 9

## GUARANTEE AND SECURITY

### 18. GUARANTEE AND INDEMNITY

#### 18.1 Guarantee and indemnity

Each Guarantor irrevocably and unconditionally jointly and severally:

(a) guarantees to each Finance Party as primary obligor and not merely as surety to the Finance Parties punctual performance by each other Obligor of all that Obligor's obligations under the Finance Documents;

(b) undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c) agrees with each Finance Party that if, for any reason, any amount claimed by a Finance Party under this Clause 18 is not recoverable on the basis of a guarantee, it will be liable to indemnify that Finance Party against any cost, loss or liability it incurs as a result of an Obligor not paying any amount when due under or in connection with any Finance Document. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 18 if the amount claimed had been recoverable on the basis of a guarantee.

#### 18.2 Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part or any increase of the Commitment, and this guarantee constitutes a guarantee of payment and not of collection..

#### 18.3 Reinstatement

If as a result of insolvency or any similar event:

(a) any payment by an Obligor is avoided, reduced or must be restored; or

(b) any discharge or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made in whole or in part on the basis of any payment, security or other thing which is avoided, reduced or must be restored,

(i) the liability of each Obligor shall continue or be reinstated as if the payment, discharge, avoidance, arrangement or reduction had not occurred; and

(ii) each Finance Party shall be entitled to recover the value or amount of that payment or security from each Obligor, as if the discharge, avoidance, arrangement or reduction had not occurred.

#### 18.4 Waiver of defences

The obligations of each Guarantor under this Clause 18 will not be affected by an act, omission, matter or thing which, but for this Clause, would reduce, release or prejudice any of its

obligations under this Clause 18 (without limitation and whether or not known to it or any Finance Party) including:

(a) any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b) the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Borrower Group or any other person;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e) any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g) any insolvency or similar proceedings.

### 18.5 Guarantor intent

Without prejudice to the generality of Clause *18.4* (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents.

### 18.6 Immediate recourse

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 18. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

### 18.7 Appropriations

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a) refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against

those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b) hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 18.

**18.8 Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Lender (or, as the case may be, the Security Trustee) otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents:

(a) to be indemnified by an Obligor;

(b) to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents; and/or

(c) to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party.

**18.9 Additional security**

(a) This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

(b) All securities pledged and/or issued to the Lender (or acquired by the Company and pledged to the Lender) shall be registered in such manner as the lender directs from time to time.

(c) Camrose may not assign any of its rights under the Africo Placing Documents without the Lender's prior written consent.

**18.10 Limitations**

(a) The Parent enters into this guarantee solely in its capacity as trustee of The Ashdale Settlement and does so without incurring any personal liability.

(b) The Lender in pursuing the remedies and enforcing the security constituted by this guarantee, shall have recourse to such assets of The Ashdale Settlement as represent capital.

(c) Any liability of the Parent hereunder shall be limited to the value of the assets held by The Ashdale Settlement acting in accordance with the terms of the Parent NAV Certificate.

## SECTION 10

## REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT

19. **REPRESENTATIONS**

Each Obligor makes the representations and warranties set out in this Clause 19 on the date of this Agreement and on each day thereafter for so long as any amount is outstanding under the Finance Documents or any Commitment is in force in each case by reference to the facts and circumstances then existing (in the case of any Obligor other than the Company, only in relation to itself, and to the extent expressed to be applicable to the Company, its Subsidiaries (if any)).

19.1 **Status**

(a) It is a limited liability company or corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b) It and each of its Subsidiaries has the power to own its assets and carry on its business as it is being, and is proposed to be, conducted.

19.2 **Binding obligations**

The obligations expressed to be assumed by it in each Transaction Document to which it is or will be a party are legal, valid, binding and enforceable, subject to:

(a) any applicable Reservations; or

(b) in the case of any Security Document, any applicable Perfection Requirements.

19.3 **Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, the Transaction Documents do not and will not:

(a) conflict with:

(i) any law or regulation applicable to it or any of its Subsidiaries;

(ii) its or any of its Subsidiaries' constitutional documents (if any); or

(iii) any agreement or instrument binding upon it or any of its Subsidiaries or any of its or any of its Subsidiaries' assets; or

(b) (except as provided in any Security Document or to the extent Permitted Security) result in the existence of, or oblige it or any of its Subsidiaries to create, any Security over any of its or any of its Subsidiaries' assets.

19.4 **Power and authority**

It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Transaction Documents to which it is a party and the transactions contemplated by those Transaction Documents.

19.5 **Validity and admissibility in evidence**

All Authorisations required or desirable:

(a) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party and the transactions contemplated by the Transaction Documents;

(b) to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions, subject to any applicable Reservations; and

(c) to enable it to create the Security to be created by it pursuant to any Security Document and to ensure that such Security has the priority and ranking it is expressed to have,

have been obtained or effected and are in full force and effect save for complying with any applicable Perfection Requirements or (in the case of any Authorisation in connection with the Acquisition) will have been obtained or effected and will be in full force and effect before the first Utilisation Request.

**19.6 Governing law and enforcement**

(a) The choice of law specified in each Finance Document as the governing law of that Finance Document will be recognised and enforced in its jurisdiction of incorporation.

(b) Any judgment obtained in England in relation to a Finance Document (or in the jurisdiction of the governing law of that Finance Document) will be recognised and enforced in its Relevant Jurisdictions and, in relation to a Finance Document governed by a law other than English law, in the jurisdiction of the governing law of that Finance Document.

**19.7 Deduction of Tax**

It is not required under the law of its Relevant Jurisdictions to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

**19.8 No filing or stamp taxes**

Under the law of its jurisdiction of incorporation it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents (save in each case for complying with any applicable Perfection Requirements or the payment of stamp duty in respect of the Acquisition).

**19.9 No default**

(a) No Event of Default is continuing or might reasonably be expected to result from the making of any Utilisation or the entry into, performance of, or any transaction contemplated by, any Transaction Document.

(b) No other event or circumstance is outstanding which constitutes (or which would, with the lapse of time, the giving of notice, the making of any determination under the relevant document or any combination of the foregoing, constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which might have a Material Adverse Effect.

19.10 **No breach of law**

(a) It has not (and none of its Subsidiaries has) breached any law or regulation which breach has, or would reasonably be expected to have, a Material Adverse Effect.

(b) No Obligor or the directors, officers, agents, employees or other persons acting on behalf of any Obligor has been party to the use of any of the assets of any Obligor for contributions, gifts, entertainment or other expenses relating to political activity or to the making of any direct or indirect payment to government officials or employees from such assets in contravention of any laws, statutes, rules, regulations, ordinances, guidance or other pronouncements applicable in any country in which any Obligor or the directors, officers, agents, employees or other persons acting on behalf of any Obligor now conducts, has conducted or intends to conduct business including, without limitation, any legislation, rules and regulations adopted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Transactions, the United Nations Convention Against Corruption and the African Union Convention on Preventing and Combating Corruption; to the establishment or maintenance of any unlawful or unrecorded fund of monies or other assets; to the making of any false or fictitious entries in the books or records of any Obligor; or to the making of any unlawful or undisclosed payment.

(c) No Obligor or any Affiliate of any Obligor has taken any action or will take any action, directly or indirectly, that would result in a violation of the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

(d) No Obligor or any Affiliate of any Obligor is currently subject to any United States sanctions administered by the United States Office of Foreign Assets Control of the U.S. Treasury Department.

(e) Anti-Terrorism and Money Laundering Laws:

(i) No Obligor or any No Obligor or any Affiliate of any Obligor is in violation of any Anti-Terrorism and Money Laundering Law applicable to such person or entity.

(ii) No Obligor or any Affiliate of any Obligor is a Designated Person.

(iii) No Obligor or any Affiliate of any Obligor:

(a) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of a Designated Person;

(b) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Anti-Terrorism and Money Laundering Law applicable to such person or entity; or

(c) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding or attempts to violate, any of the prohibitions set out in any Anti-Terrorism and Money Laundering Law applicable to such entity or person.

19.11 **Information**

(a) Any factual information provided by or on behalf of any member of the Relevant Group in connection with any Finance Document and/or the Initial Acquisition and/or the Africo Placing

was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b) Any expressions of opinion or intention provided by or on behalf of any member of the Relevant Group in connection with any Finance Document and/or the Initial Acquisition and/or Africo Placing were made after due and careful consideration on reasonable grounds.

(c) Each member of the Borrower Group and the Comide Group has made full disclosure of all material facts that it is aware of, in relation to the Borrower Group, the Comide Group, the Finance Documents, the Initial Acquisition and the Africo Placing.

19.12 **No proceedings pending or threatened**

(a) Other than as disclosed to the Lender in writing and in reasonable detail, no litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency (including any arising from or relating to Environmental Law) which, if adversely determined, would reasonably be expected to have a Material Adverse Effect have been started or (to the best of its knowledge and belief and having made due and careful enquiry) threatened against it or any of its Subsidiaries or any of the Targets, nor are there to the best of its knowledge and belief any circumstances likely to give rise to any such litigation, arbitration or administrative proceedings.

(b) Other than as disclosed to the Lender in writing and in reasonable detail, no labour disputes which would reasonably be expected to have a Material Adverse Effect have been started or (to the best of its knowledge and belief and having made due and careful enquiry) threatened against it or any of its Subsidiaries or any of the Targets, nor are there (to the best of its knowledge and belief) any circumstances likely to give rise to any such disputes.

19.13 **Security**

(a) Subject to any applicable Perfection Requirements, each Security Document creates (or, once entered into, will create) in favour of the Lender, the Security which it is expressed to create fully perfected and, subject to any applicable Reservations, with the ranking and priority it is expressed to have.

(b) The constitutional documents of any member of the Relevant Group or any of the Targets do not and would not restrict or inhibit in any manner any transfer of any shares of any member of the Relevant Group or any of the Targets which are expressed to be (or are required by this Agreement to be or become) subject to any Security under any Security Document.

19.14 **Title**

It and each of its Subsidiaries is the absolute legal and beneficial owner of all the assets over which it purports to create Security pursuant to any Security Document, free from any Security other than Permitted Security, provided for the avoidance of doubt that this Clause 19.14 shall not apply to the shares of any of the Targets until such shares are acquired by the Company pursuant to the Acquisition Documents.

19.15 **Assets**

(a) As regards the Company only, it and each of its Subsidiaries has (or will from the Initial Acquisition Closing Date or the Africo Placing Closing Date have) good and marketable title to, or valid leases or licences of, or is otherwise entitled to use (in each case, on arm's length

terms), all material assets necessary for the conduct of its business as it is being, and is proposed to be, conducted.

(b) As regards all the Obligors other than the Company, subject to Permitted Security and to the outcome of any litigation disclosed in writing and in reasonable detail to the Lender prior to this Agreement, it has (or will from the Initial Acquisition Closing Date or the Africo Placing Closing Date have) good and marketable title to, or valid leases or licences of, or is otherwise entitled to use (in each case, on arm's length terms), all material assets necessary for the conduct of its business as it is being, and is proposed to be, conducted.

19.16 **Comide Assets**

(a) All Interests in the Comide Mining Concessions (except for the Kansuki Mining Concession) are held by Comide and no other person.

(b) All Interests in the Kansuki Mining Concession are held by Kansuki Mining s.p.r.l.. and no other person.

(c) Comide holds no less than 30 per cent. of the Share Interests in Kansuki Mining s.p.r.l..

19.17 **Environmental laws and licences**

Comide has:

(a) complied with all Environmental Laws to which it may be subject;

(b) all Environmental Licences required in connection with its business and has complied with the terms of those Environmental Licences; and

(c) disclosed all budgeted investment expenditure or works necessary to ensure compliance with any Environmental Laws or Environmental Licences,

in each case where failure to do so might have a Material Adverse Effect and there are to its knowledge no circumstances that would be reasonably likely to prevent or materially interfere with such compliance in the future.

19.18 **Environmental releases**

No:

(a) property currently or previously occupied or owned by it or any of its Subsidiaries (including any offsite waste management or disposal location operated or owned at any time by it or any of its Subsidiaries) is or was contaminated with any Hazardous Substance or in a contaminated state during its period of occupation or ownership; and

(b) discharge, release, leaching, migration or escape of any Hazardous Substance into the Environment has occurred or is occurring on, onto, under or from that property,

in each case in circumstances where this might have a Material Adverse Effect or result in any liability for a Finance Party.

19.19 **Initial Acquisition Documents**

(a) The Initial Acquisition Documents:

(i) contain all the terms of the agreement and arrangements between the Initial Vendor (and/or any of its Affiliates) and the Initial Purchaser (and/or any of its Affiliates) in relation to the Initial Acquisition;

(ii) are in full force and effect; and

(iii) have not been amended or waived (in whole or in part) and no consent has been given thereunder, save for any which are minor or technical or have been approved in writing by the Lender.

(b) Neither it nor any of its Subsidiaries nor any Subsidiary of the Initial Target nor the Initial Target is in, or aware of any, breach of or default under any Initial Acquisition Document.

19.20 **Group Structure**

(a) Each Group Structure Chart shows:

(i) each member of the Parent Group that has a direct or indirect Share Interest in Comide and/or the Company and any person in whose shares Comide and/or the Company has a direct or indirect interest and any other person which has a direct Share Interest in any of the foregoing persons (and, in each case, the percentage of such Share Interests held, and whether legally or beneficially, by that person);

(ii) the jurisdiction of incorporation or establishment of each person shown in it; and

(iii) the status of each person shown in it which is not a limited liability company or corporation,

in each case as it will be immediately after, in the case of the Initial Group Structure Chart, the Initial Acquisition Closing Date, and in the case of the Second Group Structure Chart, the Africo Placing Closing Date.

(a) To the extent the level of a person's a shareholding in another person is indicated on Structure Chart, that indication is accurate.

(b) Each Obligor is directly or indirectly a wholly-owned Subsidiary of the Parent.

19.21 **Holding Company**

Each member of the Camrose Holdco Group and the Cerida Holdco Group is a single purpose vehicle and:

(i) has not carried, and does not carry, on any business;

(ii) has not acquired and does not own any asset other than cash and shares in a limited liability company (as indicated in the Group Structure Charts);

(iii) has not entered into any single transaction or series of transactions (whether related or not and whether voluntary or involuntary) to sell, lease, transfer or otherwise dispose of any asset (except as permitting pursuant to Clause 17.4 in respect of any Comide Assets);

(iv) has not created and does not have outstanding any Security over any of its assets;

(v) has not incurred and does not have outstanding any liability (including without limitation any Financial Indebtedness);

(vi) has not entered into any agreement or arrangement prohibiting or restricting any of its actions ;

(vii) has not made any loan, or provided any form of credit or financial accommodation, to any other person;

(viii) has not given or issued any guarantee, indemnity, bond or letter of credit to or for the benefit of, or in respect of liabilities or obligations of, any other person or voluntarily assume any liability (whether actual or contingent) of any other person;

(ix) is not party to any joint venture, consortium, partnership or similar arrangement with any person; or

(x) has not taken any other action of any description which is inconsistent with the role of that member of the Camrose Holdco Group as a single purpose holding company,

in each case, other than pursuant to the Finance Documents, the Investor Documents or the Comide Shareholder Document.

19.22 **Shares**

(a) The shares of any member of the Parent Group which are expressed to be (or are required by this Agreement to be or become) subject to any Security under any Security Document are or, on the Initial Acquisition Closing Date and the Africo Placing Date, will be issued, fully paid, non-assessable and freely transferable and constitute shares in the capital of limited companies, and there are no moneys or liabilities outstanding or payable in respect of any such share.

(b) No person has or is entitled to any conditional or unconditional option, warrant or other right to call for the issue or allotment of, subscribe for, purchase or otherwise acquire any share capital of the Borrower Group, the Cerida Holdco Group or any of the Targets (including any right of pre-emption, conversion or exchange) other than:

(i) the rights of conversion and options in relation to the shares in the Company and Africo granted to the Lender under the terms of this Agreement; and

(ii) any warrants and options in relation to shares in Africo, to the extent they do not relate to the Africo Shares that are expressed to be subject to any Security under any Security Document.

(c) There are no agreements in force or corporate resolutions passed which require or might require the present or future issue or allotment of any share capital of any member of the Borrower Group or the Cerida Holdco Group or any of the Targets (including any option or right of pre-emption, conversion or exchange).

(d) The shares of any member of the Parent Group or the Initial Target which are expressed to be (or are required by this Agreement to be or become) subject to any Security under any Security Document constitute all the share capital of the relevant member of the Parent Group or of the Initial Target (as appropriate).

(e) The Shares comprise the only class of share in the capital of the Company (whether or not issued), and there are no shares in the capital of the Company with more advantageous ranking, economic or voting rights than the Shares.

19.23 **Solvency**

(a) No Obligor is insolvent or unable to pay its debts (including subordinated and contingent debts), nor could it be deemed by a court to be unable to pay its debts within the meaning of:

(i) (in the case of a company incorporated in England or Wales) Section 123(1)(e) or 123(2) of the Insolvency Act 1986;

(ii) (in the case of any other company) the law of the jurisdiction in which it is incorporated,

nor, in any such case, will it become so in consequence of entering into any Transaction Document, and/or performing any transaction contemplated by any Transaction Document.

(b) No Obligor has taken any corporate action nor have any legal proceedings or other procedure or step been taken, started or threatened in relation to anything referred to in Clause 24.6 *(Insolvency proceedings)*.

19.24 **Taxes**

(a) Each member of the Relevant Group has paid when due all Taxes required to be paid by it other than any Taxes:

(i) being contested by it in good faith and in accordance with the relevant procedures;

(ii) which have been disclosed to the Lender and for which adequate reserves are being maintained in accordance with IFRS; and

(iii) where payment can be lawfully withheld and will not result in the imposition of any penalty nor in any Security ranking in priority to the claims of any Finance Party under any Finance Document or to any Security created under any Security Document.

(b) It is not, and will not apply to be, a member of a group (as such group is defined pursuant to the provisions of the Value Added Tax Act 1994) which includes any person which is not an Obligor.

19.25 **No adverse consequences**

(a) It is not necessary under the law of its jurisdiction of incorporation nor, in relation to any Finance Document, under the governing law of that Finance Document:

(i) in order to enable any Finance Party to enforce rights under any Finance Document; or

(ii) by reason of the execution of any Finance Document or the performance by any Finance Party of its obligations under any Finance Document,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in that jurisdiction.

(b) No Finance Party is or will be deemed to be resident, domiciled or carrying on business in any such jurisdiction by reason only of the execution, performance and/or enforcement of any Finance Document.

### 19.26 Pensions

(a) No member of the Relevant Group, nor (to the best knowledge of any member of the Relevant Group) any of the Targets has any material liability in respect of any pension scheme and, so far as any member of the Relevant Group is aware, there are no circumstances which would give rise to such a liability.

### 19.27 Insurances

(a) The insurances required by Clause 23.10 (*Insurance*) are in full force and effect as required by this Agreement.

(b) No event or circumstance has occurred, and there has been no failure to disclose a fact, which would entitle any insurer to reduce or avoid its liability under any such insurance where such event, circumstance or failure would reasonably be expected to have a Material Adverse Effect.

### 19.28 Documents

(a) The documents provided to the Lender under Clause 4.1 (*Initial conditions precedent*) or Clause 26 (*Changes to the Obligors*) are true, complete and accurate and in full force and effect, in each case as at the date any such documents are provided to the Lender.

(b) Any certified copy of a document provided to the Lender under Clause 4.1 (*Initial conditions precedent*) or Clause 26 (*Changes to the Obligors*) is a true, complete and accurate copy of the original document and the original document was in full force and effect, in each case as at the date any such document is provided to the Lender.

### 19.29 Parent NAV Certificate

Each of the representations and confirmations in the Parent NAV Certificate is and remains true and correct.

### 19.30 Comide Shareholder Documents

The Comide Shareholder Documents contain all of the material terms of the relationship between each member of the Relevant Group that is a direct or indirect shareholder in Comide with any other direct or indirect shareholder in Comide that is not a member of the Relevant Group.

### 19.31 Akam Litigation

To the best of the Company's knowledge, the Initial Target is the sole legal and beneficial owner of the Akam Claim.

## 20. INFORMATION UNDERTAKINGS

The undertakings in this Clause 20 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 20.1 Annual financial statements

The Parent shall supply to the Lender as soon as the same becomes available, but in any event within 120 days after the end of each of the Relevant Group's financial years, the audited consolidated financial statements of each of the Company, Comide and Cerida for that financial year.

20.2 **Quarterly financial statements**

(a) The Parent shall supply to the Lender as soon as the same become available, but in any event within 45 days after the end of each Accounting Quarter, each of the Company's and Comide's consolidated financial statements for that Accounting Quarter.

(b) Each set of quarterly financial statements delivered pursuant to paragraph (a) above shall include:

(i) a consolidated cash flow statement and profit and loss account for the relevant Accounting Quarter and for the financial year to date;

(ii) a consolidated balance sheet as at the end of the relevant Accounting Quarter;

(iii) a statement of Capital Expenditure, investments and acquisitions and disposals made during the relevant Accounting Quarter and during the financial year to date;

(iv) management commentary on Camrose Group's, Africo Group's and Comide Group's performance during the relevant Accounting Quarter (including, in the case of financial statements for periods ending more than one year after the Acquisition Closing Date, a comparison with budgeted performance and performance in the previous year) and any material developments or proposals affecting the Camrose Group's, Africo Group's and Comide Group's or their respective businesses; and

(v) details of mandatory prepayments of the Facilities or reductions of the Commitments which occurred during that Accounting Quarter or are expected to occur during the three succeeding Accounting Quarters.

20.3 **Monthly financial statements**

(a) The Parent shall supply to the Lender as soon as the same become available, but in any event within 30 days after the end of each Accounting Month, each of the Company's and Comide's consolidated financial statements for that Accounting Month.

(b) Each set of monthly financial statements delivered pursuant to paragraph (a) above shall include:

(i) a consolidated cash flow statement and profit and loss account for the relevant Accounting Month and for the financial year to date;

(ii) a consolidated balance sheet as at the end of the relevant Accounting Month;

(iii) a comparison of actual performance with the performance projected by the Budget for the relevant Accounting Month and for the financial year to date;

(iv) a statement of Capital Expenditure, investments and acquisitions made during the relevant Accounting Month and during the financial year to date; and

(v) details of mandatory prepayments of the Facilities or reductions of the Commitments which occurred during that Accounting Month or are expected to occur during the eleven succeeding Accounting Months.

20.4 **Compliance Certificate**

(a) The Company shall supply to the Lender, with each set of financial statements delivered pursuant to Clause 20.1 (*Annual financial statements*) or Clause 20.2 (*Quarterly financial statements*) a Compliance Certificate which shall confirm that no Default is continuing (or if a Default is continuing, specify the Default and the steps being taken to remedy it).

(b) A Compliance Certificate delivered with financial statements referred to in Clause 20.1 (*Annual financial statements*) shall also (to the extent requested by the Lender) include a reconciliation of the audited financial statements of the Company for that financial year and the management accounts of the Company as at the end of that financial year.

(a) Each Compliance Certificate shall be signed by a director of and on behalf of the Company and each Compliance Certificate delivered in relation to a period ending on the last day of a financial year of the Company shall (if so requested by the Lender in writing) be reported on by the Company's auditors in such manner (if any) and on such conditions that the auditors specify unless firms of auditors of international repute have adopted a general policy of not providing such reports.

20.5 **Requirements as to financial statements**

(a) Each set of financial statements delivered by the Parent pursuant to Clause 20.1 (*Annual financial statements*) or Clause 20.2 (*Quarterly financial statements*) shall be certified by a director of the relevant company and the Chief Financial Officer on behalf of the Company as fairly representing the relevant member of the Relevant Group's consolidated financial condition and operations as at the end of and for the period in relation to which those financial statements were drawn up.

(b) The Parent shall procure that each set of financial statements delivered pursuant to Clause 20.1 (*Annual financial statements*) or Clause 20.2 (*Quarterly financial statements*) is prepared using IFRS, accounting practices and financial reference periods in each case consistent with the Applicable Accounting Principles unless, in relation to any set of financial statements, it notifies the Lender that there has been a change in IFRS, the accounting practices or reference periods and the auditors of the relevant company deliver to the Lender:

(i) a description of any change necessary for the relevant financial statements to reflect the Applicable Accounting Principles; and

(ii) sufficient information, in form and substance as may be reasonably required by the Lender, to enable the Lender to determine any other relevant matter and/or to make an accurate comparison between the financial position indicated in those financial statements and financial statements previously delivered to the Lender.

Any reference in this Agreement to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the Applicable Accounting Principles.

20.6 **Annual Budget**

If requested by the Lender in writing, the Parent shall supply to the Lender as soon as the same becomes available, but in any event no later than 30 days before the start of each of its financial

years, a budget in respect of the Company and Comide for the next financial year in the Agreed Form (a "**Budget**").

20.7 **Reports**

The Parent shall supply to the Lender as soon as the same become available, any reports produced by any third party in respect of the Comide Assets or the Comide Mining Concessions, including (but not limited to) for the avoidance of doubt, any such reports produced in respect of any of the matters referred to in the Due Diligence Information definition contained in Clause 1 of this Agreement.

20.8 **Information: miscellaneous**

(a) The Company shall supply to the Lender at the same time as they are dispatched, copies of all documents dispatched by the Company to its shareholders, in their capacity as shareholders generally (or any class of them) or its creditors generally (or any class of them).

(b) The Company shall supply to the Lender:

(i) promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any Comide Assets, and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect or result in liabilities of one or more members of the Relevant Group or the Targets in excess of $100,000 (or its equivalent in another currency or currencies) in aggregate;

(ii) promptly upon becoming aware of them, the details of any material labour dispute affecting any Comide Assets;

(iii) promptly upon becoming aware of them, the details of any claim, notice or other communication received by it in respect of any actual or alleged breach of or liability under Environmental Law in relation to the Comide Assets, or any event or circumstance which is likely to result in any such claim or notice, which, if substantiated, would reasonably be expected to have a Material Adverse Effect or result in liabilities of, and/or expenditure by, one or more members of the Camrose Group's, Africo Group's and Comide Group's or the Targets in excess of $100,000 (or its equivalent in another currency or currencies) in aggregate;

(iv) promptly upon becoming aware of them, any change in the structure of the Relevant Group from that set out in the applicable Group Structure Chart which is might be adverse to the interests of the Lender;

(v) promptly upon becoming aware of them, the details of any actual or proposed material amendment to or material waiver or material consent under, any material breach of or material default under, any notice given or received under and any material claim or material potential claim made by or against any member of the Relevant Group or any of the Targets under any Acquisition Document;

(vi) at regular intervals and promptly upon request by the Lender, details as to the status and progress of the Acquisitions;

(vii) promptly upon becoming aware of them, the details of any claim and/or potential claim in respect of the Comide Assets for an amount in excess of $100,000 (or its equivalent in another currency or currencies) in aggregate made by or on behalf of any member of the Relevant Group or any of the Targets under any insurance policy;

(viii) promptly upon becoming aware of them, the details of any post-closing adjustments to the purchase price for the Targets;

(ix) promptly upon receiving the same, a copy of each document or notice the Company receives in its capacity as shareholder of Africo; and

(x) promptly, such further information regarding the Acquisitions or the financial condition, business, operations and prospects of any member of the Relevant Group or after the Initial Acquisition Closing Date or after the Africo Placing Closing Date (as appropriate) any of the Targets, as the Lender may reasonably request.

(c) The Lender hereby notifies each Obligor that pursuant to the requirements of the USA Patriot Act, the Lender is required to obtain, verify and record information that identifies such Obligor, which information includes the name and address of such Obligor and other information that will allow the Lender to identify such Obligor in accordance with the USA Patriot Act.

**20.9 Notification of Default**

(a) Each Obligor shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b) Promptly upon a request by the Lender, the Company shall supply to the Lender a certificate signed by two of its directors on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

**20.10 Inspection of books and records**

(a) Each Obligor shall (and the Parent shall ensure that each member of the Relevant Group will):

(i) keep books and records which accurately reflect in all material respects all of its business, affairs and transactions; and

(ii) permit the Lender or any of its representatives, at reasonable times and intervals in each calendar year and in circumstances when the Lender believes that a Default has occurred or might reasonably be expected to occur, and upon reasonable notice, to visit any of its offices, to inspect any of its books and records and to discuss its financial matters with its officers and auditors. The cost and expense of each such visit shall be borne by the Company.

(b) Each Obligor hereby authorises its auditors to discuss any of the Relevant Group's financial matters with the Lender or any of its representatives, whether or not any representative of the Company is present, and to inspect, and photocopy extracts from, any of its books and records provided that prior to the occurrence of a Default, the Lender shall provide written notice to the Company before any such discussions or inspections may take place.

(c) If requested by the Lender, each Obligor shall authorise and/or (as the case may be) engage its auditors to discuss any such matter with the Lender on terms and conditions acceptable to the Lender.

20.11 **Auditors**

(a) The Parent shall ensure that the same internationally recognised "big four" firm of accountants, or such other firm of accountants as may have been consented to by the Lender in writing prior to the date of this Agreement (being for the avoidance of doubt Benady Cohen & Co), is appointed as its auditors and the auditors of each other member of the Relevant Group.

(b) No Obligor shall (and the Parent shall ensure that no other member of the Relevant Group will) change its auditors without the consent of the Lender.

(c) The Parent shall ensure that the financial year end of the Relevant Group and each member of the Relevant Group is 31 December.

(d) No Obligor shall (and the Parent shall ensure that no other member of the Relevant Group will) change its financial year end or the end of its Accounting Quarter or Accounting Month without the consent of the Lender.

20.12 **Investigations**

(a) If an Event of Default is continuing or the Lender believes that any financial statement, certificate or calculation provided under this Agreement is inaccurate or incomplete in any material respect, the Lender may:

(i) instruct (or require the Company to instruct) the auditors of the Company (or such other internationally recognised "big four" firm of accountants as the Lender selects) to investigate the affairs, financial performance or accounting and other reporting procedures and standards of the Relevant Group; or

(ii) instigate such other investigations and commission such other reports as the Lender requires.

The cost and expense of each such investigation or report shall be borne by the Company.

(b) Each Obligor shall (and the Company shall ensure that each other member of the Relevant Group will) co-operate fully with any person carrying out an investigation or preparing a report pursuant to paragraph (a) above.

20.13 **"Know your customer" checks**

(a) If:

(i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii) any change in the status of an Obligor after the date of this Agreement; or

(iii) a proposed assignment or transfer by the Lender of any of its rights and obligations under this Agreement,

obliges the Lender (or, in the case of paragraph (iii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where

the necessary information is not already available to it, each Obligor shall promptly upon the request of the Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b) The Company shall, by not less than 10 Business Days' prior written notice to the Lender, notify the Lender of its intention to request that one of its Subsidiaries becomes a Guarantor pursuant to Clause 26 (*Changes to the Obligors*).

(c) Following the giving of any notice pursuant to paragraph (b) above, if the accession of such Guarantor obliges the Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Lender (for itself or on behalf of any prospective new Lender) in order for the Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement as a Guarantor.

### 20.14 No personal liability

No director, officer or employee of the Company or any other member of the Parent Group shall be personally liable for any statement made by it in any Compliance Certificate, other certificate or other document as required to be delivered to the Lender pursuant to the Finance Documents.

## 21. GENERAL UNDERTAKINGS

The undertakings in this Clause 21 shall remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 21.1 Authorisations

(a) Each Obligor shall (and the Parent shall ensure that each other member of the Relevant Group will) promptly obtain, comply with and do all that is necessary to maintain in full force and effect (and supply certified copies to the Lender of) any Authorisation required under any applicable law or regulation:

(i) to enable it to perform its obligations under the Transaction Documents;

(ii) to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of any Transaction Document; and

(iii) to enable it to carry on its business as it is being conducted from time to time if failure to obtain, comply with or maintain any such Authorisation might have a Material Adverse Effect.

(b) The Parent shall ensure that the Perfection Requirements are promptly complied with.

### 21.2 Merger

No Obligor shall (and the Parent shall ensure that each other member of the Relevant Group does not) enter into any amalgamation, demerger, merger or corporate reconstruction.

### 21.3 Arm's length terms

No Obligor shall (and the Parent shall ensure that no other member of the Relevant Group will) enter into any contract or arrangement with or for the benefit of any other person (including without limitation any disposal to that person or contract with that person in relation to the development of the Comide Mining Concessions) other than in the ordinary course of business and on arm's length terms.

### 21.4 Pari passu

Each Obligor  shall ensure that its obligations under the Finance Documents rank at all times at least *pari passu* in right of priority and payment with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

### 21.5 The Initial Acquisition and the Africo Placing

(a) Each Obligor shall (and the Parent shall ensure that each other member of the Relevant Group will):

(i) perform and comply with its obligations under or in connection with the Initial Acquisition Documents and the Africo Placing Documents;

(ii) notify the Lender (promptly upon becoming aware of the same) of any breach by any party of its obligations or default under the Initial Acquisition Documents or the Africo Placing Documents;

(iii) take all reasonable steps to enforce any claim or right it has under or in connection with any Initial Acquisition Document or any Africo Placing Document;

(iv) notify the Lender promptly of any claim made or to be made under an Initial Acquisition Document or an Africo Placing Document;

(v) provide the Lender with reasonable details of that claim and its progress and notify the Lender as soon as practicable upon that claim being resolved; and

(vi) comply with all applicable laws in all respects material in the context of the Initial Acquisition and the Africo Placing.

(b) No Obligor shall (and the Company shall ensure that no other member of the Relevant Group will) amend, terminate, give any waiver or consent under, or agree or decide not to enforce, in whole or in part, any term or condition of any Initial Acquisition Document or any Africo Placing Document, save for amendments, waivers or consents which are minor or technical or have been approved in writing by the Lender.

(c) The Parent shall keep the Lender informed as to the status and progress of the Initial Acquisition.

(d) The Parent shall keep the Lender informed and consult with it as to:

(i) the terms and conditions of any assurance or undertaking proposed to be given by or on behalf of any member of the Relevant Group to any person for the purpose of obtaining any regulatory, competition and/or anti-trust Authorisation necessary or desirable in connection with the Initial Acquisition or the Africo Placing; and

(ii) any terms or conditions proposed in connection with any regulatory, competition and/or anti-trust Authorisation necessary or desirable in connection with the Initial Acquisition or the Africo Placing.

(e) If the Lender states that, in its opinion, any proposed assurance, undertaking, term or condition referred to in paragraph (d) above might reasonably be expected to have a Material Adverse Effect, the Borrower shall not waive or treat as satisfied the condition to the Initial Acquisition or the Africo Placing relating to that Authorisation.

21.6 **Comide Assets**

Except as expressly permitted in Clause 17.4 (*Permitted sale of Comide Assets*), neither the Company nor the Parent shall (and the Parent and the Company shall procure that none of their Affiliates shall) enter into a single transaction or series of transactions (whether related or not and whether voluntary or involuntary) to sell, lease transfer or otherwise dispose of any Comide Assets.

21.7 **Financial assistance**

Each Obligor shall ensure that all payments between members of the Relevant Group, and any Security created pursuant to any Finance Document by any member of the Relevant Group, are made or created in compliance with any applicable law or regulation in any relevant jurisdiction concerning financial assistance by a company for the acquisition of or subscription for shares or concerning the protection of shareholders' capital.

21.8 **Initial Target Litigation**

(a) The Company will use reasonable endeavours to:

(i) agree in advance with the Lender a strategy pursuant to which any litigation in respect of Africo which is entitled to be conducted by the Initial Target is conducted; and

(ii) comply with such agreed strategy.

(b) The Company will promptly notify the Lender of each material step taken in connection with the litigation referred to in paragraph (a) above by any party to that litigation.

21.9 **Publicity**

(a) No Party shall (and the Parent shall ensure that none of its Affiliates will) issue or allow to be issued on its behalf any press release or other publicity which refers to any Facility or any Finance Party without the consent of the Parent and the Lender, unless the publicity is required by law or any stock exchange.

(b) If any publicity described in paragraph (a) above is required by law or any stock exchange, the Parent or the Lender (as appropriate) shall notify the other as soon as practicable upon

becoming aware of the requirement, shall consult with the other Party on the terms of the reference and shall have regard to any timely comments of the other Party.

21.10 **Compliance with laws**

Each Obligor shall (and the Parent shall ensure that each member of the Relevant Group will) comply in all respects with

(a) all laws to which it may be subject, if failure so to comply might have a Material Adverse Effect;

(b) the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and implementing statutes, including the U.S. Foreign Corrupt Practices Act, the United Kingdom Anti-Terrorism, Crime and Security Act of 2001;

(c) the United Nations Convention Against Corruption, the African Union Convention on Preventing and Combating Corruption and implementing statutes, including South Africa's Prevention and Combating of Corrupt Activities Act of 2004;

(d) the Anti-Terrorism and Money Laundering Laws;

(e) the United States trade and economic sanctions programs enforced by the Office of Foreign Assets Control of the United States Department of the Treasury;

(f) The USA PATRIOT Act of 2001, Bank Secrecy Act of 1970 and Internal Revenue Code; and

(g) any other anti-corruption or money laundering statutes of any applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental or quasi-governmental agency.

21.11 **Restricted Payments**

(a) No Obligor shall (and the Parent shall each procure that no member of the Relevant Group will):

(i) pay, repay or prepay any principal, interest or other amount on or in respect of, or redeem, purchase or defease, any Financial Indebtedness owing to any Restricted Person;

(ii) make any investment in, or pay any fee or commission or make any advance or other kind of payment to, any Restricted Person;

(iii) enter into any arrangement which imposes an obligation on any member of the Relevant Group in favour of a Restricted Person,

save that, in relation to the Parent, this restriction will only apply to the extent that the same would cause a breach of any of the undertakings contained in the Parent NAV Certificate.

(b) Each of the Company and Comide shall not:

(i) declare, pay or make any dividend or distribution or other payment or distribution of any kind on or in respect of any of its shares; or

(ii) reduce, return, purchase or repay, cancel or redeem any of its shares.

(c) In this Clause, "**Restricted Person**" means:

(i) the Parent or any Affiliate of the Parent other than a member of the Borrower Group;

(ii) any person with an interest (direct or indirect) in the shares in the Parent;

(iii) any joint venture, consortium, partnership or similar arrangement of which any person described in paragraphs (i) and (ii) above is a member;

(iv) any present or past beneficiary of The Ashdale Settlement; and

(v) any Affiliate of any person described in paragraphs (i) to (iv) above, other than a member of the Borrower Group.

21.12 **Issue of Shares**

No Obligor except for the Parent shall (and the Parent shall procure that each other member of the Relevant Group, except for a member of the Africo Group, does not):

(i) issue any share to any person other than, in the case of an issue of shares by a Subsidiary of the Company, to another member of the Borrower Group; or

(ii) grant to any person any conditional or unconditional option, warrant or other right to call for the issue or allotment of, subscribe for, purchase or otherwise acquire any share or loan capital of any member of the Borrower Group (including any right of pre-emption, conversion or exchange), or alter any right attaching to any share or loan capital of any member of the Borrower Group.

(b) Paragraph (a) above does not apply to the issue of ordinary non-redeemable shares by the Company pursuant to this Agreement.

21.13 **Gecamines Interest**

At the date of this Agreement the Gecamines Interest constitutes 20% of the issued share capital of Comide (the "**threshold**"). No Obligor shall (and the Parent shall ensure that no other member of the Relevant Group will) enter into any agreement or arrangement or take any action which would result in the increase of the Gecamines Interest above such threshold unless compelled to do so by law or court order. However the Parties acknowledge that there may be potential for increase in the threshold either pursuant to the PE 2607 Sale Agreement or as a result of an ongoing review of mining licences in the Democratic Republic of Congo or otherwise.

22. **CAMROSE HOLDCO GROUP AND CERIDA HOLDCO GROUP UNDERTAKINGS**

The undertakings in this Clause 22 shall remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

22.1 **Holding company**

The Company and Cerida shall not (and will respectively procure that each other member of the Camrose Holdco Group and each other member of the Cerida Holdco Group does not):

(i) carry on any business

(ii) acquire or own any asset other than cash, shares in a limited liability company (as indicated in the applicable Group Structure Chart) and Comide Assets;

(iii) enter into a single transaction or a series of transactions (whether related or not and whether voluntary or involuntary) to sell, lease, transfer or otherwise dispose of any asset (except as permitted pursuant to Clause 17.4 in respect of any Comide Assets);

(iv) create or permit to subsist any Security over any of it assets;

(v) incur or have outstanding any liability (including without limitation any Financial Indebtedness);

(vi) enter into any agreement or arrangement prohibiting or restricting any of its actions ;

(vii) make any loan, or provide any form of credit or financial accommodation, to any other person;

(viii) give or issue any guarantee, indemnity, bond or letter of credit to or for the benefit of, or in respect of liabilities or obligations of, any other person or voluntarily assume any liability (whether actual or contingent) of any other person;

(ix) enter into any joint venture, consortium, partnership or similar arrangement with any person; or

(x) take any other action of any description which is inconsistent with the role of each member of the Camrose Holdco Group and the Cerida Holdco Group as a single purpose holding company,

in each case, other than pursuant to the Finance Documents, the Investor Documents or the Comide Shareholder Document.

22.2 **Collateral Maintenance**

(a) The Company shall to the extent possible, deposit the assets subject to the Collateral Security in the Collateral Account.

(b) The Company shall ensure that at all times the aggregate principal amount outstanding under Facility A and Facility B shall be less than or equal to 75 per cent. of the Collateral Value (the "**Required Collateral Level**").

(c) To the extent that the Collateral Value is less than the Required Collateral Level the Company shall (and the Parent shall procure that the Company shall) grant Security (to be in a form and substance satisfactory to the Lender) to the Security Trustee over sufficient additional Eligible Collateral to ensure that the Consolidated Security Value is increased to the Required Collateral Level.

(d) If any member of the Borrower Group acquires a Comide Asset after the date of this Agreement, the Company shall ensure that such member of the Borrower Group grants Security (to be in a form and substance satisfactory to the Lender) to the Security Trustee over 50 per cent. of the Comide Asset so acquired (to the extent directly held by that member of the Borrower Group) within 10 Business Days of the date of the acquisition of that Comide Asset.

22.3 **Conditions Subsequent**

(a) The Company shall procure that each of the Initial Purchaser and the Initial Target accedes as an Additional Guarantor immediately following the Initial Acquisition Closing Date.

(b) The Company shall procure that the Initial Purchaser grants first ranking Security in favour of the Security Trustee over all of its rights under the Initial Acquisition Documents and the entire issued share capital of the Initial Target, in a form and substance satisfactory to the Lender (acting reasonably), no later than 10 Business Days after the Initial Acquisition Closing Date.

(c) The Company shall, immediately upon the occurrence of the Africo Placing Closing Date, execute and deliver to the Lender the Africo Share Security Document.

(d) The Company shall, immediately with 5 Business Days of the occurrence of the Africo Loan Closing Date, execute and deliver to the Lender the Africo Loan Security Document.

(e) The Company shall use reasonable endeavours to ensure that the Investor Documents are agreed within 30 days of the date of this Agreement.

(f) The Lender acknowledges that enforcement of the Africo Share Security shall be subject to applicable provisions of Canadian Law.

## 23. COMIDE GROUP UNDERTAKINGS

The undertakings in this Clause 21 shall remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 23.1 Comide Mining Concessions

(a) The Parent shall procure that each member of the Comide Group complies with and does all that is necessary to maintain in full force and effect each of the Comide Mining Concessions.

(b) The Parent shall procure that no member of the Comide Group:

(i) agrees to, or acquiesces in, any material variation, amendment, waiver or consent of, or agrees to or decides not to enforce, in whole or in part, any material provision of any of the Comide Mining Concessions;

(ii) terminate, cancel, suspend or agree to any termination, cancellation or suspension of any of the Comide Mining Concessions;

(iii) transfer or assign any of its rights under any of the Comide Mining Concessions (save as permitted pursuant to Clause 17 of this Agreement).

### 23.2 Negative pledge

(a) The Parent shall procure that no member of the Comide Group creates or permits to subsist any Security.

(b) The Parent shall procure that no member of the Comide Group:

(i) sells, transfers or otherwise disposes of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Borrower Group;

(ii) enters into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iii) enters into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c) The Parent shall procure that no member of the Comide Group sells, transfers or otherwise disposes of any of their receivables.

(d) Paragraphs (a) and (b) above do not apply to Permitted Comide Security.

23.3 **Disposals**

(a) The Parent shall procure that no member of the Comide Group enters into a single transaction or a series of transactions (whether related or not and whether voluntary or involuntary) to sell, lease, transfer or otherwise dispose of any asset.

(b) Paragraph (a) above does not apply to any Permitted Comide Disposal or any disposal permitted pursuant to Clause 17 of this Agreement.

23.4 **Restrictive agreements, negative pledges**

The Parent shall procure that no member of the Comide Group enters into (or, after the first Utilisation Date, has outstanding) any agreement or arrangement (other than the Finance Documents) prohibiting or restricting the creation or existence of any Security on any asset or the making of any payment under a Finance Document.

23.5 **Financial Indebtedness**

(a) The Parent shall procure that no member of the Comide Group incurs (or agrees to incur) or has outstanding any Financial Indebtedness.

(b) Paragraph (a) above does not apply to Permitted Comide Financial Indebtedness.

23.6 **Loans and Guarantees**

(a) The Parent shall procure that no member of the Comide Group:

(i) makes any loan, or provides any form of credit or financial accommodation, to any other person; or

(ii) gives or issues any guarantee, indemnity, bond or letter of credit to or for the benefit of, or in respect of liabilities or obligations of, any other person or voluntarily assumes any liability (whether actual or contingent) of any other person.

(b) Paragraph (a) above does not apply to Permitted Comide Loans or Permitted Comide Guarantees.

23.7 **Acquisitions and investments**

(a) The Parent shall procure that no member of the Comide Group:

(i) invests in or acquires any share in or any security issued by any person, or any interest therein or in the capital of any person, or makes any capital contribution to any person; or

(ii) invests in or acquires any business or going concern, or the whole or substantially the whole of the assets or business of any person, or any assets that constitute a division or operating unit of the business of any person.

except as set out in the P.E. 2607 Sale Agreement.

(b) The Parent shall procure that no member of the Comide Group enters into any joint venture, consortium, partnership or similar arrangement with any person.

23.8 **Change of business**

The Parent shall ensure that no change is made to the general nature of the business of the Comide Group taken as a whole from that carried on by the Comide Group at the date of this Agreement.

23.9 **Assets**

The Parent shall procure that each member of the Comide Group maintains all its assets necessary for the conduct of its business as conducted from time to time in good working order and condition, ordinary wear and tear excepted.

23.10 **Insurance**

(a) The Parent shall procure that each member of the Comide Group maintains insurances on and in relation to its business and assets with reputable underwriters or insurance companies:

(i) against those risks, and to the extent, usually insured against by prudent companies located in the same or a similar location and carrying on a similar business; and

(ii) against those risks, and to the extent, required by applicable law or by contract,

(b) The Parent shall procure that each member of the Comide Group promptly pays premiums and does all things necessary to maintain insurances required of it by paragraphs (i) and (ii) above.

23.11 **Environmental undertakings**

The Parent shall procure that each member of the Comide Group:

(a) complies with all Environmental Laws to which it may be subject and take all reasonable steps to prepare for known changes thereto or new obligations thereunder;

(b) obtains all Environmental Licences required or desirable in connection with its business; and

(c) complies with all Environmental Licences obtained in connection with its business,

in each case where failure to do so might have a Material Adverse Effect.

23.12 **Environmental claims**

The Parent shall procure that each member of the Comide Group promptly notifies the Lender in writing upon becoming aware of:

(a) any Environmental Claim;

(b) any communication received by it in respect of any actual or alleged breach of or liability under Environmental Law; or

(c) any facts or circumstances which shall or are reasonably likely to result in any Environmental Claim

which, if substantiated, might have a Material Adverse Effect or result in any liability for a Finance Party.

24. **EVENTS OF DEFAULT**

Each of the events or circumstances set out in Clause 24 is an Event of Default.

24.1 **Non-payment**

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a) its failure to pay is caused by administrative or technical error; and

(b) payment is made within 2 Business Days of its due date.

24.2 **Other obligations**

(a) Any person (other than a Finance Party) does not comply with any provision of the Finance Documents (other than those referred to in Clause 24.1 (*Non-payment*).

(b) No Event of Default under paragraph (a) above in relation to Clause 21.1 (*Authorisations*) will occur if the failure to comply is capable of remedy and is remedied within 7 days of the Lender giving notice to the Company or the Company becoming aware of the failure to comply.

24.3 **Misrepresentation**

Any representation or statement made or deemed to be made by any person (other than a Finance Party) in the Finance Documents or any other document delivered by or on behalf of any person (other than a Finance Party) under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

24.4 **Cross default**

(a) Any Financial Indebtedness of any member of the Borrower Group is not paid when due nor within any originally applicable grace period.

(b) Any Financial Indebtedness of any member of the Borrower Group is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c) Any commitment for any Financial Indebtedness of any member of the Borrower Group is cancelled or suspended by a creditor of any member of the Borrower Group as a result of an event of default (however described).

(d) Any creditor of any member of the Borrower Group becomes entitled to declare any Financial Indebtedness of any member of the Borrower Group due and payable prior to its specified maturity as a result of an event of default (however described).

(e) No Event of Default will occur under this Clause 24.5 if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs (a) to (d) above is less than $200,000 (or its equivalent in any other currency or currencies).

24.5 **Insolvency**

(a) A member of the Borrower Group is unable or admits inability to pay its debts as they fall due, suspends, or threatens to suspend, making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness.

(b) The value of the assets of any member of the Borrower Group is less than its liabilities (taking into account contingent and prospective liabilities).

(c) A moratorium is declared in respect of any indebtedness of any member of the Borrower Group.

24.6 **Insolvency proceedings**

Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any member of the Borrower Group;

(b) a composition, assignment or arrangement with any creditor of any member of the Borrower Group;

(c) the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any member of the Borrower Group or any of its assets; or

(d) the enforcement of any Security over any assets of any member of the Borrower Group,

or any analogous procedure or step is taken in any jurisdiction.

24.7 **Creditors' process**

Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of a member of the Borrower Group and is not discharged within 5 Business Days.

24.8 **Ownership**

The direct or indirect Share Interests held by the Parent or the Company in any member of the Relevant Group is reduced to below the percentage level set out in, after the Initial Acquisition Closing Date, the Initial Group Structure Chart, and after the Africo Placing Closing Date, the Second Group Structure Chart, save to the extent permitted under Clause 17.4 (*Permitted disposals of Comide Assets*).

24.9 **Unlawfulness**

It is or becomes unlawful for any person (other than a Finance Party) to perform any of its obligations under the Finance Documents.

24.10 **Repudiation**

Any person (other than a Finance Party) repudiates a Transaction Document or evidences an intention to repudiate a Transaction Document.

24.11 **Security and guarantees**

Any Security Document or any guarantee or indemnity in or any subordination under any Finance Document is not in full force and effect or any Security Document does not create in favour of the Security Trustee for the benefit of the Finance Parties the Security which it is expressed to create fully perfected and with the ranking and priority it is expressed to have.

24.12 **Constitutional documents**

Any constitutional document of any member of the Borrower Group or the Shareholders' Agreement is terminated, or is amended in a way, or any consent or waiver is given in respect of any such document or the Shareholders' Agreement, which might be material to the interests of the Finance Parties under the Finance Documents.

24.13 **Carry on business**

Any member of the Borrower Group suspends or ceases (or threatens to suspend or cease) to carry on all or a material part of its business.

24.14 **Nationalisation**

Any step is taken by any person with a view to the seizure, compulsory acquisition, expropriation or nationalisation of all or any of the shares, or all or any material part of the assets of any member of the Borrower Group.

24.15 **Audit qualification**

The auditors qualify their report on any audited consolidated financial statement of the Group or any audited financial statement of any Obligor.

24.16 **Litigation**

Any litigation, arbitration, proceeding or dispute is started or threatened or there are any circumstances likely to give rise to any litigation, arbitration, proceeding or dispute, in each case which might reasonably be expected to have a Material Adverse Effect.

24.17 **Ashdale Settlement NAV**

At any time:

(i) the net assets of The Ashdale Settlement (held directly or indirectly by The Ashdale Settlement) are valued at less than $2,000,000,000;

(ii) less than $500,000,000 of the assets of The Ashdale Settlement (held directly or indirectly by The Ashdale Settlement) are represented by shares in companies listed or quoted publicly or cash (the "**Liquid Assets**");

(iii) The Ashdale Settlement ceases to have the ability to sell, dispose, realise or otherwise transfer Liquid Assets and such sale, disposal realisation or transfer would result in less than $300,000,000 of net proceeds free from all mortgages charges, pledges, liens or other security interests of any description or any trust arrangements other than The Ashdale Settlement; and/or

(iv) The Ashdale Settlement makes any distribution to beneficiaries or sells, disposes, realises or otherwise transfers any assets, in each case resulting in The Ashdale Settlement holding Liquid Assets of less than $200,000,000.

24.18 **Material adverse change**

The Lender determines that a Material Adverse Effect exists, has occurred or might occur.

24.19 **Acceleration**

(a) On and at any time after the occurrence of an Event of Default the Lender may by notice to the Company:

(i) cancel the Total Commitments whereupon they shall immediately be cancelled;

(ii) declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable; and/or

(iii) declare that all or part of the Utilisations be payable on demand, whereupon they shall immediately become payable on demand by the Lender.

## SECTION 11

## CHANGES TO PARTIES

### 25. CHANGES TO THE LENDERS

#### 25.1 Assignments and transfers by the Lenders

(a) A Lender (the "**Existing Lender**") may:

(a) assign any of its rights; or

(b) transfer by novation any of its rights and obligations,

to any of its Affiliates (the "**New Lender**").

(b) An assignment or transfer by a Lender to a New Lender shall not require the consent of any Obligor.

(c) To the extent that a New Lender shall cease to be an Affiliate of the Lender, such New Lender shall assign or transfer all its rights and obligations to an entity which is an Affiliate of the Lender and such entity shall be a New Lender for the purposes of this Agreement.

#### 25.2 Disclosure of information

Any Lender may disclose to any of its Affiliates and any other person:

(a) to (or through) whom that Lender assigns or transfers (or may potentially assign or transfer) all or any of its rights and obligations under this Agreement;

(b) with (or through) whom that Lender enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made by reference to, this Agreement or any Obligor;

(c) to whom that Lender wishes to disclose information for the purpose of obtaining a private rating of any Facility; or

(d) to whom, and to the extent that, information is required to be disclosed by any applicable law or regulation,

any information about any Obligor, the Group, any other person and the Transaction Documents as that Lender shall consider appropriate if, in relation to paragraphs (a), (b) and (c) above, the person to whom the information is to be given has entered into a Confidentiality Undertaking. This Clause supersedes any previous agreement relating to the confidentiality of this information.

### 26. CHANGES TO THE OBLIGORS

#### 26.1 Assignments and transfer by Obligors

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents, in each case without the prior written consent of the Lender.

26.2 **Additional Guarantors**

(a) The Company may request that any of its wholly owned Subsidiaries become an Additional Guarantor. That Subsidiary, and/or any Subsidiary which is required by this Agreement to become an Additional Guarantor, shall become an Additional Guarantor if:

(i) the Company delivers to the Lender a duly completed and executed Accession Letter; and

(ii) the Lender has received all of the documents and other evidence listed in Part III of Schedule 1 (*Conditions precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the Lender.

(b) The Lender shall notify the Company promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part II of Schedule 1 (*Conditions precedent*).

26.3 **Repetition of Representations**

Delivery of an Accession Letter constitutes confirmation by the relevant Subsidiary that the Repeating Representations and each of the representations set out in Clause 19.5 (*Validity and admissibility in evidence*) to Clause 19.8 (*No filing or stamp taxes*) are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

26.4 **Release of Guarantors and Security**

(a) At the time of completion of any disposal by any Obligor of any asset, the Security Trustee shall, at the request and cost of the Company, execute such documents as may be required to release that asset from the Security Documents. Each other Finance Party authorises the Security Trustee to execute any such document.

(b) The Security Trustee shall only be required to grant a release under paragraph (a) above if:

(i) the disposal is permitted under Clause 23.3 (*Disposals*) or otherwise with the consent of the Lender;

(ii) to the extent that the proceeds of the disposal are, or are required by this Agreement, to be applied in or toward repayment or prepayment of the Facilities, the Security Trustee has received (or is satisfied that it will receive) those proceeds; and

(iii) to the extent that the disposal is to be in exchange for replacement assets, the Security Trustee has received (or is satisfied that it will receive) Security (in favour of the Finance Parties to secure all of the obligations of the Obligors under the Finance Documents and in form and substance satisfactory to the Security Trustee) over those replacement assets.

(c) If a Guarantor ceases to be a member of the Borrower Group in accordance with this Agreement, that Guarantor shall be released from its obligations under the Finance Documents.

(d) The Security Trustee shall, at the request and cost of the Company, execute such documents as may be required to release that Guarantor pursuant to paragraph (c) above.

## SECTION 12

## THE FINANCE PARTIES

27. **ROLE OF THE SECURITY TRUSTEE**

27.1 **Appointment of the Security Trustee**

(a) Each other Finance Party appoints the Security Trustee to act as security trustee under and in connection with the Finance Documents.

(b) Each other Finance Party authorises the Security Trustee to exercise the rights, powers, authorities and discretions specifically given to it under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

(c) Each other Finance Party authorises the Security Trustee to execute the Shareholders' Agreement on its behalf.

27.2 **Duties of the Security Trustee**

(a) The Lender shall promptly send to the Security Trustee such certification as the Security Trustee may require pursuant to paragraph 7 (*Basis of distribution*) of Schedule 4 (*Security trust provisions*).

(b) The duties of the Security Trustee under the Finance Documents are solely mechanical and administrative in nature.

27.3 **Role of the Security Trustee**

The Security Trustee shall not be an agent of any Finance Party or any Obligor under or in connection with any Finance Document.

27.4 **No fiduciary duties**

(a) Nothing in this Agreement constitutes the Security Trustee (except as expressly provided in Schedule 4 (*Security trust provisions*)) as a trustee or fiduciary of any other person.

(b) The Security Trustee shall not be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

27.5 **Business with the Group**

The Security Trustee may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Borrower Group or any other person.

27.6 **Rights and discretions of the Security Trustee**

(a) The Security Trustee may rely on:

(i) any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii) any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

(b) The Security Trustee may assume, unless it has received notice to the contrary in its capacity as security trustee for the Finance Parties, that:

(i) no Default has occurred (unless it has actual knowledge of a Default arising under Clause 24.1 (*Non-payment*));

(ii) any right, power, authority or discretion vested in any Party has not been exercised; and

(iii) any notice or request made by the Company (other than a Utilisation Request) is made on behalf of and with the consent and knowledge of all the Obligors.

(c) The Security Trustee may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

(d) The Security Trustee may act in relation to the Finance Documents through its personnel and agents.

(e) The Security Trustee may disclose to any other Party any information it reasonably believes it has received as Security Trustee.

(f) Notwithstanding any other provision of any Finance Document to the contrary, the Security Trustee is not obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

27.7 **Lender instructions**

(a) Unless a contrary indication appears in a Finance Document, the Security Trustee shall (i) exercise any right, power, authority or discretion vested in it as Security Trustee in accordance with any instructions given to it by the Lender (or, if so instructed by the Lender, refrain from exercising any right, power, authority or discretion vested in it as Security Trustee) and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with an instruction of the Lender.

(b) Unless a contrary indication appears in a Finance Document, any instructions given by the Lender will be binding on all the Finance Parties.

(c) The Security Trustee may refrain from acting in accordance with the instructions of the Lender until it has received such security as it may require for any cost, loss or liability (together with any associated VAT) which it may incur in complying with the instructions.

(d) In the absence of instructions from the Lender, the Security Trustee may act (or refrain from taking action) as it considers to be in the best interest of the Lender.

(e) The Security Trustee is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document.

27.8 **Responsibility for documentation**

The Security Trustee is not:

(a) responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Security Trustee, an Obligor or any other person given in or in connection with any Finance Document or any of the Reports; or

(b) responsible for the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document.

27.9 **Exclusion of liability**

(a) Without limiting paragraph (b) below, the Security Trustee will not be liable for any action taken by it under or in connection with any Finance Document, unless directly caused by its gross negligence or wilful misconduct.

(b) No Party (other than the Security Trustee) may take any proceedings against any officer, employee or agent of the Security Trustee in respect of any claim it might have against the Security Trustee or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Security Trustee may rely on this Clause.

(c) The Security Trustee will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

27.10 **Lender's indemnity to the Security Trustee**

(a) The Lender shall indemnify the Security Trustee, within three Business Days of demand, against any cost, loss or liability incurred by the Security Trustee (otherwise than by reason of its gross negligence or wilful misconduct) in acting as Security Trustee under the Finance Documents (unless it has been reimbursed by an Obligor pursuant to a Finance Document).

27.11 **Resignation of the Security Trustee**

(a) The Security Trustee may resign and appoint one of its Affiliates acting through an office in the United Kingdom as successor by giving notice to the other Finance Parties and the Company.

(b) Alternatively the Security Trustee may resign by giving notice to the other Finance Parties and the Company, in which case the Lender (after consultation with the Company) may appoint a successor Security Trustee.

(c) If the Lender has not appointed a successor Security Trustee in accordance with paragraph (b) above within 30 days after notice of resignation was given, the Security Trustee (after consultation with the Company) may appoint a successor Security Trustee (acting through an office in the United Kingdom).

(d) The retiring Security Trustee shall, at its own cost, make available to its successor such documents and records and provide such assistance as its successor may reasonably request for the purposes of performing its functions as Security Trustee under the Finance Documents.

(e) The resignation notice of the Security Trustee shall only take effect upon the appointment of a successor.

(f) Upon the appointment of a successor, the retiring Security Trustee shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 27. Its successor and each of the other Parties shall have the same rights and

obligations amongst themselves as they would have had if such successor had been an original Party.

(g) After consultation with the Company, the Lender may, by notice to the Security Trustee, require it to resign in accordance with paragraph (b) above. In this event, the Security Trustee shall resign in accordance with paragraph (b) above.

27.12 **Confidentiality**

(a) The Security Trustee (in acting as security trustee for the Finance Parties) shall be regarded as acting through its respective agency or security trustee division which in each case shall be treated as a separate entity from any other of its divisions or departments.

(b) If information is received by another division or department of the Security Trustee, it may be treated as confidential to that division or department and the Security Trustee shall not be deemed to have notice of it.

27.13 **Credit appraisal by the Lenders**

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, the Lender confirms to the Security Trustee that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a) the financial condition, status and nature of each member of the Borrower Group;

(b) the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and any other agreement, Security, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(c) whether that Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, Security, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(d) the adequacy, accuracy and/or completeness of the Reports and any other information provided by the Security Trustee, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, Security, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

27.14 **Management time of the Security Trustee**

Any amount payable to the Security Trustee under Clause 14.3 (*Indemnity to the Finance Parties*), Clause 16 (*Costs and expenses*) and Clause 27.10 (*Lenders' indemnity to the Security Trustee*) shall include the cost of utilising its management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as it may notify to the Company and the Lender.

27.15 **Deduction from amounts payable by the Security Trustee**

If any Party owes an amount to the Security Trustee under the Finance Documents the Security Trustee may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Security Trustee would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

27.16 **Security trust provisions**

The provisions of Schedule 4 (*Security trust provisions*) shall bind each Party.

28. **CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

No provision of this Agreement will:

(a) interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b) oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c) oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## SECTION 13

## ADMINISTRATION

29. **PAYMENT MECHANICS**

29.1 **No set-off by Obligors**

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

29.2 **Business Days**

(a) Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or an Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

29.3 **Currency of account**

(a) Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b) A repayment of a Utilisation or Unpaid Sum or a part of a Utilisation or Unpaid Sum shall be made in the currency in which that Utilisation or Unpaid Sum is denominated on its due date.

(c) Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated when that interest accrued.

(d) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e) Any amount expressed to be payable in a currency other than the Base Currency shall be paid in that other currency.

29.4 **Change of currency**

(a) Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i) any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Lender (after consultation with the Company); and

(ii) any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Lender (acting reasonably).

(b) If a change in any currency of a country occurs, this Agreement will, to the extent the Lender (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.

29.5 **Payments to the Security Trustee**

Notwithstanding any other provision of any Finance Document, at any time after any Security created by or pursuant to any Security Document becomes enforceable, the Security Trustee may require:

(a) any Obligor to pay all sums due under any Finance Document; or

(b) the Lender to pay all sums received or recovered from an Obligor under any Finance Document,

in each case as the Security Trustee may direct for application in accordance with the terms of the Security Documents.

30. **SET-OFF**

A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

31. **NOTICES**

31.1 **Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter.

31.2 **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a) in the case of the Company, that identified with its name below;

(b) in the case of any other Original Obligor, that notified in writing to the Lender on or prior to the date on which it becomes a Party; and

(c) in the case of the Lender and the Security Trustee, that identified with its name below,

or any substitute address, fax number or department or officer as the Party may notify to the Lender by not less than five Business Days' notice.

31.3 **Delivery**

(a) Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i) if by way of fax, when received in legible form; or

(ii) if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 34.2 (*Addresses*), if addressed to that department or officer.

(b) Any communication or document to be made or delivered to the Security Trustee will be effective only when actually received by it and then only if it is expressly marked for the attention of the department or officer identified with its signature below (or any substitute department or officer as it shall specify for this purpose).

(c) Any communication or document made or delivered to the Company in accordance with this Clause will be deemed to have been made or delivered to each of the Obligors.

**31.4 Notification of address and fax number**

Promptly upon receipt of notification of an address and fax number or change of address or fax number pursuant to Clause 34.2 (*Addresses*) or changing its own address or fax number, the Lender shall notify the other Parties.

**31.5 English language**

(a) Any notice given under or in connection with any Finance Document must be in English.

(b) All other documents provided under or in connection with any Finance Document must be:

(i) in English; or

(ii) if not in English, and if so required by the Lender, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document or a Security Document.

## 32. CALCULATIONS AND CERTIFICATES

**32.1 Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are prima facie evidence of the matters to which they relate.

**32.2 Certificates and Determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**32.3 Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

## 33. PARTIAL INVALIDITY

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 34. REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 35. AMENDMENTS AND WAIVERS

### 35.1 Required consents

(a) Any term of the Finance Documents may be amended or waived only with the consent of the Lender and the Obligors and any such amendment or waiver will be binding on all Parties.

(b) An amendment or waiver which relates to the rights or obligations of the Security Trustee may not be effected without its consent.

## 36. COUNTERPARTS

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## SECTION 14

## GOVERNING LAW AND ENFORCEMENT

### 37. GOVERNING LAW

This Agreement is governed by English law.

### 38. ENFORCEMENT

**38.1 Jurisdiction**

(a) The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) (a "**Dispute**").

(b) The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c) This Clause 38.1 is for the benefit of the Finance Parties only. As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

**38.2 Service of process**

Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(a) irrevocably appoints the Company as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(b) agrees that failure by a process agent to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

## SCHEDULE 1

### CONDITIONS PRECEDENT

### PART I

### CONDITIONS PRECEDENT TO INITIAL UTILISATION

1. **Original Obligors**

(a) A copy of the constitutional documents of each Original Obligor.

(b) A copy of a resolution of the board of directors or equivalent body of each Original Obligor:

(i) approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute the Finance Documents to which it is a party;

(ii) authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

(iii) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party.

(c) A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(d) A copy of a resolution signed by all the holders of the issued shares in each Original Obligor (other than the Parent) approving the terms of, and the transactions contemplated by, the Finance Documents to which the Original Obligor is a party.

(e) A certificate of each Original Obligor (signed by a director) confirming that borrowing or guaranteeing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on the Original Obligor (as appropriate) to be exceeded.

(f) A certificate of an authorised signatory of each of the Original Obligors the certifying that each copy document relating to it specified in this Part I of Schedule 1 is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

(g) A registered agent's certificate or, as appropriate, certificate of good standing in respect of each Obligor.

2. **Security**

Confirmation from the Security Trustee that it has received each of the following documents in form and substance satisfactory to it:

(a) A copy of each of the following Security Documents, duly executed by the parties to it:

(i) A first ranking fixed and floating charge over all of the assets and undertaking of the Company (including without limitation the Investments it holds in the Initial Purchaser); and

(ii) A first ranking fixed charge over all of the Investments held by Cerida in Rokesly International Limited.

(b) All title deeds and documents relating to real property (if any) over which Security is expressed to be created by any Security Document listed above.

(c) The share certificates (and blank executed stock transfer forms or equivalent means of transferring the shares) in relation to all shares over which Security is expressed to be created by any Security Document.

(d) All certificates representing Investments of an Obligor over which Security is expressed to be created under a Security Document (if any), together with transfers executed in blank.

(e) In respect of Investments over which Security is expressed to be created under a Security Document (if any) not held in the name of the relevant Obligor, Declarations of Trust and irrevocable Powers of Attorney expressed to be given by way of security and executed as a deed by the person in whose name that Investment is held.

(f) A copy of all agreements and licences, relating to the Comide Mining Concessions.

(g) All other documentation, and/or evidence of all other steps, required to perfect the Security Documents as advised to the Security Trustee by its legal advisers in each relevant jurisdiction.

3. **Legal opinions**

(a) A legal opinion of Linklaters LLP, legal advisers to the Finance Parties in England, substantially in the form distributed to the Lender prior to signing this Agreement

(b) In the case of an Original Obligor incorporated in a jurisdiction other than England and Wales, a legal opinion of the legal advisers to the Finance Parties in the relevant jurisdiction, substantially in the form distributed to the Lender.

4. **Acquisition information**

(a) A certified copy of each Initial Acquisition Document.

(b) Details of all the Initial Costs.

(c) A copy of any regulatory, competition and/or anti-trust Authorisation necessary or desirable in connection with the Initial Acquisition.

5. **Other documents and evidence**

(a) Evidence that the fees, costs and expenses then due from the Company pursuant to Clause 16 (*Costs and expenses*) have been paid or will be paid by the first Utilisation Date.

(b) The Initial Group Structure Chart.

(c) Evidence that any process agent referred to in Clause 38.2 (*Service of process*), if not an Original Obligor, has accepted its appointment.

(d) A copy of any other Authorisation or other document, opinion or assurance which the Lender considers to be necessary or desirable (if it has notified the Company accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(e) A copy of the Parent NAV Certificate, duly executed by the parties to it.

(f) A copy of each of the Comide Shareholder Documents, duly executed by the parties to it.

(g) Evidence satisfactory to the Lender as to the identity of the ultimate beneficiaries of the L.S. Settlement.

(h) Evidence satisfactory to the Lender as to the identity of the beneficial owner of the London International Mining S.A..

## PART II

### CONDITIONS PRECEDENT TO INITIAL UTILISATION OF FACILITY B

1. **Investor Documents**

A copy of each Investor Document, duly executed by the parties to it.

2. **Africo Placing Information**

(a) A certified copies of the Africo Placing Documents.

(b) Evidence satisfactory to the Lender that the only condition that remains to be satisfied for Completion to occur under the Africo Placing Documents such that the Africo Placing Shares shall be issued to the Company is the payment of the subscription price that is to be funded by a Utilisation under Facility B.

(c) A certificate of the Company (signed by a director) confirming that all regulatory and/or competition Authorisations necessary or desirable in connection with the Africo Placing have been obtained and attaching a copy of each such Authorisation.

(d) A registration rights agreement executed by Africo in favour of the Company and the Lender in form and substance satisfactory to the Lender in its sole discretion.

(e) Evidence satisfactory in form and substance to the Lender, in its sole discretion, that the shareholders of Africo have approved the termination and repeal of the Rights Plan dated as of 25 May 2007 between Africo and Computershare Investor Services Inc as Rights Agent (as amended from time to time) (the "**Rights Plan**") to take effect upon the Africo Placing Closing Date and the waiver of any rights under the Rights Plan in connection with the transactions contemplated by the Africo Placing Documents and/or this Agreement.

(f) Binding agreements executed by and enforceable against Africo in favour of the Company and the Lender in form and substance satisfactory to the Lender in its sole discretion with respect to the full and final settlement and release of the Akam Claim and all related litigation.

(g) Evidence of the issuance of one or more news releases by Africo and by Camrose in form and substance satisfactory to the Lender in its sole discretion, and which shall comply with applicable Canadian securities laws.

(h) Evidence as to the compliance by Camrose with the Investment Canada Act satisfactory to the Lender in its sole discretion.

(i) Evidence satisfactory to the Lender that all amounts owing to the Borrower pursuant to the Africo Loan Document will be set-off against the subscription price due pursuant to the Africo Placing (such that the aggregate subscription consideration provided by the Borrower pursuant to the Africo Placing shall be $100million).

3. **Other**

(a) Evidence satisfactory to the Lender that the Africo Share Security Document will become effective immediately following the Africo Placing Closing Date.

(b) Provision of a legal opinion (in form and substance satisfactory to the Lender, in its sole discretion) from legal counsel as to the enforceability and appropriateness of licences and other assets that constitute the Comide Mining Concessions.

(c) Receipt of the Due Diligence Information.

(d) Evidence satisfactory to the Lender that this Agreement has been amended (to the extent necessary) to take into account any matters that the Lender determines (in its sole discretion) are required to be addressed prior to utilisation of Facility B.

(e) The Second Group Structure Chart.

(f) Evidence satisfactory to the Lender that the First Comide Asset Transfer has occurred or will occur no later than the Utilisation Date for Facility B, in all cases in a manner and on terms satisfactory to the Lender.

(g) Receipt of an executed copy of the P.E.2607 Sale Agreement.

(h) A copy of the Intercompany Loan Assignment duly executed by the parties to it.

(i) A copy of the Africo Loan Security Document duly executed by the parties to it.

(j) Evidence satisfactory to the Lender that the fees, costs and expenses then due from the Company pursuant to Clause 16 (*Costs and expenses*) have been paid or will be paid by the second Utilisation Date.

4. **Legal opinions**

To the extent required by the Lender:

(a) A legal opinion of Linklaters LLP, legal advisers to the Finance Parties in England, substantially in the form distributed to the Lender prior to signing this Agreement.

(b) In the case of an Original Obligor incorporated in a jurisdiction other than England and Wales, a legal opinion of the legal advisers to the Finance Parties in the relevant jurisdiction, substantially in the form distributed to the Lender prior to signing this Agreement.

## PART III

### CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL GUARANTOR

1. An Accession Letter, duly executed by the Additional Guarantor and the Company.

2. A copy of the constitutional documents of the Additional Guarantor.

3. A copy of a resolution of the board of directors of the Additional Guarantor:

   (a) approving the terms of, and the transactions contemplated by, the Accession Letter and the Finance Documents and resolving that it execute the Accession Letter and each Finance Document;

   (b) authorising a specified person or persons to execute the Accession Letter and each Finance Document on its behalf; and

   (c) authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices to be signed and/or despatched by it under or in connection with the Finance Documents.

4. A specimen of the signature of each person authorised by the resolution referred to in paragraph 3 above.

5. In the case of an Additional Guarantor incorporated in England and Wales, or if so required by the Lender, a copy of a resolution signed by all the holders of the issued shares of the Additional Guarantor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Guarantor is a party.

6. A certificate of the Additional Guarantor (signed by a director) confirming that borrowing or guaranteeing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on it to be exceeded.

7. A certificate of an authorised signatory of the Additional Guarantor certifying that each copy document listed in this Part II of Schedule 1 is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Letter.

8. A copy of any other Authorisation or other document, opinion or assurance which the Lender considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Letter or for the validity and enforceability of any Finance Document.

9. If available, the latest audited financial statements of the Additional Guarantor.

10. A legal opinion of Linklaters LLP, legal advisers to the Finance Parties in England.

11. If the Additional Guarantor is incorporated in a jurisdiction other than England and Wales, a legal opinion of the legal advisers to the Finance Parties in the jurisdiction in which the Additional Guarantor is incorporated.

12. If the Additional Guarantor is incorporated in England and Wales, evidence of compliance with the procedures set out in Sections 155-158 of the Companies Act 1985 for permitting the financial assistance constituted by this Agreement and/or under the other Finance Documents, including:

    (a) certified copies of the relevant directors' statutory declarations and auditors' reports;

    (b) certified copies of the up-to-date register of directors;

    (c) a letter from the auditors addressed to the Finance Parties for the purpose of Section 155(2) of the Companies Act; and

    (d) confirmation that the relevant directors' statutory declarations have been filed at Companies House.

13. If the Additional Guarantor is incorporated in a jurisdiction other than England and Wales, evidence of compliance with any similar or equivalent procedure for permitting financial assistance.

14. If the proposed Additional Guarantor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in Clause 38.2 (*Service of process*), if not an Obligor, has accepted its appointment in relation to the proposed Additional Guarantor.

## SCHEDULE 2

### UTILISATION REQUESTS

From: [Borrower]

To: [The Lender]

Dated:

Dear Sirs

**[Company] - [__________] Facility Agreement dated [__________] (the "Agreement")**

1. We refer to the Agreement. This is a Utilisation Request. Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2. We wish to borrow a Loan on the following terms:

| | |
|---|---|
| Proposed Utilisation Date: | [__________](or, if that is not a Business Day, the next Business Day) |
| Facility to be utilised: | [Facility A]/[Facility B] |
| Currency of Loan: | US$ |
| Amount: | [__________] or, if less, the Available Facility |
| Interest Period: | 6 Months |

3. We confirm that each condition specified in Clause 4.2 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request.

4. We confirm that none of the proceeds of the Loan requested in this Utilisation Request will be applied in any manner that may be illegal or contravene any applicable law or regulation in any relevant jurisdiction.

5. The proceeds of this Loan should be credited to [account].

6. This Utilisation Request is irrevocable.

Yours faithfully

......................................

authorised signatory for
[*Borrower*]

## SCHEDULE 3

### FORM OF ACCESSION LETTER

To: [__________] as Lender

From: [*Subsidiary*] and [*Company*]

Dated:

Dear Sirs

**[Company] - [__________] Facility Agreement dated [__________] (the "Agreement")**

1. We refer to the Agreement. This is an Accession Letter. Terms defined in the Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

2. [*Subsidiary*] agrees to become an Additional Guarantor and to be bound by the terms of the Agreement as an Additional Guarantor pursuant to Clause 26.2 (*Additional Guarantors*)] of the Agreement.

3. [*Subsidiary*] is a company duly incorporated under the law of [*name of relevant jurisdiction*].

4. [*Subsidiary's*] administrative details are as follows:

   Address:

   Fax No:

   Attention:

5. This Accession Letter is governed by English law.

   This Guarantor Accession Letter has been delivered as a deed on the date stated at the beginning of this Guarantor Accession Letter.

   [Company] [Subsidiary]

## SCHEDULE 4

### SECURITY TRUST PROVISIONS

1. **Definitions**

In this Schedule:

"**Security Property**" means all right, title and interest in, to and under any Security Document, including:

(a) the Charged Assets;

(b) the benefit of the undertakings in any Security Document; and

(c) all sums received or recovered by the Security Trustee pursuant to any Security Document and any assets representing the same.

2. **Declaration of trust**

The Security Trustee and each other Finance Party agree that the Security Trustee shall hold the Security Property in trust for the benefit of the Finance Parties on the terms of the Finance Documents.

3. **Defects in Security**

The Security Trustee shall not be liable for any failure or omission to perfect, or defect in perfecting, the Security created pursuant to any Security Document, including:

(a) failure to obtain any Authorisation for the execution, validity, enforceability or admissibility in evidence of any Security Document; or

(b) failure to effect or procure registration of or otherwise protect or perfect any of the Security created by the Security Documents under any laws in any territory.

4. **No enquiry**

The Security Trustee may accept without enquiry, requisition, objection or investigation such title as any Obligor may have to any Charged Assets.

5. **Retention of documents**

The Security Trustee may hold title deeds and other documents relating to any of the Charged Assets in such manner as it sees fit (including allowing any Obligor to retain them).

6. **Indemnity out of Security Property**

The Security Trustee and every receiver, delegate, attorney, agent or other similar person appointed under any Security Document may indemnify itself out of the Security Property against any cost, loss or liability incurred by it in that capacity (otherwise than by reason of its own gross negligence or wilful misconduct).

7. **Basis of distribution**

To enable it to make any distribution, the Security Trustee may fix a date as at which the amount of the Liabilities is to be calculated and may require, and rely on, a certificate from any Finance Party giving details of:

(a) any sums due or owing to any Finance Party as at that date; and

(b) such other matters as it thinks fit.

8. **Rights of Security Trustee**

The Security Trustee shall have all the rights, privileges and immunities which gratuitous trustees have or may have in England, even though it is entitled to remuneration.

9. **No duty to collect payments**

The Security Trustee shall not have any duty:

(a) to ensure that any payment or other financial benefit in respect of any of the Charged Assets is duly and punctually paid, received or collected; or

(b) to ensure the taking up of any (or any offer of any) stocks, shares, rights, moneys or other property accruing or offered at any time by way of interest, dividend, redemption, bonus, rights, preference, option, warrant or otherwise in respect of any of the Charged Assets.

10. **Perpetuity period**

The perpetuity period for the trusts created by the Finance Documents shall be 80 years from the date of this Agreement.

11. **Appropriation**

(a) Each Party irrevocably waives any right to appropriate any payment to, or other sum received, recovered or held by, the Security Trustee in or towards payment of any particular part of the Liabilities and agrees that the Security Trustee shall have the exclusive right to do so.

(b) Paragraph (a) above will override any application made or purported to be made by any other person.

12. **Investments**

All money received or held by the Security Trustee pursuant to the trusts in the Finance Documents may, in the name of, or under the control of, the Security Trustee:

(a) be invested in any investment it may select; or

(b) be deposited at such bank or institution (including itself any other Finance Party or any Affiliate of any Finance Party) as it thinks fit.

13. **Suspense Account**

Subject to paragraph 14 below the Security Trustee may:

(a) hold in an interest bearing suspense account any money received by it from any Obligor; and

(b) invest an amount equal to the balance from time to time standing to the credit of that suspense account in any of the investments authorised by paragraph 12 above.

14. **Timing of Distributions**

Distributions by the Security Trustee shall be made as and when determined by it.

15. **Delegation**

(a) The Security Trustee may:

(i) employ and pay an agent selected by it to transact or conduct any business and to do all acts required to be done by it (including the receipt and payment of money);

(ii) delegate to any person on any terms (including power to sub-delegate) all or any of its functions; and

(iii) with the prior consent of the Majority Lenders, appoint, on such terms as it may determine, or remove, any person to act either as separate or joint security trustee with those rights and obligations vested in the Security Trustee by this Agreement or any Security Document.

(b) The Security Trustee will not be:

(i) responsible to anyone for any misconduct or omission by any agent, delegate or security trustee appointed by it pursuant to paragraph (a) above; or

(ii) bound to supervise the proceedings or acts of any such agent, delegate or security trustee,

provided that it exercises reasonable care in selecting that agent, delegate or security trustee.

16. **Unwinding**

Any appropriation or distribution which later transpires to have been or is agreed by the Security Trustee to have been invalid or which has to be refunded shall be refunded and shall be deemed never to have been made.

## SCHEDULE 5

### FORM OF COMPLIANCE CERTIFICATE

To: [Lender]

From: [*Company*]

Dated:

Dear Sirs

**[Company] - [__________] Facility Agreement**
**dated [__________] (the "Agreement")**

1. We refer to the Agreement. This is a Compliance Certificate. Terms defined in the Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2. [We confirm that no Default is continuing.]*

Signed:………………. ……………….

| | |
|---|---|
| Director | Director |
| of | of |
| [*Company*] | [*Company*] |

*[insert applicable certification language]*

…………………………

for and on behalf of
*[name of auditors of the Company]*

* If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.

## SCHEDULE 6

### TIMETABLES

### PART I

### LOANS

"D - " refers to the number of Business Days before the relevant Utilisation Date/the first day of the relevant Interest Period.

| | **Loans in other currencies** |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*)) | D - 3<br>10:00 a.m. |
| LIBOR is fixed | Quotation Day as of 11:00 a.m. |

SCHEDULE 10

## SCHEDULE 7

### CONVERSION NOTICE

To: [Name and address of the Borrower]

Attention: [Insert]

[Date]

**Conversion Notice – Convertible Loan Facility Agreement between Camrose Resources Limited and [ ] dated [ ] (the "Facility Agreement")**

We refer to the Facility Agreement. Terms defined in the Facility Agreement have the same meanings when used in this Conversion Notice. The "Definitions and interpretation" Clause of the Facility Agreement applies to this Conversion Notice as if it was fully set out herein.

Under Clause 8 (*Conversion Mechanics*) of the Facility Agreement, the Borrower is given notice as follows:

We hereby exercise our option to subscribe for the Conversion Number of Conversion Shares at the Conversion Price in accordance with Clause 8.1. of the Facility Agreement:

1. The Africo Share Value Amount as at the date of this Conversion Notice is: $[●];
2. The Comide Asset Value Amount as at the date of this Conversion Notice is: $[●];
3. The Akam Value Amount as at the date of this Conversion Notice is $[●];
4. The Camrose Value Amount is: [●] (being the sum of 1, 2 and 3 above) $[●];
5. Therefore the Conversion Price is $[●] per Conversion Share (being the Camrose Value Amount minus the Amount Owing as at the date of this Conversion Notice, divided by the number of Shares in issue immediately prior to the date of this Conversion Notice);
6. The Conversion Amount is: $[●];
7. Therefore the Conversion Number is [●] (being the Conversion Amount divided by the Conversion Price).
8. [The Conversion Number results in the Lender acquiring a stake in the Borrower in excess of 50 per cent. of its Shares and therefore the Conversion Amount shall be reduced to $[●] so as to provide that the Conversion Number shall be reduced to [●].]
9. Therefore the Lender is to be issued with [*insert Conversion Number*] Conversion Shares.

This notice is irrevocable.

The Lender authorises the Borrower to register it as the holder of the Conversion Shares.

………………………………………………

[Name of person] being

an Authorised Officer of [Name of Lender]

## SCHEDULE 8

### AFRICO SHARE WARRANTIES

1. The person transferring the relevant Africo Shares:

   (i) is the sole legal and beneficial owner of the Africo Shares; and

   (ii) has the right to exercise all voting and other rights over the Africo Shares.

2. The Africo Shares have been properly and validly issued and allotted and are each fully paid or credited as fully paid.

3. No person has the right (whether exercisable now or in the future and whether contingent or not) to call for the allotment, conversion, issue, registration, sale or transfer, amortisation or repayment of any share capital or any other security giving rise to a right over, or an interest in, the Africo Shares under any option, agreement or other arrangement (including conversion rights and rights of pre-emption)

4. Other than as created pursuant to the Finance Documents, there are no Encumbrances on the Africo Shares.

5. All consents for the transfer of the Africo Shares have been obtained or will be obtained by the Africo Placing Closing Date.

6. No member of the Parent Group has given a power of attorney or any other authority (express, implied or ostensible) which is still outstanding or effective to any person to enter into any contract or commitment or to do anything on its behalf in respect of the Africo Shares, other than pursuant to the Finance Documents.

**Execution Pages**

**The Company**

Address:

Fax No:

Attention:

By:

**The Original Guarantors**

Address:

Fax No:

Attention

By:

Address:

Fax No:

Attention

By:

Address:

Fax No:

Attention

By:

**The Lender**

Address:

Fax No:

Attention:

By:

**The Security Trustee**

Address:

Fax No:

Attention:

By: