# CAHILL GORDON & REINDEL LLP
## EIGHTY PINE STREET
## NEW YORK, NY 10005-1702

| | | | | |
|---|---|---|---|---|
| HELENE R. BANKS | JONATHAN J. FRANKEL | TELEPHONE: (212) 701-3000 | JOEL H. LEVITIN | DARREN SILVER |
| ANIRUDH BANSAL | ARIEL GOLDMAN | WWW.CAHILL.COM | GEOFFREY E. LIEBMANN | JOSIAH M. SLOTNICK |
| DAVID L. BARASH | JASON M. HALL | ———— | BRIAN T. MARKLEY | RICHARD A. STIEGLITZ JR. |
| LANDIS C. BEST | WILLIAM M. HARTNETT | 1990 K STREET, N.W. | MEGHAN N. McDERMOTT | ROSS E. STURMAN |
| BRADLEY J. BONDI | NOLA B. HELLER | WASHINGTON, DC 20006-1181 | WILLIAM J. MILLER | SUSANNA M. SUH |
| BROCKTON B. BOSSON | CRAIG M. HOROWITZ | (202) 862-8900 | NOAH B. NEWITZ | ANTHONY K. TAMA |
| JAMES J. CLARK | DOUGLAS S. HOROWITZ | | DAVID R. OWEN | JONATHAN D. THIER |
| CHRISTOPHER W. CLEMENT | TIMOTHY B. HOWELL | CAHILL GORDON & REINDEL (UK) LLP | JOHN PAPACHRISTOS | SEAN P. TONOLLI |
| LISA COLLIER | DAVID G. JANUSZEWSKI | 24 MONUMENT STREET | LUIS R. PENALVER | JOHN A. TRIPODORO |
| AYANO K. CREED | ELAI KATZ | LONDON EC3R 8AJ | KIMBERLY PETILLO-DÉCOSSARD | GLENN J. WALDRIP, JR. |
| SEAN M. DAVIS | BRIAN S. KELLEHER | +44 (0) 20 7920 9800 | SHEILA C. RAMESH | HERBERT S. WASHER |
| STUART G. DOWNING | RICHARD KELLY | ———— | MICHAEL W. REDDY | MICHAEL B. WEISS |
| ADAM M. DWORKIN | CHÉRIE R. KISER* | WRITER'S DIRECT NUMBER | OLEG REZZY | DAVID WISHENGRAD |
| ANASTASIA EFIMOVA | JOEL KURTZBERG | | THORN ROSENTHAL | COREY WRIGHT |
| JENNIFER B. EZRING | TED B. LACEY | | TAMMY L. ROY | JOSHUA M. ZELIG |
| HELENA S. FRANCESCHI | MARC R. LASHBROOK | | JONATHAN A. SCHAFFZIN | DANIEL J. ZUBKOFF |
| JOAN MURTAGH FRANKEL | ALIZA R. LEVINE | | MICHAEL A. SHERMAN | |

\* ADMITTED IN DC ONLY

(212) 701-3207

May 15, 2020

Re:  *United States* v. *OZ Africa Management GP, LLC*,
 No. 16-cr-515 (NGG)

Dear Judge Garaufis:

OZ Africa Management GP, LLC ("OZ Africa") respectfully submits this sur-reply letter on the issue of restitution, in response to the Government's and Claimants' submissions of April 30, 2020.

## Preliminary Statement

Since the Claimants' and the Government's November 2019 submissions, nothing has changed about the Claimants' property – their shares in Africo – and nothing has changed about the inoperable mine they insist on being compensated for even though they never owned it. The value of copper and cobalt has not skyrocketed (but rather declined with everything else since March) and yet somehow the Claimants have figured out a way to *inflate* the value of the nonexistent mine by more than $175 million, and the Government by more than $70 million. That their "valuations" can swing so wildly from the mere passage of a few months only underscores that the DCF methodology is far too subjective and speculative to value shareholder losses in an MVRA case. The Claimants' inputs in particular are clearly result-driven, as they and their expert have cherry-picked them based on what will yield the largest number. Even the Government's new and revised DCF valuation conveniently comes in at nearly the exact figure they cite from the 2008 OZ Africa memo (on which they principally rely), demonstrating that with the adjustment of a few subjective inputs, virtually any result can be achieved by a DCF model. And it is telling to say the least that neither the Claimants nor the Government can point to a single case in which the DCF methodology has been used to measure losses under the MVRA, which requires a "sound methodology" to calculate restitution. *United States* v. *Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013).

One of the principal flaws in the Claimants' and Government's reply arguments is their misreading of the Court's August 29 Opinion. Yes, the Court instructed the parties to address the value of the mining rights. But the Court explicitly did so with the objective of applying the MVRA, which requires the Court to calculate restitution based on the value of the "property of a victim." 18 U.S.C. § 3663A(b)(1); *see* ECF 51 at 1 (ordering "supplemental briefing regarding how to calculate the appropriate restitution amount"). In this case that property is not a mine, and it is not mining rights, but rather shares in Africo. In fact the Claimants have repeatedly conceded that they are shareholders in Africo, and the Supreme Court has directly foreclosed any argument that they owned Africo's mining rights or any other corporate asset. *See Dole Food Co.* v. *Patrickson,* 538 U.S. 468, 474-75 (2003) ("An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . .") (citations omitted). So respectfully, the Government is simply wrong in arguing that this is a matter of "discretion." ECF 92 at 10. While it is true that the Court has discretion in the actual measurement of loss to the Claimants' share values, correctly identifying the Claimants' *property* – their shares – and measuring the Claimants' loss by the decline in the value of that property is not a matter of discretion, it is required by law. And the Claimants are equally wrong in arguing that the Court has already decided this question. ECF 93 at 16-18. Their constant 'asked and answered' refrain in response to this issue only demonstrates that they have nothing substantive to say on the subject, presumably because their assertion that they should be compensated for something they never owned is directly refuted by Supreme Court precedent.

The Claimants now attempt to escape the obvious point that their loss must be measured by the value of their property (their shares) by disputing the efficiency of the market. But they have done nothing to controvert the clear showing of efficiency in Dr. Barnes's careful and thorough event study. The Second Circuit has made clear that the test for market efficiency "is not an onerous one," *In re Petrobras Securities*, 862 F.3d 250, 277-78 (2d Cir. 2017) (Garaufis, J.), and that an average weekly turnover of **2%** – and Africo's was **2.14%** during the relevant period – supports a "strong presumption" of efficiency. *Waggoner* v. *Barclays*, 875 F.3d 79, 91-92 (2d Cir. 2017) (citation omitted). To rebut this *legal presumption* and Dr. Barnes's detailed event study conclusively finding that Africo shares traded in an efficient market, the Claimants' newly-retained expert does not even conduct his own independent analysis, but rather relies on information the Claimants' counsel provided to him, and even then he conducts no event study of his own. This fatal flaw has led courts to reject expert reports in the very cases on which the Claimants rely. Notably the Government continues not to dispute the efficiency of the market for Africo shares during the relevant period.

Perhaps recognizing that the Claimants' DCF approach is unprincipled – for example that they use a discount rate that would be applicable if Kalukundi were in Arizona – the Government resorts to an argument that may have a surface 'rough justice' appeal but is ultimately unavailing, namely that OZ Africa should be "held to" the valuation in its 2008 memo in support of a convertible loan. ECF 92 at 3. The Government's approach ignores two crucial and dispositive facts: First, the 2008 memo values the mining project, *which the Claimants never owned.* Relying on it here would be like an Apple, Inc. shareholder seeking its prorated share of a lender's valuation

of the iPhone patent.  Second, while the Government insists that OZ Africa be "held to" its 12-year-old valuation, it inexplicably excuses the Claimants from being held to the contemporaneous valuation by the management of the longstanding owner of the Kalukundi project, Africo, which assessed the ***DCF value of its mining rights at $1 million*** in 2008.  In doing so, the Government clearly misreads the email chain accompanying the Africo valuation, which the Government says is "blank" and devoid of context.  This is simply not so.  The email chain (appended hereto as Exhibit 4 with all attachments, which were provided to the Claimants at their request on April 16, 2020) explicitly shows that the Chief Financial Officer of Africo sent the valuation to a Board member in response to the latter's request for the "cash flow analysis of [the] Kalukundi project" that "management prepared."  Ex. 4 at 3.  In other words, it is exactly what we said it is, a management-prepared DCF valuation of the Kalukundi project, to which the Claimants, many of whom were members of Africo's management, should be held.

In short, nothing in the Claimants' or the Government's submissions does anything to rebut the obvious fact that the Claimants' only property was shares in Africo.  And under controlling precedent and the plain language of the MVRA the only legal way to value that property is the decline in its publicly-traded price caused by the offense.

## Argument

### I. The Claimants' And Government's Reply Submissions Continue To Value Property The Claimants Never Owned.

The Government's and Claimants' reply submissions go to great lengths to avoid valuing the property the Claimants actually owned.  The Claimants dismissively assert in a footnote that "the general principle that the corporation and its shareholders are distinct entities is irrelevant."  ECF 93 at 18 n.15.  This is despite the Claimants' and the Government's repeated concession that the Claimants' property interests arise from their status as shareholders in Africo.  That being the case, the Claimants clearly never owned the mining rights for which they claim compensation, since it is a "basic tenet of American corporate law" that "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets."  *Dole*, 538 U.S. at 474-75; *see United States* v. *Dupree*, 781 F. Supp. 2d 115, 140 (E.D.N.Y. 2011) (Matsumoto, J.) ("The Second Circuit has recognized that 'shareholders do not hold legal title to any of the corporation's assets.'") (quoting *United States* v. *Wallach*, 935 F.2d 445, 462 (2d Cir. 1991)).

The Claimants and Government attempt to avoid this basic tenet of American corporate law by reading two words in the Court's August 29, 2019 Opinion to the exclusion of every other word in the Opinion, and the entirety of the MVRA.  The Claimants and Government would have the Court read no further than the Opinion's directive that the parties address "the value of the mining rights . . . as of either 2006-2008 or the present day."  ECF 51 at 20.  But this ignores entirely that this statement was – and this would have been obvious even if it were not explicit – in the context of directing the parties to "submit supplemental briefing regarding how to calculate the *appropriate restitution amount*."  *Id.* at 1 (emphasis added).  It also ignores that the MVRA

calculates restitution as the loss in the value of the "property of a victim" (18 U.S.C. § 3663A(b)(1)), which in this case is indisputably the Claimants' Africo shares.

In the context of the Court's entire opinion, not just two words of it, and the directives of Congress in the MVRA, the Claimants' position is as contrary to law as it is to common sense. The law does not compensate a victim for loss or damage to property it never owned.[1] And the Claimants' retreat to the assertion that the Court has already rejected this basic tenet of law is utterly false. ECF 93 at 16-18. The Court has never ruled on the correct methodology for determining restitution, and in fact (as Claimants omit) has said it assumed the Claimants would be submitting their "loss per share" in support of their claims. Sept. 23, 2019 Tr. at 10. As the August 29 Opinion makes clear, it only addressed the issue of whether the Claimants could qualify as victims, and explicitly did *not* decide the measure of damages, which is addressed in a separate section of the MVRA and is restricted to harm to the "property of [the] victim." *Compare* 18 U.S.C. § 3663A(b)(1) *with* § 3663A(a)(2); ECF 51 at 20 ("On the current record, the Court is unprepared to decide how much restitution Defendant owes Claimants."). Here that property is only the Claimants' Africo shares.

The Government's attempt to distinguish the numerous MVRA cases in which courts have consistently valued shareholder losses by the decline in publicly-traded share price is equally unavailing. The Government states in its reply that this case is somehow unique because the damage was caused indirectly to shareholders of a publicly traded company through theft of the company's sole material asset.[2] ECF 92 at 10. But that does not make this case unique, or require a different approach than that taken in every other MVRA case valuing shareholder losses. For example, in *United States* v. *Hatfield*, 2014 WL 7271616, *1, *15 (E.D.N.Y. Dec. 18, 2014) (Seybert, J.), the court valued the shareholder victims' losses under the MVRA as the loss to the publicly-traded value of their shares where the offense involved, in part, the looting of the company's assets – exactly what the Government says is the "unique" and distinguishing factor in this case. As the decision in *Hatfield* makes clear, and as is clear from the text of the MVRA itself, it is not *how* the harm is caused that determines the value of the victim's property, but rather the property itself. *See* 18 U.S.C. § 3663A(b)(1) (restitution is calculated based on the value of the "property of a victim"; making no reference to how harm is caused). Here it is beyond dispute that the property of the Claimants consists only of their shares in Africo, which does *not* make

---

[1] The Claimants assert that their losses should not be measured by the loss in share price because, as a result of a Shareholder Rights Plan Agreement, a third party "could not have secured the mining rights through purchasing shares." (ECF 93 at 23 n.21). This is a *non sequitur*. The Shareholder Rights Plan, and under what circumstances a third party could launch a hostile takeover of Africo, are irrelevant to the fundamental point that the Claimants' property consisted only of their shares, and a restitution award under the MVRA can only be based on a loss in value to that property.

[2] The fact that the Kalukundi project was Africo's "single material asset" (ECF 92 at 10) only makes Africo's market capitalization an even more reliable measure of the project's value, since the company's share price could only be reflecting the market's assessment of the value of the project and the opportunity to develop it. The Government's view that this somehow distinguishes this case from *Hatfield* is simply wrong. If anything, it makes the use of share price loss here even more appropriate.

them owners of the company's mining rights. *See Dole,* 538 U.S. at 474-75; *Wallach*, 935 F.2d at 462; *Dupree*, 781 F. Supp. 2d at 140. Against this backdrop of controlling authority, the Government and Claimants do not cite a single MVRA case that values losses – to shareholders or otherwise – using the imprecise and subjective DCF method they advance.

### II. The Claimants Fail To Rebut That The Market For Africo Shares Was Efficient At All Relevant Times.

Unable to escape the fact that all they ever owned is shares of Africo, the Claimants retreat to disputing that the publicly-traded share price accurately reflects the value of Africo shares. ECF 93 at 25-32. They do this by disputing the efficiency of the market for Africo shares during the relevant period – something the Government does *not* dispute. ECF 68 at 13 n.12 ("Here, there is some reason to believe that Africo stock traded in an efficient market. . . . Africo's share price and trading volume appeared to materially and quickly react to new public information . . . .").[3]

The Claimants have a steep hill to climb. The Second Circuit has rejected the box-checking approach taken by the Claimants, stating that the test for market efficiency is a "holistic analysis," and the standard "is not an onerous one." *In re Petrobras Securities*, 862 F.3d at 277-78 (Garaufis, J.). Here, Africo's average weekly trading volume during the relevant period was 2.14%, well above the 2% the Second Circuit has held creates a "strong presumption" of an efficient market. *Waggoner*, 875 F.3d at 91-92. The only response to this from Dr. Salve, the Claimants' recently-retained expert, is to selectively focus on particular weeks in which the trading volume was lower. ECF 93-2, ¶ 71. But this criticism is easily debunked, since it would read out entirely the Second Circuit's direction that the Court consider the "*average* weekly trading volume" – which is not the volume in weeks cherry-picked by the Claimants' expert.[4] *Waggoner*, 875 F.3d at 91-92 (emphasis added).

The remainder of the Claimants' efficiency dispute is equally unavailing. Perhaps most glaringly, Dr. Salve concedes that "I did not undertake my own investigation" of the relevant efficiency factors, but rather relied on information provided to him by the Claimants' counsel. ECF 93-2, ¶ 73. In particular, Dr. Salve failed to conduct his own event study, even while attempting – ineffectively as discussed below – to dispute Dr. Barnes's detailed event study. One of the very cases relied on by the Claimants to attack Dr. Barnes's efficiency analysis *rejected* an expert's efficiency attack on this basis. *See Menaldi* v. *Och-Ziff*, 328 F.R.D. 86, 98 n.1 (S.D.N.Y. 2018) (Oetken, J.) ("The mere fact that [the rebuttal expert] failed to conduct an event study of his own by itself 'arguably supports rejection of Defendants' [reliance on his] arguments at this stage.'") (citing *Pirnik* v. *Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018)

---

[3] The Government went on to conduct a share price loss analysis in much the same way OZ Africa has, which resulted in a total share price loss to *all* Africo shares at the relevant time of between $40 and $45 million. ECF 68 at 14.

[4] As Dr. Barnes notes, "assuming that Dr. Salve's calculations are correct, it follows that the average weekly turnover over the remaining 52% of weeks is likely to *exceed 2%*." Ex. 1 (Cornerstone Reply Report), ¶ 37 (emphasis added).

(Furman, J.) (rejecting efficiency criticisms where expert disputing efficiency "did not conduct, or submit, their own event study" but "instead [only relied] on, and criticize[d], the event study conducted by Plaintiffs' expert")).

The Claimants also point to *George* v. *China Automotive Systems, Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013) (Forrest, J.), in support of their attack on Dr. Barnes's event study. But the Claimants have misrepresented the facts and holding of the case. As Judge Forrest found, the expert in *George* did *not* conduct an event study, but something that was only "methodologically akin to an event study." *Id.* at *10. The expert's test did not examine "whether the days in which there was price movement had any news actually associated with them," a fact Judge Forrest determined was a "fatal logical flaw" because "it takes the event out of event study." *Id.* (internal quotations omitted). Judge Forrest was highly critical of the expert's failure to conduct an actual event study, *as Dr. Salve* has failed to do here, stating that this failure robbed the expert's report of "a reliable basis upon which to rest an opinion or evidence of market efficiency." *Id.* at *13. Far from supporting the Claimants' attack on Dr. Barnes, who did perform a full and thorough event study, *George* makes clear Dr. Salve's report should be rejected for its failure to conduct such a study.

Dr. Salve's other criticisms of Dr. Barnes's event study are also easily dismissed. The Supreme Court has recognized that a reliable event study shows a cause and effect relationship between new material disclosures and market prices. *Halliburton* v. *Erica P. John Fund*, 573 U.S. 258, 280 (2014) (event studies are "regression analyses that seek to show that the market price of the [relevant] stock tends to respond to pertinent publicly reported events"); *Waggoner*, 875 F.3d 79, 94 ("An efficient market is 'one in which the prices of the [stock] incorporate most public information rapidly.'") (quoting *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*, 546 F.3d 196, 206 (2d Cir. 2008), *cert. denied*, 138 S.Ct. 1702 (2008)). Here, Dr. Barnes has shown exactly such a cause and effect relationship by demonstrating an extremely high correlation between Africo's share price movements and material news concerning Africo, including news concerning the DRC court case involved in the offense.[5] Ex. 1 (Cornerstone Reply Report), ¶¶ 5, 12.

Dr. Salve mischaracterizes Dr. Barnes's study when he states it relied only on the market's reaction to material news on 8 of 23 days, resulting in a 35% market reaction percentage, which Dr. Salve calls "low." ECF 93-2, ¶ 36. This criticism misperceives the event study and the efficiency analysis generally. In his study, Dr. Barnes reviewed 23 days on which there was any news regarding Africo – regardless of materiality – and noted statistically significant share price

---

[5] The Claimants argue that Africo's press releases only informed the market about the dispute over Africo's interest in the mining rights, not their loss. ECF 93 at 24 & n.23. This is simply untrue. The very press release cited by the Claimants describes the April 2007 DRC judgment as "a declaration by the court to the effect that it accepts the assertion by Akam that Akam (*and thus not Africo through its subsidiaries*) is the owner of the remaining 75% of Swanmines." ECF 88-1 at QE-9 (emphasis added). That Africo also stated its intent to continue pursuing its interests as would be expected (and which it did) does nothing to controvert the market's efficient consideration of the loss of the mining rights, which loss is clearly stated in the release.

movement on eight of those days that could not be explained by external market factors. ECF 88-2, ¶ 39. Dr. Barnes explained that if this had happened on only *one* of the 23 days, it could not be ruled out that this was merely a coincidence, and not the result of the share price factoring in the news – in other words, an efficient market. *Id.* But because it happened on *eight* of the 23 days, the likelihood that this was a coincidence was 0.001% – "vanishingly small," as Dr. Barnes puts it – which "conclusively demonstrates that Africo stock price moved promptly in response to news," *i.e.*, that the market was efficient. Ex. 1 (Cornerstone Reply Report), ¶ 14; *see* ECF 88-2, ¶ 39. Putting aside entirely that the test for efficiency is "not an onerous one," *In re Petrobras Securities*, 862 F.3d at 278, the facts here clearly establish an efficient market.

The Claimants' heavy reliance on the *Menaldi* case is also misplaced. ECF 93 at 30. First, the Claimants cannot plausibly rely on Och-Ziff's criticism of the *Menaldi* plaintiffs' expert, since that expert cherry-picked sample days that he had *predetermined* would show price movement, which Dr. Barnes clearly did not do here. Ex. 1 (Cornerstone Reply Report), ¶ 15. Moreover, the Claimants cannot avoid by burying in a footnote (as they do) that the holding of *Menaldi* was that *the market was efficient*. 328 F.R.D. at 98.

Ultimately Dr. Salve's report, which conducts no independent analysis but instead seeks ineffectively to take issue with Dr. Barnes's careful and detailed study, does nothing to controvert the efficiency of the market for Africo shares, let alone rebut the aforementioned strong presumption of efficiency recognized by the Second Circuit. *See Waggoner*, 875 F.3d at 91-92; *Bombardier*, 546 F.3d at 207-08 ("[a]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of [] [the] causal relationship" that is the foundation of an efficient market). This is particularly so because perfect efficiency at all times that a company's shares are trading is not required for the market price to be the most reliable measure of value, especially when compared to DCF valuations. *See* J. Macey & J. Mitts, *Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, 74 BUS. LAWYER 1015, 1047 (2019) ("[E]ven prices produced in an *inefficient* market are a more reliable assessment of fair value than the wildly divergent predictions of an expert witness who tailors his or her valuation to the litigation imperatives of his or her client.") (emphasis added).

**III.    The Claimants' And Government's New DCF Revisions Result In Extreme And Inconsistent Swings In Values, Making Clear That DCF Is Not Reliable Enough To Value Shareholder Losses Under the MVRA.**

The Claimants' reply makes transparent why they are seeking to value property they never owned rather than their shares, and clinging to a methodology that has never been applied by a court to calculate restitution under the MVRA. The Claimants' recent revisions starkly illustrate that the DCF method can be manipulated to yield any valuation depending on the litigation objectives of the proponent.

This is particularly evident in Dr. Rigby's DCF inputs, which he clearly cherry-picked to yield the highest result. For example in November 2017, when spot copper and cobalt prices were

much higher than forecast prices, Dr. Rigby used spot prices, which resulted in an almost $400 million higher valuation for the Kalukundi project than if he had used forecast pricing. But now that spot prices have declined with the rest of the commodities market, Dr. Rigby – whose mining valuation expertise the Claimants loudly tout – suddenly decides that forecast pricing is appropriate, increasing his valuation by $175 million. Ex. 2 (Quadrant Reply Report), ¶ 4 & n.2. The ability of a hired expert to manipulate the DCF model in this way makes clear why it has never been deemed a sound enough methodology to calculate restitution under the MVRA.

This is also clear from the fluctuation in the Government's DCF values. Only six months ago the Government's DCF valuation of the entire Kalukundi project was $188.7 million. ECF 68 at 11. Nothing has happened in the intervening six months except arguably the most dire financial crisis since the Great Depression. And yet with minor adjustments to the discount rate, capital costs, and taxes – none of which are based on market fluctuation or new facts – the DCF valuation by the Government's expert (Stout Risius Ross LLC ("Stout")) has *jumped 37%* to $259 million. The explanation for this becomes clear when the Government calculates Africo's share at $151.5 million, and points out how neatly this fits in with their argument that OZ Africa should be "held to" the $150 million valuation in the 2008 memo. ECF 92 at 3. Put simply, the DCF is so susceptible to large swings based on minor, subjective input adjustments that it can be made to support virtually any result.

And all of these valuations vary widely from the 2008 DCF valuation by Dr. Rigby's own firm, SRK Consulting, at $96 million (ECF 68-9 at 54), and Africo's 2008 DCF valuation of its interest at $1 million. It is simply not credible that a project that has never generated an ounce of ore or a dollar of revenue can, simply by the passage of time, increase in value by hundreds of millions of dollars. It also makes no sense for the Government to say the methodology that generated this scattershot spread of figures is a "fair" and reliable way to value the mining rights (which the Claimants never owned). And it is logically inconsistent for the Government to take this position while at the same time acknowledging that DCF is "inherently limited" (ECF 92 at 3); that "[a]djustments to certain inputs can have a significant effect on the concluded value" (ECF 68 at 5-6); and that "because the Kalukundi mine remains undeveloped, no historical results exist on which to support estimates of future cash flows." (*Id.*).

The one decision the Government cites as authority for using a DCF in "instances like this one" (ECF 92 at 4) is an arbitration opinion that is completely inapplicable here, since "[b]oth valuation experts used the [DCF] method as the primary method for assessing the quantum of damages," and the arbitrators' use of the method was therefore *uncontested*. *Gold Reserve Inc.* v. *Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (Sept. 22, 2014), ¶ 690. Nor does this arbitration decision provide any authority for the use of a DCF in "instances like this one" since it was obviously not an MVRA case, and the dispute did not involve losses to shareholders, but rather to the company that (unlike the Claimants here) actually owned the mining rights.

Finally, it is disingenuous for the Claimants to repeatedly assert in their reply that the Government's DCF valuation is "comparable" to theirs. ECF 93 at 2, 6, 15, 40. This is pure fiction, since the Government's DCF value for Kalukundi is ***$300 million less*** than that of the Claimants. The Claimants can only argue the two are comparable by stating the tautology that if all of their inputs were accepted by the Government – which they were not – the DCF values would be roughly the same. *Id*. On this basis we could argue with equal force that if the Government accepted all of our experts' corrected DCF inputs their valuation would be "comparable" to ours. But the fact remains that the Government has *not* accepted the Claimants' DCF valuation.

> **A.    The Claimants' Persistence In Advancing A 12% Discount Rate Is Unsupportable.**

While the Claimants appear to have lobbied the Government to adopt their 12% discount rate, the Government was not persuaded and has stayed with a rate of approximately 20% (19.6%), presumably because the Claimant's 12% rate ignores entirely that Kalukundi is an undeveloped project in the most risk-laden jurisdiction in the world. ECF 92 at 5-6.

As the Government stated in its reply submission, discount rate methodologies must account for "several essential factors, such as interest rate risk, market equity risk premiums, small stock premiums, country-specific risk, company-specific risk, the capital structure of the entity, and tax effects, among others." ECF 92 at 6. Dr. Rigby adheres to the Claimants' 12% discount rate without considering even one of these factors. Rather, Dr. Rigby attempts to justify the Claimants' discount rate by relying on what he purports to be "comparable transactions." These transactions, however, did nothing to sway the Government and its expert from their original position of an approximately 20% discount rate, and with good reason. ECF 92 at 6 ("while comparing and evaluating discount rates applied to other similar mining projects may have some illustrative appeal, it is not the proper or optimal method to calculate discount rate").

As Dr. Rigby himself notes, "[t]he closer you come to matching the attributes of the property at issue, the better the comparison." ECF 93-1, ¶ 45. Yet Dr. Rigby fails to take his own advice, since the majority of his so-called "comparable" projects are already producing mines – which means they are in no sense comparable to Kalukundi. Ex. 2 (Quadrant Reply Report), ¶¶ 28-36. For example, Dr. Rigby suggests that the Mutanda mine, one of the world's largest cobalt mines which has been in production for almost ten years, *and which produces 20% of the world's supply of cobalt*, is comparable to the undeveloped Kalukundi project.[6] ECF 93-1, Exhibit 4. And Dr. Rigby fails to mention that the owner of Mutanda, Glencore, uses a universal discount rate for

---

[6]     *See* Fiston Mahamba, *Glencore's Mutanda Mine in Congo Shuts Down a Month Early*, REUTERS, (Nov. 26, 2019), https://www.reuters.com/article/glencore-congo/glencores-mutanda-mine-in-congo-shuts-down-a-month-early-idUSL8N2863D5; Alistair MacDonald & Oliver Griffin, *Glencore to Close Massive Mine as Economic Woes Hit Metals*, WALL ST. J., (Aug. 7, 2019), https://www.wsj.com/articles/metals-giant-glencore-mothballs-large-mine-amid-global-economic-trade-headwinds-11565169198; Golder Associates, Mineral Expert's Report: Mutanda, (May 4, 2011), https://www.miningdataonline.com/reports/Mutanda_May_2011_TR.pdf at 75.

all of its properties, *and factors in country risk separately,* so even the discount rate Dr. Rigby cites for this property is misrepresented.[7]

Nor does the 2008 OZ Africa memo provide any support for Dr. Rigby's 12% discount rate. The 2008 memo never purported to use a flat 12% discount rate with no consideration of country risk. Instead, the memo incorporated its assessment of project and country risk into its required internal rate of return ("IRR"). *See* ECF 88-49 at 9-10 (increasing the appropriate IRR for a mining project "in such a stage of development in the DRC"). As Quadrant notes, it is common practice for investment firms to use a base discount rate and separately calculate country risk. Ex. 2 (Quadrant Reply Report), ¶ 24. For example, Goldman Sachs uses a base 8% discount rate for all copper projects it evaluates, regardless of location, and then *separately* sets the IRR required to make the project investable "based on the jurisdiction of each project." Goldman Sachs, "Copper Top Projects" (October 2018) at 94, 98 (available at http://calichebahada.com/wp-content/uploads/20181005-GS-Copper-projects2.pdf). Alternatively, some investment firms account for country risk by adding to the base discount rate a premium based on independent sources, such as the research of renowned NYU economist Aswath Damodaran. *See* PWC, Closing the Gap 2016-2017 at 132 (available at https://www.pwc.co.za/en/assets/pdf/closing-the-value-gap-2016-2017.pdf); *see also* Aswath Damodaran, "Country Default Risk Premiums" (available at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/ctryprem.html) (attached hereto as Exhibit 5).[8] As of April 1, 2020, Professor Damodaran calculated the DRC's country risk *premium* (which must be added to the base discount rate) as ***13.72%,*** which is more *by itself* than Dr. Rigby's 12% discount rate – meaning that the actual appropriate discount rate for the Kalukundi project is more than *twice* Dr. Rigby's rate.[9] *Id.*

> **B.  The Claimants' New Assumption That The Super Profit Tax Does Not Apply Because A New Feasibility Study Would Be Conducted Is Speculative And Ignores Large Costs Associated With A New Study.**

In their initial submissions the Government agreed that the DRC's Super Profit Tax – a tax on profits in excess of those predicted in the feasibility study – applies, resulting in a 32% reduction to their DCF value. ECF 93-1, ¶ 34. Dr. Rigby did not even address the tax. Now, six months later, each for the first time asserts that the tax will not apply because they state (again for the first

---

[7]  *See* Mineral Expert's Report: Mutanda at 126 (cited by Dr. Rigby for its 10% discount rate; "the discount rate is set at 10% in real terms, which is the discount rate *used by Glencore across its portfolio*" and later discussing "risk analysis" including geographic risk, in a separate section of the report) (emphasis added).

[8]  As Quadrant explains, Professor Damodaran believes country risk should be considered as part of a discount rate calculus, especially for mining projects in Africa. Ex. 2 (Quadrant Reply Report), ¶ 15 & n.20. Quadrant also notes that the CIMVal standards state that country risk is a common factor that must be "reflected in discount rates in the [mining] industry." *Id.* at ¶ 16.

[9]  Putting aside that the 2008 OZ Africa memo provides no support for a 12% discount rate, the Claimants cite no basis for their assumption that a discount rate from 2008 would even be applicable to their *present day* DCF model. While the Government and OZ Africa have both calculated much higher present-day discount rates (19.6% and 24% respectively), Dr. Rigby selectively applies a 2008 rate, again cherry-picking the inputs that most inflate his valuation.

time), a new feasibility study would be conducted, resetting the Super Profit Tax equation. ECF 92 at 7; ECF 93 at 7.

As an initial matter, the fact remains that there is only one feasibility study for the Kalukundi project, the 2006 feasibility study. The idea that another entirely new study would be conducted and neutralize the Super Profit Tax is wholly hypothetical and speculative, and cannot be the basis for a sound calculation methodology. Ex. 2 (Quadrant Reply Report), ¶¶ 37-40; *see Gushlak*, 728 F.3d at 196 (restitution must be supported by a "sound methodology"). The cost of a new feasibility study – estimated by RPA to be at least $10 million – would also have to be factored in. Ex. 3 (RPA Reply Report) at 2-3; *see also* ECF 88-15 at 18 (After originally declaring its intention to conduct a new feasibility study in 2011, Africo decided to postpone the study because of "higher funding requirements.").

Moreover, Dr. Rigby's new hypothesis would create large cash flow reductions that he has overlooked entirely. A new feasibility study would take approximately two years to complete (Ex. 3 (RPA Reply Report) at 2-3), pushing back the production schedule accordingly, including up to the full two years. As Quadrant notes, a two-year delay in production reduces the Claimants' and Government's DCF valuations by *41%* – meaning that the Government's DCF value for Africo's share of the Kalukundi project would be approximately $90 million, and the Claimants' value for Africo's share would be approximately $227 million. Ex. 2 (Quadrant Reply Report), ¶ 5.

Finally, Dr. Rigby's hypothetical fails to consider the numerous other variables that could change with a new feasibility study, including a lower mineral count or increased capital costs. Any of these adjustments would significantly reduce Dr. Rigby's DCF value, but he has ignored them.

C. **The Government Uncritically Adopts Rigby's Mining Model, Which Still Contains Numerous Errors.**

The Government and its economic expert Stout have uncritically accepted all of Dr. Rigby's mining inputs including his inflated mineral resource count, stating that "Stout are valuation experts and do not have independent expertise in the operation or technical aspects of mines." ECF 92 at 5 n.4. Yet the Government and Stout go on to recognize that Dr. Rigby's mineral resource count includes "unproven resources, which are highly uncertain and assumed to be valueless." ECF 92 at 6 n.5. It is internally inconsistent for Stout to defer to Dr. Rigby's resource estimates while at the same time criticizing them as "unproven," "uncertain" and "valueless."

Dr. Rigby does nothing in his new report to rehabilitate his improper treatment of inferred resources, his inflated recovery rate and inaccurate pit slopes, or the numerous other errors in his mining model. *See, e.g.*, Ex. 3 (RPA Reply Report) at 2 (listing numerous errors in SRK's current mining model, including incorrect assumptions on mineable material, "arbitrarily steep pits slopes . . . in lieu of using the geotechnical data provided in the 2006 FS [feasibility study]," and "capital cost estimates [that] are much too low and do not follow the advice of its own contemporaneous

SRK 2008 Report"). The specific flaws in Dr. Rigby's revised valuation are too numerous to list here, so we respectfully refer the Court to RPA's supplemental report for a more detailed summary of his errors. *See* Ex. 3 (RPA Reply Report). But to provide just one example, Dr. Rigby claims that the 2008 SRK Report, which places a $96 million DCF valuation on the entire Kalukundi project, is not reliable because it "was not commissioned or authorized by Africo." ECF 93-1, ¶ 117. Yet the first sentence of the 2008 SRK report states, "SRK Consulting . . . was commissioned by Africo Resources Ltd and Comide s.p.r.l. to determine independent values for the Kalukundi and Mashitu Projects." ECF 68-9 at i.

As Quadrant has detailed in its attached report, when Dr. Rigby's mine plan errors are corrected, both the Claimants' and Government's DCF valuations of Africo's interest are ***negative***. Ex. 2 (Quadrant Reply Report), ¶ 8 & n.7.

\* \* \*

In sum, all of the attempts by the Claimants and the Government to rehabilitate the reliability of their DCF valuations fall flat. There is no better proof that the Claimants' and Government's DCF values are grossly inflated than that the Kalukundi project has never generated *any* cash flows, something the Claimants and Government cannot square with their hundred-million-dollar valuations.

### IV. The Claimants Ignore Legally Required Reductions For the Return Of The Property And Africo's True Economic Interest In The Mining Rights.

In addition to its numerous fundamental errors and the fact that it values the wrong property, the Claimants' new DCF valuation still does not account for the property returned to them, a mandatory reduction under the plain text of the MVRA. 18 U.S.C. § 3663A(b)(1). The Government defers on this issue, presumably to be addressed in subsequent briefing, but the reduction would likewise be mandatory with respect to the Government's valuations. ECF 92 at 8 n.7. In addition, the Claimants' new calculations fail to properly address other necessary elements of any restitution calculation, including the actual value of Africo's interest in Kalukundi and the impact of local laws on that interest.

In response to the obvious point that any DCF value of the mining rights must deduct the value of those same rights when they were returned to Africo in the Camrose Transactions, the Claimants state that the Camrose Transactions were coerced. ECF 93 at 20-21 n.16. Accepting *arguendo* that they were, clearly the Claimants' harm would be the difference between the position they were placed in by the Camrose Transactions, and the position they would have been in without the Camrose Transactions. Giving the Claimants every benefit of their argument, at a minimum they left the Camrose Transactions with 24% of the stake they had going into the Camrose Transactions. ECF 87 at 32; ECF 88-1, ¶¶ 151-52. The MVRA expressly requires that the value of this stake be deducted from any award. 18 U.S.C. §3663A(b)(1) (restitution is the value of the property taken "less (ii) the value (as of the date the property is returned) of any part of the property

that is returned"). And if the Claimants want to use the DCF to value the property taken from them, the same model would have to be used to calculate this mandatory deduction.

The Claimants also make no real effort to address Africo's actual economic interest in the mining rights. Dr. Rigby instead argues that the 30% discount rate, which all parties agree would apply in the first year of cash flows, would somehow "absorb any variation from the 75% ownership stake." ECF 93-1, ¶ 109. This is simply not true. The 30% first-year discount rate accounts for pre-production uncertainties and applies regardless of any part-owner's economic interest. It is a discount applicable to the value of the *mining rights*, not Africo's interest, and in no sense accounts for Africo's reduced share of profits as a result of its sole responsibility for the project's capital expenditures. Ex. 2 (Quadrant Reply Report), ¶ 42.

Dr. Rigby is equally unconvincing in his response to the requirement in the 2018 DRC Mining Code that upon renewal of the Kalukundi mining license (due to expire in 2021), Africo would have to surrender an additional 5% of its ownership interest to the DRC government. ECF 87 at 31; ECF 88-1, ¶ 7. Dr. Rigby dismisses this legally-required deduction because he has not found precedent for how it is applied. ECF 93-1, ¶ 112. This excuse is not a sufficient basis to disregard the impact of local laws.

The Claimants also cling to their position that any restitution award should cover 100% of shareholders from the relevant period, even though the Claimants have never identified themselves, much less the other 35% of the shareholders. *See* ECF 93 at 48 n.56. Controlling Second Circuit authority makes completely clear that this is impermissible under the MVRA. *See United States* v. *Catoggio*, 326 F.3d 323, 328-29 (2d Cir. 2003) ("[T]he district court did err in ordering restitution to unidentified, as opposed to unidentifiable, victims . . . in an amount [] that may not represent the actual losses to those victims. . . . Identification of victims is a statutory prerequisite to the application of the MVRA . . . although we believe the victims . . . are identifiable, the court erred in not identifying them before ordering restitution."); *United States* v. *Zakhary*, 357 F.3d 186, 190 (2d Cir. 2004) (Raggi, J.) ("A lump sum restitution order entered without any identification of victims and their actual losses is not permissible."); *United States* v. *Collardeau*, 2005 WL 1106475, at *7 (D.N.J. Apr. 28, 2005) (denying restitution award to "classes" of shareholders without individualized determination of losses since it would be "illogical and overly simplistic").

Accordingly, while it would be improper to use a DCF to calculate restitution since it does not value the Claimants' actual property, any DCF value of the mining rights would have to include mandatory deductions the Claimants have not incorporated, and any restitution award could only be to identified (not merely identifiable) victims.

**V.    The Government's Reliance On The 2008 OZ Memo And Lack Of Consideration For Africo's 2008 $1M Internal Valuation Is Unreasonable And Should Be Rejected.**

Perhaps recognizing the impropriety of using such a subjective and imprecise method to value loss under the MVRA, the Government reverts to the valuation in the 2008 OZ Africa memo.

CAHILL GORDON & REINDEL LLP

-14-

It seems the Government is making some attempt at rough justice, on the theory that the 2008 memo is a compromise between the Claimants' and OZ Africa's positions. But any such compromise is skewed by the Claimants' extreme position and ignores the objective reality of the Kalukundi mining rights, which have never generated any profits for any of its many owners.

The Government's approach is particularly inappropriate – and in the end contrary to law – because the 2008 memo did not even purport to value the property owned by the Claimants, namely their Africo shares. Once that fact is recognized, it is clear that the 2008 memo is *not* a reliable or legally permissible means to value the Claimants' actual property, which is what the MVRA requires. Respectfully, this again is not a matter of discretion, but of what the MVRA and Supreme Court precedent explicitly require as a matter of law. *See* 18 U.S.C. § 3663A(b)(1); *Dole*, 538 U.S. at 474-75; *Wallach*, 935 F.2d at 462; *Dupree*, 781 F. Supp. 2d at 140.

In its reply the Government asserts that the 2008 OZ Memo was drafted by investment personnel who "prepared the valuation understanding the consequences of their work." ECF 92 at 3. But the same is true – in fact it is even more true – of Africo's $1 million internal DCF valuation of its interest in the mining rights, and it is manifestly unfair for the Government to argue that OZ Africa should be held to its 2008 DCF valuation with no consideration of the contemporaneous, non-litigation driven valuation by the longstanding owner of the project, whose managers and shareholders are now claiming its value.

The Government attempts to wave off Africo's $1 million valuation by incorrectly stating that the email attaching the valuation was "blank." ECF 92 at 3. In fact, the email chain includes a detailed discussion among Michael O'Brien (Africo Chief Financial Officer) and Matthew Fisher (Africo Director), copying Christopher Theodoropoulos (Africo Chairman), in which Fisher states, "I see that management prepared a cash flow analysis of Kalukundi project using three scenarios. Would you mind sending those models across to me please?" O'Brien replies, "The simplified feasibility model is attached. Note the undiscounted cash flow is used for determining if we have impairment under Canadian GAAP." ECF 88-48 at 3. The Claimants have even confirmed in their reply that these models were used to determine whether the company "needed to take an impairment under GAAP" during the 2008 financial crisis. ECF 93 at 40 n.46. Undoubtedly, Africo's models used for this purpose – correctly applying Generally Accepted Accounting Principles – would need to be reliable.

The Government also notes that OZ Africa did not include with the email other irrelevant and voluminous attachments. ECF 92 at 3. These other attachments – which OZ Africa provided to the Claimants upon their request – are appended hereto, and include: 1) Amendment 4 to the Swanmines Agreement; 2) a translation of Amendment 4; 3) a resolution by Africo's directors regarding a stock option plan; and 4) a draft of a PricewaterhouseCoopers audit report on Swanmines's internal control and administrative procedures, and are all completely irrelevant to the Africo internal valuation model. *See* Ex. 4. The other attachments are not material in any respect, and contrary to the Government's suggestion they do nothing to controvert the credibility

of Africo's $1 million valuation of the project the Claimants now contend is worth over half a billion dollars.

If the Government needs any additional proof that Africo's own internal $1 million valuation is credible, it need look no further than what has actually happened to the property in the last decade. No one has made $150 million in cash flows from the property. This is so despite increases in cobalt and copper prices, supposed increases in mineral deposits at the site, and numerous capable and solvent owners. To our knowledge not a single owner has attempted to renew the mining license, which is set to expire next year, nor has anyone advanced a new feasibility study since 2006, nor made any effort to develop the property. This is because Kalukundi is not an economically viable mining property, as our experts have made clear, and as Africo recognized in 2008.[10] Ex. 2 (Quadrant Reply Report), ¶ 8; Ex. 3 (RPA Reply Report) at 1.

## VI. The Clear Evidence of Bribery by Africo Management to Maintain the Mining Rights Should Bar Restitution to Any Involved Claimants.

Finally, the Claimants' and the Government's reply submissions assert that the whistleblower statements submitted by OZ Africa are irrelevant to the Court's restitution determination, but their arguments are meritless. ECF 92 at 11; ECF 93 at 45. The Government argues that the witness statements do not allege that the Claimants were co-conspirators with the defendant, "[n]or is there any allegation that Africo obtained its license through bribery. ECF 92 at 11. This is splitting hairs. Whether they "obtained" the license through bribery or "maintained" it through bribery – the latter of which is clearly the case – in both instances the involved individuals at Africo would be seeking compensation for "ill-gotten gains." *See United States* v. *Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008) (restitution not proper if "victims lost ill-gotten gains"); *United States* v. *Agate*, 613 F. Supp. 2d 315, 321-22 (E.D.N.Y. 2009) (Weinstein, J.) ("[c]oncerned about restoring ill-gotten gains to criminals, courts have denied restitution to parties whose illegally obtained money was subsequently stolen from them"); *United States* v. *Martinez*, 978 F. Supp. 1442, 1453 (D.N.M. 1997) (declining to award restitution to illegally operating casino which had been robbed, as "[i]t is intuitively obvious that Congress did not intend to have the federal judiciary take the lead in rewarding, through restitution orders, persons robbed of monies they had obtained by unlawful means").

Likewise, the Claimants' argument that the witness statements and supporting documents refer to "nominal expenses [] to pay for necessary security at the Kalukundi mine site (ECF 93 at 45) ignores that these were not the only bribes paid. *See* ECF 88-4 at 1-2 (witness stating he "personally witnessed records of bribes paid for by [Africo] and its subsidiaries to *military officials, Gecamines company officials, and high-level DRC government officials*. These bribes

---

[10] As indicated, even if the figure the Government cites from the 2008 OZ Africa memo were used to calculate restitution, which it should not be, the value of the mining rights when they were returned by the Camrose Transactions – namely 24% of any DCF value – would have to be deducted.

were paid for by [Africo] *in order to maintain its interest in the Kalukundi mining rights* in the DRC.") (emphasis added).

      In the end, the Government's and the Claimants' submissions do nothing to refute the well-corroborated witness statements, which are supported by over one hundred pages of contemporaneous documents. The truth is that certain Claimants were aware of these bribes and chose to keep them concealed, which perhaps explains why the Claimants have been so secretive about who they are, the shares they owned (and when), and their roles in the management of Africo. The clear evidence of Africo management's bribery is legally significant and dispositive of at least some of the Claimants' requests for restitution under established case law.[11] *See Agate,* 613 F. Supp. 2d at 321; *Martinez,* 978 F. Supp. at 1453.

---

[11] The Government states that OZ Africa need not have filed the witness statements under seal and redacted the related sections of its March 6 letter. ECF 92 at 11-13. OZ Africa sought to file this information under seal as a courtesy to give the Government and the Claimants time to consider the issue and to prevent it from playing out publicly. Since receiving the Government's reply, we have discussed the sealing issue with the Claimants and the Government and they have no objection to the public filing of the relevant documents, with certain redactions of names, email addresses, and private telephone numbers to be discussed among the parties. Accordingly, OZ Africa will be withdrawing its sealing request and submitting the previously sealed documents for public filing with a limited set of redactions on which the parties expect to reach agreement.

\* \* \*

OZ Africa respectfully submits that the new arguments presented by the Claimants and the Government are meritless and/or immaterial, and that for the reasons stated, as well as those in OZ Africa's submission of March 6, 2020, restitution must be calculated based on the decline in the publicly-traded price of the Claimants' Africo shares as a result of the offense, which can be no more than $1.47 per share.

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By: /s/ Anirudh Bansal

Anirudh Bansal
Charles A. Gilman
Tara H. Curtin
Samantha Lawson
Benjamen Starkweather

80 Pine Street
New York, New York 10005
Tel.: (212) 701-3000

*Attorneys for OZ Africa Management GP, LLC*

ENCLOSURES

VIA ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court for the Eastern District of New York
United States Courthouse, Room 1426 S
225 Cadman Plaza East
Brooklyn, New York 11201