# Exhibit 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**Case No. 1:16-cr-00515-NGG-LB**

**UNITED STATES OF AMERICA**

**v.**

**OZ AFRICA MANAGEMENT GP, LLC**

# REPLY EXPERT REPORT OF QUADRANT ECONOMICS

**Prepared by**

**Dr. Daniel Flores**

**15 May 2020**

QUADRANT Economics | 1445 New York Avenue NW, Floor 6
Washington, DC 20005

# I. Introduction

1. At the request of Counsel for OZ Africa Management GP, LLC ("OZ Africa"), I prepared the Expert Report of Quadrant Economics dated 6 March 2020 (the "First Report" or "First Quadrant Report"). Claimants assert that they are former shareholders of Africo Resources Limited ("Africo"). In the First Quadrant Report, I carried out the valuation of shareholder loss as of two dates: (i) the date of loss, 27 April 2007, *i.e.*, the date on which Africo's loss of its share of the exploitation and mining license issued by the DRC (the "Kalukundi mining rights") was publicly announced; and (ii) the date of sentencing, which was assumed to be 28 February 2020. Counsel for OZ Africa had also asked me to review and comment on the discounted cash flow ("DCF") valuations of the Kalukundi mining rights as of the date of sentencing performed by SRK Consulting, Inc. ("SRK") on behalf of Claimants and by Stout Risius Ross, LLC ("Stout") on behalf of the Government.

2. After reviewing Claimants' and the Government's reply submissions filed on 30 April 2020, including SRK's Reply Report to the Valuation of the Kalukundi Copper/Cobalt Project (the "2020 SRK Report"), my conclusions have not changed: looking at the public share price, as opposed to a DCF, is the superior approach to measure each Claimant's loss in this case. In particular, the amount of restitution is US$ 1.47 per share as of the date of loss, which would result in an aggregate loss amount of US$ 23.9 million. This is a maximum aggregate number. The loss of each Claimant must be individually calculated, with appropriate adjustments.[1]

3. In my First Report, I was also asked to review the DCF valuations as of the date of sentencing presented by SRK and Stout. As I noted, the DCF method depends on subjective inputs and projections. When the assumptions underlying those inputs and projections are highly speculative, as in the case of start-up companies or projects without a history of operations, like Africo and Kalukundi, variations in the underlying assumptions result in an extremely wide range of valuations, rendering the approach unreliable. This is another reason why looking at the public share price, as opposed to a DCF, is the superior approach to measure each Claimant's loss in this case.

4. SRK's and Stout's April 2020 submissions reinforce my conclusion that the DCF method is too speculative and unreliable in this case. Compared to their November 2019 submissions, SRK changed its conclusion of the DCF value of 100% of the Kalukundi mining rights as of the date of sentencing from US$ 387.2 million to US$ 562.4 million, <u>a 45% increase</u>,[2] while Stout changed it

---

[1] First Quadrant Report, ¶ 20 and n. 24. Claimants misunderstand this point. Claimants state that according to the First Quadrant Report the market purportedly valued the Kalukundi mining rights at only US$ 37 million, calculated by multiplying Africo's 25 million outstanding shares by US$ 1.47. **<u>ECF. 93</u>**, Claimants' Submission dated 30 April 2020, p. 22. Claimants' interpretation is incorrect. The US$ 1.47 per share is the loss of value of one Africo share and, thus, Claimants' US$ 37 million calculation does not represent the market value of the mining rights indirectly owned by Africo, but <u>the change</u> in that market value due to the offense.

[2] SRK now relies on consensus prices for copper and cobalt. In its November 2017 DCF model, SRK used spot prices, which were higher than consensus prices and increased SRK's valuation of the Project by 73% compared to the same valuation based on consensus prices as of November 2017 (that is, US$ 911.3 million − US$ 527.6 million = US$ 383.7 million; US$ 383.7 million / US$ 527.6 million = 73%). 2017 SRK Report, Appendix F (DCF Undeveloped Project); Consensus Economics,

from US$ 188.7 million to US$ 259.0 million, a 37% increase. The fact that the valuation of the rights to an undeveloped mine can increase by that much in just a few months, especially during a serious financial crisis, casts serious doubt on the validity of the valuation method, namely, the DCF.

5. Furthermore, the DCF models presented by SRK and Stout depend on projections that are inherently speculative and are not guaranteed to occur as forecasted. For instance, SRK assumes that a new feasibility study would be required for the Kalukundi property (the "Kalukundi Project" or the "Project"). But RPA explains that such a new feasibility study would take two years in normal conditions, with a consequent delay in the production plan.[3] The delays could be even longer in adverse market conditions.[4] Delays in the deployment of the Project have a material effect on the value of the Kalukundi mining rights: according to SRK's and Stout's DCF models, every additional year of delay would require a 30% discount to the NPV. For instance, a two-year delay reduces SRK's and Stout's DCF valuations by 40.8%, which would reduce Africo's interest in the Project to US$ 226.8 million and US$ 89.6 million, respectively. [5]

6. Given the uncertainty and the speculative nature of the cash flows projected for the Kalukundi Project, the 24% discount rate proposed in my First Report constitutes a necessary and reasonable adjustment for risk, if one were to attempt to value the Kalukundi mining rights using the DCF method. But one should not forget the fundamental point from a valuation perspective, which is that the DCF models proposed by SRK and Stout are speculative and inferior to a loss assessment based on the traded share price of Africo.

7. If one were to assume that the DCF model is reliable in this case, in my First Report I corrected a number of flaws in SRK's DCF valuation with regard to production, capital expenditures, operating expenses (based on inputs from RPA),[6] taxes and discount rate. **Figure 1** below summarizes the results of applying the same corrections to SRK's increased DCF valuation of US$ 562.4 million for 100% of the Kalukundi mining rights.

---

Energy and Metals Consensus Forecasts as of November 2017.

[3] RPA Reply Report, p. 2.

[4] For example, in a recent report about junior miners, Royal Bank of Canada ("RBC") states: "We expect the pace of project progress to slow in 2020 given operational suspensions in response to COVID-19, with ~50% of the exploration/development stage assets we track having been suspended (this compares to ~40% of operating assets). We also expect the restart of pre-production assets to be slower than the restart of existing operations." RBC Capital Markets, "Tracking the Junior Miners – Valuations, Transactions, and Catalysts," 22 April 2020, p. 1.

[5] That is, for SRK, US$ 562.4 million / (1 + 30%)^2 = US$ 332.8 million; US$ 332.8 million − US$ 562.4 million = −US$ 229.6 million; −US$ 229.6 million / US$ 562.4 million = −40.8%; Africo's interest would be US$ 226.8 million (First Quadrant Report, QE−3, DCF and Calculations, tab "Control Panel"). For Stout, US$ 259.0 million / (1 + 30%)^2 = US$ 153.3 million; US$ 153.3 million − US$ 259.0 million = −US$ 105.7 million; −US$ 105.7 million / US$ 259.0 million = −40.8%; Africo's interest would be US$ 89.6 million (that is, Africo's interest calculated by Stout of US$ 151.5 million / (1 + 30%)^2 = US$ 89.6 million; **ECF. 92**, Government's Submission dated 30 April 2020, p. 5).

[6] I understand that RPA, after its review of the 2020 SRK Report, maintains the validity of its proposed corrections to SRK's production, capital expenditures, and operating expenses. RPA Reply Report, p. 1.

**Figure 1 - Effect of Changes on SRK's NPV of the Project**

| | Value | Change in Value | Percentage Change |
|---|---|---|---|
| | (US$ Millions) | | (Percent) |
| | (1) | (2) | (3) |
| **1. SRK** | **562.4** | - | - |
| 2. Production | 243.8 | (318.6) | -56.6% |
| 3. Capital Expenditures | 378.6 | (183.8) | -32.7% |
| 4. Operating Expenses | 540.3 | (22.2) | -3.9% |
| 5. Fiscal Regime | 442.3 | (120.2) | -21.4% |
| 6. Discount Rate | 176.4 | (386.1) | -68.6% |
| **7. All Corrections to SRK** | **(164.5)** | (726.9) | -129.2% |

8. The cumulative impact of correcting all of the flawed assumptions above shows that the Project is not economically viable based on the DCF method. Even correcting for just some of SRK's flawed assumptions shows that Africo's interest in the Project does not have a positive NPV.[7] Note that the corrections in **Figure 1** above assume no delays in the start of the Project and the same commodity prices used by SRK.

9. SRK takes issue with my conclusion that the Kalukundi mining rights do not have a positive DCF value today, stating that Kalukundi is "a World Class Deposit," "one of the best 'shovel ready' undeveloped copper/cobalt deposits in the world today" and "one of the most profitable undeveloped copper/cobalt properties in the world."[8] The fact is that for decades no one has ever developed the Kalukundi property, and it is even less likely that anyone would want to do so today.[9]

10. In the remainder of this Report, I respond in detail to new arguments and information in Claimants' reply submission related to three aspects of the DCF valuation: (i) discount rate; (ii) super profit tax; and (iii) the calculation of Africo's interest in Kalukundi.

[7] For instance, correcting only for capital expenditures and discount rate; or correcting only for production, capital expenditures and operating expenses. First Quadrant Report, QE−3, DCF and Calculations, tab "Control Panel."

[8] 2020 SRK Report, ¶¶ 3-4, 132.

[9] Claimants state that a decrease in the amount of restitution as of the date of sentencing compared to the date of loss is "nonsensical" because the consensus prices for copper and cobalt have nearly doubled, and the amount of minerals known to exist at Kalukundi have more than doubled since the time of the offense. <u>**ECF. 93**</u>, Claimants' Submission dated 30 April 2020, p. 24. First, spot prices have decreased by 28% for copper and 51% for cobalt between the date of loss and the date of sentencing of 28 February 2020 assumed in my First Report, and by 31% for copper and 56% for cobalt between the date of loss and 8 May 2020. Second, current consensus prices may not yet capture the long-term effects of the current global crisis. Third, regarding the amount of minerals, the 2013 AMEC Report was not a feasibility study and only estimated an increase in resources, not reserves. Lastly, Claimants fail to acknowledge other market factors that have negatively impacted the value of the Kalukundi mining rights, such as the 2018 DRC Mining Code, which substantially increased royalties, introduced a super profit tax, and requires the transfer of an additional 5% equity stake to the DRC to renew a mining license.

## II. Discount Rate

11. On instruction from counsel for Claimants, SRK applies a discount rate of 12% (with a 30% discount rate applied only in the first year). In its latest report, SRK presents two main critiques to Stout's 20% discount rate and my 24% discount rate, which are both calculated taking into account that Kalukundi is a pre-operational mining project in the DRC.

12. First, SRK claims that "the discount rates for mining projects are primarily assigned by metal type,"[10] and seeks to disregard any discount rates for mining projects which do not produce copper in the DRC.[11] Discount rates for mining projects, or any other industry, are not "assigned." That claim is unsupported and incorrect. An appropriate discount rate calculation takes into account the risk of the project being valued through the beta parameter.[12] Beta parameters are not normally calculated by specific "metal type," but by broader industry groupings,[13] given that risks have not been shown to vary significantly by metal type.[14]

13. The second major critique concerns country risk. According to Claimants, in "each of the comparable DRC copper mine valuation events identified by SRK, not one included a 'country-specific risk premium,' even though, the industry professionals who completed these valuations were undoubtedly aware of the location of the property being valued."[15] As explained below, in many instances, these discount rates are presented without underlying calculations, include country risk but contain errors, or represent generic discount rates not specific to the DRC.

14. SRK claims that mines in developed countries, like the U.S. (particularly, in Arizona), are subject to a higher level of risk than in developing countries, citing to community resistance and environmental

---

[10] 2020 SRK Report, ¶ 82.

[11] SRK dismisses the discount rate used for a lithium mine in Zimbabwe. 2020 SRK Report, nn. 45-46. There should be no doubt that projects in Zimbabwe face similar country risks than projects in the DRC.

[12] First Quadrant Report, ¶ 100.

[13] For example, Prof. Aswath Damodaran of New York University, in his often-quoted beta studies, presents calculations for "Metals & Mining" and "Precious Metals." Aswath Damodaran website, Beta, Unlevered beta and other risk measures, betas.xls, Jan 2020.

[14] *Id.* In my First Report, I also cited a study from CRU, a leading provider of analysis, prices, and consulting in the mining and metal markets, to show that discount rates are based on minimum required rates of return. That study shows that mining projects in the DRC should have a risk-adjusted discount rate of approximately 31% in nominal terms, or 26% in real terms. First Quadrant Report, ¶ 120. SRK criticizes the CRU study, stating that it does not reflect an industry standard methodology for determining discount rates and that it is limited to iron ore projects. 2020 SRK Report, ¶ 84. SRK misunderstands the document. One of the purposes of the CRU study was precisely to highlight how certain industry practices for calculating the discount rate "lead to inflated NPV compared with the true underlying value of a project." First Quadrant Report, QE−52, Serafino Capoferri, "The financial evaluation of 25 major iron ore projects using risk-adjusted discount rates," CRU Insights, 12 February 2014, p. 1. Another purpose of the CRU study was to highlight the importance of country risk. The small variations in discount rates among metal types are insignificant compared to the substantial country risk premium warranted for projects in high-risk countries.

[15] **ECF. 93**, Claimants' Submission dated 30 April 2020, p. 41.

standards.[16] As a preliminary point, those risks are also prevalent in developing countries,[17] and in those countries regulatory risk is exacerbated by the frequency and unpredictability of changes in regulations. Furthermore, country risk encompasses a number of other factors, such as government stability, socioeconomic conditions, internal conflict, corruption, strength of institutions (legal, monetary, infrastructure), local inflation, exchange rate expectations, and taxation regimes – the last being of particular concern in the DRC.[18] Confiscatory taxation and expropriation are not realistic risks in Arizona, but they are in the DRC.

15. SRK's assertion that country risk should be ignored goes against valuation practice and common sense. Investors do require higher returns to invest in riskier countries.[19] Furthermore, as Prof. Damodaran notes, mining projects specifically face substantial country risk exposure.[20]

16. Mining industry guidelines prescribe that country risk must be accounted for in the discount rate. The Canadian Institute of Mining ("CIM") Special Committee on Valuation of Mineral Properties ("CIMVal") states that country risk is a common factor that is "reflected in discount rates in the [mining] industry."[21] Lawrence D. Smith of the Management and Economics Society ("MES") of the CIM shows that the method that practitioners use the most to address increased risk in a project is to "adjust discount rate for country risk."[22] An article published by CIM explaining the formulation of a discount rate in layman's terms explains:

> <u>The jurisdiction of the project should also be reflected in the discount rate</u>. For example, Chile- or Nevada-based projects would not typically attract additional discounts to their cash flows as these regions are viewed as relatively stable jurisdictions for developing long-term mines. However, projects in some areas of Australia may now attract additional discounting due to the uncertainty around mining taxation. <u>Projects in the Democratic Republic of Congo may also need to tack five to</u>

---

[16] 2020 SRK Report, ¶ 83.

[17] *See*, *e.g.*, China Molybdenum Co., Ltd., "Very Substantial Acquisition of a Controlling Indirect Interest in World-Class Copper and Cobalt Mine from Freeport-McMoran Inc.," HK Circular, 8 September 2016 (produced by SRK), pp. VI-43, VI-44.

[18] First Quadrant Report, ¶¶ 103, 147-148.

[19] First Quadrant Report, ¶¶ 103-104. Aswath Damodaran website, "Country Risk Premiums," ctrypremApr20.xls, tab "Explanation and FAQ."

[20] "A company can be exposed to country risk, even if it derives no revenues from that country, if its production facilities are in that country. After all, political and economic turmoil in the country can throw off production schedules and affect the company's profits. Companies that can move their production facilities elsewhere can spread their risk across several countries, but the problem is exaggerated for those companies that cannot move their production facilities. Consider the case of mining companies. An African gold mining company may export all of its production but it will face substantial country risk exposure because its mines are not moveable." Aswath Damodaran, "Measuring Company Exposure to Country Risk: Theory and Practice," Stern School of Business, September 2003.

[21] Canadian Institute of Mining, Metallurgy and Petroleum Special Committee on Valuation – Standards & Guidelines (CIMVal) – Answers submitted October 22, 2012 in Response to Questions in the IVSC Discussion Paper – Valuation in Extractive Industry, pp. 10-11.

[22] Lawrence D. Smith, MES Survey of Evaluation Practices in the Mineral Industry, CIM Management & Economics Society, 2005, Figure 8, p. 5.

seven per cent onto the discount rate due to sovereign risk perceptions, as well as political and taxation uncertainty.[23]

17. To support its unreasonably low discount rate, SRK mentions that a London financial advisory firm, RFC Ambrian, compiled a database of over 300 copper M&A deals completed since 2008 and that SRK has compiled 11 discount rates that it "believes are comparable" to the Project based on "publicly available information."[24] Those 11 discount rates SRK presents are not from RFC Ambrian, rather from SRK's own research. In any event, SRK fails to note that RFC Ambrian comments on the high risks of operating in the DRC. Table 15 of the RFC Ambrian Report is reproduced below as **Figure 2**. RFC Ambrian highlights the fact that the DRC ranks as the riskiest among prominent mining countries:

**Figure 2 - RFC Ambrian: Control Risks' Ratings[25]**

**Table 15: Control Risks' Ratings for Major Copper Producing Countries**

| Country | Political | Operational | Security | Terrorism |
|---|---|---|---|---|
| Chile | Low | Low | Low | Low |
| US | Low | Low | Low | Low |
| Indonesia | Medium | Medium | Medium | Medium |
| Zambia | Medium | Medium | Low | Insignificant |
| Canada | Low | Low | Low | Low |
| Dem. Rep. Congo | High | High | Medium | Low |
| Saudi Arabia | Medium | Medium | Low | Low |
| Peru | Medium | Medium | Medium | Low |
| Australia | Low | Insignificant | Low | Low |
| Spain | Medium | Low | Low | Low |
| Mongolia | Medium | Medium | Medium | Insignificant |
| Argentina | Medium | Medium | Low | Low |

Source: S&P Global Market Intelligence, Control Risks

18. In sum, the evidence is clear: investors perceive a mining project in the DRC to be riskier than an equivalent project located in the U.S. and, therefore, require an extra return. To account for this, industry practice calls for incorporating these country-specific risks into the discount rate.

[23] Greg Gosson and Graham Wood, "Standards," CIM Magazine, 1 March 2013, p. 1 (emphasis added). The authors of this article are the technical director of geology and compliance and technical director for financial services for AMEC, the same company SRK relies on for its 2013 AMEC report.

[24] 2020 SRK Report, ¶ 61.

[25] RFC Ambrian also highlights that recent changes in the DRC mining code affect project economics and country risk for the DRC. RFC Ambrian, "Copper M&A Report," November 2018, pp. 61-62. In an updated version of the same report as of January 2020, while discussing country risk for other countries, RFC Ambrian also states the following: "When looking to build or acquire a mining asset, we would also include country risk and would highlight mining specific risks including, infrastructure and technical issues, mining specific legislation, environmental requirements, and water and waste management." RFC Ambrian, "Copper Projects Review: Copper M&A Update Report," January 2020, p. 13.

### A. Stout's Discount Rate Examples Appropriately Include Country Risk

19. As part of its new arguments on discount rate, SRK comments on three projects that Stout considered in its analysis. SRK claims that the discount rates for two of the three projects are irrelevant and that the discount rate for one project would indeed support SRK's application of a 12% discount rate.[26] In this section, I show that the SRK's critiques have no merit. I agree with the Government's observation that "the discount rate advanced by the Claimants is too low and inconsistent with sound valuation of an asset in the present-day DRC … while comparing and evaluating discount rates applied to other similar mining projects may have some illustrative appeal, it is not the proper or optimal method to calculate a discount rate."[27]

20. **Prospect Resources**: SRK claims that the 22% discount rate for Prospect Resources in Zimbabwe should not be considered because it is a lithium mine, which SRK claims (without support) has an "opaque" downstream market with additional risk over copper/cobalt markets.[28] Lithium prices are available along with cobalt and copper prices on the London Metal Exchange. McKinsey & Company, a leading consulting and research firm, explains that lithium and cobalt have similar market risk as they are both driven by demand for batteries and adds that there was "much more concern for cobalt given the lack of transparency in the value chain and DRC country risk."[29]

21. Prospect Resources explains that the reason for its use of a 22% discount rate is due to Zimbabwe's country risk: "A significant aspect of the discount rate selected in this valuation is associated with the return that an investor would require for investing in Zimbabwe which is considered a higher risk investment jurisdiction than other potential investment alternatives."[30]

22. Prospect Resources had previously used a 10% discount rate, which was a generic discount rate used in the feasibility study, similar to that which SRK proposes in this case, but explained that the valuation using a 10% discount rate had "not considered the likely jurisdictional or technical risks associated with the project. It is also considered unlikely that a project would transact for the full NPV of the project and therefore it is considered reasonable to reduce the valuation to account for the geopolitical risks associated with the project, the lack of funding to advance the project and the potential sources of funding available to Prospect."[31]

23. **Semhkat**: In its 2016 annual report, ASA Resource Group applied a 27% discount rate "for similar

---

[26] 2020 SRK Report, ¶¶ 45-60.

[27] **ECF. 92**, Government's Submission dated 30 April 2020, p. 6.

[28] 2020 SRK Report, ¶ 48.

[29] McKinsey & Company, "Lithium and cobalt – a tale of two commodities," June 2018, p. 2.

[30] Prospect Resources Limited, ACN 124 354 329, Notice of Extraordinary General Meeting Explanatory Statement & Proxy Form, 11 June 2019, p. 34. The document also states that DRM used a WACC of "between 18% and 25% with the preferred valuation being based on a discount rate of 22%. Prospect had previously used a 10% discount rate in determining the NPV of the project." *Id.*, p. 35.

[31] *Id.*, p. 37.

exploration operations in developing countries, adjusted for the specific risk of the SEMHKAT project."[32] SRK objects to the comparability of the 27% discount rate for Semhkat because the project did not yet have a bankable feasibility study.[33] But, as RPA has explained, Kalukundi's 2006 feasibility study did not meet industry standards and was not a "bankable" feasibility study, but more a pre-feasibility study.[34] In fact, SRK's own DCF valuation assumes that a new feasibility study for the Project would be needed.[35]

24. SRK also claims that this discount rate is not comparable because it is part of an impairment analysis. Duff and Phelps explains that the discount rates used in impairment analyses using IAS 36 account guidelines should reflect a pre-tax WACC.[36] What is important when considering discount rates in impairment analyses is that a generic, company-wide WACC not be confused with a project-specific discount rate. Major mining companies, in accounting for multinational investments, sometimes use a generic, company-wide WACC in impairment analyses, which is not appropriate for the valuation of a specific project. Similarly, investment banks often use a standard discount rate when comparing potential investment opportunities across jurisdictions. However, evaluating individual projects requires a project-specific IRR and discount rate. Semhkat specifically explains that the discount rate used for their impairment analysis is "for similar exploration operations in developing countries, adjusted for the specific risks of the SEMHKAT project."[37]

25. **Kinsenda**: SRK first claims that the 20% discount rate that the CEO of Metorex stated it used in 2009 to value the Kinsenda project is not a comparable discount rate because Kinsenda had not yet obtained a bankable feasibility study. SRK is incorrect. Kinsenda was a brownfield project, having been previously operated between 1977 and 2002,[38] and a feasibility study for the project was completed in December 2006.[39] Metorex's CEO stated that his "risk-based valuation" used "a real

---

[32] ASA Resource Group Plc., "A New Beginning, Realizing the True Value of Our Assets, Annual Report 2016," p. 111.

[33] 2020 SRK Report, ¶ 51. SRK states that I fail to address the comparable transaction analysis SRK put forth in its 2017 and 2019 reports. 2020 SRK Report, ¶ 129. I did not address SRK's comparable transactions analysis as I was aware that RPA reviewed it and concluded that it was flawed and should be disregarded. First RPA Report, ¶ 185.

[34] First RPA Report, ¶¶ 20, 128.

[35] SRK's comment regarding the grade of the copper mine is misplaced, as the lower grade of the Semhkat project should already be accounted for in the cash flows projections. 2020 SRK Report, ¶ 53.

[36] Duff and Phelps, Cost of Capital in Goodwill Impairment Reviews, 2011.

[37] ASA Resource Group Plc., "A New Beginning, Realizing the True Value of Our Assets, Annual Report 2016," p. 111.

[38] Brownfield are mining projects developed on or near an existing mine that is either currently operating or has been previously decommissioned, whereas greenfield projects are those with minimal to no previous exploration, like Kalukundi. Brownfield projects are less risky than greenfield projects: "One defining advantage of a brownfield property is the amount of available exploration data, which de-risks many aspects of the project and offers immense economic benefits to both the company and its shareholders. When a company acquires a brownfield project, an extensive exploration database and often detailed geological models are also a part of the package. This can prove extremely valuable." Investing News, "Greenfield vs Brownfield Mining Projects Less Risk Faster ROI," 29 January 2018, p. 2.

[39] **ECF. 93**, Claimants' Submission dated 30 April 2020, Exhibit 7, pp. V-193, V-219. Claimants' document states that the December 2006 feasibility study was never fully accepted by Metorex; however, that was "due to concerns regarding mine design

discount rate of some 20 per cent … to take account of specific risks as they relate to future project funding, project development and the DRC operating environment in general."[40] All these factors apply to a valuation of the Kalukundi Project.

26. SRK states that the Kinsenda project completed a new feasibility study by 2013 and was sold to a Chinese company, the JinChuan Group. SRK refers to a real discount rate of 10.43%,[41] but fails to mention that figure did not come from the CEO of Metorex, but was calculated by SRK itself.

27. A review of SRK's 2013 discount rate for Kinsenda reveals numerous flaws. First, the discount rate applied to Kinsenda was SRK's discount rate for another Metorex's <u>operating</u> mine in the DRC, the Ruashi mine, which SRK analyzes in the same report. Second, the Ruashi mine's discount rate assumes a highly leveraged project with a 45% debt ratio and an unreasonably low cost of debt, which results in an unreasonably low discount rate. As I explained in my First Report, it is not appropriate to assume that the Kalukundi project would incur debt. The cost of equity calculated by SRK in its 2013 report for the Ruashi mine results in a nominal discount rate of 19.72%. Finally, the Ruashi mine's discount rate also assumes that the cost of debt for a mining company in the U.S. is <u>0.68%</u>, essentially assuming that a U.S. mining project would be able to raise debt at a risk-free rate; SRK then adds a 5% premium to convert the rate "to an equivalent interest rate in the DRC."[42]

### B. SRK's Examples Do Not Support a 12% Discount Rate for Kalukundi

28. SRK presents 11 supposed examples of discount rates in the DRC to support its 12% discount rate for Kalukundi.[43] All 11 examples suffer from one or more of these issues: (i) the mine was operational, while Kalukundi is not; (ii) the discount rate was used for illustrative purposes or as a company-wide, generic discount rate; and (iii) the discount rate calculations include errors, or arbitrary and illogical assumptions. I discuss each in turn.

29. **<u>Kinsenda and Ruashi</u>**: As explained above, the discount rates calculated by SRK for the Kinsenda and Ruashi projects contain several errors and would not apply to Kalukundi.[44]

30. **<u>Mutanda</u>**: SRK cites two discount rates used to value the Mutanda operation.[45] Mutanda was an

---

and engineering design of concentrator plant," not mineral reserve or resource estimates.

[40] Metorex Limited, "A New Focus for the Future, Annual Report 2009," p. 13.

[41] 2020 SRK Report, ¶¶ 58-59.

[42] **<u>ECF. 93</u>**, Claimants' Submission dated 30 April 2020, Exhibit 7, pp. V-126, V-246. In comparison, Stout uses a U.S. BB Bond yield of 4.2% for a U.S. mining company and then applies a 7% country default spread, for a total cost of debt of 11.2% and a 30% leverage. **<u>ECF. 81</u>**, Government's Submission dated 31 January 2020, "STOUT - OZ - Discount rate to Counsel.xls."

[43] 2020 SRK Report, ¶ 82, Exhibit 4.

[44] *See* ¶¶ 25-27 above.

[45] 2020 SRK Report, Exhibit 4. SRK cites to a 13.5% discount rate related to an impairment calculation, which contradicts its own view that the discount rate of 20% for Kinsenda was inapt. 2020 SRK Report, ¶ 57. Moreover, the 13.5% discount rate was not supported by any calculations and may have been a generic discount rate applied by Glencore, similar to the 10% discount rate applied to Mutanda, as explained in this paragraph.

operational mine with well-defined reserves, while Kalukundi was pre-operational.[46] Of the two discount rates presented for the Mutanda projects, the 10% discount rate was a "discount rate used by Glencore across its portfolio," meaning it was a generic company-wide discount rate, not a project-specific discount rate.[47]

31. **<u>Tenke-Fungurume</u>**: SRK lists two 12.5% discount rates applied to the Tenke-Fungurume mine valuation, but each refers to the same asset valuation.[48] Moreover, there are several issues with the comparison and calculation of the discount rate.[49] First, Tenke-Fungurume was a profitable, operating mine.[50] Second, the discount rate calculation contains cost of equity calculations for the DRC and for the U.S. Despite the project being in the DRC, the calculation arbitrarily assigns a two-thirds weight to the U.S. cost of equity.[51] Third, the discount rate calculation uses an unreasonably low cost of debt and gives it a 65% weight, which would not apply to Kalukundi.[52]

32. **<u>Kalongwe</u>**: SRK cites a 14.0% discount rate used to value the Kalongwe project.[53] As explained in the Government's latest brief, the discount rate used for Kalongwe

> further supports the discount rate advanced by Stout and the government … Kalongwe had a recent feasibility study conducted and the valuation was predicated on the <u>proven and probable reserves</u>, … SRK's 2019 valuation model is predicated on a 2013 AMEC Report that solely estimates the <u>indicated and inferred resources</u>, which have lower geologic certainty and lower economic viability, and specifically excludes any estimate of the mineral <u>reserves</u>.[54]

33. Additionally, BDO, the consulting company that calculated the 14% discount rate, relies on arbitrary methods to estimate country risk. BDO includes country risk because "the comparable companies tend to have more diversified operations and are located in countries with less political and economic risk, compared to the Kalongwe project."[55] But instead of relying on established methodologies,

---

46 According to Glencore: "Mutanda is an operational mining company. Its resources and reserves are well-defined, and a comprehensive body of technical information on its current and planned operations is available." Glencore International Plc., Mineral Expert's Report: Mutanda, 4 May 2011 (produced by SRK), p. 125.

47 Glencore International Plc., Mineral Expert's Report: Mutanda, 4 May 2011 (produced by SRK), pp. 125-126.

48 2020 SRK Report, Exhibit 4. The two transactions occurred two months apart. SRK has assumed that the discount rate used by China Molybdenum for the first transaction was applied by BHR Partners in the second transaction, without any support.

49 China Molybdenum Co., Ltd., "Very Substantial Acquisition of a Controlling Indirect Interest in World-Class Copper and Cobalt Mine from Freeport-McMoran Inc.," HK Circular, 8 September 2016 (produced by SRK), pp. VI-51-54.

50 *Id.*, p. VI-32.

51 *Id.*, p. VI-52.

52 Using erroneous inputs from South African bond rates, the cost of debt calculation assigns an arbitrary two-thirds weight to the cost of debt for the U.S. and one-third to the cost of debt for the DRC, arriving at a 5.83% pretax cost of debt. *Id.*, p. VI-54.

53 2020 SRK Report, Exhibit 4.

54 **<u>ECF. 92</u>**, Government's Submission dated 30 April 2020, p. 6 (emphasis in the original).

55 Nzuri Copper, Chengtun Mining Group Scheme Booklet, Independent Specialist Report, Appendix 4 (produced by SRK),

BDO arbitrarily includes country risk through the beta parameter,[56] increasing its discount rate by only about 2%.[57] In comparison, the average country risk premium for the DRC from established sources that Stout and I use in our discount rate calculations is 8.9%.[58]

34. **Kamoto**: SRK references two discount rates used in the financial statements of Katanga Mining Limited ("KML").[59] These financial statements are unreliable.[60] Moreover, SRK itself prepared a technical report of KML in 2009.[61] SRK presented a range of discount rates (8%-20%) to calculate a range of NPVs for the project, but stated that the NPVs "should be considered only in relation to the risks mentioned in Item 20."[62] In Item 20, SRK considered 14 different risk factors, all of which it rated as either "high" or "very high."[63] Thus, a discount rate of 20% would be appropriate. Moreover, KML's mine was an operational brownfield project; therefore, Kalukundi, as a greenfield project, would be riskier and command a higher discount rate.[64]

35. **Kinsevere**: SRK references a 9.3% discount rate applied to the Kinsevere mine.[65] This discount rate

---

pp. 72-73. *See* First Quadrant Report, ¶ 100 for an explanation of the beta parameter.

56 BDO increased the beta calculated from its sample of companies from 1.04 to a range of 1.15 to 1.3. BDO provides no explanation, sources, or reasoning for the methodology or magnitude of its increased beta or how much each of the underlying risk factors affected the increase.

57 BDO's average discount rate in its high and low scenarios would have been approximately 12% using the median beta of its sample of 10 companies (1.04). Nzuri Copper, Chengtun Mining Group Scheme Booklet, Independent Specialist Report, Appendix 4 (produced by SRK), pp. 72-73.

58 First Quadrant Report, ¶¶ 104-105 and Figure 5.

59 2020 SRK Report, Exhibit 4. Katanga Consolidated Financial Statements for the Years Ended 2016, 2015 (produced by SRK), p. 14; Katanga Consolidated Financial Statements for the Years Ended 2017, 2016 (produced by SRK), p. 14. Katanga Mining Limited, Management's Discussion and Analysis For the years ended December 31, 2017 and 2016, p. 30.

60 On 18 December 2018, KML paid C$ 30 million (about US$ 22 million) to the Ontario Securities Commission ("OSC") over "financial misstatements and failure to disclose DRC risks" in its audited financial statements. Osler, "OSC approves $30 million settlement with Katanga over financial misstatements and failure to disclose DRC risks" (emphasis added). In addition to the payment, KML admitted that it "[f]ailed to disclose material risks to its business, and in particular, the heightened risk of public sector corruption in the DRC."

61 KML's assets included underground and open pit mines, a concentrator, and a metallurgical plant. Katanga (KML) Technical Report - 2009 SRK, p. 11, ¶ 3.1. KML had Proven and Probable Mineral Reserves of 139.8 million MT with a grade of 4.50% CU and 0.44% Co. *Id.*, pp. 14-15, Table 3.4. The 2019 SRK Report estimated mineral resources for the Kalukundi of 13.9 million MT at grades of 3.05% Cu and 0.81% Co. First Quadrant Report, ¶ 35.

62 SRK uses a base case of 14% as a discount rate but does not justify this rate, and it appears that it was simply chosen as the midpoint between 8% and 20% for illustrative purposes. Katanga (KML) Technical Report - 2009 SRK, pp. 17, 195, 198-199.

63 *Id.*, pp. 139-143. SRK points to the risk that "[t]he DRC national and local governments and their agencies will not have the ability to deliver on the infrastructure requirements of the Project." It concluded that even at a discount rate of about 15%, the project had no value (the NPV of the project turns negative at a discount rate between 14% and 16%). *Id.*, pp. 17, 198.

64 *See* n. 38 above. In an updated 2017 report, SRK omitted the "Economic Analysis" by instruction. Katanga (KML) Technical Report - 2017 SRK, p. 31. Therefore, there were no NPVs calculated for the assets. SRK provided discount rates of 10.7% but did not use them to make any calculations. *Id.*, pp. 194, 199. The 10.7% discount rate as of 2017 is the exact same rate stated in the Financial Statements of KML for which KML was forced to admit that it had downplayed risks of operating in the DRC. *See* ¶ 34 above; Katanga Consolidated Financial Statements for the Years Ended 2017, 2016 (produced by SRK), p. 40.

65 2020 SRK Report, Exhibit 4.

did not represent a fair market value rate.[66] Additionally, the discount rate calculations included a country risk premium for the DRC of only 1.65% and an unreasonably low pre-tax cost of debt of only 6.18%.[67]

36. **Kamoa-Kakula**: SRK cites a discount rate allegedly used to value the Kamoa-Kakula mines.[68] This 8.0% discount rate was used by the seller (Ivanhoe Mining) and its consultants for illustrative purposes. Thus, it was not a project-specific, risk-adjusted discount rate,[69] and was not actually applied by the acquirer of the assets (Zijin Mining).[70]

## III. Super Profit Tax

37. The 2018 DRC Mining Code includes a new tax provision, which applies to the profits generated by a mining project in excess of those anticipated in the bankable feasibility study, due to increases in the commodity market prices (the "Super Profit Tax" or "SPT").[71] In my First Report I noted that, in testing whether the SPT should apply, instead of using the commodity prices included in the feasibility study published by RSG in July 2006 (the "2006 FS" or "2006 RSG Feasibility Study"), SRK used the same commodity price projections that it included in its DCF model. As a result, the SPT is not triggered and, thus, has no impact on SRK's DCF valuations.[72] SRK now explains that, as the Project is not yet in operation, it assumes that Africo would submit an updated feasibility study, with updated commodity prices, and thereby avoid any impact of the SPT based on its 2006 FS. SRK states that a new feasibility study would be limited to updating a DCF valuation with "current capital and operating costs and metals prices" and its cost "would be tens to hundreds of thousands rather than millions of dollars."[73] I disagree with SRK.

---

[66] The report stated that only the "Technical Value" component was determined using a 9.3% discount rate, and that "the exclusion of a premium or discount related to market, strategic or other considerations" meant that the valuation did not reflect fair market value. Minmetals Resources Limited, "Major Transaction," HK Circular, 24 February 2012 (produced by SRK), p. IV-160.

[67] The cost of debt was calculated as a Libor rate of 2.18% plus an arbitrary 4.0% margin. Minmetals Resources Limited, "Major Transaction," HK Circular, 24 February 2012 (produced by SRK), pp. IV-166 - IV-167.

[68] 2020 SRK Report, Exhibit 4.

[69] In a press release in May 2015, Ivanhoe Mining illustrated the valuation using an 8% discount rate but did not convey that it was the correct discount rate to use. Ivanhoe Mines Ltd, "Ivanhoe Mines Announcement," Kamoa-Kakula Project, 12 May 2015, p. 8. To this day, in the summary of the Kamoa-Kakula Project on Ivanhoe Mining's website, Ivanhoe values the company using an 8% discount rate for illustrative purposes. Ivanhoe Mines Ltd website, "Kamoa-Kakula Project."

[70] In its circular on the Hong Kong Stock Exchange from 2015, Zijin Mining refers to a 2 July 2015 valuation of its acquisition but does not mention the 8% discount rate as a factor in its valuation. I also note that Zijin Mining considered that its acquisition may have created "enormous synergy" with its other assets in the region, which may have been used to justify a lower discount rate in its valuation. Zijin Mining, "Proposed Non-Public Issuance of A Shares," HK Circular, 3 August 2015, pp. 45-46.

[71] For the SPT to apply, the average market price for a commodity in a given fiscal year must be at least 25% higher than the estimated price for that same fiscal year in the original feasibility study. If this condition is met, the law states that a 50% tax applies to the resulting excess profits. First Quadrant Report, ¶¶ 79-81.

[72] First Quadrant Report, ¶ 82.

[73] 2020 SRK Report, ¶ 28 and n. 15.

38. First, because the only existing feasibility study for Kalukundi is the 2006 FS, that should be the relevant feasibility study for SPT calculation purposes.

39. Second, SRK seems to confuse a feasibility study with the reports it presented in this litigation. The original and only feasibility study for Kalukundi is 14 years old. A new feasibility study would entail updating, among other things: (i) the mineral resource and reserve evaluation; (ii) the mine design and plan to support the updated mineral reserve estimate; (iii) the environmental impact assessment; (iv) the capital and operating costs, based on current estimates, not just by applying escalation factors to 14-year old values.[74] As RPA has explained, the 2006 FS did not meet industry standards and was not a "bankable" feasibility study, but more a pre-feasibility study.[75] The most recent drilling at Kalukundi was performed eight years ago, in 2012, and the 2013 AMEC Report (relied upon by SRK) recommended additional metallurgical test work and drilling be performed at Kalukundi. Contrary to SRK's view, the cost of all the above activities would certainly be in the "millions of dollars."[76] Additionally, possible delays in the completion of a new feasibility study may result in a delay in the deployment of the Project, with a material adverse effect on value. For example, the 2013 AMEC Report noted that "artisanal miners are active on the permit" and drilling activities were halted during the 2011-2012 drill campaign as a result of social unrest from artisanal miners; AMEC concluded that "there is a risk that in future drilling programs, similar periods of unrest may be experienced which may delay or potentially halt program completion."[77] Given the current restrictions on economic activity and on international travel, it is unclear when on-site activities could even be carried out in the DRC.

40. SRK ignores all these considerations in its valuation model when it assumes that a new feasibility study will be undertaken as of the present day. As explained above, a two-year delay in the deployment of the Project reduces SRK's and Stout's DCF valuations by more than 40%.[78]

## IV. Valuation of Africo's Interest in Kalukundi

41. The valuation of Claimants' aggregate loss using the public share price of Africo is straightforward

---

[74] 2006 RSG Feasibility Study; First RPA Report, ¶ 87.

[75] First RPA Report, ¶¶ 20, 128.

[76] 2020 SRK Report, n. 15. The 2013 AMEC Report estimated the costs for recommended additional metallurgical tests and drillings alone at US$ 650,000 (in 2013 dollars). AMEC also mentions a possible need for a second pilot plant testing which would cost US$ 3.0 million (in 2013 dollars). 2017 SRK Report, Exhibit 4 (2013 AMEC Report), pp. 1-7, 1-23, 26-1. For the Lubembe project, a greenfield copper project in the DRC owned by Kinsenda Sarl, the company stated that, as of 2013, it was undertaking the work required to advance the project to a feasibility study level of confidence and had already spent US$ 4.0 million on exploration and, on top of the amounts spent for the pre-feasibility study, it budgeted a further US$ 9.0 million for the compilation of the feasibility study. For the Musonoi Est project, another greenfield copper/cobalt project in the DRC, Ruashi Mining had already spent US$ 1.8 million on the feasibility study and budgeted an additional US$ 6.8 million for the compilation of the feasibility study. **ECF. 93**, Claimants' Submission dated 30 April 2020, Exhibit 7, pp. 10, 42-43 of 811.

[77] 2017 SRK Report, Exhibit 4 (2013 AMEC Report), p. 4-27.

[78] *See* ¶ 5 above.

and does not require any further calculations. On the contrary, the DCF valuations of 100% of the Kalukundi mining rights need additional adjustments to arrive at an estimation of Claimants' aggregate loss. The first adjustment is required in order to determine Africo's economic interest in Kalukundi: because Africo was responsible for funding 100% of the development of the Project, its 75% equity share (which would be reduced by 5% upon renewal of the mining license according to the 2018 DRC Mining Code) was worth less than 75% of the economic value of the Project, as SRK incorrectly assumes. In their latest submissions, whereas the Government applies the correct calculations, SRK refuses to do so, without any valid justification.

42. First, SRK states that applying a 30% discount rate in the first year would somehow "absorb any variation from the 75% ownership."[79] SRK's argument is untenable. The higher discount rate for the first year is applied to the Project to account for risks that have nothing to do with the fact that Africo was responsible for funding the Project, as stipulated in the Swanmines Agreement.[80]

43. Second, SRK argues that its DCF valuation of the Project is calculated on an "unleveraged basis" and, thus, it would be more valuable if the effect of leverage is included.[81] SRK seems to suggest that by understating the DCF value and by overstating Africo's economic share of that value at the same time, the end result would somehow be correct. SRK's argument is nonsensical. In any case, according to both Africo's internal financial models and the 2008 SRK Report, the valuation of the Project should not include debt.[82]

44. Third, regarding the additional 5% ownership transfer at license renewal, which would decrease Africo's equity share from 75% to 70%, SRK rejects it based on the irrelevant point that it is a new provision of the 2018 Mining Code for which it has not found examples of how it has been implemented. SRK also points to a "parallel" 5% transfer provision in the 2002 Mining Code (which was maintained in the 2018 Mining Code and the percentage increased from 5% to 10%) that applies to licenses that are first issued, not license renewals. SRK states that, according to its review, for which it only provides one example, such provision did not historically apply to companies that had a joint venture with the state-owned mining company Gécamines and, thus, SRK is "skeptical" it would apply to Africo.[83] SRK's point is irrelevant, as this older provision never applied to renewals. In conclusion, there is no reason to value the mining rights assuming that the DRC would not exercise its right to increase its ownership at the time of license renewal.

45. **Figure 3** below shows the value of Africo's equity interest in the Project starting from the DCF valuations for 100% of the Kalukundi mining rights proposed by the Government and Claimants in

[79] 2020 SRK Report, ¶ 109.

[80] First Quadrant Report, ¶¶ 134-148.

[81] 2020 SRK Report, ¶ 110.

[82] First Quadrant Report, ¶ 94 and n. 128.

[83] 2020 SRK Report, ¶¶ 111-112.

November 2019 and April 2020, and the US$ 150 million amount the Government uses from the 2008 OZ Africa Memo. The figure also calculates Claimants' alleged aggregate share of Africo's interest and subtracts the value of the returned property.[84]

**Figure 3 - Claimants' Aggregate Loss Based on Government's and SRK's DCF Values**

| | Calculations | Government 2019 | Claimants 2019 | Government 2020 | Claimants 2020 | OZ Africa Memo |
|---|---|---|---|---|---|---|
| | | (US$ Millions) | | | | |
| | | (1) | (2) | (3) | (4) | (5) |
| 1. DCF Value of Kalukundi | | 188.7 | 387.2 | 259.0 | 562.4 | |
| 2. Africo's Interest | | 109.0 | 259.3 | 151.5 | 383.3 | 150.0 |
| 3. Claimants' Share | R2 x 65% | 70.9 | 168.5 | 98.5 | 249.1 | 97.5 |
| 4. Property Returned | R2 x 24% | 26.2 | 62.2 | 36.4 | 92.0 | 36.0 |
| 5. **Claimants' Loss** | R3 - R4 | **44.7** | **106.3** | **62.1** | **157.1** | **61.5** |

I solemnly declare upon my honor and conscience that the contents of this expert report are true and correct and that the opinions set forth herein are my considered and honestly held opinions on the issues I address.

Dr. Daniel Flores

Managing Director

Quadrant Economics LLC

[84] First Quadrant Report, ¶¶ 149-155 and Figure 11; 2020 SRK Report, ¶ 12; QE−3, DCF and Calculations, tab "Control Panel"; **ECF. 92**, Government's Submission dated 30 April 2020, pp. 5, 14 (OZ Africa's US$ 150 million amount allegedly reflected Africo's 75% equity share in the Project).