# Exhibit 4

**To:** "'Vania Baros'" [redacted]
**From:** "Matthew J Fisher"
**Sent:** Wed 4/1/2009 5:29:04 AM (UTC)
**Subject:** FW: Africo FS, MD&A, AIF
Avenant 4 EN 30-01-2009.doc
PV du 15 janvier 2009.pdf
Consent Resolution April22 08.pdf
Simplified feas model updated.xlsx
Appendix 9 - Client service report (Draft 1).doc

Pretty quick response from Michael. I also spoke to Chris about the authorised share capital point, will explain further when we next speak.
KR
Matthew

---

**From:** Michael O'Brien [redacted]
**Sent:** Tuesday, March 31, 2009 8:31 PM
**To:** Matthew J Fisher
**Cc:** Chris Theodoropoulos
**Subject:** RE: Africo FS, MD&A, AIF

Hi Matthew

I have responded in the body of your email below.

Kind regards,

Michael

---

**From:** Matthew J Fisher [redacted]
**Sent:** March 31, 2009 8:42 AM
**To:** Michael O Brien
**Cc:** Chris Theodoropoulos
**Subject:** Africo FS, MD&A, AIF

Dear Michael,

First, I trust that Douglas signed the Balance Sheet and sent it back!
Yes he did  we are currently tweaking the AIF and will file later this morning.

I have some  general queries arising from review of AIF, MD&A and PWC Report. You touched an a couple of the following items during the conference call of the Audit Committee and PWC, but I would nonetheless be gratefulif you would look at the following questions and requests and respond in due course.

* Do you have a copy of an English translation to Amendment 4 to the Swanmines JV?
Please see attached  our French speaking audit manager was not impressed with the quality of the translation (despite it having been certified) and in respect of critical issues we will seek clarification using the French version.

* Do you know what the legal ramification is for Africo of Amendment 4 having been signed with Akam (not Africo) and the responsibilities and obligations of Akam not having been assigned to Africo? This doesn't look right to me.
This was a major concern that Zahra had, and I have attached the email received from our in-house lawyer in the DRC in this regard. I will be more comfortable once Africo Resources (DRC) Sprl becomes a party to a consolidated JV agreement.

* Also, do you know the status of the 'consolidated' JV/association agreement that was supposed to be agreed between the parties within 3 months of Amendment 4?
I am following up  there was a management meeting held with Swanmines on March 26 where this process was meant to be put in motion and I am waiting for feedback on this.

* Can you send me something about the Mporokoso project. I don't know anything about it.
There is a section on this property on our website in the projects section  www.africoresources.com.
I will spend some time in the next week or so updating the website as it has fallen out of date, particularly in respect of employees.

* I note that Africo has unlimited number of authorised common shares without par value. Technically what does this mean?
I understand it to mean that are we will never have to go back to shareholders to increase our share capital, and we not restricted to a specific price when issuing shares (as we would be if we had specified shares of specific denomination). This is the standard way of setting things up for listed companies in Canada.

* Can you tell me something about the 2008 option incentive plan with 10m available common shares? Can you send me a copy of it please.
Please see copy of incentive plan attached to April 22, 2008 minutes. The increase over the previous plan was in anticipation of us issuing additional options to new directors as we had limited room in the old plan.

* I see that management prepared a cash flow analysis of Kalukundi project using three scenarios. Would you mind sending those models across to me please?
The simplified feasibility model is attached. Note that undiscounted cash flow is used for determining if we have impairment under Canadian GAAP.

* There were $10.5m of claims from lawyers and consultants while management have accured $500k. Is that enough? Can you let me know the status of those claims.
We accrued a settlement for Lukombe of $400,000 and Kasongo of $228,850 at year-end, which amounts were paid post year end. Some partial payments had been made in respect of these claims prior to the year end. The largest claim was from a company called Multiseco in the DRC who were looking for $8.6million Tony manages this relationship and sent me an email saying that no accrual was necessary at year end.

* PWC should have provided you with a summary of the control weaknesses arising from their work int he DRC. Please provide me with a copy.
Please see attached PWC client service report in respect of the DRC.

* In item 21 of the Management Representation Letter to PWC there is confirmation that Africo have reflected all outstanding debt. This is zero, right?
Correct, other than normal accounts payable.

* In PWC's Summary of Adjusted and Unadjusted Differences, item 2 is an invoice incorrectly accrued for current year-end services provided by Envirolution Consulting subsequent to year-end. Can you explain this a bit more and tell me who they are?
Envirolution did the Environmental and Social Impact assessment that we were required to do to be in compliance with IFC and World Bank guidelines, a copy of which is on our web-site. I have checked our records and have not made any payments to Envirolution subsequent to the year end I will follow up on why the accrual was made and will revert.

* I trust you have updated the outstanding share data on page 10 of the MD&A.
Yes - the information is now correct as at March 25, 2009.

I will send through my suggested budget proposal during the course of tomorrow.
I am interested to see and discuss this with you. In respect of the budget, Tony has informed me that he was not able to terminate two DRC based employees before the end of March as was originally planned. We did not have anyone for Sambu, our GM administration, to hand over to, as Aziz, the consultant who will manage this office going forward was had to return home on break on March 26. Ghislaine, our in-house lawyer is in the process of handling legal matters related to retrenchments and other claims . The combined costs of these two individuals is approximately $25k per month that will continue through April.

Thank you.
Kind regards,
Matthew

**Matthew Fisher**
[redacted]

This e-mail is confidential and may also be privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, please note that the disclosure, distribution or copying of this email is strictly prohibited. Please notify me immediately by return e-mail or by telephoning the number shown above and delete the message from your computer. It is also recommended that any attachments in this message be scanned prior to opening, as I cannot accept liability for any loss or damage caused by software viruses.

# COMPANY FORMATION AGREEMENT
## N° 460/10269/SG/GC/2001

## AMENDMENT N°4

**BETWEEN**

The **GÉNÉRALE DES CARRIÈRES ET DES MINES**, **GÉCAMINES** in short, **GCM** in abbreviation, state-owned company governed by Congolese law, formed by Decree N°049 of 7 November 1995, registered with the New Trade Register of Lubumbashi under N°453 and with its head office established at Boulevard Kamanyola, n°419, in Lubumbashi, B.P. 450, in the Democratic Republic of Congo, represented for the purpose hereof by Mr **ASSUMANI SEKIMONYO**, Chairperson of the Board of Directors, and Mr **PAUL FORTIN**, Executive Director, hereafter referred to as **GÉCAMINES** , on the one hand;

AND

Company **AKAM MINING SPRL**, private limited liability company with its head office established at Sandoa n°7, Commune of Lubumbashi, Lubumbashi, Democratic Republic, represented for the purpose hereof by Mr **Pieter DEBOUTTE**, Director, hereafter referred to as **AKAM MINING** SPRL on the other hand.

**PREAMBLE**

A- Considering that GÉCAMINES and company H&J SWANEPOEL FAMILLE TRUST, H&J SPRL in abbreviation, private limited liability company registered with the New Trade Register of Lubumbashi under n°8238, and with its head office at n°16, Avenue Mwepu, Lubumbashi, Democratic Republic of Congo, have signed on the 3rd of March 2001 the Formation Agreement N°460/10269/SG/GC/2001 of the KALUKUNDI ORE BODY MINING COMPANY, SWANMINES SPRL in short, with a capital fixed at 10 000 000 (ten million) constant Congolese Francs, equal to 200 000 (two hundred thousand) USD, distributed between the Parties as 55% for H&J SPRL and 45% for GÉCAMINES, hereafter referred to as the Formation Agreement ;

B- Considering that GÉCAMINES and H&J SPRL have signed on the 28th of September 2001 Amendment N°1 to the Formation Agreement with a view to:

Allocating to the company affiliated to H&J SPRL named SWANROUTES SPRL, the autonomous execution of all road works;
Deciding on the allocation of the dividends on the basis of 60% for the reimbursement of SWANMINES SPRL s additional loans, and on the basis of 35% of the 45% coming to GÉCAMINES as payment to SWANROUTES SPRL of its services for building roads;

[*Three illegible initials appear here*]

C- Considering that GÉCAMINES and H&J SPRL have signed on the 29th of May 2003 Amendment N°2 to the Formation Agreement with a view to extending by twelve months the deadline provided for in Article 4.2 concerning handing in the Feasibility Study;

D- Considering that GÉCAMINES and H&J SPRL have signed on the 18th of May 2004 Amendment N°3 to the Formation Agreement with a view to:

Modifying the structure of the share capital which becomes 75% for H&J SPRL (instead of 55% on signature of the Formation Agreement) and 25% for GÉCAMINES (instead of 45% on signature of the Formation Agreement);
Extending by twenty-four months the deadline concerning handing in the Feasibility Study;
Fixing at 2,5% of the Net Turnover the royalties to be paid to GÉCAMINES for the consumption of its ore deposits;
Settling the resolution of conflicts and disagreements;

E- Considering that in pursuance of the above contractual provisions, H&J SPRL has submitted to GÉCAMINES the Feasibility Study of the SWANMINES Projects;

F- Considering that under Judgment RC 16.195 bis pronounced by the *Tribunal de Grande Instance* of Lubumbashi, on the 19th of September 2006, such a Judgment being confirmed on the 4th of April 2007 by the same jurisdiction under RC 16.885, a distraint has been operated, on the 1st of December 2006, on the 75% of the shares belonging to H&J SPRL and being declared, by the latter, as having been transferred to AFRICO RESOURCES and that the public auction of these shares took place with, as a result, company AKAM MINING SPRL acquiring these shares and de facto become associate of GÉCAMINES in SWANMINES SPRL instead of H&J SPRL;

G- Considering Ministerial Order n°2745/CAB.MIN/MINES/01/2007 of 20 April 2007 on setting up the Ministerial Committee for the Re-Examination of Mining Contracts;

H- Considering Inter-Ministerial Order n°007/CAB.MIN.PORTEFEUILLE/01/2007 and n°2836/CAB.MIN/MINES/01/2007 of 12 May 2007 on protective measures preceding the rereading of partnership agreements for mining state-owned companies and parastatals;

I- Considering the report of the Ministerial Committee for the Re-Examination of Mining Contracts which was made public in November 2007;

J- Considering that the Parties agree to take into account the terms of reference of the Government following the results of the re-examination of the mining partnership contracts as sent to SWANMINES SPRL in letter n°CAB.MIN/MINES/01/0116/2008 of 11 February 2008 from the Mining Department of the Democratic Republic of Congo;

K- Considering the report of the re-negotiation of the terms of the Formation Agreement drawn up and signed by the Parties on 01/10/2008;

**THE FOLLOWING HAS BEEN SETTLED AND AGREED UPON:**

[*Three illegible initials appear here*]

**ARTICLE 1**

Article 1.1 (3) Property of the Formation Agreement, as amended, is completed as follows:

At the end of the transfer of the Property, SWANMINES SPRL will have received, subject to the more standard results of subsequent drillings and the actual production of copper, cobalt and other recyclable mineral matters, definite geological reserves estimated at a minimum of 180 000 tons concerning copper, and 53 000 tons concerning cobalt.

**ARTICLE 2**

A fourth paragraph worded as follows is inserted in Article 2 of the Formation Agreement concerning the OBJECT:

The share capital will be fixed after the actual contributions of the Parties taken into account in the bankable Feasibility Study have been evaluated and will have to be sufficient to ensure that SWANMINES SPRL can be operated. But in the statutes, the Parties have fixed the amount of 10 000 000 (ten million) Congolese Francs, equivalent to 200 000 (two hundred thousand) USD, as seed money to facilitate the formation of SWANMINES SPRL.

Without prejudice to the evaluation of the actual contributions, the Parties agree, in this Amendment, to bring the share capital to 2 000 000 (two million) USD and to maintain the distribution of the share capital thus increased at 75% for AKAM SPRL and at 25% non-dilutable for GÉCAMINES.

The share capital increase will be fully subscribed and paid-up in cash by the Parties. The Parties agree that AKAM SPRL will pay for GÉCAMINES subscription on increase of the share capital and that this advance will be reimbursed to AKAM SPRL, interest-free, from the dividends due by SWANMINES SPRL to GÉCAMINES.

Moreover, the Parties already agree that, in case of future increase of the share capital, the shares of GÉCAMINES will remain non-dilutable, i.e. they will be convertible ipso jure in as many shares as necessary so that the participation of GÉCAMINES is maintained at 25%, and this without GÉCAMINES charging for it.

**ARTICLE 3**

3.1 Paragraph 3.2 (f) worded as follows is inserted in Article 3.2 of the Formation Agreement concerning the Obligations of AKAM SPRL:
As access right to the business, AKAM SPRL will pay GÉCAMINES, as regularisation, a cash bonus in accordance with the provisions of Article 10.4 hereof.

3.2 Paragraph 3.2 (g) worded as follows is inserted in Article Obligations of AKAM SPRL :
AKAM SPRL is under obligation to carry out the Feasibility Study on the entire perimeter covered by the mining claim transferred by GÉCAMINES to SWANMINES SPRL and to submit the report thereof to GÉCAMINES within twelve (12) months after signature hereof.

[*Three illegible initials appear here*]

Notwithstanding the provisions of Article 6 of the Formation Agreement, GÉCAMINES will be in a position to cancel this Formation Agreement before the official termination date should AKAM SPRL fail to respect its obligation as provided for in the previous paragraph, after AKAM SPRL received a formal notice within 30 days of such failure and did not remedy to it.

**ARTICLE 4**

Article 3.3 of the Formation Agreement concerning the Obligations of SWANMINES SPRL , as amended, is modified as follows:

SWANMINES SPRL shall:

a) Reimburse and remunerate the Parties as provided for in the Formation Agreement and this Amendment;
b) Mine the Kalukundi ore body in accordance with the Feasibility Study approved by both Parties, professionally and by respecting and protecting the environment;
c) Market the products resulting from the metallurgical process of the ore;
d) Conform to the principles governing the administrative, financial and other management procedures, tax policy and personnel recruitment criteria, as recommended by the Feasibility Study;
e) Keep up to date and renew mineral rights and mining claims as well as all necessary permits and licences;
f) Face all its obligations as a company with as legal status;
g) Seek to protect and increase the interests of all associates, particularly by allocating orders for supplies and services fairly among such associates and by preferring them to third parties, provided they are competitive.
h) Promote the social development of the surrounding communities, as per terms and conditions to be adopted after consultation with these communities.

**ARTICLE 5**

5.1 The third paragraph of Article 5.1 concerning Advances is completed by the following paragraphs:

AKAM SPRL shall also mobilise the funds required to develop and mine the Kalukundi ore body, and this in accordance with the Feasibility Study. AKAM SPRL will advance funds as loans to SWANMINES SPRL.

These advances will be associate loans of up to 30% of the contribution amount required to develop the mining project and get the commercial production going. These associate loans will be reimbursed by SWANMINES interest-free.

Additional loans to be obtained from AKAM SPRL or its affiliates or on the market through AKAM SPRL or its affiliates, will be reimbursed with interests based on a Reference Rate [*illegible sequence*], any additional rate being submitted to the decision of the Parties under the Equity Clause in particular.

5.2 Article 5.2 of the Formation Agreement is amended and completed as follows:

GÉCAMINES s co-operation in financing will not include any obligation for it to pledge its shares in SWANMINES SPRL.

GÉCAMINES and AKAM SPRL agree also about the principle according to which, where it is incumbent upon AKAM SPRL under the Formation Agreement to find funds, the mineral rights and mining claims brought in SWANMINES SPRL by GÉCAMINES cannot be mortgaged without the prior and written consent of GÉCAMINES which cannot be refused without good reason.

In case GÉCAMINES gives its consent, AKAM SPRL undertakes to send GÉCAMINES any mortgage agreement to be concluded before signing anything and to obtain from financiers, bankers or any other backers as sole mode of realisation of the mortgage, the substitution of SWANMINES SPRL by financiers, bankers or other backers as provided for in Article 172 Paragraph 2 of the Mining Code as well as by any third party named by them.

To do this, the Parties agree that AKAM SPRL will have the clause inserted in the mortgage agreement or deed, clause according to which the financiers, bankers or other backers will maintain the participation of GÉCAMINES in the project during the realisation of the mortgage by substitution of SWANMINES SPRL by such financiers, bankers and other backers or by any third party named by them.

This provision will apply mutatis mutandis to SWANMINES SPRL or any other entity that will seek or put at the disposal of SWANMINES SPRL any finance after the Commercial Production Date.

**ARTICLE 6**

Article 6.4 of the Formation Agreement concerning the Liquidation is amended and completed as follows:

If the Associates agree on the dissolution or liquidation of SWANMINES SPRL, the provisions of the Statutes of SWANMINES SPRL concerning liquidation will apply in accordance with the laws of the Democratic Republic of Congo.

Nevertheless, the Parties agree that in case of dissolution or liquidation of SWANMINES SPRL, the mineral rights and mining claims brought in by GÉCAMINES will be ceded back to GÉCAMINES without any compensation in return except if the dissolution or liquidation is the result of a serious and known breach by GÉCAMINES.

**ARTICLE 7**

Article 10 concerning the Organisation is replaced by the following provisions:

Article 10: GENERAL MEETING

10.1 POWERS OF GENERAL MEETING

The General Meeting, regularly constituted, represents the universality of the Associates. It has the most extended powers to make or ratify the articles that interest SWANMINES SPRL.

[*Three illegible initials appear here*]



10.2 ANNUAL GENERAL MEETING

The Annual General Meeting is held within three (3) months after the end of each company s year, at the head office or a venue designated in the notification to attend the meeting, with a view to hearing the reports on the management of SWANMINES SPRL presented by the Board of Directors, to examining the annual accounts of SWANMINES SPRL, to hearing the report of the Auditors on management and the annual accounts under examination with a view to ruling on these documents and to relieving from responsibility, by separate vote, the members of the Board of Directors and the Auditors, to electing new members on the Board of Directors or new Auditors or to renew the mandate of the Auditors and, finally, with a view to ruling on any other matter written on the agenda.

10.3 EXTRAORDINARY GENERAL MEETING

a) An Extraordinary General Meeting can be convened at any time and as many times as required in the interest of SWANMINES SPRL. It must be convened within fifteen (15) working days, at the request of any Associate representing at least one-fifth of the share capital or at the request of the Chairperson or the Vice-Chairperson or two members of the Board of Directors or Auditors. Extraordinary General Meetings are held at the date, venue and time indicated on the notification to attend.

b) A Budget General Meeting will be automatically held between the 1st of September and the 31st of December of each fiscal year with a view to reviewing and approving the budget proposal of SWANMINES SPRL for the following year, to be approved beforehand by the Board of Directors.

10.4 GENERAL MEETING NOTIFICATION AND AGENDA

a) A General Meeting, whether Annual or Extraordinary, is held when convened by the Chairperson of the Board of Directors or, in his/her absence, the persons mentioned in Article 10.3 (a) of the Formation Agreement, as amended.

b) Notifications to attend an Annual General Meeting are sent by letter, fax or e-mail. Notifications to attend are addressed to Associates at least twenty (20) working days before. They must contain the agenda and indicate the date, venue and time of the Meeting. Any document relating to the agenda and which must be examined by the General Assembly must be sent with the notification.

10.5 PROXY

Any shareholder can be represented at the General Meeting by a specially authorised representative. Joint holders, usufructuaries and bare owners respectively must be represented by only one person.



10.6 BOARD OF THE GENERAL MEETING

Any General Meeting is chaired by the Chairperson of the Board of Directors or, failing that, by the Vice-Chairperson or, failing that, by a member of the Board of Directors named in this regard by the majority of the other members. The Chairperson appoints the Secretary. The Meeting selects one or several scrutineers from among its members.

10.7 ATTENDANCE AND DECISION QUORUM

a) The General Meeting rules validly if the number of shares represented constitutes more than half of the share capital and if each associate is present or represented. General Meeting decisions are taken by a majority vote. Each share gives rise to one vote.

b) In case a quorum is not reached, a new notification to attend is addressed to the Associates within seven (7) working days of the first meeting, with the same agenda, by the person who chaired the session, at a date and time set by that person. A period of at least twenty (20) working days shall separate the date at which the first meeting was held and that proposed for the second meeting. During the second meeting, each associate shall be present or represented.

c) However, the following matters will be decided upon by the General Meeting of Associates on ¾ of the votes of members who are present or represented, subject to contrary legal provisions:

(i) Modification of the share capital;
(ii) Transformation of the company into another type;
(iii) Loans for development purposes
(iv) Distribution of dividends in the form of Products.

If the decision concerns the dissolution or the liquidation or the transfer of activities or still a change in the business of SWANMINES SPRL, the required majority is four-fifth of the votes present or represented.

**ARTICLE 8**

Article 11 of the Formation Agreement concerning the General Manager and Assistant General Manager is replaced by the following provisions:

Article 11: ADMINISTRATION OF SWANMINES SPRL

The administration of SWANMINES SPRL, with the structure, the powers and the running of its management and monitoring organs in particular, is organised as follows:



11.1 BOARD OF DIRECTORS

11.1.1 STRUCTURE AND CONDITIONS OF APPOINTMENT OF THE MEMBERS OF THE BOARD OF DIRECTORS

a) The administration of SWANMINES SPRL will be ensured by the Board of Directors composed of eight (8) members.

b) The members of the Board of Directors are appointed by the General Meeting as follows: four (4) will be proposed by GÉCAMINES and four (4) will be proposed by AKAM SPRL. The Chairperson of the Board of Directors will be selected from among the members proposed by AKAM SPRL and the Vice-Chairperson will be selected from among the members proposed by GÉCAMINES. The Board will select a Secretary from among the other members. However, the Board can select a Secretary from among the personnel of SWANMINES SPRL or outside of the company.

c) Whether or not they are associates, the members of the Board of Directors are appointed for an indeterminate period and exercise their functions until their successors are appointed.

d) In case of a vacancy, due to a death, a resignation or another reason, the remaining members of the Board of Directors representing the same Associate as the Member who gave rise to a vacancy, can temporarily provide for his/her replacement until the next General Meeting which will proceed with the appointment of a new member.

11.1.2 DUTIES OF THE BOARD OF DIRECTORS

a) The Board of Directors determines the orientations of the activities of SWANMINES SPRL and sees to their implementation. It takes strategic decisions in economic, financial and technological matters. It acts in the name and on behalf of SWANMINES SPRL.

b) The Board of Directors is vested with the most extensive powers to carry out all administrative and legal proceedings in the interest of SWANMINES SPRL. It has jurisdiction to carry out all the proceedings that are not reserved expressly by law or the Statutes to the General Meeting: financial management, personnel-related contracts, sales and acquisitions, establishment of administrative offices, agencies or branches.

c) Any proceedings committing SWANMINES SPRL, any powers and proxies, and particularly any proceedings relating to the execution of the resolutions of the Board of Directors, to which a civil servant or ministerial officer gives his/her assistance, particularly deeds of sale, acquisition or exchange of building, deeds of mortgage constitution or acceptance, releases with or without payment notice, will be valid on condition that they are signed by one or several persons acting under a proxy given expressly by the Board of Directors.

[*Three illegible initials appear here*]

d) Opening representation offices, agencies and branches of SWANMINES SPRL overseas will be decided upon by the Board of Directors by a four-fifth majority. Offices, agencies and branches thus open remain under the management and control of the headquarters.

11.1.3 DAILY RUNNING MANAGEMENT COMMITTEE

a) From the date of commercial production, the daily running of SWANMINES SPRL will be entrusted to a Management Committee made up of seven (7) members maximum, of whom three (3), i.e. the Assistant General Manager, the Production Manager and the Human Resources Manager, will be appointed by the members of the Board of Directors who were proposed by GÉCAMINES, and four (4), i.e. the General Manager, the Finance, Accounting and Budget Manager, the Supplies Manager and the Marketing Manager, will be appointed by the members of the Board of Directors who were proposed by AKAM SPRL.

The General Manager or, in his/her absence, the Assistant General Manager, will chair the Management Committee.

Associates have a free hand to replace their representatives on the Management Committee.

b) The Board of Directors determines the powers, the attributions, the appointments or indemnities of the members of the Management Committee. The Board can revoke at any time the decision taken by it in this regard.

The Board of Directors will determine the remunerations of the Management Committee members by taking into account the remunerations that are usually being paid in the international mining sector for equivalent posts and the specific situation of the company.

11.1.4 DETAILS OF MEETINGS OF THE BOARD OF DIRECTORS

a) Notification to Attend

The Board of Directors gathers when convened by and under the Chairpersonship of the Chairperson or, in case of unexpected difficulty, the Vice-Chairperson or, failing that, the member of the Board of Directors named by at least three other members.

Notifications to attend a meeting of the Board of Directors are done by letter, fax or e-mail. They must contain the agenda, indicate the date, venue and time of the meeting. Any document relating to the agenda and which must be examined by the General Assembly must be sent with the notification.

[*Three illegible initials appear here*]

b) Holding Meetings

Ordinary meetings of the Board of Directors must be held at least twice a year: the first meeting is to be held before the end of March and dedicated to the approval of the financial statements of SWANMINES SPRL for the previous fiscal year; the second meeting is to be held after September but before the end of December and is to be dedicated to the approval of the budget for the following fiscal year.

Meetings are held on the date, venue and time indicated on the notifications to attend which must provide for a notice of at least fifteen (15) working days.

Moreover, the Board of Directors can be convened to attend an extraordinary meeting each time it is required in the interest of SWANMINES SPRL or each time at least two members require it.

The members of the Board of Directors can attend the meetings of the Board of Directors by teleconference and can express their views and vote in the same way.

c) Proxy

Any detained or absent member can, by simple letter, fax or e-mail, or any other means of electronic communication, give one of his/her colleagues representing the same Associate as him/her proxy to represent him/her during a session of the Board, and to vote on his/her behalf in that session. In such a case, when it comes to voting, a mandator will be deemed present. A delegate can also represent more than one member.

d) Quorum

The Board of Directors can only deliberate and rule validly if at least half of its members are present or represented and if each Associate is represented. In case such a quorum is not reached, a new notification to attend will be addressed, within seven (7) working days of the first meeting, to the members, with the same agenda, by the person who chaired the session, at a date and time set by that person. A period of at least fifteen (15) working days shall separate the date at which the first meeting was held and that proposed for the second meeting. During the second meeting, at least one member representing each of the two Associates shall be present or represented.

[*Three illegible initials appear here*]

e) Deliberations and Decisions

Any decision of the Board of Directors is taken by simple majority vote of the members present or represented. However, the Board of Directors shall rule with three-quarters of the members being present or represented concerning prior authorisations for agreements concluded between SWANMINES SPRL and one of the members of the Board of Directors or Associates (Agreements with Associates and/or Affiliate Companies).

If, during a session of the Board of Directors gathering the quorum required to deliberate validly, one or several members abstain, the resolutions are taken validly by majority of the other members present or represented.

In case of equality of votes, the vote of the Chairperson of the Board of Directors will be a casting vote.

f) Minutes

The deliberations of the Board of Directors are recorded in the minutes that are signed by the members who are present or representing other members at the Board meeting. The minutes are recorded in a special register. Delegations as well as notices and votes given in writing, by fax or other means are appended thereto.

Copies or extracts of such minutes to be produced in court or elsewhere are signed by the Chairperson or, failing that, by a member of the Board delegated to such a task.

11.1.5 RESPONSIBILITY OF THE MEMBERS OF THE BOARD OF DIRECTORS

The members of the Board of Directors do not contract any personal commitment relating to the commitments of SWANMINES SPRL, but are responsible for carrying out their mandate and for their management mistakes, in accordance with the law.

11.1.6 INDEMNITIES TO THE MEMBERS OF THE BOARD FO DIRECTORS

The General Meeting can grant members a fixed indemnity to be entered into the general expenses account. The Board of Directors is also authorised to grant members put in charge of special duties or assignments, indemnities to be deducted from the general expenses.

[*Three illegible initials appear here*]



11.1.7 LEGAL ACTIONS

Legal actions, as defendant or plaintiff, as well as any withdrawal carried out in the name of or against SWANMINES SPRL, are followed up and carried out by the Board of Directors through its Chairperson; in case the Chairperson cannot make it, such a task will be carried out by the Vice-Chairperson or, failing that, by any other member of the Board of Directors expressly delegated in this regard.

11.1.8 INDEMNIFICATION

Without prejudice to applicable legal provisions, SWANMINES SPRL will indemnify any member of the Board of Directors or the Management Committee or any proxy, as well as his/her heirs and legal representatives for any obligation contracted or any expense made reasonably on behalf of SWANMINES SPRL for any action or procedure, on condition that such action or procedure has been carried out honestly and in good faith in the best interest of SWANMINES SPRL.

11.2 AUDITORS AND AUDITS

a) The operations of SWANMINES SPRL are monitored by Auditors appointed and revoked by the General Meeting of Associates, with one Auditor proposed by each Associate and for a two-year mandate, renewable once.

b) Auditors have the unlimited right to monitor and audit all the operations of SWANMINES SPRL. They can, without having to travel, become acquainted with the books and any documentation (correspondence, minutes, accounting records and accounts) of SWANMINES SPRL they deem useful in carrying out their task.

c) Auditors must submit individually or collectively to the General Meeting, and circumstantially to the Board of Directors or the Management Committee when these have asked them to carry out specific tasks, the results of their work accompanied by recommendations deemed useful by them for putting right recorded anomalies or for improving the internal control and/or the productivity of SWANMINES SPRL.

d) Auditors are entitled to receive assistance, at SWANMINES SPRL s expense, from a firm of auditors or chartered accountants of their choice.

e) The provisions relating to the responsibility of the members of the Board of Directors applies mutatis mutandis to the Auditors.

11.3 PERSONNEL OF SWANMINES SPRL

[*Three illegible initials appear here*]



11.3.1 General

The Parties agree in principle that the employees who make up the workforce, the managers and the support staff with suitable qualifications will be recruited as a priority from among the personnel of GÉCAMINES.

11.3.2 RESPONSIBILITIES OF SWANMINES SPRL TOWARDS THE PERSONNEL OF GÉCAMINES

SWANMINES SPRL will only be contractually responsible for paying the salaries of the personnel coming from GÉCAMINES after it has hired them. All salaries, remunerations, social benefits and other obligations vis-à-vis such personnel, obtained from GÉCAMINES, will remain the sole responsibility of GÉCAMINES including, with no limitation, commitments relating to pension funds, medical aid schemes and any other commitments prior to the date at which SWANMINES SPRL hired such personnel.

11.3.3 SALARIES AND SOCIAL BENEFITS

SWANMINES SPRL will pay its personnel an appropriate salary and will offer them social benefits in accordance with the Labour Regulations of the Democratic Republic of Congo. Moreover, all other obligations and all other administrative aspects with regard to the personnel hired by SWANMINES SPRL will remain its exclusive responsibility.

11.3.4 TECHNOLOGY TRANSFER AND TRAINING

AKAM SPRL undertakes to make sure that SWANMINES SPRL will implement a technology transfer policy, in relation to mining extraction, metallurgical processing and modern management techniques.

AKAM SPRL undertakes to make sure that SWANMINES SPRL will send its personnel to receive appropriate training to enable them to carry out their work competently and to give them an opportunity to learn new techniques that will enable them to progress in the future towards more complex and demanding posts. This policy aims to encourage employees to show initiative and to take on responsibilities to reach their maximum potential.

GÉCAMINES undertakes to facilitate the action of AKAM SPRL as regards technology transfer and the training of SWANMINES SPRL personnel.

**ARTICLE 9**

Article 12 of the Formation Agreement concerning  Programme and Budget  is amended as follows:



PROGRAMME AND BUDGET

Operations will be carried out and expenses will be set out exclusively in conformity with the Programme and Budget approved by the General Meeting of Associates as per the terms and conditions defined in the Formation Agreement and its amendments.

a) Programme and Budget Presentation

A programme proposal and a budget proposal will be drafted by the Management Committee of SWANMINES SPRL and submitted for approval to the Board of Directors that will submit them to the General Meeting of Associates.

During the execution period of any adopted Programme or Budget and at least three (3) months before expiry, the Management Committee will prepare a Programme proposal and a Budget proposal for the subsequent period and will submit them for examination to the Board of Directors, before their approval by the General Meeting of Associates, in accordance with the Statutes of SWANMINES SPRL.

b) Examination of the Programme and Budget Proposals

The Board of Directors will examine the Programme and Budget proposals within fifteen (15) working days of their reception before their approval by the General Meeting of Associates.

Each Programme and Budget adopted will be potentially reviewed and adapted, irrespective of their duration, at least once a year, during a meeting of the Board of Directors on condition that such review does not lead to a gap of more than 10% of the Budgets and Programmes approved by the General Meeting of Associates.

c) Programme and Budget Approval by Associates

Within fifteen (15) working days of the adoption by the Board of Directors of the Programme and Budget, with or without modification, the Board of Directors will send in writing the said Programme and Budget to each Associate for approval by the General Meeting of Associates.

d) Programme and Budget Modifications

The General Manager will seek the prior approval of the Board of Directors for any significant gap (more than 10%) with an adopted Programme and/or Budget.

Any modification introduced shall be justified subsequently during the next meeting of the General Meeting of Associates.

[*Three illegible initials appear here*]



**ARTICLE 10**

The following provisions of Article 13 of the Formation Agreement concerning the Distribution of Benefits and Control are amended as follows:

10.1 Article 13: DISTRIBUTION OF BENEFITS AND CONTROL becomes Article 13: REMUNERATION OF THE PARTIES

10.2 Article 13.1 Distribution of Net Profit

Distribution of net profit during the period of reimbursement of initial loans made available by AKAM SPRL.

Subject to sufficient funds providing for the working capital of SWANMINES SPRL, 70% of the tax-free profit will be allocated to reimburse the loan capital and interests, and 30% to pay the Parties, in proportion to their contribution to the share capital of SWANMINES SPRL .

10.3 Article 13.5 as amended by Article 4 of Amendment N°3 to the Formation Agreement is amended as follows:

In compensation for the consumption of the Kalukundi ore body, SWANMINES SPRL will pay GÉCAMINES 2,5% of the Gross Turnover in the form of royalties. Gross Turnover refers to total product sales made by SWANMINES SPRL.

10.4 Paragraph 13.6 on Cash Bonus and worded as follows is inserted:

As access right to the business, AKAM SPRL will pay GÉCAMINES, as regularisation, a non-refundable cash bonus of 6 400 000 (six million four hundred thousand) USD.

AKAM SPRL shall, as a result, pay in four instalments of 1 600 000 (one million six hundred thousand) USD each, the first instalment being due within fifteen (15) working days of the signature hereof and the other instalments on the anniversary date at which the first instalment was paid.

Moreover, the Parties agree that AKAM SPRL will make up, to the benefit of GÉCAMINES, the amount and the payment of the cash bonus, on the basis of USD 35/tCo, in case a tonnage exceeding 180 000 tons of copper becomes manifest.

10.5 Point 13.7 entitled Distribution of Service and Provision Orders between Associates is inserted and worded as follows:

Each time SWANMINES SPRL will need to resort to subcontracting to run its business, such as requesting mining services and passing orders for supplies and/or services, it will preferably and equitably require such services from Associates or their Affiliate Companies that shall carry them out professionally and competitively. In case SWANMINES SPRL needs to resort to third parties, priority will be given to local companies fulfilling the requirements.

[*Three illegible initials appear here*]



**ARTICLE 11**

Article 14 of the Formation Agreement entitled Restriction to the Cession (of Shares) is amended as follows:

SALE AND TRANSFER OF SHARES

Except as expressly provided otherwise, no Associate, during the execution of the Formation Agreement, will be allowed to transfer any share of which s/he is the owner or which s/he could acquire subsequently, except in accordance with the provisions hereof.

14.1 General Principles

Any transfer of shares is carried out with a transfer declaration recorded in the Associates register, dated and signed by the transferor and the transferee or their proxies, or with any other legal means.

14.2 Free Transfers

Any Party can freely transfer one, several or all of its shares to the other Party or an Affiliate Company, it being understood that, concerning Affiliate Companies, (i) shares will be ceded back to the transferor if the transferee ceases to be an Affiliate Company and that (ii) the deed or agreement of transfer shall expressly provide for such a retrocession.

Any free transfer must be notified to the Board of Directors eight (8) working days before the effective transfer date. Such notification must be accompanied by a document proving that the transferee is an Affiliate Company, a document confirming that the transferee subscribes to the Formation Agreement and that it agrees to cede the shares back in case it ceases to be an Affiliate Company.

14.3 Temporary Non-Transferability

Without prejudice to the provisions concerning the free transfer of shares, the Parties consider that, due to the importance of the Project they intend to develop within SWANMINES SPRL, it is in the interest of all the Parties that the shares be non-transferable during the period going from the date at which this Amendment comes into effect to the date of Commercial Production which is to be carried out from the metallurgical extraction plants to be built in accordance with the Feasibility Study approved by the Parties.

Nevertheless, the Parties agree that this provision will only apply after the cession, at the end of the General Meeting of SWANMINES SPRL that will be convened very shortly for approval thereof, of the 750 shares of SWANMINES SPRL held by AKAM SPRL back to AFRICO RESOURCES (DRC) in pursuance of the amicable settlement of the dispute opposing these two companies.

14.4 Transfer of shares by Associates and Pre-emptive Right



Without prejudice to the provisions of the above section, the transfer of shares will be carried out as follows:

Right to Make an Offer

If a Party decides to sell all or part of its shares, that Party (the Seller) will notify the other Party (the Buyer) of its intention to sell and will offer the buyer the possibility to make an offer for such shares. The period during which the Buyer will have the possibility to make an offer will be determined by the Seller but such a period shall not be less than 30 calendar days.

The Seller is under no obligation to give the other Party the possibility to make an offer, in case the transfer of all or part of its shares concerns an Affiliate Company or in case all or part of its shares are being used as collateral security as far as financing the operation is concerned.

However, the Seller is under obligation to give the other Party the possibility to make an offer in case of merger, funding, unification or restructuring of the Seller involving a change of Control, as well as in the case of collateral security being fulfilled by a mortgage creditor. Control refers to a company or entity holding directly or indirectly more than 50% of the voting rights at the General Meeting of that company or entity.

14.5 Offer by Third Party and Pre-Emptive Right

Except in the case of Article 14.2 hereof, a third party can offer to purchase shares from an Associate.

Acceptance of such an offer is conditioned by the bidder agreeing to respect the provisions of Article 14 of the Formation Agreement.

An offer by a third party shall be irrevocable for a period of sixty (60) days. Within ten (10) days of receiving the offer, the Associate being approached will address a copy thereof to the other Associate.

The latter has a pre-emptive right on all shares likely to be ceded.

In case there are more than two Associates, distribution of the shares will be normally carried out in proportion to the number of shares held initially by each Associate, unless both Associates come to an arrangement.

This pre-emptive right is to be exercised within thirty (30) days from the date of notification of the offer as sent by the Associate initially approached.

If, within the previously-mentioned deadline, the other Associate has not accepted or accepts only partially the offer of the transferor, exercising the pre-emptive right is presumed to have been refused either in whole or concerning the part the other Associate does not want to repurchase. The transferor will be able to accept the offer of the third party and conclude the transfer with the bidder concerning the part of the shares the other Associate did not want to repurchase. In this case, Associates in SWANMINES SPRL will take all the measures and carry out all the formalities as may be required for registering the third party in the book of SWANMINES SPRL as Associate in SWANMINES SPRL.

[*Three illegible initials appear here*]



14.6 Mode of Execution of the Transfer of Shares between Associates

Unless other conditions for the execution of the sale of shares are agreed upon between the Associates, the terms and conditions of execution of such a sale are as follows:

a) Selling Price

The selling price will be payable in full by certified cheque on the date of execution of the transaction in exchange for the transfer of shares being sold, free and clear of any burden.

b) Execution of the Sale

The sale will be carried out at 10 am, at the headquarters of SWANMINES SPRL, on the fortieth (40th ) day following the acceptance, by the other Associate, of the offer contained in the transferor s offer.

c) Resignation of the Transferor s Representatives with the Board of Directors

On the execution date, the transferor will provoke, if s/he transferred all the shares, the resignation of his representatives with the Board of Directors. The transferee will be subrogated in all the transferor s rights and obligations.

14.7 Pledge of Shares

An Associate (the Pledger ) can pledge or burden by any other means all or part of his/her shares in favour of any person (the Pledgee ), if such a pledge or the other commitment expressly holds that s/he is subordinated to the Formation Agreement and to the rights which the other Associate draws for the Formation Agreement and if, in case of failure by the Pledger, the Pledgee agrees with the Pledger to transfer without any reserve all the rights on the Pledger s shares to the other Associate or to any person, in this order of preference, who could subsequently be empowered to acquire these shares, against payment to the Pledgee of all the sums of which such shares guarantee payment. From that moment onwards, the Pledger authorises irrevocably such a payment.

14.8 Transfer Conditions

As a necessary condition so that the Seller is free from any obligation according to the terms of the Formation Agreement, the transfer of the shares of a Party to a third party is submitted (i) to the written commitment of the transferee being bound by all terms, conditions and commitments of the Formation Agreement and (ii) to the payment of the taxes due to the State.

**ARTICLE 12**

Article 15 of the Formation Agreement entitled Settlement of Disputes and Disagreements is amended and completed as follows:

In case of dispute or disagreement between the Parties arising from the Formation Agreement or in relation to it or concerning its violation, the Parties concerned undertake, before instituting any arbitration procedure, and unless it is a matter of great urgency, to meet to try to reach an amicable settlement.

[*Three illegible initials appear here*]



To this end, the Chairpersons of the Parties concerned (or their representatives) will meet within fifteen (15) working days of the invitation to such a meeting sent by registered letter by the most diligent Party to the other Party concerned. If this meeting does not take place within this timeframe or if the dispute or disagreement is not the subject of a settlement written by all the Parties concerned within fifteen (15) working days of the meeting, any Party can submit such a dispute or disagreement to arbitration in accordance with the provisions of the following paragraph.

For lack of a solution after trying to reach an amicable settlement in accordance with the previous paragraph, each Party concerned by the disagreement, dispute or request in question will be entitled to submit these to the Arbitration Court of the International Chamber of Commerce of Paris to reach a final settlement in accordance with the arbitration rules of the said institution by ruling in accordance with Congolese law. The place of arbitration will be Geneva in Switzerland. The language of the arbitration will be the French language, with interpretation into English if necessary.

**ARTICLE 13**

Article 17 of the Formation Agreement concerning Force Majeure is amended and completed as follows:

17.1 In case of Force Majeure (as defined hereafter), the party affected or likely to be affected by the case of Force Majeure (the Affected Party ) will notify the other Party thereof in writing, by describing the circumstances of the Force Majeure within fourteen (14) working days of the occurrence of the case of Force Majeure. The Parties will consult each other to try to limit its impact.

17.2 Within fourteen (14) working days of the first notification, and if the case of Force Majeure endures, every months, the Affected Party will have to send the other Party additional notifications containing a description of the case of Force Majeure, its impact on the execution of its obligations under the Formation Agreement and its Amendments, and a preliminary assessment of its duration.

The other Party will have thirty (30) working days at its disposal as from the date of each notification to contest the content thereof by sending a Notification of Disagreement (the Notification of Disagreement ), failing which, each notification will be considered to have been accepted.

17.3 In case a Notification of Disagreement is sent, the Parties will endeavour to settle the disagreement amicably within the framework of discussions that shall be held within fifteen (15) working days of the date at which the addressed Party received the Notification of Disagreement, and during a period that will not exceed thirty (30) working days as from the date at which that Party received the Notification of Disagreement, unless the Parties agree on a different period (the Amicable Settlement Period ).

In the event that the Parties do not manage to settle their disagreement amicably at the end of the Amicable Settlement Period, as regards the existence, the duration or the impact of a case of Force Majeure, such a disagreement will be resolved by arbitration in accordance with Article 15 of the Formation Agreement as amended by this Amendment. The sentence of the arbitration court will be final and binding, the Parties hereby irrevocably renouncing any attempt to lodge an appeal against the arbitration sentence.

[*Three illegible initials appear here*]



17.4 For the purpose of the Formation Agreement, the expression Force Majeure means any event which is insurmountable and beyond the control of the Affected Party, including, without this enumeration being restrictive, any strike, lock-out or other social conflict, uprising, riot, act of public violence, act of terrorism, looting, rebellion, revolt, revolution, war (whether or not declared), civil war, act of sabotage, blockade, embargo, coup d état, any natural disaster, epidemic, cyclone, landslide,

lightning, storm, flood, earthquake or exceptional meteorological conditions, any fire or explosion, provided that the Affected Party has taken all reasonable precautions, appropriate care and alternative measures to avoid the total or partial delay or non-execution of the obligations stipulated in the Formation Agreement.

17.5 The interpretation of the term  Force Majeure  will comply with the principle and use of international law and Congolese law, and any dispute relating to an occurrence or to the consequences of a case of Force Majeure will be settled in accordance with Article 15 of the Formation Agreement.

17.6 AS soon as a case of Force Majeure occurs, the execution of the obligations of the Affected Party will be suspended during the duration of the Force Majeure and for an additional period to enable the Affected Party, acting with all required diligence, to restore the situation which prevailed before the occurrence of the said case of Force Majeure.

The Affected Party will act with all reasonably required diligence to eliminate, as rapidly as possible, the case of Force Majeure, without that entailing, however, the obligation to end a strike or another social conflict in a way that would go against common sense.

All conditions, all delays and all dates later than the date at which the case of Force Majeure occurred, will be adapted to take into account the prolongation and delay caused by the case of Force Majeure.

In case the execution of the obligations of an Affected Party was suspended, either in whole or in part, due to a case of Force Majeure, the obligations thus affected by the effects of the Force Majeure will be automatically extended for a period equivalent to the duration of the case of Force Majeure.

17.7 In case of Force Majeure, neither Party will be liable for being directly or indirectly prevented from or restricted in executing all or part of its obligations ensuing from the Formation Agreement.

Should the case of Force Majeure endure beyond a period of one hundred and eighty (180) working days, the Formation Agreement will remain in force, except if one of the Parties cancels it in which case each Party will be released from all its obligations under the Formation Agreement.

17.8 In case of Force Majeure, the Parties will consult each other at least twice a year to try to limit the damage caused by the case of Force Majeure and to continue to carry out the objectives of the project.

[*Three illegible initials appear here*]



**ARTICLE 14**

The other articles of the Formation Agreement and the Amendments that are prior to and non-amended by this Amendment remain unchanged, it being understood however that the Parties undertake to draw up, within three (3) months after this Amendment comes into effect, an association agreement amended and reformulated with a view to consolidating all the modifications brought to the Formation Agreement, to

resolving any contradiction that appeared after applying these amendments, and to introducing any other potentially necessary or generally required contractual provisions.

**ARTICLE 15**

The Parties appoint Me[1] Médard PALANKOY, residing in Kinshasa, and law consultancy Cabinet Emery MUKENDI WAFWANA et Associés, with its main office established in Kinshasa/Gombe, at 3642 Boulevard du 30 juin, Futur Tower, Bureau n°1, and its secondary office established at the corner of Avenues Munongo and Mwepu, Immeuble BCDC, 4th floor, in the town of Lubumbashi, in Lubumbashi, in the Katanga Province, as represented by Maîtres[1] José ILUNGA KAPANDA, Jacques ZAKAYI, Jean Pierre MUYAYA, Éric MUMWENA and Gabriel Kazadi, acting collectively or individually, one for lack of the others, for the purpose of carrying out the authentication of this Amendment by Notary Public and of accomplishing the other formalities required by law.

**ARTICLE 16**

This Amendment will come into force on the date of signature by the Parties.

In witness whereof, the Parties have signed this Amendment in Lubumbashi, on the .. / / . in six original copies, each Party having received two copies and last two copies being reserved for the Notary Public.

**FOR THE GÉNÉRALE DES CARRIÈRES ET DES MINES**

[*An illegible signature appears here*]
**Paul FORTIN**

[*An illegible signature appears here*]
**ASSUMANI SEKIMONYO**

**FOR AKAM MINING SPRL**
by Mr Pieter DEBOUTTE, Manager
[*An illegible signature appears here*]

[*Three illegible initials appear here*]


[*Translator s Notes: [1] the abbreviation* Me *stands for* Maître *and refers to the title given by courtesy to members of the legal professions (magistrates excepted) in francophone countries.*]

SOCIETE D'EXPLOITATION DES GISEMENTS DE KALUKUNDI SPRL
« SWANMINES SPRL »
Société Privée à Responsabilité Limitée NRC n°L'SHI 8477.
Identification Nationale: 6-193-N4621Q
Siège Social: 21/24, Av. MWEPU, Centre - Ville, Commune Lubumbashi, Ville Lubumbashi.
République Démocratique du Congo.

## PROCES-VERBAL
## DE L'ASSEMBLEE GENERALE EXTRAORDIANIRE DES ASSOCIES
## TENUE LE 15 JANVIER 2009.

L'an deux mil neuf, le quinzième jour du mois de janvier, s'est tenue à Lubumbashi au n°24, Avenue MWEPU, Centre - Ville, Commune Lubumbashi, Ville de Lubumbashi, l'Assemblée Générale Extraordinaire des Associés.

### Bureau–Présences-Procuration

**Sont présents ou représentés**:

- **1° LA GENERALE DES CARRIERES ET DES MINES**, ci-après dénommée GECAMINES, Entreprise Publique de droit Congolais dont le siège social est établi au n°419, Boulevard Kamanyola, NRC 453, B.P. 450, Lubumbashi, République Démocratique du Congo, représentée aux fins de la présente par Professeur MWEMA MUTAMBA, Administrateur- Directeur Technique, porteur d'une procuration spéciale conformément aux exigences de l'article 25 des statuts, assistés sur son invitation de Messieurs SUKADI DIABOD et KAKONGE SAKALA, respectivement Directeur de la Direction des Participations et Directeur Chargé de l'Administration et des relations avec les Mandataires et les Partenariats.
- **2° LA SOCIETE AKAM MINING SPRL**, Société privée à responsabilité limitée, de droit Congolais enregistrée au Nouveau Registre du Commerce de Lubumbashi sous le numéro 10171, ayant le numéro d'Identification Nationale 6-12-47.386 et ayant son siège social au n° 21/24, avenue Mwepu, centre - ville, commune de Lubumbashi, ville de Lubumbashi, représentée aux fins de la présente par Maître Médard PALANKOY LAKWAS, porteur d'une procuration spéciale conformément aux exigences de l'article 25 des statuts, assistés sur son invitation de Monsieur SAMBU LUMBU et des Maîtres Pierre KASONGO MAKANDA et Ghislaine ISONGA NYOTA.

L'Assemblée Générale Extraordinaire des Associés est présidée, de commun accord et à titre exceptionnel, par Professeur MWEMA MUTAMBA, Représentant l'Associé « Gécamines ». Il nomme comme Secrétaires Monsieur KAKONGE SAKALA et Maître Ghislaine ISONGA NYOTA. L'Assemblée Générale Extraordinaire désigne ensuite comme scrutateurs Monsieur SUKADI DIABOD et Maître Pierre KASONGO MAKANDA.

Après vérification des mandats, les Associés présents ou représentés renoncent aux formalités de convocation et considèrent que l'Assemblée Générale Extraordinaire de SWANMINES SPRL de ce jour est régulière, qu'un Bureau est régulièrement constitué d'une part et que d'autre part les deux Associés sont présents ou représentés.

Le quorum étant ainsi atteint, conformément à l'article 29 des Statuts, l'Assemblée Générale Extraordinaire des Associés de SWANMINES S.P.R.L. peut valablement siéger et délibérer sur les points inscrits à l'ordre du jour.

### Adoption de l'ordre du jour.

L'Assemblée Générale adopte l'ordre du jour suivant :

1. Rapport d'activités de la société;

3. Nomination des membres du Conseil de Gérance pour compte de l'Associé AFRICO DRC Sprl;

4. Changement d'adresse du Siège social de la société.

5. Divers

**Examen des points inscrits à l'ordre du jour - Résolutions**

1. **Rapport d'activités de la société;**

Suite aux nombreuses procédures judiciaires qu'a connues la société durant les années 2006, 2007 et 2008 sur la vente des parts sociales du Partenaire de Gécamines dans la société Swanmines Sprl (d'abord la Société H&J Swanepoel Famille Trust sprl, ensuite la société Africo Resources Ltd et enfin la société AKAM Mining Sprl) il n'a pas été possible au Conseil de Gérance de SWANMINES s.p.r.l de fonctionner normalement. Toutes les activités de la société ont été gelées jusqu'à ce jour.

L'Etude de Faisabilité n'a pas été menée normalement et cette situation a conduit au non respect du délai pour son dépôt.

A la suite de la révisitation des Contrats miniers et conformément aux Termes de Références du Gouvernement un délai de 12 mois a été accordé à AKAM MINING SPRL pour finaliser et déposer l'Etude de Faisabilité à Gécamines.

**Résolution n°01/AGE/15.01/2009**

**L'Assemblée Générale des Associés prend acte du rapport d'activités lui présenté et instruit le Conseil de Gérance de faire respecter le délai de 12 mois pour le dépôt de l'Etude de Faisabilité à partir de la signature, le 13 janvier 2009, de l'Avenant n°4 au Contrat de création de la société n°460/10.269/SG/CG/2004.**

2. **Remplacement de l'Associé AKAM Mining Sprl par AFRICO DRC Sprl;**

L'Assemblée Générale des Associés a suivi les informations lui données par l'Associé AKAM MINING Sprl sur la cession totale de ses parts sociales dans Swanmines Sprl à la Société AFRICO DRC Sprl.

A la suite de cette cession, la Société AFRICO DRC Sprl devient Associée et remplace la société AKAM MINING SPRL dans Swanmines Sprl.

Après échanges de vues, l'Assemblée Générale des Associés prend la résolution suivante:

**Résolution n°02/AGE/15.01/2009:**

**L'Associé Gécamines ayant renoncé à faire usage de son droit de préemption, l'Assemblée Générale prend acte du remplacement de l'Associé AKAM MINING SPRL par la société AFRICO DRC SPRL dans la société SWANMINES SPRL suite à la cession totale des parts sociales opérée entre les deux sociétés.**

**La société AFRICO DRC SPRL récupère toutes les obligations et tous les droits de AKAM MINING SPRL dans Swanmines Sprl.**

**La structure du capital social de SWANMINES SPRL se présente comme suit:**

- **AFRICO DRC Sprl: 75%**
- **Gécamines : 25%**

**Le Conseil de Gérance se compose de 7 Membres dont 4 pour AFRICO DRC Sprl et 3 pour Gécamines.**

**L'Assemblée Générale des Associés demande à l'Associé AFRICO DRC Sprl de déposer ses Statuts.**

3. **Nomination des Membres du Conseil de Gérance pour compte de AFRICO DRC Sprl**

Suite à l'entrée de AFRICO DRC Sprl dans la structure au sein de la société Swanmines Sprl le nouvel Associé a désigné ses Représentants au Conseil de Gérance; il s'agit de

- Monsieur Antony HARWOOD
- Monsieur Pieter DEBOUTTE
- Monsieur Médard PALANKOY LAKWAS
- Monsieur SAMBU LUNDU

Après échanges de vues, l'Assemblée Générale des Associés prend la résolution suivante:

**Résolution n°03/AGE/15.01/2009**

**Sur proposition de l'Associé AFRICO DRC Sprl, L'Assemblée Générale Extraordinaire des Associés de SWANMINES S.P.R.L. nomme en qualité des Membres du Conseil de Gérance:**

- **Monsieur Antony HARWOOD,en qualité de Membre du Conseil de Gérance qui occupera la fonction du Président du Conseil en remplacement de Monsieur Antoine MUNUNGA KASONGO;**

- **Monsieur Pieter DEBOUTTE, en qualité de Membre du Conseil de Gérance en remplacement de Monsieur MWANKE KABINDA;**

- **Monsieur SAMBU LUNDU, en qualité de Membre du Conseil de Gérance en remplacement de Monsieur KITOPI KIMPINDE;**

- **Monsieur Médard PALANKOY LAKWAS, en qualité de Membre du Conseil de Gérance en remplacement de Monsieur NGOY NUMBI**

4. **Changement d'adresse du Siège social de la société.**

L'Associé AKAM MINING Sprl informe l'Assemblée Générale des Associés du changement d'adresse du Siège social de la société qui est transféré du n°21/24, Avenue MWEPU, Centre ville, Commune Lubumbashi au n°39, Avenue Lofoi, Quartier Golf, Commune Lubumbashi à Lubumbashi.

Après échanges des vues, l'Assemblée Générale prend la résolution suivante :

**Résolution n°04/AGE/15.01/2009**

**L'Assemblée Générale Extraordinaire des Associés de SWANMINES S.P.R.L. prend acte du changement d'adresse du Siège social qui devient au n°39, Avenue Lofoi, Quartier Golf, Commune Lubumbashi à Lubumbashi et instruit le Conseil de Gérance de rendre public la nouvelle localisation du Siège social.**

5. **Divers**

Aucun point n'a été inscrit sous cette rubrique. L'ordre du jour ayant été ainsi épuisé, l'Assemblée Générale Extraordinaire des Associés de SWANMINES SPRL a pris la résolution finale suivante:

**Résolution finale n°05/AGE/028/07.**

**Les Associés donnent à Maître Pierre KASONGO MAKANDA, Avocat près la Cour d'Appel de Lubumbashi, MANDAT pour procéder aux formalités légales d'authentification, du dépôt au Greffe du Tribunal de Commerce de Lubumbashi et de la publication au Journal Officiel pour satisfaire à la LOI.**

VILLE DE LUBUMBASHI — NOTARIAT

TRIBUNAL DE COMMERCE DE LUBUMBASHI — CABINET DU GREFFIER DIVISIONNAIRE

**Vote des Résolutions**

L'ensemble des Résolutions ci-dessus a été voté à l'unanimité des Associés présents ou représentés.

Commencée à 10H15, l'Assemblée Générale des Associés de SWANMINES S.P.R.L. est levée à 11h00.

Ainsi fait à Lubumbashi le 15 janvier 2009.

**POUR LES ASSOCIES**

| | |
|---|---|
| **GECAMINES** | **AKAM MINING SPRL** |
| **Prof. MWEMA MUTAMBA**<br>Administrateur Directeur Technique | **Maître Médard PALANKOY LAKWAS**<br>Représentant |

**POUR LE BUREAU**

| | | |
|---|---|---|
| **KAKONGE SAKALA**<br>**Secrétaire** | **Ghislaine ISONGA NYOTA**<br>**Secrétaire** | **MWEMA MUTAMBA**<br>**Président** |
| **SUKADI DIABOD**<br>**Scrutateur** | **Maître Pierre KASONGO MAKANDA**<br>**Scrutateur** | |

VILLE DE LUBUMBASHI — EXIMSAD CULMINA — NOTARIAT

CABINET DU GREFFIER DIVISIONNAIRE — TRIBUNAL DE COMMERCE DE LUBUMBASHI — JUSTICE PAIX TRAVAIL

Annexe: liste des présences

5

**Annexe au procès-verbal de l'Assemblée Générale Extraordinaire des Associés de SWANMINES Sprl du 15 janvier 2009**

**LISTE DES PRESENCES**

**LES ASSOCIES :**

| | |
|---|---|
| Monsieur MWEMA MUTAMBA<br>Administrateur Directeur Technique<br>de GECAMINES | |
| Maître Médard PALANKOY LAKWAS<br>Représentant de<br>AKAM MINING SPRL | |

**LES INVITÉS :**

| | |
|---|---|
| Monsieur SUKADI DIABOD | |
| Monsieur KAKONGE SAKALA | |
| Monsieur SAMBU LUNDU | |
| Maître Pierre KASONGO MAKANDA | |
| Maître Ghislaine ISONGA NYOTA | |

VILLE DE LUBUMBASHI – EXIMISAD CULMINA – NOTARIAT

TRIBUNAL DE COMMERCE DE LUBUMBASHI – LE GREFFIER DIVISIONNAIRE

VILLE DE LUBUMBASHI – EXIMISAD CULMINA – NOTARIAT

TE NOTARIE.

L'an deux mille neuf, le ...quinzième ...............jour du mois de..janvier;....................;

Nous soussigné **KASONGO KILEPA KAKONDO**, Notaire de résidence à Lubumbashi, en présence de **KITWA DJOMBO David** et **UMBA KILUBA ILUNGA**, témoins instrumentaires à ce requis ;

Certifions que l'acte dont les clauses sont ci-dessus insérées, nous a été présenté ce jour à Lubumbashi par **Maître Pierre KASONGO MAKANDA,** Comparaissant en personne.

Lecture du contenu de l'acte susdit a été faite par Nous, Notaire au comparant.
Le comparant pré - qualifié a déclaré devant Nous que l'acte susdit, tel qu'il est dressé renferme bien l'expression de la volonté du mandant.

En foi de quoi, les présentes ont été signées par Nous, Notaire et le comparant et revêtues du sceau de l'Office Notarial de Lubumbashi.

<u>Signature du comparant</u>, <u>Signature du Notaire</u>.

**Maître Pierre KASONGO MAKANDA** **KASONGO KILEPA KAKONDO**

<u>Les témoins</u>

**KITWA DJOMBO David** **UMBA KILUBA ILUNGA**

Droits perçus/Frais d'acte ...3.380,00 FC.......................................

Suivant quittance n°NP. 21673 2/ 2.en date de ce jour.

Enregistré par Nous soussigné, ce ....quinze janvier deux mil neuf

A l'Office Notarial de Lubumbashi;

Sous le numéro ..26111.....folio........................volume.........

**Le Notaire,**

**KASONGO KILEPA KAKONDO**

**Pour expédition certifiée conforme :**

Coût :...28.410,00 FC.............

Quittance n°N.P. n° 21673 2/ 2

Lubumbashi, le...15/01/ 2009.-

**Le Notaire,**

**KASONGO KILEPA KAKONDO**

RCC 8477

15/01/2009

Greffier

CABINET DU GREFFIER DIVISIONNAIRE

TRIBUNAL DE COMMERCE

Le greffier divisionnaire
Ngoy Tangizya Mata
Chef de Division

# AFRICO RESOURCES LTD.

## CONSENT RESOLUTIONS OF THE DIRECTORS

The undersigned, being all of the directors of Africo Resources Ltd. (the "Corporation"), hereby consent to and adopt the following resolutions:

**BACKGROUND:**

A. The directors believe it to be in the best interests of the Corporation to adopt a new 2008 Stock Option Incentive Plan (the "2008 Plan") pursuant to which options to purchase a total of 10,000,000 common shares may be granted to directors, officers, employees, consultants or their permitted assigns of the Corporation or any affiliate of the Corporation upon completion of the transactions contemplated by Camrose Resources Limited.

B. The 2008 Plan will replace the Corporation's existing option plan upon the 2008 Plan receiving all required regulatory and shareholder approvals, at which time the existing plan will be terminated.

RESOLVED THAT:

**2008 Option Plan**

1. The 2008 Plan, a copy of which is attached hereto as Schedule "A", is hereby approved and adopted subject to the approval of the Toronto Stock Exchange (the "Exchange"), with such changes to the 2008 Plan as may be required by the Exchange, and subject to shareholder approval, as required by the policies of the Exchange.

2. The aggregate number of common shares issuable pursuant to the 2008 Plan and any other share compensation arrangement granted or made available by the Corporation from time to time, including options currently outstanding under the Corporation's existing stock option plan, shall not exceed in aggregate 10,000,000 (the "Option Plan Shares"), representing approximately 14% of the Corporation's common shares issued and outstanding upon completion of the transactions contemplated with Camrose Resources Limited, and such number of Option Plan Shares shall be increased or decreased from time to time as required if more or less Option Plan Shares are required to be issued due to any reorganization of the share capital of the Corporation.

3. Upon exercise of incentive stock options granted under the 2008 Plan and receipt of the applicable exercise price, the Option Plan Shares be issued as fully paid and non-assessable shares. Computershare Trust Company of Canada is hereby authorized and directed to issue, countersign and register certificates representing the Option Plan Shares as directed by any officer or director of the Corporation.

4. Upon receipt by the Corporation of all required regulatory and shareholder approvals of the 2008 Plan, and all stock options granted pursuant to and then outstanding under the

existing option plan will be deemed to have been granted pursuant to and then governed by the 2008 Plan.

**Annual and Special Meeting**

5. The annual and special meeting of the shareholders of the Corporation be held on Friday, May 23, 2008, which will be held for the following purposes:

   (a) to receive and consider the audited consolidated financial statements of the Corporation for the year ended December 31, 2007, together with the notes thereto and the auditor's report thereon;

   (b) to appoint the auditor for the Corporation to hold office until the next annual meeting of the Corporation and to authorize the directors to fix the remuneration to be paid to such auditor;

   (c) to elect directors to hold office until the next annual meeting of the Corporation;

   (d) to approve amendment to, and the subsequent termination of, the Corporation's Shareholder Rights Plan Agreement;

   (e) to approve the transactions contemplated by the Subscription Agreement dated April 17, 2008 between Camrose Resources Limited and the Corporation, and common shares issuable pursuant to the Demand Promissory Note issued by the Corporation to Camrose Resources Limited;

   (f) to approve the issuance of common shares pursuant to a transfer agreement dated April 17, 2008 between LA CONGOLAISE DES MINES ET DE DEVELOPPEMENT (COMIDE SPRL) and the Corporation;

   (g) to approve the issuance of common shares to re-establish ownership of Swanmines sprl pursuant to an agreement dated April 17, 2008 between Camrose Resources Limited and the Corporation; and

   (h) to transact such other business as may properly be transacted at such a meeting or any adjournment thereof.

6. March 25, 2008 be fixed as the record date for determining the shareholders who will be entitled to notice of and to vote at the annual and special meeting, and only shareholders of record at the close of business on the date so fixed shall be entitled to notice of and to vote at such a meeting or the adjournment thereof.

7. Proxies to be used at the annual and special meeting must be received in the office of the Corporation's transfer agent, Computershare Investor Services Inc. no later than 48 hours (excluding Saturdays, Sundays and holidays) prior to the time of the meeting, or any adjournment thereof, or by the chairman or scrutineer of the meeting prior to the commencement of the meeting.

8. Pursuant to the Bylaws of the Corporation, the number of directors is set at seven.

9. David W. Adamson, John Dixon, Antony (Tony) Harwood, Lukas (Tinus) Marthinus Maree and Chris Theodoropoulos, each having consented to act as directors of the Corporation until the next annual meeting of shareholders, or until such time as their successors are appointed in accordance with the Bylaws of the Corporation, are hereby approved as management's nominees for election as directors of the Corporation at the annual and special meeting.

10. Chris Theodoropoulos, Antony Harwood and Michael O'Brien are hereby approved as management's proxyholders at the meeting.

11. The Notice of Annual and Special Meeting of Shareholders, Management Information Circular, form of proxy and Request for Voting Instructions (collectively, the "Meeting Materials") in connection with the meeting, substantially in the form presented to the directors, are hereby approved and any officer or director of the Corporation is hereby authorized to sign the Notice of Annual and Special Meeting of Shareholders and Management Information Circular, with such amendments to the Meeting Materials as he, on advice of legal counsel, may approve, such approval to be conclusively evidenced by such director or officer signing the Notice of Meeting and Circular.

12. Any officer or director of the Corporation is hereby authorized and directed to mail or cause to be mailed a copy of the Meeting Materials to the shareholders of the Corporation and any other persons or regulatory bodies entitled thereto and to file the Meeting Materials with all regulatory authorities having jurisdiction over the Corporation's securities.

13. Any director or officer of the Corporation is hereby authorized and directed for and on behalf of the Corporation to do all such acts and things and to execute, whether under seal or otherwise, and deliver all agreements, statements, certificates, forms or other documents as such director or officer may consider advisable, or as may be reasonably required or recommended by the Corporation's solicitors; and execution of any other such agreements, statements, certificates, forms or other documents by such director or officer shall be conclusive evidence that the Meeting Materials and any such other agreements, statements, certificate, forms or other documents were authorized and approved by these resolutions; and all such action taken prior hereto be and they are approved, ratified and confirmed in all respects.

14. These resolutions may be signed by the directors of the Corporation by facsimile and in as many counterparts as may be necessary, and such counterparts together shall constitute one and the same instrument and, notwithstanding the date of execution, shall be deemed to bear the date as set out below.

DATED as of April 22, 2008.

| | |
|---|---|
| ____________________ David Adamson | ____________________ Lukas Marthinus (Tinus) Maree |
| ____________________ Antony Harwood | ____________________ Chris Theodoropoulos |
| ____________________ John Dixon | |

14. These resolutions may be signed by the directors of the Corporation by facsimile and in as many counterparts as may be necessary, and such counterparts together shall constitute one and the same instrument and, notwithstanding the date of execution, shall be deemed to bear the date as set out below.

DATED as of April 22, 2008.

| | |
|---|---|
| David Adamson | Lukas Marthinus (Tinus) Maree |
| Antony Harwood | Chris Theodoropoulos |
| John Dixon | |

14. These resolutions may be signed by the directors of the Corporation by facsimile and in as many counterparts as may be necessary, and such counterparts together shall constitute one and the same instrument and, notwithstanding the date of execution, shall be deemed to bear the date as set out below.

DATED as of April 22, 2008.

______________________________

David Adamson

______________________________

Lukas Marthinus (Tinus) Maree

______________________________

Antony Harwood

______________________________

Chris Theodoropoulos

______________________________

John Dixon

14. These resolutions may be signed by the directors of the Corporation by facsimile and in as many counterparts as may be necessary, and such counterparts together shall constitute one and the same instrument and, notwithstanding the date of execution, shall be deemed to bear the date as set out below.

DATED as of April 22, 2008.

| | |
|---|---|
| David Adamson | Lukas Marthinus (Tinus) Maree |
| Antony Harwood | Chris Theodoropoulos |
| John Dixon | |

14. These resolutions may be signed by the directors of the Corporation by facsimile and in as many counterparts as may be necessary, and such counterparts together shall constitute one and the same instrument and, notwithstanding the date of execution, shall be deemed to bear the date as set out below.

DATED as of April 22, 2008.

| | |
|---|---|
| David Adamson | Lukas Marthinus (Tinus) Maree |
| Antony Harwood | Chris Theodoropoulos |
| John Dixon | |

**SCHEDULE A**

**2008 PLAN**

**AFRICO RESOURCES LTD.**
**(the "Corporation")**

**STOCK OPTION PLAN**

## 1. INTERPRETATION

1.1 **Defined Terms** - For the purposes of this Stock Option Plan, the following terms shall have the following meanings:

(a) "**Associate**" shall have the meaning ascribed to such term in the British Columbia *Securities Act*, as amended from time to time;

(b) **"Board"** means the Board of Directors of the Corporation;

(c) "**Change in Control**" means:

(i) a takeover bid (as defined in the British Columbia *Securities Act*, which is successful in acquiring Shares of the Corporation;

(ii) the change of control of the Board resulting from the election by the members of the Corporation of less than a majority of the persons nominated for election by management of the Corporation;

(iii) the sale of all or substantially all the assets of the Corporation;

(iv) the sale, exchange or other disposition of a majority of the outstanding Shares of the Corporation in a single or series of related transactions;

(v) the dissolution of the Corporation's business or the liquidation of its assets;

(vi) a merger, amalgamation or arrangement of the Corporation in a transaction or series of transactions in which the Corporation's shareholders receive less than 51% of the outstanding shares of the new or continuing Corporation; or

(vii) the acquisition, directly or indirectly, through one transaction or a series of transactions, by any Person, of an aggregate of more than 50% of the outstanding Shares;

(d) "**Committee**" means the Compensation Committee appointed by the Board, or if no such committee is appointed, the Board itself;

(e) "**Consultant**" has the meaning ascribed in NI 45-106 from time to time which at the date hereof means, for an issuer, a person, other than an employee, Executive Officer, or director of the issuer or of a related entity of the issuer that:

(i) is engaged to provide services to the issuer or a related entity of the issuer, other than services provided in relation to a distribution,

(ii) provides the services under a written contract with the issuer or a related entity of the issuer, and

(iii) spends or will spend a significant amount of time and attention on the affairs and business of the issuer or a related entity of the issuer,

and includes, for an individual consultant, a corporation of which the individual consultant is an employee or shareholder, and a partnership of which the individual consultant is an employee or partner;

(f) "**Corporation**" means Africo Resources Ltd., a company incorporated under the laws of Canada;

(g) "**Date of Grant**" means the date on which a grant of an Option is effective;

(h) **"Disability"** means a medically determinable physical or mental impairment expected to result in death or to last for a continuous period of not less than 12 months which causes an individual to be unable to engage in any substantial gainful activity;

(i) "**Disinterested Shareholder Approval**" means an ordinary resolution approved at a shareholders meeting by a majority of the votes cast by:

(i) the holders of the issued and outstanding Shares; and

(ii) the holders of any securities of the Corporation, other than the Shares, which have a residual right to share in the earnings of the Corporation and in its assets upon liquidation or winding-up ("**Restricted Securities**"),

on a basis proportionate to their respective residual equity interests in the Corporation, excluding votes attaching to the Shares and the Restricted Securities beneficially owned by Insiders to whom Options may be issued and Associates of those persons;

(j) "**Effective Date**" means the effective date of this Plan;

(k) "**Eligible Persons**" means:

(i) an employee, Executive Officer, director or Consultant of the Corporation or of any Related Entity,

(ii) a Permitted Assign of a person referred to in (i) above, or

(iii) a Management Company Employee;

(l) "**Executive Officer**" has the meaning ascribed in NI 45-106 from time to time which at the date hereof means, for an issuer, an individual who is:

(i) a chair, vice-chair or president,

(ii) a vice-president in charge of a principal business unit, division or function including sales, finance or production,

(iii) an officer of the issuer or any of its subsidiaries and who performs a policy-making function in respect of the issuer, or

(iv) performing a policy-making function in respect of the issuer;

(m) **"Guardian"** means the guardian, if any, appointed for an Optionee;

(n) "**Insider**" shall have the meaning ascribed to such term in the British Columbia *Securities Act*, as amended from time to time;

(o) "**Investor Relations Activities**" has the meaning ascribed in NI 45-106 from time to time which at the date hereof means activities or communications, by or on behalf of an issuer or a security holder of the issuer, that promote or could reasonably be expected to promote the purchase or sale of securities of the issuer, but does not include:

(i) the dissemination of information or preparation of records in the ordinary course of the business of the issuer:

(A) to promote the sale of products or services of the issuer, or

(B) to raise public awareness of the issuer,

that cannot reasonably be considered to promote the purchase or sale of securities of the issuer,

(ii) activities or communications necessary to comply with the requirements of

(A) securities legislation of any jurisdiction of Canada,

(B) the securities laws of any foreign jurisdiction governing the issuer, or

(C) any exchange or market on which the issuer's securities trade,

or

(iii) activities or communications necessary to follow securities directions of any jurisdiction of Canada;

(p) "**Management Company Employee**" means an individual employed by a corporation or a Person providing management services to the Corporation, which management services are limited to administrative or operational services required for the ongoing successful operation of the business enterprise of the Corporation but excluding a Person engaged in Investor Relations Activities;

(q) "**Market Price**" means:

(i) where the Shares are listed for trading on the TSX, the last closing price of the Shares on the TSX immediately prior to the time of the grant of an Option;

(ii) where the Shares are suspended from or are not listed for trading on the TSX but are listed for trading on another stock exchange or over the counter market, the closing price of the Shares on the stock exchange or over the counter market which is the principal trading market for the Corporation's Shares, as may be determined for such purpose by the Committee;

(iii) where the Corporation is a reporting issuer, but the Shares are not listed for trading on a stock exchange or over the counter market, the value which is determined by the Committee to be the fair value of the Shares, taking into consideration all factors that the Committee deems appropriate, including, without limitation, recent sale and offer prices of the Shares in private transactions negotiated at arm's length; or

(iv) where the Corporation is not a reporting issuer, the Option Price, which is determined by the Committee in its absolute discretion;

(r) "**Modification**" means any change in the terms of an Option which gives the Optionee additional benefits under the Option, but such change shall not include a change in the terms of an Option:

(i) to make the Option not transferable other than by will or the laws of descent and distribution;

(ii) to make the Option exercisable only by the Optionee during the Optionee's lifetime;

(iii) in the case of an Option not immediately exercisable in full, to accelerate the time within which the Option may be exercised; or

(iv) attributable to the issuance or assumption of an Option by reason of a corporate merger, consolidation, acquisition of property or stock, separation, reorganization or liquidation if the new Option or assumption of the old Option does not give the Optionee additional benefits which he did not have under the old Option;

(s) **"NI 45-106"** means National Instrument 45-106, "Prospectus and Registration Exemptions" and all amendments thereto from time to time and any instrument which subsequently amends, replaces or supersedes NI 45-106;

(t) **"Option"** means an option to purchase Shares granted pursuant to the terms of this Plan;

(u) **"Option Certificate"** means the certificate issued by the Corporation specifying the terms of the Option being granted to the Optionee under the Plan;

(v) **"Option Price"** means the exercise per Share for an Option which shall be expressed in Canadian funds or in the United States dollar equivalent thereof;

(w) **"Optionee"** means a Person to whom an Option has been granted;

(x) **"Permitted Assign"** has the meaning ascribed in NI 45-106 from time to time which at the date hereof means for a person that is an employee, Executive Officer, director or Consultant of an issuer or of a related entity of the issuer:

  (i) a trustee, custodian, or administrator acting on behalf of, or for the benefit of the person,

  (ii) a holding entity of the person,

  (iii) an RRSP or a RRIF of the person,

  (iv) a spouse of the person,

  (v) a trustee, custodian, or administrator acting on behalf of, or for the benefit of the spouse of the person,

  (vi) a holding entity of the spouse of the person, or

  (vii) an RRSP or a RRIF of the spouse of the person;

(y) **"Person"** has the meaning ascribed in NI 45-106 from time to time which at the date hereof includes:

  (i) an individual,

  (ii) a corporation,

  (iii) a partnership, trust, fund, and association, syndicate, organization or other organized group of persons, whether incorporated or not, and

  (iv) an individual or other person in that person's capacity as a trustee, executor, administrator or personal or other legal representative;

(z) "**Plan**" means this Stock Option Plan of the Corporation;

(aa) "**Qualified Successor**" means a person who is entitled to ownership of an Option upon the death of an Optionee, pursuant to a will or the applicable laws of descent and distribution upon death;

(bb) "**Related Entity**" means, for an issuer, a Person that controls or is controlled by the issuer or that is controlled by the same Person that controls the issuer;

(cc) "**Shareholder Approval**" means approval by the affirmative votes of the holders of a majority of the voting securities of the Corporation present, or represented, and entitled to vote at a meeting duly held in accordance with applicable corporate laws;

(dd) **"Shares"** means the common shares in the capital of the Corporation as constituted at the date hereof;

(ee) "**Term**" means the period of time during which an Option may be exercised; and

(ff) "**TSX**" means the Toronto Stock Exchange.

## 2. STATEMENT OF PURPOSE

2.1 **Principal Purposes** - The principal purposes of the Plan are to provide the Corporation with the advantages of the incentive inherent in share ownership on the part of those persons responsible for the continued success of the Corporation; to create in those persons a proprietary interest in, and a greater concern for, the welfare and success of the Corporation; to encourage such persons to remain with the Corporation; and to attract new talent to the Corporation.

2.2 **Benefit to Shareholders** - The Plan is expected to benefit shareholders by enabling the Corporation to attract and retain personnel of the highest caliber by offering such personnel an opportunity to share in any increase in value of the Shares resulting from their efforts.

## 3. ADMINISTRATION

3.1 **Board or Committee** - Subject to the direction of the Board, the Plan shall be administered by the Committee.

3.2 **Appointment of Committee** - The Committee shall administer the Plan on behalf of the Board in accordance with such terms and conditions as the Board may prescribe, consistent with this Plan. The Committee shall continue to administer the Plan until otherwise directed by the Board.

3.3 **Quorum and Voting** - A majority of the members of the Committee shall constitute a quorum, and, subject to the limitations in this Section 3, all actions of the Committee shall require the affirmative vote of members who constitute a majority of such quorum. No member of the Committee who is a director to whom an Option may be granted may participate in the decision to grant such Option (but any such member may be counted in determining the existence of a quorum

at any meeting of the Committee in which action is taken with respect to the granting of an Option to him or her).

3.4 **Powers of Committee** - The Committee shall have the following authority:

(a) to administer the Plan in accordance with its terms;

(b) to determine all questions arising in connection with the administration, interpretation, and application of the Plan, including all questions relating to the value of the Shares;

(c) to correct any defect, supply any information or reconcile any inconsistency in the Plan in such manner and to such extent as shall be deemed necessary or advisable to carry out the purposes of the Plan;

(d) to prescribe, amend and rescind the rules and regulations relating to the administration of the Plan;

(e) to determine the duration and purpose of leaves of absence from employment which may be granted to Optionees without constituting a termination of employment for purposes of the Plan;

(f) with respect to the granting of Options, to make recommendations to the Board as to:

(i) the Eligible Persons to whom Options shall be granted, based on the eligibility criteria set out in this Plan,

(ii) the terms and provisions of the Option Certificate which shall be entered into with each Optionee (which need not be identical with the terms of any other Option Certificate),

(iii) amending the terms and provisions of an Option Certificate, provided it obtains:

(A) the consent of the Optionee; and

(B) the approval of any stock exchange on which the Corporation is listed, where required,

(iv) when Options shall be granted,

(v) the number of Shares subject to each Option, and, where applicable, whether or not to grant Options for the issuance of flow-through Shares,

(vi) the vesting schedule, if any, for the exercise of such Option, and

(g) to make other determinations necessary or advisable for administration of the Plan.

3.5 **Approvals** - The Corporation will use its best efforts to obtain any regulatory or shareholder approvals which may be required pursuant to applicable securities laws or the rules of any stock exchange or over the counter market on which the Shares are listed.

3.6 **Administration by Committee** - All determinations made by the Committee in good faith with respect to matters referred to in Section 3.4 shall be final, conclusive and binding upon all Eligible Persons. The Committee shall have all powers necessary or appropriate to accomplish its duties under this Plan. In addition, the Committee's administration of the Plan shall in all respects be consistent with the policies and rules of any stock exchange or over the counter market on which the Shares are listed.

**4. ELIGIBILITY**

4.1 **Eligibility for Options** - Options may be granted to any Eligible Person.

4.2 **No Violation of Securities Laws** - No Option shall be granted to any Optionee unless the Committee has determined that the grant of such Option will not violate the securities law of the jurisdiction in which the Corporation and the Optionee reside.

**5. SHARES SUBJECT TO THE PLAN**

5.1 **Number of Shares** - The maximum number of Shares issuable under the Plan is 10,000,000. The Board, based on recommendations by the Committee, may grant Options under the Plan from time to time to purchase Shares under the Plan to be made available from authorized, but unissued Shares. The maximum number of Shares issuable under the Plan shall be adjusted, where necessary, to take account of the events referred to in Section 10 hereof.

5.2 **Expiry of Option** - If an Option expires or terminates for any reason without having been exercised in full, the unpurchased Shares subject thereto shall again be available for the purposes of the Plan.

5.3 **Reservation of Shares** - The Corporation will at all times reserve for issuance and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

5.4 **Other Stock Option Grants** - Neither the existence of this Plan nor any provision contained in it shall be interpreted as restricting the powers of the Board to, in its discretion, grant options to purchase Shares outside of the Plan for purposes other than as set out in the Plan.

**6. OPTION TERMS**

6.1 **Option Certificate** - With respect to each Option granted to an Optionee, the following terms shall be specified in the Option Certificate between the Corporation and the Optionee:

(a) the number of Shares subject to purchase pursuant to such Option;

(b) the Date of Grant;

(c) the Term, provided that, subject to Section 6.2 below, the length of the Term shall in no event be greater than ten years following the Date of Grant;

(d) the Option Price, provided that the Option Price shall not be less than the Market Price of the Shares on the Date of Grant;

(e) subject to Section 6.3 below, any vesting schedule upon which the exercise of an Option is contingent; and

(f) such other terms and conditions as the Committee deems advisable and are consistent with the purposes of this Plan.

6.2 **Amendment of Expiration of Term of Option During Blackout Period** - Notwithstanding the provisions of Subsection 6.1(c) or the date of expiration of the Term of an Option determined in accordance with this Plan ("**Fixed Term**"), the date of expiration of the Term of an Option will be adjusted, without being subject to Board or Committee discretion, to take into account any black out period imposed on the Optionee by the Corporation as follows:

(a) if the Fixed Term expiration date falls within a black out period imposed on the Optionee by the Corporation, then the Fixed Term expiration date is extended to the close of business on the 10th business day after the end of such black out period by the Corporation (the "**Black Out Expiration Term**"); or

(b) if the Fixed Term expiration date falls within two business days after the end of a black out period imposed on the Optionee by the Corporation, then the Fixed Term expiration date is extended to the date which is the Black Out Expiration Term reduced by the number of business days between the Fixed Term expiration date and the end of such black out period (i.e. Options whose Fixed Term expires two business days after the end of the black out period will only have an additional eight business days to exercise).

6.3 **Vesting Schedule** - The Board, taking into account the recommendations of the Committee, shall have complete discretion to set the terms of any vesting schedule for each Option granted, including, without limitation, discretion to:

(a) allow full and immediate vesting upon the grant of such Option;

(b) permit partial vesting in stated percentage amounts based on the length of the Term of such Option; and

(c) permit full vesting after a stated period of time has passed from the Date of Grant.

6.4 **Amendments to Options** - Amendments to the terms of previously granted Options are subject to regulatory approval, if required. In particular, if required by the TSX, Disinterested Shareholder Approval shall be required for:

(a) a reduction in the Option Price; or

(b) an extension of the Term,

of a previously granted Option if the Optionee is an Insider of the Corporation at the time of the proposed amendment. In this event, only the Insider whose Option is being amended and such Insider's Associates shall be required to abstain from voting in relation to the Disinterested Shareholder Approval.

6.5 **Uniformity** - Except as expressly provided herein, nothing contained in this Plan shall require that the terms and conditions of Options granted under the Plan be uniform.

## 7. EXERCISE OF OPTION

7.1 **Method of Exercise** - Subject to any limitations or conditions imposed upon an Optionee pursuant to the Option Certificate or Section 6 hereof, an Optionee may exercise an Option by giving written notice thereof to the Corporation at its principal place of business.

7.2 **Compliance with U.S. Securities Laws** - As a condition to the exercise of an Option, the Committee may require the Optionee to represent and warrant in writing at the time of such exercise that the Shares are being purchased only for investment and without any then-present intention to sell or distribute such Shares. A stop-transfer order against such Shares may be placed on the stock books and records of the Corporation, and a legend indicating that the stock may not be pledged, sold or otherwise transferred unless an opinion of counsel is provided stating that such transfer is not in violation of any applicable United States' federal and state securities laws may be endorsed on the certificates representing such Shares in order to assure an exemption from registration. The Committee also may require such other documentation as may from time to time be necessary to comply with United States' federal and state securities laws. The Corporation has no obligation to undertake registration of Options or the Shares issuable upon the exercise of the Options.

7.3 **Payment of Option Price** - The notice described in Section 7.1 shall be accompanied by full payment of the aggregate Option Price to the extent the Option is so exercised. Such payment shall be in lawful money (Canadian funds) by cheque, wire transfer or bank order.

7.4 **Issuance of Certificates** - As soon as practicable after exercise of an Option in accordance with Sections 7.1 and 7.3 hereof, the Corporation shall issue a certificate or certificates evidencing the Shares with respect to which the Option has been exercised. Until the issuance of such certificate or certificates, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to such Shares, notwithstanding the exercise of the Option. No adjustment will be made for a dividend or other right for which the record date is prior to the date the certificate is issued, except as provided by Section 10 hereof.

## 8. TRANSFERABILITY OF OPTIONS

8.1 **Non-Transferable** - Except as provided otherwise in this Section 8, or by applicable securities laws, Options are non-assignable and non-transferable.

8.2 **Death of Optionee** - If an Optionee dies, any Options held by such Optionee shall pass to the Qualified Successor of the Optionee, and shall be exercisable by the Qualified Successor until the expiry of the Term of the Option, provided that in no case shall the Term of the Option extend beyond 10 years from the Date of Grant.

8.3 **Disability of Optionee** - If the employment of an Optionee as an employee or Consultant of the Corporation or any Related Entity, or the employment of an Optionee as a Management Company Employee, or the position of an Optionee as a director or Executive Officer of the Corporation or any Related Entity, is terminated by reason of such Optionee's Disability, any Option held by such Optionee that could have been exercised immediately prior to such termination of service shall be exercisable by such Optionee, or by his Guardian, for a period of 12 months following the termination of service of such Optionee, provided that in no case shall the Term of the Option extend beyond 10 years from the Date of Grant.

8.4 **Vesting** - Options held by a Qualified Successor or exercisable by a Guardian shall, during the period prior to their termination, continue to vest in accordance with any vesting schedule to which such Options are subject.

8.5 **Unanimous Agreement** - If two or more persons constitute the Qualified Successor or the Guardian of an Optionee, the rights of such Qualified Successor or such Guardian shall be exercisable only upon the unanimous agreement of such persons

8.6 **Deemed Non-Interruption of Employment** - Employment shall be deemed to continue intact during any military or sick leave or other bona fide leave of absence.

## 9. TERMINATION OF OPTIONS

9.1 **Termination of Options** - To the extent not earlier exercised or terminated in accordance with Section 8 above, an Option shall terminate at the earliest of the following dates:

(a) the termination date specified for such Option in the Option Certificate;

(b) where the Optionee's position as an employee, a Consultant, a director or an Executive Officer of the Corporation or any Related Entity or a Management Company Employee is terminated for just cause, the date of such termination for just cause, or such later date determined by the Board, which can be no later than the original expiry date of such Option when it was granted;

(c) where the Optionee's position as an employee, a Consultant, a director or an Executive Officer of the Corporation or any Related Entity or as a Management Company Employee, terminates for a reason other than the Optionee's Disability, death, or termination for just cause, 90 days after such date of termination, unless otherwise extended by the Board; and

(d) the date of any sale, transfer, assignment or hypothecation, or any attempted sale, transfer, assignment or hypothecation, of such Option in violation of Section 8.1 above.

9.2 **Lapsed Options** - If Options are surrendered, terminated or otherwise expire without being exercised in whole or in part, new Options may be granted covering the Shares not purchased under such Options. If an Option has been surrendered in connection with the regranting of a new Option to the same Optionee on different terms than the original Option granted to such Optionee, then the new Option is considered to be an amendment to the original Option which will require Shareholder Approval unless such re-granting of the Option occurs at least three months after cancellation of the original Option.

## 10. ADJUSTMENTS TO OPTIONS

10.1 **Alteration in Capital Structure** - If there is a material alteration in the capital structure of the Corporation resulting from a recapitalization, stock split, reverse stock split, stock dividend, or otherwise, the Committee shall make such adjustments to this Plan and to the Options then outstanding under this Plan as the Committee determines to be appropriate and equitable under the circumstances, so that the proportionate interest of the holder of each such Option shall, to the extent practicable, be maintained as before the occurrence of such event. Such adjustments may include, without limitation (a) a change in the number or kind of shares of the Corporation covered by such Options, and (b) a change in the Option Price payable per share; provided, however, that the aggregate Option Price applicable to the unexercised portion of existing Options shall not be altered, it being intended that any adjustments made with respect to such Options shall apply only to the price per share and the number of shares subject thereto. For purposes of this Section 10.1, neither (i) the issuance of additional shares of stock of the Corporation in exchange for adequate consideration (including services), nor (ii) the conversion of outstanding preferred shares of the Corporation into Shares shall be deemed to be material alterations of the capital structure of the Corporation.

10.2 **Corporate Reorganization** - In the event of a reorganization as defined in this Section 10.2 in which the Corporation is not the surviving or acquiring corporation, or in which the Corporation is or becomes a wholly-owned subsidiary of another corporation after the effective date of the reorganization, any Shares receivable on the exercise of an Option shall be converted into the securities, property or cash which the Optionee would have received upon such reorganization if the Optionee had exercised his Option immediately prior to the record date applicable to such reorganization, and the exercise price shall be adjusted proportionately by the Board and such adjustment shall be binding for all purposes of the Plan. For purposes of this Section 10.2, reorganization shall mean any statutory merger, plan of arrangement, statutory consolidation, sale of all or substantially all of the assets of the Corporation, or sale, pursuant to an agreement with the Corporation, of securities of the Corporation pursuant to which the Corporation is or becomes a wholly-owned subsidiary of another corporation after the effective date of the reorganization.

10.3 **Acceleration on Change of Control** - Upon a Change in Control, all Options shall become immediately exercisable, notwithstanding any contingent vesting provisions to which such Options may have otherwise been subject. To the extent possible, the Committee shall give not less than 30 days' notice to Optionees of a Change in Control.

10.4 **Acceleration of Date of Exercise** - The Board, on the recommendation of the Committee, shall have the right to accelerate the date of vesting of any installment of any Option which remains unvested.

10.5 **Determinations to be Made** - Adjustments and determinations under this Section 10 shall be made by the Board, on the recommendation of the Committee, and the Board's decisions as to the adjustments or determinations which shall be made, and the extent thereof, shall be final, binding, and conclusive.

10.6 **Effect of a Take-over** - If a *bona fide* offer (the "**Offer**") for Shares is made to an Optionee or to shareholders generally or to a class of shareholders which includes the Optionee, which Offer constitutes a take-over bid within the meaning of section 92 of the British Columbia *Securities Act*, as amended from time to time, the Corporation shall, immediately upon receipt of notice of the Offer, notify each Optionee of full particulars of the Offer, whereupon any Option held by an Optionee may be exercised in whole or in part by the Optionee so as to permit the Optionee to tender the Shares received upon such exercise (the "**Optioned Shares**") to the Offer. If:

(a) the Offer is not completed within the time specified therein; or

(b) all of the Optioned Shares tendered by the Optionee pursuant to the Offer are not taken up and paid for by the offeror pursuant thereto;

the Optioned Shares or, in the case of clause (b) above, the Optioned Shares that are not taken up and paid for, may be returned by the Optionee to the Corporation and reinstated as authorized but unissued shares and with respect to such returned Optioned Shares, the Option shall be reinstated as if it had not been exercised. If any Optioned Shares are returned to the Corporation under this Section, the Corporation shall refund the exercise price to the Optionee for such Optioned Shares.

## 11. TERMINATION AND AMENDMENT OF PLAN

11.1 **Power to Terminate or Amend Plan** - Subject to the approval of any stock exchange on which the Corporation's securities are listed, the Board may terminate, suspend or amend the terms of the Plan; provided, however, that, except as provided in Section 10 above, and as long as the Corporation is a "reporting issuer" under the securities laws of any jurisdiction in Canada, the Board may not do any of the following without obtaining, within 12 months either before or after the Board's adoption of a resolution authorizing such action, Shareholder Approval, and, where required, Disinterested Shareholder Approval, or by the written consent of the holders of a majority of the securities of the Corporation entitled to vote:

(a) increase the aggregate number of Shares which may be issued under the Plan;

(b) materially modify the requirements as to the eligibility for participation in the Plan which would have the potential of broadening or increasing Insider participation; and

(c) materially increase the benefits accruing to participants under the Plan.

However, the Committee may amend the terms of the Plan to comply with the requirements of any applicable regulatory authority without obtaining Shareholder Approval, including but not limited to amendments of a housekeeping nature to the Plan.

11.2 **No Grant During Suspension of Plan** - No Option may be granted during any suspension, or after termination, of the Plan. Amendment, suspension or termination of the Plan shall not, without the consent of the Optionee, alter or impair any rights or obligations under any Option previously granted.

## 12. CONDITIONS PRECEDENT TO ISSUANCE OF SHARES

12.1 **Compliance with Laws** - Shares shall not be issued pursuant to the exercise of an Option unless the Shares are fully paid and non-assessable and the exercise of such Option and the issuance and delivery of such Shares shall comply with all relevant provisions of law, including, without limitation, the United States *Securities Act of 1933*, as amended, any applicable provincial or state securities or corporate laws, the rules and regulations promulgated thereunder and the requirements of any stock exchange upon which such Shares may then be listed or otherwise traded.

12.2 **Regulatory Approval to Issuance of Shares** - The Corporation's inability to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Corporation's counsel to be necessary to the lawful issuance and sale of any Shares issued under this Plan, shall relieve the Corporation of any liability with respect to the failure to issue or sell such Shares.

## 13. USE OF PROCEEDS

13.1 **Use of Proceeds** - Proceeds from the sale of Shares pursuant to the Options granted and exercised under the Plan shall constitute general funds of the Corporation and shall be used for general corporate purposes.

## 14. NOTICES

14.1 **Notices** - All notices, requests, demands and other communications required or permitted to be given under this Plan and the Options granted under this Plan shall be in writing and shall be either served personally on the party to whom notice is to be given, in which case notice shall be deemed to have been duly given on the date of such service; faxed or electronically transmitted, in which case notice shall be deemed to have been duly given on the date the facsimile or electronic transmission is sent; or mailed to the party to whom notice is to be given, by first class mail, registered or certified, return receipt requested, postage prepaid, and addressed to the party at his or its most recent known address, in which case such notice shall be deemed to have been duly given on the tenth postal delivery day following the date of such mailing.

## 15. MISCELLANEOUS PROVISIONS

15.1 **No Obligation to Exercise** - Optionees shall be under no obligation to exercise Options granted under this Plan.

15.2 **No Obligation to Retain Optionee** - Nothing contained in this Plan shall obligate the Corporation or any Related Entity to retain an Optionee as an employee, officer, director, or consultant for any period, nor shall this Plan interfere in any way with the right of the Corporation or any Related Entity to reduce such Optionee's compensation.

15.3 **Binding Agreement** - The provisions of this Plan and each Option Agreement with an Optionee shall be binding upon such Optionee and the Qualified Successor or Guardian of such Optionee.

15.4 **Use of Terms** - Where the context so requires, references herein to the singular shall include the plural, and vice versa, and references to a particular gender shall include either or both genders.

15.5 **Headings** - The headings used in this Plan are for convenience of reference only and shall not in any way affect or be used in interpreting any of the provisions of this Plan.

15.6 **No Representation or Warranty** - The Corporation makes no representation or warranty as to the future market value of any Shares issued or issuable in accordance with the provisions of this Plan.

## 16. EFFECTIVE DATE OF PLAN AND AMENDMENTS

16.1 **Effective Date of Plan** - This Plan shall become effective on the date of its acceptance by the TSX.

______________________________

Chairman

Date approved by the Board: April 22, 2008

Date approved by the shareholders: ♦

Date of acceptance by the TSX (the "Effective Date"): ♦

**Africo Simplified Kalukundi Model** Base Case per feas updated to mid 2008, no terminal value, 100% equity, capex updated, Cu price updated

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Present Value | | US$m | $1 | Discount Rate | | 10% | | | | | | | | | | | |
| IRR | | | 10.1% | | | | | | | | | | | | | | |
| **Assumptions** | | | | | | | | | | | | | | | | | |
| **Reserves** | | Kt | **7,845** | | Cu | **2.25%** | | | | | | | | | | | |
| **Annual Production** | | Kt | **800** | | Co | **0.66%** | | | | | | | | | | | |
| **Capex** | | US$m | **387.00** | | | | | | | | | | | | | | |
| **Copper Price** | | $ | **2.00** | | | | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| **Cobalt Price** | | $ | **12.00** | | | | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 | 12.00 |
| | | Units | Totals | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| | | | Years | -1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| **PRODUCTION** | | | | | | | | | | | | | | | | | |
| **Mining** | | | | | | | | | | | | | | | | | |
| Ore Mined | | Kt | 7,845 | | | | 200 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 445 |
| Remaining Reserves | | Kt | | | | 7,845 | 7,645 | 6,845 | 6,045 | 5,245 | 4,445 | 3,645 | 2,845 | 2,045 | 1,245 | 445 | - |
| Stripping Ratio | | Times | 4.02 | | | | 13.41 | 8.12 | 6.86 | 4.74 | 4.09 | 2.98 | 2.76 | 2.49 | 1.76 | 1.45 | 1.42 |
| Waste Mined | | Kt | 31,517 | | | | 2,682 | 6,496 | 5,488 | 3,796 | 3,273 | 2,385 | 2,206 | 1,989 | 1,407 | 1,164 | 632 |
| Total Material Mined | | Kt | 39,362 | | | | 2,882 | 7,296 | 6,288 | 4,596 | 4,073 | 3,185 | 3,006 | 2,789 | 2,207 | 1,964 | 1,077 |
| **Mining Cost $/t** | **4.86** | US$m | 191.3 | | | | 14.01 | 35.46 | 30.56 | 22.34 | 19.80 | 15.48 | 14.61 | 13.55 | 10.72 | 9.54 | 5.23 |
| **Processing** | | | | | | | | | | | | | | | | | |
| Plant Feed | | Kt | 7,845 | | | | 200 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 445 |
| Cu - Head Grade | 2.25% | | | | | | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% |
| Co - Head Grade | 0.66% | | | | | | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% |
| Cu Recovery | **0.91** | | | | | | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% |
| Co Recovery | **0.74** | | | | | | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% |
| Cu Cathode | | Kt | 160.63 | | | | 4.10 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 9.11 |
| Co Cathode | | Kt | 38.31 | | | | 0.98 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 2.17 |
| **Processing Cost $/t milled** | **53.244** | US$m | 417.7 | | | | 10.65 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 23.69 |
| **CASH FLOW** | | | | | | | | | | | | | | | | | |
| **Sales** | Copper | US$m | 708.2 | - | - | - | 18.1 | 72.2 | 72.2 | 72.2 | 72.2 | 72.2 | 72.2 | 72.2 | 72.2 | 72.2 | 40.2 |
| | Cobalt | US$m | 1,013.6 | - | - | - | 25.8 | 103.4 | 103.4 | 103.4 | 103.4 | 103.4 | 103.4 | 103.4 | 103.4 | 103.4 | 57.5 |
| **Total Revenue** | | | **1,721.9** | **-** | **-** | **-** | **43.9** | **175.6** | **175.6** | **175.6** | **175.6** | **175.6** | **175.6** | **175.6** | **175.6** | **175.6** | **97.7** |
| Mining Costs | | US$m | 191.3 | - | - | - | 14.0 | 35.5 | 30.6 | 22.3 | 19.8 | 15.5 | 14.6 | 13.6 | 10.7 | 9.5 | 5.2 |
| Processing Costs | | US$m | 417.7 | - | - | - | 10.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 23.7 |
| **Total Revenue after Direct Costs** | | | **1,112.9** | **-** | **-** | **-** | **19.2** | **97.5** | **102.4** | **110.7** | **113.2** | **117.5** | **118.4** | **119.4** | **122.3** | **123.5** | **68.7** |
| **Realisation Costs** | | | | | | | | | | | | | | | | | |
| Marketing (% Sales) | **2.0%** | US$m | 34.4 | - | - | - | 0.9 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 2.0 |
| Cu Transport (US$ / t Cu) | **360** | US$m | 57.8 | - | - | - | 1.5 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 3.3 |
| Co Transport (US$ / t Co) | **444** | US$m | 17.0 | - | - | - | 0.4 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.0 |
| Royalties to DRC Gov (% Sales) | **2.0%** | US$m | 34.4 | - | - | - | 0.9 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 2.0 |
| Royalties to Gecamines (% Sales) | **2.5%** | US$m | 43.0 | - | - | - | 1.1 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 4.4 | 2.4 |
| General/Admin Costs (balancing) | **2.8** | US$m | 30.8 | - | - | - | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Environmental Costs | | US$m | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Terminal Benefits | | US$m | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Working Capital Movement | | US$m | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Realisation Costs** | | US$m | **217.6** | **-** | **-** | **-** | **7.6** | **21.8** | **21.8** | **21.8** | **21.8** | **21.8** | **21.8** | **21.8** | **21.8** | **21.8** | **13.4** |
| **Capex** | | | | | | | | | | | | | | | | | |
| Project Capex | 387.00 | US$m | 387.0 | - | 38.7 | 232.2 | 116.1 | - | - | - | - | - | - | - | - | - | - |
| Ongoing Capex | 0.05 | US$m | 0.5 | - | - | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Working Capital movement | 25.4 | US$m | (0.0) | - | - | - | - | 25.4 | - | - | - | - | - | (6.4) | (6.4) | (6.4) | (6.4) |
| **Total Investment** | | US$m | **387.5** | **-** | **38.7** | **232.2** | **116.1** | **25.5** | **0.1** | **0.1** | **0.1** | **0.1** | **0.1** | **(6.3)** | **(6.3)** | **(6.3)** | **(6.3)** |
| **Cash Flow Before Tax** | | | 507.8 | - | (38.7) | (232.2) | (104.4) | 50.2 | 80.5 | 88.8 | 91.3 | 95.6 | 96.5 | 103.9 | 106.7 | 107.9 | 61.6 |
| **Taxation** | | | | | | | | | | | | | | | | | |
| Tax Rate | 30.0% | | | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% |
| Beginning Tax Losses | | | | - | - | 38.70 | 270.90 | 375.32 | 325.08 | 244.54 | 155.77 | 64.47 | - | - | - | - | - |
| Tax Losses Accrued | | | | - | 38.70 | 232.20 | 104.42 | - | - | - | - | - | - | - | - | - | - |
| Tax Losses Used | | | | | - | - | - | (50.24) | (80.54) | (88.76) | (91.30) | (64.47) | - | - | - | - | - |
| Ending Tax Losses | | | | - | 38.70 | 270.90 | 375.32 | 325.08 | 244.54 | 155.77 | 64.47 | - | - | - | - | - | - |
| **Taxation Liability** | | US$m | **152.35** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **9.35** | **28.95** | **31.17** | **32.02** | **32.37** | **18.49** |
| **Net Free Cash Flow** | | | 355.48 | - | (38.70) | (232.20) | (104.42) | 50.24 | 80.54 | 88.76 | 91.30 | 86.27 | 67.54 | 72.73 | 74.71 | 75.53 | 43.15 |

| | | |
|---|---|---|
| **Swanmines NPV (10%)** | | **$32** |
| **IRR** | | **12.2%** |
| | NPV @ 10.0% | **$32** |
| | NPV @ 11.0% | **$17** |
| | NPV @ 12.0% | **$3** |
| | NPV @ 12.5% | **-$3** |
| | NPV @ 15.0% | **-$29** |

**CASH FLOW TO AFRICO**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan from Africo | | | 0.00 | 38.70 | 272.84 | 390.90 | 410.44 | 400.06 | 370.53 | 334.47 | 295.04 | 256.74 | 228.03 | 194.71 | 158.50 | 119.97 |
| Interest | 5.0% | | 0.00 | 1.94 | 13.64 | 19.54 | 19.77 | 18.80 | 17.20 | 15.35 | 13.46 | 11.82 | 10.31 | 8.61 | 6.79 | 5.35 |
| Max Cash Flow to Repay Loan | 60.0% | 438.48 | 0.00 | 0.00 | 0.00 | 0.00 | 30.14 | 48.33 | 53.26 | 54.78 | 51.76 | 40.53 | 43.64 | 44.82 | 45.32 | 25.89 |
| Cash Flow Used to Repay Loan | | 438.48 | 0.00 | 0.00 | 0.00 | 0.00 | 30.14 | 48.33 | 53.26 | 54.78 | 51.76 | 40.53 | 43.64 | 44.82 | 45.32 | 25.89 |
| Outstanding Loan | | | 0.00 | 40.64 | 286.48 | 410.44 | 400.06 | 370.53 | 334.47 | 295.04 | 256.74 | 228.03 | 194.71 | 158.50 | 119.97 | 99.43 |
| Cash Flow to Gecamines | 25.0% | 73.08 | 0.00 | 0.00 | 0.00 | 0.00 | 5.02 | 8.05 | 8.88 | 9.13 | 8.63 | 6.75 | 7.27 | 7.47 | 7.55 | 4.32 |
| **Post Tax Cash Flow to Africo** | | **282.40** | **0.00** | **-38.70** | **-232.20** | **-104.42** | **45.22** | **72.49** | **79.89** | **82.17** | **77.65** | **60.79** | **65.46** | **67.24** | **67.98** | **38.84** |
| | | 0.79 | 0.00 | 1.00 | 1.00 | 1.00 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |

| | | | |
|---|---|---|---|
| | | | *Per Share* |
| **Africo NPV (10%)** | | **$1** | **C$0.02** |
| **IRR** | | **10.1%** | |
| | NPV @ 10.0% | **$1** | C$0.02 |
| | NPV @ 11.0% | **-$12** | -C$0.17 |
| | NPV @ 12.0% | **-$24** | -C$0.34 |

| | | | |
|---|---|---|---|
| | NPV @ 12.5% | **-$29** | -C$0.42 |
| | NPV @ 15.0% | **-$51** | -C$0.73 |
| Shares in Issue | | **72.613** | |
| C$ / US$ | | **1.05** | |

**Africo Simplified Kalukundi Model** Base Case per feas updated early 2009, no terminal value, 100% equity, capex updated, Cu price updated

| | | Units | Totals | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Years | -1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| **Net Present Value** | | US$m | -$82 | Discount Rate | | 10% | | | | | | | | | | | |
| **IRR** | | | 3.9% | | | | | | | | | | | | | | |
| **Assumptions** | | | | | | | | | | | | | | | | | |
| **Reserves** | | Kt | 7,845 | | Cu | 2.25% | | | | | | | | | | | |
| **Annual Production** | | Kt | 800 | | Co | 0.66% | | | | | | | | | | | |
| **Capex** | | US$m | 387.00 | | | | | | | | | | | | | | |
| **Copper Price** | | $ | 1.75 | | | | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 | 1.75 |
| **Cobalt Price** | | $ | 9.50 | | | | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 | 9.50 |
| **PRODUCTION** | | | | | | | | | | | | | | | | | |
| **Mining** | | | | | | | | | | | | | | | | | |
| Ore Mined | | Kt | 7,845 | | | | 200 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 445 |
| Remaining Reserves | | Kt | | | | 7,845 | 7,645 | 6,845 | 6,045 | 5,245 | 4,445 | 3,645 | 2,845 | 2,045 | 1,245 | 445 | - |
| Stripping Ratio | | Times | 4.02 | | | | 13.41 | 8.12 | 6.86 | 4.74 | 4.09 | 2.98 | 2.76 | 2.49 | 1.76 | 1.45 | 1.42 |
| Waste Mined | | Kt | 31,517 | | | | 2,682 | 6,496 | 5,488 | 3,796 | 3,273 | 2,385 | 2,206 | 1,989 | 1,407 | 1,164 | 632 |
| Total Material Mined | | Kt | 39,362 | | | | 2,882 | 7,296 | 6,288 | 4,596 | 4,073 | 3,185 | 3,006 | 2,789 | 2,207 | 1,964 | 1,077 |
| **Mining Cost $/t** | 4.86 | US$m | 191.3 | | | | 14.01 | 35.46 | 30.56 | 22.34 | 19.80 | 15.48 | 14.61 | 13.55 | 10.72 | 9.54 | 5.23 |
| **Processing** | | | | | | | | | | | | | | | | | |
| Plant Feed | | Kt | 7,845 | | | | 200 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 445 |
| Cu - Head Grade | 2.25% | | | | | | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% | 2.25% |
| Co - Head Grade | 0.66% | | | | | | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% | 0.66% |
| Cu Recovery | 0.91 | | | | | | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% | 91.00% |
| Co Recovery | 0.74 | | | | | | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% | 74.00% |
| Cu Cathode | | Kt | 160.63 | | | | 4.10 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 16.38 | 9.11 |
| Co Cathode | | Kt | 38.31 | | | | 0.98 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 3.91 | 2.17 |
| **Processing Cost $/t milled** | 53.244 | US$m | 417.7 | | | | 10.65 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 42.60 | 23.69 |
| **CASH FLOW** | | | | | | | | | | | | | | | | | |
| **Sales** | Copper | US$m | 619.7 | - | - | - | 15.8 | 63.2 | 63.2 | 63.2 | 63.2 | 63.2 | 63.2 | 63.2 | 63.2 | 63.2 | 35.2 |
| | Cobalt | US$m | 802.5 | - | - | - | 20.5 | 81.8 | 81.8 | 81.8 | 81.8 | 81.8 | 81.8 | 81.8 | 81.8 | 81.8 | 45.5 |
| **Total Revenue** | | | **1,422.2** | **-** | **-** | **-** | **36.3** | **145.0** | **145.0** | **145.0** | **145.0** | **145.0** | **145.0** | **145.0** | **145.0** | **145.0** | **80.7** |
| Mining Costs | | US$m | 191.3 | - | - | - | 14.0 | 35.5 | 30.6 | 22.3 | 19.8 | 15.5 | 14.6 | 13.6 | 10.7 | 9.5 | 5.2 |
| Processing Costs | | US$m | 417.7 | - | - | - | 10.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 42.6 | 23.7 |
| **Total Revenue after Direct Costs** | | | **813.2** | **-** | **-** | **-** | **11.6** | **67.0** | **71.9** | **80.1** | **82.6** | **87.0** | **87.8** | **88.9** | **91.7** | **92.9** | **51.7** |
| **Realisation Costs** | | | | | | | | | | | | | | | | | |
| Marketing (% Sales) | 2.0% | US$m | 28.4 | - | - | - | 0.7 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 1.6 |
| Cu Transport (US$ / t Cu) | 360 | US$m | 57.8 | - | - | - | 1.5 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 5.9 | 3.3 |
| Co Transport (US$ / t Co) | 444 | US$m | 17.0 | - | - | - | 0.4 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.0 |
| Royalties to DRC Gov (% Sales) | 2.0% | US$m | 28.4 | - | - | - | 0.7 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 1.6 |
| Royalties to Gecamines (% Sales) | 2.5% | US$m | 35.6 | - | - | - | 0.9 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 2.0 |
| General/Admin Costs (balancing) | 2.8 | US$m | 30.8 | - | - | - | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Environmental Costs | | US$m | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Terminal Benefits | | US$m | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Working Capital Movement | | US$m | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Realisation Costs** | | US$m | **198.1** | **-** | **-** | **-** | **7.1** | **19.9** | **19.9** | **19.9** | **19.9** | **19.9** | **19.9** | **19.9** | **19.9** | **19.9** | **12.3** |
| **Capex** | | | | | | | | | | | | | | | | | |
| Project Capex | 387.00 | US$m | 387.0 | - | 38.7 | 232.2 | 116.1 | - | - | - | - | - | - | - | - | - | - |
| Ongoing Capex | 0.05 | US$m | 0.5 | - | - | - | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Working Capital movement | 25.4 | US$m | (0.0) | - | - | - | - | 25.4 | - | - | - | - | - | (6.4) | (6.4) | (6.4) | (6.4) |
| **Total Investment** | | US$m | **387.5** | **-** | **38.7** | **232.2** | **116.1** | **25.5** | **0.1** | **0.1** | **0.1** | **0.1** | **0.1** | **(6.3)** | **(6.3)** | **(6.3)** | **(6.3)** |
| **Cash Flow Before Tax** | | | 227.6 | - | (38.7) | (232.2) | (111.6) | 21.7 | 52.0 | 60.2 | 62.7 | 67.0 | 67.9 | 75.3 | 78.1 | 79.3 | 45.8 |
| **Taxation** | | | | | | | | | | | | | | | | | |
| Tax Rate | **30.0%** | | | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% |
| Beginning Tax Losses | | | | - | - | 38.70 | 270.90 | 382.46 | 360.80 | 308.83 | 248.64 | 185.92 | 118.87 | 50.96 | - | - | - |
| Tax Losses Accrued | | | | - | 38.70 | 232.20 | 111.56 | - | - | - | - | - | - | - | - | - | - |
| Tax Losses Used | | | | | - | - | - | (21.66) | (51.97) | (60.19) | (62.73) | (67.04) | (67.91) | (50.96) | - | - | - |
| Ending Tax Losses | | | | - | 38.70 | 270.90 | 382.46 | 360.80 | 308.83 | 248.64 | 185.92 | 118.87 | 50.96 | - | - | - | - |
| **Taxation Liability** | | US$m | **68.28** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **7.31** | **23.44** | **23.80** | **13.73** |
| **Net Free Cash Flow** | | | 159.32 | - | (38.70) | (232.20) | (111.56) | 21.66 | 51.97 | 60.19 | 62.73 | 67.04 | 67.91 | 68.01 | 54.70 | 55.53 | 32.03 |

| | | |
|---|---|---|
| **Swanmines NPV (10%)** | | **-$59** |
| **IRR** | | **5.7%** |
| | NPV @ 10.0% | **-$59** |
| | NPV @ 11.0% | **-$69** |
| | NPV @ 12.0% | **-$77** |
| | NPV @ 12.5% | **-$81** |
| | NPV @ 15.0% | **-$95** |

**CASH FLOW TO AFRICO**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan from Africo | | | 0.00 | 38.70 | 272.84 | 398.04 | 417.94 | 425.52 | 414.83 | 398.56 | 379.91 | 357.67 | 333.79 | 308.65 | 290.44 | 270.81 |
| Interest | **5.0%** | | 0.00 | 1.94 | 13.64 | 19.90 | 20.57 | 20.50 | 19.84 | 18.99 | 17.99 | 16.86 | 15.67 | 14.61 | 13.69 | 13.06 |
| Max Cash Flow to Repay Loan | **60.0%** | 325.07 | 0.00 | 0.00 | 0.00 | 0.00 | 13.00 | 31.18 | 36.11 | 37.64 | 40.23 | 40.75 | 40.81 | 32.82 | 33.32 | 19.22 |
| Cash Flow Used to Repay Loan | | 325.07 | 0.00 | 0.00 | 0.00 | 0.00 | 13.00 | 31.18 | 36.11 | 37.64 | 40.23 | 40.75 | 40.81 | 32.82 | 33.32 | 19.22 |
| Outstanding Loan | | | 0.00 | 40.64 | 286.48 | 417.94 | 425.52 | 414.83 | 398.56 | 379.91 | 357.67 | 333.79 | 308.65 | 290.44 | 270.81 | 264.65 |
| Cash Flow to Gecamines | **25.0%** | 54.18 | 0.00 | 0.00 | 0.00 | 0.00 | 2.17 | 5.20 | 6.02 | 6.27 | 6.70 | 6.79 | 6.80 | 5.47 | 5.55 | 3.20 |
| **Post Tax Cash Flow to Africo** | | **105.14** | **0.00** | **-38.70** | **-232.20** | **-111.56** | **19.50** | **46.77** | **54.17** | **56.46** | **60.34** | **61.12** | **61.21** | **49.23** | **49.98** | **28.83** |
| | | 0.66 | 0.00 | 1.00 | 1.00 | 1.00 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |

| | | | |
|---|---|---|---|
| | | | *Per Share* |
| **Africo NPV (4%)** | | **-$82** | **-C$1.18** |
| **IRR** | | **3.9%** | |
| | NPV @ 10.0% | **-$82** | -C$1.18 |
| | NPV @ 11.0% | **-$89** | -C$1.29 |
| | NPV @ 12.0% | **-$96** | -C$1.39 |

| | | | |
|---|---|---|---|
| | NPV @ 12.5% | **-$99** | -C$1.43 |
| | NPV @ 15.0% | **-$110** | -C$1.59 |
| | | | |
| Shares in Issue | | **72.613** | |
| C$ / US$ | | **1.05** | |

PRICEWATERHOUSECOOPERS **DRAFT**

**Client Service Report PwC Vancouver**

**Subsidiary: Swanmines SPRL**
**Date: 27 February 2009**

## Introduction

As part of our audit reporting requirements, we are pleased to submit to you this report including recommendations addressed to correct certain weaknesses for the purpose of improving the company s internal control and administrative procedures.

Our work being carried out on a test basis, this report does not necessarily include all possible recommendations that a more detailed study might have disclosed.

We look forward to receiving your comments and wish to thank management and staff for their co-operation during the completion of this assignment.

## I. Recommendations made during our audit of financial statements for previous years but not yet implemented

### 1. Absence of review evidence of bank reconciliations

***Observation***

As part of our audit procedures, we requested and reviewed bank reconciliation performed for the whole year 2008. We however noted that reconciliation schedules prepared by the accountant did not contain any evidence of review by the hierarchy or an independent person.

***Implication***

The absence of review by management of the reconciliation performed increases the risk of non detection of any anomalies not discovered by the accountant.

***Recommendation***

We recommend that bank reconciliations are reviewed by someone other than the person who prepared them, thus on monthly basis.

***Client Comments***
***At month end of each period, balance sheet reconciliation (including bank account) is performed by the accountant. Though the reconciliation binder is not physically signed, it is reviewed by the general manager administration before compiling operational and financial reports to be sent to senior management in Vancouver. Any discrepancies are discussed and adjusted before completing the monthly operational/financial reports.***

## 2. Lack of segregation of conflicting duties

***Observation***

During our review of controls in place and other related tests, we noted certain instances of employees performing conflicting tasks. We noted the following examples:

- The General Manager  Administration who prepares payslips and payroll summary sheets, approves them and authorises cash disbursements for the related salaries;

- The accountant acts as cashier and at the same time records accounting entries for cash transactions without any independent control of accounting entries made by him;

- The camp manager who acts as cashier, records cash entries and at the same time authorises most cash transactions.

- Etc.

We however understand that this situation is mainly explained by the size of the company and the limited staff numbers.

***Implication***

The absence of proper segregation of duties increases the risk of fraud and the non detection of errors or fraud cases.

***Recommendation***

- Employees should be given clear job descriptions with the performance of conflicting tasks avoided

- Review procedures should also be put in place to ensure that all tasks performed by employees at all levels are reviewed by someone senior.

***Client Comments***

1. ***Salary procedures. There are two payroll folders, one for Lubumbashi employees and the other for Kalukundi Site employees. The later is prepared by the Camp manager thereafter the payslips and payroll summaries are reviewed and approved by the General manager-administration. No payment is processed without his approval. Lubumbashi payroll is computed by the General Manager-Administration. It is then reviewed by the accountant. This is approved by the General Manager  Administration. The payment of salaries is processed by the accountant where each payee in return acknowledges receiving his/her dues.***
2. ***The accountant acts only upon approval of transactions. For each transaction an approved voucher is required and attached. All the cash is kept in a safe with the custodian being the general manager (holder of keys). Upon receiving an approved voucher, the accountant requests the cash/ cheques/Wire transfer forms from the general manager. This will be***

***recorded in the cash book register. The fund will be distributed at the same time to the requestor of the funds. The accountant also keeps a petty cash in local currency or USD small notes, minimal amount of 50USD. All journals and vouchers are reviewed at month end before closing for the period.***

3. ***The camp manager does not have access in our accounting system Quickbook . All records are entered by the accountant based in Lubumbashi. All transactions are documented with a requestor, an approver and the cash custodian (camp manager). Most cash disbursements at Site are approved by the General Manager Lubumbashi, namely salaries, development projects, food supply, salary advances.***

**3. Weaknesses in cash controls**

***Observation***

During our review of cash transactions and procedures, we did not obtain evidence of cash counts performed by independent persons for the Lubumbashi and exploration site petty cash accounts.

We also did not obtain any evidence of review the cashbooks for both Lubumbashi and the exploration site. For the site transactions in particular, we noted that entries are recorded by the accountant in Lubumbashi based on the cashbook sent from the site with supporting documents only sent at a later date. No further check is made to ensure that the supporting documents received actually correspond to the transactions in the cashbook.

The filing and referencing of these supporting documents received from the site does not also allow for the easy control of cash transactions.

***Implication***

The absence of controls over cash transactions or procedures, especially considering the high number of cash transactions carried out by the company increases the risk of fraud.

***Recommendation***

We recommend the following:

- Cash counts should be performed regularly in the presence of persons independent of the management of petty cash;

- Reconciliations should be made on a regular basis between amounts sent to the site and the relating expenses backed by appropriate supporting documents;

- Site expenses should also be approved by the General Manager in Lubumbashi.

***Client Comments***

**In Lubumbashi, the petty cash custodian is the general manager whereas the accountant is the cashier for approved transactions. The cash kept by the accountant is disbursed at the same time, keeping only small changes, in local currency, that are reconciled at month end. The cash count is performed by the general manager and the accountant. The accountant verifies the cash kept in the same by the general manager. This is documented in the cash book register marked checked . Usually this is performed, before replenishing the safe when the money kept is at it lowest.**

**At camp, all original vouchers are sent to Lubumbashi at least one a month due to the distance. The accountant reviews all the transactions and files the vouchers. Though each voucher is not recorded individually and physically received at a later stage, they are reviewed and filed according to the period. Cash balance is confirmed regularly with Camp Manager according to spreadsheet sent.**

## II. New recommendations following our audit of financial statements for the period ended 31 December 2008

### 1. Non approval of 2007 statutory financial statements

***Observation***

We did not obtain the minutes of the Annual General Meeting approving the 2007 statutory financial statements prepared by the company. According to Congolese law, financial statements should be approved by the shareholders of the company before the annual filing.

***Implication***

Apart from fines imposed by the tax local authorities (already paid by the company in 2008), the non approval of accounts by the shareholders may also:

a) have legal implications with regard to the requirements of the Congolese Code de Commerce

b) lead to disputes between shareholders.

***Recommendation***

We recommend that shareholders assume their corporate governance responsibilities of approving the accounts prepared by the Directors of the company and discharge directors for their annual responsibility to manage the company s business.

***Client Comments***
**Now, that the dispute over the rightful partner of Gecamines in Swanmines has been resolved. The statutory financials for 2007 and 2008 will be approved in the annual general meeting to be held this year 2009.**

### 2. Lack of approved operating and capital budget s (CAPEX and OPEX)

***Observation***

We did not obtain from management the approved operating or capital budgets for the year 2008.

However, as per the contract agreement with GECAMINES and for control purposes the budget should be prepared by management and approved by the shareholders. This is particularly important in a company like Swanmines, where there are several shareholders and there exists transactions carried out by related parties (e.g. Technical assistance provided by Africo Resources Ltd).

***Implication***

There exist a risk that the other partners reject certain expenditures especially if carried out by related parties. They may also contest the way exploration work are performed by management.

***Recommendation***

We recommend that the operating and investment budgets be presented for approval to the shareholders yearly.

***Client Comments***
***Now, that the dispute over the rightful partner of Gecamines in Swanmines has been resolved. The approved operating and capital budgets will be approved in the annual general meeting to be held this year 2009.***

**3. Absence of reconciliation of third party accounts**

***Observation***

During our testing of other creditor and supplier accounts balances, we noted that the company does not perform a reconciliation of these accounts on a regular basis.

***Implication***

Without such reconciliations it is difficult for the company to determine with precision at any given time amounts owed to or by third parties.

In addition :

- Risk of double payments especially for supplier accounts;
- Risk that errors or other anomalies are detected very late or not detected at all.

***Recommendation***

We recommend that a reconciliation is performed for all third party accounts on a regular basis and this reconciliation should be approved or reviewed by an independent and senior person.

***Client Comments***
***In the past the company used to pay by way of journal entries. Now, we have changed the procedures by entering creditor invoices in the sub ledger, to enable us to verify and reconcile creditors accounts. Reconciliation is conducted first by checking with creditors outstanding amounts and then confirming balances recorded in Quickbook. At month end, further reconciliation is conducted as part of balance sheet reconciliation.***

**4. Weaknesses in the follow-up of diesel consumption**

***Observation***

We noted the following weaknesses during our testing of the diesel consumed account:

a) transactions recorded based on invoices (normally backed by payments) rather than actual quantities consumed or delivered by the supplier.

As a result of the weakness noted above, of the 120,000 litres paid for by the company and recorded as consumed in 2008, there are 5,000 litres (approximately USD 6,750) not received as at 31 December 2008 and about 19,467 litres (valued at approximately USD 26,280) closing stock at 31 December 2008 included in the diesel consumed account .

b) Physical counts are also not performed by the company to determine the actual physical quantities held.

***Implication***

a) The improper recording of diesel consumption results in the overstatement of the diesel consumed account (intangible assets), and understatement of the prepayment and stock accounts.

b) The improper recording also makes it impossible for the company to follow-up quantities paid for but not yet delivered.

c) The lack of physical count of diesel quantities increases the risk of quantities reported as per the theoretical follow-up not being correct.

***Recommendation***

We recommend that diesel consumed is recorded based on actual consumption rather than invoices and also a physical count is performed regularly to confirm the theoretical quantities. Regarding consumption, the company should put in place exit note form to be prepared at each issue of stocks for consumption.

***Client Comments***

***We acknowledge the accounting treatment and its disclosure between stock, prepayment and intangible assets. However, the company keeps accurate records of the quantity of fuel delivered. Delivery notes are signed by both parties (suppliers and clients). Any shortfall in supply is followed up by our logistics department and reimbursed to the company by way of credit notes. This exercise is conducted on a quarterly basis. The last shortfall was done in October 2008 and proof of our reconciliation was also provided to our auditors.***

***At camp, any fuel consumption is approved by the camp manager by signing vouchers. Vouchers are presented at security check points as well. These vouchers are kept and reconciled before ordering new stock of fuel.***

**Comments from** **:** **Sambu Lundu**
General Manager - Administration

**Date** **:**